**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

JUSTIN GATLIN ⟩
⟩
Plaintiff, ⟩
⟩
v. ⟩ CASE NO. 3:08cv 241 /LAC/EMT
⟩
⟩
UNITED STATES ANTI-DOPING ⟩
AGENCY, INC; U.S.A. TRACK AND ⟩
FIELD, INC.; UNITED STATES ⟩
OLYMPIC COMMITTEE; ⟩
INTERNATIONAL ASSOCIATION ⟩
OF ATHLETICS FEDERATIONS; ⟩
⟩
Defendants. ⟩

---

### COMPLAINT

Comes Now Plaintiff, JUSTIN GATLIN, through, undersigned counsel, hereby files

this complaint against the UNITED STATES ANTI-DOPING AGENCY, INC.; U.S.A.

TRACK AND FIELD, INC.; UNITED STATES OLYMPIC COMMITTEE; and the

INTERNATIONAL ASSOCIATION OF ATHLETICS FEDERATIONS and alleges:


### INTRODUCTION

Plaintiff is an accomplished world record holding and Olympic Gold Medalist.    He

also suffers from a life-long disability, Attention Deficit Disorder or Attention

Deficit/Hyperactivity Disorder (hereinafter Attention Deficit Disorder and Attention

Deficit/Hyperactivity Disorder are collectively referred to as "ADD").   The Defendants are

various athletic governing bodies and anti-doping agencies whose policies and procedures

are at issue in this matter.   Specifically, Plaintiff contends below that the Defendants have

discriminated against him based upon his disability and have done so in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("RA"). Plaintiff seeks equitable and monetary relief from this Court. Equitable relief in the form of an immediate injunction allowing his participation in the United States Olympic Trials set to begin on June 27, 2008 in Eugene, Oregon. Plaintiff seeks an order from this Court declaring the relevant Defendants' policies as violations of the ADA and the RA and respectfully requests all monetary damages suffered as a result of this discrimination and permanent equitable relief as this Court deems necessary to address the violations set out in detail below.

## PARTIES, JURISDICTION AND VENUE

1.    This is an action for injunctive relief, a declaration of rights, monetary damages, attorney's fees and costs.

2.    Plaintiff, JUSTIN GATLIN, is an individual citizen of Escambia County, Pensacola, Florida.

3.    Defendant UNITED STATES ANTI-DOPING AGENCY ("USADA") is a Colorado not for profit corporation with its principal place of business in Colorado Springs, Colorado.

4.    Defendant, U.S.A. TRACK AND FIELD, INC. ("USATF") is a Virginia not for Profit Corporation with its principal place of business in Indianapolis, Indiana.

5.    Defendant, UNITED STATES OLYMPIC COMITTTEE ("USOC"), is a federally chartered nonprofit corporation and agency of the United States with its principal place of business in Colorado Springs, Colorado. The USOC was formed by an Act of Congress found at 36 USC § 220501 *et. seq.*

2

6.      Defendant INTERNATIONAL ASSOCIATION OF ATHLETICS FEDERATIONS ("IAAF") is a foreign organization that has its principal place of business in the Country of Monaco.

7.      Jurisdiction is invoked based upon the Americans with Disabilities Act, Title III of 42 U.S.C. § 12102 et seq., 29 U.S.C. § 794. *et seq.*, and 28 U.S.C. § 1331 and 1345 and the Rehabilitation Act of 1973, 29 U.S.C. § 504 and 794. Jurisdiction is also based upon 36 U.S.C. § 220505(b) (9). Plaintiff has standing under 42 U.S.C. § 121888 (a) (1) (B) and § 12189. This Court has authority to grant equitable relief, monetary damages and civil penalties pursuant to 42 U.S.C. § 12188(b) (2).

8.      At all times material, Defendant IAAF was a federation of associations including Defendants USOC, USATF and USADA.

9.      At all times material, Defendants USOC, USATF and USADA were acting as the actual and apparent agents for Defendant IAAF.

10.     Defendant IAAF is the international federation made up national athletic organizations throughout the world. Defendants USOC and USATF are member federations under the umbrella of the IAAF.

11.     Defendant USADA is the anti-doping organization for Olympic and Para Olympic sports. At all times material, USADA was acting as an agent of USOC and IAAF.

