# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

|  |  |
|---|---|
| JUSTIN GATLIN | ) |
|  | ) |
| Plaintiff | ) |
|  | ) |
| v. | )CASE NO. 3:08cv241/LAC/EMT |
|  | ) |
|  | ) |
| UNITED STATES ANTI-DOPING | ) |
| AGENCY INC.;UNITED STATES | ) |
| TRACK AND FIELD | ) |
| ASSOCIATION, INC.; | ) |
| UNTIED STATES OLYMPIC | ) |
| COMMITTEE, INC.; INTERNATIONAL | ) |
| ASSOCIATION OF ATHLETICS | ) |
| FEDERATIONS; | ) |
|  | ) |
| Defendants | ) |

---

## MEMORANDUM OF LAW AND FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Comes now Plaintiff Justin Gatlin who, pursuant to Federal Rule of Civil Procedure 64(b) and N.D. Fla. Loc. R.7.1 (A), hereby submits this Memorandum of Law and Facts in Support of Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction. In furtherance of said Motion, Plaintiff says as follows:

# I. INTRODUCTION

This is a case brought under Title III of the Americans with Disabilities Act ("ADA") and Section 794 of the Rehabilitation Act of 1973 ("RA"). The Plaintiff claims that the Defendants' failure to grant him a retro-active exemption for a 2001 doping violation relating to prescription medication used to treat his disability is a violation of the ADA and the RA. The current sanction makes the Plaintiff, an Olympic athlete, ineligible for competition until 2010. If, however, this Court ordered a retro-active exemption to the alleged discriminatory policies, the Plaintiff would be eligible for competition immediately, given the credit for the time already forfeited. This would permit his participation in the Olympic Track and Field Qualifications set for June 27, 2008 in Eugene, Oregon.

## II.     STATEMENT OF FACTS

### USADA, USATF, IAAF and USOC

The athletic world is governed and organized by 4 general categories of entities: international federations, Olympic committees, national governing bodies and anti-doping agencies. The International Association of Athletics Federations ("IAAF") is a conglomerate federation made up of the worlds Olympic committees and national governing bodies for each discipline. The United States Olympic Committee ("USOC") is a federally chartered corporation. The USOC is charged with the responsibility of approving Olympic and Para-Olympic athletes for competition. The Untied States Track and Field, Inc. ("USATF") is the national governing body for the United States track and field athletes. The United States Anti-Doping Agency ("USADA") was formed in 2000 and is a private corporation based in Colorado. USADA is the anti-doping arm for the USATF, USOC and IAAF. For American athletes, USADA represents the USATF, USOC and the IAAF in all

2

doping situations. IAAF rules are required to be implemented by the USOC and the USATF.

Anti-Doping Agency

In 1999, the World Anti-Doping Agency ("WADA") was formed. The matter at issue involves events happenings between 2001-2006. The IAAF Code sets forth the following for sanctions as of 2001 in relation to doping offenses:

> *If any person commits an anti-doping rule violation under these Anti-Doping Rules, he shall be subject to the following sanctions:*
>
> (a)    *for a violation under Rules 32.2(a), (b) or (f) (prohibited substances and prohibited methods), except where the prohibited substance is a specified substance in a case under Rule 40.5 below, or Rule 32.2(i) (competing whilst suspended or ineligible):*
>
>      (i)    *first violation: for a minimum period of two years' ineligibility*
>
>      (ii)    *second violation: ineligibility for life."*

IAAF Rule 40.1(a) (ii) (2006-2007)

In 2003, the WADA authored and adopted its own model anti-doping code. It has become the suggested code for all international federations. The WADA code provides for a consideration of fault in the determining liability. More importantly, the WADA code expressly prohibits the use of a first "no fault" violation as an enhancement for later offenses:

> *10.5.1 No Fault or Negligence*

> **. . . In the event this Article is applied and the period of Ineligibility otherwise applicable is eliminated, the anti-doping rule violation shall not be considered a violation for the Limited purpose of determining the period of Ineligibility for multiple violations under Article 10.2, 10.3 and 10.6.**

WADA RULE 10.5.1

The IAAF has not yet adopted the WADA code.

Anti-Doping Policy

These Defendants publish a list of "prohibited substances" that changes from year to year. This list includes not only substances but processes like gene and blood doping. The underlying purpose of all these policies is to insure an equal "playing field".

The "prohibited list" is currently eleven pages in length and lists the chemical name, including common brand names, of each and every substance that is considered performance enhancing. Many times substances that are legal and medically necessary may also be on this list. For instance, insulin has just recently been added to the list of prohibited substances and asthma medications have been on this list for several years. Until recently, "brand names" were not included on the list. In 2001, no brand names were referenced for ADD medications.

In order to balance the athletes need to treat themselves with these medically necessary substances and the goal of making certain that play is fair, the Defendants have provided a Therapeutic Use Exemption or "TUE". A TUE is an exemption that must be applied for in writing and typically requires 21 days advance filing. It requires that medical records and consultations be performed to insure that only legitimate medically necessary substances are permitted.

