IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JUSTIN GATLIN

Plaintiff

v.                                              CASE NO. 3:08cv241/LAC/EMT

UNITED STATES TRACK AND FIELD
ASSOCIATION; UNTIEDSTATE OLYMPIC
COMMITTEE;
UNITED STATES ANTI-DOPING
AGENCY;INTERNATIONAL
ATHELITICASSOCIATION
FEDERATION;

Defendants.

## AFFIDAVIT OF JUSTIN GATLIN

Before me, the undersigned authority, personally appeared Justin Gatlin, known to me, who being by me first duly sworn, deposes and says on oath as follows:

1. I am over the age of 18 and have personal knowledge of the following facts and, if called as a witness, could and would testify to them.

2. I am 26 years old, and I currently reside in Pensacola,

3. As a result of the January 2008, AAA Panel decision, I am currently ineligible to participate in USATF and IAAF sanctioned events, a suspension that ends on July 25, 2010.

4. I am a professional track and field athlete, competing in the 100 meter and 200 meter track races. I began running track in high school in Pensacola, Florida, ranking in the top five nationwide in the 110 meter hurdles. After high school, I attended the University of Tennessee and competed on the

track team. As a freshman (first year), I won the NCAA Championship in the 100 meter and 200 meter. I repeated as champion in both races my sophomore year at the University of Tennessee. Overall, in my two years at Tennessee, I won ten NCAA Championships.

5. After my sophomore year in college, I decided to become a professional track and field athlete. In 2004, my second year as a professional, I won three medals in the summer Olympics in Athens, Greece. I won the Gold Medal in the 100 meter sprint; I won the bronze medal in the 200 meter sprint; and my relay team won the bronze medal in the 4 by 100 meter relay. In 2005, my third season as a professional, I won the 100 meter sprint and the 200 meter sprint at the World Championships.

6. I have been afflicted by a learning disability all of my life. In 1991, when I was nine years old, I was evaluated by psychiatrist at the naval base where my father worked. They diagnosed me with Attention Deficit Disorder ("ADD"). Those doctors initially prescribed Ritalin, which I took to treat the disorder.

7. I remember being jittery in the classroom and specifically having difficulty focusing on my teachers' lessons. I would never take my Ritalin in front of other children because I did not want anyone knowing that I had ADD.

8. In 1996, when I became a freshman in high school, I started seeing Dr. Robin E. Barnett to treat my learning disability. Dr. Barnett switched my prescription from Dexedrine to Adderall. I noticed an immediate change while taking Adderall. I was better able to focus on my school work and my grades improved. I noticed a side effect from taking Adderall - it made me

drowsy and lethargic. While this helped me stay on subject (and in one place) mentally, it adversely affected me when I was participating in athletics.

9. At one point, due to my improvement, my parents, doctor, and I decided I should try to see if I could sustain my improvement without my medication. As part of this process, I decreased my dosage of Adderall from 20 mg to 10 mg. I immediately noticed a decreased ability to focus. And my grades fell sharply.

10. With the help of my medication, I was able to graduate High School in good academic standing and be eligible to participate on the track and field team at the University of Tennessee.

11. Prior to attending college, Dr. Barnett warned me about the academic challenges college would present and how my ADD and its treatment would impact my ability to succeed. Dr. Barnett explained my classes and practice schedule may be on different times so I may have to alter when I take my medication. Dr. Barnett stressed the importance of taking my medication because I would have to qualify to participate in athletics or risk losing my scholarship at Tennessee. Dr. Barnett recommended that I inform University of Tennessee's Health Services so it could monitor my condition and medication. When I got to UT, I followed Dr. Barnett's advice.

12. UT placed me in a special education program due to my learning disability. The program assisted me with class work, gave me additional time to take my examinations, and provided me steady access to tutors. The special Education program was aware of my condition and my medication.

