IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF FLORIDA

JUSTIN GATLIN

Plaintiff

v.                                          CASE NO. 3:08cv241/LAC/EMT

UNITED STATES ANTI-DOPING
AGENCY, IINC; U.S.A. TRACK AND
FIELD, INC.;
UNTIED STATES OLYMPIC
COMMITTEE;
INTERNATIONAL ATHELITIC
ASSOCIATION FEDERATION;

Defendants.

### AFFIDAVIT OF VINCE ANDERSON

Before me, the undersigned authority, personally appeared Vince Anderson, known to me, who being by me first duly sworn, deposes and says on oath as follows:

I, Vince Anderson, declare and state as follows:

1. I am over the age of 18 and have personal knowledge of the following facts and, if called as witness, could and would testify to them.

2. I am 52 years old, and I currently reside in College Station, Texas. I am employed as an assistant coach for the Texas A&M University Track Team in charge of the sprinters and hurdlers. I have been an assistant track coach for twenty-three years. Sixteen of those years were spent at the University of Tennessee. I have been at Texas A&M for the last four years.

3. From 1988 to 2004, I was employed with the University of Tennessee, where I was an assistant coach with the University of Tennessee's track and field

team. My coaching responsibilities included coaching the sprinters, and I had a major role in recruiting high school athletes to the University of Tennessee's track team.

4. In 1999, I became aware of a promising athlete coming out of Pensacola, Florida, named Justin Gatlin. He was a high ranked hurdler, but showed even more promise in the short sprint events. I got a call from Justin's High School coach who informed me that Justin would be a good fit with our program. I talked to Justin on the phone, and we instantly had a good relationship and had several good phone conversations.

5. After our promising phone conversations, I invited Justin to the University of Tennessee for an official visit. Under NCAA regulations, each recruit gets five official visits, which are all expenses paid visits to the campuses. Justin accepted my offer and came to campus. He had appeared to me a good visit and decided to sign with the University of Tennessee. At the time, he was choosing between the University of Arkansas, Louisiana State University and the University of Tennessee, which are three of the best college programs for track and field. We were thrilled to have Justin at the University of Tennessee.

6. During my recruitment of Justin to the University of Tennessee, I found Justin to be polite, shy and a very respectful young man. He was courteous on the phone and was respectful and well-behaved on his visit to the University of Tennessee.

7. During his recruitment, I also became very aware of Justin's Learning disability, Attention Deficit Disorder ("ADD"). To ensure that Justin received proper medical treatment and monitoring, and to receive the academic

assistance he would require through the special education programs at the University, the proper departments were notified of Justin's learning disability and his treatment. Specifically, the team doctors and the University Health Center and the academic support personnel at the Thornton Center were made aware that Justin treated his ADD with Adderall.

8.     Justin's athletic performance in his freshman year was amazing. He excelled during the indoor season and was even better during the outdoor season, winning both the 100 meter and 200 meter events at the NCAA Championships in the Spring, which helped the University of Tennessee win a national championship.

9.     In April 2001, Justin and I decided it would be best for him to compete in the USATF Junior National Championships. I firmly believed he would sweep all of the major events he would enter. After registering for the event, we received a pledge from the USATF regarding the use of performance enhancing drugs. The pledge required Justin to sign a statement saying he would not take any performance enhancing drugs during the meet. This pledge specifically listed numerous performance enhancing drugs, but it did not mention ADD medication or Adderall. At the time, I was not sure whether Justin was still taking his ADD medication. However, I knew that, at least to my knowledge, Justin did not test positive for any performance enhancing drugs during the NCAA season when he was taking his Adderall to treat his ADD. After Justin and I reviewed the types of performance enhancing drugs mentioned on the sheet, Justin signed the pledge.

10.     During Justin's freshman year, we became concerned about his academic performance. He did not receive credit for two classes and would not be eligible to compete in his sophomore year unless he took and passed two summer school classes. To maintain his eligibility, Justin enrolled din these summer school classes. The coaching staff put a good deal of pressure on Justin to pass these classes. The coaching staff continually checked in on Justin to make sure he was studying and progressing towards passing those classes. I recall that Justin took classes very seriously and put a great deal of effort to obtain a passing grade.

