BEFORE THE AMERICAN ARBITRATION ASSOCIATION
North American Court of Arbitration for Sport Panel

------------------------------------------x
Justin Gatlin

    Claimant,

    v.                                              AAA No. 30 190 00546 01

United States Anti-Doping Agency

    Respondent.
------------------------------------------x

## DECISION

### I. The Parties and Facts

A one hour telephonic hearing in this matter took place on April 30, 2001, commencing at 2:30 pm eastern time ("hearing"). The Claimant, Mr. Justin Gatlin ("Mr. Gatlin"), was represented by his legal counsel, Mr. John Collins of Jenkens and Gilchrist. The Respondent, The United States Anti-Doping Agency ("USADA"), was represented by its legal counsel, Richard Young and Travis Tygart of Holme Roberts & Owen LLP. Also present was Terry Madden, CEO of USADA. The Panel reviewed the parties' submissions, including the Parties Stipulation, USADA's Position on Sanctions and Mr. Gatlin's Position on Suspension. It also considered the arguments presented by the parties at the hearing and asked extensive questions.

Based on the foregoing, the Panel makes its finding of facts, which are uncontested by the parties, and its decision.

    1.    On June 16 and 17, 2001, Mr. Gatlin was drug tested by USADA at the USA Track and Field ("USATF") Junior National Championships. His urine samples were

declared positive by the IOC-accredited laboratory at the University of California at Los Angeles ("UCLA Laboratory") for the stimulant amphetamine. Amphetamine is a substance prohibited during competition under the International Association of Athletics Federation ("IAAF") rules, which were applicable to the USATF competition at issue. Amphetamines are not prohibited by the IAAF outside of competition. USADA notified Mr. Gatlin of his positive A sample on July 12, 2001. The UCLA Laboratory reported Mr. Gatlin's B sample positive on July 23, 2001. Mr. Gatlin does not contest the integrity of the sample collection process, the transport, or laboratory chain of custody, of his samples. Mr. Gatlin further does not contest any aspect of the laboratory analysis, including the findings of amphetamine in his samples.

2. Mr. Gatlin is a 19-year-old college student who attends the University of Tennessee on a track scholarship. Mr. Gatlin has a medical condition known as attention deficit disorder ("ADD"). He was first diagnosed with this condition when he was nine years old and he has been taking prescribed medication for this condition ever since.

3. There is no dispute that Mr. Gatlin suffers from ADD and that the medication taken by him was an appropriate treatment for his condition. When Mr. Gatlin was first diagnosed with ADD in 1991, after a thorough medical evaluation, it was determined that he could benefit from prescription medicine. Over the next ten years, Mr. Gatlin has continued to be regularly evaluated by his treating physician, and his prescriptions were adjusted as needed to treat his condition in light of side effects and efficacy. For the past five years, Mr. Gatlin's treating physician has prescribed Adderall to treat Mr. Gatlin. Adderall contains amphetamine asparate, amphetamine sulfate, dextroamphetamine saccharate and dextroamphetamine sulfate.

2

An international panel of medical experts reviewed Mr. Gatlin's medical file and agreed with the diagnosis that Mr. Gatlin has ADD and the treatment prescribed for him.

4. Mr. Gatlin stopped taking his medication several days before his first in-competition test. At the time Mr. Gatlin was enrolled in summer school. Mr. Gatlin was taking two summer school classes which he needed to successfully complete in order to satisfy requirements for his scholarship. He had mid-term exams in these courses the week of June 11, 2001, the week prior to the competition.

5. Mr. Gatlin took his prescription medicine to study for mid-terms. He did not want to have the medication in his system at the time of the competition because it makes him feel "sluggish" and unable to run as well. Mr. Gatlin did not take his medication for three days prior to the competition. He did not feel the effects of his medicine and believed that it had cleared his system. He was nevertheless unaware that there was still the possibility that detectable amounts of the medicine could exist in his urine. As it turned out, his medicine did not completely clear his system. Small amounts of amphetamine, less than 200 nanograms per milliliter of urine, were detected in the urine sample he provided on June 16, 2001. The sample he gave the next day on Jun 17, 2001, contained even smaller amounts. These decreasing amounts are consistent with Mr. Gatlin having stopped taking his medication on or about June 13, 2001, before he ran in the competition.

6. The USADA Protocol for Olympic Movement Testing is applicable to this case and hearing, as are the IAAF definitions of doping, prohibited substances and applicable sanctions.

3

7. The applicable IAAF definitions of doping, prohibited substances, sanctions and the reinstatement rules are as follows:

### Rule 55
### Doping

1. Doping is strictly forbidden and is an offence under IAAF Rules.
2. The offence of doping takes place when either:
   (i) a prohibited substance is found to be present within an athlete's body tissue or fluids; or
   (ii) an athlete uses or takes advantage of a prohibited technique; or
   (iii) an athlete admits having used or taken advantage of a prohibited substance or a prohibited technique. (See also Rule 56.)

