# AMERICAN ARBITRATION ASSOCIATION
## North American Court of Arbitration for Sport Panel

In the Matter of the Arbitration between

United States Anti-Doping Agency,

Claimant

and

Justin Gatlin,

Respondent

Re: AAA No. 30 190 00170 07

## AWARD OF ARBITRATORS

WE, THE UNDERSIGNED ARBITRATORS ("Panel"), having been designated by the above-named parties, and having been duly sworn and having duly heard the proofs and allegations of the parties, and, after hearing held from July 30, 2007 through August 1, 2007, and having reopened the hearing to receive additional evidence, briefs and arguments, now then, having considered all evidence and arguments presented by the parties, do hereby render a decision and award pursuant to the Panel's undertaking.

### 1. Summary

The Panel notes at the outset that this case appears to be unique, and its circumstances are unlikely ever to be repeated. It has proved particularly nettlesome, involving as it does an earlier AAA Panel Decision, made in 2001 under a prior set of IAAF code provisions. That earlier 2001 AAA Panel rendered what appears to be an interim, non-final decision pending disposition of a petition for reinstatement by the IAAF. When the IAAF reinstated Mr. Gatlin in 2002, the 2001 AAA Panel did not resume its deliberations, nor render a final decision, nor in any way

Dockets.Justia.com

modify its initial decision, finding a doping violation and imposing a 2 year suspension on Mr. Gatlin for what the Panel found, and evidently the IAAF found was a completely inadvertent, unintentional violation which would have been avoided through the simply step of seeking permission for the use of a therapeutic, prescription medication[1]. Nevertheless, the 2001 AAA Panel found a doping violation, Mr. Gatlin, and all of his witnesses consistently testified that they considered and understood that finding to constitute a first doping violation. At no time did Mr. Gatlin claim it was not a violation, nor did he present any evidence that it was not a finding of a first doping violation.

Nevertheless, the Panel found itself constrained by its obligations to consider the implications on the present case, of the findings or lack of findings in that 2001 decision.

Turning to the present case, the Panel finds that the evidence presented supports a finding that Mr. Gatlin committed a doping violation in 2006, namely the use of exogenous testosterone, which was detected in his system on or about April 22, 2006. The Panel further finds that Mr. Gatlin failed to sustain his burden of proof to show how the Prohibited Substance entered his body, in order to rely upon a claim of no fault, or no significant fault in connection with the 2006 doping violation.

The doping violation which was established by the proofs herein, was Mr. Gatlin's second doping violation, the first having occurred in 2001 while Mr. Gatlin was a student at the University of Tennessee[2]. Since that finding meant that the present matter constitutes a second

---

[1]   This Panel notes that the 2001 AAA Panel expressly retained jurisdiction over the first offense and did not subsequently relinquish that jurisdiction.

[2]   The Dissent hereing makes an impassioned case that the facts and circumstances of that first offense, namely the advice of the USATF and USADA that it was sufficient for athletes simply to discontinue their non-competition use of medications, and law, namely the Americans with Disabilities Act and Swiss Law, compel the conclusion that Mr. Gatlin essentially had no fault at all in the first offense. The Dissent does not explain, then, why that first panel found a doping violation. If the standard in 2001 was simply negligence, and Mr. Gatlin was not negligent because the actions and advice of the USATF and USADA had to be considered as part of the anti-doping

violation and additional potential penalties be considered, the Panel considered arguments of Mr. Gatlin that the first violation should not be counted and USADA's to the contrary.

Despite the arguments of Mr. Gatlin, detailed more fully hereinbelow, there is no evidence before the Panel which would sustain the argument that the first doping violation should not be considered and that the current doping violation was, therefore, effectively a first violation.

Mr. Gatlin's period of ineligibility will be four (4) years from May 26, 2006 ( thirty (30) days following the date on which his urine sample was taken). He is disqualified from and forfeits any and all competitive results, if any, received on or subsequent to April 22, 2006 through the end of his period of ineligibility.

While the Panel has held that it has no basis upon which to ignore the first finding of a doping violation, for the reasons discussed below, we adjure the International Amateur Athletic Federation ("IAAF") to determine whether, in the exercise of its discretion, if its decision reinstating Mr. Gatlin in 2002 and eliminating any further ban from competition should be held to have been based on or the equivalent of a finding that he had no contributing fault in connection with his first doping violation. Similarly, Mr. Gatlin may choose to present evidence that the anti-doping authorities in 2001 affirmatively represented to Mr. Gatlin that cessation of use three days prior to competition would be sufficient compliance with the rules, and therefore the first panel, which has never relinquished jurisdiction over that offense would have found "no fault.." If either be the case, then it ought not be counted for purposes of the present award, and the Panel will retain jurisdiction over the award set out hereinbelow to adjust that award should a decision of the IAAF, or subsequently discovered facts or events so warrant.

---

rules or an interpretation of those rules, then the appropriate conclusion would, it appears to the majority, have been a finding of no doping offense. However, that was not the case.

As will be more fully discussed below, the Panel notes that no AAA or CAS Panel has ruled that proceedings by Anti-Doping Organizations are subject to the Americans with Disabilities Act or comparable Swiss laws that prohibit discrimination against the disabled. Given the abject failure of Mr. Gatlin to support his mere generalized statement about those laws, this Panel likewise does not have to rule on that issue as it was not properly presented to it. We do note that the task of this Panel is made more difficult by the complexity caused by those statutes, which have not been explored in detail before this Panel. The Dissent presents detailed argument and citation as to why those statutes should be considered and thereby either invalidate the 2001 AAA Panel decision, or prohibit its consideration. Had Mr. Gatlin presented such arguments, or indeed virtually any arguments, they would have been considered by the Panel but the Panel makes no conclusions as to the outcome had he done so.

## 2.     Parties

2.1     Claimant, USADA, is the independent anti-doping agency for Olympic Sports in the United States and is responsible for conducting drug testing and any adjudication of positive test results pursuant to the United States Anti-Doping Agency Protocol for Olympic Movement Testing, Effective as Revised August 13, 2004 ("USADA Protocol").

2.2     The Respondent, Justin Gatlin, is a member of the USA Track & Field, Inc. ("USATF").[3]  He is the 2005 World and USA Outdoor 100m and 200m champion; 2004 Olympic 100m gold, 200m bronze, 4x100m relay silver medalist.

## 3.     Jurisdiction

---

[3] USATF is the National Governing Body ("NGB") for track and filed, long-distance running and race walking in the United States.  It is a member of the International Amateur Athletic Federation ("IAAF").

3.1     This Panel has jurisdiction over this doping dispute pursuant to the Ted Stevens

Olympic and Amateur Sports Act ("Act") §220521 because this is a controversy involving

Respondent's opportunity to participate in national and international competition for his

NGB.   The Act states:

> An amateur sports organization is eligible to be recognized, or to continue to
> be recognized, as a national governing body only if it . . . agrees to submit to
> binding arbitration in any controversy involving . . . the opportunity of any
> amateur athlete . . . to participate in amateur athletic competition, upon
> demand of . . . any aggrieved amateur athlete. . ., conducted in accordance
> with <u>the Commercial Rules of the American Arbitration Association, as
> modified and provided for in the corporation's constitution and bylaws. . .</u>
> (emphasis added)[4]

3.2     Under its authority to recognize an NGB[5], the United States Olympic

Committee ("USOC") established National Anti-Doping Policies, effective August 13,

2004 ("USOC Policies"), which, in part, provide:

> . . .NGBs shall not have any anti-doping rule which is inconsistent
> with these policies or the USADA Protocol, and NGB compliance with
> these policies and the USADA Protocol shall be a condition of USOC
> funding and recognition.[6]

3.3     Regarding athletes, the USOC Policies provide:

> . . .By virtue of their membership in an NGB or participation in a
> competition organized or sanctioned by an NGB, Participants agree to
> be bound by the USOC National Anti-Doping Policies and the
> USADA Protocol. [7]

3.4     In compliance with the Act, the USADA Protocol, Article 10 (b),

---

[4] *Ted Stevens Olympic and Amateur Sports Act ("Act") § 220521.*

[5] Act, §220505(c)(4). .
[6] *National Anti-Doping Policies,* ¶13.

[7] *Id.* at ¶12.

provides that hearings regarding doping disputes "will take place in the United States before the American Arbitration Association ("AAA") using the supplementary Procedures."[8]

3.5     Mr. Gatlin entered into a voluntary agreement on July 25, 2006, not to compete pending further notice.

3.6     Thereafter, apparently following extended discussions between the parties, USADA filed the present action, seeking imposition of sanctions, on February 20, 2007. The parties selected the dates of July 30 through August 1, 2007 as hearing dates. The hearing adjourned on August 1, 2007, but was not closed until receipt of the hearing transcript. The transcript was received on August 20, 2007 and the hearing closed. Thereafter, following consideration of arguments made during the hearing, the Panel reopened the hearing in order to provide the parties with the opportunity to brief specific issues further and to provide additional evidence in support of their respective positions. The parties indicated that they could not act within the window of opportunity provided by the Panel, and sought additional time within which to do so. On August 13, 2007 through October 22, 2007, the Panel held discussions with the parties regarding the open issues and received the supplemental briefs and supplemental reply briefs of the parties. After considering whether the parties had met the Panel's request for information to the extent they were able to do so[9], the hearing was again closed on December 21, 2007.

4.     **FACTUAL BACKGROUND**

   a.     **Present Case**

---

[8] The supplementary procedures refer to the American Arbitration Association Supplementary Procedures for the Arbitration of Olympic Sport Doping Disputes, as approved by the USOC's Athletes' Advisory and NGB Councils.
[9]     While the Panel did not receive all the information it had hoped to receive, it appears that the parties provided that which they could, and therefore the Panel closed the record.

4.1      The parties stipulated to a substantial portion of the facts relevant to this dispute.

The stipulated facts that are adopted by this Panel as its factual findings are as follows:

(i) on April 22, 2006 at the Kansas Relays, Mr. Gatlin gave the urine sample designated by USADA as USADA specimen number 4960404 ("Sample");

(ii) each aspect of the sample collection and processing or the A and B bottles of USADA specimen number 496040 was conducted appropriately and without error;

(iii) the chain of custody for USADA specimen number 496040 from the time of collection and processing at the collection site to the receipt of the sample by the World Anti-Doping Agency accredited laboratory at the University of California in Los Angeles ("UCLA Laboratory") was conducted appropriately and without error;

(iv) the UCLA Laboratory's chain of custody for USADA specimen number 496040 was conducted appropriately and without error;

(v) the UCLA Laboratory, through accepted scientific procedures and without error, accurately determined by carbon isotope ratio analysis the sample positive for the finding of the substance testosterone or its precursors, which are prohibited as an androgenic anabolic agent under the applicable rules, in both the A and B bottles of USADA specimen number 496040 ("Positive Test"); and

(vi) this Positive Test is a doping offense in violation of the WADA Code and IAAF Rules;

4.2 The parties further stipulated to the following:

(i)The period of [Mr. Gatlin's] ineligibility will be a maximum of eight (8) years beginning on August 15, 2006, with credit being given for the time Mr. Gatlin has served a provisional suspension beginning on July 25, 2006. Mr. Gatlin reserves the right to argue for an earlier start date under WADA Code Article 10.8 because his A sample was not reported to him until June 15, 2006;

(ii)That by accepting the test results finding the presence of "testosterone or its precursors" in both the A and B sample of USADA specimen number 496040, Mr. Gatlin is in no way admitting that the presence of any such substance was the result of any knowing actions by Mr. Gatlin to cause such substances to be present in his body. USADA expressly understands and agrees that Mr. Gatlin expressly reserves his right to argue "exceptional circumstances" as defined under the applicable rules (Article 10.5.1 and 10.5.2 of the WADA Code), including being able to argue that Mr. Gatlin had "no fault" or that he had "no significant fault;

