UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JUSTIN GATLIN,

      Plaintiff,

v.

UNITED STATES ANTI-DOPING AGENCY,
INC.; USA TRACK AND FIELD, INC.;
UNITED STATES OLYMPIC COMMITTEE;
and INTERNATIONAL ASSOCIATION OF
ATHLETICS FEDERATIONS,

      Defendants.

Case No. 3:08cv241/LAC/EMT

**RESPONSE OF DEFENDANT UNITED STATES OLYMPIC COMMITTEE TO
PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR
PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW**

      Defendant United States Olympic Committee (USOC) files this response to Plaintiff's
Motion for Temporary Restraining Order and/or Preliminary Injunction (Plaintiff's Motion),
pursuant to this Court's June 20, 2008 order.

## INTRODUCTION

      The central tenet of Mr. Gatlin's claim is that he should be granted preliminary injunctive
relief because, if he indeed should be excluded from the forthcoming Olympic trials, "this Court
would be able to enforce such a finding at a later date" and "[n]othing is lost on behalf of the
Defendants." Plaintiff's Motion at ¶3.a. That is simply not so. Forcing the USOC and the other
defendants to allow Mr. Gatlin to race in the United States Olympic trials will destroy the
carefully created international anti-doping protocol through which the USOC and other sports
organizations have striven to rid amateur sports of the scourge of performance-enhancing drugs.
Of equal importance, compelling the USOC and defendant USA Track and Field, Inc. (USATF)

Dockets.Justia.com

to allow Mr. Gatlin to race this week, despite his ineligibility to compete in the 2008 Olympics, will inevitably undermine the ability of other athletes to compete and will destroy their fair opportunity to qualify for the Olympics.

Contrary to the inaccurate picture created by Mr. Gatlin, upon which the Court based its *ex parte* temporary restraining order (TRO), this is not a case of "no harm, no foul." The actual equities are far different than Mr. Gatlin's papers would have them, and USOC welcomes this opportunity to set the record straight.

*First,* Mr. Gatlin – like all athletes who participate in amateur sports in the United States and internationally – has agreed that all eligibility and doping disputes are to be resolved through binding arbitration. The American Arbitration Association (AAA), perhaps the preeminent arbitral forum in the United States, has been selected to conduct the initial round of arbitration when, as here, an athlete disputes a determination by a sports organization. With respect to doping-related sanction disputes, if the AAA proceedings result in a decision upholding the ineligibility determination, the athlete may seek appellate arbitral review in the well-respected Court of Arbitration for Sport (CAS), which is based Switzerland. Like the rulings of arbitral panels around the globe, the CAS's decisions are final and not subject to appellate review, except to the extent that, under governing Swiss law, the Swiss Federal Supreme Court may review arbitration awards.

Allowing Mr. Gatlin's purported equities to overturn a structure that has been developed and revised over the last 25 years will do incredible violence to that structure. Any aggrieved athlete would be emboldened to follow Mr. Gatlin's example and take his or her grievance directly to the federal courts, leaving the agreed-upon arbitration/appeal system an empty shell, and substituting federal judges for experienced sports arbitrators with deep institutional knowledge of the Olympic system and worldwide anti-doping efforts. Even more injurious would be the fallout from court rulings that order banned athletes to be allowed to participate in qualifying events, as athletes who are bested and eliminated during the several heats that constitute the trials bring actions in other jurisdictions to strip the banned athlete of qualification

status and seek redress for the damage done to their own rights.

In short, a system that offers all the advantages that arbitration traditionally affords, and that has served the Olympic movement well, will be cast aside in favor of *ad hoc* eligibility adjudications in the federal courts. The very Congressional act that constitutes the USOC as the National Olympic Committee for United States, overseeing the United States' participation in the Olympics, prohibits that result, as does the convention that governs extraterritorial enforcement of international arbitration awards. And, as Judge Posner rightly has observed, "[t]here can be few less suitable bodies than the federal courts for determining the eligibility, or the procedures for determining the eligibility, of athletes to participate in the Olympic Games." *Michels v. U.S. Olympic Comm.,* 741 F.2d 155, 159 (7th Cir. 1984) (Posner, J. concurring).

*Second,* it is wrong for Mr. Gatlin to argue that allowing him to race will have no negative effect on the trials. It is primarily wrong because the nature of the trials was never revealed in Mr. Gatlin's papers, which were the sole basis for the court's ruling. As is set forth in USOC's submissions, the trials are run in heats, with the fastest finishers advanced to a single elimination tournament, and the top four finishers from each race advancing to the next round. Allowing an ineligible participant to race would skew the competition, because some eligible participants would be eliminated in the early heats and, when Mr. Gatlin is ultimately disqualified, it would be impossible to reconstitute the rounds to provide an opportunity for wrongfully eliminated runners.

And it is also wrong because, even if Mr. Gatlin were allowed to participate and were to qualify for the Olympics, the International Olympic Committee (IOC), a Swiss entity that is not before this Court as a defendant, will *not* allow an athlete whose suspension has been upheld by the CAS to participate in the Olympics, and there is nothing that the USOC or any other defendant in this case can do to change that inalterable fact. Forcing the defendants to allow Mr. Gatlin to compete under these circumstances thus fundamentally changes the nature of the trials, which are conducted solely for the purpose of selecting American Olympic competitors, and necessarily runs the risk that, as noted above, an eligible participant may be denied his

opportunity to run in the Olympics.

