# EXHIBIT 1

Dockets.Justia.com

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

_____

)

**JUSTIN GATLIN**                        Case No. 3:08cv241/LAC/EMT

                              **Plaintiff,**    )

**UNITED STATES ANTI-DOPING
AGENCY INC.; UNITED STATES
TRACK AND FIELD
ASSOCIATION, INC.;
UNITED STATES OLYMPIC
COMMITTEE, INC.; INTERNATIONAL
ASSOCIATION OF ATHLETICS
FEDERATIONS**                        )

                              **Defendants**)

_____  )


## DECLARATION – EXPERT REPORT OF
## DR. ANTONIO RIGOZZI


I, Dr. Antonio Rigozzi, do hereby state as follows:


## I.    INTRODUCTION


1.    I am a Lecturer at the University of Neuchâtel Law School in Switzerland. I

teach international arbitration and sports law, in particular "anti-doping law".

2.   I am also an attorney-at-law and partner in the law firm LÉVY KAUFMANN-KOHLER. I was admitted to the Geneva Bar in 1999.

3.   I have published extensively, notably in the fields of international arbitration, in particular with regard to sport arbitration[1], as well as in the fields of international private law (conflicts of law) and sports law. A copy of my resume including a list of my publications is attached to this opinion as Annex A.

4.   I have been asked by counsel for the United States Olympic Committee ("USOC") to provide a Declaration and Expert Report, pursuant to Rule 26(a)(2) of the U.S. Federal Rules of Civil Procedure, on questions relating to Swiss law in respect to the Court of Arbitration for Sport (CAS), which questions are set forth below.

5.   I have agreed to be compensated CHF 500 per hour for the present Declaration/Report. I have not testified as an expert at trial or by deposition in the past four years. The authorities that I have considered in forming my opinions are cited in the text or in the footnotes of this Declaration/Report.

---

[1]   *See* in particular ANTONIO RIGOZZI, L'arbitrage international en matière de sport, Basel 2005.

## II. ASSUMED FACTS, QUESTIONS PRESENTED AND SUMMARY OF CONCLUSIONS

6.   The opinions included in this Declaration/Expert Report are based on the following assumed facts set forth in the following paragraphs:

1) Justin Gatlin tested positive for Adderal in 2001;

2) The 2001 Adderal positive test was caused by Justin Gatlin's use of prescription medication for a previously diagnosed Attention Deficit Disorder;

3) Justin Gatlin had a second positive test for testosterone in 2006;

4) Justin Gatlin submitted his second positive test to arbitration before the American Arbitration Association ("AAA");

5) The AAA, following an arbitration hearing, suspended Justin Gatlin for a period of four years, running from May 25, 2006;

6) Justin Gatlin filed a Statement of Appeal to CAS in January 2007, requesting that his suspension be reduced;

7) A Procedural Order was entered by CAS, and agreed to by Mr. Gatlin, wherein it was designated that the seat of the CAS arbitration was Lausanne, Switzerland;

8) An arbitration hearing was held before the CAS tribunal in May 2008, in New York;

9) Justin Gatlin raised the Americans with Disabilities Act as a defense and justification before CAS for a shorter suspension;

10) CAS, following an arbitration hearing, suspended Justin Gatlin for a period of four years, running from July 25, 2006.

7.    In view of the hearing on Mr. Gatlin's Motion for Preliminary Injunction set for 6/23/2008, at 8:30 AM in Courtroom 4 South, I have been asked to opine on the status of the CAS under Swiss law and more specifically to answer the following questions:

(i)    What is the law applicable to CAS arbitration proceedings?

(ii)   Does Swiss law provide for an action to set aside CAS awards?

(iii)  What are the proper procedural steps to file an action to set aside a CAS award, in particular can the plaintiff seek preliminary relief?

8.    For the reasons explained below, my opinion is that even though the hearing in Mr. Gatlin's CAS case was held in New York, the proper forum to challenge the CAS award is the Swiss Supreme Court. More specifically, my answer to the questions presented can be summarized as follows:

(i) All CAS proceedings involving American athletes are governed by Swiss international arbitration law.

(ii) Under Swiss international arbitration law, all CAS award can be appealed in front of the Swiss Federal Tribunal, i.e. the Swiss Supreme Court.

(iii) Within 30 days from the reception of the reasoned award Mr. Gatlin can file a brief to set aside the CAS award accompanied by or including a request for preliminary relief.

## III. OPINION

9. In order to answer the question presented, I will first illustrate the main characteristics of the CAS (*see* 1. below), and opine on the law applicable to the CAS arbitration proceedings, i.e. Swiss international arbitration law (*see* 2. below). I will then turn to consequences of the applicability of Swiss law and in particular to the availability of an action to set aside the award and to the proper procedural steps to file an action to set aside a CAS award including the possibility to obtain preliminary relief while the action is pending (*see* 3. below).

10.  In the course of this opinion, I shall make frequent reference to the 1987 Swiss Act on Private International Law (hereinafter, the "Swiss PILA")[2], and in particular to its 12th Chapter devoted to international arbitration, as well as to the Code of Sports-related Arbitration (hereinafter "CAS Code"). In passing I shall also refer to the 1958 United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (hereinafter, the "New York Convention").

## 1.  THE COURT OF ARBITRATION FOR SPORT (CAS)

### A.  The CAS's History and its current functioning

11.  Much has been written on the history of the functioning of the CAS[3], including in the United States[4]. Hence, for the sake of the present opinion, it suffices to quote the very accurate description made by the Swiss Supreme Court in the well known landmark *Lazutina* decision in 2003:[5]

> The CAS was officially created on 30 June 1984, when its Statute came into force. Its function was to resolve sports-related disputes

---

[2]  A translation published in Michael Schöll (Ed.), Sourcebook of International Arbitration (Switzerland), Zurich 2007, pp. 29-33 of which are attached to the present Declaration/Report as Annex B.

[3]  See among many others RIGOZZI, op. cit., *passim* and HAAS.

[4]  See among many others James A.R. NAFZIGER, Arbitration of Rights and Obligations in the International Sports Arena, 35 VAL. U.L. REV. 357.

[5]  Decision 4P.267-270/2002 of 25 May 2003 (*Lazutina et. al. v. IOC, FIS & CAS*), reported in the Federal Tribunal's official record (ATF 129 III 425) and in BULL. ASSOC. SUISSE ARB., 601 (2003). An English transaltion of the original french is available in XXIX Y. B. COM. ARB, 206, (2004) and in Matthieu REEB (Ed), Digest of CAS Awards [hereinafter CAS Digest] III, 2001-2003, The Hague 2004, p. 674.

and its headquarters were established in Lausanne. An independent arbitral institution without legal personality, it was originally composed of 60 members, 15 appointed by the [International Olympic Committee] IOC, 15 by the [Olympic International Federations] IFs, 15 by the [National Olympic Committees] NOCs and 15 by the IOC President. The operating costs of the CAS were borne by the IOC, which was entitled to modify the CAS Statute.

In a judgment issued in 1993, the Federal Supreme Court expressed reservations concerning the CAS' independence vis-à-vis the IOC on account of the organizational and financial links between the two bodies. It thought that the CAS needed to become more independent of the IOC. This judgment led to a major reform of the CAS. The main developments were the creation of the International Council of Arbitration for Sport (ICAS) in Paris on 22 June 1994 and the drafting of the Code of Sports-related Arbitration (hereinafter the [CAS] Code), which entered into force on 22 November 1994.

A private-law foundation subject to Swiss law (Art. 80 et seq. CC), the ICAS, whose seat is established in Lausanne (Art. S1 of the Code), is composed of 20 members, namely high-level jurists appointed in the following manner (Art. S4 of the Code): four members by the Summer Olympic IFs (3) and Winter Olympic Ifs (1), chosen from within or from outside their membership; "214" four members by the Association of the NOCs (ANOC), chosen from within or from outside its membership, four members by the IOC, chosen from within or from outside its membership, four members by the twelve members listed above, after appropriate consultation with a view to safeguarding the interests of the athletes; four members by the sixteen members listed above and chosen from among personalities independent of the bodies designating the other members of the ICAS. The members of the ICAS are appointed for a renewable period of four years. Upon their appointment, they must sign a formal declaration of their independence (Art. S5 of the Code). The ICAS members may not appear on the list of arbitrators of the CAS nor act as counsel to one of the parties in proceedings before the CAS; under certain circumstances, they must spontaneously disqualify themselves or [they] may be challenged (Art. S5 and S11 of the Code).

According to Art. 3 of the Agreement related to the constitution of the ICAS, the foundation is funded through deductions made by the IOC from the sums allocated to the following bodies as part of the IOC's revenue from the television rights for the Olympic Games: 4/12 by the IOC, 3/12 by the Summer Olympic IFs, 1/12 by the Winter Olympic IFs and 4/12 by the ANOC.

