# EXHIBIT 8

Dockets.Justia.com

# Enhancing the Performance of the Doping Court: How the Court of Arbitration for Sport Can Do Its Job Better

*By Michael Straubel\**

## I. INTRODUCTION

Marion Jones, a three time Gold Medalist at the Sydney Olympic Games, referred to it as a kangaroo court.[1] Others have called it an innovative and efficient way to settle the sports world's disputes.[2] Whatever one thinks of the Court of Arbitration for Sport ("CAS"), it is emerging as a major institution in the sports world, and as an example of the need for the unification of private international law.[3] Because of this prominent role, it is necessary to understand and evaluate the complex and sometimes contradictory system employed by the CAS. The need for this analysis is heightened by the growing international profile of sport doping cases, and the center-stage that the CAS and its

    *    Michael S. Straubel, Associate Professor of Law, Valparaiso University School of Law, Head Cross Country Coach and Assistant Track Coach, Valparaiso University. I would like to thank and acknowledge the valuable input and help of Hollie Tanguay in preparing this Article. Without her help, I could not have done it. I would also like to thank Debbie Bercik for her assistance and diligence in meeting my deadline demands.

    1.    Tom Weir & Jon Swartz, *Jones Wants to go Public with Fight,* USA TODAY, June 17, 2004, at C1. Marion Jones won the 100 meters, 200 meters, and was on the winning 4 x 100 meter relay team at the 2000 Sydney Olympics. She has been questioned and investigated by the United States Anti-Doping Agency ("USADA"), but as of the date of drafting this Article, she has not been charged with a doping offense. The USADA has refused to comment further on Marion's case.

    2.    *See* Anthony T. Polvino, *Arbitration as Preventative Medicine for Olympic Ailments: The International Olympic Committee's Court of Arbitration for Sport and the Future for the Settlement of International Sporting Disputes,* 8 EMORY INT'L L. REV. 347, 347–48 (1994) (stating that the CAS is the "ideal vehicle for administering such disputes").

    3.    As will be discussed later in this Article, CAS has established itself as a single judicial entity with worldwide jurisdiction. In the world of doping adjudication, a single entity with consistent doctrines is very desirable. However, differences of opinion between decisions from CAS panels and AAA-CAS panels, and even between CAS panels themselves, has created confused doping case doctrine. One of the conclusions of this Article will be that this confusion of doctrine is harming the CAS, harming athletes' rights, and harming the Olympic Movement's fight against harmful performance enhancing drugs.

affiliates are likely to have in the adjudication of these cases. This evaluation and analysis will illustrate that the CAS must shed its original commercial dispute settlement structure and adapt to the unique demands of adjudicating and settling doping accusations.

As the 2004 Olympics approached, the doping cases coming out of the Bay Area Laboratory Co-Operative ("BALCO") investigation[4] brought the CAS to the attention of the general public, and—along with that attention—criticism. Star athletes preparing for the United States Olympic Trials and Athens Olympic Games were charged with doping violations that would ultimately be decided by the CAS.[5] Suddenly, the future of these athletes and possibly the outcome of the Olympic Games would be decided by an obscure institution located in Lausanne, Switzerland. Consequently, the sports world, the media, the athletes and their lawyers, and the general public began to ask questions about the role, function, and ultimately the fairness of the previously anonymous CAS.[6]

In their subsequent investigation of the CAS, athletes and other interested parties learned that the CAS is the judicial institution (branch) of the Olympic Movement.[7] The CAS—in addition to hearing private disputes among athletes, teams, and leagues—decides disciplinary claims brought by the enforcement agencies of the Olympic Movement.[8] For instance, the United States Anti-Doping Agency,

---

4. The BALCO investigation is a United States Federal Government investigation of the Bay Area Laboratory Co-Operative for possible tax crimes. As a result of that investigation, a number of athletes, both professional and Olympic athletes, testified before a federal grand jury. Information has led to charges against four athletes for doping violations even though none of the four athletes have tested positive for banned drugs. Pete Carey, *Lifetime Ban Sought for Montgomery; Doping agency alleges use of illegal substances*, CHI. TRIB., June 24, 2004, at 3.

5. *See* Dick Patrick, *Going CAS Route Risky for Runner*, USA TODAY, June 29, 2004, at C12 (discussing athletes' decisions to seek CAS arbitration following USADA's push for lifetime bans).

6. *See* Liz Robbins, *Lower Standard of Proof Angers Athletes and Lawyers*, N.Y. TIMES, June 15, 2004, at D2 (noting USADA's desire to use the "comfortable satisfaction" standard instead of "beyond a reasonable doubt" when deciding whether to ban athletes for drug use against stiff opposition from athletes and their respective lawyers).

7. The "Olympic Movement" refers to an umbrella of international sport encompassing the Olympic games and other international competitions (e.g., World Championships), the governing bodies of those competitions, and related institutions (such as the World Anti-Doping Agency and the Court of Arbitration for Sport). For a detailed explanation of the Olympic Movement's governing structure, see Michael Straubel, *Doping Due Process: A Critique of the Doping Control Process In International Sport*, 106 DICK. L. REV. 523 *pasim* (2002) (detailing and discussing the pre-Sydney doping control system, doping control, due process, and post-Sydney improvements).

8. *See* INT'L OLYMPIC COMM., COURT OF ARBITRATION FOR SPORT, STATUTES OF THE BODIES WORKING FOR THE SETTLEMENT OF SPORTS-RELATED DISPUTES S12 (June 30, 1984) [hereinafter CAS CODE] (arbitrating and mediating disputes arising within the field of sports in

("USADA"), acted as the enforcement agency in investigating and bringing charges against athletes implicated in the BALCO controversy.[9] Those athletes had the option of contesting the charges before the CAS or the North American Office of CAS, operating as the American Arbitration Association ("AAA-CAS").[10] Thus, the CAS acts as a surrogate court for the various sports bodies around the world that end up prosecuting doping claims against athletes.

However, Olympic athletes are not the only athletes wondering about the CAS and its affiliates. As the BALCO investigation implicated professional sports like baseball and football, some began to wonder if professional athletes should be treated like Olympic athletes. Many saw the efforts of the USADA and the doping rules of the Olympic Movement to be much more effective than the relatively weak rules and enforcement efforts of the professional sports leagues.[11] Members of Congress and others discussed applying the Olympic Movement's doping rules and enforcement measures to professional athletes.[12] If changes such as these were effected, the CAS and the AAA-CAS would begin hearing professional athletes' cases, and would influence the sports world on an even larger stage.

The purpose of this Article is to examine the structure, operation, and practice of the CAS and the AAA-CAS to determine if they are fair, impartial, and independent institutions that are achieving their stated goal of creating a system of jurisprudence that harmonizes and fairly applies the principles of the sports world.[13] While the CAS will be examined in its entirety, the primary focus will be on how the CAS is equipped to handle doping cases, which seem to be the future of CAS

---

conformity with the Procedural Rules), *available at* http://www.tas-cas.org. These sorts of charges can be brought by any International Federation, National Olympic Committee, the IOC, or any body acting on behalf of those entities such as the USADA and the World Anti-Doping Agency ("WADA").

9. *See* Carey, *supra* note 4, at 3 (discussing the anti-doping agency's proposed bans against several track athletes).

10. AM. ARBITRATION ASS'N, SUPPLEMENTARY PROCEDURES FOR ARBITRATION INITIATED BY THE UNITED STATES ANTI-DOPING AGENCY R-57 (2004) [hereinafter AAA-CAS SUPPLEMENTARY PROCEDURES], *available at* http://www.adr.org/sp.asp?id=22251; Patrick, *supra* note 5, at C12.

11. James Kuhnhenn, *Senators Rip Union's Steroids Stance*, CHI. TRIB., Mar. 11, 2004, at § 4 p.1 (quoting Senator John McCain as warning hat baseball was "about to become fraud"); *Congress, Officials Seek Steroid Laws*, CHI. TRIB., July 14, 2004, at 7.

12. Kuhnhenn, *supra* note 11, at § 4 p.1.

13. *See* COURT OF ARBITRATION FOR SPORT, DIGEST OF CAS AWARDS II 1998–2000, at xxx (Matthieu Reeb ed., 2002) (noting that in more than fifteen years of existence, the CAS has continued to evolve by the creation of a new structure, an increase in the number of arbitrators, and through the expansion of new offices in North America and Oceania).

arbitrations. Additionally, though the CAS family includes a decentralized office headquartered in Australia, only the CAS and the AAA-CAS will be examined.[14]

To further this examination, this Article will first lay a foundation by examining the history and development of the CAS and the AAA-CAS.[15] The next Section will take an in-depth look at the operating rules and procedures as they now stand.[16] This Article will then examine and make suggestions for improvement on the various controversial questions of CAS operations: (1) how CAS and AAA-CAS arbitrators are selected;[17] (2) whether the two institutions are indeed impartial and independent;[18] (3) whether CAS panels have an adequate choice of laws to adjudicate fairly and correctly;[19] (4) how the lack of available precedent effects the arbitration process;[20] and finally (5) what standards ought to be employed considering the varied and undefined nature of CAS cases.[21] This Article then concludes by suggesting that the CAS, in doping cases, cannot conduct business as usual and should create a second chamber to exclusively hear doping cases and specifically tailor new practices for that second chamber.[22]

## II. BACKGROUND

The CAS and its offspring, the AAA-CAS, were both conceived to deal with crises of legitimacy in the sports world. They arose from commercial dispute resolution parentage beginning with answering

---

14. A helpful (if mixed) analogy is to think of the CAS as a parent corporation with its headquarters and primary place of operations in Switzerland, and two branch offices in the United States and Australia. Although these two offices operate relatively autonomously, the headquarters in Switzerland has ultimate authority, serving as a "supreme court" with appellate jurisdiction.

15. *See infra* Part II.A (discussing the origins of the CAS, challenges faced by the CAS in 1994 and the addition made to the CAS in 1996).

16. *See infra* Part II.B (discussing the application, jurisdiction, and administration of the Ordinary Division Rules and the Appeals Division as well as the AAA-CAS North American Rules).

17. *See infra* Part III.A (discussing the process of creating a master list of arbitrators as well as the selection process for panel members).

18. *See infra* Part III.B (examining the institutional independence of the CAS from the IOC and other bodies of the Olympic Movement).

19. *See infra* Part III.C (evaluating whether participants have an adequate choice of laws when gaps occur in the CAS Code).

20. *See infra* Part III.D (analyzing the effect of unclear or unavailable precedent in CAS panel decisions).

21. *See infra* Part III.E (appraising the appropriateness of the use of either a strict liability standard, a 'comfortable satisfaction' standard or a 'beyond a reasonable doubt' standard).

22. *See infra* Part IV (concluding that the CAS's current structure is appropriate for deciding contract cases, but not sufficient for dealing with doping cases).

tough questions concerning their legitimacy, and more recently, about their fitness to address doping accusations. Thus, it is important to understand their parallel development and the various influences that have shaped their dispute resolution procedure and doctrine. This understanding is also crucial to appreciate what the two have achieved, and have yet to achieve.

The CAS was created to bring order to the chaotic and inconsistent world of international sports adjudications. These had previously been handled by various bodies with different ideologies and far-ranging adjudication and settlement methodologies. Similarly, the AAA-CAS was created to deal with the chaotic, inconsistent, and perhaps even corrupt adjudication system administered by United States national governing bodies ("NGBs").[23] In forging these two new institutions, the United States Olympic Committee ("USOC") looked to the most established and successful examples of private dispute settlement: commercial arbitration. Thus, bodies such as the International Chamber of Commerce were drawn from, and AAA-CAS went as far as adopting (with modifications) the Commercial Arbitration Rules of the American Arbitration Association. Finally, both institutions, in ironically lock-step procession, amended their operating rules to respond to doubts about their independence: the CAS created the International Council of Arbitration for Sport ("ICAS") in 1994 and the AAA-CAS amended its Supplementary Procedures as recently as 2005.

In this Section, the history, relationship, and operating rules of CAS and AAA-CAS will be fully explored.[24] This exploration will demonstrate the influence that the commercial arbitration model has had on both institutions, and the additional influence of civil law traditions on CAS. Through this exploration, some of the structural weaknesses, with regards to handling doping cases, will be exposed.

