# EXHIBIT 8-A

Dockets.Justia.com

With very important questions, such as an athlete's reputation, career, and income involved, the NA-CAS arbitration system should strive to eliminate or at the very least reduce taint wherever possible. Two possible solutions exist that may reduce this taint. First, in addition to removing from the master list arbitrators that have current or recent connections with parties, a random appointment system for all three panel members or at least the panel chairman could be used. Second, the parties could be allowed to challenge the independence of all three arbitrators, with that challenge decided by the ICAS or a similar body outside of the AAA.

Of the systems discussed above, a combined system, where each party would retain the right to appoint one arbitrator, with the third arbitrator randomly selected and each party allowed one strike of the potential third arbitrator would be the best alternative. Such a combined system would retain the security of appointing a friendly arbitrator while reducing the insecurity of the swing vote arbitrator selected in a manner that the parties may not trust. Further, as was suggested for the CAS process, regardless of the process chosen the process should be as transparent as possible. The master list of arbitrators should be publicly available, and the names and positions of the people making administrative decisions should be easily learned.

## C. Choice of Substantive Law

A fair and well-constructed arbitration process should include a process for selecting the procedural rules and the substantive laws that govern the arbitration. However, there should also be a back-up choice of law to fill the gaps that invariably occur in the primary choice of procedural and substantive laws, and importantly a body of mandatory law that will ensure that the process protects basic notions of fairness and due process. For example, for the CAS Appeals Division the choice of procedural rules is the Code of Sports-related Arbitration and Mediation Rules. The body of law chosen to fill the gaps in the Code is the law agreed to by the parties or the law of the IF's home state, and the method for ensuring fairness is the Swiss Statute on Private International Law.[258] This Section, which examines the CAS and AAA-CAS choice of law provisions, uses a template that looks at whether the choice of procedural rules or the choices of substantive laws includes these three categories: (1) an initial choice; (2) a back-up,

---

258. *See* CAS CODE, *supra* note 8, at R27, 28, 58 (detailing procedural rules). The effect of designating Lausanne, Switzerland, as the seat of all CAS arbitrations is to subject the Swiss statutes to Private International Law.

gap-filling choice; and (3) mandatory due process protections.

### 1. Basic Provisions

Both the CAS and AAA-CAS rely on substantive law and procedural rules established by Code. These basic, initial choices of law are not complete, and thus have to be supplemented with further, gap-filling law.

#### a. CAS Code

The Code's procedural rules apply whenever the parties agree to submit a dispute to CAS.[259] The Code does not specifically provide for a backup body of procedural law to fill the gaps that may occur in the Code's procedural rules. Thus far, the practice of CAS panels has been to look to the back-up substantive law chosen by the parties to fill the gaps.[260] By designating its legal seat as Lausanne, Switzerland, the CAS has indirectly designated that the fairness of its process in general, as well as the process in each individual arbitration, can be tested under Swiss law, specifically the Swiss Statute on Private International Law.[261] The Swiss Statute on Private International Law sets out the minimum requirements for international arbitrations—such as impartiality and due process—required when the legal seat is in Switzerland.[262]

The substantive law applied in CAS arbitration is the law chosen by the parties.[263] The law chosen by the parties can be the rules set by the governing body, or state laws.[264] In the absence of a choice by the parties, the Ordinary Division uses Swiss law and the Appellate Division uses the law of the sports body's country of domicile.[265] In practice, however, the only choice of law is the IF's rules and the panels are thus forced to use Swiss law and the sports body's home law to fill

---

259. *Id.* at R27. Such an agreement may be expressed either in a contract or may be included in a sports-governing body's rules. *Id.* Such a rule is considered to be a contractual agreement between the governing body and a member of the sports organization. *Id.* However, it can be argued that such a "contractual agreement" is a contract of adhesion.

260. *See, e.g.,* S. v. FINA, CAS 2000/A/274 (Oct. 19, 2000), DIGEST OF CAS AWARDS II 1998–2000 389 (Matthieu Reeb ed., 2002) (applying the parties' choice of Swiss law), *available at* http://www.klumberarbitration.com (last visited Feb. 2, 2005).

261. A. & B. v. Int'l Olympic Comm. Swiss Fed. Tribunal (1st Civ. Chamber) Judgment of 27 May 2003.

262. *Id.*

263. CAS CODE, *supra* note 8, at R45, 58.

264. *Id.* at R58.

265. *Id.*

the gaps.[266] Also, in the Appellate Division, panels are permitted to apply any law it deems necessary, as long as the reasons for using such law are explained.[267] When CAS panels have used this third option, they have resorted to general principles of law,[268] civil law doctrines,[269] and basic concepts of human rights.[270] The use of back-up laws, in addition to filling gaps in an IF's substantive rules, has also provided CAS panels with much-needed due process standards to help ensure fairness in the decision process.[271]

### b. AAA-CAS Supplementary Procedures

The procedure of AAA-CAS arbitrations is governed by the Commercial Arbitration Rules of the AAA, as modified by the Supplementary Procedures.[272] However, in practice, the Commercial Arbitration Rules play little, if any, role.[273] The Supplementary Procedures do not provide for a back-up source of domestic law to fill gaps.[274] Further, the Supplementary Procedures do not designate a legal seat for AAA-CAS arbitrations, as the CAS Code does, and thereby does not designate a body of mandatory law to ensure the fairness of AAA-CAS procedures.[275] However, as will be discussed in more detail below, the Swiss statute on Private International Law and the Federal Arbitration Act may apply to AAA-CAS arbitrations and

---

266. Strahija v. FINA, CAS 2003/A/507 para. 6.1 (Aug. 11, 2003), *available at* http://www.sportslaw.nl/categorieen/print.asp?p_nr=42 (last visited Apr. 24, 2005).

267. CAS CODE, *supra* note 8, at R58.

268. *See* B. v. ITU, CAS 98/222 (Aug. 9, 1999), DIGEST OF CAS AWARDS II 1998–2000 330 (Matthieu Reeb ed., 2002) (applying the civil law concept of strict liability), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

269. *Id.*

270. *See* H. v. FIM, CAS 2000/A/281 (Dec. 22, 2000), DIGEST OF CAS AWARDS II 1998–2000 410 (Matthieu Reeb, ed. 1998) (explaining that the human rights of an accused athlete must be preserved even if not provided for in the federation rules), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

271. *See* S. v. FINA, CAS 2000/A/274 (Oct. 19, 2000), DIGEST OF CAS AWARDS II 1998–2000 389 (Matthieu Reeb, ed. 1998), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005) (asserting that the Panel must guarantee equal treatment of the parties and ensure the right to be heard).

272. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-1.

273. A survey of all AAA-CAS awards finds no cites to the Commercial Rules.

274. The 2000 Supplementary Procedures in Rule 33 provided that prior CAS decisions may be used to mitigate IF rules. That provision has been removed from the 2005 Supplementary Procedures, thereby calling into question the role of CAS precedent in AAA-CAS.

275. The Supplementary Procedures do not contain a declaration of a seat of the arbitration. *Id.* at R-11. However, Rule 11 does require that any CAS hearing held under these rules be held in the United States. *Id.* If held in the United States, the FAA likely applies unless there has been a contractual choice of Swiss law replacing the FAA. *See infra* Part III.C.1.b.2 (discussing *Bremen*).

Loyola University Chicago Law Journal        [Vol. 36

provide the vital fairness check.[276]

The substantive law that applies in AAA-CAS arbitrations is the rules of the World Anti-Doping Code and IF involved.[277] However, there is no provision that acts as a gap-filler. Therefore, there is no template for ensuring the fairness of the World Anti-Doping Code and IF rules, such as a national body of law.

### 2. The Application of the Swiss Statute on Private International Law to AAA-CAS Proceedings

The Code designates Lausanne, Switzerland as CAS's seat.[278] The purpose and result of selecting a "seat" for all CAS arbitrations is to pick a municipal law to test and ultimately validate the legitimacy of the CAS arbitration process. Selecting the law to govern the arbitration (*les arbitri*),[279] as opposed to the law governing the merits of the dispute, confers nationality upon CAS awards for purposes of enforcement under the New York Convention[280] and creates confidence in the system and ensures basic fairness within Swiss law. All international arbitrations, defined as an arbitration involving at least one non-Swiss citizen, must satisfy the requirements of the Swiss Statue on Private International Law.[281]

CAS and its arbitration process have been tested in admittedly limited circumstances, under the Statute on Private International Law. In all challenges to CAS, the Swiss Federal Tribunal has found CAS and its process impartial and fair.[282] However, because these challenges came from arbitrations physically held within Switzerland, there is some question of whether the concept of a "seat" designation will have extraterritorial application to arbitrations physically held outside of Switzerland. While the Swiss Federal Tribunal has accepted the concept of a split between the physical location of an arbitration hearing

---

276. *See infra* Part III.C.1.b.2 (discussing the protections of the FAA).

277. AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-33.

278. CAS CODE, *supra* note 8, at R28.

279. For more discussion of the concept of *lex arbitri*, see Gabrielle Kaufmann-Kohler, ARBITRATION AT THE OLYMPICS: ISSUES OF FAST-TRACK DISPUTE RESOLUTION AND SPORTS LAW 100-102 (Kluwer Law International 2001).

280. To enforce an arbitration award under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards the award must be made in the territory of a member state. Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201–208 (1970).

