# EXHIBIT 9

Dockets.Justia.com

# Excerpt of the judgment of 27 May 2003, delivered by the 1st Civil Division of the Swiss Federal Tribunal in the case A. & B. versus International Olympic Committee (IOC) and International Ski Federation (FIS) (4P. 267, 268, 269 & 270/ 2002/ translation)

*International arbitration*
*Independence of the CAS*
*Right to a fair hearing*
*Procedural public policy*

## A.

A.a A._____ and B._____ are both cross-country skiers of X._____ nationality and domiciled in X._____. Members of the X._____ Ski Association, they have represented X._____ in various international competitions and participated in the Olympic Winter Games in Salt Lake City (United States of America) in 2002.

The International Olympic Committee (IOC) is an international not-for-profit non-governmental organisation, established as an association under Swiss law, with its headquarters in Lausanne. According to the Olympic Charter, it is responsible for managing the Olympic Movement, which comprises, in addition to the IOC, the International Federations (IFs), the National Olympic Committees (NOCs), the Organising Committees of the Olympic Games (OCOGs), the national associations, clubs, and the persons belonging to them, particularly athletes, as well as other organisations and institutions recognised by the IOC. The goal of the Olympic Movement is to contribute to building a peaceful and better world by educating youth through sport practised in the conditions described in the Olympic Charter. The Olympic Games represent the peak of its activity. In order to participate in the Games, competitors must conform to the Olympic Charter and to the rules laid down by the relevant IF. In particular, they are required to respect the Olympic Movement Anti-Doping Code. Athletes who infringe the Olympic Charter should be disqualified and lose the benefit of any ranking obtained; any medal they have won should be withdrawn, as well as any diploma they have been awarded. The Olympic Charter states that any dispute arising on the occasion of, or in connection with, the Olympic Games shall be submitted exclusively to the Court of Arbitration for Sport (CAS), in accordance with the Code of Sports-Related Arbitration.

The International Ski Federation (FIS), based in Switzerland, is the supreme authority for all questions related to skiing. Its members include all national ski associations that have approved its Statutes and been admitted as members. The X._____ Ski Association is a member. In order to participate in an international skiing competition, competitors must hold an FIS licence issued by their national association. Licences are only issued to competitors who have signed the athletes'

declaration. By signing this declaration, competitors promise to submit any claims firstly to an arbitral tribunal set up in accordance with the Statutes and Rules of the Court of Arbitration for Sport. Competitors must respect the rules laid down by the FIS. Those guilty of a first offence of deliberate doping are liable to suspension from all international competitions for a minimum of two years and to the invalidation of all results obtained during their suspension period. Decisions of the FIS Council in doping cases may be appealed before the CAS.

**A.b** On 8, 14 and 22 December 2001, at international cross-country skiing competitions organised by the FIS in Italy, Switzerland and Austria, A._____ underwent anti-doping tests which revealed the presence of a prohibited substance, darbepoietine, in her body.

Tests carried out on 21 February 2002, during the Salt Lake City Olympic Games, on A._____ and B._____ produced the same result and, consequently, led to the opening of a disciplinary investigation. In view of the conclusions of that investigation, the IOC Executive Board, through a decision of 24 February 2002, disqualified both skiers from an event in which they had participated, withdrew the gold medal won by A._____ and the diploma awarded to B._____ and excluded both athletes from the 2002 Olympic Winter Games. The file was then submitted to the FIS so that it could amend the result of the race and take the necessary measures.

At its meeting on 3 June 2002, the FIS Council suspended both X._____ skiers from international competitions for two years, A._____ from 8 December 2001 and B._____ from 21 February 2002.

## B.

A._____ and B._____ appealed against the decisions of the IOC and FIS.

Giving judgement on 29 November 2002, the CAS, comprising C._____ (President), D._____, arbitrator chosen by the appellants, and E._____, arbitrator chosen by the IOC and FIS, issued four awards, dismissing the appeals and upholding the decisions of the IOC and FIS against A._____ (cases CAS 2002/A/370 and CAS 2002/A/397) and B._____ (cases CAS 2002/A/371 and CAS 2002/A/398).

## C.

A._____ and B._____ each lodged public-law appeals in accordance with Article 191 para. 1 of the Swiss Federal Code on Private International Law (LDIP) and Article 85 (c) of the Federal Statute on the Organisation of the Judiciary (OJ), requesting that each award concerning them be set aside.

The IOC and FIS consider that the appeals should be dismissed insofar as they are admissible. The CAS also believes they should be dismissed.

The plaintiffs submitted supplementary statements of appeal without being invited to do so.

## The Federal Supreme Court considers that, in law:

**1.**

The four public-law appeals, even though they refer to four separate awards, are nevertheless closely linked. The two X._____ skiers who lodged them are both represented by the same lawyer, who drafted four virtually identical statements of appeal. The responses to the questions raised by the plaintiffs are the same in each appeal, subject to the reservations set out in the main body of the present judgement. It is therefore appropriate, in order to shorten the proceedings, to join together cases 4P.267/2002 (A._____ v. IOC), 4P.268/2002 (B._____ v. IOC), 4P.269/2002 (A._____ v. FIS) and 4P.270/2002 (B._____ v. FIS), in accordance with Article 24 of the Federal Civil Procedure (PCF), which applies by analogy under the referral mentioned in Article 40 OJ (ATF 113 Ia 390 rec. 1 and the quoted judgements), and to deal with them in a single judgement.

**2.**

According to Article 85 (c) OJ, public-law appeals to the Federal Supreme Court may be lodged against arbitral awards under the conditions described in Articles 190 et seq. of the LDIP (RS 291). It is therefore necessary to consider first of all whether the conditions laid down in these provisions are met.

**2.1** The CAS headquarters are in Switzerland and at least one of the parties (in this case, both plaintiffs) at the time the arbitration agreement was concluded was neither domiciled nor habitually resident in Switzerland. The provisions of Chapter 12 of the LDIP are therefore applicable (Art. 176 para. 1 LDIP).

An arbitral award, in the sense of Art. 189 LDIP, is a judgement rendered on the basis of an arbitration agreement by a non-State tribunal entrusted by the parties to decide an arbitrable dispute (Art. 177 para. 1 LDIP) of an international nature (Art. 176 para. 1 LDIP); a true award, which is comparable to the judgement of a State tribunal, is dependent on the arbitral tribunal concerned offering sufficient guarantees of impartiality and independence as derived from Article 30 para. 1 of the Constitution (regarding Art. 58 (a) of the Constitution, see ATF 119 II 271 rec. 3b and the quoted judgements). The Federal Supreme Court has accepted that the CAS may be considered a true arbitral tribunal for cases in which the IOC is not a party, but where the CAS is established by an international sports association as the appeals body charged with examining the validity of sanctions imposed by its organs (ATF 119 II 271 rec. 3b confirmed most recently by judgement 4P.64/2001 of 11 June 2001, rec. 2d/ee). There is therefore no doubt that the disputed decisions are awards, since they were rendered in cases between the plaintiffs and the FIS. The question of whether the CAS, if it rules on a request for arbitration that seeks the annulment of an IOC decision, renders a true arbitral award was raised in the aforementioned judgement (ATF 119 II 271 rec. 3b, p.279) and again more recently (judgement 5P.427/2000 of 4 December 2000, rec. 1c). However, the Federal Supreme Court left this question open in both cases. The

matter cannot remain undecided any longer, since the plaintiffs expressly contest the fact that the CAS offers sufficient guarantees of impartiality and independence when it decides a dispute between an athlete and the IOC, as it did in their case. Besides, resolving this question of principle, on which judgement has been reserved for a decade, will help to clarify the fairly hazy situation which has evolved in the meantime and, therefore, to establish legal certainty in the interests of any athlete who might be faced with the same problem as the plaintiffs in the future. We will therefore disregard the illogicality of the plaintiffs' action in referring the disputed decision of the association in question (the IOC) to an arbitral tribunal accused of partiality (the CAS) instead of appealing to a State tribunal to set aside the decision on the basis of Article 75 of the Civil Code (CC). Therefore, since the point at issue – the alleged lack of independence of the CAS to pass judgement in a case involving the IOC – constitutes both a ground of inadmissibility of the appeals and the plaintiffs' principal complaint, it seems sensible to examine it at a later stage (see rec. 3.3, below), to accept for the time being that we are dealing with a true arbitral award (analogical application of the theory of doubly relevant evidence; see ATF 128 III 50 rec. 2b/bb, p. 56 in fine; 122 III 249 rec. 3b/bb) and to deal firstly with the other matters relating to the admissibility of the appeals.

