# EXHIBIT 11

Dockets.Justia.com

MAURICE M. SUH
DANIEL L. WEISS
ANDREW DEMKO
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue, Suite 5115
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
MSuh@gibsondunn.com
DWeiss@gibsondunn.com
ADemko@gibsondunn.com

Attorneys for Justin Gatlin

## IN THE COURT OF ARBITRATION FOR SPORT

IN THE MATTER OF JUSTIN GATLIN,

CAS Case No: 2008/A/1461; 2008/A/1462

UNITED STATES ANTI-DOPING AGENCY v. JUSTIN GATLIN

IAAF v. UNITED STATES OF AMERICA TRACK AND FIELD AND JUSTIN GATLIN

---

## BRIEF SUBMITTED BY JUSTIN GATLIN

---

# I. INTRODUCTION AND STATEMENT OF CASE

This case stands for simple principles. These principles cannot be ignored: A prior case that does not constitute a prior sanction can not be used to enhance a suspension in a subsequent case, that a US entity can not be forced to violate US law by imposing a sanction and that someone who provides substantial assistance in the fight against doping should be rewarded for it. As applied here, Justin Gatlin's prior positive test in 2001 ("2001 positive test") for a prescription drug for his diagnosed medical condition, Attention Deficit Disorder ("ADD"), should not be used to enhance his sanction in *USADA v. Justin Gatlin*, Case No. AAA NO. 30 190 00170 07 ("Appealed Case"). This principle rests on a number of independent grounds, each of which is sufficient to support the imposition of no more than a two year sanction in the Appealed Case:

- The 2001 Case does not constitute a sanction that can be used for purposes of enhancement. The 2001 Case was not adjudicated on the merits and did not determine fault. Most importantly, the 2001 Case was simply held at the request of the IAAF in order to allow for the IAAF to reinstate Justin. The panel in the 2001 Case imposed a *provisional suspension* in order to allow the reinstatement to occur. Critically, the panel retained jurisdiction in the event that Justin's reinstatement did not occur, thereby allowing the opportunity to correct any failures. Indeed, once the reinstatement did occur, the 2001 panel stated *"the provisional sanction no longer had effect."* Having no effect means exactly that – it can not and should not be used to enhance Justin's sanction in the Appealed Case.

- Justin was not at fault in the 2001 Case. In 2001, CAS did not apply a strict liability standard, instead requiring a finding of fault in order to impose a sanction. If this Panel reviews the facts of the 2001 Case – an unnecessary step given the foregoing point – abundant facts substantiate that Justin was not at fault. He acted reasonably given the circumstances and that even if asked, the IAAF would not have granted Justin a TUE for Adderall.

- To the extent that this Panel considers the 2001 Case as a sanction, it should be classified as a violation pursuant to WADA Code 10.3 and any sanction in the Appealed Case should be imposed pursuant to WADA Code 10.6.3.

2

- Any sanction for the 2001 Case, and any enhancement of the Appealed Case by way of the 2001 Case, would violate the Americans with Disabilities Act ("ADA"). The importance of the ADA in this case is that the entity responsible for enforcing any sanction in this case, the US Track and Field Association ("USATF"), can not be ordered to violate U.S. law. To impose an enhanced sanction would constitute a violation of the ADA because it unfairly penalizes Justin for his learning disability and presented with him the Hobbesian choice of learning or running – clearly prohibited by the ADA.

- Any sanction for the 2006 Case should be reduced pursuant to WADA Code 10.5.3. for substantial assistance. Justin's extraordinary assistance in the fight against doping deserves the greatest reduction in the applicable sanction.

Behind each of these independent grounds supporting the imposition of a sentence no greater than two years, however, lies the even more basic principle that rules should apply equally as to the anti-doping agencies as to athletes, and that enhancement of sanction must be applied judiciously and fairly.

## A.    STATEMENT OF JURISDICTION AND PROCEDURAL HISTORY

In January 2008, a three-arbitrator panel of the North American Court of Arbitration of Sport of the American Arbitration Association ("AAA") issued its decision in *USADA v. Justin Gatlin*, Case No. AAA No. 30 190 00170 07 (the "Appealed Case"). Exhibit 1. The majority panel's decision concluded that: (1) the alleged anti-doping rule violation had been established by a comfortable satisfaction and (2) Mr. Gatlin did not satisfy the requirements of Article 10.5.1 and 10.5.2 of the WADA Code. The majority panel also concluded that the 2001 positive test result should be considered a first offense, and thus, the 2006 anti-doping rule violation was treated as second offense. A contemporaneously filed dissenting opinion concluded that the 2001 positive test should not be considered a first offense because the 2001 AAA panel did not find that Justin was at fault for the positive test and, had the 2001 AAA panel found Justin was at fault, the imposition of a sanction for the 2001 positive test result would have been in violation of the American with Disabilities Act. Exhibit 2. On January 21, 2008, Mr. Gatlin filed his

3

notice of intent to appeal, and on January 24, 2008, the IAAF filed its notice of intent to appeal. The Court of Arbitration for Sport ("CAS") has jurisdiction over this appeal pursuant to Article 10 of the USADA Protocol and Article 60 of the IAAF rules.

From the outset of his appeal, Justin has requested an expedited hearing such that if the panel awards Justin the relief he is seeking, he will have the opportunity to compete in the USATF Olympic trials. The parties have agreed to the expatiated briefing schedule currently in effect, and have proposed to have a hearing in the middle to late April, at the Panel's convenience, to provide sufficient time for the Panel, at the very least, to issue a statement of decision by the end of May 2008. In sum, CAS has scheduled this appeal on a timetable that would allow for a final decision to be rendered in this appeal such that, if he were to prevail, Justin Gatlin would be able to participate in the June trials, and if he were to qualify, to participate in the 2008 Beijing Olympic Games.

## B.    PRAYER FOR RELIEF

Appellant seeks an order:

1.    That the Appealed Case be *reversed* such that the Panel issue a finding that, even if Appellant committed an anti-doping rule violation in 2006, it is to be considered a first offense and punishable by, at most, a two year sanction starting in May 2006;

2.    Such further relief as this Panel may deem necessary to effect the relief sought above.

### *In the alternative:*

1.    That the Appealed Case be *reversed* such that the Panel issue a finding that, even if Appellant committed an anti-doping rule violation and it is considered a second

4

offense, but in light of the circumstances of both offenses, a two year sanction starting in May

2006 be imposed.

## C.    STANDARD OF REVIEW

CAS Art. R57 provides that this is a *de novo* hearing, and that CAS shall review all of the

facts and the law.  As such, neither the Panel nor the parties are constrained in any way by the

evidence that was previously presented; to the contrary, the Panel is entitled to consider new

evidence.  See H v. FIM (CAS 2000/A/281).

## D.    RECORD FROM THE APPEALED CASE, ITS PREVIOUSLY FILED
## EXHIBITS AND TESTIMONY

Appellant respectfully requests that the entire record from the Appealed Case be made

part of the record in this case.  The record includes:

1.    The pretrial motions, responses and briefs of the Parties, inclusive of
exhibits to those filings;

2.    Any stipulations entered into between the parties;

3.    Appellant's trial exhibits;

4.    Appellee's trial exhibits; and

5.    The Final Award and accompanying dissent.

## II. STATEMENT OF FACTS

## A.    JUSTIN GATLIN SUFFERS FROM ATTENTION DEFICIT DISORDER

Justin Gatlin has been afflicted by a severe learning disability for nearly his entire life.  In

1991, when Justin was only nine years old, his difficulties learning in the classroom became

readily apparent.  Justin's teachers recommended that his parents seek medical treatment for his

poor school performance and apparent inability to learn.  After being thoroughly evaluated by

the Navy doctor at the naval base where his father worked, Justin was diagnosed with ADD.

