GATLIN v. UNITED STATES ANTI-DOPING AGENCY INC Doc. 17

**UNITED STATES DISTRICT COURT**
**NORTHERN DISCTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| JUSTIN GATLIN,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES ANTI-DOPING AGENCY, INC., U.S.A. TRACK AND FIELD, INC., UNITED STATES OLYMPIC COMMITTEE and INTERNATIONAL ASSOCIATION OF ATHLETICS FEDERATIONS,<br><br>Defendants. | Cause No. 3:08–cv–00241–LC–EMT |

**DEFENDANT UNITED STATES ANTI-DOPING AGENCY'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

Robert C. Palmer, III
WADE PALMER & SHOEMAKER P.A.
25 W Cedar Street, Suite 450
Pensacola, Florida 32591

William Bock, III
General Counsel
UNITED STATES ANTI-DOPING AGENCY
1330 Quail Lake Loop, Suite 260
Colorado Springs, CO 80906

Brent E. Rychener
HOLME ROBERTS & OWEN, LLP
90 S. Cascade Avenue
Colorado Springs, Colorado 80903
*Of Counsel*



Dockets.Justia.com

The United States Anti-Doping Agency (USADA), by counsel, respectfully submits its brief in opposition to the motion for temporary restraining order and for preliminary injunction filed by the Plaintiff, Justin Gatlin.

## I. INTRODUCTION

This case is not about Justin Gatlin's use of attention deficit disorder medication in 2001; it is, rather, about Mr. Gatlin's use of synthetic testosterone, an anabolic steroid and performance enhancing drug, in 2006 in violation of the rules of sport. Even if Mr. Gatlin had never had a prior anti-doping rule violation, his 2006 use of testosterone and refusal to take a provisional suspension until July 25, 2006, would require that he have a two year period of ineligibility lasting through July 24, 2008. *See* IAAF Rules 32.2(a) and 40.1(a)(i), USADA Exh. **25**. Thus, Mr. Gatlin's use of a medication in 2001 did not take him out of the upcoming Olympic Trials. Rather, as two arbitration panels have found, his use of a steroid means he is not entitled to compete.

The Americans with Disabilities Act (ADA) has nothing to say about Mr. Gatlin's competition in the 2008 Olympic Trials because the standard sanction for his 2006 steroid offense is a two year period of ineligibility and a two year sanction takes him out of the 2008 Trials. *See* IAAF Rules 32.2(a), 40.1(a)(i). This Court's order of June 20, 2008, stated a concern that the sanction start date "seems suspiciously designed to moot the very sort of legal action against Defendants that Plaintiff raises in this action." At the time of that writing the Court did not have access to the relevant documents that would remove any such suspicion. However, as this Court can now see from the stipulation entered into by Mr. Gatlin and his lawyers in 2006 following his positive drug test, Mr. Gatlin did not take a provisional suspension until July 25, 2006. *See* 2006 Stipulation between Gatlin and USADA ("2006 Stipulation"), ¶ 9, USADA Exh.



#186198 v1

**32**. Rather, he refused to take a provisional suspension and remained free to compete (and in fact did compete in June, 2006) until July 25, 2006. That is why the applicable anti-doping rules require that his sanction effectively start on July 25, 2006. Certainly, there is not any basis in the ADA or the Rehabilitation Act to alter the start date of Mr. Gatlin's period of ineligibility that was issued by the Court of Arbitration for Sport Panel. For this reason and many others the ADA will not support an injunction permitting Mr. Gatlin to participate in the upcoming U.S. Olympic Trials.

## II. FACTUAL BACKGROUND

### A. The United States Anti-Doping Agency and Other Organizations Engaged in the Fight Against Doping in Sport

In 2000 the United States Anti-Doping Agency (USADA) was formed as an independent, private, not for profit corporation on the recommendation of the United States Olympic Committee (USOC). USADA was given responsibility for drug testing, investigation of potential doping violations, results management of anti-doping rule violations, and anti-doping education and research in Olympic, Paralympic and Pan American Games sports in the United States. USADA's creation occurred in connection with a movement within Olympic sport to "externalize" the responsibility for anti-doping matters to independent entities which did not have the responsibility to fund and train athletes, stage competitions and select and promote athletic teams as do national Olympic committees such as the USOC and the national governing bodies (NGBs) of individual sports such as USA Track & Field (USATF). USADA has been delegated the anti-doping responsibilities that were previously shared by the USOC and the more than forty (40+) NGBs in the United States. The procedures applicable to drug testing and the results management and adjudication of doping matters under USADA's jurisdiction are set forth

in the USADA Protocol for Olympic Movement Testing (the "USADA Protocol"), *See* Gatlin's Motion for Preliminary Injunction, Exh. F.

USADA's formation was preceded by the creation of the World Anti-Doping Agency (WADA). WADA resulted from recommendations received at the World Conference on Doping in Sport convened by the International Olympic Committee (IOC) in February, 1999 and was established as a Foundation in November, 1999 to promote and coordinate the fight against doping in sport internationally. The United States' representative on the WADA Foundation Board is Mr. Scott Burns, the Director of the U.S. Office of National Drug Control Policy (ONDCP).

A significant achievement of WADA was the drafting and adoption in 2004 of the World Anti-Doping Code (the "Code"), a consistent body of rules which inform the anti-doping rules adopted by each of the international federations (IFs) responsible for governing each individual Olympic sport. Significant portions of the WADA Code were incorporated into the Anti-Doping Rules of the International Association of Athletics Federations (IAAF) in 2004. The IAAF is the international federation which governs the sport of track and field.

In addition to WADA and national anti-doping organizations (NADOs) such as USADA, most of the IFs, including the IAAF, also retain responsibility for anti-doping matters within their sport. Thus, for example, WADA, USADA and the IAAF have overlapping authority to conduct drug testing on elite U.S. track and field athletes who compete in international competition. This overlapping authority helps to ensure a level playing field internationally and ensures the ability to test athletes in countries which may not have an operational NADO.

**B. The Role of Arbitration in Olympic Sport Eligibility Disputes**

**It has long been a principle of international Olympic sport that eligibility athletic questions are resolved <u>exclusively</u> by arbitration**. In the United States this principle is embodied in the Ted Stevens Olympic and Amateur Sports Act which provides for American Arbitration Association (AAA) arbitration of eligibility disputes involving athletes engaged in, or who seek to be engaged in, "protected competition" such as the Olympic Trials. **When an athlete becomes a member of a NGB such as USATF they agree to submit their eligibility disputes, including disputes concerning anti-doping rule violations, to arbitration.**

Arbitration is likewise provided for in the Olympic Charter as the exclusive means of dispute resolution in matters concerning the Olympic Games and is the exclusive means provided for under the Code, under the USADA Protocol and in the IAAF Anti-Doping Rules for appealing eligibility decisions arising from anti-doping rule violations. The final arbitral body for disputes in Olympic Movement Sports is the Court of Arbitration for Sport (CAS) seated in Lausanne, Switzerland. The CAS was formed by the IOC to ensure, the swift and equitable resolution of disputes relating to participation in the Olympic Games. The CAS panel of arbitrators consists of an international group of arbitrators with recognized experience in sport and arbitration matters. CAS handles all appeals of eligibility questions involving the Olympic Games, as well as a vast variety of other sports and commercial disputes. The only avenue of appeal of a CAS arbitration award is to the Swiss Federal Tribunal, the Swiss appellate court which functions as Switzerland's Supreme Court. *See Brief of the USOC*. The Swiss Federal Tribunal has expedited procedures which permit swift provisional (i.e., injunctive) relief in appeals from arbitral bodies, including the CAS. *Id*.

