## BEFORE THE AMERICAN ARBITRATION ASSOCIATION
### North American Court of Arbitration for Sport Panel

| | |
|---|---|
| Justin Gatlin<br><br>    Claimant,<br><br>        v.<br><br>United States Anti-Doping Agency,<br><br>    Respondent. | AAA No. 30 190 00546 01 |

## PARTIES STIPULATION

For purposes of the hearing in this matter involving Mr. Justin Gatlin ("Mr. Gatlin") and the United States Anti-Doping Agency ("USADA"), concerning Mr. Gatlin's positive urine samples, USADA numbers 456473 and 456500, the parties submit the following stipulation:

1. On June 16 and 17, 2001, Mr. Gatlin was drug tested by USADA at the USA Track and Field ("USATF") Junior National Championships. His urine samples were declared positive by the IOC-accredited laboratory at the University of California at Los Angeles ("UCLA Laboratory)" for the stimulant amphetamine. Amphetamine is a substance prohibited during competition under the International Association of Athletics Federations ("IAAF") rules applicable to the competition. USADA notified Mr. Gatlin of his positive A sample on July 12, 2001. The UCLA Laboratory reported Mr. Gatlin's B sample positive on July 23, 2001. Mr. Gatlin does not contest the integrity of the sample collection process or, the transport or laboratory chain of custody of his samples. Mr. Gatlin further does not contest any aspect of the laboratory analysis, including the finding of amphetamine in his samples.

GATLIN v. UNITED STATES ANTI-DOPING AGENCY

#112496 v3

Dockets.Justia.com

2. Mr. Gatlin is a 19-year old college student who attends the University of Tennessee on a track scholarship. Mr. Gatlin has a medical condition known as attention deficit disorder ("ADD"). He was first diagnosed with this condition when he was nine years old and he has been taking prescribed medication for this condition ever since.

3. There is no dispute that Mr. Gatlin suffers from ADD and that the medication taken by him was an appropriate treatment for his condition. Mr. Gatlin was first diagnosed with ADD in 1991. After a thorough medical evaluation, it was determined that Mr. Gatlin suffered from ADD and that he could benefit from prescription medicine. Over the next ten years, Mr. Gatlin continued to be regularly evaluated by his treating physician and his prescriptions were adjusted as needed to treat his condition in light of the side effects and efficacy. For the past five years, Mr. Gatlin's treating physician, Dr. Robin E. Barnett, has prescribed Adderall to treat Mr. Gatlin. Adderall contains amphetamine asparate, amphetamine sulfate, dextoamphetamine saccharate, dextroamphetamine sulfate.

In evaluating this matter, USADA obtained medical opinions from an international panel of experts who reviewed Mr. Gatlin's medial history and records. This panel consisted of Dr. Paul Hutchins from Australia, Dr. William Mahoney of Canada, and Dr. Mark Walraich of the United States. All three of these experts concluded that Mr. Gatlin suffers from ADD and that Adderall is an accepted and an appropriate medical treatment for his condition.

USADA does not dispute the amphetamine found in Mr. Gatlin's sample came from the prescription medicine, Adderal, that Mr. Gatlin was taking for ADD.

4. Mr. Gatlin's testimony will be that he last took his medication several days before his first in-competition test. At the time Mr. Gatlin was enrolled in summer school. Mr. Gatlin was taking two summer school classes, English 101 and Music History 350, which he needed to

successfully complete in order to satisfy requirements for his scholarship. He was under significant pressure to pass these courses and took his medicine regularly so that he could study productively. He had mid-term exams in these courses the week of June 11, 2001, the week prior to the competition.

5. Mr. Gatlin will testify that he took his prescription medicine to study for mid-terms and that he did not want to have the medication in his system at the time of the competition because it makes him feel "sluggish"[1] and he is not able to run as well on it. Mr. Gatlin did not take his medication for three days prior to the competition. He did not feel the effects of his medicine and believed that it had cleared his system. He was unaware despite the fact that he could not feel his medicine that, there was still the possibility that detectable amounts of the medicine could exist in his urine. As it turns out, his medicine did not completely clear his system. Small amounts of amphetamine, less than 200 nanograms per milliliter of urine, were detected in the urine sample he provided on June 16, 2001. The sample he gave the next day on June 17, 2001, contained even smaller amounts. These decreasing amounts are consistent with Mr. Gatlin having stopped taking his medication on or about June 13, 2001, before he ran in the competition.

6. The IAAF definition of doping, prohibited substances and sanctions are applicable in this hearing.

7. Under the IAAF definition of doping the [offence] of doping takes place when a prohibited substance (in this case amphetamine) is found to be present within an athlete's bodily

---

[1] Amphetamine has exactly the opposite effect on people with ADD that it has on healthy individuals. Whereas it works as a powerful stimulant on most people, it has the opposite effect on ADD patients. The international panel of experts who reviewed this case for USADA confirmed that most likely, Mr. Gatlin's medication would make a person like him with ADD feel sluggish and that it would not have enhanced his performance at the competition.

#112496 v3

-3-

fluids, unless a prior medical exemption was given by the IAAF for the use of the substance. Mr. Gatlin never sought any medical exemption from the IAAF. Mr. Gatlin advises that he disclosed his prescription medicine to his doctor at the University of Tennessee.

