# Jenkens & Gilchrist
A PROFESSIONAL CORPORATION

225 WEST WASHINGTON STREET
SUITE 2600
CHICAGO, ILLINOIS 60606-3418

(312) 425-3900
FACSIMILE (312) 425-3909

www.jenkens.com

AUSTIN, TEXAS
(512) 499-3600

DALLAS, TEXAS
(214) 855-4500

HOUSTON, TEXAS
(713) 951-3300

LOS ANGELES, CALIFORNIA
(310) 820-8800

NEW YORK, NEW YORK
(212) 704-6000

SAN ANTONIO, TEXAS
(210) 246-5000

WASHINGTON, D.C.
(202) 326-1500

JOHN P. COLLINS
(312) 425-8520

May 22, 2002

Craig Masback
USA Track & Field
One RCA Dome, Suite 140
Indianapolis, Indiana 46225

Re: Justin Gatlin's Petition for Early Reinstatement

Dear Craig:

Enclosed please find materials in support of Justin Gatlin's petition for early reinstatement to the International Amateur Athletic Federation pursuant to IAAF Rule 60.9 and Chapter 4 of the Procedural Guidelines for Doping Control. Please forward these materials to the IAAF as soon as possible so that the matter may be placed on the agenda for the IAAF's next Council meeting which is set for July 3-4, 2002 in Paris, France.

As you can see from the attached materials, Mr. Gatlin's case is clearly one of exceptional circumstances which warrants early reinstatement. Moreover, since the announcement of his suspension and his public statements about his disability, other similarly situated individuals have come forward to ensure that their use of prescription medicine is fully disclosed to the IAAF. These efforts have and will continue to substantially assist USA Track & Field and the IAAF in fulfilling their doping control objectives. Justin is also providing an excellent role model for individuals with ADHD and helping them know that they too can accomplish their goals.

Also, please note that Justin was drug tested by USADA in January and again this week. USADA will perform the third test required under Rule 60.9 in June and will forward the results of these tests to the IAAF prior to the IAAF's July Council meeting.

CHICAGO 225064v1 99909-00004

      Please contact me if you have any questions or would like any additional information. Thank you for your prompt attention to this matter.

                              Very truly yours,

                              John P. Collins

Encl.
cc:    Rich Young w/o encl.

# JUSTIN GATLIN'S REQUEST FOR EARLY REINSTATEMENT

On June 16 and 17, 2001, the presence of amphetamine was detected in the urine of Justin Gatlin, a 19-year-old college student. The amphetamine was the direct result of prescription medicine that Justin was taking to treat his disability, Attention Deficit Disorder ("ADD"). For the past 10 years, Justin has taken prescription medicine, like his current medicine, Adderall, to treat his disability so he may lead a normal life and progress through school with his peers.

If Justin was a typical student, his use of prescription medicine would not be an issue. Under U.S. law, he has a legal right to take his medicine and parties are prohibited from discriminating against him for doing so. In fact, parties are required by law to make special accommodations to assist Justin in overcoming his disability.

Justin, however, is not a typical student. He is a gifted athlete. Justin's urine samples were taken on June 16 and 17, 2001 as part of his participation in the USA Track & Field's ("USATF") Junior National Championships. Thus, the presence of amphetamine, a Schedule 1, Part 1(b) prohibited substance, in Justin's urine is a technical violation of International Amateur Athletics Federation ("IAAF") Rule 55 as applied by the USATF. Under IAAF Rule 60, the presence of this prescription medicine carries a minimum sanction of two years of ineligibility.

Fortunately, IAAF Rule 60.8 understands that not every violation of IAAF's anti-doping rules is the same and that in exceptional circumstances an athlete should be reinstated before the expiration of the full period of ineligibility. As more fully set forth below, Justin Gatlin's case is one of "exceptional circumstances" that merits early reinstatement. Justin Gatlin, therefore, respectfully requests that IAAF grant him early reinstatement effective beginning May 1, 2002.

