BEFORE THE AMERICAN ARBITRATION ASSOCIATION
North American Court of Arbitration for Sport Panel

| | | |
|---|---|---|
| Justin Gatlin | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | AAA No. 30 190 00170 07 |
| | ) | |
| United States Anti-Doping Agency | ) | |
| | ) | |
| Respondent. | ) | |

<u>JUSTIN GATLIN'S PRE-HEARING BRIEF</u>

Claimant, Justin Gatlin, by and through his attorneys, Collins & Collins, hereby submits his pre-hearing brief in this matter and states as follows:

## I.    SUMMARY

This matter involves an adverse analytical test result from a sample collected from Justin Gatlin, the current world-record holder and 2004 Olympic Gold Medalist in the 100m dash. Since July of 2001, Mr. Gatlin has been tested by USADA and IAAF/WADA more than 35 times. All of those tests were negative, except for an aberrational test taken at the Kansas Relays on April 22, 2006. Mr. Gatlin did not knowingly take any Prohibited Substance and never intended to violate the WADA Code. The evidence in this case will demonstrate that the presence of the substance giving rise to the positive test result was the product of exceptional circumstances – circumstances beyond his control – and for which he should receive a reduced penalty or no penalty. In addition, the evidence will show that promptly upon learning of his confirmed adverse analytical finding, Mr. Gatlin began cooperating with USADA (See Exhibit 1, Stipulation between Justin Gatlin and USADA, dated August 16, 2006.) and the United States Government in their efforts to eradicate doping in sport – including the extraordinary measure of placing undercover recorded calls to Trevor Graham, his former coach.

Unfortunately, this matter is not Mr. Gatlin's first experience with USADA. In 2001, while a junior athlete participating in the 2001 USA Track & Field Junior Nationals, Mr. Gatlin tested positive for having trace amounts of amphetamine, the active ingredient in his prescription medicine, Adderall, which he had been taking to treat his disability, ADD, for more than 10 years. In that matter, the AAA Panel specifically found that "Mr. Gatlin's inadvertent violations of IAAF's rules" was "at most, a 'technical' or 'paperwork' violation" and Mr. Gatlin was "certainly not a doper." See Exhibit 2, AAA Decision dated May 1, 2002. It further specifically found that "Mr. Gatlin neither cheated nor did he intend to cheat. He did not intend to enhance his performance nor, given his medical condition, did his medication in fact enhance his

GATLIN v. UNITED STATES ANTI-DOPING AGENCY INC. Doc. 28 Att. 2

Dockets.Justia.com

performance." *Id.* At that time, prior to the adoption of the WADA Code, the IAAF Rules did not include a provision for "No Fault" as contained in the WADA Code, so that panel had no ability to grant such relief. Instead, the only option for the AAA Panel was to institute a conditional finding against Mr. Gatlin while retaining jurisdiction over matter and then have the matter presented to the IAAF for early reinstatement. See Exhibit 3, Gatlin's Request for Early Reinstatement.

This "violation" from 2001 is too old and of such a nature that it should not be considered a "first violation." Under the current WADA Code, any prior violation – no matter how long ago it occurred or how trivial (or serious) the prior violation, results in the mandatory increase of the minimum penalty (Period of Ineligibility) to a "Lifetime" ban.[1] The failure of the current WADA Code to recognize the nature or age of prior positive test clearly violates the proportionality doctrine[2] and, with respect to the failure to place a limit on the interval between a "first violation" and a "second violation" violates Swiss[3] law.[4] Moreover, this failure to consider the nature of the prior violation, the fact that it occurred in a junior (juvenile) event, and the time interval between that violation and the current violation violates the clear public policy of the United States with respect to due process and harmonizing penalties (proportionality). Consequently, this Hearing Panel should find Mr. Gatlin's 2001 incident does not constitute a "first violation," his 2006 adverse analytical finding should be consider a "first violation" and any period of ineligibility for that violation should be based on a maximum 2-year period of ineligibility.

Therefore, as more fully set forth below, Mr. Gatlin's period of ineligibility, if any, should be reduced and/or suspended so that he may resume participation in IAAF and USA Track & Field related events no later than April 22, 2008. In addition, Mr. Gatlin should only be disqualified and required to forfeit the results of the competition on April 22, 2006 (the Kansas Relays) and he should not be disqualified or required to forfeit any other results from any other competitions.

---

[1] Article 10.2 of the WADA Code provides that the penalty for a "second violation" is "Lifetime Ineligibility."

[2] See Exhibit 4, CAS 2006/A/1025 M. Puerta v/ITF, Arbitral Award, dated July 12, 2006, at p. 32.

[3] Swiss law is generally applied by CAS, which is based in Switzerland, to Olympic and international sports federations. See Exhibit 4, CAS 2006/A/1025 M. Puerta v/ITF at p. 20.

[4] See Exhibit 5, CAS 2005/C/976 & 986, FIFA & WADA, Advisory Opinion, dated April 21, 2006.

## II.    BACKGROUND FACTS

### a.   Justin Gatlin

Justin Gatlin is a gifted athlete. He is the current world-record holder in the 100m, with a time 9.77 seconds. In 2005, he was the World and USA Outdoor 100m and 200m champion. In 2004, he won the Olympic Gold Medal in the 100m, the Olympic Bronze Medal in the 200m and the Olympic Silver Medal in the 4x100m relay. Justin's success is nothing new. He dominated college sprinting, winning the 100m and 200m dashes – the first man to do so since 1976 – and helping his University of Tennessee track team win the NCAA title. Similarly, in high school, he won 5 individual State Championships in his junior and senior years, and helped lead his team to the Team State Championship.

As gifted as he is on the track, Justin equally excels off the track. He is generally viewed as on of the truly "good guys" in the sport. Throughout his life, Justin has consistently given back to his community. He is active in his church and regularly speaks to youth groups and others on the need to stay in school and to avoid drugs. Justin's commitment in these areas dates back to his high school days when he was active in D.A.R.E and other community activities.

Justin's accomplishments – both on and off the track – are even more impressive in light of the difficult challenges he has faced. In 1991, at age 9, Justin was diagnosed with Attention Deficit Disorder ("ADD"). Ten years later, in 2001, at his first USAT Track & Field competition, the 2001 USATF Junior Nationals, Justin's use of his prescription medicine to treat his disability caused him to suffer an inadvertent positive test. This event was doubly difficult for Justin. Not only was he deemed to have violated an IAAF rule but he also was forced to disclose to the world his disability. Justin accepted this challenge as an opportunity. He began speaking with youth groups about his disability and how they can overcome the challenges they face.

In June 2006, Justin learned of this latest challenge. Somehow despite his utmost caution, the urine sample Justin provided to USADA on April 22, 2006 was found to have contained testosterone or its precursors. Justin had never knowingly used any banned substance or authorized anyone else to administer such a substance to him. When Justin's adverse analytical finding was made public, he was inappropriately and unjustly branded a "cheat" in the media worldwide. Moreover, as a result of his voluntary suspension pending the hearing in the matter, Justin has suffered more than $5,000,000 in lost compensation and effectively has missed the last 2 track seasons, including his opportunity to defend his world titles in the 100m and 200m. Thus, given the short career of sprinters, Justin has effectively already forgone approximately 20% or more of his career – opportunities and resources he can never recover.

Even in the face of these most difficult circumstances, Justin has remained positive and committed to his community and the anti-doping movement. He continues to speak to youth groups and others about avoiding drugs and competing clean. He has

also actively assisted anti-doping efforts, including making undercover recorded calls to targets of federal criminal investigations into doping in sport.

In short, Justin is gifted and blessed. He is a remarkable athlete with outstanding character who continues to be positive in the face of adversity. He is not cheater. He looks forward to presenting his case to the arbitration panel and looks forward to their just and proportionate treatment.

