BEFORE THE AMERICAN ARBITRATION ASSOCIATION

## North American Court of Arbitration for Sport Panel

| | |
|---|---|
| United States Anti-Doping Agency, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | ) |
| | ) AAA No. 30 190 00170 07 |
| Justin Gatlin, | ) |
| | ) |
| Respondent. | ) |
| | ) |

## UNITED STATES ANTI-DOPING AGENCY'S PRE-HEARING BRIEF

The United States Anti-Doping Agency ("USADA"), by counsel, respectfully submits
its Pre-Hearing Brief.

## I. INTRODUCTION

The Respondent, Justin Gatlin, tested positive for an anabolic steroid at a track meet in
Kansas less than three weeks before setting the world record in the 100 meter dash on May
12, 2006 at a major international meet in Doha, Qatar in a time of 9.77 seconds. It is well
known that anabolic agents are performance enhancing drugs that provide strength, power and
recovery benefits to athletes including sprinters. Fortunately, for clean athletes, USADA
tested the Kansas Relays for the first time in 2006 and utilized a special laboratory testing
method which is the gold standard in detecting synthetic testosterone use.

On April 23, 2006, Respondent's sample #496040 was shipped by overnight courier to
the WADA-accredited laboratory at the University of California at Los Angeles ("UCLA
Laboratory") and was analyzed using all routine testing methods. Additionally, upon request
by USADA, the UCLA Laboratory also analyzed Respondent's sample by the Carbon Isotope
Ratio ("CIR") method.[1] The CIR method is not routinely performed by the UCLA Laboratory

GATLIN v. UNITED STATES ANTI-DOPING AGENCY, INC.

---

[1] A brief summary of the scientific basis of IRMS analysis may be helpful. Everything in nature is made of
molecules and most molecules are made of atoms of carbon, hydrogen, and oxygen. Atoms are nature's building

Dockets.Justia.com

on every sample it receives because it is more expensive and time consuming than the routine testosterone to epitestosterone ratio test ("T/E Test"), which is typically used for the detection of the anabolic steroid testosterone. USADA's testing program strategically aims to use its resources in an efficient and effective manner in furtherance of its mission to protect clean athletes when requesting CIR and other special, more expensive tests like EPO.

The UCLA Laboratory reported Respondent's sample positive for testosterone or its precursors, all of which are substances prohibited by the WADA List in the class of anabolic androgenic agents.[2] On June 27, 2006, Respondent requested the opening and analysis of the B bottle from sample # 496040. Respondent's expert, Dr. David Black, was present for the opening and the entire analysis of the Respondent's B sample. The B sample analysis was completed on June 28, 2006 and was reported as confirming the A sample for synthetic testosterone to USADA on June 30, 2006. Respondent has stipulated that all aspects of the sample processing and analysis were conducted appropriately and without error. Respondent has also stipulated that the presence of synthetic testosterone in his sample "is a doping offense in violation of the WADA Code and IAAF Rules."

Respondent now asks this Panel to grant him extraordinary relief. Conceding that the laboratory test results showing synthetic testosterone in his system are accurate, Respondent

---

blocks and carbon is a dominant atom in the human body. The human food-chain begins with plants. Animals eat plants. Humans eat plants and animals. Ultimately all carbon atoms in the human body are derived from the plants and animals that we eat. Most is $^{12}C$ (carbon 12), but a small amount is $^{13}C$, a difference isotope, heavier by one extra neutron. Roughly 1.1% of all carbon is $^{13}C$, but different compounds contain more or less $^{13}C$. These small differences in $^{13}C$ content can be measured with an analytical instrument which performs a process known as a Gas Chromatography–Combustion–Isotope Ratio Mass Spectrometry ("GC/C/IRMS"). The GC/C/IRMS method is designed to determine the ratio of $^{13}C$ to $^{12}C$ in biological molecules such as testosterone, its precursors, and its metabolites. The units of measurement are called delta units ($\delta$). Through a fortuitous quirk of nature, there is a measurable difference in $^{13}C$ content between natural (endogenous) and pharmaceutical steroids. This is because they arise from different metabolic pathways. Natural steroids are made in the human body from cholesterol. Pharmaceutical steroids are synthesized from plant products (soy and others). Pharmaceutical steroids contain less $^{13}C$ than natural or endogenous testosterone; therefore, their $^{13}C/^{12}C$ ratio is lower. By measuring just how much lower, if at all, the GC/C/IRMS method determines whether the steroid is from pharmaceutical or endogenous sources. Steroids in the urine with a low delta value come from the use of pharmaceutical steroids.
[2] For ease of reference throughout the remainder of this brief, USADA will simply refer to doping with testosterone, omitting the phrase "or its precursors."

2

asks that the Panel nevertheless order that he retain the world record set just a short time after his positive steroid test and only disqualify his results from his competition on April 22. Respondent also asks that he not be held responsible for his positive drug test and suffer no further period of ineligibility.

