BEFORE THE AMERICAN ARBITRATION ASSOCIATION
North American Court of Arbitration for Sport Panel

| | | |
|---|---|---|
| Justin Gatlin | ) | |
|     Claimant, | ) ) ) | |
| v. | ) | AAA No. 30 190 00170 07 |
| United States Anti-Doping Agency | ) ) ) | |
|     Respondent. | ) | |

## Justin Gatlin's Memorandum
### Regarding the Issue of "Fault" in the 2001 Arbitration

Claimant, Justin Gatlin, by and through his attorneys, Collins & Collins, hereby submits his Memorandum in support of his position that the decision in AAA proceeding No. 30 190 00546 01 (the "2001 Arbitration") constitutes a finding of "No Fault or Negligence" and may not be considered a "first offense" for purposes of this arbitration and states as follows:

### I. Panel Must Evaluate Fault Level Of First Offense

The Panel in its August 13, 2007 order asked: "whether it is appropriate for the Panel to evaluate the fault level of the first offense." Not only is it appropriate, it is required. As many CAS opinions have held over the years, any sanction must be "just and proportionate." *See Puerta* at p. 39. This need is particularly great where the WADA Code has a lacuna or hole in it like it does here when dealing with prior offenses where the athlete was not at fault or those cases where an athlete only had no significant fault or negligence. *Id*. It is simply neither just nor proportionate to treat intentional cheaters caught twice the same as someone who had no such ill intent. Failure to recognize and distinguish between these two scenarios runs the risk of the WADA Code

1

GATLIN v. UNITED STATES ANTI-DOPING AGENCY INC    Doc. 29 Att. 5

itself being "struck down in [a] jurisdiction as not producing a just and proportionate sanction." *Id.*

Not only have numerous CAS panels recognized this requirement, it is now universally recognized by the drafters of the WADA Code and all of the stakeholders in the anti-doping movement. Where the *Puerta* panel saw a lacuna, the WADA Code drafters have agreed and taken efforts to fill that hole. In particular, the drafters of the WADA Code have inserted a new provision, Article 10.7, which expressly address situations where an athlete faces a sanction for a second offense. This new provision includes a grid that compares relevant fault of the first and second offense and assigns different sentencing ranges for each of the 36 different scenarios. In addition, a prior finding of "No Fault" is not counted as a "first offense" so there is no need to even consult the new chart in the new Article 10.7 of the proposed revised WADA Code.

Thus, it is clear that this Panel not only should, but must, consider the relevant fault – or more accurately, lack there of – in Justin's 2001 Arbitration, particularly in light of principles of *lex mitor*, which the WADA Code and CAS panels have recognized.[1]

## II. 2001 Arbitration Panel Decision Indicates That If It Had Issued Express Determination of Fault It Would Have Found Justin Gatlin Had "No Fault or Negligence"

In its August 13, 2007 Order, this Panel correctly noted that the panel in the 2001 Arbitration did not make an express finding with respect to fault. That panel, however, did make it clear that if it were to have made such a finding, it would have found Justin

---

[1] This Memorandum addresses issues raised by the determination that the 2001 Arbitration constituted a finding of "No Fault." For an analysis of potential sanctions if the Panel determines that the 2001 Arbitration constituted a "Reduced Sanction" or "No Significant Fault" finding, then see pages 21-22 of Justin Galtin's Pre-hearing Brief.

2

had "No Fault or Negligence" as those terms are now defined under the WADA Code and CAS decisions interpreting the WADA Code.

2001 Panel Was Required By IAAF To Impose
Two-Year Suspension As Pre-Condition to Reinstating Justin Gatlin

Before reviewing the Hearing Panel's May 1, 2002 Decision, it is important to put that decision[2] in context. The 2001 Arbitration pre-dated the WADA Code. It was governed by the IAAF's 2000-2001 Rules for Control of Drug Abuse. (The applicable IAAF Rules are set forth in the Decision. A more complete copy of Division III of the 2000-2001 IAAF Handbook containing the doping control rules (Rules 55 – 61) is attached hereto as Exhibit I).

