*UNITED STATES ANTI-DOPING AGENCY v. JUSTIN GATLIN*
American Arbitration Association No. 30 190 00170 07
North American Court of Arbitration for Sport Panel

Christopher L. Campbell, concurring in part and dissenting in part.

## I.   SUMMARY

I concur with the majority decision in finding that Mr. Gatlin should be sanctioned for

his second violation.  I dissent from the majority decision to increase Mr. Gatlin's

sanction on the basis of his first violation.  The procedural and substantive status of the

first violation makes it improper for the Panel to impose an increased sanction because

there was no finding of fault by the arbitration panel or the IAAF Council.   Moreover,

given the facts, Mr. Gatlin was not at fault for his first violation.

The first violation was caused by the medication Mr. Gatlin was taking for his

disability, Attention Deficit Disorder ("ADD").  Increasing Mr. Gatlin's sanction for his

first violation because of his disability is blatant discrimination in violation of the

Americans with Disabilities Act.

By imposing sanctions on athletes like Mr. Gatlin who take medication for their

legitimate disability, the Anti-Doping Organizations are willfully violating the law—

behaving as if they are above the law.    In these circumstances, they are nothing more

than bullies preying on the vulnerable.  The federal government should take a serious

look at this practice.

## II.   SABOTAGE DEFENSE

Mr. Gatlin's accusation of sabotage was far from frivolous.  He presented strong

evidence that the trainer had a motive and an opportunity to sabotage him.  However,

after Mr. Gatlin's offer of proof, I concluded three scenarios were equally likely: (1) Mr.

GATLIN v. UNITED STATES ANTI-DOPING AGENCY INC.   Doc. 30 Att. 1

- 1 -

Dockets.Justia.com

Gatlin very well could have been sabotaged by the trainer, (2) Mr. Gatlin could have been unwittingly administered testosterone by a coach, or (3) Mr. Gatlin could have intentionally taken testosterone.

Mr. Gatlin proved sabotage by 33⅓%, not the balance of probabilities (plus 50%) required by the World Anti-Doping Code ("WADA Code") Article 3.1. I reach this conclusion realizing that if sabotage did occur, it would more than likely be impossible for Mr. Gatlin to prove. An innocent athlete will be labeled a drug cheat.

## III. NO FINDING OF FAULT

In 2001, Court of Arbitration for Sport ("CAS") legal precedent clearly established that the onus was on the American Arbitration Association Panel ("AAA Panel") or the IAAF to make a finding of guilt or negligence in order to impose a sanction on an athlete for a doping violation. CAS held:

> The Panel is of the opinion that as a matter of principle and irrespective of 'specific and exceptional circumstances' an athlete cannot be banned from competition for having committed a doping offence unless he is guilty, i.e., he has acted with intent or negligence. Even if the rules and regulations of a sports federation do not expressly provide that the guilt of the athlete has to be taken into account the foregoing principle will have to be read into these rules to make them legally acceptable.[1]

The AAA Panel presiding over Mr. Gatlin's first case <u>expressly</u> did not rule on the issue of Mr. Gatlin's fault. Pursuant to a stipulation entered into by USADA and Mr. Gatlin, the AAA Panel forwarded the matter to the International Association of Athletics Federations' ("IAAF") Council for a determination of early reinstatement.

The IAAF Council did not make a finding of fault. The IAAF Council immediately reinstated Mr. Gatlin so that he could compete in the Olympic Games. The

---

[1] *Aanes v. FILA*, CAS 2001/A/317, p. 16; *Canas v. ATP*, CAS 2005/A/951, ¶8.14 (without negligence no doping offense).

failure to make a finding of fault is a lacuna the majority relies upon to completely misstate the law governing fault in 2001. The majority outrageously and erroneously states that the AAA Panel or IAAF did not have to make a finding of fault under the law in 2001. As evidenced above, the majority is simply wrong.

Since there was no finding of guilt or negligence in 2001, this Panel is in no position to increase Mr. Gatlin's penalty for his second violation because of the procedural and substantive status of the first violation. Procedurally, there was not a final decision by the AAA Panel. Substantively, there was no finding of fault by the AAA Panel or the IAAF.

## IV.    FAULT EVALUATION

1.    <u>AAA Panels have the exclusive authority at the national level to rule over the question of fault in Mr. Gatlin's first violation.</u>

USADA argued that this Panel does not have the authority to determine whether there is No Fault or Negligence for Mr. Gatlin's first violation pursuant to IAAF ADR 38.16. IAAF ADR 38.16 directs this Panel to refer the issue of fault to the IAAF Council for its ruling. I vehemently disagree.

