MAURICE M. SUH
DANIEL L. WEISS
ANDREW DEMKO
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue, Suite 5115
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
MSuh@gibsondunn.com
DWeiss@gibsondunn.com
ADemko@gibsondunn.com

Attorneys for Justin Gatlin

# IN THE COURT OF ARBITRATION FOR SPORT

IN THE MATTER OF JUSTIN GATLIN,

CAS Case No: 2008/A/1461; 2008/A/1462

UNITED STATES ANTI-DOPING AGENCY v. JUSTIN GATLIN

GATLIN v. UNITED STATES ANTI-DOPING AGENCY INC                    Doc. 30 Att. 6

IAAF v. UNITED STATES OF AMERICA TRACK AND FIELD AND JUSTIN GATLIN

## JUSTIN GATLIN'S WITNESS STATEMENTS

Dockets.Justia.com

Please find attached the witness statements of the following witnesses as requested by the Panel in this appeal:

1. Justin Gatlin

2. Dr. Robin E. Barnett

3. Vince Anderson

4. Kay Shanahan

5. Dr. Lois Prislovsky

6. Special Agent Jeff Novitzky

7. Paul Scott

DATED: April 7, 2008

Respectfully submitted,

GIBSON DUNN & CRUTCHER, LLP

Maurice M. Suh
Daniel L. Weiss
Andrew Demko

100423857_1.DOC

MAURICE M. SUH
DANIEL L. WEISS
ANDREW DEMKO
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue, Suite 5115
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
MSuh@gibsondunn.com
DWeiss@gibsondunn.com
ADemko@gibsondunn.com

Attorneys for Justin Gatlin

## IN THE COURT OF ARBITRATION FOR SPORT

IN THE MATTER OF JUSTIN GATLIN,

CAS Case No: 2008/A/1461; 2008/A/1462

UNITED STATES ANTI-DOPING AGENCY v. JUSTIN GATLIN

IAAF v. UNITED STATES OF AMERICA TRACK AND FIELD AND JUSTIN GATLIN

## DECLARATION OF JUSTIN GATLIN

APR. 07. '08  14:44PM  GD&C LA  WHXXX                          P. 3

I, Justin Gatlin, declare and state as follows:

1.      I am over the age of 18 and have personal knowledge of the following facts and, if called as a witness, could and would competently testify to them.

2.      I am 26 years old, and I currently reside in Atlanta, Georgia. Previously, I resided in Pensacola, Florida.

3.      As a result of the January 2008, AAA Panel decision, I am currently ineligible to participate in USATF and IAAF sanctioned events, a suspension that ends on May 25, 2010.

4.      I am a professional track and field athlete, competing in the 100 meter and 200 meter track races. I began running track in high school in Pensacola, Florida, ranking in the top five nation-wide in the 110 meter hurdles. After high school, I attended the University of Tennessee and competed on its track team. As a freshman (first year), I won the NCAA Championship in the 100 meter and 200 meter. I repeated as champion in both races my sophomore year at the University of Tennessee. Overall, in my two years at the University of Tennessee, I won ten NCAA Championships.

5.      After my sophomore year in college, I decided to become a professional track and field athlete. In 2004, my second year as a professional, I won three medals in the Summer Olympics in Athens, Greece. I won the Gold medal in the 100 meter sprint; I won the bronze medal in the 200 meter sprint; and my relay team won the bronze medal in the 4 by 100 meter relay. In 2005, my third season as a professional, I won the 100 meter sprint and the 200 meter sprint at the World Championships.

6.      I have been afflicted by a learning disability all of my life. In 1991, when I was nine years old, I was evaluated by psychiatrists at the naval base where my father worked. They

2

diagnosed me with Attention Deficit Disorder ("ADD"). Those doctors initially prescribed Ritalin, which I took to treat the disorder.

7.    I remember being jittery in the classroom and specifically having difficulty focusing on my teachers' lessons. I would never take my Ritalin in front of other children because I did not want anyone knowing I had ADD.

8.    In 1996, when I became a freshman in High School, I started seeing Dr. Robin E. Barnett to treat my learning disability. Dr. Barnett switched my prescription from Dexedrine to Adderall. I noticed an immediate change while taking Adderall. I was better able to focus on my school work and my grades improved. I noticed a side effect from taking Adderall—it made me drowsy and lethargic. While this helped me stay on subject (and in one place) mentally, it adversely affected me when I was participating in athletics.

9.    At one point, due to my improvement, my parents, my doctor, and myself decided I should try to see if I could sustain my improvement without my medication. As part of this process, I decreased my dosage of Adderall from 20 mg to 10 mg. I immediately noticed a decreased ability to focus. And my grades fell sharply.

10.    With the help of my medication, I was able to graduate High School in good academic standing and be eligible to participate on the track team at the University of Tennessee.

11.    Prior to attending college, Dr. Barnett warned me about the academic challenges college would present and how my ADD and its treatment would impact my ability to succeed. Dr. Barnett explained my classes and practice schedule may be on different times so I may have to alter when I take my medication. Dr. Barnett stressed the importance of taking my medication because I would have to qualify to participate in athletics or risk losing my scholarship to the University of Tennessee. Dr. Barnett recommended that I inform University of Tennessee's

3

Health Services so it could monitor my condition and medication. When I got to UT, I followed Dr. Barnett's advice.

12. UT placed me in a special education program due to my learning disability. The program assisted me with class work, gave me additional time to take my examinations, and provided steady access to tutors. The Special Education program was aware of my condition and my medication.

13. Despite my hard work, I was disappointed with my grades in my first semester at UT. I had to withdraw from my Health and Wellness class and received an "NC" in English Composition, which means I received a grade lower than a "C" and did not receive credit for the class. I believe one of the reasons I struggled in these two classes was because they were both in the afternoon close to when I would practice for track and field. As discussed earlier, my medication made me drowsy and lethargic so I tried not to take (unless I had to) close to track and field practice or any competitions. Because these two classes were close to my practice time in the afternoon, I would make sure the medication had worn off by the time of practice. But the medication had also worn off by the time these classes started. My performance in these classes was affected greatly.

14. My academic performance in my second semester was worse. I received no credit for English Composition for a second time, and I also received no credit for my writing workshop class. In addition, I also received a "D" in drawing, which had been one of my favorite past times. It was much harder for me to deal with my ADD during this second semester because of the weekend track events. Much (almost all) of the track and field season occurs in the Spring Semester with the meets occurring on the weekends – Friday to Sunday. As a result, I would stop taking my medication on Wednesday evening or early Thursday morning in order to

4

HPR 07 '08 01:45PM GD&C LA 74865 P.6

ensure it was out of my system by the time I competed on the track. Because I did not receive credit for my English class or my Health and Wellness class, my academic eligibility was seriously in doubt.

15. To remain academically eligible to participate at the University of Tennessee for my sophomore year, I had to take and receive credit for English Composition I and History of Jazz during summer school. My parents and the coaching staff at the University of Tennessee stressed the importance of passing those two classes to remain eligible to participate in track and field and to keep progressing on track at college. I put tremendous pressure on myself to pass these courses.

16. My summer English Composition final examination was scheduled for June 13, 2001, three days before I was scheduled to compete in the 2001 USATF Junior National Championships. I decided to adhere to the same studying and medication schedule that I used during the school year. I stopped taking my prescription medicine on the morning of the 13th so I would not feel its effects when competing in the Junior Nationals. I took my English Composition final examination and thought I did well. I ended up passing the course, earning a "C" grade. I also passed my History of Jazz course. I had accomplished my goal for the summer to remain eligible to participate in athletics at the University of Tennessee and was on track to progress academically as a sophomore.

17. On June 16, 2001, I participated in the USATF Junior Nationals. This was my first USATF event, and I had no experience as to what to expect. I hardly received any information from the USATF before the meet. I received a pledge a couple of months before the competition, saying I would not use any performance enhancing drugs. The paper listed several

HPR 07 '05  01:45PM GD&C LH #4060                                    P. 7

prohibited substances. My medication was not one of them. After reviewing the pledge with my coach, Vince Anderson, I signed it.

18.    At the time I signed the pledge, I had no idea my Adderall medication could trigger a positive test, especially when I had stopped using it some three days before the start of the competition. I had been tested several times the previous year during NCAA competitions, and, to my knowledge, I had never tested positive for performance enhancing drugs. In all of those competitions, I had stopped taking my Adderall medication anywhere from one to three days prior to the competitions.

19.    At the USATF Junior Nationals, I won the 100 meters, the 200 meters, and the 300 meter hurdles. On June 16 and 17, I provided the relevant authorities with urine samples. The process for submitting samples, including the various forms, reminded me of the NCAA tests. Surprising to me, USADA informed me on July 12, 2001, that both of my samples resulted in a positive finding for amphetamines. I was surprised because I had done several of these drug-tests, all the time using the same supplements and same medication but had never to my knowledge tested positive.

20.    I learned through my later investigations that the tests indicated small amounts of amphetamine in my urine, which was consistent with me taking my prescription medicine some three to four days before the start of the competition. Later, USADA conceded that the positive amphetamine finding resulted from my use of the proscribed Adderall, and not because I desired to enhance my performance. The truth is the results from the Junior Nationals indicate no performance enhancing as I ran the three worst times of the year in those races.

21.    I was devastated when I learned the results of my positive test. The only reason I took my prescription medication that summer was to remain eligible to compete at the University

APR 07 '08 01:46PM GD&C LA #4535                                          P.8

of Tennessee and to remain in good standing as a sophomore. I became extremely emotional in the wake of the positive test—so much so that my parents became concerned about my safety.

22.    After the positive test, I voluntarily withdrew from USATF competitions and vacated my place on the USATF national team that would compete at the World Junior Nationals. I was able to return to school and participate on the University of Tennessee track team for the 2001-2002 season. I just wanted to make the consequences of this positive test go away as soon as possible. To that extent, my attorney decided the best method would be to petition the IAAF for early reinstatement. We tried to do this initially but were told we needed USADA to prosecute and a AAA panel to find a doping violation.

23.    To that end, USADA, who was cooperating with my attorney and me, myself, my attorney, and a panel of AAA arbitrators got on the phone and decided to issue a provisional suspension sufficient to get the IAAF to look at reinstating me. Once we had this provision suspension, we re-petitioned the IAAF, and the IAAF reinstated me based on the exceptional circumstances of my alleged violation. I was happy to be reinstated and happy to have cleared my name with the IAAF.

24.    Going into the 2001-2002 season, I was concerned that my continued use of Adderall may lead to a positive test for the NCAA. I consulted with my doctor briefly, but ultimately decided to stop taking the medication to ensure I would never test positive again. I did not consult with my coaches or anyone at the school regarding this decision. To me, it seemed like the only thing to do to ensure I never tested positive again.

25.    Without my medication, my already shaky academic performance got much worse. In the first semester of my sophomore year, I received only one grade above a "C," and that was weight training – something I already knew a good deal about. I did a little better my

HMK UF TUB UZ:47MI GU&L LH #46&S                              P.9

second semester, but was still two classes short of being eligible to participate in my Junior year of college. I would have to take summer school again to remain eligible.

