MAURICE M. SUH
DANIEL L. WEISS
ANDREW DEMKO
GIBSON, DUNN & CRUTCHER LLP
333 S. Grand Avenue, Suite 5115
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
MSuh@gibsondunn.com
DWeiss@gibsondunn.com
ADemko@gibsondunn.com

Attorneys for Justin Gatlin

# IN THE COURT OF ARBITRATION FOR SPORT

IN THE MATTER OF JUSTIN GATLIN,


CAS Case No: 2008/A/1461; 2008/A/1462

UNITED STATES ANTI-DOPING AGENCY v. JUSTIN GATLIN

IAAF v. UNITED STATES OF AMERICA TRACK AND FIELD AND JUSTIN GATLIN

---

## REPLY BRIEF SUBMITTED BY JUSTIN GATLIN

---

Docket.Justia.com

# I.
## INTRODUCTION

In urging this panel to find that Justin is ineligible to compete for life, *see* IAAF Brief, at 3 ("Mr. Gatlin . . . is ineligible for life"), the IAAF now (1) ignores the correct legal principles applicable in both 2001 and 2006, (2) reverses its previous position taken in connection with the 2001 case and (3) ignores and misconstrues critical facts. Perhaps concerned that its urging to find a lifetime ban violates the stipulation that USADA entered into with Mr. Gatlin, it states that it is "content" to find that eight years is tantamount to that lifetime ban, but its reasoning and position clearly argues for such a ban. USADA, in joining in the IAAF's reasoning, adopts in this reasoning and intended outcome. Even the most cursory examination of the IAAF's and USADA's position reveals the fact that their entirely unreasonable position stands outside the jurisprudence of anti-doping rules and the facts of this case:

- The WADA Code Applies To An American Athlete

The WADA Code is not applicable unless adopted and incorporated into the rules of the Anti-Doping Organization, which is a defined term that includes the organizations responsible for adopting, implementing and enforcing anti-doping rules within their authority. Here, the USOC, the USATF and USADA have all adopted the WADA Code. In the case of an American athlete such as Justin, the WADA Code should therefore apply. The IAAF knew that the WADA Code is applied by its own member national governing body, USATF, and knew that in this case, the WADA Code was applied before the AAA, and stood silent. It is therefore now estopped from taking a contrary position when it suits their litigation needs.

- The Applicable Law in 2001

CAS precedent supports the existence of fault, proportionality and fairness in the

2

determination of sanction. The AAA Panel explicitly recognized these principles – and did not

fully consider them – because the AAA proceeding was merely a mechanism to cause the IAAF's

reinstatement to occur. Even in failing to consider them fully, the AAA recognized that if it did

consider fault, it may well have found Justin to be not at fault. *See* 2001 Decision at 8. The AAA

Panel thereby implicitly recognized that a finding of fault may have impacted the finding of a

sanction, which affects whether the case could be used to enhance a later offense. But because

the 2001 case occurred for the purpose of reinstatement, no full evidentiary hearing was

conducted, and only a conditional sanction was imposed. As a result, Justin was never given the

opportunity to show that he was not at fault or to present a proportionality defense for having

trace amounts of Adderall in his system in 2001. The IAAF now itself recognizes that this

proceeding was invalid. *See* IAAF Brief at ¶ 30. It can not now go back and seek to claim that

this proceeding, with its procedural flaws, in sufficient protection, lack of consideration of

fundamental principles of fairness and proportionality expressed in CAS cases, now clearly

supports the imposition of a life sentence against Justin.

-    <u>The IAAF is Now Estopped From Arguing that the 2001 Decision Can Support a</u>
        <u>Lifetime Ban</u>

        The IAAF now contends that it is Justin who should have appealed to correct the record.

This is nonsense. The IAAF stood silent in the face of both the AAA's conditional award and the

language contained within it that telegraphed the AAA panel's willingness to consider fault. The

IAAF accepted Justin's reinstatement petition -- indeed, it had indicated that it was necessary to

hold a AAA proceeding in order to accept such a reinstatement. If the IAAF in fact understood

the AAA to have issued an "invalid" order as it now recognizes, it was IAAF's burden to seek a

clarification of the very rules it now seeks to use against Justin.

#### The IAAF Misconstrues the ADA

. In a declaration unsupported by signature under penalty of perjury, the IAAF has submitted a misreading of the applicable caselaw. This misreading and misconstruction will be the subject of cross-examination. However, the IAAF has completely missed the mark on a critical point. The problem with a decision that imposes a penalty in violation of the ADA (which would occur if the 2001 case were used to enhance Justin's sanction) is that this ruling would force a US agency, the USATF, to enforce a sanction in violation of US law. Nowhere does the IAAF address this critical problem, which has ramifications not only for this appeal for ancillary litigation in U.S. court.

#### The IAAF Misconstrues Key Facts, Ignores Justin's Substantial Assistance, and Rejects the Fundamental Principle of Proportionality

To round out the legal errors, the IAAF misconstrues key facts regarding Justin's absence of fault in the 2001 case (after contending that Justin not be allowed to argue those very facts), and ignores the substantial assistance he provided to the U.S. Government in connection with the government's case. Most troublingly, it rejects any real application of proportionality in determining sanction.

The IAAF's position on the facts and the law is more vendetta than even-handed application of anti-doping protocol. After considering the relevant doping provisions and principles established in CAS precedent, the Panel should conclude that it cannot enhance Justin's sanction for his 2006 violation based on his 2001 positive test and, therefore, should impose a two-year sanction beginning in May 2006 and ending May 2008. In the alternative and at the least, the Panel should recognize that these unique circumstances and the principles of proportionality dictate that Justin receive a reduced sanction.

## II.
## THE APPLICABLE LEGAL STANDARD

A.    THE WADA CODE APPLIES TO THIS PROCEEDING

Justin Gatlin, as an American athlete, has a right to have any allegation of an anti-doping rule violation brought against him adjudicated under the provisions of the WADA Code because the United States Anti-Doping Agency ("USADA") has adopted and incorporated the WADA Code. That the IAAF has not incorporated the WADA Code into its rules is not determinative as is argued by IAAF in its answer. The WADA Code is not applicable absent it being adopted and incorporated into the anti-doping rules of the "Anti-Doping Organization." WADA Code Introduction. The IAAF conveniently ignores, however, that the term "Anti-Doping Organization" is a defined term in the WADA Code. The introduction of the WADA Code states that an "Anti-Doping Organization" is defined as "organizations responsible for adopting, implementing, or enforcing anti-doping rules within their authority – e.g., the International Olympic Committee . . . International Federations, Major Event Organizations, National Anti-Doping Organizations." The organization responsible for adopting, implementing and enforcing the anti-doping rules for American athletes is the United States Anti-Doping Agency, not the IAAF. And, importantly, USADA has adopted and incorporated the mandatory WADA code into its rules. This definition was also overlooked in the *Hellebuyck* decision and so it provides no reasoned authority to the contrary.

