*⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓*

# *BEFORE THE AMERICAN ARBITRATION ASSOCIATION*

## *North American Court of Arbitration for Sport Panel*
## *USADA vs. Justin Gatlin*
## *AAA No. 30 190 00170 07*

*⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓*

## TRANSCRIPT OF PROCEEDINGS

*⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓⚓*

*American Arbitration Association Office*
*2200 Century Parkway, Suite 300*
*Atlanta, Georgia*
*July 30 – August 1, 2007*

GATLIN v. UNITED STATES ANTI-DOPING AGENCY INC          Doc. 32 Att. 1

Transcript provided by:

### RESLING SPORTSCRIPT
**4 Cheyenne Boulevard**
**Colorado Springs, Colorado  80906**
**(719) 632-6391, (719) 661-7226 (cell)**

Dockets.Justia.com



**Page 1**

BEFORE THE AMERICAN ARBITRATION ASSOCIATION
North American Court Of Arbitration For Sport Panel

HEARING HELD July 30, 31, August 1, 2007
AAA No. 30 190 00170 07

----------------------------------------

UNITED STATES ANTI-DOPING AGENCY,
Claimant,
vs.
JUSTIN GATLIN,
Respondent.

----------------------------------------

PURSUANT TO NOTICE, the above arbitration hearing was held before CAS, pursuant to Order, at the American Arbitration Association, 2200 Century Parkway, Suite 300, Atlanta, Georgia, July 30, 31, 2007, commencing at 10:00 a.m., before Debra K. Resling, RMR, Certified Realtime Reporter and Notary Public; the telephonic hearing was held on August 1, 2007, before Stephanie Ostdahl, RPR and Notary Public.

**Page 2**

```
 1                    CAS Panel
 2
        MR. EDWARD T. COLBERT, Attorney at Law, from the
 3  Law Firm of Kenyon & Kenyon, 1500 K. Street NW, Suite
    700, Washington, D.C., 20005, ecolbert@kenyon.com
 4
        MR. SAMUEL DAVIS CHERIS, Attorney at Law, 11385
 5  East Alabama Circle, Aurora, CO, 80012,
    sam.cheris2@relera.com
 6
        MR. CHRISTOPHER L. CAMPBELL, Attorney at Law,
 7  from the Law firm of Chapman & Intrieri, LLP, 2236
    Mariner Square Drive, Suite 300, Alameda, CA  94501,
 8  ccampbell@chapmanandintrieri.com
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                    APPEARANCES
 2      MR. WILLIAM BOCK, III, Attorney at Law, from the
    Law Firm of Kroger, Gardis & Regis, LLP, 111 Monument
 3  Circle, Suite 900, Indianapolis, IN  46205, appeared
    on behalf of U.S. Anti-doping Agency.
 4
 5      MR. TRAVIS TYGART, Attorney at Law, General
    Counsel, USADA, 1330 Quail Lake Loop Circle,  Suite
 6  260, Colorado Springs, CO 80906, appeared on behalf of
    U.S. Anti-doping Agency.
 7      MR. JOHN P. COLLINS, Attorney at Law, from the
    Law Firm of Collins & Collins, 8 South Michigan
 8  Avenue, Suite 1414, Chicago, IL  60603, appeared on
    behalf of Justin Gatlin.
 9
        Also Present:  Justin Gatlin and Mr. Gatlin.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                    I N D E X
 2  July 30, 2007,  Pages  1 - 401
    July 31, 2007,  Pages 402 - 722
 3  August 1, 2007, Pages 722 - 946
 4                                          Page
    JUSTIN GATLIN
 5  Examination by Mr. Collins        48
    Examination by Mr. Bock       181, 402
 6  Examination by Mr. Collins       706
 7  JEFF NOVITZKY
    Examination by Mr. Collins       254
 8  Examination by Mr. Tygart        297
    Examination by Mr. Campbell      314
 9  Examination by Mr. Cheris        322
    Examination by Mr. Colbert       324
10  Examination by Mr. Collins       331
11  TERRI BLANKENSHIP
    Examination by Mr. Collins       336
12  Examination by Mr. Bock          344
    Examination by Mr. Collins       356
13  Examination by Mr. Bock          356
14  JEANETTE GATLIN
    Examination by Mr. Collins       363
15  Examination by Mr. Bock          383
    Examination by Mr. Collins       384
16  Examination by Mr. Bock          385
    Examination by Mr. Collins       397
17  Examination by Mr. Campbell      397
18  CHRIS WHETSTINE
    Examination by Mr. Collins       490
19  Examination by Mr. Tygart        554
    Examination by Mr. Campbell      563
20  Examination by Mr. Cheris        570
    Examination by Mr. Colbert       578
21  Examination by Mr. Campbell      582
22  RENALDO NEHEMIAH
    Examination by Mr. Collins       593
23  Examination by Mr. Bock          649
    Examination by Mr. Campbell      691
24  Examination by Mr. Colbert       699
    Examination by Mr. Bock          700
25
```

7-30-07 to 8-01-07                                    USADA vs. GATLIN

2 (Pages 5 to 8)

Page 5

1   DAVID L. BLACK, Ph.D.
       Examination by Mr. Collins      723
2      Examination by Mr. Tygart       751
       Examination by Mr. Collins      777
3
       (Exhibits introduced during the hearing.)
4
5   GATLIN EXHIBITS:                    PAGE
6
    14   Color Photos                   708
7
    15   E-mail                         708
8
    16   Invoice from Cary Orthopedics  709
9
    17   Analysis Report of Steroid
10       Contaminants                   739
11  18   Analysis Report of Steroid
         Contaminants                   838
12
13  USADA EXHIBITS:
14  29   Packet of exhibits             210
15  30   Stipulation                    710
16  Closing Arguments                   842
17
18
19
20
21
22
23
24
25

Page 6

1              (Commencing at 10:00 a.m.)
2              MR. COLBERT:   Are parties both
3    ready?
4              MR. COLLINS: Yes.
5              MR. COLBERT:  Mrs. Resling, would
6    you please swear in the witness?
7              MR. COLLINS: We're going to have
8    opening?
9              MR. COLBERT:  Oh, I thought you guys
10   had waived opening.
11             MR. TYGART: Just very brief remarks
12   from us.
13             MR. COLLINS:  I have a few remarks.
14   Do you want to go over any housekeeping
15   beforehand?
16             MR. TYGART: The only thing I have is
17   a second stipulation that was entered by the
18   parties that we have copies of for the panel
19   that I will pass out now.
20             MR. COLBERT: That would be good,
21   thank you.
22             Do you have any other housekeeping
23   matters?  I think it's a little more than
24   housekeeping.
25             MR. COLLINS: I wasn't thinking that,

Page 7

1    What I was thinking, just to cover them up
2    front, was that one, we already did the
3    witnesses being out. Two, Travis and I have
4    already talked, there are a couple of witnesses
5    that have to be on phone.  Some are on the West
6    Coast.  Some are on the Central time zone.
7    We're going to try to juggle those, to the
8    extent we can.  We have three witnesses here --
9    four witnesses here.  Justin is going to be a
10   witness.  Terri Blankenship, Renaldo Nehemiah,
11   Jeanette Gatlin.  We do not plan on calling
12   Randall Evans.
13             MR. COLBERT: So he will not be
14   called at all?
15             MR. COLLINS: We are not calling him.
16             MR. TYGART: I guess if we want to
17   discuss that now on Randall.  As of Thursday of
18   last week, it was our understanding he would be
19   here live, and he obviously wanted at that point
20   and still want today, the opportunity to examine
21   him.  We heard Friday for the first time that
22   he's not going to be made available.  We sent an
23   e-mail Saturday to Mr. Collins -- yesterday to
24   Mr. Collins -- to have him available if at all
25   possible.  We would like the opportunity to

Page 8

1    examine him.
2              MR. COLBERT:  Let me just ask a
3    question then.  Looking at United States -- I
4    don't know the designation of witnesses which is
5    -- we've got, you don't list --
6              MR. TYGART: Yeah, we named all
7    witnesses that were designated by Mr. Collins.
8              MR. COLLINS: Yeah.
9              MR. COLBERT:  Right, but those are
10   witnesses presented by Mr. Gatlin and if Mr.
11   Gatlin hasn't produced a witness here -- have
12   you made arrangements to have Mr. Evans or have
13   Mr. Collins have Mr. Evans --
14             MR. TYGART: He designated Mr. Evans
15   on his witness disclosure, and as of Thursday,
16   he was calling him.  We found out this Friday
17   that he wasn't calling him, and have asked for
18   him to be made available.
19             MR. COLBERT:  The question I've got
20   is you are asking Mr. Collins to make Mr. Evans
21   available.
22             MR. COLLINS: My response would be, I
23   can give him his telephone number, but I can't
24   make him show up.  I'm not his lawyer.  If he
25   wants to do it, he will do it; if he doesn't

7-30-07 to 8-01-07                    USADA vs. GATLIN

3 (Pages 9 to 12)

Page 9

1  want to do it, he doesn't want to do it.
2       MR. TYGART: Yeah, at a minimum, we
3  would appreciate his telephone number. He is a
4  former assistant coach.
5       MR. COLLINS: He also though --
6  there's been allegations against him. I know he
7  was called into the grand jury. I think he has
8  an attorney that represented him that went to
9  the grand jury.
10      MR. TYGART: Well, if you can provide
11  any of those numbers, that would be, one step we
12  could take to attempt to reach out to him.
13      MR. COLLINS: I have a cell number
14  for him.
15      MR. COLBERT: You want to do it
16  right now?
17      MR. COLLINS: If you want, I will
18  give it to him. I have not talked to him. I
19  didn't get his e-mail until about 10 or 11:00
20  last night; 919-255-0875.
21      MR. TYGART: Make sure I got it,
22  John. 919-255-0875.
23      MR. COLBERT: So if I understand
24  you're going to have Mr. Gatlin, Renaldo
25  Nehemiah, Jeanette Gatlin, Terri Blankenship to

Page 10

1  testify live.
2       MR. COLLINS: Right.
3       MR. COLBERT: You are not going to
4  call Mr. Evans, and that leaves Dr. David Black
5  and Jeff Novitzky, two potential by phone?
6       MR. COLLINS: Right.
7       MR. COLBERT: And they will
8  definitely be called by phone.
9       MR. COLLINS: Yes.
10      MR. COLBERT: So as long as we are
11  doing that, let me ask you, Mr. Tygart. You had
12  indicated that you weren't sure who you were
13  going to call, either Dr. Shackleton, or
14  Dr. Geyer, so I'll go through the list. Is
15  Dr. Cedric Shackleton going to testify?
16      MR. TYGART: Again, depending on what
17  the case is that comes in, I would expect he
18  would testify. He would be by telephone. And
19  he's on the West Coast as well, so, late this
20  afternoon, or some reasonable time for him in
21  the morning would be fine.
22      MR. COLBERT: What about
23  Dr. Bowers?
24      MR. TYGART: Unfortunately
25  Dr. Bowers' father passed away yesterday, and

Page 11

1  he's not -- he was going to be here live, but
2  he's not going to be here live.
3       MR. COLBERT: Will he testify by
4  phone?
5       MR. TYGART: He will, just depending
6  on the schedule with his dad, yeah, and again,
7  the evidence that comes in, whether or not we
8  will have him.
9       MR. COLBERT: And Hans Geyer, will
10  he   be --
11      MR. TYGART: I don't anticipate we
12  will be calling Hans Geyer.
13      MR. COLBERT: Probably not calling
14  him, okay. Kate Mittlestadt.
15      MR. TYGART: We will not be calling
16  her, in lieu of the stipulation that I just
17  handed you all, and I think, the same goes for
18  the next witness Michelle Collins, in lieu of
19  the stipulation that we just entered, we don't
20  feel the need at this point to call either one
21  of them.
22      MR. COLBERT: And then interestingly
23  enough, this is the question I have. Jeff
24  Novitzky has been listed, unlike Mr. Evans, both
25  of you specifically identified Mr. Novitzky to

Page 12

1  testify. It sounds like you are both calling
2  him. You intend to call him twice, or have him
3  testify once, you know, for both of you? I
4  don't know why both of you called the same
5  witness, quite frankly.
6       Normally in the case, you would
7  decide to put the witness on, unless you agree
8  that you, because you have an issue with terms
9  of cross-examination, scope of examination,
10  whether you're going to go beyond that. Have
11  you talked about that?
12      MR. TYGART: From our end, we named
13  him simply because they did, and I think he's
14  important to the overall facts of the case, and
15  the issues before the panel. We put him on
16  there to make it absolutely clear that we have
17  no intent to cross-examine Agent Novitzky,
18  because I think there will be areas of his
19  testimony that he's not going to be able to
20  testify about, that, you know, some lawyers may
21  want to try to impeach him with or go after him,
22  on some of those facts, and we just have no
23  intent to do that, which is why we named him as
24  someone we just anticipate to have from a
25  direct testimony.

Page 13

1    MR. COLBERT: So you don't intend to
2  cross-examine Mr. Novitzky?
3    MR. TYGART: We may ask him
4  questions, but if he says he can't answer a
5  question, that's fine with us.
6    MR. BOCK: If John asks him a
7  question first, we may follow up with questions.
8    MR. COLBERT: But other than that,
9  you don't intend to then separately call him for
10  some other purpose in your case.
11    MR. TYGART: No.
12    MR. COLLINS: Right, and just on
13  Novitzky, we should put out, that he is going to
14  be an interesting witness to call, and I have to
15  be careful what I ask him, because Justin
16  cooperated in a grand jury investigation which
17  is a pending indictment, and the grand jury
18  materials haven't been released, so there's
19  going to be some limitations on what he can
20  answer, and when he does testify, it's my
21  understanding, there's going to be to two AUSAs
22  from the San Francisco office on the phone.
23    MR. TYGART: That was only our point.
24  We are going to ask him questions, but we have
25  no desire to investigate other areas that he's

Page 14

1  not allowed to testify about.
2    MR. COLLINS: If I seem even more
3  inarticulate than usual, it's because I'm --
4    MR. COLBERT: I understand. That's
5  one of the questions I had too, had his agency,
6  et cetera, been notified in sufficient time they
7  could make arrangements? Apparently they have.
8    MR. COLLINS: Yes. We will have to
9  figure out how the conference call works for
10  him. We will call Jeff. The AUSAs in San
11  Francisco can't do it until after 1:00 or after
12  their time, so it would be 4:00 our time. So
13  we're going to try and I think it makes sense,
14  whatever we're doing to try to call him at that
15  time, because I don't know how late we plan on
16  going today, but it's going to be very, you
17  know, obviously, he's a critical witness, and we
18  want to do it -- and he's got multiple people to
19  organize.
20    MR. COLBERT: So basically 4 p.m. or
21  later.
22    MR. COLLINS: Yeah.
23    MR. COLBERT: And then Chris
24  Whetstine, did I pronounce that correctly?
25    MR. TYGART: I think that's right.

Page 15

1    MR. COLBERT: You have got him on
2  your list.
3    MR. TYGART: Again, we listed him,
4  because we thought it was a noticeable absence
5  on their sheet, witness list that they didn't
6  list him. He's agreed to be available by
7  telephone.
8    MR. COLBERT: You have got him
9  listed as in person.
10    MR. TYGART: I found out yesterday,
11  due to some health concerns, he's not going to
12  be able to travel. He's also on the West Coast
13  in Oregon. I don't know that we need to call
14  him in our case. I listed him, because I
15  thought it was somebody that was relevant for
16  Mr. Collins or the panel, and he's agreed to
17  make himself available. I will defer to
18  Mr. Collins, if he wants to call him, and we
19  would reserve the option.
20    MR. COLLINS: We certainly have a
21  number of questions we want to ask him, and
22  prior to our filing our witness list, we had
23  been informed by Mr. Whetstine that he was
24  talking to USADA, and that USADA indicated that
25  they would be calling him.

Page 16

1    So we didn't put him on our list
2  based on that. We're disappointed to learn
3  today that he's not going to be here, because we
4  do view him as a hostile witness or adverse
5  witness, and our questions would be in the
6  nature of cross-examination, which we would have
7  really appreciated for the panel would have had
8  the opportunity to see his demeanor. I think
9  he's the only witness that's going to be of any
10  real contention. I don't know how you plan on
11  crossing ours, but our scientists are just going
12  to be experts, so that is what it is. I don't
13  think there's anything we can do.
14    MR. COLBERT: You are not going to be
15  calling Mr. Whetstine in your case in chief?
16  You are going to wait to cross him?
17    MR. COLLINS: If he doesn't call him,
18  then I would call him, but request that it be a
19  hostile witness so I can ask questions.
20    MR. COLBERT: It's a little unusual,
21  the circumstances here are a little unusual. I
22  would suggest that we don't do this, in that,
23  normally, we, we would be hearing from USADA
24  first, and we're not doing that because of the
25  stipulations you entered into, so, which means,

Page 17

1 I don't know how you can make a determination as
2 to whether to call Mr. Whetstine or not based on
3 whether USADA calls him. You are essentially
4 looking for like a surrebuttal kind of an
5 ability to call him after USADA puts their reply
6 case on, because they have got a rebuttal. Your
7 case is a rebuttal case, not a case in chief,
8 and so you are looking for a sur-reply,
9 essentially.
10     MR. COLLINS: Right, he indicated he
11 would be uncooperative and wouldn't do it when
12 we tried to call him. That's how we did it to
13 try to resolve it, just as you have seen Travis'
14 sort of with his list. We put people on there
15 to try to make it happen. If we have to call
16 him, we will call him and consider him an
17 adverse witness, if you want to do it that way.
18     MR. COLBERT: It's not how I want to
19 do it. I'm just trying to think how we will do
20 it. Let me just postulate the following: You
21 don't call him in your case in chief, and
22 Mr. Tygart doesn't call him in his case in
23 rebuttal, he hasn't been called, there's nobody
24 to cross-examine.
25     MR. COLLINS: And I understand.

Page 18

1     MR. COLBERT: And then you want to
2 call Mr. Whetstine, and you don't have him on
3 your list, unless there's an objection there,
4 but what basis would we put him on? I just want
5 to make sure we all understand how this is going
6 to happen.
7     MR. COLLINS: I would assume what's
8 going to happen at that point, is that once we
9 run through our list of witnesses, we will ask
10 them if they would plan to call him at all. If
11 they're not going to do, then before I would
12 rest my case, I'd say I would call
13 Mr. Whetstine.
14     MR. BOCK: Why don't you just call
15 him, John? The whole factual scenario revolves
16 around him and a couple of other people. Just
17 call him in your case.
18     MR. COLLINS: This just happened this
19 morning. I would have to discuss how we want to
20 do it, because we have the burden of proof. If
21 we -- there may be tactical decisions; if he's
22 not being called at all, maybe we don't need to
23 call them.
24     MR. COLBERT: You don't have to tell
25 us until you rest your case.

Page 19

1     MR. CAMPBELL: Where is he located;
2 in Oregon, you said?
3     MR. COLLINS: Eugene or the Eugene
4 area.
5     MR. TYGART: I'm not exactly sure,
6 just Oregon, is all I know. Is it Eugene?
7     MR. COLBERT: I'm assuming somebody
8 has his telephone number.
9     MR. TYGART: I have his telephone
10 number.
11     MR. COLBERT: Do you have a set time
12 for him to be called?
13     MR. TYGART: I spoke to his lawyer
14 yesterday. His lawyer would like to be on the
15 phone as well. His lawyer said in the afternoon
16 tomorrow, which is today, so late afternoon his
17 time.
18     MR. COLBERT: Late his afternoon, so
19 anytime 3:00 on, our time?
20     MR. TYGART: I think that's fair.
21     MR. COLLINS: I anticipated that he
22 would be called tomorrow, because I figured our
23 case would take all of today. So that does put
24 me in a little bit of a time position for
25 preparation in what I have done to ask him his

Page 20

1 questions.
2     MR. COLBERT: Let me just ask.
3     MR. COLLINS: I request that he be
4 called in the morning, if we're going to call
5 him. Because I think we're going to be -- by
6 the time we have Novitzky at 4:00, unless we're
7 going to really late tonight, it's going to
8 be -- it's going to be tough.
9     MR. TYGART: It will be tough for his
10 lawyer, but during one of our breaks this
11 morning, I will see if there's any way we can do
12 it tomorrow. Our interest obviously is just to
13 move as rapidly as possible, fairly as possible.
14 But to have it concluded tomorrow.
15     MR. COLBERT: You guys can talk
16 about it and let us know. And the last thing is
17 "other USADA witnesses." I was taking that
18 there aren't any -- you say you reserve the
19 right, but in light of the stipulation, do you
20 anticipate any unknown witnesses?
21     MR. TYGART: I don't believe so.
22     MR. CAMPBELL: Just going through the
23 list.
24     MR. COLBERT: I'm just going through
25 the list to see who they're going to call; see

Page 21

1  who they're not going to call.
2       MR. COLLINS: Potentially, you are
3  calling no witnesses?
4       MR. BOCK: Shackleton and Bowers.
5       MR. COLBERT: Maybe Bowers, maybe not
6  Bowers. We're talking about Shackleton.
7       MR. BOCK: It's possible we wouldn't
8  call any witnesses, but those are the two.
9       MR. TYGART: Those are the most
10  likely, that we will call those.
11       MR. COLBERT: Okay.
12       MR. COLLINS: The only other
13  housekeeping question I had, was obviously, we
14  have submitted our briefs, and we both submitted
15  extensive exhibits with our briefs, and I'm
16  assuming all of those are in the record for the
17  hearing, because I wasn't planning on --
18       MR. TYGART: We're fine admitting
19  what you have submitted, if there's any argument
20  about the way --
21       MR. COLBERT: Is there any objection
22  to the admission of the other party's exhibits?
23       MR. TYGART: From our end, no. We
24  reserve the right to argue the weight of them if
25  that's appropriate.

Page 22

1       MR. COLLINS: Now, a lot of exhibits
2  are legal precedent, and that short of thing
3  which aren't exhibits. There's not evidence --
4       MR. COLLINS: But also, for example,
5  there's one that came in Friday, that the panel
6  requested, and I assume everyone got it, and
7  that's already in. I just need to know do I
8  need to start asking witnesses, do you recognize
9  this or that? And showing exhibits? I haven't
10  done --
11       MR. BOCK: Authenticating documents.
12       MR. COLBERT: Let me back up for a
13  minute. Neither party has put the longitudinal
14  steroid study on the record or submitted it as
15  possible evidence. The panel has asked for it,
16  because it might be relevant, so to the extent
17  that anybody wants that to be made part of the
18  record, then I think they are going to have to
19  address that in their case in chief.
20       MR. TYGART: The one qualifier to
21  that is in the stipulation, there are a couple
22  of points, 1, to 3.
23       MR. COLBERT: It's part of this
24  packet. Okay. I hadn't looked at this yet, but
25  I have got this one study here, but you sent, at

Page 23

1  least, a lot of material came in, I guess, it
2  was on Friday.
3       MR. COLLINS: Yeah, that had some
4  backup pages.
5       MR. TYGART: That had backup data.
6       MR. COLLINS: The only thing I
7  noticed late last night in looking at it is that
8  one test, for some reason, isn't on there, and
9  it's the test that we got from the IAAF on May
10  12th from his world record, which was done at
11  the London lab, which was a negative test. For
12  some reason that's not on there.
13       MR. COLBERT: Was it shown on the
14  other materials?
15       MR. COLLINS: It's in the exhibits
16  that are in their briefs.
17       MR. BOCK: No.
18       MR. COLLINS: Yes, it is, the May
19  12th.
20       MR. BOCK: The May 12th.
21       MR. COLLINS: I believe it's Exhibit
22  8 in your book.
23       MR. TYGART: You are saying we don't
24  have the steroid profiles for that test?
25       MR. COLLINS: Exhibit 9, you can see

Page 24

1  at the bottom of it, in competition, there's
2  12-05-06, London EPO. That's the May 12th, 2006
3  test, from when he set the world record.
4       MR. BOCK: I don't think there's a
5  doping control -- I'm wrong, you are right.
6  There is.
7       MR. COLBERT: Looking at Exhibit 8?
8       MR. COLLINS: Actually 9, I was off
9  by one. I was trying to show off and blew it.
10       MR. COLBERT: You're talking about
11  the 12-05-06, May 12th?
12       MR. COLLINS: Yes.
13       MR. COLBERT: It's got no sample code
14  on it.
15       MR. COLLINS: I understand that. But
16  there is one in there later, two pages in, it's
17  USADA. It's marked USADA, Bates stamped USADA
18  0250, would show that it, when it --
19       THE REPORTER: Would show?
20       MR. COLLINS: -- would show when it
21  was collected. That's the doping control form
22  from the IAAF.
23       MR. COLBERT: Just a second.
24       Any questions?
25       MR. CAMPBELL: Not yet.