12.     Venue is proper in the Northern District of Florida pursuant to 28 U.S.C. § 1391(e) as the claims described herein arise out of a relationship between the Plaintiff and an agency or agencies of the United States. These relationships were initiated in this District and the Defendants do business, through their respective agents, within this District, and its activities within this District are continuous and

3

substantial. Further, a significant portion of the events associating the Plaintiff with the Defendants occurred in this District.

13.     Plaintiff has exhausted all available administrative remedies available to him under the Ted Stevens Olympic and Amateur Sports Act[1] ("ASA").

14.     Plaintiff is also exempt from any further administrative proceeding resolution since there are exigent circumstances including the impending United States Olympic Trials set for June 27, 2008.


## GENERAL ALLEGATIONS

15.     In 1991, at the age of 9, Plaintiff JUSTIN GATLIN was diagnosed with Attention Deficit Disorder.   This diagnosis was provided following Justin's elementary school teachers pointing out that he was having a difficult time concentrating on his work.

16.     Justin was first treated at the Navy Hospital, NAS Pensacola for this inability to concentrate.  Navy Doctors formally diagnosed him with ADD in 1991.  He was then referred to a specialist for monitoring and treatment, Robin E. Barnett, M.D. ("Dr. Barnett").

17.     Dr. Barnett is a medical doctor who is Board Certified in General Psychiatry.

18.     Following this formal diagnosis, Justin was prescribed and began taking prescription medication to address his ADD[2].

19.     ADD has been defined as the "persistent and frequent pattern of developmentally inappropriate inattention and impulsivity, with or without

---

[1] 36 U.S.C. § 371 *et seq.* (1978).
[2] Plaintiff was first prescribed the drug Ritalin for his ADD.

4

hyperactivity."[3] Although the etiology is uncertain, the leading hypothesis suggests neurotransmitter abnormalities in dopaminergic and noradrenergic systems with decreased activity or stimulation in upper brain stem and frontal-mid brain tracts.[4]

20.     The prescription medication Adderall® eventually became the prescription that best addressed Justin's ADD symptoms. Adderall® is a drug made up of a combination of dextroamphetamine and amphetamine. This combination is in a class of medicines classified as nervous system stimulants. Adderall® continues to be prescribed to Justin as of the date of this document.

21.     Justin was first prescribed Adderall® in March of 1996.

22.     According to Justin's doctor, Adderall® has no performance-enhancing benefits.

23.     Without his medication, Justin's attentiveness would become less controlled and his scholastic performance would greatly diminish.

24.     Justin's ADD had and continues to have a significant effect on his ability to perform important life activities including learning.

25.     With his disability treated, Justin eventually attended and graduated from Woodham High School where he would excel in the sport of track and field.

26.     In fact, during his senior year, Justin was ranked number one in the Country for high school athletes in the 300 meter hurdles.

27.     Justin had scholarship offers from nearly every major track program in the United States.

28.     Eventually, he accepted a full scholarship to attend and run track at the University of Tennessee, Knoxville ("UT").

---

[3] *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition.*
[4] *Merck Manual,* Seventeenth Edition, pp. 2255-2260, (1999).

29.     While at UT, Justin was monitored by Student Health Services and the track team doctors for his ADD.

30.     Justin was placed in a special education program at Tennessee to assist him with class work. Other accommodations for his disability were provided by the school such as extended time on his examinations and more access to tutors that otherwise would not be allowed by the NCAA regulations. These were accommodations and modifications implemented by UT and the National Collegiate Athletic Association ("NCAA") to accommodate persons suffering from ADD.

31.     Despite these accommodations, Justin struggled academically at UT.

32.     The classes that gave him the most trouble were afternoon classes. These were particularly difficult for him since he would typically skip his afternoon Adderall® because it made him feel lethargic around the time of afternoon track practice.

33.     Justin's lackluster academic performance, however, did not affect his performance on the track.

34.     In his freshman year at UT, he led the team to the SEC and NCAA championships.

35.     Additionally, Justin won the NCAA Championship in both the 100 and 200 meter races, breaking all freshman UT records.