JUSTIN GATLIN

Plaintiff was diagnosed with ADD at the age of 9. He continues to be under the care of a physician for this condition. (*See* Affidavit of Robin E. Barnett, M.D. attached as Exhibit A). Plaintiff struggled academically in elementary school and later at Woodham High School. He did graduate from high school with several track scholarship offers from several schools. (*See* Affidavit of Justin Gatlin attached as Exhibit B). Justin accepted an athletic scholarship from the University of Tennessee.

4

Prior to his freshman year at the University of Tennessee, Dr. Barnett warned Justin that balancing his academics and intercollegiate athletics at Tennessee was going to be a challenge especially with his disability. (*See* Exhibit B). Justin enrolled in Tennessee's Special Education Program that provided specific accommodations for his ADD. These accommodations included more time with tutors than typically allowed by the NCAA policies and more time to take his exams. (*See* Exhibit B) Despite these accommodations, Justin's academics suffered. He had particular trouble with his afternoon classes. These were more difficult because Justin would always skip his afternoon dose of Adderall®. He skipped this dose since he did not like the lethargic side effect it gave him by the time of track practice. (*See* Exhibit B)

Outside of the classroom, Justin was a huge success. On the track his that first year at Tennessee, he helped them win both the SEC and National Championships. (*See* Exhibit B). The academic struggles though continued and Justin received a grade of "no credit" in two courses. This required him to attend two summer classes between his freshman and sophomore years. (*See* Exhibit B). These classes were required core classes. Failing either meant that he would loose his NCAA eligibility and scholarship. (*See* Exhibit B) Justin was determined to pass these classes and to accomplish this he was fully compliant with his Adderall® dosages. (*See* Exhibit B). While Justin was studying very hard in the summer classes there was one track meet that he was asked to compete, The USATF Junior Nationals. This meet was commonly referred to as the "Junior Nationals" and it is an IAAF sanction meet. The meet was scheduled for June 16 and 17, 2001. This was a weekend that coincidentally fell just 3 days following an exam in one of his summer classes. To make certain that he did well on the exam he took his Adderall® as prescribed. Following the test, he stopped his medicine so that he could insure that it was out of his system by the

5

weekend. (*See* Exhibit B). This had been the way that Justin had managed all of his freshman NCAA events and he had no indication from the NCAA that any of his, in season, drug tests were positive for any substance. In fact, the 2001 USATF manual endorsed this practice specifically directing ADD athletes to stop the medication days before competition. The USADA, the NCAA and the University of Tennessee also expressly endorsed this same method of compliance with ADD medications. (*See* Exhibits B and Affidavit of Coach Vince Anderson attached as Exhibit C)

On June 16 and 17, 2001, Mr. Gatlin was drug tested by USADA at the USATF Junior Nationals. About two months later, his urine samples were declared positive by the IOC-accredited laboratory at the University of California at Los Angeles for the stimulant amphetamine. Amphetamine is a substance prohibited during competition under the IAAF rules which were applicable to the USATF competition. The test results showed 20 nanograms of the drug per milliliter of urine on the first day of testing and less the second day. These amounts were consistent with Justin stopping his medication days before the competition as he had indicated. (*See* 2002 American Arbitration Association Decision attached as Exhibit D).

At that time USADA, NCAA, USATF and the University of Tennessee had no specific exemption requirement for Adderall and all of these entities recommended that the medicine be stopped before the competition. (*See* Exhibits B & C)

At the time of Justin's 2001 violation for taking his Attention Deficit Disorder ("ADD") medicine, the "prohibited list" did not contain any reference to ADD, Adderall® or Ritalin®. The list mentioned only amphetamine. USADA, who had just been formed in October of 2000, also did not identify any need for an athlete taking medicines for ADD to apply for a "TUE".

In May 2005, USADA started using a form that specifically alerted ADD athletes to the need for them to apply for a "TUE" so that their medically necessary stimulant would not render them in violation of anti-doping policies. (See 2005 United States Anti-Doping Agency Therapeutic Use Exemption Form for use with ADD and AD/HD Medications attached as Exhibit E) At the time of Justin's 2001 Adderall® violation his track coach at the University of Tennessee was not aware of a requirement that a "TUE" be completed for Adderall®. (*See* Exhibit C) Justin's treating physician, Dr. Barnett, even tried to write USADA to ask whether Adderall could cause a result in a drug test and he never received any response. (*See* Exhibit A).

A properly filed and accepted TUE relieved the athlete from any and all adverse consequences of a positive drug test. However, the failure to file a TUE even with the proper medical evidence, if submitted after the positive test, resulted in an automatic violation and a 2 year suspension. Most relevant for this matter, this type of violation was also considered an athletes first violation for purposes of an enhancement of sanctions with future violations.