13. Despite my hard work, I was disappointed with my grades in my first semester at UT. I had to withdraw from my Health and Wellness class and received an "NC" in English Composition, which means I received a grade lower than a "C" and did not receive credit for the class. I believe one of the reasons I struggled in these two classes was because they were both in the afternoon close to when I would practice for track and field. As discussed earlier, my medication made me drowsy and lethargic so I tried not to take (unless I had to) close to track and field practice or any competitions. Because these two classes were close to my practice time in the afternoon, I would make sure the medication had worn off by the time of practice. But the medication had also worn off by the time those classes started. My performance in those classes was affected greatly.

14. My academic performance in my second semester was worse. I received no credit for English Composition for a second time, and I also received no credit for my writing workshop class. In addition, I also received a "D" in drawing, which had been one of my favorite past times. It was much harder for me to deal with my ADD during this second semester because of the weekend track events. Much (almost all) of the track and field season occurs in the spring semester with the meets occurring during the weekends - Friday to Sunday. As a result, I would stop taking my medication on Wednesday evening or early Thursday morning in order to ensure it was out of my system by the time I competed on the track. Because I did not receive credit for my English class or my Health and Wellness class, my academic eligibility was seriously in doubt.

15. To remain academically eligible to participate at the University of Tennessee for my sophomore year, I had to take and receive credit for English Composition I and History of Jazz during summer school. My parents and the coaching staff at the University of Tennessee stressed the importance of passing those two classes to remain eligible to participate in track and field and to keep progressing on the track at college. I put tremendous pressure on myself to pass these courses.

16. My summer English Composition final exam was scheduled for June 13, 2001, three days before I was scheduled to compete in the 2001 USATF Junior National Championships. I decided to adhere to the same studying and medication schedule that I used during the school year. I stopped taking my prescription medicine on the morning of the 13th so I would not feel its effects when competing in the Junior Nationals. I took my English Composition final exam and thought I did well. I ended up passing the course, earning a "C". I also passed my History of Jazz course. I had accomplished my goal for the summer to remain eligible to participate in athletic at the University of Tennessee and was on track to progress academically as a sophomore.

17. On June 16, 2001, I participated in the USATF Junior Nationals. This was my first USATF event, and I had not experience as to what to expect. I hardly received any information from the USATF before the meet. I received a pledge card a couple of months before the competition. It stated that I would not use any performance enhancing drugs. The paper listed several prohibited substances. My medication was not one of them. After reviewing the pledge with my Coach, I signed it.

18. At the time I signed the pledge, I had no idea my Adderall medication could trigger a positive test, especially when I had stopped taking it some three days before the start of competition. I had been tested several times the previous years during NCAA competitions, and, to my knowledge, I had never tested positive for performance enhancing drugs. In all of those competitions, I had stopped taking my Adderall medication anywhere from one to three days prior to competitions.

19. At the USATF Junior Nationals, I won the 100 meters, the 200 meters, and the 300 meter hurdles. On June 16 and 17, I provided the relevant authorities with urine samples. The process for submitting samples, including the various forms, reminded me of the NCAA test. Surprising to me, USADA informed me on July 12, 2001, that both of my samples resulted in a positive finding for amphetamines. I was surprised because I had done several of these drug tests, all the time using the same supplements and same medications but never to my knowledge tested positive.

20. I learned through my later investigation that the tests indicated small amounts of amphetamine in my urine, which was consistent with me taking my prescription medicine some three to four days before the start of the competition. Later, USADA conceded that the positive amphetamine finding resulted form my use of the prescription Adderall, and not because I desired to enhance my performance. The truth is the results from the Junior Nationals indicate no performance enhancing as I ran three of the worst times of the year in those races.

21. I was devastated when I learned the results of my positive test. The only reason I took my prescription medication that summer was to remain eligible to compete at the University of Tennessee and to remain in good standing as a sophomore. I

became extremely emotional in the wake of the positive test-so much that my parents became concerned about my safety.

22. After the positive test, I voluntarily withdrew from USATF competitions and vacated my place on the USATF national team that would compete at the World Junior Nationals. I was able to return to school and participate on the university of Tennessee track team for the 2001-2002 seasons. I just wanted to make the consequences of this positive test go away as soon as possible. To that extent, my attorney decided the best method would be to petition the IAAF for an early reinstatement. We tried to do this initially but were told we needed USADA to prosecute and a AAA panel to find a doping violation.