11.     After Justin finished with his examinations, we traveled to Virginia for the USATF Junior Nationals. Justin participated in the 100 meter, 200 meter and 110 meter hurdles, winning all three events even though he ran the slowest times of the year at the USATF Juniors. He provided and urine sample to the testing authorities on June 16 and June 17. I was with him when he was reviewing the form. It was similar to the forms Justin filled out for the NCAA drug testing. The procedures were also fairly similar in the manner in which the urine sample was provided. Justin went through the testing and thought nothing of it. We were celebrating his wins and looking forward to the Pan American Junior Championships.

12.     The following month Justin was notified that he had tested positive for a stimulant. We learned that this positive result was from his ADD medication, which he had taken to study for an examination in his summer school class, which he passed. Justin was completely devastated, switching from uncontrollably sobbing to a near catatonic state.

13.       Soon after being notified of the positive test, Justin sought the assistance of a lawyer. Justin hoped to clear his name as soon as possible, I was involved closely with Justin's defense. Most importantly, I wanted to make sure he was able to participate in IAAF and USATF functions as soon as possible because Justin's next challenge was to compete on the World's stage. His attorney believe that IAAF would reinstate Justin based on the exceptional circumstances of his positive test - the fact that Justin ingested the Adderall as part of his treatment for his ADD in preparation for ana examination in his summer school class.

14.       While I am not an attorney, it is my understanding that Justin originally petitioned the IAAF for early reinstatement, but that the IAAF requested that Justin be sanctioned first by the United States governing body before being reinstated. It is my further understanding that Justin's attorney and USADA quickly empaneled a panel that issued a provisional sanction. Once that sanction was in place, Justin's attorney re-petitioned the IAAF, which immediately reinstated Justin.

15.       During the adjudicative process with the USATF, Justin was eligible to compete, and did in fact compete, in NCAA sanctioned events. Justin's athletic achievements in his sophomore year were as outstanding as his freshman year. Justin dominated all year and ended up defending his individual championships in the 100 meter and 200 meter sprints. In all, Justin had won a total of 10 NCAA Championships either individually or as part of the University's Track Team. Justin's first two years as a college athlete surpassed my every comparative athletic reference, even better than Carl Lewis's two years at the

University of Houston, where I was a graduate assistant and saw im train from 1986-1988.

16. Similar to his freshman year despite outstanding achievements on the track, Justin's academic performance was poor. Again, to remain eligible for the following year, Justin would have to take and pass summer school classes. Despite a tremendous amount of effort, Justin was not able to pass these classes. This resulted in Justin being academically ineligible for at least the fall semester of his junior year. The track coaching staff tried to convince him that, depending on his academic performance in the fall semester of his junior year, he could become eligible in the Spring, when the bulk of our track season would take place. After significant deliberation, Justin decided to turn professional.

17. Once Justin decided to turn professional, I did everything I could to assist him in is career. Throughout Justin's remarkable professional career, I have kept in touch with him. I recall Justin contacting me after he was notified that he tested positive for a prohibited substance following the Kansas Relays. Similar to when he was notified in 2001 of the positive test, Justin was distraught. At the time, Justin had no idea what could have caused his positive result, but he was adamant that he never took, nor would he take performance enhancing drugs. Based on my years of friendship with Justin, especially during the 2001 incident, I do not believe that Justin would knowingly take performance enhancing substances. It is even harder to believe that Justin knowingly took performance enhancing substances for a an insignificant event, such as the Kansas Relays. This event is best described as a early season event similar to an early April baseball game in the Major Leagues.

18. I understand that USADA is taking the position that a "TUE" was required for Justin in 2001. If a "TUE" was required for Adderall in 2001, it is not a fact that would have been brought to my attention.

Further, affiant sayeth not.

_____
Vince Anderson

**STATE OF:**
**COUNTY OF:**

Sworn to and subscribed before me this \_thurs\_ day of \_June\_, 2008, by _____, who are personally known to me and have producced _____, as identification and who did take on oath.

Toddie Zimney
**Print Name**
**Notary Public:**



TODDIE ZIMNEY
Commission Number 734808
My Commission Expires
7-3-08

My Commission Expires:

7-3-08