. . . .

### PROHIBITED SUBSTANCES
### Schedule I
### PART 1

(a) **Anabolic Agents**

. . . .

(b) **Amphetamines: e.g.**

| | |
|---|---|
| amineptine | mesocarb |
| amphetamine | methoxyphenamine |
| amphetaminil | methylamphetamine |
| benzphetamine | methylphenidate |
| bromantan | morazone |
| carphedon | pemoline |
| dimethylamphetamine | phendimetrazine |
| ethylamphetamine | phenmetrazine |
| fenethyline | pipradrol |
| fenproporex | pyrovalerone |
| furfenorex | selegiline |
| mefenorex | |

and chemically or pharmacologically related compounds.

. . . .

4

## Rule 59
### Disciplinary Procedures for Doping Offences

4. If an athlete is found to have committed a doping offence, and this is confirmed after a hearing, or the athlete waives his right to a hearing, he shall be declared ineligible. In addition, where testing was conducted in a competition, the athlete shall be disqualified from that competition and the result amended accordingly. His ineligibility shall begin from the date of the suspension. Performances achieved from the date on which the sample was provided shall be annulled.

....

## Rule 60
### Sanctions

2. If an athlete commits a doping offence, he will be ineligible for the following periods:
   (a) for an offence under Rule 60.1(i) or 60.1(iii) above involving the substances listed in Part I of Schedule 1 of the "Procedural Guidelines for Doping Control" or, for any of the other offences listed in Rule 60.1:-
      (i) first offence - for a minimum of two years from the date of the hearing at which it is decided that the Doping Offence has been committed. When an athlete has served a period of suspension prior to a declaration of ineligibility, such a period of suspension shall be deducted from the period of ineligibility imposed by the relevant Tribunal.;

....

8. In exceptional circumstances, an athlete may apply to the Council for re-instatement before the IAAF's period of ineligibility has expired.
   Where an athlete has provided substantial assistance to a Member in the course of an enquiry into doping carried out by that Member, this will normally be regarded by the Council as constituting exceptional circumstances.

5

However, it is emphasized that only truly exceptional circumstances will justify any reduction. Detail of the procedure and the criteria for application are to be found in the "Procedural Guidelines for Doping Control".

. . . .

8. Under the IAAF definition of doping a doping violation takes place when a prohibited substance (in this case amphetamine) is found to be present within an athlete's bodily fluids, unless a prior medical exemption was given by the IAAF for the use of the substance. Mr. Gatlin never sought any medical exemption from the IAAF. He did, however, disclose his prescription medicine to his doctor at the University of Tennessee.

9. Based on the medical experts' opinion in this case, it is not unreasonable for this Panel to assume that, if requested, the exemption likely would have been granted. Rather than to seek a medical exemption, the course of action followed by most athletes with ADD is simply to discontinue their medication in advance of a competition. This is what Mr. Gatlin did. USADA advises athletes after consultation with their physicians to discontinue using the ADD medication prior to competition in order for the medication to clear their system. Mr. Gatlin's doctor did not know how far in advance of competing Mr. Gatlin should stop taking his medication.

10. Under the IAAF rules the sanction for a "first offense" involving amphetamine is forfeiture of competitive results at the tested competition plus a minimum suspension period of two years from the date of the hearing at which it is decided that a "Doping Offense" has been committed. However, "[w]hen an athlete has served a period of suspension prior to a declaration of ineligibility, such a period of suspension shall be deducted from the period of ineligibility imposed by the relevant Tribunal." IAAF Rule 60(2)(a)(i).

6

11. The IAAF rules provide that after a two year suspension is imposed the IAAF Council may consider an application from the athlete seeking early reinstatement, thus reducing or eliminating the two year suspension in appropriate circumstances. The IAAF Council will only consider an early reinstatement for athletes <u>after</u> the two year suspension is imposed.

12. When Mr. Gatlin received notice of his positive A sample on July 12, 2001, he immediately advised the United States Track and Field Federation ("USATF") that he was withdrawing from all further IAAF and USATF sanctioned competitions until such time as the doping matter was resolved. This included withdrawing from the place he had earned on the USATF National Team which was scheduled to leave for competitions in England and Scotland in August 2001. To date, Mr. Gatlin still has not competed in any IAAF or USATF competitions in the nearly ten months since the return of his positive test. In that period he would normally have competed in a number of USATF and IAAF sanctioned events.