(iii) That Mr. Gatlin will be disqualified from and forfeits any and all competitive results, if any, received on or subsequent to April 22, 2006, the date that USADA specimen number 496040 was collected through the end of this period of ineligibility. Mr. Gatlin reserves his right to argue a different outcome concerning the disqualification of his results under WADA Code Article 10.7 based on his attempt to argue "exceptional circumstances" as defined under the applicable rules (Article 10.5.1 and 10.5.2 of the WADA Code), including his arguments that Mr. Gatlin had "no fault" or that he had "no significant fault" with respect to the Positive Test;

(iv) That Mr. Gatlin has and will continue to cooperate with and provide assistance to USADA and expressly reserves his right to argue that he had provided "substantial assistance" as defined under the applicable rules (Article 10.5.3 of the WADA Code);

(v) That the eight-year sanction agreed to by the parties is a maximum penalty and that nothing herein shall preclude either USADA from recommending or Mr. Gatlin from seeking a lesser penalty or no penalty. The parties agree that USADA is not obligated to seek lesser sanction and that USADA may at all times, in all proceedings, argue that eight (8) years is the appropriate sanction. USADA expressly acknowledges and agrees that the maximum penalty of eight years agreed to by the parties does take into account the facts and circumstances surrounding Mr. Gatlin's positive test as reflected in *USADA v. Gatlin* (AAA 30 190 00546 01), but does not take into account any assistance that Mr. Gatlin may provide to USADA, the IAAF, WADA or any other entity, including the United States government, engaged in the investigation of anti-doping rule violations by athletes, coaches, or others;

(vi) That Mr. Gatlin reserves the right to contest the eight-year sanction recommended by USADA and if he chooses to do so, will be required to submit the matter to arbitration no later than six (6) months from the date of this stipulation, unless both parties agree there is good cause to extend such deadline (this paragraph supersedes paragraph 10 of the USADA Protocol);

4.3.    The Panel conducted a hearing on July 30, 2007 through August 1, 2007. After receipt and review of the hearing transcript along with the exhibits placed in evidence by the parties, the Panel was not persuaded by the evidence and arguments submitted by Mr. Gatlin that he should be held to have had no fault, or no significant fault, in connection with the present doping violation. Specifically, Mr. Gatlin presents no evidence from which the Panel could determine the source of the exogenous testosterone which was found in his system.

4.4    However, the Panel further found that it was not satisfied with the evidence or arguments presented by either party regarding how the Panel should treat Mr. Gatlin's first doping violation, and specifically the issue of Mr. Gatlin's fault or negligence in his first violation. On August 13, 2007, the Panel issued an order reopening the hearing and requesting further briefing on the issue of Mr. Gatlin's fault in the first violation. In part, the order stated the following:

> . . . . The May 1, 2002 decision in the first offence, did not make a determination of fault. In the Panel's view, a decision on the issue of fault in the first case is critical to its deliberative process. The Panel has no intention of retrying the first case. The Panel is merely looking to fill in the blanks of the first case given its procedural history of not coming to a final decision on the issue of fault.

### (b) First doping violation - 2001

4.4    On June 16 and 17, 2001, Mr. Gatlin was drug tested by USADA at the USATF Junior National Championships. As a result of this in-competition drug test, Mr. Gatlin's urine samples were declared positive for the stimulant amphetamine.[10] This constituted a positive test under the IAAF rules at that time. Pursuant to the Act, an AAA panel was designated to conduct a hearing regarding this positive drug test.

4.5    Mr. Gatlin and USADA entered into a stipulation regarding a substantial portion of the facts surrounding the 2001 positive test. The stipulated facts were inserted into the decision and findings of the 2001 AAA Panel which are summarized below:

> (i) Mr. Gatlin was a 19 year-old college student who attended the University of Tennessee on a track scholarship. He was suffering from a medical condition known as attention deficit disorder ("ADD"). He was first diagnosed with this condition in 1991 when he was nine years old and he was taking this medication up until the time of the hearing in 2001.[11]

---

[10] *Gatlin v. USADA*, AAA No. 30 190 00546 01 (May 1, 2002)
http://www.usantidoping.org/files/active/arbitration_rulings/arbitration_ruling_5_14_2002_Gatlin.pdf
[11] *Gatlin, supra*, at page 2.

(ii) He was diagnosed with ADD after a thorough medical evaluation. His treating physician determined he would benefit from prescription medicine. He was regularly evaluated by his treating physician from 1991 to the date of the 2001 hearing and his prescriptions were adjusted as needed to treat his condition in light of side effects and efficacy. For the five year period preceding the 2001 hearing, his treating physicians prescribed Adderall for his disability. Adderall contains the amphetamine which caused the positive test. [12] An athlete can take amphetamines outside of competition.

(iv) An international panel of medical experts mutually selected by USADA and Mr. Gatlin reviewed Mr. Gatlin's medical file and agreed with the diagnosis of his treating physician. The international panel also agreed with the treatment prescribed for Mr. Gatlin. [13]

(v) Mr. Gatlin stopped taking his medication several days before his first in-competition test. At the time he was enrolled in summer school. He was taking two summer school classes which he needed to successfully complete in order to satisfy requirements for his scholarship. He had mid-term exams in these courses the week of June 11, 2001, the week prior to the competition in which he tested positive.[14]

(vi) Mr. Gatlin took his prescription medicine to study for mid-terms. He did not want to have the medication in his system at the time of the competition because it made him feel "sluggish" and unable to run as well. He did not take his medication for three days prior to the competition. He did not feel the effects of his medicine and he believed that it had cleared his system. He was unaware that there was still the possibility that detectable amounts of the medicine could exist in his urine.[15]

(vii) As it turned out, his medicine had not completely cleared his system. Small amounts of amphetamine, less than [20] nanograms per milliliter of urine was detected in the urine sample he provided on June 16, 2001. The sample he gave the next day on June 17, 2001 contained even smaller amounts. These decreasing amounts were found to be consistent with Mr. Gatlin having stopped taking his medication on or about June 13, 2001, three days before he ran in the competition in which he tested positive.[16]

(viii) The course of action followed by most athletes with ADD is simply to discontinue their medication in advance of a competition. USADA advised athletes after consultation with their physicians to discontinue using the ADD medication prior to competition in order for the medication to clear their system.

---

[12] *Id.* at page 2.
[13] *Id.* at pages 2 and 3.
[14] *Id.* at page 3, ¶4.
[15] *Id.* at page 3, ¶5.
[16] *Id.* at page 3, ¶5.

(ix) Mr. Gatlin neither cheated nor intended to cheat. He did not intend to enhance his performance nor, given his medical condition, did his medication in fact enhance his performance.

4.6     The IAAF Rule 60 (2)(a)(i) in effect at that time, required that the panel impose a sanction of two years on Mr. Gatlin for this first offense *regardless of any mitigating circumstances.* That is, there was no provision at that time for a finding of "no fault" or of "no significant fault."

4.7     The IAAF rules did provide, however, that in the case of "exceptional circumstances" an athlete may apply to the IAAF Council for re-instatement before the two-year period of ineligibility expired."[17] Under the IAAF rules in effect in 2001, only the IAAF Council could make finding of facts and a decision regarding "exceptional circumstances."

4.8     Regarding the provision that only the IAAF could make findings of facts and a decision on the issue of "exceptional circumstances," the 2001 AAA Panel found "some independent review of the IAAF Council's decision must be available."[18] For this reason the AAA Panel imposed a two-year period of ineligibility based on Mr. Gatlin's first offense to allow Mr. Gatlin to petition the IAAF Council for early reinstatement, which could not be done until the 2001 AAA Panel issued its ruling. That AAA Panel further held:

> This Panel hereby retains full jurisdiction over this case so that it may reconsider the two-year suspension which it as imposed by this order should the IAAF not take expeditious action in granting Mr. Gatlin early reinstatement to a term appropriate to his circumstances and satisfactory to Mr. Gatlin. [19]

4.9 Thereafter, Mr. Gatlin petitioned the IAAF Council for early reinstatement. The

---

[17] IAAF Rule 60 (8) (2000).
[18] *Gatlin,* supra, at page 9, ¶6.
[19] *Gatlin, supra,* at page 8, ¶5.

IAAF found "exceptional circumstances" existed and immediately granted Mr. Gatlin reinstatement.    There is no written decision from the IAAF Council making a finding on the issue of Mr. Gatlin's fault or negligence.

4.10    Further, the AAA Panel expressly did not make a finding on the issue of Mr. Gatlin's fault or negligence[20].  The 2001 AAA Panel observed:

> While Mr. Gatlin may have violated the IAAF anti-doping rules in that he did not first seek an exemption from the IAAF for his medication before he competed, he certainly is not a doper.  This Panel would characterize Mr. Gatlin's inadvertent violation of the IAAF's rules based on uncontested facts as, at most, a "technical" or a "paperwork" violation.  As such, the seriousness of Mr. Gatlin's conduct and his personal culpability are open to dispute and are certainly proportionately very much less than other athletes who would receive a two-year suspension under the same IAAF rules.  <u>Were this Panel to address the issue of culpability</u> and sanctions in a full evidentiary hearing, <u>this Panel clearly would not apply the full two-year suspension to Mr. Gatlin.</u>[21](emphasis added.)

## 5.    RULES APPLICABLE TO THE PRESENT DISPUTE

As the parties have agreed that there is a present doping violation the rules related to the outstanding issues in this case are under the mandatory provisions of the WADA Code[22]:

**2.1** [Doping is]The presence of a Prohibited Substance or its Metabolites or Markers in an Athlete's bodily Specimen.

2.1.1 It is each Athlete's personal duty to ensure that no Prohibited Substance enters his or her body.  Athletes are responsible for any Prohibited Substance or its Metabolites or Markers found to be present in their bodily Specimens. Accordingly, it is not necessary that intent, fault, negligence or knowing Use on

---

[20]    The Dissent argues that the failure by the 2001 AAA Panel to make an affirmative finding as to fault, compels this Panel to find "no fault."  The majority respectfully disagrees that the absence of a finding – which the Dissent agrees was not required in 2001 – is the legal equivalent of a finding of "no fault" under the 2006 standard. It is this gap, however, which compelled the Panel to examine that prior decision over the strenuous objections of USADA.

[21]    *Gatlin, supra*, at pages 7-8, ¶¶2,3.

[22]    Mr. Gatlin has spent a great deal of time and effort arguing that under the as yet not adopted 2007 proposed revisions to the WADA Code, the decision of the Panel would be impacted and that the period of suspension would be different than under the current Code. (See, e.g, Gatlin Prehearing brief at 21-22).  However, this Panel must apply the Code as it is presently in effect, not a Code which may or may not be adopted at some time in the future, in the present form or in as yet unknown form.

the Athlete's part be demonstrated in order to establish an anti-doping violation under Article 2.1.

### 3.1 Burdens and Standards of Proof.

The Anti-Doping Organization shall have the burden of establishing that an anti-doping rule violation has occurred. The standard of proof shall be whether the Anti-Doping Organization has established an anti-doping rule violation to the comfortable satisfaction of the hearing body bearing in mind the seriousness of the allegation which is made. This standard of proof in all cases is greater than a mere balance of probability but less than proof beyond a reasonable doubt. Where the Code places the burden of proof upon the Athlete or other Person alleged to have committed an anti-doping rule violation to rebut a presumption or establish specified facts or circumstances, the standard of proof shall be by a balance of probability.