Thus, on both legal and equitable grounds, Mr. Gatlin's claims and his motion utterly fail the test for preliminary relief. His motion should be denied.

## STATEMENT OF THE FACTS

### I. THE DEFENDANTS.

The IOC "is an international, non-governmental, non-profit organization organized under the laws of Switzerland." Declaration of James E. Scherr (Scherr Dec.) at ¶10. It is recognized by the Swiss Federal Council as an "association with the status of a legal person," and is headquartered in Lausanne. Olympic Charter, R.15 (2004). The IOC serves as "an umbrella organization of the Olympic Movement," and is responsible for supervising the summer and winter Olympic Games. *Id.*

"Perhaps the IOC's most important function is the role it plays in setting international sports law," because nations generally adhere voluntarily to "the rules, decisions and practices of the IOC and the Olympic Charter, often incorporating them into their respective national sports laws policies." Note, *The Olympic Binding Arbitration Clause and the Court of Arbitration for Sport: An Analysis of Due Process Concerns,* 18 FORDHAM INTELL. PROP. MEDIA & ENT. L. J. 997, 1002 (2008) (footnote omitted) (hereinafter, *Binding Arbitration*). The IOC recognizes National Olympic Committees (NOCs), such as the USOC, as well as international sports federations (IFs), which administer specific sports. Scherr Dec. at ¶¶6, 12. Defendant International Association of Athletics Federations (IAAF) is the IF recognized by USOC for track and field. *Id.* at 13.

The Amateur Sports Act, as first enacted in 1978, was intended by the Congress to recognize "an already long lasting relationship" between the USOC, as the entity overseeing the Olympic movement in the United States, which relationship extends back to 1896, and to "statutorily legitimize[] that relationship with a federal charter and federal incorporation." *DeFrantz v. U.S. Olympic Comm.,* 492 F.Supp. 1181, 1187 (D.D.C. 1980). Though the Act,

Congress has granted the USOC "exclusive jurisdiction … over … [a]ll matters pertaining to United States participation in the Olympic Games." 36 U.S.C. § 220503(1).

The USOC and recognized IFs, such as the IAAF, in turn recognize national governing bodies (NGBs), "to administer and govern a particular sport within the United States." Scherr Dec. at ¶¶14-15. Defendant USA Track and Field (USATF) is the NGB recognized by USOC and IAAF for track and field sports. *Id.* at 16.

The USOC and other NOCs "work in conjunction with the IOC to promote the worldwide Olympic movement and each are responsible for organizing their country's participation in the Olympic Games." Scherr Dec. at ¶11. As a recognized NOC, the USOC must abide by IOC rules. Olympic Charter, art. 24(A).

The IOC "requires all NOCs to abide by a strict set of anti-doping standards" established by the World Anti-Doping Agency (WADA). *Id.* at 18. Defendant U.S. Anti-Doping Agency (USADA) "is the national anti-doping organization for the Olympic movement in the United States." *Id.* at ¶20. USADA operates an Olympic drug-testing program in the United States under an agreement with the USOC.

## II.   THE BINDING DECISIONS OF ARBITRAL BODIES ON MR. GATLIN'S ELIGIBILITY TO PARTICIPATE IN OLYMPIC TRIALS.

### A.   The Olympic-Eligibility Arbitration Structure.

#### (1)   The first-level arbitration.

As a USATF member, Mr. Gatlin signed a membership application, in which he agreed "to abide by the applicable USATF Bylaws, Operating Regulations, and Competition Rules." See USATF Membership Application (filed with separate notice of filing). Among the rules by which Gatlin agreed to be bound is a provision that disciplinary proceedings "related to domestic positive drug tests of USATF athletes shall be conducted by USADA." USATF Regulation 10. As Mr. Gatlin concedes, he testified positive for banned substances in both 2001 and 2006. Following the 2006 test, Mr. Gatlin invoked his right to review the finding by submitting his dispute to the required arbitration procedures.

The Olympic arbitration structure is founded in several sources. Under the Amateur Sports Act, in accordance with its Congressionally mandated mission "to provide swift resolution of conflicts and disputes involving amateur athletes," 36 U.S.C. § 220503(8), the USOC provides for arbitration by the AAA for disputes involving doping charges, 36 U.S.C. § 220529(a). The AAA panel's decision "is binding on the parties if the award is not inconsistent with the [USOC's] constitution and bylaws." 36 U.S.C. § 220529(d).[1] The USADA Protocol for Olympic Movement Testing (the Protocol) adopts the AAA's Commercial Arbitration Rules, as modified to accommodate doping disputes. Protocol R-1, R-2. A full panoply of arbitral protections are imposed by the Protocol, including expansive rights to introduce evidence and the opportunity to be represented by counsel. Protocol R-26, R-33. The IAAF's Anti-Doping Rules also entitle a suspended athlete to a hearing. IAAF R. 60.3-.5.