The tasks of the ICAS include to safeguard the independence of the CAS and the rights of the parties (Art. S2 of the Code). Its various functions include adopting and amending the Code, managing and financing the CAS, drawing up the list of CAS arbitrators who may be chosen by the parties, deciding on the challenge and removal of arbitrators and appointing the Secretary General of the CAS (Art. S6 of the Code).

The CAS sets in operation panels which have the task of resolving disputes arising within the field of sport. It is composed of two divisions, each headed by a president who takes charge of the first arbitration operations before the panel of arbitrators is appointed: the Ordinary Arbitration Division and the Appeals Arbitration Division (Art. S12 of the Code). The former deals with cases submitted to the CAS as the sole instance (execution of contracts, civil liability, etc.), while the latter hears appeals against final-instance disciplinary decisions taken by sports bodies such as federations (e.g., suspension of an athlete for doping, violence on the field of play or abuse of a referee). The CAS has at least 150 arbitrators, who are not assigned to one particular division (Art. S13 and S18 of the Code). The ICAS draws up the list of arbitrators, which is updated and published (Art. S15 of the Code). It calls upon personalities with legal training and who possess recognized competence with regard to sport, while respecting the following distribution (Art. S14 of the Code) and ensuring, wherever possible, fair representation of the different continents (Art. S16 of the "215" Code): one-fifth are selected from among the persons proposed by the IOC, the IFs and the NOCs respectively, chosen from within its/their membership or from outside; one-fifth are chosen from among persons independent of these bodies; and, finally, one-fifth are chosen after appropriate consultations with a view to safeguarding the interests of the athletes. Only the arbitrators included on the list – they appear on the list for a renewable period of four years (Art. S13 of the Code) – may serve on panels (Art. R33, R38 and R39 of the Code).

When they are appointed to a panel, they must sign a formal declaration of their independence (Art. S18 of the Code). Incidentally, arbitrators must immediately disclose any circumstances likely to affect their independence with respect to any of the parties (Art. R33 of the Code). They may be challenged if the circumstances give rise to legitimate doubts over their independence. Challenges, which are in the exclusive power of the ICAS, must be brought immediately after the ground for the challenge has become known (Art. R34 of the Code).

If three arbitrators are to be appointed, in the absence of an agreement, each party appoints one arbitrator, one in the request and

the other in the response, and the President of the panel is selected by the two arbitrators or, if they do not agree, by the President of the Division (Art. R40.2 of the Code). Any arbitrator selected by the parties or by other arbitrators is only deemed appointed after confirmation by the President of the Division. Once the panel is formed, the file is transferred to the arbitrators for them to investigate the case and render their award.

In 1996, the ICAS created two permanent decentralized offices in Australia and the United States of America. In the same year, a specific new institution was established: the CAS ad hoc division. This is a temporary arbitral body, created by the ICAS under the terms of Art. S6(8) of the Code for certain major sports events such as the Olympic Games, Commonwealth Games and European Football Championships. For each ad hoc division, the ICAS appoints a team of arbitrators which is usually based at the site of the event concerned so that it can meet at any time during a fixed period. Special arbitration rules make provision for a simplified procedure for the formation of panels and the settlement of disputes. In principle, decisions must be made within twenty-four hours of the application being filed.

Having originally comprised 60 members, the CAS now has around 200 arbitrators. According to its Secretary General, all Olympic IFs have recognized its jurisdiction, which indicates that, over the years, it has become an indispensable institution in the world of sport.[6]

12. In that same decision, the Swiss Supreme Court, added the following with respect to anti-doping disputes:

An important new step in its development was recently taken at the World Conference on Doping in Sport, held in Copenhagen at the beginning of March 2003. This Conference adopted the World Anti-Doping Code as the basis for the worldwide fight against doping in sport. Many States, including China, Russia and the United States of America, have adopted the Copenhagen Declaration on Anti-Doping

---

[6] Decision 4P.267-270/2002 of 25 May 2003 (*Lazutina et. al. v. IOC, FIS & CAS*), translation of the French original reported in XXIX Y. B. COM. ARB, 206, (2004) at 21 *et seq.* . The "judgment issued in 1993, [in which] the Federal Supreme Court expressed reservations concerning the CAS' independence vis-à-vis the IOC on account of the organizational and financial links between the two bodies" is the Decision 4P.217/1992 of 15 March 1993 (*Elmar Gundel v.FEI*), ATF 119 II 271; BULL. ASSOC. SUISSE ARB., 398 (1993).

in Sport, thus under taking to support a process which should result in the Code entering into force in time for the 2006 Olympic Winter Games. Under the terms of Art. 13.2.1 of the new Code, the CAS is the appeals body for all doping-related disputes related to international sports events or international-level athletes.[7]

13. For the sake of completeness, it should be pointed out that the Code was recently amended to provide that "[a]n appeal may be filed with the CAS against an award rendered by the CAS acting as a first instance tribunal if such appeal has been expressly provided by the rules applicable to the procedure of first instance". This new wording was added in order to take into account the two-stage dispute resolution process provided for by Section 10 of the USADA Protocol:

14. A first hearing is conducted under the rules of the AAA (pursuant to the Ted Stevens Olympic and Amateur Sports Act), which requires the (first) hearing to be conducted under the rules of the AAA. The arbitrators are selected from a pool of the "North American Court of Arbitration for Sports (CAS)" of the AAA (often referred to with the acronym "CAS/AAA")[8]. The arbitration will take place in the US and will

---

[7]   Decision 4P.267-270/2002 of 25 May 2003 (*Lazutina et. al. v. IOC, FIS & CAS*) at 3.3.3.3., translation of the French original reported in CAS DIGEST III, p. 688.

[8]   The AAA has formed this pool of arbitrators (as to July 2001 made up of 123) specialized in sports matters (for more details about the establishment of this list, see 56-JUL DISP. RESOL. J. 4). The administration of the arbitration is handled by the Vice President of the AAA who is also the administrator of the decentralized office of CAS in the Americas (USADA Protocol, Sect. 9(c)(i)). One should note that the use of the acronym 'TAS' in an AAA context does not seem very appropriate because of the risk of misunderstandings – particularly in view of the abovementioned Australian system – that it creates.

be conducted in accordance with specific AAA Arbitration Rules (hereinafter the "AAA/USADA Rules")[9].

15. In a second phase, either the athlete or the International Federation (irrespective of its participation to the AAA arbitration) is entitled to appeal the AAA Panel's decision to CAS:

> The final decision by the AAA/CAS arbitrator(s) may be appealed to the Court of Arbitration for Sport ("CAS") as set forth in Article 13 of Annex A. The appeal procedure set forth in Article 13 of Annex A shall apply to all appeals not just appeals by International-Level athletes or other persons. A CAS appeal shall be filed with the CAS Administrator, the CAS hearing will automatically take place in the U.S. and CAS shall conduct a de novo review of the matter on appeal which, among other things, shall specifically include the power to increase, decrease or void the sanctions imposed by the previous AAA/CAS Panel. Otherwise the regular CAS appellate rules apply. The decision of CAS shall be final and binding on all parties and shall not be subject to further review or appeal.

**B.   The Proceedings in front of CAS**

16. CAS arbitrations are conducted under three different sets of rules, depending on the Division to which the case is assigned:

(a) Cases concerning a challenge of a decision by a sport governing body, mainly disciplinary and doping cases are assigned to the CAS Appeals Division and are governed by the so-called Appeals Procedure.

---

[9] AAA Supplementary Procedures for Arbitration Initiated by the United States Anti-Doping Agency. In fact the new rules are the well known 'AAA Commercial Rules', generally used in sports arbitration in the US, as modified by Sect. 10 of the USADA Protocol

(b) The other cases, mainly contractual cases, are assigned to the CAS Ordinary Divisions and are governed by the so-called Ordinary Procedure (i.e. Art. R38 to R46 of the Code).

(c) The cases decided by the Ad Hoc Division for a specific competition are governed by the so-called Ad-Hoc Arbitration Rules adopted for that competition (for instance the Ad Hoc Rules for the upcoming Beijing Olympics).

17. The following paragraphs will outline the main features of the CAS Appeals Procedure that applies as a default rule under the USADA Protocol ("otherwise the regular CAS appellate rules apply"):

- *Applicable rules.* The procedure is thus governed by Section 10 (c-f) of the USADA Protocol, Article 13 of Annex 3 of the USADA Protocol and Article R27 to R37 and R47 to R59 of the CAS Code as *Applicable rules.* The procedure before the Appeals Arbitration Division is governed by the General Provisions of the Code, i.e. Art. R27 to R37, and by the Special Provisions Applicable to the Appeal Arbitration Proceedings, i.e. Art. R47 to R59 of the CAS Code.

- *Standing to Appeal.* The CAS appeal is available both to the athlete and to USADA (as well WADA, the relevant International Federation or the IOC if the decision may have an effect in relation to the Olympic Games).

- *Time limit to appeal*: The statement of appeal must be filed with the CAS Court office (either in Lausanne or in New York) within 21 days from the communication of the AAA decision (Art. R49 of the CAS Code). The appellant then has 10 days to file an appeal brief stating the facts and legal arguments giving rise to the appeal and the exhibits relied upon (Art. R51 of the Code).