### A. History and Development of the CAS

The history of CAS is one of dramatic transformation that led to its now prominent role in the sports world. Its origins and initial structure

---

23. A national governing body is the organization that operates on behalf of the International Federations ("IFs") within each individual country. Straubel, *supra* note 7, at 532. The IFs sit just below the IOC and each IF governs an individual sport. *Id.* The IFs can only operate with the "blessing" of the IOC to have its sport become part of the Olympic games. *Id.* Both the CAS and the AAA-CAS were created by the United States Olympic Committee ("USOC"), in large part as a response to a flood of international criticism that the decisions of United States NGBs and the USOC on doping cases were nothing more that cover-ups. *See id.* at 525–40 (detailing several incidents of sport doping and how it was handled by the nation's NGBs).

24. *See infra* Parts II.A–B (explaining the history and development of the CAS and the AAA-CAS).

raised doubts about its ability to be impartial. This initial concern has been quelled, however, by change and expansion within CAS, a malleability that has garnered respect from the international community, and hopefully speaks to its ability to confront further problems moving forward.

### 1. Origins of the CAS

The attempt to create a single tribunal to settle the growing number of international sports disputes began with an International Olympic Committee ("IOC") working group headed by IOC member and International Court of Justice Judge Kéba Mbaye in 1982.[25] This working group set out to create a tribunal that could settle international disputes quickly and inexpensively,[26] and this resulted in the establishment of the Statute of the Court of Arbitration for Sport.[27] This statute was ratified by the IOC in 1983 and CAS began operation in 1984.[28]

The Statute of the Court of Arbitration for Sport required a master list of sixty arbitrators for parties to choose from. Fifteen of these arbitrators were appointed by the IOC, fifteen by the International Federations ("IF"), fifteen by the National Olympic Committees ("NOCs"), and the final fifteen were appointed by the IOC President from outside the other three groups (IOC, IF, and NOC).[29] The original statute created only a single division, as compared to the Ordinary Division and Appellate Division established later.[30] All of the CAS's operating expenses were covered by the IOC and, in turn, only the IOC could amend the statute.[31]

From 1984 to 1991, the CAS saw very few disputes generally, and virtually no disciplinary cases.[32] This changed in 1991, however, when

---

25. *See* COURT OF ARBITRATION FOR SPORT, DIGEST OF CAS AWARDS II 1998–2000 xxiv (Matthieu Reeb ed., 2002) (describing the creation of statutes that would ultimately be known as the "Court of Arbitration for Sport").

26. *Id.*

27. *Id.*

28. *Id.*

29. COURT OF ARBITRATION FOR SPORT, DIGEST OF CAS AWARDS II 1998–2000 vii (Matthieu Reeb ed., 2002).

30. *See infra* Part II.A.2 (explaining fully the transformation of the tribunals in light of cases arising in the early to mid-1990s).

31. Gundel v. CAS, CAS 119 (March 15, 1993), DIGEST OF CAS AWARDS 1986–1998 271 (Matthieu Reeb, ed. 1998), *available at* http://kluwerarbitration.com (last visited Feb. 2, 2005).

32. To illustrate the changing demands on the CAS, between 1984 and 1991 only 34 requests for arbitration were filed with the CAS, whereas in 2003 there were 107 filed. *See* Arbitration for Sport, Statistics, tbl. 1, *available at* http://www.tas-cas.org/en/stat/frmstat.htm (last visited Apr. 17, 2005).

the International Equestrian Federation ("FEI") adopted a CAS model clause that, in essence, granted the right to appeal disciplinary decisions to the CAS.[33] Even though the CAS did not at that time have an appellate division, FEI decisions taken to the CAS were treated like appeals, with *de novo* review provided.[34]

## 2. 1994 Challenge and Changes

In 1993, Elmar Gundel, a German-born jockey, appealed an FEI disciplinary decision to the CAS.[35] Unhappy with the subsequent CAS decision that basically upheld the FEI decision, Gundel challenged the impartiality and independence of the CAS under the Swiss Statute on Private International Law.[36] The essence of Gundel's claim was that the CAS was controlled by, or was not strictly independent from, the IFs and the FEI, as one of the IFs. While the Swiss Federal Tribunal[37] found the CAS to be independent from the IFs, it expressed concern about CAS's independence from the IOC.[38] The Swiss Federal Tribunal pointed to three connections between the IOC and the CAS that raised concern about the CAS's independence: (1) the CAS was almost entirely funded by the IOC; (2) the IOC appointed up to half of the arbitrators to the master list; and (3) only the IOC could amend the CAS Statute.[39]

As a direct result of the *Gundel* decision, the CAS redrafted its basic enabling statute, the Statute of the Court of Arbitration for Sport, to address the concerns of the Swiss Federal Tribunal.[40] In the Code of

---

33. *See* COURT OF ARBITRATION FOR SPORT, DIGEST OF CAS AWARDS II 1998–2000 xxv–xxvi (Matthieu Reeb ed., 2002) (adopting the CAS model arbitration clause binding the parties to the judgment and mandating their cooperation).

34. Under the Statute of the Court of Arbitration for Sport, all cases were treated as an initial arbitrations. Therefore, all were decided as if they were being heard for the first time, with both judgments of fact and law vulnerable to review.

35. *See* COURT OF ARBITRATION FOR SPORT, DIGEST OF CAS AWARDS II 1998–2000 xxv (Matthieu Reeb ed., 2002) (reducing the period of suspension for horse rider, but upholding the imposition of a fine).

36. *See id.* at xxvi (Matthieu Reeb ed., 2002) (noting how the *Gundel* judgment led to major reform of the CAS).

37. The Swiss Federal Tribunal acts as a supreme court for questions of federal law in Switzerland as opposed to questions of canton law. Cyrill P. Rigamonti, *The New Swiss Constitution and Reform of the Federal Judiciary, at* http://jurist.law.pitt.edu/world/swisscor1.htm (last visited April 13, 2005).

38. *See* A. & B. v. Int'l Olympic Comm., Swiss Fed. Tribunal (1st Civ. Chamber) Judgment of 27 May 2003, at para. 3 (discussing a case brought against two cross-country skiers competing in the 2002 Olympic Winter Games in Salt Lake City, Utah where the plaintiffs argued that "the CAS [was] not an independent tribunal in a dispute in which the IOC [was] a party").

39. *Id.*

40. *See* COURT OF ARBITRATION FOR SPORT, DIGEST OF CAS AWARDS II 1998–2000 xxvi

Sports-related Arbitration, the CAS adopted three major changes. First, the Code created the ICAS, which was designed to stand between the CAS, as the arbitration body, and the IOC, as the administrative body, by carrying out many management functions.[41] The ICAS was now responsible for approving the appointment of arbitrators to the master list, hearing challenges to arbitrators, and setting the CAS's budget.[42] Second, the CAS's funding was diversified to include other sources, thus reducing the IOC's percentage of the funding.[43] Third, the CAS was divided into an Ordinary Division and an Appellate Division.[44] The Ordinary Division was charged with management of first time disputes (mainly those of a commercial nature) while the Appellate Division was designed to handle appeals from IF disciplinary decisions.[45]

### 3. 1996 Additions

In 1996, the CAS family—and hence level of service—expanded further when it established two decentralized offices and an ad hoc tribunal at the Atlanta Olympic Games.[46] The two decentralized offices, one in North America and the other in Australia, were established to allow for local dispute settlements. In accordance with its local focus, the North American office uses American Arbitration Association administrators and arbitrators, and has its own set of procedural rules. Despite these local characteristics, AAA-CAS

---

(Matthieu Reeb ed., 2002) (discussing the revision of the statute to make it more efficient).

41. *See A. & B.,* Swiss Fed. Tribunal at para. 3.3.1 (describing the events leading toward the creation of ICAS and its structure and function); CAS CODE, *supra* note 8, at S2 (stating that the "task of ICAS is to facilitate the settlement of sports-related disputes through arbitration and mediation and to safeguard the independence of the CAS and the rights of the parties").

42. *See* CAS CODE, *supra* note 8, at B.

S6. The ICAS exercises the following functions:

> 3. It appoints personalities who are to constitute the list of arbitrators and the list of CAS mediators and can remove them from lists (Article S3);
>
> 4. It exercises those functions concerning the challenge and removal of arbitrators, and any other functions which the Procedural Rules confer upon it;
>
> . . . .
>
> 5.2. It approves the ICAS budget prepared by the CAS Court Office.

*Id.*

43. A. & B. v. Int'l Olympic Comm., Swiss Fed. Tribunal (1st Civ. Chamber) Judgment of 27 May 2003, at para. 3.3.1, *translation available at* http://www.spotrecht.org/urteile/SchwBGzuTAS.pdf (last visited Apr. 23, 2005).

44. *See* CAS CODE, *supra* note 8, at S3 ("It comprises an ordinary Arbitration Division and an Appeals Arbitration Division.").

45. COURT OF ARBITRATION FOR SPORT, DIGEST OF CAS AWARDS II 1998–2000 xxviii (Matthieu Reeb ed., 2002).

46. *Id.*

decisions may still be appealed to the CAS.[47]

Since the Atlanta ad hoc tribunal in 1996, other ad hoc tribunals have been established at the 1998 Nagano, 2000 Sydney, 2002 Salt Lake City, and 2004 Athens Olympic Games. An ad hoc tribunal was also established at the Kuala Lumpur Commonwealth Games in 1998.[48] Primarily, the responsibility of these ad hoc tribunals is to quickly decide disputes, within twenty-four to forty-eight hours.[49] They achieve this shortened process by employing a separate set of operating rules from the two permanent divisions, and utilizing a list of only twelve arbitrators.[50]

### B. CAS Rules and Regulations

This survey of the procedural and operating rules employed by the CAS will reveal two separate roles filled by the organization, and the tension spawned by these disparate functions. On one hand, the CAS functions as a private dispute settlement body, with a corresponding emphasis on confidentiality and informal procedures. Alternatively, the CAS must also act as a public settlement body, with a need to create precedent and behave like a traditional court. Emblematic of this division are two unwritten CAS procedures: (1) the use of CAS clerks to brief arbitrators; and (2) the decision to publish some awards and not others. In order further develop, and meet evolving challenges properly, these contradictions will have to identified and addressed.

### 1. CAS Rules

The CAS is based in Lausanne, Switzerland and is divided into two divisions: an Ordinary Division that hears initial cases and an Appeals Division that handles review of decisions from other sports bodies. The Code of Sports-Related Arbitration contains rules common to both divisions as well as rules specific to each of the two divisions.

### 2. Common Rules

Lausanne is the seat of all arbitration proceedings, regardless of where they are physically held.[51] Effectively, this ensures that certain

---

47. *See* AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-49A (explaining that appeals may be made either by the athlete or by the applicable IF and appeals filed under these rules are heard in the United States).

48. COURT OF ARBITRATION FOR SPORT, DIGEST OF CAS AWARDS II 1998–2000 xxix (Matthieu Reeb ed., 2002).

49. *Id.*

50. *Id.*

51. CAS CODE, *supra* note 8, at S1.

municipal laws of Switzerland will govern all arbitrations.[52] An arbitration will be conducted in either English or French depending on the parties' agreement.[53] In the event that the parties cannot agree on a language, the president of the division will choose either French or English.[54]

The list of potential arbitrators for both panels is created by the ICAS.[55] Although the ICAS selects arbitrators for the master list, three-fifths of that list consists of arbitrators first nominated by the IOC, IFs, and NOCs, diluting the ICAS power of appointment.[56] The remaining two-fifths are to be—in equal parts—selected with an eye toward protecting the interests of athletes, and thus independent from the IOC, IFs, and NOCs.[57] Further, the master list of arbitrators shall be a fair representation of the continents and different judicial cultures of the world.[58] Each arbitrator must be legally trained, possess recognized competence in sports law or international arbitration, and have a command of either French or English.[59] Each arbitrator serves a renewable four-year term on the master list and takes an oath to be objective and independent.[60] Finally, each arbitrator must disclose any circumstances that call into question his or her objectivity and

---

52. According to the analysis of several courts and the Presidents of the CAS ad hoc Divisions for the Atlanta and Sydney Games, there is a separation between the legal seat of an arbitration and the physical site of an arbitration. The legal seat of the arbitration is a choice of the municipal law that will govern the procedure of the arbitration and any challenge to the result of the arbitration. Therefore, by choosing Lausanne, all CAS arbitrations are governed only by Swiss law. Specifically, when a hearing is physically held outside Switzerland, and one party is not Swiss, Chapter 12 of the Swiss Private International Law Act will govern. *See* Raguz v. Sullivan & ORS, Supreme Ct. of New South Wales Ct. App. 240 (Sept. 1, 2000) (holding that the agreement in this case was not a "domestic arbitration agreement because the agreed judicial 'seat' or 'place' of arbitration was Switzerland"); Union of India v. McDonnell Douglas Corp., 2 Lloyd's Rep. 48, Queen's Bench Div., Comm. Ct. (Dec. 22, 1992) (finding that the arbitration clause provided London as the seat of arbitration and the procedure was to be conducted in accordance with the supervisory jurisdiction of the English Courts).