281. A. & B. v. Int'l Olympic Comm., Swiss Fed. Tribunal (1st Civ. Chamber) Judgment of 27 May 2003, *translation available at* http://www.spotrecht.org/urteile/SchwBGzuTAS.pdf (last visited Apr. 23, 2005).

282. *Id.*

and the legal location or "seat" of the arbitration hearing, the important question of whether foreign courts (such as the courts of the United States) will accept the "seat" doctrine remains.[283]

This question of extraterritoriality has gained increasing import with the advent of "ad hoc," on-location CAS tribunals. Starting with the 1996 Atlanta Olympic Games, special CAS ad hoc tribunals have been established at the Olympic Games to hear disputes arising during the Olympic Games. All of those ad hoc tribunals have designated their "seat" as Lausanne, Switzerland. It can be argued that the ad hoc tribunals are legally different, for purposes of analyzing the "seat" question, from the permanent tribunals in Switzerland and the decentralized CAS tribunals such as AAA-CAS. In fact, a challenge of the Sydney Olympics ad hoc tribunal framed an analysis that could apply to determining whether AAA-CAS's "seat" is Lausanne, Switzerland.[284] In *Raguz v. Sullivan*, the Supreme Court of New South Wales Court of Appeal found that the selection of a "seat" was at its essence a contractual choice of law that would be upheld as long as it did not violate Australian public law and policy.[285] Since it did not violate Australian law and the parties had contractually agreed to Lausanne as the seat of the arbitration, the Court found that it did not have the jurisdiction to interfere with the enforcement of the contract choice of Lausanne as the seat of the arbitration.[286]

The analysis used by the Australian Court in *Raguz* could very conceivably be followed by a United States Court hearing a challenge to the selection of Lausanne as the seat of AAA-CAS arbitrations. In the court's analysis, the first step would be to determine if an athlete in an AAA-CAS hearing had agreed to the selection of Lausanne. Such an agreement would have to rest on a series of interlocking contracts.[287] The first contract would be the athlete's membership in the governing NGB and IF. The second contract would be the agreement or statutorily required connection between the NGB and the USOC. The third contract would be the contract between the USOC (or possibly IF) and CAS to decide the disputes. The fourth contract, or connection, would be that the North American Decentralized Office of CAS is part of a larger CAS structure governed by the Code of Sport-related

---

283.  *Id.*
284.  Raguz v. Sullivan & ORS, 2000 N.S.W.C.A. 240 (Sept. 1, 2000).
285.  *Id.*
286.  *Id.*
287.  The Supreme Court of New South Wales Court of Appeal in *Raguz*, relied on the same reasoning. *Id.* at para. 65.

Arbitration.[288]    Assuming the court finds that there has been a contractual choice, the next question is whether it would honor this choice of law agreement.

In the United States, a contract choice of law clause is evaluated under the rubric initially established in *Bremen v. Zapata Off-Shore*.[289] Under the *Bremen* test, a choice of law clause will be honored unless it is unreasonable.  A clause can be unreasonable if it was the result of fraud, undue influence, overweening bargaining power, or will result in the breach of an important public policy found in mandatory public law.[290]  Using the *Bremen* test in the case of selecting Lausanne as the seat of arbitration, the strongest arguments for declaring the clause unreasonable would be that it was the result of overweening bargaining power[291] and that it violates public policy found in the Federal Arbitration Act or Amateur Sports Act.  Assuming for the sake of argument that the clause was not the result of overweening bargaining power, the effect of the Federal Arbitration Act and Amateur Sports Act should be briefly examined.

The Federal Arbitration Act, in section ten, lists a series of grounds upon which an arbitration award may be set aside.[292]  The intent of Congress, in drafting section ten, was to ensure an impartial arbitration process.[293]  Similarly, the Amateur Sports Act, in sections 220509 and 220529, attempts to ensure an impartial arbitration process to protect

---

288.  CAS CODE, *supra* note 8, at S6; AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-2.

289.  M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972).

290.  *Id.* at 12–13.

291.  It could be argued that the contract between an athlete and an NGB, represented by the athlete's membership in the NGB, is a contract of adhesion.  In order to compete, an athlete must join the NGB and the athlete is forced to accept the NGB's rules and conditions of membership as they exist and without the ability to negotiate over those terms.

292.  Those grounds include:

where the award was procured by corruption, fraud, or undue means;

where there was evident partiality or corruption in the arbitrators, or either of them;

where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced;

where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made; or

where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.

9 U.S.C. § 10 (2000 & Supp. 2002).

293.  Commonwealth Coatings Corp. v. Cont'l Cas Co., 393 U.S. 145, 147 (1968).

athletes' rights.[294]    Considering the goal of both Acts to ensure an impartial arbitration process, it is fair to characterize these as laws expressing public policy concerns of Congress.[295]    As expressions of important public policy concerns, the question becomes whether Swiss law, particularly the Statute on Private International Law, provides the same protections as the Federal Arbitration Act and the Amateur Sports Act provide.    A reading of the decision by the Swiss Federal Tribunal in *A. & B. v. International Olympic Committee*[296] suggests that the Statute on Private International Law is generous in its protections and would likely satisfy the test employed in *Bonny v. Society of Lloyd's*.[297]    Thus, the selection of Lausanne as the seat would likely be upheld.

### 3.  The Use of Supplementary Law

The Code permits CAS panels to use—in the event gaps exist in the rules of a sports governing body—the laws of domestic legal systems and, in some cases, any rule of law the panel deems appropriate.[298]  Many CAS panels, both Ordinary and Appellate, have found it necessary to fall back on these supplementary sources of law.  While the primary source of supplementary law used by panels is Swiss domestic law, largely due to the fact that many IFs are headquartered in Switzerland, panels have also drawn upon the domestic law of the United Kingdom,[299] general principles of law,[300] civil law traditions,[301] and concepts from international human rights.[302]  When CAS panels use

---

294.  Amateur Sports Act, 36 U.S.C. §§ 220501–220529 (1978).  Section 220509 states that an ombudsman will handle athletes' complaints and concerns.  36 U.S.C. § 220509 (1978).  Section 220529 provides for an arbitration process which employs the AAA and AAA Commercial Rules for parties aggrieved by the decisions of the USOC and its member NGBs.  36 U.S.C. § 220529.

295.  A mandatory law is one that applies as a matter of law rather than by the choice of the parties and expresses the intent of Congress to protect an important public policy.  An example of a mandatory law is the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300–1315 (1936).

296.  A. & B. v. Int'l Olympic Comm., Swiss Fed. Tribunal (1st Civ. Chamber) Judgment of 27 May 2003.

297.  *See* Bonny v. Soc'y of Lloyd's, 3 F.3d 156, 162 (7th Cir. 1993) (holding that a choice of foreign law will be upheld even if it means that it will result in an escape from mandatory United States law if the foreign law does not offend the policy behind the United States law).

298.  CAS CODE, *supra* note 8, at R45, 58.

299.  *See* ITF v. K., CAS 99/A/223 (Aug. 31, 1999), DIGEST OF CAS AWARDS II 1998–2000 345 (Matthieu Reeb ed., 2002) (applying the parties' choice of English law), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

300.  *See* B. v. ITU, CAS 98/222 (Aug. 9, 1999), DIGEST OF CAS AWARDS II 1998–2000 330 (Matthieu Reeb ed., 2002) (applying civil law concepts to supplemental CAS rules), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

301.  *Id.*

302.  *See* H. v. FIM, CAS 2000/A/281 (Dec. 22, 2000).  DIGEST OF CAS AWARDS II 1998–2000 410 (Matthieu Reeb ed., 2002) (providing the accused athlete an opportunity to discharge himself), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

supplementary law, the need usually comes from one of three categories: (1) procedural rules and doctrines;[303] (2) due process requirements;[304] and (3) definitions of IF rules.[305]

Quite different from the Code of Sports-related Arbitration, the AAA-CAS Supplementary Procedures do not explicitly permit recourse to supplementary sources of law.[306] However, in a few cases, AAA-CAS panels found it necessary to fall back on supplementary source material.[307] Without guidance in selecting the source of supplementary law, AAA-CAS panels are likely to use the law that the arbitrators are most familiar with, namely, the law of the United States. It is open to question as to whether this lack of guidance for choosing supplementary law in the AAA-CAS Supplementary Procedures and the open-ended choice of supplementary law found in the Code is equitable.[308]

### 4. Choice of Law Analysis

Since the inception of CAS arbitration, panels have found it necessary to resort to supplementary sources of law to decide the cases before them. When an IF's rules are inconsistent or ambiguous, panels have resorted to rules of statutory construction. When the rules of an IF are incomplete panels have resorted to general principles of law and domestic law to fill the gaps.[309] When the fairness of an IF substantive rule or the fairness of IF conduct is challenged, panels have resorted to general principles of law and domestic law to resolve those claims.[310]

---

303.  *See* S. v. FINA, CAS 2000/A/274 (Oct. 19, 2000) DIGEST OF CAS AWARDS II 1998–2000 389 (Matthieu Reeb ed., 2002) (supplementing with Swiss domestic law), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005); B. v. FINA, CAS 98/211 (June 7, 1999), DIGEST OF CAS AWARDS II 1998–2000 255 (Matthieu Reeb ed., 2002) (detailing appellate procedures), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

304.  *See, e.g.,* B. v. ITU, CAS 98/222 (Aug. 9, 1999), DIGEST OF CAS AWARDS II 1998–2000 330 (Matthieu Reeb ed., 2002) (discussing basic legal and procedural guarantees such as the presumption of innocence), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

305.  *See, e.g., id.* (discussing the relevant IF rules).