A public-law appeal is only admissible if the arbitral tribunal concerned ruled on points of law and not solely on the application of sporting rules, which do not in principle fall under the jurisdiction of the courts. That is the case in this instance, since anti-doping rules, which deal primarily with sanctions, generally lie outside the framework of simple sporting rules (François Vouilloz, *Règles de droit et règles de jeu en droit du sport – l'exemple du dopage*, in PJA 1999, pp. 161 et seq., esp. p. 165 and the references mentioned in footnote 26). Furthermore, suspension from international competitions is far more serious than simple sanctions designed to protect the smooth running of a sport and constitutes a genuine statutory punishment that affects the legal interests of the person concerned. It therefore falls within the jurisdiction of the courts (ATF 119 II 271 rec. 3c and references).

Appeals may only be lodged on one of the grounds listed exhaustively in Article 190 para. 2 of the LDIP (ATF 128 III 50 rec. 1a, p. 53; 127 III 279 rec. 1a, p. 282; 119 II 380 rec. 3c, p. 383). The grounds submitted by the plaintiffs fall within the scope of this provision.

**2.2** Since a public-law appeal is possible in this case, we must now consider whether the procedural rules were respected. For appeals related to international arbitration, the procedure before the Federal Supreme Court is governed by the provisions of the Federal Statute on the Organisation of the Judiciary regarding public-law appeals (Art. 191 para. 1, sentence 2, LDIP).

The plaintiffs are directly affected by the disputed awards, which ratify the withdrawal of the prizes they received at the 2002 Olympic Winter Games (gold medal and diploma respectively), as well as their suspension from all international competitions for a two-year period which is still running. They therefore have a personal, current, legally protected interest in establishing whether these decisions were rendered in

violation of the guarantees derived from Art. 190 para. 2 of the LDIP, and are thus entitled to appeal (Art. 88 OJ).

Having been lodged in due time (Art. 89 para. 1 OJ) and in the form prescribed by law (Art. 90 para. 1 OJ), all four appeals are admissible in principle.

**2.3** Since the applicable procedural rules are those relating to public-law appeals, the plaintiffs must list their complaints in accordance with the conditions set out in Art. 90 para. 1 (b) OJ (ATF 128 III 50 rec. 1c; 127 III 279 rec. 1c; 117 II 604 rec. 3, p. 606). When dealing with a public-law appeal, the Federal Supreme Court only examines admissible complaints that have been raised with sufficient grounds in the statement of appeal (see ATF 129 I 113 rec. 2.1 and the judgements mentioned). The plaintiffs therefore had to indicate which of the situations mentioned in Art. 190 para. 2 LDIP had, in their view, arisen in this case and, based on the disputed awards, show, with evidence, how they thought the relevant principles had been violated (ATF 127 III 279 rec. 1c). It will be necessary to check whether this condition has been fulfilled when examining the various complaints raised by the plaintiffs.

**2.4** On 11 April 2003, the plaintiffs' lawyer submitted unsolicited supplementary statements of appeal, one for each appeal procedure, asking for a second exchange of correspondence. Such an exchange usually only takes place under exceptional circumstances (Art. 93 para. 3 OJ). The Federal Supreme Court holds strictly to this rule and only orders a reply and a rejoinder if they appear genuinely indispensable to resolve a case while respecting the right to a fair hearing (Bernard Corboz, *Le recours au Tribunal fédéral en matière d'arbitrage international*, in SJ 2002 II, pp. 1 et seq., 15 (h)).

There is no reason to make an exception to this rule in the present case. Indeed, as will be explained in the examination of the relevant complaint, the facts contained in the supplementary statement of appeal are unlikely to affect the outcome of the dispute (see rec. 4.2.2.1, below).

## 3.

The plaintiffs submit, as their principal argument, that the CAS is not an independent tribunal in a dispute in which the IOC is a party. On the basis of Art. 190 para. 2 (a) LDIP in conjunction with Art. 6 para. 1 of the ECHR and Art. 30 para. 1 of the Constitution, they argue that the two awards in which the IOC is named as a party should be set aside. They claim that the defect inherent in the aforementioned awards is also present in the other two awards, which relate to the FIS, since the four appeals were heard jointly by the same Panel of arbitrators.

**3.1** By their own admission, the plaintiffs lodged their appeals with the CAS without reservation. In their opinion, this should not prevent them now from complaining that this arbitral tribunal lacks independence. However, the authors whose work they refer to (Thomas Rüede/Reimer Hadenfeldt, *Schweizerisches Schiedsgerichtsrecht*, 2nd ed., pp. 142 et seq.) are of no help to them, since they say precisely the opposite (see also

Corboz, *op. cit.*, p.17 in limine; Bernard Dutoit, *Commentaire de la loi fédérale du 18 décembre 1987*, 3rd ed., note 4 ad Art. 190; Cesare Jermini, *Die Anfechtung der Schiedssprüche im internationalen Privatrecht*, Zurich, 1997, notes 178 et seq.). The case-law of the Federal Supreme Court also runs counter to the plaintiffs' opinion. If an arbitral tribunal lacks independence or impartiality, it is "constituted irregularly" in the sense of Art. 190 para. 2 (a) LDIP. According to the principle of good faith, however, this ground is only valid if the party raises it immediately; the latter cannot hold its arguments in reserve in order to bring them up should they lose the arbitral procedure (judgement 4P.188/2001 of 15 October 2001, rec. 2b, quoting ATF 126 III 249 rec. 3c).

In this case, the plaintiffs did not appeal to the State courts to set aside the IOC's decisions concerning them. Instead, they lodged an appeal with the CAS and, through their counsel, signed the proceedings order confirming the jurisdiction of the CAS. At no point did they question the CAS' independence vis-à-vis the IOC. To raise this issue for the first time before the Federal Supreme Court in an appeal against the final award appears incompatible with the rules of good faith. Under these rules, the admissibility of the corresponding complaint, which was submitted late, is questionable. However, the question of admissibility would only need to be answered definitively if the complaint was deemed to be well-founded. We shall therefore now consider whether that is the case, leaving the issue of admissibility to one side, particularly since this is a question of principle which it would be unwise to leave unanswered.

**3.2** The Federal Supreme Court has accepted that the CAS may be considered a true arbitral tribunal for cases in which the IOC is not a party, but where the CAS is established by an international sports association as the appeals body charged with examining the validity of sanctions imposed by its organs (ATF 119 II 271 rec. 3b confirmed most recently by judgement 4P.64/2001 of 11 June 2001, rec. 2d/ee).