ADD or Attention Deficit/Hyperactivity Disorder ("AD/HD") is a condition in which both

children and adults show problems with attention, impulsivity, and overactivity. ADD is a biological, brain-based condition, that can lead to poor school or work performance, poor social relationships, and a general feeling of low self-esteem. This diagnosis would be consistently confirmed by doctors throughout his life, including most recently an international panel of medical experts. Exhibit 3 at 3. As a child, Justin was proscribed Ritalin to treat his disorder, which, for a time, was moderately effective. *Id.*

Throughout his adolescence, Justin's disability caused him to be under the regular treatment of physicians, who would monitor and adjust his prescriptions as necessary. Justin's physician began to prescribe him Adderall in March 1996 to treat his ADD, shortly after Adderall became approved by the Federal Drug Administration for the treatment of ADD. Exhibit 4, Medical Records at 5-20-1996. Adderall is a drug that contains a small amount of amphetamine, a stimulant. Stimulants affect chemicals in the brain, and for people with ADD, this affect can increase their focus and attention. Adderall has absolutely no performance-enhancing benefit.

After only a few months of usage, Justin reported "good improvement comparing the new Adderall with the old Dexedrine [Ritalin] tablet." *Id.* at 9/11/96. Indeed, the change to Adderall made Justin "more attentive and focused" and he started to do better in school. *Id.* On the occasions that Justin failed to take his prescribed medicine, his academic performance decreased sharply, interfering with his ability to learn. Indeed, at one point, Justin decreased his dosage from 20 mg to 10 mg. He was rewarded with a sharp decline in his grades. *Id.* at 2-24-99.

B.    JUSTIN GATLIN'S HOBBESIAN CHOICE: LEARNING OR RUNNING

Justin attended the University of Tennessee ("UT") on a full athletic scholarship for track. He has always been a standout athlete. During his senior year in High School, Justin was ranked number 1 for all high school athletes in the 300 meter hurdles. Justin had scholarship

6

offers from nearly every major track powerhouse. He considered University of Arkansas, Louisiana State University before choosing UT.

The summer before Justin started his freshman year at UT, his physician, Dr. Barnett, warned him about the academic rigors of college and how his disability would affect his success. In particular, Dr. Barnett explained that his ADD treatment regimen would have to be adapted to meet these new challenges, because if Justin failed to perform to NCAA standards, he could be disqualified from participating in the track program. Dr. Barnett thus recommended that Justin be monitored by UT's Student Health Services, which Justin did. Throughout the school year, Justin continued to take Adderall to treat his disability at the direction of Student Health Services.

The academic challenges that Justin faced in college as a result of his disability were immediately recognized by UT. Justin was placed in a Special Education program to assist him with class work and other accommodations for his disability were made, including giving him extended time on his examinations and having more access to tutors than otherwise allowed under NCAA regulations.

Despite his participation in the Special Education program, the Adderall treatment and hard work, Justin struggled academically while at UT. During his first semester at UT, even on Adderall, Justin withdrew from his Health and Wellness class and received a grade lower than a "C" in English Composition. Exhibit 5. Justin believes that he struggled in English and Health and Wellness because of the timing of his classes with respect to when he took his medication. Justin took Adderall in the morning and his English and Health and Wellness class were not until the afternoon. *Id.* Because a side effect of Justin taking Adderall was drowsiness and lethargy, which affected his performance during track and field practice, Justin did not take his medication

7

in the afternoon.  Justin's second semester at UT was worse.  He received no credit in English

Composition for the second straight semester, and he also received no credit for his writing

workshop class.  In addition, Justin received a "D" in one of his favorite pastimes: Drawing and

Design.  Again, Justin struggled in these classes especially in the Spring semester, because Justin

would stop taking his Adderall medication on Thursday mornings so as not to feel the effects of

the medication on his weekend track meets.  Justin did not receive credit for his English class or

his Health and Wellness Class, which put his academic eligibility seriously in doubt.

Despite his struggle in the classroom, Justin did not struggle on the track.  He led UT to

the SEC and NCAA championships in his freshman year.  Individually, he won the NCAA

Championship in both the 100 meter and the 200 meter.  And, according to his coach, had a first

year that rivaled (if not surpassed) Carl Lewis's freshman year at the University of Houston.

Justin broke all of UT's freshman records in his events.

Throughout this period, Justin had to balance his disability, his medication and his track

obligations.  This balance was especially difficult because even on Adderall, Justin struggled

with school.  Dr. Louis Prislovsky, who was in charge of the special education department at UT

and worked closely with its ADD students, noted that Justin had significant educational

challenges due to his ADD even when medicated.  These challenges were even greater when

Justin was not taking his Adderall.

To remain academically eligible, Justin had to take six credits during summer school, the

maximum credits allowed under NCAA regulations, to keep his athletic scholarship with UT and

to remain eligible to compete in the 2002 season.  This put enormous pressure on Justin to pass

his summer school courses.

8

1. **NCAA Drug Testing**

NCAA track and field events usually take place on Fridays, Saturdays and Sundays. Because Justin often felt sluggish after taking his Adderall, Justin would cease taking his Adderall on the Thursday morning before a weekend track competition. Thus, Justin would stop taking Adderall only a day or a day and one-half before a competition.

The NCAA conducts anti-doping testing similar to that performed by USADA. For instance, the NCAA conducts in-competition testing for amphetamines but not out of competition. During the year that Justin competed for UT, he was subject to around five in-competition drug tests. Not one of these drug tests resulted in a positive finding of amphetamines, as far as Justin is aware, despite him ceasing his Adderall use only a day before the competitions.

2. **The 2001 USATF Junior Nationals and the Positive Test for Adderall**

In order to maintain his NCAA eligibility, Justin faced significant pressure to pass his summer school classes. Indeed, he was required to take summer classes simply to keep his NCAA eligibility due to his poor performance in school during the regular academic year. Failure to pass his classes would result in his ineligibility to participate on the track.

Justin's summer English Competition final examination was scheduled for June 13, 2006, three days before he would compete in the 2001 USATF Junior Nationals ("Junior Nationals"). To ensure that he could concentrate while studying for his English Composition final, Justin continued to take his Adderall. After taking his final, however, Justin immediately ceased his Adderall treatment. By the time Justin competed in the Junior Nationals three days later, he did not feel any of the effects of the Adderall.

9

The Junior Nationals was Justin's first USATF sanctioned competition. Before competing in the Junior Nationals, Justin was not provided with the 2001 USATF Elite Athlete Handbook.[1]  The only paperwork that Justin received from USADA or USATF before the Junior Nationals was a pledge against using performance enhancing drugs. This pledge listed several potential prohibited substances -- Adderall was not on the list.[2]  Justin reviewed this pledge with his UT track and field coach, Vince Anderson. In light of the fact that Justin was not aware of testing positive for amphetamines during the NCAA anti-doping testing and due to the similarities between the programs, Justin signed the pledge.

After winning the 100 meters, the 200 meters, and the 300 meter hurdles at the Junior Nationals, USADA tested Justin for the presence of a prohibited substances on both June 16 and 17, 2001.[3]  On July 12, 2001, USADA notified Justin that both his samples resulted in a positive

---

[1]  Justin only received a copy of the 2001 USATF Elite Handbook Athlete Handbook after competing in the Junior Nationals. This handbook did not list Adderall as a prohibited substance; however, it did list amphetamine as a prohibited substance. Further, the handbook notified athletes that if they were taking prescription drugs to treat their ADD, the athlete should stop taking the prescription medication before the competition. Exhibit 6 at 26. Additionally, two months after Justin tested positive for having amphetamines in system, USADA posted on its website a notice that the use of Adderall could cause an athlete to test positive for a prohibited substance. Exhibit 7. USADA's advice on its website was the same as in the Handbook — simply to stop using the medication prior to any competitions. Exhibit 8.

[2]  The paperwork also stated that an individual taking prescription medicine should contact USADA. Exhibit 9.

[3]  To highlight the similarities between the NCAA testing program and USADA's, one need only look at the similarities between the doping control records. The similarities did not end with the records, as the physical procedure was nearly identical. Compare Exhibit 10 with Exhibit 11.

finding for amphetamines, which the IAAF prohibits for in-competition use.[4]  USADA then

tested Justin's B samples on July 23, 2001, which also resulted in a positive finding for

amphetamines.  The tests discovered "small amounts of amphetamine, less than 200 nanograms

per milliliter of urine" in his June 16, 2001 sample, and an even smaller amount in his June 17,

2001 sample.[5]  This decreasing amount of amphetamine in his urine is consistent with Justin

ceasing his use of Adderall several days before the competition.  Indeed, USADA conceded that

the positive finding for amphetamine resulted from Justin's use of his proscribed Adderall, and

not because of some desire to enhance his performance.  Exhibit 12.