### C. The USADA Results Management Process

The USADA Protocol provides a multi-step review process for positive drug tests, such as Justin's Gatlin's 2006 positive test for synthetic testosterone. Once the laboratory reports a urine sample as initially positive the athlete is given the opportunity to have another bottle of the athlete's urine (the "B" bottle) tested and the athlete may attend in person and/or send a representative to witness the B analysis. *See* USADA Protocol § 8(b). A drug test is not considered positive unless the B analysis confirms the laboratory's finding concerning the A bottle. *See* USADA Protocol § 8(b).

Upon notice that the B analysis confirms the A analysis, the athlete is given an opportunity to review the laboratory documentation and make a written submission to the Anti-Doping Review Board (ADRB). *Id*. § 9. The ADRB is a body of experts independent from USADA who review the laboratory analysis and any submission by the athlete and recommend whether sufficient information exists for USADA to proceed with a charge of an anti-doping rule violation against the athlete. *Id*. § 9(a).

In the event that USADA decides to proceed in the matter following receipt of the ADRB recommendation, USADA will formally charge the athlete with an anti-doping rule violation and notify the athlete of the period of ineligibility USADA is seeking as well as inform the athlete that he or she has ten (10) days to either accept the proposed sanction or contest the charge and request an arbitration hearing before a panel of the AAA. *Id*. § 10(a). If the athlete requests an arbitration they have the right to select an arbitrator, USADA selects an arbitrator and then these two panel members select the third arbitrator who chairs the arbitration panel. *See* USADA Protocol, Annex E (AAA Supplementary Procedures for the Arbitration of Olympic Sport Doping Disputes), Rule R-13. **The arbitration then proceeds very much like any commercial**

**arbitration with arbitration rules which closely follow the model of the AAA's Commercial Rules**. Following the hearing and the closing of the arbitration the panel is required to issue a written reasoned award. *Id*., Rule R-44.

Subsequently, any party to the AAA's award or the relevant IF and/or WADA may appeal the AAA decision to the CAS. *See* USADA Protocol § 10(c). As in the AAA process, the athlete may select an arbitrator from the CAS panel, the other party (or parties) to the appeal select the second arbitrator and the President of CAS selects the third arbitrator. *See* Code of Sports-Related Arbitration ("CAS Code"), USADA Exh. **1**. The CAS hearing is a hearing *de novo*. *Id.* The parties may introduce evidence from the prior hearing as well as any additional evidence desired by the parties and may raise new arguments for the first time before CAS should they so choose. For the convenience of American athletes, the hearing for any CAS appeal under the USADA Protocol is conducted in the United States, although the seat of CAS is in Switzerland and a CAS arbitration is an international arbitration. *See* USADA Protocol, § 10(c); CAS Code, USADA Exh. **1**.

### D. Gatlin's 2006 Positive Drug Test for Synthetic Testosterone, Participation in the June 2006 National Championships and Acceptance of a Provisional Suspension

Justin Gatlin, tested positive for synthetic testosterone, an anabolic steroid (i.e., a performance enhancing drug which promotes muscle growth), at a relatively obscure track meet in Kansas on April 22, 2006, less than three weeks before setting the world record in the 100 meter dash on May 12, 2006 at a major international meet in Doha, Qatar in a time of 9.77 seconds. It is well known that anabolic agents are performance enhancing drugs that provide strength, power and recovery benefits to athletes including sprinters. USADA tested the Kansas



#186198 v1

Relays for the first time in 2006 and utilized a special laboratory testing method known as carbon isotope ratio ("CIR") testing which is the gold standard in detecting synthetic testosterone use.

On April 23, 2006, Respondent's sample #496040 was shipped by overnight courier to the WADA-accredited laboratory at the University of California at Los Angeles ("UCLA Laboratory") and was analyzed using all routine testing methods. Additionally, upon request by USADA, the UCLA Laboratory also analyzed Respondent's sample by the CIR method.

The UCLA Laboratory reported Respondent's sample positive for testosterone or its precursors, all of which are substances prohibited by the WADA List in the class of anabolic androgenic agents. Gatlin was notified by USADA of his positive drug test on June 15, 2006. *See* AAA Transcript, USADA Exh. **43**, pp. 135-36; 2006 Stipulation, ¶ 9. Despite notice of the positive result from the analysis of Mr. Gatlin's A sample and despite USADA's notice to Gatlin that he could immediately accept a provisional suspension which would commence the start date of any suspension he might receive Mr. Gatlin elected instead not to take a provisional suspension but rather to run in the 2006 U.S. National Championships on June 23, 2006. *See* AAA Transcript, pp. 136, 145; June 14, 2006, Letter from Linda Barnes to Justin Gatlin, USADA Exh. **29**. **Thereafter, Mr. Gatlin still did not accept a provisional suspension, which under the applicable rules could have activated the start date of any suspension he might ultimately receive, until he finally did so on July 25, 2006**. 2006 Stipulation, ¶ 9.

On June 27, 2006, Respondent requested the opening and analysis of the B bottle from sample # 496040. Respondent's expert, Dr. David Black, was present for the opening and the entire analysis of the Respondent's B sample. The B sample analysis was completed on June 28, 2006 and was reported as confirming the A sample for synthetic testosterone to USADA on June 30, 2006. Respondent stipulated that all aspects of the sample processing and analysis were

conducted appropriately and without error. Respondent also stipulated that the presence of synthetic testosterone in his sample "is a doping offense in violation of the WADA Code and IAAF Rules." *See* 2006 Stipulation, ¶ 8.

**E. The Stipulation Concerning Gatlin's 2006 Positive Drug Test**

Nearly four weeks after his acceptance of a provisional suspension Mr. Gatlin and his attorneys entered into a stipulation with USADA "for purposes of all proceedings involving USADA urine specimen number 496040[.]" *See* 2006 Stipulation, p. 1. In that stipulation Mr. Gatlin agreed, among other things, "[t]hat the mandatory provisions of the World Anti-Doping Code . . . including, but not limited to, . . . sanctions . . . and contained in [the] USADA Protocol . . . and the International Association of Athletics Federations ("IAAF") Anti-Doping Rules are applicable to this hearing for the doping offense involving USADA specimen number 496040[.]" *See* 2006 Stipulation, ¶ 2.