Based on the international expert opinions obtained through USADA's independent review, it is not unreasonable to assume that if requested, the exemption likely would have been granted. However, rather than seek a medical exemption, the course of action followed by most athletes with ADD is to simply discontinue their medication in advance of a competition. This is what Mr. Gatlin did. USADA advises athletes after consultation with their physicians to discontinue using the ADD medication prior to competition in order for the medication to clear their system. USADA does not advise athletes on how long before a competition to discontinue taking medication because with the potential variations in the metabolism of different human beings, it is difficult to judge precisely when athletes need to discontinue taking medication in advance of a competition so that no trace will be detected in their urine.

The parties agree that Mr. Gatlin's positive test result is technically a doping violation under IAAF Rules.

8. Under the IAAF rules the sanction for a first offense involving amphetamine is forfeiture of competitive results at the tested competition plus a minimum suspension period of two years from the date of the hearing at which it is decided that a Doping Offense has been committed. However, "[w]hen an athlete has served a period of suspension prior to a declaration of ineligibility, such a period of suspension shall be deducted from the period of ineligibility imposed by the relevant Tribunal." IAAF Rule 60 2 (a)(i).

9. The IAAF rules contemplate that after a two year suspension is imposed the IAAF Council may consider an application from the athlete seeking early reinstatement, thus reducing the two year suspension in appropriate circumstances. The IAAF Council will only consider an early reinstatement from athletes <u>after</u> the two year suspension is imposed.

10. When Mr. Gatlin received notice of his positive A sample on July 12, 2001, he immediately advised the United States Track and Field Federation ("USATF") that he was withdrawing from all further IAAF and USATF sanctioned competitions until such time as the doping matter was resolved. This included withdrawing from the position he had earned on the USATF National Team which was scheduled to leave for competitions in England and Scotland in August 2001. To date, Mr. Gatlin still has not competed in any IAAF or USATF competitions in the nearly ten months since the return of his positive test. In that period he would normally have competed in a number of USATF and IAAF sanctioned events.[2]

The parties also agreed, with the concurrence of the IAAF, that in connection with the delay of the hearing from January 29, 2002, to April 30, 2002, in order to attempt to accommodate possible advance consideration of this matter by the IAAF Council, that this four-month period would be credited towards any suspension which might ultimately be imposed.

---

[2] Mr. Gatlin also refrained from competing in any NCAA competitions, even though those events are not sanctioned by USATF or the IAAF and even though the NCAA and the Olympic Movement bodies do not recognize each other's doping suspensions. The parties understand that this would not have been a doping violation under NCAA rules. In January 2002, Mr. Gatlin was advised by the University of Tennessee that either he commenced competing for the University, or he risked losing his athletic scholarship. He only did so after his counsel confirmed with counsel for the IAAF that doing so would not jeopardize his status in this case or his voluntary suspension.

#112496 v3

-5-

Respectfully submitted,

_____
Richard R. Young
Travis T. Tygart
HOLME ROBERTS & OWEN LLP
90 South Cascade Avenue, Suite 1300
Colorado Springs, Colorado 80903
Telephone: (719) 473-3800
Fax: (719) 633-1518

Attorneys for the United States Anti-Doping Agency


_____
John P. Collins
JENKENS & GILCHRIST
225 West Washington Street, Suite 2600
Chicago, IL 60606-3418
Telephone: (312) 425-3900
Fax: (312) 425-3909

Attorneys for Justin Gatlin

#112496 v3

Respectfully submitted,

---

Richard R. Young
Travis T. Tygart
HOLME ROBERTS & OWEN LLP
90 South Cascade Avenue, Suite 1300
Colorado Springs, Colorado 80903
Telephone: (719) 473-3800
Fax: (719) 633-1518

Attorneys for the United States Anti-Doping Agency

---

John P. Collins
JENKENS & GILCHRIST
225 West Washington Street, Suite 2600
Chicago, IL 60606-3418
Telephone: (312) 425-3900
Fax: (312) 425-3909

Attorneys for Justin Gatlin

#1124196 v3

301523

# Holme Roberts & Owen LLP  *Attorneys at Law*

90 South Cascade Ave.  Tel (719)473-3800
Suite 1300  Fax (719)633-1518
Colorado Springs, CO 80903



FACSIMILES MAY BE SENT TO FIRM'S FAX LINE, (719)633-1518 or to the individual's direct fax line, if any:

| TO: Walter G. Gans | FAX: 212-202-5456 |
| TO: Christopher L. Campbell | FAX: 415-397-3170 |
| TO: Edward V. Lahey, Jr. | FAX: 860-767-1729 |

Date: April 30, 2002

Billing: 45787-00080

From: Travis T. Tygart    Atty/User #: 3212

Message:   RE:   Justin Gatlin and USADA
AAA #30 190 00546 01

Enclosed are the Parties' Stipulation and USADA's Position of Sanctions for the hearing in this matter.

Number of pages following this cover sheet: _____

If you need a confirmation or any of the pages sent again or if there are any transmission problems, please contact Idell Mulhern at the following number: Ext. 2425 or call (719) 473-3800. If you do not call within 15 minutes, we will assume you have received the pages satisfactorily.

CONFIDENTIALITY NOTE: The information contained in this facsimile transmittal sheet and document(s) that follow are for the exclusive use of the addressee and may contain confidential, privileged and nondisclosable information. If the recipient of this facsimile is not the addressee, or a person responsible for delivering this facsimile to the addressee, such recipient is strictly prohibited from reading, photocopying, distributing or otherwise using this facsimile transmission, or its contents, in any way. If the recipient has received this facsimile transmission in error, please call us immediately and return the facsimile transmission to us via the United States Postal Service. Thank you.

Offices in:   Denver   Salt Lake City   Boulder   Colorado Springs   London

#112981 v1