A. History of Justin's Disability and Treatment

Justin was first diagnosed with Attention Deficit Disorder in 1991 when he was 9 years old. Justin was experiencing difficulty at school and his teachers and parents were concerned. After a thorough evaluation, it was determined that Justin suffered from ADD and that he could benefit from prescription medicine. Justin responded well to this treatment and his performance in school improved.

Over the next 10 years, Justin continued to be regularly evaluated by his treating physicians and his prescriptions were adjusted as needed to treat his disability in light of the side effects and efficacy. For approximately the past 5 years, Justin's treating physician, Dr. Robin E. Barnett, has prescribed Adderall to treat Justin. Adderall contains amphetamine asparate, amphetamine sulfate, dextroamphetamine saccharate, and dextroamphetamine sulfate. Adderall is approved by the United States government (FDA) for the treatment of ADD.

At all times, Justin's treatment and prescription medication has been well within the acceptable limits of treatment in the United States. The sole consideration in his treatment has always been mitigating Justin's disability and allowing him the opportunity to realize his full potential in the classroom. Benefiting his athletic career has never been a consideration.

B.   No Competitive Advantage

In June 2001, Justin Gatlin was taking two summer school classes, English 101 and Music History 350, which he needed to successfully complete in order to satisfy his academic scholarship requirements for his freshman year at the University of Tennessee. He was particularly concerned about English 101 because that course had given him difficulty both semesters his freshman year. He was under significant pressure to pass this course and took his medicine regularly so that he could study productively. The only thing on his mind when he took his medicine during the week of June 15, 2001 was passing his mid-term exams. He was not preparing for the USATF Junior Nationals. In addition, like many other individuals with ADD, Justin wanted to keep his condition and its treatment a private matter known by his family and doctors. He did not want to be branded as an "ADD student" and suffer all of the other negative stigmas attached to that label.

Justin was not concerned about his track meet when he took his prescription medicine because he had no intention of taking it while at his meet. He did not want to take his prescription while at the meet because it makes him "sluggish" and he is not able to run as well while on it. For him, his prescription medicine and the amphetamines contained within it are not performance enhancing drugs, but rather the opposite – performance detriments. Throughout his career Justin's times are slower when he is taking his medicine. As a result, on or about June 13, 2001, Justin completed his mid-terms and stopped taking his prescription medicine. He then traveled to the USATF Junior Nationals on June 15, 2001 for his events on June 16 and 17, 2001.

Justin is a college student and not a physician. In his layman understanding of how the body processes medicine, he believed that when he raced on June 16 and June 17 that he was not on his prescription medicine and it would not be an issue. At that time he had not taken it for approximately 3 days. He did not feel the effects of his medicine and believed that it had cleared his system. He was unaware that despite the fact that he could not feel his medicine, there was still the possibility that detectable amounts could exist in his urine.

Unfortunately, as it turns out, despite his good faith efforts and intentions his medicine had not completely cleared his system. Trace amounts of amphetamine, less than 200 ng/ml, were detected in the urine sample he gave on June 16, 2001. Also, the sample he gave the next day, June 17, 2001, contained even smaller amounts. These decreasing amounts are consistent with Justin having stopped taking his prescription medicine on or about June 13, 2001 well before he ran in the USATF Junior Nationals. Moreover, these trace amounts would not provide competitive advantage to Justin. In

- 2 -

fact, under federal United States regulations, these trace amounts would not even constitute a positive test for amphetamine.

For these reasons, it is clear that Justin did not take his prescription medicine in an attempt to gain a competitive advantage over his opponents. Justin took his prescription for school, not track. Incidentally, Justin successfully completed both of his summer school courses.

C. No IAAF Wavier Requested

Justin never intended to participate with his prescription medicine in his system. Justin intended to run his race "clean" – without any prohibited substances in his system - and believed that by discontinuing his medicine when he did, he was running a "clean" race. He believed that he had fully complied with all of the relevant IAAF rules and acted in accordance will all notices he had actually received. Therefore, Justin did not apply to the IAAF for an exemption to use a prohibited substance during competition because he did not believe that one was needed.