### b. Justin Gatlin's April 22, 2006 Positive Test

At the time, the collection of Justin Gatlin's sample at the April 22, 2006 Kansas Relays seemed unremarkable. The Kansas Relays is not one of the marquee events in track season. The week prior to the event, Justin Gatlin had sponsor and publicity commitments so he did not arrive in Kansas until late on the Thursday night before the Saturday meet. Once in Kansas, Mr. Gatlin resumed his standard pre-meet preparations, which included training on Friday as well as stretching and rub downs from his physical therapist, Christopher Whetstine. At no time prior to the meet did Mr. Gatlin knowingly ingest any prohibited substance.

The meet itself was also generally uneventful. Justin Gatlin and his relay team performed well. After the race, the USADA official at the event informed Justin that he had been selected to provide a urine sample and to report to drug testing. Again, nothing unusual since Justin has been tested at numerous events over the years.

Shortly after being notified that he was to report to drug testing, Justin was approached by Chris Whetstine, who indicated that he wanted to rub some anti-inflammatory lotion or cream on Justin's legs.[5] Justin was speaking with some reports at the time, so Mr. Whetstine pulled down Justin's sweats and began rubbing the cream on Justin's legs, including his inner thighs and back of his knees, while Justin continued speaking with the reporters. This "rub down" seemed a little odd to Justin since it was not standard operating procedure, but Mr. Gatlin did not otherwise think anything of it at the time. He believed that Mr. Whetstine was simply attempting to do his job and looking out for Justin's best interests by making sure he received his anti-inflammatory cream. (There had been an incident between Trevor Graham and Chris Whetstine at a meet shortly before the Kansas Relays, so Justin believed that Mr. Whetstine was being extra-diligent.)

Justin then went to the short post-race press conference before continuing to drug testing. Again, nothing very out of the ordinary, other than Justin recalls feeling some discomfort from substance Chris had just applied, which Justin attributed to the large quantity Chris had applied, presumably due to unorthodox method. (Typically, such rub

---

[5] It is fairly standard practice for anti-inflammatory lotions or creams to be applied to sprinters legs shortly after a race. These anti-inflammatory lotions or creams do not contain prohibited substances.

downs would occur on a table.) After meeting with the press, Justin continued to drug testing and timely provided his urine sample.

Thus, overall Justin's participation at the Kansas Relays seemed relatively unremarkable at the time. There were certainly no "red flags" or incidents that caused Justin – or that would have caused any other athlete exercising the utmost caution required by the WADA Code – to have any heightened awareness or concern.

After learning that the sample he provided on April 22, 2006 produced an adverse analytical finding, Justin has caused an extensive investigation into the facts and circumstance at, and leading up to, that competition. Justin has reviewed what he knowingly ingested and has been unable to uncover anything that would have lead to such a finding. Simply put, Justin did not knowing ingest any prohibited substance. As a result, Justin has determined that the only possibility is that the prohibited substance must have entered his body transdermally.

Justin further determined that the only person to have applied any substances to his body during the relevant time prior to the collection of the April 22, 2006 sample was Chris Whetstine. Mr. Whetstine has expressly denied knowingly rubbing any prohibited substance on Justin Gatlin. Mr. Gatlin has not discovered any tangible evidence to refute the veracity of Mr. Whetstine's assertions. Through investigation, however, Mr. Gatlin has discovered circumstantial evidence that that he did not know in April 2006 but that could be interpreted as possible motive for Mr. Whetstine to have performed such an act. Thus it is impossible for Mr. Gatlin to eliminate definitively the possibility that Mr. Whetstine may have knowingly applied a prohibited substance to him. Also during his investigation, Mr. Gatlin has heard numerous rumors and theories indicating that Mr. Whetstine may have unknowingly applied a prohibited substance to him. Again, Mr. Gatlin has been unable to discover any tangible evidence to support the veracity of such rumors so it is impossible for him to definitively rule out such rumors.

Ultimately, why or how the prohibited substance was caused to be rubbed on Mr. Gatlin is not relevant. What is relevant – and what Mr. Gatlin must demonstrate to this Hearing Panel by a balance of the probabilities – is that such substance was rubbed on Mr. Gatlin without his knowledge or authorization. Mr. Gatlin looks forward to presenting to this Hearing Panel his diligence in avoiding the ingestion of any prohibited substance.

c. Justin Gatlin's Cooperation With The Federal Government and USADA

Justin Gatlin has provided prompt and extraordinary Substantial Assistance to the anti-doping movement. Almost immediately after his positive test result was confirmed, Justin began actively cooperating with the USADA. As indicated in the Stipulation (Exhibit 1), Mr. Gatlin began providing assistance to USADA prior to his signature of the Stipulation on August 13, 2006. This cooperation was extremely early in the results management process. Mr. Gatlin had just recently received the results of his "B" sample

test and he had not yet received a decision from the USADA Anti-Doing Review Board, which was sent on August 22, 2006.

Justin has also cooperated and assisted with criminal law enforcement, in particular the United States Internal Revenue Service, which for the past several years has been conducting an expansive criminal investigation of doping in sport. In August 2006, Mr. Gatlin voluntarily met with IRS Special Agent Jeff Novitsky, the IRS' lead investigator in its anti-doping investigations. Justin answered in detail all of Special Agent Novitsky's questions. Then, as the interview progressed, Special Agent Novitsky requested that Justin place an undercover call to his coach, Trevor Graham, who apparently Special Agent Novitsky had been investigating for at least 2 years. Justin agreed on the spot and made the undercover, recorded call soliciting information relevant to Special Agent Novitsky's on-going criminal investigation.

Justin's cooperation with the IRS did not end there. Special Agent Novitsky provided Justin with special recording equipment, which Justin used for the next several weeks to record additional conversations with Trevor Graham. In November 2006, Trevor Graham was indicted as a result of that investigation.

Mr. Gatlin's cooperation is truly unique in that he actively participated *in an undercover capacity* in a *criminal* investigation. While there have been a number of athletes who have assisted USADA and the U.S. government by telling what they knew or what they had done, Justin Gatlin took "cooperation" and "Substantial Assistance" to an entirely new level. His participation – proactive, covert action – is precisely what anti-doping movement has recognized it needs if it is to be successful going forward.

### d.  Justin Gatlin's 2001 Positive Test[6]

In 2001, while a junior athlete participating in the 2001 USA Track & Field Junior Nationals, Mr. Gatlin tested positive for having trace amounts of amphetamine, the active ingredient in his prescription medicine, Adderall, which he had been taking to treat his disability, ADD, for more than 10 years. Mr. Gatlin, who won multiple events at that meet, was tested on two consecutive days. The sample from the first day contained trace amounts of this prohibited substance and the sample from the second day contained even less.

The AAA Panel in that matter specifically found that "Mr. Gatlin's inadvertent violations of IAAF's rules" were "at most, a 'technical' or 'paperwork' violation" and that Mr. Gatlin was "certainly not a doper." See Exhibit 2, AAA Decision dated May 1, 2002. It further specifically found that "Mr. Gatlin neither cheated nor did he intend to cheat. He did not intend to enhance his performance nor, given his medical condition, did his medication in fact enhance his performance." *Id.*

---

[6] For a more thorough description of Mr. Gatlin's 2001 incident, please read the request for early reinstatement that he filed with the IAAF, a copy of which is attached as Exhibit 3.

That matter, which pre-dated the WADA Code, was adjudicated under the IAAF Rules, which did not include any provisions like the "No Fault" and "No Significant Fault or Negligence" provisions contained in the current WADA Code. Consequently, the AAA Panel had no ability to grant such relief. Instead, the only option for that AAA Panel was to institute a conditional finding against Mr. Gatlin, which he could then present to the IAAF and request early reinstatement. See Exhibit 3, Gatlin's Request for Early Reinstatement. To ensure that IAAF immediately terminated Mr. Gatlin's sanction and reinstated his right to compete, the AAA Panel specifically retained jurisdiction over the matter. *Id.* The IAAF then reinstated Justin at its next meeting.