Such extraordinary relief would be unprecedented and manifestly unfair in this case and is legally unavailable unless and until Respondent carries his burden of providing extraordinary proof. To obtain the complete exoneration, which he is seeking, section 10.5.1 of the World Anti-Doping Code (the "Code") specifies that Respondent rebut the incontrovertible proof of synthetic testosterone in his system with similarly strong and compelling evidence. In order to meet this standard Respondent must carry his burden of proving three things:

1.    How synthetic testosterone entered his system;

2.    That he was not at fault for entry of synthetic testosterone into his system; and

3.    That his negligence did not contribute to the entry of synthetic testosterone into his system.

Yet, Respondent does not focus first, or, by comparison, much on what he must prove regarding the instant steroid offense. Rather, Respondent focuses first and repeatedly on his prior amphetamine violation from 2001, such that discussion of the 2001 offense nearly overwhelms consideration of the present offense. *See* Respondent's Brief pp. 1-3 (summary focusing largely on 2001 offense), 6-14 (discussion of whether Panel should consider first offense), 21-22 (treatment of first offense under proposed new Code).

USADA was supportive of Respondent's position in 2001 and essentially worked with Respondent to present a stipulated agreement to the hearing panel. USADA also facilitated Respondent's successful request for early reinstatement by the IAAF. Moreover, in this case USADA gave credit to Respondent for the nature of the 2001 offense by reducing the

3

stipulated penalty faced by Respondent from a lifetime ban (which is the period under section 10.2 that would otherwise be faced by an athlete who tested positive first for an amphetamine and then for an anabolic steroid) to an eight (8) period of ineligibility as provided in section 10.5.2 for when one of the two offenses involves "no significant fault or negligence." In the first instance, however, this case is not about what happened in 2001 and the hearing in this case should focus primarily on Respondent's positive drug test in 2006 for an anabolic steroid and not be permitted to turn into an appeal for sympathy based on the events surrounding Respondent's 2001 positive in competition drug test.

As set forth below, Respondent's legal positions regarding treatment of his prior offense are largely unsupportable. More importantly, however, Respondent's arguments about the past should not be permitted to obscure his current burden to prove the cause of his present doping offense.[3]

As explained herein, Respondent is asking that the clear and consistent anti-doping rules which should apply to every athlete not be applied consistently towards him. Through his legal arguments Respondent attempts to construct a number of loopholes and legal detours that would allow him to retain hold on perhaps the most cherished record in sport and avoid any consequences for his positive drug test. Respondent's strained legal arguments must be rejected and the anti-doping rules of his sport and the Olympic Movement must be fairly and consistently applied to him regardless of his stature, accomplishments or the sympathetic aspects of his tale.

USADA respectfully requests that throughout the hearing in this matter that the Panel do two things: (1) keep an open mind until all the evidence is in, and (2) apply the rules of sport in a fair and even handed manner without favoritism. At the end of the hearing USADA

---

[3] The parties entered into a 17 paragraph stipulation of facts wherein Respondent agreed that he had committed a second doping offense through the presence of testosterone in his urine sample. *See* Respondent's Exhibit 1.

believes that the Panel will be comfortably satisfied that a doping offense has been committed and that the appropriate sanction is an eight (8) year period of ineligibility and disqualification of all results subsequent to the positive drug test.

## II. RESPONDENT'S BURDEN OF PROOF CONCERNING HIS 2006 STERIOD OFFENSE

**A.    Has Respondent Proven How Synthetic Testosterone Entered His System?**

**Answer: No.**

Once an anti-doping rules violation has been established the burden of proof shifts to the athlete who "shall have the opportunity to establish that there are exceptional circumstances in his case justifying a reduction of the sanction otherwise applicable[.]" IAAF Rule 38.11.[4] Because the Respondent has stipulated that he had synthetic testosterone in his body he must carry the burden of establishing entitlement to a reduction in sanction on the basis of exceptional circumstances.

The first item that Respondent must prove in order to be potentially entitled to any reduction in the period of ineligibility under either the "no fault or negligence" (10.5.1) section of the Code or the "no *significant* fault or negligence" (10.5.2) section is "how the *Prohibited Substance* entered his or her system." Code §§ 10.5.1, 10.5.2. Without such proof the Panel need go no further in evaluating Respodents' arguments of lack of fault or lack of significant fault, because without such proof an athlete can never be entitled to a reduction in his or her sanction.[5]

As a foundational principle, the Code places responsibility for every substance that enters an athlete's body squarely upon the shoulders of that athlete. The Code states:

---

[4] In most respects the World Anti-Doping Code (the "Code") and the IAAF Anti-Doping Rules are the same. Where there is not a significant difference USADA has generally referred directly to the Code.
[5] With the sole exception that a reduction can be obtained pursuant to § 10.5.3 for "Substantial Assistance in Discovering or Establishing Anti-Doping Rule Violations by Athlete Support Personnel and Others."

> It is each *Athlete's* personal duty to ensure that no *Prohibited Substance* enters
> his or her body. *Athletes* are responsible for any *Prohibited Substance* or its
> *Metabolites* or *Markers* found to be present in their bodily *Specimens*.
> Accordingly, it is not necessary that intent, fault, negligence or knowing *Use*
> on the *Athlete's* part be demonstrated in order to establish an anti-doping
> violation under Article 2.1.

Code §§ 2.1.1. The principle that an athlete is responsible for what enters his or her body is

not a new principle; it was a part of sport anti-doping rules long before adoption of the Code.