The 2001 IAAF Rules contained a true "strict liability" system. Under IAAF Rule 55.2(i), a doping offense occurred whenever "a prohibited substance is found to be present within an athlete's body tissue or fluids." In addition, the 2001 IAAF Rules contained a mandatory minimum penalty for a violation; namely a minimum penalty of a 2-year suspension for a first offense. (Rule 60.2) The IAAF Rules did not contain the concepts of "No Fault" or "No Significant Fault or Negligence" that are present in the WADA Code today. Thus, under the 2001 IAAF Rules an athlete's only option to receive something less than a 2-year sanction was to first accept a 2-year sanction and then petition the IAAF for "early reinstatement," which is what occurred in Justin's 2001 Arbitration.

In the 2001 Arbitration, Justin Gatlin received the minimum suspension possible under the circumstances. All parties to the 2001 Arbitration recognized that Justin's

---

[2] The May 1, 2002 Decision is Exhibit 2 to Justin Gatlin's Pre-Hearing Brief. It is referred to herein as the "Decision."

3

positive test was the result of his having taken his prescription medicine, Adderal, at least 3 days prior to his competition. See Decision at p.3; see also, Parties Stipulation, dated April 30, 2002 at p. 2. When Justin learned of his positive test, he promptly notified USADA that it was the result of his use of his prescription medicine and voluntarily imposed upon himself a *de facto* provisional suspension. Decision at p. 9.

The parties (Justin and USADA) then worked to have Justin "reinstated" by the IAAF. As part of these efforts, Justin's medical records were submitted to an international panel of doctors, who confirmed that Justin had been properly diagnosed with Attention Deficit Disorder ("ADD") and that his use of Adderal, which contains amphetamine, was proper treatment for his disability. See Decision pp.2-3; see also, Exhibit II for the full text of the letters from the international panel of doctors.

The parties then submitted those materials to the IAAF and requested that it "reinstate" Justin at its April 13, 2002 meeting. The IAAF, however, refused to consider these materials at that meeting, indicating that it would only consider Justin's situation after he had accepted the minimum 2-year suspension. See January 17, 2002 AAA Hearing Panel Report and April 30, 2002 Hearing Panel Report. Thus, as a pre-condition to the IAAF even considering Justin's case, the panel in the 2001 Arbitration was required to conditionally impose a 2-year suspension against Justin. In doing so, the panel in the 2001 Arbitration made it abundantly clear that but for the IAAF's requirement that such a penalty be imposed as a pre-condition to Justin being reinstated, it would not have imposed such a penalty. Decision at p.8 ("Were this panel to address the issue of culpability and sanctions in a full evidentiary hearing, this panel clearly would not apply the full two-year suspension to Mr. Gatlin.")

4

Hearing Panel Decision Clearly Implies Finding No Fault By Justin Gatlin

While the panel in the 2001 Arbitration technically imposed a two-year suspension on Justin as required by the IAAF, it is clear from the Decision that had the IAAF not reinstated Justin, that panel would found Justin's conduct to constitute what the WADA Code defines as "No Fault or Negligence."[3] The Decision is replete with language clearly indicating that if the IAAF did not eliminate Justin's suspension, then that panel would have.

For example, on page 8 of the Decision the panel states: "the seriousness of Mr. Gatlin's conduct and personal culpability are open to dispute and certainly proportionately very much less other athletes who would receive a two-year suspension under the same IAAF rules." Decision at p.8. It then states: "Were the panel to address the issue of culpability and sanctions in a full evidentiary hearing, this Panel **clearly** would **not** apply the full two-year suspension to Mr. Gatlin. *Id.* (emphasis added). The panel then noted it was "conditionally impos[ing]" the two-year suspension out of deference to the IAAF to allow it (IAAF) "the opportunity to assess the exceptional circumstances" of the case before the panel did. *Id*. The panel then expressly retained jurisdiction over the case to re-consider its conditional imposition of the two-year suspension in case the IAAF did "not take expeditious action in **granting** Mr. Gatlin early reinstatement to a term appropriate to his circumstances **and satisfactory to Mr. Gatlin**. *Id.* (emphasis added). So, not only did the panel indicate that the IAAF must grant Justin early reinstatement, it went even further to note that such early reinstatement

---

[3] Prior to the WADA Code, in cases such as Justin's where the athlete's conduct did not justify receiving the "mandatory" minimum penalty, the hearing panel would reduce or eliminate the penalty based on "proportionality." Effectively, this reduction equated to time served since athletes were suspended upon discovery of the positive test.

5

must be satisfactory to Justin (i.e., time served without further sanction) and if not, then the panel retained jurisdiction to do what it believed was right – immediately reinstate Justin.