Mr. Gatlin has a fundamental due process right to an independent trier of fact.[2] Federal law provides that this Panel is that independent trier of fact.[3]  Allowing a prosecuting party such as the IAAF to decide the facts and the law of a case as IAAF ADR 38.16 directs would divest Mr. Gatlin of a fair hearing. It would be the quintessential definition of a Kangaroo Court.

---

[2] USOC Due Process Checklist, http://www.usolympicteam.com/USOCDueProcessChecklist.pdf.; *See also* Legal Opinion on the Conformity of Certain Provisions of the Draft World Anti-Doping Code with Commonly Accepted Principles of International Law, Kaufmann-Kohler et al., (2003) ¶ 52 (citing Article 14 of the UN Covenant on Civil Rights which provides that a party must have a competent, independent and impartial tribunal) http://www.wada-ama.org/rtecontent/document/kaufmann-kohler-full.pdf.
[3] *Ted Stevens Olympic and Amateur Sports Act § 220521.*

2.    Mr. Gatlin was not at fault for his first violation

It may be improper for the Panel to retroactively make a decision on the issue of Mr. Gatlin's fault for his first violation. This is not because the IAAF should make the decision. Rather, the issue of fault should have been determined in 2001. Going back now to determine that issue may very well be improper. However, if the Panel were to make a decision on the issue of fault, Mr. Gatlin was not at fault.

The majority appears Schizophrenic regarding how to treat the first violation. The majority states that Mr. Gatlin failed to meet the "utmost caution" standard yet directed Mr. Gatlin to seek a determination of no fault by the IAAF.    To be fair, this Schizophrenic treatment is caused in no small measure by the unique facts of this case.

The majority also erroneously states that the fact that Mr. Gatlin was striped of his competition results in 2001 is evidence that he was found to be at fault. This is a non sequitur. Athletes testing positive in competitions automatically have their competition results striped irrespective of the issue of fault.[4] This practice has been followed since at least 1996.[5] Mr. Gatlin never requested that his competition results in 2001 be restored.

Mr. Gatlin's first offense occurred in his first IAAF event in June of 2001.    At that time the AAA Panel determined that Mr. Gatlin suffered from the disability of Attention Deficit Disorder ("ADD"). It was undisputed that the source of the Prohibited Substance in Mr. Gatlin's body was from his medication for ADD.

---

[4] WADA Code 2.1, comment 2.1.1; Legal Opinion on the Conformity of Certain Provisions of the Draft World Anti-Doping Code with Commonly Accepted Principles of International Law, Kaufmann-Kohler et al., (2003) ¶¶ 95-101;
[5] *Aanes v. FILA*, CAS 2001/A/317 (2001); *Raducan v. ICO*, CAS Digest II, p.665 (2000); *Chagnaud v. FINA*, CAS Digest I, p. 205, 220 (1996); *Wei v. FINA*, CAS Digest II, p. 234,248 (1998).

(i) <u>Mr. Gatlin's conduct for his first violation must be evaluated under the general negligence standard.</u>

The WADA Code was not enacted in 2001. There was no "utmost caution" standard of care for a finding of No Fault or Negligence as there is now under WADA Code 10.5.1. The standard of care was general negligence. [6] As such, in evaluating his first violation, Mr. Gatlin has a substantive right to have the first violation evaluated under general negligence, not the "utmost caution" standard. [7] The majority's statement that Mr. Gatlin must be evaluated under the "utmost caution" standard is not supported by any legal authority. If Mr. Gatlin's 2001 violation were to be evaluated under the "utmost caution" standard as the majority suggests, Mr. Gatlin would be treated differently (worse) than all the other athletes facing a second violation who had their first violation in 2001. This is not fair, proper or supported by legal authority.

The general negligence test is as follows: "the failure to do something which a reasonably careful person would do, or the doing of something which a reasonably careful person would not do.[8] Mr. Gatlin produced uncontradicted evidence that the 2001 USA Track & Field ("USATF") Manual was approximately 160 pages long. The USATF Manual specifically directed individuals suffering from ADD to discontinue their prescription prior to competing. As such, the USATF Manual established the standard of care for athletes suffering from ADD.

The United States Anti-Doping Agency ("USADA") gave the same instructions to athletes suffering from ADD. Even two (2) months after Mr. Gatlin tested positive,

---

[6] This was an admission of USADA in a tribunal proceeding. *See Neben v. USADA*, AAA No. 30 190 00713 03 (2003), dissenting opinion page 3, ¶10.