26.     This time in summer school I found it even more difficult to concentrate and study. I did not pass both my summer school courses and would have been ineligible for the Fall of 2002 had I gone back to school. Luckily, I had another good year athletically, winning both the 100 meter and 200 meter NCAA Championship for the second straight year. My good fortune on the track made it possible to make a living as a professional track and field athlete, so I decided to forego my final two years at the University of Tennessee and become a professional athlete.

27.     Instead of going back to school and being ineligible, I decided to become a professional. After some minor set backs my first season, I experienced a great amount of success, winning three Olympic medals in the 2004 Summer Olympics and winning both the 100 and 200 meter sprints at the 2005 World Championships.

28.     Ever since my positive test for Adderall in 2001, I had vowed to and did work closely with USADA to help educate athletes about anti-doping testing and why performance enhancing drugs were detrimental to sports. In this effort, I also repeatedly told my coaches, trainers, agents, and, really, anyone who would listen that I did not want to use any performance-enhancing drugs and wanted to compete cleanly in every way.

29.     As a tune-up for the 2006 track and field season, I competed in the Kansas Relays. This was a very small and overall insignificant race. I competed with my relay team in the 4-by-100 relay. I was selected for drug testing and gave a sample on April 22, 2006. On June 15, 2006 I was notified the sample resulted in a positive result for exogenous testosterone or

APR 07 '08  01:47PM GD&C LA 94003                                    P.10

its metabolites. I was shocked to have tested positive for testosterone as I have never knowingly ingested any performance enhancing drugs, including any anabolic steroid.

30.     I launched an investigation along with my agent Renaldo Nehmiah to determine the source of the positive test. I believe the testosterone must have been applied transdermally by Chris Whetstine, my former massage therapist. I believe Whetstine applied testosterone cream on me as a means to sabotage me either out of a financial dispute we had in the months immediately preceding the Kansas Relays or for reasons of which I am not aware.

31.     After learning of the positive test, I immediately began cooperating with authorities including USADA and the United States government. Specifically, I worked with Special Agent Jeff Novitzky of the Internal Revenue Service, Criminal Investigation Division. About a month after I learned of my positive test, I met with Special Agent Novitzky for about five hours. During the initial meeting, I answered all of his questions and immediately made a recorded telephone call to my former track coach, Trevor Graham. Special Agent Novitzky thanked me and praised me for my cooperation.

32.     After the meeting, I continued to work with Special Agent Novitzky by making several more undercover phone calls to Trevor Graham. In total, I made approximately eleven recorded telephone calls. I have since learned that Trevor Graham has been indicted in connection with Special Agent Novitzky's investigation. I have indicated to Special Agent Novitzky and the United States Attorneys Office that I am available to testify if needed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on April ___, 2008, in Atlanta, Georgia.

Justin Gatlin

MAURICE M. SUH
DANIEL L. WEISS
ANDREW DEMKO
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue, Suite 5115
Los Angeles, CA 90071-3197
Telephone: (213) 229-7260
Facsimile: (213) 229-6260
MSuh@gibsondunn.com
DWeiss@gibsondunn.com
ADemko@gibsondunn.com

Attorneys for Justin Gatlin

# IN THE COURT OF ARBITRATION FOR SPORT

IN THE MATTER OF JUSTIN GATLIN,

CAS Case No: 2008/A/1461; 2008/A/1462

UNITED STATES ANTI-DOPING AGENCY v. JUSTIN GATLIN

IAAF v. UNITED STATES OF AMERICA TRACK AND FIELD AND JUSTIN GATLIN

---

## DECLARATION OF DR. ROBIN E. BARNETT

---

I, Dr. Robin E. Barnett, declare and state as follows:

1.    I am over the age of 18 and have personal knowledge of the following facts and, if called as a witness, could and would competently testify to them.

2.    In 1990, I obtained my Doctorate of Medicine degree with High Honors from the University of Tennessee, Memphis. I later became board-certified in General Psychiatry.

3.    From 1990-1995, I did my residency at the University of Kentucky Medical Center in a triple board program, which included pediatrics, psychiatry, and child psychiatry. I was the Chief Resident from 1994-1995. After residency, I became a Staff Psychiatrist at the Lakeview Center in Pensacola, Florida. I was in this position until 2005. From 1996 to 2005, I also served as the Medical Director for the Center for Personal and Family Development at the Lakeview Center, which was its private practice outpatient program. Additionally, from 2003 to 2005, I was the Youth Residential Director, Meridian at the Lakeview Center. I currently semi-retired but remain board certified in General Psychiatry.

4.    In my capacity as a licensed psychiatrist at the Lakeview Center, I came to treat Justin Gatlin in the beginning of 1996. At the time, Justin was fourteen-years-old and about to enter high school. I treated Justin from 1996 through 2001. I monitored Justin's disability and adjusted his prescriptions as necessary. Throughout my treatment of Justin, I found him to be a respectful and pleasant young man.

5.    I diagnosed Justin with Attention Deficit Hyperactivity Disorder ("ADHD"), predominantly inattentive type, which is a condition in which both children and adults show problems with attention and distractibility, and sometimes impulsivity and overactivity. ADHD is a biological, brain-based condition, that often can lead to poor school or work performance, poor social relationships, and sometimes a feeling of low self-esteem. Justin showed classic

2

symptoms of ADHD, including severe attention deficit. When I first began to treat Justin, he was taking dexedrine; however, it started to become ineffective. One indication of its ineffectiveness was that Justin's grades were decreasing.

6.    Due to the lack of effectiveness of the dexedrine treatment, I switched Justin's prescription to Adderall in March 1996, shortly after Adderall became approved by the Federal Drug Administration for the treatment of ADHD. Adderall contains mixed salts of amphetamine, a stimulant, which for people suffering from ADHD, increases their focus and attention. Amphetamines, in my opinion, would not have provided Justin with a performance enhancing benefit. Indeed, based on my discussions with Justin, his use of Adderall decreased his performance ability.

7.    After only a few months of usage, Justin reported good improvement. Justin reported the change to Adderall made him more attentive and focused, and he started to do better in school. At one point, I decreased the dosage of Adderall Justin took from 20 mg to 10 mg, however, this resulted in an evident decline in Justin's grades.

8.    Throughout his High School years, Justin predominantly took his Adderall prescription in the mornings. Justin did not like taking Adderall in the afternoons, because, as I noted above, it tended to affect his performance on the track negatively, and it affected his sociability. Justin told me that while Adderall made him focused, it resulted in him being more lethargic on the track and generally affected his energy levels overall. Attempting to accommodate his track practice schedule, Justin and I agreed that he take Adderall in the mornings only unless he had a large amount of homework in the afternoon.

9.    Before Justin went to the University of Tennessee, we discussed the different schedules in college and how he might have to adjust his prescription. I advised Justin to inform

3

the Health Services Department at the University that he was taking Adderall and to have them monitor his academic progress much like I had been doing. Justin and I also discussed how he may have to adjust when he took Adderall and adjust the size of his Adderall dosage to fit his study time and schedule.

10.    When Justin returned to see me after his freshman year of college, he was devastated about the fact that his Adderall treatment led to a positive test result for the use of a prohibited substance. Justin was very concerned about continuing his use of Adderall because of a concern that it could lead to further positive test results. I researched how long it would take Adderall to clear a patient's system completely such that not even a trace level of the amphetamine remained. However, I was unable to find any published authority for how long it would take for Adderall to completely clear the system. Unable to find any published articles on this topic, I wrote to Ed Ryan, Director of USOC Sports Medicine on July 21, 2001, asking him to provide me, either from the drug testing industry or from USA Track and Field, the typical length of time necessary for an athlete to be off of this medication prior to attending a track meet. This letter is attached to this declaration. Much to my dismay, I did not receive a response to my letter.

11.    During the summer after his freshman year of college, Justin and I discussed other possible medications he could take, for example, Wellbutrin. My belief was that Adderall was going to be the most effective treatment of his condition and that Wellbutrin would not be as effective. I have since learned that during his sophomore year at the University, Justin stopped taking medication to treat his ADHD, which resulted in a poor academic performance that caused him to lose his eligibility to compete in his junior year.

12.    Much of what I have described in this declaration with respect to my treatment of Justin is contained in his medical file from the Lakeview Center which is attached hereto.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on April 7, 2008, in

MILTON, FLORIDA.

_____        4/7/2008
Dr. Robin E. Barnett

5



## LAKEVIEW CENTER, INC.
### MEDICAL NOTES

SERVICE:       MEDICATION MANAGEMENT / IMP
LOCATION:    The Center for Personal & Family Developm
DATE:           08/08/01
TIME:           11:00 to 11:30 a.m.
SCHEDULED

**S:**   Justin comes in today along with his mother. It has been an extended absence since I have seen him. He has been at college at UT and their student health services have been filling his prescriptions for Adderall. He did fairly well academically and definitely believes the Adderall helps with focus and attention. Unfortunately because of his status as an NCAA track athlete, the possibility of stimulants in his system could hurt his track outcome. For that reason, they would like to try an alternative medication. Evidently, his track coaches were unaware of that potential problem as he tested positive for amphetamines at a USA tract event. He stopped the medication around three days before but still tested positive at a very low level, and unfortunately, this may result in a suspension. Visibly he is upset about that today and shows some grief that he hasn't been able to show at other times. The mother and I encourage him that none of this was his fault in terms of deliberately trying to fool anyone. All the people at UT knew exactly what he was taken and should have been aware of this. I also let him know that it is this kind of life stressor that usually results in stepping up a level in terms of performance both personally as well as probably athletically.

**O:**   As above, visibly tearful at times, but is at least able to express some emotion that hasn't been available before. No suicidality.

**A:**   ADHD Predominantly Inattentive.

**P:**
1.   We would like to try an alternative for ADD that will not test positive or will certainly not be performance enhancing. I had the USA track book and it did not mention Wellbutrin and we wrote in a letter to make sure that it was approved. We will start with the 100 mg SR tablet once a day and increase to twice a day after four to five days, if he has not problems. I gave him a handout describing side effects and benefit, risk profile of the medicine in general. He or mother will call me if he has any difficulty with the medication. If it seems effective, then I would probably stay on it at least through the Christmas period and winter semester. If he is doing well at that point, then it will be worth a try of decreasing it to make sure that it absolutely is necessary.

I will see him back probably sometime over the Thanksgiving or winter break. He will call in the interim if there are any problems.

SIGNATURE: _____
                       ROBIN BARNETT, M.D.