The USADA Anti-Doping Protocol could not be more clear on this issue. Article 3(a) of the USADA Protocol states that "those Articles of the WADA Code which must be incorporated into the rules of every Anti-Doping Organization and are . . . incorporated by reference into this Protocol." Further, the USADA Protocol continues that "Any [International Federation] or [National Governing Body] procedural rule inconsistent with this Protocol shall be superseded

by this Protocol." USADA Protocol at Article 3(f). Accordingly, since the WADA Code has been incorporated by Justin's national anti-doping organization, the mandatory articles of the WADA Code should be applied.

The position of USADA is consistent with the position taken by every other national governing body that is involved here. The United States Olympic Committee has stated that the it "hereby adopts the rules set forth Annex A [the mandatory articles of the WADA Code], which are incorporated herein by reference." USOC National Anti-Doping Policies, Article 1. Further, the USOC has delegated the responsibility for all anti-doping rule violations to be prosecuted by USADA, which as noted above, has adopted and incorporated the WADA Code into its rules. Further and critically, United States Track and Field, as a national governing body subject to the recognition and rule of the USOC, has complied with the USOC's requirement that enforcement of all anti-doping rule violations will be by USADA. The USATF states that "[t]he disciplinary proceedings related to domestic positive drug tests of USATF athletes shall be conducted by USADA, as mandated in Chapter XXIV(2)(G) of the USOC Bylaws. When the USATF is notified by the IAAF that an athlete's "A" sample has tested or has been deemed positive for a prohibited substance, the matter shall be referred to USADA . . . ." USATF, Governance Handbook, Article III, Regulation 10(D).

The conflict arises, because, USATF, as the National Governing Body of Track and Field, must become a member of the International Federation, the IAAF. As set forth in the IAAF brief, the IAAF rules do not incorporate the WADA Code. However, the IAAF defers the prosecution of the alleged anti-doping rule violation to the National Governing Body, USATF. As noted above, the USATF, then refers the prosecution of the anti-doping offense to USADA, which has adopted the WADA Code. Therefore, while the IAAF has not adopted and

incorporated the WADA Code into its rules, it is fully aware that, at the very least with American athletes, when the anti-doping rule violation is prosecuted by USADA, the WADA code will be use - contrary to its position in its Answer.

While the IAAF has not adopted the WADA Code, in the case of an American athlete, like Justin Gatlin, the fact that USADA, the USOC and the USATF have explicitly done so – with the knowledge of the IAAF and its tacit approval through the acceptance of the USATF as a member of the IAAF – makes clear that the WADA Code should govern this proceeding.

The IAAF knows that the WADA code will be used in the prosecution of every American athlete alleged to have violated an anti-doping rule and it claims its rules should apply, but, it has taken no action to remedy this conflict. Despite taking the steadfast position in this case that its rules apply over the WADA Code, Justin is unaware of demand on USATF, USADA or the USOC to carve out an exception in their rules for IAAF athletes. Further, and critically here, the IAAF did not move to intervene in the AAA proceeding when both Justin and USADA were applying the WADA Code. IAAF's failure to take action with direct knowledge that this conflict exists in the rules is instructive and should be deemed as an implicit acceptance of the WADA Code in its rules. The IAAF has had ample opportunity to properly address its contention that the WADA Code does not apply to American athletes prior to this juncture, or at the very least, intervene in the AAA proceeding to ensure the IAAF rules were used. By failing to do so, the IAAF is estopped from now contending that the IAAF rules should govern this proceeding. Additionally, the policy rationale set forth in IAAF's brief for why the IAAF rules govern supports Justin's position more than the IAAF's position. The first policy rationale provided is that to introduce the WADA Code into the IAAF rules, ambiguity and confusion would be created. IAAF Answer at 4. This argument is specious. By finding that the WADA Code

7

applies, this Panel would not be faced with contradictory clauses because all of IAAF's rules that are inconsistent with the mandatory provisions of the WADA Code would be superseded. But more importantly, the ambiguity and confusion created when a AAA proceeding is governed under one set of rules, the WADA Code, and then the CAS hearing is governed under a second set of rules, the IAAF rules, adds greater ambiguity and confusion, and is simply nonsensical. This confusion and ambiguity is further exacerbated because unless the IAAF appeals in every case, there will be instances when AAA proceedings and CAS appeals involving American track and field athletes will have the WADA Code applied and other instances where the IAAF rules are applied. Indeed, the importance of having one set of rules apply at all levels of the proceeding is found in the introduction comment to the WADA Code which states that "[t]hese substantive rules must be the same whether a hearing takes place before an international Federation, at the national level or before CAS." It is ironic that IAAF trumpets the principle of clarity when as noted above, despite knowledge of this conflict, it has taken no action to resolve the conflict.

Additionally, the IAAF's argument that Justin is bound by the IAAF's rules because he competed in track and field meets, whereby he binds himself to the terms of the IAAF's rules is meaningless. IAAF Brief at 5. The logic supporting this proposition can equally be used to support the finding that the WADA Code should be used. That is, by Justin being a member of USATF, which is recognized by the USOC, and that refers all anti-doping prosecutions to USADA, both of which have adopted the WADA Code, Justin binds himself to the WADA Code. Therefore, IAAF's argument should be afforded no weight.

Lastly, the IAAF's assertion that it is absurd to argue that that WADA Code can be applied without being adopted by the International Federation is not supported by the WADA

8

Code itself. The WADA code states that it should be incorporated into the rules of the International Federations, but also National Anti-Doping Organizations as well. Therefore, assuming an International Federation's rules are silent on the issue, but the National Anti-Doping Organizations rules adopt the WADA Code, it is undisputed that the WADA Code would apply. Based on the USATF, USADA, and USOC rules, American athletes have the right to have their cases adjudicated pursuant to the WADA Code. If the IAAF believes that its rules should govern anti-doping rule violations brought against American athletes, the burden should be on the IAAF to resolve the conflict between itself, its own member national governing body, the USOC and National Anti-Doping Agency. To permit the IAAF to pick and choose when in wants to intervene and force arbitration panels to use its rules over the WADA Code will only create havoc in the system. Accordingly the WADA Code shall govern.

## III.
## ARGUMENT

### A.    THE IAAF IMPROPERLY STATES THE APPLICABLE LEGAL PRINCIPLES GOVERNING THE 2001 INCIDENT

#### 1.    The AAA Panel Issued an Improper Ruling

The crux of Justin's opening brief is that the 2001 AAA Panel's interim decision was improper and could not be used as a basis for enhancing the sanction imposed on Justin for his 2006 incident. The IAAF explicitly concedes the first half of Justin's opening brief at paragraph 30, where it states: "[t]he validity of the 2001 AAA Panel's conditional imposition of the sanction is very much open to doubt." IAAF Answer at 10. Although the IAAF fails to make the next logical link that the 2001 incident cannot be used as a basis for enhancement because of the decision's invalidity, this is plainly the result of this concession. The IAAF's basis for why the 2001 incident can be used to enhance the 2006 sanction is not supported by CAS precedent, and, moreover, the IAAF is estopped from taking its current position based on the inconsistent

9

position it took in 2001. However, without considering these particular arguments, the fact that IAAF admits that the 2001 AAA decision was improper, but then takes the position that it can still be used to enhance a later sanction is specious, at best.