7-30-07 to 8-01-07                    USADA vs. GATLIN

7 (Pages 25 to 28)

Page 25

1        MR. COLBERT: I think that's all the
2  housekeeping.
3        MR. COLLINS: That's all I have.
4  I don't mean to dominate.
5        MR. COLBERT: Actually, it does
6  indicate that there's far fewer witnesses, we're
7  likely to be able to get it done in two days.
8  All right.
9        If there isn't anything else, now,
10  you can swear the witness. I'm -- excuse me,
11  still doing opening here? Opening.
12        Usually, by this time, 10:30, we've
13  long since started. Now, typically, again, it
14  would be your case, Mr. Tygart, but have you
15  guys agreed on who is going first.
16        MR. COLLINS: I'm happy to let him
17  open. I assume we're calling the witnesses. If
18  he wants me to open, these are just prefatory
19  remarks to try to get things in context, given
20  the volumes of briefs we have, you probably have
21  a pretty good context already.
22        MR. COLBERT: Are you going to open
23  also, Mr. Tygart?
24        MR. TYGART: We will have just a
25  brief opening.

Page 26

1        MR. COLBERT: Okay. Mr. Collins.
2        MR. COLLINS: First, thank the panel.
3  I appreciate you coming down and doing this. I
4  wanted to start by noting that doping in sport
5  is a problem. It's a big problem. And it's
6  been a problem for years. You are not going to
7  hear us say anything other than doping is a
8  problem, and we also agree that doping in sport
9  is bad. It's very bad.
10        And currently, there's a war on
11  doping in sport. It's something we've learned
12  is that it's something we know, is that wars are
13  also bad, and that no matter how just the cause
14  or the reason for the war, the war is still bad,
15  and bad things happen. Often during wars, the
16  people waging them do so zealously, which is
17  their job, which is what they're to do, but as
18  part of that, the rights and liberties of people
19  are sometimes trampled. We saw that after Pearl
20  Harbor. We saw it recently after 9/11, and we
21  have learned over time that the war on doping
22  sport is no different.
23        They've adopted strict liability,
24  which by definition is going to sweep in
25  innocent victims.

Page 27

1        Over time, things start to moderate
2  a bit, in these wars, and we have seen that
3  here. Initially, when a war was first started
4  in doping in sport, the IAAF code had no
5  exceptions. It was strict liability, and that
6  was it. Unfortunately, Justin got caught in
7  that war as a casualty on a case where he had
8  been taking prescription medicine, and an AAA
9  panel much like yours found that he never
10  intentionally cheated or did anything, but
11  because of the rules of engagement at that time,
12  he was swept in, and it didn't matter that he
13  was an innocent victim.
14        But panels like you have recognized
15  that there's -- and it's always, you know, when
16  these things are happening, it's always the
17  court, it's always the judges, or in this case,
18  the arbitration panels, that are the voice of
19  reason that comes in, and says, wait, natural
20  justice still doesn't exist. That there still
21  is proportionality, that we can't abandon our
22  ideas, and that's what CAS panels, AAA panels
23  have done on the war in doping. And those
24  messages have been heard.
25        The WADA code, when it came in, it

Page 28

1  heard and read and knew about the opinions of
2  proportionality and how it came in, and they
3  knew that strict liability was unfair, and they
4  gave a little bit of a break. They gave the no
5  fault, no significant fault was added to the
6  code to try to get some level of
7  proportionality.
8        But once again, it was learned that
9  there was still, there was still problems.
10  There was lacunas or gaps in the code. And once
11  again, it was the arbitration panels that had
12  that right to do natural justice, to rule with
13  proportionality, the rights that aren't taken
14  away from people. And those arbitration panels
15  acted. And again, WADA has heard that. And
16  they have heard, and you can see it in the new
17  code, that things like the Puerta case, and the
18  lacunas that were found there, are now being
19  drafted into the new code.
20        So what you are going to hear over
21  the next couple of days is you are going to hear
22  how, unfortunately, Justin, who happens to be
23  one of the most gifted athletes in the world,
24  has the unfortunate luck of being one of the
25  most unlucky ones. And he's once again an

Page 29

1   innocent victim.
2         You are going to hear evidence over
3   the next two days that Justin never knowingly
4   took any banned substance. He never authorized
5   anyone to give him a banned substance. You are
6   going to hear about the aberrational test in
7   Kansas on April 22nd and how that came back
8   positive for CIR, or the CIR test there came
9   back positive. But you are also going to hear
10  how the CIR test taken around the exact same
11  time came back negative. You are going to hear
12  evidence that there were aberrational things in
13  and around Kansas relays that we believe, and we
14  believe will demonstrate to you, by what caused
15  that result.
16        We will demonstrate how the only way
17  the substance could have gotten into his body,
18  based on ruling out the other possibilities, was
19  through his skin. You will hear how Justin has
20  accepted responsibility, how he used his utmost
21  care to avoid it happening, but then even when
22  he was caught in this terrible situation, you
23  will find out and hear evidence that what we did
24  was he started to cooperate immediately. He
25  started working with the Internal Revenue

Page 30

1   Service that had the ongoing doping case in
2   BALCO, how he, on the spot, when asked, made
3   undercover calls, nothing to hide, nothing to
4   do. They asked him to make the call, and he
5   made it.
6         You will also hear how -- there's
7   going to be a lot of stuff, there's going to be
8   talk that Justin was somehow bad because he was
9   with Trevor Graham. In many ways, this case is
10  about Justin Gatlin. But our concern is there's
11  going to be this Trevor Graham is going to be
12  this elephant in the room, they're going to try
13  to keep pointing to that isn't in the room.
14        And you're going to hear evidence
15  how at the time this happened, Trevor Graham had
16  not been suspended. He had turned in the
17  syringe. He publicly said he was trying to
18  clean up the sport, and that Justin Gatlin
19  believed that that was the case. His parents
20  believed that to be the case and they didn't
21  have information to the contrary. They didn't
22  know what USADA and the federal government knew.
23        You will also hear what I have
24  called guilt by association arguments, I
25  suspect, that Justin should be found negligent

Page 31

1   because he was with Trevor Graham, or because he
2   was with Chris Whetstine, but you will learn
3   that Chris Whetstine was actually hired by Nike.
4   He was working on Nike athletes, the elite Nike
5   athletes in the world.
6         And throughout all of this, it's
7   going to be very important to remember what is
8   the burden of proof here. The code has strict
9   liability. That just means if it's in you, you
10  have to say how it entered your body, and you
11  are going to hear evidence that it was through
12  his skin. But in weighing all these facts, what
13  has to happen when you are looking at no fault,
14  no significant fault, is whether Justin has
15  provided evidence that proves it by a balance of
16  probability, or in the United States, what we
17  would call a mere preponderance. There is no
18  presumption of guilt, there's no presumption of
19  intentional use. He just has to show by a
20  balance of probabilities that he was not at
21  fault, and there was no significant fault.
22        And we thank you in advance for
23  keeping an open mind and for recognizing your
24  obligation to do and find a just and
25  proportionate result.

Page 32

1         Thank you.
2         MR. CAMPBELL: I have a couple of
3   questions, if I may.
4         MR. COLBERT: Go ahead.
5         MR. CAMPBELL: Mr. Collins, when
6   Mr. Gatlin was, went before the IAAF, for his
7   first test, for the first test in 2002, was it?
8         MR. COLLINS: 2001.
9         MR. CAMPBELL: 2001, okay. Did they
10  give him any period of suspension, or did they
11  immediately reinstate him?
12        MR. COLLINS: I believe they
13  reinstated him effective immediately.
14        MR. CAMPBELL: Was there any
15  documents that they produced to you about that
16  reinstatement?
17        MR. COLLINS: I think all there was
18  was a press release following the meeting saying
19  he was reinstated.
20        MR. CAMPBELL: That's it.
21        MR. COLLINS: That's all I recall.
22        MR. BOCK: There's one of our
23  exhibits references that, the minutes from the
24  IAAF meeting.
25        MR. CAMPBELL: I saw the press

7-30-07 to 8-01-07                                           USADA vs. GATLIN

9 (Pages 33 to 36)

## Page 33

1  release. Were there any decisions that the IAAF
2  made as a result, I mean, other than the press
3  release?
4          MR. BOCK: Well, actually --
5          MR. COLLINS: The minutes of the
6  meeting, where it happened, I think it was noted
7  in those minutes, but there was not a separate
8  document that was sent over, that I'm aware of.
9          MR. BOCK: There wasn't an agreement
10  or anything like that.
11          MR. CAMPBELL: Okay.
12          MR. COLBERT: Mr. Tygart?
13          MR. TYGART: Very briefly. Also
14  thank you for your time and consideration in
15  this matter.
16          One of the truly great aspects of
17  the USADA process that started in October of
18  2000 is that we now have independent arbitrators
19  that uniformly apply the established rules to
20  the facts of the case, and that's a great
21  benefit to Mr. Gatlin. It's also a great
22  benefit to USADA, and it's a great benefit to
23  all those other athletes out there who are
24  competing clean, who don't have positive tests,
25  who expect fair and uniform decisions coming out

## Page 34

1  of independent arbitrators. So we appreciate
2  you all for taking your job seriously.
3          Our goal in this case is the same
4  goal as it is in every case. It's to have a
5  fair and just outcome based on the facts of the
6  case, after uniform application of the
7  established rules.
8          In this case, the parties by our
9  stipulation have essentially agreed to many of
10  the factual issues that are normally at issue in
11  these doping cases. And I'm not going to take
12  the time to run through each of those factual
13  issues and recite the stipulation to you. You
14  have it, and it's been provided at Gatlin
15  Exhibit 1. But what you know from that, and
16  what you know from the briefing is that the only
17  issue to be decided by this panel is exact
18  consequence, under the established rules for
19  Mr. Gatlin's second positive test, second doping
20  violation.
21          In his briefing, and again, a little
22  bit in opening, Mr. Collins has offered sort of
23  a grab bag of different legal theories and
24  arguments. And while it could be a classic
25  throw everything up on the wall, and see what

## Page 35

1  sticks, I think, unfortunately, it's not
2  necessary. And it's a sideshow that hopefully
3  won't distract this panel from applying the
4  clear legal framework to come to a fair and just
5  resolution based on the applicable rules and the
6  facts that are presented. And I think any other
7  decision that's based on any of these, this
8  legal sideshow is not a fair and just decision
9  that clean athletes in the world can rely on,
10  and really doesn't do Mr. Gatlin or USADA any
11  good to have that questioned.
12          The legal framework is
13  straightforward. As you know, we've agreed to
14  an eight-year period of ineligibility. This
15  eight-year period of ineligibility was agreed to
16  based on Mr. Gatlin receiving credit for the
17  nature of his first offense.
18          It's expressly spelled out in the
19  code, and again confirmed in the Puerta decision
20  that we have the ability to do that. If we had
21  not considered the nature of this first offense
22  in agreeing to an eight-year period, we would be here
23  seeking a lifetime ban.
24          Mr. Collins indicates in his brief
25  that the eight-year period of ineligibility was

## Page 36

1  agreed to because Mr. Gatlin waived his right to
2  challenge the collection and the laboratory
3  analysis. We frankly just don't have that
4  discretion under the rules. And we in no case,
5  regardless of the penalty, can waive the
6  otherwise applicable sanctions simply because an
7  athlete agrees to not contest certain issues.
8  The only reason we did it is based on giving
9  credit for the nature of the first offense.
10  That's in the stipulation. You look at the
11  press release that they saw and agreed to prior
12  to it being released, and the quote from Terry
13  Madden in that press release says: "Based on
14  the unique nature of the international press,
15  and his first offense, we felt an eight-year
16  outcome was fair and just."
17          You also see -- and that's Exhibit
18  23 in USADA exhibit book -- you also see another
19  press release from the Scott Boothby case, a
20  Track and Field athlete who similarly had a
21  first offense based on a medical situation, had
22  a second offense, it was a full standard
23  offense, he received an eight-year period of
24  ineligibility. That's the precedent that we
25  followed in this case. That's the precedent we

## Page 37

1   followed in Mr. Boothby's case.
2       So the reason we're here is to
3   consider the facts of the second offense, and if
4   Mr. Gatlin has met his burden to establish that
5   he's entitled to any further reduction in the
6   eight-year period of ineligibility, and he's not
7   entitled to any further reduction in that
8   eight-year period of ineligibility, unless he
9   meets one of the only two legal avenues, and he
10  meets it to the burden that is set forth for
11  him.
12      These two legal avenues are one,
13  exceptional circumstances concerning the
14  positive testosterone test, as described in the
15  WADA code Article 10.5, and/or, has he met and
16  proven he deserves a further reduction based on
17  his substantial assistance as defined in Article
18  10.3 of the WADA code.
19      There's no dispute that it's his
20  burden, and there's no dispute what the burden
21  is, you can look in Article 3 of the WADA code,
22  and it's by a balance of the probabilities,
23  preponderance of the evidence.  There's no
24  dispute on that.  So exceptional circumstances.
25      Again, he's not received any further

## Page 38

1   reduction unless and until he meets his burden
2   to prove he has exceptional circumstances with
3   respect to his second positive test result.  To
4   do this, first he must prove the source of the
5   prohibited substance; how the prohibited
6   substance got into his system.  The theories and
7   allegations on those have been public.  They
8   have been outrageous at times, and they have
9   been wildly inconsistent.  We have yet to see
10  any legitimate source, any evidence, proving the
11  legitimate source of this positive test.
12      In his brief, the allegation is that
13  immediately following the relay race on April
14  22nd, 2006, and just prior to doping control,
15  that Mr. Gatlin's masseuse, Chris Whetstine,
16  applied a testosterone cream on his leg.  There
17  hasn't really been any evidence on this, other
18  than speculation and interesting, as we already
19  discussed, despite this allegation, which, I
20  think, is essentially a criminal battery
21  allegation, they didn't even list or attempt to
22  call Mr. Whetstine as a witness, which is why we
23  then felt it was in the panel's interest and our
24  interest to have him at least be able to respond
25  to these allegations.

## Page 39

1   Again, if he fails to prove how the
2   source entered his body, the exceptional
3   circumstance analysis ends there.  In the event
4   he establishes it, and not until he establishes
5   it, he then must prove he's without fault or
6   negligence or that he's without significant
7   fault or negligence in order to receive any
8   reduction.
9       Now, the second legal avenue found
10  in the code rules applicable to this hearing
11  10.5.3, allow Mr. Gatlin the opportunity to
12  prove he's entitled to a reduction, based on his
13  substantial assistance in discovering or
14  establishing an anti-doping rules violation.
15      There's no evidence that he
16  provided, and you won't hear any evidence that
17  he's provided any assistance to USADA.  Because,
18  truthfully, he just hasn't.
19      USADA fully supports athletes
20  providing substantial assistance.  And while we
21  do not know all the particulars of Mr. Gatlin's
22  assistance, we thank him for agreeing to work
23  with the federal government and doing the things
24  that he did; however, simply because someone
25  agrees to provide assistance does not

## Page 40

1   automatically entitle them to a reduction and
2   the otherwise applicable period of
3   ineligibility.
4       WADA Article 10.5.3 is very specific
5   that the assistance must lead to the discovering
6   or establishing an anti-doping rule violation.
7       Frankly, we hope that Mr. Gatlin
8   assisted in a manner that would be good for the
9   anti-doping movement, and that it would lead to
10  the establishment or discovering of other
11  anti-doping rules violations.
12      But until we hear the evidence, we
13  just don't believe that has been done.
14      We ask you again to keep an open
15  mind until all the evidence is presented.  We
16  think there's clear legal pathways for you to
17  analyze that evidence, and come to a just and
18  right outcome, based on the established
19  principles and the facts that Mr. Collins
20  presents.  Thank you.
21      MR. COLBERT: I have a -- you want to
22  ask first?
23      MR. CAMPBELL: Go ahead.
24      MR. COLBERT: You mentioned a couple
25  of times, the applicable code, Mr. Tygart, and

Page 41

1  you referenced the 2003 code, WADA code.
2  Mr. Collins, in his brief, points to an amended
3  code, 2007 code. Could you please, for the
4  panel, identify your position, because I didn't
5  see any argument in your papers, position with
6  regard to the provisions of the 2007 proposed
7  code, and how -- whether the panel should
8  consider them, whether it may consider them or
9  what your position is.
10      MR. TYGART: Yeah. We will, we'll
11  obviously address that in closing, if it's still
12  relevant. I think, initially, it's not in
13  effect yet. I mean, it clearly states, until
14  it's in effect, it doesn't apply. You can look
15  at Article 25 1.2.3. It's not in effect yet.
16  And even on sort of a lex mitior argument, which
17  we haven't heard yet, the code addresses that.
18  It says: Nonretroactive, unless principles of
19  lex mitior apply, but specifically it says lex
20  mitior doesn't apply until it's effective,
21  because it's not effective.
22      If this was after November 1st, if
23  this was arguably after January 1, and this
24  version of this code was approved, then there
25  may be a tenable lex mitior argument. But we

Page 42

1  have seen no proof that a document that is in
2  draft form hasn't been approved, has any legal
3  basis to apply in this proceeding even under a
4  lex mitior analysis, because again, it's not
5  effective.
6      MR. CAMPBELL: Mr. Tygart, I'm very
7  interested in the first offense. And in your
8  brief, you mentioned that, I think you are
9  categorizing the first offense as no significant
10  fault or negligence, is that right?
11      MR. TYGART: That's right.
12      MR. CAMPBELL: And where do you get
13  that ruling from?
14      MR. TYGART: Well, he served a
15  one-year period of ineligibility, which is what
16  would be applicable under the current code and
17  under even this code for an amphetamine offense
18  that derived from use of a medicinal product.
19  It would most likely be -- we've seen, you were
20  on the Ricky Harris case, you know that case
21  well -- we have seen other cases where a year
22  suspension based on a no significant fault
23  analysis was applied. And I think you combine
24  that fact, today, that's what it would be, with
25  the Puerta reasoning, that's exactly where

Page 43

1  it should be.
2      MR. CAMPBELL: Well, here's my
3  problem with that. The decision in the first
4  case found that he absolutely had disability, so
5  he has rights associated with that disability.
6  The decision in the first case expressly did not
7  determine whether there was fault, so I don't
8  know where you get no significant fault and
9  negligence. That issue never was addressed.
10      MR. TYGART: Well, we're not here to
11  retry the first decision.
12      MR. CAMPBELL: No, but our decision
13  is going to be based on the first decision. In
14  other words, if he had a legitimate disability,
15  and he wasn't at fault, our decision is much
16  different.
17      MR. TYGART: Well, he was -- I mean,
18  again, we will address some of these issues
19  further in close -- but he was given, he should
20  have received a two-year penalty. We, along
21  with --
22      MR. CAMPBELL: You say he should have
23  received a two-year penalty?
24      MR. TYGART: That was the rules in
25  effect at the time. And USADA, with Mr. Gatlin,

Page 44

1  essentially did a stipulated agreement where,
2  and then approached IAAF for the early
3  reinstatement. And if you remember the rules at
4  the time were that the two years went into
5  effect, if you did not have an exemption in
6  advance, which he failed to do. We presented
7  that to the IAAF counsel. They agreed, at the
8  time, to reduce it, essentially reinstate him
9  after a year. He had served a year of
10  ineligibility, and that was accepted by the
11  panel in the AAA level. And specifically
12  Mr. Gatlin was given notice following that
13  decision that this will be an offense, it is an
14  offense, and any further offense will be a
15  lifetime penalty, so he was specifically put on
16  notice. He had a heightened sense and specific
17  notice and warning of the consequence of that
18  first decision.
19      And so, you know, we are not here to
20  retry the first decision. It is what it is. He
21  received a one-year penalty, was specifically
22  told your next offense will be a lifetime ban.
23  We are here now on the second offense.
24      MR. CAMPBELL: Well, it's important
25  to me because in this particular case, the issue

7-30-07 to 8-01-07                                   USADA vs. GATLIN

12 (Pages 45 to 48)

Page 45

1  becomes fault, and the issue becomes fault for
2  both cases, not just one, and I don't see
3  determination of fault in the first case unless
4  you can show me.
5           MR. TYGART: Well, I tell you,
6  we're -- I think you look at one, the
7  stipulation; two, we're not here to retry -- it
8  goes to the heart of why you don't retry first
9  cases -- I mean we have a panel. We don't have
10 the facts. That decision has been made. That
11 decision is what it is. There's a decision that
12 confirms it. He didn't appeal it.
13          MR. CAMPBELL: He didn't have to
14 appeal the first decision. Because the decision
15 said, if he didn't get a result that he liked,
16 then, he could, then he could bring further
17 proceedings. When have you ever read a
18 decision, that says, if you don't get a decision
19 that you like from the IAAF, and you can reach a
20 further decision? We made no decision.
21          MR. TYGART: I just respectfully
22 disagree. The decision was that it was a first
23 offense. It's absolutely clear in IAAF's
24 decision that Mr. Gatlin --
25          MR. CAMPBELL: You can have a first

Page 46

1  offense without having fault, can't you?
2           MR. TYGART: Well, yeah. I mean,
3  sure.
4           MR. CAMPBELL: Okay.
5           MR. COLBERT: Do you have any
6  questions?
7           MR. CHERIS: No.
8           MR. COLBERT: Any others?
9  Mr. Collins. Do you want to comment or --
10          MR. COLLINS: I just want to make a
11 comment that I tried not to, in my opening,
12 reargue things that were in the briefs.
13 Obviously, there's positions of his we disagree
14 with that have been briefed. I don't want
15 anybody to believe that I have waived those. In
16 an efficient use of time, I wasn't going to make
17 arguments I have already made in paper.
18          MR. COLBERT: I don't think anybody
19 is thinking you waived anything.
20          MR. COLLINS: I have been pretty
21 clear on that point?
22          MR. COLBERT: You have been pretty
23 clear on that point, I believe.
24          MR. COLLINS: Thank you.
25          MR. COLBERT: Are you prepared to

Page 47

1  proceed?
2           MR. COLLINS: We are prepared to call
3  our first witness. We are going to have you sit
4  here, Justin.
5           MR. COLBERT: Okay.

Page 48

1           WHEREUPON,
2                JUSTIN GATLIN,
3  the Respondent herein, having been first duly
4  sworn to state the whole truth, testified on his
5  oath as follows:
6                EXAMINATION
7  BY MR. COLLINS:
8      Q.  Could you please state your name for
9  the record? I think everyone knows it.
10     A.  Justin Alexander Gatlin.
11     Q.  You are a track athlete?
12     A.  Yes, I am.
13     Q.  Approximately, when did you first
14 start running track?
15     A.  At the age of about 15; 14, 15 years
16 old.
17     Q.  So when you were in high school?
18     A.  Yes, sir.
19     Q.  Did you have a very successful high
20 school career?
21     A.  I did. State champion, two times
22 state champion, 100-meter hurdles, 300-meter
23 hurdles, third long jump, world -- won the
24 junior record in the state championship as well.
25     Q.  What state was that?