36.     Meanwhile, his academics were creating eligibility concerns. In fact, Dr. Louis Prislovsky, who was in charge of the Special Education Department at UT working closely with its ADD students, noted that Justin had significant educational challenges due to his ADD even when medicated. These challenges were intensified when Justin was off of his medication.

37.      Justin would routinely skip his afternoon Adderall® so as not to affect his track practice performance.   During the race season, he would completely stop taking Adderall® on Thursdays so he would not feel the lethargic side effects at his weekend meets.

38.      During his freshman year at UT, Justin submitted to about 5 NCAA in-competition drug tests.

39.      None of these tests resulted in a positive finding for amphetamine.   Justin, naturally, attributed this to stopping the drug on Thursday before the weekend meets.

40.      Justin's poor academic performance required that he take summer classes between his freshman and sophomore years.   These classes were very important since they would determine whether he would remain academically eligible.

41.      During these summer school classes, Justin made a point to take his Adderall® as prescribed.   This was important since both Justin and his treating doctor concluded that there seemed to be a direct relationship between his prescription compliance and his academic performance.

42.      On June 13, 2001, Justin was set to take his most important summer school exam, English Composition.

43.      On June 16, 2001, Justin was also set to compete in the 2001 USATF Junior Nationals ("Junior Nationals").

44.      Justin took his Adderall® as prescribed through the exam and then immediately stopped using it.   He felt that this would be the best way to achieve the highest grade on his exam and also not feel the side effects in competition.

7

45.     By the time of the meet, Justin was not feeling any of the effects of the medicine.

46.     The Junior Nationals would be Justin's first USATF sanctioned competition. Prior to this meet, Justin had only participated in NCAA events and had only been tested under its anti-doping policies.

47.     Justin had never been instructed or advised that his use of Adderall® could pose drug testing issues for a USATF event. In fact, Justin had been instructed that it was standard practice for those athletes on this medication to stop 2 days prior to competition. This routine was the way Justin had managed his dosage in NCAA events.

48.     The only document provided to Justin that referenced drug testing was a pledge sheet that referred to several prohibited substances. Adderall® was not included on the list of prohibited substances nor was there any reference to any medication used to treat ADD.

49.     This pledge was reviewed by Justin's coach at Tennessee, Vince Anderson, and Justin signed it. There were no special forms or presentations presented by any of the Defendants that discussed other prohibited substances or "use exemptions".

50.     At the time of this race, the Defendants had a process called "therapeutic use exemption" ("TUE"). A TUE could be used by an athlete to inform the Defendants of a "medically necessary" medication prior to drug testing. At the time of this race, there were no specific TUE forms for athletes with ADD utilized by any of the Defendants.     The main description of prohibited substances used by these organizations was "performance enhancing."

8

51.     After winning the 100 meter, 200 meter events and 300 meter hurdles at the Junior Nationals, USADA, on behalf of USATF, tested Justin for the presence of prohibited substances on two consecutive days, June 16 and June 17, 2001.

52.     On July 12, 2001, USADA notified Justin that both of his samples were positive for amphetamines.

53.     The amount of amphetamine present on both testing days was less than 200 nanograms.    The second testing day resulted in an even smaller amount of amphetamine. This finding was consistent with Justin's last dose taken three days prior to the testing.

54.     Justin was shocked and devastated by this news.

55.     Prior to this testing, Justin was never made aware by Defendants that TUEs were necessary for prescribed medications. It was common practice and advised by UT officials that Justin stop his medicine on Thursday.

56.     Pursuant to USADA, USATF and IAAF protocol, Justin withdrew from all USATF competitions but remained eligible for NCAA events his sophomore year. On the academic front, he ended up passing his summer English Composition class. Ironically, it was his desire to do well in that class that caused him to have a positive drug test.

57.     As a result of this positive test, Justin had the option of consenting to a charge or disputing it and participating in arbitration.    The USADA protocol required a hearing before an American Arbitration Association ("AAA") Panel.

58.     Justin sought out the counsel of the USOC Ombudsman who advised that he seek and retain independent counsel to assist with the positive findings and the arbitration process.