USADA's OPPORTUNITY TO ACCOMMODATE

The USADA Protocol for Olympic Movement Testing ("Protocol") was the applicable guideline for this doping offense as are the IAAF definitions of doping, prohibited substances and applicable sanctions. This protocol required that the USADA Review Board ("Board") evaluate this offense and recommend, or not recommend, further prosecution (*See* United States Anti- Doping Agency's Protocol for Olympic Movement Testing attached as Exhibit F). The Board collected all of the relevant medical records and other medical evidence. This Board confirmed that Justin had been a long time sufferer of ADD and was taking Adderall® under physician supervision and direction. The Board

chose, however, to continue with the prosecution of Mr. Gatlin despite this knowledge and despite Mr. Gatlin's request to accommodation.

Mr. Gatlin was instructed that the only way that he could receive consideration for his innocent mistake was to admit to a doping offense and then request "early reinstatement." (*See* Exhibit B) So, relying on this instruction, Justin requested early reinstatement from the IAAF. The IAAF refused to consider this request until Justin had actually received a sanction. So, Justin was brought before an AAA panel and USADA made its case against him for violating their doping policy. (*See* Exhibit B)

Under the IAAF regulations, a doping violation takes place when a prohibited substance (in this case amphetamine) is found within an athlete's bodily fluids, unless a prior medical exemption was given by the IAAF for the use of the substance.

This AAA panel explicitly made no finding of fault but retained jurisdiction to hear the merits of the case if Justin was not reinstated by the IAAF. (*See* Exhibit D). The Panel concluded, in part, the following:

> *This Panel would characterize Mr. Gatlin's inadvertent violation of the IAAF's rules based on uncontested facts as, at most, a* ***'technical'*** *or* ***'paperwork'*** *violation.*
> (Emphasis Added) (Exhibit D)

The IAAF granted early reinstatement after Justin had served a year of suspension. (*See* Exhibit B). It is undisputed that based upon the medical experts' opinion in this case, it is not unreasonable to assume that if requested the exemption likely would have been granted. (*See* Exhibit D)

At that time, USADA, consistent with the IAAF rules in effect in 2001, imposed a two year penalty for this Adderall® offense without regard to any mitigating circumstances. In 2001, there was no provision in the IAAF rules that allowed consideration given to "fault or "no fault". (*See* Exhibit D). However, a new set of WADA rules were passed in 2006

that does now allow the consideration of fault in determining liability. Perhaps most importantly, the current sets of rules provide that a finding of "no fault" **prevents that violation from being used against the athlete for purposes of enhancing a future sanction**. (*See* Exhibit D and "IAAF Rule 10.5.1" contained within 2007 American Arbitration Decision attached as Exhibit G)

Between 2001 and 2006, Justin won three Olympic medals and won the 2005 World Championships. He was drug tested over ten separate times and none of these tests revealed the presence of any prohibited substance. In 2006, while attending a tune up, pre-season race, USADA tested Justin and later reported finding traces of synthetic steroids. (*See* Exhibit B) USADA has prosecuted and sanctioned Justin taking the position that this is his second doping offense. The 2007 AAA panel considered these issues and all mitigating factors and imposed a 4 year ban. (*See* 2007 American Arbitration Association Award attached as Exhibit G). This reduction from 8 years was based upon 2001 issues and the IAAF provision allowed for a reduction for "exceptional circumstances" and Justin's cooperation with USADA on unrelated issues. (*See* Exhibit F).

At the 2001 USADA Review Board, the 2007 AAA hearing and again at the 2008 CAS hearing Justin requested accommodation and modification for his 2001 Adderall® violation. These requests have all been denied. (*See* 2008 Court for the Arbitration for Sport Decision attached as Exhibit H)

The Olympic trials are being operated, at least in part, by Defendants USOC and USATF. (*See* Affidavit of Renaldo Nehemiah attached as Exhibit I). It is clear that the USOC and USATF are sponsoring this event and the USATF is controlling the schedule of events. The USOC has conducted many of its Olympic Trials in other stadiums across the

country. . The USOC, USADA and USATF operate events at public stadiums on a regular basis. (*See* Exhibit I).

## III. REQUIREMENTS FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER and/or PRELIMINARY INJUNCTION

Before injunctive relief may be granted the moving party must show that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

(1)     Substantial Likelihood of Success on the Merits

The level of proof required to meet this burden has been described as the type of proof that would withstand scrutiny under Fed. R. Civ. P. 12(b) 6. *Klay v. United Heatlhgroup, Inc.*, 376 F. 3d 1092, 1097 (11th Cir. 2000).   In order for Justin to prevail on his ADA and RA claims he has the burden of establishing the following elements: (a) that he has a disability within the meaning of the ADA and the RA; (b) that Defendants are subject to the provisions of the ADA and the RA and (c) that allowing an exemption/waiver from any adverse consequence suffered as a result of the Defendants policies is a reasonable accommodation and does not fundamentally alter the sport of track and field.