23. To that end, USADA, who was cooperating with my attorney and me, and a AAA panel conducted a phone conference. The arbitrators decided to issue a provisional suspension sufficent to get the IAAF to look at reinstating me. Once we had this provisional suspension, we re-petitioned the IAAF, and the IAAF reinstated me based on the exceptional circumstances of my alleged violation. I was happy to be reinstated and happy to have cleared my name with the IAAF.

24. Going into the 2001-2002 season, I was concerned that my continued use of Adderall may lead to a positive test for the NCAA. I consulted with my family doctor briefly, but ultimately decided to stop taking the medication to ensure I would never test positive again. I did not consult with my coaches or anyone at the school regarding this decision. To me, it seemed like the only thing to do to ensure I never tested positive again.

25. Without my medication, my already shaky academic performance got much worse. In the first semester of my sophomore year, I received only one grade above a "C", and that was weight training-something I already knew a good deal about. I did a little better my second semester, but was still two classes short of being eligible to participate in my junior year of college. I would have to take summer school again to remain eligible.

26. This time I found summer school even more difficult to concentrate and study. I did not pass both my summer school courses and would have been ineligible for the fall of 2002 had I gone back to school. Luckily, I had another good year athletically, winning both the 100 meter and 200 meter NCAA championship for the second straight year. My good fortune on the track made it possible for me to make a living as a professional track and field athlete, so I decided to forego my final two years at the University of Tennessee and become a professional athlete.

27. Instead of going back to school and being ineligible, I decided to become a professional. After some minor set backs my first season, I experienced a great amount of success, winning three Olympic medals in the 2004 Summer Olympics and winning both the 100 and 200 meter sprints at the 2005 World Championships.

28. Ever since my positive test for Adderall in 2001, I had vowed to and did work closely with USADA to help educate athletes about anti-doping testing and why performance enhancing drug were detrimental to sports. In this effort, I also repeatedly told my coaches, trainers, agents and really anyone who would listen

that I did not want to use and performance enhancing drugs and wanted to compete cleanly in every way.

29. As a tune up for the 2006 track and field season, I competed in the Kansas Relays. This was a very small and overall insignifigant race. I competed with my relay teams in the 4-by-1000 relay. I was selected for drug testing and gave a sample on April 22, 2206. On June 15, 2006, I was notified the sample resulted in a positive result for exogenous testosterone or its metabolites. I was shocked to have tested positive for testosterone ad I have never knowing ingested any performance enhancing drugs, including any anabolic steroid.

30. I launched an investigation along with my agent Renaldo Nehemiah to determine the course of the positive test. I believe the testosterone must have been applied transdermally by Chis Whetstine, my former message therapist. I believe Whetstine applied testosterone cream on me a s means to sabotage me either out of a financial dispute we had in the months immediately preceding the Kansas Relays or for reason of which I am not aware.

31. After learning of the positive test, I immediately began cooperating with authorities including USADA and the Untied States government. Specifically, I worked with Special Agent Jeff Novitzky of the Internal Revue Service, Criminal Investigation Division. About a month after I learned of my positive test, I met with Special Agent Novitzky for about five hours. During the initial meeting, I answered all of his questions and immediately made a recorded telephone call to my former track coach, Trevor Graham. Special Agent Novitzky thanked me and praised me for my cooperation.

32. Presently, I have served over two years in suspension. I served one year before I was reinstated because of the Adderall Offense and then one year and 11 months for the 2006 violation.

_____
Justin Gatlin

**STATE OF:**
**COUNTY OF:**

Cyndi J. Amerson
Print Name
Notary Public:

Sworn to and subscribed before me this 16th day of June, 2008, by Justin Gatlin, who are personally known to me and have produced FLORIDA DRIVERS I.D. G345 421 82 0560, as identification and who did take on oath.

Cyndi J. Amerson
Print Name
Notary Public:

My Commission Expires:
3-26-09