## II. Decision

1. The difficult question before the Panel is how to literally enforce the scheme in the applicable IAAF's rules regarding the imposition of sanctions with reconsideration by the IAAF Council and at the same time to properly take into account Mr. Gatlin's defenses, conduct and rights, given the unique circumstances of his case.

2. While Mr. Gatlin may have violated the IAAF anti-doping rules in that he did not first seek an exemption from the IAAF for his medication before he competed, he certainly is not a doper. This Panel would characterize Mr. Gatlin's inadvertent violation of the IAAF's rules based on uncontested facts as, at most, a "technical" or a "paperwork" violation.

7

As such, the seriousness of Mr. Gatlin's conduct and his personal culpability are open to dispute and are certainly proportionately very much less than other athletes who would receive a two-year suspension under the same IAAF rules.

3.  Were this Panel to address the issue of culpability and sanctions in a full evidentiary hearing, this Panel clearly would not apply the full two-year suspension to Mr. Gatlin.

4.  In deference, however, to the IAAF Council's authority to assess whether, in a particular case, the two-year suspension should be reduced through reinstatement for exceptional circumstances, this Panel will respect the process set forth in the IAAF rules and allow the IAAF Council the opportunity to assess the exceptional circumstances of this case first before they are addressed by this Panel.

5.  Accordingly, the Panel will conditionally impose the two-year minimum suspension set forth in the IAAF Rules. The Panel understands that this suspension will be considered in an application for early reinstatement which, the Panel is informed, Mr. Gatlin intends to file with the IAAF. This Panel hereby retains full jurisdiction over this case so that it may reconsider the two-year suspension which it has imposed by this order should the IAAF not take expeditious action in granting Mr. Gatlin early reinstatement to a term appropriate to his circumstances and satisfactory to Mr. Gatlin.

6.  The Panel finds that it has authority to retain jurisdiction as provided above. The Panel notes that a previous panel of CAS arbitrators retained jurisdiction to reopen a case after issuing an order imposing sanctions in a doping case. *See Meca-Medina v. FINA* and *Majcen v. FINA* (CAS 99/A/234 and CAS 99/A/235). The Panel further notes that Mr. Gatlin

8

specifically requested that this Panel retain jurisdiction and that USADA did not object to that request and specifically acknowledged that some independent review of the IAAF Council's decision must be available.

7. Under the IAAF's rules, sanctions commence on the date a hearing decision is announced, with credit for any time during which the athlete was provisionally suspended. In this case, Mr. Gatlin voluntarily imposed a *de facto* provisional suspension upon himself. He announced to USATF that he would not compete in USATF or IAAF sanctioned events while this matter was pending, and, indeed, he withdrew himself from the USATF National Team that was scheduled to compete in England and Scotland in August of 2001. Consistent with his word, Mr. Gatlin has refrained from competing in any other USATF or IAAF sanctioned competition through the date of this hearing.

8. In light of the foregoing, the Panel determines that Mr. Gatlin has served a period of suspension prior to this Panel's declaration of ineligibility in accordance with IAAF Rule 60(2)(a) and should have credit against his two-year suspension for the period from July 12, 2001, the date Mr. Gatlin was notified of his Positive A Sample result and subsequently informed USATF that he was withdrawing from competition, until the date of this Panel's decision. Thus, Mr. Gatlin's two-year suspension will commence on the date of this Order, May 1, 2002, and conclude on July 11, 2003. Consistent with IAAF rules, Mr. Gatlin shall forfeit all competitive results which he achieved at the 2001 USATF Junior National Championships.

9. This Panel is very concerned that Mr. Gatlin's reputation not be unnecessarily tarnished as a result of this decision. Anti-doping rules are like other sporting rules in that sometimes there are adverse consequences even when an athlete is not at fault. The Panel

9

specifically notes that, in this case, Mr. Gatlin neither cheated nor did he intend to cheat. He did not intend to enhance his performance nor, given his medical condition, did his medication in fact enhance his performance. At most, his mistake was in not raising his medical condition for a review with the appropriate authorities before the race, instead of after it. The Panel requires that this fact be made clear in any public release describing or relating to this decision.

*Walter G. Gans*
_____
Walter G. Gans, Chair


_____
Christopher Campbell


_____
Edward Lahey, Jr.

Dated as of May 1, 2002

Wednesday, 02 January 2008

# Arbitration panel suspends Justin Gatlin for four years

The United States Anti-Doping Doping Agency (USADA) has announced that Justin Gatlin (USA) has committed an anti-doping rule violation and has received a four year period of ineligibility starting on May 25, 2006.

To read the full USADA announcement please **click here**.

The IAAF has not yet reviewed the decision and will not be able to comment on this decision until this review is complete.

© 1996-2008 International Association of Athletics Federations - IAAF - All Rights Reserved.

**Contact IAAF Webmaster**