### 3.2 Methods of Establishing Facts and Presumptions.

Facts related to anti-doping rule violations may be established by any reliable means, including admissions. The following rules of proof shall be applicable in doping cases. . . .

### 10.2 Imposition of Ineligibility for Prohibited Substances and Prohibited Methods

Except for the specified substances indentified in Article 10.3, the period of Ineligibility imposed for a violation of Articles 2.1 (presence of Prohibited Substance or its Metabolites or Makers). . .

- First violation: Two (2) years' ineligibility.
- Second violation: Lifetime Ineligibility

However, the Athlete or other Person shall have the opportunity in each case, before a period of Ineligibility is imposed, to establish the basis for eliminating or reducing this sanction as provided in Article 10.5.

### 10.5 Elimination or Reduction of Period of Ineligibility Based on Exceptional Circumstances.

### 10.5.1 No Fault or Negligence

If the Athlete establishes in an individual case involving an anti-doping rule violation under Article 2.1 (Presence of Prohibited Substance or its Metabolites or Makers) or Use of a Prohibited Substance or Prohibited Method under Article 2.2 that he or she bears No Fault or Negligence for the violation, the otherwise applicable period of Ineligibility shall be eliminated. When a

Prohibited Substance or its Markers or Metabolites is detected in an Athlete's Specimen in violation of Article 2.1 (Presence of Prohibited Substance). The Athlete must also establish how the Prohibited Substance entered his or her system in order to have the period of Ineligibility eliminated. In the event this Article is applied and the period of Ineligibility otherwise applicable is eliminated, the anti-doping rule violation shall not be considered a violation for the Limited purpose of determining the period of Ineligibility for multiple violations under Article 10.2, 10.3 and 10.6.

### 10.5.2 No Significant Fault or Negligence

This Article 10.5.2 applies only to anti-doping rule violations involving Article 2.1 (Presence of Prohibited Substance or its Metabolites or Markers), Use of Prohibited Substance or Prohibited Method under Article 2.2, failing to submit to Sample collection under Article 2.3, or administration of a Prohibited Substance or Prohibited Method under Article 2.8. If an Athlete establishes in an individual case involving such violations that he or she bears No Significant Fault or Negligence, then the period of Ineligibility may be reduced, but the reduced period of Ineligibility may not be less than one-half of the minimum period of Ineligibility otherwise applicable. If the otherwise applicable period of Ineligibility is a lifetime, the reduced period under this section may be no less than 8 years. When a Prohibited Substance or its Markers or Metabolites is detected in an Athlete's Specimen in violation of Article 2.1 (Presence of Prohibited Substance), the Athlete must also establish how the Prohibited Substance entered his or her system in order to have the period of Ineligibility reduced.

### 10.5.3 Athlete's Substantial Assistance in Discovering or Establishing Anti-Doping Rule Violations by Athlete Support Personnel and Others.

An Anti-Doping Organization may also reduce the period of Ineligibility in an individual case where the Athlete has provided substantial assistance to the Anti-Doping Organization which results in the Anti-Doping Organization discovering or establishing an anti-doping rule violation by another Person involving Possession under Article 2.6.2 (Possession by Athlete Support Personnel), Article 2.7 (Trafficking), or Article 2.8 (Administration to an Athlete). The reduced period of Ineligibility may not, however, be less than one-half of the minimum period of Ineligibility otherwise applicable. If the otherwise applicable period of Ineligibility is a lifetime, the reduced period under this section may be no less than 8 years.

### 10.7 Disqualification of Results in Competitions Subsequent to Sample Collection.

In addition to the automatic Disqualification of the results in the Competition which produced the positive Sample under Article 9 (Automatic Disqualifications

of Individual Results), all other competitive results obtained from the date a positive Sample was collected (whether In-Competition or Out-of-Competition), or other doping violation occurred, through the commencement of any Provisional Suspension or Ineligibility period, shall, unless fairness requires otherwise, be Disqualified with all of the resulting consequences including forfeiture of any medals, points and prizes.

**10.8 Commencement of Ineligibility Period.**

The period of Ineligibility shall start on the date of the hearing decision providing for Ineligibility or, if the hearing is waived, on the date Ineligibility is accepted or otherwise imposed. Any period of Provisional Suspension (whether imposed or voluntarily accepted) shall be credited against the total period of Ineligibility to be served. Where required by fairness, such as delays in the hearing process or other aspects of Doping Control not attributable to the Athlete, the body imposing the sanction may start the period of Ineligibility at an earlier date commencing as early as the date of Sample collection.

## 6. Gatlin's Arguments in the Present Case

6.1 Regarding his second violation, Mr. Gatlin alleges his positive test was the result of sabotage. He speculated that his physical therapist might have rubbed cream spiked with testosterone on his legs without his knowledge the night before and the day of drug testing on April 22, 2006. He asserted that he exercised "utmost caution" in attempting to keep prohibited substances out of his system. Therefore, he argues that under 10.5.1, this Panel should find for Mr. Gatlin under the No Fault or Negligence standard of care.

6.2 Mr. Gatlin points out that he supported USADA's efforts and served as its anti-doping spokesperson in 2005[23], and that he has been tested 35 times, before and after the 2006 positive test at the Kansas relays, and argues from that, that the 2006 test was an aberration, demonstrating that the 2006 test must have been from sabotage.

---

[23]   The Panel finds Mr. Gatlin's service commendable, but not probative of the present issues, other than USADA apparently agreed with the 2001 AAA Panel decision that Mr. Gatlin was "not a doper" and did not intend to cheat, and had not cheated through use of the ADD medication for which he tested positive at the time.

6.3   Mr. Gatlin requests that this Panel disregard comments to 10.5.2 which preclude a Panel from finding "No Fault or Negligence" when an athlete is sabotaged by a coach, physical therapist, or spouse.

6.4. Mr. Gatlin argues that, by showing that he did not administer the testosterone to himself, he has satisfied the provision of the WADA Code 10.5.1 which requires that the athlete show how the substance got into his system. He alleges that while he has produced no direct evidence to show how the testosterone got into his system, or even that the cream applied by his trainer was even spiked at all, he has eliminated all possible explanations for how the prohibited substance got into his system, except by sabotage. Thus, he argues, he has proved his case by elimination.

6.5   Mr. Gatlin also makes a back up argument for why an eight (8) year or life-time ban under WADA Code10.2 is inappropriate, in the event that the Panel finds he did not carry his burden of showing "no fault" in his 2006 doping violation. Namely, Mr. Gatlin argues that the eight (8) year sanction sought by USADA should be reduced because he has provided prompt and extraordinary assistance to the United States Internal Revenue Service's criminal investigation regarding doping in sport.

6.6   USADA has argued in response that the WADA Code's Article 10.5 requires that the athlete's assistance must "result in the Anti-Doping Organization discovering or establishing an anti-doping rule violation by another Person. . .", and that Mr. Gatlin's assistance, as extensive as it may have been, failed to meet that test. Mr. Gatlin responded that such a limitation is difficult to impossible to meet and is particularly prejudicial to innocent victims. The Panel finds much merit in Mr. Gatlin's position and the facts of his cooperation, which were substantiated by the pertinent government witness, supports the extensive, voluntary and unique

nature of Mr. Gatlin's assistance. The fact that the assistance has not, to date, resulted in conviction of another is not the responsibility of Mr. Gatlin in this instance.

6.7 Mr. Gatlin also argues that in any case where an athlete is faced with a life-time ban, the Panel should be extraordinarily vigilant in reviewing the circumstances of both violations, rather than merely applying by rote, a first offense/second offense calculation. The Panel is cognizant of the severity of the ban faced by Mr. Gatlin, but it is the ambiguity of the first doping violation holding and result which compelled this Panel to consider the circumstances of the 2001 decision in this case, rather than merely the severity of the potential award.

6.8 In attacking any reliance on his first violation as a basis for finding the present case to be a second violation, Mr. Gatlin first argues it is too old and too insignificant to count as a first offense. He argues that the WADA Code is somehow unfair in that it does not impose a time limit on the interval between the first violation and the second violation, as may be the case in other legal settings. For example, Mr. Gatlin asserts this Panel should consider the requirements of the United States Sentencing Commission Guidelines ("Guidelines") Manual for criminal cases, to determine an appropriate sanction for Mr. Gatlin's second violation. The Panel rejects this contention.[24]

6.9 Mr. Gatlin further argued that the Guidelines limit the duration of time an offense of a juvenile can be considered to five (5) years. He asserts that because the first event was in the 2001 U.S. Junior Nationals, an age restricted event, Mr. Gatlin, though 19 at the time, should be considered a minor for the purposes of the Panel's evaluation under the Guidelines. This argument is similarly rejected with the same cautionary note as with the prior argument.

---

[24] The Panel found this argument so wholly devoid of merit that it could likely subject Mr. Gatlin to sanctions if repeated at the CAS level.

6.10 Returning to the appropriate standards, Mr. Gatlin next argues that the WADA Code does not provide any mechanism to take into consideration the severity of a prior violation when determining the appropriate sanction for a subsequent violation. For this reason, he argues that the Panel should strike those portions of the WADA Code that violate public policy. The Panel does not consider it within its purview to strike the WADA Code or any portion of the WADA Code, but does consider it within its power to take into account all relevant circumstances in determining application of that Code and the sanctions, if any, imposed thereunder.

6.11 He argues that given the 2001 AAA Panel's decision on the first violation, there can be no serious contention that Mr. Gatlin should be treated the same as a person who intended to cheat on both occasions[25]. To subject Mr. Gatlin to an eight (8) year or life-time ban would violate proportionality and fundamental fairness. The Panel notes that, while the IAAF Code would impose a lifetime ban on Mr. Gatlin, it appears that USADA is cognizant of the circumstances of the first violation and has sought only a "maximum" of eight (8) years suspension rather than a lifetime ban. The Panel considers this recognition to be significant.

6.12 Because there was no provision for a finding of "no fault" in 2001, and hence the 2001 AAA Panel made no such finding, Mr. Gatlin argues that this Panel must now determine the appropriate category of fault for the first violation – effectively applying the current IAAF code retroactively to the facts of the first case. USADA has vigorously opposed this request on the reasonable ground that prior decisions should not be examined beyond their results, and certainly not be "retried" in essence.

6.13 This issue has given this Panel a great deal of pause, and lead to the reopening and supplemental briefing in this case. The Panel believes that, in determining the appropriate

---

[25] The Panel does not disagree, but notes that the IAAF Rules would require a lifeime ban for an athlete that was found to have "intended" to cheat on two occassions.

sanctions in this case, it should consider the facts and circumstances of the prior case and the underlying purposes for enhancing a punishment for a subsequent violation. It appears that the this necessity has been recognized by amendments to the WADA Code to now permit findings of "no fault" or "no significant fault" and that such findings are important in considering the imposition of sanctions for subsequent violations of the IAAF Rules, Indeed, it appears that USADA agrees, in that it has only sought a reduced penalty in this case, based on "the facts and circumstances surrounding Mr. Gatlin's positive test as reflected in *USADA v. Gatlin* (AAA 30 190 00546 01)..."

6.14 Turning to the 2001 doping violation by Mr. Gatlin, there appears to be no question that he had a legal right to take the prescription medication that caused his first violation, he was appropriately taking that prescription medicine to treat a properly diagnosed disability, and taking the medication outside of competition was not a violation of the IAAF Code in 2001, nor is it a violation now.