### (2) Appellate review of the arbitration decision.

The AAA panel's eligibility decision is reviewable by the Court of Arbitration for Sports (CAS). Protocol R-49A; IAAF R.60.13(a); CAS Code, art. R47. A thorough explanation of the CAS's history and operation is set forth in the Declaration of Antonio Rigozzi, at ¶¶11-15. In brief summary, the IOC created the CAS in 1984, with the intention of it being an independent, international arbitration body to resolve issues directly or indirectly related to sport. Since 1994, the CAS Code of Sports-related Arbitration (CAS Code) has governed the organization and arbitration procedures of CAS. CAS is governed by the International Court of Arbitration for Sport (ICAS), whose main task is to safeguard the independence of CAS and the rights of the parties to a CAS proceeding. See CAS Code, art. S6. ICAS is responsible for the appointment of the CAS arbitrators, who are also nominated by various entities to safeguard the interests of

---

[1] The Amateur Sports Act, as amended by the Ted Stevens Olympic and Amateur Sports Act in 1998, is intended by the Congress "to protect the USOC against lawsuits for situations in which an athlete's right to participate in the Olympic Games is at stake." *Binding Arbitration, supra* at 1008 (footnote omitted). Indeed, the Olympic arbitration structure itself was created "to keep disputes out of the U.S. courts." Nancy K. Raber, DISPUTE RESOLUTION IN OLYMPIC SPORT: THE COURT OF ARBITRATION FOR SPORT, 8 Seton Hall J. Sport L. 75, 77 (1998) (hereinafter *Dispute Resolution*).

International Sports Federations, National Olympic Committees, the International Olympic Committee, and the athletes. See CAS Code, arts. S6 (3), S14. There are currently over 200 CAS arbitrators from around the world. The list of CAS arbitrators includes many of the leading commercial arbitrators in the world.

The CAS has a broad scope of review, with "full power to review the facts and the law," including the authority to either "issue a new decision which replaces the decision challenged or annul the decision and refer the case back" to the original panel. CAS Code, art. R57. Parties are allowed both briefing and the opportunity to present witnesses. *Id.,* arts. R51, R55, R57.

The Swiss Federal Supreme Court has recognized the CAS as "a real arbitral tribunal offering sufficient guarantees of independence and objectivity for its awards to be final and enforceable." Jan Paulsson, *The Swiss Federal Tribunal Recognises the Finality of Arbitral Awards Relating to Sports Disciplinary Sanctions Rendered by the IOC's Court of Arbitration for Sports,* 8 *International Arbitration Reports* 12, 15 (Oct. 1993) (citing *Grundel v. Int'l Equestrian Federation,* Judgment of Mar. 15, 1993). The Swiss Federal Supreme Court has more recently reaffirmed that the CAS is an independent and fair international arbitral body. *See, e.g., A & B v. IOC and Int'l Ski Federation,* (May 27 2003 decision of 1st Civil Division of the Swiss Federal Supreme Court) (translation submitted with separate notice of filing) at ¶3.2 ("[t]he Federal Supreme Court has accepted that the CAS may be considered a true arbitral tribunal"); *id.* at ¶¶3.3.3.3 – 3.3.4 ("having gradually built up the trust of the sporting world, this institution … remains one of the principle mainstays of organized sport" and is sufficiently independent vis-à-vis the IOC, as well as all other parties that call upon its services, for its decisions in cases involving the IOC to be considered true awards, equivalent to the judgments of State courts"); Antonio Rigozzi Dec. at ¶32.

The IAAF rules provide that CAS decisions "shall be final and binding on all Members, and no right of appeal will lie." IAAF R. 60-31. The CAS Code similarly provides that a CAS decision is "final and binding upon the parties." CAS Code, art. R59. Under the USADA Protocol, "[t]he decisions of CAS shall be final and binding on all parties and shall not be subject

to any further review or appeal except as permitted by the Swiss Federal Judicial Organization Act or the Swiss Statute on Private International Law." Protocol R-49A.[2]

**B.     Mr. Gatlin's Challenge to His Suspension.**

Mr. Gatlin challenged his 2006 suspension on some of the same grounds that are raised in his complaint, including his arguments under the Americans with Disabilities Act, in both first-level arbitration and an appeal to CAS.  The AAA panel gave Mr. Gatlin's claims painstaking consideration, issuing a 53-page decision, over a strong dissent.  Plaintiff's Exhibit G.  The panel rejected Mr. Gatlin's claim, with respect to the 2006 violation, based on a positive test for exogenous testosterone, that he should be found without fault because the positive finding could have resulted from use of a steroid cream by a disaffected trainer.  This argument was rejected because Mr. Gatlin produced no factual support for that defense and, in particular, the AAA panel found that such evidence as Mr. Gatlin presented was neither credible nor substantiated. *Id.* at 28-31.   The panel took into consideration that "Mr. Gatlin has tested positive for testosterone, a very serious violation." *Id.* at 36.

Further, and critical to the matter before this Court, the panel specifically considered and rejected Mr. Gatlin's argument that the 2006 violation should be treated as his first offense, in support of which argument Mr. Gatlin relied on the ADA claim that underpins his current action before this Court. *Id.* at 19-20.  After supplemental briefing, the panel concluded that the 2001 violation "cannot be construed … as constituting a 'no fault' level of responsibility," such that the 2006 violation was properly treated as a second violation. *Id.* at 52.  The panel also noted that Mr. Gatlin had not appealed the 2001 violation to the CAS. *Id.* at 20.  The panel imposed a four-year suspension, retroactive to May 2006. *Id.*

On appeal to the CAS, Mr. Gatlin expressly acknowledged the CAS's jurisdiction over the appeal.  Brief Submitted by Justin Gatlin, Court of Arbitration for Sport at 4 (Feb. 25, 2008)

---

[2] The IOC has secured recognition that CAS decision are binding from all recognized ISFs.  Urvais Naidoo & Neil Sarin, *Dispute Resolution at Games Time,* 12 FORDHAM INTELL. PROP. MEDIA & ENT. L.J. 489, 495-96 (2002).