- *Application to stay the enforcement of a decision under appeal and application for provisional and conservatory measures*: The Statement of Appeal may be accompanied by an application to stay the enforcement of a decision under appeal (Art. R48 of the CAS Rules). Once the Statement of Appeal has been filed, the President of the Appeals Arbitration Division – before the file has been transmitted to the Panel – or the Panel – thereafter – may make an order for provisional or conservatory measures (Art. R37 of the Code). Consistent with the practice generally followed in international commercial arbitration, the CAS makes the granting of provisional measures subject to the following conditions: (a) a *prima facie* analysis of the merits of the dispute indicates that the applicant has a reasonable chance of success; (b) the applicant is at risk of suffering substantial damage that would be difficult to remedy; and (c) the interests of the applicant as to the risk of damage to which it may be exposed outweigh the interests of the summoned party in maintaining the *status quo*.

- *Applicable substantive law*: The Panel must apply the applicable regulations and the rules of law chosen by the parties. In the absence of such a choice, the applicable substantive law is that of the country in which the federation, association or sports body having issued the decision under appeal is domiciled (Art. R58 of the Code). Following the latest revision of the Code, Art. R58 further provides that the dispute may de decided "according to the rules of law, the application of which the Panel deems appropriate. In the latter case, the Panel shall give reasons for its decision". [This option is very useful in order to assure the development of consistent sport jurisprudence].

- *Hearing*: the CAS hearing will automatically take place in the U.S. and CAS shall conduct a de novo review of the matter on appeal which, among other things, shall specifically include the power to increase, decrease or void the sanctions imposed by the previous AAA Panel.

## 2. THE LAW APPLICABLE TO CAS ARBITRATIONS

18. Pursuant to Article 176 Swiss PILA, the provisions of Chapter 12 of such Act *"s'appliquent à tout arbitrage si le siège du tribunal arbitral se trouve en Suisse et si au moins l'une des parties n'avait, au moment de la conclusion de la convention d'arbitrage, ni son domicile, ni sa résidence habituelle en Suisse."* i.e. "apply to any arbitration if the seat of the arbitral tribunal is in Switzerland and if, at the time when

the arbitration agreement was entered into, at least one of the parties had neither its domicile nor its habitual residence in Switzerland."[10]

19. Hence, Under Swiss law, Chapter 12 of the Swiss PILA applies if (A) the seat of the arbitration is in Switzerland[11], if (B), at the time when the arbitration agreement was entered into, at least one of the parties had neither its domicile nor its habitual residence in Switzerland (*see* Article 176(1) Swiss PILA) and (C) if the dispute resolution mechanism chosen by the parties qualifies as "true arbitration" within the meaning of Swiss arbitration law.

### A.   The Seat of the Arbitration

20. In accordance with Article 176(3) of the Swiss PILA, the parties are free to choose the seat of the arbitration, either directly or by reference to a set of arbitration rules.

21. In the present case Article R28 of the CAS Code provides that the place, or seat, of the arbitration is in Lausanne, Switzerland, in the following terms:

> *Siège*

---

[10]    English translation published in SCHÖLL, op. cit., p. 29.

[11]    The Swiss approach pursuant to which the place or seat is not a geographical localization, but a legal connection between an arbitration and the procedural law is consistent with the concept of seat adopted by the drafters of the UNCITRAL Model Law (see references to the legislative history of the Model Law in Gabrielle KAUFMANN-KOHLER, Identifying and Applying the Law Governing the Arbitration Procedure – The Role of the Law of the Place of Arbitration, in International Council for Commercial Arbitration, Congress Series no. 9, Paris 1998, pp. 343-344, excerpts of which are attached thereto).

*Le siège du TAS et de chaque formation est fixé à Lausanne, Suisse. Toutefois, si les circonstances le justifient, le Président de la Formation ou, à défaut, le Président de la Chambre concernée, peut décider, après consultation des parties, qu'une audience se tiendra dans un autre lieu.*

22.   And in the English version of the Code:

Seat

The seat of the CAS and of each Arbitration Panel ('Panel') is in Lausanne, Switzerland. However, should circumstances so warrant, and after consultation with all the parties, the President of the Panel or, failing him, the President of the relevant Division may decide to hold a hearing in another place.

23.   In the present case the Parties have explicitly confirmed the choice of Lausanne as the seat of the arbitration by agreement to the procedural order mentioned above at II, 6, pt. 7).

24.   Under Swiss law, the place or seat of arbitration is a legal concept, not a physical, geographical location. Or in the words of leading commentators:

The seat is a legal connection which links the parties and the arbitrators, on the one hand, to local courts and to a national arbitration law, on the other hand.[12]

25.   Hence, the fact that the place or seat of arbitration is fixed in one location does not mean that hearings, consultations among arbitrators, or other procedural steps

---

[12]   LALIVE/POUDRET/REYMOND, Le droit de l'arbitrage interne et international en Suisse, Lausanne 1989, p. 295, original in French, loose translation.

must be conducted in that location. In a Swiss international arbitration, it is generally accepted that hearings and meetings may take place outside of Switzerland:[13]

> "The place for hearings and meetings of the tribunal need not e in Switzerland; arbitration having their place or "seat" in Switzerland in which all hearings and meetings of the arbitral tribunal in fact take place outside the country with the agreement of the parties and the arbitral tribunal are not infrequent. Such practice is not unobjectionable as a matter of Swiss law."[14]

26.   In a 1997 decision, the Swiss Supreme Court stressed the legal nature of the seat concept and emphasized that there is no necessary link between the chosen seat and the place where the arbitration is actually conducted:

> By choosing a Swiss legal domicile [*ein schweizerisches Rechtsdomizil*] for the arbitral tribunal, the parties manifestly intended to submit their dispute to Swiss arbitration law, and not to provide for an exclusive location for meetings among arbitrators at the place of arbitration [...].The determination of a given place of arbitration is of significance to the extent that the award is deemed to be rendered at such place. It is irrelevant that a hearing was effectively held or that the award was effectively issued there [citations omitted].[15]

27.   In other words, the "legal nature" of the concept of seat means that the law of the seat of the arbitration is applicable irrespective of the actual place in which the hearing (or even the entire arbitration) is conducted/held.

---

13   see e.g. LALIVE/POUDRET/REYMOND, *op. cit*, p. 297; Felix EHRAT, "Article 176" in Stephen V. Berti (Ed.), International Arbitration in Switzerland, Basel 2000, p. 309.

14   Paolo Michele PATOCCHI, Switzerland, in The Practitioner's Handbook on International Arbitration and Mediation, 2nd Ed. Huntington NY 2007, p. 884.

28. In the present case, the fact that pursuant to Section 10 of the USADA Protocol the hearing was held in New York is of no relevance as to the law applicable to the arbitration. In a recent similar CAS doping case involving the tennis player Guillermo Cañas the Swiss Supreme Court expressly noted that the CAS Award was "issued as part of an international arbitration pursuant to Articles 176 *et seq.* of the Swiss PILA" despite the fact that the CAS hearing was held in New York.[16]

29. As an aside, it bears emphasizing that the main reason for the choice of a sole seat is that it provides a uniform procedural regime for all CAS arbitrations, wherever the hearings take place, whether the arbitrations are managed by the Lausanne office exclusively or in conjunction with a decentralized office. This uniform regime achieves equal treatment in procedural matters, which is consistent with the equal standards that govern the activities giving rise to disputes, i.e. sports competition.

### B. The Parties' Domicile

30. In the present case, it is undisputed that all the parties to the arbitration had neither its domicile nor its habitual residence in Switzerland.

---

[15] Decision of 24 March 1997, BULL. ASSOC. SUISSE ARB. 316, 329-330 (1997), original in German, loose translation.

[16] Decision 4P.172/2006 du 22 mars 2007 (*X. [Guillermo Cañas] c. ATP Tour*), ATF 133 III 235 at 3.1 (original in French, loose translation).

### C. The "true" arbitral nature of the CAS

31.   The applicability of Swiss arbitration law finally presupposes that the dispute resolution mechanism at hand qualifies as a "true arbitration", *i.e.* a system of adjudication sufficiently independent to be considered equivalent to state courts.[17] The question was first raised in the *Gundel* case of 1993, in which the Swiss Supreme Court expressed reservations as to whether CAS was a true arbitration albeit limited to the case where the IOC would be a party to the arbitration (due to the organizational and financial links that existed at that time between the IOC and the CAS).