53. CAS CODE, *supra* note 8, at R29.

54. *Id.*

55. *Id.* at S6 & S14.

56. One-fifth of the list of CAS arbitrators shall be selected from persons nominated by the IOC, another one-fifth from a list nominated by the IFs, and another one-fifth from a list nominated by the NOCs. CAS CODE, *supra* note 8, at S14.

57. One-fifth of the list of arbitrators are to be appointed with the view of safeguarding the interests of athletes and another one-fifth of the list is to be persons independent of the IOC, IFs, and NOC. However, the Code does not detail how these potential arbitrators are to be identified. *Id.*

58. *Id.* at S16.

59. *Id.* at S14.

60. *Id.* at S13, S18.

independence.[61]  Any party can then challenge an arbitrator to the ICAS Board.[62]

### 3. Ordinary Division Rules

The Ordinary Division handles the initial cases brought to the CAS; because of this singular purpose, some of its rules differ from the Appeals panel, which handles review.

#### a. Application and Jurisdiction

The CAS Procedural Rules govern any dispute referred by agreement of the parties to the CAS for resolution.[63]  The CAS will resolve any dispute involving sport-related activity, including pecuniary matters.[64] The Ordinary Division hears cases at their initial stage, as opposed to appeals from previous decisions, including giving advisory opinions.[65] Ordinary Division cases are governed by the General Provisions of the Procedural Rules and the Special Provisions applicable to Ordinary Arbitration Procedure.[66]    Although it previously appeared that any USADA case taken directly to the CAS under Supplementary Procedure Rule 57 would be heard by the Ordinary Division, the 2005 version of the Supplementary Procedures and USADA protocol negated this "direct" option.[67]

#### b. Administration

The President of the Ordinary Division is responsible for administering the division, with some help from the Secretary General.[68]  The President's duties include ensuring the seamless nature of the proceedings, ordering provisional measures, and appointing arbitrators when the parties are unable to agree (on the make-up of the arbitration panel).[69]  The Secretary General reviews all awards before they become final to make "rectifications of pure form" and potentially

---

61. *Id*. at R33.

62. *Id*. at R34.

63. *Id*. at R27.

64. *Id*.

65. *Id*. at S20.

66. *Id*. at R38-46.

67. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-57.

68. Of course, the administration of individual hearings is primarily in the hands of each panel, with a supervisory role for the President of the panel.

69. CAS CODE, *supra* note 8, at S20, R37, and R40.1.  The President of the Division can order provisional measures until the case file has been transferred to the panel.  Then the panel is empowered to order provisional measures. *Id*. at R37.

draw the panel's attention to fundamental issues of principle.[70]

### c. Pre-Hearing Procedures

The Code of Sports-Related Arbitration does not call for pre-hearing conferences and meetings as the AAA and Supplementary Procedures do. However, the parties can submit requests for provisional measures to the President before the panel is confirmed.[71] When such a request is made, except in the case of extreme emergencies, the responding party is given ten days to offer counter arguments.[72] Then, in making a provisional request, the requesting party is considered to have waived the right to request relief from a state authority.[73]

In addition to provisional measures, in a further nod to pre-hearing procedures, the Code permits the parties to request an order for the production of documents and the examination of witnesses from the panel.[74] It is not clear from the Code text, however, whether such requests may be made before the commencement of the hearing, in the manner of pre-trial discovery, or simply during the hearing process.[75] Besides these allowances, there does not appear to be much in the way of pre-hearing discovery available to the parties.

### d. Hearing Process

The hearing process begins with written submissions from both sides. The applicant's initial submission must include a statement of the claim, any written evidence to be submitted, and a list of witnesses and experts intended to be called.[76] The respondent's initial submission must include a response to the claim, written evidence, and a witness and expert list.[77] The applicant is then allowed a reply and the respondent a second response.[78] After all of the written submissions have been proffered, the panel, after consulting with the parties, may hold an oral

---

70. *Id.* at R46. The scope of the Secretary General's power to review decisions does not read clearly, rather in a possibly open-ended way. Rule 46 could be read as stating that a decision does not become final until the Secretary General has approved the decision, including the power to force changes to the decision on matters of fundamental issues of principle.

71. *Id.* at R37.

72. *Id.*

73. *Id.*

74. CAS CODE, *supra* note 8, at R44.3.

75. Rule 44.3 states that the panel may address orders at "any time," which suggests that the order can be made before the hearing has begun. *Id.* However, Rule 44.3 is a subpart of Rule 44, which is dedicated to the hearing process as opposed to a pre-hearing process. *Id.*

76. CAS CODE, *supra* note 8, at R44.1.

77. *Id.*

78. *Id.*

hearing.[79]

In the case of a hearing, the panel president oversees and is particularly responsible for ensuring that the statements are concise and relevant to the written submissions.[80] Witnesses are "invited" to tell the truth under the sanction of perjury and the panel may exclude witnesses for irrelevance.[81] Additionally, the hearings are closed and the awards private unless the parties agree otherwise.[82] Considering the limited structural extent regarding hearings in the Code, it is evident that the President and Panel have a great deal of discretion over the operation of hearings.

The Code does not contain a specific reference to the evidentiary rule that will apply during a hearing, aside from the obligations of the President of the panel to ensure that statements be concise and relevant.[83] The Code does, however, specifically speak to the production of evidence prior to the hearing. Parties may request that the panel order the production of documents, if the requesting party can demonstrate that the documents exist and are relevant.[84] Further, the panel may order, on its own motion and for its own needs, the production of documents, witnesses, and experts.[85]

The substantive law that governs the dispute will be the law chosen by the parties, and includes the equitable principle *ex aequo et bono*. Failing an agreement between the parties, Swiss law will be used.[86] Panel decisions are to be achieved by majority vote, or if a majority cannot be obtained, then by the President of the panel.[87]

The award is to be written and briefly state the panels' reasoning, unless the parties agree otherwise.[88] An award is not final, however, until the CAS Secretary General has reviewed the decision and has called the Panel's attention to any fundamental issues of principle

---

79. *Id.* at R44.2, 44.1.

80. *Id.* at R44.2.

81. *Id.* at R44.2. The Code does not elaborate as to how the penalty of perjury will be pursued or enforced.

82. *Id.* at R44.2, 43.

83. *Id.* at R44.2.

84. *Id.* at R44.3. The requirement that the party prove relevancy prior to the production of the document follows the continental view of discovery rather than the United States' view, which allows production of evidence that may lead to admissible evidence.

85. *Id.*

86. *Id.* at R45.

87. *Id.* at R46.

88. *Id.* While the decision must be brief, perhaps following in the civil law tradition, it cannot be too brief in order to allow the Secretary General to review the decision for fundamental issues of principle.

overlooked by the Panel.[89]

### e. *Appeals Division*

In cases where there is an appeal, matters are shifted from a sports body or the Ordinary Division to the Appeals Division.

#### i. Jurisdiction and Administration

The Appeals Division has jurisdiction and the Appeals Division's procedural rules apply when an appeal is taken from a sports body's decision, provided that the sports body's rules permit such an appeal and all other remedies have been exhausted.[90] The Appeals Division also has jurisdiction if the parties specifically agree to its jurisdiction.[91] An appeal must be made within twenty-one days of the lower decision to trigger the Appeals Division's jurisdiction.[92]

Oversight and administration of Appeals Division cases is handled by the Appeals Division's President.[93] The Division President is given specific power to combine appeals that contain the same issues and oversee the appointment of the arbitrators.[94]

#### ii. Hearing Process

As an appellate tribunal, the Appeals Division needs few pre-hearing procedures. However, the applicant, in the statement of appeal, may request a stay of the decision originally rendered by the sports body.[95] Apparently, this kind of a request is decided by the Appeals Division President without further proceedings.[96]

The hearing process, which must be completed (completion is indicated by the publishing of the panel's written decision) within four months of the filing of the statement of appeal, is initiated with the applicant's brief. The brief must include a statement of the facts, legal arguments, all exhibits and evidence, a list of all witnesses and experts

---

89. *Id.* The extent of the Secretary General's power to force a change in the award is unclear from Rule 46.

90. *See id.* at R47 (providing for an appeal against the decision of a federation, association, or sports-related body, as well as against the CAS acting as a first instance tribunal).

91. *Id.*

92. *Id.* at R49.

93. *Id.* at R49–56 (containing provisions that give the President powers such as the power to form a panel in the absence of an agreement and the power to authorize direct examination of parties, witnesses, and experts).

94. *Id.* at R53, R54.

95. *Id.* at R48.

96. *Id.* The rule does not provide for a hearing. *Id.* Therefore, the only logical conclusion is that no other formalities are required before the President can grant the stay.

that the applicant intends to call at the hearing, any witness statements, and any request for "other evidentiary measures."[97] The respondent must then submit an answer that includes the items required in the applicant's brief, plus any counterclaims.[98] The breadth and detail of the two briefs should be comprehensive when compared with a traditional appellate brief, because the Appeals Divisions hears the case de novo. Thus, the panel has full power to review both the facts and law and to either issue a new decision or refer the case back to the original sports body for reconsideration.[99]

The applicable substantive law governing the hearing is the law chosen by the parties, which in most cases will be the rules of the sports body.[100] When the parties have not agreed on the substantive law, the law of the country of the sports body's domicile will be used.[101] Regardless of the law that governs the appeal, a panel may use general rules of law it deems appropriate and necessary to help interpret IF rules and fill gaps in those rules.[102] Panels must then explain why it was necessary to use such rules to supplement the chosen law and rules.[103]

The hearing itself is controlled by the Panel President, who directs the examination of witnesses and any oral argument.[104] The decision of the panel is to be taken by majority vote and in the failure of a majority, taken by the President of the Panel.[105] The decision is to be written and made public unless the parties agree otherwise.[106] However, as stated above, the decision is not final until the CAS Secretary General has reviewed the decision and drawn the panel's attention to fundamental issues of principle.[107]

### 4. AAA-North American Rules

Cases initiated by the USADA are procedurally governed by the Commercial Arbitration Rules and Mediation Procedures ("Commercial Rules") of the American Arbitration Association ("AAA") as modified

---

97.  *Id.* at R51. Although the rule does not explicitly define "other evidentiary measures," this open-ended language seems to indicate a general policy of providing wide latitude to the arbitrators in the process.

98.  *Id.* at R55.

99.  *Id.*

100.  *Id.* at R58.

101.  *Id.*

102.  CAS CODE, *supra* note 8, at R58.

103.  *Id.*

104.  *Id.* at R57.

105.  *Id.* at R59.

106.  *Id.*

107.  CAS CODE, *supra* note 8, at R59.

by the Supplementary Procedures for Arbitration of Olympic Sport Doping Disputes (formerly Supplementary Procedures).[108] In most instances, the provisions of the Commercial Rules have been replaced by the Supplementary Procedures to the point that the Commercial Rules play virtually no role in governing the arbitration. The resulting combination or synthesis of the procedural rules can be divided, for the purposes of analysis, into the categories of: (1) application and jurisdiction; (2) administration; (3) pre-hearing procedures; (4) hearing procedures; and (5) post-hearing and appeal The rules governing the composition and selection of panel members will be covered in the Section below.

### a. Application and Jurisdiction

Both the Commercial Rules and the Supplementary Procedures apply to cases that arise out of the USADA's Protocol for Olympic Movement Testing.[109] Once an athlete has tested positive for a prohibited substance, the USADA Review Board review has been completed, and the USADA has consequently decided to prosecute an athlete, then the Commercial-Supplementary Procedure Rules will apply.[110] Although proceedings under the Supplementary Procedures are initiated when the USADA serves notice on the athlete, it appears, though not explicitly stated in the Supplementary Procedures, that the Supplemental Procedures do not apply to the USADA Review Board process.[111]

---

108. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-1.