306.  AAA-CAS SUPPLEMENTARY PROCEDURES, *supra* note 10, at R-33.

307.  *See, e.g.,* USADA v. Neben, AAA No. 30-190-00713-03 (October 2003) (dissent by Christopher Campbell); USADA v. Ina, AAA No. 30-190-00814-02 (October 2002) (dissent by Christopher Campbell).

308.  It could be argued that the absence of a supplementary law selection gives the arbitrators the freedom to fashion the best result for the dispute before them rather than being limited to the solution found in the supplementary law.

309.  *See* S. v. FINA, CAS 2000/A/274 (Oct. 19, 2000), DIGEST OF CAS AWARDS II 1998–2000 389 (Matthieu Reeb ed., 2002) (using Swiss law to fill in the gaps), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

310.  *See* B. v. IJF, CAS 98/214 (Mar. 17, 1999), DIGEST OF CAS AWARDS II 1998–2000 308 (Matthieu Reeb ed., 2002) (applying French law as supplementary), *available at*

Without being able to resort to supplementary sources of law, these panels would not have been able to render reasoned and well-supported decisions. Without supplementary sources, the panels would have been forced to resort to their personal notions and experience to decide the cases. While an arbitrator's personal experience may be sufficient to fill some gaps in the law, relying on this personal input for qualified, fair decisions bets the entire process on the luck of finding a sufficiently experienced arbitrator on the panel. It certainly does not enhance the credibility and legitimacy of the arbitration process. Unfortunately, this is exactly the situation that the open-ended nature of AAA-CAS Supplementary Procedures creates.

Because the Supplementary Procedures do not provide for the use of supplementary sources of law, AAA-CAS panels can find themselves without sufficient guidance to decide new issues and arguments. This may have been the situation in two AAA-CAS cases where at least one of the panel members felt compelled to issue a dissenting opinion that relied on United States domestic law for guidance.[311] A lack of guiding authority, however, is not the only reason to provide for the use of supplementary law in the CAS and AAA-CAS arbitration process. Supplementary law can be the source of due process and substantive law protections for the parties, two essential assets in the adjudication process.

These protections are of heightened importance in doping cases, which are increasing in numbers and importance, internationally. Though often characterized as a contractual relationship, the relationship between athletes and the Olympic Movement in disciplinary and doping cases is not one of equal power. The Olympic Movement drafts the rules and operates the administrative machinery, thus giving it a more powerful position. Due process protections such as are found in the Swiss Statute on Private International Law [312] can help protect the balance of power between the parties and ensure the fairness of the arbitration process. Protections like these need to be expanded if CAS is to be able to adequately handle the doping cases headed its way.

The AAA-CAS Supplementary Procedures and the Code of Sports-

---

http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

311. For an example of a CAS decision with a dissenting opinion, see ITF v. K, CAS 999/A/223 (Aug. 31, 1999), DIGEST OF CAS AWARDS II 1998–2000 (Matthieu Reeb ed., 2002), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

312. *See* G. v. FEI, CAS 91/53 (Jan. 15, 1992), DIGEST OF CAS AWARDS 1986–1998 79 (Matthieu Reeb, ed. 1998) (the panel used the general principle of the law of interpretation *contra stipulatorem*), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

related Arbitration should be amended to provide a single source of supplementary law. Creating a single supplementary of law, such as Swiss law, would make CAS and AAA-CAS decisions more consistent, and thus improve the quality of the decisions, the efficiency of the arbitration process, and protect the fairness of the process.

Choosing Swiss law as the back-up source of law for all CAS and AAA-CAS arbitrations would avoid placing arbitrators in the predicament of having to refer to an unfamiliar body of law to decide a case. Swiss law, because it has a rich history of dealing with sports law issues and because it has been widely and consistently used by many CAS panels, is as good if not better than any other country's law. Non-Swiss educated arbitrators would certainly be at a disadvantage in applying Swiss law, but they could easily become familiar with it. Further, they would not face the problem of becoming familiar with another country's laws—for example South Korea's laws for Judo cases—the next time they were on a panel. [313] Also, athletes with similar charges against them, and similar defenses, would not run the risk of being treated differently because the supplementary law used was different. In an example of the inequity of the current, scattered process, in the penalty phase of a doping hearing, one country's law may prohibit a four-year suspension while another country's law may allow a four-year suspension. [314] This kind of disparity completely destroys the credibility of CAS, and must be remedied.

Using a single source of supplementary law would lead to higher quality decisions and precedent. As arbitrators become more familiar with Swiss law, both by applying it in cases before them and by seeing and reading opinions where it was used in other CAS decisions, their comfort level with Swiss law and in turn the quality of their decisions using Swiss law would improve. CAS and AAA-CAS precedent would be legitimized because there would not be conflicting precedent due to the use of conflicting supplemental law. But most importantly, using

---

313. *See* S. v. FEI, CAS 91/56 (June 25, 1992), DIGEST OF CAS AWARDS 1986–1998 93 (Matthieu Reeb, ed. 1998) (noting that IF rules does not mention the right to present counter evidence), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005); S v. FINA, CAS 2000/A/274 (Oct. 19, 2000), DIGEST OF CAS AWARDS II 1998–2000 389 (Matthieu Reeb ed., 2002) (using Swiss law to determine when a change in procedural rules became effective), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

314. *See* S. v. FINA, CAS 2000/A/274 (Oct. 19, 2000), DIGEST OF CAS AWARDS II 1998–2000 389 (Matthieu Reeb ed., 2002) (examining due process fairness of IF introducing new evidence on appeal not used in the first proceeding), *available at* http://www.kluwer arbitration.com (last visited Feb. 2, 2005); P. v. FINA, CAS 97/180 (Jan. 14, 1999), DIGEST OF CAS AWARDS II 1998–2000 184 (Matthieu Reeb ed., 2002) (testing strict liability doctrine under Swiss law), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

Swiss law would provide a consistent touchstone for ensuring the fairness of the arbitration process, an essential feature moving forward generally, and specifically in the pseudo-criminal doping cases that are becoming more prevalent.

### D. The Development and Use of Precedent

Historically, the notion of precedent and its role in arbitration proceedings has been minimal.[315] Arbitration was originally designed to seek unique solutions individually tailored to the circumstances of the dispute before the arbitrators.[316] However, arbitration proceedings—particularly in CAS as well as other situations—are becoming concerned with consistency, predictability, and fairness. Therefore, precedent, as a way of promoting consistency, predictability, and fairness has begun to play a larger role in CAS decisions. But the role that precedent plays in the decision process seems to vary between CAS and AAA-CAS. Additionally, the flat structure of CAS does not lend itself to easily reconciling conflicting precedent.

#### 1. The Role and Production of Precedent in CAS

The Code of Sports-related Arbitration does not specifically speak to the role of precedent. Code Rules 46 and 59 provide that before an award can be signed by the arbitrators, it must be reviewed by the CAS Secretary General who may draw to the panel's attention fundamental issues of principle.[317] One of the purposes of this process, according to the current CAS Secretary General, is to allow the Secretary General to point out discrepancies in their award from existing CAS precedent, so that the panel may bring the award into line with existing principles, if it so desires.[318] But, as the current Secretary General has stressed, Rules 46 and 59 do not give him the authority to force a change in the award nor has he expressed a willingness to pressure the panel to change the award to conform to existing principle.[319] The Secretary General will only ask that the panel explain in the award why it has departed from existing principle. Interestingly, this can be seen as a way of bringing the award into line with existing principle without changing the outcome of the award, as it will show that existing principle has not

---

315. S.C. Nelson, *Alternatives to Litigation of International Disputes*, 23 INT'L LAWYER 187, 187–206(1989).

316. *Id.*

317. CAS CODE, *supra* note 8, at R46, 59.

318. Interview with Matthieu Reeb, Secretary General, Court of Arbitration for Sport, in Lausanne, Switz. (May 25, 2004) (on file with author).