Applied to this particular case, this well-established case-law demands that the ground of the CAS' lack of independence should be rejected in relation to the two awards rendered in the cases between the plaintiffs and the FIS. There is no reason to assume that, just because the CAS lacked sufficient independence vis-à-vis the IOC, the same would be true vis-à-vis the FIS. The plaintiffs claim that this is the case, but fail to offer any convincing arguments to support this point of view. The fact that the four cases were heard jointly by the same arbitrators is not a convincing reason. Of course, there was nothing, in theory, to stop the arbitrators treating the appeals concerning the IOC differently from those involving the FIS in the four separate awards that were issued on the same day. Indeed, one of the awards (A._____ v. FIS) concerned cases of doping established prior to the 2002 Olympic Winter Games and which were based on entirely different evidence from that which brought to light a further case of doping involving the same skier during the Games, subsequently resulting in her disqualification (A._____ v. IOC).

**3.3** In order to tackle the question of the CAS' independence vis-à-vis the IOC, we shall begin by sketching a brief history of this permanent arbitral institution before

describing its current structure (rec. 3.3.1) and the opinions that have been expressed concerning its reform (rec. 3.3.2). We shall then consider the CAS' situation in relation to the objections raised by the plaintiffs and the counter-arguments put forward by the IOC and the CAS itself (rec. 3.3.3). Finally, we shall draw the necessary conclusions concerning the merit of the complaint and, consequently, the admissibility of the appeals lodged against the awards involving the IOC (rec. 3.3.4).

**3.3.1** The CAS was officially created on 30 June 1984, when its Statute came into force. Its function was to resolve sports-related disputes and its headquarters were established in Lausanne. An independent arbitral institution without legal personality, it was originally composed of 60 members, 15 appointed by the IOC, 15 by the IFs, 15 by the NOCs and 15 by the IOC President. The operating costs of the CAS were borne by the IOC, which was entitled to modify the CAS Statute (for more details, see ATF 119 II 271 rec. 3b, pp. 277 et seq. and the authors mentioned).

In a judgement issued in 1993, the Federal Supreme Court expressed reservations concerning the CAS' independence vis-à-vis the IOC on account of the organisational and financial links between the two bodies. It thought that the CAS needed to become more independent of the IOC (ATF 119 II 271 rec. 3b, p. 280). This judgement led to a major reform of the CAS. The main developments were the creation of the International Council of Arbitration for Sport (ICAS) in Paris on 22 June 1994 and the drafting of the Code of Sports-related Arbitration (hereinafter "the Code"), which entered into force on 22 November 1994 (for a more detailed history of the CAS, see the accounts by Matthieu Reeb, CAS Secretary General, in Digest of CAS Awards II, 1998-2000, pp. xxiii et seq. [hereinafter "Digest II"] and in *Revue de l'avocat 10/2002*, pp. 8 et seq. [hereinafter "Revue"]; see also, *inter alia*, Piermarco Zen-Ruffinen, *Droit du Sport*, Schulthess 2002, notes 1461 et seq.).

A private-law foundation subject to Swiss law (Art. 80 et seq. CC), the ICAS, whose seat is established in Lausanne (Art. S1 of the Code), is composed of 20 members, namely high-level jurists appointed in the following manner (Art. S4 of the Code): four members by the Summer Olympic IFs (3) and Winter Olympic IFs (1), chosen from within or from outside their membership; four members by the Association of the NOCs (ANOC), chosen from within or from outside its membership, four members by the IOC, chosen from within or from outside its membership, four members by the twelve members listed above, after appropriate consultation with a view to safeguarding the interests of the athletes; four members by the sixteen members listed above and chosen from among personalities independent of the bodies designating the other members of the ICAS. The members of the ICAS are appointed for a renewable period of four years. Upon their appointment, they must sign a formal declaration of their independence (Art. S5 of the Code). The ICAS members may not appear on the list of arbitrators of the CAS nor act as counsel to one of the parties in proceedings before the CAS; under certain circumstances, they must spontaneously disqualify themselves or may be challenged (Art. S5 and S11 of the Code). According to Art. 3 of the Agreement related to the constitution of the ICAS, the foundation is funded through deductions made by the IOC from the sums allocated to the following bodies

part of the IOC's revenue from the television rights for the Olympic Games: 4/12 by the IOC, 3/12 by the Summer Olympic IFs, 1/12 by the Winter Olympic IFs and 4/12 by the ANOC. The tasks of the ICAS include to safeguard the independence of the CAS and the rights of the parties (Art. S2 of the Code). Its various functions include adopting and amending the Code, managing and financing the CAS, drawing up the list of CAS arbitrators who may be chosen by the parties, deciding on the challenge and removal of arbitrators and appointing the Secretary General of the CAS (Art. S6 of the Code).

The CAS sets in operation Panels which have the task of resolving disputes arising within the field of sport. It is composed of two divisions, each headed by a president who takes charge of the first arbitration operations before the Panel of arbitrators is appointed: the Ordinary Arbitration Division and the Appeals Arbitration Division (Art. S12 of the Code). The former deals with cases submitted to the CAS as the sole instance (execution of contracts, civil liability, etc.), while the latter hears appeals against final-instance disciplinary decisions taken by sports bodies such as federations (e.g. suspension of an athlete for doping, violence on the field of play or abuse of a referee). The CAS has at least 150 arbitrators, who are not assigned to one particular division (Art. S13 and S18 of the Code). The ICAS draws up the list of arbitrators, which is updated and published (Art. S15 of the Code). It calls upon personalities with legal training and who possess recognised competence with regard to sport, while respecting the following distribution (Art. S14 of the Code) and ensuring, wherever possible, fair representation of the different continents (Art. S16 of the Code): one-fifth are selected from among the persons proposed by the IOC, the IFs and the NOCs respectively, chosen from within its/their membership or from outside; one-fifth are chosen from among persons independent of these bodies; and, finally, one-fifth are chosen after appropriate consultations with a view to safeguarding the interests of the athletes. Only the arbitrators included on the list – they appear on the list for a renewable period of four years (Art. S13 of the Code) – may serve on Panels (Art. R33, R38 and R39 of the Code). When they are appointed to a Panel, they must sign a formal declaration of their independence (Art. S18 of the Code). Incidentally, arbitrators must immediately disclose any circumstances likely to affect their independence with respect to any of the parties (Art. R33 of the Code). They may be challenged if the circumstances give rise to legitimate doubts over their independence. Challenges, which are in the exclusive power of the ICAS, must be brought immediately after the ground for the challenge has become known (Art. R34 of the Code). If three arbitrators are to be appointed, in the absence of an agreement, each party appoints one arbitrator, one in the request and the other in the response, and the President of the Panel is selected by the two arbitrators or, if they do not agree, by the President of the Division (Art. R40.2 of the Code). Any arbitrator selected by the parties or by other arbitrators is only deemed appointed after confirmation by the President of the Division. Once the Panel is formed, the file is transferred to the arbitrators for them to investigate the case and render their award.

In 1996, the ICAS created two permanent decentralised offices in Australia and the United States of America. In the same year, a specific new institution was established:

the CAS ad hoc division. This is a temporary arbitral body, created by the ICAS u[n]…
the terms of Art. S6 para. 8 of the Code for certain major sports events such a[s]…
Olympic Games, Commonwealth Games and European Football Championships…
each ad hoc division, the ICAS appoints a team of arbitrators which is usually ba[sed]…
at the site of the event concerned so that it can meet at any time during a fixed perio[d]…
Special arbitration rules make provision for a simplified procedure for the formatio[n]…
Panels and the settlement of disputes. In principle, decisions must be made withi[n]…
hours of the application being filed.