Justin was simply devastated by the positive test at the Junior Nationals.  All Justin

wanted to achieve by taking his prescription medication was to remain academically eligible by

passing his English Composition final.  In the months following the Junior Nationals and being

notified of the positive test, Justin experienced several emotional breakdowns and, at times,

became self-destructively upset.

3.    **The Positive Test for Adderall Effectively Ends Justin's Ability to
Attend College**

Upon receiving notice of his positive test result for amphetamine, even though it resulted

from Justin taking his prescription medication to help him study for his finals, Justin sacrificed

everything he had been working toward on the track by immediately withdrawing from future

USATF competitions and vacating his place on the USATF national team.  However, because

---

[4]  Note that the IAAF does not prohibit the use of stimulants out-of-competition.

[5]  Justin did not contest the integrity of the sample collection process, the transport, laboratory
chain of custody of his samples, or the any aspect of the laboratory analysis including the
finding of the presence of amphetamines in his sample.  Exhibit 12.

Justin passed the English Composition class over the summer, he remained academically eligible to compete for UT in NCAA sanctioned competitions during his sophomore year.[6]

Still devastated by the positive test result from the Junior Nationals, Justin was concerned about his continued use of Adderall to treat his ADD. Justin considered changing medications, but, ultimately, out of a fear of testing positive again, Justin decided to stop taking any medication to treat his ADD. Without taking his medication to treat his disability, Justin's less than stellar academic performance from his first year worsened. Exhibit 5. In his first semester of his sophomore year, Justin only received one grade above a "C," and that was weight training. *Id.* Justin's second semester of his sophomore year was a slight improvement but Justin again was forced to take summer school classes to keep his academic eligibility.[7] *Id.* Without taking any medication to treat his ADD, he was unable to concentrate and focus, which led to him receiving an incomplete in his Health and Wellness class during the summer. *Id.* Without the aid of his medicine, unlike the previous summer, Justin was not able to pass his summer school class. *Id.* Justin lost his NCAA eligibility, causing him to turn him to turn professional.

## C.    JUSTIN'S PROFESSIONAL CAREER

After learning that he would likely be academically ineligible for the 2003 NCAA season, Justin decided to turn professional. As discussed more fully below, due to the extraordinary

---

[6] There is no reciprocity between NCAA and USADA for positive drug tests. Justin had another remarkable year, garnering indoor and outdoor individual NCAA Championships. In all, Justin ended his college career with 10 NCAA Championships.

[7] NCAA regulations require a student-athlete to pass 24 credit hours in a calendar year to be eligible to compete in a given semester. To be eligible to compete in the indoor fall season in 2002, Justin would have needed to pass 24 credit hours in the Fall of 2001, Spring of 2002, and Summer of 2002. As shown by his transcript, Justin failed to earn 24 credit hours during that time. Exhibit at 5.

circumstances of Justin's 2001 positive test, the IAAF had reinstated Justin, thus allowing him to compete. From 2003 through 2006, Justin had one of the most decorated professional careers in the history of track and field, including winning three Olympic Medals at the 2004 Summer Olympics, and winning both the 100 and 200 meters at the 2005 World Championships. Additionally, because of his previous experience testing positive for amphetamines for simply taking Adderall, Justin worked heavily with USADA to help educate athletes about anti-doping testing and why doping in sports was detrimental. Further, Justin repeatedly told his coaches and trainers that he did not want to use any performance-enhancing drugs and wanted to compete cleanly.

As a tune-up event for the 2006 track and field season, Justin competed in the Kansas Relays, a race that had little overall significance to Justin's race calendar and is best described as a pre-season track and field event. On April 22, 2006, after competing only in the 4-by-100 relay competition, Justin was selected by USADA for anti-doping control. On June 15, 2006, nearly two months after Justin submitted his sample at the Kansas Relays, Justin learned that the sample was reported by the laboratory as positive for exogenous testosterone or its metabolites. This finding was confirmed by the testing of his "B" sample on July 23, 2006. Justin was utterly shocked by these results as he never knowingly used synthetic testosterone.

After learning about this positive test result, Justin started an extensive investigation into how he may have tested positive for exogenous testosterone. While Justin is not challenging the portion of the Appealed Case that found he was at fault for the 2006 anti-doping rule violation, based on his investigation, Justin determined that the synthetic testosterone must have been applied transdermally by his former massage therapist, Chris Whetstine. Justin believes that

13

Whetstine applied the exogenous testosterone as a means of sabotaging Justin because of a

substantial dispute between Whetstine and Justin's coach, Trevor Graham.

**D.     Justin Gatlin's Assistance in the Anti-Doping Effort**

      In addition to investigating how he could have possibly tested positive for exogenous

testosterone, Justin almost immediately began cooperating with USADA, and, critically, Special

Agent Jeff Novitzky of the Internal Revenue Service, Criminal Investigation Division. Exhibit

13 at 3. Indeed, the extent of Justin's cooperation has been unparalleled by any other athlete.

On August 16, 2006, less than a month after receiving notice that his "B" sample was reported

positive for exogenous testosterone, Justin met with Special Agent Novitzky[8] for almost five

hours. During this meeting, Justin answered questions and immediately made a recorded

telephone call to his track coach Trevor Graham at the direction of Special Agent Novitzky's

investigation. Transcript of Proceeding before AAA at 262:1; 267:15-22. In all, Justin made

eleven recorded telephone calls to Trevor Graham at the behest of Special Agent Novitzky. *Id.*

at 281:21-22. In fact, of the 40 or so athletes Special Agent Novitzky worked with during the

BALCO investigation, Justin made the most recorded telephone calls of any athlete. *Id.* at 287.

      During the AAA trial, Special Agent Novitzky applauded two aspects of Justin's

substantial cooperation. First, Novitzky commented on just how quickly Justin agreed to make

recorded telephone calls to Trevor Graham. As he stated in the Appealed Case:

> Yes, especially, you know, as I talked about, in terms of the August 16th date. I
> mean, he literally flew out to New York that week that we requested it. And then
> obviously, the call, the request to make the call, that wasn't something that I
> talked about with his attorneys previous to that day. Didn't give any indication
> that we were even thinking about that, and a part of that was because I wanted to,

---

[8] Special Agent Novitzky is the lead investigator in the BALCO investigation.

14

you know, to judge the reaction, I would get from that request. And again, as I testified, it was a period of minutes, where he agreed to make the call.

*Id.* at 293:7-19.

Second, Novitzky noted that Justin's cooperation was genuine. *Id.* at 294:2-15. In sum, Justin provided more cooperation than any of the other athletes with which Special Agent Novitzky interviewed and worked. In fact, Justin's assistance helped the United States Government indict Trevor Graham.[9] Trevor Graham is scheduled to go to trial on May 2008, and Justin is ready to provide whatever cooperation or testimony is necessary in that case.

### III. SUMMARY OF THE PROCEEDINGS

A.   The 2001 AAA Arbitration Hearing

The circumstances of the 2001 positive test result for amphetamines and the panel's decision, are remarkably unique. After USADA brought a charge against Justin for his ingestion of Adderall at the Junior Nationals, the AAA Panel, USADA, and Justin sought to send Justin's case directly to the IAAF so that Justin could seek an immediate reinstatement. The IAAF, however, rejected this request and demanded that the AAA Panel impose a two-year sanction before it would consider Justin's application for reinstatement. Despite the IAAF's request, the Panel refused to do, even though it could have simply imposed a two-year sanction after a full hearing on the merits. Instead, the 2001 AAA panel held a one-hour *telephonic* conference, not an evidentiary hearing on the merits, and deliberately imposed a two year provisional

---

[9] Special Agent Novitzky could not speak to how much Justin's cooperation assisted in securing Trevor Graham's indictment. Several sources told Justin his cooperation helped dramatically. In addition, Novitzky told Justin privately that Justin had helped catch Trevor Graham in numerous lies.

suspension.[10] Indeed, in issuing the provisional suspension, the 2001 AAA Panel explicitly

retained jurisdiction over the matter, so that if the IAAF did not reinstate Justin immediately, the

panel could hold a full evidentiary hearing. Exhibit 14. In sum, the Panel's May 21, 2002

decision imposed on Justin a "provisional suspension in order to facilitate Gatlin's request for

early reinstatement," and specifically did not impose a legitimate sanction after a full hearing on

the merits. Exhibit 14 and Exhibit 15.