Mr. Gatlin further stipulated that the laboratory results were accurate, that the sample in question was his urine sample and "[t]hat Mr. Gatlin agrees that this Positive Test with a finding of the substance testosterone or its precursors in both the A and B bottles of USADA specimen number 496040 is a doping offense in violation of the WADA Code and IAAF Rules[.]" *See* 2006 Stipulation, ¶ 8. In terms of the applicable sanction, "the parties agree[d] that the period of ineligibility will be a maximum of eight (8) years beginning on August 15, 2006, with credit being given for the time Mr. Gatlin has served a provisional suspension beginning on July 25, 2006." *See* 2006 Stipulation, ¶ 9. Mr. Gatlin reserved the right that his suspension should start at an earlier point because he did not receive notice of his positive test until June 15, 2006. *Id.*

Finally, the parties unambiguously agreed that any arguments regarding the length of his sanction would be submitted to arbitration. USADA and Mr. Gatlin stipulated, "[t]hat **Mr.**

**Gatlin reserves the right to contest the eight-year sanction** recommended by USADA and **if he chooses to do so, will be required to submit the matter to arbitration no later than six (6) months from the date of his stipulation**, unless both parties agree there is good cause to extend such deadline[.]" *See* 2006 Stipulation, ¶ 14. (emphasis added). The stipulation was signed by Mr. Gatlin and by both of his New York attorneys who were handling his case at that time.

### F. Gatlin's Arguments to the 2007 AAA Panel Concerning the Americans with Disabilities Act and the Rehabilitation Act

There is no question that Mr. Gatlin presented extensive argument to the 2007 AAA Panel regarding his claim that reliance on a prior doping violation in 2001 to enhance the period of ineligibility for Gatlin's 2006 positive drug test was in violation of the ADA and the Rehabilitation Act. The AAA Panel observed that:

> Mr. Gatlin argued loosely that it would be a violation of United States law, specifically the Americans with Disabilities Act and the Rehabilitation Act ("ADA") to base any enhancement of Mr. Gatlin's period of ineligibility on the use of such medication. He argues that USADA and the IAAF are required to make a "reasonable accommodation for Mr. Gatlin. In this case, he argues, a reasonable accommodation would be to limit the effective time and scope of the first violation in considering the second violation.

AAA 2007 Opinion, ¶ 6.15.

### G. The 2007 AAA Hearing and the Panel's Decision

As provided for in the USADA Protocol and in the 2006 stipulation between USADA and Mr. Gatlin, the question concerning the length of suspension from his testosterone offense was submitted to an arbitration hearing which eventually took place on July 29 – August 1, 2007. At the hearing Mr. Gatlin claimed that his positive drug test was the result of sabotage by his masseuse. However, all three arbitrators found that Mr. Gatlin had not proved this contention and that Mr. Gatlin's positive drug test could have come either from steroids taken intentionally by Gatlin or given to him by his coach.

Mr. Gatlin testified at the hearing that in mid April of 2006 shortly before his positive drug test and before he ran in the Kansas Relays his "hamstring was damaged," meaning that he could not run on it. AAA Transcript, p. 214, line 13, lines 22-24. Mr. Gatlin recalled that it was his coach, Trevor Graham's recommendation to get a "B-12" shot in his damaged hamstring. AAA Transcript, p. 222, lines 8-10. Gatlin testified that shortly thereafter an injection of what Gatlin believed to be B-12 was recommended by a physician named Dr. Martini over the phone and was given to Gatlin by another coach Randall Evans in Trevor Graham's presence. AAA Transcript, pp. 223-24. Yet, Martini had never examined Gatlin's damaged hamstring. *Id.* Moreover, Gatlin "didn't know if he [Evans] had any experience" giving injections other than that he had given an injection to a teammate. AAA Transcript, p. 226, lines 8-9. Prior to getting the injection from Evans, Gatlin did not ask Evans whether he had ever injected any performance-enhancing substances into any athlete. AAA Transcript, p. 227, lines 16-20. However, according to Gatlin, he subsequently became aware of allegations concerning Evans' involvement with steroids. AAA Transcript, p. 227, lines 3-15; pp. 230-31. Neither Evans nor Martini were called by Gatlin at the hearing to corroborate his account of the circumstances surrounding the injection. AAA Opinion, ¶ 8.9.

In addition, federal agent Jeff Novitzky, who testified at the AAA hearing, explained that he was "concern[ed]" about Mr. Gatlin's statements regarding a "Voltaren bean" Gatlin said he had been given by his coach within this same time frame. AAA Transcript, pp. 277-78. Gatlin took the pill in April 2006 about two weeks prior to his positive drug test. *Id.* Mr. Gatlin denies he ever used the term "bean" when describing the pill to Agent Novitzky. AAA Transcript, pp. 191-94. However, Agent Novitzky testified unambiguously that Gatlin used the term and that "bean" is slang for a testosterone pill. *Id.* Agent Novitzky also testified that Gatlin's testimony

regarding the color of the pill was inconsistent, switching from green in the initial interview to brown (the color of a testosterone pill) in a later conversation with another individual. AAA Transcript, pp. 277-78, 299.

Of course, there was no dispute that Gatlin had synthetic testosterone in his system. It, therefore, was Gatlin's burden to prove he was not at fault for his positive drug test. After hearing the evidence presented by Gatlin and USADA, the AAA panel concluded that "this Panel does not know with any degree of confidence how the testosterone entered Mr. Gatlin's system; transdermally or by pill or injection." AAA Opinion, ¶ 8.10. The panel found that Mr. Gatlin did not prove "that he did not intentionally take testosterone." *Id.* On this point all three arbitrators were in agreement. Even the dissenting arbitrator, Mr. Campbell, concluded that "three scenarios were equally likely," including the scenario that "Mr. Gatlin could have intentionally taken testosterone." AAA Dissent, pp. 1-2. Thus, because the anti-doping rules make Mr. Gatlin responsible for any prohibited substance in his system which he cannot explain, the Panel found that Mr. Gatlin was at fault for the synthetic testosterone found in his system.

On Mr. Gatlin's ADA arguments, the AAA Panel held:

> Mr. Gatlin, through his attorney, John P. Collins, in his Memorandum Regarding the Issue of Fault in the 2001 Arbitration, did present an argument relating to the applicability of the ADA to the first case, which noted that "reasonable accommodation," in the first case should have been that "USADA provide" Mr. Gatlin "individualized notice on how far in advance of a competition he should stop taking his prescription medication." The Panel agrees that the issue of a reasonable accommodation to permit the taking of a prescription drug should apply to the instance for which it is involved, namely here the 2001 violation. Apparently, it was not argued then. In any event, the Panel finds neither that question, nor the question whether USADA should take on the duties of a personal physician and advisor is before it in this case. Asking this Panel to go back and consider that issue for the first case, truly would be a "retrial" of that case.

AAA 2007 Opinion, ¶ 6.15.

In terms of the start date of Mr. Gatlin's period of ineligibility, the Panel acknowledged that Mr. Gatlin had argued that his period of ineligibility should commence earlier than the July 25, 2007, date set forth in the stipulation due to delay in the sample analysis which Gatlin claimed was attributable to USADA. AAA 2007 Opinion, ¶ 8.25. Again, however, the Panel concluded that Mr. Gatlin "failed to sustain his burden of proof" on this issue. *Id.* Nevertheless, for a reason entirely unexplained in the Panel's opinion, the Panel commenced the start of Mr. Gatlin's period of ineligibility on May 25, 2007. AAA 2007 Opinion, ¶ 10.7.

Ultimately, the AAA panel gave Mr. Gatlin a four year suspension for his positive drug test commencing on May 25, 2006, and invited Mr. Gatlin to come back to the Panel if he could present further evidence that a reduction was justified based on his cooperation with law enforcement in uncovering acts of doping in sport by his coach Trevor Graham or if he could present additional evidence that might further explicate the issue of the degree of fault attributed by the 2001 AAA Panel to Mr. Gatlin in connection with his 2001 rule violation. AAA 2007 Opinion, ¶¶ 8.23, 9.26, 10.7. However, Mr. Gatlin elected instead to appeal the AAA 2007 award directly to the CAS, making USADA a defendant in the CAS proceeding.