Even now, Justin does not seek the IAAF's permission to compete with prohibited substances in his system. Justin is ready and willing to discontinue his medicine sufficiently far enough in advance of any IAAF or USATF competition so that he will not test positive. The University of Tennessee has agreed accommodate Justin's academic schedule by moving classes and exams as needed so that he can discontinue his medication and compete without negatively impacting his education.

Unfortunately, to date Justin has been unable to determine how far in advance he needs to discontinue his medicine in order to not test positive for amphetamines. It is extremely difficult to find any specific information on how long it takes Justin's prescription medicine to clear his system. Justin's treating physician, Dr. Barnett, has been unable to determine the proper amount of time and has specifically requested the United States Olympic Committee to provide that information. The USOC has not done so. In addition, the United States Anti-doping Agency ("USADA"), has not provided that information.

Readily available literature on the issue is inconclusive and confusing. U.S. scientists typically state as a rule of thumb that 2-4 days after taking amphetamines an individual will no longer "test positive." They indicate that the actual time may vary depending upon the specific characteristics of the individual being tested such as diet, metabolism, water consumption and other variables. Unfortunately, the literature generally does not state that "testing positive" is a term of art. Under U.S. law and federal government regulations, a urine sample must contain more that 500 ng/ml to be considered a "positive test" and more than 1000 ng/ml for certain screening tests. This amount is significantly higher than the IAAF threshold which is based upon a zero tolerance policy. It is also significantly higher – 2 to 5 times higher – than the amounts found in Justin's urine samples. Literature on when a urine sample will contain 0 ng/ml is not readily available.

- 3 -

It should be noted that Justin has not sought permission for an exemption because amphetamines are only tested "in competition" and thus permitted to be used "out of competition." Similarly, USADA, as evidenced by its notices (to the extent they exist), has recognized an athlete's right to use prescription medicines containing amphetamines and has only indicated that individuals should stop using them prior to the competition. If out of competition use were ever to come into question, Justin would apply for an exemption and reserves his right to do so. In the United States, under the Americans with Disabilities Act and the Rehabilitation Act, Justin has a legal right to use his prescription medicine. He may not be discriminating against because of his disability and its treatment and entities must make reasonable accommodations to allow Justin to participate and overcome his disabilities. Finally, if the IAAF believes that Justin should apply for an exemption at this time, he will do so.

### D. Inadequate Notice

In preparing for the USATF Junior Nationals, Justin believed that his conduct complied with the notice and advice he had received with respect to prohibited substances. To the extent he had received any notice and advice, it was simply to stop taking his medicine before the meet. He did not receive any notice on specifically how long before an event he should discontinue using his medicine. For all he knew, discontinuing his medicine at least two days before his race was sufficient for it to clear his system. Had Justin been notified that this time was not sufficient, he would have discontinued taking his medicine sooner. Justin unfortunately did not receive this notice. In fact, to date Justin still has not received any specific guidance on how far in advance he should discontinue his medicine before an event.

On April 20, 2001, Justin registered to participate in the 2001 USATF Junior National Championships. This event was Justin's first major USATF event. Justin registered to participate through his coach at the University of Tennessee. The University of Tennessee regularly participates in college track events that are governed by the NCAA and not USATF. The NCAA is a separate, independent entity that has different anti-doping protocol than the IAAF. Justin had participated in numerous NCAA track events and never had an issue with his use of his medicine.

As part of his registration, Justin received a copy of a limited notice concerning the potential use of prohibited substances. This notice, which he filled out and turned in approximately three months before the event, merely stated that an individual taking prescription medicine should contact USADA. The notice did not provide any specific information. It did not indicate when an individual like Justin, who takes prescription medicine to treat disability, should discontinue use of that prescription. (To date, USADA still has provided no guidance on when athletes should discontinue their medicine before an event.) Thus, Justin believed that continuing to use his medicine would not violate any rule provided he did not take it on the day of the race.