## III. ARGUMENT

### a. Standard of Review

In matters such as this one, where a body is seeking to effectively ban an individual for life[7] from the sport in which he excels and makes his livelihood – the entire sport throughout the entire world[8], not just one event or one possible employer – fundamental fairness, due process and proportionality require that the Hearing Panel be extraordinarily vigilant in exercising "the careful scrutiny of the individual circumstances and the particular facts relevant to each case." See Exhibit 6, Major League Baseball Players Association and the Commissioner of Major League Baseball (Steven Howe), Arbitration Decision 1992. As Arbitrator Nicolau aptly described in that case:

> *The need for scrutiny is at its zenith here simply because of the nature of the penalty at issue.* Contrary to the analogy counsel seeks to draw, the Commissioner is not an employer who has decided for himself that he will no longer retain an employee who is then free to go elsewhere in the same industry. The Commissioner's imposition of Baseball's "ultimate sanction, lifetime ineligibility," means that no employer in Baseball may hire Howe, no matter what he thinks of his ability, his good faith or his chances of successfully resisting the addiction with which he has been plagued. Thus, *the burden on the Commissioner to justify his action transcends* that of the ordinary employer inasmuch he can effectively prevent a player's employment by anyone at any level of his chose profession.

*Id.* (emphasis added). In fact, the potential life ban that Mr. Gatlin faces here is even more expansive than the life ban considered by Arbitrator Nicolau. Here, under the WADA Code, not only will Justin Gatlin be ineligible from **all** track and field activities, he will be ineligible from **all** Olympic sports and **all** other sports that are signatories to the WADA Code. WADA Code Art. 10.9.

---

[7] While USADA has agreed in the Stipulation not to seek a penalty in excess of 8 years, an 8-year penalty is essential a lifetime ban for Mr. Gatlin given his age, 25, and his specialty, the 100m and 200m dash. See *Puerta*, CAS 2006/A/1025 M. Puerta v/ITF at p. 36.

[8] Article 10.9 of the WADA Code provides that during a period of ineligibility a individual may not "participate in any capacity" in the sport.

In *Puerta*, the CAS panel recognized the extraordinary nature of an 8-year ban, which it found to be indistinguishable from a lifetime ban, and the requirements under Swiss law to review the facts and circumstances of each such case to ensure that the sanction is just and proportionate. CAS 2006/A/1025 M. Puerta v/ITF at pp. 36-41. The *Puerta* CAS Panel further noted that no matter how laudable WADA's goal of eradicating doping in sport, its "one size fits all" approach to sanctions where an individual has committed a "second violation" will inevitably produce a result that is "neither just nor proportionate." *Id.* at p. 38. It continued stating that while some may find a need "to wage a remorseless war against doping in sport, and that in any war there will be the occasional innocent victim" that analogy is not "appropriate nor is it necessary for there to be undeserving victims in the war against doping." *Id.* "It is a hard war, and to fight it requires eternal vigilance, but no matter how hard the war, it is incumbent upon those who wage it to avoid, so far as possible, exacting unjust and disproportionate retribution." *Id.*

In addition to the increased scrutiny stemming from the severity of the potential penalty, it must be further noted that the contract through which this Hearing Panel receives its authority to hear this matter – the WADA Code and the IAAF adoption of the WADA Code for all IAAF related events, (including all USA Track & Field related events) – is a contract of adhesion.[9] As such, any ambiguity in the drafting of the WADA Code, including those provisions in which it is silent, must be interpreted in favor of Mr. Gatlin.[10]

### b. Justin Gatlin's Prior Positive Test Is Too Old And Too Insignificant To Count As A "First Violation"

The WADA Code does not limit the time interval between a "first violation" and a "second violation." WADA Code Art. 10.2. To the contrary, the Comment to Article 17 of the WADA Code expressly indicates that the general limitation period for prosecuting a violation (8 years) does not similarly limit how far back WADA may reach in considering a prior violation for purposes of determining the sanction for a subsequent violation. Similarly, the WADA Code does not provide any mechanism to take into consideration the severity of a prior violation when determining the appropriate sanction for a subsequent violation. The WADA Code merely states "Second violation: Lifetime *Ineligibility*." WADA Code Art. 10.2 (emphasis in original). Simply put, such a cavalier

---

[9] Black's Law Dictionary defines an adhesion contract as: "Standardized contract form offered to consumers of goods or services on essentially "take it or leave it" basis without affording consumer realistic opportunity to bargain and under such conditions that consumer cannot obtain desired product or services except for acquiescing in form contract. Distinctive feature of adhesion contract is that weaker party has no realistic choice as to its terms. *Black's Law Dictionary*, 5th Ed., West Publishing, St. Paul, Minn. 1979.

[10] Exhibit 13, *New Castle County, DE v. National Union Fire Ins. Co. of Pittsburgh, PA.*, 243 F.3d 744 (3rd Cir (Del.) 2001).

"one size fits all" approach to sanctions clearly violates the doctrines of proportionality and fundamental fairness as well as Swiss law and United States public policy.[11]

Proportionality Requires Consideration of
Underlying Conduct of Prior Violation

First, there can no debate that the failure to consider the underlying nature of the first violation when assessing the sanction for a second violation violates proportionality. Certainly, the athlete who receives a reduced penalty for his or her first violation should not receive the same sanction for a second violation as someone who received the maximum penalty for their first offense. See *Puerta*, CAS 2006/A/1025 M. Puerta v/ITF at p. 32. Likewise, an athlete whose first violation was ingesting an over-the-counter cold medicine given to them by medical professional who failed to recognize that it contained a banned substance should not automatically be forced into the same category of "Lifetime *Ineligibility*" as an athlete who knowingly engaged in a doping regime in order to gain a competitive advantage against his competitors.

In fact, as evidenced by the latest draft amendments to the WADA Code (June 1, 2007 Code Version 2.0), WADA itself has recognized this inherent flaw in the WADA Code.[12] See Exhibit 7, World Anti-Doping Code, 2007 Code Amendments, Code Version 2.0, June 1, 2007 (the "WADA Code 2.0). In the WADA Code 2.0, WADA has added a new provision, Article 10.7, which addresses how a second violation is to be treated. Specifically, Article 10.7 creates a new table with six categories for first violations on the vertical axis and the same six categories for the second violations on the horizontal axis. It then provides a specific period of *Ineligibility* range for each cell in the table. For example, if the first violation involved a "Reduced Sanction for Specified Substance under Article 10.4" ("RS") and the second violation received a reduced sanction for "No Significant Fault or Negligence" ("NSF"), then the athlete would be subject to a sanction between 1-4 years.

Similarly, given the public position it has taken with international sports federations, WADA cannot assert that "proportionality" does not apply to prior violations. As Richard Pound, WADA's Chairman stated at the FIFA Centenial Congress on May 21, 2004 in Paris, "There is a universal view that each doping case has be considered as an individual case and that all of the facts relevant to that case (such as the circumstances of the athlete, the nature and quantity of the substance, and the repetition of offenses) have to be carefully studied before any sanction could be considered. The WADA shares this philosophy entirely." CAS 2005/C/976&986, FIFA & WADA at p. 31-32 (emphasis added).

---

[11] In *Puerta*, the CAS panel characterized this part of the WADA Code as a "an application of a very crude *"Two strikes and you are out"* policy. CAS 2006/A/1025 M. Puerta v/ITF at p. 32 (emphasis in original).
[12] The *Puerta* CAS Panel referred to this inherent flaw in the WADA Code as a "gap or lacuna." CAS 2006/A/1025 M. Puerta v/ITF at p.39.