*See, e.g., Aanes v. FILA*, (CAS 2001/A/317), pp. 19-20 ("when weighing the interests of the

federation to combat doping and those of the athlete not to be punished without fault, the

scales tip in favor of the fight against doping. In fact, doping only happens in the sphere of

the athlete: he/she is in control of his/her body, of what he/she eats and drinks, of who has

access to his/her nutrition, of what medication he/she takes, etc.").[6] The principle that an

athlete is responsible for what enters his or her body is the same whether the athlete hails from

Tanzania or Texas. Without adherence to this principle, clean athletes would lose all hope of

success. Just as importantly, without adherence to this principle the anti-doping system is not

fair and equitable for every athlete.

The necessity of proving "how the substance got there" as a precondition to qualify for

any reduction in sanction flows naturally from the principle of athlete responsibility for what

goes into his or her body. If an athlete cannot prove *how* a banned substance got into his or

her body he cannot exclude the presumed intentional use of the drug that lead to the positive

test. The Code is clear that an athlete must exclude the intentional use in order to be entitled

to a reduction in sanction.

---

[6] There has never been a requirement under the IAAF's Anti-Doping rules that USADA prove any element of intent to dope or intent to take a prohibited substance. *Walker v. IAAF* (IAAF Arbitration Panel); *Ottey v. IAAF* (IAAF Arbitration Panel); *See Baumann v. IOC, et al.* (CAS OG 00/006), p. 145. "[I]t has never been a requirement in establishing a doping violation that a performance enhancing effect be demonstrated." *Baumann v. IOC, et al.* (CAS OG 00/006), p. 14; accord *Raducan v. IOC*, (CAS OG 00/011), p. 120.

Therefore, with but one exception[7], proof of how the banned substance came to be in the athlete's body (not appeals to sympathy, complaints about money lost, denials or musings about the philosophical underpinnings of sport anti-doping rules) *must* be the starting point for any effort to seek reduction of a period of ineligibility for a doping violation.

The Respondent starts off his brief by trying to sidestep the bedrock principle of athlete responsibility for what enters his body. He does this by contending that his denials are enough and that he need not prove how synthetic testosterone entered his system. Time and again in various forms in Respondent's Brief the Panel is told that:

- "Justin had never knowingly used any banned substance or authorized anyone else to administer such a substance to him." p. 3.

- "At no time prior to the meet did Mr. Gatlin knowingly ingest any prohibited substance." p. 4.

- "Justin has reviewed what he knowingly ingested and has been unable to uncover anything that would have lead to such a finding." p. 5.

Respondent's proof does not merely begin with statements claiming unknowing use – it ends there too. Respondent's explanation for a synthetic anabolic steroid showing up in his urine is strikingly void of anything more than a frequently heard denial:

> Justin has reviewed what he knowingly ingested and has been unable to uncover anything that would have lead to such a finding. Simply put, Justin did not knowing [sic] ingest any prohibited substance. As a result, Justin has determined that the only possibility is that the prohibited substance must have entered his body transdermally.

Respondent's Brief ("Res. Br.") p. 5. This explanation is not proof of how a synthetic steroid got into Respondent's body it is rather speculation based exclusively on Respondent's word about what he took, used and did.

---

[7] The one exception is proof of an athlete's substantial assistance in discovering or establishing anti-doping rule violations by athlete support personnel and others pursuant to section 10.5.3. The applicability *vel non* of this section is discussed below.

Perhaps the most striking aspect of Respondent's claim is that Respondent is willing to blame his physical therapist for his own positive drug test result with apparently no more proof than that Respondent knew what he ate so it must have been "Mr. Whetstine [who] knowingly or unknowingly administered the prohibited substance." Res. Br. p. 18. Respondent contends, "[a]fter eliminating all substances he had consumed, Mr. Gatlin was left with the only reasonable conclusion; namely, that this prohibited substance must have entered his body transdermally, which means that it must have been contained in a substance that was applied to him by his physical therapist, Christopher Whetstine." Res. Br. pp. 17-18.

As Respondent did not request a subpoena from the Panel to attempt to compel Mr. Whetstine's attendance at the hearing, nor name Mr. Whetstine as a witness, it appears that Respondent's only intended proof that Mr. Whetstine is the alleged source of the synthetic testosterone in his urine is again Respondent's own testimony. Certainly, Respondent has not disclosed to USADA that he has any other admissible information about the alleged source of the steroid in his urine and none of the summaries of the testimony for any of Respondent's witnesses identifies any testimony about Mr. Whetstine. Presumably, since Respondent is seeking a reduction of his sanction pursuant to section 10.5.3 for alleged substantial assistance in "discovering or establishing anti-doping rule violations by Athlete Support Personnel and others" he would have by now conveyed to USADA any other information that he has that Mr. Whetstine allegedly engaged in antidoping rule violations, including "Possession under Article 2.6.2 (Possession by Athlete Support Personnel), Article 2.7 (Trafficking), or Article 2.8 (Administration to an Athlete)." Section 10.5.3. Because Respondent has not provided any such information to USADA, USADA believes it unlikely that Respondent possesses legally sufficient proof of the source of Respondent's positive test result.

Thus, it appears to USADA that Respondent will be unlikely to prove the most basic of the threshold elements which he must prove in order to be entitled to any reduction for

either "no fault or negligence" or "no significant fault or negligence." Like the Panel in *USADA v. Wade*, No. AAA 30 190 01334 04, this Panel should reject Respondent's "exceptional circumstance" argument because he cannot prove the source of the prohibited substance. *See Wade* at Para. 47 (holding that "his period of ineligibility may be reduced only if the athlete can establish how the prohibited substance entered his system, which Mr. Wade had not.").