The Decision contains further evidence that that panel did not believe that Justin committed a doping violation for which he should have been sanction. For example, on page 7, the panel states that Justin "is certainly not a doper." *Id*. at p. 7. The panel then expressly noted that Justin "neither cheated nor did he intend to cheat" and that he "did not intend to enhance his performance nor, given his medical condition, did his medication in fact enhance his performance. *Id*. at p.10. The panel then further **required** that any public release regarding Mr. Gatlin's positive test clearly reflect these findings that Justin did **not** cheat and did **not** intend to cheat. *Id*. (emphasis added).

Then, in the most telling provision of the Decision – the most direct statement that that panel found that Justin had No Fault – the panel stated:

> This Panel is very concerned that Mr. Gatlin's reputation not be unnecessarily tarnished as a result of this decision. Anti-doping rules are like other sporting rules in that sometimes there are adverse consequences *even when an athlete is not at fault.*

*Id.* at p. 9.

Thus it is clear from the Decision that the panel in the 2001 Arbitration believed that Justin's positive test result constituted "No Fault or Negligence" as those terms are defined under the WADA Code.

Stipulated Facts Underscore "No Fault" Determination

The stipulated facts upon which the decision is based further underscore that Justin's positive test in 2001 was the result of "No Fault or Negligence" by him. In particular, it states that Justin was a 19-year old college student, who suffers for ADD as

6

confirmed by the international panel of doctors. Parties Stipulation at p. 2. Justin took his prescription medicine to study for his mid-terms, stopped taking the medicine 3 days before competing, did not feel the effects of his medicine the day he competed and his positive test was caused by his prescription medicine. *Id.* at pp. 2-3. USADA advised athletes taking prescription medicine to treat ADD to stop taking their medication before competing but did not advise them on how far in advance they should stop taking their prescription medicine. *Id.* at p.4. Instead, USADA recommended that athletes contact their doctors to determine how far in advance to discontinue use. *Id.* As set forth below, that advice was of no help to Justin since his doctor did not know the proper time needed and readily available published was unclear and misleading. As a result, it is clear that Justin did everything he could have and was instructed to do; namely, he stopped taking his medicine days before he competed. Thus, under the WADA Code, his actions support a finding of "No Fault or Negligence."

Justin Gatlin's Doctor Did Not Know How Far In Advance
Justin Should Discontinue Use Of His Prescription Medicine
<u>In Order To Have Zero Residual In His Urine</u>

In 2001, USADA advised athletes with Justin's disability, ADD, to contact their personal physicians to determine how far in advance to discontinue use of their prescription medicine. USADA did not provide any individualized advice to disabled athletes like Justin, nor did USADA make any reasonable accommodations to disabled individuals like Justin. All USADA did was say stop taking your medicine and call your doctor.

Unfortunately for Justin, complying with that advice was insufficient. Justin's treating physician, Dr. Barnett, did not know how long it would took for the

7

amphetamine in Adderal to clear his system so that there would be zero residual in his urine. Exhibit 3 at p. 3. Dr. Barnett contacted the United States Olympic Committee to determine that information but received no response. *Id.* Likewise, USADA did not provide that advice. *Id.*

Moreover, the readily available published literature on the topic at the time, to the extent any existed, failed to provide any clear answer. First, literature on how far in advance of a drug test someone would need to discontinue use of his or her medications containing amphetamine so that his or her urine sample will contain 0 ng/ml, the IAAF/WADA threshold amount, was not readily available. *Id.* To the extent that there was any published information available, it addressed "positive tests" under the threshold contained in U.S. law and federal regulations (i.e., a urine sample for employment purposes must contain more that 500 ng/ml to be considered a "positive test" and more than 1000 ng/ml for certain screening tests) that are significantly higher than the IAAF threshold – approximately 2 to 5 times higher than the amounts found in Justin's urine samples. In other words, based upon those sources, Justin's discontinued use 3 days before being tested was sufficient to avoid a "positive test" since his test result was only approximately 200 ng/ml. *Id.* Based on these facts, Justin exercised the utmost care and there was nothing more he could have been reasonably expected to do.[4]