[7] *Cannon v. University of Chicago* (1979) 441 U.S. 677, 732, 99 S.Ct. 1946, 1976 (negligence is a substantive standard); *Elsner v. Uvegeus* et al. (2004) 34 Cal. 4th 915, 928; 102 dP.3d 915, 939 (retroactive application of standard of care is impermissible); *Grover v. Dr. W..E. ISOM et* al (2002) 137 Idaho 770, 775, 53 P.3d 821,826(standard of care is not procedural).

[8] *Ford Motor Co. v. Burdeshaw* (1995) 661 So. 2d 236, 238.

USADA placed on its website that athletes suffering from ADD should merely discontinue use of their medication prior to their event. *__There is absolutely no evidence that the USATF, USADA, United States Olympic Committee ("USOC") or the IAAF ever advised athletes suffering from ADD to seek a Therapeutic Use Exemption (" TUE").__*

The USATF, USADA, and USOC probably did not advise athletes suffering from ADD to seek a TUE Exemption because the IAAF would not grant such an application. The administration of that medication would not have been at the time of an in-competition drug test. The athlete would merely be dealing with an "Out-Of-Competition" situation. The IAAF's 2001 TUE exemption procedure stated, in part, the following:

> 5.1 IAAF Rules 55.5 was introduced in order to make it possible for an athlete to participate in sport who, for a limited or prolonged period of time, needs a prohibited substance for medical reasons . . . .
> 5.3 Out-Of-Competition doping control is used as a deterrent for the use of anabolic agents and certain listed hormones, including the substances under prohibited techniques. Application for exception of drug use during training is, therefore, needed only for these substances.[9] (emphasis added)

CAS legal precedent clearly establishes that athletes should not be confronted with contradictory rules.

> "The fight against doping is arduous, and it may require strict rules. But the rule-makers and the rule-appliers must begin by being strict with themselves. Regulations that may affect the careers of dedicated athletes must be predictable."[10]

The specific instruction of USAFT and USADA for athletes with ADD regarding the standard of care (i.e., merely stop taking your medication before competition) would

---

[9] *IAAF Procedural Guidelines for Doping Control*, 2000 Edition.
[10] *USA Shooting v. Quigley*, CAS 94/129, ¶55.

override the general language of IAAF Rule 55 (5.1). This is particularly the case because IAAF Rule 55 (5.3) creates an ambiguity when its states that a TUE would not be granted for Out-of-Competition use.

USATF's and USADA's notice to athletes suffering from ADD to merely stop taking their medication before competition would establish the standard of care that Mr. Gatlin's conduct would have to conform to in 2001. It is undisputed that Mr. Gatlin's conduct conformed to that standard of care.

> (ii) **USATF's and USADA's directions to athletes suffering from ADD established the community standard.**

In dealing with general negligence, the Restatement of Tort directs the trier of fact to look to the conduct of the community to determine what conduct is reasonable. The chief advantage of this "reasonable man" standard is that it enables the triers of fact to look to a community standard rather than an individual one (as in the "utmost caution" standard of the WADA Code.) in determining whether an individual is at fault.[11] This prevents the difficulty that can arise when you have a standard of care that looks exclusively at an individuals conduct without the context of ordinary human behavior. That is, in those instances a trier of fact may impose a standard of care that is virtually impossible for innocent athlete who inadvertently tests positive to meet, i.e., as can occur with the "utmost caution" standard of care of the WADA Code.[12]

For his first violation, the community standard is established by those athletes who were suffering from ADD. In the 2001 stipulation, the parties established that athletes suffering from ADD merely stopped taking their medication before a competition. They did not seek TUE Exemptions. No doubt, this conduct (community

---

[11] *Restatement of the Law – Torts* §283, Comments (b) and (c).
[12] See *Advisory Opinion, FIFI and WADA*, CAS 2005/C/976 & 986, ¶73.

standard) was created by the notices provided by USATF and USADA to athletes suffering from ADD. Mr. Gatlin's conduct conformed to the community standard test.

### (iii) Fairness demands a finding of no fault.

In 2001, Mr. Gatlin was suffering from a legitimate disability.[13] He was properly taking his medication under a doctor's prescription that an international panel of experts determined was appropriate. These experts established that Mr. Gatlin stopped taking his medication three (3) days before the competition. His conduct conformed to the specific instructions of USAFT and USADA. No one knew that Mr. Gatlin would test positive after not taking his medication for three days, not even USADA as evidenced by their advice. How would an athlete suffering from a cognitive disability know if USADA did not know? Under these facts no reasonable, fair minded person acting in good faith could ascribe fault to Mr. Gatlin.