RB: cel   D: 08/08/01   T: 08/14/01

CLIENT NAME:    GATLIN, Justin      MR #:   7008994

REV 6/00                FILE UNDER MEDICAL

LAKEVIEW CENTER, INC.
An Affiliate of Baptist Health Care
MEDICAL PROGRESS NOTES

STAFF NAME: BARNETT ROBIN                      STAFF ID: 3704C
CLIENT NAME: GATLIN, JUSTIN A                  CLIENT ID: 7008994

                                               EMERG SCHED X
SERVICE: 7717 - MED MANAGEMENT                 LOCATION: AT CENTER
START TIME: 16:10     END TIME: 16:30    LENGTH: 00:20  DATE: 07/27/00
DATES ATTEND (DT):
PROB #

S: JUSTIN COMES IN TODAY WITH MOM.  HE FINISHED THE ACADEMIC YEAR WITH
FAIR PROGRESS.  HE IS PREPARED TO RUN TRACK AT UT IN THE FALL.  MOTHER
CONTINUES TO BE A LITTLE CONCERNED ABOUT HIS WORK ETHIC AND WHETHER HE HAS
ENOUGH SELF-MOTIVATION TO DO WELL IN SCHOOL.  JUSTIN SAYS THAT HE THINKS IT
WILL BE GOOD FOR HIM TO BE OUT ON HIS OWN AND MAKING DECISIONS.  I TALKED
TO HIM IN GENERAL ABOUT TRYING TO PUT ACADEMIC PRIORITIES FIRST.  HE
CONTINUED TO TAKE ADDERALL THROUGH THE SCHOOL YEAR.  I TALKED TO HIM ABOUT
THE SCHEDULE AT COLLEGE BEING MUCH DIFFERENT THAN HIGH SCHOOL.  HE WILL
HAVE TO WORK WITH A PHYSICIAN THERE BECAUSE THEY MAY NEED TO ADAPT THE
AMOUNT OF MEDICINE AND THE TIMES THAT HE TAKES IT TO FIT HIS SCHEDULE AND
HIS STUDY TIME IN THE EVENING.  TALKED ABOUT AVOIDING TAKING IT TOO LATE IN
THE EVENING BECAUSE IT MIGHT KEEP HIM AWAKE.  ALSO, F HE TAKES IT TOO
OFTEN, IT MIGHT AFFECT HIS APPETITE AND ABILITY TO GAIN WEIGHT AND STRENGTH
TRAIN.

O: AGAIN, FAIRLY QUIET AND LAID BACK.  MOTHER VOICES SOME GENERAL
NEGATIVITY AND SOME DISPLEASURE AT HIS OVERALL EFFORT.

A: ADHD, PREDOMINANTLY INATTENTIVE.

P:

1. HE WILL RE-START ADDERALL AT 20 MG. ON SCHOOL MORNING WHEN SCHOOL
RESUMES.  I RECOMMEND STARTING WITH 1/2-TABLET IN THE AFTERNOON IF HE NEEDS
IT FOR A LONG DAY OF STUDYING.  HE WILL CONTACT STUDENT HEALTH UPON ARRIVAL
TO SET UP FOLLOW-UPS THERE TO MAINTAIN AND MONITOR MEDICINE.  MOTHER SAID
THEY WILL TRY TO SET UP AN APPOINTMENT TO SEE ME WHEN HE RETURNS DURING THE
CHRISTMAS BREAK.


_____        3704C      August 9, 2000
CLINICIAN SIGNATURE/CREDENTIALS  ID #      DATE SIGNED


CLIENT: GATLIN, JUSTIN A                       ID: 7008994
REV 2/99            FILE UNDER PROGRESS NOTES  ISN: 0727000727

LAKEVIEW CENTER, INC.
An Affiliate of Baptist Health Care
PROGRESS NOTES

STAFF NAME: BARNETT ROBIN                         STAFF ID: 3704C
CLIENT NAME: GATLIN JUSTIN A                      CLIENT ID: 7008994

                                        EMERG     SCHED X
SERVICE: 7717 - MED MANAGEMENT         LOCATION: AT CENTER
START TIME: 16:00     END TIME: 16:20     LENGTH: 00:20  DATE: 04/17/00
DATES ATTEND (DT):
PROB #

S:  JUSTIN COMES IN TODAY WITH DAD.  THEY REPORT FAIR ACADEMIC PROGRESS
CONTINUING.  HE IS AT LEAST ON SCHEDULE WITH HIS A.C.T. AND CORE CURRICULUM
GRADES TO GO ON WITH THE TRACK SCHOLARSHIP AT TENNESSEE.  HE CONTINUES TO
EXCEL, ESPECIALLY IN THE 300-METER HURDLES.  HE IS CURRENTLY RANKED #1 IN
THE NATION AND RECENTLY SET THE RECORD AT A MEET IN MOBILE.  THE STATE
TOURNAMENT IS IN MAY AND HE HOPES TO BE ONE OF THREE KIDS FROM FLORIDA
INVITED TO A NATION-WIDE MEET IN CALIFORNIA OVER THE SUMMER.  HE CONTINUES
TO SAY THAT THE ADDERALL HELPS WITH FOCUS.  HIS MOTHER HAS BACKED OFF A
LITTLE IN TERMS OF MONITORING.  JUSTIN CONTINUES TO LOOK FORWARD TO A
DIFFERENT LIVING ENVIRONMENT AND THINKS HE WILL ENJOY COLLEGE.  HIS SLEEP
IS GOOD AT NIGHT.  HE NOW TAKES THE ADDERALL PRETTY MUCH ON SCHOOL MORNINGS
ONLY.

O:  NO CHANGE.

A:  ADHD, PREDOMINANTLY INATTENTIVE.

P:

1.  CONTINUE ADDERALL 20 MG. ON SCHOOL MORNINGS.  I'VE SCHEDULED TO SEE HIM
BACK IN LATE JULY BEFORE HE LEAVES FOR SCHOOL.  THEY WILL CALL IN THE
INTERIM WITH ANY PROBLEMS.


_____        3704C      April 28, 2000
CLINICIAN SIGNATURE/CREDENTIALS  ID #       DATE SIGNED

LAKEVIEW CENTER, INC.
An Affiliate of Baptist Health Care
PROGRESS NOTES

STAFF NAME: BARNETT ROBIN                        STAFF ID: 3704C
CLIENT NAME: GATLIN JUSTIN A                     CLIENT ID: 7008994

                                    EMERG    SCHED X
SERVICE: 7717 - MED MANAGEMENT           LOCATION: AT CENTER
START TIME: 16:00      END TIME: 16:20    LENGTH: 00:20  DATE: 02/04/00
DATES ATTEND (DT):

S:  JUSTIN COMES IN TODAY ALONG WITH MOM. THEY CONTINUE TO VOICE THE SAME
FRUSTRATION THAT'S MOSTLY SURROUNDING JUSTINS LACK OF MOTIVATION TOWARDS
SCHOOL WORK. CURRENTLY HE MEETS MINIMUM REQUIREMENTS IN TERMS OF THE ACT
AND GRADE POINT. HE HAS A SCHOLARSHIP OFFER TO THE UNIVERSITY OF TENNESSEE
FOR TRACK. MOTHER IS FRUSTRATED THAT INSPITE OF THAT HE SPENDS NO TIME
STUDYING AND HE DOESN'T SEEM TO DO WHAT HE NEEDS TO. JUSTIN TELLS ME THAT
MOTHER IS JUST INTRUSIVE AND A LITTLE OVER A MESHED IN ALL THAT SHE NEEDS
TO DO IS BACK OFF. HE SAYS THAT HE DOES PROCRASTINATE BUT HE USUALLY GETS
THINGS DONE AT THE LAST MINUTE IF HE HAS TO AND THAT'S THE SAME WAY WITH
THIS. HE DOES SAY THE ADDERALL DOES CONTINUES TO HELP WITH FOCUS AND
ATTENTION. MOTHER AGREES THAT IT DOES SEEM TO MAKE A DIFFERENCE AT SCHOOL.

O:  NO CHANGE. JUSTIN AGAIN IS FAIRLY CALM AND UPBEAT WHEN HE SEE'S ME BUT
BECOMES MORE PESSIMISTIC AND NEGATIVE WHEN MOM IS PRESENT. SHE IS GENERALLY
ANGRY AND UPSET AND ASKS ME IF SHE CAN POSSIBLE SEE A COUNSELOR TO
VENTILATE SOME OF HER FRUSTRATION.

A:  ADHD, PREDOMINATELY INATTENTIVE.

PLAN:

1.  CONTINUE THE ADDERALL 20 MG ON SCHOOL MORNINGS. I WILL SEE HIM BACK IN
AROUND 10 WEEKS AND THEY WILL CALL WITH ANY PROBLEMS IN THE INTERIM.

_____     3704C     February 15, 2000
CLINICIAN SIGNATURE/CREDENTIALS      ID #      DATE SIGNED

LAKEVIEW CENTER, INC.
An Affiliate of Baptist Health Care
PROGRESS NOTES

STAFF NAME: BARNETT ROBIN B                     STAFF ID: 3704
CLIENT NAME: GATLIN JUSTIN A                    CLIENT ID: 7008994

                                      EMERG     SCHED X
SERVICE: 7717 - MEDICATION MANAGEMENT  LOCATION: AT CENTER
START TIME: 16:00      END TIME: 16:20  LENGTH: 00:20  DATE: 09/27/99
DATES ATTEND (DT):

S:  JUSTIN COMES IN TODAY ALONG WITH MOTHER. THE SAME DYNAMIC SEEMS TO BE
PRESENT, THAT IS THAT JUSTIN DOES JUST ENOUGH TO GET BY AND HAS TO BE
FREQUENTLY REMINDED BY MOTHER. HE SAYS THAT IF SHE WILL BACK OFF THAT HE
WILL GET IT DONE. SHE SAYS THAT IF SHE DOESN'T STAY ON TOP OF HIM THAT IT
WON'T GET DONE. I AGAIN TALK TO THEM ABOUT A CONSEQUENCE AND REWARD SYSTEM
AND MOTHER SEEMS A LITTLE MORE EAGER THAT THIS TIME TO TRY THAT. THE
POSITIVE NOTE IS THAT JUSTIN SAYS THAT HIS GRADES ARE GOING TO BE IT LEAST
A'S, B'S AND C'S AND HE IS GETTING SEVERAL INTERVIEW FOR COLLEGES FOR
TRACK. HE REPORTS NO PROBLEMS WITH THE MEDICINES.

O:  GENERALLY MORE FRUSTRATION FROM MOM VOICED. JUSTIN APPEARS A LITTLE
UPSET ABOUT THAT.

A:  ADHD, PREDOMINATELY INATTENTIVE

PLAN:

1.  CONTINUE ADDERALL 20 MG IN THE MORNING AND OCCASIONALLY A HALF IN THE
AFTERNOON. I WILL SEE THEM BACK IN 10 WEEKS AND MOTHER WILL INSTITUTE A
REWARD CONSEQUENCE PROGRAM FOR BEHAVIOR. WE WILL FOLLOW UP ON THAT WHEN
THEY RETURN.


_____      3704      October 6, 1999
CLINICIAN SIGNATURE/CREDENTIALS  ID #      DATE SIGNED

LAKEVIEW CENTER, INC.
An Affiliate of Baptist Health Care
PROGRESS NOTES

STAFF NAME: BARNETT ROBIN E                    STAFF ID: 3704
CLIENT NAME: GATLIN JUSTIN A                   CLIENT ID: 7008994

                                    EMERG     SCHED X
SERVICE: 7717 - MEDICATION MANAGEMENT   LOCATION: AT CENTER
START TIME: 14:30        END TIME: 14:50   LENGTH: 00:20  DATE: 06/28/99
DATES ATTEND (DT):
PROB #

S:  JUSTIN COMES IN TODAY WITH MOM.  THEY REPORT GOOD STABILITY SINCE THE
LAST VISIT.  HE CONTINUES TO TAKE ADDERALL THAT GETS HIM THROUGH THE
ACADEMIC DAY.  HE ENDED UP THE YEAR WITH MOSTLY A "B" AVERAGE AND ONLY ONE
"D" IN MATH.  HE IS MAKING THIS UP IN SUMMER SCHOOL.  HE CONTINUES TO EXCEL
ATHLETICALLY IN TRACK PROGRAMS AND MADE ALL-REGION AND PLACED THIRD IN THE
NATIONALS FOR THE 400 HURDLES.  HE IS EXCITED BECAUSE HE IS GETTING
RECRUITMENT LETTERS FROM DIFFERENT COLLEGES.