The simple fact is that the 2001 AAA Panel got it wrong. As noted in his opening brief and as will be discussed below, Justin contends that the 2001 Panel should not have issued any sanction, whether conditional or not, until it made a factual finding that Justin was at fault for the 2001 incident. On the other hand, the IAAF argues that the 2001 Panel should have issued a non-conditional, two-year sanction and it was improper for it to retain jurisdiction over the matter. IAAF Answer at 10. Nevertheless, regardless of why the 2001 AAA Panel decision is improper, the logical conclusion is that an improper ruling cannot be used to enhance a later sanction. To do so, violates an athlete's fundamental right to fairness.

To overcome this logical conclusion, the IAAF recognized that the 2001 Panel's decision was deficient, but then attempted to re-write history by speculating what it believes should have happened in 2001. The IAAF then used this imaginary history as the starting point to why it is appropriate for the 2006 sanction to be enhanced by the 2001 incident. That is, the IAAF contends that although a conditional sanction was imposed, the 2001 *should have* imposed a non-conditional, two-year sanction, and that had the 2001 conditional sanction been imposed, the IAAF Arbitration Panel, which at the time was the appellate body, *should have* overturned the 2001 Panel's interim decision. IAAF Brief at 10 and 11. As Justin will establish below, the IAAF's speculation is not supported; but, critically, none of what IAAF speculates should have happened actually did happen. The IAAF should not now be permitted to rewrite what occurred in 2001 to support its current position. This Panel can only decide this proceeding based on what actually happened in 2001, which, as agreed by all parties, was improper. Thus, since the 2001

10

Panel's conditional imposition of a sanction was improper, it would violate Justin's right of fundamental fairness for this agreed improper and invalid decision to be used as a basis for enhancing Justin's sanction. Accordingly, Justin should only be sanctioned two years for his 2006 anti-doping rule violation.

### 2.    The 2001 Panel Should Have Considered Whether Justin Was At Fault For The 2001 Violation

#### a.    The 2001 Panel rejected the rigid framework of the IAAF rules

In his opening brief, Justin asserted that before the 2001 Panel imposed any sanction against him, even a conditional sanction, the Panel was required to find that he was at fault for the anti-doping rule violation. The IAAF responded that according to the IAAF rules, the Panel's decision was improper because it was required to issue a non-conditional, two year sanction, which it did not do. IAAF Answer at 10. However, the IAAF's position is not supported.

Similar to the discussion regarding whether the WADA Code applies, the IAAF chooses to ignore CAS precedent and merely argue that since the IAAF rules state that a two-year sanction must have been imposed, it must be imposed regardless. However, the anti-doping system in 2001 was based on more than just the IAAF rules. While the rules were one component, the second component was that an independent arbitration body would adjudicate anti-doping rule violations in accordance with the rules *and* generally accepted principles of fairness, human rights, and justice. In other words, in government, while the executive branch or legislative branch may create rules, the judicial branch must adjudicate the matters before them in accordance with the rules, with due consideration given to the principles, among others, mentioned above. If a rule fails to comport with these principles, the judicial system may then deviate from the rule. Thus, for the IAAF to consider only its rules, without due consideration to

11

the established principles such as requiring a finding of fault before a sanction is imposed, it is not presenting the complete body of law that the 2001 Panel should have considered.

These additional principles of fault, proportionality and fairness that the IAAF now seeks to disregard were acknowledged by the 2001 Panel. In the face of the IAAF rule requiring the imposition of the two-year sanction, the 2001 AAA panel found that such a sanction would not be appropriate. Put differently, the 2001 Panel believed that it had inherent powers to deviate from the IAAF rules when such principles as fault, fairness, and proportionality required it to do so. While Justin submits that the 2001 panel erred by not considering, after a full evidentiary hearing, that he was at fault before issuing even the conditional sanction it imposed, the fact remains that the Panel understood that it could deviate from the rigid IAAF rules. The IAAF's argument that had the 2001 Panel issued a final sanction of less than two years that the IAAF Arbitration Panel would have overturned such a sanction, is nothing more than rank speculation and should be afforded no weight.

> b.  **Legal precedent at the time required the 2001 Panel to consider whether Justin was at fault before imposing a sanction**

The IAAF asserts that in 2001, the IAAF's rigid and draconian strict liability regime in which it acted as the prosecuting authority, the final judge and jury, and executioner was the anti-doping system in place. Because the IAAF rules (and other systems like it) obviously violated principles of justice, due process and basic human rights, these rules were curtailed, at first by the independent arbitration bodies that were adjudicating the matters, and then by the introduction of the WADA code and amendments to the IAAF rule, which, for example, has

codified the well established principle that one could not be sanctioned without a finding of fault.[1]

The need for principles of justice and respect for the fundamental rights of athletes was not first expressed by the 2001 AAA Panel in Justin's case, as the IAAF seems to imply, but in fact was first articulated at the very latest by the European Anti-Doping Convention in 1989, and has permeated CAS decisions ever since. These general principles have caused rigid rule structures like that of the IAAF to be tempered by requiring that, even in sports with strict rules, that a panel find fault before sanctioning an athlete or that the panel consider whether the sanction to be imposed is proportional to the violation.

These principles first emerged in CAS case law because the principles of justice *required* that a panel read these provisions into whatever code applied, regardless of whether the particular code called for strict liability.

The principle that an athlete cannot be sanctioned without a finding of fault is fundamental and has been applied by CAS panels throughout its history. For instance, in 1996, CAS discussed the notion of strict liability and specifically whether an athlete had to have the opportunity to demonstrate a lack of fault before receiving a sanction. CAS reasoned:

> In conjunction with such a sporting sanction, a disciplinary sanction may also be involved in doping cases. In the majority of cases, this is suspension for the athlete who tested positive. On this precise aspect of the issue, the Panel believes that the different sports rules on sanctions in doping cases should make allowance for an appreciation of the subjective elements in each case. For it is indeed the task of the sports authorities to establish the guilt of an athlete in order to fix a just and equitable sanction.
>
> ...
>
> the Panel considers that, generally speaking, the principle of presumption of the athlete's guilt may remain but that, by way of compensation, the athlete must

---

[1] *See* Wada Code § 10.5 (2008) and IAAF Rule 40.2 and 40.3 (2008).

have the possibility of shifting the burden of proof by providing exculpatory evidence. The athlete will thus be allowed to demonstrate that he did not commit any fault intentionally or negligently.[2]

This principle was reinforced in later cases. For instance, in 2002, CAS ruled:

... the Panel is of the opinion that as a matter of principle ... an athlete cannot be banned from competition for having committed a doping offence unless he is guilty, i.e., he has acted with intent or negligence. Even if the rules and regulations of a sports federation do not expressly provide that the guilt of the athlete has to be taken into account the foregoing principle will have to be read into these rules to make them legally acceptable.