## Page 49

1      A.   Florida.
2      Q.   And after high school, did you
3   continue to run track?
4      A.   I did. I got a full scholarship to
5   the University of Tennessee in the hurdles.
6      Q.   When you got to Tennessee, what
7   events did you run?
8      A.   I started running hurdles, and then
9   my coach obviously saw that I had the talent,
10  the gift of speed, as well, and he put me into
11  many sprinter events.
12     Q.   How did you -- were you very
13  successful in college?
14     A.   Yes, I was. I have acquired within
15  two years, a ring for each finger, and I also
16  have the six-time NCAA champion, 100, 200-,
17  60-meters, 200-meters, and I have set the
18  collegiate record.
19     Q.   And your high school track team won
20  the state title?
21     A.   Yes, it did. It hasn't been won in
22  the northwest Florida in 72 years.
23     Q.   And you won a number of -- you were
24  the leading point person on that team, I assume?
25     A.   All my points individually, and what

## Page 50

1   it got me third place in the state championship
2   by myself.
3      Q.   In college in Tennessee, your second
4   year, you won the NCAAs?
5      A.   Yes.
6      Q.   Now, after your first year at
7   Tennessee, did you win -- what events did you
8   win as a freshman?
9      A.   I won the 100- and 200-meters as a
10  freshman outdoors.
11     Q.   And after that, did you go
12  participate in the USA Track and Field Junior
13  Nationals?
14     A.   I did, yes, sir.
15     Q.   Who entered you in that?
16     A.   University of Tennessee, my coach.
17     Q.   And who filled out the paperwork for
18  that?
19     A.   My coach.
20     Q.   Did you participate in USA Track and
21  Field events prior to that?
22     A.   Never knew anything about it; no, I
23  have not.
24     Q.   Now, at the 2001 -- the end of your
25  freshman year would have been 2001, Tennessee?

## Page 51

1      A.   Yes, sir.
2      Q.   And at the 2001 Junior Nationals,
3   you tested positive for having trace amounts of
4   amphetamine in your system; is that correct?
5      A.   Yes, sir, Adderall.
6      Q.   Now, why were you taking Adderall?
7      A.   I'm ADD. I'm still ADD, and at that
8   point in time, I was taking exams, and it helped
9   me study and concentrate, and I have been taking
10  Adderall since I was nine years old.
11     Q.   When were you first diagnosed with
12  ADD?
13     A.   Nine years old.
14     Q.   And the medicine you took, you said
15  was Adderall?
16     A.   Yes, sir.
17     Q.   Did you try other medicines?
18     A.   I tried Zoloft, and I tried Ritalin,
19  but none of the stuff had really, it didn't work
20  on my appetite. I didn't eat. I was losing
21  weight, so I had to try something, and we had
22  Adderall.
23     Q.   And did that work?
24     A.   A little bit, but I still didn't eat
25  that much, but it was better than the others.

## Page 52

1      Q.   How did you feel when you were
2   taking your medicine?
3      A.   Sluggish. I felt that I could focus
4   and concentrate, but it didn't help on the
5   track. It felt like one lap was a mile, and so,
6   I would take it at a point where I know that I
7   could study for all my classes, and that towards
8   the end of the day, I was able to still function
9   and run track and practice.
10     Q.   So you then -- your sophomore year
11  at Tennessee, you again go to Nationals, and you
12  go indoor and outdoor?
13     A.   Yes, sir.
14     Q.   And how did you perform there?
15     A.   I won the 60-meters indoor, and I
16  won the national title in 2001 and 2002 indoor
17  championships. We went outdoors, and I won the
18  100-meter and 200-meter at LSU.
19     Q.   Now, after your sophomore year of
20  college, did you run your junior year in college
21  or no?
22     A.   No, I did not.
23     Q.   Why was that?
24     A.   I turned pro.
25     Q.   And how did that come to be?

Page 53

1    A.  Well, I was debating with my coaches
2  if I should stay.
3    Q.  Which coaches is that?
4    A.  Bill Webb and Vince Anderson, both
5  University of Tennessee coaches.  And from
6  there, I received a phone call from Trevor
7  Graham while I was en route to driving to New
8  York with my family, and he called.  And I was
9  already talking to some agents, agents were
10  calling me, and I didn't know who Trevor Graham
11  was at that point in time at all.
12    And he said that I -- he said his
13  name was Trevor Graham.  And I said, so what do
14  you want to do?  Do you want to represent me
15  like an agent?  And he kind of, kind of was
16  taken back, because I didn't know who he was at
17  all, and he, he said, no, I want to coach you.
18  So that's how it went.
19    Q.  How did he represent himself as a
20  coach to you?
21    A.  He basically said that Nike was very
22  interested in me to come out of high school, but
23  they didn't want to seem like they were taking
24  athletes out of school, especially from rival
25  schools, such as Adidas.

Page 54

1    Q.  And Tennessee was an Adidas school?
2    A.  Yes, sir.
3    Q.  Did he ever say that he ever coached
4  anybody of any note to try to sell you?
5    A.  He said he was coaching Marion
6  Jones, and that's when I put two and two
7  together.
8    Q.  And you said this was in a car ride
9  to New York?
10    A.  Yes.
11    Q.  And why were you going to New York?
12    A.  My aunt died, my great-aunt died,
13  and we didn't have the finances to fly all of us
14  up there, so we drove 12 hours to New York.
15    Q.  Did you say yes to --
16    A.  At that point in time, no.  We told
17  him that we have a lot of things on our plate
18  right now, that we need to take care of
19  family-wise, and that if he's interested in
20  coaching me, and interested in giving a contract
21  then get back to us in a week, and he did.
22    Q.  So, you ended up -- did you end up
23  being coached by Trevor Graham?
24    A.  Yes, sir.
25    Q.  And did you end up signing with

Page 55

1  Nike?
2    A.  Yes, I did.
3    Q.  And how did that happen?
4    A.  Well, I gave up my eligibility as a
5  college athlete, and at that point in time,
6  there was another athlete called Alan Webb, who
7  was running, and we saw an article how much he
8  was getting paid, and we felt that we did pretty
9  much, I pretty much did the same thing he had
10  done or better on the track, and we asked for a
11  specific price, and Nike did not turn it down.
12  Nike, by the course, so they were very intent on
13  having me as an athlete.
14    Q.  All right.
15    Did you have any discussions with
16  Trevor Graham prior to signing this, about
17  making sure that you participated clean without
18  using any doping.
19    A.  Yes, I did.
20    Q.  What were those conversations?
21    A.  I sat down with me, both of my
22  parents, and we talked, and I told him that I
23  had a previous incident in 2001, and due to that
24  incident, we don't want to have any kind of drug
25  haps or drug mistakes, and he told me at that

Page 56

1  point in time that he would take care of me like
2  a son.  He would make sure that I wasn't harmed
3  in any way, because I was 21 years old, moving
4  somewhere in North Carolina, I have never been
5  before.
6    Q.  So, did you then go to train with
7  Trevor Graham?
8    A.  Yes, I did.
9    Q.  When was that?
10    A.  In 2000, going into 2003, 2002.
11    Q.  So fall of 2002 instead of going to
12  Tennessee, you go to North Carolina?
13    A.  Yes, sir.
14    Q.  How were the workouts once you got
15  to -- did he call his group, his running group
16  something?
17    A.  Sprint Capitol.
18    Q.  Sprint Capitol?
19    A.  Yes, sir.
20    Q.  How were the workouts at Sprint
21  Capitol?
22    A.  Grueling.  I mean something I wasn't
23  used to at all.  We lifted weights six times a
24  week.  We were on the track six hours a day,
25  every day, three hours in the weight room, three

Page 57

1  hours in the track, no matter if it was snowing.
2  The only time we would not be on the track, if
3  it was like, other than that, there were times
4  we were shoveling snow off the tracks, so we
5  could just go out there and run.
6      Q.  I'm assuming that that was a few
7  more hours a day than you were putting in when
8  you were at Tennessee?
9      A.  Definitely.  He would not allow us
10 to take certain vacations off, Thanksgiving, I
11 had to plead with him for Christmas to be able
12 to go see my family.
13     Q.  Did you work on your technique and
14 stuff?
15     A.  Technique was a big part of our,
16 part of our workout.  We were on the track, some
17 days, like Wednesdays, we would have a technique
18 day, where you sit and watch certain athletes
19 like Carl Lewis, Leroy Burrell, and watch their
20 techniques, like highlight those.
21     Q.  When you were training with Sprint
22 Capitol, did Trevor Graham ever discuss with the
23 group, performance-enhancing drugs?
24     A.  No.
25     Q.  Did he ever say -- about avoiding

Page 58

1  drugs?
2      A.  Yes, he did.
3      Q.  What would he do there?
4      A.  We would have a chant before our
5  practice, and we would get together, and he
6  would always emphasize that he is our coach, but
7  he cannot be around us 24-7.  So whatever you do
8  will affect this camp in a negative way or a
9  positive way.
10     Q.  Would part of this chant be staying
11 off of drugs?
12     A.  Yes, it was.
13     Q.  So you go -- when do you start
14 competing professionally, because you are
15 working out hard on the fall.  Do you run in
16 meets in the fall?
17     A.  Not in the fall, going into the
18 winter, the latter part -- well, actually, going
19 into the next year, early 2003 I ran indoors.  I
20 made a deal with Trevor, and I said, I'm really
21 excited to be a professional athlete.  I want to
22 set the tone early.  So I asked him could I run
23 indoors, and he's not very particular about
24 indoors, and he said that if you go out there,
25 and you work hard, and you show me that you are

Page 59

1  ready to run, I will let you run.  So I pretty
2  much, every day, I went out there.  I threw up.
3  I worked hard in the sun, and I showed him that
4  I was ready to run, be a world champion.
5      Q.  Did you participate in indoor meets?
6      A.  I participated in three indoor
7  meets.
8      Q.  How was your -- were you successful?
9      A.  I was, in every race.
10     Q.  And did you compete in the world
11 indoor championships in 2003?
12     A.  Pardon?
13     Q.  Did you participate in the world
14 indoor championships in 2003?
15     A.  Yes, I did.
16     Q.  How did you do?
17     A.  I won the world championships.
18     Q.  And in what event?
19     A.  60-meters.
20     THE REPORTER:  I'm sorry?
21     A.  60-meters.
22     THE REPORTER:  Thank you.
23     Q.  How did the outdoor season go in
24 2003?
25     A.  Coming off my indoor world

Page 60

1  championship, I was very excited about the
2  outdoors, and I loved the 200, and I was ready
3  to run the 200, and I ran in Mexico, and I
4  pulled my hamstring in Mexico.  I didn't even
5  finish the race.  So, that was, that set me back
6  for the summer season.
7      Q.  In 2004, did you continue running?
8      A.  I did.
9      Q.  And how did your 2004 outdoor -- did
10 you run indoor in 2004?
11     A.  No, I did not.
12     Q.  Why not?
13     A.  Because Trevor didn't like the
14 transition from running the 60-meters to running
15 100-meters or 200-meters.  He felt that your
16 body and your muscle memory was so used to
17 running a 60-meters that it would already tank
18 out at 60, while you are running  100- or
19 200-meter race, so basically he didn't like to
20 structure you to run a 60-meters, and have to
21 clean your whole slate within less than a month
22 to run 100-meters or 200-meters.
23     Q.  So you only ran outdoor in 2004?
24     A.  Yes, sir.
25     Q.  And how was your season in 2004?

7-30-07 to 8-01-07                                    USADA vs. GATLIN

16 (Pages 61 to 64)



Page 61

1      A.  It was good.  I had a training, a
2  new training partner named Shawn Crawford, and
3  we worked well together.  We meshed well
4  together, and he was running great times, you
5  know, and I was not that far behind him.  And I
6  just think that in '04, I was more worried about
7  my dream that I have always dreamt since I was a
8  little boy.
9      Q.  What was that dream?
10     A.  Winning the Olympics, or even just
11  being there.  I have always prayed, I prayed
12  almost every night, just to be at the Olympics,
13  even if I sat at the stands.  And at a moment of
14  clarity, when I was at the finals, and I began
15  to cry before the race, because I was so happy
16  that I was just here even if I just came across
17  the line.  Even if I came dead last, I was just
18  so happy to be a part of the situation.
19     Q.  You didn't finish last, did you?
20     A.  No, sir.
21     Q.  Where did you finish?
22     A.  I finished first.
23     Q.  In which event?
24     A.  100-meters.
25     Q.  Did you get any other medals?

Page 62

1      A.  I got a silver, in a 4-by-1, and a
2  gold, I mean a bronze in the 200.
3      Q.  Coming out of college, were you
4  better known for the 1 or 2?
5      A.  I was better known for the 200.
6      Q.  So, you win three medals in the
7  Olympics, a gold, a silver and a bronze. 2005,
8  how does your -- do you run -- you don't run
9  indoor again in 2005?
10     A.  No, sir.
11     Q.  You run outdoor?
12     A.  Yes, sir.
13     Q.  How does that season go?
14     A.  It went very well.  I believe, as an
15  athlete, when you get to a certain level that
16  you have to maintain that, to make sure that
17  history, you are placed in history.  You can't
18  be up and down athlete, and from that point on,
19  winning the gold medal, I was focused on just
20  being on top, and just honing in on my God-given
21  talent.  And in '05, I prepared myself for
22  Nationals and I prepared myself for the world
23  championships.
24     Q.  How did you do at Nationals?
25     A.  I won the 100 and the 200, like I

Page 63

1  did in college.
2      Q.  So you got gold, or first in both of
3  those?
4      A.  Yes, sir.
5      Q.  And the world championships were
6  held in 2005?
7      A.  Yes, sir.
8      Q.  How did you do in those?
9      A.  I won both races.  I was one of the
10  only athletes that has ever done that before in
11  the worlds.
12     Q.  So you won the 100 and the 200 at
13  the worlds too?
14     A.  Yes, sir.
15     Q.  During this time, after turning pro,
16  were you drug-tested?
17     A.  Yes.
18     Q.  Often?
19     A.  Yeah, I think I was -- as I became
20  more popular and beginning to win more races, I
21  was drug-tested more often, which I had no
22  problem with.  I knew that was part of the
23  standard of being a runner, and being a
24  successful runner.
25     Q.  Did you ever miss a test?

Page 64

1      A.  No, I have not.  I pride myself on
2  that.  I pride myself that I would never miss a
3  test, and I had no excuse to miss a test, so I
4  made sure that I was where I need to be at all
5  times.
6      Q.  And at the Olympics after you won
7  medals, you were tested each time?
8      A.  Yes.
9      Q.  And those were all negative tests?
10     A.  Yes, sir.
11     Q.  And then you won double gold at the
12  2005 World Championships, you were tested?
13     A.  Both times.
14     Q.  And those were negative tests?
15     A.  Negative tests.
16     Q.  And you won the Nationals in 2005?
17     A.  Tested both times.
18     Q.  And those were negative?
19     A.  Negative tests.
20     Q.  Now, during this time, would you
21  ever speak to community groups, kid groups,
22  anything like that?
23     A.  I did.  I got turned on to that in
24  college, where every weekend, as athletes,
25  football players, baseball players, track and

Page 65

1 field athletes, we would go to orphanages, or we
2 would go to hospitals and talk to kids and read
3 them stories, or just help out with them, and
4 then we would also go to smaller groups of
5 athletes in the area, and we would talk to them
6 about staying out of drugs of any kind,
7 street-wise or performance drugs.
8    Q.   Did you ever work with USA Track and
9 Field about it?
10    A.   Yes, I did, actually in '05, I was
11 the front runner for their campaign for being a
12 champion, which is a, will be -- we go to
13 different schools and different areas while we
14 were running there, and we would have an
15 assembly in their auditoriums, and we would come
16 and speak to all of them and read a code card to
17 stay off drugs and have a pledge.
18    Q.   And you would have the people in the
19 audience take the pledge with you?
20    A.   Yes, sir.
21    Q.   Since you had this test result in
22 August -- or April 22nd, 2006 -- have you still
23 spoke to groups?
24    A.   Definitely. I have had calls from
25 people, I have had calls from the DARE program

Page 66

1 who wanted me to come out and speak. And I have
2 called from Ronald McDonald's house, and I have
3 turned down none. It's something I love to do.
4 I love to give back to the community, I love to
5 help with the kids.
6    Q.   And what's your message when you
7 talk to them?
8    A.   Stay drug free. If God has given
9 you a talent to go out there and do what you can
10 do, then use that, use that to the best of your
11 abilities and don't be peer pressured to
12 anything.
13    Q.   Do you need a glass of water or
14 anything? I know you have got a sore throat.
15    A.   Yeah.
16    Q.   I want to go back just briefly to
17 talk about your relationship with Trevor Graham.
18    A.   Okay.
19    Q.   He was your coach. And again, you
20 have talked about throwing up on the track. I'm
21 assuming he's a bit of a taskmaster?
22    A.   Yes, we used to call him the drill
23 sergeant.
24    Q.   Did he ever push any banned
25 substances on you?

Page 67

1    A.   No, he did not.
2    Q.   Did he ever tell you to take any
3 banned substances?
4    A.   No, sir.
5    Q.   Did he ever ask you to take any
6 blood tests?
7    A.   No, sir. The only time I have ever
8 taken any blood tests was by the IAAF or USADA.
9    Q.   What about urine tests?
10    A.   Only for IAAF or USADA.
11    Q.   Now, did there come a time when you
12 learned that Trevor Graham was the individual
13 that had turned in the infamous syringe that
14 sort of sparked off the BALCO investigation?
15    A.   The only time I knew that Trevor
16 Graham was the person that turned in the syringe
17 was when he came forward after my 100-meter
18 finals at the Olympics, when we were walking
19 through the media area, and he was -- he had a
20 bigger crowd around him than I did around me,
21 and I had just won the gold medal -- so come to
22 find out, he was the one that had turned in the
23 syringe at that point in time.
24    Q.   Did you later have any discussions
25 with him about that?

Page 68

1    A.   Definitely.
2    Q.   What were those discussion?
3    A.   I was -- I was very confused and
4 infuriated, I mean, for not knowing that
5 situation. And then he told me that this is,
6 he's helping clean up the sport, for turning in
7 that syringe, that no one knew about at all, or
8 undetectable substance that no one had, and he
9 was helping the sport by cleaning it up by
10 turning it in.
11    Q.   Did you have any knowledge to the
12 contrary?
13    A.   No.
14    Q.   You had heard rumors about it?
15    A.   I had heard rumors that it was a
16 coach, but I never thought it would be my coach.
17    Q.   Now, there's another individual that
18 I want to ask you about, Chris Whetstine. Do
19 you know who he is?
20    A.   Yes, I do.
21    Q.   How did you first meet Chris
22 Whetstine?
23    A.   When I pulled my hamstring outdoor
24 season in 2003, in Mexico. Like I said, Nike
25 flew me to Oregon, Portland, Oregon, and they



Page 69

1  grove him down from Eugene, Oregon, and that's
2  the first time I remember meeting him. And he
3  proceeded to work on my leg and make sure he
4  could rehab me and get me back on the track.
5      Q. Did you hire Chris Whetstine to work
6  for you?
7      A. I have never paid Chris Whetstine a
8  dime.
9      Q. Do you know how Chris Whetstine made
10  money?
11      A. He made it through Nike.
12      Q. And were you aware that he had
13  worked on other Nike athletes?
14      A. Most definitely.
15      Q. Who, and what athletes would he work
16  on for Nike?
17      A. He worked on Sanya Richards, he
18  worked on -- who is a gold medalist, Olympic
19  gold medalist, 400-meters -- he worked on James
20  Carter, who is a silver medalist in the 400, and
21  world championships in '05; so he worked on the
22  elite of the elite Nike athletes. He worked on
23  Shawn Crawford, my teammate.
24      Q. So he didn't work on every Nike
25  athlete?

Page 70

1      A. Not every Nike athlete, only ones
2  that Nike requested him to work on.
3      Q. So how often would you work with
4  Chris? He didn't move to North Carolina where
5  you were training?
6      A. No.
7      Q. Would he go to every meet?
8      A. He was there for every meet because
9  he had to, usually, there was a lot of athletes
10  there that he needed to work with.
11      Q. So you would see him at meets?
12      A. (Nod of head.)
13      Q. And occasionally, you would see him;
14  other times he would come to training camps if
15  there was an issue?
16      A. Yes.
17      Q. So he -- when he was not in town,
18  was there someone else you went to?
19      A. Yes.
20      Q. Who was that?
21      A. Terri Blankenship.
22      Q. Now, in 2005, we have talked about
23  how you had a very successful season, you won
24  double gold, world championships.
25      Did there become an issue with Chris

Page 71

1  Whetstine, at the end of 2005?
2      A. There was. It was in December. In
3  my contract, it states that after winning --
4      Q. In your contract with who?
5      A. Nike. After my contract with Nike,
6  it states that after winning certain
7  championships, I get a bonus, and also has in
8  Trevor Graham's contract that he had, not
9  knowing it until now, and Chris was, I guess,
10  infuriated by it. He was upset, because his
11  contract did not have that, and he felt that it
12  was my obligation or my duty to give him $5,000
13  for a bonus.
14      Q. Did you pay him?
15      A. No, I did not.
16      Actually, we actually spoke to Nike
17  at that point in time and asked them, would it
18  be ethical or the right thing to do to pay him
19  the bonus? And Nike, John Capriotti who is the
20  director of Nike, said, no, that's his
21  responsibility, as a Nike employee to get paid
22  by Nike.
23      Q. So, this is at the end of 2005,
24  correct?
25      A. Yes.

Page 72

1      Q. Now, let's start looking into
2  January 2006. What is your training schedule in
3  January 2006?
4      A. As a group, sometimes, we take --
5  because it gets really cold in North Carolina --
6  so in my past, I have lived in North Carolina
7  for three and a half years, and for two years
8  there was ice storms, not snow storms,
9  everything was frozen. So we would take trips
10  to warmer weather. We went to Jamaica for a
11  week, and then from there, we went to Miami.
12      Q. I think earlier you testified about
13  working hard in the sun.
14      A. Yes.
15      Q. That would have been when you were
16  in Miami, not North Carolina, right?
17      A. Yes.
18      Q. So where do you go to train in
19  January 2006?
20      A. Jamaica. And we trained at the
21  national facility there in Jamaica, and we also
22  trained in Miami.
23      Q. Did Chris Whetstine go on those
24  trips?
25      A. He was supposed to. He had a ticket

## Page 73

1 made and everything, it was confirmed by Nike
2 that he would be there, and he never showed up.
3     Q. Do you know why he didn't show up?
4     A. He still was upset about him not
5 receiving a bonus at that point in time, so he
6 stood us up.
7     Q. Now, in February of 2006, where did
8 you train?
9     A. Raleigh, North Carolina.
10     Q. Is Chris Whetstine there in
11 February?
12     A. No, he was not.
13     Q. Now, March 2006, were you training?
14     A. Raleigh, North Carolina.
15     Q. The outdoor season starts when,
16 approximately?
17     A. Relay starts probably around April,
18 like, mid April.
19     Q. Now, did you have any tweaks or
20 injuries in March of 2006?
21     A. I did, yes.
22     Q. What was the first one you had?
23     A. My knee.
24     Q. What was with your knee?
25     A. It was called plantar's knee, where

## Page 74

1 the tendons in your knee will start slightly
2 deteriorating and become sore. And I needed
3 medical attention for it to get it looked at,
4 especially going into the season, so close to
5 the season.
6     Q. Who did you have look at it?
7     A. A doctor named Dr. Martini.
8     Q. Where was he located?
9     A. He was located in Raleigh, North
10 Carolina.
11     Q. Did he recommend treatment?
12     A. Yes, he did.
13     Q. What did he recommend?
14     A. He recommended a shot for my knee.
15     Q. Do you remember exactly what the
16 shot was?
17     A. I can't remember the name of the
18 shot.
19     Q. Before getting the shot, was there
20 anything you did?
21     A. No.
22     Q. Did you contact anybody about
23 getting the shot or did you have any of your
24 representatives contact anybody?
25     A. Oh, USADA. We talked to USADA. We

## Page 75

1 called USADA. I had my agent, I got on the
2 phone with him immediately, and his assistant
3 contacted USADA. And they said that it was okay
4 to take this shot, if it's ten days outside of
5 active competition.
6     Q. And you got that shot?
7     A. Yes, I did.
8     Q. Now, after receiving that shot, did
9 you have any other tweaks or injuries in the
10 month of March?
11     A. I did. I tweaked my hamstring.
12     Q. And I'm using the word "tweak," can
13 you sort of tell --
14     A. I twinged it, yeah, I kind of, in a
15 way, slightly repulled it. I have always had
16 hamstring problems.
17     Q. Which hamstring?
18     A. My right hamstring.
19     Q. Did you take anything for this
20 hamstring?
21     A. I did. I took anti-inflammatories.
22 I have take an Excedrin back and body pain. I
23 have tooken B12.
24     Q. Now, does Chris -- do you talk to
25 Chris Whetstine at all in March?