9

59.        As required by the USADA Protocol for Olympic Movement Testing (the "USADA Protocol"), the USADA Anti-Doping Review Board met to consider whether there was sufficient evidence of a Doping Offense to proceed to a hearing, and, if so, to recommend a sanction. This review board had the option of waiving this violation in light of the medically necessary nature of the positive drug test and Justin's specific disability.

60.        Justin presented this Board with all of his medical records and his request that this positive result be waived.    The Board met and considered this accommodation but rejected it.

61.        On August 24, 2001, Justin was notified that the USADA Anti-Doping Review Board had recommended that the case proceed to discipline and that a two year sanction be imposed for the offense.

62.        Prior to the AAA hearing, Justin attempted to appeal directly to the IAAF for early reinstatement. The IAAF refused to entertain such an issue until there had been a formal sanction imposed by the AAA panel.

63.        Justin chose to contest the sanction recommended by the USADA Anti-Doping Review Board and, therefore, pursuant to USADA Protocol, the case moved to a hearing before an American Arbitration Association Panel.

64.        USADA and Justin stipulated to findings of fact at the AAA hearing. First, it was admitted that Justin suffered from ADD since the age of 9.  Second, it was admitted that a prohibited substance, amphetamine, had been detected in his samples.  Third, it was admitted that the cause of ingestion was the prescription

10

medicine Adderall® and, fourth, the parties agreed that Justin's positive result was technically a doping violation under the, then current, IAAF Rules[5].

65.        At that time, IAAF Rule 60(2) (a) (i) required that the arbitration panel impose a 2 year sanction for the first offense regardless of any mitigating circumstances.  There was no provision, at that time, for a finding of "fault" or "no fault" and such findings would not have any effect on the sanction.

66.        In essence in 2001, once the drug test was positive, there was "strict liability" and issues related to mitigation were only considered in relationship to the severity of the sentence.  However, in 2001 even fault was not expressly considered under the IAAF and/or USADA protocol.

67.        The IAAF rules[6] did provide, however, that in "exceptional circumstances" an athlete may apply to it for reinstatement before the 2 year period of ineligibility expired.

68.        In response to this mandate, the AAA panel held a perfunctory, one hour, telephonic hearing.  The panel expressly made no independent findings of fact, but imposed the 2 year sanction with the caveat that it would retain jurisdiction should the IAAF not take expeditious action in granting an early reinstatement.

69.        In fact, the AAA panel went so far as to term the 2 year sanction "provisional".  They noted that if there was not quick action taken by the IAAF, the panel would have a "full" evidentiary hearing on the merits.

70.        To present, no such hearing has ever occurred on the merits of this violation.  (Hereinafter this violation will be referred to as the "Adderall® violation").

---

[5] IAAF rules are adopted and used by USADA.
[6] IAAF Rule 60 (8) 2000.

11

71.     Justin petitioned the IAAF for early reinstatement setting forth the medical

reasons for his use of Adderall®.

72.     Justin perfected service of his appeal to the IAAF through their agent for

such service, Defendant USATF. Specifically served was, Mr. Craig Masback who,

at that time, was the Chief Executive Officer of USATF.

73.     At all times material, Mr. Masback and other USATF personnel acted as

agents for IAAF.

74.     The IAAF granted Justin's application for immediate reinstatement but did

not release a written opinion. However, the then General Secretary Istvan Gyulai

noted in a 2002 newsletter:

> The IAAF 'agreed that Gatlin had a genuine
> medical explanation for his positive test:
> prescription medication for the condition
> 'Attention Deficit Disorder' (ADD) which was
> first diagnosed when Gatlin was 9 years old,
> had never challenged his suspension, and
> had not competed in USATF and IAAF events
> since the test result on 12 July 2001."[7]

75.     Following the IAAF's reinstatement, the AAA panel issued the following

order:

> The Panel's May 1, 2002 provisional suspension
> Decision was issued **without an evidentiary hearing**
> **on the merits** by stipulation of the parties in order
> to facilitate Gatlin's request for early reinstatement.
> Since we are informed that Gatlin was expeditiously
> reinstated by the IAAF, our May 1, 2002 decision
> and provisional sanction no longer had effect, and
> hence our retention of jurisdiction pending a
> reinstatement decision by the IAAF was ipso
> facto terminated. (Emphasis Added)

---

[7] However, Council also stated that Gatlin had committed a doping offense and issued a warning that any
repetition of his positive result would result in a life ban.