(a)     Justin's A.D.D. is a disability recognized by both the ADA and the RA. The ADA provides the following definition of "disability":

-a physical or mental impairment that substantially limits one or more of the major life activities of such individual,
-a record of such an impairment; or
-being regarded as having such an impairment.
42 U.S.C. § 12102(2) (1994).

Once the plaintiff presents sufficient evidence to establish a physical or mental impairment, courts evaluate the degree to which the disability limits a major life activity.

10

"The phrase major life activities means functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 28 C.F.R. § 36.104 (2000). The Supreme Court has pointed out that ADA's fundamental requirement that only impairments causing substantial limitations in an individuals' ability to perform major life activities constitute disabilities. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565, 119 S. Ct. 2162, 144 L.Ed.2d 518 (1999). Determining whether a person is disabled under the ADA requires an "individualized inquiry" made on a case by case basis. *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 794 (9th Cir. 2001). The Ninth Circuit has recognized that a learning disability can constitute a disability under the ADA. *Zukle v. Regents of Univ. of California*, 166 F. 3d 1041, 1046 (9th Cir. 1999). Other courts, after conducting their own individualized inquiry, have also held that certain levels of mental deficiencies affects the ability of a person to learn or work. *See, e.g., Whitney v. Greenburg, Rosenblatt, Kull & Bitsoli, P.C.*, 258 F. 3d 30 (1st Cir. 2001)(dementia that did not substantially limit plaintiff's ability to learn or work did not constitute "disability" within the meaning of the ADA); Bowen v. Income Producing Mgmt. of Oklahoma, Inc., 202 F.3d 1282, 1287 (10th Cir. 2000)(Brain injured plaintiff who, in spite of injury, had greater skills and abilities than average person, not considered "disabled" under ADA); *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 155 (1st Cir.1998) (attention deficit hyperactivity disorder that substantially affected learning did constitute disability under ADA).

In 1998, the Federal District Court in Oregon in *Bingham v. Oregon School Activities Association* was confronted with an athlete suffering from ADD who was requesting a preliminary injunction based upon a Title III ADA claim. Mr. Bingham was a high school football player who, due to his disability, was forced to repeat the tenth grade. In his senior year, he tried out for the football team only to be informed that the school district had an

eight semester rule that prohibited any student from being eligible to play any more than eight semesters. Mr. Bingham filed this suit after his waiver of this rule was denied by the school board. The District Court granted the motion for temporary restraining order and preliminary injunction holding that ADD was a disability in light of the facts of that case and the ADA. That court also found that the plaintiff satisfied all of the elements of a preliminary injunction.

In the case at bar, Justin has, since the age of 9, been diagnosed as and treated for Attention Deficit Disorder. Plaintiff had been under the continuous care of a physician for this disability. Justin has been prescribed both Ritalin and, more recently, Adderall® to combat the harmful effects of ADD. Despite these medications, Justin's ability to learn was significantly affected. While at the University of Tennessee, the school placed him in a special education program. This program provided accommodations and modifications for person's suffering from ADD. These accommodations included more time with tutors than usually allowed by NCAA athletic policies and more time to complete exams.

Despite these accommodations, Justin was not able to pass the minimum required course load for either his freshman or sophomore years at Tennessee. For example, Justin was forced to withdraw from a Health and Wellness class and also received an "NC" in English Composition in his first semester. His second semester freshman year was worse. Justin received another "NC" for writing workshop and a "D" in drawing class which happened to be his favorite class. Following his positive drug test in 2001, Justin's grades sharply fell since he stopped his medicines altogether fearing that any trace would show up in his drug tests.

Dr. Barnett has testified that throughout Justin's academic life there was a noticeable difference in academic performance while medicated. (*See* Exhibit A). Dr. Barnett has the opinion that Justin has a severe case of ADD that affects his ability to learn.

A review of Justin's medical records from Dr. Barnett's treatment illustrates the effect this disability had on Justin's learning. There are many instances in these records where there is a discussion about ADD and its effect on Justin's academics. These items include mental status testing performed by Dr. Barnett in 1996. This test resulted with Justin meeting the text book definition of ADD and having "marked academic difficulties." (*See* Medical Records Attached to Exhibit A specifically a March 27, 1996 Psychiatric Evaluation). These records provide perhaps the most reliable indicia of the effects ADD has had on Justin's ability to learn. An effect that can best be characterized as substantial. Hence, Justin's ADD is a disability that affects a "major life activity". Justin clearly has records documenting this disability and he has been regarded as suffering from ADD since the age of 9. Hence, Justin's ADD is a disability under the ADA.