6.15 Based on the foregoing, Mr. Gatlin argued loosely that it would be a violation of United States law, specifically the Americans with Disabilities Act and the Rehabilitation Act ("ADA"), to base any enhancement of Mr. Gatlin's period of ineligibility on the use of such medication. He argues that USADA and the IAAF are required to make a "reasonable accommodation" for Mr. Gatlin. In this case, he argues, a reasonable accommodation would be to limit the effective time and scope of the first violation in considering the second violation.[26] The Panel first notes that Mr. Gatlin did not present reasoned arguments with respect to this claim, nor explicate the law as it might apply, nor apply the present facts to that law. Mr. Gatlin,

---

[26] The Panel suggests that the language requiring a "reasonable accomodation" refers to the event in question. In this case, the 2001 prescription medication for a diagnosed condition. Had Mr. Gatlin raised it in that matter, and USADA argued that it would take the failure to provide for a "reasonable accomodation" in 2001, in the event that Mr. Gatlin was involved a second time in a doping case, Mr. Gatlin would understandably and reasonably objected. *There is no claim in this matter that the use of exogenous testosterone was under physician's care or was required by any chronic condition of Mr. Gatlin.*

through his attorney, John P. Collins, in his Memorandum Regarding the Issue of "Fault" in the 2001 Arbitration, did present an argument relating to the applicability of the ADA to the first case, which noted that the "reasonable accommodation," in the first case should have been that "USADA provide" Mr. Gatlin "individualized notice on how far in advance of a competition he should stop taking his prescription medicine." The Panel agrees that the issue of a reasonable accommodation to permit the taking of a prescription drug should apply to the instance for which it is involved, namely here the 2001 violation. Apparently it was not argued then. In any event, the Panel finds neither that question, nor the question whether USADA should take on the duties of a personal physician and advisor is before it in this case. Asking this Panel to go back and consider that issue for the first case, truly would be a "retrial" of that case.

6.16 Mr. Gatlin then goes to the heart of his argument. He argues his first violation was vacated by the IAAF. Therefore, as a result of that action by the IAAF, there can be no first violation upon which to enhance the penalty in this case. Either the decision of a first doping violation was vacated and hence of no effect, or the IAAF, in finding "exceptional circumstances," implicitly made a finding of no fault or negligence for the first violation. It is this issue which has occupied this Panel and lead to the reopening of the record and supplemental briefing herein.

6.17 First, the Panel must note that the 2001 AAA Panel's decision was not overturned or vacated by the IAAF. That is not within the purview of the IAAF, but within that of the Court of Arbitration for Sport ("CAS"). Rather, the IAAF was able to act under its code to reinstate an athlete *despite* a finding of a doping violation, and that appears to be what was done in 2002. Second, the Panel must note that no appeal to CAS was taken from the 2001 first finding of a doping violation. Finally, the Panel notes that the 2001 AAA Panel decision, while "retain[ing]

full jurisdiction . . . so that it may reconsider the two-year suspension" which was imposed by that Panel, the 2001 AAA Panel did find a doping violation and did impose a period of ineligibility. Circumstances intervened so that, although retaining "full jurisdiction," the 2001 AAA Panel was never called upon by Mr. Gatlin to reconsider the case, nor did it take it upon itself to reconsider or otherwise finalize its decision and award once the IAAF found "exceptional circumstances" and reinstated Mr. Gatlin. That 2001 AAA Panel never surrendered jurisdiction either.

6.18 Mr. Gatlin argues that general equitable principles should estop USADA from relying on his first violation, since, as was found in the 2001 decision, USADA was at the time advising athletes generally simply to stop taking any problematic medications and that would be sufficient. There is no argument made that Mr. Gatlin was specifically advised on this point by USADA in 2001, nor that USADA advised athletes not to seek to document his therapeutic use and seek a Therapeutic Use Exemption (a "TUE"). Nevertheless, Mr. Gatlin argues, he followed this general advice and his clearly inadvertent and unknowing violation in 2001 should not be counted by USADA. The Panel finds some merit to this position and will discuss it further, below.

6.19 Mr. Gatlin further argued that only 2% of the world was testing junior athletes at their events in 2001 and, therefore, for the sake of harmonization, the Panel should limit the applicability of the first test. The Panel finds no merit to this argument, as there is no question that testing was being conducted, that it was properly conducted and accurate results were obtained in 2001. Seeking shelter behind an argument that others were not tested, so "why me," is so meritless as to be frivolous.

6.20 He argues that the WADA Code is a contract of adhesion. Therefore, any ambiguity in the Code must be interpreted in favor of Mr. Gatlin.

6.22 He argues the date of the commencement of the sanction imposed by this Panel should start from April 22, 2006, the date the sample was tested.

## 7. USADA's Arguments

7.1 USADA argues that, for Mr. Gatlin to obtain relief in the form of a reduction in the period of his suspension for his second violation, he must rebut the incontrovertible proof of the existence of a synthetic testosterone in his system with "strong and compelling" evidence that he was not at fault. USADA argues in order to meet this standard, Respondent must prove:

(i) How the synthetic testosterone entered his system;

(ii)That he was not at fault for entry of synthetic testosterone into his system; and

(iii)That his negligence did not contribute to the entry of synthetic testosterone into his system.

7.2 USADA argues that Mr. Gatlin has not proved how the synthetic testosterone entered his system therefore he cannot exclude the possibility of intentional use.

7.3 USADA argues that Mr. Gatlin did not present sufficient evidence to prove that his physical therapist, or anyone else, sabotaged him.

7.4 USADA argues it gave Mr. Gatlin the benefit of the unfortunate circumstances of his first doping violation in 2001, by self-imposing a reduction from a life-time ban to eight (8) years because of the nature of his first violation. If the Panel further reduced his period of ineligibility, USADA argues, it would be the equivalent of obtaining a double recognition of the circumstances of the first violation.

7.5 The WADA Code principle that an athlete is responsible for conduct of his entourage in providing him prohibited substances is essential, USADA argues, because otherwise a huge loophole will exist for athletes to seek to avoid penalties for drug use simply by having their coach, trainer or other support personnel take responsibility for causing the positive test.

7.6 USADA argues that Mr. Gatlin has not provided sufficiently substantial assistance to USADA to justify a reduction of any sanction. Specifically, USADA argues that while Mr. Gatlin may have provided substantial assistance to the U.S. Government, his assistance has not lead to the discovering or establishing of a listed anti-doping rule violation. This is required in order for this Panel to consider whether a reduction is appropriate under 10.5.3.

7.7 USADA argues that Mr. Gatlin's first violation should, if anything, be considered to involve a finding of "no significant fault or negligence" and as such his period of ineligibility should be reduced to eight (8) years under the IAAF Code, and for that reason, USADA has sought only eight (8) years. While USADA argues that Mr. Gatlin should be precluded from seeking a lower sanction based on this fact in light of USADA's unilateral reduction evidenced by the stipulation, that very stipulation explicitly states that "Mr. Gatlin reserves the right to contest the eight-year sanction recommended by USADA," (paragraph vi)and "nothing herein shall preclude either **USADA from recommending** or **Mr. Gatlin from seeking a lesser penalty** or no penalty…" (paragraph v). (Emphasis added). While USADA has not recommended a lesser penalty at this point, it clearly left open the potential.

7.8 USADA argues that this Panel has no authority to exercise any discretion to vary the penalties found in the Code where no "lacuna" in the provisions of the WADA Code is found. Mr. Gatlin's violations were for two serious doping offenses that did not involve "specified substances," such as in the first offense in the *Puerta* case, and "no significant fault" in both the

first and the second offense. USADA argues that *Puerta* found a lacuna and that the *Puerta* Panel decision was proper because 10.5.2 provides for a reduction when "*one*"of the offenses (emphasis in original) involved no significant fault or negligence, and that 10.5.2 did not cover the situation where "*both*" (emphasis original) involved "no significant fault" on the part of the athlete. Indeed, rather than being based essentially on the nature of the first offenes, the essential thrust of the Puerta case is found paragraph 11.7.22, where the panel concluded:

> [T]he fact is that the second offence does not, in the Panel's view, require the imposition of a sanction that would have the effect of bringing Mr. Puerta's career to an end.

That is not an issue in the present case where there is neither a finding of nosignificant fault, nor a technical or minor violation of the WADA Code. However, since the Panel finds its deliberations to be focused solely on the first offense, this is not relevant. What the Panel here finds relevant is the holding in Puerta that it does not have "general discretion" to impose such an award as the members might deem appropriate in the absence of clear guidelines, or if called on to act as a body reviewing a petition to determine if there are such "exceptional circumstances" as to justify a reduction in the period of suspension, notwithstanding the existence of a violation and the appropriate award under the rules (paragraph 11.7.25) and cautioning subsequent panels against being "tempted to find a gap or lacuna in the WADC. (at 11.7.27).

7.9 USADA argues Mr. Gatlin fails to prove that the WADA Code represents a contract of adhesion.

7.10 USADA argues the fact that Mr. Gatlin's first offense took place in a "junior" competition is also completely irrelevant. Further as Mr. Gatlin was 19 at the time, he was not a

minor. Attributing special status to a junior offense would undermine the consistent application of the rules as other athletes have had juvenile offenses considered prior offenses without any mitigation in penalty.

7.11 USADA argues if this Panel were to determine that "exceptional circumstances" may exist in relation to the first offense then it is this Panel's duty pursuant to IAAF ADR 38.16 to refer the matter to the IAAF Doping Review Board for consideration of the circumstances of the first offense, as was done in the case of the 2001 doping violation. Under no circumstances, USADA insists, is it appropriate under the applicable IAAF Anti-Doping Rules for this Panel to evaluate the fault level of the first violation.

7.12 USADA argues that any effort by this Panel to explain, supplement or go behind the written decision of the 2001 AAA Panel would constitute an improper collateral attack on the determination of the first panel. This is improper, USADA argues, because the introduction of new evidence to supplement a prior arbitration decision or to retry an issues that was, or could have been, decided in a prior arbitration proceeding will unnecessarily complicate and multiply proceedings. Attempting to supplement the record of a prior proceeding or to "investigate" the basis for a prior proceeding is inherently unreliable as memories fade, documents are lost, live witness testimony that was not transcribed cannot be reliably reproduced and the circumstances of the first case can never be precisely recreated. The parties to the prior decisions have a right to expect that the prior decision is final and should not have to be concerned that it is subject to change or retrying in a second proceeding. The prospect of going outside the written decision of the first panel presents the additional complication that a member of this Panel hearing the second arbitration, was also a member of the 2001 AAA Panel. Consequently, the danger exists

that a single arbitrator's view of the decision of the first panel could be given undue weight because he was a witness to the prior proceedings.

7.13 USADA argues that in 2001 the sanction for the use of an amphetamine in competition was a "minimum" two year period of ineligibility. This was clearly a serious offense. Thus some degree of fault must be assigned because Mr. Gatlin failed to abide by the IAAF rules in place in 2001 regarding medical exemptions.

7.14 USADA argues it is apparent that Mr. Gatlin was at least negligent and perhaps even significantly negligent for failing to follow the 2001 defined medical exemption process.

## 8. Legal Analysis and Decision

### (a) Gatlin failed to sustain his burden of proof regarding the second offense.

8.1 Mr. Gatlin accepts his positive test on April 22, 2006 as a second violation. However, he petitions this Panel to reduce the two-year sanction specified by the WADA Code to one of the following: (1) no sanction under 10.5.1 because he bears No Fault or Negligence for this positive test; (2) a reduced sanction (one year) under 10.5.2 because he bears No Significant Fault or Negligence for this positive test; and/or (2) a reduced sanction under 10.5.3 because he has provided Substantial Assistance in Discovering or establishing an Anti-Doping Rule Violation by Athlete Support Personnel and Others.