(submitted with separate notice of filing). The parties selected arbitrators pursuant to the previously noted CAS procedures, and submitted both briefs and detailed witness statements. Mr. Gatlin submitted seven detailed witness statements, including two medical statements covering the issues that were central to his ADA defense, and briefed that defense extensively. *Id.* at 5-18, 27-28, 34-38. The CAS conducted a two-day hearing on May 28-29, 2008. The CAS panel elected to issue a summary decision because Mr. Gatlin was asserting his purported right to participate in the upcoming trials, with the expectation that the required full decision will issue in due course. CAS Procedural Order ¶10 (filed with separate notice of filing).

Mr. Gatlin was able to fully raise his ADA issues before the Olympic trials only because the CAS was established to address disputes such as he now presents to this Court. Any suggestion that Mr. Gatlin did not fully litigate his claims before the CAS would be inaccurate. In reality, his complaint is not that he was not able to be heard, but rather, that the tribunal to which he agreed to submit his eligibility issues did not agree with him.

## ARGUMENT

### I. MR. GATLIN CANNOT SEEK RELIEF FROM THIS COURT ON CLAIMS THAT WERE FULLY AND FAIRLY LITIGATED IN ARBITRATION.

Artful pleading aside, Mr. Gatlin is asking this Court to step into the shoes of the arbitral tribunals and to retry the question whether his 2001 suspension should count as a first violation – for the *third* time. This he cannot do. Mr. Gatlin raised his ADA arguments in his AAA hearing. He then fully litigated all of his claims, including the present ADA claim, before the CAS. To address his claim that invalidating his 2001 violation through a retroactive therapeutic use exception (TUE) would be a "reasonable accommodation" under the ADA, this Court would be required to determine, among other things: (i) whether the 2001 violation can be used to enhance the sanction for the 2006 violation; (ii) whether Mr. Gatlin was at fault for the 2001 violation; and, most importantly (iii) whether *any* sanction for the 2001 positive test would violate the ADA. Those are precisely the questions that were expressly addressed before the CAS.

The Court should reject Mr. Gatlin's attempt to relitigate his arbitration claims in a judicial forum, just as the Seventh Circuit did in *Slaney v. IAAF & USOC*, 244 F.3d 580 (7th Cir. 2001). *Slaney* involved a similar attempt by an athlete to artfully plead a challenge to a doping sanction as a violation of various state and federal laws (including an allegation that the doping test involved systematically discriminated against women), and which the court rejected because the disqualified athlete sought judicial review of "the identical issues" that had been adjudicated by the CAS. *Id.* at 590. As in *Slaney,* granting relief to Mr. Gatlin would necessarily undermine or, indeed, nullify the CAS's decision.

The USOC is entitled (and, indeed, required) to enforce the CAS's decision under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, also known as the New York Convention, which entered into force in 1959, and was subsequently codified in 9 U.S.C. §§ 201-208. The New York Convention governs because the CAS is a foreign tribunal, and the proceedings were governed by Swiss law. *Indust. Risk Insurers v. M.A.N. Gutehoffenungshutte GmbH,* 141 F.3d 1434, 1440-41 (11th Cir. 1998) ("[w]e join the First, Second, Seventh, and Ninth Circuits in holding that arbitration agreements and awards 'not considered as domestic' in the United States are those agreements and awards which are subject to the Convention," not necessarily for being "made abroad, but because [they were] made within the legal framework of another country, *e.g.* pronounced in accordance with foreign law *or involving parties domiciled or having their principal place of business outside the enforcing jurisdiction*"; "broad construction … is more in line with the intended purpose of the treaty, which was entered into to encourage the recognition and enforcement of international arbitration awards") (original emphasis). Although the statute codifying the convention sets forth grounds for evading enforcement, 9 U.S.C. § 207, Mr. Gatlin has failed even to allege, much less establish, *any* basis for not enforcing the CAS's decision.[3] Indeed, he entirely ignores the New

---

[3] At most, the court has jurisdiction to refuse to enforce the award. It cannot have jurisdiction to vacate the award, as that power lies solely with the Swiss Federal Tribunal.

York Convention, as he seeks the equivalent of *de novo* review of a claim that he voluntarily submitted to arbitration, in compliance with procedures by which he is bound.[4]

In the end, the Court's lack of power to grant Mr. Gatlin that which he seeks is established by the overarching rule that parties are entitled to enforcement of binding arbitration agreements. *E.g., Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991); *Volt Info Sci., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 476 (1989); *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *Employers Ins. of Wausau v. Bright Metal Specialties,* 251 F.3d 1316, 1322 (11th Cir. 2001). The very essence of arbitration is that judicial review is all but eliminated, save for narrow grounds for vacatur, such as are set forth in New York Convention or under the Federal Arbitration Act. *E.g., Hall St. Assocs. v. Mattel, Inc.,* --- U.S. ___, 125 S.Ct. 1396, 1402 (2008); *Mastrobuono v. Shearson Lehman Hutton, Inc.,* 514 U.S. 52, 57 (1995); *Southland Corp. v. Keating,* 465 U.S. 1, 10 (1984). "Otherwise plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final." *Bianchi v. Roadway Exp.,* 441 F.3d 1278, 1284 (11th Cir. 2006) (citation omitted).