32.   Following this judgment, the CAS underwent a major reform, which led notably to the creation of the ICAS and to the adoption of the CAS Code. In 2003, in the above mentioned *Lazutina* case, the Swiss Supreme Court was confronted with the same question with respect to the CAS in its current structure and functioning. In its decision, the Supreme Court recognized the work done after *Gundel* and confirmed that the CAS is a "true" arbitral tribunal in any event (even when the IOC is a party to the proceedings). In particular the Court finally settled[18] the issue of the arbitral nature of the CAS, in light of the fact that the parties are not completely free to choose 'their' arbitrator but are required to appoint an arbitrator appearing on the so-called 'CAS arbitrators list'. In substance, the Swiss Supreme Court upheld the

---

[17]   RIGOZZI, *op. cit.*, No. 466 *et seq.*

mechanism of the arbitrators list emphasizing that it was necessary to ensure the specialization of the arbitrators and a consistency of the decisions rendered. After a careful analysis of the structure, the functioning and the financing of the CAS, the Supreme Court came to the conclusion that "it is clear that the CAS is sufficiently independent vis-à-vis the International Olympic Committee (IOC), as well as all other parties that call upon its services, for its decisions in cases involving the IOC to be *considered true awards, equivalent to the judgments of State courts*".[19]

* * *

33.  In conclusion, since the CAS panels have their seat in Switzerland and qualify as true arbitral tribunals and at least one of the parties to the arbitration at hand had its domicile outside Switzerland, the CAS arbitration in *Gatlin v. USADA et al.* was governed by Chapter 12 of the Swiss PILA.

## 3.  LEGAL CONSEQUENCES OF THE APPLICATION OF SWISS LAW

34.  As a preliminary matter, it is of the greatest importance to understand that, by choosing the CAS — whose Panels have their seat in Lausanne, Switzerland — the parties trigger the application of the provisions of Chapter 12 Swiss PILA by

---

[18]  For some marginal criticism, *see* MICHAEL STRAUBEL, Enhancing the Performance of the Doping Court: How the Court of Arbitration for Sport Can Do Its Job Better, Loyola University Chicago Law Journal 2005, pp. 1231 *et seq.*

[19]  Decision 4P.267-270/2002 of 27 May 2003 (*Lazutina & Danilova v. IOC, FIS & CAS*) at 3.3; ATF 129 III 445 at 463; BULL. ASSOC. SUISSE ARB., 601 (2003); XXIX Y. B. COM. ARB, 206, *224* (2004); emphasis added.

*operation of law.*[20] Moreover, it should be emphasized that the since the seat of the arbitration in Switzerland (and the other requirements for the applications of Chapter 12 are met) the law applicable to the arbitration is *Swiss* law and Swiss law *only.* In other words, the application of Swiss international arbitration law is *mandatory* when the seat is in Switzerland.[21] "By choosing the seat, the parties choose the *lex arbitri*".[22]

35. As an aside, it shall be noted that the fixing of the seat in Switzerland and thus the application of Swiss arbitration law also means that, outside Switzerland, CAS awards constitute "foreign awards" within the meaning of the New York Convention.[23] Hence CAS awards have *res judicata* effect abroad, unless one of the limited grounds to refuse recognition and enforcement pursuant to the New York Convention is fulfilled.

---

[20]    Paolo Michele PATOCCHI, Switzerland, in The Practitioner's Handbook on International Arbitration and Mediation, 2nd Ed. Huntington N.Y 2007, p. 885.

[21]    RIGOZZI, op. cit., NNo. 439 – 443 and footnotes.

[22]    Pierre A. KARRER, Peter A. STRAUB, Switzerland, in Frank-Bernd Weigand (Ed), Practitioner's Handbook on International Arbitration, Munich [etc.] 2002, p. 1060.

[23]    *See* for instance the decision of the German Oberland Gericht München 10 October 2002 in the well known *Stanley Roberts* case, according to which the award rendered by the CAS was a award capable of being enforced and recognized through the New York Convention (loose translation of the German original "*« gemäss § 1061 Abs. 1 ZPO i.V.m. Art. III UNÜ anerkennungsfähiger Schiedsspruch*", reported in SpuRt 2003, p. 199). With respect to the former IAAF Arbitration Panel, the seat of which was in Monaco, *see* also *Slaney v. Int'l Amateur Ath. Fedn*, 244 F.3d 580, *587-594* (7th Cir. 2001).

## A.   Jurisdiction of the Swiss Courts

36.   Chapter 12 of the Swiss PILA provides that Swiss courts have jurisdiction in aid and control of arbitrations falling within the scope of this statute, in particular with respect to the setting aside of the award.[24]

37.   Specifically, Article 191 of the Swiss PILA vests jurisdiction over actions to set aside arbitral awards in the Swiss Federal Tribunal.[25] In other words, the parties have a one-shot appeal directly before the highest court of the country.

38.   In sports matters, this guarantees uniformity in the interpretation and application of Chapter 12 of the Swiss PILA.

39.   As an aside, it bears pointing out that the Supreme Court has no discretion in assessing its jurisdiction and concepts such as *forum non conveniens* are unknown in Swiss law. Accordingly, provided an arbitration is governed by Chapter 12 of the Swiss PILA, i.e. whenever the place of arbitration is in Switzerland and one of the parties is domiciled outside of this country (as in the present case), the Supreme Court *must accept jurisdiction*.

40.   Indeed, the Supreme Court has done so in at least 25 instances in which a party filed an action to set aside a CAS award.[26]

---

[24]   Gabrielle KAUFMANN-KOHLER, Antonio RIGOZZI, Arbitrage International, Droit et pratique à la lumière de la LDIP, Zurich/Basel/Geneva 2006, NNo. 119, 152, and 154.

41. To sum up, because the seat of the arbitration is Switzerland under the CAS Code which the parties have agreed to applies, and because the seat is a legal concept which does not imply that the arbitration actually be conducted in Switzerland, I firmly believe that the Swiss Supreme Court would accept jurisdiction over an action to set aside the decision under challenge.

---

[25] Under the heading "Competent Court" Art. 191 PILA reads as follows: "The action for annulment may only be brought before the Federal Supreme Court. The procedure shall be governed by Article 77 of the Supreme Court Act of 17 June 2005." SCHÖLL, op. cit., p. 32.

[26] Decision of the Swiss Federal Tribunal 4A_528/2007 of 4 April 2008 (*X [Esporte Clube Victória] v. Y [Al Itthiad S/A].*); Decision 4A_506/2007 of 20 March 2008 (*X [organizer of football games] v. Y [Turkish Football Federation]*); Decision 4A_370/2007 of 21 February 2008 (*Charles N'Zogbia v. le Havre AC*); Decision 4A_286/2007 of 30 November 2007 (*Club X. v. OL & TAS*); Decision 4A_204/2007 of 5 November 2007 (*Esteghlal FC v. AFC & TAS*) ; Decision 4A_160/2007 of 28 August 2007 (*Football Club X v. Federation Y & TAS*) ; Decision 4A_42/2007 of 13 July 2007 (*X [Besiktas] v. A [M. Del Bosque] et al.*) ; Decision 4A_17/2007 of 8 June 2007 (*A [Nuno Assis] v. AMA & TAS*); Decision 4P.172/2006 of 22 March 2007 (*X. [Guillermo Cañas] v. ATP Tour*), ATF 133 III 235; Decision 4P.298/2006 of 14 February 2007 (*X [Greek player] v. Y [Greek club] & TAS*); Decision 4P.148/2006 of 10 January 2007 (*X [Danilo Hondo] v. AMA et al. & TAS*), BULL. ASSOC. SUISSE ARB. 2007, p. 569; Decision 4P.240/20067 of 5 January 2007 (*X [Rayo Vallencano de Madrid] SAD. v. FIFA & TAS*), BULL. ASSOC. SUISSE ARB. 2007, p. 381; Decision 4P.105/2006 of 4 August 2006 (*Hazza Bin Zayed v. Lissarague & FFE & World Championship 05 & FEI*); Decision 4P.314/2005 of 21 February 2006 (*Player A. v. FC X. [Switzerland] & CAS*); Decision 4P.26/2005 of 23 March 2005 (*Club X. v. [Brazilian] Players A. and B., FIFA & CAS*), BULL. ASSOC. SUISSE ARB., 704 (2005); Decision 4P.62/2004 of 1 December 2004 (*Federación costarricense de triatlón (FECOTRI) v. International Triathlon Union, Comité Olimpico de Costa Rica, & CAS*), BULL. ASSOC. SUISSE ARB., 483 (2005); Decision 4P.269/2003 of 6 May 2004 (*Sport Club X. Istanbul v. Fédération Internationale de Football Association (FIFA), Player A., Club Y. Rio de Janeiro & CAS*), BULL. ASSOC. SUISSE ARB., 477 (2005), SCHIEDSVZ, 212 (2004), p. 212; Decision 4P.253/2003 of 25 March 2004 (*Football Club A. v. Coach B. & CAS*), BULL. ASSOC. SUISSE ARB., 139 (2005), SCHIEDSVZ 2004, p. 214; Decision 4P.149/2003 of 31 October 2003 (*A. [Laurent Roux] v. Union Cycliste Internationale (UCI) & CAS*), RSDIE 2005, p. 177; Decision 4P.267-270/2002 of 27 May 2003 (*Lazutina & Danilova v. IOC, FIS & CAS*), ATF 129 III 445, BULL. ASSOC. SUISSE ARB., 601 (2003), XXIX Y. B. COM. ARB, 206, *219* (2004); Decision 4P.124/2001 of 11 June 2001 (*Abel Xavier v. Union des Associations Européennes de Football*), ATF 127 III 429, BULL. ASSOC. SUISSE ARB., 566 (2001); Decision 4P.230/2000 of 7 February 2001 (*Stanley Roberts c. Federation Internationale de Basketball*), BULL. ASSOC. SUISSE ARB., 523 (2001); Decision of 5P.427/2000 of 4 December (*Andreea Raducan v. IOC*), 2000, BULL. ASSOC. SUISSE ARB., 508 (2001); Decision 4P.83/1999 of 31 March 1999 (*N. [Lu Na Wang], J., Y., W. c. FINA*), CAS Digest II, p. 767; Decision 4C.44/1996 of 31 October 1996 (*Nagel v. Fédération équestre internationale*), reported in CAS Digest I, p. 577; Decision