109. *Id.*

110. UNITED STATES ANTI-DOPING AGENCY, PROTOCOL FOR OLYMPIC MOVEMENT TESTING *at* http://www.usantidoping.org/files/active/what/protocol/pdf [hereinafter USADA PROTOCOL] (effective as of Aug. 13, 2004). Under the United States Anti-Doping Agency's Protocol, once an athlete's A-sample has tested positive for a prohibited substance, a specific set of procedures is initiated. *Id.* at § 8. First, the athlete is notified of the positive result, and is notified of his right to be present with a witness at the testing of a B-sample. *Id.* at § 8(b). He is also supplied with laboratory documents from the A-sample testing process. *Id.* If the B-sample test is positive, USADA's Anti-Doping Review Board reviews the test result and any documentary evidence submitted by the athlete to determine if there is sufficient evidence of doping to justify a hearing. *Id.* If the Review Board finds sufficient evidence USADA may, in its discretion, charge the athlete with a doping offense. *Id.* at §§ 8–9; *see also* Straubel, *supra* note 7, at 563–64 (outlining the USADA's procedure for taking two samples from athletes).

111. USADA notifies an athlete that his or her A-sample tested positive. USADA PROTOCOL, *supra* note 110, at § 8. This notification may be considered the notification which triggers the application of the Supplementary Procedures under Rule 4; however, this is likely not the case. Rule 1 reads that "these Supplementary Procedures shall apply to arbitrations." AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-1. Rule 4 reads that "Arbitration proceedings shall be initiated by USADA by sending a notice to the athlete . . . ." *Id.* at R-4. Thus, Rule 1 and Rule 4, read alone, could be interpreted to say that the Supplementary Procedures apply to section 8(b) notification of the A-positive test results. *See* USADA PROTOCOL, *supra* note 110, at § 8(b) (detailing the procedures by which the USADA notifies an

Therefore, it appears that two separate notifications of the athlete are contemplated. The first notification occurs when an athlete's A-sample has tested positive but before the B-sample is tested. The second notice occurs after the review board process has been completed and the USADA has made the administrative decision to prosecute the athlete.[112] After the AAA-CAS hearing, the athlete may choose to have the matter decided by a CAS Appeals Panel. The CAS appeal hearing, despite taking place in the United States, is administered by the CAS's Lausanne Office, using the CAS Appeals Division rules.[113]

### b. Administration

According to the Supplementary Procedures, doping cases are administered by the AAA through an AAA Vice-President, who is also the Secretary for the North American, Central American, and Caribbean Islands decentralized office of the CAS.[114] However, it appears that in practice USADA doping cases are administered by the AAA's case

---

athlete of the test results). But section 9(a)(i)(5) of the USADA Protocol reads "the process before the Review Board shall not be considered a 'hearing.'" *Id.* at § 9(b)(v). If an arbitration is considered a hearing, then the first notice does not trigger the application of the Supplementary Procedures.

112. USADA PROTOCOL, *supra* note 110, at § 9. It could be argued that the first notice is notice of an administrative process that does not trigger procedural protections, and that the second notice is notice of an adjudicative process that does involve and trigger procedural protections.

113. Many questions remain about CAS-administered arbitrations held in the U.S. as is permitted by Rule 49A. The first question is whether the arbitration would be considered an initial arbitration and governed by the rules of the Ordinary Arbitration Division, or whether it would be considered an appeal and governed by the rules of the Appeals Division. The second question is—since the hearing must be held in the United States—whether Swiss or United States public law and choice of law rules would apply. For example, while Rule 57 states that the CAS decision "shall be final and binding and shall not be subject to further review or appeal except as permitted by the Swiss Federal Judicial Organization Act or the Swiss Statute on Private International Law," because the hearing is being held in the United States, it might also be governed by the Federal Arbitration Act ("FAA"). CAS CODE, *supra* note 8, at R57. Application of the FAA would occur under the following reasoning. First, the Act applies to "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising." 9 U.S.C. § 2 (2000). Second, the term "involving commerce" has been equated to Congress's power to regulate under the commerce clause. *See* Snyder v. Smith, 736 F. 2d 409, 418 (7th Cir. 1984) (interpreting the "involving commerce" requirement not as a limitation but a qualification suggesting that Congress intended the FAA to apply to all contracts that it constitutionally could regulate), *overruled on other grounds by* Felen v. Andreas, 134 F.3d 873 (7th Cir.1998). Finally, the Supreme Court found, in *Flood v. Kuhn,* that professional baseball is a business which engages in interstate commerce. Therefore, if Olympic Movement sports are considered now similar to professional baseball, the arbitration of disputes arising out of Olympic movement sports involves interstate commerce and is therefore "commercial." Flood v. Kuhn, 407 U.S. 258, 282-83 (1972).

114. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-2.

management office. [115]Thus, the Secretary of the North American decentralized CAS serves primarily as a communication link between the AAA and the CAS's Lausanne Office.

### c. Pre-Hearing Procedures

Pre-hearing procedures are the same under the Commercial Rules and the Supplementary Procedures, and fall into two categories: (1) pre-panel selection; and (2) post-panel selection. Before the arbitrator(s) have been selected, the AAA, at the request of the parties or at the AAA's initiative, can hold an administrative conference.[116] The conference is conducted by the AAA, and may address any administrative matter including arbitrator selection and discovery. Once the arbitrator(s) are selected, control of the proceedings shifts from the AAA to the panel of arbitrators.

After establishment of the panel, the parties, arbitrators, or AAA can request a preliminary hearing.[117] At the preliminary hearing the parties discuss the scheduling of the rest of the process and the narrowing of the issues.[118] At this stage the arbitrators may order interim measures, including injunctive relief and discovery requests.[119] The parties may request the production of documents, the identity of witnesses to be called, and any other pertinent information.[120]

### d. The Hearing

After the 2004 amendments to the Supplementary Procedures there is no longer a time limit for completing the arbitration process, only interim limits within the process. The arbitrators, however, are given the authority to shorten the time limits as necessity dictates, particularly in the case of protected competitions.[121] Further, even though the

---

115. E-mail from Mr. Brian Winn, District Vice President for the AAA, Atlanta Regional Office, to Michael S. Straubel, Associate Professor of Law, Valparaiso University (June 16, 2004, 13:26:36 CST) (on file with author).

116. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-10; AMER ARBITRATION ASS'N, COMMERCIAL ARBITRATION RULES AND MEDIATION PROCEDURES R9 (July 1, 2003) [hereinafter AAA COMMERCIAL ARBITRATION RULES], *available at* http://www.adr.org/sp.asp?id=22440 (last visited Apr. 30, 2005).

117. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-22; AAA COMMERCIAL ARBITRATION RULES, *supra* note 116, at R20.

118. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-22; AAA COMMERCIAL ARBITRATION RULES, *supra* note 116, at R20.

119. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-36; AAA COMMERCIAL ARBITRATION RULES, *supra* note 116, at R34.

120. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-23; AAA COMMERCIAL ARBITRATION RULES, *supra* note 116, at R21.

121. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-24. Protected

standard order of proof presentation is called for,[122] the arbitrators have
the authority to alter the proceeding as needed, provided that the parties
are treated equally and each party is given a fair opportunity to present
its case.[123]  In other words, arbitrators have a large degree of autonomy
to manage and control each particular hearing process as they see fit, as
long as basic notions of due process are followed.[124]

During the hearing, the substantive rules governing the question of
whether a doping offense has occurred is now governed by the World
Anti-Doping Code.  Should the World Anti-Doping Code not address an
issue, the USADA Protocol, USOC National Anti-Doping Policy, and
applicable IF rules will be used. [125]  Prior to their amendment in 2005,
the Supplementary Procedures specifically allowed for the mitigation of
the Anti-Doping Code and IF rules by the principles of CAS precedent.
The reason for this change is unknown.  Further, neither the
Commercial Rules nor the Supplementary Procedures provide for a
method of selecting a fall-back body of national substantive law, a
contingency the rules of the European CAS do provide for.[126]  Thus, in
a case where a back-up substantive law is needed, it must be asked
whether the process provided in the European CAS's rules will be
used—or should be used—in order to create uniformity and
predictability in the Global CAS system. [127]

During a hearing, standard rules of evidence need not be followed. [128]
Nevertheless, to be admitted, evidence must be relevant and material.[129]
Additionally, the arbitrators are required to recognize legal privileges
and may subpoena witnesses when necessary. [130]  While the World Anti-

competitions are the most important events and include the Olympic and Pan American Games.

122.  Supplementary Procedures Rule 32 states that the claimant, USADA, shall first present
its case, and then the respondent, the athlete, shall present his or her case.  AAA-CAS
SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-32.  Beyond those simple guidelines, there
are no dictates as to the conduct of the hearing.  The process is left to the discretion of the
arbitrators. *Id.*

123.  *Id.*

124.  Though not due process in the Constitutional sense, as interpreted by attorneys in the
United States attorneys, the requirement of a fair hearing will undoubtedly be viewed as a
minimal level of procedural due process.

125.  AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-33(e).

126.  *See* CAS CODE, *supra* note 8, at R45 (stating that Swiss law will apply if the parties did
not choose a law to govern); *id.* at R58 (stating that, on appeal, the panel should apply the law
chosen by the parties, or, in the absence of this choice, the country law where the sports body is
domiciled, or according to laws that the panel deems appropriate).

127.  If precedent is to be used and serve as a stabilizing tool, then one source of substantive
law should also be used if consistency is to be achieved.

128.  AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-33(a).

129.  *Id.* at R33(a), (b).

130.  *Id.* at R33(c), (d).

Doping Code establishes the ultimate burden of proving a doping offense,[131] the Supplementary Procedures establish a very important presumption and accompanying burden of proof: that the transportation, custody, and testing of an athlete's sample is presumed to be done properly and according to prevailing scientific standards.[132]  To rebut the presumption, an accused athlete need only submit counter-evidence to remove the presumption and have the USADA charged with the burden of proving proper custody and reliable testing by clear and convincing evidence.[133]  It is uncertain, however, whether the USADA's burden on the question of sample testing will be to show that the testing process itself was properly carried out, or whether the proscribed process does in fact itself produce reliable results.[134]

Hearings are to be private, with only concerned parties allowed to attend, unless the arbitrators decide otherwise.[135]  Concerned parties can include the applicable IF's representatives, at the IF's election.[136]  At the conclusion of the hearing process, the arbitrators must reach a decision by a majority vote.  Additionally, the Supplementary Rules— as opposed to the Commercial Rules—then require a written, reasoned decision.[137]

### e. Post Hearing and Appeal

Because the AAA-CAS proceedings are initial hearings, decisions can be appealed to the European CAS.[138]  However, that appellate hearing must be held in the United States,[139] which raises interesting questions of the law that might govern the hearing.[140]  Finally,

---

131.  *Id.* at R33(e).  *See* WORLD ANTI-DOPING AGENCY, THE WORLD ANTI-DOPING CODE § 3.1 (Feb. 20, 2003), *available at* http://www.cces.ca/pdfs/wada-wadc-Final-E.pdf (last visited Apr. 23, 2005) [hereinafter WADA CODE] (establishing that the standard of proof will be whether the organization has established a violation to the comfortable satisfaction of the hearing body).

132.  AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-33(e).

133.  *Id.*

134.  The reliability of the testing procedure has been challenged in several CAS cases.  *See infra* Part III.E.2 (noting several CAS cases in which the reliability of the testing procedure has been challenged).

135.  AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-25.

136.  *Id.* at R-4.

137.  *Id.* at R-44.  *But see* AAA COMMERCIAL ARBITRATION RULES, *supra* note 116, at R42(b) (providing that the arbitrator does not need to render a reasoned award unless one is requested in writing prior to appointment of the arbitrator or the arbitrator deems one necessary).

138.  *Id.* at R-49.

139.  *Id.*

140.  When the hearing is physically held within the United States, public laws, such as the FAA, could apply under the territorial principle of jurisdiction.

according to Rule 49(a) of the Supplementary Procedures, the decision of the European CAS is final and may only be challenged as is permitted by the Swiss Federal Judicial Organization Act or the Swiss Statute on Private International Law.[141]    However, the Federal Arbitration Act may be applicable despite the limitations contained in Rule 49(A).[142]

### III. QUESTIONS OF FAIRNESS AND CONSISTENCY

The CAS, and later AAA-CAS, were spawned from commercial dispute models.[143]    However, both of these bodies are now being forced—because of the burgeoning questions surrounding drug use in international sport—into deciding disputes that are decidedly un-commercial in nature.  In fact, these doping allegations, regardless of whether they are quasi-criminal in nature, or breach of contract in nature, are accusatory and therefore require a heightened level of fairness, apparent to all parties.