319. *Id.*

been changed.[320] But, ultimately, the panel can refuse to even explain its departure from existing principle.[321]

CAS panels' use of precedent has become more standardized over time. But even though CAS precedent has existed for some time, CAS panel has been slow, until the past several years, to cite and rely on CAS-created precedent.[322] This sparse use of precedent could be due to the civil law traditions of the majority of the early and active CAS arbitrators.[323] Nevertheless, panels over the past three to four years have demonstrated and created a willingness to cite and rely on CAS precedent.[324] In fact, several panels have referred to the development of CAS *lex sportive*.[325] But, unlike AAA-CAS panels, CAS panels generally limit their use of precedent to that of reference to legal principles.[326]

---

320. *Id.* Requiring the panel to explain its reasons for departing from existing precedent would lead to two possible results: the first is that the case is distinguished on its facts and the precedent is preserved and unchanged; the second is that the precedent is challenged head-on and a conflict is created. *Id.*

321. Tom Weir, *Jones Quickens Pace of Confronting Drug Use Issue*, USA TODAY, June 17, 2004, at 11C.

322. Court of Arbitration for Sport, DIGEST OF CAS AWARDS II 1998–2000 xxx (Matthieu Reeb, Ed. 2000) (creating digest to develop jurisprudence and harmonization of judicial rules and principles within the sports world). For examples of sparing use precedent, see USA Shooting and Q v. UIT, CAS 94/129 (May 23, 1995), DIGEST OF CAS AWARDS II 1998–2000 345 (Matthieu Reeb ed., 2002), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005); W. v. X._S.A., CAS 91/45 (MaR. 31, 1992), DIGEST OF CAS AWARDS 1986–1998 33 (Matthieu Reeb, ed. 1998), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005); G. v. Int'l Equestrian Fed'n, CAS 91/53 (Jan. 15, 1992), DIGEST OF CAS AWARDS 1986–1998 79 (Matthieu Reeb, ed. 1998), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005). For examples of mid-life reluctance to rely on precedent, see also B. v. FINA, CAS 98/211 (June 7, 1999), DIGEST OF CAS AWARDS II 1998–2000 255 (Matthieu Reeb ed., 2002), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005); UCI v. FCI, CAS 98/212 (Feb. 24, 1999), DIGEST OF CAS AWARDS II 1998–2000 274 (Matthieu Reeb ed., 2002), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005). But, for examples of CAS increased use of precedent, see IAAF v. Boulami, CAS 2003/A/452 (Nov. 19, 2003); Baxter v. Int'l Olympic Comm., CAS 2002/A/376 (Oct. 15, 2002), *available at* http://www.britski.org.uk/baxter.pdf (last visited Feb. 2, 2005); Jovanovic v. USADA, CAS 2002/A/360 (Feb. 7, 2002), *available at* http://www.usantidoping.org/files/active/ arbitration_rulings/arbitration_ruling_2_11_2002_jovanovic.pdf (last visited Feb. 2, 2005).

323. Interview with Jean-Philippe Rochat, former CAS Secretary General, Lausanne, Switz. (May, 25, 2004) (on file with the author). CAS's view and use of precedent is the same as the civil law system's use of precedent. *Id.*

324. *See, e.g.*, IAAF v. Boulami, CAS 2003/A/452 (rejecting an athlete's argument based on earlier CAS decisions); Baxter v. Int'l Olympic Comm., CAS 2002/A/376 (rejecting athlete's argument based on earlier CAS decisions and citing specifically to several earlier CAS decisions); Jovanovic v. USADA, CAS 2002/A/360 (rejecting the same argument as in *Baxter*).

325. Canadian Olympic Comm & Scott v. Int'l Olympic Comm., CAS 2002/O/373 (Dec. 18, 2003) (finding jurisprudence developed from a number of principles of sports law and regulation).

326. *Id.*

## 2. The Role and Production of Precedent in AAA-CAS

Prior to their amendment in 2005, the AAA-CAS Supplementary Procedures, unlike the Code of Sports-related Arbitration, specifically recognized the role of precedent. 2004 Supplementary Procedure Rule 33(e), which covers choice of law matters, stated that IF and Anti-Doping Code rules may be mitigated by principles found in CAS decisions. While the reason for the deletion of reference to CAS precedent in Supplementary Procedure 33(e) is not known, and its effect speculative at this time, it is quite likely that the use of CAS precedent has become a common practice that will continue despite the 2005 amendment. In practice, AAA-CAS panels have made generous use of Rule 33(e). However, AAA-CAS panels use precedent in the way that courts in the United States rely on precedent. In addition to using precedent as a source of legal principles as CAS panels do, AAA-CAS panels use precedent to produce consistent results by comparing facts of the case before them with the facts of previous decisions.[327] Also, in addition to comparing facts, the language used by AAA-CAS panels suggests that they view precedent as close to binding.[328]

## 3. Evaluation of CAS and AAA-CAS Use of Precedent

Both CAS and AAA-CAS panels are increasingly turning to prior decisions for guidance. While CAS practice is more limited in its reliance on precedent than AAA-CAS practice, CAS is embracing the use of precedent in order to help it ensure consistency and quality in its decisions. However, the structure of CAS could stand in the way of achieving consistency. Arbitration in general and the CAS structure in particular is a flat system where all decisions are final and equal in precedential value. With the exception of appeals from AAA-CAS

---

327. *See, e.g.*, USADA v. Vencill, AAA-CAS No. 30 190 00291 03 (July 24, 2003) (citing a series of CAS decisions in order to develop proper sanctions and noting that the panel was not bound to apply the ISO standard in laboratory testing of the urine sample at issue in the case), *available at* http://www.usantidoping.org/files/active/arbitration_rulings/arbitration_ruling _7_24_2003_Vencill.pdf (last visited Feb. 2, 2005); USADA v. Neben, AAA-CAS 30 190 00713 03 (Oct. 16, 2003) (relying on *USADA v. Moninger*, AAA-CAS 30 190 00930 02, to conclude that UCI regulations do not require the USADA to prove or identify the source of of the prohibited substance in the respondent's urine sample), *available at* http://www.usantidoping.org/ files/active/ arbitration_rulings/arbitration_ruling_10_21_2003_Neben.pdf (last visited Feb. 2, 2005).

328. *See, e.g.*, USADA v. Moninger, AAA-CAS 30 190 00930 02 (ApR. 2, 2003) (relying on the analogous facts and standard of proof found in *Blackwelder v. USADA*, AAA-CAS 30 190 0012 02, and *USADA v. Dickey*, AAA-CAS 30 190 00241 02, to hold that respondent failed to meet its burden of proof that the chain of custody of open bottle of 15 capsules was adequate), *available at* http://www.usantidoping.org/files/active/arbitration_rulings/arbitration_ruling _4_3_2003_Moninger.pdf (last visited Feb. 2, 2005).

decisions to the CAS Appellate Division, there is no review of CAS decisions that could correct mistakes in the use or development of precedent, including the reconciliation of conflicting precedent. In a judicial system, conflicting precedent can be and often is reconciled by the single supreme court of the system. However, in CAS there is no single supreme court to reconcile conflicting awards.

Existing conflicts in precedent—in an arbitration setting—may not be an evil that demands much attention. It can be argued that conflicting precedent gives subsequent panels a choice of precedent that allows it to craft the most equitable solution to the present dispute or that time will allow a sort of Darwinian process where the best precedent is chosen or survives. But on the other hand, conflicting precedent can lead to unequal treatment of athletes. Such unequal treatment could particularly occur in the penalty phase of a doping case.

An example of this unequal treatment can be seen in two recent CAS Appeals Division decisions involving a conflict over the power of a CAS appeals panel to increase an athlete's doping sentence. The panel in *Pastorello v. USADA*, in an award issued June 27, 2002, specifically announced that on appeal "there is a possibility that a sentence will be increased."[329] However, the panel in *Demetis v. Fédération Internationale de Natation Amateur* ("FINA"),[330] found that a sentence cannot be increased. Therefore, while the step of creating a CAS supreme court might be unnecessary, the use of advisory decisions to reconcile conflicting precedent should be considered. While not changing the result of an award, the Secretary General or any party desiring to reconcile conflicting precedent, would ask a third panel to reconcile the question of law created by the conflict. Such a process, while perhaps academic in some sense, would improve the consistency and predictability of future CAS proceedings.[331] Improved consistency and predictability are going to be necessary if CAS is going to be able to handle, fairly, the increasing number of doping cases coming before its panels.

### E. The Development and Application of Key Legal Doctrines

Even though the rules governing doping cases come from the IFs and the World Anti-Doping Code, CAS and AAA-CAS play a large role in developing and even modifying those rules. In particular, three key

---

329. Pastorello v. USADA, CAS 2002/A/363, at para. 6.8 (June 27, 2002).

330. Demetis v. FINA, CAS 2002/A/432 (May 27, 2003).

331. Demetis v. FINA, CAS 2002/A/432, at para. 9.4.8-9.4.11 (citing Swiss law to justify additional review in order to limit the risk of injustice).

doctrines that have been developed by CAS play an important role in doping cases. Those three doctrines: (1) the quasi-criminal nature of doping cases, discussed below because they are not only important, but they are uncertain and still developing; (2) strict liability; and (3) the comfortable satisfaction burden of proof.

### 1. Quasi-Criminal Doctrine

Sport disputes, including the enforcement of doping rules, are fundamentally private law matters of contract obligations. However, the quantum of procedural protections due athletes under notions of general principles of law, basic concepts of fairness, and the growing body of sports lextiva can depend on whether doping cases are considered criminal by nature.[332]  If doping cases are considered criminal by nature, then matters such as the burden of proof and permissible defenses will be affected.