Having originally comprised 60 members, the CAS now has around 200 arbitrato[rs]…
According to its Secretary General, all Olympic IFs have recognised its jurisdictio[n]…
which indicates that, over the years, it has become an indispensable institution in th[e]…
world of sport.

**3.3.2** In the opinion of its President and Secretary General, the CAS, since it wa[s]…
restructured, has established its independence vis-à-vis the IOC (Kéba Mbaye, in Dige[st]…
II, p. xi; Reeb, in Digest II, p. xxv and in Revue, p.9). Not all legal experts agree[s]…
contrary to the IOC's claim in its responses to the appeals. Certain authors do agre[e]…
(Jean-François Poudret/Sébastien Besson, *Droit comparé de l'arbitrage international*,
note 106; Philippe Meier/Cédric Aguet, *L'arbitrabilité du recours contre la suspension
prononcée par une fédération sportive internationale*, in *JdT 2002*, p. 56 footnote 6;
Gérald Simon, *L'arbitrage des conflits sportifs*, in *Revue de l'arbitrage 1995*, pp. 185 et
seq., 209 et seq.; Zen-Ruffinen, *op. cit.*, note 1463). Others are more sceptical about the
effectiveness of the 1994 reforms (Mark Schillig, *Schiedsgerichtsbarkeit von Sportver-
bänden in der Schweiz*, Zurich, 1999, pp. 157 et seq.; Margareta Baddeley, *L'association
sportive face au droit*, Geneva, 1994, pp. 272 et seq., footnote 79; Dietmar Hantke,
*Brauchen wir eine Sport- Schiedsgerichtsbarkeit?*, in SpuRt *[Zeitschrift für Sport und
Recht]* 1998, p. 187; Rémy Wyler, *La convention d'arbitrage en droit du sport*, in *RDS*
116/1997 I pp. 45 et seq., 60); one author describes the reforms as a "*Symptombekämpfung*"
which does nothing to change the fundamental problem (Schillig, *op. cit.*, p. 159).

**3.3.3** In order to conclude whether an arbitral tribunal offers sufficient guarantees of
independence and impartiality, reference must be made to the constitutional principles
concerning State courts (ATF 125 I 389 rec. 4a; 118 II 359 rec. 3c, p. 361).

According to Article 30 para. 1 of the Constitution, every person whose case must
be judged in judicial proceedings has the right to have this done by a court that is
established by law, has jurisdiction, and is independent and impartial. This principle
means it should be possible to demand that a judge be challenged if his situation or
conduct is likely to give rise to doubts about his impartiality (ATF 126 I 68, rec. 3a, p.
73); in particular, it is meant to prevent circumstances external to a case from influenc-
ing the judgement either in favour or to the detriment of one of the parties. It does not
mean that a judge can only be challenged if prejudice is established, since an internal
predisposition on his part is virtually impossible to prove; it is sufficient that circum-
stances produce the appearance of prejudice and cast doubt over the judge's imparti-
ality. Only objectively noted circumstances may be taken into consideration; the purely

individual impressions of one of the parties to the case are not sufficient in themselves (ATF 128 V 82, rec. 2a, p. 84 and the quoted judgements).

The question of whether, as legal opinion suggests, the demands made on arbitrators chosen by one of the parties should be less strict has not been resolved (judgement 4P.188/2001 of 15 October 2001, rec. 2b in fine; ATF 118 II 359 rec. 3c, p. 362 and the authors mentioned; see also Corboz, *op. cit.*, pp. 16 et seq.) and does not need to be answered in the present case. However, case-law suggests that account should be taken of the specific characteristics of arbitration, especially international arbitration, when considering whether an arbitral tribunal offers sufficient guarantees of impartiality and independence (judgement 4P.224/1997 of 9 February 1998, rec. 3, published in *Revue suisse de droit international et de droit européen [RSDIE]* 1999, pp. 579 et seq.; judgement 4P.292/1993 of 30 June 1994, rec. 4a). International arbitration is actually a narrow field and it is inevitable that, after a few years on the circuit, arbitrators, many of whom are lawyers themselves, will hear cases in which either a fellow arbitrator or one of the counsels has served with them on a previous Panel. This does not automatically mean they are no longer independent (Pierre Lalive/Jean-François Poudret/Claude Reymond, *Le droit de l'arbitrage interne et international en Suisse*, note 8 ad Art. 180 LDIP; see also Philippe Fouchard/Emmanuel Gaillard/Berthold Goldman, *Traité de l'arbitrage commercial international*, note 1031; Poudret/Besson, *op. cit.*, notes 418 et seq.; Klaus Peter Berger, *Internationale Wirtschaftsschiedsgerichtsbarkeit*, p. 178, footnote 288; Corboz, *op. cit.*, p. 16).

**3.3.3.1** The plaintiffs dispute the fact that the CAS offers sufficient guarantees of impartiality and independence vis-à-vis the IOC. In their view, the structure of the ICAS, the way in which arbitrators are appointed, and the organisation, financing and functioning of the CAS create excessively close links between the permanent arbitral institution and the supreme authority of the Olympic Movement.

In concrete terms, the plaintiffs' first argument is that many ICAS members are subordinate to the IOC on account of their role within the Olympic Movement. They point out that the ICAS President is a former Vice-President of the IOC and remains an honorary IOC member. The two ICAS Vice-Presidents are both members of IOC Commissions. The President of the Appeals Division is an IOC Vice-President and his deputy is a member of an IOC Commission. Furthermore, of the nine ICAS members who do not have a particular function, four are current or previous NOC members. The Secretary of the ICAS, meanwhile, is also the Secretary General of the CAS.

The plaintiffs go on to observe that they had to choose an arbitrator from the official list. They argue that the range of possibilities open to athletes is extremely limited if they wish to appoint an arbitrator who is familiar with their sport, speaks their language and lives in the same country as them.

Finally, the plaintiffs claim that, by virtue of Art. 3 of the Paris Agreement and Art. 11 of the Olympic Charter, the IOC has complete control over the financing of the ICAS and CAS. In particular, the IOC pays the travel and accommodation costs and fees of arbitrators who work for the ad hoc divisions.

**3.3.3.2** The arguments summarised above, which are based partly on false premises, do not appear convincing.

According to the explanations submitted with supporting evidence by the CAS in its responses to the appeals – explanations which are not disputed by the plaintiffs – in 2002 the ICAS members included one former IOC member, one IOC Vice-President and one IOC member. However, none of its other members were part of the IOC or any of its commissions. This proportion was not sufficient to enable the IOC actually to control the ICAS. Of course, the wording of Article S4 of the Code does not totally exclude the possibility of the former having control over the latter: if each of the bodies mentioned under letters a (IFs) and b (ANOC) of the said Article were to appoint four IOC members to the ICAS, which they are perfectly at liberty to do ("chosen from within or from outside their/its membership"), and if the IOC appointed four of its own members, twelve of the twenty ICAS seats would be held by IOC members, which could cause problems. However, that is only a rather unlikely scenario which is irrelevant in the current case. Moreover, the plaintiffs are wrong to suggest that the ICAS organs are structurally dependent on the IOC because they belong to the Olympic Movement. An autonomous foundation, the ICAS is not mentioned in Rule 3 of the Olympic Charter which, in conjunction with Rule 4, sets out the conditions for membership of the Olympic Movement. It can amend its own Statutes (Art. S25 of the Code), does not take orders from the IOC and is not obliged to abide by the IOC's decisions (Rule 1 of the Olympic Charter, a contrario). Incidentally, the ICAS does not exercise any influence on the CAS' arbitral procedures as such, other than when it is asked to rule on a request for an arbitrator to be challenged (Art. R34 of the Code); however, in such cases, the ICAS member should spontaneously disqualify himself if a sports body to which he belongs (e.g. the IOC) is a party in the arbitration (Art. S11 of the Code). ICAS members may not, in any case, appear on the list of CAS arbitrators, nor act as counsel to any party in proceedings before the CAS (Art. S5 of the Code). As for the Secretary General of the CAS, who also acts as Secretary to the ICAS, he only has a consultative voice within the latter institution (Art. S8 of the Code) and does not form part of CAS Panels. With this structure, subject to the aforementioned reservation, the ICAS is therefore able to safeguard the independence of the CAS and the rights of the parties.