> After the IAAF reinstated Justin, the Panel's decision and provisional sanction no longer

had effect:

> The Panel's May 1, 2002 provisional suspension decision was issued without an
> evidentiary hearing on the merits by stipulation of the parties in order to facilitate
> Gatlin's request for early reinstatement. Since we are informed that Gatlin was
> expeditiously reinstated by the IAAF, our May 1, 2002 decision and provisional
> sanction **no longer had effect**, and hence our retention of jurisdiction pending a
> reinstatement decision by the IAAF was ipso facto terminated.

Exhibit 14.

> In other words, the Panel never entered a final award regarding Justin's fault or whether

in fact he should be sanctioned for an anti-doping violation. *Id.* Even in drafting the decision to

impose the provisional suspension and without having an evidentiary hearing, the Panel

struggled with its decision. Exhibit 3 at 7. The Panel noted that Justin is "certainly . . . not a

doper." *Id.*[11] The Panel further wrote that Justin "neither cheated nor did he intend to cheat. He

did not intend to enhance his performance nor, given his medical condition, did his medication in

---

[10]  Indeed, prior to the hearing, USADA and Justin entered into a stipulation in which Justin
    conceded the validity of the 2001 test results and USADA conceded that the amphetamine in
    Justin's system was the ingestion of his prescribed medication, Adderall.

[11]  Justin's results certainly reflected he was not using Adderall for a competitive advantage. He
    ran the three slowest times of his 2001 season at the USATF Junior Nationals.

fact enhance his performance." *Id.* at 10. At best, the only criticism the Panel had of Justin was "in not raising his medical condition for a review with the appropriate authorities before the race, instead of after it." *Id.* As will be discussed below, the fact that Justin did not consult with the appropriate testing authorities before the race is a meaningless criticism, as the IAAF would not have granted him a Therapeutic Use Exemption for Adderall. Furthermore, if he had consulted USADA, USADA would have simply told Justin to discontinue use of the medication prior to the competition, which is what Justin did. In the end, the Panel realized that "[a]nti-doping rules are like other sporting rules in that sometimes there are adverse consequences even when an athlete is *not at fault.*" *Id.* at 9, (emphasis added).

B.   IAAF Reinstatement Proceeding

After the Panel imposed a provisional suspension for the 2001 positive test result for amphetamines, and as agreed by USADA before this provisional suspension was imposed, Justin applied to the IAAF to be reinstated because of his genuine medical explanation for the anti-doping rule violation. The IAAF granted Justin's application for immediate reinstatement but did not release a written decision. Rather, the rationale of the IAAF is contained in a July 23, 2002 Newsletter by General Secretary Istvan Gyulai:

> The IAAF "agreed that Gatlin had a genuine medical explanation for his positive test: prescription medicine for the condition 'Attention Deficit Disorder' (ADD) which was first diagnosed when Gatlin was 9 years-old, had never challenged his suspension, and had not competed in USATF or IAAF events since learning of his test result on 12 July 2001."[12]

Exhibit 16 at 2.

---

[12] However, Council stressed that Gatlin HAD committed a doping offence and issued a warning that any repetition of his positive result would result in a life ban.

17

Justin was reinstated by the IAAF just over a year after he competed in the Junior Nationals, which permitted him to compete in IAAF and USATF sanctioned events. Therefore, there was no reason for Justin to litigate whether he bore any fault for the 2001 positive test.

## C. 2006 Panel Decision

After conducting a three-day evidentiary hearing, the 2006 panel imposed a four-year suspension on Justin as a sanction for the 2006 doping offense. Exhibit 1. The panel reduced the maximum sentence of 8 years because it found that the "totality of the circumstances" warranted such a sanction. In not applying a further reduced sanction, the Panel noted that there was a lack of evidence in the record about what advice USADA gave athletes about taking medication to treat Adderall.[13] In particular, the Panel found that Justin did not produce the 2002 advisory regarding ADD or the USATF Handbook, both of which advised the athletes to discontinue the use of their ADD medication before a competition. However, these documents were located and are Exhibit 8 and Exhibit 6 at 26. The Panel additionally found that Justin had not presented sufficient evidence to meet his burden of proving no fault or no significant fault for the 2006 positive test. Specifically, the Panel found that Justin failed "to prove how the testosterone entered his system, as required by 10.5.1 and 10.5.2." Exhibit 1. While finding that "Mr. Gatlin seems like a complete gentlemen, and was genuinely and deeply upset during his testimony," the Panel concluded that they could not "eliminate the possibility that Mr. Gatlin intentionally took testosterone, or accepted it from a coach."

---

[13] As discussed below, USADA's only advice to athletes was to stop taking the medication prior to events without specifying a certain period of time.

Further, despite Special Agent Novitzky's testimony of Justin's unmatched cooperation, the Panel gave Justin no credit for this assistance. *Id.* at 35-36. The Panel wrote that the evidence it received was inconclusive as to whether the information Justin provided to doping authorities led to the discovery or identification of persons involved in doping in sport. *Id.* at 36. Because Justin may be able to provide future evidence that his cooperation led to the discovery of a person involved in doping in sport, the Panel retained jurisdiction to amend the award if such evidence was discovered. *Id.*

The dissenting arbitrator agreed with the majority opinion except for its finding that the 2001 anti-doping violation should be considered a first violation. Exhibit 2 at 1. The dissent concludes that Justin was not at fault for the 2001 anti-doping violation and any sanction based on the 2006 violation should not be enhanced because of the 2001 violation. The stated rationale for finding that the 2001 violation is not a first offense was because the 2001 Panel and the IAAF did not determine whether Justin was at fault as they were required to make under CAS precedent. *Id.* at 2-3. And, even assuming *arguendo* that the IAAF made a determination of fault, it would violate Justin's due process because it would deprive him of a fair and impartial decision-maker. *Id.* at 3. Additionally, based on the facts of the 2001 violation, the dissent contended that Justin was not at fault for the violation under the general negligence standard. *Id.* at 4-5. Finally, as the dissent noted and as explained below, punishing Justin for using his ADD medication violates both the Americans with Disabilities Act and certain similar provisions of Swiss Law. *Id.* at 9-22.

19

## IV. ARGUMENT

**A.    The 2001 Positive Test Cannot Be Used to Enhance Any Sanction Imposed for the 2006 Anti-Doping Rule Violation**

### 1.    Justin has not been sanctioned for the 2001 positive test

The procedural history of the 2001 positive test is unique. After the adverse analytical finding in 2001 and the initiation of a disciplinary proceeding, USADA, Justin, and the panel all sought to have the case referred to the IAAF for immediate reinstatement on exceptional circumstances grounds without any decision by the AAA panel. The IAAF, however, refused to consider Justin's reinstatement application unless and until a suspension was imposed on Justin. Forced to take some action, the panel held a one-hour telephonic conference – not an evidentiary hearing on the merits. Instead of issuing a legitimate two-year sanction after a full hearing and closing the case, the panel issued a provisional suspension against Justin, but retained jurisdiction over the matter so that if the IAAF did not reinstate Justin immediately, a full evidentiary hearing could be held. The 2001 AAA Panel did not consider whether Justin was at fault for the 2001 positive test and never imposed a final sanction against him. Indeed, as the AAA panel has recently clarified:

> The Panel's May 1, 2002 provisional suspension decision was issued without an evidentiary hearing on the merits by stipulation of the parties in order to facilitate Gatlin's request for early reinstatement. Since we are informed that Gatlin was expeditiously reinstated by the IAAF, our May 1, 2002 decision and provisional sanction *no longer had effect*, and hence our retention of jurisdiction pending a reinstatement decision by the IAAF was ipso facto terminated.