In response, the IAAF also appealed the AAA award to CAS, seeking to extend Mr. Gatlin's period of ineligibility from four (4) to eight (8) years and requested that the sanction start date be shifted from May 25, 2006 to the July 25, 2006, date on which Mr. Gatlin accepted his provisional suspension. USADA ultimately adopted those parts of the IAAF's brief opposing a reduction of Mr. Gatlin's period of ineligibility and seeking alteration of the start date. *See* USADA Exh. **62**.

### H. Mr. Gatlin's Arguments to the 2008 CAS Panel

Mr. Gatlin's arguments to the CAS Panel primarily concerned his claim that Gatlin's 2001 doping violation should be entirely disregarded and should not be used to increase the length of his sanction in any regard. Significantly, Gatlin did not challenge in any respect the degree of fault attributable to him for the synthetic testosterone found in his system in 2006. In terms of his ADA and Rehabilitation Act arguments Mr. Gatlin again devoted a significant amount of his briefing to these arguments. *See* Gatlin's Opening CAS Brief, pp. 34-38; CAS Reply Brief, pp. 21-32; Power Point Presentation of Maurice Suh to CAS Panel, USADA Exhs. **58**, **64**, **69**.

### I. The 2008 CAS Panel Decision

On June 6, 2008, the CAS Panel rejected Mr. Gatlin's appeal, confirmed the four (4) year period of ineligibility announced by the AAA Panel and "alter[ed] the commencement date of the period of ineligibility from 25 May 2006 to 25 July 2006 when Mr. Justin Gatlin voluntarily accepted a provisional suspension." *See Gatlin Complaint*, Exh. H.

### J. Gatlin's 2001 Anti-Doping Rule Violation

Mr. Gatlin tested possible for an amphetamine at the U.S. Junior Nationals in 2001 due to the apparent failure of Justin, his parents, his physicians and his coaches to recognize either that amphetamines were substances banned for use in athletic competition and/or that Justin's attention deficit disorder ("ADD") medication, Adderall, contained amphetamines.

In his Complaint in this case Mr. Gatlin contends that he made a request for accommodation to the ADRB in 2001.[1] Mr. Gatlin alleges, "Justin presented this Board with all

[1] For an explination of the role of the ADRB in the USADA results management process please see *infra* at pp. 5-6.

of his medical records and his request that this positive result be waived. The Board met and considered this accommodation but rejected it." Complaint, ¶ 60.

Mr. Gatlin's account, however, is inaccurate. Rather, in Mr. Gatlin's submission to the ADRB he did not request that his "positive result be waived" as claimed by his new lawyer. Instead, he and his parents expressly acknowledged that he bore some fault for his positive drug test and violation of the anti-doping rules. Indeed, Justin noted that his physician was searching for alternative medications that could be used to treat his ADD but that were permissible under anti-doping rules.

Further, Mr. Gatlin said, "I will faithfully accept and abide by terms of whatever penalty you recommend imposed to USADA and USOC." USADA Exh. **9**. Justin's parents wrote, "[w]e do not expect total exoneration, but hopefully minor or secondary violation of charge will be imposed based our son's medical history and all supporting documents enclosed herein." *Id.* Finally, in his letter to the USOC, which was submitted to the ADRB, Justin's physician, Dr. Robin Barnett, confirmed that he was engaged in a search for alternative mediations, saying "there are perhaps a couple of alternative agents that could be considered." *Id.* Plainly, these submissions to the ADRB were not requests for accommodation as claimed by Plaintiff's counsel. Rather, the sense of Mr. Gatlin's ADRB submission is of an acknowledged mistake by Mr. Gatlin and of a search for an alternative medication. Leniency is requested but total exoneration quite clearly was not requested.

Following the ADRB proceeding, Mr. Gatlin's counsel in 2001 engaged in a cooperative effort with USADA to submit Mr. Gatlin's situation to an AAA panel on stipulated facts so that Mr. Gatlin could ultimately request leniency and early reinstatement from the IAAF. Mr. Gatlin could have requested an ADA accommodation or he could have alleged an ADA violation in the

2001 proceeding but he did not. Rather, he and his counsel either made a conscious decision to seek leniency rather than to pursue relief under the ADA and/or the Rehabilitation Act or they simply failed to pursue any relief under those statutes.

In fact, the strategic choice made by Mr. Gatlin and his lawyer appears to have been a relatively good one. Mr. Gatlin's claim for early reinstatement was granted by the IAAF, and Justin was back competing again in 2002, albeit with the clear knowledge that any future doping violation could result in a lifetime ban from competition. *See* USADA Exhs. **18**, **19**, **20**, **41**.

The documents produced by USADA from its interactions with Mr. Gatlin in 2001 and 2002 point to but a single conclusion. Mr. Gatlin did not pursue an ADA or Rehabilitation Act action then but eschewed litigation or a request for accommodation in favor of reasoning his way to a reduced period of ineligibility. Having made a choice not to seek an accommodation under the ADA in 2001 and having induced USADA and the IAAF to act upon his plan for seeking reinstatement in 2001, it is disingenuous for Justin to now attempt to rewrite history in a last gasp effort to participate in the 2008 Olympic Trials.

These documents from 2001 and 2002 demonstrate as well that it was not a failure of any sporting body to abide by the ADA in 2001 that has left Mr. Gatlin in his present predicament. Rather, the cause of Mr. Gatlin's lost opportunity to compete for a chance to defend his Olympic title in 2008 is solely Mr. Gatlin's use of an anabolic steroid in 2006.

## LEGAL ARGUMENT

### I. PLAINTIFF CANNOT SHOW A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

This case closely resembles another case involving a famous American runner, Mary Decker-Slaney, who asked a federal court to grant relief directly contrary to a final arbitration



#186198 v1

award in favor of the IAAF. In an exhaustive written opinion,[2] U.S. District Judge S. Hugh Dillin dismissed Slaney's claims against the IAAF and USOC.

First, Judge Dillin found Slaney's claims "would undermine or nullify the Tribunal's decision" and were therefore barred by the New York Convention. *Slaney v. IAAF*, Case No. IP-99-0502-C-D/F (S.D. Ind. 1999), *affd*., 244 F.3d 580 (7th Cir. 2001). Then with respect to Slaney's claims against the USOC, Judge Dillin concluded:

> Much like the [New York] Convention proved an insurmountable obstacle for Slaney's claims against the IAAF, the Amateur Sports Act presents a wall too high to hurdle for Slaney's claims against the USOC. The Amateur Sports Act gives the USOC the exclusive right to determine disputes over eligibility.

*Id*. at 20. Judge Dillin's summary of Slaney's claims applies with equal force here:

> The court sympathizes with Slaney's plight and realizes dismissal of this action basically closes the last avenue Slaney had to challenge the IAAF's decision. However, as this Entry and many of the cases cited herein indicate, this avenue was bound to lead to a dead end. Slaney's claims against the IAAF are barred by the [New York] Convention, for to entertain her arguments would severely undermine the Tribunal's determination. Her claims against the USOC fare no better, as her state law claims are preempted by the Amateur Sports Act, and the Amateur Sports Act allows no private cause of action.