- 4 -

CHICAGO 185658v1 -

After the USATF Junior Nationals, Justin received a copy of the 2001 USATF Anti-doping manual. Of course by then it was too late to be of any use. Even if it had been delivered timely – which it was not – it still would have been of dubious value at best. This manual, which is approximately 160 pages long and lists numerous medicines and other substances by name, does not list Adderall. The closest reference to Justin's situation is buried in four lines in approximately the middle of the entire document which consists of thousands and thousands of lines of text. And, then all that provision does is advise individuals who suffer from ADD to discontinue their prescriptions prior to competing. The notice specifically references Ritalin and Cylert but does not list Adderall. The notice provides no guidance on how long before a competition one should discontinue taking his medicine. Thus, Justin's actions fully complied with the notice he received after having tested positive.

It should be noted that it was not until after Justin had been notified of his positive "A" test that USADA provided any notice that Adderall may lead to a positive test for a prohibited substance. It was not until September 2001 – more than 2 months later – that USADA posted on its website that use of Adderall could cause one to test positive for a prohibited substance. Even then, USADA only indicated that a person should discontinue use prior to the event. USADA provided no guidance on how long before the event. USADA made no attempt to make the reasonable accommodation of helping the individual disabled athletes determine how far in advance they should discontinue use of their prescription medicine.

E. Commitment to the Sport and Compliance with IAAF Rules

Justin Gatlin always intended to comply with all IAAF rules and regulations. Regrettably, he has learned that his good faith intentions were not enough and that as a result of inaccurate information and assumptions he inadvertently violated an IAAF rule. Justin has learned from this experience and his error will not be repeated. Justin is fully committed to the sport, the IAAF and its mission. Justin intends to turn his unfortunate circumstances into a positive event for himself and all future track participants. Justin's accomplishments and the way he has handled this matter, strongly indicate that Justin will be able to accomplish these goals.

Justin intended to comply with the IAAF's rules and would have altered his actions had he been informed that his conduct in this instance violated IAAF's rules. Unfortunately, Justin first learned that his actions violated IAAF on July 12, 2001 when he received notice of his positive test results – and when it was too late to do anything about it. His actions upon learning of his positive "A" sample further demonstrate his good faith in this matter and belief in the IAAF's rules.

When Justin received notice of his positive A sample test, Justin immediately imposed a voluntary provisional suspension against himself and withdrew from all IAAF and USATF events. He withdrew from the US Junior National Team and did not travel to compete in competitions in England and Scotland. To date, Justin still has not participated in any IAAF or USATF events despite the nearly six months since the return

of his positive A sample. Justin's provisional suspension has been completely voluntary; the USATF did not require him to take these actions. Justin voluntarily undertook this provisional suspension as a result of his desire to work within the spirit IAAF's rules and not to exploit any technicalities.

In addition to personally complying with IAAF rules, Justin intends to actively assist the IAAF and USATF in their efforts to keep the sport drug free. Justin will work with the IAAF and USATF to help educate participants on the benefits of a drug-free sport. He will work with the IAAF and USATF to educate individuals that their prescription medicines may cause them to test positive for banned substances and that even if it may be personally embarrassing or potentially stigmatizing they must let their coaches and trainers know what medications they are taking and that they must take all necessary actions to comply with IAAF rules. Also, should Justin ever learn of other athletes or coaches violating IAAF's anti-doping rules, he will promptly notify the USATF and USADA.

Justin's dedication to the fight against drugs is nothing new. Throughout junior high school and high school, Justin was an active member of D.A.R.E, a youth group dedicated to helping children avoid drugs. Justin has continued his community activities while at the University of Tennessee. In the past year, he has appeared at grade schools and other community events to speak out against drug use and for the positive benefits of participating in track and the community. Justin has also been very active in his church for years.

F.  Conclusion

For the reasons stated above, Justin Gatlin respectfully requests that the IAAF grant his request for early reinstatement based upon the exceptional circumstances in this matter. He respectfully requests that his eligibility be reinstated effective beginning May 1, 2002. Thank you for your prompt consideration of this matter.