The CAS panel in the FIFA-WADA Advisory Opinion (Ex. 5) determined that the WADA Code's failure to limit the time period in which a first violation may be considered in determining the sanction for a subsequent violation violates Swiss law. See Exhibit 5 at ¶¶161-164. In addition, this illegal portion of the WADA Code also violates public policy in the United States.[13]

Recognizing that the WADA Code as currently drafted violates Swiss law, WADA has proposed in the WADA Code 2.0 that for the multiple violation provisions of Article 10.7 to apply, each anti-doping rule violation must have occurred within the same 8-year period. WADA Code 2.0 Art. 10.7.4. Although this 8-year limit in the WADA Code 2.0 is better than the limitless provision in the WADA Code, its "one size fits all" approach still violates public policy and due process in the United States.

In the United States, it is clear that not only must there be a limit on the interval between violations but the length of that interval must vary based upon the nature of the prior violation. Much as the WADA has attempted to harmonize or standardize sanctions for doping violations in its various jurisdictions (countries and sports), in the 1990s the United States attempted to standardize the sentences that individuals receive for federal criminal convictions. The basic principle of proportionality applied by CAS was adopted by the United States Sentencing Commission; namely, that individuals who commit essentially the same offenses under essentially the same circumstance should receive the same sentence irrespective of where in the United States the offense occurred or which judge sentenced them.

The United States Sentencing Commission, which is comprised of Judges, prosecutors, and defense attorneys, created the United States Sentencing Commission Guidelines Manual (the "United States Sentencing Guidelines" or "USSG"). The United States Sentencing Guidelines essentially set forth and ascribe relative points to all of the different factors to be assessed in determining the appropriate sentence for all of the various federal criminal offenses in the United States.

These factors are broken down into two basic categories (i) offense level and (ii) criminal history points. The "offense level" points take into consideration the specific aspects of the instant offense for which an individual is to be sentenced and the "criminal history" points take into consideration the individual's prior criminal record. The USSG then sets forth a table with offense level points listed on the vertical axis and criminal history points listed on the horizontal axis. See Exhibit 8 USSG Sentencing Table.

---

[13] While WADA may be governed by Swiss law, USADA, which receives the majority of its funding from the United States government, is equally bound by U.S. law and may not enforce rules or contract provisions that contrary to public policy.

The USSG are a clear reflection of the public policy in the United States with respect to how a prior violation may be used in determining one's sentence for a current offense. As clearly set forth in the Chapter 4 of the USSG, Criminal History and Criminal Livelihood (attached hereto as Exhibit 9), in the United States, one must not only look at the nature of a prior offense, but rather must look at **both** the nature of the prior offense *and when* that prior offense occurred in relation to the offense on which the individual is to be sentenced. In other words, the United States Sentencing Commission determined that a blanket, "one size fits all" time frame for counting prior offenses as proposed by WADA in the WADA Code 2.0 in inappropriate and thus contrary to clearly articulated public policy in the United States.

The United States Sentencing Commission has clearly determined that time period for which a prior offense may be considered varies based upon the relative severity of that prior offense. Specifically, USSG §4A1.2(e)(1) provides that a prior sentence of imprisonment exceeding one year and one month only count if imposed within 15 years of commencement of the instant offense. USSG §4A1.2(e)(2) provides that other sentences are only counted if they were imposed within 10 years prior to the commencement of the instant offense. Under USSG §4A1.2(d)(2), sentences for juvenile offenses are only counted if the sentence imposed or concluded within 5 years of the commencement of the instant offence. Other sentences, such as sentences for certain misdemeanors are never counted as set forth in USSG §4A1.2(c). Similarly, sentences resulting from convictions that were reversed, vacated or invalidated are never counted. USSG 4A1.2, comment. (n.6).

Thus, from these provisions of the United States Sentencing Guidelines it is clear that public policy in the United States dictates that when determining the impact of a prior offense on the penalty for a current offense, the sentencing body must consider **both** the nature of the prior offense *and when* the prior offense occurred in relation to the commencement of the instant offense. It should also be noted that when viewing this public policy in the context of periods of ineligibility for a violation of an anti-doping code provision, the sentencing body must recognize the difference in the length of an athlete's career and that of a criminal. In the criminal context, the relevant period is basically a person's entire adult life – approximately 40 years. Meanwhile, the relevant period for an athlete is significantly shorter since his or her sports "career life" is significantly shorter – approximately 10 years. As a result, when applying this public policy to the anti-doping movement, the critical part is that there is to be a significant reduction in the applicable time periods based upon the nature of the underlying violation.

Separately, use of Justin Gatlin's prior violation, which related to his use of his prescription medicine to treat a properly diagnosed disability – a right protected by the Americans with Disabilities Act and the Rehabilitation Act[14] – violates the prohibition of

---

[14] The Rehabilitation Act, which is essentially the same as the Americans with Disabilities Act, applies to all entities that receive federal funds. Therefore, since

discrimination against individuals with disabilities contained in those statutes. In fact, more than just prohibit discrimination, these statutes affirmatively require entities like USADA to make reasonable accommodations for individuals with disabilities like Justin Gatlin. Here, a reasonable accommodation would be to limit the use of Justin's prior "violation" in time and scope so that his sanction, if any, for this current violation, which occurred nearly 5 years later is not enhanced and converted to essentially a lifetime ban on competition because Justin's prior treatment of his disability.[15]

WADA Code Provision on First Violations Is Unenforceable

In the United States, contract provisions that are illegal or violate public policy are unenforceable. The WADA Code is the contract – albeit a contract of adhesion in which Mr. Gatlin had no say in the drafting of the contract and was required to consent on a "take it or leave it" basis – from which this Hearing Panel derives its ability to hear and decide this matter. Mr. Gatlin does not assert that entire contract (WADA Code) is illegal or that all of it violates public policy. As indicated above, however, the failure of the WADA Code to limit how long a prior violation may be used to enhance the sanction for a future violation has been found illegal and is contrary to public policy. Likewise, the WADA Code's failure to consider the underlying facts and circumstances of prior violations violates public policy and the doctrines of proportionality and fundamental fairness. As such, the proper remedy here is for this Hearing Panel to strike those portions of the contract that are illegal and violate public policy; namely, to strike the enhanced penalty for a second violation. Exhibit 10, *Bragg v. Linden Research, Inc.,* 487 F.Supp.2d 593 (E.D.Pa. 2007); Exhibit 11, *Panasonic Co., Div. of Matsushita Elec. Corp. of America v. Zinn,* 903 F.2d 1039 (C.A.5 (Tex.) 1990).

WADA Code Must Be Modified To Comply With U.S. Public Policy

Alternatively, if this Hearing Panel decides not to strike the illegal portions of this contract, then it must modify the contract so that it comports with the law and public policy. Cf., Exhibit 10, *Bragg v. Linden Research, Inc.,* 487 F.Supp.2d 593 (E.D.Pa. 2007) (Citing Cal. Civ.Code § 1670.5(a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.) To do that here, the Hearing Panel must (a) determine the relevant interval between violations based upon the nature of the prior violations and (b) how Justin Gatlin's prior violation should be characterized.

---

USADA receives the bulk of its funding from the United States government, it is bound by the Rehabilitation Act.
[15] Mr. Gatlin expressly reserves his rights under the Americans with Disabilities Act and the Rehabilitation Act to contest any enhancement of his sanction in this matter related to his prior violation.