**B.     Has Respondent Proven He Had No Fault or Negligence for the Entry of Synthetic Testosterone Into His System?**

**Answer: No.**

The second aspect of Respondent's burden of proof in seeking a complete elimination of the period of ineligibility for his positive drug test is to establish that he bore "no fault or negligence" (10.5.1) for the positive drug test result. On this aspect of Respondent's burden as well he offers nothing more than his denial and his speculation that it must have been his trainer. The IAAF Anti-Doping Rules define "No Fault or Negligence" as:

> When exceptional circumstances have been determined in an athlete's case under Rule 38 to demonstrate that the athlete did not know or suspect, and could not reasonably have known or suspected even with *the exercise of utmost caution,* that he had used or been administered a prohibited substance or prohibited method.

IAAF Anti-Doping Rules (Definitions) (emphasis added).

The IAAF's Anti-Doping Rules provide for the reduction of the minimum period of ineligibility only in rare cases. The IAAF Rules explicitly state that "exceptional circumstances will exist only in cases where the circumstances are truly exceptional and not in the vast majority of cases." IAAF Rule 38.12(ii). The "exceptional circumstances" rules are not meant to undermine the fundamental principles that "it is each athlete's personal duty to ensure that no prohibited substance enters his body tissues or fluids" and that "[a]thletes are

warned that they shall be held responsible for any prohibited substances found to be present in their bodies." IAAF Rule 38.12(i).

The Comments to the Code suggest that a finding of "no fault or negligence" cannot be premised on a claim of sabotage by a "spouse, coach or other person within the Athlete's circle of associates" because "Athletes are responsible for what they ingest and for the conduct of those persons to whom they entrust access to their food and drink[.]" 10.5.2 Comment. Respondent notes that one CAS panel has observed that there could be circumstances in which the examples in the foregoing Comment could lead to a finding of no fault or negligence. He then keys on this observation to contend that the "facts in this case likely present precisely the type of 'particular circumstance' envisioned by the CAS Panel in the FIFA & WADA Advisory Opinion." Res. Br. p. 17. USADA respectfully disagrees with this conclusion which conflicts with well established legal principles.

Even if Respondent were to prove through sufficient evidence that Mr. Whetstine, a person admittedly within Respondent's circle of associates for whom he was responsible, caused the positive test result, Respondent concedes that he is unable to exclude *either* of the twin possibilities "that Mr. Whetstine may have *knowingly* applied a prohibited substance to him" *or* "that Mr. Whetstine may have *unknowingly* applied a prohibited substance to him." Res. Br. p. 5 (emphasis added). Thus, even granting Respondent his supposition that Mr. Whetstine is the cause of his test result, Respondent admits he cannot prove whether Mr. Whetstine acted knowingly or unknowingly. Accordingly, Respondent has already effectively conceded that he will not be able to prove that the application of a prohibited substance to him involved "no fault or negligence" – if the application of the prohibited substance was unknowing or unintentional (and Respondent has admitted he cannot prove that it was not unknowing or unintentional) then Whetstine's negligence must be attributed to

Respondent because Whetstine, albeit negligent, was a member of Respondent's entourage and/or was acting as Respondent's trainer.

Perhaps there is a circumstance where sabotage by a coach or trainer is so devious and extreme and the proof of such sabotage by the athlete is so conclusive that an athlete could prove that it would be unjust to have to bear complete responsibility for the conduct of his entourage. However, such a case, if it comes, will involve proof far different from what Respondent professes that he will be able to proffer, which apparently will not even include conclusive proof of the source of the alleged contamination and will be unable to even distinguish whether the speculative cause he suggests was intentional or unintentional. The Code principle that an athlete is responsible for conduct of his entourage in providing him prohibited substances is essential because otherwise a huge loophole will exist for athletes to seek to avoid penalties for drug use simply by having their coach, trainer or other support personnel take responsibility for causing the positive test. CAS jurisprudence has reinforced the importance of this principle. For instance in *Demetis v. FINA*, CAS 2002/A/432, the panel said:

> If an athlete . . . is permitted to exculpate and reinstate himself . . . by merely pleading that he has been made the unwitting victim of his or her physician's (or coaches) mistake, malfeasance or malicious intent, the war against doping in sports will suffer a severe defeat. It is the trust and reliance of clean athletes in clean sports, not the trust and reliance of athletes in their physicians and coaches which merits the highest priority . . . If such a defense were permitted in the rules of sport competition, it is clear that the majority of doped athletes will seek refuge in the spurious argument that he or she had no control over the condition of his or her body.

*Demetis*, ¶ 9.3.11. Numerous cases confirm that an athlete can be held at fault for either the negligent and/or the intentional conduct of their circle of associates in knowingly or unwittingly providing the athlete a prohibited substance. *See, e.g., Demetis v. FINA*, CAS 2002/A/432, *Edwards v. IAAF and USATF*, CAS/OG/04/003 (Panel found that athlete who had been given stimulant through an oversight by her trainer deserved two year ban for

11

negligence of her and her trainer. The Panel agreed that the uniform standard sanction imposed by the WADA Code did not violate principles of fairness); *USADA v. Sahin*, No. 30 190 01080 04 (athlete responsible for prohibited substance intentionally given to him by angry ex-wife).