---

[4] Justin's behavior compares favorably to that of Graydon Oliver, whose actions Professor Richard McLaren found to be "exceptional circumstances" and basis for lowering his mandatory 2-year suspension to a suspension of only 2 months. See Exhibit IV. In *Oliver*, Professor McLaren noted that the athlete's reliance upon his mother's providing a herbal sleep aid that it turned out contained a prescription diuretic not listed on the label was "reasonable" and constituted "very limited" fault. Professor McLaren noted in that case that while Mr. Oliver's actions were reasonable, there was more he could have done, namely he could have had his nutritionist review the substance prior to taking it, particularly since it was a supplement, which tennis athletes had been

8

## III. Justin Gatlin's Conduct In 2001 Supports Finding of No Fault Or Negligence

Under the WADA Code, Article 10.5, an otherwise applicable period of ineligibility will be eliminated if the athlete can demonstrate that he or she bears no fault of negligence. WADA Code Art. 10.5. CAS panels have interpreted this provision as requiring that the athlete display "utmost" care. Justin's actions in 2001 satisfy this high standard.

First, amphetamine is not banned for out-of-competition use, so Justin committed no violation by ingesting this substance out-of-competition. Justin took Adderal, which contains amphetamine, to treat for his properly diagnosed disability, as confirmed by an international panel of experts. Justin only took his medication to assist his studies and not to enhance athletic performance. In fact, his medication hinders rather than enhances his athletic performance. Justin stopped taking his medication 3 days before competing. Thus, Justin only took and only intended to take his prescription medication "out-of-competition."

Second, athletes like Justin were advised to discontinue taking their prescription medicine prior to competing. Justin fully complied with this advice, having discontinued his medication 3 days before the 2001 USATF Junior Nationals. Justin exercised utmost

---

specifically cautioned about taking. Also, had Mr. Oliver searched the internet, he would have been able to learn that the product likely contained a diuretic.

Here, Justin had no such relative culpability. He was taking a prescription medicine – not a supplement – that had been properly prescribed by his doctor, who did not know how far in advance Justin should stop taking his medication before competing. Also, there was no available information on the internet that would have been helpful to Justin. To the extent there was any such information, it was misleading in that it contained the wrong thresholds and compliance with that information would have resulted in the same result for Justin – a positive test. Thus, if Mr. Oliver's relative fault was "very little" (justifying a reduction in penalty from 2 years to 2 months) then by comparison Justin's actions must constitute No Fault or Negligence.

9

care by taking his medicine only in connection with education and discontinuing it immediately thereafter. There was nothing more Justin could have done under the circumstances.

Justin participated in the 2001 USATF Junior Nationals through the University of Tennessee. His coach entered him into the event approximately 3 months prior to the event. Justin had fully disclosed to his University of Tennessee doctor he had been prescribed and was using Adderal to treat his disability.

Justin had a legal right to take medicine for school under the Americans with Disabilities Act ("ADA) and the Rehabilitation Act. To the extent that Justin received any advice or notice regarding the potential implications of his taking his prescription prior to testing positive that advice was simply that he should discontinue taking it prior to competing. Justin did just that, discontinuing his medication as soon as he finished his midterms some 3 days before competing. There was no way for Justin to know that even though he was complying with that advice, he would still "test positive" under the IAAF threshold. Justin's treating physician did not know and could not advise him on how far in advance to discontinue use of his prescription medicine. Neither USADA, USATF nor USOC were willing to advise him on how far in advance he should discontinue use of his prescription medicine. Also, there was no readily available literature on the topic applying IAAF's 0ng/ml threshold. Justin's approximately 200 ng/ml would not have been deemed a "positive test" as that term is used U.S. law and federal regulations.

Based upon these factors alone, there was sufficient evidence for the panel in the 2001 Arbitration to determine that Justin had exercised utmost care and his positive test should be determined to have been the result of no fault or negligence on his part. That

panel, however, would not have been so limited. It could have properly considered additional factors, all of which further supported a finding of No Fault or Negligence by Justin.

## AAA Hearing Panel Could Properly Consider Justin's Age And Experience

As indicated above, Justin Gatlin was only 19-years old when participated in the 2001 USATF Junior Nationals. In fact, that competition was the first USATF event in which he participated. Tr. p.50. Prior to that event he had only participated in high school and NCAA track events, which had completely different anti-doping programs, if any.

Also as indicated above, Justin relied upon his track coach at the University of Tennessee to enter him in the competition and to advise him of the various rules of the competition, including any anti-doping rules. Justin's reliance upon his college coach was perfectly reasonable and appropriate given Justin's age and inexperience. Justin's reliance was further justified based upon his disability. Children with ADD regularly rely upon parents, teachers, coaches and others to assist them.