Given his offer of proof, Mr. Gatlin did not fail to prove his case in 2001. Rather, both the AAA Panel and the IAAF avoided ruling on whether Mr. Gatlin was at fault, something they were obligated to do. It was more expedient to just let Mr. Gatlin compete. The truth is, Mr. Gatlin's disability was beyond dispute. No one wanted to deal with the 300 hundred pound gorilla in the room-- The Americans with Disabilities Act ("ADA").[14]

---

[13] *Bingham v. Oregon School Activities Association,* 24 F. Supp. 2d 1110, 1116 (1998) (recognized ADD as a disability under federal law.
[14] 42 USC 12101 et Seq.

## V.    AMERICANS WITH DISABILITIES ACT

1.    Mr. Gatlin's request for a reasonable accommodation satisfies all of the requirements of Title III.

"A person alleging discrimination under Title III must show (i) that he is disabled within the meaning of the ADA; (ii) that the defendant is a private entity that owns, leases, or operates a place of public accommodation; (iii) that the defendant took adverse action against the plaintiff that was based upon the plaintiff's disability; and (iv) that the defendant failed to make reasonable accommodations that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation."[15]

   (i) Mr. Gatlin sustained his burden of proof that he suffers from a mental impairment that substantially limits one or more of the  major life activities under 42 USC § 12102(2)(A).

The federal regulations list major life activities per se.  They include "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.[16] The Ninth Circuit has held that learning is a major life activity.[17]

Under federal regulations 28 C.F.R. §36.104, a physical or mental impairment means any mental or psychological disorder such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.[18]

The Panel must determine whether the specified impairment "substantially limits" the major life activity of learning.[19]  This is a mixed question of law and fact.[20]  The

---

[15] *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir. 1999).
[16] 28 C.F.R. § 36.104.
[17] *Zukle v. Regents of Univ. Of California* ( 9th Cir. 1999) 166 F.3d 1041, 1046; *Matthews, 179 F. Supp. 2d 1209; See also Amir,* 184 F. 3d at 1027 (individual suffering from obsessive compulsive disorder affecting ability to concentrate and learn is disabled under ADA).
[18] 28 C.F.R. §36.104.

Department of Justice regulations in the preamble state a "Person is considered an individual with a disability . . . when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people.[21]

The AAA Panel in Mr. Gatlin's first violation found an international group of experts determined Mr. Gatlin suffered from ADD. The AAA Panel found that Mr. Gatlin had to take his medication to be successful in school for over a ten year period. The AAA Panel found the international group of experts determined that Mr. Gatlin's medication was required and appropriate for his learning impairment. This ten year period covered Mr. Gatlin's entire educational experience after his diagnoses. Given these findings, as a matter of law, Mr. Gatlin suffered from a disability.[22]

     (ii)    <u>The USOC, USATF and IAAF are private entities that own, lease, or operate a place of public accommodations.</u>

There are three major titles in the ADA. The first title addresses discrimination in employment.[23] The second one addresses discrimination in public services provided by public entities.[24] The third, and relevant provisions for this case, addresses discrimination in public accommodations and services operated by private entities.[25]

Individuals "discriminated against on the basis of disability" by a "place of public accommodation" have a claim under Title III of the ADA.[26] For purposes of Title III, a "private entity" is defined as "any entity other than a public entity."[27] The private entities

---

[19] 42 U.S.C. §12102(2)(A).
[20] *Bartlett v. New York State Bd. Of Law Examiners*, 226 F. 3d 69, 80 (2000).
[21] 28 C.F.R. Pt. 35, App. A § 35.104.
[22] *See Bingham*, 24 F. Supp. 2d 1110.
[23] *See* 42 USC §§12111-12117.
[24] *See* 42 USC §§ 12131-12165.
[25] *See* 42 USC §§ 12181-12188.
[26] *See* 42 USC § 12182.

that are covered by Title III of the ADA are those whose operations "affect commerce."[28]

The list of private entities that are "considered public accommodations" for purposes of

Title III is extensive.[29] Defendants of ADA claims also include persons who own, operate

or lease a place of public accommodation.[30]

Nowhere in the ADA has Congress explicitly exempted sports from ADA

application. Had Congress intended to exempt sports from ADA application, it could

have created such an exemption as it did for private clubs or establishments exempted

from coverage under Title II of the Civil Rights Act of 1964 and religious organizations

or entities controlled by religious organizations, including places of worship under 42

U.S.C § 12187.