O:  NO CHANGE.

A:  ADHD, PREDOMINANTLY INATTENTIVE.

P:

1.  CONTINUE ADDERALL 20 MG. IN THE MORNING.  DEPENDING ON HOW MUCH
HOMEWORK HE HAS IN THE FALL, WE MAY CONSIDER A HALF-TABLET IN THE
AFTERNOON.  I WILL SEE THEM BACK IN 3 MONTHS.  THEY WILL CALL IN THE
INTERIM WITH PROBLEMS.

_____        3704       July 7, 1999
CLINICIAN SIGNATURE/CREDENTIALS        ID #        DATE SIGNED

LAKEVIEW CENTER, INC.
An Affiliate of Baptist Health Care
PROGRESS NOTES

STAFF NAME: BARNETT ROBIN E                          STAFF ID: 3704
CLIENT NAME: GATLIN JUSTIN A                    CLIENT ID: 7008994


                                        EMERG    SCHED X
SERVICE: 7717 - MEDICATION MANAGEMENT    LOCATION: CPFD
START TIME: 16:30  END TIME: 17:00   LENGTH: 0:30   DATE: 02/15/99
DATES ATTEND (DT):

S: JUSTIN COMES IN TODAY WITH MOM.  THEY REPORT GOOD PROGRESS SINCE OUR LAST
VISIT.  HE INCREASED THE ADDERALL FROM 1/2 TABLET TO A WHOLE TABLET BECAUSE
HIS GRADES STARTED SLIPPING A LITTLE AND THIS WAS IMPACTING HIS ABILITY TO
RUN TRACK THIS SPRING.  SINCE INCREASING THE DOSE, HIS GRADES HAVE COME UP TO
AROUND A "B" AVERAGE.  HE IS NOT HAVING ANY PROBLEMS WITH APPETITE OR SLEEP
AT NIGHT.  HIS PARENTS ARE GENERALLY PLEASED, ALTHOUGH WISH HE WAS A LITTLE
MORE ENERGETIC AND MOTIVATED WITH SOME OF THE HOME PROJECTS THAT THEY WOULD
LIKE HIM TO DO.

O: GOOD MOTHER-CHILD INTERACTIONS.  VERY PLEASANT.

A: DSM IV:  AXIS I = ADHD, PREDOMINANTLY INATTENTIVE.

P:

1. CONTINUE ADDERALL AT THE HIGHER DOSE OF 20 MG.  I WILL SEE THEM BACK IN
2-3 MONTHS.  THEY WILL CALL IN THE INTERIM WITH PROBLEMS.


_____     3704      February 24, 1999
CLINICIAN SIGNATURE/CREDENTIALS      ID #        DATE SIGNED

5|10|99 - C|C

LAKEVIEW CENTER, INC.
An Affiliate of Baptist Health Care
PROGRESS NOTES

STAFF NAME: BARNETT ROBIN E                    STAFF ID: 3704
CLIENT NAME: GATLIN JUSTIN A                   CLIENT ID: 7008994

                                        EMERG    SCHED X
SERVICE: 7717 - MEDICATION MANAGEMENT   LOCATION: CPFD
START TIME: 16:30   END TIME: 17:00   LENGTH: 0:30   DATE: 12/07/98
DATES ATTEND (DT):

S:  JUSTIN COMES IN TODAY AND REPORTS GOOD STABILITY ON ADDERALL.  HE WAS
ABLE TO DECREASE HIS DOSAGE DOWN TO 1/2 OF A 20 MG. TABLET AND STILL MAINTAIN
GOOD EFFECT.  HE HAS CHANGED FROM WASHINGTON TO WOODHAM HIGH SCHOOL BECAUSE
OF A BETTER TRACK PROGRAM AND, FOR THE MOST PART, HIS GRADES HAVE BEEN A'S,
B'S, AND C'S.  HE HAD ONE D BUT THAT GRADE IS BEING BROUGHT UP.  HIS PARENTS
CONTINUE TO BE A LITTLE CONCERNED ABOUT OVERALL MOTIVATION AND ENERGY LEVEL.
THE ZOLOFT REALLY DIDN'T MAKE MUCH DIFFERENCE AND I THINK THIS IS MORE
TEMPERAMENT THAN ANYTHING ELSE.  NO PROBELMS WITH SIDE EFFECTS.

A:  DSM IV:  AXIS I = ADHD, PREDOMINANTLY INATTENTIVE.

              = R/O DEPRESSIVE DISORDER.

P:

1.  CONTINUE ADDERALL AT 1/2 OF A 20 MG. TABLET IN THE MORNING.  I WILL SEE
THEM BACK IN 2-3 MONTHS.  THEY WILL CALL IN THE INTERIM WITH PROBLEMS.


_____     3704      December 16, 1998
CLINICIAN SIGNATURE/TITLE/CREDENTIALS   ID #     DATE SIGNED

LAKEVIEW CENTER, INC.
An Affiliate of Baptist Health Care
PROGRESS NOTES

STAFF NAME: BARNETT ROBIN E                    STAFF ID: 3704
CLIENT NAME: GATLIN JUSTIN A                   CLIENT ID: 7008994


                                    EMERG    SCHED X
SERVICE:   739 - MED FOLLOW-UP VISIT    LOCATION: CPFD
START TIME: 16:00   END TIME: 16:30  LENGTH: 0:30   DATE: 08/31/98
DATES ATTEND (DT): 083198

S:  Justin comes in today along with mom.  They report an uneventful summer
for the most part.  He was off the medication during this period of time and
has competed in a couple of state and inter olympic track trials.  He placed
High Leap 2nd and 3rd in a couple of different hurdle events.  He reports no
problems starting back on his medications again this fall except that  a
fairly small decrease in his appetite.  He can tell the difference between
his motivation and amount of work he gets done when he takes his medicine and
so would like to continue.  They could not however tell a big difference
after stopping the Zoloft so for now we will hold off on resuming that dosage
regiment.

O:  No change.

A:  DSM IV:  Axis I = ADHD, predominately inattentive
               = R/O Depressive Disorder

P:

1.  For now will resume the Adderall for school mornings.  I have asked them
to try and cut back to  15mg to see if he gets the same response than to 20
mg. because his appetite definitely fall during this period.  I would like to
get back to the lowest dose that can maintain his academics.  They can even
go on back to 10 mg if it seems to be given the same benefit as the 20.   I
will schedule to see them in 2 months but they will call sooner if they have
any problems.


_____    3704      September 22, 1998
CLINICIAN SIGNATURE/TITLE/CREDENTIALS   ID #      DATE SIGNED

LAKEVIEW CENTER, INC.
An Affiliate of Baptist Health Care
PROGRESS NOTES

ISN ID: 0402980468
STAFF ID: 3704
CLIENT ID: 7008994

STAFF NAME: BARNETT ROBIN E
CLIENT NAME: GATLIN JUSTIN A

EMERG       SCHED X
SERVICE:739 - MED FOLLOW-UP VISIT      LOCATION: CPFD
START TIME: 16:00    END TIME: 16:30      LENGTH: 0:30
DATES ATTEND (DT): 4/2/98
PROB # -

S:  Justin comes in today with his mother.  They report that academics
continue at a satisfactory level.  Mother is always a little frustrated at
Justin's overall attitude toward academics.  She thinks that he places a very
low priority and with his temperament being very laid-back, he tends to just
get by with a minimum in order to maintain track and to keep them off his
back.  He tolerates the medicine and says he can tell a definite difference
when he takes the Adderall in terms of focus and attention.  Mother said that
she thinks it helps because she doesn't get those same notes and reports from
teachers that she used to.  However, they do wonder if the Zoloft is making
any difference and I agree with them that maybe we will taper off the
medication during the summer to see if they can tell.

O:  No change.

A:  DSM IV:  Axis I = ADHD, predominantly inattentive.
               = R/O Depressive Disorder.

P:

1.  For now, continue Adderall 20 mg. on school mornings.

2.  Will stop Adderall at the end of the school year and begin a Zoloft
taper.  He will go to 1/2 of a 50 mg. tablet for 3 weeks and then 1/2 every
other day for 1-2 weeks.  If they notice no decline in his energy,
motivation, or mood, they will discontinue that.  I will see them back
shortly after school starts in the fall after he resumes taking his Adderall.
They will call in the interim with problems.

_____        3704   April 14, 1998
CLINICIAN SIGNATURE/TITLE/CREDENTIALS            ID #        DATE

CLIENT: GATLIN JUSTIN A                                      ID: 7008994
REV 12/97            FILE UNDER PROGRESS NOTES



**The Center**
for Personal & Family Development
A Service of Lakeview Center, Inc.
⊕ An Affiliate of Baptist Health Care

3298 Summit Blvd.
Jefferson Park, Suite 12
Pensacola, FL 32503
(904) 436-4007
Fax (904) 444-8542

LAKEVIEW CENTER, INC.
MEDICAL PROGRESS NOTE

EMERG      SCHED X

CLIENT NAME: GATLIN, Justin      CLIENT ID: 7008994

SERVICE: Individual Therapy/Med Check  LOCATION: CPFD

TIME: 5:40-6:00 P.M.  LENGTH: .20  DATES ATTEND (DT): 4/14/97

Prob #1:

S: Justin comes in today with mother.  In general, they report fairly
good improvement on the combination of Zoloft and Adderall.  He is
maintaining at least minimal expectations with grades as far as
parents are concerned, making mostly C's with an occasional B.  He is
at least showing some interest in track and football which drives him
for a potential scholarship.  In general, he still seems fairly laid
back and needs a lot of external motivation to get him started.  He is
reporting no negative side effects, however, from the medicine and is
still sure that they seem to be helping.

O:  No real change.

A:  DSM IV:  Axis I = ADHD, predominantly inattentive.

              = R/O Depressive Disorder.

P:

1.  Continue Adderall 20 mg. in the morning and Zoloft 50 mg. q. day.
I will see him back in 3 months.  They will call in the interim with
problems.

Robin E. Barnett,  M.D.