... it has to be recognized that in professional sport doping sanctions have the effect of restraining the athlete from carrying out his chosen trade and thus from earning a living for a certain period of time. In addition, doping sanctions clearly affect the honour and social standing of the athlete concerned and are a stigma on his future.

When weighing up the interests of both sides the Panel is of the view that the interests of the athlete take precedence over those of the federation to enforce a rule of "strict liability." ...

The so called strict liability rule, i.e. a rule as advocated by the Respondent according to which the mere presence of a prohibited substance in an athlete's body justifies his suspension, does not, in the Panel's opinion, sufficiently respect the athlete's right . . . .[3]

The principles are well established in the case law; and in fact, were deemed to be so fundamental to the anti-doping system that they were codified in the WADA code. For instance, Article 10.5 of the WADA Code does not permit a sanction to be imposed if the athlete can establish that he was not at fault for the violation. Indeed, these fundamental principles that the IAAF wants this Panel to believe did not exist in 2001, are now codified in the IAAF's current rules. What the IAAF contends that AAA panel could not have done in 2001, i.e., consider

---

[2] *Changuad v. FINA*, 95/141, April 22, 1996.

[3] *Aanes v. FILA*, 2000/A/317, July 9, 2001.

14

whether Justin was at fault, the IAAF rules now permit.[4]  Simply put, although the IAAF's rules

did not specifically incorporate the principles of finding fault as it related to a doping offense,

this principle was firmly imbedded in anti-doping jurisprudence.  The AAA Panel was well

aware of this, as described more fully below.  Had the 2001 Panel conducted a full blown

hearing, properly considered fault, rendered a final (and not conditional award), the 2001 Panel

could have found that no sanction should be imposed.

> c.    **The 2001 Panel should have considered whether Justin's
>        sanction was proportionate to his culpability.**

Similar to the requirement of finding fault, there was substantial case law requiring a

panel to consider whether the sanction imposed was proportionate to an athlete's level of

culpability.  Indeed, the concept and importance of proportionality was recognized by Prof.

McLaren when he wrote the following:

> Proportionality is the most common rationale cited by CAS for modifying a fixed
> sanction applied to an athlete under an [International Federation's] rules.  CAS
> has established that the severity of a penalty must be in proportion to the
> seriousness of the infringement. . . . Proportionality has focused on the perceived
> fairness to the athletes based upon the pretence that the sanction imposed is
> arbitrary, or deemed excessive or unfair on their face.[5]

> The recent CAS decision in Aanes v. Fila [cited above] illustrates the basis of
> proportionality in CAS arbitration.[6]

---

[4]  IAAF Rule 40.2 (2006).  Justin's case would not have to be referred to the Doping Review
Board because Justin was not an international athlete at the time.  This was Justin's first
USATF event and it did not include competition against international athletes.  *See* IAAF
Rule 38).

[5]  Richard McLaren, *Doping Sanctions: What Penalty*, 2 INT'L SPORTS L. REV. 29-30 (2002).

[6]  *Id.* at 31.

> The principle of proportionality is the appropriate juridical basis upon which to modify fixed sanctions established by the [International Federation]. . . . Proportionality is the vehicle by which fairness and justice can be extended to a particular athlete when the rigid application of fixed sanctions would be excessively harsh or punitive.[7]

> At the end of the day, it is clear CAS will continue to apply the principle of proportionality, . . . [However,] [t]his task is better left to organizations such as the World Anti-Doping Agency (WADA).[8]

The 2001 Panel was not required to simply impose a two-year sanction as posited by the IAAF, rather, the Panel, even in the face of the IAAF system, was supposed to consider proportionality. Panels adjudicating cases in which the anti-doping rules contained exceptional circumstances provisions must still consider whether a sanction is proportionate to the circumstances of the violation to ensure the athlete is treated fairly:

> [T]he Panel holds that the mere adoption of the WADA Code (here FINA-Rule DC 10.15 being of interest) by a respective Federation does not force the conclusion that there is no other possibility for greater or less reduction of a sanction than allowed by DC 10.5. The mere fact that regulations of a sport federation derive from the World Anti-Doping Code does not change the nature of these rules. The are still – like before – regulations of an association which cannot (directly or indirectly) replace fundamental and general legal principles like the doctrine of proportionality *a priori* for <u>every</u> thinkable case.[9]

Therefore, all arbitration panels must apply the anti-doping rules in accordance with fundamental and general legal principles.

---

[7] *Id.* at 32.

[8] *Id.* at 34.

[9] *Squizzato v. FINA*, CAS 2005/A/830, July 15, 2005 at ¶ 10.24.

**d.   The 2001 Panel failed to consider whether Justin was at fault or whether any sanction was proportional to the circumstances of the alleged violation, which has created the gap faced by this panel**

Justin never had the opportunity to present a case for fault or proportionality. The 2001 Panel instead held a brief telephonic hearing and then did not consider questions of fault and proportionality. By not making a finding of fault or considering the proportionality of the sanction, and instead imposing a conditional sanction dependant on IAAF reinstating Justin, this Panel now finds itself having to address a gap in its reasoning and result, whether the IAAF rules or WADA Code is applied.

CAS encountered a similar situation in which the WADA Code had not anticipated a situation where an athlete was being sanctioned for a second offense when the athlete bore no significant fault or negligence for one or both of the offenses. In the *Squizzato* case, CAS reasoned:

> Again, under the WADC it is irrelevant that the second offence may itself attract a reduced sanction because there has been no Significant Fault of Negligence on the part of the athlete. The athlete will be treated in exactly the same way as if the first offence had attracted the full rather than the reduced sanction. *It will be a previous breach, and its facts will be ignored.* This is an application of a very crude *"Two strikes and you are out"* policy.
>
> .... The issue that arises in the present case is not an issue which the draftsmen of the WADC appear to have had in mind. ...
>
> ... Nevertheless, the sanction must be *proportionate* ....
>
> ... In the Panel's view, an eight year sanction in the present case is indistinguishable from a lifetime ban: it brings Mr. Puerta's career to an end.

And to bring an athlete's career to an end in circumstances . . . does not commend itself to the Panel as being a just and proportionate sanction.[10]

The CAS Panel in *Puerta* described the situations in which principles of justice and proportionality must apply to fill gaps in codes that have provisions for exceptional circumstances. It began by restating the principle that every sanction "must be just and proportionate."[11] The Panel concluded that in the rare cases in which a code's exceptional circumstances provisions do not provide a just and proportionate sanction because there is a unforeseen gap in the code, "that gap or lucana must be filled by the Panel."[12] Such gaps are to be filled by CAS Panels by "applying the overarching principle of justice and proportionality on which all systems of law . . . [are] based."[13]

As discussed above and more fully in Justin's opening brief, the sanctioning of his 2006 offense illustrates a gap in the rules because the WADA Code and IAAF rules do not contemplate a situation where an athlete has a previous "offense," for which he has received no permanent sanction, for which he never had the opportunity to present a proportionality defense or demonstrate that he bore no fault or no significant fault, and for which both the provisional sanction and the IAAF's reinstatement were based on some unknown level of reduced fault. The Panel should fill this gap by using principles of justice and proportionality as described herein,

---

[10] *Puerta v. ITF*, CAS 2006/A/1025, July 12, 2006 at ¶¶ 11.7.3-11.7.14 (emphasis added).