## Page 76

1     A. Yes.
2     Q. And does he tell you anything about
3 the upcoming season?
4     A. He does. I do not have a personal
5 relationship with Chris Whetstine. It was
6 merely just business, and he would usually call
7 me, maybe a half a month before the season
8 starts, sort of evaluate my body and make sure
9 that I was okay, going to season, so he knows
10 what to prepare for.
11     And in '06, he called me, and he was
12 very excited saying that he had some new
13 techniques, and in '05, he had a Tecar machine,
14 it's called Tecar. It's more powerful than an
15 ultrasound machine, so it works on reviving your
16 muscles and make sure that you are not sore and
17 healing pain.
18     Q. Do you know how he got that machine?
19     A. It was funded by Nike.
20     Q. Do you have any idea what it cost or
21 did he ever say what it cost?
22     A. $4,000.
23     Q. Did he have any other techniques
24 that were going to be different for 2006 that he
25 told you about?

Page 77

1     A.  2006, he had acupuncture, and he had
2  also a new Voltaren cream.
3     Q.  What is a Voltaren cream?
4     A.  It's a cream substance, I guess,
5  that would be -- Voltaren is usually, you can
6  buy them in pills, and it's also just a cream
7  substance, same thing, anti-inflammatory.
8     Q.  It's anti-inflammatory, and you can
9  get them in Europe?
10    A.  Yes, you can, over the counter.
11    Q.  Is Voltaren a banned substance?
12    A.  No, it's not.
13    Q.  Was there -- did he come to North
14  Carolina to treat you --
15    A.  Yes, he did.
16    Q.  -- in March?
17    A.  Yes.
18    Q.  Was your hamstring 100 percent back
19  yet?
20    A.  No, it was not.
21    Q.  Now, we are like in April 2nd.  Was
22  your hamstring 100 percent at this point?
23    A.  I was able to get back to
24  practicing, but I wasn't 100 percent.
25    Q.  Did you, at that point start, in the

Page 78

1  season, the first meet is at Mt. SAC that you
2  were going to run; is that correct?
3     A.  Mt. SAC relays in California, yes,
4  sir.
5     Q.  Do you know approximately when that
6  was going to be?
7     A.  Mt. SAC relays?
8     Q.  Yes
9     A.  April 14th and 16th.
10    Q.  Did you start discussing -- you
11  said you were taking anti-inflammatories.  Were
12  you taking anything else to try to get your
13  hamstring to heal?
14    A.  Other than Voltaren and Excedrin
15  anti-inflammatories?
16    Q.  Did you discuss with anybody about
17  getting some other treatment to help your
18  hamstring?
19    A.  I did.  I talked to Dr. Martini
20  about B12, because orally B12 was not helping,
21  because it was in the belly of my hamstring.  It
22  was deep down inside, and he recommended a B12
23  shot.
24    Q.  Who did you discuss the B12 shot
25  with other than Dr. Martini?

Page 79

1     A.  Trevor Graham, Randall Evans, and
2  Me'Lisa Barber.
3     Q.  Who was the last one?
4     A.  Me'Lisa Barber.
5     Q.  And what did you discuss about the
6  B12 shot with her?
7     A.  She received it, also, a B12 shot
8  before, and I asked her about that, you know, I
9  understand it's B12, what does it do?  How does
10  it act in your system?  Is it okay to take?
11    Q.  And B12 is just an over-the-counter
12  --
13    A.  It's a vitamin.  It's a B12, you can
14  find it in foods.
15    Q.  And B12 is not a banned substance?
16    A.  No, not at all.
17    Q.  Does there come a time when you
18  actually get a shot, a B12 shot?
19    A.  Yes, it is.
20    Q.  And when is that?
21    A.  In March.
22    Q.  March or April?
23    A.  April, April 6th, or the 7th, around
24  that time.
25    Q.  Who gave you the shot?

Page 80

1     A.  Randall.
2     Q.  Can you describe sort of the
3  situation when you get the B12 shot, where you
4  are and how you get it?
5     A.  At my house.  And they came by my
6  house to give me a B12 shot.
7     Q.  Before you took, got the shot, did
8  you look at the package?
9     A.  Yes, I did.
10    Q.  And what did it say?
11    A.  It was a white box, and it said B12,
12  and it said vitamins right across the front of
13  it.  It was an unopened package.  It was sealed,
14  and so was -- the needle was also sealed.
15    Q.  So they showed you the needle.  What
16  did the needle look like?
17    A.  Just a regular needle.
18    Q.  Did you -- was it normal for you to
19  get any sort of a shot by Randall Evans?
20    A.  No, it wasn't.
21    Q.  Had you ever gotten a shot from
22  Randall Evans?
23    A.  No.
24    Q.  Were you concerned about getting a
25  shot from Randall Evans?

Page 81

1     A.   At that point in time, no, I wasn't,
2  because I talked to Dr. Martini, and Dr. Martini
3  also explained to me that Randall Evans was
4  taking classes to become more medically inclined
5  under his wing, and Dr. Martini is a great
6  doctor. He was a good doctor, and I believed
7  him as well.
8     Q.   He's an orthopedic doctor?
9     A.   Yes, sir.
10    Q.   So you got the shot in your leg,
11 correct?
12    A.   Yes.
13    Q.   And which leg?
14    A.   My right.
15    Q.   Was it like a magic elixir, and it
16 was suddenly cured?
17    A.   No, it wasn't. It actually made it
18 sore. It made it more sore than it was.
19    Q.   Did you take anything after that?
20    A.   Voltaren.
21    Q.   Did you take anything before you
22 took Voltaren? Did you take any medicine to
23 treat the soreness prior to taking Voltaren?
24    A.   Also, yeah, Excedrin, I took
25 Excedrin, back and body pain.

Page 82

1     Q.   Okay. Did that work?
2     A.   It helped out a little bit, it
3  helped out the fatigue in my body, but it didn't
4  help out the source of the pain.
5     Q.   Did there come a time when you took
6  another pill?
7     A.   Yes.
8     Q.   And what was that?
9     A.   The Voltaren pill.
10    Q.   And who gave you that pill?
11    A.   Randall.
12    Q.   Excedrin, you took, that was like
13 over-the-counter stuff that you find in a store?
14    A.   Yes, it comes in a white bottle.
15 You can get it in an airport. You can get it in
16 a convenience store, wherever.
17    Q.   And Randall gave you the pill. What
18 -- how was that?
19    A.   It was in a blister pack, and they
20 come in like a silver package where they have
21 all, maybe, like, 12 to 10 Voltaren pills in
22 there.
23    Q.   Have you ever seen Voltaren pills
24 before?
25    A.   Yes, I have taken them throughout my

Page 83

1  professional career.
2     Q.   And where would you get them?
3     A.   You can get them in Europe.
4     Q.   Approximately when did you receive
5  the Voltaren pill from Randall Evans?
6     A.   The day after I got my B12 shot.
7        MR. CAMPBELL: Who is Randall Evans?
8     A.   He's an assistant to Trevor Graham,
9  assistant coach.
10    Q.   Okay. So, you received the pill,
11 approximately the shot and the pill,
12 approximately a week before Mt. SAC, correct?
13    A.   Yes, sir.
14    Q.   You run at Mt. SAC?
15    A.   Yes.
16    Q.   Does your leg feel any better by the
17 time you get to Mt. SAC?
18    A.   Mentally, I wasn't prepared to
19 really run 100 percent for the simple fact
20 because I was still nervous. I didn't want to
21 pull my hamstring, be in the middle of the
22 season and not be able to finish the season off.
23 I ran; we ran fairly well. We lost the race, we
24 got second, but I made it through the race
25 without any significant injuries, and I was

Page 84

1  ready to run for the season.
2     Q.   Did you receive any treatment from,
3  or, massage therapy from Chris Whetstine at Mt.
4  SAC?
5     A.   No, I didn't.
6     Q.   Do you know why?
7     A.   Well, after we finish running, we
8  came on the track, and usually, the procedure is
9  that we go to drug testing, and then we go to a
10 press conference, and from there, we go to Chris
11 Whetstine to get worked on, and that's usually,
12 any athlete that gets worked on, that he works
13 on. After doing those procedures, Chris was
14 nowhere to be found.
15    Q.   Chris had been at Mt. SAC prior to
16 that?
17    A.   Yes.
18    Q.   And he didn't show up after the
19 race?
20    A.   Did not.
21    Q.   Did you -- did there come a time
22 when you learned why he didn't show up?
23    A.   I found out that he had an argument,
24 got in a really heated argument with Trevor
25 Graham before the race . And after the race,

## Page 85

1  Chris left, and he, I called him, and I said,
2  Why did you stand us up, man? What's going on
3  with this? And from there, he said, Oh, I had
4  to go downtown and meet somebody, went out for
5  some drinks, had to cool my head or something,
6  and then later on, he told someone else that he
7  was just driving around downtown.
8      Q.  So Mt. SAC is in Los Angeles,
9  correct?
10     A.  (Nod of head.)
11     Q.  The next meet you are going run in
12 is the Kansas relays, right?
13     A.  Yes, sir.
14     Q.  Did you go straight from L.A. to
15 Kansas?
16     A.  No, I did not.
17     Q.  What did you do after Mt. SAC?
18     A.  I had some campaigns I had to do
19 with people who I was also endorsed by.  I went
20 to Minnesota to do the Early Morning Show with
21 two other athletes, and then the next day, I
22 went to Hershey's Chocolate Factory in
23 Pennsylvania.
24     Q.  And so when do you arrive in Kansas?
25     A.  I arrive in Kansas about 11 o'clock

## Page 86

1  at night, p.m.
2      Q.  What day of the week?
3      A.  Like a Thursday.
4      MR. COLLINS: He's been going for
5  about an hour, and I drank a large coffee.  I
6  was wondering if we're going to get into the
7  Kansas stuff, which is of particular relevance
8  -- this might be a good time --
9      MR. COLBERT: Okay, we'll take a
10 12-minute break.
11     MR. COLLINS: That would be great.
12     MR. COLBERT: So, back at 20 minutes
13 to 12.
14     MR. COLLINS: Okay.  My nephrologist
15 thanks you.
16     (Brief recess taken from 11:30 to
17 11:45 a.m.)
18     MR. COLBERT:  Ready? Back on the
19 record.
20     Q.  Apparently, I'm actually talking
21 slow enough for a change, but if you could talk
22 a little louder, it would be greatly
23 appreciated.
24     A.  Okay.
25     Q.  So I think we had just left, it was

## Page 87

1  --
2      MR. COLBERT: Do you need her to read
3  back the record?
4      MR. COLLINS: I know where we were.
5  I'm just trying to frame it up.
6      Q.  The Kansas relays were the 22nd of
7  April?
8      A.  Yes, sir.
9      Q.  Which was a Saturday?
10     A.  Yes.
11     Q.  And so you landed, after going to
12 Hershey and Minnesota, you landed in Kansas, you
13 said, on Thursday evening?
14     A.  Thursday night, about 11 p.m.
15     Q.  And what happens when you get to
16 Kansas?
17     A.  Well, I mean, it takes us about,
18 almost an hour to get to the hotel, because the
19 meet is in Lawrence, and the airport is in
20 Kansas City, so by the time we get there, and
21 while in the process, en route to get into the
22 hotel, and also while in Hershey and Minnesota,
23 I'm talking to my teammates, and we were very
24 disappointed and embarrassed about our loss, you
25 know, at Mt. SAC.  So we were all pumped up to

## Page 88

1  go out there and run a good time, and it was
2  pegged that Sprint Capitol would get HSI, so we
3  were ready to run.
4      Q.  Who is HSI?
5      A.  HSI is John Smith's camp in
6  California.
7      Q.  And is there any famous runner that
8  --
9      A.  Maurice Greene.
10     Q.  And he's run a race or two?
11     A.  He's a very respected runner.
12 Someone I looked up to as a young athlete.
13     Q.  He's won gold medals and world
14 championships?
15     A.  He was a former world record holder,
16 gold medal, Olympic gold medalist, and world
17 championship and won the 200-meter world
18 championship.
19     Q.  So you call your teammates.  What
20 happens, is you are driving to the hotel, you
21 get to the hotel, what happens there?
22     A.  I call Chris and ask him if he's
23 still up, can he work on my body? I'm feeling
24 tight, and he says, he's up, and he's willing to
25 work on me.



Page 89

1     Q. What treatments do you receive from
2 Chris that night?
3     A. I received a combination of
4 treatments, where they use acupuncture, he used
5 a Tecar machine, and he also used a cream where
6 he would lather on my body and let it sit while
7 he would do acupuncture maybe on my shoulder,
8 and use the Tecar machine on my other leg.
9     Q. And what is a Tecar machine? You
10 said it's stronger than an ultrasound, but if
11 you could just maybe explain it to the panel.
12     A. A Tecar machine has different wave
13 lengths in it, and you have to have a ground, a
14 grounder system, basically, you have to have a
15 metal plate under your body, somewhere touching
16 your body at all times, while the machine is
17 being used on you, so it's a more powerful than
18 an ultrasound machine.
19     Q. And that's used to do what?
20     A. Heal microfibric tears in your
21 hamstrings or your knees, or just part of your
22 body. It's just a quick way to rehabilitate
23 yourself.
24     Q. And now this stuff that you said was
25 lathered on you, could you explain that?

Page 90

1     A. From what he told me, it was
2 Voltaren cream that he used. He lathered it on
3 my quads, my hamstrings, behind my knees and
4 inside of my thighs.
5     Q. And what do you mean by "lathered it
6 on"?
7     A. I guess, like, the best, like you
8 would put peanut butter on a piece of bread, you
9 know, you would just smear it on, and let it sit
10 for a little while.
11     Q. Was that the normal way? Have you
12 ever had Voltaren cream rubbed on you before?
13     A. Yes.
14     Q. Was that how it would be rubbed on?
15     A. No.
16     Q. How did the cream, sort of the
17 peanut buttery stuff, feel when it was on you?
18     A. It tingled a little bit, and he said
19 it's a new process, a new cream that he had,
20 that he used.
21     Q. Did the old ones give that tingly
22 feeling?
23     A. No, they did not.
24     Q. How long does he work on you?
25     A. He works on me for about an hour,

Page 91

1 take a little time to work on your whole body
2 from one leg to the other, go from one arm to
3 the other, back and shoulder, so it takes about
4 an hour, I was done maybe done about 11 -- 1,
5 1:30.
6     Q. Then what do you do?
7     A. I go to my room, take a shower,
8 clean up, and get ready for bed, get ready for
9 the races tomorrow.
10     Q. So then the next day is Friday,
11 April the 21st?
12     A. Yes, sir.
13     Q. What time do you wake up?
14     A. We wake up about 11:00 a.m. There
15 was no rush to get up early, got me some
16 breakfast in my room and prepared myself for
17 practice.
18     Q. Did you normally eat in the room
19 when you are on the road?
20     A. Yeah, they used to make fun of me,
21 because I used to always eat in my room. They
22 called me the room king, service king.
23     Q. The room service king?
24     A. The room service king.
25     Q. Why was it you would eat in your

Page 92

1 room?
2     A. Um, I have this paranoia about
3 people messing with my food, or, especially,
4 from the first incident where I don't like to
5 let people do anything orally to my food, and my
6 water, and I don't like people touching my stuff
7 or around me.
8     Q. What happens after breakfast?
9     A. After breakfast, go back to the
10 room, put my workout clothes on and head to the
11 track. Head to a high school track, that's at
12 the real stadium, not just my group of athletes,
13 but also other groups of athletes who are
14 participating in the relay for the weekend,
15 enter this high school track to work out.
16     Q. Did you have lunch that day?
17     A. Yeah.
18     Q. Where did you have lunch?
19     A. In my room.
20     Q. So in the afternoon, you go to
21 practice at the high school track, you said?
22     A. Yes, sir.
23     Q. Who all was at the track, was it
24 just you, or others?
25     A. Maurice Greene, his group, other



Page 93

1  athletes, from Barton College; just a number of
2  athletes that were there.
3      Q.  What did you do at the track?
4      A.  We warmed up. We put our headphones
5  on. We got in the zone, and then it started to
6  rain, after we warmed up, so we weren't able to
7  do any stick passes or practices, and there was
8  a breezeway at the high school, and usually
9  Chris sets up this table at the track. And so
10 it was raining. So he got shelter, he was in
11 the breezeway, and he worked on myself, and I
12 think, after me, it was Shawn Crawford.
13     Q.  Do you know approximately what time
14 of day this was? Was it late afternoon?
15     A.  About five, four; four or five.
16     Q.  What procedures did Chris give you
17 while you were in the breezeway?
18     A.  He stretched me, flushed me, and he
19 put the cream on my body. He put it on my
20 quads, my hamstrings, when I'm at ease, and the
21 inside of my thighs.
22     Q.  When you say "flush," what is that?
23     A.  Flush is a -- it's basically a quick
24 rubdown to get rid of the lactic acid in your
25 body.

Page 94

1      Q.  It's not like a flush, like you are
2  flushing a radiator, where you are putting a
3  bunch of liquids in?
4      A.  No it's quickly rubbing your body,
5  like this (indicating.)
6      Q.  When you say he rubbed the cream on
7  you, what sort of cream was it again?
8      A.  It was the Voltaren cream.
9      Q.  Was this the thick peanut buttery --
10     A.  Yes, sir.
11     Q.  What did you do after he finished
12 up?
13     A.  From there, I went back to the hotel
14 and I took a shower, because it was all over me.
15 It was between my legs, and behind my knees, so
16 I wanted to make sure that I could shower and
17 put some regular clothes on, and I went back to
18 the real stadium, where the high school kids
19 were running, and I participated, that's what I
20 do. I like watching kids run. I like watching
21 that kind of stuff.
22     Q.  When Chris finished up on you, was
23 Trevor Graham around?
24     A.  Trevor left.
25     Q.  Did he go to the meet earlier than

Page 95

1  you?
2      A.  Yes, he did.
3      Q.  What did you do after the meet on
4  Friday? You went and watched the high school
5  kids run, and then what did you do?
6      A.  Came back to my room, and I worked
7  on, got worked on by Chris about, maybe, 10,
8  10:30, where he stretched me out, and he flushed
9  me again.
10     Q.  Did he use the cream this time?
11     A.  No, he didn't.
12     Q.  Did you have dinner again?
13     A.  Yes, I did.
14     Q.  Where did you eat?
15     A.  In my room.
16     Q.  What time did you go to bed that
17 night?
18     A.  Probably about 12:00.
19     Q.  About midnight?
20     A.  Midnight. There was no rush to go
21 to sleep early. We didn't run until about 3:00,
22 4:00 in the afternoon the next day.
23     Q.  Okay. So the next day is Saturday,
24 April 22nd, correct?
25     A.  Yes, sir.

Page 96

1      Q.  And that's the day of the Kansas
2  Relays?
3      A.  Yes, sir.
4      Q.  Approximately what time did you wake
5  up?
6      A.  About 11:00 again.
7      Q.  Another early morning.
8          Did you have breakfast?
9      A.  Yes, sir, in my room.
10     Q.  What did you do after breakfast?
11     A.  Usually, what I do is I try to kill
12 time by charging my I-pod, watch some MTV,
13 stretch myself, talk on my phone.
14     Q.  How long were you in your room?
15     A.  I left the room, woke about 11, left
16 the room, maybe about 2:30.
17     Q.  Did you eat lunch?
18     A.  A little bit.
19     Q.  Where?
20     A.  In my room.
21     Q.  Where did you go from your room?
22     A.  From my room, I went to the track,
23 got on the bus and went to the track.
24     Q.  What did you do at the track?
25     A.  I got there a little early, before I

7-30-07 to 8-01-07                                     USADA vs. GATLIN

25 (Pages 97 to 100)

Page 97

1  raced, so stood around, signed some autographs
2  for some of the kids and watched some of the
3  races or college runners.
4       Q.  And then what did you do?
5       A.  From there, I proceeded to warm up
6  and do my drills with my teammates.
7       Q.  Was this a normal routine?
8       A.  Normal routine, every time I run.
9       Q.  What is the normal routine then?
10 Please describe it.
11      A.  We do -- the track consists of two
12 curves and two straightaways.  And we would jog
13 the straightaways, and we would do the
14 straightaway, we would build up, each one a
15 little bit faster.  So the 6th one, you are up
16 to a full sprint basically.  So from there, we
17 would stretch ourselves, stretch our body, and
18 then we go into a different ballistic workouts,
19 where it would be like A skips, where you are
20 marching in place, B skips, where you are
21 kicking out, and then from there, we do like
22 30-meter drives, like, we are simulating we're
23 coming out of the blocks, and that's basically
24 what our drills consist of.
25      Q.  How long does a warmup take

Page 98

1  approximately?
2       A.  Takes about an hour.  You don't want
3  to tire yourself out, so you try to do it and
4  you walk back and do it again.
5       Q.  Did Chris work on you at the track
6  before the race?
7       A.  No, he didn't.
8       Q.  After your warmup what happens?
9       A.  Each athlete gets on the table, gets
10 stretched by Chris, and he kind of puts you on
11 his little massage table, and he straps one leg
12 down, and he stretches the other leg with a
13 ballistic stretch, and he will do it again with
14 the other leg, he will reverse it and stretch
15 you again, and then get ready for the race.
16      Q.  So he did stretch you before the
17 race?
18      A.  Yes.
19      Q.  But he didn't put Voltaren creams
20 and all that other -- -
21      A.  No.
22      Q.  So when you say he didn't work on
23 you, you just mean he didn't do that stuff?
24      A.  Yes.
25      Q.  What happens then?

Page 99

1       A.  We go to the track.  We -- the gun
2  goes off.  Our team was doing very well.  We
3  come around the curve.  Shawn hands the stick
4  off to me, and we were victorious.  We came in
5  first.  We crossed the finish line.  Excited,
6  threw the baton into the crowd, and turned
7  around and was interviewed by the commentator,
8  talked to the crowd a little bit, and then I
9  walked off the track, and I was immediately
10 stopped by a USADA official to be tested.  I had
11 no problem with that whatsoever.  I signed the
12 waiver, and as I'm getting the waiver signed,
13 I'm talking to a USA Track and Field official
14 named Melissa Beasley, about my race and getting
15 ready for drug testing.
16      Chris Whetstine comes over, kind of
17 kneels down in front of me, while I'm already
18 occupied talking to someone, and he pulls my
19 pants down, and he pulls my tights up and he
20 rubs the cream in the fashion on my quads, my
21 hamstrings, behind my knees, and in between my
22 legs, and he proceeds to pull my tights down a
23 little bit and pull my pants up.
24      Q.  You were talking to Michelle --
25 Melissa Beasley?

Page 100

1       A.  Melissa Beasley.
2       Q.  Were there any reporters or anything
3  there?
4       A.  There were some reporters standing
5  around, but I had a press conference also.  So
6  at that point in time, Melissa was talking to
7  some of the reporters, like, you know, if you
8  have any questions, wait for him in the press
9  room.
10      Q.  Was this the normal procedure for
11 Chris to come up --
12      A.  No, not at all.  This was the first
13 time he's ever done anything like that.
14      Q.  Was Trevor Graham there?
15      A.  He was.  He was standing, he was
16 standing to my right, a little bit away about
17 where my father is, and he yells out to Chris,
18 What are you doing?  Like that.
19      And Chris kind of looks back at him
20 in a shocked face, and I look at him, like, you
21 know, this man has been, I was like, let Chris
22 do what he has to do, because he's been very
23 neglecting on his, on his obligation of working
24 on me as an athlete, you know, so, you know, I
25 was happy I won the race.  I wasn't really

7-30-07 to 8-01-07                                    USADA vs. GATLIN

26 (Pages 101 to 104)



Page 101

1 worried that he was rubbing on me and working on
2 me, so I was happy.
3     Q.   So, then, after you have this stuff
4 rubbed on you, you go where?
5     A.   Go into the press conference. And
6 the press conference consists of myself, Trevor
7 Graham, John Smith, who is a coach and Maurice
8 Greene, Maurice Greene is there as well, and a
9 couple other relay athletes as well, on both
10 sides.
11     Q.   Approximately how long is the --
12     A.   Twenty minutes or more. Usually,
13 you have, you get asked questions all in a
14 group, while you are up there, and then you
15 break off, so you have more of an intimate Q and
16 A with different reporters.
17     Q.   And where do you go from the press
18 conference?
19     A.   After the press conference, I
20 immediately head over to drug testing.
21     Q.   What do you do when you get to drug
22 testing?
23     A.   Sign in, sit down for a little
24 while, drink a Gatorade, try to fill my belly up
25 so I can use the bathroom, which in all, while

Page 102

1 I'm in the drug testing, takes about 28 minutes.
2 So, it takes maybe about 20 minutes to cycle
3 through my body and have to go to the bathroom.
4     Q.   That 28-minute figure, I showed you
5 the record or told you about 28 minutes. You
6 wouldn't just sitting here today know 28 minutes
7 off the top of your head?
8     A.   No.
9     MR. COLLINS: Okay. I just wanted to
10 make it clear. I think it's Tab 7 in the USADA
11 brief which says he went in at 5:58 and out at
12 6:26.
13     Q.   (By Mr. Collins) So this morning, I
14 asked you if 28 minutes seemed about right?
15     A.   It was much longer than 15 minutes,
16 definitely.
17     Q.   So, anything noteworthy after you go
18 to drug testing?
19     A.   Carry through the same procedures of
20 giving my sample, sitting down with the USADA
21 drug testing official, checking my pH balance on
22 my urine, closing it up, screwing the top on and
23 closing it and sealing it for shipping. After
24 that --
25     Q.   You just leave?