12

76.     Justin was reinstated by the IAAF just over a year after he competed in the Junior Nationals. Unfortunately, the impact of this process would begin to take a toll on him.

77.     He became consumed insuring that all of his drug tests showed no evidence of his medicine. Contrary to his best interest, he stopped taking his much needed and medically necessary Adderall®. In turn, his grades took a sharp turn for the worse during his sophomore year.

78.     As a sophomore, Justin received only one grade above a "C".

79.     Without his medication, Justin could not even pass summer school classes. As a result, he lost his NCAA eligibility.

80.     After learning that he would most likely be academically ineligible for the 2003 season, Justin decided to turn professional.

81.     In 2004, Justin qualified for and competed in the Summer Olympics. Justin won the gold medal in the 100 meter, a silver medal in the 4 x 100 meter relay and a bronze medal in the 200 meter.

82.     Justin is the 2005 World and USA 100 meter and 200 meter champion.

83.     In May of 2005, USADA created a special form directed to draw the attention of ADD athletes to the importance of filing a TUE for their prescription medicine.[8]

84.     Prior to April 2006, Justin had provided nearly 50 drug samples for testing throughout his career. USADA had conducted nearly 25 of these tests including 7 tests in 2004 prior to and during the Summer Games in Athens, Greece.

---

[8] This form is attached to this complaint as Exhibit One.

85.     Until 2006, none of these tests, with the exception of the positive Adderall®
test, had shown any prohibited substance.

86.     As a tune up for the 2006 track and field season, Justin competed in a track
meet known as "The Kansas Relays." This event has been described as having little
overall significance but was often described as a pre-season track and field warm up
event.

87.     On April 22, 2006, after competing only in the 4 x 100 relay competition,
Justin was selected by USADA for anti-doping control.

88.     On June 15, 2006, nearly two months after providing the sample at the
Kansas Relays, Justin learned that the laboratory reported it as positive for
exogenous testosterone or its metabolites.

89.     Justin was shocked by these results as he had never knowingly used synthetic
testosterone.

90.     Justin again was facing a USADA charge for a prohibited substance.

91.     Although the substance of Justin's defense is not relevant to this action,
Justin presented evidence that the positive test was the result of cream applied by a
disgruntled massage therapist.

92.     In late 2007, just prior to the hearing on this testosterone finding, Justin, on
the advice of counsel, entered into a stipulation wherein he admitted that his urine
sample showed signs of a prohibited substance.

14

93.     IAAF Rules, as of 2006, made it clear that the second positive result would prescribe an 8 year suspension ban from the sport[9] (also referred to as an lifetime ban given the athletic life expectancy in this sport).

94.     The 2007 arbitration was a three day evidentiary hearing that concluded with the imposition of a four year suspension. This four year suspension ran from May 26, 2006 to May 26, 2010.

95.     The panel reduced the maximum sentence from 8 years to 4 years because it found that the "totality of the circumstances" warranted such a reduction.

96.     In the absence of the Adderall® violation, the maximum punishment available to the Defendants would have been a two year sentence that would have expired on May 26, 2008.

97.     At the time of the 2007 hearing the IAAF had formally adopted a new version of the World Anti-Doping Association Code ("WADA") that now considered the "fault" of the offender a relevant issue for purposes of sanction.

98.     More importantly, the new WADA Rule 10.5.1 also considered a finding of "no fault" important since such a finding expressly prohibited the use of the violation to be used as a predicate or aggravating factor for later offenses.

99.     The 2007 AAA panel concluded that there was some level of fault and therefore 2 of the 3 arbitrators imposed a 4 year period of suspension.

100.    The third arbitrator, however, wrote a 22 page dissent pointing out that the use of the Adderall® violation as a predicate or justification for a more severe penalty would in effect be a violation of Justin's rights to not be discriminated due to his disability.

---

[9] IAAF Rule 40.1(a)(ii)(2006-2007)

101.    The formal opinion and dissent of this three member panel was released on
December 31, 2007.

102.    USADA recently began using a specific form directed at athletes suffering
from ADD. This form is titled "TUE Requirements for ADD and ADHD
Medications." This title is in bold font and seems to be directed at capturing the
attention of athletes suffering from this disease as to the importance of a TUE for
ADD medication.