     (b)   <u>Defendants are subject to the provisions of the ADA</u>

Title III of the ADA lists the entities regulated under the statute as "places of accommodation", explaining that a private entity is covered if its operations "affect commerce" and it falls within one or the twelve enumerated categories. 42 U.S.C. § 12181(7)A-L. These categories of covered entities include, *inter alia*,

> (c)     ... **Stadium** or other place of exhibition or entertainment.
> (i)     a park, zoo, amusement park, or **other place of recreation;**
> (l)     a gymnasium, health spa, bowling alley, golf course, or **other place of exercise or recreation**.

ADA 42 USC 12182(7) (Emphasis Added)

"A reading of the plain and unambiguous statutory language reveals that the definition of discrimination provided in Title III covers both tangible barriers, that is

physical and architectural barriers and intangible barriers, such as eligibility requirements and screening rules or discriminatory policies and procedures that restrict a disabled person's ability to enjoy the defendant entity's goods, services and privileges." *Rendon v. Valeycrest Productions, Inc.,* 294 F.3d 1279 (11th Cir. 2002).

In *Rendon*, the plaintiffs brought a Title III ADA claim against a production company and ABC. The plaintiffs argued the telephone screening process for ABC's "Who Wants to be a Millionaire?" was discriminatory. The process required would be contestants to answer various questions by pressing their number buttons on their phone. Some of the plaintiffs were hearing impaired and others had a disability that prevented them from completing the phone procedures. ABC argued that the ADA did not apply to it since the phone selection process did not involve a "place of accommodation." The Eleventh Circuit rejected this argument pointing out that the telephone interview was a screening process that could eventually end in a contestant visiting the "studio". The Court reasoned that a studio is akin to one of the twelve designations contained in § 12181(7)C (covering theatres and other places of entertainment). The crux of the case to the Eleventh Circuit was the nexus between the alleged discrimination and the physical concrete structure, the studio. Although studios are not explicitly referenced in the ADA text the Eleventh Circuit found that a t.v. studio was included in the phrase " . . . theatres and other places of entertainment."

In *Access Now, Inc. v. Southwest Airlines, Inc,* 227 F. Supp2d 1312 (S.D. Fla. 2002), Judge Seitz granted Southwest Airlines' Motion to Dismiss plaintiffs Title III ADA claim. The basis of this dismissal was the lack of a nexus between the claims of discrimination and a physical structure. The Plaintiffs here were arguing that Southwest Airlines' website (Southwest.com) was violative of Title III in that it was not equipped to handle "screen

reader" software and other computer assist software available to the visually impaired. In holding that this website did not meet the definition of "place of public accommodation", The Court first noted that "websites" were not explicitly enumerated in § 12181(7) A-L of the ADA. Further, the Court pointed out that the plaintiff's interaction with the website did not lead to a physical interaction with a structure like a travel agent office or airport. In other words, the intangible barrier would remain intangible for these plaintiffs.

For purposes of the matter at hand, the USOC and USATF are sponsoring the 2008 United States Track and Field Olympic Trials at Hayward Field on the campus of the University of Oregon. Hayward field is a 17,500 seat track and field stadium. It has been referred to as the "centerpiece" of track and field competition in the United States. This Olympic event is one of many instances where the Defendants either "lease" or "operate" a stadium. USADA acts as the anti-doping agent for both the USOC and USATF at these events and will do the same at the Olympic Trials. USADA will also be utilizing this place of public accommodation to carry out its anti-doping duties on behalf of the USOC and USATF. The fact that these entities are only controlling these premises for a limited amount of time still makes them subject to the ADA. *Disabled Rights Action Committee v. Las Vegas Events, Inc.*, 375 F. 3d 861 (9th Cir. 2004). Clearly, Hayward Field is a stadium. These venues are expressly included in the twelve enumerated "places of public accommodation." 42 USC § 12181(7) (c)

The issue of a "place of public accommodation" was discussed, at some length, by the Supreme Court in *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 121 S.Ct. 1879 (2001). In *Martin*, a golfer who was afflicted with a disability known as Klippel-Trenaunay-Weber Syndrome, was denied a waiver to use a golf cart in the last stage of the PGA's qualifying school ("Q-School"). The *Martin* Court found that the PGA's failure to make this

15

accommodation amounted to a violation of the ADA. The PGA argued, in part, that the ADA should not apply to the PGA since " . . . the play areas of its tour competitions do not constitute places of 'public accommodation' within the scope of that Title." Martin, 532 U.S. 661, 121 S. Ct. 1879 (2001). The Court noted that "golf courses" were expressly contained as places of public accommodation. 42 USC 12181(7) (L) The PGA argued, however, that even though "golf courses" were explicitly mentioned in the ADA statute they should not be considered places of public accommodation since their events were not open to the public but rather only PGA certified and qualified professionals who played "beyond the ropes". The District Court in *Martin* rejected this position as attempting to "create private enclaves within the facility...and thus relegate the ADA to hop-scotch areas." *Martin v. PGA, Inc.*, 984 F. Supp. 1320, 1326-1327 (D.Or.1998). The PGA made this same argument to the 9th Circuit. That Court also rejected that position noting that " . . . as with a private university the fact that users of a facility are highly selected does not mean that the facility cannot be a public accommodation." *Martin*, 204 F. 3d 994, 998.