8.2 Mr. Gatlin must prove the following to obtain relief under 10.5.1 or 10.5.2: (1) under 10.5.1 that he bears No Fault or Negligence or under 10.5.2 that he bears No Significant Fault or Negligence for the violation and (2) how the Prohibited Substance entered his body. The definition of No Fault or Negligence establishes the standard of care Mr. Gatlin must meet to satisfy the first part of this two-part test under 10.5.1. It states the following:

The Athlete's establishing that he or she did not know or suspect, and could not reasonably have known or suspected even with the exercise of utmost caution, that he or she had Used or been administered the *Prohibited Substance* or *Prohibited Method*.[27]

8.3 The definition of No Significant Fault or Negligence under 10.5.2 is as follows:

The Athlete's establishing that his or her fault or negligence, when viewed in the totality of the circumstances and taking into account the criteria for No Fault or Negligence, was not significant in relationship to the anti-doping rule violation.[28]

8.5 Mr. Gatlin testified that he believes his physical therapist sabotaged him by rubbing cream on his legs that contained testosterone[29]. He stated this happened the night before his April 22, 2006 doping control test at the Kansas Relays and the day of his test, right before he provided a urine sample to drug control.[30] He testified that having the physical therapist rub cream on his legs right before drug control was a change in protocol.[31] He testified that the cream the physical therapist rubbed on him felt different than at other times. It had a tingly feeling.[32] However, Mr. Gatlin admitted that he never asked why the cream used in 2006 felt different, which alone might be sufficient to demonstrate that he did not exercise "utmost caution",[33] and the testimony of the trainer Mr. Whetstine was that the product came in a lipid (or oily) base as well as a lighter based used previously, and that was the difference. He denied that the product was otherwise different from that previously used or that he otherwise switched products on Mr. Gatlin. While the Panel might not expect Mr. Whetstine to admit to such

---

[27] WADA Code, Appendix 1, page 76.

[28] *Id.*

[29]     The Panel has considered this argument and the evidence presented in support, even though it may be an open issue as to whether Mr. Whetstine was a member of Mr. Gatlin's "entourage." The evidence indicated that, while Mr. Whetstine worked with other athletes as well, he regularly attended to Mr. Gatlin and had virtually unrestricted access to him.
[30] Transcript of Proceedings, *USADA v. Justin Gatlin*, AAA No. 30 190 00170 07, Atlanta, Georgia ("Transcript") (July 30 – August 1, 2007) pp.89:3-91:5;93:18-21.
[31] *Id.* at 99:16-100:13.
[32] *Id.* at p. 93:18-21.
[33]     . In addition, it appears that Volteran cream is a prescription item, and Mr. Gatlin had no prescription, the product being obtained by the trainer in Europe or elsewhere.

underhanded activity (if it occurred), the fact is that there is no substantiation of Mr. Gatlin's naked claim.

8.6 He submitted evidence that the physical therapist had a motive for sabotaging him. The physical therapist had requested a $5,000 bonus from Mr. Gatlin, which his agent, Renaldo Nehemiah had rejected. Evidence was introduced to show that the physical therapist may have had an unrealistic view of his significance to Mr. Gatlin. In noting Mr. Gatlin's accomplishments, the physical therapist used the term "we," including himself as an individual who won the world championships. The physical therapist testified as follows:

> Yes. When we were in Yokohama in 2006, I had a professional meeting with Renaldo wherein I discussed the possibility of a consideration – I offered up for consideration the idea of having his client consider bonusing me. I mean, we had experienced a great deal of success, as well published in the papers and seen on television, and, you know, we had the world – I mean, we were, the world championships, gold medals in the Olympics. I mean, I just offered up the idea. I put it in his hands. [34]

8.7 The physical therapist also knew that after his bonus request, Mr. Gatlin's group was trying to terminate him.[35] This was the extent of Mr. Gatlin's circumstantial evidence of sabotage. There was no evidence that any of the creams used by the physical therapist actually tested positive.

8.8 There was some hearsay testimony regarding the physical therapist using a different tube of cream from his pocket with Mr. Gatlin than with other athletes at the Kansas event. However, Mr. Gatlin did not observe this directly and did not present the witnesses who allegedly observed this conduct. There was some testimony regarding a tube of cream in the physical therapist's hotel room that showed the symbol of a product that might have contained testosterone. Again, Mr. Gatlin did not observe this directly and the witnesses who allegedly

---

[34] *Id.* at 572:13-25.
[35] *Id.* at p. 532:13-535:8.

observed this did not testify. The testimony in this regard was not credible, was not substantiated, and what efforts were made to substantiate the claim were not originally presented by Mr. Gatlin, and when requested to do so, actually refuted any claim of a tainted ointment or cream.

8.9 More importantly, the evidence submitted by Mr. Gatlin did not eliminate the possibility of intentional use or the possibility that he was the unwitting victim of doping by members of his coaching staff. Mr. Gatlin testified that he had been given an injection, supposedly of vitamin B12, by his assistant coach, Randall Evans, before the Kansas Relays at which he testified positive. Mr. Gatlin testified that this was very unusual to be given an injection by the coaching staff, but believed that it was approved by his doctor, Dr. Martini. Yet, he did not produce either Randall Evans or Dr. Martini as a witness to verify this information.[36] Mr. Gatlin testified that in April, prior to the Kansas Relays, his hamstring was not fully healed and that was the reason for the shot.[37] However, if that injection actually contained testosterone, that could have caused the positive test. Also, Mr. Gatlin testified to being given a Voltaren pill (anti-inflammatory) by coach Evans. That pill could have likewise contained testosterone. In either case, as it was administered by his coach, it would not qualify as an instance of "no fault" or "no significant fault." During his testimony concerning the alleged B-12 shot, and on cross examination, Mr. Gatlin exhibited some uncertainty as to dates and sequences, and subsequent documentation supported a conclusion that more than just the one shot was administered to Mr.

---

[36] *Id.* at 223:2-234:15.
[37]     Mr. Gatlin's leg problems in March to April of 2006 were corroborated by his massage therapist, Ms. Blankenship.

Gatlin during the Spring of 2006.[38]. Similarly, Mr. Gatlin expressed some contradictory testimony about the nature and color of the supposed Volteran pill.

8.10   Simply stated, this Panel does not know with any degree of confidence how the testosterone entered Mr. Gatlin's system; transdermally or by pill or injection.[39]  Mr. Gatlin's expert, Dr. Black, testified that certain food supplements given to him for analysis did not contain any prohibited substances. Based on this absence of evidence, Mr. Gatlin argued that he eliminated anything that he self-administered which could have resulted in the positive test. The Panel finds this kind of argumentation for an inference from the absence of evidence not probative of anything and singularly unhelpful.  That would not establish that Dr. Black had the right supplements to test in the first place, nor that the testosterone was not administered by shot, pill or otherwise.  Dr. Black admitted that he could not say how the testosterone entered Mr. Gatlin's system.  Most significantly, Mr. Gatlin testified that Dr Black did not test any creams, including Volteran cream, whether obtained from Mr. Gatlin's trainer or otherwise.  Since Mr. Gatlin's theory of sabotage relied upon application of a topical cream, that might have proved more helpful.

In this regard, USADA makes a strong argument.  If Mr. Gatlin cannot prove how the testosterone entered his system, and he did not, he cannot prove two significant facts.  First, that it was the physical therapist that placed the testosterone in his system transdermally; and second, that he did not intentionally take testosterone.  Furthermore, despite the initial representations that creams were not tested by Dr. Black, that turned out not to be the case.  Dr. Black was provided with a number of cream or ointment products obtained from Mr. Gatlin's trainer, who

---

[38]    Ms. Blankenship also testified that, while she did not see any injection sites while working on Mr. Gatlin, the evidence showed that he could have had as many as 3 shots in the Spring of 2006, and she did not see those either.  Hence, the Panel finds Ms. Blankenships' testimony to be not probative and unhelpful.
[39] Id. at p.749:21-750:3.

had allegedly applied the suspected cream upon which the sabotage theory is based. Mr.Whetstine testified that he provided Mr. Gatlin's investigators with samples of these therapeutic creams in 2006 upon request.

8.11  Finally, while Mr. Gatlin seems like a complete gentlemen, and was genuinely and deeply upset during his testimony, the Panel cannot eliminate the possibility that Mr. Gatlin intentionally took testosterone, or accepted it from a coach, even though he testified to the contrary. Thus, by failing to prove how the testosterone entered his system, as required by 10.5.1 and 105.2, Mr. Gatlin has failed to sustain his burden of proof to show that he had either No Fault or Negligence or  No Significant Fault or Negligence, and the Panel so finds.

### (b)  The WADA Code is Lawful and Enforceable

8.12  Mr. Gatlin argues that the WADA Code is a contract that is in violation of U.S. and Swiss law and public policy  Consequently, Mr. Gatlin states "… the proper remedy here is for this Hearing Panel to strike those portions of the contract that are illegal and violate public policy; namely, to strike the enhance penalty for a second violation.  (Gatlin Prehearing Brief at 12).  The Panel finds the argument unpersuasive and unsupported.

### (i)  Even if a Contract of Adhesion, the WADA Code Applies

8.13  Mr. Gatlin argues that the WADA Code constitutes a "contract of adhesion" and quotes from Black's Law Dictionary for a definition.  His solitary argument, however, is that any ambiguity should, therefore, be construed against WADA and in favor of the individual.  Mr. Gatlin's judicious limitation on his attack based on this theory is well considered.  Even if a contract of adhesion, that does not make the arbitration agreement binding Mr. Gatlin to performance under the WADA Code unenforceable.

8.14    U.S law strongly favors the arbitration of disputes and the enforcement of agreements to arbitrate. *First Options of Chicago, Inc, v. Kaplan*, 514 U.S. 938, 945 (1995); *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-5 (1983); *In re Prudential Ins. Co. of America Sales Practice Litig. All Agent Actions*, 133 F.3d 225, 231 (3d Cir. 1998). *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002). Congress specifically enacted the Federal Arbitration Act ("FAA") to "revers[e] centuries of judicial hostility to arbitration agreements" by "plac[ing] arbitration agreements upon the same footing as other contracts." *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1113 (3d Cir. 1993) (*quoting Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 225-26 (1987)); *Harris v. Green Tree Financial Corp.*, 183 F.3d 173, 178 (3d Cir. 1999) (citing *Shearson/American Express* and *Pritzker*). Federal law, thus, "presumptively favors the enforcement of arbitration agreements." *Harris*, 183 F.3d at 178 (citing *In re Prudential Ins Co.*, 133 F.3d at 231).

8.15    Arbitration agreements are particularly favored for resolving disputes between individuals and corporations: "We agree that Congress, when enacting [the FAA], had the needs of consumers, as well as others, in mind ... [t]he act, by avoiding the delay and expense of litigation, will appeal to big business and little business alike, corporate interests [and] individuals. Indeed, arbitration's advantages often would seem helpful to individuals [...] who need a less expensive alternative to litigation." *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 280 (1995) (citations omitted). Agreements to arbitrate remain favored and enforceable even in the face of alleged disparity in the parties' bargaining power. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32-33 (1991); *Harris*, 183 F.3d 173.

> The mere fact that there is a lack of equivalence between the performances of the parties does not even get close to the establishment of unconscionability. A harsh result alone is an insufficient ground for a finding of unconscionability. Superior bargaining power is not in itself a ground for striking down a resultant contract as unconscionable.

7-29 CORBIN ON CONTRACTS § 29.4.