The courts are to "rigorously enforce" arbitration agreements. *Brandon, Jones, Sandall, Zeide, Kohn, Chalal & Musso, P.A. v, MedPartners, Inc.,* 312 F.3d 1349, 1357-58 (11th Cir. 2002) (citation omitted). Here, enforcing the agreement by which all parties to this action are bound would require Mr. Gatlin, under controlling Swiss law, to seek such review of the CAS decision as may be available before the Swiss Federal Supreme Court, in accordance with the

---

[4] Even if an unduly generous reading of Mr. Gatlin's complaint and motion could allow him to raise the "public policy" exception under the New York Convention, 9 U.S.C. § 207, that exception is to be applied narrowly, and should only be invoked where enforcement would violate the forum's basic notions of morality and justice. *Trans Chem. Ltd. v. China Nat'l Mach. Import & Export Corp.*, 161 F.3d 314 (5th Cir. 1998); *Indocomex Fibres Pte, Ltd. v. Cotton Co. Int'l, Inc.*, 916 F.Supp. 721 (W.D. Tenn. 1996). No such argument could possibly be made here: enforcement of the CAS decision would further the well-established goals of the Olympic Movement in creating a unitary and highly expert panel for review of eligibility determinations, as well as the USOC's statutorily granted exclusive authority to determine Olympic eligibility.

USADA Protocol and the CAS Code.[5]

As set forth in the Rigozzi Declaration, the Swiss Act on Private International Law (PILA) provides for the review contemplated under the CAS Code. Rigozzi Dec. at ¶18. Under the PILA, a CAS award may be challenged on certain specified grounds; and the Swiss tribunal would entertain an appeal by Mr. Gatlin. Rigozzi Dec. at ¶60-62.[6] Because the seat of the CAS arbitration was Switzerland (as agreed by the parties), and because the procedural law of the CAS arbitration was Swiss law, Mr. Gatlin's claims must be presented to the Swiss Federal Supreme Court and cannot be considered by this Court, much less as an original action:

> It is clear, we believe, that any suggestion that a Court has jurisdiction to set aside a foreign award based upon the use of its domestic, substantive law in the foreign arbitration defies the logic both of the [New York] Convention debates and of the final text, and ignores the nature of the international arbitration system …. The whole point of arbitration is that the merits of the dispute will not be reviewed in the courts, wherever they be located. Indeed, this principle is so deeply embedded in American, and specifically, federal jurisprudence, that no further elaboration is necessary. That this was the animating principle of the Convention, that the Courts should review arbitrations for procedural irregularity but resist inquiry into the substantive merits of awards, is clear from the notes on the subject by the Secretary General of the United Nations. Accordingly, we hold that the contested language of Article V(1)(e) of the Convention, "… the competent authority of the country under the law of which, [the] award was made" refers exclusively to procedural and not substantive law, and more precisely, to the regimen or scheme of arbitral law under which the arbitration was conducted.

*Int'l Std. Elec. Corp. v. Bridas Sociedad Anonima Petrolera*, 745 F.Supp. 172, 177-78 (S.D.N.Y. 1990) (citation omitted).

This Court may feel that Justin Gatlin has been wronged. If so, then Mr. Gatlin should be encouraged to challenge the CAS award immediately before the sole tribunal with jurisdiction to

---

[5] Indeed, doing so would be required even if New York Convention did not apply and the CAS's decision were treated as an ordinary commercial arbitration award, governed by the Federal Arbitration Act (FAA). The FAA, 9 USC § 1, *et seq.,* "imposes a heavy presumption in favor of confirming arbitration awards," with the movant limited to four narrow statutory grounds and the burden placed squarely on the losing party in arbitration to establish grounds for vacatur. *Riccard v. Prudential Ins. Co.,* 307 F.3d 1277, 1288-89 (11th Cir. 2002). Mr. Gatlin has neither pled nor even suggested that the CAS's decision is subject to review under the FAA's constrained review scheme.

[6] Indeed, the Swiss Federal Supreme Court is expressly empowered to issue preliminary relief, such as Mr. Gatlin improperly seeks before this Court. *Id.* at 58.

review the award – the Swiss Federal Supreme Court. What this Court cannot do, however, is to usurp that jurisdiction by cloaking itself with the power to act in the Swiss court's stead.

## II. MR. GATLIN'S ADA CLAIM CANNOT TRUMP THE USOC'S EXCLUSIVE JURISDICTION TO DETERMINE ELIGIBILITY UNDER THE AMATEUR SPORTS ACT.

Not only does the Amateur Sports Act not create a private right of action, the Congress's conferral of exclusive authority to determine eligibility on the USOC preempts claims that would "override legislative intent" underlying that conferral of authority. *Slaney,* 244 F.3d at 594-95. Here, Mr. Gatlin's purported ADA claim – even if it could be successfully brought before this Court – would trump the Amateur Sports Act by empowering this Court to determine his eligibility to participate in the forthcoming trials. This the Court cannot do: although a properly raised discrimination claim may, under certain circumstances, go forward against a sports organization governed by the Amateur Sports Act, such a claim cannot provide a springboard for injunctive relief that would contravene the act's conferral of exclusive jurisdiction to determine *eligibility* on the USOC. *Abdallah v. U.S. Ass'n of Taekwondo, Inc.,* 2007 U.S. Dist. LEXIS 68179 (S.D. Tex. Sept. 14, 2007). Indeed, a discrimination claim can go forward, if at all, *only* on monetary damages, as a federal court "is powerless to order" that an athlete be credentialed in Olympic competition because such relief "is precisely the kind of relief that is preempted by the Amateur Sports Act." *Lee v. U.S. Taekwondo Union,* 331 F.Supp.2d 1251, 1269 (D. Hawai'i 2004).