### B.   Unenforceability of Waivers to Appeal in Sports Disputes

42.   The Supreme Court will do so notwithstanding the above mentioned waiver language of the USADA Protocol that "[t]he decision of CAS shall be final and binding on all parties and shall not be subject to further review or appeal".[27]

43.   Though Chapter 12 Swiss PILA provides the possibility of a waiver[28], such an *indirect* waiver does not meet the stringent requirements set by case law for the waiver to be enforceable.[29] In any event, the Swiss Supreme Court has recently held that any waiver contained in sports regulations is unenforceable per se as the athletes do not have any other choice but to subscribe to the waiver in order to participate in the sport.[30] It bears quoting the relevant passage of this decision, because it shows how dedicated the Swiss Supreme Court is at ensuring that the athletes are not deprived of their fundamental rights, in particular of their right to challenge CAS awards:

---

4P.217/1992 of 15 March 1993 (*Elmar Gundel v.FEI*), ATF 119 II 271; BULL. ASSOC. SUISSE ARB., 398 (1993).

[27]   *See* above ¶ 15

[28]   Under the heading "Waiver of annulment", Article 192(1) of the Swiss PILA reads as follows: "If none of the parties have their domicile, their habitual residence, or a business establishment in Switzerland, they may, by an express statement in the arbitration agreement or by a subsequent written agreement, waive fully the action for annulment or they may limit it to one or several of the grounds listed in Art. 190(2)".

[29]   Decision 4P.62/2004 of 1 December 2004 (*Federación costarricense de triatlón (FECOTRI) v. International Triathlon Union, Comité Olimpico de Costa Rica, & CAS*) at 2.1, BULL. ASSOC. SUISSE ARB., 483 (2005).

[30]   Decision 4P.172/2006 of 22 March 2007 (*X. [Guillermo Cañas] c. ATP Tour*), ATF 133 III 235.

As is suggested by the text of Article 192(1) PILA, a waiver of appeal is based on an agreement between the parties, whether in the arbitration agreement or in a subsequent written agreement. Such an agreement, just like any other contract, is only valid if the parties have, mutually and in agreement with each other, demonstrated their wish to exclude all appeals. Freedom of contract, which forms part of the parties' freedom to arrange their own affairs, requires that such a demonstration does not emanate from a desire that is subject to any kind of interference. It is especially important that the expression of the desire to exclude all appeals should not be invalidated by any form of constraint, since such an exclusion denies its author of the possibility of appealing any future award, even if it were to violate the fundamental principles of the rule of law, such as public policy, or essential procedural guarantees such as the proper composition of the arbitral tribunal, its jurisdiction, the equality of the parties or even the right to a fair hearing in an adversarial proceeding.

Competitive sport is characterized by a very hierarchical structure at both national and international levels. Established on a vertical basis, the relations between athletes and the organizations that govern the different sporting disciplines are different from the horizontal relations between the parties to a contract (ATF 129 III 445 [*Lazutina*] at 3.3.3.2 p. 461). This structural difference between the two types of relations has an impact on the volitional process that leads to the conclusion of an agreement. In principle, when two parties are on an equal footing, each expresses its wishes without being subject to the goodwill of the other. This is generally the case in international commercial relations. The situation is quite different in the world of sport. Apart from the fairly hypothetical situation where a famous athlete is so well known that he is able to dictate his conditions to the international federation governing his sport, experience shows that, most of the time, athletes do not have a great deal of power over their federation and have to adhere to its wishes whether they like it or not. Therefore, an athlete who wishes to participate in a competition organized under the auspices of a sports federation whose regulations include an arbitration clause has no option but to accept such a clause, particularly by adhering to the statutes of the sports federation in question in which the clause appears. This is especially true where professional athletes are concerned. They are confronted with the dilemma of either agreeing to arbitration or practicing their sport as an amateur (for discussion of the problem of enforced arbitration, *see* Antonio RIGOZZI, L'arbitrage international en matière de sport, No. 475 ff and No. 811 ff., with numerous references to the different opinions expressed on this subject). Faced with the choice of either submitting to arbitral jurisdiction or practicing his sport "in his garden" (François

KNOEPFLER / Philippe SCHWEIZER, Arbitrage international, p. 137 i.f.) while watching the competitions "on television" (RIGOZZI, op. cit., p. 250, note 1509 and the first author mentioned), an athlete who wishes to face genuine opponents or who wishes to do so because it is his only source of income (prize money or earnings in kind, advertising income, etc.) will in effect be compelled *nolens volens* to take the first option.

It is clear that an athlete's waiver of appeal against future awards will not generally be the result of a freely expressed desire on their part. The agreement that results when such a wish tallies with that expressed by the sports organization concerned will therefore be affected from the very outset by the fact that one of the parties was forced to give his consent. Now, by agreeing in advance to submit to any future award, the athlete, as we have seen, immediately waives his right to seek punishment for future violations of fundamental principles and essential procedural guarantees that might be committed by the arbitral tribunal ruling on cases in which he is a party. Furthermore, with regard to disciplinary measures imposed against him, such as a suspension, which does not need to be the subject of an exequatur procedure, he will not be able to submit his complaints on this subject to the enforcement judge. Therefore, in view of its importance, a waiver of appeal should not, in principle, be used as a defence against an athlete, even if it meets the technical requirements laid down in Art. 192(1) PILA (in this regard, see Gabrielle KAUFMANN-KOHLER / Antonio RIGOZZI, Arbitrage international – Droit et pratique à la lumière de la LDIP, Bern 2006, No. 766). This conclusion is all the more necessary insofar as the refusal to hear an appeal by an athlete who had no other choice but to agree to waive his right of appeal in order to be allowed to participate in competitions also appears questionable under Article 6(1) of the European Convention on Human Rights (see KAUFMANN-KOHLER / RIGOZZI, op. cit., no. 767; more generally, see also: Sébastien BESSON, Arbitration and Human Rights, in ASA Bulletin 2006, pp. 395 ff., 405 f., nos. 35 to 37; Franz MATSCHER, in La Convention européenne des droits de l'homme, Commentaire article par article, 2nd Edition, p. 285, note 1).

The liberalism which characterizes case-law relating to the form of arbitration agreements in international arbitration is also evident in the flexibility with which this case-law deals with the problem of the arbitration clause by reference (ATF 129 III 727 at 5.3.1 p. 735 and the judgments mentioned), including in the sports field (judgments 4P.253/2003 of 23 March 2004, rec. 5.4, 4P.230.2000 of 7 February 2001, rec. 2a and 4C.44/1996 of 31 October 1996, rec. 3c; see also: RIGOZZI, op. cit., No. 796 ff). Conversely, as we have already highlighted, case-law is strict when it comes to accepting waivers of

appeal, since it states that such a waiver may not be made indirectly (at 4.3.1) and does not, in principle, allow them to be used as a defence against an athlete (at 4.3.2.2).

It is probably true that it is rather illogical, in theory, to treat an arbitration agreement differently from an agreement to exclude all appeals in respect of form and consent (for more on this, see François Knoepfler in François KNOEPFLER / Philippe SCHWEIZER, Jurisprudence suisse en matière d'arbitrage international, in RSDIE 2006, pp. 105 ff., 159). However, in spite of appearances, this difference in treatment is logical insofar as it promotes the swift settlement of disputes, particularly in sport, by specialized arbitral tribunals that offer sufficient guarantees of independence and impartiality (concerning the CAS, see ATF 129 III 445 [*Lazutina*] at. 3.3.3.3), while at the same time ensuring that the parties, especially professional athletes, do not give up lightly their right to appeal awards issued by a last instance arbitral body before the supreme judicial authority of the state in which the arbitral tribunal is domiciled. In other words, this logic is based on the continuing possibility of an appeal acting as a counterbalance to the "benevolence" with which it is necessary to examine the consensual nature of recourse to arbitration where sporting matters are concerned (RIGOZZI, op. cit., No. 1352).[31]

44. Considered together with the above mentioned *Gundel* decision through which it ensured the CAS' independence[32], the *Cañas* decision clearly indicates that the Swiss Supreme Court is committed to ensure that the athletes are given a fair opportunity to challenge an arbitration award. In other words, if Justin Gatlin challenged the CAS award before the Swiss Federal Tribunal, his challenge would be considered and decided by the Swiss Federal Tribunal as the only appropriate court to decide such a challenge.