There are five areas in which the CAS and the AAA-CAS, because of this change in focus, need to address questions and concerns about their methods and the appearance of fairness: (1) in the selection of arbitrators to hear the cases; (2) CAS independence from the governing bodies of the Olympic Movement; (3) the choice of substantive law used in each case; (4) the development and use of precedent; and (5) the development and consistent use of key legal doctrines.  In looking at these five areas of concern, it can be seen that the effort to create a unified international adjudication system has encountered bumps along the way.  These bumps will be identified and then addressed with suggestions for the coming challenges in the future of international sport arbitration.

### A.  The Arbitrator Selection Process

The process of creating a master list of arbitrators has proven to be a very important question to the legitimacy of the CAS, and thus subject to litigation in the national courts of Switzerland and the United States.[144]    Thus, the process and the litigation it has spawned must be

---

141.  CAS CODE, *supra* note 8, at R49(A).

142.  *See supra* note 113 and accompanying text (suggesting that the FAA may be applicable because it applies to arbitration of a contract "involving commerce" and interpreting this phrase to include professional sports).

143.  *See supra* Part II (describing the origins of CAS and AAA-CAS).

144.  For examples involving athletes and the use of arbitration under the CAS, see Jacobs v. USA Track & Field, 374 F.3d 85, 89 (2d Cir. 2004); A. & B. v. Int'l Olympic Comm., Swiss Fed. Tribunal (1st Civ. Chamber) Judgment of 27 May 2003, *translation available at*

examined very closely in any appraisal of CAS's legitimacy and potential to handle doping cases.

## 1. CAS Selection

The first step in the process of creating a CAS arbitration panel is the formulation of a master list of arbitrators from which to choose.[145] Then, from this list, arbitrators must be selected for both ordinary division and appellate division matters.[146]

### a. Creating the Master List

The lists of potential arbitrators for both the Ordinary and Appeals divisions are created by the ICAS.[147] However, while the ICAS selects the arbitrators for the master list, three-fifths of that list consists of arbitrators first nominated by the IOC, IFs, and NOCs.[148] The remaining two-fifths are to be, in equal parts, selected with an eye toward protecting the interests of athletes and to be independent from the IOC, IFs, and NOCs.[149] Further, the master list of arbitrators shall be a fair representation of the continents and different judicial cultures of the world.[150] Each arbitrator must be legally trained, possess recognized competence in sports law or international arbitration, be knowledgeable of sports in general, and have a command of either French or English.[151] Each arbitrator serves a renewable four-year term on the master list and takes an oath to be objective and independent.[152] Finally, each arbitrator must disclose any circumstances that call into question his or her objectivity and independence.[153] Any party can then challenge an arbitrator, and the challenge will be decided by the ICAS Board.[154]

---

http://www.spotrecht.org/urteile/SchwBGzuTAS.pdf (last visited Apr. 23, 2005).

145. *See infra* Part III.A.1.a (describing the process of selecting arbitrators for a master list).

146. *See infra* Part III.A.1.b.i-ii (explaining the selection process).

147. CAS CODE, *supra* note 8, at S6, 14.

148. *Id.* at S14. One-fifth of the list of CAS arbitrators shall be selected from persons nominated by the IOC, another one-fifth from a list nominated by the IFs, and another one-fifth from a list nominated by the NOCs. *Id.*

149. *Id.* One-fifth of the list of arbitrators are to be appointed with the view of safeguarding the interests of athletes and another one-fifth of the list is to be persons independent of the IOC, IFs, and NOC. However, the Code does not detail how these potential arbitrators are to be identified. *See id.* (outlining who will make the list of potential arbitrators without clarifying how they are picked).

150. CAS CODE, *supra* note 8, at S16.

151. *Id.* at S14.

152. *Id.* at S13, 18.

153. *Id.* at S33.

154. *Id.* at R34.

### b. Selecting Panel Members

Since the process for selecting panel members differs between the Ordinary and Appeals divisions, it is necessary to break up the processes into two separate Sections.

### i. Ordinary Division

An Ordinary Division case is heard by either a single arbitrator or a panel of three arbitrators, as agreed to by the parties.[155] Failing an agreement, the choice of single arbitrator or panel is determined by the President of the Division.[156] The method of selecting the arbitrator(s) is also done according to the agreement of the parties.[157] In the absence of an agreement, if a single arbitrator is to be used, the President shall make the appointment.[158] If a panel of three is to be used, each party selects one arbitrator and the third arbitrator is selected by agreement of the appointed arbitrators.[159] In the case of more than two parties, the applicants and the respondents jointly appoint an arbitrator for each side to the panel, and the two appointed arbitrators select the third arbitrator.[160] If the three parties have divergent interests, and in the absence of an agreement selecting the arbitrators, the President appoints all three arbitrators.[161] Finally, arbitrators are only considered officially appointed after the President of the Division has confirmed their appointment. In the confirmation process the President is to confirm that the arbitrators are independent as required by Code Rule 33.[162] Unfortunately, the Code is silent on the extent of the President's power to block appointment at this stage.[163]

### ii. Appeals Division

The Code expresses a preference that appeals be heard by a panel of three arbitrators unless the parties agree on a single arbitrator at the outset, or alternatively if the President of the Division deems the appeal

---

155. CAS CODE, *supra* note 8, at R40.1.

156. *Id.*

157. *Id.*

158. *Id.*

159. *Id.*

160. CAS CODE, *supra* note 8, at R41.1.

161. *Id.*

162. *Id.* at R40.3.

163. R40.3 does not specify if the President may veto or reject the appointment of an arbitrator that does not meet the requirements of R33. *Id.* This power may be implied, otherwise the requirement would be a nullity. However, the Code gives exclusive right to disqualify arbitrators to the ICAS Board in R34. *Id.* at R34.

to be an emergency case that should be heard by a sole arbitrator.[164]  If the appeal is to be heard by a single arbitrator, the arbitrator is appointed by the Division President.[165]  On the other hand, if a panel is to hear the appeal, the applicant nominates an arbitrator in the statement of the appeal, and the respondent nominates an arbitrator within ten days of receiving the statement of appeal,[166] and the Division President names the President of the panel after consulting with the party appointed arbitrators.[167]  All nominations become final only after the Division President confirms that each arbitrator is independent of the parties.[168]

### 2. North American CAS

The recent amendments to the Supplementary Procedures seem to have addressed some of the concerns about the rules for selecting arbitrators for AAA-CAS panels.  However, concerns about the creation of the master list, which ultimately leads to the panels, remain.

#### a. Creating the Master List

The arbitrator or arbitrators that will hear a USADA claim (prosecution) are chosen from a combined roster composed of both AAA and CAS arbitrators.[169]  In some cases, if the parties agree, an arbitrator not from the AAA-CAS roster may be appointed.[170]  In order to be named to the AAA-CAS Master list, the arbitrator must be approved by ICAS.[171]  The arbitrator then appears on both the CAS and

---

164.  *Id.* at R50.

165.  CAS CODE, *supra* note 8, at R54.

166.  *Id.* at R48, 53.

167.  *Id.* at R54.

168.  *Id.* at R33, 54.

169.  AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-3.  Also, arbitrators appointed to hear disputes brought under the AAA Commercial Rules, unless otherwise agreed, are drawn from an AAA created roster.  AAA COMMERCIAL ARBITRATION RULES, *supra* note 116, at R3, 11.

170.  While both the AAA Commercial Rules and Supplementary Procedures do not explicitly permit the parties to name arbitrators not on the national rosters, Rule 12 of the Commercial Rules states that when the parties agree on an arbitrator or a method to select an arbitrator, that agreement will be honored.  Rule 12 goes on to require that the name and address of the arbitrator be sent to the AAA.  The provisions of Rule 12 imply that the parties will name arbitrators unknown to the AAA.  However, Rule 3 of the Supplementary Procedures reads that "[t]he Panel of Arbitrators for doping cases shall consist of the North American Court of Arbitration for Sport (CAS) Arbitrators who shall also be AAA Arbitrators."  But the title of Rule 3 is "National Pool of Arbitrators."  This may all be academic however, because athletes are unlikely to ask USADA before testing positive to agree to a non-AAA-CAS arbitrator and USADA is unlike to agree to a non AAA-CAS arbitrator.

171.  Although the Supplementary Procedures do not specifically state that ICAS must

AAA-CAS master list.    The details of who nominates the AAA arbitrators to the ICAS are not covered in the Code or Supplementary Procedures, however, and inquiries of AAA and CAS officials have produced incomplete answers.[172]

### b. Selecting Panel Members

Prior to the 2005 amendments to the Supplementary Procedures, the parties were free to agree on their own process for selecting arbitrators and failing such an agreement the Procedures called for a selection process that involved significant AAA involvement and discretion.[173] Now, after the 2005 amendments to the Procedures, the selection process is carefully proscribed and the role of the AAA is reduced.

The new selection process begins with the AAA sending a list of all the AAA-CAS arbitrators to the accused athlete and to the USADA.[174] A single arbitrator is to be chosen unless either party notifies the AAA within five days of its desire for a three arbitrator panel.[175] If a single arbitrator is chosen, the parties are first encouraged to agree upon that particular arbitrator.[176] Failing an agreement, each party is to strike up to one-third of the arbitrators from the list provided by the AAA and rank the remaining arbitrators.[177] The parties are then invited to "accept" or agree upon a mutually acceptable arbitrator from the combined preference list provided by the AAA.[178] If a mutually acceptable arbitrator cannot be found, the AAA will appoint the

---

approve AAA-CAS arbitrators appointed to the master list, ICAS must approve all arbitrators appointed to the CAS master list. *See supra* Part III.A.1.a (detailing creation of the CAS master list).

172. North American-CAS Regional Secretary Jennifer Coffman did not know how AAA-CAS arbitrators were nominated. E-mail from Jennifer Coffman, Regional Secretary, North American-Comm'l Arbitration for Sport, to Michael S. Straubel, Associate Professor of Law, Valparaiso University School of Law (June 7, 2004) (on file with author). AAA Vice-President Brian Winn believed that the USOC and USADA nominated the arbitrators to ICAS. E-mail response from Brian Winn, Vice President, AAA, to Michael S. Straubel, Associate Professor of Law, Valparaiso University School of Law (June 8, 2004) (on file with author). Requests to USOC General Counsel Jeffrey Benz and USADA General Counsel Travis Taggart have gone unanswered to date.

173. *See* AAA COMMERCIAL ARBITRATION RULES, *supra* note 116, at R12 (discussing the powers of the AAA). For example, under the 2000 Supplementary Procedures the AAA chose the ten arbitrators from which the parties were allowed to select their "party-appointed" arbitrator. Under the 2005 Supplementary Procedures the parties are permitted to select their "party-appointed" arbitrator from the entire master list of AAA-CAS arbitrators.

174. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-13(a).

175. *Id.* at R-13(b).

176. *Id.* at R-13(c).

177. *Id.*

178. *Id.*

arbitrator from the remaining members of the panel.[179]

If the parties elect to use a three arbitrator panel, USADA first selects and notifies the AAA of its chosen arbitrator. The AAA then notifies the athlete of the USADA selection, after whic h the athlete has five days to make his or her selection.[180] The third arbitrator, and henceforth president of the panel, is selected by an agreement between the two chosen arbitrators.[181] Should the appointed arbitrators be unable to agree, then the aforeme ntioned process of selecting a single arbitrator is used.[182]

All arbitrators selected to a panel, both the "party-appointed" arbitrators and the panel chair, are expected to be neutral.[183] Ensuring this fair-mindedness, both the party-appointed arbitrator and the panel chair can be disqualified for circumstances indicating a lack of impartiality or independence.[184] This includes "any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives."[185] The AAA serves as the judge of whether an arbitrator shall be disqualified.[186] However, due to the use of anachronistic labels and uncorrected overlaps between the Supplementary Procedures and the Commercial Rules, only the panel chair is required to disclose circumstances affecting their neutrality. Further, the parties may only request the disqualification of a panel chair, not the other party-appointed arbitrator.[187] In the Commercial Rules and then the Supplementary Procedures, the panel chair is referred to as the "neutral arbitrator."[188] Although all of the arbitrators are mandated to be neutral, this title is used for the panel chair because, unlike the party-appointed arbitrators who can communicate with the parties during the hearing, the panel chair has no contact with the parties and was not selected by the

179. AAA-CAS S᷒UPPLEMENTARY PROCEDURES, *supra* note 10, at R-13(c).

180. *Id.* at R-13(d)(i).

181. *Id.* at R-13(d)(ii).

182. *Id.*

183. *Id.* at R-12.