When analyzing the question of whether doping cases are criminal in nature, CAS panels have focused on the consequences and sanctions being imposed. In the majority of cases, CAS and AAA-CAS panels have found the consequences to be penal.[333]  Because doping cases are criminal in nature, athletes are entitled to procedural protections such as

---

332. *See* B. v. Int'l Triathlon Union, CAS 98/222 (Aug. 9, 1999), DIGEST OF CAS AWARDS II 1998–2000 330 (Matthieu Reeb ed., 2002) (examining the scope of strict liability and proof requirements in doping cases), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

333. *See id.* (finding doping investigations are quasi-private procedures); *see also* Demetis v. FINA, CAS 2002/A/432 (agreeing that sanctions are similar to criminal penalties); H. v. FIM, CAS 2000/A/281 (Dec. 22, 2000), DIGEST OF CAS AWARDS II 1998–2000 410 (Matthieu Reeb ed., 2002) (holding that the "special circumstances of each case 'should be reviewed when determining sanctions'"), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005); C. v. FINA, CAS 95/141 (Apr. 22, 1996), DIGEST OF CAS AWARDS 1986–1998 215 (Matthieu Reeb, ed. 1998) (implying doping sanctions are private in nature), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005); N. v. Int'l Equestrian Fed'n, CAS 92/73 (Sept. 10, 1992), DIGEST OF CAS AWARDS 1986–1998 153 (Matthieu Reeb, ed. 1998) (holding sanctions are dependent on the level of culpability of the athlete), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005); USADA v. Neben, AAA-CAS 30 190 00713 03 (Oct. 16, 2003) (applying a strict liability standard), *available at* http://www.usantidoping.org/files/active/arbitration_ruling_10_21_2003_neben.pdf (last visited Feb. 2, 2005); USADA v. Vencill, AAA-CAS 30 190 00291 03 (July 24, 2003) (finding doping sanctions to be quasi-criminal), *available at* http://www.usantidoping.org/files/active/ arbitration_ruling_7_24_2003_Vencill.pdf (last visited Feb. 2, 2005). *But see* N., J., Y., W. v. FINA, CAS 98/208 (Dec. 22, 1998), DIGEST OF CAS AWARDS II 1998–2000 234 (Matthieu Reeb ed., 2002) (finding doping cases to be non-criminal in nature), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005); Blackwelder v. USADA, AAA-CAS 30 190 00012 02 (May 17, 2002) (noting the proceeding is not criminal and "principles of criminal law do not generally apply when reviewing sanctions proposed by USADA"), *available at* http://www.usantidoping.org/files/active/arbitration_rulings/arbitration_ruling_5_22_2002_ blackwelder.pdf (last visited Feb. 2, 2005).

the presumption of innocence.[334]   However, while the imposition of penal sanctions requires a showing of intent in most domestic legal systems, CAS panels have been able to reconcile the imposition of penal sanctions with the use of the strict liability doctrine.[335]   These panels have found that the difficulty of proving intent and the need to rid sport of drugs justify use of the strict liability doctrine.[336]   The panels, perhaps as a way to rationalize allowing the use of the strict liability doctrine in a criminal-like matter, make intent an element of the penalty phase of the process.[337]

However, this bifurcation of the process and divorce of the intent element from the guilt phase of the process may be a problematic fix. As will be explored below, the use of non-criminal, private law tools such as strict liability has caused CAS doctrinal concerns and could, unless better reconciled, continue to raise doubts about the soundness and fairness of the doping control system.

### 2. Strict Liability

Cases involving application of the strict liability doctrine were slow arrivals to CAS.  Although CAS opened for business in 1986, it was not until 1992 that a CAS panel published its first opinion on an appeal from the IF application of the strict liability doctrine.[338]   This was due in part to the mistrust or uncertainty about the new CAS entity and partly due to the relatively rare enforcement of anti-doping rules.  Once strict liability cases came before CAS panels it became clear that CAS, as a body, would struggle for a consistent definition of strict liability.

---

334.  *See B. v. Int'l Triathlon Union*, CAS 98/222 (determining the principle of 'in dubio pro reo' or the benefit of the doubt is applicable in doping investigations).

335.  *See C. v. FINA*, CAS 95/141 (asserting lack of strict liability would make the "fight against doping . . . practically impossible"); *H. v. FIM*, CAS 2000/A/281 (finding that the "high objectives and practical necessities of the fight against doping amply justify the application of a strict liability standard" (internal citations omitted)).

336.  *C. v. FINA*, CAS 95/141; *H. v. FIM*, CAS 2000/A/281.

337.  *C. v. FINA*, CAS 95/141 (preferring a sliding scale of sanctions based on the athlete's level of fault); *H. v. FIM*, CAS 2000/A/281 (holding that the "special circumstances of each case" should be reviewed when determining sanctions).

338.  G.v. Int'l Equestrian Fed'n, CAS 91/53 (Jan. 15, 1992), DIGEST OF CAS AWARDS 1986–1998 79 (Matthieu Reeb, ed. 1998), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

   The [CAS] wishes first of all to recall that, where doping of the taking of prohibited substances in concerned, there is normally and generally in the sporting regulations of Federations an inversion of the burden of proof in the sense that, as soon as the presence of prohibited substances is detected, there is the presumption of a voluntary act.  It is then up to the athlete to produce evidence to the contrary.

*Id.*

Some of the trouble that CAS had in refining the strict liability doctrine can be attributed to the overlap of several steps or doctrines in the doping adjudication process. Proof of a doping violation naturally involves matters of burdens of proof and presumptions. Strict liability is an end point in proving a doping violation, burdens of proof and presumptions are tools or routes to the end conclusion of strict liability. CAS panels have disagreed and struggled with the appropriate burdens of proof and presumptions to reach or prove strict liability.[339] And, CAS panels have been plagued by the use of strict liability in what is basically a penal process.[340]

Another difficulty in finding a single definition of strict liability can be blamed on the IFs. IFs and the IOC itself have defined strict liability differently.[341] CAS, as required by its rules and jurisprudence, must apply the definition of strict liability found in the IFs rules.[342] When IFs disagree, the CAS definitions can disagree. However, CAS panels, seeing the need for uniformity and fairness, have uniformly insisted that any definition of strict liability abide by general principles of law and

---

339. *See* C. v. FINA, CAS 95/141 (Apr. 22, 1996), DIGEST OF CAS AWARDS 1986–1998 215 (Matthieu Reeb, ed. 1998) (endorsing the presumption of the athlete's guilt, but allowing for burden shifting by the athlete by providing exculpatory evidence), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005); S. v. Int'l Equestrian Fed'n, CAS 91/56 (June 25, 1992), DIGEST OF CAS AWARDS 1986–1998 93 (Matthieu Reeb, ed. 1998) (upholding a presumption of guilt, but allowing the presumption to be overturned by proof to the contrary, but not requiring peremptory evidence), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

340. *See, e.g.*, N. v. Int'l Equestrian Fed'n, CAS 92/73 (Sept. 10, 1992), DIGEST OF CAS AWARDS 1986–1998 153 (Matthieu Reeb, ed. 1998) (noting that, in this context, the concept of strict liability imposes the burden of proof normally imposed on the accuser, on the accused), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005); *see also* B. v. Int'l Triathlon Union, CAS 98/222 (Aug. 9, 1999), DIGEST OF CAS AWARDS II 1998–2000 330 (Matthieu Reeb ed., 2002) (arguing that the rule of strict liability should be construed to go even further than imposing a presumption of guilt on the accused athlete and should allow exoneration only in a very limited set of specifically defined cases), *available at* http://www.kluwer arbitration.com (last visited Feb. 2, 2005).

341. *See, e.g.*, W. v. Int'l Equestrian Fed'n, CAS 92/86 (April 19, 1993), DIGEST OF CAS AWARDS 1986–1998 161 (Matthieu Reeb, ed. 1998) (noting the IF adoption of IOC rules to conform with a strict liability standard), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005). Perhaps the most dramatic example of the disparate standards can be seen in the definitions applied by FINA, on the one hand, and the International Shooting Union and the IAAF on the other. *Compare* C. v. FINA, 95/141 (Apr. 22, 1996), DIGEST OF CAS AWARDS 1986–1998 187 (Matthieu Reeb, ed. 1998) (finding that strict liability required an irrefutable presumption of guilt), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005) *with* USA Shooting & Q. v. Int'l Shooting Union, CAS 94/129 (May 23, 1995), DIGEST OF CAS AWARDS 1986–1998 187 (Matthieu Reeb, ed. 1998) (finding the Union's regulation of strict liability different from the IOC regulation even though the Union argued the regulations were the same), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

342. *See USA Shooting & Q. v. Int'l Shooting Union*, CAS 94/129 (applying definition of strict liability found in IF's rules).

natural justice.[343]

With all of this under consideration, CAS has developed two somewhat competing definitions of strict liability. The first, developed early in the court's history, can be best described as a "simple legal presumption." Under this definition, once the presence of a prohibited substance is established, a rebuttable presumption of guilt, negligence, or fault is created. The athlete may rebut this presumption by counter evidence such as the act of a third person.[344] Presumably, such counter proof would allow the athlete to escape all sanctions and responsibility.

The second, now dominant definition, can be best labeled as "pure strict liability."[345] Under this definition, any question of fault, intent, or negligence is irrelevant: an athlete may not avoid a sanction by showing an absence of fault. The concept is said to be similar to "civil liability, without fault in tort, or comparable to product liability cases."[346]

While pure strict liability seems to have won the day in CAS, its panels have been uncomfortable with the potential harshness of the doctrine and have developed two mitigating doctrines. The first mitigating doctrine stems from the view that the strict liability doctrine is akin to a penal sanction. The second mitigating doctrine requires a vigorous analysis of the causal link that supports a finding of strict liability.

Early in the CAS evaluation of the doctrine, strict liability was viewed as "akin to a penal sanction."[347] Because it was akin to a penal

---

343. *See B. v. Int'l Triathlon Union*, CAS 98/222 (reasoning that strict liability "does not eliminate the need to establish the wrongful act itself and the causal link. . . ."); *S. v. Int'l Equestrian Fed'n*, CAS 91/56 (June 25, 1992) (viewing strict liability as a presumption as well as burden).