The rule that stipulates that only arbitrators appearing on the list drawn up by the ICAS may serve on Panels is much debated, as acknowledged by the CAS Secretary General (Reeb, Revue, p. 10; more generally, see also: Rüede/Hadenfeldt, *op. cit.*, p. 129 ch. 1 and p. 149 ch. 4; Baddeley, *op. cit.*, p. 267; Schillig, *op. cit.*, pp. 157 *et seq.*; Fouchard/Gaillard/Goldman, *op. cit.*, note 1004). This system is especially common in corporative institutions, where it is justified by the highly technical nature of most disputes, although it restricts parties' options and, depending on the circumstances, can jeopardise the principle of equality of the parties (Fouchard/Gaillard/Goldman *ibid.*). Nevertheless, when faced with this problem, the Federal Supreme Court has always refused to condemn this system as such, whilst recommending that care should be taken to prevent any particular party influencing the composition of the list of arbitrators (see ATF 107 Ia 155, rec. 3b, p. 161; 93 I 265 rec. 3c; 84 I 39 rec. 6a, which

...theless distinguish between the arbitral tribunals of chambers of commerce that are involved in these cases, and those created by associations; concerning this case, see Thomas Clay, *L'arbitre*, Dalloz 2001, note 477). In order to justify the continued use of this system, the CAS Secretary General advocates that arbitrators who are asked to decide disputes in this very specific context should be specialised (Reeb, *op. cit., ibid.*). This is a valid point, which supports the notion that the status quo should be maintained. In competitive sport, particularly the Olympic Games, it is vital both for athletes and for the smooth running of events, that disputes are resolved quickly, simply, flexibly and inexpensively by experts familiar with both legal and sports-related issues (for more information on the advantages of judicial arbitration in the world of sport, see Zen-Ruffinen, *op. cit.*, note 1420). The idea of a list of arbitrators, as used by the CAS, helps to achieve these objectives. Thanks in particular to the creation of ad hoc divisions, it enables the parties concerned to obtain a decision quickly, following a hearing conducted by persons with legal training and recognised expertise in the field of sport, whilst protecting their right to a fair hearing. Furthermore, since the CAS arbitrators are regularly informed of developments in sports law and CAS case-law, the system in question, which also helps to eliminate the problems linked to the international nature of many sports-related disputes, ensures a degree of consistency in the decisions taken (concerning the latter two points, see Zen-Ruffinen, *ibid.*).

Following the changes introduced since the 1994 reforms, the use of a list of arbitrators is now in keeping with the constitutional demands of independence and impartiality applicable to arbitral tribunals. At least 150 names must appear on the list of arbitrators and the CAS currently has around 200. Whatever the plaintiffs may argue, parties therefore have a wide choice of names to choose from, even taking into account the nationality, language and sport practised by athletes who appeal to the CAS. Besides, the importance of these three factors should be put into perspective: an arbitrator's nationality should not, under normal circumstances, influence his appointment, especially since all arbitrators must, or at least ought to, be independent of the parties, including the one which appointed them. Since the CAS working languages are French and English (Art. R29 of the Code), the issue of language should also not be a determining factor in the choice of an arbitrator. As far as the question of sports disciplines is concerned, the plaintiffs seem to have grasped the wrong end of the stick: they have no right to demand that their case be heard by arbitrators who once practised the same sport as them. The most important thing in this respect is that the list should comprise a wide range of competent arbitrators with a certain level of experience of competitive sport. Athletes are free to appoint arbitrators from another discipline if they think they seem more independent and impartial. The disadvantages of choosing an arbitrator from another sport should not be exaggerated, since the issues dealt with by the CAS (doping, abuse of officials, violence on the field of play, etc.) are more or less common to all sports. Doping cases in particular tend to be very similar, irrespective of the sport practised by the offender. A question mark remains over what would happen under the exceptional circumstances whereby, on account of the specific nature of the object of a dispute and of the issues involved, it proved necessary to

685

appoint an arbitrator specialising in the sports discipline practised by an athlete involved in proceedings before the CAS, and where the arbitrator concerned was not sufficiently independent of the IOC. This does not apply in the present case.

Furthermore, the establishment of an independent body – the ICAS – which is responsible for drawing up the list of arbitrators, means that the IOC cannot influence the composition of the list. The same is true regarding the appointment of arbitrators to the list, given that the IOC can only propose one-fifth of the candidates. It is also worth mentioning that a further fifth are meant to be chosen to protect the interests of the athletes, thus enabling athletes involved in a procedure before the CAS to select from a pool of at least thirty arbitrators appointed on that basis.

Nevertheless, the list of arbitrators is perhaps not as legible as it might be. It would be preferable, with this in mind and with a view to greater transparency, if the published list were to indicate, alongside the name of each arbitrator, which of the five categories mentioned in Article S14 they belonged to (arbitrators chosen from those proposed by the IOC, the IFs and the NOCs; arbitrators chosen to safeguard the interests of the athletes; arbitrators chosen from among persons independent of the three aforementioned bodies) and, for those in two of these categories, by which IF or NOC they were proposed (on the same subject, see Schillig, *op. cit.*, p. 159). The parties would then be able to appoint their arbitrator with full knowledge of the facts. For example, it would prevent a party in dispute with the IOC, in the belief that he was choosing an arbitrator completely unconnected to the latter, from actually appointing a person who was proposed by that organisation but who is not an IOC member (see Art. S14 of the Code, which advocates this practice).

As for the other points raised, the rules concerning the independence and challenge of arbitrators (Articles R33 and R34 of the Code), interpreted in the light of Articles S11 and S21 of the Code, prevent members of the IOC or its Commissions or persons too closely connected to it for other reasons such as the method of their selection, from acting as arbitrators in cases in which the IOC is a party.

It should also be pointed out that the CAS, which functions as an appeals body, independent of the international federations, cannot be compared to a permanent arbitral tribunal set up by an association and responsible to rule in the last instance on internal disputes. As a body which reviews the facts and the law with full powers of investigation and complete freedom to issue a new decision in place of the body that gave the previous ruling (Reeb, Revue, *ibid.*), the CAS is more akin to a judicial authority independent of the parties. Used by the CAS, therefore, a list of arbitrators does not give rise to the same objections as those raised when such a list is used by an arbitral tribunal created by an association. Incidentally, the so-called open list system where, unlike the closed list system used by the CAS, the parties (or one party) are able to choose an arbitrator who is not listed (see Clay, *op. cit.*, note 478, p. 400) and which is favoured by some authors (see in particular: Baddeley, *op. cit.*, p. 274, Stephan Netzle, *Das Internationale Sport-Schiedsgericht in Lausanne. Zusammensetzung, Zuständigkeit und Verfahren, in Sportgerichtsbarkeit*, in *Recht und Sport*, vol. 22, pp. 9 et seq., 12) is not necessarily the answer. On the contrary, with regard to the effectiveness of the arbitral tribunal, the open list system carries the risk that one or more non-specialist

...bitrators within the tribunal might be inclined to act as if they were lawyers representing the parties that had appointed them (see Schillig, *op. cit.*, p. 160).