As shown above, once the IAAF reinstated Justin, the 2001 Panel's was a legal nullity. Therefore, the 2001 positive test has never been adjudicated by an independent, impartial, and fair review body, and cannot be considered the equivalent of an anti-doping rule violation subjected to the complete result management process. Accordingly, without an adjudication of the merits, considering such issues as fault, no legitimate sanction has been imposed against

20

Justin, and, hence, Justin has never been subject to a previous sanction that can be used as a basis to enhance the 2006 sanction.[14]

Leaving aside the procedural uniqueness of this particular case, the question before the Panel is whether a positive test for which an athlete was never sanctioned by an independent review body can be considered a first offense when determining the sanction for a later offense. This is a gap or lacuna in the WADA Code and must be filled in by the Panel by applying the "overarching principle of justice and proportionality." *Puerta v. ITF*, CAS 2006/A/1025, ¶ 11.7.23, attached as Exhibit 17. While the WADA Code does not specifically address this question, it is simply untenable to increase Justin's sanction for the 2006 violation based on a 2001 positive test for which Justin has never served a sanction. Indeed, the structure of the WADA Code supports this position. Section 10.5.1. of the WADA Code specifically states that when no sanction is imposed on an athlete because that athlete was not at fault for the violation, the violation may not be considered a "first offense" when determining the period of ineligibility for multiple violations. Exhibit 18.

There is no doubt that USADA and the IAAF will argue that the current situation is distinguishable from the situation addressed in section 10.5.1 because in that section the athlete is directly found to have no fault for the violation, but here, fault was not considered by the

---

[14] The 2006 AAA Panel improperly assumed that the mere fact that Justin admitted the validity of the positive test – trace amounts of amphetamines were found in his system – means that such a positive test could be used to enhance his sanction for the 2006 violation. The fallacy of this assumption is evidenced by WADA Code 10.5.1, which states that although there was a positive test, since no sanction was awarded, the positive test cannot be later used to enhance a sanction for a later violation. The mere finding of positive test result, standing alone, is not sufficient to justify an enhanced sanction.

panel. But this is not a meaningful distinction.[15] The underling principle that supports Section 10.5.1 is that an athlete should not have a later sanction enhanced based on an earlier positive test for which no sanction was imposed. It is this principle that provides guidance here, and supports Justin's position. To enhance a sanction for a later violation based on a previous positive test in which no sanction was imposed is tantamount to finding that a sanction can be enhanced if an athlete has a previous adverse analytical finding that was never pursued by the anti-doping agency. Taken to this logical extension, it is clear that enhancing a sanction for a later violation based simply on an earlier positive test (an earlier violation for which no sanction was imposed) is inappropriate. While there is a gap in the WADA Code with respect to this situation, in light of the serious ramifications of enhancing Justin's sanction for the 2006 violation and the principle underlying Section 10.5.1., and in light of the overarching principle of justice and proportionality, the gap should be decided in Justin's favor.

Any argument that the Panel's imposition of a provisional suspension should be considered the equivalent of a final and permanent sanction is equally specious. First, the Panel has made clear that its May 2002 decision and provisional suspension are no longer effective.[16]

---

[15] Justin does not contend that the Panel's failure to determine whether he was at fault for the 2001 violation means that the Panel here on this basis alone should find that Justin was not at fault. Rather, Justin contends that by failing to address fault, and by failing to impose a sanction, the 2001 anti-doping violation cannot be used to enhance the 2006 violation.

[16] The AAA panel noted that the May 2002 decision was "an interim, non-final decision pending disposition of a petition for reinstatement by the IAAF. . . . the 2001 AAA Panel did not . . . render a final decision, nor in any way modify its initial decision, finding a doping violation and imposing a 2 year suspension on Mr. Gatlin . . . ." Exhibit 1 at 1 - 2. However, throughout the decision the Panel regards the May 2002 decision as imposing an actual sanction because it issued a provisional suspension, and thus a conclusion that Justin was at fault for the 2001 positive test. *Id.* at n.2. Based on the 2001 Panel's recent clarification of its decision, no actual sanction was imposed for the positive test and the May 2002 decision

[Footnote continued on next page]

Second, although it appears from the record that the Panel issued the provisional suspension as a means of permitting Justin to file an application of reinstatement with the IAAF, the fact remains that Justin's fault was not considered by the Panel and no legitimate sanction was imposed for the 2001 positive test.

The consideration of whether Justin was at fault for the 2001 positive test is of critical importance in determining whether the 2001 violation should be classified as a first offense. But nothing now can change the fact that fault was not considered in 2001 and there was no official sanction. In the proceedings before the 2006 AAA panel, USADA strenuously objected to the Panel considering whether Justin was at fault for the 2001 positive test on the basis that the 2001 case should not be "retried." However, the 2001 positive test has never been "tried" in the first instance and no sanction was issued. Without the May 2002 decision and provisional sanction in effect, and without any finding of fault, there is no basis for USADA to make its request for an enhanced sanction. Indeed, to request an increased sanction for the 2006 anti-doping violation, USADA would be implicitly requesting this Panel to "try" the 2001 case, something it fought hard to prevent.

Moreover, that the IAAF commented in a newsletter announcing Justin's reinstatement that the 2001 positive test was considered a first offense bears no weight in this analysis. An athlete has a right to have his or her case decided by a independent hearing body. The IAAF, as

---

[Footnote continued from previous page]
and provisional suspension are not effective. As discussed in more depth below, any inference that the Panel found that Justin was at fault for this violation from the issuance of a provisional suspension is not warranted.

the international governing body, and opposing party in this appeal, is not such a body.[17] The IAAF statements, in this appeal and before this appeal, as to whether the 2001 positive test should be considered a first offense are nothing more than self-serving statements.

Accordingly, Justin never served a sanction for the 2001 positive test. Therefore, there is no basis in the WADA Code to enhance Justin's 2006 sanction.

### 2. Justin Gatlin was not at-fault for the 2001 anti-doping rule violation

To the extent the panel desires to make an independent determination of Justin's 2001 positive test for amphetamines contained in his Adderall prescription (which it should not), it should find Justin is without fault for this violation.

#### a. The Applicable Rules

Justin's positive test occurred in 2001, and, thus, substantive rules and law from 2001 should apply. Regardless of whether the 2001 USATF or IAAF rules required a finding of fault to issue sanction, CAS precedent clearly required that every tribunal find fault before banning an athlete from competition: "The Panel is of the opinion that as a matter of principle and irrespective of 'specific and exceptional circumstances' an athlete cannot be banned from competition for having committed a doping offense unless he is guilty, i.e., he has acted with intent or *negligence*."[18] The CAS panel further held that "even if the rules and regulations of a sports federation do not expressly provide that the guilt of the athlete has to be taken into

---

[17] Since the IAAF is not a independent body, its determination of whether Justin was at fault for the 2001 positive test has no bearing on this Panel's decision whether Justin's 2001 positive test is a first offense for the purposes of increasing Justin's sanction for the 2006 offense.

[18] *Aanes v. FILA*, CAS 2001/A/317, p. 16 (emphasis added).

account[,] the foregoing principle *will have to* be read into these rules to make them legally acceptable." Accordingly, if this tribunal is to assess Justin's level of fault for the 2001 positive test, it must do so by placing itself in the shoes of the 2001 AAA Panel and apply the rule that would have been applied if that Panel had assessed fault.

In 2001, WADA had yet to be formed and, thus, no WADA Code had been drafted. Consequently, the "utmost caution" standard for a finding of "No Fault or Negligence," as there is now in the current version of WADA Code 10.5.1., did not exist. In determining whether a sanction should be imposed for an anti-doping rule violation, the standard was general negligence. In fact, USADA has admitted as much.[19] To apply the current "utmost caution" standard violates the principle contained in almost every legal system that stricter standards cannot be applied retroactively to make conduct punishable that would have been innocent at the time such conduct was committed.[20]

For a sanction to have been imposed against Justin for the 2001 positive test, it would have to be found that Justin failed to do "what a reasonably prudent person would have done under the same or similar circumstances, or the doing of something that a reasonably prudent

---

[19] *Neben v. USADA*, AAA No. 30 190 00713 03 (2003), dissenting opinion at 3, ¶10, attached as Exhibit 19.

[20] In the United States, the *ex post facto* clause of the United States Constitution protects against the application of statutes that make conduct criminal retroactively if it was lawful when it occurred. Most European nations, and all European Union nations, are bound by the European Convention on Human Rights. Article 7 of the convention prohibits *ex post facto* criminal laws. It also prohibits a heavier penalty being imposed than was applicable at the time when an act was committed.

person would not have done under the same or similar circumstances."[21] The circumstances of the 2001 anti-doping rule violation support a finding that Justin acted as a reasonably prudent person would have done under similar circumstances. Accordingly, Justin bore no negligence, and, therefore, no fault for the 2001 positive test.