*Id*. at 28. As in *Slaney*, Plaintiff's claims here cannot succeed for several reasons explained below.

---

[2] Attached hereto as Attachment **A**.

### A. Plaintiff's Claims Are Barred By a Final Binding Arbitration Award.

Under the guise of ADA claims, Plaintiff seeks to re-litigate issues which were raised and determined in an arbitration proceeding which resulted in a final arbitration award. Plaintiff seeks relief in this case which would be directly contrary to the 2008 CAS Award. Well-established legal principles supporting the finality of arbitration awards preclude the court from granting such relief.

#### 1. Under the New York Convention, the Court has no subject matter jurisdiction to override the 2008 CAS Award.

##### a. The 2008 CAS Award is a non-domestic arbitration award under the New York Convention.

The parties to the 2008 CAS arbitration included Mr. Gatlin, USADA, USATF, and the IAAF. The IAAF is a foreign organization with its principal place of business in Monaco. The IAAF's rules provide that the law of Monaco shall govern all CAS appeals. The arbitration proceeded under CAS rules which are governed by Swiss law. *See* CAS Rule R28 ("The seat of the CAS and each Arbitration Panel is in Lausanne, Switzerland."); CAS Rule R45 (In absence of choice of law by parties, dispute is decided according to Swiss law). The 2008 CAS Award was issued by CAS from Switzerland.[3]

Where an arbitration award involves a party having its principal place of business outside of the United States, any action to review the award is governed by the New York Convention.

---

[3] Legal commentaries have noted that CAS "is undoubtedly the best available dispute resolution organization for athletes and sports federations," and is a "reputable arbitration tribunal whose decisions are respected by athletes." Fitzgerald, *The Court of Arbitration for Sport: Doping and Due Process During the Olympics*, 7 Sports Law J. 213, 241 (2000). Judicial decisions from other countries have established that "CAS awards will be final, binding, and offer very narrow grounds for review." McLaren, *Sports Law Arbitration by CAS*, 29 Pepp. L.Rev. 101, 114 (2001).

This issue received extensive discussion in *Industrial Risk Insurers v. M.A.N. Gutehoffenungshutte GmbH*, 141 F.3d 1434, 1440-1441 (11th Cir. 1998):

> The instant case presents an issue of first impression in this court: Do the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), and thus the provisions of Chapter 2 of the FAA, govern an arbitral award granted to a foreign corporation by an arbitral panel sitting in the United States and applying American federal or state law? We hold that they do.
>
> The New York Convention was drafted in 1958 under the auspices of the United Nations. *See* Convention on the Recognition and Enforcement of Foreign Arbitral Awards, *opened for signature* June 10, 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N.T.S. 3. The United States acceded to the treaty in 1970, and Chapter 2 of the FAA was passed that same year. The purpose of the New York Convention, and of the United States' accession to the convention, is to "encourage the recognition and enforcement of international arbitral awards . . ."
>
> . . .
>
> We join the First, Second, Seventh, and Ninth Circuits in holding that arbitration agreements and awards "not considered as domestic" in the United States are those agreements and awards
>
> > which are subject to the Convention not because [they were] made abroad, but because [they were] made within the legal framework of another country, e.g., pronounced in accordance with foreign law *or involving parties domiciled or having their principal place of business outside the enforcing jurisdiction*. We prefer this broad[] construction because it is more in line with the intended purpose of the treaty, which was entered into to encourage the recognition and

> enforcement of international arbitration awards.

(Emphasis in original); s*ee also LaPine v. Kyocera Corp*., 2008 U.S. Dist. LEXIS 41172, *11 ("In sum, the court concludes that the arbitral award made in the United States under American law falls under the [New York] Convention as defined in 9 U.S.C. section 202 because one of the parties to the arbitration, Kyocera, is not a citizen of the United States.")

**b. Plaintiff cannot make an end-run around the award and the New York Convention by arguing "defenses" to enforcement of the award.**

Plaintiff may argue he can re-litigate his claims in this Court by raising affirmative defenses that, under Article V of the Convention, would preclude *enforcement* of the 2008 CAS Award. Such defenses, however, must be brought in Swiss court by way of an application to set aside the Award. This distinction is crucial because the Convention deprives this Court of jurisdiction to set aside, either directly or indirectly, a non-domestic arbitration award. *See* 9 U.S.C. § 207. If Plaintiff were allowed to raise defenses to enforcement of the 2008 CAS Award "offensively" in this lawsuit, then any U.S. national who has lost a non-domestic arbitration could simply raise the same arguments again in an action against the prevailing party in the United States, ignoring the requirement that any such action in this case must be brought before a Swiss court. Important as this principle is, it does not ultimately make a difference in this case because Plaintiff has not presented, and cannot present, any ground that could justify vacating the 2008 CAS Award under the Convention.[4]

Plaintiff's ADA claims cannot satisfy any exception under the Convention. Plaintiff had a full and fair opportunity to present his claims, including those under the ADA, to the neutral

---

[4] Even if the Federal Arbitration Act were applied here, Plaintiff has not demonstrated any grounds for vacating the 2008 CAS Award.

and independent CAS panel members. Indeed, Plaintiff's brief to CAS contained extensive argument, nearly identical to Plaintiff's claims here, concerning alleged violations of the ADA. *See* Brief Submitted by Justin Gatlin to CAS dated February 25, 2008, pp. 34-38, USADA Exh. **58**.

United States public policy strongly favors arbitration. "Although previously disfavored by the courts, arbitration agreements to resolve disputes between parties have now received near universal approval." *Weeks v. Harden Manufacturing Corp.*, 291 F.3d 1307, 1312 (11th Cir. 2002). "Courts have consistently found that claims arising under federal statutes may be subject to arbitration agreements . . . . Similarly, arbitration agreements encompassing claims brought under federal employment discrimination statutes have also received near universal approval." (*Id.* at 1313.) Based on the strong public policy favoring arbitration, recent courts uniformly have held that ADA claims are properly subject to arbitration agreements. *Id.* at 1314; *Bercovitch v. Baldwin School*, 133 F.3d 141, 149 (1st Cir. 1998) (holding that ADA claims are subject to mandatory arbitration, and noting that "the ADA expressly encourages arbitration of disputes"); *Siebert v. Amateur Athletic Union*, 422 F.Supp. 2d 1033, 1046 (D. Min. 2006) (holding that plaintiff was bound by agreement to arbitrate contained in membership agreement, and finding that "Congress intended to support, rather than prevent, voluntary arbitration of ADA claims"); *Santos v. GE Capital*, 397 F.Supp. 2d 350, 356 (D. Conn. 2005) (holding that agreement to arbitrate extended to ADA claims).

Given the strong public policy in favor of arbitration, including arbitration of ADA claims, Plaintiff cannot establish any exception under the Convention.

### 2. Even apart from the New York Convention, standard principles of U.S. law preclude plaintiff from re-litigating claims and issues resolved by the 2008 CAS Award.