In order to comport with established U.S. public policy, the Hearing Panel must adopt a method consistent with the method used in the United States Sentencing Guidelines. Essentially, the Hearing Panel can satisfy this requirement in either of two ways. First, a linear extrapolation of the terms included in the Sentencing Guidelines adjusted to reflect the respective "expected lives" of the subjects (i.e., the relevant periods converted from a 40 year expectancy to a 10 year expectancy). Under this method, the most serious violations would count for a period of 3.75 years or 40 months ((15 years/40 years) x 10 year expected athletic career), other serious violations would count for 2.5 years or 30 months ((10 years/40 years) x 10 year expected athletic career), and juvenile (junior) violations would count for 1.25 years of 15 months ((5 years/40 years) x 10 year expected athletic career) and of course insignificant matters or reversed, vacated or invalidated matters would never count. Using this method, there is no need to examine the underlying facts of Mr. Gatlin's prior violation since it occurred more than 4.75 years or 57 months before the current violation.

A second method would be to base reach back period on a quadrennium cycle on the assumption that the 8 year statute of limitation in the WADA Code was intended to represent 2 Olympic cycles. Under this method, it would appear that the most serious violations would count for 2 cycles (8 years to insure it encompassed 2 Olympic Games), less severe penalties would count for 1 cycle (4 years to insure that it encompassed at least 1 Olympic Games), juvenile penalties would count for 2 years (Olympic participation is more remote for Junior athletes and therefore less critical) and again insignificant matters or reversed, vacated or invalidated matters would never count. Under this scenario, Mr. Gatlin's prior violation would only be counted if considered to be of the most serious nature – which clearly cannot be the case in light of the AAA Decision and that panel's assessment of that "violation."

Justin Gatlin's Prior Violation Should NOT Be Considered a First Violation

Once the Hearing Panel has determined the appropriate time limits for intervals between violations, it must determine in which category Mr. Gatlin's prior violation would fall. In order to make this determination the Hearing Panel must consider the underlying purposes for enhancing a punishment for subsequent violation. Essentially, the purpose is to deter recidivism by sending a message to the individual (specific deterrence) and to the public (general deterrence) that repeat violators and violations will be treated more harshly. Clearly such deterrence purposes can only be directed at, and effective to, knowing violations; one cannot deter an unintentional or unknowing act.

Applying these principles Justin Gatlin's prior violation, it is clear that it should never be counted to enhance any future sanction for any future violation. As the AAA Panel found in that matter, Justin Gatlin never cheated and never intended to cheat. All he did was take prescription medicine to treat his disability – which he had legally protected right to do – and then discontinued taking his medicine days before the competition consistent with the then recommend practice. In other words, Justin attempted to comply with the applicable IAAF rules so there was no behavior to "deter". At most, as that panel found, Justin committed a "technical" or "paperwork" violation.

13

Under those uncontested facts, Justin's prior violation is most consistent with those insignificant misdemeanors set forth in USSG §4A1.2(c)(2), which are never counted.

Similarly, Jusin's prior violation is directly analogous to the "reversed, vacated, or invalidated convictions" described in USSG 4A1.2, comment. (n.6). As indicated above, Justin Gatlin's prior violation was essentially vacated by IAAF. Under the then existing IAAF rules the AAA Panel lacked authority to enter any judgment other than a conditional 2-year penalty, which Mr. Gatlin could then present to the IAAF Council as part of a request for early reinstatement – a request the IAAF Council granted at its first opportunity thereby restoring his eligibility. The AAA Panel, however, made it abundantly clear that but for the IAAF's rules, it would have issued a different sanction and that it specifically retained jurisdiction over the matter in case the IAAF did not "take expeditious action in granting Mr. Gatlin early reinstatement to a term appropriate to his circumstances." Exhibit 2 at p. 8. Thus, it is likely that if the IAAF had not vacated Mr. Gatlin's sanction, then the AAA Panel in that case would have.

In addition, it should be noted that Mr. Gatlin's prior violation occurred at the 2001 U.S. <u>Junior</u> Nationals, an age restricted competition. In other words, his violation is the equivalent of a juvenile conviction. It should further noted that in 2001 USA Track & Field was one of at most a handful of the 212 affiliate members of the IAAF that conducted drug testing at their Junior Championships. In other words, approximately 2% or less of the countries in the world tested athletes at their respective Junior National events. This fact, coupled with the WADA Code's purported purpose of seeking to harmonize doping sanctions throughout the world further underscores the need for limiting the time period for which the sanction for a subsequent violation may be enhanced by a violation at a Junior (juvenile) event – particularly one where a AAA panel found that the junior athlete participating in his first USATF/IAAF neither cheated nor intended to cheat.

Lastly, in light of the AAA Decision in Justin Gatlin's prior violation, there can be no serious contention that it should be treated as one of the most-severe penalties (violations). Any effort to do so would strain credulity. Moreover, any sanction based on such an interpretation would violate proportionality and fundamental fairness. *See Puerta*, CAS 2006/A/1025 M. Puerta v/ITF. If the Hearing Panel believes that further argument on point is needed, Mr. Gatlin will do so at the hearing.

For these reasons, Mr. Gatlin believes that his 2001 "violation" is too old, too remote, and too insignificant of a violation (i.e., lacking in culpability or the type of knowing misconduct capable of being deterred) to be used to enhance any sanction he may receive in this matter based upon his aberrational positive test on his April 22, 2006 urine sample.

### c. Justin Gatlin's Penalty Should Be Reduced (Suspended) For His Cooperation With The Federal Government And USADA

Article 10.5.3 of the WADA Code provides that an athlete's period of ineligibility may be reduced by up to 50% of the otherwise applicable minimum period of *Ineligibility* in situations where that individual has provided substantial assistance to Anti-Doping Organization which results in the Anti-Doping Organization discovering or establishing an anti-doping violation by another.

Artcicle 10.5.3 of WADA Code Version 2.0 expands the authority of Anti-Doping Organizations, and hearing bodies such as this Hearing Panel, to reduce[16] the sanction of athletes that cooperate with anti-doping authorities, criminal authorities and other professional disciplinary bodies.

These proposed changes have removed the 50% limitation.[17] The Comments to this provision of the WADA Code Version 2.0 provide further guidance on how and how much a sanction may suspended or reduced. For example, the Hearing Panel is to consider the "seriousness of the anti-doping violation" and whether the person providing the Substantial Assistance may be likely to "still enjoy" any performance-enhancing benefit. Comment to WADA Code Version 2.0 Art. 10.5.3. In addition the Comment further provides that "the earlier in the results management process that the Substantial Assistance is provided, the greater the percentage of the period of *Ineligibility* may be suspended."

Here, Justin Gatlin has provided prompt and extraordinary Substantial Assistance. Almost immediately after his positive test result was confirmed, Justin began actively cooperating with the USADA and with criminal law enforcement, in particular the United States Internal Revenue Service, which for the past several years has been conducting an expansive criminal investigation of doping in sport. As indicated in the Stipulation (Exhibit 1) Mr. Gatlin began providing assistance to USADA prior to his signature of the Stipulation on August 13, 2006. This cooperation was extremely early in the results management process. Mr. Gatlin had just recently received the results of his "B" sample test and he had not yet received a decision from the Panel of the USADA Anti-Doing Review Board, which was sent on August 22, 2006.

Justin's cooperation was also unique and extraordinary. In August 2006, Mr. Gatlin met with IRS Special Agent Jeff Novitsky and fully cooperated. Justin answered in detail all of Special Agent Novitsky's questions. Then, as the interview progressed, Special Agent Novitsky requested that Justin place an undercover call to his coach Trevor

---

[16] WADA Code 2.0 uses the term "suspend" rather than the term "reduce." The practical implications of this change in terminology are not readily apparent.

[17] The earlier draft amendments, WADA Code 1.0, increased the amount by which a sanction could be reduced to up to 75%. WADA Code 2.0 does not include a specific percentage but rather currently has inserted a "__" for the otherwise applicable period of *Ineligibility*.

Graham, who Special Agent Novitsky had been investigating for at least 2 years. Justin agreed on the spot and made the call soliciting information relevant to Special Agent Novitsky's on-going criminal investigation. Justin's cooperation did not end there. Special Agent Novitsky provided Justin with special recording equipment, which Justin used for the next several weeks to record additional conversations with Trevor Graham. In November 2006, Trevor Graham was indicted as a result of that investigation.