The conclusion that Respondent cannot prove "no fault or negligence" pursuant to § 10.5.1 of the Code compels the conclusion that he must receive a period of "ineligibility" as a sanction with the resulting effect that competitive results occurring after the April 22, 2006, positive test – including the world record tying performance on May 12, 2006 – must be invalidated due to his ineligibility. § 10.7.

### C. Has Respondent Proven He Had No Significant Fault or Negligence for the Entry of Synthetic Testosterone Into His System?

Answer: No.

In the event that an athlete is able to prove that the prohibited substance entered his body with "no significant fault or negligence" on the part of the athlete the athlete may qualify for a "reduced period of Ineligibility [of] not less than one-half of the minimum period of Ineligibility otherwise applicable." § 10.5.2. "No Significant Fault or No Significant Negligence" is defined in the IAAF Rules as:

> When exceptional circumstances have been determined in an athlete's case under Rule 38 to demonstrate that the athlete's fault or negligence, when viewed in the totality of the circumstances, was not significant in relationship to the anti-doping rule violation.

IAAF Anti-Doping Rules (Definitions).

As explained above, the concept of no significant fault or negligence can only come into play if Respondent proves the *source* of his positive drug test result. It does not appear that Respondent has any evidence outside of his own denials and speculation concerning his trainer that point to a source for his positive drug test for a synthetic anabolic steroid.

12

An important interpretive key to the IAAF's exceptional circumstances rule is the principle that, "[a]ll decisions taken under [the IAAF's Rules] regarding exceptional circumstances must be harmonized so that the same legal conditions can be guaranteed for all athletes[.]" IAAF Rule 38.12. Accordingly, the IAAF Rules indicate that highly subjective circumstances such as a misunderstanding of the contents of a supplement or medicine or bad advice received from a coach, doctor or athlete support personnel do not justify a reduction of a doping sanction. *See*, e.g., IAAF Rule 38.12(iii). Giving weight to such factors would undermine the consistent application of doping penalties within the sport of track and field and permit athletes to easily evade the overriding principle that "it is each athlete's personal duty to ensure that no prohibited substance enters his body tissues or fluids." IAAF Rule 38.12(i).

It does not appear that Respondent will be able to prove the source of his positive drug test and it also appears unlikely that he will be able to prove that he had no significant fault or negligence for the presence of synthetic testosterone in his system.

D. **Has Respondent Proven He Provided Substantial Assistance in Discovering or Establishing Anti-Doping Rule Violations by Athlete Support Personnel and Others?**

Answer: **Not as to USADA. With respect to possible assistance to the U.S. government, USADA reserves judgment on the character and quality of any assistance provided until after hearing Respondent's evidence at the hearing.**

The final means by which Respondent can seek a reduction of the period of ineligibility for his most recent positive test result for a period up to one-half the minimum is through providing "substantial assistance to the *Anti-Doping Organization* which results in the *Anti-Doping Organization* discovering or establishing an anti-doping rule violation . . . involving *Possession* under Article 2.6.2 (*Possession by Athlete Support Personnel*), Article 2.7 (*Trafficking*), or Article 2.8 (*Administration to an Athlete*)." § 10.5.3.

Respondent has not provided substantial assistance to USADA. Respondent has provided very little, if any, significant information to USADA and has not assisted USADA in discovering or establishing an anti-doping rule violation as set forth in § 10.5.3. Accordingly, Respondent should not receive a reduced period of ineligibility due to any assistance to USADA.

Respondent contends he has provided substantial assistance to the U.S. government. Res. Br. pp. 5-6, 15-16. However, USADA notes that Respondent has not specifically contended in his brief that he has provided substantial assistance in "discovering or establishing" one of the listed anti-doping rule violations as required for a reduction pursuant to § 10.5.3.

In order to be entitled to a reduction Respondent must demonstrate that any assistance provided led to *discovery or establishment* of a listed anti-doping rule violation *and* that such assistance was *substantial*. It is not enough to merely be cooperative, to obey instructions, to attend meetings, do interviews or even wear a wire. Rather, the rule clearly provides that the assistance must lead to discovery or establishment of a violation and that it must be substantial. Thus, the rule directs the Panel to assess the quality and quantum of the assistance provided and to ascertain whether it added something new to the case. Discovery *or* establishment of a violation is required. Merely being cooperative or helpful is not enough.

With the foregoing caveats, USADA must reserve judgment on the character and quality of any assistance provided to the U.S. government until after hearing Respondent's evidence at the hearing.

### III. RESPONDENT'S 2001 AMPHETAMINE OFFENSE

A. **USADA Gave Credit for the Prior Offense in the Parties' Stipulation Which Provides for a Maximum Sanction of 8 Years.**

14

The proper treatment under the Code of Respondent's 2001 amphetamine offense is straightforward and simple. The 2001 violation is a first offense and did not involve a "specified substance."[8] Pursuant to § 10.2 of the Code a second violation where both violations involve "hard substances" (i.e., a substance such as an amphetamine or steroid) generally results in lifetime ineligibility. However, where one of the offenses involves "no significant fault or negligence" and the applicable period of ineligibility is a lifetime offense then the period of ineligibility is 8 years. § 10.5.2.