The panel in the 2001 Arbitration could have properly considered Justin's age, inexperience and disability in evaluating his conduct and whether any fault or negligence should be attributed to him based upon that conduct. In or about December 2001, in his decision of the appeal of the 19-year old tennis player, Guillermo Coria, CAS Arbitrator Richard McLaren established such precedent as part of the applicable *lex sportif*. In that case, which involved Mr. Coria ingesting a prohibited substance from a contaminated supplement for a manufacturer with which Mr. Coria had an arrangement, Professor McLaren found it reasonable for a 19-year old athlete to rely upon the advise of his

personal physician. Exhibit V, *Coria* Decision at p. 17, ¶58. Professor McLaren further noted that manufacturer's website included photos of bodybuilders and included photos for which Mr. Coria had posed lifting weights to assist in the promoting the company, and that such photos should have alerted even a young athlete like Mr. Coria to the possible dangers of receiving a contaminated supplement. Professor McLaren found that on balance these photos and warning signs only partially undercut the reasonableness of Mr. Coria's reliance on his advisors so as to provide merely some "degree of blame and fault be assigned to" Mr. Coria. *Id.* at p. 18, ¶59. That panel still found that Mr. Coria's suspension should be substantially reduced because of his age and lack of experience. *Id.*

Notably, the WADA drafters effectively have endorsed Professor McLaren's decision. Specifically, in the comments to final revised WADA Code, version 3.0, published October 15, 2007, a new comment has been added to the comments to Article 10.5.2, which states:

> While minors are not given special treatment per se in determining the applicable sanction, certainly youth and lack of experience are relevant factors to be assessed in determining the Athlete or Other Person's fault under Article 10.5.2, as well as Articles 10.4 and 10.5.1.

See http://www.wada-ama.org/rtecontent/document/WADA_Code_2007_Redline_3.0_to_2.0.pdf

Here, the facts of Justin Gatlin's 2001 Arbitration are even more favorable than those in Mr. Coria's case. Justin Gatlin was the same age as Mr. Coria, 19, but Justin was less experienced – Justin was participating in just his first IAAF/USATF event. More significantly, Justin had no counter-balancing fault as Mr. Coria did. Justin was not using a tainted supplement, but rather was taking his prescription medicine to treat his disability. Justin was not posing for photos, lifting weights; he was trying to overcome his disability so that he could study and pass his midterms. Then as soon as his test was

12

done, Justin discontinued his medication so that he could run without it in his system. Under these circumstances, Justin's actions in relying upon his doctor and coaches were reasonable and not blame-worthy or negligent.

## USADA Should Be Estopped From Imposing Sanction On Athlete That Complied With USADA's Advice

In addition to the panel for the 2001 Arbitration appropriately finding that Justin Gatlin's actions did not constitute fault or negligence under the circumstance, that panel also could have estopped USADA from enforcing strict liability against Justin. The doctrine of equitable estoppel has been recognized by CAS and is part of the *lex sportif* of CAS. See Exhibit VI, *Uliharch* Decision at p. 13, ¶26. As defined in *Uliharch*, for CAS purposes, the doctrine of equitable estoppel is to be applied as a matter of fairness and good conscience to estoppe the person whose conduct has brought the situation about from asserting their legal rights against another party who may have been misled or affected by that conduct. *Id.*

Here, USADA's conduct for which it should be equitably estopped is its inadequate notice to disabled athletes with ADD such as Justin. USADA did not provide – and made no effort to provide – any individualized notice or assistance to Justin. The only notice USADA provided was its general statement advising athletes to discontinue use of their prescription medicine prior to competing. See Exhibit 3 to Justin Gatlin's Pre-Hearing Brief at pp. 4-5. USADA did not provide any information on how far in advance an athlete should discontinue such use. *Id.* USADA did recommend athletes to inquire with their treating physicians, but as set forth above, that advice was of no use to Justin since his doctor did not know. USADA's notice did not include the name of Justin's medicine, Adderal, until <u>after</u> Justin had tested positive.

13

Thus, to the extent that Justin received any notice from USADA, he complied with that notice. Justin stopped taking his prescription medicine 3 days before competing. It would be patently unfair to apply the strict liability against Justin when he complied with USADA's notice. As a result, the hearing panel may have appropriately estopped USADA from applying the strict liability provisions of the IAAF Rules.