The courts have consistently applied Title III to sports organizations. This

was the case for Oregon School Activities Association.[31] The *Bingham* court held

a voluntary organization (such as USAFT and IAAF) must comply with the

ADA.[32] This was the case for the NCAA.[33] This was the case for the PGA

Tour.[34] This was the case for the Professional Rodeo Cowboys Association.[35]

All of these organization attempted to escape the application of Title III though

various arguments too numerous to list in this dissent. None of those arguments

prevailed.

---

[27] 42 USC § 12181(6).
[28] 42 USC 12181(7).
[29] *See* 42 USC § 12181(7)(A)-(L).
[30] *See* 42 USC § 12182(a).
[31] *Bingham*, 24 F. Supp. 2d 1110.
[32] *Id.*
[33] *Matthews v. NCAA*, 179 F. Supp.2d 1209 (E.D. Wash. 2001).
[34] *PGA Tour, Inc. v. Casey Martin*, 532 US 661 (2001).
[35] Disabled Rights Action Committee v. Las Vegas Events, Inc., 375 F. 3d 861 (2004).

Title III of the ADA is mandatory law.[36] Title III of the ADA carves out no exemption for organizations to avoid making reasonable modification of rules for elite athletics.[37] Thus, the USOC, USADA[38], USATF, and/or IAAF cannot use their rules to avoid Title III.

(iii)     <u>Mr. Gatlin demonstrated that USADA and the IAAF took adverse action against him based on his disability and continue to do so.</u>

In *Bingham*, the adverse action was the Oregon School Activities Associations failure to modify its rules to allow a disabled athlete to participate in a ninth semester of competition.[39] The refusal to allow an athlete to compete was an adverse action subject to injunction by the court.[40] The NCAA rules precluding an athlete from competing because of failing to achieve a certain grade-point average was an adverse action.[41] It is an adverse action to increase the sanction for a subsequent disciplinary action based on a prior disciplinary action that was caused by a disability.[42] The duty to accommodate is a continuing duty.[43]

The adverse action of a discriminatory policy may be shown where an organization fails to make a reasonable modification in their rules.[44] In fact, the ADA describes discriminatory conduct, in part, as follows:

(i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods,

---

[36] *See* 42 USC § 12101(b); 42 USC § 12182(b)(1)(A)(i)-(iii); *PGA Tour, Inc,* 532 US at 679 (2001).
[37] *PGA Tour, Inc.,* 532 US at 689.
[38] Organizations cannot take themselves out of the reach of the ADA by delegating rule-making or enforcement authority to a third party. *Bingham,* 24 F. Supp. 2d at 1116; 42 USC § 12182(b)(1)(A)(i)-(iii).
[39] *Bingham,* 24 F. Supp. 2d at 1117
[40] *Id.*
[41] *Matthews,* 179 F. Supp. 2d at 1224.
[42] *Humprey v. Memorial Hospital Association,* 239 F. 3d 1128,1137.
[43] *Id.*
[44] *Matthew,* 179 F. Supp. 2d at 1224-1225.

services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered;

(ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.[45]

(emphasis added)

Mr. Gatlin clearly satisfies this prong of the four part test. Mr. Gatlin was precluded from competing for almost a year in 2001 because of the required medicine for his disability. Now, pursuant to the policies under the WADA Code, USADA is seeking to increase Mr. Gatlin's period of ineligibility beyond two years because of the positive test caused by his disability in 2001.

(iv) USADA and IAAF have failed to make a reasonable accommodation based upon Mr. Gatlins' disability.

Mr. Gatlin has the burden of showing the existence of a reasonable rule modification that would enable him to participate in IAAF events.[46] Once Mr. Gatlin meets that burden, USADA must show that the requested modification would fundamentally alter the nature of the program or activity.

Mr. Gatlin requests that this Panel and USADA not use his first violation to increase his sanction for his second violation above two years. USADA and the IAAF have an obligation to engage in an individualized inquiry to determine

---

[45] 42 U.S.C.§12182(b)(1)(A)(I)

[46] Zukle, 166 F. 3d at 1048.

whether this request is reasonable and if not to determine if there are other reasonable modifications that can be made.[47]

As a threshold matter, this arbitration is prima facie evidence that both USADA and the IAAF have failed to engage in the interactive process required in dealing with an individual with a disability. There approach is simply to sanction the athlete. This refusal to engage in an interactive process, A fortiori, is a violation of Title III.