Approved:  Client Name: GATLIN, Justin Client ID: 7008994  4/14/97

bw 4/16/97

**The Center** ✎
for Personal & Family Development

A Service of Lakeview Center, Inc.
♧ An Affiliate of Baptist Health Care

3298 Summit Blvd.
Jefferson Park, Suite 12
Pensacola, FL 32503
(904) 436-4007
Fax (904) 444-8542

LAKEVIEW CENTER, INC.
MEDICAL PROGRESS NOTE

EMERG    SCHED X

CLIENT NAME: GATLIN, Justin A.  CLIENT ID: 7008994

SERVICE: Individual Therapy/Med Check  LOCATION: CPFD

TIME: 5:20-5:40 p.m.  LENGTH: .20  DATES ATTEND (DT): 8/15/97

Prob #1:

S: Justin comes in today with Mom.  They report a fairly good summer
off the medication.  They just re-started the school year and he is
back on his medication and so far so good.  She reports a little more
energy than he typically has and he recently scored very well on some
vocabulary testing that had given him trouble before.  His grades were
just good enough last spring to maintain his football status.  He will
be playing free-safety this year for Washington High School.

O: Seems a little more motivated and energetic.  Good mother-child
interactions.

A: DSM IV:  Axis I = ADHD, predominantly inattentive.

           = R/O Depressive Disorder.

P:

1.  Continue Zoloft 50 mg./day and Adderall 20 mg./morning.  I will
see them back in 2 months.  They will call in the interim with
problems.

Robin E. Barnett, M.D.

Approved: Client Name: GATLIN, Justin A. Client ID: 7008994 8/25/97

bw 8/28/97

## LAKEVIEW CENTER, INC.

## MEDICAL PROGRESS NOTE

EMER_____   SCHED_X____

Service:  Individual Therapy/Med. Check      Location: CPFD

Time: 5:30-6:00 p.m.  Length: .30    Dates Attended (DT): 10/23/97

Prob #1:

S:  Justin comes in today with his dad.  They report very good academics this past term.
He made the A-B Honor Roll, which is as well as he has done in a long time, especially
when he didn't have to do it for football.  He didn't enjoy the coach and how he selected
team starters, so he is now just running track.  He questions, and so does his mother, if
the Zoloft is particularly helpful, as it really hasn't changed his overall energy level.  I'm
not so sure that it hasn't and they also noticed a difference in the beginning, so I talked to
them about trying a slow taper.  Only at that point, if we can't tell a difference, will we
stop it altogether.  The Adderall continues to help with focus and attention and maximize
his work efficiency at school.

O:  Fairly good father-child interactions.

A:  DSM IV:  Axis I ≈ ADHD, predominantly inattentive.

           ≈ R/O Depressive Disorder

P:

1.  Decrease Zoloft to 25 mg./day for an entire month.  If they cannot tell any difference,
    they can discontinue it at that time.
2.  Continue Adderall 20 mg. in the morning.  I will see them back in 2 months.  They
    will call in the interim with problems.

Robin E. Barnett, M.D.

bw 11/4/97

LAKEVIEW CENTER, INC.

MEDICAL PROGRESS NOTE

EMBR_____ SCHED_X_____

Service: Individual Therapy/Med. Check        Location: CPFD

Time: 5:30-6:00 p.m.    Length: .30    Dates Attended (DT): 12/30/97

Prob #1:

S: Justin comes in today with Dad. They report continued good improvement since our last visit. Grades continue to be a little better than they have been and they don't have to stay on top of him as much. They do continue to monitor him fairly closely, however. It appears that the incentive to stay with track gives him enough motivation and energy to continue to make fairly good progress. In addition, mother decided that he had been doing well enough that she didn't really want to try to alter the course and discontinue the Zoloft, so he is just maintained on that. Appetite is a little better even on the Adderall through the day. Sleep is good. No evidence of tics.

O: No change.

A: DSM IV: Axis I: ADHD, predominantly inattentive. R/O Depressive Disorder.

P:

1. Continue Adderall 20 mg. in the morning. I will see them back in a little over 2 months. They will call in the interim with problems.

Robin E. Barnett, M.D.

/bw 1/8/98

Approved: Client Name: GATLIN, Justin A. ID#: 7008994  Date: 12/30/97



**The Center** 🖋
for Personal & Family Development
A Service of Lakeview Center, Inc.
✿ An Affiliate of Baptist Health Care

3298 Summit Blvd.
Jefferson Park, Suite 12
Pensacola, FL 32503
(904) 438-4007
Fax (904) 444-8542

LAKEVIEW CENTER, INC.
MEDICAL PROGRESS NOTE

                              EMERG      SCHED X

CLIENT NAME: GATLIN, Justin A.     CLIENT ID: 7008994

SERVICE: Individual Therapy        LOCATION: CPFD

TIME: 5:40-6:00 p.m.  LENGTH: .20  DATES ATTEND (DT): 1/28/97

Prob #1:

S: Justin returns today with his mother.  They report continued same
complaints and that his passive behavior tends to cause him academic
problems at school.  They have tried various intervention strategies
which lean mostly on the side of intrusiveness as opposed to just
showing him expectations and rewarding and consequencing the results
of those.  He had an initial intake with Dr. Cronemeyer but, for
whatever reason, mother does not want to follow-up.  She tells me that
it is because of the scheduling of appointments but when I try to have
her work around that, she seems resistant for some other reason.  He
will begin seeing an LCT counselor.  They report that over the past
few weeks, there has seemed to be some improvement in terms of
responsibility both at home and at school.  While initially they don't
seem to think the Zoloft is helping, it has also been during that same
time frame that he has been taking it consistently.  As opposed to the
100 mg., he has been taking 1/2 per day.

O:  No change.

A:  DSM IV:  Axis I = ADHD, predominantly inattentive.

              = R/O Depressive Disorder.

P:

1.  Continue Adderall 20 mg. in the morning and Zoloft 50 mg.
regularly.  I will see him back in 8 weeks for follow-up.

2.  I recommend that they follow up with Dr. Cronemeyer whose
speciality is school intervention strategies but will leave this
choice up to Mom.

Robert E. Barnett, M.D.

Approved:  Client Name: GATLIN, Justin A. Client ID: 7008994 1/28/97
bw 1/31/97

3/24/97  NO SHOW

**The Center** *✐*
for Personal & Family Development
A Service of Lakeview Center, Inc.
& An Affiliate of Baptist Health Care

3298 Summit Blvd.
Jefferson Park, Suite 12
Pensacola, FL 32503
(904) 438-4007
Fax (904) 444-8642

LAKEVIEW CENTER, INC.
MEDICAL PROGRESS NOTE

EMERG     SCHED X

CLIENT NAME: GATLIN, Justin         CLIENT ID: 7008994

SERVICE: Individual Therapy/Med Check  LOCATION: CPFD

TIME: 5:40-6:00 p.m. LENGTH: .20  DATES ATTEND (DT): 12/3/96

Prob #1:

S:  Justin returns today along with mother and they report that after
some initial improvement with the combination of Attirol and Zoloft,
he has once again returned to baseline activity level of mostly
appearing lazy and very daydreamy.  They have tried different
motivational systems in order to get him involved with any activities
at home or at school.  Basically, he seems to just not have any
interests.  He tells me that sometimes he feels the medicine is
working but he is just very bored with school and cannot get
interested in doing anything even though he knows it is required.
They have tried various consequence systems at home including loss of
privileges but he never seems to have any motivation to try to earn
these back.  He voices having some interest in paranormal astronom-
ical-type phenomena but does not seem really involved in this and the
parents don't feel he is obsessional about it whatsoever.  He does not
appear schizotypal in any other way.  Have discussed with mother the
possibility of trying to refer him to Dr. Cronemeyer who can do more
specific school intervention strategies to help develop some kind of
motivation other than what the medication might do.  She is in
agreement with this today.

O:  No change.  Mother continues to voice frustration and although she
does not deliberately try to cut him down, just by her communicating
the problems, I can see where this might be depressogenic.  No
suicidality.  Good reality testing but I'm not sure if he is being a
little defensive about some of my line of questioning.

A:  DSM IV:  Axis I = ADHD, predominantly inattentive.

              = R/O Depressive Disorder.

P:

1.  Will refer to Dr. Cronemeyer to help implement school intervention
strategies as well as to get a second opinion as to the individual
nature of Justin's problem.

2. For now, will continue current medications but increase Zoloft to 100 mg./day. Will maintain Attirol at 20 mg. in the morning. I will see them back after follow-up with Dr. Cronemeyer. They will call in the interim with problems.

Robin E. Barnett, M.D.

Approved: Client Name: GATLIN, Justin A. Client ID: 7008994 12/3/96

bw

# The Center
### for Personal & Family Development

A Service of Lakeview Center, Inc.
& An Affiliate of Baptist Health Care

3298 Summit Blvd.
Jefferson Park, Suite 12
Pensacola, FL 32503
(904) 438-4007
Fax (904) 444-8542

LAKEVIEW CENTER, INC.
MEDICAL PROGRESS NOTE

EMERG      SCHED X

CLIENT NAME: GATLIN, Justin        CLIENT ID: 7008994

SERVICE: Individual Therapy/Med. Check  LOCATION: CPFD

TIME: 4:40-5:00 p.m. LENGTH: .20  DATES ATTEND (DT): 8/29/96

Prob #1:

S: Justin comes in today along with his parents.  He is reporting
good improvement comparing the new Adderall with the old Dexedrine
tablet.  He says he is more attentive and focused and is doing better
work at school.  In addition, the Zoloft seems to have helped with
energy and motivation.  The combination of medications is without too
many side effects after some appetite suppression with the Adderall.
We don't have any official grades yet, but he predicts that, so far,
he would be making the A-B Honor Roll

O: He is a little more animated.  Smiling some today.  Parent-child
interactions are positive.  Reality testing is good.  No suicidality.

A: DSM IV:  Axis I = ADHD, predominately inattentive, provisional.

          = R/O Depressive Disorder.

P:

1.  Will continue Adderall 20 mg. 1 p.o. q. a.m.

2.  Continue Zoloft 50 mg. p.o. q. afternoon.  I will see them back in
6 weeks.  They will call in the interim with problems.

Robin E. Barnett, M.D.

Approved:  Client Name: GATLIN, Justin A. Client ID: 7008994 8/29/96

bw 9/11/96



for Personal & Family Development

LAKEVIEW CENTER, INC.
MEDICAL PROGRESS NOTE

EMERG    SCHED X

CLIENT NAME: GATLIN, Justin          CLIENT ID: 7008994

SERVICE: Med. Check                  LOCATION: CPFD

TIME: 4:20-4:40 p.m. LENGTH: .20  DATES ATTEND (DT): 5/20/96

Prob #1:

S:  Justin returns today with mother and they are a little more
positive about the progress he has been making since beginning Zoloft.
He seems to be in a little better mood, has been more agreeable, with
a higher frustration tolerance.  His energy and motivation level seems
to be increased somewhat and he is getting a little more academic work
done.  He still doesn't seem to be achieving to his full potential and
continues with his "laid-back-type" personality.

O:  He seems more animated today and mother-child interactions are
more positive.  She continues talking about how lazy he is but is much
more smiling and agreeable that he is doing better.

A:  DSM IV:  Axis I = Depressive Disorder NOS.

              = ADHD, predominately inattentive.

P:

1.  Will continue with Zoloft 50 mg. p.o. q. day during the summer.

2.  Have written them a prescription for Adderal 20 mg. and will try
beginning the school year with a half-tab/day and increasing to a
whole tab./day as needed.  He had been on the Dexedrine Spansule
before with some success.  We will try a different formulation to see
if it works better for him.