[11] *Id.* at ¶ 11.7.23.

[12] *Id.*

[13] *Id.*

which make clear, that Justin's 2006 sanction should not be enhanced based on an offense for which proportionally he bore no fault as that term was defined in 2001.[14]

## B.    THE IAAF IS ESTOPPED FROM ARGUING THAT THE 2001 PANEL SHOULD HAVE IMPOSED A NON-CONDITIONAL, TWO-YEAR SANCTION

The IAAF once again seeks to re-write history so that it can find support for its position that the 2001 Panel issued a decision that can now be used to enhance Justin's 2006 sanction. Despite taking a steadfast position in this appeal that the IAAF rules are mandatory such that the 2001 Panel had to impose a non-conditional sanction, the IAAF's actions in 2001 undercut its own argument.

After the 2001 Panel issued its interim decision imposing a conditional sanction against Justin, Justin did in fact petition the IAAF for reinstatement. The IAAF then accepted this petition and reinstated Justin. Had the IAAF believed in 2001 that the Panel had to impose a non-conditional sanction based on its rules, the IAAF should not have rejected Justin's petition for reinstatement. The IAAF could have – and under its revisionist reasoning – should have denied Justin's petition until the AAA proceeding issued a final sanction imposing a non-conditional, two-year sanction. Had the AAA Panel refused to do so, the IAAF could have appealed the decision. Indeed, the AAA Panel telegraphed that it perhaps would not have found fault in this case, thereby implicitly recognizing that (1) it had the power to do so and (2) that doing so might impact the decision as to whether a sanction occurred. *See* 2001 Decision at 8 ("Were this Panel to address the issue of culpability and sanctions in a full evidentiary hearing,

---

14  In determining whether a sanction should be imposed for an anti-doping rule violation, the standard was general negligence. *See Appellate Brief of Justin Gatlin* at 25-26.

this Panel clearly would not apply the full two-year sanction to Mr. Gatlin."). Instead, the IAAF stood silent in the face of both the AAA's "conditional award," *see* 2001 Decision any 8 ("This Panel hereby retains full jurisdiction over this case so that it may reconsider the two-year suspension which it has imposed by this order should the IAAF not take expeditious action in granting Mr. Gatlin early reinstatement to a term appropriate to his circumstances and satisfactory to Mr. Gatlin.") and the language supporting that "conditional award" that telegraphed the AAA Panel's willingness to consider fault. Instead, it accepted Justin's reinstatement petition, accepted the 2001 Panel's interim decision and, thus, accepted the fact that the 2001 Panel was not required to impose a two-year sanction. Therefore, the IAAF must be estopped from now taking the position that the 2001 Panel was required to impose a non-conditional, two-year sanction.

Further, the fact that the IAAF accepted and then granted Justin's petition without the 2001 Panel either issuing a non-conditional, two-year sanction or making a factual finding of fault has partially caused this unique circumstance. The IAAF fails to acknowledge its own failures in 2001 and, instead, shifts the blame to Justin for not appealing the 2001 interim decision. But, there was no reason for Justin to have appealed the 2001 interim decision. First, there was no actual decision for Justin to appeal. The 2001 Panel retained jurisdiction pending the reinstatement application and if the IAAF did not reinstate Justin, the 2001 Panel would then consider whether Justin was at fault and if he should be sanctioned. Simply put, Justin could not have appealed the 2001 Panel's decision because it was not final. Second, once Justin's exceptional circumstances petition was granted and he was permitted to run, it made little sense to appeal the 2001 decision because he was never actually sanctioned for the 2001 violation. As noted above, there was no finding of fault, and thus, no actual sanction. Even though Justin's

20

intent when challenging the 2001 positive test in front of the AAA panel was to have his fault adjudicated by an impartial tribunal, after being reinstated, it simply no longer made economic sense to pursue such a ruling. Justin never intended to use a prohibited substance in the future, which made the expensive nature of appealing the 2001 Panel's interim decision far from economical.

Accordingly, the IAAF now takes an inconsistent position from the one it took in 2001 – all for the purpose of imposing a lifetime suspension on Justin. The IAAF should be estopped from arguing that the 2001 Panel had to impose a non-conditional, two-year sanction.

## C.    THE IAAF MISCONSTRUES KEY FACTS

The IAAF has misstated many key facts in this case. As Justin's opening brief sets forth, if this Panel were to consider whether Justin was at fault for the 2001 violation, a finding of no fault must occur. However, to support its position that Justin was at fault, the IAAF has to misconstrue several of the facts in the hope of re-writing what actually occurred in 2001. It is thus necessary to correct the record:

56.1    *Mr. Gatlin knew Adderall contained amphetamine, and that amphetamine was a Prohibited Substance under the IAAF Rules.*

The IAAF makes a leap of logic from the statement "to ensure that no Adderall was in his system at the time of a competition, Justin generally stopped taking the medication two to three days before the competition" to conclude that "it is clear" that Justin knew Adderall would trigger a positive test. It is hard to believe the IAAF's inference (which gives it more credit than is due) is in good faith. In Justin's declaration, he states, "[M]y medication made me drowsy and lethargic so I tried not to take it (unless I had to) close to track and field practice or any competitions."[15] Justin also states, "I stopped taking my prescription medicine on the morning of the 13th so I would not feel its effects when competing in the

---

15  Decl. of Justin Gatlin ¶ 13.

Junior Nationals."[16]  Of course, Justin is referring to the drowsy and lethargic side effects.  This is also confirmed in Dr. Prislovsky's declaration in which she states, "When Justin took his medication close to competitions, and practice, he would feel 'sluggish.'"[17]  The record and opening brief are full of references of why Justin stopped taking his Adderall close to competitions –because it adversely affected him on the track.  IAAF is simply grasping at straws in stating that Justin knew that Adderall contained amphetamine.

56.2    *Mr. Gatlin failed to make an application for a medical exemption for his use of Adderall to the IAAF pursuant to IAAF Rule 55.5.*

It is hard to see how the IAAF would hold Justin at fault for not doing something that would have been fruitless and a complete waste of time.  As discussed in Justin's opening brief the IAAF would not have even considered granting a TUE for Adderall: "The IAAF has been steadfast in its position that it would not, and will not, grant an athlete a Therapeutic Use Exemption for the use of Adderall to treat ADD or a ADHD.  The IAAF made its position clear immediately following Justin's case: '[T]he IAAF will not grant applications brought by athletes with ADD who seek exemption under IAAF Rules to use amphetamines in-competition.'  Exhibit 16 at 5"  The IAAF's argument that Justin is at fault for not filing for a TUE that it admits would never have been granted is laughable.  Further, the evidence establishes that Justin acted in conformance with the custom and practice of all athletes at the time, and in conformance with what USADA was telling athletes at the time, i.e., to stop taking the medication prior to competition.