Page 103

1     A.   Yes.
2     Q.   What happens after the Kansas
3 relays? Where do you go?
4     A.   I head back to Raleigh for a little
5 while, to work out.
6     Q.   At this time you were living in
7 Raleigh, North Carolina?
8     A.   Yes, sir.
9     Q.   Do you recall being drug-tested on
10 April 26th?
11     A.   Yes.
12     Q.   Who was that by, do you know?
13     A.   I would say USADA.
14     Q.   I can show you the record to refresh
15 your recollection. That one was actually done
16 by the IAAF.
17     A.   Okay.
18     MR. TYGART: Is there a document for
19 that?
20     MR. COLLINS: Yeah, if you want to
21 look at document 8, no, actually, document 9.
22     MR. TYGART: Exhibit 9?
23     MR. COLLINS: Exhibit 9, yes, it's at
24 the bottom of that first page on USADA document
25 0247, 4-26-06, there's one, and also, I believe,

Page 104

1 it is reflected on the chart in the stipulation
2 which the panel received today.
3     I'm referring to the second
4 stipulation just for the record to be clear.
5     MR. COLBERT: All right.
6     MR. CAMPBELL: This attachment 1, is
7 this part of the -- I've got mine as USADA
8 Exhibit 29 here, the profile. Is this one --
9     MR. TYGART: It's the same.
10     MR. CAMPBELL: I didn't see a Bates
11 number on file, 0296.
12     MR. TYGART: I'm not sure what the
13 last one is, Mr. Campbell.
14     MR. COLLINS: There appears to be an
15 inaccuracy on the one that's attached, this
16 longitudinal that was put together. For some
17 reason, the longitudinal which appears to be a
18 summary that was put together I assume by --
19     MR. TYGART: It was put together by
20 us, based on the documents received from UCLA
21 and the IAAF.
22     MR. COLLINS: Right, if you look to
23 the documents, that one actually occurred on
24 4-26, not 4-28.
25     MR. CAMPBELL: It says 4-28 on the

## Page 105

1  document here. 4-28-06.
2      MR. COLLINS: That, I believe, is the
3  incorrect document. If you look at the ones
4  that chart was compiled from are the documents
5  from --
6      MR. CAMPBELL: It says Montreal
7  though.
8      MR. COLLINS: Right, it was a IAAF
9  test.
10      MR. CAMPBELL: The results were at
11  the Montreal lab?
12      MR. COLLINS: It was collected in
13  North Carolina and was shipped to Montreal, and
14  it was collected, if you look at that tab 8 --
15  tab 9, sorry -- that's the one where it shows
16  the sample number, and says it was April 26th,
17  and I believe in the documentation behind
18  that --
19      MR. CAMPBELL: Are you claiming that
20  an IRMS test was done?
21      MR. COLLINS: No, that was not a CIR.
22      MR. CAMPBELL: It wasn't -- just an
23  EPO?
24      MR. COLLINS: It was an EPO, and I
25  assume it was a standard scan.

## Page 106

1      MR. TYGART: Well, let me try to
2  clarify this. We have got USADA 0247, which is
3  found in Exhibit 9 of USADA's documents, which
4  is an e-mail from Thomas Capdevielle from the
5  IAAF to Linda Barnes, where it identifies an
6  out-of-competition test of 4-26-06, and the
7  sample number is 394995. Do you see that, John?
8      MR. COLLINS: Yeah.
9      MR. TYGART: And then if you look at
10  the documents that were sent to the panel
11  Friday, in response to their request for the
12  longitudinal study, if you look at USADA 0304,
13  there's a document from the Montreal lab that we
14  also received from the IAAF, that has sample
15  Number 394995, which is the same sample number,
16  but it says date 4-28-06. So I'm assuming 4-28
17  is the date that Montreal received it, and 4-26
18  is the date that IAAF collected it.
19      MR. COLLINS: Right, in fact, I think
20  I can clarify the discrepancy. If you look at
21  USADA 0251, you will see testing information
22  collection date 26 April, 2006, and then the
23  next column over, it says reception date 28, so
24  that is in fact what happened.
25      MR. TYGART: So when the chart was

## Page 107

1  made by our paralegal, she used the date from
2  the Montreal lab, not --
3      MR. COLLINS: I don't think
4  anybody --
5      MR. TYGART: There's no disagreement
6  on that. That sample was collected on 4-26-06.
7      MR. COLLINS: Yeah. Okay. Is that
8  clear?
9      MR. CAMPBELL: That's very clear.
10      MR. TYGART: Clear as mud.
11      Q. (By Mr. Collins) So, four days after
12  the test, after the Kansas Relays you are tested
13  in North Carolina, where do you go next?
14      A. Penn Relays.
15      Q. Where are the Penn Relays?
16      A. The Penn Relays are held in
17  Philadelphia.
18      Q. Do you know the date of the Penn
19  Relays?
20      A. Not off top of my head, sir.
21      Q. If I said it was the week following
22  the April 22nd, so April 29th?
23      A. Yeah, that would be, that would be
24  correct. They usually have a relay every
25  weekend.

## Page 108

1      Q. Do you run at the Penn relays?
2      A. Yes, sir.
3      Q. How many events do you run?
4      A. Between two to three.
5      Q. While you were at the Penn Relays,
6  do you receive -- for lack of a better term --
7  the peanut butter treatment from Chris
8  Whetstine?
9      A. No.
10      Q. Your relay wins at Penn?
11      A. Yes, we do.
12      Q. And you are drug-tested?
13      A. Yes.
14      Q. After winning?
15      A. Well, that's the thing, we won the
16  race, and then 15 minutes later, an official
17  came up to me, and was like, well, you don't
18  have to get drug-tested, and I was like, okay,
19  because it showed it on the big screen that
20  Shawn Crawford, who was third leg, completely
21  ran on his own, so we were DQed, so I understood
22  that. I accepted that. I was okay. So they
23  grabbed the other second-place relay anchor, and
24  proceeded to go drug-test him.
25      Now, 20 minutes later after that, I

Page 109

1  had a USADA official and a USA Track and Field
2  official come up to me and say that they
3  reinstated us as the winners, and I had -- time
4  was running out for me to be drug-tested. And
5  at that point in time, I have no -- I have
6  nothing against getting drug-tested at all --
7  but at that point in time, that's when I really
8  felt I was being targeted or something was up.
9  I mean, we clearly had DQed.
10  Q.  But you were reinstated, and you
11  went to drug testing?
12  A.  Went to drug testing.  I told the
13  official that it was very unprofessional of them
14  to do that.  I mean, we lost the race, but I had
15  no arguments with them, and I proceeded to give
16  them a sample without any arguments.
17  Q.  And that test result was negative?
18  A.  Yes, sir.
19  Q.  And the record will show that that
20  was when he got a CIR test also?
21  MR. CAMPBELL: Which one, so what
22  date was that on this?
23  MR. COLLINS: That would be the 4-29
24  date.
25  MR. CAMPBELL: I don't want to ask

Page 110

1  too much, but there were a number of CIR tests,
2  you said.  Which ones were they on?
3  MR. COLLINS: The CIR tests, if you
4  are looking at this chart, are the January 21,
5  2005; April 26th, 2006 -- or April 22nd, sorry,
6  2006 -- that's the Kansas rerun, the 4-22-06,
7  4-29-06 is the Kansas Relay.  5-18, 2006, June
8  5th, 2006, June 23rd, 2006 and November 9th,
9  2006.
10  MR. COLBERT: Those are all CIRs?
11  MR. COLLINS: Those are all CIRs.
12  And out of that, since we have it
13  here and I have it in front of me, I was just
14  going to note that four of those are out of
15  competition, the January 25, 2005 is out of
16  competition, the 5-18 --
17  MR. CAMPBELL: Slow down.
18  MR. COLLINS: The January 25 is out
19  of competition, 4-22-06 is in competition,
20  4-29-2006 is in competition, 5-18-2006 is out of
21  competition; June 5th, 2006 is out of
22  competition; June 23rd, 2006 is in competition,
23  and then the last, obviously, the 11-9, November
24  9th, 2006 is out of competition.
25  MR. TYGART: And I would just

Page 111

1  refer -- I think he got it accurate -- but the
2  document that's been provided is Exhibit 8,
3  USADA 001, that identifies the event, if it was
4  at an event, and OOC, if it was an
5  out-of-competition test, and then it says full
6  screen, and then if any additional CIR EPO is
7  performed, it has it clearly identified for the
8  USADA test.
9  MR. COLLINS: Right.  That's the
10  information I used to create that one.
11  MR. TYGART: You lost me a little bit
12  on some of the dates.
13  MR. COLLINS: Absent a brain cramp on
14  my part, that was certainly what I was trying to
15  import.
16  MR. COLBERT: These are -- just so I
17  understand this -- going back and forth, on 8,
18  you have got 001 is a list of USADA test
19  results, what I think has been marked as 0304,
20  Attachment 1, is the IAAF and USADA tests
21  combined, so these will be slightly different,
22  won't they?
23  MR. COLLINS: Yes, as I understand
24  it, the more of the denser or the I-chart of the
25  Excel spreadsheets is a combination of the tests

Page 112

1  that are at tab 8 and at tab 9 in USADA, because
2  Tab 8, I believe, is the USADA test, and tab 9
3  is the IAAF test.
4  MR. CAMPBELL: So none of the IAAF
5  tests did a CIR?
6  MR. COLLINS: I don't think they did
7  a CIR.
8  MR. TYGART: No.
9  MR. COLLINS: I think we did say that
10  this chart is missing one of the IAAF ones.
11  Remember, we talked about that at the beginning.
12  MR. CAMPBELL: Which one?
13  MR. COLLINS: It's missing the world
14  record May 12th.
15  MR. CAMPBELL: And that was May 12th,
16  2006.
17  MR. COLLINS: May 12th, 2006 in Doha,
18  Qatar.
19  MR. CAMPBELL: And so that was
20  negative.
21  MR. COLLINS: It was a negative test,
22  it was an EPO in a normal screen.
23  MR. CAMPBELL: No CIR.
24  MR. COLLINS: I don't believe -- I'm
25  not aware of any CIR.

## Page 113

1  MR. TYGART: We're not saying no CIR
2  was done on either one of the tests, but --
3  MR. COLLINS: That's my
4  understanding. They haven't indicated.
5  MR. TYGART: We can -- if it would
6  make it easier for the panel, we can have this
7  Attachment 1, do in-comp, out-of-comp, who
8  collected it, and put a check for CIR or not.
9  MR. CAMPBELL: That would be great.
10  MR. TYGART: All right. On the next
11  break, I will call my secretary, and see if she
12  can handle that.
13  MR. COLLINS: I will sheepishly admit
14  that would exceed my Excel --
15  MR. COLBERT: If I could go back for
16  a minute to the 0304, this is not with regard to
17  whether it's IAAF or USADA, but I notice a CIR
18  test January 21 of '05, and there's a series of
19  tests and the next one is over a year later, and
20  then there are immediately following 4-22, there
21  are five additional CIR tests over this next
22  few months. Now, I guess somebody could address
23  is there a particular reason why the sudden
24  increase in CIR tests were being done here, when
25  there were large gaps in time, and all of a

## Page 114

1  sudden, virtually every single time he was
2  tested, he was tested in CIR.
3  MR. COLLINS: They would have to say
4  why that happened. The stipulation was that, at
5  least with respect to the 4-22, that one was a
6  normal. I can't explain it.
7  MR. TYGART: I think if you look at,
8  you know, there are three, four in-comp, is it
9  Kansas, Penn's, Nike, Nationals, so there's four
10  in-comp tests by USADA.
11  MR. COLBERT: And you are saying
12  those were in tests, CIR would be a standard
13  test for in-comp --
14  MR. TYGART: It's not necessarily
15  standard. It has to be uniquely ordered or a
16  strategy put into certain events, certain
17  sports. But all of those fell within those
18  selections for those events, and then there were
19  the out-of-comps, I guess, from 5-18 and 6-5
20  that we performed, and again, leading into a
21  Nationals. I would appreciate some respect for
22  not compromising our testing program, but having
23  an EPO and a CIR leading into a national event
24  like that would be something that's fell through
25  in our test issue vision plan, and would be part

## Page 115

1  of the overall strategy.
2  MR. COLBERT: If we take out the
3  November, if I just look at April through June,
4  a period of under two months, well, just about
5  exactly two months 4-22 to 6-23, the athlete was
6  tested 1, 2, 3, 4, 5, 6, 7 times. Five of those
7  times CIR tests, and of those, 1, 2, 3, it looks
8  like three of them were OOC, out of competition.
9  MR. TYGART: Yeah.
10  MR. COLBERT: And two of those were
11  CIR.
12  MR. TYGART: Yeah.
13  MR. COLBERT: And yet for the
14  period -- just so I understand -- from January
15  21, 2005, through 4-22-06, a period of over a
16  year he was tested once?
17  MR. TYGART: I think that's right.
18  MR. CAMPBELL: You are saying, for
19  example, at the Olympic games, there wouldn't be
20  a CIR test?
21  MR. TYGART: Once by us.
22  I don't know what it would have
23  been.
24  MR. COLBERT: That would be '04 then.
25  I'm just going January 1, '05, because I think

## Page 116

1  the only thing we've talked about here today is
2  starting January 1, '05, when he had a CIR test.
3  MR. CAMPBELL: When he won a gold
4  medal, where that would test be?
5  MR. COLLINS: I think that's an IOC
6  test, and that one might not have been -- we
7  contacted the IAAF, but we don't think we did a
8  similar contact to the IOC.
9  MR. TYGART: Yeah, that's right.
10  MR. COLLINS: I think it's safe to
11  say that more than roughly two years after the
12  event that test came back negative.
13  MR. TYGART: Again, and I will
14  request certain nondisclosure on some of the
15  strategies behind testing, but I think, you
16  would see, particularly, in a sport like Track
17  and Field, periods where doping risk is not
18  necessarily at its height, less testing during
19  those periods, and more leading up to particular
20  events like Nationals, World Championships,
21  Olympic Games, where the focus would increase.
22  MR. COLBERT: If I understand it
23  correctly, then, though, looking at this, then
24  the athlete participated in a minimum at the,
25  between the dates we're talking about, the

## Page 117

1   minimum that Reebok ran for the U.S.
2   Junior/Senior National Championships, so, there
3   are three tests, championships, not tested CIR.
4   Anyway, just -- that's okay.
5        MR. TYGART: It is what it is. And
6   one other factor, you know, that would be part
7   of our consideration was there was a world
8   record set, right at that point, and that, you
9   know, is obviously under international standards
10  and our practice, a key point of a risk of
11  potential doping, and we would respond to that,
12  to the extent we needed to.
13       MR. CAMPBELL: But it wasn't as a
14  result of the April 22nd, 2006 testing?
15       MR. BOCK: Just the last of those,
16  the last four or after the world record,
17  the last four CIRs, but not the 22nd or the 29th.
18       MR. CAMPBELL: But my question was --
19  and maybe it shows my ignorance more than
20  anything else -- it seems to me you could be
21  tested because you knew you had a previous
22  positive test, but these other tests aren't the
23  result of your knowledge of any other previous
24  positive tests. As I understand it, these were
25  just part of your practice, whatever that is,

## Page 118

1   which we will remain, which will remain
2   confidential, is that right?
3       MR. TYGART: Yeah.
4       MR. COLBERT: Excuse me. Unless
5   someone is going to testify as to what the
6   policies or practices are, I don't want to make
7   any assumptions on the record as to what the
8   reasons for these was. I don't want to make any
9   assumptions unless somebody is going to testify
10  as to the reason for it.
11       MR. CAMPBELL: But my question was,
12  the reason wasn't for result of this positive
13  test on April 22nd.
14       MR. COLBERT: Do we know that?
15       MR. CAMPBELL: He just said it.
16       MR. COLBERT: I didn't think I heard
17  him say that.
18       MR. TYGART: Part of, in an effort
19  not to have to put Kate up to fully disclose all
20  of our strategies for testing that ultimately
21  may end up being on record, that I'm sure will
22  be shared amongst the defense counsel bar and
23  force you all to put some of that into a
24  decision, we entered a stipulation, and I think
25  the stipulation is pretty clear that he was

## Page 119

1   selected for testing at the Kansas Relays,
2   because his relay, in accordance with our normal
3   routine selection criteria, paragraph 10,
4   because his relay won first-place, and he was
5   the anchor leg on that first place relay team.
6       MR. COLLINS: That has to do with the
7   Kansas one. There's no stipulation as to the
8   other ones. I don't want to get into an
9   argument now, necessarily, but I would note that
10  as you pointed out, that if they were doing it
11  with respect to World Championships and
12  Nationals, that he did win double in, double
13  gold in 2005, and World Championships, he won
14  double at the Nationals, and there were no CIRs
15  then. And the record speaks for itself, then,
16  as to when they ran it.
17       MR. COLBERT: Yeah.
18       MR. CAMPBELL: I'm just trying to
19  figure out, okay, when did you guys realize he
20  had a positive test? What date?
21       MR. TYGART: From?
22       MR. CAMPBELL: There's only one
23  positive test that I know of.
24       MR. TYGART: I thought you were
25  referring to his amphetamine violation.

## Page 120

1       Well, I assume, we got it reported
2   at least on --
3       MR. COLBERT: Would you tell us what
4   exhibit you were looking at?
5       MR. TYGART: I'm not sure it's the
6   right one, it's 5 A, but it was reported to us,
7   June 13th, 2006.
8       MR. CAMPBELL: So somewhere in
9   between June 5th, and June 23rd test that you
10  have got notes of it?
11       MR. TYGART: Yeah.
12       MR. CAMPBELL: When you say you got
13  notes, that's your first -- that's when you
14  would first get notes?
15       MR. TYGART: That's when it was
16  reported as a positive to us. I mean, if there
17  was something --
18       MR. CAMPBELL: Did you get a
19  telephone call saying hey --
20       MR. TYGART: We probably did. Before
21  it came.
22       MR. CAMPBELL: Would it have been
23  before June 6th?
24       MR. TYGART: Chris, I really don't
25  offhand know the exact dates.

Page 121

1     MR. COLBERT: Can I ask, Mr. Tygart,
2 where are you reading on Exhibit 5 A?
3     MR. TYGART: Well, I just looked at
4 the date of the first page.
5     MR. COLLINS: At the upper, first
6 page, it says 6-13 on it.
7     MR. COLBERT: What I was looking at
8 was the rest of the documentation, because
9 there's nothing else in the rest of that
10 documentation, other than that first page that
11 would indicate when any transmission of
12 information occurred or am I incorrect on that?
13     MR. TYGART: Again, I think that's
14 the date I'm going to go with, because that's
15 the date it was reported to us.
16     MR. COLBERT: Can I ask what the
17 significance of May 8th, '06 is that appears on
18 a number of these documents?
19     MR. TYGART: Where is that date? I'm
20 sorry.
21     MR. COLBERT: In example, on the
22 margin of Page 9 of Exhibit 5 A, there's a note,
23 that looks like someone's initials, 5-8-06.
24     MR. TYGART: Direct me to that page,
25 if you would, Mr. Chairman.

Page 122

1     MR. COLBERT: If you go to 5 A, and
2 you look at the results here, and if you look at
3 the upper margin, you will have pages -- they're
4 the actual documentation, Page 4, Page, 5, Page
5 7.
6     MR. TYGART: Those are laboratory --
7 for example, you can look at Page 7 in that A
8 pack, and you have got a chain of custody with a
9 date.
10     MR. COLBERT: Complete with, for
11 example, there's a date here, I'm sorry, there's
12 nothing indicating -- across the line -- other
13 than at the end, there's a 5-8-06 date, there's
14 a 5-8-06 date on Page 9, and there's no
15 indication what those are for.
16     MR. BOCK: There's an indication on
17 Page 7, that there was some, apparently, some
18 analysis done on that date.
19     MR. COLBERT: But it doesn't say what
20 it is.
21     MR. BOCK: It has the initials on the
22 first.
23     MR. COLLINS: Actually, on this
24 exercise, I just noticed something. If you
25 look, on the top, they have a Page 15.