103.    At the time of Justin's Adderall® violation there was no such form and
USADA did not refer to medications for treatment of ADD in any direct fashion.

104.    Defendants have refused to reasonably accommodate and/or modify its
policies and procedures in relation to the use of a predicate or underlying offense
enhancing a later offense.

105.    The accommodations and modifications requested to accommodate the
Plaintiffs disability would not "fundamentally alter" the nature of Defendant
sanctioned track events.

106.    Justin has appealed this decision to the highest entity available under the
IAAF Protocol, the Court of Arbitration for Sport ("CAS").

107.    The CAS collected written briefs and evidence from the IAAF, USADA and
Justin.

108.    On May 28 and 29, 2008, the CAS conducted a hearing on these issues in
New York City, New York.

109.    On June 6, 2008, The CAS panel affirmed the decision of the AAA panel
confirming the use of the Adderall® violation as a penalty enhancement.

16

110.     As a result of this illegal sanction, Justin has suffered significant monetary damages and his career as a runner has been effectively terminated.

111.     The USATF and USOC are sponsoring Olympic Qualifications at a "Hayward Field" ("stadium") on the University of Oregon campus.

112.     This stadium is being leased by the USOC and USATF for purpose of this qualification.

113.     This stadium is a place of public accommodation as defined by the Americans with Disabilities Act.

## AMERICANS WITH DISABILITIES ACT
### 42 U.S.C. §12101 *et seq.*

114.     On July 26, 1990, Congress enacted the Americans with Disabilities Act ("ADA") 42 U.S.C. §12101.

115.     Congress found, among other things, that:

(i)      some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;

(ii)     historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and persuasive social problem;

(iii)    discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

(iv)     individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing

17

facilities and practices. Exclusionary qualification standard and criteria, segregation, and regulation to lesser services, programs, activities, benefits, job or other opportunities; and

(v)     the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars on unnecessary expenses resulting from dependency and nonproductively.

116.     Congress explicitly stated that the purpose of the ADA was to:

(i)     provide a clear and comprehensive national mandate for the elimination of discrimination against individual with disabilities.

(ii)     Provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and,

(iii)     invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities.

<u>REHABILITATION ACT OF 1973</u>
<u>29 U.S.C. § 794</u>

117.     The Rehabilitation Act of 1973 § 794 states in relevant part:

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under **any program or activity** receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. The head of each such agency shall promulgate such regulations

18

> as may be necessary to carry out the
> amendments to this section made by the
> Rehabilitation, Comprehensive Services, and
> Developmental Disabilities Act of 1978. Copies
> of any proposed regulation shall be submitted
> to appropriate authorizing committees of the
> Congress, and such regulation may take effect
> no earlier than the thirtieth day after the date
> on which such regulation is so submitted to
> such committees.[10] (Emphasis added)

118.     The Act then defines "program or activity" as a term that includes all

activities of any government agency.  Also included in this definition are private

corporations who receive some federal assistance and who are involved in providing

"parks and recreation" activities[11].

COUNT ONE
IMPOSITION OF
ELGIBILITY CRITERIA
THAT SCREEN OUT INDIVIDUALS
WITH DISABILITIES

119.     Plaintiff hereby adopts and incorporates his allegations set out in

paragraphs 1-103 here.

120.     The Defendants impose or apply eligibility criteria.

121.     The eligibility criteria imposed or applied by the Defendants screen out or

tend to screen out individuals with disabilities, like Justin, from fully and equally

enjoying the goods, services, facilities, privileges, advantages or accommodations that

it offers, in violation of 42 U.S.C.§ 12182 (b)(2)(A)(i).  Justin has in fact been

screened out by such criteria.

---

[10] Rehabilitation Act of 1973, 29 U.S.C. § 794 (a)

[11] 29 U.S.C. § 794 (b)

122. The eligibility criteria imposed or applied by the Defendants are not necessary for the provision of goods, services, facilities, privileges, advantages or accommodations that it offers.