Here, as in *Martin*, we have a venue that is expressly designated by the ADA as a place of public accommodation. Specifically, in 42 USC § 12181(7) C, "stadiums" are included in the definition of places of public accommodation. In addition to this precise designation the ADA text also refers indirectly to track and field venues. For instance, the ADA includes "other places of exhibition or entertainment and other places of exercise or recreation." 42 USC § 12181(C) and (L) respectively.

The "nexus" test set out in *Rendon* and *Access Now* is also met by Mr. Gatlin. Here, the Title III claim arises from a screening process that excludes ADD athletes. This discrimination is directly related to their participation in track meets. These meets occur in stadiums and are sponsored and/or sanctioned by Defendants USATF and IAAF and in the

16

case of Olympic trials are also sponsored by Defendants USOC. These "stadiums" are the concrete structures mentioned in both *Rendon* and *Access Now* so as to confirm these places as "public accommodations" as intended by the ADA.

Defendants USOC, USATF, IAAF and USADA (who plaintiffs contend are always acting as the anti-doping agents for USOC, IAAF and USATF) are clearly entities that operate "places of accommodation" and therefore meet the operative definition for ADA purposes.

    (c)    <u>A retro-active therapeutic use exemption or "TUE" is a reasonable modification/accommodation under the facts of this case and does not fundamentally alter the nature of track and field</u>

The ADA definition of discrimination includes: a failure to make reasonable modifications in **policies**, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, **privileges**, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations. 42 USC 12182(b) (2) (A) (ii) (Emphasis Added).

The Plaintiff has the burden of proving that a modification was requested and that the requested modification is reasonable. The Plaintiff meets this burden by introducing evidence that the requested modification is reasonable in the general sense, that is, reasonable in the run of cases. If the Plaintiff meets this burden the Defendant must make the modification unless Defendant pleads and meets its burden of proving that the requested modification would fundamentally alter the nature of the public accommodation. *Staron v. McDonald's,* 51 F.3d 353 (2nd Cir 1995).

In *Matthews v. NCAA,* 179 F. Supp.2d 1209 (E.D. Wash. 2001), the District Court for the Eastern District of Washington considered Plaintiffs Motion for Temporary

Restraining Order and a later filed Motion Preliminary Injunction pursuant to a Title III claim. Plaintiff in *Matthews* was a college football player with a learning disability. He argued that the NCAA was screening him, in violation of the ADA, by refusing to permit a waiver of its 75/25 academic rule. This rule required that NCAA athletes complete 75% of their course work during the regular school term as opposed to special winter or summer sessions. Matthews argued that a blanket waiver should be granted and the failure to do so would amount to discrimination against him based on his learning disability. The Court in *Matthews* spent a good portion of its opinion analyzing the reasonableness of the requested modification. *Matthews*, 179 F. Supp 2d 1209 at 1214. On this issue the Court noted that this waiver had been granted once before to the Plaintiff and once to another athlete, that the 75/25 rule was relatively new and that the goal of fostering good academic performance did not seem frustrated by this waiver . The Court found that the Plaintiff's academic success on the courses he did complete seem to reassure the NCAA that their overall goal of academic success was being met by this athlete. The District Court in *Matthews* did grant the Motion for Temporary Restraining Order. *Matthews*, 179 F. Supp2d 1209, at 1226.

The *Bingham* decision also spoke directly to the issue of reasonableness of the modification or waiver. *Bingham*, 24 F. Supp 2d 1110 at 1116. Again, in *Bingham*, an ADD student athlete was seeking a waiver from a county sports association rule. The rule prohibited high school players playing more than 8 semesters. Mr. Bingham had been held back in the 10th grade for his ADD and wanted to play on the football team his senior year. This would have been his 9th semester. In analyzing the reasonableness of the modification, that Court noted that waivers allowing older students to play football had been granted on previous occasions and allowing this 5th year senior with ADD would not frustrate the purposes of the rule. The Court pointed out that the purpose of the rule was to prevent

unfair advantage by allowing older, bigger and more experienced players on the team for a 5th year. Bingham was the same age as most of his teammates and was not more athletically experienced than the average player since his actual playing time had been low. The *Bingham* Court also pointed out that ADD is a condition that is beyond the athlete's control and this fact should favor accommodation. The Court found that Mr. Bingham being allowed a waiver would not frustrate the basis of the rule.

Justin's request for a waiver was submitted to the 2001 USADA Review Board immediately following the positive Adderall® test. This is when he submitted his medical records and other evidence confirming his disability and medical necessity. The Review Board summarily denied the request and recommended that Justin be prosecuted. Justin's request for a waiver then and is now, reasonable. Like the *Bingham* and *Matthews* requests, Justin's request for a retroactive waiver immediately following his 2001 positive drug test should have been permitted. The Defendants all recognized the waiver process and had explicit procedures for granting "TUE"'s. These TUE's were routinely granted prior to competition. Further, their policy of deterring cheating is not frustrated so long as they only punish those persons who cheat. It is clear that even the AAA Panel did not feel that Justin was a cheater.