8.16    Moreover, a finding of unconscionability requires a two-fold determination – that **both** "procedural" and "substantive" unconscionability are present. *Harris*, 183 F.3d at 181; *Bullick v. Sterling Inc.*, 2004 U.S. Dist. LEXIS 21128, *20-21 (E.D. Pa. 2004).   Procedural unconscionability pertains to the process by which an agreement is reached and substantive unconscionability refers to the contents of the agreement. *Harris*, 183 F.3d at 182.  At most, Mr. Gatlin has challenged the procedural aspects of the contract by which he is bound to the WADA Code.

8.17    There are clearly legitimate sports "realities" that have lead to the adoption of a comprehensive anti-doping code, and those realities include the fact that adherence cannot be voluntary, nor different from athlete to athlete.

8.18    However, Mr. Gatlin's position that the contract was not negotiated by him, and therefore any terms, if ambiguous, ought to be construed in a light most favorable to him, is a long established maxim of contract interpretation.

### (ii)    Neither U.S. nor Swiss law invalidates the WADA Code

8.19    Even accepting Mr. Gatlin's arguments that Swiss law would, under some circumstances, invalidate the provisions of the WADA Code that relate to second offenses, namely the failure to have a "sunset" provision that would eventually negate a prior offense as a relevant consideration, and even accepting his arguments that WADA has recognized this and proposed changes to avoid that issue, at most Mr. Gatlin has established that a time limit of less

than eight (8) years would be presumptively reasonable. In light of the fact that the 2001 positive test was only 5 years prior to the 2006 positive test (and the award only 4 years prior to the 2006 event), the Panel concludes it need not consider this argument further. The references by Mr. Gatlin to the United States Sentencing Guidelines for criminal offenses is singularly irrelevant and would, in any event, merely establish that even for incarceration, a sentence imposed as long ago as 10 or 15 years would be pertinent for determining recidivism.

### (iii) Mr. Gatlin has not presented evidence that the WADA Code violates public policy

8..20  Mr. Gatlin's argument appears in a single paragraph and makes no attempt to explain how the Americans with Disabilities Act or the Rehabilitation Act would apply, or how the facts of this case should be viewed in light of those statutes. The argument is essentially that USADA must make a "reasonable accommodation" for individuals with disabilities, and then goes on to suggest that the appropriate "accommodation" is that the enhancement provisions of the WADA Code for a second violation not be applied to Mr. Gatlin – again by reason of the limitation in time of the applicability of the first offense. While the Panel finds that the issues have not been presented adequately to preserve any claim by Mr. Gatlin on this subject, we observe that what constitutes a reasonable accommodation would likely vary case by case, and since the claim is made only as to the first offense and not the second, the time to have done so was in 2001.

### (c) Consideration of a reduction under 10.5.3

8.21  This Panel next considers whether to reduce Mr. Gatlin's period of ineligibility under WADA Code 10.5.3. The language under 10.5.3 is permissive. It states in part, the Anti-Doping Organization "may also reduce the period of Ineligibility in an individual case where the

Athlete has provided substantial assistance to the Anti-Doping Organization which results in the Anti-Doping Organization discovering or establishing an anti-doping rule violation by another Person . . ."

8.22 The term "may" provides this Panel with the discretion whether to reduce the period of ineligibility if the athlete satisfies the requirements of 10.5.3. The Panel finds that Mr. Gatlin has provided substantial assistance to the United States Government in investigating doping in sport. He immediately cooperated with the IRS without hesitation. He made undercover calls.[40] He wore a wire, putting himself at risk. While USADA contended that Mr. Gatlin did not "cooperate" with it in any investigations and ought not be given credit under 10.5.1, USADA did concede (See, USADA Prehearing Brief, at 14) that that it reserved judgment as to whether the assistance to the U.S. government would be sufficient to justify a reduction. Moreover, the record reflects that USADA never sought to avail itself of Mr. Gatlin's assistance, and that is not within Mr. Gatlin's control. USADA did enjoy the fruits of the investigation and assisted the IRS with advice. The record reflects extended assistance to the United States Government, which goes far beyond the contemplated assistance to anti-doping sports authorities.

8.23 In considering, however, whether such cooperation was sufficient under the WADA Code to justify a reduction, the Panel must first analyze the language of Section 10.5.3, indicating that discretion should be based on the cooperation resulting in ". . . the Anti-Doping Organization discovering or establishing an anti-doping rule violation by another Person...." At this stage of the proceedings, there is no evidence that it has been established that any other person or organization definitely has been discovered involved in doping violations. However, the Panel is faced with the fact that the U.S. government agency involved was willing only to give limited information of a conclusory nature rather than specifics, and that the investigation is

---

[40] Id. at 162:23-164:25.

apparently still on going.  Hence, there may or may not be information which has is the "discovery" of the identify of persons involved in doping in sport, and the investigation, in which Mr. Gatlin clearly assisted, may yet result in such a "discovery."  Hence, the Panel finds that under the particular circumstances of this case, and the general principles of equity, it retains the discretion to consider a reduction in the award in this matter.

8.24 The Panel must consider, however, that Mr. Gatlin has tested positive for testosterone, a very serious violation and weigh that against the assistance given the anti-doping authorities.

(d)     No Reduction under 10.8

8.25. Mr. Gatlin also requests that we start his sanction from the date of the positive test on April 22, 2006 because he  was not told about his April 22, 2006 test until June 15, 2006.  The parties have submitted no evidence that would allow this Panel to conclude that the delay was intentional or negligent on the part of USADA, but there was an unusually long period of time between test and notification.  As this was Mr. Gatlin's burden to prove, he has failed to sustain his burden of proof and the Panel declines to start his sanction from the date the urine specimen was collected.  However, the Panel declines to adopt the start date proposed by USADA of August 15, 2006.

# DECISION

# AWARD

**Mr. Gatlin's liability for the doping violation.**

9.1    Since there is no question that there has been a 2006 doping violation, the major issue before the Panel is whether the eight (8) year suspension sought by USADA[41] because of Mr. Gatlin's first violation in 2001. The WADA Code provides that with respect to a doping violation, the Athlete shall have the opportunity to establish the basis for eliminating or reducing the sanction as provided in Article 10.5.1.[42] In pertinent part, it states:

> If the Athlete establishes in an individual case involving an anti-doping rule violation . . . that he or she bears No Fault or Negligence for the violation, the otherwise applicable period of Ineligibility shall be eliminated. . . . . The athlete must also establish how the Prohibited Substance entered his or her system in order to have the period of Ineligibility eliminated.  In the event this Article is applied and the period of Ineligibility otherwise applicable is eliminated, the anti-doping rule violation shall not be considered a violation for the limited purpose of determining the period of Ineligibility for multiple violations under Article 10.2, 10.3 and 10.6.

9.2 The Panel finds that this provision means what it says.  If an athlete is has "no fault" for a violation, then that particular violation "shall not be considered a violation" for purposes of enhancing a penalty for a subsequent violation.  This concept comports with the principle of fundamental fairness.

9.3  The real dilemma for this Panel in evaluating Mr. Gatlin's first violation is that given the procedural history of the case, the 2001 AAA Panel did not make a finding of whether Mr. Gatlin was at fault for his first violation.   At the time of the 2001 AAA Panel decision, the WADA Code had not been adopted and there was no such provision for a "no fault" reduction - and hence no reason for the 2001 AAA Panel to have done so.  Were that 2001 case heard today, under CAS legal precedent and the WADA Code, it is clear that any Panel hearing that case would have to consider the nature of the fault involved if presented by a respondent.  That,

---

[41]    In light of the stipulation of USADA, a lifetime ban for a second offense is not at issue.
[42] WADA Code Article 10.3.

however, is not the set of circumstances facing the Panel. This Panel, as detailed above, has been asked to consider whether a "no fault" finding would have or should have been made in the 2001 AAA Panel decision, and whether this Panel may do so now.

9.4    In *Puerta v. International Tennis Federation* CAS 2006/A/1025, the CAS panel found that the underlying International Tennis Federation ("ITF") panel failed to take into consideration the circumstances of the first offense in imposing an eight year sanction on the Athlete for his second doping offense. [43] The CAS panel in *Puerta* found that the imposition of an eight-year period of ineligibility would effectively put an end to the Athlete's career. Given this drastic sanction, the CAS panel considered the circumstances of the first case.[44] Given its review of the first violation, the CAS panel gave Mr. Puerta a two (2) year sanction rather than the eight (8) year sanction imposed by the ITF. We concur with the *Puerta* reasoning and gave consideration to the circumstances of the first violation, which includes evaluating Mr. Gatlin's level of fault.

9.5    USADA has argued that the *Puerta* panel action was proper under the circumstances because there was a gap or lacuna in the WADA Code and that the facts before it involved a "unique factual circumstance that 'may never arise again' ... that was not covered by the express language of the Code." (USADA Prehearing brief at 16). The Panel respectfully observes that the likelihood of an athlete having two offense, both of which involve a finding of "no significant fault," is far higher than the case presently before this Panel, where the athlete in question has received the assistance and cooperation of an anti-doping agency (USADA) in securing an immediate reinstatement from the governing body (IAAF), because the AAA Panel found that the athlete did not cheat, did not intend to cheat and had observed standard, accepted

---

[43] *Puerta, supra,* at ¶11.7.6.
[44] *Puerta, supra,* at ¶11..7.22.; ¶11.7.14.

and recommend procedures to manage prescribed, therapeutic medications. While in the present case the respondent did not carry his burden of showing no significant fault in the second violation, we find that is not the question that faces the Panel.

In *Puerta*, there was in the first instance, a self-medication before an event, without an historical diagnosis or prescribed medication for a chronic problem. Also, in Puerta, while the suspension was reduced by the Panel in the first offense for no significant fault, it was still a finding of a first offense with the imposition of a penalty and, therefore, it should have been considered as a first offense.. This Panel also disagrees with USADA's distinction of the Puerta lacuna from the facts of this case. 10.5.2, which governed the *Puerta* case, provides:

> This Article 10.5.2 applies only to anti-doping rule violations involving Article 2.1 (Presence of Prohibited Substance or its Metabolites or Markers), Use of Prohibited Substance or Prohibited Method under Article 2.2, failing to submit to Sample collection under Article 2.3, or administration of a Prohibited Substance or Prohibited Method under Article 2.8. If an Athlete establishes in an individual case involving such violations that he or she bears No Significant Fault or Negligence, then the period of Ineligibility may be reduced, but the reduced period of Ineligibility may not be less than one-half of the minimum period of Ineligibility otherwise applicable. If the otherwise applicable period of Ineligibility is a lifetime, the reduced period under this section may be no less than 8 years. When a Prohibited Substance or its Markers or Metabolites is detected in an Athlete's Specimen in violation of Article 2.1 (Presence of Prohibited Substance), the Athlete must also establish how the Prohibited Substance entered his or her system in order to have the period of Ineligibility reduced.

Code provision 10.5.2 does not provide, as USADA argues, that the section applies only to one rather than two instances of a finding of "no significant fault." It applies in any given specific "... individual case...," and that in the case of a second offense, it ought not be reduced to less than 8 years. That section makes no mention of the first offense, which may be the lacuna mentioned by the *Puerta* Panel. In contrast, 10.5.1, which is the basis of the arguments presented by Mr. Gatlin that the first offense ought be considered a "no fault" event, specifically

contemplates analysis of the first offense in determining the penalty for the second offense, and provides:

> If the Athlete establishes in an individual case involving an anti-doping rule violation under Article 2.1 (Presence of Prohibited Substance or its Metabolites or Makers) or Use of a Prohibited Substance or Prohibited Method under Article 2.2 that he or she bears No Fault or Negligence for the violation, the otherwise applicable period of Ineligibility shall be eliminated. When a Prohibited Substance or its Markers or Metabolites is detected in an Athlete's Specimen in violation of Article 2.1 (Presence of Prohibited Substance). The Athlete must also establish how the Prohibited Substance entered his or her system in order to have the period of Ineligibility eliminated. *In the event this Article is applied and the period of Ineligibility otherwise applicable is eliminated, the anti-doping rule violation shall not be considered a violation for the Limited purpose of determining the period of Ineligibility for multiple violations* under Article 10.2, 10.3 and 10.6. (emphasis added).