ADA claims are also subject to overarching principles of international law.

If, moreover, Title III's "readily achievable" exemption were not to take conflicts with international law into account, it would lead to the anomalous result that American cruise ships are obligated to comply with Title III even if doing so brings them into noncompliance with [international law], whereas foreign ships – which unlike American ships have the benefit of the internal affairs clear statement rule – would not be so obligated. Congress could not have intended this result.

*Spector v. Norwegian Cruise Line, Ltd.,* 545 U.S. 119, 236 (2005). Here, Mr. Gatlin's attempted use of the ADA would trump the carefully created protections for Olympic eligibility

determinations.

Even if that were not so, forcing the USOC and other defendants to allow Mr. Gatlin to participate in the Olympic trials, when he cannot participate in the Olympics, would fundamentally alter the trials. The IOC is bound by the rules that Mr. Gatlin has flouted, regardless of this Court's ruling on the pending motion, and would not allow Mr. Gatlin to run in the Olympics, regardless of this Court's ruling and Mr. Gatlin's performance in the trials. *See, e.g., Reynolds v. Int'l Amateur Athletic Fed.,* 23 F.3d 1110, 1113 (6th Cir. 1994). The ADA specifically prohibits accommodations that would "fundamentally alter" the goods or services at issue 42 U.S.C. § 12182(b)(2)(A)(ii). *See PGA Tour, Inc. v. Martin,* 532 U.S. 661, 682 (2001). If the trials were to proceed with Mr. Gatlin's participation, the Court's order would thus fundamentally alter the nature of an event the purpose of which is to select runners to *compete in the Olympics*. Declaration of Christopher Vadala at ¶¶10-12

That is, if Mr. Gatlin were to qualify, to the exclusion of other athletes, when he cannot compete in the Olympics, the trials would be converted from the Olympic design, which is the integral nature of the USOC's selection process, into a type of a "hometown" remedy and would eliminate the international competition. The ADA precludes such fundamental change:

> [B]oth of Plaintiffs' proposed modifications would alter a fundamental aspect of craps-the dimensions by which the game is played. Craps is a common casino game, and it is played under common conditions, including the positioning of the players and the boundaries of the playing surface. Lowering the rail of a craps table or lowering the entire table would alter the playing surface in a manner that is he equivalent of changing the dimensions of a playing field or the size of the diameter of a golf hole. Similarly, moving one of the croupiers or the stickmam from his designated spot on the table to another spot would change the dimensions of where competitors play. Moving a croupier or the stickman would also require lowering the railing of the table on the spot that he is moved to, further distorting the playing surface. Moreover, allowing disabled players to play from a spot on the table that other players cannot play from may provide the disabled players with an advantage not enjoyed by the other players. As Plaintiffs' proposed modifications of the craps tables would fundamentally alter the nature of the game, Plaintiffs are entitled to no relief with respect to the craps tables.

*Ass'n for Disabled Americans, Inc. v. Concordegaming Corp.,* 158 F. Supp. 2d 1353, 1367 (S.D.

Fla. 2001).[7] That rationale is fully applicable here.

Moreover, here the legal requirements of the "game" are not only those set by the defendants but those imposed on the defendants by law. As a result, failure to comply with the law and the legal requirements that have been described relating to arbitration and the remedies and requirements would be a fundamental alteration precluded by the ADA and the Rehabilitation Act. *McPherson v. Michigan High School Athletic Ass'n, Inc.*, 119 F.3d 453, 561 (6th Cir. 1997) (district court abused its discretion in entering TRO for fifth-year high school senior with ADA claims in face of athletic association's longstanding eight-semester eligibility rule, because the only possible accommodation would have been complete waiver of regulation). Because Mr. Gatlin has proceeded before an arbitral tribunal, raising the ADA and the Rehabilitation Act claims, he accepted the fundamental rules and requirements of the law and should not now be able to ignore them.

The ADA prohibits the fundamental alteration that Mr. Gatlin seeks here. No matter how much sympathy one might have for Mr. Gatlin, he cannot destroy the sport or the rights of others to participate, and ignore the jurisdictional prohibitions created by binding arbitration and a system of justice that enables international competition. The reality is that when all the chairs are moved and stacked as Mr. Gatlin requests, solely to enable his competition, the United States and its Olympic team, and the United States judicial system, will come up short on the international stage.[8]

---

[7] Mr. Gatlin's attempt to analogize his claim to that in *Rendon v. Valleycrest Prods., Ltd.*, 294 F.3d 1279 (11th Cir. 2002), is unavailing. *Rendon* involved only a question of access by disabled persons, and the question whether off-site screening for a game show was immune from ADA limitations. *Id.* at 1285. There was no question of fundamentally altering the game show.

[8] Indeed, the IOC would be bound by the existing CAS decision unless and until a Swiss Federal Court altered or vacated such award. This very fact further makes clear that the Swiss courts are the appropriate forum for this dispute in the first place.