---

[31]     Decision 4P.172/2006 of 27 March 2007 at 4.3.2.2, ATF 133 III 235, *245*. Emphasis added.

[32]     *See* above at ¶¶ 29-30.

### C. The Grounds for Appeals

45. According to Art. 190 Swiss PILA, the award can be set aside only on specific grounds. The only grounds allowed are the ones spelled out in Art. 190(2) Swiss PILA[33], namely:

> a. *Lorsque l'arbitre unique a été irrégulièrement désigné ou le tribunal arbitral irrégulièrement composé;*
>
> b. *Lorsque le tribunal arbitral s'est déclaré à tort compétent ou incompétent;*
>
> c. *Lorsque le tribunal arbitral a statué au-delà des demandes dont il était saisi ou lorsqu'il a omis de se prononcer sur un des chefs de la demande;*
>
> d. *Lorsque l'égalité des parties ou leur droit d'être entendues en procédure contradictoire n'a pas été respecté;*
>
> e. *Lors que la sentence est incompatible avec l'ordre public.*

46. And in the English translation:

> a. if the sole arbitrator has been improperly appointed or if the arbitral tribunal has been improperly constituted;
>
> b. if the arbitral tribunal has wrongly accepted or declined jurisdiction;
>
> c. if the arbitral tribunal's decision went beyond the claims submitted to it; or failed to decide one the items of the claims;
>
> d. if the principle of equal treatment of the parties or their right to be heard in an adversary procedure was violated;
>
> e. if the award is incompatible with public policy.[34]

47. These grounds for setting aside are similar to both the grounds to refuse enforcement of an award under the New York Convention[35] and the grounds to vacate

---

[33]  ATF 128 III 50, *53*; ATF 127 III 279, *282*.

[34]  Translation published in SCHÖLL referenced above.

[35]  Jean Francois POUDRET, Sebastien BESSON, Comparative Law of International Arbitration, London 2007, NNo. 786 *et seq.*

an award under the U.S. Federal Arbitration Act. Broadly speaking, only serious procedural defects or rulings on substance that are contrary to international public policy will be considered. More specifically, the following could be said as to the grounds for setting aside:

48.   *Irregular constitution of the arbitral tribunal.* Article 190(2)(a) of the Swiss PILA provides that an award can be set aside if the arbitral tribunal was irregularly constituted. In practice, this ground for setting aside guarantees the parties' right to an independent and unbiased judge or arbitrator (this right results in particular from Art. 6 of the European Human Rights Convention and Art. 30 of the Swiss Constitution).

49.   *Wrong ruling on jurisdiction.* In accordance with Article 190(2)(b) of the Swiss PILA, an award can be set aside if the arbitral tribunal wrongly accepts or declines jurisdiction. Based on this provision a party may challenge the arbitral tribunal's decision on the existence, validity, scope, etc. of the arbitration agreement.

50.   *Award ultra, infra or extra petita.* Pursuant to Article 190(2)(c) of the Swiss PILA, an award can be set aside if the arbitral tribunal has adjudicated beyond the relief sought (*ultra petita*) or granted relief different than what was sought (*extra petita*) or failed to adjudicate certain claims (*infra petita*). The purpose of this provision is to guarantee each party's right to have its claims addressed by the arbitral

tribunal and to avoid adjudication of claims where a party was unable to or was not given the opportunity to present its case.

51. *Violation of due process.* Pursuant to Article 190(2)(d) of the Swiss PILA, an award can be set aside if a breach of the parties' right to equal treatment or right to be heard occurred.

52. *Violation of public policy.* Pursuant to Article 190(2)(e) of the Swiss PILA, an award can be set aside for violation of public policy. The definition of public policy is not entirely settled. In particular, it appears that public policy is not necessarily limited to Swiss public policy. From a practical point of view, this ground for setting aside relates to awards containing a specific result which is contrary to fundamental legal and moral principles recognized in any civilized state, such as, for example, *pacta sunt servanda* (sanctity of contract), observance of good faith, the prohibition of spoliation and discriminatory measures, the prohibition of bribery and corrupt practices and the prohibition of expropriation without compensation.

### D. Procedural questions

53. According to Art. 191 Swiss PILA, Article 77 of the Swiss Supreme Court Act of 2005 (Swiss SCA) shall determine the appeal procedure.

54. Pursuant to Article 77(2) of the Swiss SCA the action to set aside an international arbitral award shall be filed as a *recours en matière civile* before the

Swiss Federal Supreme Court according to the conditions set out by Article 190-192 Swiss PILA. For the sake of the present opinion I will limit myself to a brief summary of the conditions of admissibility (1.) and examine whether preliminary relief is available.

### 1. Admissibility

55. According to the Supreme Court, the appealing party must (i) be « directement touché par la sentence attaquée » and have « un intérêt personnel actuel et juridiquement protégé ». The first condition will be easily met with respect to the party that loses the arbitration, either totally or partially. The second condition would only be problematic in cases where the athlete has already served her or his period of suspension, which is clearly not Mr. Gatlin's case in the present instance.

56. The *délai du recours* is stated in Art. 100 Swiss SCA. According to Art. 100 of the Swiss SCA the appeal must be lodged with the Swiss Federal Tribunal within 30 days from the reception of the fully reasoned award, it being specified that the time-limit does not run during the judicial recess, i.e. in the summer from July 15 to August 15. Hence, as the operative part of the award was notified on 6 June 2008 and the reasoned award is not available yet, Mr. Gatlin still has the possibility to file an appeal against the CAS award before the Swiss Supreme Court.

57. To file an action to set aside an award, a party must retain Swiss counsel, who will prepare an appellate brief. The respondent(s) will then be granted an opportunity

to file a reply. Thereafter, usually within three to four months, the Supreme Court will issue its decision.

### 2. *Preliminary relief*

58.  In general the appeal against an arbitral awards is not granted suspensive effect. Such an effect as well as any other provisional orders to maintain the status quo or to protect threatened interests may be requested from the instructing judge.[36] According to the Swiss Supreme Court the granting of suspensive effect to the award « doit rester exceptionnel » and can only be granted under the cumulative conditions that (i) the award would otherwise cause both serious and irrevocable damage to the applicant, (ii) the balance of opposing interests rests in favor of the requesting party and (iii) the party seeking relief has « de bonnes chances de succès » on a *prima facie* case on the merits (i.e. the requesting party has - at least upon a *prima facie* examination – a good chance of success to be granted the legal right asserted).

59.  What if, as in the present case, the reasons of the award have not been notified yet? It is submitted that a party in such a situation could file a summary action to set aside the CAS Award in order to request the preliminary relief pursuant to Article 103 and/or 104 Swiss SCA. In a similar situation occurring under the previous law, the Supreme Court was exceptionally generous in granting preliminary relief on the ground that "considering that one is still unaware of the reasons behind the decision

under appeal, it is neither possible to make a prediction as to the chances of success of the action nor maintain that they are non-existent"[37]. In that case, the cyclist was allowed to continue to compete despite the fact that the CAS had sanctioned him to 2 years of ineligibility for doping.

* * *

## 4.  ANSWERS TO THE QUESTIONS PRESENTED

60.  In light of the above developments, I can answer the questions posed as follow:

### A.  What is the law applicable to CAS arbitration proceedings?

61.  All CAS arbitrations have their legal seat in Switzerland. Hence it is mandatory that they are held under Swiss arbitration law. Since at least one of the parties was domiciled outside Switzerland at the relevant time, the arbitration CAS 2008/A/1461 and 1462 in *Gatlin v. USADA et al.* was governed by Chapter 12 of the Swiss PILA (although the hearing was held in New York).

---

[36] Art. 103(3) and Art. 104 Swiss SCA.

[37]   Decision 4P.148/2006 of 3 July 2005 (*Danilo Hondo v. WADA & UCI*), unreported, at p. 4 (loose translation of the French original: *"Considérant, par ailleurs, que l'on ignore encore tout des motifs sur lesquels repose la décision attaquée, il n'est pas possible d'émettre un pronostic quant aux chances de succès du présent recours ni de retenir, partant, que celles-ci seraient inexistantes"*).

**B.    Does Swiss law provide for an action to set aside CAS awards?**

62.    Article 190-191 of the Swiss PILA provides for a one-shot appeal directly before the Swiss Supreme Court.

**C.    What are the proper procedural steps to file an action to set aside a CAS award, in particular can the plaintiff seek preliminary relief?**

63.    The party that wishes to have an award set aside shall file an appeal brief within thirty days from the reception of the reasoned CAS award. The appeal brief can include or be accompanied by a request for preliminary relief.

\* \* \*

64.    In conclusion, I firmly believe that the proper forum to challenge and bring an action to set aside a CAS awards is the Swiss Supreme Court pursuant to Articles 190 and 191 of the Swiss PILA.