184. *Id.* at R-19.

185. *Id.*

186. *Id.*

187. 2005 Supplementary Procedure Rule 19 permits the parties to object to the service of the "neutral" arbitrator. Rule 12 states that party-appointed arbitrators may be disqualified for the reasons listed in Rule 19 but there is no express statement in the rules permitting the parties to object to the service of a party-appointed arbitrator.

188. AAA-CAS S᷒UPPLEMENTARY PROCEDURES, *supra* note 10, at R12, -19, -20; AAA COMMERCIAL ARBITRATION RULES, *supra* note 116, at R12, 13, 16, 17, 18.

parties.[189]

### B. Independence From Governing Bodies

One of the major challenges to the effectiveness and legitimacy of the CAS and AAA-CAS have been doubts about their independence. Questions of independence have been raised about the organizations' relative autonomy from the governing bodies of the Olympic movement and about the independence of individual arbitrators within the organizations. Three specific situations raise doubts about independence: (1) the operation of CAS and AAA-CAS; (2) the creation of the master list of arbitrators; and (3) the appointment of an individual arbitrator to hearing panels. These separate concerns will be raised in turn with the second two combined into a single category on arbitrator independence.[190]

#### 1. CAS-Lausanne Independence

In order to keep their concerns separate and more easily understood, this Section, like the one before, will first examine the CAS in Lausanne, and then the North American-CAS. First, this Section will look at the institutional independence of the entire organization, and then the specific independence of the arbitrators and how the selection process potentially affects their level of independence.[191]

##### a. Institutional Independence

The independence of the CAS, as an institution, from the IOC and the rest of the bodies of the Olympic Movement was a concern early in the history of the CAS and remains—although at a much reduced level—a continuing concern. The foundation of this concern is the CAS's birth from the IOC and enduring dependence on the IOC and other Olympic Movement institutions for its funding.[192] The fear is that at a minimum, the CAS will see the IOC and other governing bodies as its constituency and feel the need, however subtle, to please that constituency. This concern was perhaps most importantly expressed by the Swiss Federal Supreme Court in a 1993 judgment.[193] As a direct result of that

---

189. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 116, at R-18.

190. *See infra* Parts III.B.1–2 (commenting on the challenges and concerns raised by certain areas of CAS independence, or lack thereof).

191. *See infra* Part III.B.1.a–b (examining CAS independence).

192. *See supra* Part II.A.1 (detailing the genesis of CAS and its financial backing).

193. *See supra* Part II.A.2 (describing the *Gundel* case and its effects on CAS). The *Gundel* case was a public law appeal of a CAS decision (CAS 92/63 G. v. FEI) to the Swiss Federal Tribunal, decided March 15, 1993, published in OFFICIAL DIGEST OF FEDERAL TRIBUNAL

judgment, the CAS was restructured.[194]

In order to address concerns about its institutional autonomy, the CAS has taken two main steps. One was to create the ICAS and the other was to diversify its funding. The ICAS was created in order to serve as a buffer between the IOC and sports establishment in the arbitration process.[195] It consists of twenty members, four appointed by the IOC, four appointed by the International Federations, four appointed by National Olympic Committees, four selected by the twelve previously appointed members with an eye toward protecting the interest of athletes, and four selected by the already appointed members intended to be independent of the governing bodies of the Olympic Movement.[196] ICAS functions include amending the Code, electing the President of each CAS Division, appointing arbitrators to the master list, hearing challenges on the independence of arbitrators, and approving the CAS budget.[197] Second, to diversify its funding, the CAS now receives one-third of its funding from the IOC, one-third from the International Federations, and one-third from the National Olympic Committees.[198]

The first step in determining whether the ICAS and the new funding system adequately protect the CAS's independence is to identify the appropriate standard. While many standards would be appropriate, the most appropriate is that found in Swiss law.[199] This standard has been applied by the Swiss Federal Tribunal to the CAS in cases challenging the CAS's independence from the IOC.[200] The Swiss standard looks for

---

JUDGMENTS II, 119, 271.

194. *See* COURT OF ARBITRATION FOR SPORT, DIGEST OF CAS AWARDS II, 1998–2000 xxv–xxvi (Matthieu Reeb ed., 2002) (highlighting the role of *Gundel* in bringing about organizational reform at CAS); *supra* Part II.A.2 (discussing the organizational changes that followed the 1993 challenge to CAS independence).

195. The ICAS statute specifically states that its purpose is to "safeguard the independence of the CAS . . . ." CAS CODE, *supra* note 8, at S2.

196. *Id.* at S4.

197. *Id.* at S6.

198. *See* Agreement concerning the constitution of the International Council of Arbitration for Sport (Paris Agreement), art. 3, *reprinted in* DIGEST OF CAS AWARDS II 1998–2000 884 (Mattieu Reeb, ed. 2002) (putting forth the proportion of funding from various entities).

199. Although CAS operates on the international level, hearing cases between citizens of different countries and sometimes applying different national law, it has declared Switzerland to be its "seat" and thereby choosen Swiss law to govern its operation. *See supra* note 51 and accompanying text (discussing the application of Swiss law to all CAS arbitrations, regardless of where the arbitrations are physically held). Further, Switzerland has become the de facto homeland of the Olympic Movement and the IOC, since a good number of IFs are headquartered there and Swiss law is the de facto law of the Olympic Movement.

200. A. & B. v. Int'l Olympic Comm., Swiss Fed. Tribunal (1st Civ. Chamber) Judgment of 27 May 2003, *translation available at* http://www.spotrecht.org/urteile/SchwBGzuTAS.pdf (last

"circumstances [that would] produce the appearance of prejudice and cast doubt over [a] judge's impartiality."[201]

Before applying that standard, however, it should be noted that the question of CAS independence becomes more important, and therefore scrutinized more carefully, when the case before the CAS involves an accusation of wrongdoing by an athlete. Such a case pits an institution of the Olympic Movement, in a prosecutorial posture, against an individual athlete. Thus, the relative power relationship between the two parties creates a strong need for CAS to be independent.

In 2001, the Swiss Federal Tribunal addressed the question of CAS independence from the IOC and concluded that the CAS was sufficiently independent from the IOC.[202]    The foundation of the Court's conclusion was that the creation of the ICAS and the diversification of funding have sufficiently reduced the IOC's ability to influence any CAS decision by essentially diluting the IOC's role in controlling and funding the CAS.[203]   Before moving on, it must be stated that the 1994 reforms have gone a long way to ensuring CAS independence.[204]   But the facts and arguments presented to the Court failed to frame the issue as it may now exist. That issue may be more properly phrased as: is the CAS sufficiently independent from the collective governing bodies of the Olympic Movement? The CAS's constituency—its benefactors, upon whom it relies for its continued existence—is now the combination of the IOC, the IFs, the NOCs, and the NGBs.    Those governing bodies collectively share common interests, particularly vis-à-vis individual athletes.    Therefore, the question has simply been rearranged to ask: does the collective influence of the Olympic governing bodies on the ICAS and CAS and the exclusive funding of the CAS by Olympic governing bodies challenge the independence of the CAS?

Despite the concerns, CAS reforms have insulated it for the most part.    Direct influences—such as those feared by the Swiss Federal Tribunal before the 1994 reforms—are now highly unlikely.    Any potential influences will be subtle.    For example, administrative decisions, such as the appointment of panel presidents, the review of decisions for publication and approval, and the approval of executive position appointments could all be done, however subconsciously, to

---

visited Apr. 23, 2005).

   201.  *Id.* at para. 3.3.3.

   202.  *Id.* at para. 3.3.3.1-3.3.4.

   203.  *Id.*

   204.  *See supra* Part II.A.2 (discussing the changes instituted in 1994).

please the constituency that the CAS owes its existence and financial support to. But, assuming this worst case scenario, does this threat rise to the level of "circumstances [that would] produce the appearance of prejudice and cast doubt over [a] judge's impartiality?"[205] Likely not. Subtle institutional pressures like these are rarely demonstrable and would not create the objective circumstances sufficient to create impartiality.[206] Nevertheless, such subtle pressures can manifest themselves in a way that, while not outcome determinative in an individual case, and despite the best of intentions, work—over the long run—to affect the outcome of cases. Such subtle effects could cause the development of doctrine that favors governing bodies, over time stacking the deck against an athlete, or in cases involving management decisions.

These subtle influences are inherent to almost all judicial institutions. But efforts must still be made to minimize their effects. Grand structural solutions or changes, such as alternative funding for the CAS could be practically difficult and may not reduce significantly the existing pressures. The best protections will likely come with day to day changes in the CAS operating rules, such as the openness of the arbitrator appointment and selection process and other steps mentioned below.[207] One unique solution which would require more analysis, and is beyond the scope of this Article, is the creation of monitoring groups comprised of athletes or athletes' attorneys, perhaps akin to a union.

### b. Arbitrator Independence

The other main source of questions about CAS autonomy revolves around the arbitrators that hear CAS disputes, and how much autonomy *they* are allowed in the hearings. There are two ways in which CAS arbitrators can have their autonomy curtailed. First, by creating a finite list of arbitrators, only certain people will be appointed, and thus reliance on the body creating the list may be fostered. Second, in order to become a member of a panel, arbitrators must pass through the tricky panel selection process, a process that can usurp some of their independence.

---

205. A. & B. v. Int'l Olympic Comm., Swiss Fed. Tribunal (1st Civ. Chamber) Judgment of 27 May 2003 at para. 3.3.3; *see* Gundel v. CAS, Swiss Fed'l Tribunal (Mar. 15, 1993), *appeal from* G. v. FEI, CAS 92/63, *in* OFFICIAL DIGEST OF FED'L TRIBUNAL JUDGMENTS II, 119, 271 (using this as its standard).

206. The Swiss Federal Tribunal requires proof of bias by objective circumstances only. A. & B. v. Int'l Olympic Comm., Swiss Fed. Tribunal (1st Civ. Chamber) Judgment of 27 May 2003 at para. 3.3.3.

207. *See infra* Part III.B.2.a-b (recommending changes in the arbitrator selection process to improve transparency and independence).

### i. Master List Creation

The independence of the CAS arbitration process depends largely on the initial selection of independent and qualified arbitrators. Under the provisions of the Code, the CAS maintains a master list of at least 150 arbitrators[208] who must be legally trained, possess "competence" in sports law or international arbitration, and have a good command of English or French.[209] Further, the arbitrators should represent the different continents and judicial cultures of the world.[210] One-fifth of the arbitrators on this list are to come from those nominated by the IOC, one-fifth from those nominated by the IFs, and one-fifth from those nominated by the NOCs.[211] The fourth one-fifth of the master list is to be appointed with an eye toward protecting the interest of athletes, and the final group is required to not be associated with the governing bodies of the Olympic Movement.[212] All arbitrators on the master list must be approved by ICAS.[213]

Despite the attempt to create a diversified master list of arbitrators, as is described above, there are concerns that the list either contains too many—or is dominated by—potentially biased arbitrators. While the Swiss Federal Tribunal addressed this claim and dismissed it, the Tribunal focused on the influence of the IOC alone and not the collective influence of the governing bodies of the Olympic family.[214] The Olympic governing bodies together nominate three-fifths of the master list. Then, the remaining two-fifths of the arbitrators, though theoretically from the outside the Olympic Movement, are identified and approved by an ICAS dominated by members appointed by the Olympic family. It can be argued, therefore, that all of the arbitrators come from, have ties to, or owe their presence on the master list of arbitrators to the Olympic family. Further, the list can and does include arbitrators who have and continue to represent parties before the CAS, including governing bodies, an arrangement that can create a conflict of interest or the appearance of a lack of independence. Finally, as a closed list, even though the list consisted at one time of over 180 persons, the selection of experienced and well-qualified arbitrators is

---

208. CAS CODE, *supra* note 8, at S13.

209. *Id.* at S14.

210. *Id.* at S16.

211. *Id.* at S14.

212. *Id.*

213. *Id.* at S6. Interestingly, the composition of the ICAs has the same distribution, as far as the percentage of nominations allocated to each group, as the master list. *Id.* at S4.

214. Gundel v. CAS, *appeal from* G. v. FEI, CAS 92/63 (Mar. 15, 1993), *in* OFFICIAL DIGEST OF FEDERAL TRIBUNAL JUDGMENTS II, 119, 271.

limited to a small group of frequently used arbitrators.