344. *See S. v. Int'l Equestrian Fed'n*, CAS 91/56 (allowing proof of intentional act of a third party or faulty testing procedures to clear the athlete); *see also* B. v. Int'l Triathlon Union, CAS 98/222 (Aug. 9, 1999), DIGEST OF CAS AWARDS II 1998–2000 330 (Matthieu Reeb ed., 2002) (viewing as proper that the accused athlete may present counter-evidence on the basic question of guilt or culpability), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005); G. v. Int'l Equestrian Fed'n, CAS 92/63 (Sept. 10, 1992), DIGEST OF CAS AWARDS 1986–1998 115 (Matthieu Reeb, ed. 1998) (reviewing evidence of an act by a third party as a valid method to rebut presumption), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

345. *See* L. v. FINA, 95/142 (Feb. 14, 1996), DIGEST OF CAS AWARDS 1986–1998 225 (Matthieu Reeb, ed. 1998) (outlining strict liability usage in doping cases), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

346. *L. v. FINA*, CAS 95/142 (internal citations omitted).

347. N. v. Int'l Equestrian Fed'n, CAS 92/73 (Sept. 10, 1992), DIGEST OF CAS AWARDS 1986–1998 153 (Matthieu Reeb, ed. 1998), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

[B]earing in mind the gravity of the measures which could be applied in this case, and which are akin to penal sanctions, there is no doubt that, by applying the general principals of law, the person responsible has the possibility of proving himself innocent

sanction, general principles of law give every defendant the right to prove his innocence by showing that the positive test result was the result of the action of a third party or that the analysis carried out was erroneous.[348] Then, after the IOC redefined the strict liability doctrine in 1992, CAS seemed to abandon the view of strict liability as a penal sanction and saw it as "civil liability, without fault in tort."[349] Then, in 1999, CAS seemed to return to the view that strict liability indeed has aspects of a penal sanction.[350]

In two successive decisions, CAS declared that while athletes were still responsible regardless of fault, they should be allowed to rebut the presumption of guilt by showing no fault to a virtual certainty.[351] This showing could be done by demonstrating that the results were caused by *force majeure* circumstances or the wrongful act of a third person.[352] CAS, by providing this opportunity to rebut the finding of guilt, bifurcated the concept of strict liability. Responsibility would still lead to sanctions, but the athlete could be declared blameless. It seemed as though the CAS was still uncomfortable with punishing in the absence of fault.

CAS, or at least one CAS panel, then took focus on the procedures accompanying the strict liability doctrine. In *B. v. International Triathlon Union,* the panel started with the conclusion that because strict liability is a quasi-penal process, general principles of law and the requirements of a fair trial apply to the process.[353] That being so, strict liability is a scheme that punishes the consequences, the presence of a prohibited substance, or a previous act of consuming the prohibited

---

by providing proof to the contrary . . . .
*Id.*

348.  *N. v. Int'l Equestrian Fed'n,* CAS 92/73.

349.  L. v. FINA, CAS 95/142 (internal citations omitted).

350.  *See* B. v. Int'l Judo Fed'n, CAS 98/214 (Mar. 17, 1999), DIGEST OF CAS AWARDS II 1998–2000 308 (Matthieu Reeb ed., 2002), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005) (finding that the athlete is innocent until the banned substance is found in his body). The CAS found that:

> Every athlete enjoys a presumption of innocence until such a time as the presence of a banned substance in his body is established. It is a matter for the sports organization to prove that presence; it is not required to prove intentional doping on the part of the athlete. That intent, and his culpability, are presumed as soon as proof of the presence of the banned substance has been furnished. The athlete can reverse this presumption of guilt by showing that the case is not one of doping and that he is innocent.

*Id.*

351.  *Id.*

352.  B. v. Int'l Triathlon Union, CAS 98/222 (Aug. 9, 1999), DIGEST OF CAS AWARDS II 1998–2000 338 (Matthieu Reeb ed., 2002), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005)

353.  *Id.*

substance.[354] This process of working backward from a consequence to predicate act necessarily relies on a causal link between the consequence and the act.[355]   General principles of law and the requirements of a fair trial require that the causal link leave no doubt that the consequence was caused by one single act, the prohibited act. When that link cannot exclude other causes, the strict liability doctrine cannot be applied.[356]   *B. v. International Triathlon Union* therefore required that the scientific presumption that linked the consequences to the prohibited act to be beyond doubt.  Thus, CAS now recognized the right to challenge the science that strict liability rests upon.

Since *B. v. International Triathlon Union*, CAS panels appear to have agreed on a common basic definition of strict liability.  That basic definition accepts that proof of a banned substance in an athlete's body is sufficient to prove a doping violation.[357]  Yet, CAS panels do not seem ready to accept that the doctrine stops there.  CAS panels have implied that in the absence of fault, defined as either the intent to use a prohibited substance or negligence in not preventing the ingestion of a banned substance, a doping violation has not occurred.[358] CAS panels have spoken of strict liability as "a legal presumption and the allocation of burdens of proof,"[359] and have concluded that despite the presence of a banned substance in an athlete's body, athletes still have a right to "discharge" themselves.[360]   Discharging oneself according to CAS means that the forbidden substance was "the result of an act of malicious intent by a third party" or that test results were "impaired by procedural defect."[361]  Thus, it appears CAS does not employ strict

---

354.  *Id.*

355.  *Id.* (reasoning that "[t]he principle of the strict liability rule does not exempt the sports federations [from proving] the existence of a doping offense. . . . [The] rule does not eliminate the need to establish the wrongful act itself and the causal link between the wrongful act and its consequences") .

356.  *Id.*

357.  *See* Strahija v. FINA, CAS 2003/A/507 (Aug. 11, 2003) (finding a doping offense occurs when a "prohibited substance is found within a competitor's body tissue or fluids"); Baxter v. Int'l Olympic Comm., CAS 2002/A/376 (Oct. 15, 2002) (citing earlier cases as establishing the strict liability definition), *available at* http://www.britski.org.uk/baxter.pdf (last visited Feb. 2, 2005); *H v. FIM*, CAS 2000/A/281 (Dec. 22, 2000), DIGEST OF CAS AWARDS II 1998–2000 410 (Matthieu Reeb ed., 2002) (determining the general rule under strict liability to be a finding of a forbidden substance in urine and test results not affected by procedural defects in a laboratory), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

358.  *See Baxter v. Int'l Olympic Comm.*, CAS 2002/A/376 (reviewing a charge of doping and finding no intent by athlete, but still holding athlete liable for use of an illegal substance).

359.  *Demetis v. FINA*, CAS 2002/A/432.

360.  *H. v. FIM*, CAS 2000/A/281 (finding that "common principles of law and the human rights of the accused" allow the athlete an attempt to challenge the panel's findings).

361.  *Id.*

liability if a banned substance is found in an athlete's body.

Also since *B. v. International Triathlon Union*, panels have continued to uphold strict liability doctrine and the no fault standard despite finding doping sanctions—such as suspension from competition—to be similar to penalties in criminal proceedings in which prosecutors bear the burden of proving guilt.[362]   One reason CAS panels seem able to accept these seemingly contradictory concepts are the conceptual separation of the step of finding guilt and the step of determining the penalty.[363]    While these steps are normally separated in a criminal proceeding, the separation in doping cases emphasizes that questions of fault are relevant in the penalty phase and minimal fault can reduce a penalty.[364]   In fact, one panel has gone as far as stating that the strict liability doctrine applies to the question of disqualification from a competition, but not necessarily the question of suspension from further competition.[365]

AAA-CAS panels, on the other hand, have not, like CAS panels, expressed reservations about the strict liability doctrine working in practice like absolute liability.  AAA-CAS panels have routinely and frequently stated that the USADA need only show the presence of a prohibited substance in an athlete's sample to prove a doping offense.[366]  No mitigating language or conditions have been used by AAA-CAS panels to date.  Thus, despite the characterization of doping cases by many AAA-CAS panels as quasi-criminal, they continue to shun criminal case constructs meant to protect the accused.[367]

---

362.  *Demetis,* CAS 2002/A/432.

363.  For examples of cases affirming that an unintentional doping can result in reduced penalties compared to an intentional doping, see *Strahija,* CAS 2003/A/507 and *Demetis,* CAS 2002/A/432.

364.  *Strahija,* CAS 2003/A/507; *Demetis,* CAS 2002/A/432.

365.  Baxter v. Int'l Olympic Comm., CAS 2002/A/376 (Oct. 15, 2002), *available at* http://www.britski.org.uk/baxter.pdf (last visited Feb. 2, 2005).  "Consistent CAS law has held that athletes are strictly responsible for substances they place in their body and that for purposes of disqualification (as opposed to suspension), neither intent nor negligence needs to be proved by the sanctioning body." *Id.*

366.  *See* USADA v. Cherry, AAA-CAS 30 190 00463 03 (Nov. 24, 2003) (noting that IAAF rules determine a doping offense has occurred when a prohibited substance is present in the athlete's body), *available at* http://www.usantidoping.org/files/active/arbitration_rulings/ arbitration_ruling_11_24_2003_Cherry.pdf. (last visited Feb. 2, 2005); Neben v. UCI, AAA-CAS 30 190 00713 03 (Oct. 21, 2003) (applying strict liability), *available at* http://www.usantidoping.org/files/active/arbitration_rulings/arbitration_ruling_10_21_2003_Neb en.pdf. (last visited Feb. 2, 2005); USADA v. Vencill, AAA-CAS 30 190 00291 03 (July 24, 2003) (noting that knowledge by the athlete in taking a prohibited substance is immaterial), *available at* http://www.usantidoping.org/files/active/arbitration_rulings/arbitration_ruling _7_24_2003_Vencill.pdf. (last visited Feb. 2, 2005).