The plaintiffs submit that the way in which the ICAS and CAS are financed, which has already been criticised by legal writers, means that these institutions are not financially independent of the IOC. We should point out straight away that, by way of legal opinion, the plaintiffs merely quote the opinion expressed, without any grounds at all, by their representative in the aforementioned article (RDS 116/1997 I, pp. 47 et seq.). Nevertheless, it is wrong to suggest, as the plaintiffs claim, that the IOC has complete control over the financing of the ICAS and CAS. In accordance with Art. S6 para. 5 of the Code, it is the ICAS that looks after the financing of the CAS and approves its budget and annual accounts. To this end, it receives and manages the funds allocated to its operations. The activities of the two bodies are funded by the IOC, the IFs and the ANOC in the proportions laid down in the aforementioned Art. 3 of the Paris Agreement. According to this provision, the IOC only finances one-third, with the rest being covered by the other organisations, which are independent of the IOC. Admittedly, this financing structure involves deductions from the funds allocated by the IOC to the said organisations as part of the revenue earned from the sale of television rights for the Olympic Games. However, this does not in any way change the financing structure of the ICAS and CAS. It is merely a collection mechanism (deduction at source) used for practical reasons in order to prevent the ICAS from having to collect directly from each of the numerous IFs and from the ANOC or its various members the funds it and the CAS need to function. Furthermore, it is hard to see how the fact that the Olympic Games and all related rights are the exclusive property of the IOC (see Art. 11 of the Olympic Charter) would give the latter sole control of the remaining two-thirds of the funds allocated to the ICAS. If the IOC were to take the rather preposterous decision to keep for itself all the money received from the sale of television rights for the Olympic Games, the financing structure set out in Art. 3 of the Paris Agreement would still apply and the other organisations that are currently required, alongside the IOC, to fund the ICAS and CAS would probably have to look elsewhere for the resources needed to meet their obligation. Regarding the operational costs of the CAS ad hoc divisions, the CAS explains in its responses to the appeals that these are covered by the ICAS and the Organising Committee of the event in question, but never by the IOC. This leads us to conclude that the financing structure of the CAS is not likely to jeopardise the independence of this arbitral institution vis-à-vis the IOC.

On a more general level, it is also hard to imagine that any other possible structure could ensure the financial autarky of the CAS, and the plaintiffs do not propose any alternative arrangement. This state of affairs is linked to the extremely hierarchical structure of sport at both international and national levels (on this point, see Zen-Ruffinen, *op. cit.*, notes 103 et seq.). The relationship between the athletes and the organisations that look after the various sports is a vertical one, as opposed to the horizontal ties between the parties to a contractual agreement. This structural difference between the two types of relationship does affect the financing of the bodies responsible for resolving the disputes that may result. Indeed, although an equal financing structure is logical when a dispute arising from a contractual relationship is referred to

an arbitral tribunal, whether the costs are actually paid by the parties themselves or by organisations representing their interests (employers' federations, trade unions, home-owners' and tenants' associations, etc.), this does not apply when an arbitral tribunal is asked to examine the validity of a sanction imposed by the supreme body of a sports federation against one of its members: in the latter scenario, the financial means of the opposing parties (the federation and the sanctioned athlete) are extremely unequal (apart from a few rare exceptions) and the person at the bottom of the pyramid, i.e. the athlete, is much less able to contribute.

To conclude our discussion of the financing of the CAS, it should be added that there is not necessarily any relationship of cause and effect between the way a judicial body is financed and its level of independence. This is illustrated, for example, by the fact that State courts in countries governed by the rule of law are often required to rule on disputes involving the State itself, without their judges' independence being questioned on the ground that they are financially linked to the State. Similarly, the CAS arbitrators should be presumed capable of treating the IOC on an equal footing with any other party, regardless of the fact that it partly finances the Court of which they are members and which pays their fees.

**3.3.3.3** The CAS has produced evidence to show that it is not the vassal of the IOC. Its Secretary General has listed the cases in which the IOC has been a party to CAS proceedings. According to his report, which has not been disputed, of the twelve cases submitted to the CAS since 1996 in which it was the respondent (excluding the cases currently pending), the IOC won eight and lost four. It is also interesting to note that arbitrators C._____, E._____ and D._____, who dealt with the appeals lodged by the plain-tiffs, have all been part of Panels that have ruled against the IOC. Of course, this statistic only has indicative value, but it nevertheless provides concrete evidence of the independence and freedom with which the CAS acts in relation to all parties, including the IOC.

A true "supreme court of world sport", to use the phrase coined by Juan Antonio Samaranch, former IOC President (quoted by Kéba Mbaye in Digest II, p. xii), the CAS is growing rapidly and continuing to develop (see Reeb, Digest II, p. xxx). An important new step in its development was recently taken at the World Conference on Doping in Sport, held in Copenhagen at the beginning of March 2003. This Conference adopted the World Anti-Doping Code as the basis for the worldwide fight against doping in sport. Many States, including China, Russia and the United States of America, have adopted the Copenhagen Declaration on Anti-Doping in Sport, thus undertaking to support a process which should result in the Code entering into force in time for the 2006 Olympic Winter Games. Under the terms of Art. 13.2.1 of the new Code, the CAS is the appeals body for all doping-related disputes related to international sports events or international-level athletes. This is a tangible sign that States and all parties concerned by the fight against doping have confidence in the CAS. It is hard to imagine that they would have felt able to endorse the judicial powers of the CAS so resoundingly if they had thought it was controlled by the IOC.

This new mark of recognition from the international community shows that the CAS is meeting a real need. There appears to be no viable alternative to this

institution, which can resolve international sports-related disputes quickly and inexpensively. Certainly, the plaintiffs have not suggested one. The CAS, with its current structure, can undoubtedly be improved. This has already been noted in relation to the legibility of the list of arbitrators (see rec. 3.3.3.2, above). Having gradually built up the trust of the sporting world, this institution which is now widely recognised and which will soon celebrate its twentieth birthday, remains one of the principal mainstays of organised sport.

**3.3.4** To conclude, it is clear that the CAS is sufficiently independent vis-à-vis the IOC, as well as all other parties that call upon its services, for its decisions in cases involving the IOC to be considered true awards, equivalent to the judgements of State courts.

Consequently, the public-law appeals lodged against the CAS awards in the cases between the two X._____ skiers and the IOC are admissible. However, the complaint concerning the unlawful composition of this arbitral tribunal, also lodged by the plaintiffs, is unfounded.

# 4.

**4.1** In a second ground of appeal, also based on Art. 190 para. 2 (a) of the LDIP, the plaintiffs dispute not the independence of the CAS as such, but that of the three arbitrators who made up the Panel which rendered the four contested awards.

They argue that, when a small number of arbitrators travel to the Olympic Games host city in order to form a CAS ad hoc division, they forge such close personal and professional relationships with one another that their independence is affected when, at a later time and in different roles, they are involved in cases submitted to the CAS, with one functioning as a Panel member and another as a lawyer or associate of the lawyer of one of the parties. For example, arbitrator E._____ had worked alongside the IOC lawyer (Mr F._____) in one such division which had dealt with a case involving the IOC. He, as well as President C._____, had also served alongside Mr G._____, associate of the FIS counsel (Mr I._____). D._____, meanwhile, had also been a member of an ad hoc division alongside lawyer F._____. Under these circumstances, which were sufficient to cast doubt over their independence and impartiality, these three arbitrators, in the plaintiffs' view, should have disqualified themselves. The plaintiffs dispute the claim that they acted too late in this regard and accuse the CAS Panel of violating procedural public policy by taking a decision itself regarding its own disqualification instead of leaving that decision to the ICAS, which holds exclusive power in this area.