### b. Justin Acted Reasonably Under the Circumstances

As an elite-level track and field athlete at the University of Tennessee, Justin was subject to strenuous drug testing from both the University of Tennessee and the NCAA. In particular, after most prominent track meets Justin won, he would be tested. The NCAA's drug testing program was remarkably similar to the testing performed at the USATF Junior Nationals, the critical similarity being that both the NCAA and USADA tested for stimulants, including amphetamines and their "related compounds" in-competition.[22]

During the 2001 NCAA season, to ensure that no Adderall was in his system at the time of a competition, Justin generally stopped taking the medication two to three days before the competition. Although tested several times for performance-enhancing drugs during the season, to Justin's knowledge, he never tested positive for amphetamines.[23] Even if Justin sought an

---

[21] Negligence is defined by Black's Legal Dictionary as "[t]he failure to exercise the standard of care that a reasonably prudent person would have exercised in a similar situation." A reasonably prudent person is defined as "a person who exercises the degree of attention, knowledge, intelligence, and judgment that society requires of its members for the protection of their own and of others' interests." Black's Law Dictionary (8th Ed. 2004).

[22] NCAA Bylaw 31.2,3.1 (Banned Drugs), at Exhibit 20.

[23] Neither Justin nor his coaches ever learned of a positive test resulting from UT's or the NCAA's testing.

exemption for the use of Adderall by the NCAA, the athletic department (and the coaches) would still have been notified of a positive test if one had occurred.

> "In the event that a student-athlete is tested by the NCAA and tests positive for a substance for which the institution desires an exception, *normal procedures* for reporting positive test results will be followed . . . and the institution, through its director of athletics, may [then] request an exception by submitting to the NCAA the Exceptions Procedure physician's letter and any other medical documentation it wishes to have considered."

Exhibit 21. The reason the NCAA puts the onus on the school to prove that a student has been diagnosed with ADD or ADHD and is prescribed a medication to treat it, is because the sheer number of student athletes that have ADD or ADHD make it unmanageable for the NCAA to administer the exemptions.

Justin's previous experience of his Adderall clearing his system with only two to three days between the time of cessation and the testing bears significant importance in determining whether Justin acted reasonably before the 2001 anti-doping violation. Indeed, the only caution Justin received from USADA, USATF, or the IAAF about the dangers of taking a prescribed medication before competing was in a one page handout that accompanied the application he signed for entering into the USATF Junior Nationals. Exhibit 9. The application informed an athlete to "Be Safe!" and "Be Sure" by calling the USADA hotline before taking any supplements, over-the-counter medications, or prescribed medications. *Id.* Nonetheless, in light of never testing positive for a stimulant during the NCAA season, it was reasonable not to have any concerns about taking Adderall as long as he stopped taking it two to three days before the competition. In fact, it would be irrational to think that his cessation of Adderall usage two to three days before a competition would result in a positive test when the same procedure resulted in negative tests in his mind when tested by the NCAA.

27

Even if Justin had called the USADA hotline, which he had no reason to do, USADA would have, at best, told him to stop taking his ADD medication before the competition. In a May 2002 advisory, USADA stated the following:

> Ritalin, Adderall, Pemoline, Wellbutrin and other medications prescribed for Attention Deficit Disorder and Attention Deficit Hyperactivity Disorder contain substances, which are prohibited in competition. Unless an athlete has obtained a prior medical authorization from his or her International Federation, the detection of these substances in an athlete's urine from an <u>in-competition</u> doping control is a doping offense. As a practical *solution*, many athletes with ADD or ADHD simply choose to *discontinue* their medication in advance of competitions.

Exhibit 8. USADA's "practical solution" is somewhat hollow, however. First, this advice and recommendation simply reiterated what athletes were already doing. Second, advising an athlete to "discontinue their medication in advance of competitions" fails to provide any indication of how far in advance an athlete should discontinue his or her use of the medication. Indeed, this recommendation is likely purposefully vague because there is no one answer to the question.[24] Critically, had Justin received this advice from the USADA hotline, it would have been reasonable from him to believe that stopping his Adderall usage two to three days before the competition would have been sufficient, given his experiences in the NCAA, which is exactly what he did.

### c. The IAAF would not have granted Justin a TUE for Adderall

The 2006 AAA Panel wrote that the 2001 positive test "would have been avoided through the simply [sic] step of seeking permission for the use of a therapeutic, prescription medication."

---

[24] Dr. Barnett, albeit after Justin had tested positive, contacted the USOC to determine how far in advance the use of the medication should cease, but he received no response. Moreover, there was no public literature available for how long it would take a drug to pass completely through someone's system.

28

Exhibit 1 at 2. The 2001 AAA Panel wrote in its now ineffective May 2002 decision that "if requested, the exemption likely would have been granted." Exhibit 3 at 7. Despite these assumptions, the contrary is true. The IAAF has been steadfast in its position that it would not, and will not, grant an athlete a Therapeutic Use Exemption for the use of Adderall to treat ADD or a ADHD. The IAAF made its position clear immediately following Justin's case: "[T]he IAAF will not grant applications brought by athletes with ADD who seek exemption under IAAF Rules to use amphetamines in-competition." Exhibit 16 at 5. Further, the IAAF's advice to athletes suffering from ADD was remarkably similar to USADA's: "If athletes require amphetamine medication for the treatment of an ADD condition, such medication should be taken under close medical supervision and on a schedule designed to ensure that the athletes do not compete with amphetamines present in their bodies." As explained above, "USADA advises athletes after consultation with their physicians to discontinue using the ADD medication prior to competition in order for the medication to clear their system."

> **d.** **Justin Discontinued the Use of His Medication as Early as Possible Before Competing in the USATF Junior Nationals.**

Justin stopped using Adderall as soon as possible before the USATF Junior Nationals. Justin had a final examination in his English Composition summer school class that he had to pass in order to remain academically eligible in NCAA. There was intense pressure put on Justin by his parents, coaches and academic advisors to pass his English class and keep his eligibility. Because his ADD disability greatly affects his academic performance, Justin had no choice but to use his medication to treat the manifestations of his disability. As soon as his examination was over, Justin stopped taking his prescription medication. This was three days before the start of the USATF Junior Nationals and consistent with Justin's practice in the NCAA. It was reasonable for Justin to continue his use of Adderall until the final for his English Composition

class was finished. To hold otherwise would be a true travesty. Justin should be rewarded for his diligence and hard work to remain academically eligible instead of being punished. No student athlete should ever have to choose between treating his or her disability in order to pursue a college education, and fulfilling a dream to compete at the highest levels of his or her sport.

> ### e. Compared to Incidents in Which a Panel Has Found No Significant Fault Under the Utmost of Caution Standard, this Panel Easily Should Conclude Justin Bears No Fault Under a Negligence Standard.

In two recent decisions, athletes who recreationally used prohibited substances were found to have no significant fault or negligence for the violation. In *USADA v. Eric Thompson*, Case No. AAA 52 190 00556 07, attached as Exhibit 22, Eric Thompson, who at the time was 18 years old, was charged with an anti-doping rule violation stemming from a positive test result for the presence of cocaine at the USATF Junior Nationals. *Id.* at ¶¶ 1.2, 2.9. Thompson presented evidence that he had ingested a small amount of cocaine at a graduation party two days before the Junior Nationals. *Id.* at ¶ 2.5. The Panel found that Thompson had satisfied the No Significant Fault or Negligence standard because "Mr. Thompson is a naïve young man, a virtual stranger to national athletic competition, who wondered briefly on that stage without any material guidance from support personnel." *Id.* at ¶ 5.1. Similarly, Oussama Mellouli, an elite swimmer, was charged with an anti-doping rule violation based on the presence of a stimulant. Exhibit 23. Mellouli claimed that he used Adderall to help him stay awake so that he could finish writing a report. Mellouli does not suffer from ADD or ADHD and did not have a prescription for Adderall. However, the Panel found that Mellouli did not intend to enhance his performance and that he satisfied the other requirements to establish No Significant Fault or

30

Negligence. The Panel found that if Mellouli was negligent at all, his negligence did not rise to the level to warrant a two-year ban.