Plaintiff's attempt to re-litigate issues decided in the 2008 CAS Award is barred not only by the New York Convention, but also by the principle that "issues submitted to arbitration cannot be re-litigated in federal court." *Teamsters Local Union No. 760 v. United Parcel Service, Inc.*, 921 F.2d 218, 220 (9th Cir. 1990). Indeed, "[t]he whole point of arbitration is that the merits of the dispute will *not* be reviewed in the courts." *International Standard Elec. Corp. v. Bridas Sociedad*, 745 F.Supp. 172, 178 (S.D.N.Y.) (emphasis in original); *see also Bopp v. Brames*, 677 N.E. 2d 629, 634 (Ind. Ct. App. 1997) ("Relitigation of the merits of arbitration awards by the courts would only serve to frustrate the purpose of arbitration").

A valid and final award by arbitration has the same effect under the rules of *res judicata* as a final judgment on the merits from a court. *Lewis v. Circuit City Stores, Inc.*, 2007 U.S. App. LEXIS 21073, *18 (10th Cir. 2007). The principle of *res judicata* applies with equal force to a final arbitration award even if unconfirmed by a court. *See, e.g.*, *Val-U Construction Company v. Rosebud Sioux Tribe*, 146 F.3d 573, 581-582 (8th Cir. 1998) (principles of *res judicata* and collateral estoppel applied to an unconfirmed arbitration award); *Jacobson v. Fireman's Fund Insurance*, 111 F.3d 261, 266 N.6 (2d Cir. 1997) ("*Res judicata* is applicable to arbitration awards and may serve to bar the subsequent re-litigation of a single issue or an entire claim"); *City of Gainesville v. Island Creek Coal Sales Company*, 618 F. Supp. 513, 517-519 (N.D. Fla. 1984).

The same principles apply, of course, to non-domestic and foreign arbitrations. A foreign arbitral award is a "binding adjudication on the merits" that is not reviewable in U.S. courts. *Fotochrome, Inc. v. Copal Company, Ltd.*, 517 F.2d 512, 517 (2d Cir. 1975); *see also Industrial*

*Risk Insurers v. M.A.N. Gutehoffnugshutte*, 141 F.3d 1434, 1440 (11th Cir. 1998), *cert. denied*, 119 S.Ct. 797 (1999). These principles are expressly invoked by the IAAF rule providing that the Arbitral decision shall be "final and binding." The term "final and binding" means that "the issues joined and resolved in arbitration may not be tried de novo in any court." *Iran Aircraft Industries v. Avco Corp.*, 980 F.2d 141, 145 (2d Cir. 1992); *quoting, I/S Stavborg v. National Metal Conversers, Inc.*, 500 F.2d 424, 427 (2d Cir. 1974).

Nor does the assertion of a statutory claim entitle Plaintiff to religitate issues decided in the 2008 CAS Award. In *Rudell v. Comprehensive Accounting Corp*., 802 F.2d 926 (7th Cir. 1986), *cert. denied*, 480 U.S. 907 (1987), the court upheld the dismissal of plaintiffs' RICO claim that they had been fraudulently induced to sign a franchise agreement under which they had unsuccessfully arbitrated various disputes; plaintiffs could not then bring a lawsuit that would "undermine the earlier arbitration award secured by [the defendant]." 802 F.2d at 931. *See also Val-U Construction Co. of South Dakota v. Rosebud Sioux Tribe*, 146 F.3d 573, 581-582 (8th Cir. 1998) (arbitral award precludes relitigation of issues as to which plaintiff "was given a full and fair opportunity to litigate . . . at the arbitration hearing").

The member federations of the IAAF established an international arbitration procedure to ensure uniform world-wide decisions and to avoid parochial, nationalistic bias that would undermine the integrity of international athletics. The IAAF's rules explicitly state, "[t]he decision of CAS shall be final and binding on all parties, and on all Members, and no right of appeal will lie from the CAS decision." IAAF Rule 60.31. Now, Plaintiff seeks to have this Court intervene and decide *de novo* the issues that were resolved by the "final and binding" arbitration. This would unquestionably raise the suspicions of athletes and federations everywhere as to the nationalistic bias in favor of a popular U.S. athlete, which would be the

kind of "parochial refusal by the courts of one country to honor an international arbitration agreement" that the Supreme Court has condemned. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985), *quoting Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516-17 (1974).

### B. The Amateur Sports Act Gives the USOC and USATF Exclusive Jurisdiction Over Athlete Eligibility Issues; Therefore, the Court Lacks Subject Matter Jurisdiction.

The Amateur Sports Act grants the USOC and NGBs the power to determine eligibility for amateur sporting events. *See* 36 U.S.C. §220503(3) and 220523(a)(5). Under §220503(3), Congress granted the USOC "exclusive jurisdiction, directly or through constituent members," over "all matters pertaining to United States participation in the Olympic Games." The USOC, in turn, has designated the USATF as the NGB for the sport of track and field. As noted above, USADA is the independent anti-doping organization recognized by the USOC for Olympic, Pan-American and Paralympic sports in the United States.[5]

Congress intended, in enacting the Amateur Sports Act, to keep the regulation of amateur athletics out of the courtroom and within the structure established by the appropriate NGB and the USOC. Congress specifically rejected proposed legislative provisions that would have created authority for the judicial system to become embroiled in issues related to amateur athletes, and Congress specifically identified the USOC and NGBs as having exclusive jurisdiction over eligibility for competitions.[6]

---

[5] Since October 2000, every doping case for Olympic athletes in the United States has been adjudicated under the USADA Protocol and AAA Supplementary Procedures. The USADA Protocol and Supplementary Procedures were adopted by the USOC with the advice and concurrence of the Athlete's Advisory Council (a body consisting of, and elected by, United States amateur athletes) and the National Governing Bodies' Council.

[6] In enacting the Amateur Sports Act, the House of Representatives struck down a provision that would have provided special jurisdiction in district courts for certain injunctive

Pursuant to 36 U.S.C. §220523, the USATF, with respect to United States track athletes:

> exercises jurisdiction over international amateur athletic activities and sanctions international amateur athletic competitions held in the United States and sanctions the sponsorship of international amateur athletic competition held outside the United States; conducts amateur athletic competition . . . and establishes procedures for determining eligibility standards for participation in competition; and recommends to [the USOC] individuals and teams to represent the United States in the Olympic Games, the Paralympic Games, and Pan-American Games.

Thus, under the Amateur Sports Act, the USATF and USOC exercise exclusive jurisdiction, without court intervention, with regard to all matters related to Plaintiff's eligibility to compete. *Slaney v. Int'l Amateur Ath. Fed'n*, 244 F.3d 580, 596 (7th Cir.) ("the USOC has exclusive jurisdiction, under the Amateur Sports Act, to determine all matters pertaining to eligibility of athletes"), *cert. denied*, 534 U.S. 828 (2001).

In addition to granting exclusive jurisdiction to the USOC and the NGBs over matters pertaining to athlete eligibility, Congress declined to create any private right of action under the Amateur Sports Act. The Seventh Circuit held that the legislative history of the Act "clearly reveals that Congress intended not to create a private cause of action under the Act":

> The Act as originally proposed contained an "Amateur Athlete's Bill of Rights," which included a civil cause of action in federal district court for any athlete against an NGB, educational institution or other sports organization that threatened to deny the athlete's right to participate in certain events . . . Congress omitted the bill of rights provision in the Act's final version. Congress thus considered and

---

proceedings and struck down a provision that would have provided district courts with jurisdiction to enforce decisions of arbitrators. *See Barnes v. International Amateur Athletic Fed'n*, 862 F.Supp. 1537, 1544 (S.D. W. Va. 1993).