Mr. Gatlin's cooperation was unique in that he actively participated in a *criminal investigation* in an *undercover capacity*. While there have been a number of athletes who have assisted USADA and the U.S. government by telling what they knew or what they had done, Justin Gatlin has taken "cooperation" and "Substantial Assistance" to an entirely new level. His participation is precisely what anti-doping movement has recognized it needs – proactive, covert actions by athletes – if it is to be successful. The revisions in the WADA Code Version 2.0, which specifically add assistance criminal authorities, highlights the growing need for cooperation like Justin's, particularly with criminal law enforcement agencies. Moreover, Justin's willingness to accept the risks of acting in an undercover capacity further underscore his unique and extraordinary cooperation and willingness to provide Substantial Assistance to the anti-doping movement. Just as Justin has accepted the risks the new type of cooperation envisioned by the new WADA Code Version 2.0, he should also be entitled to receive the benefits to be conferred by the new WADA Code 2.0.

Furthermore, as indicated above, Justin Gatlin began providing assistance to anti-doping authorities, including the IRS, early in the results management process thus supporting a finding that a greater percentage of his sanction, if any, should be suspended. Also, there is no indication that Justin Gatlin ever received any performance enhancing benefit from the prohibited substance found in his urine sample and now, 15 months later, there is zero likelihood Justin would "enjoy" any performance enhancing benefit from that substance. This fact further supports a finding that a greater percentage of any sanction against Justin should be suspended in light of his assistance.

For these reasons, Justin Gatlin's sanction in this matter should be reduced or suspended the maximum amount permissible, which in light of the proposed revisions to the WADA Code is by 3/4 of the otherwise applicable period of *Ineligibility*.

### d. Justin Gatlin's Penalty Should Be Reduced For Lack Of Culpability (No Fault/No Significant Fault)

Article 10.5.1 of the WADA Code provides that if an Athlete establishes that he or she bears No Fault or Negligence for an anti-doping violation, then the otherwise applicable period of *Ineligibility* shall be eliminated. "No Fault or Negligence" is defined in the WADA Code as: "The Athlete's establishing that he or she did not know or suspect, and could not reasonably have known or suspected even with the exercise of utmost caution, that he or she had *Used* or been administered the *Prohibited Substance* or *Prohibited Method*." In addition, Article 10.5.1 requires that the Athlete establish how the *Prohibited Substance* entered his or her system.

Clearly this standard creates a very difficult burden to meet as has been recognized in numerous CAS decisions. As the CAS Panel in *Puerta* stated: "Utmost caution" means that [the Athlete] must establish, to the satisfaction of the Panel, that (a) he took all of the steps that could reasonably be expected of him to avoid inadvertently ingesting [the substance] and (b) it would be unreasonable for him to take any other steps. Exhibit 4, CAS 2006/A/1025 M. Puerta v/ITF at p. 25. This burden, however, may not rise to an "unrealistic" level that creates "impractical expectations" for athlete behavior. Exhibit 5, CAS 2005/C/ 976 & 986 FIFA & WADA at p. 30.

Comment 10.5.2, which provides commentary that also applies to Article 10.5.1, notes that an Athlete may successful establish No Fault or Negligence, where he can establish he was sabotaged by a competitor. This Comment, however, asserts that an Athlete could not prove No Fault or Negligence if the prohibited substance was ingested as the result of his food or drink being sabotaged by his spouse, coach or other person within his circle of associates or if the prohibited was administered by his personal physician or trainer. The comment then states that while these situations may not meet "No Fault or Negligence" they may qualify for "No Significant Fault or Negligence".

The validity of the examples in this comment have been called into question by CAS Panel in the FIFA & WADA Advisory Opinion, which specifically stated that it could not "exclude that under particular circumstances, certain examples listed in the comment to art. 10.5.2 of the [WADA Code] as cases of "no significant fault or negligence" may reasonably be judged as cases of "no fault or negligence." Exhibit 5, CAS 2005/C/ 976 & 986 FIFA & WADA at p. 30-31.

<u>No Fault or Negligence</u>

The facts in this case likely present precisely the type of "particular circumstance" envisioned by the CAS Panel in the FIFA & WADA Advisory Opinion. Here, Justin Gatlin did everything within his power to avoid ingesting any prohibited substance. As the evidence at the hearing will show, Mr. Gatlin exercised the utmost caution in what he ingested. He would not drink out of a bottle if he did not personally open. He was extremely cautious about what he ate and where he would eat. At times, he even checked into hotels under an assumed name to avoid potential contamination of his food. Plus, to the extent that he ever consumed any supplements, he would personally purchase those items to make sure they complied with all applicable WADA requirements.

Despite his utmost caution, the Carbon Isotope Ratio test performed on the urine sample he provided on April 22, 2006 found testosterone or its precursors.[18] After

---

[18] The aberrational nature of this positive test result must be noted. Mr. Gatlin has been test more than 50 times since 2001 without incident. Even more notably, Mr. Gatlin was tested 7 times in the approximately six weeks between providing the April 22, 2006 and receiving the results of that test in mid-June 2006. *All* of those test results were negative, including the 3 other CIR tests – a test that is not normally conducted. Clearly, if Mr.

eliminating all substances he had consumed, Mr. Gatlin was left with the only reasonable conclusion; namely, that this prohibited substance must have entered his body transdermally, which means that it must have been contained in a substance that was applied to him by his physical therapist, Christopher Whetstine, the only individual to have rubbed anything on him around the time of the Kansas relays, where the April 2002 sample was collected. Dr. David Black, a scientist assisting Mr. Gatlin in this case, has confirmed that the test results on the April 22, 2006 sample are consistent with having had a cream containing testosterone or its precursors applied to Mr. Gatlin shortly before providing the urine sample.

On its face, this fact pattern may appear to be precisely the type of fact pattern covered in Comment 10.5.2 – unknowing administration by an athlete's trainer or sabotage by someone within his circle of associates. What distinguishes this case, however, is that the trainer in question, Mr. Whetstine, has denied any involvement. Mr. Gatlin has thoroughly investigated this situation but has been unable to determine whether Mr. Whetstine knowingly or unknowingly administered the prohibited substance.

Thus, this situation is materially different than the normal scenario contemplated in Comment 10.5.2. That comment clearly envisions the situation where a coach, trainer or spouse comes forward to "fall on their sword" to exonerate the athlete. Clearly, that has not occurred here. On this fact pattern, if Mr. Whetstine is to be believed, then it is difficult to see what more could have been reasonably required of Mr. Gatlin to avoid this situation. Justin's situation is unlike the *Canas* case where the athlete was receiving medication and should have exercised heightened awareness before consuming any medicine he had been given. See Exhibit 12, CAS 2005/A/951 Canas v/ATP, Arbitral Award, dated May 23, 2006. Here, Justin was simply receiving another rub down.

Likewise, if Mr. Whetstine is not to be believed, and the Hearing Panel finds that he knowingly applied this substance, it is still difficult to see what additional steps Mr. Gatlin could have taken to avoid this situation. Mr. Gatlin, as well as numerous other athletes, had used Mr. Whetstine's services without incident. Mr. Gatlin had no information that Mr. Whetstine had ever taken such retaliatory action against an athlete. Mr. Gatlin was well within his rights and not negligent to expect that Mr. Whetstine would act consistent with the WADA Code.

For these reasons, the Hearing Panel should find that Mr. Gatlin has met all of the requirements of WADA Code Art. 10.5.1 ((a) has demonstrated how the prohibited substance entered his system, (b) he exercised the utmost care in attempting to prevent the ingestion of such a substance, and (c) therefore bears no fault for this violation) and that the otherwise applicable period of ineligibility should be eliminated.