As a result, USADA stipulated that Respondent's "period of ineligibility will be a maximum of eight (8) years[.]" Stipulation ("Stip.") ¶ 9. The Stipulation provides that "USADA expressly acknowledges and agrees that *the maximum penalty of eight years agreed to by the parties does take into account the facts and circumstances surrounding Mr. Gatlin's positive test as reflected in USADA v. Gatlin (AAA 30 190 00546 01),* but does not take into account any assistance that Mr. Gatlin may provide to USADA, the IAAF, WADA or any other entity, including the United States government, engaged in the investigation of anti-doping rule violations by athletes, coaches, or others." Stip. ¶ 13 (emphasis added).

Thus, it is disingenuous for Respondent to argue now that his prior doping offense should even be considered by the Panel in this matter. Respondent has already by agreement received the benefit of USADA's acknowledgment that the prior offense involved no significant fault or negligence. Consequently, Respondent is only facing at maximum an eight year period of ineligibility and not a lifetime ban in this proceeding.[9]

As explained above, USADA believes that Respondent will likely be unable to prove no fault or negligence and/or no significant fault or negligence. Accordingly, USADA

---

[8] That is, a substance identified by WADA as to which lesser sanctions apply. Neither amphetamines nor steroids have ever been considered specified substances.
[9] It is also inconsistent for Respondent to contend as on page 7 of his brief that the eight year sanction he is facing is equivalent to a lifetime ban when he has expressly agreed that he would accept the laboratory test results in this case in return for facing no more than an eight year period of ineligibility.

believes that the most appropriate sanction in this case is likely to be an eight (8) year period of ineligibility.

### B. The *Puerta* Case Does <u>Not</u> Suggest that Respondent's Prior Offense Should Be Disregarded.

Respondent places significant weight on the relatively recent decision of a CAS Panel in *Puerta v. ITF*, CAS 2006/A/1025. However, analysis reflects that the case will not support the weight Respondent asks it to bear. In fact, the teachings of the *Puerta* panel run directly counter to the Respondent's effort to evade the clear penalties provided for in the Code. As explained in detail below, the *Puerta* panel filled a "gap" or "lacuna" in the Code by adopting a Code-based remedy for a unique factual circumstance that "may never arise again" and that was not covered by the express language of the Code. *Puerta*, ¶ 11.7.32. More fundamentally, however, the *Puerta* panel repeatedly reaffirmed the importance of CAS panels strictly adhering to the express terms of the Code whenever possible. The *Puerta* panel expressly affirmed that it made "no apology for repeating that in its view the [Code] provides a proportionate and just result in all but the very rare case." *Puerta*, ¶ 11.7.34.

The *Puerta* panel counseled against taking liberties with the Code and found that it did not have the authority to exercise <u>any</u> discretion to vary the penalties found in the Code where no "lacuna" (i.e., situation which the drafters did not contemplate) in the Code's provisions was found. In language that directly undermines many of the arguments put forth by Respondent the *Puerta* panel said:

> The Panel does not consider that to fill the gap or lacuna that it believes to exist in the [Code] requires it, or any tribunal, to exercise a general discretion. Although *the [Code] does provide for tribunals to exercise a discretion in certain, limited, circumstances, such as whether to eliminate or reduce a sanction on the basis of No Fault or Negligence or No Significant Fault or Negligence or whether to grant a TUE (Article 13.3) or whether to treat two offences as one offence (Article 10.6), it does not bestow upon tribunals a general discretion. Indeed, the existence of such a general discretion would be inimical to the [Code], which seeks to achieve consistency and certainty.* The

16

Panel does not believe that such a discretion exists, and would not welcome its existence.

*Puerta*, ¶ 11.7.25 (emphasis added). Thus, the *Puerta* case fully undermines the arguments for the exercise of sweeping discretion and the invalidation of express provisions of the Code which Respondent seeks to base upon *Puerta*.

In any case, the instant case is nothing like the case which confronted the panel in *Puerta*. In the *Puerta* case the athlete had previously tested positive for, Clenbuterol, an asthma medication which he had taken for an asthma attack but without obtaining advance permission, and his period of ineligibility for that prior offense had been reduced to nine (9) months under rules in force prior to the adoption of the Code. *Puerta*, ¶¶ 2.8, 2.9, 11.6.4. Clenbuterol, a beta-2 agonist, is a "specified substance" under the current Code meaning that it is particularly susceptible to an unintentional anti-doping rule violation and the penalty for a first offense can be as little as a public warning and disqualification of results from the competition in which the athlete tested positive. Thus, Mr. Puerta's first offense is classified as less serious under the Code than a first time use of amphetamine as in Mr. Gatlin's case.

In the case of Mr. Puerta's second offense he was able to very precisely prove how he had ingested a trace amount of etilefrine, a stimulant on the WADA Prohibited List. The stimulant was contained in his wife's medication and Mr. Puerta established that after he had left the cafeteria during a competition his wife had used a glass to dissolve her medication, drank the contents of the glass and left the cafeteria. Mr. Puerta's brother remained at the table and a few minutes later Mr. Puerta returned to the table, sat back down and ended up putting water in the glass and drinking it. As a result, a trace amount of the stimulant showed up in Mr. Puerta's urine sample. The panel found that Mr. Puerta was negligent but concluded that he did not have significant fault or negligence. Thus, the *Puerta* panel was confronted with a situation where the first offense was for a specified substance and involved

no significant fault or negligence and the second offense involved no significant fault or negligence.