It should be noted that Professor McLaren in the *Ulihrach* decision caution that the equitable estoppel should be used very rarely. Justin's case is that rare exception. As stated above and as more fully set forth below, Justin Gatlin suffered from a recognized disability, Attention Deficit Disorder. Therefore, at a minimum under the Rehabilitation Act and the Americans with Disabilities Act, USADA had a duty to make individualized assessment and reasonable accommodation to Justin. USADA -- as well as USATF and the USOC – failed take make any such individualized assessment and Justin did not receive any accommodation – reasonable or otherwise. In other words, USADA failed to exercise its heightened duty in compliance with those statutes. Accordingly, equity and fairness dictated that the hearing panel estoppe USADA from applying strict liability against Justin Gatlin when USADA has failed to comply with US law. Without the benefit of strict liability, USADA would have been incapable of proving a doping offense against Justin since he clearly had no intent to cheat and did not enhance his performance.

USADA/IAAF/USATF Required to Make
Reasonable Accommodation To Justin Gatlin
Under ADA and Rehabilitation Act

The ADA and Rehabilitation Act apply to USADA and the USATF. In light of the U.S. Supreme Court decision in *PGA Tour, Inc. v. Casey Martin*, 532 US 661 (2001), there should be little question that the ADA applies to USA Track & Field and its 2001

USATF Junior National Championships. Since USADA received (and continues to receive) a significant portion of its budget from the United States government, it also clear that the Rehabilitation Act applies to USADA.

Likewise, it is clear that the Justin Gatlin is protected under the ADA and Rehabilitation Act because (i) Justin is disabled within the meaning of the ADA and Rehabilitation Act; (ii) USADA and USATF are private entities that own, lease or operate a place of public accommodation (plus at least USADA receives federal funds); (iii) USADA and USATF took adverse action against Justin based upon his disability (suspended him for taking his prescription medicine); and (iv) USADA and USATF failed to make reasonable accommodations that would accommodate Justin's disability without fundamentally altering the nature of the public accommodation. See 42 USC §§12101 *et seq*.

USADA has indicated that it was not possible to make reasonable accommodations to individuals with ADD since permitting athletes to compete while using amphetamines would fundamentally alter the sport. USADA's position, however, is not correct. Justin Gatlin never sought the right to participate while using amphetamines. To the contrary, Justin Gatlin consistently maintained his desire to insure that he competed without any residuals of his prescription medicine in his system. Specifically, the reasonable accommodation that Justin Gatlin sought was that USADA provide him individualized notice on how far in advance of a competition he should stop taking his prescription medicine. Alternatively, Justin Gatlin would have requested that the threshold for a positive test be harmonized with the federal standard of 500 ng/ml so

that public information available on how far in advance to stop taking his medicine prior to competing would have been beneficial.

Had USADA provided either of these reasonable accommodations, Justin Gatlin would not have tested positive. Also, neither of these reasonable accommodations would have altered the nature of his sport. Individualized notice would have had no impact on his sport. Similarly, raising the applicable threshold to 500 ng/ml would not fundamentally alter the sport. An athlete would not derive any competitive advantage by having such de minimis amounts of amphetamine in his urine.

Ultimately, the panel in the 2001 Arbitration did not have to address this issue since it conditionally imposed the 2-year suspension, which the IAAF then agreed to terminate upon its first consideration. Had the panel had the opportunity to address this issue, however, it would have been appropriate for it to require USADA to make such reasonable accommodations to Justin. In addition, it also would have been appropriate to find that Justin's conduct under the circumstances constituted no fault or negligence.

## IV. Conclusion

For the reasons set forth above, Justin Gatlin respectfully that the Hearing Panel find that (i) Justin Gatlin's conduct with respect to the 2001 Arbitration constituted "No Fault or Negligence" as those terms are defined by the WADA Code and (ii) that, as a result, his 2001 positive tests should not be consider a first doping offense and not used to enhance any penalty that may be assessed in this matter.

Respectfully submitted,<br>
COLLINS & COLLINS<br><br>
_____<br>
John P. Collins<br><br>
Attorneys for Claimant Justin Gatlin

John P. Collins
COLLINS & COLLINS
8 S. Michigan Ave., Ste. 1414
Chicago, IL 60603
312-201-8700