Assuming that these Anti-Doping Organizations would engage in an interactive process, Title III of the ADA contemplates three inquiries this Panel should make with respect to a requested accommodation for participants in athletic competition: whether the requested modification was reasonable, whether it was necessary for the disabled individual, and whether it would fundamentally alter the nature of the competition.[48] The key component is that the evaluation of what constitutes a reasonable modification of rules for a disabled participant must focus on the individual and may not generally evaluate whether a blanket waiver of a requirement would constitute a fundamental alteration.[49]

In routine cases, the fundamental alteration inquiry may end with the question whether a rule is essential. Alternatively, the specifics of the claimed

---

[47] Matthews, 179 F. Supp. 2d at 1226
[48] *PGA Tour, Inc.*, 532 U.S. at 683, fn38.
[49] *PGA Tour, Inc.*, 532 U.S. 661; *Ganden v. Nat'l Collegiate Athletic Ass'n* (alteration to the NCAA's eligibility requirements would not fundamentally alter the nature of the privilege offered; Court must look to underlying purpose of eligibility requirement); *Matthews,* 1789 F. Supp. at 1226 (athlete requesting modification at the time athlete satisfies academic requirements does not fundamentally alter NCAA mission to promote academics and athleticism.

disability might be examined within the context of what is a reasonable or necessary modification.[50]

The "fundamental rationale of the World Anti-Doping Code" is stated to be to preserve what is intrinsically valuable about sport. It is the "essence of Olympism."[51] The rationale are four-fold:

First, to ensure a level playing field. Mr. Gatlin is not requesting that his victories in the events he tested positive for be restored. He is merely requesting that he face no further sanctions. As such, his request would not fundamentally alter the purpose behind drug testing under this rationale.

The second rationale is to ensure the protection of the athletes' health. Mr. Gatlin's request for an accommodation does not fundamentally alter this rationale.

The third rationale is to ensure the social (and economic) standing in sport. Again, the world wants athletes with disabilities to be able to participate. Mr. Gatlin's request for an accommodation does not fundamentally alter this rationale. Preventing Mr. Gatlin and other disabled athletes from competing because of positive drugs tests related to their disability places an extreme financial burden and perhaps poverty on these athletes. For the period of the sanction, they cannot work in their chosen profession.

---

[50] *PGA Tour, Inc.*, 532 U.S. at 683, fn 38.
[51] *Legal Opinion on the Conformity of Article 10.6 of the 2007 draft World Anti-Doping Code with the Fundamental Rights of Athletes*, Kaufmann-Kohler et al., (2007) http://www.wada-ama.org/rtecontent/document/Legal_Opinion_Conformity_10_6_complete_document.pdf.

The fourth rationale is to provide role models. No one can argue that an athlete inadvertently testing positive because of the medication related to his disability would not be a positive role model.

Finally, the current TUE Exemption policy allows retroactive TUEs in the event of an emergency. The fact that a TUE can be granted in an emergency is additional, persuasive evidence that granting the accommodation Mr. Gatlin requests would fundamentally alter drug testing or be an undue hardship.[52]

USADA and the IAAF had an obligation to consider the circumstances of Mr. Gatlin's disability retroactively and it appears that they did in 2001 because they immediately reinstated him.[53] Because USADA and the IAAF is aware that Mr. Gatlin's first violation was caused by his disability, it would be inconsistent with the purpose of the ADA to permit the organization to deny a present request for a reasonable accommodation based on the past positive test.[54]

2. Under the ADA Mr. Gatlin can make a request for an accommodation at any time.

The majority, without reference to any legal authority, states that Mr. Gatlin should have raised his reasonable accommodation claim in 2001. They state it is now too late. Again, the majority is blatantly in error about the law. Mr. Gatlin did request a reasonable accommodation in 2001 and he was immediately reinstated. Under the ADA, Mr. Gatlin has a right to request a

---

[52] *See Matthews*, 179 F. Supp. 2d at 1226.
[53] *Matthews v. National Collegiate Athletic Association* (E.D. Wash. 2001)1789 F. Supp. 1209, 1226 (athlete requesting modification at the time athlete satisfies academic requirements does not fundamentally alter NCAA mission to promote academics and athleticism.

[54] *See Humphrey v. Memorial Hospital Association* (2001) 239 F. 3d 1128,1137.)

reasonable accommodation in 2001 and now.[55] The duty to accommodate is a

continuing duty that is not exhausted by one effort.[56]

3.  Sending documents to athletes with ADD, without more, is not enough
    to satisfy the requirements to accommodate under the ADA.