3.  I will also refer to an individual therapist who can, hopefully,
help with some school intervention and parenting intervention
strategies at home as far as setting minimal expectations and helping
follow up his progress before it becomes too late this year.  I will
see them shortly after the school year begins.  They will call in the
interim with problems.

Robin E. Barnett, M.D.

Approved:  Client Name: GATLIN, Justin Client ID: 7008994 5/20/96

bw 6/5/96



LAKEVIEW CENTER, INC.
MEDICAL PROGRESS NOTE


                              EMERG     SCHED X

CLIENT NAME: GATLIN, Justin A.   CLIENT ID: 7008994

SERVICE: Ind. Therapy/Med. Mgt.   LOCATION: CPFD

TIME: 5:00-5:20 p.m.  LENGTH: .20  DATES ATTEND (DT): 4/22/96

Prob #1:

S: Justin comes in today with his father.  They report a possible
improvement since starting the Zoloft.  He took a half-tablet a day
for a long time and has been on a whole tablet a day for just less
than a week.  Both he and his parents report a general increase in his
energy level and possible motivation, but there continues to be
academic difficulties in school, such as just using his time unwisely
and socializing instead of doing his homework.  It is probably too
late to make marked improvement this year and he will have to be in
summer school.  He denies any problems since beginning Zoloft such as
headaches, nausea, vomiting, or problems with sleep.  There are no
problems with continued use of Dexedrine such as weight loss, tic
disorder.

O:  His mood appears a little dysphoric today and he feels that his
mom and dad have been on his back too much lately.  Dad explains that
he is just unable to get his tasks done at home that he is supposed to
do and they have to bug him about it constantly.  I talked to them
again about the need to back off some and just make him responsible
for his behavior, both good and bad.  He denies any suicidality and
does give a positive report of increased energy since beginning
Zoloft.

A:  1.   ADHD, predominately inattentive.

    2.   R/O Depressive Disorder.

P:

1.  Will continue Zoloft 50 mg. 1 p.o. q. day.  Will write for 100 mg.
tablets to be broken in half.

2.  Discussed the options for his stimulant medication, including the
use of Adderol.  For the current time, they will continue the current
dosing of Dexedrine 15 mg. Spansule in the morning and two 5 mg.
Dexedrine tablets around lunchtime.

3.  Discussed the possibility of making a therapeutic referral to help
with some family intervention and school strategies.  Father will call
back and let me know whether they want to do that or not.  If not, I

will see them back in 4 weeks.  Will call in the interim with
problems.

Robin E. Barnett, M.D.

Approved:   Client Name: GATLIN, Justin A. Client ID: 7008994 4/22/96

bw 4/26/96



## PSYCHIATRIC EVALUATION

### IDENTIFYING DATA:

Name:               GATLIN, Justin
File Number:        7008994
Date of Evaluation: 3/27/96

Justin is a 14-year-old, black, male 8th grader at Ferry
Pass Middle School, referred by the Naval Hospital because
they no longer see adolescents and are uncomfortable with
maintaining his Dexedrine medication for Attention Deficit
Hyperactivity Disorder (ADHD).

### HISTORY OF PRESENT ILLNESS:

Justin comes in today with his mother who gives a history of
being diagnosed with ADHD since the 4th grade, after
presenting with what sounds like the classic triad of ADHD
symptoms to include attention problems, hyperactivity, and
impulse-control problems. Since that time, he was begun on
Ritalin and eventually changed to Dexedrine because of
marked appetite suppression. The first couple of years that
he was on the medication, they noted a marked improvement.
Over the last several years, his level of fidgetiness and
hyperactivity has seemed to lessen, while his level of
attention and distractibility continues, or may have even
worsened, such that his grades are going from an average of
B's and C's with an occasional A to more C's and D's with an
occasional F. They describe his personality as always being
very laid back and lazy, that nothing ever gets him excited
or motivated. The teachers describe him as daydreamy and
distractible. I have Conner's Inventories that were
positive for both parents and teachers with T-scale scores
of 72 and 62, respectively, with the most marked areas in
attention and distractibility. Because of lack of
performance and frustration, mother has gotten over-involved
in the monitoring of his school performance and he has lost
many privileges to include TV and telephone and it sounds
like he has given up. Most of his resistance has always
been passive and he has never been an overt behavior
problem. There has been no conduct disorder and he denies
any alcohol or drug abuse and the parents do not suspect
this. Other than a chronic low energy level, trouble with
concentration, and occasional intermittent appetite changes,
there is no report of depressive symptoms. I had him fill
out a Beck Depression Inventory which was, for the most
part, negative, but he did report some difficulty with
school work and feeling alone at times because he is an only

child. His current medication regimen is Dexedrine 15 mg.
Spansule in the morning and two 5 mg. Regular Dexedrine
around lunchtime at school.

PAST PSYCHIATRIC HISTORY:

As given in History of Present Illness.

PAST MEDICAL HISTORY:

A normal term pregnancy and delivery without complications.
He met all milestones ahead of time with the exception of
speech which was on time. No known drug allergies. Only
surgery was an appendectomy at age 5. He has no chronic
medical problems and is on no other medication than
Dexedrine.

SOCIAL HISTORY:

His parents have been married for 18 years and have been
living in Pensacola for the past seven years. Mother works
as a teller at Regions Bank and Dad is retired military,
currently back in school and looking for a job. They
describe a fairly stable upbringing, although Justin has
been in the home pretty much by himself and might have been
spoiled at times. They each have grown children from a
prior marriage. Justin is involved in track at school, but
this is being threatened because of his grades. He is also
a talented artist and would like to do something with that
when he gets older.

FAMILY HISTORY:

Mother denies any primary psychiatric or substance abuse in
the family.

MENTAL STATUS EXAM:

Justin comes along very cooperatively with mother. He sits
very quietly on the couch through most of the dual and
individual interviews. He appears very "laid back", but is
able to smile and show expression when we talk about
basketball, which he has a good deal of interest in. No
abnormal motor activity is noted and there are no tics.
There is a little slowing to his speech and he talks in a
very quiet manner. No evidence, past or present, of any
thought disorder. Affect is a little restricted, by report,
as in his mood, but no obvious depressive symptoms or neuro-
vegetative symptoms. No history of suicidality.
Cognitively, mother says he has been tested and is at least
of above-average intelligence and should be doing better,
although I don't have those results with me. Insight is

fair in that Justin tells me that, basically, he is a lazy person and is just not motivated to do some of the work because it is boring to him and he can't get interested in it.  Judgment has been a little impaired in the past regarding decision-making.

ASSESSMENT:

DSM IV:  Axis I  = ADHD, predominately inattentive, provisional.

           = R/O Depressive Disorder.

     Axis II  = None.

     Axis III = None.

     Axis IV  =  Marked academic difficulties.

     Axis V  = Current GAF: 55.

TREATMENT PLAN:

1.  Given the degree of severity and at least marked impairment in school, and failing grades in at least two subjects, I recommend a change in the typical regimen that is being done.  Talked to mother about some parenting changes regarding their intrusiveness into his school work and gave them a hand-out on school under-achieving.

2.  Discussed medication options and recommended at least a one-month trial of an antidepressant medication.  Will begin with Zoloft 25 mg. and increase to 50 mg. as soon as tolerated.  Discussed the benefits and side effects, as well as the risk profile.  For the current time, will not change his Dexedrine regimen and will re-assess at follow-up the need to continue Zoloft or not.  See if the need for a more intensive therapeutic referral is indicated.  They will call in the interim with problems.

Robin E. Barnett, M.D.

bw 4/2/96

## Lakeview Center
### BAPTIST HEALTH CARE

1221 West Lakeview Avenue
Pensacola, Florida 32501-1835
Phone (850) 432-1722
Fax (850) 555-1400

Ed Ryan, Director
USOC Sports Medicine
Olympic Plaza
Colorado Springs, Colorado 80909

July 17, 2001

Dear Sir:

I am writing this letter on behalf of Justin Gatlin (date of birth 2/10/82). I have been the treating child psychiatrist for Justin since March 27 of 1996. He carries a diagnosis of Attention-Deficit Hyperactivity Disorder, Predominantly Inattentive Type. Justin has been maintained on psychostimulant medication, namely, Adderall, throughout this length of time, with very good success as regards in increased focus and attention and therefore improved academic output. He has always been compliant with care, and both he and his parents have been intensively involved in all aspects of treatment intervention. At no time have I ever had any suspicion of any abuse potential or misuse of medication on Justin's part. We have tried on a couple of occasions to decrease the medicine, and at least at the last point that I saw him clinically, which was in July of 2000, the medication was still medically necessary in order for him to adequately progress academically.

As you may or may not know, this type of medication can be used on an as-needed basis in the academic setting. The medicine is in and out of the patient's system relatively rapidly. It would certainly be possible for Justin to use the medication as needed for his academic work and then to discontinue the medication long enough before a track event, to make sure that the medication is out of his system and certainly not enhancing any performance. It would be very helpful to Justin and his family if he could get some clarification either from the drug testing industry or from USA Track and Field, as to the typical length of time necessary for him to be off of this medication prior to attending a meet. Justin's typical dose of Adderall is usually no more than 20mg up to a maximum of two times a day, as they may need that information to have a better idea of the length of time necessary for the drug to clear his system. If clarification is needed, Adderall is a combination of amphetamine salts, including dextroamphetamine as well as regular amphetamine, and is certainly a mainstream drug of choice for attention deficit disorders.

If it is determined that the length of time necessary for urinary clearance of the amphetamine is such that it will markedly interfere with academic functioning, then there are perhaps a couple of alternative agents that could be considered. One medication called Wellbutrin (bupropion) has been somewhat helpful for Attention-Deficit Disorder clients, and has no psychostimulant properties, and I did not find it in the list of illegal substances given to me in the USA Track and Field Book dated June 2001. I do believe that Wellbutrin would probably be suboptimal to the Adderall and would only be a secondary choice if some other more manageable arrangement could not be made for him to continue the use of Adderall for school. Both the primary concern for myself, Justin, and his parents, obviously is his

Page 2

academic progress foremost, and so we are hoping that some compromise or at least clarification should be able to come out of any information that we are able to provide you. If I can be of any further assistance, please to not hesitate to call me.

Dr. Robin E. Barnett
Medical Director
Center for Personal and Family Development

REB:jrh

MAURICE M. SUH
DANIEL L. WEISS
ANDREW DEMKO
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue, Suite 5115
Los Angeles, CA 90071-3197
Telephone: (213) 229-7260
Facsimile: (213) 229-6260
MSuh@gibsondunn.com
DWeiss@gibsondunn.com
ADemko@gibsondunn.com

Attorneys for Justin Gatlin

## IN THE COURT OF ARBITRATION FOR SPORT

IN THE MATTER OF JUSTIN GATLIN,


CAS Case No: 2008/A/1461; 2008/A/1462

UNITED STATES ANTI-DOPING AGENCY v. JUSTIN GATLIN

IAAF v. UNITED STATES OF AMERICA TRACK AND FIELD AND JUSTIN GATLIN


---


### DECLARATION OF VINCE ANDERSON

---

I, Vince Anderson, declare and state as follows:

1.     I am over the age of 18 and have personal knowledge of the following facts and, if called as a witness, could and would competently testify to them.