56.3    *Mr. Gatlin continued to take Adderall notwithstanding.*

This, of course, begs the question – notwithstanding what?  Justin needed to take Adderall to treat his ADD and, in this particular instance, Justin needed to take Adderall to help him study for his summer school exam.  Justin had stopped taking his Adderall immediately after his exam, which was several days before the competition.  Justin had used this same process several times before and it never resulted in a positive test that he was aware of in any NCAA competition.

---

[16]  Decl. of Justin Gatlin ¶ 16.

[17]  Decl. of Dr. Lois Prislovsky ¶ 6.

56.4 · *Mr. Gatlin failed to consult his doctor about when to stop taking Adderall in advance of competitions in order to ensure that the substance was no longer in his system when he came to compete.*

As discussed in Justin's opening brief, he had no reason to consult his doctor because he had never before tested positive for Adderall despite being tested numerous times. In fact, the facts demonstrate that if Justin had stopped taking Adderall two days earlier he would not have tested positive. Justin's third test, taken on the final day of the three-day competition was negative for amphetamines. Further, there was no available literature about the clearance rate for amphetamine.

56.5 and 56.6: *Mr. Gatlin failed to consult the USADA Drug Hotline and failed to disclose his use of Adderall.*

Justin has demonstrated that he had no reason to believe he would test positive. Moreover, negligence requires causation, and even if Justin had performed the acts the IAAF argues that demonstrate Justin's negligence, none would have prevented the positive test in 2001. No reasonable steps existed that would have prevented Justin from testing positive when considering the necessity of his medication for him to function in a college environment.

As shown above, many of the factual assertions made by the IAAF clearly misconstrue the facts set forth in the declarations. When the actual facts are considered, it is clear that IAAF's position is unsupportable. This misconstruction is no different than its attempt to apply strict liability to Justin's 2001 positive test instead of recognizing the principles of justice CAS panels have been applying throughout their existence – the same principles now incorporated into the IAAF Rules.

## D.    THE IAAF MISUNDERSTANDS HOW THE ADA APPLIES TO THIS CASE

The IAAF's position on the affect of the Americans With Disabilities Act on this case is premised on one attorney's utter misreading of the relevant cases, pure speculation and opinion, and at times, illogical extensions of law. Before turning to the substantive arguments, Justin notes the peculiarity in litigation of introducing a declarant who provides "factual evidence" which consists of nothing more than pure legal advocacy. Had the IAAF wanted to make the

23

arguments contained in Mr. Gulland's declaration, the IAAF should have simply included them in the body of its brief with the other legal arguments. Moreover, Mr. Gulland failed to sign his "declaration" under the penalty of perjury. Therefore, Justin objects to the inclusion of Mr. Gulland's declaration as actual evidence in this case; rather, this declaration should be considered a mere extension of the IAAF's answer. Nevertheless, no weight should be given to the arguments of the IAAF because they are not supported by the law.

Mr. Gulland and the IAAF first argue that the ADA does not apply here because the enactment of the Amateur Sports Act ("ASA") by Congress preempts the ADA.[18] To support this position, three federal appellate cases were cited; however, these cases all concern the interaction of the ASA and the federal anti-trust laws, *Behagen v. Amateur Basketball Ass'n of the United States*, 884 F.2d 524 (10th Cir. 1989); *Eleven Line, Inc. v. North Texas State Soccer Ass'n*, 213 F.3d 198 (5th Cir. 2000) and *JES Properties, Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224 (11th Cir. 2006). In broad terms, the main issue in these cases was whether the ASA set up a structure in which there was one national governing body for each sport that could then make governing rules for the sport in violation with federal anti-trust laws. The *Behagen* court held that there was no anti-trust violation because by purposefully giving one national governing body control of an entire sport in enacting the ASA, Congress exempted national governing bodies from anti-trust laws. *Behagen*, 884 F.2d at 529-530. Therefore, the holding of the three cases cited by Mr. Gulland and the IAAF are extremely narrow.

Additionally, in a further attempt to misguide this Panel, Mr. Gulland cites to several cases in which courts have stated that the plaintiffs' state law claims should be dismissed for

---

[18] Decl. at Mr. Gulland at ¶¶ 4-9.

24

failure to comply with the ASA administrative review scheme. For example, in *Cantrell v. United States Soccer Federation*, 924 P. 2d 789, 792 (Okla. Ct. App. 1996) the court found that since the plaintiff was complaining about a failure of the national governing body to follow its own rules, the proper procedure for the plaintiff was to file a claim pursuant to the procedures in the ASA.

> Although Cantrell purports to assert his claims in tort, it is clear from reading his Petition as a whole that he effectively seeks a further appeal of the administrative determinations made by Appellees under the authority of the Act. His claims are grounded, whether alleged as arising from implied contract or common law duty, on his contention that Appellees failed to comply with their own rules and regulations. That contention is exactly what the administrative review scheme under the Act is intended to cover. Congress has reserved those questions for determination according to the Act.

Justin's ADA argument is not based on the national governing body failing to follow its own rules. In other words, Justin does not complain that USATF is violating the ASA, he is arguing that USATF, and the other related entities, are violating a wholly separate law, the ADA. The additional cases cited are equally unpersuasive.[19]

Justin's ADA claim is not subject to the case law regarding the anti-trust laws because there is not a well-established principle that Congress can exempt an entity or public accommodation from the requirements of the ADA. And the citation to the other cases finding

---

19 In *Dolan v. U.S. Equestrian Team, Inc.*, 608 A.2d 434, 437-438 (App. Div. 1992), the court found that a plaintiff had to exhaust her claims that the national governing body violated the ASA because the ASA had an established administrative review system. "We agree with the trial judge that there is nothing unfair about requiring plaintiff to exhaust her administrative remedies." Likewise, in *Walton-Floyd v. United States Olympic Committee*, 965 S.W.2d 35, 40 (Tex. Ct. App. 1998), the Court found that there was no private right of action under the ASA and that there can be no state law claims which fall under the purview of the ASA.

that claims based on violations of the ASA must be brought in conformance with the ASA's

administrative review framework are equally unpersuasive. Indeed, after implying to this Panel

that there is indeed case law to support his position, Mr. Gulland finally states the only real fact

in his declaration: "I am not aware of any cases that address the precise issue presented here . . .

."[20] However, later in his declaration, Mr. Gulland cites a case, *Shepherd v. USOC*, 464 F. Supp.