Page 123

1     MR. CHERIS: Page 15, a later dated
2 31 May, 2006.
3     MR. COLLINS: Yes, and if you look at
4 the last one, Page 25, it's June 13th, it's
5 substantially similar.
6     MR. CHERIS: One is 87 MO5 A, and one
7 is 87 MO5, as far as the drug testing report,
8 that appears to otherwise say almost the same
9 thing. The data is slightly different.
10     MR. TYGART: This may have been -- I
11 have to go back and check, but this may have
12 been a screen result. They do a screen result,
13 and then they do an A confirmation.
14     MR. COLLINS: This appears to be a --
15 that's a CIR result.
16     MR. TYGART: Right. But they would
17 do the CIR method once, and then do it again for
18 the A confirmation, so I'm assuming that's what
19 that is.
20     MR. COLLINS: But given that that's
21 addressed to Terry Madden, May 31st, it would
22 seem that we're trying to establish when it got
23 to USADA.
24     MR. TYGART: Yeah, I guess, if we,
25 assuming this came to us at the time, May 31st,

Page 124

1 then we received some report on May 31st, 2006.
2     MR. COLBERT: But correct me if I'm
3 wrong. If you're talking about doing internal
4 screening at UCLA, they would not report the
5 screen, they would report the final A sample
6 results to you.
7     And can you explain, or somebody
8 explain the difference in the analytical data
9 between the May 31, and the June 13th dates?
10     I'm assuming they're both still the
11 A sample?
12     MR. TYGART: I would have to check on
13 it. I don't know, I just don't know now looking
14 at it, what's the accurate response. I mean, on
15 the analytical data, suggests that they're well
16 within any reasonable level of uncertainty and
17 that's probably exactly what you would expect,
18 so I don't think there's any issue with respect
19 to the analytical data.
20     But the question, I think, is what's
21 the date of -- if, in fact, USADA received this
22 transmission on May 31st or not. I don't see
23 any fax lines; although, I don't see fax lines
24 on the June 13th letter either, so we will have
25 to --

## Page 125

1    MR. CHERIS: We have one is in a
2  section called A Sample Screening Documentation,
3  and one is A Sample Confirmation document.
4    MR. TYGART: Bill makes a good point.
5  There is not a cc. One other difference that we
6  noticed from the June 13th to the May 31st
7  document is there's not a cc to the World
8  Anti-Doping Agency, that happened on the June
9  13th letter, so maybe it was a refax to cc the
10  World Anti-Doping Agency, which is normal
11  protocol, and that wasn't done in the first, and
12  it's not a refax, it's obviously a different --
13    MR. CHERIS: You have a screening
14  documentation, is it normal that a screening
15  documentation is sent to USADA rather than the
16  confirmation documentation?
17    MR. TYGART: We wouldn't normally
18  receive -- it's -- we wouldn't normally receive
19  a screen document, I wouldn't think.
20    MR. COLLINS: That's not -- all the
21  negatives are always just a screen.
22    MR. TYGART: Right. I mean outside
23  of that.
24    MR. COLLINS: Right. I think it
25  might be safe to say, a CIR positive is a rare

## Page 126

1  enough thing, that we might not be able to say
2  what would be normal or not normal, because I
3  don't think there's many of them. Just because
4  of the volume of the tests, not many of them are
5  positive, so I would assume it's very, very
6  small. You would have to confirm that.
7    MR. TYGART: Right. Yeah, I mean, we,
8  to be -- I don't know for sure. I will have
9  to look. We very well could have said this May
10  31st, and said, Hey, is that the final A
11  confirmation? And got the response, well, yeah,
12  that's it. Well, did you do it again, to
13  confirm it? Well, no, we'll go back and confirm
14  it. I just don't recall. It just hasn't been a
15  relative point for those purposes.
16    MR. COLBERT: Do they retest if you
17  get a positive on the screen, does the lab
18  retest the A sample to confirm it before
19  reporting it out?
20    MR. TYGART: Well, again, the CIR, as
21  John indicated, is a CIR with a negative T/E is
22  -- this may have been the first one, we have had
23  one other, I believe, in the Hartman case --
24  where, again, it just wasn't an issue before the
25  panel. But yeah, in an abundance of caution, I

## Page 127

1  would encourage a lab, if they were going to
2  rely on a negative T/E as the screen and then
3  have a single run of a positive CIR, I would say
4  let's do another run on the CIR to confirm it.
5    MR. COLLINS: It's my understanding
6  that this was one that was told to go straight
7  to CIR originally.
8    MR. TYGART: Right.
9    MR. COLLINS: So it wasn't based on a
10  negative T/E screen that went to the CIR.
11    MR. TYGART: Right.
12    MR. COLLINS: They were going CIR the
13  day this one showed up.
14    MR. TYGART: Right.
15    MR. COLLINS: What got us into this
16  debate, I would note that there isn't any 6-5
17  out-of-competition test. It's a CIR.
18    MR. TYGART: So the to-do list, I
19  will for sure get you an updated list of the
20  attachment.
21    EXAMINATION (cont'd.)
22  BY MR. COLLINS:
23    Q.  I think we were just talking
24  about why -- we're back to the witness -- I
25  believe we were talking about the Penn Relays,

## Page 128

1  correct?
2    A.  Yes, we just finished, just finished
3  getting selected for drug testing.
4    Q.  And you did not receive, prior to
5  the drug testing there, the gooey peanut buttery
6  consistency slathering or lathering?
7    A.  No, sir, because I had other races
8  to run after that one.
9    Q.  Now, I want to call your attention
10  to the week between Kansas and Penn.
11    As part of your training regimen,
12  you were very particular about what you eat,
13  correct?
14    A.  Yes, sir.
15    Q.  Now, did you also take supplements?
16    A.  I did. I took multivitamins and
17  protein shakes.
18    Q.  And how would you get those?
19    A.  Purchased them myself from either
20  Vitamin World or GNC.
21    Q.  Why would you do that?
22    A.  Because you are putting your body
23  through such a rigorous performance, that it
24  would break down, actually, so I mean I would
25  take Myoplex, which is a morning shake, I would

Page 129

1 take like Mega Men, which is a multivitamin that
2 you can buy over the counter from GNC or Vitamin
3 World.
4     Q. And you would do this personally?
5     A. Yes, sir.
6     Q. Why would you do it personally?
7     A. I didn't need anybody else touching
8 my vitamins, or my Myoplex or anything else, I
9 would buy for myself. I did it -- it didn't
10 feel right.
11     Q. Now, this was part of your regular
12 routine? You would take these every day?
13     A. Yes, sir.
14     Q. What would you do when you traveled?
15     A. Usually, they come in big
16 containers, so I would siphon it off into
17 smaller Tupperware containers, and then I also
18 put them in a carry-on bag, and I would lock the
19 carry-on bag, so I would only have the key, so
20 it wouldn't be tampered with.
21     Q. And you would take those with you
22 when you would travel, and where would you leave
23 them when you were in your room?
24     A. Sometimes, only, so, if I felt
25 comfortable in the situation, then, I would take

Page 130

1 them, I wouldn't take them, but if I had like a
2 key and a lock, like I usually would, then I
3 would leave them.
4     Q. Do you recall purchasing any
5 different supplements between Kansas and Penn?
6     A. No. I have always had the same
7 supplements since 2003.
8     Q. Do you remember running out that
9 weekend and having to buy a new bottle?
10     A. No.
11     Q. Do you remember any particular
12 difference between the lead-up to Kansas and
13 through the test in Kansas and the difference in
14 talking about your diet or your supplements
15 between Kansas and Penn?
16     A. Not at all. Usually, that, it all
17 works as clockwork. I would have supplements
18 that would last me all the way to, maybe, my
19 second individual race, and then, from there, I
20 would come back home, and I would restock on my
21 supplements.
22     Q. Now, we're into May 2006. Where do
23 you run?
24     A. May 2006, Japan, Osaka.
25     Q. And what races do you run there, do

Page 131

1 you recall?
2     A. 100-meters.
3     Q. Were you tested in Osaka?
4     A. No, I was not.
5     Q. Where do you go from Osaka?
6     A. From Osaka, I go to Qatar, where I
7 break the world record.
8     Q. Where were you -- you set the
9 record, was it 9.77?
10     A. It was 9.76, and don't ask me why,
11 it takes officials of timing to take a whole
12 week, six days to give me a phone call and tell
13 me that they rounded the time up to 9.77. But
14 it was, it was a moment that I will always live
15 with, regardless of the situation, because it
16 was something special to me.
17     It was something that no matter what
18 you do for whatever sport as a youngster, you
19 want to be the best in your sport. You want to
20 be the world record holder. You want to be the
21 Olympic gold medalist, and you strive for those
22 things. And I had a checklist throughout my
23 whole career of how I wanted to do things
24 personally. And at that point in time,
25 everything was going according as planned, you

Page 132

1 know, and I was achieving my goals, and the next
2 step was going to be personally starting a
3 family, and basically, settling down and maybe
4 even become an agent.
5     Q. Now, was Chris in Qatar?
6     A. Yes, he was.
7     Q. Did you receive the -- what
8 treatments did you receive from him there?
9     A. None, because I was whisked away by
10 the media, and IAAF drug testers to the drug
11 testing room. And he repeatedly tried to get
12 into the drug testing room to work on my body,
13 abnormally, tried to get into the drug testing
14 room. He was trying to carry his table into the
15 room.
16     Q. And then you said you had to go?
17     A. Well, I had obligations to fulfill
18 in Indianapolis that my agent, Renaldo Nehemiah
19 had set up promptly after I broke the world
20 record, to campaign and promote the Nationals
21 that were going to be held later on that year.
22     Q. And again, the drug test was
23 negative after the world record?
24     A. Yes, sir.
25     Q. So May 12th, you fly back from Qatar

Page 133

1  to the states. You go to Indianapolis.
2       Now, in May 18th, 2006, you are
3  drug-tested again?
4       A.  Yes.
5       Q.  Did you receive  -- this is an
6  out-of-competition test?
7       A.  Yes.
8       Q.  Did you receive any of the
9  treatments from Chris Whetstine at or around the
10 time of that drug test?
11      A.  No, I don't really see Chris
12 Whetstine that much outside of competition.
13      Q.  And the next time you run is May
14 28th, 2006; is that right?
15      A.  Yes, sir.
16      Q.  And where is that?
17      A.  Eugene, Oregon.
18      Q.  And what meet is that?
19      A.  Prefontaine.
20      Q.  Do you receive treatment from Chris
21 Whetstine there?
22      A.  No.
23      Q.  Do you recall if you were
24 drug-tested at that meet?
25      A.  Yes, I was.

Page 134

1       Q.  Just since we went through that,
2  actually, it's the one in-competition, it's not
3  a CIR during that period of time.
4       June, 2006, where do you run?
5       A.  I run in New York. I have done the
6  Reebok Classic.
7       Q.  In New York?
8       A.  Yes, sir.
9       Q.  Do you get drug-tested at the event?
10      A.  No, I do not get drug-tested at the
11 event, but I get drug-tested two days later.
12      Q.  Where are you when you get tested?
13      A.  I'm still in New York City. I opted
14 to stay in New York, because I was born in
15 Brooklyn, and I still have a lot of family
16 members that I don't get to see often. And
17 actually coming off of my world record and such
18 a victorious race there in New York, I wanted to
19 stay and spend time with them because I usually
20 don't get a chance to do that. And I got a
21 phone call from Trevor telling me that the drug
22 testers are looking for me in Raleigh.
23      And at that point in time, I asked
24 him, What's the best thing for me to do? And he
25 says, call them back, because they called me,

Page 135

1  and tell them that you are still in New York,
2  and have the drug testers sent there
3  immediately. So I did that, and within the
4  hour, a drug tester was sent to my hotel room
5  where I stayed at in New York City.
6       Q.  And that test was negative?
7       A.  Yes, sir.
8       Q.  And that test was another CIR, I
9  think that was the one we just mentioned in that
10 window.
11      Approximately, when do you learn
12 that the test results from Kansas had come back
13 positive?
14      A.  On the 15th, around that time.
15      Q.  Of June?
16      A.  (Nod of head.)
17      Q.  How is it you learned?
18      A.  My agent, and my parents called me
19 on a three-way call, when I'm at home in
20 Raleigh, North Carolina.
21      Q.  How did you receive that news?
22      A.  It was It was a nightmare that I
23 live again, from my first situation, and I
24 found, I prided myself, I would never put myself
25 in that situation again, and it happened to me

Page 136

1  again, and I remember the only thing that I kept
2  saying over and over was that my life was over.
3  I didn't know what to do. I mean, because,
4  running is, running is what I love. I love to
5  run. And I never would do anything like that,
6  because I know I have the support of my family
7  and my friends.
8       Q.  Did you have any idea what caused
9  the positive test at that time?
10      A.  No, I did not.
11      Q.  So these positive results came as a
12 surprise to you?
13      A.  Yes, sir.
14      Q.  What did you do after learning of
15 the initial shock? You are in Raleigh, correct?
16      A.  Yes, sir.
17      Q.  It's June 15th. When are the
18 Nationals?
19      A.  The Nationals is probably like a
20 week away.
21      Q.  And those were going to be in
22 Indianapolis?
23      A.  Yes, sir.
24      Q.  Do you know approximately when you
25 go to Indianapolis?



Page 137

1    A.   I don't know the exact date, when I
2  get there.  I want to say around the 19th.
3    Q.   After learning these results, did
4  you start reliving all your steps to try to
5  figure out how this could possibly happen?
6    A.   Definitely, from the moment I had
7  that phone call.
8    Q.   And what were you able to come up
9  with?  Did you have any injections?
10   A.   Not since earlier in the year.
11   Q.   Did you ever take a banned substance
12  that you knew about?
13   A.   The only substance I have taken, I
14  have taken them, almost for three years, since I
15  first started professional track.
16   Q.   Those, the supplements you were
17  taking weren't banned substances?
18   A.   No, not at all.
19   Q.   Did you take any oral pills that
20  would have led to this?
21   A.   No.
22   Q.   Did you take any inhalers?
23   A.   No, sir.
24   Q.   Any drops?
25   A.   No, sir.

Page 139

1  trying to ensure that if he was a suspect, we
2  could somehow catch him.  So the only people
3  that knew about it was my mother, my father, my
4  agent and Trevor.
5    Q.   And you had a lawyer at that time,
6  too, correct?
7    A.   Yes, I did.
8    Q.   It wasn't me, though?
9    A.   No, it was Cameron Myler.
10   Q.   And she knew about the positive
11  test?
12   A.   Yes.
13   Q.   Did you take any actions to see if
14  you could discover evidence with respect to
15  Chris Whetstine at that point?
16   A.   I did.  I took action on my own
17  accord, and I hired private investigators to
18  follow Chris and question Chris.
19   Q.   Where?
20   A.   I had one investigator at Nationals.
21   Q.   Let's deal with that one first.
22   A.   Okay.
23   Q.   So you hired private investigators
24  to follow Chris and see what they could learn in
25  Indianapolis?

Page 138

1    Q.   Did there come a time when you
2  believed how you think this substance would have
3  entered your body?
4    A.   Yes.  There was a time when I
5  eliminated all those factors, and the only way I
6  could come up with it is that it had to have
7  been placed on my body somehow.
8    Q.   And in and around Kansas when the
9  test happened, who rubbed things on you?
10   A.   Chris Whetstine is the only person
11  that touched my body while I'm in competition.
12   Q.   Nobody else touched it?
13   A.   No.
14   Q.   Did anybody else rub a substance on
15  you?
16   A.   No, sir.
17   Q.   And you didn't take anything through
18  injection?
19   A.   No.
20   Q.   And you didn't take anything orally?
21   A.   No, sir.
22   Q.   So you go to -- did you discuss the
23  possibility that something must have been rubbed
24  on you with anybody else?
25   A.   It was kept quiet, because we were

Page 140

1    A.   Yes.
2    Q.   What happened when you get to
3  Indianapolis?
4    A.   He starts acting weird, Chris does.
5    Q.   How is that?
6    A.   Well, he only came out to the track
7  one time, the whole time, and usually, when you
8  were at a National Championship, you are there
9  for almost five days or more.  And he came out
10  to the track, like, the first day, worked on all
11  the athletes, and then he claimed that he got
12  sick from Shawn Crawford, who was not sick,
13  because Shawn Crawford competed in that event.
14   Q.   So did you see Chris Whetstine
15  around, outside much?
16   A.   No, sir.
17   Q.   Do you know where he was?
18   A.   He was in his room.
19   Q.   Did he come out of his room?
20   A.   The only time he came out of his
21  room was the night of the last competition, and
22  he came out, to go drinking with his girlfriend
23  and go clubbing, after he said that he was
24  already sick.
25   Q.   And did anything happen that night?

## Page 141

1     A.  He got in a fight with a Nike
2 representative, and his name was Llewellyn
3 Starks.
4     MR. COLBERT: Excuse me, I couldn't
5 quite hear you.
6     A.  He got into an altercation, a fight,
7 with a Nike employee named Llewellyn Starks.
8     MR. CAMPBELL: How do you spell that?
9 Llewellyn?
10     MR. COLLINS: L-l-e-w-e-l-l-y-n,
11 Llewellyn. Justin wasn't there at the fight,
12 and there's currently a lawsuit between Chris
13 Whetstine and Llewellyn Starks, and -- I was not
14 planning on calling Llewellyn Starks.
15     MR. CAMPBELL: Do you have a copy of
16 the lawsuit?
17     MR. COLLINS: There was supposed to
18 be -- there was supposed to have one faxed to me
19 here today.
20     MR. BOCK: I actually have a copy.
21     MR. CAMPBELL: You do? Can we have a
22 copy of it?
23     MR. BOCK: Yeah.
24     MR. COLBERT: We can do it at a
25 break, with that machine outside.

## Page 142

1     MR. COLLINS: He also sued Nike in
2 that lawsuit, actually, Nike's attorney -- I
3 misspoke -- Nike's attorney was supposed to send
4 me a copy.
5     MR. CAMPBELL: Do you have a suit
6 against Nike?
7     MR. COLLINS: Chris Whetstine sues
8 Nike and Llewellyn Starks.
9     MR. CAMPBELL: Same suit?
10     MR. COLLINS: Same suit.
11     Q.  Is there a time prior to running the
12 race that you go into Chris Whetstine's room
13 while you were still in Indianapolis?
14     A.  While I'm still training, I wasn't
15 in competition just yet to run, I went to his
16 room twice. The first time I went to his room,
17 and he used the techniques on me. And then the
18 second time, as, actually while I was in that
19 room the first time, I felt like I got a moment
20 of clarity, because that's what I already
21 learned about my positive test, and I thought
22 about it. I was like, he's using these
23 different kind of techniques on me all at once,
24 you know, acupuncture, Tecar machine, the
25 creams. And he's massaging me all at the same

## Page 143

1 time, which can become very confusing, you know,
2 especially if your head is down in the cradle
3 and you are not able to see what this person is
4 doing to you. And at that point in time, before
5 this even happened, I trusted him. He was in my
6 inner circle. He's one of the people that made
7 me successful for what I was doing, and there
8 was no reason for me to think that he would harm
9 me.
10     And from that point on, I did not
11 feel comfortable being around Chris Whetstine,
12 especially working on my body. They asked me,
13 and the investigator asked me if he worked on me
14 one more time, and I had my agent's assistant in
15 the room with me.
16     Q.  And who is that?
17     A.  Britton Stackhouse.
18     Q.  What happened then?
19     A.  Britton Stackhouse came into the
20 room, which I know was awkward and weird because
21 she's never in the room, and at that point in
22 time, he didn't use any of the new techniques,
23 he just stretched me and flushed me. And I
24 asked him, I said I got a competition coming up,
25 are you not going to work on my body like you

## Page 144

1 usually would? He said no, no, you are okay,
2 and he kind of like brushed it off, and then
3 went into the bathroom and cleaned his hands.
4     Q.  And what happened then?
5     A.  I was told to see if I could find
6 any kind of evidence around his room that looked
7 out of place. And I saw a container, a white
8 container with this tall (indicating) and it was
9 said on the label, BioMart, it looked like a
10 prescription, it said BioMart, and it looked
11 like a small prescription.
12     Q.  Were you able to determine what was
13 in there?
14     A.  No, I didn't, it was happening so
15 quick. I just saw the big letters BioMart, and
16 from there, he came back into the room, so I
17 was, I didn't do anything else.
18     Q.  Did you -- but you didn't take the
19 bottle with you?
20     A.  No, I didn't.
21     Q.  Did you then report what you had
22 found to anybody?
23     A.  I did.
24     Q.  Who did you report it to?
25     A.  I reported it to the investigator; I

## Page 145

1  reported it to Renaldo, my agent; Cammy Myler,
2  and my family, everyone, who was already in the
3  know.
4      Q.  Prior to then, had you ever heard of
5  BioMart?
6      A.  No, I haven't.
7      Q.  Now, even with all of this circling
8  around you, you participate at the National
9  Championships?
10     A.  Yes, sir.
11     Q.  Did you have discussions with USA
12 Track and Field about running?
13     A.  I had discussions with the head, the
14 CEO, Craig Masback of Track and Field.  And at
15 that point in time, a B sample was not given to
16 us yet, and his words were, with tears in his
17 eyes, he said, you know, innocent until proven
18 guilty.  If you feel like you can go out there
19 and run and defend your title, then by all means
20 to do so.  And I took his word, and I took his
21 advice, and I went out there, and I did it.
22     Q.  How did you run that weekends?
23     A.  I ran three sub-10s in an hour, and
24 that was something that hasn't been done by an
25 athlete, and I think I was trying to prove a

## Page 146

1  point to myself.  And the point was what was I
2  going to do about this situation I was in?  That
3  I'm a legit athlete.  This is a God-given
4  talent.  And from this point on, do I still want
5  to go out there and want to be successful?  Yes,
6  I do.  I believe in my talent to the fullest.
7  And I think God is trying to be, my way of
8  showing everyone that I can do this, I can run
9  great times without even trying to use
10 performance- enhancing drugs.
11     Q.  So you run three sub-10s.  You win
12 the hundred?
13     A.  Yes.
14     Q.  You are drug-tested?
15     A.  Yes, sir.
16     Q.  And the test comes back negative?
17     A.  Yes, it does.
18     Q.  And as we already established that
19 was one of the CIR tests that comes back
20 negative.
21         Now, after Nationals, you have the B
22 sample tested?  Correct?
23     A.  Yes, sir.
24     Q.  And that sample comes back also as a
25 positive?

## Page 147

1      A.  Yes, it does.
2      Q.  Now, you indicated before that you
3  had hired two different private investigators,
4  the first one was at Nationals.  What was the
5  second group?
6          MR. CAMPBELL: Do you have the names
7  of those private investigators?
8          MR. COLLINS: I have the names of the
9  second one.  I will have to get you the name of
10 the first one.
11     Q.  (By Mr. Collins) Do you know the
12 name of first one?
13     A.  His name was Jack, I can't remember
14 his last name.  Renaldo knows him. Renaldo
15 summoned him.
16     Q.  And he's local in Indianapolis?
17     A.  Yes, he is.
18     Q.  The second group you hired is out of
19 New York, I believe.
20     A.  Yes.
21     Q.  The New York area?
22     A.  Through my lawyer at the time,
23 Cameron.
24     Q.  She was based in New York?
25     A.  Yes, sir.

## Page 148

1      Q.  And the firm she hired I believe was
2  called SafirRosetti?
3      A.  Yes.
4      Q.  What do these investigators do?
5      A.  They flew all the way across the
6  country to Eugene, Oregon, and they pretty much
7  questioned Chris Whetstine right there in his
8  house.  They stayed around for a little while
9  and watched his routines and how he acted
10 without him knowing.
11     Q.  And then did they interview him?
12     A.  Yes, they did.
13     Q.  Now, when you learn of your positive
14 test, the A test, did you gather all the
15 different supplements you had been taking and
16 ship those off to a scientist to test them?
17     A.  I did personally, yes, I did.  And I
18 was wanting to make sure that, I wanted to rule
19 out any other way that I could test positive,
20 maybe tainted supplements, and I shipped them
21 off to see if they were tainted or not.  They
22 came back negative.  They weren't tainted.
23     Q.  You sent those to Dr. Black?
24     A.  Yes.
25     Q.  After learning of the B positive,

## Page 149

1  you start negotiating or talking with USADA
2  about cooperating?
3      A.  Yes.
4      Q.  And that leads to your entering into
5  the stipulation?
6      A.  Yes, it does.
7      Q.  And you agree not to challenge --
8      A.  Yes.
9      Q.  -- the science.  And that's what you
10 were told you were doing when you entered into
11 the stipulation?
12     A.  Yes, sir.
13     Q.  Now, in August of 2006, do you
14 recall sending text messages to Chris Whetstine?
15     A.  Yes, I did.
16     Q.  Do you know or recall what prompted
17 you to send text messages to Chris Whetstine?
18     A.  Well, at this point in time, we were
19 still trying to figure how this happened, and
20 what was the motive behind it, and who was
21 behind the situation.  And I got a call from
22 Trevor Graham saying that he spoke to Chris
23 Whetstine at length, and Chris basically said
24 that he was involved in the situation, but he
25 wanted to come forward and say he did it, but he

## Page 150

1  didn't want me to take any action against him.
2  He didn't want me to sue him in any way or harm
3  him in any way.
4      Q.  So what did you do after receiving
5  this call from Trevor Graham?
6      A.  I texted Chris Whetstine.  I asked
7  him, I said if you know anything about the
8  situation, please come forward.  If you are
9  guilty, just say you did it.  I just want to get
10 back on the track and run, that's all I wanted
11 to do.  I will not take action against you.
12     MR. COLLINS:  At this point, I have a
13 question.
14     You sent those to me, Travis.  I
15 don't know if they were in flow-backs of the
16 text messages.  Are those in the record yet or
17 no?
18     MR. TYGART:  No, as my e-mail said to
19 you that we weren't introducing them, but if you
20 wanted to, you could.
21     MR. COLLINS:  Okay.  I have.
22     MR. COLBERT:  These are not in the
23 materials provided to us.
24     MR. COLLINS:  These are not in the
25 materials.  So I will --

## Page 151

1      MR. CAMPBELL:  Do you have any
2  objection?
3      MR. TYGART:  No.
4      MR. CAMPBELL:  I just want to clarify
5  -- if you don't mind.  I thought I heard you say
6  Trevor Graham talked to this guy Chris.  Chris
7  said he did it, but before he would really
8  confess to it, he wanted an agreement from you
9  that you wouldn't sue him; is that right?
10     MR. GATLIN:  Yes, sir.
11     MR. COLBERT:  Can I ask just one
12 little clarification?  I understand that you had
13 a conversation with Trevor Graham, not with
14 Chris Whetstine?
15     MR. GATLIN:  Yes, sir.
16     MR. COLBERT:  Trevor Graham said
17 that Chris Whetstine was willing to come forward
18 and say he did it.
19     MR. GATLIN:  That was told to me,
20 yes, sir.
21     MR. COLBERT:  That's what Trevor
22 Graham told you.  He didn't tell you that Chris
23 Whetstine actually did it.  Chris Whetstine
24 didn't tell you that he actually did it, just
25 what you said here.