123. The Defendants' imposition of eligibility criteria that screen out, or tend to screen out, individuals with disabilities discriminates against persons with disabilities and this discrimination raises an issue of general public importance under 42 U.S.C.§ 12188(b)(1)(B)(ii).

124. The discrimination alleged in this Count directly and adversely affected, and continues to affect, an unknown number of individuals with disabilities.

WHEREFORE, Plaintiff, JUSTIN GATLIN, hereby respectfully requests that This Court enter an order providing for equitable, monetary, attorney's fees and costs and any and all other damages appropriate to address the allegations contained in this Count.

### COUNT TWO
### FAILURE TO MAKE REASONABLE
### MODIFICATIONS IN ITS POLICIES,
### PRACTICES OR PROCEDURES

125. Plaintiff hereby adopts and incorporates his allegations as set out in paragraphs 1-103 here.

126. Individuals with disabilities are not able to fully and equally enjoy the goods, services, facilities, privileges, advantages or accommodations that the Defendants offer because of the Defendants' policies, practices and procedures in violation of 42 U.S.C. § 12182(b)(2)(A)(ii).

127. The Defendants have failed to make reasonable modifications in policies, practices and procedures that are necessary to afford the Defendants' goods,

20

services, facilities, privileges, advantages or accommodations to individuals with disabilities. Specifically, the Defendants have failed to modify their procedures for TUEs and/or sanction procedures to accommodate Justin's disability.

128.     The Defendants' failure to make reasonable modifications in their policies, procedures and practices constitutes a pattern and practice of discrimination in violation of 42 U.S.C. § 12182(b) (2) (A) (i) and 121188(b) (1) (B) (i).

129.     The Defendants' failure to make reasonable modifications in their policies, procedures and practices discriminates against persons with disabilities, and this discrimination raises an issue of general public importance for the Plaintiff and other citizens similarly situated.

130.     The discrimination alleged in this Count directly and adversely affected, and continues to affect, the Plaintiff.

WHEREFORE, Plaintiff, JUSTIN GATLIN, hereby respectfully requests that This Court enter an order providing for equitable, monetary, attorney's fees and costs and any and all other damages appropriate to address the allegations contained in this Count.

<u>COUNT THREE</u>
<u>DENIAL OF AN OPPORTUNITY TO BENEFIT</u>
<u>FROM THE SERVICES OFFERED BY THE DEFENDANTS</u>

131.     Plaintiff hereby adopts and incorporates his allegations set out in paragraphs 1-103 here.

132.     The Defendants' policies, practices and procedures denied the Plaintiff who has a disability the opportunity to participate in or receive the benefit from the

21

goods, services, facilities, privileges, advantages, or accommodations that they offer, in violation of 42 U.S.C.§ 12182(b)(1)(A)(i).

133.    The Defendants' creation, maintenance and imposition of policies, practices and procedures that deny individuals with disabilities the opportunity to participate in or receive the benefit from the goods, services, facilities, privileges, advantages, or accommodations that they offer constitutes a pattern and practice of discrimination in violation of 42 U.S.C.§ 12182(b)(1)(A)(i) and 12188(b)(1)(B)(i).

134.    The discrimination alleged in this Count directly and adversely affected, and continues to affect, the Plaintiff and an unknown number of individuals with disabilities similar to the Plaintiff.

WHEREFORE, Plaintiff, JUSTIN GATLIN, hereby respectfully requests that This Court enter an order providing for equitable, monetary, attorney's fees and costs and any and all other damages appropriate to address the allegations contained in this Count.

## COUNT FOUR
### PROVISION OF SERVICES THAT ARE NOT EQUAL TO, OR SEPARATE FROM, THOSE AFFORDED TO OTHER INDIVIDUALS

135.    Plaintiffs hereby adopts and incorporates his allegations contained in paragraphs 1-103 as if set out here.

136.    The Defendants provide, directly and through contractual, licensing and other arrangements, goods, services, facilities, privileges, advantages or accommodations.

137.    The goods, services, facilities, privileges, advantages or accommodations provided by the Defendants for individuals with disabilities, like the Plaintiff, are not equal to, and are separate from, those provided to other individuals.