In fact the AAA held that if the purpose of anti-doping policies is to stop athletes from cheating, then a determination that an athlete is not should be significant. On top of this finding, if an entity learns that the same athlete was suffering from and treating his disability and that this gave rise to the positive test and the entity still refused to accommodate, the ADA is violated. In a case like this one, the ADA is meant to force such an accommodation.

Perhaps, the most convincing evidence that a modification is reasonable and does not frustrate the Defendants policies, is the 22 page dissenting opinion from an arbitrator sitting in judgment of this Athlete and these Defendants. (*See* 2007 American Arbitration Association for the Dissenting Opinion authored by Chris Campbell attached as Exhibit J)

Another factor in accessing the reasonableness of the modification in this particular case is the disability. Here, we have an athlete that suffers from ADD. No party contests this fact. Further, it is also undisputed that at the time of the 2001 Adderall® violation none of the Defendants had any "prohibition list" that included a reference to Adderall® or any other ADD medications. None of the Defendants, at that time, had a process that alerted these particular ADD athletes to the requirement that their medication (most of whom had taken since elementary school and to whom this medicine had become part of their daily routine) could ban them for 2 years and later serve to ban them for life.

Then consider what the Defendants did following Justin's Adderall® sanction. They changed their rules making them more explicit now pointing out that ADD medications were on the prohibited list and required a "TUE". The only guidance given prior to this was to stop your medicines before competition. Is it reasonable to expect an athlete suffering from ADD to know more about the anti-doping policies than the entities promulgating them? This again is the point that a reasonable agency modifies its procedures to accommodate a disability. Here, the ADA is forced to pick up where the Defendants have fallen short.

Following a positive finding, the USADA Review Board was vested with the authority to consider Justin's medical condition and then to decide whether or not to prosecute Justin for this offense. The Review Board met after examining all of Justin's medical records and after receiving professional opinions that confirmed Justin's diagnosis,

they decided to move forward with the doping offense. The discrimination occurred at this point in the process but the impact of this discrimination would not have full effect until 2007.

If the Review Board had decided to modify or accommodate Justin by allowing for a retro-active TUE then no violation of the ADA would have occurred. The fact that an exemption would have been granted had the same information been provided before the testing seems only to unfair punish a class of persons for exhibiting symptoms of their disability, inattentiveness.

If, however, Justin had been taking most any other medicine then this same analysis would not apply. For instance, asthma medication requires a TUE since one of its ingredients is on the prohibited list. Assuming that an asthma stricken athlete failed to file a TUE (assuming no authority is requiring it) and then, following a positive drug test, he claims a retro active exemption, the asthmatic athlete's argument is much less compelling since the nature of their illness, respiratory insufficiency, does not cause inattentiveness.

Plaintiff submits that these specific references to ADD are not accidental. USADA's decision to expressly reference "ADD MEDICATIONS" was an implicit admission that those suffering from this disease should be accommodated. (See Exhibit E) This recognition also serves to justify a retroactive exemption and makes such an accommodation reasonable under the specific facts of this case.

A reasonable accommodation for an athlete who was sanctioned for failing to comply with a policy that would have been physically challenging for him to even notice until the 2005 changes is a retroactive exemption.

The United States Supreme Court in *Martin v. PGA* closes its opinion affirming a modification for an ADA plaintiff with the following:

21

"Congress intended that an entity like the PGA not only give individualized attention to a handful of requests for a modification or waiver of a rule to allow them access to the competition, but also carefully weigh the purpose, as well as the letter, of the rule before determining that no accommodation would be tolerable. 532 U.S. 661 at 691, 121 S.Ct. 1879 at 1898.

Plaintiff would submit that the Defendants here have not carefully weighed the purpose, letter or spirit of its policies in light of Justin's disability. The Defendants have simply blindly enforced their policies as they were written in 2001.

The reasonableness of this accommodation must be viewed considering the effects of the disability on Justin. Eugene R. Hershorin, M.D. ("Dr. Hershorin") is the current Chief of General Pediatric Division at the University of Miami Medical Center. Dr. Hershorin is Board Certified in Pediatrics with a boarded subspecialty in Developmental and Behavioral Pediatrics as well as a mini-fellowship graduate in psychotropic pharmacology from the Neuroscience Education Institute.