In the instant case, while the language of 10.5.1 specifically requires consideration of the circumstances of the first offense, *no provision is made for a case in which the first offense predates the WADA Code and for which no finding of fault is required or even expected.* This Panel is faced with a requirement to consider the fault level of the first offense, without the benefit of any holding on that question due to the age of that case – but for which the Panel found no cheating or intent to cheat, and for which the IAAF "eliminated" the remainder of the "period of ineligibility otherwise applicable," with the active assistance of USADA. The IAAF did not eliminate the penalty. If ever there were a lacuna in the rules, and a unique set of facts, this case should qualify.

Since it is 10.5.1. which must be addressed, the level of fault in the second offense is not relevant to the determination whether the first offense ought be treated as one.

8.21 USADA's argument that the Panel should not look beyond the face of the decision by the 2001 AAA Panel, is in conflict with its own position in this case. USADA has stipulated that it has considered the fact and circumstances of the first case, and argued in its brief and at

oral arguments that Mr. Gatlin's conduct in his first violation comes under the standard of "No Significant Fault or Negligence," thereby justifying a reduction from a lifetime to an eight (8) year ban.[45] However, the 2001 AAA Panel made no such finding (nor a finding of "no fault"). If the nature of the decision is to be analyzed and the result characterized under the modern rubric of the Code as it exists today, which is apparently what USADA itself has done, it should be the task of this Panel.

9.6     The Panel is sympathetic to and credits USADA's argument that the 2001 case ought not be retried. The Panel has not done so and has in previous communications with the parties, explicitly set out that it is not interested in doing so. Nor is this Panel collaterally attacking the 2001 AAA Panel's interim decision. The Panel sees no reason to do so, even were it within the Panel's power, which it is not. Rather, the Panel has been asked to determine whether, from the language of the decision below, in light of the totality of circumstances in the 2001 case, the 2001 AAA Panel can be considered essentially to have made a finding of "no fault" on the part of Mr. Gatlin (since USADA appears to concede that the 2001 Panel should be held to have found at least "no significant fault.")

9.7     While the Panel credits USADA's arguments concerning the problems with unnecessarily complicating or multiplying proceedings, memory fading, the availability of evidence, the right to expect a final decision and the like, the Panel is not retrying that case. Rather, the Panel has been asked to determine the meaning of the reported decision, a process to which Mr. Gatlin is entitled given the second offense nature of the current matter[46].     To do otherwise would not be in accord with either the language or the intent of the Code.

---

[45] Transcript, *supra*, at pp. 42:6-46:5.  See also, USADA Prehearing Brief at 15. ("... where one of the offenses involves 'no significant fault or negligence' ... then the period of ineligibility is 8 years."
[46]     The Panel does not consider the fact that Mr. Gatlin faces an 8 year ban as opposed to a lifetime ban, as altering its obligations in this case.

9.8    While it has previously been quoted herein, the importance of WADA Code

provision 10.5.1 warrants its repetition:

> If the Athlete establishes in an individual case involving an anti-doping rule
> violation under Article 2.1 (Presence of Prohibited Substance or its Metabolites or
> Makers) or Use of a Prohibited Substance or Prohibited Method under Article 2.2
> ***that he or she bears No Fault*** or Negligence for the violation, the otherwise
> applicable period of Ineligibility shall be eliminated.  When a Prohibited
> Substance or its Markers or Metabolites is detected in an Athlete's Specimen in
> violation of Article 2.1 (Presence of Prohibited Substance). The Athlete must also
> establish how the Prohibited Substance entered his or her system in order to have
> the period of Ineligibility eliminated.  In the event this Article is applied and the
> period of Ineligibility otherwise applicable is eliminated, the anti-doping rule
> violation shall not be considered a violation for the Limited purpose of
> determining the period of Ineligibility for multiple violations under Article 10.2,
> 10.3 and 10.6.

10.5.1 does not purport to exclude the ability of an athlete to establish no fault for a

doping offense under an anti-doping regime which predated its enactment, and the Panel finds

that it would be inappropriate to construe such a limitation into the plain language of the Code.

In such a case, as with the case before this Panel, it would be unfair and inequitable to hold that

an athlete could not enjoy the privilege of 10.5.1, merely because at the time of the first doping

violation, there was no reason to make such a finding as it was not contemplated by the Code.

That would create two classes of athletes, with two different sets of rights, based solely on an

accident of timing.  While this Panel has not credited Mr. Gatlin's arguments that that the first

doping violation ought not be counted simply because it is too old, the Panel conversely holds

that it cannot ignore the exception of 10.5.1, simply because the first offense decision was too

old.

9.9  USADA, despite its own position that Mr. Gatlin has been treated in this case as

though there had been a finding of "no significant fault," nevertheless argues that only the IAAF,

pursuant to IAAF ADR 38.16, has the ability to determine how that first violation should be

viewed. USADA argues that, should this Panel believe that the 2001 AAA Panel decision should be construed as having found "no fault," it must then refer this matter to the IAAF for a determination as to reinstatement for "exceptional circumstances," much as was done in the first case. While Mr. Gatlin is free to do so, the Panel respectfully disagrees with the conclusion that this option divests the Panel of jurisdiction over the question. This Panel must make a determination in the first instance if it can do so, and should not abdicate its responsibility simply because the issue may also be addressed by another body or because it is difficult.

It is precisely because of this obligation that the Panel found itself faced with the necessity of providing the parties with an opportunity to supplement the record to give the Panel the information necessary to accomplish this analysis. While the record was reopened, unfortunately neither party, and in particular Mr. Gatlin, was able to provide all the information sought by the Panel and what information was provided, took longer than expected. The Panel had expected that the request for additional information and argument would shed light on the nature of the finding in respect to the first offense, but that expectation was dashed and the Panel cannot engage in speculation.

9.10    In addition, in the 2001 case, Mr. Gatlin specifically requested, and USADA agreed, to refer the matter to the IAAF. Neither Mr. Gatlin nor USADA has made such a request in this case. The Panel cannot and will not refer the matter to the IAAF without the consent of the parties. [47]

9.11  Finally, USADA's argument that the Panel has been or could be influenced by one of its Panel members in construing that 2001 AAA Panel decision, is not well founded. The

---

[47] USOC Due Process Checklist, http://www.usolympicteam.com/USOCDueProcessChecklist.pdf.; See also Legal Opinion on the Conformity of Certain Provisions of the Draft World Anti-Doping Code wit Commonly Accepted Principles of International Law, Kaufmann-Kohler et al., (citing Article 14 of the UN Covenant on Civil Rights which provides that a party must have a competent, independent and impartial tribunal) http://www.wada-ama.org/rtecontent/document/kaufmann-kohler-full.pdf

Panel members are arbitrators, each capable of independent analysis and consideration of the facts and law. They are not witnesses, and in any event the Panel has not gone beyond the language of the 2001 AAA Panel decision and the record events surrounding that decision. The Panel has not tried to go behind the facts of that decision.

9.12 Mr. Gatlin's first offense occurred in his first IAAF event in June of 2001. The WADA Code was not enacted 2001. There was no "utmost caution" standard of care for a finding of no fault as presently exists under WADA Code 10.5.1. The standard of care was general negligence.[48] As such, in evaluating his first offense, Mr. Gatlin had a substantive right to have the first violation evaluated under general negligence, and the Panel sees no reason to conclude that was not done. [49] However, the Panel must be vigilant not to confuse the issues. Hence, it cannot merely rely on the observations of the 2001 AAA Panel as to the generally unintentional nature of the 2001 offense, to find that there was "no fault" under the "utmost caution" standard. The exception to the imposition of an enhanced penalty when the first offense was found to be a "no fault" offense, is based on the current WADA Code, which requires that the "no fault" finding be under the prevailing "utmost caution" standard, not the old, simple negligence standard.

9.13 The negligence standard may be expressed as follows: "the failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not do. *Ford Motor Co. v. Burdeshaw* (1995) 661 So. 2d 236, 238.

---

[48] This was an admission of USADA in a tribunal proceeding. USADA in *Neben v. USADA*, AAA No. 30 190 00713 03 (2003), dissenting opinion page 3, ¶10.

[49] *Cannon v. University of Chicago* (1979) 441 U.S. 677, 732, 99 S.Ct. 1946, 1976 (negligence is a substantive standard); *Elsner v. Uvegeus* et al. (2004) 34 Cal. 4th 915, 928; 102 dP.3d 915, 939 (retroactive application of standard of care is impermissible); *Grover v. Dr. W..E. ISOM et al* (2002) 137 Idaho 770, 775, 53 P.3d 821,826(standard of care is not procedural).

9.14 Mr. Gatlin has argued that the USATF Manual in effect in 2001 included references for the use of athletes suffering from ADD, but that the specific reference did not state that an athlete suffering from ADD should seek a TUE exemption. He does not address the question whether the Manual otherwise describes the process and direct athletes generally to seek a therapeutic use exemption if they are taking any product which might result in a finding of a doping violation. Nor does Mr. Gatlin argue that the USATF Manual advises athletes that they need not seek a physician's guidance or that any specific period of discontinuance would be sufficient that a doping violation will not be found. This is one of the documents specifically requested by the Panel so that it could be reviewed in light of the arguments being raised. It was not produced despite the granting of ample opportunity to so produce.

9.15 Mr. Gatlin has also argued that the alleged advice by USATF to discontinue any problematic medication prior to competition was echoed by USADA. Mr. Gatlin argues that USADA advised on its website that an athlete suffering from ADD should discontinue use of his or her medication prior to an event. Once again, however, Mr. Gatlin does not allege that USADA made any representations that mere cessation would be sufficient to avoid a finding of a doping violation, or that it would result in a negative urine test, or that any particular period of cessation prior to competition would be considered sufficient. Once again, this is a piece of evidence for which the Panel expressly reopened the record in this case, but to no avail as it was not produced.

9.16 While the Panel does not have either the USATF or the USADA materials in the record, it is undisputed that Mr. Gatlin did not seek from IAAF a therapeutic use exemption for his medication[50], and his position can be described as a lack of knowledge that he needed one, and that he followed practices of other athletes or coaches. It is also apparently undisputed, and

---

[50]     See also, the 2001 Panel decision at paragraph 8.

was found by the 2001 Panel, that Mr. Gatlin had disclosed his medications to representatives fo the University of Tennessee, where he was enrolled and behalf of which he competed at the time of his positive test in 2001. (2001 Decision at ¶8.)

9.17    Nevertheless, Mr. Gatlin stated in his 2002 petition for reinstatement that he had received a "... notice concerning the potential use of prohibited substances. This notice, which he filled out and turned in approximately three months before the event, merely stated that an individual taking prescription medicine should contact USADA." (at 4)  2There is nothing in the record before this Panel which would indiate that Mr. Gatlin complied with the advice and "contact[ed] USADA," nor that the notice "which he filled out and turned in" disclosed use of the prohibited amphetamine.