### III. BALANCING THE EQUITIES REQUIRES A DENIAL OF PRELIMINARY RELIEF.

Under Rule 65(b)(1)(A) of the Federal Rules of Civil Procedure, Mr. Gatlin was required to show "immediate and irreparable injury, loss, or damage," before defendants could be heard, to obtain a TRO, although "our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck Drivers, Local No,. 70 of Alameda County,* 415 U.S. 423, 438-39 (1974). For a preliminary injunction, Mr. Gatlin must show – in addition to "a substantial likelihood of success on the merits," which, as set forth in Points I and II, *supra,* he cannot satisfy – that he has "a substantial threat of irreparable injury," that his injury "outweighs the potential harm to the defendant," and that injunctive relief will not disserve the public interest." *Palmer v. Braun,* 287 F.3d 1325, 1329 (11th Cir. 2002) (citation omitted). In addition to his inability to show any likelihood of success, Mr. Gatlin cannot show that his potential injury outweighs the potential harm to USOC and the other defendants and, moreover, the public interest would truly be disserved by injunctive relief.

First, as set forth in Point II, *supra,* the IOC will not allow Mr. Gatlin to compete in the Olympics, even if he were to qualify in trials in which he participated pursuant to this Court's order, because the IOC is bound by its own rules. And this Court cannot shield Mr. Gatlin "from the decisions of international bodies" even if it attempts to craft injunctive relief that would force United States entities to allow him to compete. *Gahan v. U.S. Amateur Confederation of Roller Skating,* 382 F.Supp.2d 1127, 1129-30 & n.4 (D. Neb. 2005). Thus, the consequences addressed in Point II, *i.e.,* that forcing the defendants to allow Mr. Gatlin to race, take on most serious dimensions:

> 9. In order to compete at the Olympic trials, an athlete must be eligible to compete within the definition of the selection process.

> 10. Many of the events at the USATF Olympic Trials, specifically 100 dash competitions, are run in heats with the fastest times advancing to a single elimination tournament with the top four finishers from each race advancing to the next round of races.

16

11.  Allowing an ineligible athlete would harm the rest of the eligible field because the athlete selection system bases an athlete's final rank order of finish on "the highest round completed by an athlete.,"

12.  Should an ineligible athlete compete in the USATF Olympic Trials, he could damage the chances of an eligible competitor by knocking that competitor out of a spot in the quarterfinal round, the semifinal or the final round of an event.

13.  It is for this reason that in any arbitration brought pursuant to Article IX of the USOC bylaws involving the selection of an athlete to participate in a protected competition, all athletes may be adversely affected by the outcome of the arbitration must be notified.

Vadala Dec. at ¶¶9-13.

Injunctive relief would thus accomplish only an unwarranted disruption of a finely tuned competition to determine who will represent the United States in this track event at the Olympics, and likely deny a deserving athlete the opportunity to do so. *Rhodes v. Ohio High School Athletic Ass'n*, 939 F.Supp. 584, 593 (N.D.Ohio 1996) (declining to enter TRO for learning disabled high school student to participate in football program for 9th and 10th semester of high school because students were eligible for eight high school semesters only and, although student showed irreparable harm due to inability to play and be scouted by college scouts, student was likely unable to demonstrate "that his disability was the sole cause of his ineligibility"; also, injunction would displace another athlete).[9]  *See also Lee,* 331 F. Supp. 2d at

---

[9] The conundrum that is likely to be created by forcing defendants to allow Mr. Gatlin to race is perhaps best shown by the tortured litigation history surrounding Butch Reynolds' attempt to run in the 1992 Olympics.  Mr. Reynolds obtained injunctive relief from the district court, only to have that injunction overturned by the Sixth Circuit and then reinstated by a single Justice of the United States Supreme Court.  *Reynolds v. Int'l Amateur Athletic Ass'n,* 841 F.Supp. 1444, 1454-56 (S.D. Ohio 1992), *stay granted,* 968 F.2d 1216 (6th Cir.), *stay granted,* 505 U.S. 1301 (1992). Justice Stevens, in granting a stay – the effect of which was that Mr. Reynolds raced in the trials – suggested that, although his ruling would not "establish [Mr. Reynolds'] right to complete in the Olympics … that opportunity will presumably be foreclosed if he is not allowed to participate in the Olympic Trials," and the harm from allowing him to run would be curable "by a fair and objective" post-race determination.  *Reynolds v. Int'l Amateur Athletic Ass'n,* 505 U.S. 1301, 1302 (1992).  In fact, however, although Mr. Reynolds competed in the United States trials, he "was not allowed to compete abroad until 1993" and did not run in the 1992 summer Olympics.  Daniel H. Yi, *Turning Medals into Metal:  Evaluating the Court of Arbitration of Sport as an International Tribunal,* 6 ASPER REV. INT'L BUSINESS & TRADE L. 289, 303-04 (2006) (hereinafter *Medals into Metal*).  "The Reynolds case is a perfect example of how everyone can lose when sports disputes end up in the hands of domestic courts." *Id.*  Since that time, of course, the CAS has been given the broad appellate powers that Mr. Gatlin appropriately invoked, with judicial review available in the Swiss Federal Supreme Court, in part to ensure that there would not be a repeat performance of the Reynolds debacle.  *Dispute Resolution, supra* at 76.