65.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is in accordance with my sincere beliefs.

66.    Geneva, 22 June 2008

Dr. Antonio Rigozzi

# ANNEX A

## Antonio RIGOZZI

# CURRICULUM VITAE
### (June 2008)

| | |
|---|---|
| **Date and Place of birth** | 16 June 1969; Lugano, Switzerland |
| **Present Positions** | Partner<br>LÉVY KAUFMANN-KOHLER<br>3-5, rue du Conseil-Général – PO Box 552 – CH-1211 Geneva 4<br>Email: antonio.rigozzi@lk-k.com<br>Tel: +41 22 809 6200<br>Fax: +41 22 809 6201 |
| | Lecturer<br>NEUCHÂTEL UNIVERSITY LAW SCHOOL<br>(International Arbitration; Sports Law)<br>Email: antonio.rigozzi@unine.ch |
| **Professional experience** | SCHELLENBERG WITTMER Geneva, Associate (2002-2007) |
| | HARVARD LAW SCHOOL; Visiting Fellow – Swiss National Science Foundation's Fellow (2001-2002) |
| | GENEVA UNIVERSITY LAW SCHOOL; Research and Teaching Assistant, Department of Private International Law (1999-2001) |
| | PYTHON PITTER Geneva, Intern (1997-1999) |
| **Languages** | Italian (mother tongue), French, English, German |

### Bar Admission and Education

PhD *[Doctorat en droit]*, Geneva University Law School (2004)

Geneva Bar (1999)

LL.M. *[Diplôme d'études approfondies (DEA) en droit européen]*, Geneva University Law School (1995)

Law Degree *[Licence en Droit]*, Geneva University Law School (1996)

International Relations Degree *[Licence en Relations Internationales]*, Graduate Institute of International Studies, Geneva (1992)

### Areas of Specialization

International arbitration

Conflicts of laws and international private law

International sports law

**Experience in Arbitration**

Counsel or Co-counsel in commercial and sports arbitrations (ad hoc, ICC, CAS) as well as in arbitration related litigations

Arbitrator or Secretary to the Tribunal in international arbitrations (ad hoc, ICC, LCIA, DIS, SCC, ICSID)

**Experience in Sports Law**

- Representing and advising athletes before the CAS and before the Swiss Olympic's Disciplinary Board in doping and doping related disputes concerning various sports (swimming, cycling, sailing, ice-hockey, equestrian sport, football)

- Representing and advising athletes, clubs and national federations before the CAS, ad hoc arbitral tribunals and various jurisdictions in disputes against international federations as well as the IOC (venue of matches, re-awarding of medals after positive tests, sponsorship disputes, labor law disputes, change of nationality and other eligibility issues)

- Representing athletes, clubs and international federations before the Swiss Federal Tribunal in appeals against CAS awards

- Arbitrator or President of the arbitral tribunal in national and international arbitrations concerning sports matters (sponsoring contracts, eligibility disputes)

- Advising national and international federations on dispute resolution issues and in setting up dispute resolution mechanisms

- Advising Formula 1 Team on anti-doping regulations, informing pilots on rights and obligations in and out-of competition

- Drafting several legal opinions on doping matters, in particular for WADA, and on arbitration law, in particular in connection with CAS proceedings

**Other professional, academic and scientific activities**

SWISS ATHLETICS; Chairman of the Arbitral Tribunal (since 2006)

JUSLETTER LEGAL ONLINE REVIEW; Editor responsible for sports law (since 2004)

SWISS BAR ASSOCIATION; Member of the Scientific Board on Sports Law (since 2004)

**Professional associations**

GENEVA AND SWISS BAR ASSOCIATIONS

SWISS ARBITRATION ASSOCIATION

## Main Publications

- *Arbitrati e Tribunale internazionale sportivo* [Arbitration and the Court of Arbitration for Sport], in: MAURO RUBINO-SAMMARTANO (ED.), ARBITRATO, ADR, CONCILIAZIONE, Bologna (Zanichelli), publication forthcoming, September 2008

- *Le recours contre les sentences du Tribunal arbitral du sport (TAS)* [Remedies against CAS Awards], in: REVUE DE L'AVOCAT 2008, pp. 216-222

- *Player Agents Regulations in Switzerland*, in: ROBERT SIECKMANN ET AL. (ED.) PLAYER AGENTS IN EUROPE, The Hague (TMC Asser), 2007, pp. 525-540

- ARBITRAGE INTERNATIONAL – DROIT ET PRATIQUE À LA LUMIÈRE DE LA LDIP [International arbitration – Law and Practice in Light of the Swiss Private International Law Act], Bern [etc.] (Weblaw-Schulthess) 2006 (with Gabrielle Kaufmann-Kohler)

- L'ARBITRAGE INTERNATIONAL EN MATIÈRE DE SPORT [International Arbitration in Sport Matters], Basel[etc.] (Helbing & Lichtenhahn, LGDJ, Bruylant) 2005

- *The Decisions Rendered by the CAS Ad Hoc Division at the Turin Winter Olympic Games 2006*, JOURNAL OF INTERNATIONAL ARBITRATION 2006, pp. 453-466

- *Provisional Measures in CAS Arbitrations*, in: THE COURT OF ARBITRATION FOR SPORT 1984-2004, The Hague (TMC Asser) 2006, pp. 216-234

- *Die Internationalität der Schiedsgerichtsbarkeit in Sportstreitigkeiten* [The international character of arbitration in sports disputes], in: JUSLETTER of 27 November 2006 (with Yves Hochuli)

- *Introducing the Court of Arbitration for Sport*, REVISTA LATINOAMERICANA DE ARBITRAJE, Vol. VI, N° 1, 2006 (Dossier especial el arbitraje deportivo); available *at <http://www.med-arb.net/numeros/2006/rlma2006-1.pdf>*

- *Sports Arbitration for the 2008 Beijing Olympic Games*, in ARBITRATION: THE JOURNAL OF THE CHARTERED INSTITUTE OF ARBITRATORS, Volume 69 N° 3 (August 2003), pp. 184-189 (with G. Tucker)

- *Doping and Fundamental Rights of Athletes: Comments in the Wake of the Adoption of the World Anti-Doping Code*, in: INTERNATIONAL SPORTS LAW REVIEW 2003, pp. 39-67 (with G. Kaufmann-Kohler and G. Malinverni)

- *L'arbitrabilité des litiges sportifs* [Arbitrability of Sports Disputes], in: SWISS ARBITRATION ASSOCIATION (ASA) BULLETIN 2003, pp. 501-537

- DIE REVISION INTERNATIONALER SCHIEDSSPRÜCHE IN DER SCHWEIZ [The revision of international arbitral awards in Switzerland], Basel (Helbing & Lichtenhahn) 2002 (with M. Schöll)

- *Correction and Interpretation of Awards in International Arbitrations held in Switzerland: Note on a Decision of the Swiss Federal Court (ATF 126 III 524)*, in: MEALEY'S INTERNATIONAL ARBITRATION REPORTS (2001) Volume 16, Issue #4 (with G. Kaufmann-Kohler)

- *Arbitrage, ordre public et droit communautaire de la concurrence* [Arbitration, Public Policy and European Competition Law], in: SWISS ARBITRATION ASSOCIATION (ASA) BULLETIN (1999), pp. 455-502

- Annual *Chronique de jurisprudence en matière d'arbitrage sportif*, CAHIERS DE L'ARBITRAGE - GAZETTE DU PALAIS (since 2006)

- Regular contributions on International Arbitration and Sports Law, in JUSLETTER (available at *www.weblaw.ch/jusletter*)

## Recent Conferences –Speeches

- "'Real-Time' Dispute Management Processes: What can we learn from the Ad Hoc Division of the Court of Arbitration for Sport for the Olympic Games", *Fourth Annual CPR European Congress on Business Dispute Management*, Vienna 15-16 May 2008

- "Remedies against CAS Awards", *2nd joint CAS and Swiss Br Association Sport Law Seminar*, Lausanne 22-23 February 2008

- "Introduction to Sports Arbitration", *AIJA International Arbitration Commission*, Helsinki, 7-9 June 2007

- "Provisional Measures in CAS Arbitrations", *International Congress on the Court of Arbitration for Sport (CAS) & Football*, Real Federación Española de Fútbol, Madrid 10-11 November 2006

- "Sports Arbitration on the Eve of the FIFA World Cup"; *Deutsche Institution für Schiedsgerichtsbarkeit (DIS40 - Frankfurt Treffen)*, Frankfurt 31 May 2006

- "Fans als Feinde? – Die Verantwortung des Vereins für seine Fans"; 2. Sportrechtstage in Magglingen, *Association suisse de droit du sport (ASDS)*; Macolin 11-12 May 2006

- "The Future of Arbitration in Sports Disputes", International Arbitration: Taking Stock Of Contemporary Developments; *Union Internationale des Avocats (UIA)*, Athens 31 March 2006