Do these concerns rise to the level of "circumstances [that would] produce the appearance of prejudice and cast doubt over [a] judge's impartiality" and can the number of potentially biased arbitrators populating the master list be reduced? Yes, the inclusion of arbitrators that continue to represent parties before the CAS does create an appearance of doubt of impartiality, and there are steps that can be taken to reduce the number of potentially biased arbitrators. Further, the impact of the remaining potentially biased arbitrators can be reduced by expanding the source of arbitrator nominations.

Just as it may be a violation of the Code of Judicial Conduct for a judge to hear a case being argued by a government agency that formerly employed him,[215] it creates the appearance of a conflict of interest when an attorney represents an athlete or a governing body and then serves as an arbitrator in a disciplinary case. This is particularly so when the collective interest of the Olympic Movement is then called into question by an athlete, such as in doping cases.[216] The easiest way to prevent this appearance of impropriety is to not appoint arbitrators to the master list that represent parties, including athletes, before the CAS. This will, of course, reduce the number of available experienced arbitrators. This shortage will be temporary, however,[217] and CAS arbitrators' resultant improved legitimacy would be worth the temporary shortage of experienced arbitrators.

The source of arbitrators should also be expanded in order to balance out the number of arbitrators nominated by governing bodies. The current one-fifth division of nominations should be expanded to sixths. An athletes' union should be added as a source of nominations to the master list. Adding an athletes' union as a source of nominations would create a balance of one-half of the nominations coming from governing

---

215. *See* IND. CODE ANN., CODE OF JUDICIAL CONDUCT, Canon 2 & cmt. (West 2003) (stating that a judge should disqualify himself in a proceeding in which the judge's impartiality might reasonably be questioned because he was formerly employed by a government agency that is a party in the case).

216. All governing bodies now have a commonality of interest in doping cases because they have adopted the World Anti-Doping Code and any interpretation of the Code or precedent could affect how all governing bodies enforce the World Anti-Doping Code. All of the IFs were forced to accept the World Anti-Doping Code as a condition of participation in the 2004 Olympics.

217. The growing importance and number of CAS cases will attract more qualified persons to become arbitrators thus expanding the pool of independent arbitrators. Also, to be a qualified arbitrator, an arbitrator need not satisfy both of the CAS eligibility criteria: arbitration experience and sport experience. Arbitration experience is the more important of the two criteria and easily found. *See* CAS CODE, *supra* note 8, at S14 (requiring qualified arbitrators to have "competence with regard to sports law and/or international arbitration").

bodies, and one-half of the nominations coming or representing non-governing body origins.   While adding an athletes' union as a nominating source may not work to remove potentially biased arbitrators from the master list, it will at the least create a better appearance of balance.[218]

Alternative solutions, such as an open list of arbitrators or the addition of arbitrators nominated by an athletes' union, without excluding arbitrators that have represented parties, likely would not eliminate the conflicts of interest.   An open list would compromise the quest for using only qualified arbitrators, as well as still allowing the appointment of arbitrators that represent parties before the CAS. Expanding the master list to include arbitrators nominated by an athletes' union would only increase the number of arbitrators that have represented parties.   Perhaps the CAS could prohibit arbitrators from hearing cases between a governing body and an athlete when the arbitrator has represented either in the past.   But that prohibition might not clearly announce that the CAS does not tolerate any appearance of a conflict of interest.

## ii. Selection of Panel Members

In both the Ordinary and Appellate Divisions each party is permitted to name an arbitrator to the panel.[219]   In Ordinary Division cases the President or third member of the panel is selected by the two party-appointed arbitrators.[220]   In the Appellate Division the panel President is appointed by the Division President.[221]   Permitting the parties to appoint panel members creates the opportunity for the appointment of biased or friendly arbitrators.   The parties in both Divisions will quite logically and reasonably appoint arbitrators that they believe are receptive or friendly to their positions in the case.   To do otherwise would be foolish and possibly even professional malpractice by the attorney representing a party.   This may explain why the same arbitrators are consistently re-appointed by federation and athletes' attorneys.[222]   The result is two arbitrators with directly opposite

---

218.  While creating an athletes' union may be a benefit to Olympic athletes, creating an international union to counter balance the international presence of the IOC will be difficult for many reasons.  Perhaps the best vehicle for such a counter balance would be a strong athletes' advisory committee and ombudsman, similar to but even stronger than the once created by the USOC.

219.  CAS CODE, *supra* note 8, at R40.2, 48, 53.

220.  *Id.* at R40.2.

221.  *Id.* at R54.

222.  This information is based on interviews with two CAS arbitrators and a review of the published CAS decisions.

predispositions and attitudes on the panel. With two votes potentially predetermined, this leaves the panel President to break the deadlock. Then, because the panel President plays the critical tie-breaking role, his appointment becomes, perhaps, the pivotal event in deciding who wins the case. This increases the importance of the CAS's role and increases the chance for control of the outcome by CAS.

In an effort to reduce these possible improper influences, arbitrators are required to complete and sign a declaration of independence in which they are required to disclose any possible conflicts of interest.[223] The Division President then confirms that each panel member is independent of the parties to the case before the panel can proceed to hear the case.[224] Finally, the parties can challenge an arbitrator's independence; this challenge would be heard by the ICAS.[225]

Does the appointment of friendly arbitrators create circumstances that produce the appearance of prejudice and cast doubt over a judge's impartiality? Do these safeguards prevent the appointment of friendly or biased arbitrators? Because objective circumstances are required to prove the appearance of prejudice or doubt of an arbitrator's impartiality, the appointment of friendly arbitrators is likely not enough to disqualify an arbitrator.[226] But that does not remove a serious problem, and one that seriously challenges the CAS's credibility.

The practice of party-appointed arbitrators is deeply-rooted in the tradition of arbitration. It is a time-honored practice that is not easily challenged. But, it was developed primarily for commercial arbitration involving contract disputes. Many of the cases that the CAS hears do not fit the commercial arbitration mold. Doping cases and other disciplinary cases are more akin to a prosecution. Doping cases are more like a criminal prosecution than like a traditional arbitration case because there is an accusation of wrongdoing and the remedy is more than mere compensation. This distinction may be best demonstrated by comparing arbitration of a contract dispute with the arbitration of a doping accusation. In a contract dispute, the parties are arguing over

---

223. CAS Code R33 requires that each arbitrator disclose any circumstances likely to affect his independence. CAS CODE, *supra* note 8, at R33. At the beginning of each arbitration, each arbitrator is requested to complete a form on which he or she declares any circumstance likely to affect his independence. Interview with Matthieu Reeb, Secretary General, CAS, in Lausanne, Switzerland (May 25, 2004) (on file with author).

224. CAS CODE, *supra* note 8, at R33, 40.3, 54.

225. *Id.* at R34.

226. The standard applied by ICAS in deciding disqualification requests is one of Swiss public law and a difficult standard to satisfy. Interview with Matthieu Reeb, *supra* note 223 (May 25, 2004).

their obligations under the contract and whether there was a breach of these obligations. The remedy can be either specific performance or compensatory damages. On the other hand, in a doping case, one party, the USADA, accuses the other party of violating disciplinary rules and the potential remedy is a two-year suspension. The difference in the remedy is the critical difference that makes the process like a prosecution. A two-year suspension is a penalty or a punishment. Arguably, if the remedy of a doping case would be limited to specific performance or compensatory damages (designed to make the parities whole) the athlete would only be disqualified from the competition involved or suspended as long as the drug involved enhanced the athlete's abilities.

Indeed, the Swiss Federal Tribunal expressed this view when it declared that a suspension, such as what flows from a doping violation, is a "genuine statutory punishment that affects the legal interests of the person."[227] As a prosecution-like proceeding imposing a statutory punishment, the practice of party-appointed arbitrators creates a taint on the proceeding. The panel in a prosecution-like proceeding should be as beyond reproach as possible, and party-appointed arbitrators create reproach.

The CAS declaration and challenge procedure is laudable and effective, but not entirely sufficient to remove the taint of parties appointing friendly arbitrators. The CAS does not investigate the completeness and truthfulness of the declarations.[228] The challenge procedure standard is that of Swiss public law, a tough standard to satisfy.[229] The declaration and challenge procedure only stops the appointment of a clearly-biased arbitrator, but it does not stop the appointment of party-friendly arbitrators. The publication of reasoned decisions does help prevent undue influence by friendly arbitrators: the arbitrators must explain and support their decision publicly. But publication does not prevent undue subtle influence; it may only expose blatant examples.

If the CAS wishes to reduce the appearance—if not the reality—of undue influence by party appointed friendly arbitrator, it could do away with party-appointed arbitrators in disciplinary cases and use a bttery system for the appointment of arbitrators. In such a system the CAS

227. A. & B. v. Int'l Olympic Comm., Swiss Fed. Tribunal (1st Civ. Chamber) Judgment of 27 May 2003 para. 2.1, *translation available at* http://www.spotrecht.org/urteile/ SchwBGzuTAS.pdf (last visited Apr. 23, 2005).

228. Interview with Matthieu Reeb, *supra* note 223 (May 25, 2004).

229. *Id.*

would select all three arbitrators by lot and then allow each party a limited number of preemptory strikes. A random appointment process would not allow either side to claim that the other side or the CAS manipulated the panel composition. Furthermore, the overall credibility of the decision would be enhanced.

A potential downside to using a random appointment process would be that parties lose the security of having an advocate on the panel. Given the choice between a random system and the current system, some parties might reasonably choose the current system because they prefer the security provided with the appointment of one friendly arbitrator—knowing that the other side will appoint an unfriendly arbitrator—over the insecurity of risking a panel with no friendly faces on it. This insecurity would be increased when a party faces a closed panel that it feels is dominated by unfriendly faces. All of this begs the threshold question: which selection system reduces the likelihood of biased arbitrators tainting the process? Picking between the two systems may require a choice between: (1) a system that is based on only a slightly cynical view of the arbitration process; and (2) a system that is based on a very cynical view of the arbitration process.

Adopting the random selection process over the current system would be based on the assumption that under the current system, parties can find friendly arbitrators who will identify with their position. This assumption stems from a cynical view of arbitration. But choosing the random process would also be based on assumptions. It would assume that there are a limited number of "friendly" arbitrators on the master list and that the odds are good that the preemptory strikes will be enough to ensure an unbiased panel. This second assumption, however, is the optimistic view of arbitration. Continuing with the current system would admit that many or all arbitrators are friendly to one side or the other and that it is safer to have at least one arbitrator friendly to each position on the panel than risk a panel with three unfriendly arbitrators on it. Keeping the current system might just require an even more cynical view of arbitration.

Perhaps there is a middle ground that recognizes the parties' fears, but at the same time puts faith in the majority of arbitrators to be neutral. In this kind of combined system, each party would retain the right to appoint one arbitrator, but the third arbitrator would be randomly selected and each party allowed one strike. Such a combined system would retain the security of appointing a friendly arbitrator, while reducing the insecurity (particularly from the athlete's perspective) of the swing vote arbitrator being selected by an institution that the parties may not trust. Selecting the third party arbitrator by lot

would also help insulate the CAS from claims of influencing the process. Nevertheless, it is important to note that for any system to work well, as much information as possible about each arbitrator should be made available to the parties, so that the parties may make well informed decisions. In addition to a resume for each arbitrator, the CAS should list every case that an arbitrator has decided on its web site list of arbitrators.

### 2. North American-CAS Independence

The question of the North American CAS institutional independence has been thrust into the limelight recently by several high profile cases and involves several preliminary questions.[230] Several cases arising out of the BALCO matter, including one case that has been taken to the Federal Courts, have raised concerns that the USADA and the USOC exert undue influence over the AAA-CAS arbitration process.[231] Before an analysis of AAA-CAS can be done, it must first be determined whether the institution in question is North American-CAS or the AAA.

Under the Supplementary Procedures, doping cases—cases brought by USADA—are administered by "the AAA through the AAA Vice President then serving as the Secretary" for North American-CAS.[232] This reference to both the AAA and to North American-CAS creates some initial confusion about which institution is really administering USADA cases. This confusion is compounded by the reference to the establishment of decentralized offices by CAS in the Code[233] and the right, under the Supplementary Procedures, to appeal an AAA-CAS decision to the CAS.[234] Combined, these provisions suggest the existence of a single entity, known as the CAS, with a branch office in North America. If there is in fact a single entity, that conclusion could have significant legal consequences.[235] However, a close examination of the Supplementary Procedures shows that it is the AAA that performs

---

230. *See, e.g.,* Jacobs v. USA Track & Field, 374 F.3d 85, 87 (2d Cir. 2004) (stating that the AAA sided with the USADA in concluding that the arbitration should proceed under the Supplementary Procedures rather than the Commercial Rules).