367.  *Vencill,* AAA-CAS 30 190 00291 03.

Loyola University Chicago Law Journal        [Vol. 36

### 3.  Comfortable Satisfaction Standard of Proof

The standard of proof in a doping charge is in most cases dictated by the applicable IF rules, causing great confusion.  Historically, the CAS standard of proof has varied between different IFs.  For example, until recently the IAAF used a "beyond a reasonable doubt standard" while FINA has at times used a preponderance of the evidence standard.[368] However, the Olympic Movement, through the World Anti-Doping Code, is attempting to create one uniform standard of proof for all IFs in doping cases.  The IOC, by requiring all IFs to adopt the World Anti-Doping Code in order to be a member of the Olympic Games, is creating the uniform standard of proof "to the comfortable satisfaction of the hearing body."[369]  While the standard has been codified in the World Anti-Doping Code, it was CAS that developed the standard and it will be CAS that will refine the standard.

The first use of the comfortable satisfaction standard of proof may have occurred in the Australian case of *Briginshaw v. Briginshaw*.[370]  In *Briginshaw*, the Australian Supreme Court searched for the appropriate standard of proof to establish wrong doing or fault in a divorce proceeding.  As the foundation of the Court's analysis, it established that a divorce proceeding was neither a criminal nor a quasi-criminal proceeding.[371]  Therefore, proof beyond a reasonable doubt was not required as is required in all criminal matters.[372]  Yet, on the other hand, while the Court said that a divorce proceeding is a civil matter, it was not a routine civil matter that employed proof by a preponderance of the evidence (or balance of probabilities).[373]  A divorce case was different

---

368.  *See* INT'L ASS'N OF ATHLETIC FED'N, COMPETITION RULES 33 (2004-05) (detailing the standard of proof required by the IAAF), *available at* http://www.iaaf.org/newsfiles/23484.pdf (last visited Feb. 2, 2005).  The rules state:

> The standard of proof shall be whether the IAAF, the Member or other prosecuting authority has established an anti-doping rule violation to the comfortable satisfaction of the relevant hearing body, bearing in mind the seriousness of the allegation which is made.  This standard of proof is greater than a mere balance of probability but less than proof beyond a reasonable doubt.

*Id.; see* IAAF v. Boulami, CAS 2003/A/452, para. 4.3 (Nov. 19, 2003) (citing IAAF rule 21.9 requiring IAAF to prove beyond a reasonable doubt that doping occurred).

369.  WADA CODE, *supra* note 131, § 3.1 (2003), *available at* http://www.wada-ama.org/rtecontent/document/code_v3.pdf (last visited Apr. 22, 2005).  "The standard of proof in all cases is greater than a mere balance of probability but less than proof beyond a reasonable doubt." *Id.* at § 3.1.

370.  Briginshaw v. Briginshaw (1938) 60 C.L.R. 336.

371.  *Id.* at 347.  "A petition for dissolution of marriage is not quasi-criminal, whatever the grounds." *Id.* at 350 (internal citations omitted).

372.  *Id.* at 347.

373.  *Id.* at 361.

historically, but more importantly because it involved allegations of wrongdoing, even allegations of immorality, a higher level of proof than by a preponderance of the evidence was needed.[374] Stressing that the burden of proof depends on the seriousness of the allegation or gravity of the consequences and that the presumption of innocence must be given weight, the court concluded that "the nature of the allegation requires (proof) to a comfortable satisfaction."[375]

After *Briginshaw*, Australian courts used the comfortable satisfaction standard of proof in professional misconduct cases,[376] unfair trade practice cases,[377] immigration cases,[378] and civil rights cases.[379] However, the Australian courts have refused to use the standard in criminal or quasi-criminal cases.[380] The Australian experience therefore instructs us that the comfortable satisfaction burden of proof can be employed civil matters where allegations of misconduct or immorality are involved, but not criminal or quasi-criminal proceedings. It further teaches that the quantity of proof is higher than a preponderance of the evidence, but not quite as high as beyond a reasonable doubt; exactly where in that range, however, is uncertain.

### a. CAS Use of the Standard

Possibly because of its relative newness, only a handful of CAS panels have used the comfortable satisfaction standard. Further, those

---

374.  *Id.* at 365–66.

375.  *Id.* at 350.

376.  Murphy v. The Bar Assoc. of New South Wales (2001) N.S.W.S.C. 1191 at para. 21 (citing *Briginshaw* to warrant caution in making a determination of liability).

377.  *See* Austl. Competition & Consumer Comm'n v. Pauls, Ltd., (2002) 1586 F.C.R. 43 (noting that the applicable standard of proof is that "[t]he facts proved must from a reasonable basis for a definite conclusion affirmatively drawn of the truth of which the tribunal of fact may reasonably be satisfied") (quoting Jones v. Dunkel (1959) 101 C.F.R. 298 at 305 (emphasis omitted)); Austl. Competition & Consumer Comm'n v. Mar. Union of Austl. (2001) 1549 F.C.R. 56 (reasoning that the civil standard of reasonable satisfaction may take into consideration the gravity of the allegations in determining whether a fact has been proven to the requisite satisfaction of the court).

378.  Sun v. Minister for Immigration and Ethnic Affairs (1997) 81 F.C.R. 103, 123 (finding *Briginshaw* required "cogent evidence" to determine bias and ultimately liability); Wati v. Minister for Immigration and Ethnic Affairs (1996) 71 F.C.R. 103, 113-14 (determining the level of proof required is "the balance of probabilities" or "reasonable satisfaction").

379.  Maced. Teachers' Ass'n of Vict., Inc. v. Human Rights and Equal Opportunity Comm'n (1998) 91 F.C.R. 8, 42 (stating that *Briginshaw* provides guidance to applying the level of proof in civil matters involving serious allegations).

380.  Thomas v. The Queen (1960) 102 C.L.R. 584 (Austl.) (insisting that criminal liability could be had only upon a finding of guilt beyond a reasonable doubt and nothing less), *available at* http://www.austlii.edu.au/cgi-bin/disp.pl/au/cases/cth/high%5fct/102clr584.html?query=%7e+thomas+v+the+queen (last visited Apr. 24, 2005).

panels have not discussed or examined the standard very extensively. The first panel to employ the comfortable satisfaction standard was the *Kornev and Ghoulie v. International Olympic Committee* ad hoc panel at the Atlanta Games in 1996.[381] Though unreported, the *Kornev* panel is quoted as stating, in a doping case, that the "ingredients must be established to the comfortable satisfaction of the Court having in mind the seriousness of the allegation which is made."[382] That language was next used by the *N., J., Y., W. v. FINA* panel in 1998. The *N., J., Y., W.* panel was careful to point out that the comfortable satisfaction standard was less than the criminal standard of beyond a reasonable doubt, but more than the ordinary civil standard of a preponderance of the evidence. Thus, a lower standard of proof than is required in a criminal case is appropriate in doping cases, according to the *N., J., Y., W.* panel, because disciplinary cases are not of a criminal nature.[383] Rather, according to the panel, disciplinary cases are of a private law of association nature.[384]

CAS panels that have used the comfortable satisfaction standard after *N., J., Y., W.* have not discussed the standard's meaning or the notion of whether it is a non-criminal standard.[385] However, many CAS panels since *N., J., Y., W.* have characterized disciplinary cases involving doping to be criminal or quasi-criminal in nature.[386] Considering the *N., J., Y., W.* panel premise that the comfortable satisfaction standard is a non-criminal standard and that the other CAS panels have found doping cases to be criminal in nature, there is, at the least, a question about the doctrinal foundation and the appropriateness of using the comfortable satisfaction standard in doping cases.

Problematically, where the standard falls between the preponderance of the evidence and beyond a reasonable doubt standard is unclear. Is proof to a comfortable satisfaction closer to proof beyond a reasonable

---

381. N., J., Y., W. v. FINA, CAS 98/208 (Dec. 22, 1998), DIGEST OF CAS AWARDS II 1998–2000 234 (Matthieu Reeb ed., 2002) (citing Kornev & Ghouliev v. Int'l Olympic Comm., OG 96/003/004 (unpublished)), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

382. *Id.*

383. *Id.* (adopting the test established in *Kornev*).