In their responses to the appeals, the IOC and FIS both dispute that the circumstances described by the plaintiffs, which they mentioned too late, constitute a ground for disqualification.

For its part, the CAS claims that the plaintiffs never submitted to the ICAS a request for a challenge in due form. The plaintiffs try to refute this in their supplementary statement of appeal. In their view, a request for a challenge need not be submitted in written form and may be addressed to the ICAS via the CAS.

## 4.2

**4.2.1** An award can be attacked if it is incompatible with public policy (Art. 190 para. 2 (e) LDIP). A distinction is made between material public policy and procedural public policy. Procedural public policy guarantees the parties the right to an independent ruling on the conclusions and facts submitted to the arbitral tribunal in compliance with the applicable procedural law; procedural public policy is violated when fundamental, commonly recognised principles are infringed, resulting in an intolerable contradiction with the sentiments of justice, to the effect that the decision appears incompatible with the values recognised in a State governed by the rule of law (see ATF 128 III 191 rec. 4a, p. 194 and the quoted judgement). However, it should be explained that not every violation, even arbitrary, of a procedural rule constitutes a violation of procedural public policy. Only the violation of a rule that is essential to ensure the fairness of proceedings can be taken into consideration (ATF 126 III 249 rec. 3b and references; Corboz, *op. cit.*, p. 29).

**4.2.2** The challenge of a CAS arbitrator is in the exclusive power of the ICAS (Art. R34 of the Code; see also Art. S6 para. 4 of the Code). In the present case, the Panel decided itself on its own disqualification at the hearing held in Lausanne on 4 and 5 November 2002, the discussions at which were recorded on CD-Rom. The fact that it assumed the right to take such a decision does not mean that it violated procedural public policy. On this point, it should be recalled that, according to the case-law of the Federal Supreme Court, a tribunal which is challenged en bloc may itself declare the request inadmissible if it is unreasonable or clearly unfounded, even though the applicable procedural law states that the decision should be taken by another authority (judgements 1P.391/2001 of 21 December 2001, rec. 3.1; 1P.553/2001 of 12 November 2001, rec. 2b; 1P.396/2001 of 13 July 2001, rec. 2a; ATF 114 Ia 278 rec. 1, p. 279; 105 Ib 301 rec. 1c and 1d, p. 304). If this exception to the rule is taken into account in the present case, the arbitrators cannot be accused of violating procedural public policy. Such is the case here, since the request for a challenge lodged by the plaintiffs was clearly not only inadmissible (see rec. 4.2.2.1) but also completely unfounded (see rec. 4.2.2.2).

**4.2.2.1** A party wishing to challenge an arbitrator must cite the ground for the challenge immediately after becoming aware of it (ATF 128 V 82 rec. 2b, p. 85; 126 III 249 rec. 3c and references). This judicial rule, which expressly appears in Art. R34 para. 1 of the Code, refers both to the grounds for a challenge that the party concerned was actually aware of and to those it might have become aware of if it had paid sufficient attention (rec. 6, not published, of ATF 119 II 271).

On 7 May 2002, the President of the Panel issued a proceedings order for the cases of A._____ v. IOC and B._____ v. IOC. This proceedings order, which was signed by the counsels of both parties, contained, *inter alia*, the names of the three arbitrators and those of the parties' counsels. A similar order was issued on 17 July 2002 for the cases of A._____ v. FIS and B._____ v. FIS. Having read these

orders, the plaintiffs must have been aware of who would be judging their respective appeals and whom their opponent had appointed to represent its interests. It was therefore their responsibility to take the necessary steps to verify the independence of the arbitrators appointed to hear their cases. However, they waited several months before raising the question in fine litis. The practical reasons they give for this procrastination appear flimsy to say the least. In particular, the alleged difficulty of gaining access to documents and sources of information is barely credible, given that these were world-class athletes represented by a powerful national federation and involved in a case where the stakes were tremendously high (loss of a gold medal won at the Olympic Games, long-term suspension from all international competitions, etc.). Besides, as the CAS notes in its responses to the appeals, all the information concerning the personal circumstances that the plaintiffs wished to raise as grounds for a challenge were published on the CAS Internet site at the time when the appeals were lodged. It was therefore easily accessible, even from X._____, where the plaintiffs' main counsel was domiciled.

By themselves dismissing a request for a challenge that was clearly submitted late, the Panel members therefore did not violate procedural public policy. It therefore does not matter whether that request should have been made in writing and whether it was acceptable to address it to the ICAS via the CAS. Discussion of this point, which began in the responses to the appeals and continued in the supplementary statement of appeal that the plaintiffs wished to add to the file, is irrelevant to the outcome of the dispute. There is therefore no need to bring it to a conclusion.

**4.2.2.2** Under Art. 180 para. 1 (c) of the LDIP, an arbitrator may be challenged if the circumstances permit legitimate doubt about his independence. An arbitrator's independence means that he should not be linked in any way to the party which appointed him, but should ultimately be only a representative of that party. It can only be evaluated on a case-by-case basis; there are no absolute grounds for a challenge. Doubts about the independence of an arbitrator must be based on the existence of objective facts which are likely, for a rational observer, to arouse suspicion concerning the arbitrator's independence. On the other hand, the purely subjective reactions of one party should not be taken into account. The principles developed by the Federal Supreme Court on the basis of Art. 58 para. 1 (a) (now Art. 30 para. 1) of the Constitution concerning the challenge of State judges also apply to members of arbitral tribunals. However, account should be taken of the different context of the relations between a State court judge or an arbitrator on one hand, and the parties and their lawyers on the other. For those involved in private arbitration, these relations are more frequent due to economic and professional necessities, with the result that they alone should not be considered a ground for a challenge (see aforementioned judgement 4P.224/1997, 9 February 1998, rec. 3, published in RSDIE 1999, pp. 579 et seq.; and, on the same subject, Poudret/Besson, *op. cit.*, note 419, p. 372). It has even been ruled that the friendship (use of the familiar form of address plus mutual recommendations) between an arbitrator and the lawyer of one of the parties was, in principle, insufficient grounds for a challenge (see aforementioned judgement 4P.292/1993, 30 June 1994, rec. 4a, mentioned by Corboz, *op. cit.*, p. 17, footnote 79).

Generally speaking, a judge cannot be challenged simply on the ground that he dealt with one of the parties in a previous procedure, even if he ruled against that party in the previous case (ATF 114 Ia 278 rec. 1; 113 Ia 407 rec. 2a, p. 409 in fine; 105 Ib 301 rec. 1c). The same should apply to the field of arbitration, particularly international arbitration (see, *inter alia*, Lalive/Poudret/Reymond, *op. cit.*, note 8 ad Art. 180 LDIP, p. 343; Jermini, *op. cit.*, note 327). In the small world of international arbitration, individuals often find themselves working together on different cases; as the IOC points out, it is not uncommon for the same person to be an arbitrator in one particular case and the counsel to a party in another case, pleading in front of one of his fellow arbitrators from the previous case. Such contact will inevitably become even more regular if, as in the CAS, the arbitrators appear on a closed list and need to have legal training as well as recognised competence with regard to sport. The fact that each member of the Panel that dealt with the plaintiffs' cases was, during the Olympic Games, part of the CAS ad hoc division alongside the lawyer of one of their opponents (IOC) or the associate of the lawyer of their other opponent (FIS) is therefore not, in itself, likely to permit legitimate doubt concerning their independence, particularly since arbitrators C._____, E._____ and D._____ have all been part of Panels that have rendered awards unfavourable to the IOC. Additional circumstances would be required if these arbitrators were to be challenged. Those mentioned by the plaintiffs – that the arbitrators shared meals together, probably stayed at the same hotel and travelled together – are certainly not sufficient. Given the type of people involved, it can be assumed that these contacts are unlikely to affect their independence of mind and opinion. In fact, according to the case-law of the Federal Supreme Court, it should be assumed that the members of a tribunal are capable of rising above the eventualities linked to their appointment when they are required to render concrete decisions in the discharge of their duties (ATF 126 I 235 rec. 2c, p. 239; 119 Ia 81 rec. 4a, p. 85).