Justin's case is distinguishable from these cases in two important respects. First, the above cases were decided using the "utmost caution" standard, a stricter standard than the general negligence standard that would have applied in Justin's case. Second, Justin's medication was **prescribed** to treat his ADD. Justin's use of Adderall was anything but recreational. By comparison, if the two cases above are rare unique exceptional circumstances that warrant a finding of No Significant Fault or Negligence, the circumstances and applicable rules in Justin's case clearly support a finding of No Fault or Negligence.

By stopping his medication three days before the competition, Justin followed every practical caution USADA would have suggested and acted as any reasonably prudent person would have in light of the circumstances. USADA's own advice and the community standard at the time was to stop taking Adderall before the competition. Yet, no information was ever provided, nor was it generally available to physicians, about how far in advance of a competition an athlete should discontinue using his or her Adderall to ensure that it clears his or her system. USADA now wants to punish Justin for following its advice, even though it provided no guidelines other than to suggest discontinuing the use of the medication prior to competition. However, it should be USADA that is held accountable for its complete disservice to Justin, and all other athletes who have ADD or ADHD, not the other way around. The framework established by USADA and the IAAF presented athletes with ADD or ADHD with a stark choice: Compete or learn; but you cannot do both. USADA is seeking to sanction Justin not because he enhanced his sport performance, but because he chose to learn.

3. **To the Extent the Panel Considers the 2001 Positive Test as a Violation, It Should Be Classified as a Violation Pursuant to WADA Code 10.3 and any Sanction Imposed Should be Imposed Pursuant to 10.6.3.**

The WADA Code now recognizes that there are instances when an unintentional anti-doping rule violation may occur because some prohibited substances are generally available in medicinal products. Exhibit 18, § 10.3. If an athlete can establish that the use of one of these substances, referred to as a "specified substance," was not intended to enhance sport performance, a reduced sanction will be imposed. Importantly, when an athlete is found to have committed two separate violations, one involving a specified substance and the other involving a Prohibited Substance, the sanction imposed for the second offense shall be between two to three years. *Id.* at § 10.6.3. Sections 10.3 and 10.6.3 of the WADA Code acknowledge that not all anti-doping rule violations should be treated as equal and that reduced sanctions are appropriate in situations when an athlete tests positive for a prohibited substance commonly found in medicinal products and where there was no intent to enhance sport performance.

Section 10.3 of the WADA Code states that the Prohibited List may identify specified substances that are particularly susceptible to unintentional anti-doping rule violations. However, the provisions of this section are not limited to just the specified substances on the prohibited list. To receive the reduced sanction in Section 10.3, an athlete is only required to establish that he or she used a specified substance – which is defined as a substance particularly susceptible to unintentional anti-doping rules violations because of their general availability in medicinal products – and that such a use was not intended to enhance sport performance. In other words, nothing in Section 10.3 states that an athlete must have tested positive for a specified substance as listed on the Prohibited List. A contrary reading of this section would

32

require one to insert qualifying language not present in the rule, which is not appropriate in statutory interpretation.

Further, it is unreasonable to interpret the definition of "specified substance" as to only those substances identified on the prohibited list. Doing so will lead to drastically different sanctions for athletes who are similarly situated, with the only difference being what medication the athlete ingested. For instance, there is no meaningful distinction between an athlete who ingested a medication for his heart condition that contained beta blockers and an athlete ingested a medication to treat his ADD that contained amphetamine. However, if section 10.3 is interpreted as limiting a specified substance to only those identified by the Prohibited List, one athlete would receive a reduced sanction and the other would receive the full two-year sanction. These two inconsistent results of similarly situated athletes does not achieve the WADA mission of achieving consistent, just and proportionate sanctions for anti-doping rule violations.

As described in great detail above, the 2001 positive test resulted from Justin taking his prescribed medication to treat his ADD. This medication, Adderall, contained amphetamines, a prohibited stimulant. This stimulant does not appear in the "specified substance" list, but given the fact that the positive test for amphetamines was caused by a prescribed medicinal product and, in this case, caused an unintentional anti-doping rule violation, Justin's 2001 positive test should be considered an anti-doping rule violation involving a "specified substance."[25]

---

[25] This is especially true where it is clear that Justin did not use Adderall to enhance athletic performance. Justin (and his doctor agrees) testified that taking his Adderall makes him sluggish. In addition, his times at the 2001 USATF Junior Nationals were the worst competitive results of the 2001 season. Clearly, Justin did not use the Adderall to enhance performance.

In the alternative, even if the Panel believes that the 2001 positive test does not literally satisfy the requirements of 10.3, the 2001 positive test satisfies the spirit of 10.3, i.e., that certain violations, resulting from substances found in medicinal products that were not intended to enhance sporting performance, should be reduced. Justin should not be treated differently based on the sole fact that the medication he ingested contained one prohibited substance rather than another one. In the end, Justin's 2001 positive test resulted from a substance contained in his medication and, critically, was not intended to enhance his performance.

Accordingly, if this Panel considers Justin's 2001 positive test as a first offense, the Panel should sanction Justin's 2006 anti-doping rule violation in accordance with WADA Code Section 10.6.3. In light of the substantial assistance provided by Justin after the 2006 violation, as noted above, the minimum sanction under 10.6.3., two years, should be imposed.

### 4.  Any Sanction for the 2001 positive test was in violation of the American with Disabilities Act

To impose a sanction against Justin for the 2001 positive test, would cause the USATF, and American entity, to violate the American with Disability Act in enforcing the sanction. That no AAA or CAS case has held that an anti-doping organization is subject to the ADA or comparable Swiss anti-discrimination laws is of no relevance to the analysis below. The question is not whether the AAA, CAS, or the anti-doping organization is violating the ADA in imposing a sanction, the concern is with the USATF's enforcement of the sanction imposed. While not subject to the ADA, the AAA and CAS should be cognizant of its requirements so that it does not impose a sanction the enforcement of which is in violation of the law.

Justin's 2001 positive test was caused by prescribed medication to treat Justin's disability, ADD. To sanction him for this positive test would be to discriminate against him

34

because, unlike other athletes, he had to take medication to control a disability. The American with Disabilities Act ("ADA") forbids discrimination against disabled individuals in the areas of employment, public services, and public accommodations. Particularly, Title III of the ADA prescribes:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, or operates a place of public accommodation.

Exhibit 24, 42 U.S.C. § 12182(a).

### a. Disability

In 2001, at the time of the positive test, Justin was considered disabled as defined by the ADA. For purposes of the ADA, a disability is defined as: (1) "a physical or mental impairment that substantially limits one or more of the major life activities," (2) "a record of such an impairment," or (3) "being regarded as having such a impairment." Exhibit 25. Further, physical or mental impairment has been defined as "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." Exhibit 26, 29 C.F.R. § 1630.2(h)(2). And, major life functions include, "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, *learning*, and working." Exhibit 26, 29 C.F.R. § 1630.2(i) (emphasis added). The Ninth Circuit and other courts have found that someone with a learning disability is considered disabled under the ADA. *See generally, Zukle v. Regents of the Univ. of Cal.,* 166 F.3d 1041 (9th Cir. 1999) at Exhibit 25.

Justin clearly satisfies this definition. Justin suffers from ADD, which from a very early age, has substantially interfered with his ability to learn. His ADD affected his ability to focus in the classroom and frustrated his attempts to study and complete other assignments out of the class room. Indeed, to even qualify for special assistance at the University of Tennessee, a

clinician found that Justin's ADD substantially limited the major life activity of learning. Exhibit 27.

### b. Discrimination

A disabled person is considered discriminated against when there is "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." Exhibit 24, 42 U.S.C. 12182(b)(2)(A)(ii). It is undisputed that Justin's positive test resulted from his ingestion of Adderall to treat his ADD. And it is undisputed that Justin had no intent of gaining, and did not gain, a sport performance enhancement from the medication. By not providing Justin with a reasonable accommodation of the anti-doping policy, e.g., a retroactive TUE for Adderall, and instead imposing a sanction on Justin for having trace quantities of amphetamine in his system from the medication used to treat his disability, USADA and the International and National Governing Bodies would be discriminating against Justin on the basis of his disability.