> rejected a cause of action for athletes to enforce the Act's provisions.

*Michels v. United States Olympic Committee*, 741 F.2d 155, 157-58 (7th Cir. 1984).

Numerous other courts similarly have held that the Act does not create a private right of action. *See Martinez v. United States Olympic Committee*, 802 F.2d 1275, 1281 (10th Cir. 1986) (affirming dismissal of boxer's suit for personal injury under the Act); *Oldfield v. Athletic Congress*, 779 F.2d 505, 508 (9th Cir. 1985) (affirming summary judgment in favor of the USOC on claim for damages and reinstatement; "it is highly improbable that Congress absentmindedly forgot to mention an intended private action"); *De Frantz v. United States Olympic Committee*, 492 F.Supp. 1181, 1192 (D.D.C.) (dismissing athletes' suit to lift 1980 boycott of summer Olympics; the legislative history of the Act is "barren of any implication that Congress intended to create a private cause of action"), *aff'd without opinion*, 701 F.2d 221 (D.C. Cir. 1980).

In addition, when it revised the Amateur Sports Act in 1998, Congress indicated its approval of the judiciary's interpretation of the Amateur Sports Act as not creating any private right of action. Congress provided explicitly that "[no] provision of this chapter shall create a private right of action under this chapter." 36 U.S.C. §220505(b)(9).

Based on the exclusive jurisdiction over athlete eligibility granted to the USOC and USATF by the Amateur Sports Act, courts have held that the Act preempts all claims relating to such eligibility. In *Slaney*, *supra*, the Seventh Circuit first looked to the express language of the Act:

> According to the Amateur Sports Act, one of the purposes of the USOC is to exercise exclusive jurisdiction over all matters pertaining to United States participation in the Olympic Games. *See* 36 U.S.C. § 220503(3). The Act also states that the USOC is designed "to provide swift resolution of conflicts and disputes involving amateur athletes,

> national governing bodies, and amateur sports organizations . . ." *Id*. at §§ 220503(8), 220503(12).

*Slaney*, *supra*, 244 F.3d at 594. The court concluded it lacked jurisdiction to adjudicate Slaney's claims against the USOC, as "those claims were preempted by Congress's grant of exclusive authority to the USOC to determine the eligibility of American athletes." *Id*. at 601.

Both Texas and Oklahoma state appellate courts likewise have held that the Act preempts an athlete's claims against the USOC or a NGB:

> The interest of maintaining consistent interpretations among jurisdictions requires the [Amateur Sports Act] to pre-empt claims asserted under state tort law. To hold a common law duty exists outside the scope of the Act, thereby enabling an individual athlete to bring suit, threatens to override the intent of Congress and open the door to inconsistent interpretations of the Act.

*Walton-Floyd v. The United States Olympic Comm*., 965 S.W. 2d 35, 40 (Tex. App. 1998); *accord*, *Cantrell v. United States Soccer Fed*., 924 P.2d 789, 792 (Okla. App. 1996) ("We find Congress, as a general matter, intended to leave questions of eligibility of those involved in amateur athletics to be resolved in accordance with the Act.").

In *Dolan v. United States Equestrian Team, Inc.*, 608 A.2d 434, 436-37 (N.J. App. 1992), the court explained that the Amateur Sports Act must not be subjected to differing interpretations under varying sources of law:

> The prompt resolution of disputes was a principal purpose of the Act. [Citations omitted.] One of the enumerated purposes of the United States Olympic Committee (USOC), the vehicle created by Congress to coordinate amateur athletics and national governing bodies, was to
>
> > provide for the swift resolution of conflicts and disputes involving amateur athletes, national governing

> > bodies, and amateur sports organizations, and protect the opportunity of any amateur athlete, coach, trainer, manager, administrator, or official to participate in amateur athletic competition . . . [36 U.S.C.A. § 374(8)]
>
> To this end the USOC was empowered to
>
> > facilitate, through orderly and effective administrative procedures, the resolution of conflicts or disputes which involved any of its members and any amateur athlete, coach, trainer, manager, administrator, official, national governing body, or amateur sports organization and which arise in connection with their eligibility for and participation in the Olympic Games, the Pan-American world championship competition, or other protected competition as defined in the constitution and bylaws of the [USOC] . . . [36 U.S.C.A. § 375(a)(5).]
>
> and was required to establish an appropriate mechanism in its constitution and bylaws.

. . .

> And finally, Congress set forth a detailed mechanism by which grievances or disputes were to be resolved. 36 U.S.C.A. § 395.
>
> [W]e believe the Act should be uniformly interpreted; that it would be inappropriate to attribute different or unique meanings to its provisions in New Jersey and thus create a jurisdictional sanctuary from the Congressional determination that these types of disputes should be resolved outside the judicial processes.

*Accord*, *Michels*, *supra*, 741 F.2d at 159 (Posner, J., concurring) ("there can be few less suitable bodies than the federal courts for determining the eligibility, or the procedures for determining the eligibility, of athletes").

### C. Even if the Court Had Subject Matter Jurisdiction, Plaintiff's ADA Claims Are Too Late as a Matter of Law.

#### 1. Plaintiff's ADA claims are barred by the statute of limitations.

Each of Plaintiff's ADA claims rests upon the allegation that "Justin's request for a retroactive waiver immediately following his 2001 positive drug test should have been permitted." Plaintiff's Memorandum of Law and Facts in Support of Plaintiff's Motion for a Temporary Restraining Order and/or Preliminary Injunction, p. 19. Plaintiff complains that, rather than grant a waiver, USADA and USATF, consistent with IAAF rules in effect in 2001, "imposed a two-year penalty for this Adderall offense without regard to any mitigating circumstances." *Id*. at 8. As explained in the facts section, Justin never made the request for accommodation his lawyer claims was made. However, even had such a request been made it is far too late to predicate an ADA claim on something which allegedly occurred in 2001 or 2002.

In determining the applicable limitations period for ADA or Rehabilitation Act claims, courts look to the state's limitations period for personal injury actions. *Everett v. Cobb County School District*, 138 F.3d 1407, 1409 (11th Cir. 1998). For purposes of plaintiff's claims in this case, the court could look to Tennessee or Florida law for statute of limitations purposes. If Tennessee law applies, the applicable statute of limitations for ADA and Rehabilitation Act claims is one or two years. *Miller v. City of Knoxville*, 2006 U.S. Dist. LEXIS 61786, *8 (E.D. Ten. 2006). If the relevant state is Florida, "the statute of limitations on a federal ADA claim arising in Florida is four years." *Merker v. Miami-Dade County*, 485 F.Supp. 2d 1349, 1354 (S.D. Fla. 2007).