---

Gatlin had been engaging in any sort of intentional doping regime, some, if not all of those other test would have been positive.

## No Significant Fault or Negligence

Alternatively, if the Hearing Panel does not believe that Mr. Gatlin has demonstrated No Fault or Negligence as required by WADA Code Art. 10.5.1, then at a minimum, it should find that he committed "no significant fault or negligence" as defined by WADA Code Art. 10.5.2. The WADA Code defines "No Significant Fault or Negligence" as: "The Athlete's establishing that his or her fault or negligence, when viewed in the totality of the circumstances and taking into account the criteria for No Fault or Negligence, was not significant in relationship to the anti-doping rule violation."

This standard is still a very exacting standard but less than that for No Fault of No Significant Fault. Consequently, if the Hearing Panel believes that Justin's utmost caution as stated above was not sufficient to meet the requirements for No Fault or Negligence, then such conduct should satisfy the lower threshold for No Significant Fault or Negligence.

## Justin Gatlin Was Not Negligent By Training Under Trevor Graham

Mr. Gatlin suspects that USADA will argue at the hearing that Mr. Gatlin's positive test is the result of his association with Trevor Graham, who as indicated above has been indicted and who it is believed is subject to a pending USADA charge. Such "guilt by association" is inappropriate -- particularly here where the potential punishment for such "guilt by association" is effectively a lifetime ban ending Justin's career and taking away his livelihood.

Mr. Gatlin has heard rumors that the sabotage he suffered was the result of rivals of Mr. Graham "spiking" the creams in Mr. Whetstine's bag as a way to get at Mr. Graham by causing another of his athletes to have tested positive. Justin Gatlin has not been able to produce any tangible evidence to substantiate such a conspiracy. Regardless, Mr. Gatlin anticipates that USADA will argue that Mr. Gatlin was negligent and should have known better to have been coached by someone like Mr. Graham. Such an argument is unfair to Justin.

While such an argument may seem attractive now that Mr. Graham has been indicted, his alleged misdeeds were not always as infamous. To the contrary, Mr. Graham repeatedly told Justin and his family, that he [Mr. Graham] was not a "doping" coach but rather he was responsible for "cleaning up the sport." Mr. Graham stated on more than one occasion that he was the one who had anonymously sent in the syringe containing the previously undetectable steroid "THG" that touched off the entire Balco criminal investigation that has lead to numerous criminal convictions and USADA convictions. In addition, Mr. Graham never attempted to cause or pressure Justin to take any prohibited substances.

Given that information, it is difficult to understand how Justin Gatlin was negligent or what more he should have done. Justin was only able to base his conduct on the "facts" as he knew them. Clearly, Justin did not possess the same information as

USADA or the IRS. If USADA had information in its possession that clearly refuted Mr. Graham's position and implicated him in doping, then it never communicated that information to Mr. Gatlin. To date, USADA has still not told Mr. Gatlin what it knew and when about Trevor Graham, even though he requested that information as part of the discovery in this matter. Instead of providing that information, USADA indicated that it did believe it was relevant.

If USADA agrees that no negative inferences may be drawn from Justin having trained under Mr. Graham, then such information is irrelevant. If, however, USADA attempts to argue such a negative inference, then Mr. Gatlin respectfully requests that the Hearing Panel estop them from doing so.

For these reasons, if the Hearing Panel determines that Mr. Gatlin's adverse analytical result is some how related to his having trained under Mr. Graham, then based upon the facts known to Mr. Gatlin he actions constitute no significant fault or negligence and his sanction should be reduced accordingly.

### e. Calculating Penalty Reductions When Athlete Has BOTH Provided Substantial Assistance AND Bears No Significant Fault or Negligence

The WADA Code currently does not contain any provision to address the situation where an athlete has *both* provided substantial assistance as provided in WADA Code Article 10.5.3 *and* bears "no significant fault or negligence" as provided in WADA Code Article 10.5.2. The CAS Panel in *Puerta* faced a similar "gap or lacuna" in that the WADA Code did not address the situation where an athlete's first and second violation both resulted in reduced penalties. See Exhibit 4, CAS 2006/A/1025 M. Puerta v/ITF. In that instance, the CAS Panel determined that proportionality required that it fill in this gap or lacuna and adjust the athletes sanction to comport with doctrines of proportionality and fundamental fairness. The same result is appropriate in this instance where the WADA Code has failed to address the situation where an athlete has provided substantial assistance and bears no significant fault or negligence.

Fortunately, this Panel, unlike the *Puerta* CAS Panel can take comfort in the fact that WADA has already recognized this gap or lacuna and proposed a solution in the WADA Code Version 2.0. Specifically, Article 10.5.5 of the WADA Code Version 2.0 states that: "If the Athlete…establishes entitlement to a reduction or suspension of the period of *Ineligibility* under two or more of Articles 10.5.2 [No Significant Fault or Negligence], 10.5.3 [Substantial Assistance] or 10.4 [Admission in the Absence of Other Evidence], then the period of *Ineligibility* may be reduced, but not below one-quarter of the otherwise applicable period of *Ineligibility*."

Thus, with the confidence of knowing that it is complying with intended and future policy of the WADA Code, this Hearing Panel may fill in the current gap or lacuna by providing a cumulative reduction/suspension to Mr. Gatlin's otherwise applicable penalty in excess of the individual reductions set forth in the Code so that Mr. Gatlin

receives a benefit for *both* the substantial assistance he has provided and because he bears no significant fault or negligence in this matter. In other words, Mr. Gatlin's sanction, if any, should be reduced by 50% for his substantial assistance and then reduced again by 50% because he bears no significant fault or negligence, so that his final sanction would be 25% of the otherwise applicable minimum sanction.

For these reasons and the reasons set forth above, Mr. Gatlin respectfully request that to the extent that this Hearing Panel determines that Mr. Gatlin be subject to a period of ineligibility, the Hearing Panel shall grant him the his full entitlement under Articles 10.5.2 and 10.5.3 of the WADA Code and reduce his period of *Ineligibility* to the lesser of 25% of his otherwise applicable period of *Ineligibility* or the period of his provisional sentence and sanction he has been serving since July 25, 2006.

### f. Calculating Justin Gatlin's Penalty
   ### Pursuant to the WADA Code Version 2.0

As indicated above, this matter raises a number of points not currently addressed by the WADA Code. For example, if Justin's 2001 "violation" is considered a "first violation" by the Hearing Panel – which it should not be – then this Hearing Panel faces the same gap of lacuna in the WADA Code that the *Puerta* CAS Panel faced. One solution to this problem is to apply Article 10.7 of the WADA Code Version 2.0 which includes some consideration for particular circumstances of the each violation when calculating the otherwise applicable penalty for a "second violation."

To apply Article 10.7 of the WADA Code Version 2.0, the Hearing Panel must first characterize both the first and second violations using the six possible categories: RS (Reduced Sanction for Specified Substance under Article 10.4), WMT (Whereabout or Missed Tests), NSF (Reduced Sanction for No Significant Fault or Negligence), St (Standard Sanction under 10.2 or 10.3.1), AS (Aggravated Sanction), and TRA (Trafficking and Administration).

We can immediately eliminate three of the possible categories for both offenses: WMT, AS and TRA. Likewise, RS can be eliminated for 2006 violation. Consequently, the Hearing Panel must determine whether the 2001 violation should be characterized as an RS, NSF or St and whether the 2006 violation should be characterized as an NSF or St.

In reviewing the specific facts of the 2001 violation, it appears to be best characterized as an RS. It clearly meets all of the requirements of Article 10.4 of the WADA Code Version 2.0 in that it was a prescription medicine that Justin had been taking for more than 10 years, and the AAA Panel determined that he did not take it, or intend to take it, for any illicit purposes and that it did not enhance his performance in any way.