The *Puerta* panel noted that the factual scenario before it was not precisely covered by section 10.5.2 of the Code which provides that the lifetime ban for a second offense under the Code can be reduced to 8 years when *one* of the offenses involves no significant fault or negligence. Section 10.5.2 does not provide for the proper penalty when *both* of the offenses involve no significant fault or negligence. This was the "lacuna" or gap found by the *Puerta* panel and the panel ultimately concluded that a two year period of ineligibility was appropriate.

A significant difference between *Puerta* and the instant case is the fact that in *Puerta* the athlete was able to precisely identify the source of the contamination. Moreover, the fact that the substance involved was not a hard doping substance such as a steroid was so important to the *Puerta* panel that the panel observed that a gap would not exist at all if the second offense had been for a steroid. The *Puerta* panel said "the Panel would suggest that [the lacuna] *would not be found to exist,* if, in respect to one of the breaches, an athlete had been found to have committed a serious drug offence, for example, by the use of anabolic steroids, EPO, THG, HGH or the like, or by the use of a prohibited method." *Puerta,* ¶ 11.7.26. In other words, if the second offense had involved as steroid, as in Respondent's case, the Panel would have found no gap and would have imposed the 8 year period of ineligibility found in 10.5.2. Thus, the reasoning of the *Puerta* case supports the 8 year period of ineligibility agreed to by USADA with Respondent.

In Respondent's case there is no "lacuna." The Code clearly specifies that the appropriate sanction is an 8 year period of ineligibility. "[I]n all but the very rarest of cases the sanction stipulated by the [Code] is just and proportionate." *Puerta,* ¶ 11.7.27. This is not

a rare case. Respondent's brief demonstrates that he cannot prove circumstances that would permit a reduction of the 8 year sanction stipulated by the Code.[10]

### IV. THIS PANEL SHOULD REJECT RESPONDENT'S ATTEMPTS TO COLLATERALLY ATTACK RESPONDENTS' PRIOR OFFENSE AND/OR TO ARGUE THAT THE CODE IS INVALID

As noted above, Respondent spends much of his brief arguing about the import and impact of his 2001 amphetamine offense. These arguments are misdirected.

First, the WADA Code is not contrary to any applicable policy as suggested by Respondent. Interestingly, not only has Respondent failed to prove that the WADA Code is contrary to any established policy but he has in fact specifically agreed in the Parties' Stipulation that the WADA Code applies to this proceeding. His suggestion is exploded by numerous accepted facts. The United States government has a member on the WADA board, the agency that has promulgated the Code. Congress has by statute recognized the United States Olympic Committee which, like USADA, is a signatory to the Code. The United States is one of the 190 governmental signatories to the Copenhagen Declaration on Anti-Doping in Sport[11] which expressly approves the WADA Code. *See* http://www.wada-ama.org/rtecontent/document/declaration_en.doc. The U.S. government has expressly approved the principles of the Code, and this fact is a recognized matter of international law.[12]

Second, Respondent complains but fails to prove that the WADA Code constitutes a contract of adhesion and if proven what relevance, if any, that has on this proceeding. Here, not only has Respondent failed to prove this suggestion but he seems to forget that he has in fact specifically agreed in the Parties' Stipulation that the WADA Code applies to this proceeding.

---

[10] This conclusion is confirmed by the proposed revisions to the Code. Under the revised Code, as presently proposed, the sanction imposed would be from 6 to 8 years.
[11] For a list of the 190 governmental signatories see http://www.wada-ama.org/en/dynamic.ch2?pageCategory.id=391.
[12] In accordance with Article 23.5 of the Code, if the U.S. did not comply with the Code, the U.S. would run the risk of never hosting an Olympic Game or sending a team to the Olympic Games.

Third, the fact that Respondent's prior offense took place in a "junior" competition is also completely irrelevant. The Code does not contain such a distinction. Respondent's analogy to criminal juvenile offenses is inapposite. Respondent was 19 years old at the time of his prior offense and in college. The age of majority for purposes of the criminal law (to which Respondent attempts to analogize) is typically 16 to 18 years of age. Third, Respondent was not competing in a local event. His prior offense came at a national competition. Fourth, attributing special status to a junior offense would undermine the consistent application of the rules as other athletes have had juvenile offenses considered prior offenses without any mitigation in penalty. *See, e.g., USADA v. Calvin Harrison*, (AAA 30 190 00091 04). In the *Harrison* case, as in the instant case, the athlete had tested positive at the Junior National Championships during his first national competition[13] and in *Harrison* the time period between the first and second offenses was more than double what it is in this case. Mr. Harrison's first offense had occurred in 1993 about 10 years prior to the second positive test in 2003. *Harrison*, ¶¶ 2.2, 5.1 n. 19. Moreover, in *Harrison* the *first* offense was for pseudophedrine, a stimulant that had been entirely *removed* from the WADA Prohibited List by the time of the second offense. Further, the *second* offense was for a stimulant in a category the panel found would have only resulted in a sanction of a warning and disqualification of results had it been a first offense. Nonetheless, the Panel found that the athlete had committed a second offense and imposed the maximum penalty of a two year period of ineligibility and disqualification of his spot on the 2004 U.S. Olympic Team (in the sport of track and field).