Refusing to offer retroactive TUEs for athletes who suffer from ADD is, in most

cases, discrimination. USADA is threatening to do that to Mr. Gatlin now, and they

have done so to another track athlete, Rick Harris.[57] The current policy is to prohibit

retroactive TUEs except in emergency circumstances. The Anti-Doping Organizations

do not account for inadvertent violations based on an athletes' inattentiveness. This

seems counter intuitive for athletes suffering from ADD whose precise problem is the

ability to pay attention.

Holding an athlete suffering from ADD to the same standard of care as an

athlete not suffering from ADD is absurd and discriminatory. By definition, they

are going to fail to take action that most individuals without ADD would take.

USADA and the IAAF should have an affirmative duty to educate any athletes

they discover suffering from ADD by in person instruction. The way these

organizations would most discovery an athlete suffering from a disability is the

result of a positive test. At that time, no sanction should tolerated by a civilized

society. These organizations should encourage individuals with disabilities to

participate and instruct them on how to comply with the rules.

---

[55] Id.
[56] Id. at 1138.
[57] Harris v. USADA, AAA No. 30 190 01114 05 (2006)

The major thrust of the ADA is that athletes and individuals who suffer from a disability should not have their disability work against them in pursuing the fundamental rights we are all entitled to in life, including sports.[58] The ADA takes away the typical excuses and rationales use by organizations to stripe individuals of their rights. The issue becomes is this person disabled. If so, you have to do everything reasonable within your power to allow them to participate. We don't want to hear excuses about your rules if they are not absolutely necessary. The world has championed the adoption of such rules.[59]

4. <u>Refusing to consider Mr. Gatlin's request for a reasonable accommodation is a wrongful refusal to protect his statutory rights.</u>

The majority has refused to consider Mr. Gatlin's request for an accommodation under the ADA. They claim that Mr. Gatlin has not sufficiently raised the issue. I respectfully disagree. Mr. Gatlin has sustained his burden of proof regarding all the relevant issues related to the ADA. It is the duty of this tribunal to apply the laws to the facts that he has alleged. The majority on its own researched and quoted legal authority that was not presented by either party. Courts and tribunals do this all the time. The Panel's refusal to rule on Mr. Gatlin's request for a reasonable accommodation is a refusal to protect his

---

[58] International Olympic Committee Olympic Charter, Fundamental Principles, No.4, "The practice of sport is a human right. . ."
[59] *See United Nations, Declaration on the Rights of Disabled Person* (1975) *http://www.unhchr.ch/html/menu3/b/72.htm*; *See also* The *United Nations, World Programme of Action Concerning Disabled Persons* (1982) *http://www.un.org/esa/socdev/enable/diswpa00.htm*; *See also* the United Kingdoms, The Disability Discrimination Act 1995 and The Disability Discrimination (Amended) Act of 2006 (http://www.england-legislation.hmso.gov.uk/acts/acts1995/ukpga_19950050_en_1) and (http://www.opsi.gov.uk/SI/si2006/20061721.htm).

statutory rights. It is an abuse of the arbitration process which justifies review by the courts.[60]

5. <u>The USADA Protocol and the WADA Code are contracts of adhesion. To the extent they strip Mr. Gatlin of his statutory rights under the ADA they are procedurally and substantively unconscionable.</u>

Mr. Gatlin has asserted that the WADA Code is a contract adhesion and is unconscionable. A finding of unconscionability requires a two-fold determination – that both "procedural" and "substantive" unconscionability are present.[61] Procedural unconscionability pertains to the process by which an agreement is reached and substantive unconscionability refers to the contents of the agreement.[62]

It can no longer be disputed that the USADA Protocol and/or the WADA Code is a contract of adhesion.[63] The issue becomes whether the provisions are substantively unconscionable. To the extent that the USADA Protocol or the WADA Code strips an athlete of his statutory rights they are substantively unconscionable.[64] It is an illegal contract.

Contracts contrary to express statutes or to the policy of express statutes are illegal. Such illegality voids the entire contract, including the arbitration clause.[65]

Under federal law, Mr. Gatlin has the right to have his dispute fully decided by an AAA Panel. Federal law also protects Mr. Gatlin from being discriminated against

---

[60] *Moncharsh v. Heily & Blase* (1992) 3 Cal. 4th 1, 32; *See Board of Education of Round valley Unified School District v. Round Valley Teachers Association* (1996) 13 Cal. 4th 269, 277; *Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal. 4th 83, 106-107.
[61] *Harris*, 183 F.3d at 181; *Bullick v. Sterling Inc.*, 2004 U.S. Dist. LEXIS 21128, *20-21 (E.D. Pa. 2004).
[62] *Harris*, 183 F.3d at 182.