2.     I am 51 years old, and I currently reside in College Station, Texas. I am employed as an assistant coach for the Texas A&M University track team in charge of the sprinters and hurdlers. I have been an assistant track coach for twenty-three years. Sixteen of those years were spent at the University of Tennessee. I have been at Texas A&M for the last four years.

3.     From 1988 to 2004, I was employed with the University of Tennessee, where I was an assistant coach with the University of Tennessee's track and field team. My coaching responsibilities included coaching the sprinters, and I had a major role in recruiting high school athletes to the University of Tennessee's track team.

4.     In 1999, I became aware of a promising athlete coming out of Pensacola, Florida, named Justin Gatlin. He was a highly ranked hurdler, but showed even more promise in the short sprint events. I got a call from Justin's high school coach who informed me that Justin would be a good fit with our program. I talked to Justin on the phone, and we instantly had a good relationship and had several good phone conversations.

5.     After our promising phone conversations, I invited Justin to the University of Tennessee for an official visit. Under NCAA regulations, each recruit gets five official visits, which are all expenses paid visits to the campuses. Justin accepted my offer and came to campus. He had what appeared to me a good visit and decided to sign with the University of Tennessee. At the time, he was choosing between the University of Arkansas, Louisiana State

University and the University of Tennessee, which are three of the best college programs for track and field. We were thrilled to have Justin at the University of Tennessee.

6.    During my recruitment of Justin to the University of Tennessee, I found Justin to be a polite, shy and a very respectful young man. He was courteous on the phone and was respectful and well-behaved on his visit to the University of Tennessee.

7.    During his recruitment, I also became aware of Justin's learning disability, Attention Deficit Disorder ("ADD"). To ensure that Justin received proper medical treatment and monitoring, and to receive the academic assistance he would require through the special education programs at the University, the proper departments were notified of Justin's learning disability and his treatment. Specifically, the team doctors and the University Health Center and the academic support personnel at the Thornton Center were made aware that Justin treated his ADD with Adderall.

8.    Justin's athletic performance in his freshman year was amazing. He excelled during the indoor season and was even better during the outdoor season, winning both the 100 meter and 200 meter events at the NCAA Championships in the spring, which helped the University of Tennessee win a national championship.

9.    In April 2001, Justin and I decided it would be best for him to compete in the USATF Junior National Championships. I firmly believed he would sweep all of the major events he would enter. After registering for the event, we received a pledge from the USATF regarding the use of performance enhancing drugs. The pledge required Justin to sign a statement saying he would not take any performance enhancing drugs during the meet. This pledge specifically listed numerous performance enhancing drugs, but it did not mention ADD medication or Adderall. At the time, I was not sure whether Justin was still taking his ADD

medication. However, I knew that, at least to my knowledge, Justin did not test positive for any performance enhancing drugs during the NCAA season when he was taking his Adderall to treat his ADD. After Justin and I reviewed the types of performance enhancing drugs mentioned on the sheet, Justin signed the pledge.

10.  During Justin's freshman year, we became concerned about his academic performance. He did not receive credit for two classes and would not be eligible to compete in his sophomore year unless he took and passed two summer school classes. To maintain his eligibility, Justin enrolled in these summer school classes. The coaching staff put a good deal of pressure on Justin to pass these classes. The coaching staff continually checked in on Justin to make sure he was studying and progressing towards passing those classes. I recall that Justin took these classes very seriously and put a great deal of effort to obtain a passing grade.

11.  After Justin finished with his examinations, we traveled to Virginia for the USATF Junior Nationals. Justin participated in the 100 meter, 200 meter and 110 meter hurdles, winning all three events even though he ran the slowest times of the year at the USATF Juniors. He provided a urine sample to the testing authorities on June 16 and June 17. I was with him when he was reviewing the form. It was similar to the forms Justin filled out for the NCAA drug testing. The procedures were also fairly similar in the manner in which the urine sample was provided. Justin went through the testing and thought nothing of it. We were celebrating his wins and looking forward to the Pan American Junior Championships.

12.  The following month Justin was notified that he had tested positive for a stimulant. We learned that this positive result was from his ADD medication, which he had taken to study for an examination in his summer school class, which he passed. Justin was completely devastated, switching from uncontrollably sobbing to a near catatonic state.

4

13.    Soon after being notified of the positive test, Justin sought the assistance of a lawyer. Justin hoped he could clear his name as quickly as possible. I was involved closely with Justin's defense. Most importantly, I wanted to make sure he was able to participate in IAAF and USATF functions as soon as possible because Justin's next challenge was to compete on the World's stage. His attorney believed the IAAF would reinstate Justin based on the exceptional circumstances of his positive test—the fact that Justin ingested the Adderall as part of his treatment for his ADD in preparation for an examination in his summer school class.

14.    While I am not an attorney, it is my understanding that Justin originally petitioned the IAAF for early reinstatement, but that the IAAF requested that Justin be sanctioned first by the United States governing body before being reinstated. It is my further understanding that Justin's attorney and USADA quickly empanelled a panel that issued a provisional sanction. Once that sanction was in place, Justin's attorney re-petitioned the IAAF, which immediately reinstated Justin.

15.    During the adjudicative process with the USATF, Justin was eligible to compete, and did in fact compete, in NCAA sanctioned events. Justin's athletic achievements in his sophomore year were as outstanding as his freshman year. Justin dominated all year and ended up defending his individual championships in the 100 meter and 200 meter sprints. In all, Justin had won a total of 10 NCAA championships either individually or as part of the University's track team. Justin's first two years as a college athlete surpassed my every comparative athletic reference, even better than Carl Lewis's two years at the University of Houston, where I was a graduate assistant and saw him train from 1986-88..

16.    Similar to his freshman year, despite outstanding achievements on the track, Justin's academic performance was poor. Again, to remain eligible for the following year, Justin

would have to take and pass summer school classes. Despite a tremendous amount of effort, Justin was not able to pass these classes. This resulted in Justin being academically ineligible for at least the fall semester of his junior year. The track coaching staff tried to convince him that, depending on his academic performance in the fall semester of his junior year, he could become eligible in the spring, when the bulk of our track season would take place. After significant deliberation, Justin decided to turn professional.

17. Once Justin decided to turn professional, I did everything I could to assist him in his career. Throughout Justin's remarkable professional career, I have kept in touch with him. I recall Justin contacting me after he was notified that he tested positive for a prohibited substance following the Kansas Relays. Similar to when he was notified in 2001 of the positive test, Justin was distraught. At the time, Justin had no idea what could have caused this positive result, but he was adamant that he never took, nor would he take performance enhancing drugs. Based on my years of friendship with Justin, especially during the 2001 incident, I do not believe that Justin would knowingly take performance enhancing substances. It is even harder to believe that Justin knowingly took performance enhancing substances for such an insignificant event, such as the Kansas Relays. This event is best described as a early season event similar to an early April baseball game in the Major Leagues.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on April 7, 2008, in College Station, Texas.

Vince Anderson

MAURICE M. SUH
DANIEL L. WEISS
ANDREW DEMKO
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue, Suite 5115
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
MSuh@gibsondunn.com
DWeiss@gibsondunn.com
ADemko@gibsondunn.com

Attorneys for Justin Gatlin

## IN THE COURT OF ARBITRATION FOR SPORT

IN THE MATTER OF JUSTIN GATLIN,

CAS Case No: 2008/A/1461; 2008/A/1462

UNITED STATES ANTI-DOPING AGENCY v. JUSTIN GATLIN

IAAF v. UNITED STATES OF AMERICA TRACK AND FIELD AND JUSTIN GATLIN

---

## DECLARATION OF KAY SHANAHAN

---

I, Kay Shanahan, declare and state as follows:

1.      I am over the age of 18 and have personal knowledge of the following facts and, if called as a witness, could and would competently testify to them.

2.      For the past 10 years, I have been an academic counselor in the Thornton Athletic Student Life Center at the University of Tennessee at Knoxville. The Thornton Center is the academic support center for athletes on campus. Within the Thornton Center, there is a special needs department that assists student-athletes who suffer from learning disabilities with the academic challenges of higher education. In particular, the special needs department provides the following services: administration and evaluation of learning disability screening tests, one-on-one tutoring specifically designed for the learning needs of that student, student advocacy and liaison w/faculty & Disability Services to arrange for oral exams, readers, extra time, note-takers, and alternate materials as each student's exceptionality calls for, equipment and special materials, e.g. voice activated computers, audio recorders, books on tape, flash cards, etc., interpretation expertise on disability laws for waiver & petitioning purposes, time management and study skills training, problem solving training to help students handle difficult situations, anger and frustration, teaching compensatory techniques to help students understand their learning strengths and weaknesses to foster learning, and community education seminars concerning disability law and appropriate adaptation methods.

3.      In my role as an academic counselor, I counsel student-athletes from three of the University's athletic teams, including those student-athletes with special needs on those teams. Generally, it is my responsibility to supervise, monitor and give academic advice to student athletes. It was in this role that I met Justin Gatlin in the fall of 2000. I was Justin's academic counselor at the Thornton Center and responsible for guiding his academic progress at the

2

University of Tennessee. In this capacity, I worked with Dr. Lois Prislovsky who was in charge of the special needs department in setting up a program for Justin to be successful at school.

4.     My first impressions of Justin, which were confirmed throughout the year, were that he was a hard worker and very respectful young man, who not only wanted to succeed on the track, but wanted to succeed in school as well. To this end, Justin always did his work and strived to do well in school. Justin also used the services provided by the University such as tutors and the writing workshop. Justin was one of the nicest and most appreciative student-athletes I have come across at the Thornton Center.

5.     Dr. Prislovsky created an Individual Education Plan with Justin to best take advantage of the resources at the Thornton Center. Justin was given several special accommodations that student-athletes without disabilities did not have available to them. These included extra time on examinations, access to notetakers, and access to more tutors, who were specially trained to work with learning-disabled students. Additionally, Justin was encouraged to take his Attention Deficit Disorder ("ADD") medication. I learned later that Justin's Adderall prescription had caused him to be sluggish at track practice so he would not take it in the afternoon close to practice or after Thursday morning when he would have a weekend track meet.

6.     Even with all of his hard work and the special accommodations, Justin still struggled in school. In his first year, he received an "NC" in his English Composition class both semesters. He also decided to withdraw from Health and Wellness his first semester. This left Justin two classes shy of being academically eligible in his Sophomore year. Justin enrolled in summer school to obtain the credits needed to remain eligible. Justin seemed to be under an enormous amount of pressure from us, his parents and his coaches.

3

7.      Justin remained on campus during the Summer of 2001 for his classes and put a great deal of effort into them to ensure that he passed these classes. Dr. Prislovsky and I were in constant contact with his professors who all reported that Justin was working diligently. It was a great accomplishment for Justin to pass his summer school classes and I was very proud of Justin. I was saddened to learn that this accomplishment was overshadowed by the fact that because Justin took his prescribed medication, Adderall, to help him study for a test, he tested positive for a prohibited substance at a USATF track event. He consulted with his parents and doctors and decided to stop taking Adderall during the next school year.