2d 1072 (D. Colo. 2006), in which a plaintiff raises an ADA claim, and that Court does not

dismiss it on grounds that it is preempted by the ASA. Therefore, the cases cited by Mr. Gulland

do not support the position that the ADA is preempted by the ASA, and in fact, the cases support

that such a claim is not preempted.

   After admitting that there is no case law support for his and the IAAF's position, Mr.

Gulland then presents his rather convenient opinions, which have no basis in any law or fact, for

why he believes a court would not permit an ADA claim to be filed. These opinions, however,

do not even withstand the slightest scrutiny:

   o   Mr. Gulland asserts that federal courts give anti-trust laws far greater status than

       that of the ADA and yet many courts have found that the anti-trust laws do not

       apply. But, as noted above, these decisions have nothing to do with status and are

       instead based on the fact that Congress has the ability to specifically exempt an

       entity from the anti-trust laws.

   o   Mr. Gulland opines that since the ASA does not prohibit discrimination based on

       disability, but does so on the basis of race, color, age, religion, sex, and national

       origin, a court would find that the ADA is preempted. This logic presupposes that

---

[20] Decl. of Mr. Gulland at ¶ 10.

the ASA preempts the ADA and concludes that since the ASA does not include disability, there is no disability claim. This logic is circular, however. The ADA, which prevents discrimination based on disability is equally applicable whether the ASA prevents discrimination based on disability or not. Further, as noted above, in the case cited in this section by Mr. Gulland, *Shepherd*, the court did not find that the ADA was preempted or displaced in any way by the ASA. While the court found that the ADA claim was untenable, it was based on the language of the ADA and the particular facts of the case and the relief requested. *Shepherd v. USOC*, 464 F. Supp. 2d at 1072 (D. Colo. 2006).

o   Mr. Gulland then contends that since the ASA defines amateur athlete as one that is eligible under the rules, the ASA was meant to control eligibility. Frankly, this contention does not make any sense. Whether a national governing body can violate the ADA in refusing to permit someone from competing based solely on a sanction that resulted because of a disability has little to do with the ASA definition of amateur athlete.

o   In his last opinion for why he believes that the a court would find that the ASA displaces the ADA, Mr. Gulland argues that unless otherwise directed, laws that have an extraterritorial application may not apply in the United States when they would interfere with international harmony. The case cited by Mr. Gulland, *McCulloch v. Sociedad Nacional de Marineros*, 372 U.S. 10, 21 (1963) involved whether American labor laws can be extended to seaman on vessels owned by a foreign subsidiary of an American company. Moreover, Mr. Gulland's opinion appears to be that any enforcement of an American law that affects another

27

country will result in the law not being enforced seems awfully unlikely in this global economy.

### 2.    Justin Has Sufficient Evidence to Establish That He Was Discriminated Against on the Basis of His Disability

Mr. Gulland then argues that even if the ADA were to apply, Justin's claim would fail because he can not establish that he was discriminated against. Mr. Gulland incorrectly frames the question as whether the "IAAF doping rules . . . discriminated against him on the basis of disability."[21] However, the relevant question is whether USATF and other entities that sanction races are going to discriminate against Justin by enforcing an anti-doping suspension that resulted from his disability. In other words, it is not whether the rules specifically discriminate against someone with a disability, but whether the application of the rule affect one person only because that person suffers a disability. When the relevant question is framed correctly, Mr. Gulland's arguments about whether the IAAF rules specifically take into account learning disabilities becomes meaningless. Further, as discussed in his opening brief, Justin can establish that he had been discriminated against on account of his disability because the only reason why he tested positive for amphetamines was through the treatment of his ADD.

Mr. Gulland also argues that the ADA does not permit a person to hide behind the ADA to avoid accountability for their actions. However, the Court in *Hamilton v. Southwestern Bell Telephone Co.*, 136 F.3d 1047 (5th Cir. 1998) did not permit the plaintiff from hiding behind the ADA because the court found that the ADA would "not insulate emotional or violent outbursts blamed on an impairment." *Id.* at 1052. Here, however, Justin brought a case under a different

---

[21] Decl. at Mr. Gulland at ¶ 13.

28

title of the ADA, one dealing with public accommodations, and Justin is not asking to hide behind the ADA for a emotional or violent outburst.

Mr. Gulland's second case cited in support of this proposition is equally unpersuasive. In *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 667 (7th Cir. Ill. 1995), the court held very clearly that "when an employee knows that he is afflicted with a disability, needs no accommodation from his employer, and fails to meet the employer's legitimate job expectations due to his failure to control a controllable disability, he cannot state a cause of action under the ADA." Mr. Gulland then opines that because Justin failed to monitor his amphetamine levels, he can seek no relief under the ADA. Mr. Gulland's analogy of the *Siefken* case to Justin's case is not only incorrect, but offensive. This is not an instance when Justin did not manage his disease; rather this case stems from the fact that Justin was trying to treat his disease. Additionally, the *Siefken* precedent only is applicable if a plaintiff does not manage their disease and is not seeking an accommodation from his or her employer; in other words, it is applicable when the plaintiff is seeking a second chance. Mr. Gulland misleads the Panel when he stated that under the *Siefken* case, Justin should have been monitoring his amphetamine levels. Justin's amphetamine levels have nothing to do with the disease but rather the prohibited conduct. Mr. Gulland's opinion is tantamount to saying that the plaintiff in *Siefken*, had he managed his disease, was supposed to monitor his driving which was affected by his disease. This position is illogical. Therefore, Mr. Gulland has no support for his opinion that Justin cannot establish that he was discriminated against on the basis of his disability.

### 3. Justin Requested Accommodation is Reasonable

Mr. Gulland believes that the reasonable accommodation Justin requested, that he not be sanctioned for the 2001 incident or not have his sentence enhanced based on the 2001 incident,

would fundamentally alter IAAF competitions. There is no dispute that the ADA only allows reasonable accommodations, or those accommodations that do not fundamentally alter the good, service, facility, privilege and accommodations. 42 U.S.C. § 12182(b)(2)(A)(ii). But, here, Mr. Gulland again opines, without any actual factual evidence, that if the IAAF allowed people with ADD to properly treat their disease by taking medications with amphetamines, it would fundamentally affect the track and field competitions. Mr. Gulland does not cite to any medical journals to support this position. The most Mr. Gulland can do is point to the fact that since the IAAF has prohibited Adderall, its use must substantially alter the competitions. Mr. Gulland conveniently disregards Justin's testimony that he is disadvantaged by taking Adderall. Based on the only evidence on point, Mr. Gulland's opinion appears to be unsupported.

### 4.   Justin Did Not Waive His Opportunity to Request a Reasonable Accommodation

Mr. Gulland additionally argues that Justin has waived any opportunity to request a reasonable accommodation because he failed to request an accommodation. Before turning to why Mr. Gulland's position is infirm, Mr. Gulland states that it is not sufficient for Justin to "speculate" that the IAAF would not have granted him an accommodation. However, this statement fails to consider that Justin does not need to speculate because as noted in Justin's opening brief, the IAAF formally announced after Justin tested positive that it would not grant TUE's for athletes who suffered from ADD.