## Page 152

1      MR. GATLIN:  Yes.  Trevor Graham was
2  also quoted in the paper as saying that he knew
3  that Trevor -- that he knew Chris did it, and
4  this is how he did it.
5      MR. CAMPBELL:  Do we have that
6  newspaper article?
7      MR. TYGART:  We did provide some of
8  those.
9      MR. COLLINS:  Some of those are in
10 there.
11     Q.  (By Mr. Collins) When Trevor told it
12 to you, did he say he was willing or did he say
13 he wanted to come clean or do you recall what
14 words he told you?
15     A.  He said he wanted to come clean, but
16 he didn't want me to take action against him.
17 He didn't want me to give him any kind of harm.
18 So, from there, I proceeded to text him and say,
19 you know, if you did it, then just come forward.
20 I just want to run.
21     MR. COLBERT:  And these are the
22 texts that your counsel has?
23     MR. COLLINS:  Right.  I have  -- as I
24 understand it these are -- we could read them
25 into the record -- in speaking with Special

## Page 153

1    Agent Novitzky, there is actually one more that
2    you, for some reason don't have a copy of, but
3    for some reason the IRS does.
4          MR. CAMPBELL: Do you have a copy of
5    it?
6          MR. COLLINS: I don't have it, but
7    Novitzky has read it to me over the phone.
8          MR. CAMPBELL: This is a text message
9    from --
10         MR. COLLINS: They're text message
11    exchanges between, between Justin and Chris
12    Whetstine. I will try to read them.
13         MR. COLBERT: If you actually have
14    them, can you make copies?
15         MR. COLLINS: Yes, we can make copies
16    of them, they're kind of confusing, because text
17    messaging, you can only fit so much in there and
18    it kind of continues over to the next one.
19         MR. COLBERT: I got kids, I
20    understand.
21         MR. TYGART: Why don't we do this:
22    That's why I sent it in advance, if you wanted
23    them in, we could clarify this before today.
24    But why don't I do this: I will ask my
25    secretary again to print color copies because

## Page 154

1    the black and white copies are terrible, print
2    colored copies, overnight them to us for
3    delivery tomorrow, and we'll enter them in
4    tomorrow. Are there questions you need to ask
5    this witness about?
6         MR. COLLINS: There's one -- the one
7    thing we have to work out, and I don't know if
8    Novitzky will give it to us, I don't know if he
9    has indicated to me, the text of the missing
10    one, if I can find it here.
11         MR. TYGART: And again -- you can
12    ask him when he's here.
13         MR. COLLINS: The text of the one
14    that's missing that you didn't have states from
15    Justin to Chris Whetstine, "My family and I just
16    want me to" --
17         MR. TYGART: Again, I'm just going to
18    object. Let's get it on the record from
19    Novitzky. It's fifth-hand hearsay at this
20    point.
21         MR. CAMPBELL: This is a text message
22    from him.
23         MR. COLLINS: It's from him. He can
24    testify whether this is accurate of what he
25    said, the actual one.

## Page 155

1         It was a message sent on August 7th,
2    2006, that says: "My family and I just want me
3    to run again. That's it! Exclamation mark. We
4    will not come after you! Exclamation mark. I
5    promise that's our word! Exclamation mark.
6    Let's work this out! Exclamation mark. I am
7    tired of crying."
8         MR. CAMPBELL: Did you make that
9    statement?
10         MR. GATLIN: I did.
11         MR. CAMPBELL: You text-messaged that
12    to Chris.
13         MR. GATLIN: I text-messaged that to
14    Chris Whetstine, yes, sir.
15         MR. COLBERT: We haven't seen any
16    e-mails yet, but may I ask, were there any
17    e-mails from Chris Whetstine back to Mr. Gatlin
18    in any of this package?
19         MR. COLLINS: There's one from Chris
20    Whetstine to Justin Gatlin saying, What are you
21    asking me to do. And then it's followed up by
22    an e-mail from Justin back to him saying, Tell
23    the truth, please.
24         MR. COLBERT: I guess we will see
25    the whole package together.

## Page 156

1         MR. CAMPBELL: What date was the
2    first text message?
3         MR. COLLINS: They were all on August
4    7th, I believe.
5        Q. (By Mr. Collins) Now, shortly --
6    now, in sending these, were you trying to
7    threaten Chris Whetstine?
8        A. Not at all.
9        Q. What was your reason for sending
10    these?
11        A. To find the truth, to find out what
12    happened to me and trying to resolve it.
13        Q. Approximately, a week or so after
14    meeting, or sending these texts, do you have a
15    meeting with Special Agent Novitzky?
16        A. Yes, I do.
17        Q. Where is that meeting?
18        A. New York, at Cameron Myler's firm.
19        Q. How did that meeting come to be?
20        A. I don't know exactly how Novitzky
21    got involved, but he was told that he wanted me
22    to come, I mean, well, he wanted to come, and I
23    accepted him coming, and I was asked different
24    questions, and he also asked me to --
25        Q. We're going to get into what was

## Page 157

1 there. I just wanted to first establish how it
2 came to be.
3       So you meet with Special Agent
4 Novitzky in New York?
5       A. Yes, sir.
6       Q. Who is present in that meeting?
7       A. Renaldo Nehemiah, Cameron -- no, I
8 don't think Renaldo isn't there, Renaldo wasn't
9 there for that part -- Cameron Myler, my mom,
10 and Special Agent Novitzky, and his assistant.
11       Q. And was there another attorney from
12 Cameron Myler's firm there?
13       A. Brian.
14       Q. Now, approximately, how long do you
15 recall meeting with Special Agent Novitzky?
16       A. Through our questions and everything
17 and cooperation, it took maybe an hour.
18       Q. So it was a period of time?
19       A. Yes, a period, definitely.
20       Q. Was this the first time you had ever
21 been interviewed by the government?
22       A. Yes.
23       Q. Were you a little nervous?
24       A. I was petrified. I mean, this is the
25 government, the United States Government. This

## Page 158

1 is what holds our country together, so I mean, I
2 felt, I knew I was innocent and I knew he had
3 questions for me, and I tried to give him as
4 much information that I knew that I could give
5 him.
6       Q. And you answered all the questions
7 he asked you?
8       A. Yes, I did.
9       Q. Now, during this investigation, or
10 during this interview with Special Agent
11 Novitzky, did you discuss receiving a B12 shot?
12       A. Yes, I did.
13       Q. And did your description that the
14 B12 shot basically coincide with what you said
15 today?
16       A. Yes, it did.
17       Q. And what was your understanding in
18 giving this interview? You were given a letter
19 that -- back when I was a prosecutor it was
20 called a proffer letter -- was that shown to
21 you, and explained to you what you meant?
22       A. What?
23       Q. A letter where you have to tell the
24 truth, they won't prosecute. They have the right
25 to pursue any leads from it --

## Page 159

1       MR. TYGART: It might be nice to hear
2 what his understanding of that is, instead of
3 yours. I know you know, John, being a former
4 prosecutor.
5       MR. COLLINS: I kick into autopilot,
6 it's like when you drive the train --
7       MR. TYGART: If my memory serves me,
8 I think, it's an objection, leading question.
9       Q. (By Mr. Collins) But you signed what
10 was known as a proffer letter or a letter --
11       A. Yes, sir.
12       Q. What was your obligation as to what
13 you had to tell them?
14       A. Any information I had dealing with
15 Trevor Graham, and any information that I had
16 dealing with my case and my situation.
17       Q. And you were truthful?
18       A. Yes, sir.
19       Q. And did you try to be truthful?
20       A. Oh, yeah.
21       Q. Now, you discussed the B12 shot. Do
22 you recall discussing the receipt of a pill from
23 Randall Evans after the B12 shot?
24       A. Yes.
25       Q. Do you recall how you described that

## Page 160

1 pill?
2       A. I described it as a green pill.
3       Q. And later when you were asked about
4 it, do you describe it as something other than a
5 green pill?
6       A. Yes.
7       Q. What did you describe it as?
8       A. A brown pill.
9       Q. Do you know why you described it as
10 a green pill when you were there?
11       A. Well, earlier, like I said in my
12 statement, I was nervous, when I was there with
13 him, I wanted to make sure, I pleased him with
14 all my questions. I asked him questions
15 truthfully and honestly. It was just a confusion
16 between like I said the Excedrin back and body
17 pain, which is a green pill, and the Voltaren,
18 which is a brown pill.
19       Q. Do you know when you realized what
20 the green pill was -- during, after your
21 interview, was there a time when Special Agent
22 Novitzky asked you about the discrepancy between
23 a green pill and a brown pill?
24       A. He did, and I totally forgot about
25 the Excedrin back and body pain

## Page 161

1 anti-inflammatory until maybe a week ago.
2      Q.   Could you explain how it was that
3 you recalled the green pill?
4      A.   I was on business in Tennessee.
5      Q.   What were you doing in Tennessee?
6      A.   I was trying out for their football
7 team.
8      Q.   And so what happened?
9      A.   I was in the airport after the
10 workout, and my body was aching from the
11 rigorous workout.  And I went to the airport,
12 and I went to the little, where they have the
13 magazines, and different candy bars, and
14 medicines, and I saw the Excedrin, and I was
15 used to taking that, something that we could,
16 and I picked it up, and I bought it, and opened
17 the bottle, and had me a bottle of water, and put
18 the pill in my hand, and I looked at it, and
19 there was a green pill.  I was just like
20 floored.  I was just standing there and I was, I
21 was happy, for the simple fact, because I know I
22 was not lying to him, and I knew that there was
23 a green pill.  And that was the green pill, that
24 I remember.
25      Q.   What did you do when you saw the

## Page 162

1 pill?
2      A.   I jumped up and down, and I was
3 happy.  I was elated.  I called my parents, and
4 Renaldo, and I told her that I knew what the
5 green pill was.
6      Q.   And you had been, since learning of
7 the discrepancy from Special Agent Novitzky, you
8 had been racking your brain pretty hard to
9 figure out?
10      A.   Definitely.  I know -- knowing that
11 I was being truthful with him, I knew that there
12 was something I had to find out what it was.
13      Q.   Okay.  So you are answering all of
14 his questions, which takes a period of time.
15 Does there come a time during this interview
16 where Special Agent Novitzky asks you to do
17 something?
18      A.   Yes, it is.
19      Q.   What does he ask you to do?
20      A.   He asks me to do wiretaps to Trevor
21 Graham.
22      Q.   And what do you mean by wiretaps?
23      A.   He wanted me to talk to Trevor
24 Graham undercover without Trevor Graham knowing
25 that I have a recorded conversation.

## Page 163

1      Q.   Just -- I saw Travis raise his
2 eyebrows there, a wiretap is a little  -- you
3 are talking about using a machine to record the
4 conversation?
5      A.   Record the conversation.
6      Q.   It wasn't as if you were actually
7 placing a wire into it secretly to get all
8 things.  There is a federal statute on wiretaps.
9 We want to make sure that it's clear that no one
10 violated any kind of statute.
11           So he asked you to make an
12 undercover call.
13      A.   Yes, sir.
14      Q.   When did he ask you to do it?
15      A.   Immediately, after he questioned me
16 about everything I knew.
17           From there, he asked me to make
18 these phone calls, make this phone call to
19 Trevor Graham.  He said that he wanted to at
20 least ask between five and ten minutes, and I
21 wanted to show him, that I wanted to help as
22 much as possible.  So I let the phone call last
23 for a good substance in the subjects, 20 to 30
24 minutes.
25      Q.   And you said there were subjects,

## Page 164

1 how were those subjects decided to talk about.
2      A.   Jeff Novitzky brought up a list of
3 what he wanted me to talk about right there on
4 the spot.
5      Q.   So did you talk to Trevor Graham
6 before calling him, and told him, hey, I'm going
7 to call you and say you, I'm going to tell you a
8 bunch of BS, because I'm calling for the federal
9 government?
10      A.   No.
11      Q.   Did you cover all the topics that
12 Jeff Novitzky asked you to cover?
13      A.   From Point A to Point B, yes, sir.
14      Q.   Is that the only undercover call
15 that you ever made?
16      A.   No, it's not.  I made at least
17 between eight to ten phone calls.
18      Q.   And how did you make those calls,
19 because you are there, I'm assuming Special
20 Agent Novitzky had the recording equipment?
21      A.   Yes.
22      Q.   What happened with that recording
23 equipment at the end of that interview?
24      A.   He wanted me to keep it and take it
25 with me.

Page 165

1    Q.   Did you?
2    A.   Yes, I did.
3    Q.   And did you use that equipment?
4    A.   Yes, I did.
5    Q.   And how did that go?
6    A.   Well, the equipment is like a tape
7    recorder with two wires coming out of it, and
8    one goes into your ear, and it records the
9    conversations that you are having on the other
10   end.
11   Q.   Okay.  And did you record more calls
12   with Trevor Graham?
13   A.   Yes, I did.
14   Q.   Did you record them with anybody
15   else?
16   A.   I started recording phone calls with
17   Randall, but then he told me not to, because he
18   didn't tell me to do it, but --
19   Q.   He, meaning Agent Novitzky, did not
20   tell you to record them with Randall Evans?
21   A.   Yes.
22   Q.   So -- and you recorded approximately
23   eight to ten more calls?
24   A.   Yes, I did, with Trevor Graham.
25   Q.   And how would this happen?  Would

Page 166

1    you call Trevor?  Would Trevor call you?
2    A.   Either/or.  If Trevor was calling
3    me, I would quickly assemble the recorder or I
4    would call him.
5    Q.   Now, in the fall of 2006, is there a
6    time when you would go to New Orleans?
7    A.   Yes, sir.
8    Q.   Why was it you went to New Orleans?
9    A.   For a brief trial with the New
10   Orleans Saints.
11   Q.   Now, when you were cooperating with
12   the government, you were supposed to be
13   recording all your calls with Trevor Graham; is
14   that correct?
15   A.   Yes.
16   Q.   Did you bring that equipment with
17   you to New Orleans?
18   A.   I accidentally left it for those two
19   days.
20   Q.   Was there anything unusual about
21   your travel to New Orleans?
22   A.   Yes.  I was put on a flight by the
23   New Orleans Saints, and already knowing
24   traveling situations, I was delayed in Pensacola
25   which was going to make me miss my flight to

Page 167

1    Atlanta, so I wasn't going to make it there
2    until the next day, basically, to New Orleans,
3    and flying from Pensacola to Atlanta, and
4    then all the way to New Orleans, I might as well just
5    drove, because New Orleans was only two and a
6    half hours from Pensacola, Florida, so I just
7    got in my truck, and I just drove.
8    Q.   You drove to New Orleans, and you
9    forgot to bring the recording equipment?
10   A.   Yes, I did.
11   Q.   When you got back, did you explain
12   that to Special Agent Novitzky?
13   A.   Yes, sir.
14   Q.   I want to draw your attention to
15   late November, 2006.  Actually, before that.  Is
16   there a time where Agent Novitzky just indicates
17   you don't have to keep recording calls?
18   A.   They came -- it came to a point
19   where he felt my help, I went above and
20   beyond the call of duty, what he wanted me to
21   do, and he was very excited for what I did, and
22   he was very pleased.  So he was -- he said I
23   didn't have to do it anymore.
24   Q.   Now, I want to draw your attention
25   to late November 2006.

Page 168

1    Have you ever heard of an individual
2    named Angel Heredia?
3    A.   Yes.
4    Q.   How did you ever hear of Angel
5    Heredia?
6    A.   I heard of Angel Heredia in the
7    newspapers, and I also heard him through my
8    agent Renaldo Nehemiah.
9    Q.   Does Angel have a nickname?
10   A.   Memo.
11   Q.   Memo.  Have you ever had a
12   conversation with Memo?
13   A.   Yes, I have.
14   Q.   When was the first time you ever had
15   a conversation with Memo?
16   A.   It was a three-way call between
17   myself, and, myself, my agent, and Memo.
18   Q.   And do you know when that was?
19   A.   It was sometime in November.
20   Q.   Do you know how that call got set
21   up?
22   A.   My agent set it up.
23   Q.   Do you know an individual named John
24   Burks?
25   A.   Yes.

Page 169

1      Q.  Do you know who he is?
2      A.  He's also a professional coach.  He
3  lived in the Carey area of North Carolina which
4  is only about 30 minutes, 15 minutes away, from
5  where we worked out at.
6      Q.  Does -- your agent is Renaldo
7  Nehemiah?
8      A.  Yes, sir.
9      Q.  Does he ask you to get a number for
10  John, Burks?
11      A.  He asked me to get John Burks'
12  number.
13      Q.  And you provided that to Renaldo
14  Nehemiah?
15      A.  I did.
16      Q.  Now, when you talk with Memo, what
17  are you discussing, or what do you remember
18  discussing in that first conversation?
19      A.  Well, it was just talking to me
20  about the reason why we even talked to Memo was
21  because we were trying to find out, we pretty
22  much figured out it was some kind of a cream
23  used on my body, and we basically wanted to
24  reverse-engineer to find out what was in my
25  body, or find out what Chris used, if he used

Page 170

1  something on that.
2      Q.  Why would you think Memo would know?
3      A.  Well, from the papers saying that he
4  was known to be in the works with Trevor Graham,
5  so within that time, we felt that him knowing
6  Trevor and Chris and all knew that he might know
7  what the cream is.
8      Q.  And it's been reported that this
9  Memo has been involved in doping in Track?
10      A.  Yes.
11      Q.  Did you ever receive any substances
12  from Memo?
13      A.  No.
14      Q.  Did you ever take anything that came
15  from Memo?
16      A.  No, sir.
17      Q.  Had you ever talked to Memo prior to
18  November of 2006?
19      A.  No.
20      Q.  Now, what do you discuss with Memo
21  and Renaldo on that call?
22      A.  He asked me different questions
23  about beans, and he asked me about the cream,
24  what the cream looked like.  Just, basically,
25  the conversation was to describe it.  And I felt

Page 171

1  at unease about talking to him.  I know that
2  ironically, this might have been the way to help
3  get me exonerated to find out what the cream
4  was, because he was in association with him, so,
5  he just asked me, just different various
6  questions about what it looked like.
7      Q.  Did he give any indication as to how
8  he felt towards Trevor Graham?
9      A.  Yes.  He very much disliked Trevor
10  Graham.
11      Q.  And did he indicate whether they
12  ever had a falling-out?
13      A.  He did.
14      Q.  And did he give you any idea when
15  that had happened?
16      A.  He did not give me a specific time
17  or day when it happened.
18      Q.  But it was in the past?
19      A.  Yes.
20      Q.  Now, is that the only conversation
21  you have with Memo?
22      A.  Maybe like two others.
23      Q.  Were those conversations similar?
24      A.  Yes.
25      Q.  What do you recall about those?

Page 172

1      A.  I remember him being excited saying
2  that you -- Justin, you didn't test positive,
3  and I can show you that you didn't test
4  positive.  I can write up these charts and show
5  you that they made a mistake, and this is how
6  this really happened, and that's where this
7  conversation came from.
8      Q.  Did there come a time where money is
9  paid to Memo to develop what he -- does Memo
10  ever represent to you, or do you know if he's
11  ever made a representation that he could say
12  what the cream was?
13      A.  Yes.
14      Q.  And what did he say?  How did he say
15  that?
16      A.  He basically said that I knew, I
17  know exactly what's going on.  And I can prove
18  to you, and I can break it down for you, so you
19  could use it for your case.
20      Q.  And then did there come a time when
21  you provided money for Memo to figure out what
22  was in this cream?
23      A.  I did.  He asked for 10,000.  I said
24  I will only give you half.  You give us this
25  information -- because I was uneasy about it --



Page 173

1  you give us this information, and you can get
2  the rest of the money.
3      Q.  Do you recall how that money was
4  paid?
5      A.  It was paid from Renaldo Nehemiah.
6      Q.  Did you, you didn't -- did you
7  ultimately receive a report from Memo?
8      A.  After a long wait, yes.
9      MR. COLLINS: Which, I have
10  occasionally will refer to as the Memo memo.
11     Q.  The report when he finally, or the
12  Memo memo, when he finally gets around to
13  drafting it and sending it in, does it say what
14  the cream is?
15     A.  No.
16     Q.  And the purpose for having it
17  drafted was he was going to say -- did you
18  provide him or have any documents provided to
19  him to help him figure out what the cream was?
20     A.  Other than my tests, my different
21  tests that I have had done by USADA.
22     Q.  So the test results of the A and B
23  sample on April 22nd, were sent to him to see if
24  he could then figure out what caused the
25  positive?

Page 174

1      A.  Yes, sir.
2      Q.  The report comes back.  Does it say
3  what the cream was?
4      A.  Not at all.
5      Q.  What happens instead?
6      A.  He goes on one of his another rants,
7  saying, you know, I just need a little more
8  time, I know what's going on, and that's when we
9  basically shut the door on it, you know, you are
10  full of it.
11     Q.  Now, does there come a time after
12  this, where you learn that Agent Novitzky was
13  displeased that you and Renaldo and others had
14  had conversations with Memo?
15     A.  Yes.
16     Q.  And once you learn of Agent
17  Novitzky's displeasure, do you have any
18  discussions with him about what had happened or
19  how it had happened?
20     A.  With Novitzky or Memo?
21     Q.  With Novitzky.
22     A.  Yes.  I explained to him, honestly,
23  how it happened, how I was introduced to him
24  through Renaldo Nehemiah, my agent, and how
25  Renaldo paid him for his work.

Page 175

1      Q.  Do you know if Renaldo then had
2  conversations with Agent Novitzky about this as
3  well?
4      A.  Yes, he did.
5      Q.  Do you know if Renaldo provided a
6  copy of the Memo memo to Agent Novitzky?
7      A.  Yes.
8      Q.  And do you know if he provided him
9  copies of the bank account numbers of where the
10  money was sent?
11     A.  Yes, we volunteered that information
12  to him.
13     Q.  And do you know if he gave any
14  telephone numbers of Memo to Agent Novitzky?
15     A.  Yes, we did.
16     Q.  Now, throughout your career, have
17  you been cautious of what you eat and drink?
18     A.  I still am to this day.
19     Q.  Would you, for example, when you had
20  a cold, would you just take anything off the
21  shelf?
22     A.  No, sir.
23     Q.  Do you have allergies?
24     A.  Yes.
25     Q.  And would you take medicine to treat

Page 176

1  those?
2      A.  Most of the time, no.
3      MR. COLLINS: I only have just a
4  couple more minutes, and maybe it would be a
5  good time to break for lunch?
6      MR. CAMPBELL: Time for a break,
7  sure.
8      MR. COLLINS:  You've been drinking
9  coffee too.
10     MR. CAMPBELL: Water.
11     MR. COLLINS:  Okay, water, same
12  problem.
13     Q.  (By Mr. Collins) Now, what was your
14  practice with drinking bottles of water if you
15  were in and around a competition?
16     A.  I would personally label them, so I
17  would take off the wrapper, so I could
18  individualize my bottles, or I would make sure
19  they're in my bags.
20     Q.  Would you make sure -- would you
21  drink out of a bottle that you didn't open?
22     A.  No.
23     Q.  What would happen if you lost sight
24  of the bottle?
25     A.  I would throw it away, immediately.

Page 177

1    Q.   When you check into hotels, do you
2    always check in under your name?
3    A.   No, I didn't.  I checked in under
4    various names such as John Brown or other
5    different kind of names.
6    Q.   Why did you do that?
7    A.   From the point of paranoia and
8    making sure that I'm safe, and no one could have
9    access to my room, and tamper with my stuff.
10   Q.   When you took supplements, who
11   purchased them?
12   A.   I did.
13   Q.   Would you take them if someone else
14   purchased them?
15   A.   No.
16   Q.   What about stuff rubbed on you by
17   massage therapists, did you purchase that?
18   A.   No, I did not.
19   Q.   Why didn't you?
20   A.   Because at that point in time, I
21   felt that everything was funded through my
22   employer, Nike.  I felt that Nike would not put
23   their own athlete in jeopardy, especially when
24   they're their top athletes.
25   Q.   So Chris Whetstine, you met through

Page 178

1    Nike?
2    A.   Yes, sir.
3    Q.   He was paid by Nike?
4    A.   Paid by Nike.
5    Q.   You didn't do a personal background
6    check of him?
7    A.   No, I did not.
8    Q.   And why not?
9    A.   He was an employee of Nike, like I
10   was an employee of Nike.
11   Q.   I think we've covered this, but
12   after learning of your positive test in June of
13   last year, you continued to speak to youth
14   groups about a drug-free sport?
15   A.   Yes.
16   Q.   This one might seem a little silly,
17   but did you have any input in the WADA code?
18   A.   No, sir.
19   Q.   Did you have any ability to
20   negotiate drug testing or anything like that?
21   A.   No.
22   Q.   And you had the forms, it was just
23   take it or leave it, and you had to sign them?
24   A.   Yes, sir.
25   Q.   Did you ever knowingly take a banned

Page 179

1    substance?
2    A.   No.
3    Q.   Did you ever intend to cheat by
4    taking a banned substance?
5    A.   No, sir, not at all.
6    Q.   Did you ever authorize anyone to
7    give you a banned substance?
8    A.   No, sir.
9    MR. COLLINS: I believe that's all I
10   have for now.
11   MR. COLBERT: You mean all you have
12   for now, you mean on your direct?
13   MR. COLLINS: Yeah.
14   MR. COLBERT: Well, I think, we have
15   been going for an hour and 45 minutes, since the
16   last break.  It's 1:25. We can go off the
17   record.
18   (Discussion off the record.)
19   MR. COLBERT: Back here at 2:30,
20   we'll start.
21   (Recess taken from 1:25 to 2:30 for
22   the noon hour.)
23   (Justin Gatlin, Mr. Gatlin and Visie
24   Simms were present in the room.)
25   MR. COLBERT: Are we ready to go?