138.     The Defendants' provision of goods, services, facilities, privileges, advantages
         or accommodations that are not equal to, or separate from, those provided to other
         individuals constitutes a pattern and practice of discrimination in violation of 42
         U.S.C.§ 12188(b)(1)(B)(ii).

139.     The Defendants' provision of goods, services, facilities, privileges, advantages
         or accommodations that are not equal to, or are separate from, those provided to
         other individuals raises an issue of importance to all citizens situated similarly to the
         Plaintiff.

140.     The discrimination alleged in this Count directly and adversely affected, and
         continues to affect, the Plaintiff.

WHEREFORE, Plaintiff, JUSTIN GATLIN, hereby respectfully requests that This Court
enter an order providing for equitable, monetary, attorney's fees and costs and any and all
other damages appropriate to address the allegations contained in this Count.

## COUNT FIVE
### REHABILITATION ACT OF 1973
#### 29 U.S.C. §794

141.     Plaintiff adopts and incorporates his allegations contained in paragraphs 1-
         103 here.

142.     At all times material, Plaintiff was and continues to suffer from a disability as
         defined in the Rehabilitation Act of 1973.

143.     Solely as a result of his suffering from this disability, the Plaintiff has been
         caused to be excluded from his participation in his work and recreation.

144.     Defendants USOC, USADA and USATF receive Federal financial assistance
         and/or are under an Executive Agency.

145.     As a result of the discrimination described above, Plaintiff has suffered and

continues to suffer significant damages.

WHEREFORE, Plaintiff, JUSTIN GATLIN, hereby respectfully requests that This Court

enter an order providing for equitable, monetary, attorney's fees and costs and any and all

other damages appropriate to address the allegations contained in this Count.

Justin Gatlin

**PRAYER FOR RELIEF**

Declare that the Defendant's policies and procedures as enforced violate title III of the
Americans with Disabilities Act, 42 U.S.C. §§ 12181-12189 as well as the Rehabilitation Act
of 1973 29 U.S.C. § 794, and its implementing regulations, 28 C.F.R. part 36.

Enjoin the Defendants, and its officers, agents and employees, and all other persons in
concert with the Defendants, from discriminating on the basis of disability against the
Plaintiff and others seeking to be certified as eligible to participate in Olympic Sports
including the Olympic Trials and 2008 Olympic Games in Beijing.

Order Defendants to institute and implement policies and procedures which will eliminate
discrimination against the Plaintiff and similarly situated athletes.

Order the award of monetary damages in an amount to be determined by the trier of fact.

Order additional relief as justice may require.

Respectfully Submitted,

Joseph A. Zarzaur, Jr.
Attorney for Plaintiff
Florida Bar Number 96806
Zarzaur Law, P.A.
Post Office Box 12305
Pensacola, Florida 32591
(850)444-9299 p
(866)588-1493 f
joe@zarzaurlaw.com

PLAINTIFF RESPECTFULLY REQUESTS A TRIAL BY JURY.

Joseph A. Zarzaur, Jr.



# TUE Requirements for
# ADD and ADHD Medications

For a TUE to be considered for the use of an ADD or ADHD medication, there are basic medical information requirements. The following information must be submitted, in a legible format, with the TUE application. Required are:

1. A thorough clinical history, including the initial report(s) that led to the diagnosis of ADHD, discussion of the measures used and their interpretation, age of onset, and family history of related diagnoses. Please include documentation from all medical evaluations, teacher or other school evaluations, and psychological evaluations.

2. The results of any laboratory testing that was done during the workup (for example, TSH). Were there any abnormalities or tests out of range?

3. A description of the deficit in performance, physical or mental, exhibited by the athlete and the description of how the proposed medication improved that performance.

4. Evaluation of the efficacy of the medications used (including dosage and dosing regimen). In addition, any observations and consequences when the medication is not taken for a brief period of time should be reported.

5. Evidence that allowed medications have been considered or tried and that the outcome of use of the allowed medications is such that the prohibited medication must be used.

6. Any clinical, educational, or consultative reports with comments on related performance issues such as anxiety or depression.

7. A statement provided by the athlete outlining how he/she feels when the medication is being taken and not taken.



# EXHIBIT 1

*STRICTLY CONFIDENTIAL*