As part of his work with this matter, Dr. Hershorin has reviewed the USADA "TUE" policies in place in 2001 compared to the form used since 2005. Dr. Hershorin has testified that, without an explicit directive, the "TUE" procedures existing in 2001, would most likely not have provided Justin notice any need to have an exemption. (*See* Affidavit of Eugene Hershorin, M.D. attached as Exhibit K)

Dr. Hershorin has also reviewed the 2005 USADA document titled "TUE REQUIREMENTS FOR ADD AND ADHD MEDICATIONS." (*See* Exhibit E) After evaluating this 2005 TUE form, Dr. Hershorin testified that a form of this type would most likely assist a person with ADD in appreciating the severity and necessity of complying with the TUE procedures. (*See* Exhibit K)

Dr. Hershorin, at the Plaintiff's request, conducted an exhaustive search and was not able to find any medical support for the proposition that Adderall® can in some manner enhance the performance of any athletes much less one competing in a foot race.

22

The argument that Adderall® will provide an unfair advantage to any runner is not supported by the medical literature. (*See* Exhibit K) Hence, any suggestion that a waiver would fundamentally alter the nature of track and field is unsupportable in the medical and scientific communities.

### (2) Irreparable injury will be suffered in the absence of the requested relief and there is no adequate legal remedy.

Preliminary injunctive relief derives from the necessity to restrain or compel conduct in those extraordinary situations where irreparable injury might result from delay or inaction. United Bonding Ins. Co. v. Stein, 410 F. 2d 483, 486-487 (3rd Cir. 1969). If this injunction is not granted the Plaintiff will not be eligible to participate in the 2008 Olympic Games in Beijing, China. These Games are scheduled to begin on August 8, 2008.

Under the most recent arbitration decision that was rendered Friday June 6, 2008, Justin will not be eligible to compete until July 25, 2010. If however, this Court were to act and order a retro-active therapeutic use exemption it would nullify the 2001 sanction and in turn make the 2007 sanction punishable by a maximum of two years. Justin has served 2 years and 10 months (one year prior to reinstatement from the Adderall® violation and nearly two years since 2006 positive test result). After accounting credit to Justin for the amount of time already spent ineligible, the two year sanction would have been served and Justin should be immediately reinstated to an eligible status. (*See* Exhibit B)

Clearly, in the absence of immediate Court action, Justin will not be allowed to qualify for the 2008 Summer Olympic Games.

### (3) Threatening Injury to Movant Outweighs Whatever Damage The Proposed Injunction May Cause the Opposing Party.

Not being able to defend your Gold Medal at the Olympic Games is injury without an adequate remedy at law. On the other hand, if granted, this injunction would arguably

23

cause the Defendants to revisit all such cases where retro-active TUE's under these facts should be provided. These Defendants could assert that their hard line policy on doping offenses may be undermined by such an injunction. This interest, however, is outweighed by the more important purpose served by the ADA, ending discrimination based upon disability. Additionally, this decision will only have a very limited application since the facts of this case are unusual the applicable rules governing TUE's and ADD have been modified. (See Arbitration Reference to Unusual Facts). Clearly, the threatened life altering injury to Mr. Gatlin outweighs any potential harm to Defendants.

### (4) If Issued the Injunction Would Not Be Adverse to Public Interest

As Congress noted in its comments following the passage of the ADA, it enacted the ADA to remedy widespread discrimination against disabled individuals. In studying the need for such legislation, Congress found that ". . . historically, society had tended to isolate and segregate individuals with disabilities and despite some improvements such forms of discrimination against individuals continue to be a serious and pervasive social problem." 42 USC § 12101(a) (2). Congress also noted that many forms of discrimination include "outright intentional exclusion" as well as the "failure to make modifications to existing facilities and practices." § 12105(a) 5. Frankly, the Defendants have been slow to evolve in the post ADA era and have, so far, resisted such progression by claiming exclusive jurisdiction over the matter, without any legal support for such a claim. The public will most always be served greater by an order prohibiting discrimination based upon disability.

### IV. REHABILITATION ACT OF 1973

To establish a violation of the Rehabilitation Act, Plaintiff is required to prove the following: "(1) that he has a disability; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit due to

24

discrimination solely on the basis of the disability." *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F. 3d 1261, 1264-65 (4th Cir. 1995).

An individual is considered disabled under the Rehabilitation Act if he "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment."

It is also generally held that due to the similarities in the language of the ADA and the RA, the two are generally construed to impose the same requirements. *Baird v. Rose,* 192 F. 3d 462, 468 (4th Cir. 1999).

Plaintiffs would assert his arguments set out above for the ADA claim be adopted and incorporated for arguments under the Rehabilitation Act.

Wherefore Plaintiff respectfully requests that this court enter an order requiring USADA to issue a retro-active therapeutic use exemption for Mr. Gatlin's 2001 Adderall® offense. Further, Plaintiff respectfully requests that this Court consider this matter on an expedited basis considering that the Olympic Track and Field Trials are to be conducted on June 27, 2008.

Joseph A. Zarzaur, Jr.
Attorney for Justin Gatlin
Zarzaur Law, P.A.
Post Office Box 12305
Pensacola, Florida 32591
Florida Bar #96-806
850-444-9299 p
866-588-1493 f