9.18    The parties did produce the IAAF Procedural Guidelines for Doping Control, 2000 Edition, which contained both an anti-doping provision (Rule 55):

55.2 The offence of doping takes place when . . .:

(i) a prohibited substance is found to be present within an athlete's body ... fluids;

55.5 An athlete may request the Anti-doping Commission to grant prior exemption allowing him to take a substance normally prohibited under IAAF Rules. Such an exemption will only be granted in cases of clear and compelling clinical need. Details of the procedure for such an application are to be found in the "Procedural Guidelines for Doping Control".

and the "Procedural Guidelines for Doping Control" contains a specific TUE provision, which reads as follows:

5.1 IAAF Rules 55.5 was introduced in order to make it possible for an athlete to participate in sport who, for a limited or prolonged period of time, needs a prohibited substance for medical reasons .

5.2 Exemption will not, therefore, normally be granted in cases of acute disease and never when sporting activity may be hazardous to the athlete. Exemptions, consequently, will be granted only rarely and in very special cases.

5.3  Out-Of-Competition doping control is used as a deterrent for the use of anabolic agents and certain listed hormones, including the substances under prohibited techniques.  Application for exception of drug use during training is, therefore, needed only for these substances.

9.19  In 2001, Mr. Gatlin was suffering from a legitimate disability and[51] he was properly taking his medication under a doctor's prescription that an international panel of experts determined was appropriate.  He stopped taking his medication three (3) days before the event as established by the experts.

9.20    It does not appear beyond doubt that Mr. Gatlin would have been found by the Panel to be at least contributorily negligent to some extent for his first offense in 2001.  There is no evidence that the three (3) days was the period of time recommended by his physician[52].  Although it was recommended that he stop taking the substance prior to competing, the record is blank with respect to whether it was solely up to the athlete to determine the amount of time necessary for the substance to clear his system, or if an anti-doping agency advised him of such a time period.  Mr. Gatlin has failed to provide any evidence as to why he chose three (3) days, or even that he consulted a physician regarding that choice[53].  It proved to be an insufficient period of time.

---

[51] *Bingham v. Oregon School Activities Association* (1998) 24 F. Supp. 2d 1110,1116 (recognized ADD as a disability under federal law).

[52]    To the contrary, in his petition to the IAAF for reinstatement for the 2001 offense, Mr. Gatlin states that his physician "has been unable to determine the proper amount of time...." (at 3)  Moreover, Mr. Gatlin further admitted in that petition, that he understood that literature at the time cited as a "rule of thumb," a period of "2-4 days...," that the period will vary depending a range of factors, and that even the "2-4" day period could refer to reducution of amphetimine detection down to a level still much higher than that permitted under IAAF Rules.  (Id.)

[53]    While Mr. Gatlin's physician apparently was cited in his IAAF petition in 2002, there is no indication that those questions were even asked at the time of the first doping offense.  Moreover, the 2001 Panel Decision points out that "Mr. Gatlin's doctor did not know how far in advance of competing mr. Gatlin should stop taking his medication.) (2001 Decision at ¶9).

9.21    Under these facts, the 2001 Panel's finding of a doping violation and a tentative award of a two (2) year ban could[54] suggest that the 2001 AAA Panel found that Mr. Gatlin bore some responsibility for governing his own actions.  Had the 2001 Panel found that the USATF and/or  USADA had affirmatively misled Mr. Gatlin into a well founded belief that a three day cessation was sufficient under the Rules then in force, it might have found that there was no violation as Mr. Gatlin would have been in full compliance with the Rules[55].  The Panel did not do so, nor did it find that Mr. Gatlin had "no negligence" (the standard at the time), nor that either sports organization had made representations that a three day period was sufficient.  This does not mean, of course, that these facts did not occur, just that there is no evidence of them in the records available to this Panel.   By the same token, the Panel notes that it is undisputed that the 2001 AAA Panel made no finding that Mr. Gatlin had any fault, either.  Rather, that 2001 panel applied IAAF Rules[56]:

> 55.2    ...doping takes place when ...(i) a prohibited substance is found to be present within an athlete's body tissue or fluids....
>
> 60.2:   If an athlete commits a doping offence, he will be ineligible for the following periods:
>
> (a) for an offence ... involving the substances listed in Part I of Schedule 1 of the Procedural Guidelines for Doping Control"....
> (i)       first offence – for a minimum of two years ....
>
> 60.8    In exception circumstances, an athlete may apply to the Council for re-instatement before the IAAF's period of ineligibility has expired
>
> ... it is emphasized that only truly exceptional circumstances will justify any reduction.

---

[54]    The Panel uses this cautionary language in that, on its face, the 2001 AAA Panel decision indicates that the totality of its proceedings was "[a] one hour telephonic hearing...."
[55]    Again, in his 2002 petition to the IAAF, Mr. Gatlin states that neither the USOC nor USADA had provided any specific information on the amount of time prior to competition that Mr. Gatlin would have to cease us of his medication in order not to test positive. (at 3)
[56]    2001 Decision at ¶7

9.22   Indeed, the record indicates that USADA cooperated with Mr. Gatlin's reinstatement, because it felt he had "no significant fault," not because it felt he had "no fault."[57] However, neither the tentative holding of the 2001 Panel nor the cooperation of USADA changes the nature of the standard under which that case was decided.

9.23   The question for this Panel is whether, in light of the totality of circumstances and the findings of the 2001 AAA Panel's decision, that decision can be construed as being the equivalent of a "no fault" finding under the "utmost caution" standard, rather then merely the "negligence" standard.  The Panel concludes that while the circumstances and facts as they existed in 2001 might (or might not) have resulted in a "no fault" conclusion by the 2001 AAA Panel, that Panel was not called upon and did not make such a finding.

9.24   However, the 2001 Panel did make the following holdings and observations:

> "[Mr. Gatlin] did ... disclose his prescription medicine to his doctor at the University of Tennessee." (at ¶8)

> "Based on the medical experts' opinion in this case, it is not unreasonable for this Panel to assume that, if requested, the exemption likely would have been granted." (at ¶9)

> "This panel would characterize Mr. Gatlin's inadvertent violation of the IAAF's rules ... as, at most, a "technical" or a "paperwork" violation. (at II.2).

> "...Mr. Gatlin's ... personal culpability [is] open to dispute...." (Id.)

> Mr. Gatlin's "culpability" is "proportionately very much less than other athletes who would receive a two year suspension under the same IAAF rules." (Id.)

> "Were this Panel to address the issue of culpability and sanctions in a full evidentiary hearing, this panel clearly would not apply the full two-year suspension to Mr. Gatlin." (at II.3).

---

[57]      The Panel notes that the Panel in *Puerta*, after extolling the "extraordinary manner" in which an accidental contamination occurred, to water which Mr. Puerta carried with him to avoid contamination, nevertheless found that "Mr. Puerta failed to exercise the "utmost caution" at this critical time.  In this instance, the first offense by Mr. Gatlin was failure to follow proper procedures to record and seek exemption for a known amphetamine product. While Mr. Gatlin argues that the specific drug was not listed by name in the IAAF Rules, there is no dispute that amphetamines are listed as a category and that Mr. Gatlin knew enough to register his medication with his University.

"Anti-doping rules are like other sporting rules in that sometimes there are adverse consequences even when an athlete is not at fault." (at II.9).

While the foregoing observations and holdings clearly evidence that the 2001 Panel was not in accord with a two year suspension, they do not arise to the level of a finding of "no fault." The Panel merely stated that it "assumed" that Mr. Gatlin could have received a TUE; that his violation, while technical, was nevertheless a violation; that his culpability could be disputed, not that he had none; that his culpability was "very much less than" other athletes, not that there was "no" culpability; and that the Panel would prefer to apply less than "the full two-year suspension," not that it would impose no suspension.

9.25    By the same token, it does not appear that the 2001 AAA Panel ever made a final decision in that case, deferring to the IAAF for a decision. The IAAF made no decision at all as to fault, but did immediately reinstate Mr. Gatlin without any additional period of disqualification, other than that already served. To do so, it appears that the IAAF had to find that "exceptional circumstances" justified the reinstatement of Mr. Gatlin and the avoidance of the tentative holding of a two (2) year suspension by the 2001 Panel.[58]

9.26    The Panel, though having held that there is no evidence at present in the record to justify a finding of "no fault" under the "utmost caution" standard, strongly urges the parties, and adjures USADA to cooperate as it did in the past, to rectify this gap in the record. The Panel holds that the burden to show "no fault" in the first offense is Mr. Gatlin's and it simply has not been met. The Panel does not make any finding that "fault" was or should be found in the first offense. In doing so, Mr. Gatlin may seek to present the requisite evidence before an appeal

---

[58]    USADA has characterized this reinstatement as a "reduction" in the ban from two years to one, rather than a vacating of the finding of a first offense.

panel, or may seek to clarify the actions of the IAAF in deciding his reinstatement.[59]  If the IAAF "eliminated" any period of ineligibility because it believed that, under the circumstances either there should have been no finding of a doping violation or because Mr. Gatlin had "no fault" in that violation, then the first offense should not be considered to be a prior offense for purposes of the award for a second violation.  This Panel is unable, on the record before it, to ignore the first doping violation, but shall retain jurisdiction to amend this award in the event that Mr. Gatlin receives from IAAF or otherwise, a ruling which might alter the view of the first offense in 2001.

## 10.  Decision and Award

On the basis of the foregoing facts and legal aspects, this Panel renders the following decision:

10.1    Respondent has committed a doping violation under the WADA Code, Article 10.2, by reason of the use of exogenous testosterone in 2006.

10.2    The 2006 doping violation was Respondent's second doping offense.

10.3    There was no finding of the nature, level or existence of "fault" as to the first doping violation, either by the 2001 AAA Panel in 2001, which referred the matter for a final determination to the IAAF,  nor by IAAF in 2002 when it decided that such "exceptional circumstances" existed so as to justify the immediate reinstatement of Mr. Gatlin.

10.4    It therefore falls to this Panel to construe the language of and the record in that prior doping offense decision, to determine if it qualifies as the *equivalent* of a "no fault"

---

[59]    While this Panel makes no holding as to the fact that the first panel in 2001 retained jurisdiction over that doping offense, it notes that fact and the fact that the Panel never issued a "final" decision nor otherwise repudiated its jurisdiction.

determination such as to justify not counting it as a first offense, solely for purposes of the award for a second offense.

10.5    The lack of requested evidence, finding by the 2001 AAA Panel of a doping violation, the nature of the standard applied in 2001, and the actions of the IAAF clearly suggest at a minimum, a finding of "no significant fault" in 2001. However, there is no evidence from which this Panel may determine that a finding of "no fault" under the current WADA standard was made or could be inferred.

10.6    Therefore, the totality of circumstances causes the Panel to conclude that the 2001 decision of the AAA Panel and the 2002 decision of the IAAF cannot be construed, on the record before this Panel, as constituting a "no fault" level of responsibility on the part of the Respondent under Code section 10.5.1.

10.7 The following sanctions shall be imposed on Respondent:

A four-year period of ineligibility commencing on May 25, 2006 through May 24, 2010, including his ineligibility from participating in U.S. Olympic, Pan American or Paralympics Games, trials or qualifying events, being a member of any U.S. Olympic, Pan America or Paralympics Games team and having access to the training facilities of the United States Olympic Committee Training Centers or other programs and activities of the USOC including, but not limited to, grants, awards, or employment pursuant to the USOC Anti-Doping Policies.

10.8    The retroactive cancellation of all competitions results and awards occurring after April 22, 2006 through the date of this Award.

10.9    The administrative fees and expenses of the American Arbitration Association $750.00 and the compensation and expenses of the arbitrators shall be borne by the Claimant.

10.10 This Award is in full resolution of all claims submitted in or which could have been submitted in this Arbitration. All claims not expressly granted here are herby denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

**MAJORITY OPINION**

_____
Date

_____
Edward T. Colbert, Chair

_____
Date

_____
Samuel D. Cheris, Arbitrator