1269 (refusing, despite claims of national origin discrimination, to enter temporary restraining order requiring USOC to credential coach because the requested relief would cause harm to the other candidates for the coaching position).

It is even more inappropriate, however, to grant relief because, as set forth in Point II, *supra,* Mr. Gatlin has refused to exercise his available remedy to challenge the CAS ruling, and has made no showing whatsoever that the Swiss Federal Supreme Court cannot address his claim before the trials commence. *Gahan,* 382 F.Supp.2d 1129-30 & n5 (denying TRO for skater excluded from international competition because administrative remedies remained available, association had "follow[ed] the rules to the letter of them," procedures existed for "the speedy resolution" of the dispute and, although plaintiff would be in China at time of United States arbitration, technology would likely be available to allow plaintiff to participate).

"Intervention is appropriate only in the most extraordinary circumstances, where the association has breached its own rules, that breach will imminently result in serious and irreparable harm to the plaintiff, and the plaintiff has exhausted all internal remedies." *Slaney,* 244 F.3d at 595 (citation omitted). Where administrative remedies are available, it cannot be said with the requisite certainty that an ineligible athlete will suffer irreparable injury absent an injunction. *Ohio Taekwondo Ass'n v. U.S. Olympic Comm.,* 2005 WL 11988561, *8 (S.D. Ohio Apr. 20, 2005).

Finally, even assuming for the purpose of argument that Mr. Gatlin were able to participate in the Olympics, and effectively eliminate runners from other countries, there is no point in fostering an effort to construct a judicial Tower of Babel. Each runner could sue in his country, as Mr. Gatlin has sued here. The result would be that race outcomes could be determined by varying interpretations of judges in different jurisdictions applying different laws, rather than on the field of play.

This would create insuperable conflicts. In a classic text, Conflicts of Law, by E.E. Cheatham, E.N. Griswold, W.L.M. Reese, and M. Rosenberg (University Casebook Series, Brooklyn, The Foundation Press, Inc. 1964), the authors, using a sense of humor, introduced

their text with a photograph of the courthouse on the island in Tobago with a quotation from a leading English case, *Buchanan v. Rucker,* Court of Kings Bench 1808, 9 East 192, in which Lord Ellenborough, D.J. asks: "Can the island of Tobago pass a law to bind the rights of the whole world? Would the world submit to such an assumed jurisdiction?"

There are 250 CAS arbitrators, who have "legal training and who possess recognized competence with regard to sport, and who serve four-year terms. CAS Code, arts. S13, S20; *Medals into Metal*, *supra* at 299. The CAS "serves as the court of highest appeal for Olympic athletes when they are subject to disciplinary action." *Id.* at 294. Its institutional knowledge and international jurisdiction make the CAS a far superior forum for adjudication of eligibility disputes: there are 203 countries in the Olympic movement – more nations than are members of the United Nations – and, "[w]ere the institutions of the Olympics subject to the laws and jurisdictions of every one of its 203 member nations, the entire enterprise could be paralyzed by conflict laws and constant litigation." *Id.* at 301. As a matter of practicality, institutions such as the USOC "simply cannot defend its myriad of decisions in the courts of every single member nation." *Id.* at 301-02 (footnote omitted).

This Court should follow the law. The best reason for this was stated by Chief Justice Burger in *TVA v. Hill*, 437 U.S. 153 (1978):

> The lines ascribed to Sir Thomas More by Robert Bolt are not without relevance here: "The law, Roper, the law. I know what's legal, not what's right. And I'll stick to what's legal…. I'm, *not* God. The currents and eddies of right and wrong, which you find such plain-sailing, I can't navigate, I'm no voyager. But in the thickets of the law, oh there I', a forester…. What would you do? Cut a great road through the law to get after the Devil? … And when the last law was down, and the Devil turned round on you-where would you hide, Roper, the laws all being flat? … This country's planted thick with laws from coast to coast-Man's laws, not God's-and if you cut them down … d'you really think you could stand upright in the winds that would blow then? … Yes, I'd give the Devil benefit of law, for my own safety's sake."

*Id.* at 195 (citation omitted).

**CONCLUSION**

Based on the foregoing, the USOC requests the Court to deny Plaintiff's Motion, to vacate the TRO, and to grant such other and further relief as the Court may deem appropriate.

Respectfully submitted,

GREENBERG TRAURIG, P.A.
101 East College Avenue
Post Office Drawer 1838
Tallahassee, Florida  32302
Telephone:  (850) 222-6891
Facsimile:  (850) 681-0207

*Counsel for United States Olympic Committee*

By:        /s/ Lorence Jon Bielby
LORENCE JON BIELBY
Florida Bar No. 0393517
JOHN K. LONDOT
Florida Bar No. 0579521

**CERTIFICATE OF SERVICE**

I certify that a copy of this response was mailed on June 22, 2008 to:

| | |
|---|---|
| Joseph A. Zarzaur, Jr. | Robert C. Palmer, III |
| Zarzaur Law, P.A. | Wade, Palmer & Shoemaker, P.A. |
| Post Office Box 12305 | 25 West Cedar Street, Suite 450 |
| Pensacola, Florida  32591 | Pensacola, Florida  32502 |
| *Counsel for Justin Gatlin* | *Counsel for United States Anti-Doping Agency, Inc.* |

       /s/ Lorence Jon Bielby
Lorence Jon Bielby