- "Procedura arbitrale", Procedura civile ed arbitrale: temi scelti e recenti sviluppi; *GASI - Gruppo ASA della Svizzera italiana*, Lugano 14 November 2005

- "The Role of Swiss Arbitration Law in Resolving Olympic Disputes", Dispute Resolution Methods for the Turin Winter Olympics 2006 and other 'Hot' Topics; *Chartered Institute of Arbitrators (European Branch)*, Turin 8-10 April 2005

- "Arbitrage et sport - Une sélection de problèmes issus de la pratique actuelle", Temi scelti di diritto dello sport; *Giornata di studio della Commissione per la formazione permanente dei giuriste (CFPG)*; Lugano 12 March 2004

- Regular conferences within the framework of the *Master of Advanced Studies in Sport Administration & Technology* (Lausanne) and the *FIFA International Master in Management, Law and Humanities of Sport* (Neuchâtel)

\* \* \* \* \*

ANNEX B

# Federal Statute on Private International Law (SPIL)

(of 18 December 1987, translation)[*]

French original text (RS 291).......................................................35
German original text (SR 291)......................................................41

## Chapter 12: International Arbitration

### Article 176

[1] The provisions of this chapter shall apply to all arbitrations if the seat of the Arbitral Tribunal is in Switzerland and if, at the time of the conclusion of the arbitration agreement, at least one of the parties had neither its domicile nor its habitual residence in Switzerland.

[2] The provisions of this chapter shall not apply where the parties have agreed in writing that the provisions of this chapter are excluded and that the cantonal provisions on arbitration should apply exclusively.

[3] The seat of the Arbitral Tribunal shall be determined by the parties, or the arbitral institution designated by them, or, failing both, by the arbitrators.

**I. Scope of application; seat of the Arbitral Tribunal**

### Article 177

[1] Any dispute of financial interest may be the subject of an arbitration.

[2] A state, or an enterprise held by, or an organization controlled by a state, which is party to an arbitration agreement, cannot invoke its own law in order to contest its capacity to arbitrate or the arbitrability of a dispute covered by the arbitration agreement.

**II. Arbitrability**

### Article 178

[1] The arbitration agreement must be made in writing, by telegram, telex, telecopier or any other means of communication which permits it to be evidenced by a text.

[2] Furthermore, an arbitration agreement is valid if it conforms either to the law chosen by the parties, or to the law governing the

**III. Arbitration agreement**

---

[*] English translation by Dr. Pierre A. Karrer, reprinted with kind permission of the author, updated by the editor.

subject-matter of the dispute, in particular the main contract, or to Swiss law.

[3] The arbitration agreement cannot be contested on the grounds that the main contract is not valid or that the arbitration agreement concerns a dispute which had not as yet arisen.

## Article 179

**IV. Arbitrators**
**1. Constitution of the Arbitral Tribunal**

[1] The arbitrators shall be appointed, removed or replaced in accordance with the agreement of the parties.

[2] In the absence of such agreement, the judge where the tribunal has its seat may be seized with the question; he shall apply, by analogy, the provisions of cantonal law on appointment, removal or replacement of arbitrators.

[3] If a judge has been designated as the authority for appointing an arbitrator, he shall make the appointment unless a summary examination shows that no arbitration agreement exists between the parties.

## Article 180

**2. Challenge of an arbitrator**

[1] An arbitrator may be challenged:

a.  if he does not meet the qualifications agreed upon by the parties;

b.  if a ground for challenge exists under the rules of arbitration agreed upon by the parties;

c.  if circumstances exist that give rise to justifiable doubts as to his independence.

[2] No party may challenge an arbitrator nominated by it, or whom it was instrumental in appointing, except on a ground which came to that party's attention after such appointment. The ground for challenge must be notified to the Arbitral Tribunal and the other party without delay.

[3] To the extent that the parties have not made provisions for this challenge procedure, the judge at the seat of the Arbitral Tribunal shall make the final decision.

## Article 181

**V. *Lis Pendens***

The arbitral proceedings shall be pending from the time when one of the parties seizes with a claim either the arbitrator or arbitrators designated in the arbitration agreement or, in the absence of such designation in the arbitration agreement, from the time when one of the parties initiates the procedure for the appointment of the Arbitral Tribunal.

30

## Article 182

VI. Procedure
1. Principle

[1] The parties may, directly or by reference to rules of arbitration, determine the arbitral procedure; they may also submit the arbitral procedure to a procedural law of their choice.

[2] If the parties have not determined the procedure, the Arbitral Tribunal shall determine it to the extent necessary, either directly or by reference to a statute or to rules of arbitration.

[3] Regardless of the procedure chosen, the Arbitral Tribunal shall ensure equal treatment of the parties and the right of both parties to be heard in adversarial proceedings.

## Article 183

2. Provisional and conservatory measures

[1] Unless the parties have otherwise agreed, the Arbitral Tribunal may, on motion of one party, order provisional or conservatory measures.

[2] If the party concerned does not voluntarily comply with these measures, the Arbitral Tribunal may request the assistance of the state judge, the judge shall apply his own law.

[3] The Arbitral Tribunal or the state judge may make the granting of provisional or conservatory measures subject to appropriate sureties.

## Article 184

3. Taking of evidence

[1] The Arbitral Tribunal shall itself conduct the taking of evidence.

[2] If the assistance of state judiciary authorities is necessary for the taking of evidence, the Arbitral Tribunal or a party with the consent of the Arbitral Tribunal, may request the assistance of the state judge at the seat of the Arbitral Tribunal; the judge shall apply his own law.

## Article 185

4. Other judicial assistance

For any further judicial assistance the state judge at the seat of the Arbitral Tribunal shall have jurisdiction.

## Article 186

VII. Jurisdiction

[1] The Arbitral Tribunal shall itself decide on its jurisdiction.

[1bis] It shall decide on its jurisdiction notwithstanding an action on the same matter between the same parties already pending before a State Court or another Arbitral Tribunal, unless there are serious reasons to stay the proceedings.

[2] A plea of lack of jurisdiction must be raised prior to any defence on the merits.

[3] The Arbitral Tribunal shall, as a rule, decide on its jurisdiction by preliminary award.

## Article 187

VIII. Decision on the merits
1. Applicable law

[1] The Arbitral Tribunal shall decide the case according to the rules of law chosen by the parties or, in the absence thereof, according to the rules of law with which the case has the closest connection.

[2] The parties may authorize the Arbitral Tribunal to decide *ex aequo et bono*.

## Article 188

2. Partial award

Unless the parties otherwise agree, the Arbitral Tribunal may render partial awards.

## Article 189

3. Arbitral award

[1] The arbitral award shall be rendered in conformity with the rules of procedure and in the form agreed upon by the parties.

[2] In the absence of such an agreement, the arbitral award shall be made by a majority, or, in the absence of a majority, by the chairman alone. The award shall be in writing, supported by reasons, dated and signed. The signature of the chairman is sufficient.

## Article 190

IX. Finality, Action for annulment
1. Principle

[1] The award is final from its notification.

[2] The award may only be annulled:

a. if the sole arbitrator was not properly appointed or if the Arbitral Tribunal was not properly constituted;

b. if the Arbitral Tribunal wrongly accepted or declined jurisdiction;

c. if the Arbitral Tribunal's decision went beyond the claims submitted to it, or failed to decide one of the items of the claim;

d. if the principle of equal treatment of the parties or the right of the parties to be heard was violated;

e. if the award is incompatible with public policy.

[3] Preliminary awards can be annulled on the grounds of the above paras. 2(a) and 2(b) only; the time limit runs from the notification of the preliminary award.

## Article 191

2. Competent court

The action for annulment may only be brought before the Federal Supreme Court. The procedure shall be governed by Article 77 of the Supreme Court Act of 17 June 2005.

## Article 192

X. Waiver of annulment

[1] If none of the parties have their domicile, their habitual residence, or a business establishment in Switzerland, they may, by an

express statement in the arbitration agreement or by a subsequent written agreement, waive fully the action for annulment or they may limit it to one or several of the grounds listed in Art. 190(2).
[2] If the parties have waived fully the action for annulment against the awards and if the awards are to be enforced in Switzerland, the New York Convention of June 10, 1958 on the Recognition and Enforcement of Foreign Arbitral Awards applies by analogy.



## Article 193

**XI. Deposit and Certificate of enforceability**

[1] Each party may at its own expense deposit a copy of the award with the Swiss court at the seat of the Arbitral Tribunal.
[2] On request of a party, the court shall certify the enforceability of the award.
[3] On request of a party, the Arbitral Tribunal shall certify that the award has been rendered pursuant to the provisions of this Statute; such certificate has the same effect as the deposit of the award.

## Article 194

**XII. Foreign arbitral awards**

The recognition and enforcement of a foreign arbitral award is governed by the New York Convention of June 10, 1958 on the Recognition and Enforcement of Foreign Arbitral Awards.

Michael Schöll

# Sourcebook of
# International Arbitration

## (Switzerland)

Schulthess § 2008