231. *See id.* (discussing the interplay between the AAA-CAS, USADA, and USOC).

232. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-2.

233. *Id.*

234. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-49A, -57.

235. If North American-CAS is legally part of CAS, in other words CAS and North American-CAS are one legal entity, it is possible that CAS's declaration of Lausanne as the legal seat of CAS could mean that NA-CAS cases are subject to Swiss law and not U.S. law. *See* CAS CODE, *supra* note 8, at S1 (stating that the seat of the CAS is established in Lausanne, Switzerland).

most, if not all, of the important administration tasks.[236] Therefore, it is important to first examine the AAA.

### a. Institutional Independence from Governing Bodies

The proper test to evaluate AAA independence from USADA and the USOC is whether its funding and the USOC's and USADA's control of the AAA constitute "circumstances [that would] produce the appearance of prejudice and cast doubt over [a] judge's impartiality."[237] As for the question of the AAA's funding: AAA's administrative costs in handling USADA cases are paid by the USADA.[238] Otherwise, the AAA is a large non-profit arbitration institution that does not rely upon funding from the USADA, the USOC, or any other party to the USADA-initiated cases for its existence. This is an important difference from the CAS, which does rely upon funding from the parties that appear before it for its continued existence.[239] Because the AAA does not rely upon funding from the parties that appear before it for its continued existence, it cannot be said that the AAA's funding casts doubts on its institutional impartiality.[240]

The second question in the test for institutional independence is whether the USADA and the USOC exert any control over the AAA's administration of arbitration proceedings. The Supplementary Procedures and the USADA's Protocol do not contain any provisions giving the USOC or USADA a direct say in the AAA's administration of the arbitration process. The allegations in current litigation and conflicting information from NA-CAS and AAA officials raise some red flags. In *Jacobs v. USADA*, the plaintiff alleged that the USADA conducted training sessions for North American-CAS arbitrators and pays all of their expenses.[241] Additionally, AAA and NA-CAS officials have given conflicting information or have been unable to explain who nominates AAA arbitrators to the CAS master list, and in one case

---

236. *See* AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-10, -13, -19 (stating that the AAA conducts administrative conferences, oversees the selection of arbitrators, and decides any challenges to an arbitrator).

237. A. & B. v. Int'l Olympic Comm., Swiss Fed. Tribunal (1st Civ. Chamber) Judgment of 27 May 2003 at para. 3.3.3, *translation available at* http://www.spotrecht.org/urteile/SchwBGzuTAS.pdf (last visited Apr. 23, 2005)

238. USADA PROTOCOL, *supra* note 110, at § 10(e).

239. *See supra* Part III.B.1 (discussing the funding for CAS).

240. While the AAA does not rely on USADA's business for its existence, the desire to retain USADA's business or frequent and consistent contact with USADA representatives may still influence individual AAA officials.

241. Brief for the plaintiff, Jacobs v. USA Track & Field, 374 F.3d 85 (2d Cir. 2004) (on file with author).

suggested that the USADA screens or appoints them.[242] Assuming, arguendo, that these allegations are accurate, and then adding the possibility of indirect control through the pressure to please a consistent client, there still does not appear to be enough control of the AAA by USADA and the USOC to conclude that the AAA is dependent. However, if these allegations are true, the USADA is tainting the current pool of arbitrators by conducting ex parte training sessions and it should not be permitted to nominate or play any role in selecting the master list of arbitrators. Thus, the ICAS should refuse to consider arbitrators screened or nominated by the USADA. If the USOC is consulting the USADA on nominations, the USOC has committed an ethical breach that should be stopped immediately.

### b. Master List Creation

To be on the master list of NA-CAS arbitrators, an arbitrator must satisfy the requirements of both the CAS and the AAA.[243] Next, the arbitrator must be approved by the ICAS.[244] After being approved by the ICAS, an arbitrator then appears on both the CAS and AAA-CAS master list.[245] There are currently forty-three potential AAA-CAS arbitrators.[246] However, who nominates the arbitrators to the ICAS and whether those nominations are required to—or actually do—fall into the five categories of nominations that make-up the CAS master list is not covered in the Supplementary Procedures. Further, inquiries of the NA-CAS and the AAA officials have produced conflicting answers.[247]

---

242. *See supra* note 172 and accompanying text (discussing the ambiguity in how the master arbitrator list is compiled and the lack of clarification provided by the AAA and North American-CAS officials).

243. *See* AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-3 (stating that the National Panel of Arbitrators consists of those that are both CAS and AAA arbitrators).

244. CAS CODE, *supra* note 8, at S3, 6.

245. A separate list of NA-CAS arbitrators is not kept. E-mail from Jennifer Coffman, Regional Secretary, North American-CAS, to Michael S. Straubel, Associate Professor of Law, Valparaiso University School of Law (June 7, 2004) (on file with author). All NA-CAS arbitrators appear on the master CAS list. *Id.* However, there are forty-three arbitrators from North America on the CAS master list, and Regina Jacobs, in her claim against USADA claims that she has been told by NA-CAS and AAA sources that there are currently anywhere from 25 to 38 NA-CAS arbitrators. Jacobs v. USA Track & Field, 374 F.3d 85, 85 (2d Cir. 2004).

246. There are currently forty-three arbitrators on the CAS master list from North America. *See* Court of Arbitration for Sport, Master List of CAS Arbitrators, *at* http://www.tas-cas.org [hereinafter CAS Arbitrators] (providing biographical information on each of the arbitrators) (last visited Feb. 2, 2005).

247. North American-CAS Regional Secretary Jennifer Coffman was unaware of whether NA-CAS arbitrators fell into the five categories listed in S14. E-mail from Jennifer Coffman, Regional Secretary, North American-CAS, to Michael S. Straubel, Associate Professor of Law, Valparaiso University School of Law (June 7, 2004) (on file with author).

Recent high profile cases have raised a number concerns about the composition of the NA-CAS master list and thereby the method of constructing the master list.[248] The leading concern is that many, if not the majority, of the arbitrators are biased due to their current or previous connections with the USOC, USADA, or NGBS. Of the forty-three AAA-CAS arbitrators, nine have connections with the USOC, eleven have connection with NGBs, four have connections with IFs, two with the IOC and Olympic Organizing Committees, and one is the President of WADA.[249] A similar concern is that a large number of the arbitrators have been influenced by contracts with or educational programs put on by the USADA.[250] The allegation of improper contacts by the USADA is not a structural problem and can be easily prevented in the future. Currently there are concerns, however, that many of the arbitrators have contacts with the governing bodies of the Olympic Movement that could influence their rulings. This is a structural concern that should be addressed.

Similar to questions about the CAS master list, the questions exist of whether these concerns rise to the level of producing the appearance of prejudice and casting doubt over a judge's impartiality and whether the number of potentially biased arbitrators populating the master list be reduced? The inclusion of a large number of arbitrators that have connections with the governing bodies of the Olympic Movement, if not raising the appearance of doubt, at least raise a red flag that the NA-CAS should be concerned about. This concern is particularly heightened by the fact the NA-CAS arbitrator only hears doping cases that pit the Olympic Movement's representative, USADA, against athletes.

There are four possible ways to deal with this taint on the NA-CAS. The most drastic is to purge the master list of all arbitrators with current or recent ties to the governing bodies of the Olympic Movement. This step would certainly enhance the credibility of the process. But would it simultaneously gut the list of experienced and informed arbitrators? The second alternative is to increase the number of arbitrators with no connection to the Olympic Movement. For example, the proposed athletes' union could nominate arbitrators until there is a fair balance on the master list. This alternative would dilute the taint, but may just increase the number of conflicts of interest by adding arbitrators tied to

---

248. *See, e.g., Jacobs,* 374 F.3d at 88 (arguing that arbitrators should be selected under the Commercial Rules).

249. *See supra* note 246 (discussing the CAS master list of arbitrators).

250. *See* CAS Arbitrators, *supra* note 246 (detailing biographical data of arbitrators).

the athletes and their representative body. The third alternative is to go to either an open list or an alternative list of arbitrators such as the AAAs list of commercial arbitrators. This alternative would remove some of the taint but it would forsake the benefit of using arbitrators who are knowledgeable and experienced in sport and doping law.[251] Finally, the fourth alternative is to create a permanent, or semi-permanent, small list of full-time arbitrators completely lacking in, or with very minimal connections with both the Olympic Movement and athletes' causes. This kind of panel would function like full-time professional judges. This solution would remove the taint but change the nature of the process from traditional arbitration to something new.

Considering the prosecutorial nature of all current NA-CAS cases, the composition of the master list and the process of selecting a panel of arbitrators, as will be discussed below, should be changed to improve the integrity and legitimacy of the process. Of the four possible solutions listed above, the best long-term solution would be the first: to establish a list of arbitrators with no current or recent connections with the Olympic Movement or athletes. The nominating and screening process would have to be open and interests other than those of the governing bodies, such as the athletes', would have to be involved. Then the arbitrators would have to pledge not to represent or be involved in the governing activity of governing bodies or athletes' interests.

Furthermore, purging the NA-CAS master list of arbitrators with connections to Olympic Movement Governing bodies and athletes that have appeared before the CAS would not reduce the quality of the arbitration process and instead improve the legitimacy and credibility of the arbitration process. While the CAS seeks arbitrators with expertise and experience in both arbitration and sport, expertise and experience in sport is not limited to experience within the Olympic Movement governing bodies, and the sporting world is very big. Further, of the two backgrounds, arbitration experience is more valuable than a sport background. It is the ability to understand the rules and doctrines at issue in an arbitration that is important. A sound legal background and experience is more valuable in understanding the relevant rules and doctrines than the desire for a sports background. Therefore, filling the NA-CAS master list with arbitrators from outside the Olympic Movement, but who have significant legal experience, will not harm and only improve the arbitration process.

---

251. *See* CAS CODE, *supra* note 8, at S14, 16 (requiring that the arbitrators be selected from a varying pool and that each arbitrator be familiar with the sport and law and be objective).

### c. Selection of Panel Members

The 2005 amendments to the Supplementary Procedures has made the panel selection process more like that of the CAS, and consequently, has removed some of the concerns that existed before.[252] Now, when a three arbitrator panel is used, each party selects one from the entire list of arbitrators and the two appointed arbitrators work together to select the third arbitrator.[253] In the event the two appointed arbitrators are unable to agree on the third, the parties are then asked to prioritize the remaining choices, so that the AAA can facilitate an agreement.[254] Failing agreement, the AAA will select the third arbitrator.[255] The parties may then challenge that appointment if they are unhappy with the selection, by raising concerns about their ability to be neutral and impartial – it appears, however, that this same kind of appeal can not be raised with respect to the other party's selection.[256] These appeals are decided by the AAA.[257]

The same concerns that raise doubt about the panel selection process of the CAS apply to the AAA-CAS process. Permitting the parties to appoint panel members creates the opportunity to appoint friendly arbitrators that the parties believe are likely to, if not rule in their favor, be sympathetic to their position. The practice of parties appointing arbitrators is akin to judge shopping, a practice that offends notions of due process in the United States. Further, because the AAA can both select the panel chairman and decides any challenge against that chairman, there is a fear that the process is tightly controlled by an institution that could be influenced by the USOC and USADA. Whether or not these concerns are in fact valid, they do create the appearance of prejudice and cast doubt over the impartiality of the process, and certainly call the fairness and legitimacy of the process into question.

---

252. Before the 2005 Amendments both parties had to select their party-appointed arbitrators from a list of 10 arbitrators created by the AAA. AAA-CAS SUPPLEMENTARY PROCEDURES R-13 (2000). This power gave the AAA control over the selection of the arbitrators. Also, the AAA appointed the third arbitrator, who became the chair of the panel. *Id.*

253. *See infra* Part III.A.3.b (detailing this method as employed in CAS arbitrator selection).

254. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-13 (d)(i).

255. *Id.* at R-13(c)(2).

256. Supplementary Procedure R-19 states that the parties may challenge the independence of a "neutral arbitrator," but does not state that any other arbitrators, including a party-appointed arbitrator may be challenged. *Id.* A reading of other sections of the Supplementary Procedures, particularly Rule 15 and Rule 20, suggests that the terms "chairman" and "neutral arbitrator" are synonymous in this context. *Id.* at R-15, -20. Therefore, it seems reasonable to conclude that only the chairman can be challenged.

257. *Id.* at R-19.