384. *Id.*

385. *Id.*

386. *See, e.g.,* Strahija v. FINA, CAS 2003/A/507 (Aug. 11, 2003) (affirming that the standard of proof falls between criminal and civil standards), *available at* http://www.sportslaw.nl/categorieen/print.asp?p_nr=42 (last visited Apr. 24, 2005); B. v. FINA, CAS 99/211 (June 7, 1999), DIGEST OF CAS AWARDS II 1998–2000 255 (Matthieu Reeb ed., 2002) (finding that a charge of testing manipulation against an athlete includes elimination of *mens rea*), *available at* http://www.kluwerarbitration.com (last visited Feb. 2, 2005).

doubt because doping cases are at the least quasi-criminal in nature? Or, is proof to a comfortable satisfaction closer to the preponderance of the evidence standard because doping cases are private in nature? Before the comfortable satisfaction standard becomes entrenched in CAS practice, these basic questions should be answered. These questions are important because, if doping cases truly are criminal in nature and if the comfortable satisfaction standard is a private-civil law standard, then, at the least, CAS is being doctrinally untrue and inconsistent by concluding that a private-civil law standard can be used in a criminal like proceeding. At the worst, CAS is permitting due process violations by allowing the imposition of penal sanction with a non-criminal standard of proof.

### b. AAA-CAS Use of the Standard

AAA-CAS panels have used the comfortable satisfaction standard more often than CAS panels have. This is largely due to the fact that the USADA protocol and the Supplementary Procedures call for the use of Olympic Movement Anti-Doping Code ("OMADC"), which has been superseded by the World Anti-Doping Code, when IF rules are silent on a matter. The OMADC uses the comfortable satisfaction standard.[387] However, there is some question as to whether IF standards have been used in all cases.[388] Nevertheless, AAA-CAS panels, just like CAS panels, have not examined or discussed the standard extensively.[389] Furthermore, AAA-CAS panels have not

---

387. *See* USADA PROTOCOL, *supra* note 110 (discussing the OMADC procedures to determine violations); WADA CODE, *supra* note 131, cmt. § 3.1 (noting the standard is comparable to the one "applied in most countries to cases involving professional misconduct"), *available at* http://www.wada-ama.org/rtecontent/document/code_v3.pdf (last visited Apr. 24, 2005).

388. In USADA v. Cherry, the comfortable satisfaction standard was used despite the fact that at the time of the positive test and the time of hearing, the IAAF used the beyond a reasonable doubt standard. USADA v. Cherry, AAA-CAS 30 190 00463 03 (Nov. 24, 2003), *available at* http://www.usantidoping.org/files/active/arbitration_rulings/arbitration_ruling_11_24_2003_Cherry.pdf (last visited Feb. 2, 2005).

389. USADA v Cherry, AAA -CAS 30 190 00463 03 (Nov. 24, 2003) (applying the comfortable satisfaction standard without explaining elements of standard), *available at* http://www.usantidoping.org/files/active/arbitration_rulings/arbitration_ruling_11_24_2003_Cherry.pdf (last visited Feb. 2, 2005; *see also* USADA v. Sbeih, AAA-CAS 30 190 001 100 03 (Mar. 25, 2004) (confirming the strict liability standard), *available at* http://www.usantidoping.org/files/active/arbitration_rulings/arbitration_ruling_3_25_2004_sbeih.pdf (last visited Feb. 2, 2005); USADA v. Neben, AAA-CAS 30 190 00713 03 (Oct. 20, 2003) (applying the comfortable satisfaction standard), *available at* http://www.usantidoping.org/files/active/arbitration_rulings/arbitration_ruling_10_21_2003_Neben.pdf (last visited Apr. 24, 2005); USADA v. Moninger, AAA No. 30-190-00930-02 (April 2, 2003), *available at* http://www.usantidoping.org/files/active/arbitration_rulings/arbitration_ruling_4_3_2003_Moninger.pdf (last visited Feb. 2, 2005) (applying the comfortable satisfaction standard); Blackwelder v. USADA, AAA-CAS 30

explained if a comfortable satisfaction is closer to a preponderance of the evidence or proof beyond a reasonable doubt.

Like the CAS panels, AAA-CAS panels have not agreed on the nature of doping cases, thus failing to clarify the foundation of the comfortable satisfaction standard. Clarifying the foundation of the comfortable satisfaction standard, namely whether it is a criminal or private-civil law standard of proof in origin, could show whether it is high standard of proof closer to proof beyond a reasonable doubt, or a lower standard of proof closer to proof by a preponderance of the evidence. Many AAA-CAS panels have, without elaboration, declared that the comfortable satisfaction standard is appropriate despite the quasi-criminal nature of doping cases.[390] Yet, other AAA-CAS panels have found doping cases to not be criminal proceedings, thereby justifying the use of a standard other than proof beyond a reasonable doubt.[391] Just like the unsettled foundation of the standard in CAS jurisprudence, the unsettled nature of the AAA-CAS jurisprudence on the standard should be settled. If doping cases are truly quasi-criminal proceedings and the comfortable satisfaction standard is a private law, civil cause of action, standard of proof, due process violations could occur.

## IV. CONCLUSION

CAS and its affiliates are necessary, beneficial, and innovative institutions in the world of lex sportive. They have been a leader in developing and modernizing sports law. However, the structure of CAS and—as also analyzed in this Article—AAA-CAS, are outdated and ill-suited to properly handle all of the types of disputes presented to them. Their weaknesses are particularly glaring in perhaps the most explosive type of matters the CAS handles: doping cases. This is even more troublesome considering the increased vigilance in the international sports community towards doping, and the potentially exponential leap in CAS influence if professional sports adopt their rules and procedures.

CAS and AAA-CAS were constructed as arbitration institutions. However, doping cases are different from disputes that can be easily and equitably settled by arbitration. Doping cases are accusatory and

---

190 00012 02 (May 17, 2002) (adopting a higher standard of comfortable satisfaction instead of the civil standard of balance of probabilities), *available at* http://www.usantidoping.org/files/active/arbitration_rulings/arbitration_ruling_5_22_2002_blackwelder.pdf (last visited Feb. 2, 2005).

390. *Cherry,* AAA-CAS 30 190 00463 03 (applying the comfortable satisfaction standard).

391. *See Blackwelder,* AAA-CAS 30 190 00012 02 (noting the proceeding is not criminal and applying the comfortable satisfaction standard).

quasi-criminal in nature and therefore fundamentally different from the typical contract dispute decided by arbitration. The processes and machinery for deciding quasi-criminal cases, such as doping charges, are inherently different from the processes and machinery for deciding contract type cases.

As several CAS panels have noted, doping sanctions are penal in nature and as such, require certain protections for the accused.[392] Among those protections are the presumption of innocence and the right to "discharge" oneself.[393] To those protections, an unbiased and independent tribunal and methods to ensure equal protection and due process should be added. These protections are necessary because the basic objective of doping cases, like that of criminal cases, is to determine guilt.

On the other hand, the basic objective of settling contract disputes and other disputes typically settled by arbitration is to find an equitable solution or middle ground that best fits the circumstances of the particular dispute. Arbitration, with its flexible and less formal structure is designed specifically to settle contract disputes. However, a flexible and less formal structure may not ensure equal protection and due process in guilt determination, or quasi-criminal proceedings like those necessary in doping cases.

CAS's current structure is excellent for deciding contract disputes, however, it is inadequate, and should be modified for doping cases. CAS should consider developing a second chamber, with separate procedures and arbitrators, to hear doping cases. Such a second chamber would draw its arbitrators form a separate master list of arbitrators, choose its arbitrators in a different way, and adopt procedures to ensure equal treatment of all accused athletes.

CAS has been making progress toward the fair treatment of accused athletes. CAS panels have used principles of fairness to soften what might otherwise be an unfair result under the applicable IF rules.[394] Also, CAS rules attempt to insulate arbitrators for improper outside influences[395] and its panels are attempting to harmonize the rules and principles that it applies to accused athletes in the name of increased

---

392. *See supra* note 333 (using CAS cases finding sanctions are penal in nature).

393. *See supra* notes 350-352 and accompanying text (discussing an athlete's ability to counter charges of doping).

394. *See* supra notes 347-352 and accompanying text (discussing the CAS procedure that allows an athlete to defend against charges given under strict liability).

395. *See supra* Part III.B (discussing CAS and AAA-CAS procedures for selecting arbitrators).

fairness.[396]

Despite this movement in the direction of equity for accused athletes in doping cases, more steps must be taken. CAS, and particularly AAA-CAS, should take the following steps to ensure the fairness of doping hearings and—particularly in the situation of AAA-CAS—to answer doubts about legitimacy. First, arbitrators on the master list drawn upon in doping cases should have no current or recent connections with the governing bodies of the Olympic Movement or athletes that have been accused of doping violations. Second, the arbitrator selection process should do away with, or at the least minimize, the practice of parties appointing arbitrators. Third, the burden of proof used in doping cases should be more like that used in criminal cases. And, fourth, a mechanism, such as a single supervisory panel, should be created to reconcile conflicting precedent to ensure equal treatment and remove some of the arbitrariness of panel decisions.

The doping cases growing out of the BALCO investigation, with their unique issues of proof and hurried nature as the Olympics approached in the summer of 2004,[397] created, in a sense, a moment of truth for CAS, and particularly AAA-CAS. If CAS and AAA-CAS are to continue and even improve their legitimacy, they should consider the charges suggested above. And, as displayed by this analysis, CAS must shed its original commercial dispute settlement structure and adapt to the unique demands of settling doping accusations.

---

396. *See supra* Part III.D (discussing the use of precedent in CAS and AAA-CAS panels).

397. Pete Carey, *Lifetime Ban sought for Montgomery; Doping agency alleges use of illegal substances,* CHI. TRIB., June 24, 2004, § 4, at 3.