Therefore, the challenge of the arbitrators who formed the Panel appears clearly unfounded. By dismissing it themselves, the arbitrators concerned did not in any way infringe procedural public policy.

## 5.

Having alleged violations of equality of the parties, the right to a fair hearing and public policy, the plaintiffs, in their final set of reasons, criticise the way in which proceedings before the Panel were conducted.

**5.1** According to Art. 190 para. 2 (d) of the LDIP, an award can be attacked if the equality of the parties or their right to be heard in an adversarial proceeding was not respected.

The right to be heard in this case is no different to that enshrined in Art. 29 para. 2 of the Constitution. According to case-law, the right to be heard includes, in particular, the chance for the defendant to explain his actions before a decision is taken against him, the right to produce evidence likely to influence the final decision, the right of access to the file, the chance to participate in the taking of evidence, to inspect

it and to determine one's position in that connection (ATF 126 I 15 rec. 2a/aa; 124 I 49 rec. 3a; 241 rec. 2; 124 II 132 rec. 2b; 124 V 180 rec. 1a, 372 rec. 3b).

Art. 190 para. 2 (d) of the LDIP guarantees not only the right to be heard, but also the right to an adversarial proceeding. The adversarial principle enables each party to determine their position vis-à-vis the arguments of their opponent, to examine and discuss the evidence produced by the latter and to disprove it using their own evidence (ATF 117 II 346, rec. 1a, pp. 347 et seq.; 116 II 639 rec. 4c, p. 643).

Finally, the equality of the parties, which is expressly enshrined in Art. 182 para. 3 of the LDIP, is also protected by Art. 190 para. 2 (d) of the LDIP. It implies that proceedings should be regulated and conducted in such a way that all parties have the same opportunities to argue their case. It demands that the parties should have access to the same tools, although procedural rights may clearly be subject to reasonable non-discriminatory conditions (Corboz, *op. cit.*, p. 22).

**5.2** In the light of these principles, it is necessary to consider the various complaints made by the plaintiffs concerning the conduct of the arbitration proceedings.

**5.2.1** At the beginning of the hearing of 4 and 5 November 2002, the plaintiffs formally requested permission to call as a witness Professor H._____, a specialist in medical toxicology and former director of the Swiss doping analysis laboratory. The Panel refused this request for the reasons set out in its awards (ch. 2.5 to 2.18), which particularly included the fact that the request had been submitted late and that the letter sent by Prof. H._____ could not be considered to be a "witness statement" (regarding this notion, see Podret/Besson, *op. cit.*, note 657). It nevertheless allowed Prof. H._____ to remain in the arbitration room throughout the hearing and to assist the plaintiffs' counsel in the cross-examination of the IOC and FIS witnesses. Incidentally, the Panel did not take into account the objection raised by the plaintiffs, who claimed that they had not been able to read the voluminous witness statements of the IOC witnesses (K._____ and L._____) until a few days before the hearing began.

According to the plaintiffs, in order to guarantee the equality of the parties, the arbitrators should either have agreed to call Professor H._____ as a witness or discarded the written declarations of the IOC witnesses. Their failure to do either amounted to a violation of the right to be heard as well as of the equality of the parties.

The grounds of this complaint do not meet the requirements set out by case-law relating to Art. 90 para. 1 OJ and which are also applicable to public-law appeals in the sense of Art. 191 para. 1 LDIP and Art. 85 (c) OJ. Firstly, the plaintiffs do not properly challenge the detailed grounds given by the arbitrators in their awards for rejecting the request for Prof. H._____ to be called as a witness; in particular, they fail to explain why they think the arbitrators were wrong to consider that the written declaration produced by Prof. H._____ did not constitute a witness statement. Secondly, the plaintiffs also do not criticise the ground on which the arbitrators dismissed their objection concerning the late submission of the witness statements of Professor K._____ and Dr L._____ (ch. 2.24 of the awards). It goes without saying that if,

regarding the two points raised by the plaintiffs, the Panel respected the Code and its own proceedings orders, the plaintiffs' claim that their right to be heard and the equality of the parties were violated must be dismissed.

This complaint is therefore inadmissible.

**5.2.2** The subsequent complaint is also groundless. The plaintiffs criticise the Panel for failing to grant their request for the witness statements filed by the FIS to be rejected because they had not been signed. However, they do not question the various reasons given by the arbitrators for dismissing their request (ch. 2.19 to 2.22 of the awards). The arbitrators considered, *inter alia*, that the objection raised by the plaintiffs had been submitted too late (ch. 2.21 of the awards). This is not disputed by the plaintiffs, whose claim that Article 13 of the Code of Obligations (CO) was breached is therefore dismissed.

**5.2.3** The plaintiffs also deplore the fact that the witnesses were allowed to be present at the hearing before they were questioned and that they were therefore inevitably influenced by preceding witnesses, the parties' statements and the proceedings in general. They believe this to be a breach of procedural public policy. This argument is groundless. The plaintiffs do not refer to any provision of the Code which either prevents witnesses from attending the debates before they are questioned or, in particular, obliges them to retire while another witness is being questioned. Neither do they mention any CAS case-law or legal opinion that suggests this should be the case. Furthermore, it cannot be argued that this rule is essential to the fairness of the proceedings. Besides, arbitration rules generally leave it to the arbitral tribunal to decide whether a witness should retire during part of the proceedings, particularly during the testimony of other witnesses (see, for example, Art. 54 (f) of the WIPO Arbitration Rules, Art. 4 of the Rules and Procedures of the American Arbitration Association and Art. 25 para. 4 of the UNCITRAL arbitration rules).

We should also mention that, in any case, following the example of the CAS and the FIS, on 22 October 2002 the plaintiffs' counsel himself asked the CAS to allow the expert witness called by the plaintiffs – Professor M._____ – to be present in the chamber throughout the hearing; that this request was accepted the following day by the President of the Panel; and therefore that, in order to safeguard the equality of the parties, a similar measure applied to the other witnesses called by the IOC and FIS. The plaintiffs are therefore not entitled to complain about a measure which was intended solely to ensure that the parties were treated equally.

**5.2.4** Finally, the plaintiffs deplore, in vain, the fact that all their requests were dismissed, whereas the procedural errors attributable to the FIS and IOC were never punished. An ill-founded request should not be granted, nor a legitimate procedural measure sanctioned on the grounds of equal treatment.

**5.3** All the complaints concerning the conduct of the arbitral procedure therefore appear either groundless or inadmissible. Consequently, the four appeals must be dismissed insofar as they are admissible.

**6.**

( ... )

**On these grounds, the Swiss Federal Tribunal hereby rules:**

1. Cases 4P.267/2002, 4P.268/2002, 4P.269/2002 and 4P.270/2002 are joined together.

2. The public-law appeals filed by A._____ concerning cases CAS 2002/A/370 and CAS 2002/A/397 and by B._____ concerning cases CAS 2002/A/371 and CAS 2002/A/398 are dismissed insofar as they are admissible.

3. ( ... )