### c. Public Accommodation

The ADA prohibits a person or entity that operates a public accommodation from denying a disabled person the right to equal access and enjoyment of the public accommodation. Exhibit 24. A place of public accommodation is defined as including, among other places, a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation. Exhibit 24, 42 U.S.C. § 12181(7)(L). The USATF, IAAF, and USOC, which sanctions and assists in the operation of track competitions, thereby act as the operator and lessee of the track

stadiums in which the competitions take place. See *PGA Tour, Inc., v. Martin*, 532 U.S. 661 (2001), *Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 873-874 (9th Cir. 2004). ("[T]he Supreme Court has held that a private entity that stages an event for a limited time period at a facility owned by a third party is covered by Title III."), Exhibits 28, and 29, respectively.

These track stadiums clearly fit within the definition of other place of exercise or recreation. Therefore, USATF is prohibited from preventing a person, both spectators and athletes, from enjoying equal access to the stadium because of their disability. However, if Justin was sanctioned for the 2001 positive test, the enforcement of that sanction against Justin – i.e., denying Justin equal access to compete in track and field competitions based on his disability – it would be violating Title III of the ADA.

Accordingly, no sanction could have been imposed on Justin for the 2001 positive test because the imposition of such a sanction, and its enforcement by USATF, the USOC, and the IAAF, would have violated the ADA. Indeed, the NCAA exempts athletes who are prescribed ADD medication because sanction for taking their medication would be in violation of the ADA. Exhibit 27. Further, since the imposition of a sanction for the 2001 violation was improper, it is in turn improper to use the 2001 violation as a basis to enhance Justin's sanction for the 2006 violation. In the alternative, USATF, IAAF and the USOC enforcement of an enhanced sanction, in which the enhancement is based on the 2001 violation, is equally questionable under the ADA because the reasonable accommodation to make is simply to not consider the 2001 anti-doping rule violation as a first offense. See *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001). ("It would be inconsistent with the purposes of the ADA to permit

an employer to deny an otherwise reasonable accommodation because of past disciplinary action taken due to the disability sought to be accommodated.")

**B.** **Any Sanction Imposed For The 2006 Anti-Doping Rule Violation Should be Reduced Pursuant to Article 10.5.3 of the WADA Code**

WADA Code Section 10.5.3 permits an athlete's sanction to be reduced because of substantial assistance provided to the authorities. Specifically, the section states that where the athlete has provided substantial assistance in discovering or establishing an anti-doping rule violation by another person, the period of ineligibility should be reduced. There was significant debate before the AAA Panel about whether Justin's assistance qualifies under the rules because Justin worked directly with the Criminal Division of the Internal Revenue Service instead of directly with USADA. Before this point is addressed, however, the unsurpassed assistance Justin provided to Special Agent Novitzky should be noted.

Justin began cooperating with USADA immediately after his "B" sample was reported positive; indeed, Justin's cooperation began before the USADA Independent Review Board had decided Justin's case could proceed to a disciplinary proceeding. Due to an on-going criminal investigation by the criminal division of the IRS, Justin also met with Special Agent Jeff Novitzky, who for the last several years has been conducting an extensive investigation of doping in sport. Justin not only answered Special Agent Novitzky's questions, Justin instantly agreed to made a recorded, undercover telephone call to his coach, Trevor Graham, whom Special Agent Novitzky had been investigating for several years for criminal narcotics charges. In fact, for several weeks after the August 2006 meeting with Special Agent Novitzky, Justin recorded numerous telephone calls between himself and Trevor Graham, in which Justin solicited incriminating evidence against Graham. While Special Agent Novitzky cannot provide specific details regarding Justin's assistance because there is an ongoing investigation of

38

Graham, Special Agent Novitzky notes that Justin's assistance was unparalleled to other athletes and assisted in the investigation that led to an indictment against Graham in November 2006. In sum, Justin did more than just provide information, Justin's assistance was proactive.

There is no question that Justin provided unmatched assistance to a federal governmental agency investigating doping in sport. There is further no question that this assistance came without any hesitation or negotiation. Exhibit 13. And there is no question that Justin, by placing several undercover, recorded telephone calls to Trevor Graham was proactive, covert, and could have put himself at significant risk if his cooperation was uncovered. What is questioned by USADA, however, is whether Justin's substantial assistance to the criminal division of the IRS is sufficient to satisfy the requirements of WADA Code Section 10.5.3. This question is just silly. Providing assistance to a criminal investigative body investigating doping in sport, such as the criminal division of the IRS, should be equivalent, if not superior, to providing information to an anti-doping agency. In fact, the WADA Code Version 2.0 recognizes this concept by adding "criminal authorities and other professional disciplinary bodies" to Article 10.5.3 of the WADA Code. Additionally, it was USADA's decision to not avail itself of Justin's assistance and seek disciplinary action against Trevor Graham.

Further, Justin should not be penalized by Special Agent Novitzky's inability to provide detail on how Justin's assistance aided investigators. Although Graham has been indicted, there remains an open investigation into Graham's activities, and Special Agent Novitzky cannot disclose the substance of Justin's assistance. Without providing any detail, Special Agent Novitzky did note that Justin followed all his instructions with a few minor exceptions, stayed on script during the original telephone call with Graham, put himself at risk by wearing a wire and recording conversations with Graham, truthfully answered Special Agent Novitzky's

39

questions, and promptly offered his assistance. While Special Agent Novitzky could not comment on whether Justin's assistance led to the discovery of an anti-doping violation, the extent of Justin's assistance, including the risk he subjected himself to, is noteworthy. Transcript of 2006 AAA proceeding at 268:8-10; 273:12-22; 274:8-11.

The extent of Justin's assistance to the federal government will not be disclosed until the judgment in the Trevor Graham criminal case is final. That could be years. What this Panel does know is that Justin substantially assisted in an ongoing federal investigation that resulted in the indictment of a former elite-level track and field coach with a reputation for providing performance enhancing drugs to his athletes. While Justin's assistance may not have led to the finding of *a* doping violation by *one* athlete, his substantial assistance potentially saved *dozens* of athletes from the hands of Graham, was part of the investigation that led to a finding of a large doping ring (which if USADA so chooses is considered a doping violation), and helped end one of the most corrupt periods of Track and Field.

Based on the extent of Justin's assistance, this Panel should reduce the sanction imposed on Justin for the 2006 anti-doping rule violation pursuant to Article 10.5.3 of the WADA Code. It does not reward an athlete for his or her assistance for a Panel to defer ruling on a reduction under 10.5.3 until an on-going investigation is resolved, especially in this instance where the on-going investigation may not be resolved before the suspension is completed. Accordingly, based on the evidence that can be presented to the Panel at this time in light of the on-going Federal investigation, Justin requests his sanction to be reduced pursuant to 10.5.3.

## C.   Any Sanction Imposed Must begin No Later than May 2006

Article 10.8 of the World Anti-Doping Code, provides that the commencement of any suspension period is the date of the hearing decision. However, this section further provides that:

> Where required by fairness, such as delays in the hearing process or other aspects of Doping Control not attributable to the Athlete, the body imposing the sanction may start the period of Ineligibility at an earlier date commencing as early as the date of the sample.

Here, fairness dictates that Justin's sanction for the 2006 violation commence no later than April 2006. Justin provided the sample on April 22, 2006, after competing in the Kansas City Relays. At no fault of his own, Justin did not receive notice that his "A" sample was reported positive until June 15, 2006. The reason for this delay was because it was not until the laboratory was directed by USADA to conduct a longitudinal analysis, and then a Carbon Isotope Ratio test, that the laboratory reported Justin's "A" sample as positive. While Justin does not contend that this delay was intentional or negligent on USADA's part, this delay was equally not attributable to Justin. Further, while Justin did compete in events after the Kansas City Relays but before he was notified of his positive "A" sample, Justin immediately accepted a voluntary provisional suspension and began assisting the anti-doping authorities after his "B" sample resulted in a positive finding. On the basis of fairness, and based on the above facts, the period of ineligibility should begin no later than May 2006.

41

## V. CONCLUSION

For all the foregoing reasons, Justin respectfully requests that the Panel find that, even if Appellant committed an anti-doping rule violation in 2006, it is to be considered a first offense and punishable by, at most, a two year sanction starting in May 2006.

DATED: February 25, 2008

Respectfully submitted,

GIBSON, DUNN & CRUTCHER, LLP

Maurice M. Suh
Daniel L. Weiss
Andrew Demko

100391722_2.DOC

42