Under either a one-year or four-year statute of limitations, Plaintiff's claims are barred as a matter of law. Plaintiff alleges that "[his] request for a retroactive waiver immediately following his 2001 positive drug test should have been permitted." Plaintiff's Memorandum of

Law, p. 19. Plaintiff also alleges he was notified on August 24, 2001, that the USADA Anti-Doping Review Board had recommended that the case proceed to discipline and that a two-year sanction be imposed. Complaint, ¶61. The AAA Award, which imposed a two-year suspension commencing May 1, 2002, is dated May 1, 2002. Plaintiff states in his brief to CAS that the IAAF's published statement on July 23, 2002, made it clear the IAAF would treat Plaintiff's 2001 violation as a first offense and would not grant Plaintiff an exemption. *See* Brief Submitted by Justin Gatlin to CAS dated February 25, 2008, p. 17, USADA Exh. **58**. Thus, even using a four-year statute of limitations, and giving Plaintiff every benefit of the doubt as to when the limitations period began, his ADA and Rehabilitation Act claims must have been filed no later than July 2006.

Perhaps anticipating a statute of limitations defense, Plaintiff argues that Defendants have denied his request for accommodation "at the 2001 USADA Review Board, the 2007 AAA hearing and again at the 2008 CAS hearing." Plaintiff's Memorandum of Law, p. 9. Essentially, Plaintiff contends that Defendants failed in 2007 and 2008 to remedy the alleged discrimination which occurred in 2001.

Plaintiff's argument fails as a matter of law. As explained by the Eleventh Circuit in *Everett*, *supra*, 138 F.3d at 1410:

> Claims of discrimination accrue when the plaintiff is informed of the discriminatory act. *Delaware State College v. Ricks*, 449 U.S. 250, 258, 66 L.Ed. 2d 431, 101 S.Ct. 498 (1980) (period commenced at time the tenure decision was made and communicated to plaintiff, even though one of the effects of denial of tenure, the eventual loss of a teaching position, did not occur until later). . . .
>
> Failure to remedy a prior act of discrimination does not constitute a new act of discrimination for the purpose of determining whether a claim is time barred.

*See also Lever v. Northwestern University*, 979 F.2d 552, 556 (7th Cir. 1992) ("An employer's refusal to undo a discriminatory decision is not a fresh act of discrimination.")

**2. Further, any attempt by plaintiff to vacate or override the 2002 AAA Award is untimely.**

In order to grant the relief requested by Plaintiff, the Court would necessarily be required to vacate or overrule the 2002 AAA Award. Under the Federal Arbitration Act, however, any application to vacate or modify the 2002 AAA Award must have been filed no later than August 2002 (within three months from the date the Award is filed). 9 U.S.C. § 12.

**D. Even if CAS had Treated Plaintiff's 2006 Anti-Doping Rule Violation as a First Offense, Plaintiff Would Not be Eligible to Compete Before July 25, 2006.**

In his Memorandum of Law, Plaintiff asserts that, if the Court ordered a retroactive exemption for his 2001 doping violation, "Plaintiff would be eligible for competition immediately, given the credit for the time already forfeited." Plaintiff's Memorandum of Law, p. 2. Plaintiff is wrong.

There is no dispute that, even if the 2001 anti-doping rule violation were not considered, Plaintiff would have been subject to a two-year period of ineligibility based on the 2006 anti-doping rule violation alone. *See* IAAF Rules 32.2(a) and 40.1(a)(i), USADA Exh. **25**. According to the 2008 CAS Award, Plaintiff's period of ineligibility begins on July 25, 2006. This means that, based solely on the 2006 doping violation, Plaintiff is not eligible to compete until, at the earliest, July 24, 2008. Therefore, even if Plaintiff received the full relief he is requesting (i.e., a retroactive exemption for the 2001 doping violation), he would not be eligible to compete at the Olympic trials this month.

## II. PLAINTIFF ALSO CANNOT DEMONSTRATE IRREPARABLE INJURY.

The irreparable injury claimed by Plaintiff is that, without an injunction, he "will not be eligible to participate in the 2008 Olympic Games in Beijing, China." Plaintiff's Memorandum of Law, p. 23. This misses the critical point, however, that an injunction by this Court would have no effect on whether Plaintiff would be allowed to compete at the Olympic Games.

The decision as to whether Plaintiff would be allowed to compete at the Olympic Games is made by the IOC. Based on precedent from prior Olympic Games and the organizations' rules, it must be expected that the IOC will honor the final and binding 2008 CAS Award. Indeed, the World Anti-Doping Code mandates that the 2008 CAS Award "shall be recognized and respected" by the IOC. As the IOC is not named as a party in this case, and the Court has no personal jurisdiction over the IOC or the IAAF at this time, any injunction entered by the court could have no power over the IOC or IAAF. As Judge Posner noted in similar circumstances, "[T]he USOC has no control over [an International Federation]. [The International Federation] can thumb its collective nose at the USOC . . . ." *Michels*, *supra*, 741 F.2d at 159 (Posner, J. concurring). Accordingly, Mr. Gatlin cannot demonstrate irreparable injury because he is unable to reasonably demonstrate that his injunction request in not a futile exercise.

## III. THE ENTRY OF RELIEF WOULD NOT SERVE THE PUBLIC INTEREST.

Finally, there is a strong public interest in both enforcing final arbitration awards and ensuring a level playing field for all international-level athletes. If a final arbitration award can be overturned without any recognition of the strong deference required by the New York Convention or the Federal Arbitration Act, the effectiveness of the worldwide campaign for clean sports will be greatly undermined. Thus, Mr. Gatlin's request for an injunction conflicts

with public interest and settled U.S. policy articulated in the Amateur Sports Act and the New York Convention.

## CONCLUSION

For the reasons stated above, USADA respectfully requests that Plaintiff's motion for preliminary injunction be denied and that the temporary restraining order entered by this Court be immediately dissolved.

Dated: **June 22, 2008**.

Respectfully submitted,

**WADE PALMER & SHOEMAKER P.A.**

s/ *Robert C. Palmer, III*

WADE PALMER & SHOEMAKER P.A.
25 W Cedar Street, Suite 450
Pensacola, Florida 32591
bpalmer@wpslawyers.com

Of Counsel:

William Bock, III
General Counsel
**UNITED STATES ANTI-DOPING AGENCY**
1330 Quail Lake Loop, Suite 260
Colorado Springs, CO 80906
Telephone: (317) 692-9000
Facsimile: (317) 264-6832
wb@kgrlaw.com

Brent E. Rychener
Holme Roberts and Owen LLP
90 South Cascade Avenue
Suite 1300
Colorado Springs, CO 80903-1615
Telephone: (719) 473-3800
Facsimile: (719) 633-1618

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing document was served upon the following counsel of record by way of operation of the Court's electronic filing system this **22nd day** of **June**, **2008**:

Joseph A. Zarzaur, Jr
ZARZAUR LAW, P.A.
PO Box 12305
Pensacola, Florida 32591
joe@zarzaurlaw.com
*Attorneys for Justin Gatlin*

Lorence J. Bielby
John K. Londot
GREENBERG TRAURIG P.A.
101 E. College Ave
PO Drawer 1838
Tallahassee, Florida 32302–1838
bielbyl@gtlaw.com
LondotJ@gtlaw.com
*Attorneys for United States Olympic Committee*

Robert C. Palmer, III
WADE PALMER & SHOEMAKER P.A.
25 W Cedar Street, Suite 450
Pensacola, Florida 32591
bpalmer@wpslawyers.com
*Attorneys for United States Anti-Doping Agency*

s/ *Robert C. Palmer, III*

WADE PALMER & SHOEMAKER P.A.
25 W Cedar Street, Suite 450
Pensacola, Florida 32591
bpalmer@wpslawyers.com