As a pre-Code violation, the 2001 violation would also have to comply with Article 25.4 of the WADA Code Version, 2.0. The period of *Ineligibility* for the 2001

violation was less than 2 years. The substances "categorized as Specified Substances under the under the 2007 Code Amendments" do not appear to have been set at this time, so it not possible to determine definitively if these requirement has been satisfied. However, given the strong language of the AAA Decision (See Exhibit 2), if the 2001 incident is to be considered in any way to enhance any sanction against Justin in this matter – which it should not be – then characterizing it as an RS seems most appropriate. If for any reason the Hearing Panel believes an RS classification is not appropriate than at worst, the 2001 violation should be classified as an NSF. Under no circumstance should the 2001 violation be classified as a St.

With respect to the 2006 violation, as set forth above, that violation (if it is not found to be a "No Fault or Negligence" for which an sanction would be eliminated) it should be classified as an NSF. If not an NSF, than at worst it should be an St.

Thus, using the table contained in Article 10.7 would produce the following applicable ranges:
- •2001 RS; 2006 NSF -- 2-4 years
- •2001 RS; 2006 St    -- 4-6 years
- •2001 NSF; 2006 NSF – 4-8 years
- •2001 NSF; 2006 St   -- 6-8 years

Next, in accordance with Article 10.5.3, the Hearing Panel would be required to determine the portion of Mr. Gatlin's period of *Ineligibility* he is entitled to have suspended based upon the Substantial Assistance he has provided. This suspension should be based on the low point in the range. These calculations would produce the following un-suspended sanction:

- •2001 RS; 2006 NSF -- 2 years less 75% suspension = **6 months**
- •2001 RS; 2006 St    -- 4 years less 75% suspension = **1 year**
- •2001 NSF; 2006 NSF – 4 years less 75% suspension = **1 year**
- •2001 NSF; 2006 St   -- 6 years less 75% suspension = **1 1/2 years (18 months)**

Based on these calculation any un-suspended sanction in this matter applied to should be 18 months or less and Mr. Gatlin should receive full credit for the 12 months that he has already served.

### g. Calculating The Commencement Date Of Mr. Gatlin's Period Of Ineligibility, If Any

In the Stipulation (Exhibit 1) USADA has agreed that the commencement date for Mr. Gatlin's sanction, if any, should be August 15, 2006 at the latest, with Gatlin receiving full credit back to the beginning date of his provisional sentence, July 25, 2006. This commencement date, however, fails to take into consideration the excessive delay in reporting the results of the tests on the April 22, 2006 sample to Mr. Gatlin. Notably, the test results for the "A" sample of his April 22, 2006 sample were not provided until June 15, 2006 – nearly 2 months later. This delay is particularly troubling in that the results

for Mr. Gatlin's samples taken on April 29, 2006, May 18, 2006, and May 28, 2006 – all negative results – were all reported to USADA prior to USADA reporting the results of April 22, 2006 sample to Justin. USADA has provided no reason why the tests on the April 22, 2006 sample took so long to complete and report to Mr. Gatlin.

In addition, in light of the similarity in the issues raised in this case to those raised in the *Puerta* case, Mr. Gatlin respectfully requests – and proportionality supports – that his case receive the same consideration with respect to his commencement date as Mr. Puerta. In that case, Mr. Puerta's sample was collected on June 5, 2005, he was notified of his positive test on September 21, 2005 and continued playing on the tour until November 2005. There is no indication that Mr. Puerta cooperated and provided substantial assistance to anti-doping authorities. Based on those facts, the *Puerta* CAS panel agreed that the commencement date of his sanction (a life penalty the CAS Panel reduced to 2 years based on proportionality concerns) should be the date of his sample collection, June 5, 2007. See Exhibit 4, CAS 2006/A/1025 M. Puerta v/ITF at p. 41.

The facts in Mr. Gatlin's case are even more favorable than Mr. Puerta's. Here, Mr. Gatlin's sample was collected April 22, 2006. He was then tested *seven* more times (April 26, 2006, April 29, 2006, May 12, 2006, May 18, 2006, May 24, 2006, May 28, 2006, and June 5, 2006) – *all* of which were *negative* – before he received the test results for his April 22, 2006 sample. Mr. Gatlin was then again tested on June 23, 2006, the results of which were also negative. It should also be noted that the negative tests from the April 29, 2006, May 18, 2006, June 5, 2006 and June 23, 2006 samples included negative CIR test results. Also, unlike Mr. *Puerta*, Justin Gatlin did not participate in any competitions after receiving the test results on his "B" sample.[19] Plus, Mr. Gatlin promptly began cooperating and providing assistance to anti-doping authorities. Based upon these numerous negative tests and the inexplicable delay in report the results of the tests on the April 22, 2006 sample, Mr. Gatlin respectfully requests that the Hearing Panel set April 22, 2006 as the commencement date for any sanction it may impose in this matter.

In addition, in light of all of these negative tests in this very short period of time further corroborating the aberrational nature of the April 22, 2006 sample and that Mr. Gatlin was *not* participating in any sort of doping regimen, Mr. Gatlin further respectfully requests that in accordance with fundamental fairness and Article 10.7 of the WADA Code he not be disqualified and required to forfeit any of the result from any

---

[19] The only competition in which Mr. Gatlin competed after receiving notice of the positive test results on his "A" sample was the 2006 USA Track & Field Championships June 23, 2006. The Hearing Panel should not penalize Mr. Gatlin for participating between the return of his "A" and "B" samples given that Mr. Gatlin did not know how the substance had entered his body and there have cases where the results of the "A" and "B" sample did not match. The Hearing Panel should note that in 2001 when Mr. Gatlin was notified of the positive test when he knew how the substance entered his body (his ADD medication) he did not even request that his "B" sample be tested and immediately, voluntarily withdrew from all IAAF related competitions.

competitions other than the April 22, 2006 competition (the Kansas Relays) at which the April 22, 2006 sample was collected.

## IV.   CONCLUSION

For the reasons set forth above, Justin Gatlin respectfully requests that Hearing Panel find that:

(1) Justin Gatlin's 2001 violation shall not be deemed a "first violation" and shall not used to enhance the any sanction or period of ineligibility, he may receive as a result of the adverse analytical finding related to his April 22, 2006 sample;

(2) The maximum possible sanction for the adverse analytical finding related to Justin Gatlin's April 22, 2006 sample shall be a 2 year period of ineligibility;

(3) The commencement of any sanction imposed upon Justin Gatlin shall be set as April 22, 2006, the date of the collection of the sample;

(4) Justin Gatlin bears No Fault or Negligence with respect to the adverse analytical finding related to his April 22, 2006 sample so any sanction or period of ineligibility which otherwise might be applicable is eliminated, or, *alternatively*, Justin Gatlin bears No Significant Fault or Negligence with respect to the adverse analytical finding related to his April 22, 2006 sample and the otherwise applicable minimum period of ineligibility should be reduced accordingly;

(5) Justin Gatlin has provided substantial assistance to anti-doping authorities and the otherwise applicable minimum period of ineligibility should be reduced accordingly;

(6) Justin Gatlin be disqualified from, and his results from the 2006 Kansas Relay on April 22, 2006, the date of the sample collection, shall be forfeited;

(7) Fairness requires that Justin Gatlin not be disqualified or forfeit the results from any other competition; and

(8) In light of the foregoing findings, the applicable sanction and period of ineligibility in this matter shall be equal to the time period from July 25, 2006, the first date of Justin Gatlin's voluntary provisional suspension, through the date of the Hearing Panel's decision.

Respectfully submitted,
COLLINS & COLLINS

John P. Collins

Attorneys for Claimant Justin Gatlin

John P. Collins
COLLINS & COLLINS
8 S. Michigan Ave., Ste. 1414
Chicago, IL 60603
312-201-8700