The *Puerta* Panel also confirmed that anti-doping rule violations committed prior to the implementation of the WADA Code were required to be considered for purposes of

---

[13] The circumstances regarding the event at which Mr. Harrison's first positive test occurred are not recited in the Panel's written opinion.

determining the period of ineligibility for a second doping violation committed. The *Puerta* Panel at Paragraph 11.6.8 stressed that:

> . . . it would be contrary to the spirit of the rules and would seriously undermine the fight against doping in sport if the "slate were to be wiped clean" on entry into force of the Programme [WADA Code]". The fight against doping must be a long term campaign if it is to succeed. The adoption of the Programme [WADA Code] did not provide for an amnesty for all athletes previously sanctioned who committed a second offence.

The time interval between Respondent's first offense and his second offense, less than five years, is also insignificant. Respondent has cited no authority for the proposition that offenses occurring within an eight year period cannot be considered together, as required by the Code, to establish the proper penalty. Respondent cites to the *Puerta* case for the argument that the alleged "failure of the . . . Code to recognize the . . . age of prior [sic] positive test clearly violates the proportionality doctrine." Res. Br. p. 2. However, the *Puerta* case did not involve any issue concerning the age of the prior offense. Plainly, offenses slightly more than an Olympiad apart are not too far apart to violate any principal of CAS jurisprudence.[14]

## V. REFERRAL TO THE IAAF IS APPROPRIATE IF EXCEPTIONAL CIRCUMSTANCES OR SUSBTANTIAL ASSISTANCE "MAY" EXIST

At this stage of the proceedings the Respondent's burden is to prove that exceptional circumstances and/or substantial assistance "may" exist. *See USADA v. Torri Edwards*, AAA 30 190 00675 04. The exceptional circumstances rule was "meant to have an impact only in cases where the circumstances are truly exceptional and not in the vast majority of cases." Comments to WADA Code § 10.5.2 (emphasis added); *Hipperdinger v. ATP Tour (CAS*

---

[14] Respondent's vague and unsupported reference to the Americans with Disabilities Act (ADA) in relation to his first offense is a red herring without merit. Nothing about his first offense violated the ADA and Respondent (who was represented by the same counsel) did not contend that it did before the hearing panel. Any effort to collaterally attack Respondent's first offense whether based on the ADA or otherwise is improper in this proceeding.

21

*2004/A/690); Torri Edwards and IAAF* (CAS OG 04/003); *Kicker Vencill and USADA* (CAS 2003/A/484); and *USADA v. Faruk Sahin* (AAA 30 190 01080 04). As explained above, USADA does not believe Respondent has established that exceptional circumstances may exist.

In the event that the Panel finds that "the circumstances in the athlete's case may be exceptional" this Panel should refer the case to the IAAF Doping Review Board which shall make the final determination of whether exceptional circumstances exist. IAAF Rule 38.13-16 and *Edwards*. If, following a referral by an arbitral tribunal such as this Panel, the IAAF Doping Review Board finds that exceptional circumstances do not exist, this "determination shall be binding on the relevant tribunal, which shall impose the sanction prescribed in Rule 40.1[.]" IAAF Rule 38.18. On the other hand, if it is the IAAF Doping Review Board's determination that there are exceptional circumstances the matter is to be returned to the arbitral tribunal to "decide the athlete's sanction in accordance with [the relevant IAAF Rules and] consistent with the Doping Review Board's categorization of the exceptional circumstances[.]" IAAF Rule 38.19.

## VI.    CONCLUSION

The parties' stipulation establishes that Respondent committed a second doping violation by testing positive for a prohibited anabolic steroid. It presently appears that the only fair and appropriate sanction for Respondent's commission of a second doping offense is an eight (8) year period of ineligibility from the date of the hearing, with credit being given for the time Respondent served a provisional suspension beginning on July 25, 2006. Further, in accordance with the rules and in fairness, the Respondent's competitive results on and subsequent to April 22, 2007 including Respondent's World Record set on May 12, 2006 must be disqualified.

Dated this 20th day of July, 2007.

United States Anti-Doping Agency

Travis T. Tygart
General Counsel, USADA
1330 Quail Lake Loop, Suite 260
Colorado Springs, CO 80906
Telephone: 719.785.2031
Fax: 719.785.2028

William Bock, III
Kroger, Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Telephone: (317) 692-9000
Fax: (317) 264-6824

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 20th day of July, 2007, a true and correct copy of the foregoing **UNITED STATES ANTI-DOPING AGENCY'S PRE-HEARING BRIEF** was served via electronic mail as follows:

Edward T. Colbert, Esq.
Kenyon & Kenyon
1500 K. Street, NW, Suite 700
Washington, DC 20005
ecolbert@kenyon.com

Samuel David Cheris, Esq.
11385 East Alabama Circle
Aurora, CO 80012
sam.cheris2@relera.com

Christopher L. Campbell, Esq.
Chapman & Intrieri, LLP
2236 Mariner Square Drive, Suite 300
Alameda, CA 94501
ccampbell@chapmanandintrieri.com

John P. Collins, Esq.
Collins & Collins
8 South Michigan Avenue, Suite 1414
Chicago, IL 60603
john.collins@collinsandcollins.com