[63] *Legal Opinion on the Conformity of Article 10.6 of the 2007 draft World Anti-Doping Code with the Fundamental Rights of Athletes*, Kaufmann-Kohler et al., (2007) p. 20-21.www.wada-ama.org/rtecontent/document/Legal_Opinion_Conformity_10_6_complete_document.pdf.

[64] *See Armendariz*, 24 Cal. 4th at 103-104.
[65] *Green v. Mount Diablo Hospital Dist.* (1989) 207 Cal. App. 3d 63, 73.

because of his disability. This arbitration Panel has a legal duty to decide this issue. The majority refused to do so. Stating that Mr. Gatlin has the right to appeal may mean that a CAS panel will not consider or respect his statutory rights under U.S. Law. If that were to occur, you would have substantive unconscionability, for which Mr. Gatlin, or any other athlete in the United States, should have redress in federal court.

## VI. SWISS LAW DOES NOT ALLOW PRIVATE ENTITIES TO DISCRIMINATE AGAINST THE DISABLED

The excuse used by anti-doping organizations for refusing to obey the law is that their conduct is necessary in order to have uniform treatment of all athletes around the world. With respect to athletes suffering from a disability, this is a spurious and callus argument. Providing protection for individuals with disabilities evidences human decency. It shows a developed and civilized society. The United States is not the only country capable of evidencing human decency.

Under Swiss law, like in the United States, individuals suffering from disabilities are protected against discrimination. The protection against discrimination derives from the Swiss Constitution, art. 8, 35 and 36. These provisions state the following:

Equality before the Law

1. All human beings are equal before the law.

2. Nobody shall suffer discrimination, particularly on grounds of origin, race, sex, age, language, social position, lifestyle, religious, philosophical or political convictions, *or because of a corporal or mental disability*.

3. Men and women have equal rights. Legislation shall ensure equality in law and in fact, particularly in family, education, and work. Men and women shall have the right to equal pay for work of equal value.

*4. Legislation shall provide for measures to eliminate disadvantages affecting disabled people.*[66] (emphasis added)

Mr. Gatlin's first offence would be covered by art. 8 because it was a mental disability and he obviously faced a disadvantage because of it. Incidentally, so did Mr. Ricky Harris. These Fundamental Rights must be respected by private entities such as the USOC, USADA, USATF and the IAAF. Article 35 states:

Realization of Fundamental Rights

1. The fundamental rights shall be realized in the entire legal system.

2. Whoever exercises a function of the state must respect the fundamental rights and contribute to their realization.

*3. The authorities shall ensure that the fundamental rights also be respected in relations among private parties whenever the analogy is applicable.*[67] (emphasis added)

Mr. Gatlin, Mr. Harris and any other athlete who has received sanctions because of taking medicine for their disability have their fundamental rights violated. In the case of Mr. Gatlin, he will not be allowed to work in his chosen profession for two years above what he should have been sanctioned. In Mr. Harris' case, he was not allowed to work for a year and faces the same draconian predicament that Mr. Gatlin is experiencing. As stated above, there is no justifiable reason to limit these athletes' fundamental rights. There is no goal pursued by the Anti-Doping Organizations that a retroactive award would inhibit. The sanctions are a violation of the law. Article 36 provides:

---

[66] Swiss Constitution, art. 8.

[67] Swiss Constitution, art. 35.

Limitations of Fundamental Rights

1. Any limitation of a fundamental right requires a legal basis. Grave limitations must be expressly foreseen by statute. Cases of clear and present danger are reserved.

2. Any limitation of a fundamental right must be justified by public interest, or serve for the protection of fundamental rights of other persons.

3. Limitations of fundamental rights must be proportionate to the goals pursued.

4. The essence of fundamental rights is inviolable.[68]

In addition, the Federal Statute, Loi sur l'égalité pour les handicapés, RS 151.3, states that the Swiss Confederation and the Cantons must take measures in order to prevent, reduce or eliminate any kind of inequality (art. 5 para. 1). The same Federal Act states under art. 6 that "private persons or entities providing services or goods to the public cannot discriminate against the disabled because of his or her handicap".

## VII.    CONCLUSION

It is deeply disturbing how the majority has played fast and loose with the facts and the law in justifying discriminating against Mr. Gatlin.    To find fault and fail to provide a reasonable accommodation for the first violation of an athlete testing positive because of a legitimately disability is an affront to the federal law and human rights.  Such discrimination is incompatible with the public policy of the United States and Switzerland.


Christopher L. Campbell

---

[68] Swiss Constitution, art 36.