8.      The drug test at the USATF event caused Justin to forego his medication treatment for his ADD. During his sophomore year, Justin continued to struggle with school, receiving only one grade higher than a "D" in his first semester, weight lifting. Justin ended up not passing two more courses and was required to take summer school to maintain his eligibility. Like the previous summer, Justin dedicated himself and worked hard to pass his summer school classes, but unfortunately was not able to pass his summer school class even with the help of tutors and the writing center. After that, Justin turned professional and ended his time at the University of Tennessee to the great disappointment of everyone at the Thornton Center.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on April 7, 2008, in Knoxville, Tennessee.

_____

Kay Shanahan

4

MAURICE M. SUH
DANIEL L. WEISS
ANDREW DEMKO
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue, Suite 5115
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
MSuh@gibsondunn.com
DWeiss@gibsondunn.com
ADemko@gibsondunn.com

Attorneys for Justin Gatlin

## IN THE COURT OF ARBITRATION FOR SPORT

IN THE MATTER OF JUSTIN GATLIN,

CAS Case No: 2008/A/1461; 2008/A/1462

UNITED STATES ANTI-DOPING AGENCY v. JUSTIN GATLIN

IAAF v. UNITED STATES OF AMERICA TRACK AND FIELD AND JUSTIN GATLIN

## DECLARATION OF DR. LOIS PRISLOVSKY

I, Dr. Lois Prislovsky, declare and state as follows:

1.      I am over the age of 18 and have personal knowledge of the following facts and, if called as a witness, could and would competently testify to them.

2.      I am a psychologist, having received my Bachelors degree in psychology from Christian Brothers University in Memphis Tennessee, my Masters degree in psychology from the University of Memphis, and my Ph.D. in Educational Psychology from the University of Tennessee, Knoxville. A more detailed description of my educational history can be found in my curriculum vitae attached to this declaration.

3.      Currently I am the president of and a psychologist at the Psychoeducational Network ("PEN"), an organization I created in 2007. PEN is a consolidated team of educational and mental health professionals that provides the community of Knoxville, Tennessee with a variety of psychological, developmental, education and therapeutic services. One of many services provided by PEN is diagnosing and treating people who suffer from Attention Deficit Disorder ("ADD") or Attention Deficit Hyperactivity Disorder ("ADHD"). In that capacity, we provide diagnosis, medication management, educational consultation, and advocacy, tutoring, self-management skills training and therapy.

4.      Before starting the Psychoeducational Network, I served as the Director of the Special Needs Program ("SNP") at the University of Tennessee, Knoxville, a program I created and developed from its inception into a nationally respected program that comprehensively assists student athletes with disabilities, including ADD/ADHD, allowing them to attain academic and personal success. I served the University of Tennessee's student athletes in this capacity from 1994 to 2005.

5.    · In my capacity as Director of the SNP, I had the opportunity to meet and work
with Justin Gatlin while he was at the University of Tennessee. As a long-time sufferer of ADD,
Justin sought the assistance of the SNP program when he first entered the University. To qualify
for assistance from the SNP program, the Office of Disability Services at the University of
Tennessee had a strict requirement that the student demonstrate a documented disability. Justin
presented the requisite documentation, and it was determined Justin had a learning disability,
which qualified him for special accommodations. Therefore, Justin underwent diagnostic testing
conducted by the University. These tests showed the Justin qualified for the program because he
faced significant educational challenges due to his ADD symptoms. In response to these
challenges, Justin was put on a treatment plan, which included his prescription for Adderall.
Even by following this plan, Justin's educational challenges were substantial enough that even
when undergoing his treatment, Justin had difficulty learning in class. While I was not
responsible for the administration or monitoring of Justin's ADD medication, Justin performed
academically at a higher level while taking his medication. Accordingly, we encouraged Justin
to incorporate his medication as part of his educational plan at the University.

6.    While I note that Justin's academic performance improved while taking his ADD
medication, it is by no means a "magic drug." The medication is not without any side effects.
For Justin, the most detrimental side effect was its effect on his athletic performance. When
Justin took his medication close to competitions, and practice, he would feel "sluggish." Despite
this side effect, it is my understanding that during his first year at the University, Justin routinely
took his medication.

7.    Even with medication and the academic support from SNP, Justin struggled in
school. In his first semester at the University of Tennessee, Justin did not pass two classes,

3

which required him to take summer school classes to stay academically eligible. Justin had even more difficulty in his second semester, partially because of the increase in travel because of the track season. I suspect, however, that part of his academic troubles resulted from him varying his ADD medication because of the effect it had on his athletic performance.

8.      As I noted above, Justin's grades during his first year resulted in having to take summer school classes to remain eligible. Therefore, there was tremendous pressure on Justin, from himself, his parents, and his track coaches. When Justin passed his summer school classes, we were thrilled.

9.      After the incident Justin had in 2001 at the Junior Nationals event, I believe Justin stopped taking his ADD medication to ensure he would never again test positive for a prohibited substance. However, this resulted in an academic performance during his Sophomore year that was worse than his Freshman year. In his first semester, he received only one grade above a "C" and that was in weight training for which he did not require our help. In his second semester, he faired slightly better, but not great. He would need to pass two classes again to keep his academic standing. This time he did not pass, which disappointed us.

10.      We were saddened by the news that Justin would not be coming back for his Junior year at the University of Tennessee. We always felt with the right program of medication, study techniques, and special assistance, Justin may have graduated from the University of Tennessee and obtained his educational goals..

//

//

4

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on April 7, 2008, in Knoxville, Tennessee.

Dr. Lois Prislovsky

MAURICE M. SUH
DANIEL L. WEISS
ANDREW DEMKO
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue, Suite 5115
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
MSuh@gibsondunn.com
DWeiss@gibsondunn.com
ADemko@gibsondunn.com

Attorneys for Justin Gatlin

## IN THE COURT OF ARBITRATION FOR SPORT

IN THE MATTER OF JUSTIN GATLIN,

CAS Case No: 2008/A/1461; 2008/A/1462

UNITED STATES ANTI-DOPING AGENCY v. JUSTIN GATLIN

IAAF v. UNITED STATES OF AMERICA TRACK AND FIELD AND JUSTIN GATLIN

---

## DECLARATION OF SPECIAL AGENT JEFF NOVITZKY

---

I, Jeff Novitzky, declare and state as follows;

1.    I am over the age of 18 and have personal knowledge of the following facts and, if called as a witness, could and would competently testify to them.

2.    I am employed as a Special Agent of the Internal Revenue Service in its Criminal Investigation Division. For the past 6 years, I have been the lead investigator in the BALCO investigations, a series of investigations involving the distribution of athletic performance-enhancing drugs to elite athletes throughout the United States and the world.

3.    In my role as lead investigator, I interviewed Justin Gatlin on August 16, 2006. After that, Justin provided me with assistance relative to a portion of the BALCO investigations.

4.    I testified to the nature and extent of Justin Gatlin's participation on July 30, 2007, in *USADA v. Justin Gatlin*, AAA No. 30 190 00170 07. I fully adopt my testimony as a true and correct account, which is attached hereto as Exhibit A.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on April 7, 2008, in San Jose, California.

_____

Special Agent Jeff Novitzky

2

MAURICE M. SUH
DANIEL L. WEISS
ANDREW DEMKO
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue, Suite 5115
Los Angeles, CA 90071-3197
Telephone: (213) 229-7260
Facsimile: (213) 229-6260
MSuh@gibsondunn.com
DWeiss@gibsondunn.com
ADemko@gibsondunn.com

Attorneys for Justin Gatlin

# IN THE COURT OF ARBITRATION FOR SPORT

IN THE MATTER OF JUSTIN GATLIN,

CAS Case No: 2008/A/1461; 2008/A/1462

UNITED STATES ANTI-DOPING AGENCY v. JUSTIN GATLIN

IAAF v. UNITED STATES OF AMERICA TRACK AND FIELD AND JUSTIN GATLIN

---

# DECLARATION OF PAUL SCOTT

---

I, Paul Scott, declare and state as follows:

1.     I am over the age of 18 and have personal knowledge of the following facts and, if called as a witness, could and would competently testify to them.

2.     I received a B.S. in Chemistry and Biology from Cornell College in 1989 and I received a J.D. from Rutgers Law School in 1997. I was licensed to practice in New Jersey and did in fact practice law for several years, specializing in patent and antitrust law. I have also been an adjunct professor of law at Rutgers Law School at Newark.

3.     I am currently the President of Scott Analytics, Inc., a company that provides independent anti-doping services to athletic organizations, including urine and blood screening for performance enhancing drugs. Before starting Scott Analytics, I was the co-founder and Chief Science Officer of the Agency for Cycling Ethics. Prior to starting the Agency for Cycling Ethics, from May 2004 through October 2006, I was Director of Clients at the WADA-accredited UCLA Olympic Analytical Laboratory (the "UCLA Lab"), where I, among other things, supervised the reporting of athlete's urine samples. Additionally, as Director of Clients for the UCLA Lab, I had direct contact with the agencies for which we performed testing, such as USADA. In my capacity as the Director of Clients, I supervised the reporting of Justin Gatlin's sample in the summer of 2006 and, along with the laboratory director, Dr. Don Catlin, would have been in direct contact with USADA regarding the results.

4.     Justin's sample was provided on April 22, 2006. However, it was not until June 15, 2006, that an Adverse Analytical Finding ("AAF") was reported on the sample. This nearly two month delay between the time the sample was given and when it was reported positive was not common practice at the UCLA Lab. The reason for this delay was that Justin's sample produced a negative result under the T/E ratio test, which is the standard testosterone screening

test used as part of both in-competition and out-of-competition testing menus. Accordingly, Justin's sample was originally reported to USADA as a negative (e.g., no AAF was reported).

5.     Approximately one month after we reported the sample as negative, USADA contacted the lab and requested that the UCLA Lab perform a longitudinal analysis because they had reason to believe that the athlete was using testosterone, a prohibited substance. I now know this athlete to be Justin. Mr. Tygart did not inform the lab of the nature of the "tip" he received nor the basis for his belief. The UCLA Lab performed the longitudinal analysis and concluded that Justin was a low-mode individual. While oversimplified, a low-mode individual is an individual lacking a particular enzyme such that testosterone does not clear to the urine as it does in the more common case of a high-mode individual. As a result, the T/E ratio of a low mode individual is typically very low (in the range of 0.1) and does not substantially change if that individual is administered exogenous testosterone. After it was determined that Justin was low-mode, Dr. Catlin spoke with Mr. Tygart to report the findings. I am not aware of whether we recommended or USADA requested that a Carbon Isotope Ratio test be performed; however, the test was performed by the UCLA Lab in June 2006. The test results were consistent with the presence of exogenous testosterone and thus an AAF on the sample was reported.

6.     The delay between when the sample was provided by Justin and when the sample was reported positive for the presence of a prohibited substance was not the fault of Justin. As I have described above, the significant time period between when the sample was provided and when it was reported as positive was simply that the sample was originally negative using the UCLA laboratory's screening test and it was not until about one month after the test was reported as negative that a Carbon Isotope Ratio test was performed.

3

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration was executed on April 7, 2008, in Pasadena, CA.

Paul Scott