The cases Mr. Gulland cites to support his position that Justin fail to establish that he requested a reasonable accommodation is silent as to time. The cases cited, *Johnson v. Gambrinus Company/Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997), and *Mershon v. St. Louis Univ.*, 442 F.3d 1069 (8th Cir. 2006) only establish that there must be evidence that a reasonable accommodation was requested. Here, in 2001, while Justin did not expressly request

that the IAAF, USADA, USOC, and USATF, pursuant to the ADA, provide him a reasonable accommodation, Justin challenged the imposition of a sanction and requested reinstatement based on the fact that the positive test resulted from him treating his disability. Despite his challenges, the IAFF, USADA, USOC and USATF did not provide Justin with the reasonable accommodation of a retroactive TUE. Further, for the 2006 case, Justin's opening brief is sufficient to be considered as a request for an accommodation that Justin's 2001 incident not be considered as a first violation such that his 2006 sanction is enhanced. This request has also been denied. Therefore, Justin can establish his burden that he requested a reasonable accommodation that was rejected by the IAAF, USADA, USOC, and USATF.

5.    **Mr. Gulland's Personal Opinion on This Matter Is Irrelevant**

Mr. Gulland went to great lengths to stretch and extend the existing legal principles to mislead this Panel into believing that he had any semblance of factual or legal support for his opinion that ADA does not apply. However, the absurdity of Mr. Gulland's declaration is clearly evidenced when his opinions in Section III are considered. Mr. Gulland, who is not acting as counsel for the IAAF, presents his personal opinions on the case before the panel. Mr. Gulland opines in his declaration that based on his reading of the facts, without any personal knowledge of the actual events that occurred, that in 2001 the parties entered into a plea agreement in which the 2001 Panel entered an "improper" decision based on uncontested facts and retained jurisdiction so that the IAAF Panel could consider Justin's reinstatement application. Based on this conclusion, Mr. Gulland has concluded that since Justin was reinstated, the plea agreement was satisfied and the matter came to an end. Mr. Gulland's analysis is without any reference to the applicable rules and precedent and is meaningless. And most interestingly, Mr. Gulland's position is inconstant and in contradiction to the IAAF's position in this case – the IAAF rules,

which the IAAF argue cannot be altered, do not allow for the plea deal Mr. Gulland argues occurred in 2001.

Mr. Gulland's opinion, while objectionable as an improper legal opinion, are not supported by any facts or legal precedent. Mr. Gulland simply has stated his personal opinion and attempted to cloak his infirm position with citations to cases that are not on point. Therefore, Mr. Gulland should be found not credible and no weight should be given to his "declaration."

F.    THE IAAF'S REMAINING ARGUMENTS

The remaining arguments the IAAF asserts in its response brief have been previously addressed in Justin's opening brief and deserve little mention. First, with regard to the period of ineligibility beginning in May 2006, the WADA Code applies, and even if it did not, beginning the period of ineligibility more than two months after Justin's sample was taken due to an undue delay by USADA and the UCLA Laboratory is patently unfair. Second, with regard to Justin's argument that there are exceptional circumstances because he provided assistance to the Federal Government in its investigation of Trevor Graham, despite the IAAF comparing Justin's assistance with other athletes, the fact remains that Justin made more undercover phone calls, placing himself at great risk, than any other athlete. That USADA or any other anti-doping body failed to seek Justin's assistance or prosecute Trevor Graham, should not be used against Justin in light of the help her provided Agent Novitzky. Accordingly, exceptional circumstances apply to reduce Justin's 2006 sanction, and Justin's sanction should begin no later than May 2006 due to the delay in reporting Justin's positive sample.

## G.    PROPORTIONALITY

As explained above, the principle of proportionality applies in all cases and should be used her to reduce Justin's otherwise applicable period of ineligibility. The IAAF's position is that Justin should be sanctioned for life, which it deems synonymous with eight years. Based on the facts of the 2001 violation and the 2006 violation, life or eight years is clearly not an appropriate sanction. As such, this panel, giving due consideration to the totality of the circumstances, should find that Justin should be sanction to two years, and at the very most, four years.

## IV.  CONCLUSION

For the following reasons, the reasoning of Justin's opening brief should be adopted and Justin should be sanctioned to two years starting May 2006.

DATED: May 5, 2008                    Respectfully submitted,

                                      GIBSON DUNN & CRUTCHER, LLP


                                      Maurice M. Suh
                                      Daniel L. Weiss
                                      Andrew Demko

100439411_3.DOC

33

**GIBSON, DUNN & CRUTCHER LLP**
A Registered Limited Liability Partnership
Including Professional Corporations
333 South Grand Avenue
Los Angeles, California 90071-3197

TELEPHONE: (213) 229-7000
FACSIMILE: (213) 229-7520

## FACSIMILE TRANSMISSION INFORMATION                    May 5, 2008

TO:

| | | | |
|---|---|---|---|
| Name: | Matthieu Reeb | Company: | TRIBUNAL ARBITRAL DU SPORT, |
| Facsimile No. | 011-41-21-613-50-01 | City: | Lausanne, Switzerland |
| Main No. | 011-41-21-613-50-00 | State: | |

| | | | |
|---|---|---|---|
| Name: | William Bock | Company: | U.S. Anti-Doping Agency |
| Facsimile No. | 1-719-785-2001 | City: | Colorado Springs |
| Main No. | (719) 785-2061 | State: | CO |

| | | | |
|---|---|---|---|
| | | | International Association of Athletics |
| Name: | Pierre Weiss | Company: | Federations |
| Facsimile No. | 011-377-93-15-95-15 | City: | Principality of |
| Main No. | | State: | Monaco |

| | | | |
|---|---|---|---|
| Name: | USA Track and Field | Company: | |
| Facsimile No. | (317) 261-0481 | City: | Indianapolis |
| Main No. | | State: | IN |

| | | | |
|---|---|---|---|
| Name: | | Company: | |
| Facsimile No. | | City: | |
| Main No. | | State: | |

FROM: Maurice M. Suh          Room: LA-5115          Direct Dial: (213) 229-7260

Our File Number: T 36015-00001          Fax: (213) 229-6260          Email: MSuh@gibsondunn.com

TOTAL NUMBER OF PAGES, INCLUDING COVER LETTER: _____

☞ If you do not receive all the pages transmitted, please contact the facsimile operator immediately at telephone number (213) 229-7180.

Fax Operator:    **Trish Davis**

The written message is for the exclusive use of the addressee and contains confidential, privileged and non-disclosable information. If the recipient of this message is not the addressee, or a person responsible for delivering the message to the addressee, such recipient is prohibited from reading or using this message in any way. If you have received this message by mistake, please call us immediately and destroy the facsimile message.

SPECIAL INSTRUCTIONS/MESSAGE:

100383815_1.DOC