Page 180

1    Are you ready?
2    Do you want the witness to resume
3    his seat, or is he okay where he is?
4    MR. BOCK: He's okay.  Where -- it's
5    up to you, and it's up to the court reporter.
6    MR. COLBERT: As long as the court
7    reporter has no problems, then --
8    MR. GATLIN: I will go back, because
9    I couldn't see the projector, and I moved back.
10   MR. BOCK: Okay.  Sounds good.  We
11   won't get to the projector for a few minutes.
12   MR. CAMPBELL: The light can be
13   turned off.
14   MR. BOCK: We won't be there for a
15   few minutes.  But it's okay with me if he sits
16   there and if he's comfortable.
17   MR. COLLINS : You want to move over
18   here?  I will slide down.  Slide over a little
19   bit.
20   MR. GATLIN: I will just move over
21   here.
22   MR. COLLINS: I'm a little bit
23   better door than window.

## Page 181

1          EXAMINATION
2  BY MR. BOCK:
3     Q.  Mr. Gatlin, my name is Bill Bock,
4  and along with Mr. Tygart, one of the attorneys
5  for USADA. And, of course, you have been in a
6  hearing before, but it's a little different than
7  this one. And my role is to just ask you
8  questions about your testimony and about the
9  facts that we think relate to this case, so you
10  have got your counsel there to protect you as
11  well, but before we begin, do you have any
12  questions about the process?
13     A.  No.
14     Q.  Okay. And you recall that you were
15  sworn under oath at the beginning of your
16  testimony?
17     A.  Yes.
18     Q.  Okay. And is it your understanding
19  that you are still under oath?
20     A.  Yes.
21     Q.  Okay. And do you understand what
22  the oath means in terms of potential liability
23  for perjury if you do not tell the truth?
24     A.  Yes.
25     Q.  And so you are committed to telling

## Page 182

1  the truth?
2     A.  Yes.
3     Q.  Okay. We won't get to it at the
4  moment, but there were some newspaper articles
5  that USADA submitted. And one of those articles
6  had a quote from your attorney, Mr. Collins, and
7  that quote was: "This time" -- referring to the
8  upcoming arbitration hearing -- "we'll explain
9  the full stack of circumstances and everything
10  around it, and hopefully we'll get a similar
11  result."
12         In terms of the first part of that
13  statement "explain the full stack of
14  circumstances," as he was quoted, is that your
15  goal today to explain all of the relevant
16  information about your case?
17     A.  As much as I can.
18     Q.  Okay. The first thing I want to
19  talk with you about is the Voltaren cream that
20  you discussed in your direct examination.
21      The Voltaren cream is an
22  anti-inflammatory; is that correct?
23     A.  Yes.
24     Q.  And I was intrigued by the questions
25  from your counsel and your responses. Do you

## Page 183

1  recall when your counsel asked you, Can you get
2  it in Europe?
3     A.  Yes, I remember that.
4     Q.  Okay. And do you recall your
5  response, yes, you can over the counter?
6     A.  Yes.
7     Q.  The fact is in the United States,
8  you can't get it over the counter, can you?
9     A.  My knowledge, I never looked into
10  that.
11     Q.  You never looked into it? Okay.
12     A.  No.
13     Q.  But you did testify that this was a
14  subject that you used throughout -- or a
15  substance that you used throughout your career,
16  correct?
17     A.  Yes, the majority of my career is
18  overseas.
19     Q.  And do you know that Voltaren is a
20  prescription substance in the United States?
21     A.  At that point in time, no, I didn't.
22  At this point now, I do.
23     Q.  And have you ever had a prescription
24  for Voltaren cream?
25     A.  No, I haven't.

## Page 184

1     Q.  Who recommended the use of Voltaren
2  cream?
3     A.  Chris Whetstine.
4     Q.  Who else?
5     A.  Who else?
6     Q.  Mm-hm.
7     A.  Other than that, Chris Whetstine was
8  the only person that used Voltaren cream.
9     Q.  Well, how about Voltaren pills?
10     A.  They were used by my coach and by
11  Chris Whetstine as well.
12     Q.  Your coach used Voltaren pills?
13     A.  Well, he recommended when I was
14  overseas as an anti-inflammatory.
15     Q.  And did he recommend them in the
16  United States?
17     A.  At that one time.
18     Q.  Trevor Graham recommended that you
19  use the Voltaren pill in April of 2006, correct?
20     A.  Yes.
21     Q.  And you've told Mr. Novitzky about
22  that, correct?
23     A.  Yes.
24     Q.  And, in fact, that pill was given to
25  you by Randall Evans, correct?



**Page 185**

1    A.   Yes.
2    Q.   The assistant track coach; is that
3  right?
4    A.   Yes.
5    Q.   Who also gave you an injection,
6  correct?
7    A.   Of B-12, yes.
8    Q.   Are you aware of other athletes that
9  Mr. Graham gave Voltaren pills to in the United
10  States?
11    A.   As far as I know, all -- everyone in
12  the camp and anyone outside of the camp and
13  other camps have taken Voltaren pills as well.
14    Q.   Okay.  And how many of those
15  athletes have a prescriptions for Voltaren?
16    A.   I do not know that information, but
17  I would say, if I had to guess, I would say
18  none.
19    Q.   You would guess none?
20    A.   I would say none.
21    Q.   And when was the first time that you
22  realized that Voltaren was a prescription drug
23  in the United States?
24    A.   When my lawyer, John Collins, told
25  me it was.

**Page 186**

1    Q.   Why this long-term use of Voltaren?
2    A.   It was an anti-inflammatory.  It was
3  very potent for its use.  I mean, something that
4  -- you can't find everyday aspirin overseas.  So
5  I mean, sometimes they have different things
6  that substitute the American product, and
7  Voltaren is one of those.
8    MR. COLLINS:  Obviously, he's gone on
9  with this quite a bit, but I think I'm going to
10  object to the extent that Voltaren is not a
11  banned substance.
12    MR. BOCK:  Mr. -- go ahead, I'm
13  sorry.
14    MR. COLLINS:  -- take it without --
15  we're not here -- you know, we're here to find
16  out whether there was a doping violation, and
17  Voltaren is not on the list of prohibited
18  substances on the WADA code or anything else.  I
19  mean, if I'm wrong, correct me, but I'm not sure
20  what all this is leading to.
21    MR. COLBERT:  Well, the witness
22  testified at length about Voltaren.  And I guess
23  I'm inclined to give Mr. Bock a little bit of
24  leeway --
25    MR. COLLINS:  That's fine.

**Page 187**

1    MR. COLBERT:  -- some leeway about
2  it, but your client testified at quite some
3  length about it.
4    MR. COLLINS:  Right.  And I -- yeah,
5  there's nothing -- I don't think there's
6  anything impeaching.  We're just saying the same
7  thing.  I just -- there's a relevance objection,
8  if he's going to keep going about something
9  that's not a banned substance.
10    MR. COLBERT:  Well, let's --
11    MR. BOCK:  Can I respond -- if I
12  could respond to that, and one of the things
13  here that's being charged is that Mr. Gatlin is
14  entitled to a redaction based on exceptional
15  circumstances which requires him to exercise the
16  utmost care for what goes into his body.  And I
17  think an examination of how -- he testified on
18  direct that the only way he could possibly have
19  received this -- gotten this positive test
20  result was because of this one substance,
21  because of his extreme care in the use of other
22  substances.
23    So I'm going to go through a lot of
24  substances and ask him questions about what care
25  he used and what investigation, knowledge, to

**Page 188**

1  test his testimony about the extreme care that
2  he allegedly used in protecting his body against
3  the use of prohibited drugs either from his
4  coach or from other sources.
5    MR. COLBERT:  I'm not stopping you
6  from --
7    MR. BOCK:  Great.  I just -- I felt a
8  need to respond to Mr. Collins' remarks about
9  the relevance.
10    Q.   (By Mr. Bock) When you had your
11  investigators test products, did they test
12  Voltaren cream?
13    A.   I don't understand the question.
14    Q.   You testified earlier that you had
15  both investigators test some of your
16  supplements.  Did they test Voltaren cream?
17    A.   Dr. Black?  It wasn't investigators.
18  It was Dr. Black, who tested my supplements.  My
19  supplements -- that was Chris Whetstine's stuff
20  that he used.
21    Q.   So Dr. Black never tested the
22  Voltaren cream, correct?
23    A.   Not to my recollection.
24    Q.   But is it correct that Mr. Whetstine
25  gave your investigators a bunch of creams that

## Page 189

1    he was using?
2       A.  Yes.
3       Q.  Why weren't those tested?
4       MR. COLLINS: I'm going to object.
5    That's assuming a fact not in evidence.
6       MR. BOCK: He can answer.
7       MR. COLBERT: Could you -- excuse me.
8    Could you read back the last question and
9    answer.
10      (Reporter reread the last question and
11    answer, Page 188, Line 24 to Page 189, Line 3.)
12      MR. COLLINS: There's been no
13    evidence that they weren't tested.
14      MR. BOCK: He can tell me whether
15    they were or they weren't.
16      MR. COLBERT: You are objecting to
17    foundation?
18      MR. COLLINS: Yeah, he said, why
19    didn't he test them?  And there's been no
20    evidence that they weren't tested.  And when
21    Dr. Black testifies, he can say --
22      MR. COLBERT: Can you rephrase?
23      Q.  (By Mr. Bock) Were the creams that
24    Chris Whetstine gave your investigators tested?
25       A.  I don't know.

## Page 190

1       Q.  Did you ask?
2       A.  I asked the -- I asked the
3    investigators to pick up the cream, yes, and
4    they got it from him.
5       Q.  Weren't you curious about whether
6    there were any prohibited substances in the
7    creams that Chris Whetstine gave your
8    investigators?
9       A.  Yes. As far as I'm concerned, when
10    they were -- if they were tested, someone would
11    come back and tell me that they found something.
12       Q.  Well, sir, your whole theory today
13    is that Chris Whetstine contaminated your body
14    through rubbing a cream onto your body, and are
15    you telling me that you weren't curious about
16    whether the creams that you gave your
17    investigators had a prohibited substance in
18    them?
19       A.  I'm not saying that at all, no.  I'm
20    just saying that at that point in time, I had a
21    lot of things going on, and I was investigating
22    that. I'm the one that started that, to get the
23    creams.
24       Q.  All right. And did you ever ask
25    anybody where are these going to be tested?

## Page 191

1       A.  Well, I was having a
2    miscommunication with my lawyer, Cameron Myler.
3    That's why I have John Collins now, because a
4    lot of things weren't getting done with Cameron
5    Myler at that point in time, and a lot of things
6    still haven't been brought to us from that law
7    firm that we should have in this case.
8       Q.  Do you have any information that
9    those creams were ever tested, regardless of who
10    your --
11       A.  That's one of the informations I do
12    not know.
13       Q.  Have you ever used the term
14    "Voltaren bean" before?  Bean, b-e-a-n.
15       A.  No.
16       Q.  No? Have you ever used the term
17    "bean" in describing a substance that you
18    ingested, that you ate?
19       A.  A bean that I have eaten?
20       Q.  Yeah --
21       A.  I have taken -- I have said Voltaren
22    pill.
23       Q.  You said "pill"? How about bean?
24       A.  Bean, not to my recollection, I
25    don't remember.

## Page 192

1       Q.  Do you recognize the term "bean" as
2    slang for anything?
3       A.  When it was told to me. Not by my
4    own knowledge.
5       Q.  Okay. And what were you told and
6    by --
7       A.  It was told to me by Jeff Novitzky.
8       Q.  And what did he tell you?
9       A.  It was some sort of testosterone.
10       Q.  And how did the term "bean" come up
11    in your conversation with Jeff Novitzky?
12       A.  He was describing the bean and what
13    it looked like and everything. He said "bean."
14       Q.  And did you use that term in a
15    conversation with Memo to describe what Trevor
16    Graham gave you?
17       A.  No, I didn't. The discrepancy was
18    the color of the pill.
19       Q.  But did you use the term "bean"?
20       A.  Not that I remember.
21       Q.  Well, do you have a recollection of
22    what term you used?
23       A.  All I can remember is cream.
24      MR. COLLINS: I'm going to object.
25    Because he hasn't set forth the question. It's

## Page 193

1  -- it may be possible that Memo said and
2  referred to it as a "bean," and he may have
3  answered --
4         MR. BOCK: Okay. Well, let's --
5         MR. COLLINS: As opposed to him
6  referring to it as a bean independently. If you
7  ask the question, "Did you take a bean" -- or,
8  "What color was the bean you took," that's
9  different than him saying "Oh, I took a bean."
10        MR. BOCK: And the basis of the
11 objection is?
12        MR. COLLINS: Is that you are
13 saying -- that you were asking, Did he say
14 "bean"? He said "no," it was asked and
15 answered. You asked it again, and you didn't
16 ask the other part, and so it would be asking it
17 in full context, because apparently you --
18        MR. COLBERT: I hate to do this, but
19 I just want -- would you go back and read the
20 two questions about -- that Mr. Bock asked about
21 the bean. I just want to see where we are,
22 because it's -- because I prefer not to have
23 lawyers testifying about what's going on. Just
24 object. Give me the basis of the objection, and
25 then we can make a decision, but overexplaining

## Page 194

1  your objection, I think, is unnecessary.
2         MR. COLLINS: Oddly, I was trying to
3  prevent testimony.
4         (The reporter read back the preceding
5  testimony on Page 192, Lines 14 to 23.)
6         MR. COLLINS: I think he said
7  "green."
8         MR. COLBERT: I'd have to say, I
9  haven't seen -- heard anything objectionable yet
10 in that line of questioning.
11        Q.  (By Mr. Bock) Just to clarify, I'm
12 not asking you about the color. I'm asking you
13 about the term "bean." Can you say with
14 certainty that you yourself never used the term
15 "bean" in a conversation with Memo?
16        A.  I don't remember.
17        Q.  You don't remember?
18        And in terms of your conversations
19 with Jeff Novitzky, can you tell us whether you
20 recall ever using the term "bean"?
21        A.  I did not.
22        Q.  Are you certain about that?
23        A.  Yes.
24        Q.  How many conversations did you have
25 with Memo?

## Page 195

1         A.  As far as I can remember,
2  collective, maybe three.
3         Q.  And was someone else always present
4  in those conversations with Memo?
5         A.  Say, my agent, Renaldo Nehemiah.
6         Q.  Was he always present in those
7  conversations?
8         A.  As far as I can remember.
9         Q.  We'll come back to those.
10        Next topic I want to cover with you,
11 Mr. Gatlin, is the topic of injections that you
12 testified regarding on your direct examination.
13        In the course of your career, how
14 many injections of substances have you received
15 in order to assist you in recovering from injury
16 or fatigue?
17        A.  As far as I can recall, three.
18        Q.  And could you go ahead and tell us
19 when you received those three injections?
20        A.  Once before for the hamstring, and
21 then a B-12 shot in the hamstring, and then on
22 my knee.
23        Q.  And the shot in your knee and the
24 B-12 in your hamstring were the two that you
25 testified when Mr. Collins was asking you

## Page 196

1  questions, correct?
2         A.  Yes.
3         Q.  When did the one before occur?
4         A.  Early 2004.
5         Q.  And who gave you that injection?
6         A.  Dr. Martini.
7         Q.  Dr. Martini?
8         A.  Yes.
9         Q.  Let's talk about Dr. Martini a bit.
10 Who referred you to Dr. Martini?
11        A.  Trevor Graham.
12        Q.  I'm sorry?
13        A.  Trevor.
14        Q.  Trevor.
15        When was the first time he referred
16 you to Dr. Martini?
17        A.  Early '04.
18        Q.  Why did Trevor refer you to
19 Dr. Martini?
20        A.  Well, I had an injury, and it was a
21 very respected doctor in the area.
22        Q.  How do you know he's a respected
23 doctor in the area?
24        A.  Because he works with a lot of
25 professional athletes from that area.



**Page 197**

1    Q.   Who are some of the other athletes
2   he's worked with?
3    A.   He's worked with soccer teams.  He's
4   worked with baseball teams.  I can't say just
5   one individual.
6    Q.   And he's worked with athletes on
7   Sprint Capitol?
8    A.   Yes.
9    Q.   Who are the athletes on Sprint
10  Capitol he's worked for?
11   A.   Demetrie Washington, Shana Robinson.
12  I also think he did with Me'Lisa Barber.
13   Q.   Any others?
14   A.   That's all I can remember.
15   Q.   Do you know if he worked with Dennis
16  Mitchell?
17   A.   No.
18   Q.   How about C.J. Hunter?
19   A.   No, they weren't there when I was
20  there.
21   Q.   All right.  Was Jerome Young there
22  when you were there?
23   A.   No, he wasn't.
24   Q.   And you don't know whether
25  Dr. Martini worked with Jerome?

**Page 198**

1    A.   No.
2    Q.   How about Tim Montgomery?
3    A.   He wasn't there when I was there.
4    Q.   And how about Calvin and/or Alvin
5   Harrison?
6    A.   I don't know if they went to him or
7   not.  I only -- there was only one in the camp
8   for less than a year..
9    Q.   And Michelle Collins was not there
10  while you were there; is that right?
11   A.   No, sir.
12   Q.   Okay.  And do you know whether she
13  worked with Dr. Martini?
14   A.   No, I don't.
15   Q.   How about Antonio Pettigrew?
16   A.   Definitely wasn't there when I was
17  there.
18   Q.   And what was in that first injection
19  that you received from Dr. Martini?
20   A.   Basically the same thing that it was
21  for my knee.
22   Q.   Do you know what substance was
23  injected into your knee?
24   A.   It was a mixture of
25  anti-inflammatories and a slight steroid.

**Page 199**

1   That's why I had recommendations from USADA to
2   get it.
3    Q.   Well, you testified that you called
4   USADA's reference line in March of 2006.  But
5   you didn't testify about contacting USADA in
6   2004.  Is that what you are saying now?
7    A.   Well, first of all, I didn't contact
8   any reference line.  I had my agent's assistant
9   call, and whichever way she called, I don't
10  know, but she's the one who called, and it was
11  confirmed through them.
12   Q.   And who is your agent's assistant?
13   A.   Britton Stackhouse.
14   Q.   Brenda?
15   A.   Britton Stackhouse.
16   Q.   Can you spell that for us, please?
17  Sorry.
18   A.   B-r-i-t-t-o-n.
19   Q.   Stackhouse.
20        And she called and asked if you
21  could have an injection on your knee that
22  combined an inflammatory and a steroid?
23   A.   Yes.
24   Q.   Anti-inflammatory and a steroid?
25   A.   Yes.

**Page 200**

1    Q.   What kind of steroid?
2    A.   I'm not sure, sir.  I can't remember
3   the name.
4    Q.   All right.  And that injection you
5   did have that contained a steroid was in March
6   of 2006, correct?
7    A.   Yes.
8    Q.   And do you have any record of this
9   phone call that was made to USADA?
10   A.   No, I don't.  Maybe my agent does,
11  at the time.
12   Q.   Now, Britton Stackhouse hasn't been
13  identified as a witness in this proceeding.  Do
14  you know where she is?
15   A.   She knows -- she works with Octagon,
16  but my agent, Renaldo Nehemiah, is here as a
17  witness.
18   Q.   Well, but Mr. Nehemiah didn't make
19  the phone call; is that correct?
20   A.   He directed her to make the phone
21  call, so maybe he'll have the information.
22   Q.   Well, I'm asking what you know.  If
23  you don't know, you can tell me.
24   A.   Okay.
25   Q.   But was Mr. Nehemiah on that phone



Page 201

1  call, to your knowledge?
2      A.   No, he wasn't.
3      Q.   And where was Mr. Nehemiah when that
4  phone call was made?
5      A.   They worked in the same office, so I
6  called Renaldo Nehemiah, and he referenced to
7  tell Britton to call, so ...
8      Q.   And who talked with you -- at some
9  point did somebody come back with you and tell
10  you that a phone call had been made?
11     A.   Yes.
12     Q.   And who was that?
13     A.   Britton Stackhouse.
14     Q.   And what did she tell you?
15     A.   She told me everything was okay.  I
16  could take a pill ten days outside of
17  competition.
18     Q.   All right.
19          What else did she tell you?
20     A.   That's all, really.
21     Q.   Okay.  Well, I thought you testified
22  that she called to find out about whether you
23  could take an injection?
24     A.   Yes.
25     Q.   You just said that she told that she

Page 202

1  could -- you could take a pill ten days outside
2  of the competition?
3      A.   I meant the injection, sorry.
4      Q.   Was there another phone call about a
5  pill?
6      A.   No, there wasn't.
7      Q.   Have you ever consulted with USADA
8  about taking a pill?
9      A.   No.
10     Q.   So, did Ms. Stackhouse tell you who
11  she spoke with at USADA?
12     A.   No, she didn't.
13     Q.   Did you ask?
14     A.   I didn't.  I asked if she spoke to
15  USADA, and did it come through.  She said, yes.
16  I didn't ask what person she directly spoke to.
17     Q.   So for all you knew, it could have
18  been the receptionist that she spoke with?
19     A.   Yes.
20     Q.   And what was the substance of the
21  conversation that you understood Ms. Stackhouse
22  had with USADA?
23     A.   She asked a question about if it was
24  okay for me to take the shot.
25     Q.   Did Ms. Stackhouse have your medical

Page 203

1  records?
2      A.   Meaning the shot, the information
3  for the shot?  Yes.
4      Q.   She has your medical records?
5      A.   Are you talking about the
6  information for the shot?
7      Q.   No, sir.
8      A.   The medical records?
9      Q.   No, sir.  What I'm referring to
10  would be the file that your physician maintains
11  on you.
12     A.   No.
13     Q.   Okay.  She didn't have that?
14     A.   No.
15     Q.   What did she know about your
16  condition?
17     A.   She knew that I was injured.
18     Q.   What else did she know?
19     A.   That's the only thing she knew.
20     Q.   What was the extent of your -- you
21  testified earlier that you had knee pain.  What
22  was your injury?
23     A.   I had -- the tendons in my knee were
24  rupturing or they were just -- they were rubbing
25  against the bone.

Page 204

1      Q.   Did you tell Ms. Stackhouse that the
2  tendons of your knee were rubbing against the
3  bone?
4      A.   Yes.
5      Q.   When did you tell her that?
6      A.   I don't recall..
7      Q.   I thought that you had talked with
8  Mr. Nehemiah, and he talked with Ms. Stackhouse?
9      A.   I told Nehemiah, I'm sorry.
10     Q.   Okay.  So you actually did not have
11  a conversation with Ms. Stackhouse?
12     A.   When I talked to Renaldo Nehemiah,
13  he puts the phone on the speaker, because they
14  work in the same office, at that point in time,
15  because they had construction going on, so when
16  he would -- when I would talk with both of them
17  at the same time.  He would coordinate the
18  conversation, and then he would refer it to her.
19     Q.   So now it's -- it really wasn't a
20  conversation with you and Mr. Nehemiah, where he
21  went and talked to her in a different office;
22  actually, the conversation was with both of them
23  together on the speakerphone; is that correct?
24     A.   Well, it was a conversation that I
25  could hear Britton Stackhouse in the background,