7-30-07 to 8-01-07　　　　　　　　　　　USADA vs. GATLIN

52 (Pages 205 to 208)



Page 205

1　and that's her boss, and her boss ordered her to
2　do something.
3　　　Q.　Okay.　So that's what I'm saying:
4　It actually was a conversation on a
5　speakerphone; is that correct?
6　　　A.　Yeah.
7　　　Q.　Are you sure about that?
8　　　A.　Yeah.
9　　　Q.　Because you recall hearing both
10　Mr. Nehemiah and Ms. Stackhouse on the phone at
11　the same time, correct?
12　　　A.　Yes.
13　　　Q.　And this conversation took place in
14　March of 2006; is that right?
15　　　A.　Yes.
16　　　MR. COLLINS:　Just to clarify -- and
17　I don't know if we covered this in our direct --
18　I believe the shot occurred on March 1st, and if
19　you want, the medical record is there, so I
20　think he testified that's when the shot
21　happened.　It's possible -- I don't know that it
22　all happened in one day.　You can ask.　But I
23　don't want it to be misled.　We could
24　introduce -- I saw that for the first time
25　today, the record says March 1st shot.

Page 206

1　　　MR. BOCK:　Let me just comment to
2　that:　No.　At the hearing, it's kind of a
3　difficult time to get records.　You made a
4　decision to apparently present your case without
5　medical records, so I guess -- are you
6　attempting now to get medical records into --
7　　　MR. COLLINS:　Well, one, I don't
8　believe I rested my case, and I think that we
9　could introduce the records.
10　　　MR. COLBERT:　Could I just suggest
11　that arguing about what you may or may not put
12　on in the rebuttal case may be appropriate
13　in the middle of cross-examination?　I
14　understand Mr. Bock has questions, and you may
15　need to do some follow-up on redirect or
16　rebuttal, but why don't we just continue the
17　examination for the moment.
18　　　Q.　(By Mr. Bock) So after your lawyer's
19　comment, do you now think that perhaps the
20　conversation did not occur in March?
21　　　A.　I'm not sure.
22　　　Q.　Do you have a specific recollection
23　of this conversation, Mr. Gatlin?
24　　　A.　Not the time frame.
25　　　Q.　Do you have a specific recollection

Page 207

1　of the conversation, Mr. Gatlin?
2　　　A.　I remember talking to my agent and
3　his assistant, yes.
4　　　Q.　And you recall that they were on the
5　speakerphone?
6　　　A.　Yes.
7　　　Q.　And what do you recall that
8　Ms. Stackhouse said when you were on the
9　speakerphone?
10　　　A.　She said -- she greeted me, said,
11　"Hello Justin," and I told Renaldo my problem.
12　He understood what I was talking about.　And she
13　also said "Okay," and that's the conversation.
14　　　Q.　What did you ask them to do?
15　　　A.　To check with USADA if I could take
16　it or not.
17　　　Q.　Now, your testimony on direct was
18　that you do all your supplements yourself, you
19　take full responsibility for everything you
20　ingest; is that correct?
21　　　A.　Yes.
22　　　Q.　Why did you leave this conversation
23　to USADA to your agent?
24　　　A.　Because my agent, that's his job.
25　　　Q.　And so, you felt like you could just

Page 208

1　leave it to your agent without investigating
2　further?
3　　　A.　Yes.
4　　　Q.　Now, that's the conversation where
5　you asked for your agent to contact USADA, now I
6　want to go to the conversation where you
7　received information about the contact, alleged
8　contact with USADA.
9　　　When did that occur?
10　　　A.　The contact about what now?
11　　　Q.　I'm assuming that there was a second
12　phone call about contacting USADA because you
13　had to be informed what USADA said; right?
14　　　A.　Yes.
15　　　Q.　When did that conversation occur?
16　　　A.　I'm not sure.
17　　　Q.　Who did you speak with about the
18　information that was received back from USADA?
19　　　A.　My agent, my agency.
20　　　Q.　Your agency?　I was looking for the
21　name of an individual.
22　　　A.　I can't remember if it was either
23　Britton or Renaldo.
24　　　Q.　Can you remember what was said?
25　　　A.　That it was okay to take the shot.

GATLIN v. UNITED STATES ANTI-DOPING AGENCY

Dockets.Justia.com



Page 209

1    Q.  And did you inform them what drugs
2  were going to be in the shot?
3    A.  Yes.
4    Q.  Why can't you remember those today?
5    A.  Because I'm going through a very
6  traumatic situation right now that has nothing
7  to do with that information.  I mean, I can't
8  remember.  I do have ADD, I'm sorry.
9    Q.  And I appreciate that.  And I want
10  you to take as much time as you want to respond
11  to these questions, but I guess I would ask you
12  why you think it doesn't relate to why we're
13  here today?
14    A.  Because I didn't test positive for
15  it.
16    Q.  How do you know?
17    A.  How do I know I didn't test positive
18  for it?
19    Q.  Yeah.  You don't know what was in
20  the shot.
21    A.  Well, I mean, for one, from what I
22  found out that it might be a cream-based tested
23  positive, so cream and injection are two
24  different things.
25    Q.  What's a cream-based?  You tested

Page 210

1  positive for testosterone.  Do you understand
2  that?
3    A.  I'm talking about the information
4  from Dr. Black.
5    Q.  Okay.  And you understand that you
6  tested positive for testosterone; is that right?
7    A.  I understand that.
8    Q.  Do you understand that testosterone
9  can be injected?
10    A.  It can be a testosterone precursor.
11    Q.  Do you understand that testosterone
12  can be injected?
13    A.  Yes.  But if I said it was an
14  anti-inflammatory steroid, then it's not a
15  testosterone.
16    Q.  So, it's -- your testimony is that
17  it was not a combination of an anti-inflammatory
18  and a steroid?  It was an anti-inflammatory
19  steroid?
20    A.  What I'm saying is that I think that
21  they're two different things.  Maybe I'm wrong.
22  Maybe -- I'm not a scientist, I'm sorry.
23    Q.  I'm not either.  That's okay.
24    A.  I'm just saying that I really
25  believe in my heart that having a test positive

Page 211

1  for this shot that was given to me by a doctor
2  who is a sports orthopedic who understands the
3  difference between something he can't give to
4  his athletes, that would test them positive.
5    Q.  Okay.  All right.
6    A.  That's all I know.
7    Q.  All right.  And -- okay.
8    Do you know for sure that you told
9  your agent the precise substances that were in
10  the shot?
11    A.  Yes.
12    Q.  Now, that occurred -- that shot then
13  occurred in March of 2006, right?
14    A.  Somewhere around that time.
15    Q.  And there were no drug tests between
16  the time of that shot and the time of your
17  positive test results; is that correct?
18    A.  Yes.
19    Q.  So were there any drug tests between
20  the time of the shot and your positive test
21  results?
22    A.  Between April?
23    Q.  Between the time of the shot and
24  April 22nd?
25    A.  No, I don't think so.

Page 212

1    Q.  Now, you said something just a
2  minute ago that caused me to think.  You said
3  the shot was given to you by your doctor?
4    A.  Yes.
5    Q.  Okay.  So it was given to you by the
6  doctor in his office?
7    A.  Dr. Martini?
8    Q.  Yes.
9    A.  He works in an office, yes.
10    Q.  I guess I got confused with the
11  other shot that you had in April.
12    A.  Okay.
13    Q.  When you were in Dr. Martini's
14  office, did you ask him what he was injecting
15  into your knee?
16    A.  Yes.
17    Q.  What did you say to him, and what
18  did he say to you?
19    A.  He informed me that this -- the
20  medication that he was injecting into my knee
21  was not going to test me positive at the point
22  in time because I was not ready, and it would
23  not last till the duration of when I started
24  running.  He asked me when I started to -- when
25  I was going to run, and he mapped out what

7-30-07 to 8-01-07                              USADA vs. GATLIN

54 (Pages 213 to 216)

Page 213

1    procedures he should do.
2        Q.    Okay.  And so it was your
3    understanding that if you took that substance
4    close enough in relation to a drug test, that
5    you would test positive?
6        A.    It would come up, yes.
7        Q.    So your understanding was that he
8    was injecting a prohibited substance into your
9    knee?
10       A.    Yes.
11       Q.    Did you discuss that with Trevor
12   Graham?
13       A.    Yes.
14       Q.    And he knew that you were injecting
15   a prohibited substance into your knee?
16       A.    Yes.
17       Q.    Did you discuss it with anyone else
18   besides Dr. Martini, your agent, and Trevor
19   Graham?
20       A.    No.
21       Q.    How about Randall Evans?
22       A.    No, he was not there.
23       Q.    Let's talk about the second
24   injection that you received in 2006, the third
25   to which you testified.

Page 214

1            That was for a different physical
2    issue, correct?
3        A.    Yes.
4        Q.    That was for pain in your hamstring;
5    is that correct?
6        A.    Yes.
7        Q.    Have you ever told anyone that you
8    had tightness in your hamstrings in April 2006,
9    and that that was the reason that you took the
10   injection?
11       A.    That I had tightness?
12       Q.    Yeah.
13       A.    My hamstring was damaged.
14       Q.    Okay.
15       A.    It was pulled.
16       Q.    Okay.  Well, let's kind of figure
17   this out.  I mean, is there a difference in your
18   mind between tightness and damage?
19       A.    Tightness means you can stretch it,
20   and you can run.
21       Q.    Okay.
22       A.    Damaged is, you can't run.
23       Q.    So was it tight or was it damaged?
24       A.    It was damaged.
25       Q.    And what is that knowledge about

Page 215

1    your hamstring being damaged in April of 2006
2    based on, your experience, or what somebody told
3    you?
4        A.    It was both.
5        Q.    Okay.  What were your experiences
6    that showed you that you couldn't run on your
7    hamstring in April of 2006?
8        A.    What was my experience?
9        Q.    Yes.
10       A.    Pulling it while I was at practice.
11       Q.    When did that occur?
12       A.    I don't know the exact date.
13       Q.    In April of 2006?
14       A.    Yeah, a little bit before that.
15       Q.    So, in March of 2006?
16       A.    It was at the end.
17       Q.    Okay.  End of March, 2006.
18            And what workout were you doing when
19   you pulled your hamstring?
20       A.    Some speed workout.
21       Q.    Where did it occur?
22       A.    Over at the track.
23       Q.    In Raleigh?
24       A.    Yes.
25       Q.    Were you aware at the time that it

Page 216

1    happened that you had done something?
2        A.    Yes.
3        Q.    Describe to us how it developed.
4        A.    It wasn't as bad as when I pulled my
5    hamstring in Mexico, but it was twinged to where
6    it gave me a significant limp when I walked, I
7    was walking around.
8        Q.    So you couldn't walk without a limp?
9        A.    Yes.
10       Q.    And I'm assuming -- well, let me
11   back up.
12            How long did this damaged condition
13   last?
14       A.    In my mind, it lasted almost all the
15   way up to Mt. SAC.
16       Q.    And Mt. SAC ended on the 15th of
17   April?
18       A.    Yes.
19       Q.    So this damaged condition lasted
20   through April 15th?
21       A.    I would say a little before.
22       Q.    The 13th, or 24th?
23       A.    I think it was like the 14th or the
24   15th.  I had to have been ready to run before
25   then, because if I wasn't ready to run, I wasn't

Page 217

1  going to go.
2      Q.  So when did you make the decision
3  about whether you were okay to run?
4      A.  I guess, maybe, like around the
5  10th. I'm not sure.
6      Q.  So that you recovered from your
7  damaged hamstring by April 10th?
8      A.  Possibly.
9      Q.  Is it difficult to recall back then?
10     A.  It is.
11     Q.  All right. So some time in the
12  frame of a few days before Mt. SAC, your
13  hamstring started to feel better; is that
14  correct?
15     A.  Yes.
16     Q.  And that was, then, a couple of days
17  after you received an injection in your
18  hamstring from Randall Evans, correct?
19     A.  Yes.
20     Q.  On April 6th or 7th?
21     A.  Yes.
22     Q.  And you've recounted all these
23  events that we are talking about now to a
24  federal investigator, correct?
25     A.  Yes.

Page 218

1      Q.  And you realize you had to tell the
2  truth then, correct?
3      A.  Yes.
4      Q.  And you realized that if you didn't,
5  you could be prosecuted; is that correct?
6      A.  Yes.
7      Q.  Okay. So, were you instantaneously
8  on April 10th just running at top speed?
9      A.  No.
10     Q.  Make a quick recovery?
11     A.  No.
12     Q.  How long did it take you to recover
13  from that damaged hamstring?
14     A.  I don't know.
15     Q.  You don't know?
16     A.  (Nod of head.)
17     Q.  Well, can you talk us through your
18  recovery and tell us when you started to feeling
19  better, and what meets you seemed to get better?
20     A.  Well, I mean, you don't just
21  instantaneously just get better on the 10th if
22  you are hurt significantly on the 9th. So,
23  obviously you work towards getting better. I
24  just knew the time frame of maybe the 10th, all
25  the way working my way up to the 14th, or 15th.

Page 219

1      Q.  When did you feel like you were all
2  the way back at 100 percent?
3      A.  After Mt. SAC.
4      Q.  So within just a few days?
5      A.  Well, I wouldn't say in a few days.
6  I mean, I would say the 16th, and the Mt. SAC
7  was on the 15th. I said after Mt. SAC, so,
8  between --
9      Q.  But I assumed it meant before
10  Kansas, which was the next week?
11     A.  Well, that's a week away.
12     Q.  Uh-huh, some time in there. I'm not
13  trying to get you down to the day.
14     A.  I understand. I'm trying to get you
15  to understand that it wasn't the next day, so,
16  within that time that I was traveling and doing
17  stuff, yes, it feels better when you are not on
18  it all the time, and you are not working out all
19  the time on it.
20     Q.  Okay. All right. Getting back to
21  the injection, this injection on April 6th or
22  7th, you testified, was a B12 injection; is that
23  right?
24     A.  Yes, sir.
25     Q.  And what was your understanding that

Page 220

1  the B12 was supposed to do?
2      A.  It was a vitamin. It was supposed
3  to help heal my torn hamstring and micro fibro
4  tears and reduce swelling.
5      Q.  Who told you this?
6      A.  Dr. Martini, that's what B12 does.
7  You can read up on it too.
8      Q.  And so before April of 2006, when
9  you went to see Dr. Martini, how long had you
10  been meeting with Dr. Martini?
11     A.  I only met with Dr. Martini on two
12  occasions.
13     Q.  Had you ever been alone with
14  Dr. Martini before?
15     A.  Oh, yeah, usually, when you are in
16  the office with him.
17     Q.  Well, on direct, you testified that
18  you met with him, Randall Evans, your assistant
19  coach, Trevor Graham, your coach, and Me'Lisa
20  Barber, another athlete?
21         MR. COLLINS: I'm going to object. I
22  think that mischaracterized the record. I think
23  his testimony --
24         MR. BOCK: Why don't you let your
25  witness -- or your client respond?

## Page 221

1    MR. COLLINS: You said he said that
2  on direct testimony.  I can object that that's
3  not what the record says.  That's a proper
4  objection.
5    MR. BOCK: Was my -- could -- do you
6  mind reading my question?  I thought I said it
7  was my understanding; if not, I misspoke.
8    (Reporter reread the previous
9  question.)
10    THE REPORTER:  And then you
11  objected.
12    MR. COLBERT: Can you rephrase?
13    Q.  (By Mr. Bock) Yeah, I can rephrase.
14  I apologize.  I wasn't -- because I wasn't
15  completely sure about that point.
16    Didn't you testify that you met with
17  Randall Evans, Trevor Graham, Me'Lisa Barber,
18  and Dr. Martini?
19    A.  On separate occasions.  I didn't say
20  all at once.
21    Q.  Okay.  And what were the purpose of
22  these separate meetings?
23    A.  Well, Me'Lisa Barber had a B12 shot
24  before, and I was asking her how she felt, what
25  did she feel, did it benefit her.  And I met

## Page 222

1  Randall Evans and Trevor Graham to talk about
2  the B12.  And I met with Dr. Martini to confirm
3  that it was something that I was able to take.
4    Q.  Who did you meet with first?
5    A.  Dr. Martini -- I mean, well, talked
6  to Trevor and Randall about it, then met with
7  Dr. Martini.
8    Q.  So it was initially Trevor's
9  recommendation to get the B12 shot?
10    A.  Yes.
11    Q.  Okay.  And then you went -- after
12  Trevor recommended it, then you went to
13  Dr. Martini?
14    A.  Yes, I did.
15    Q.  Did you contact USADA in relation to
16  that shot?
17    A.  No, I did not.
18    Q.  Did you ask anybody about whether
19  you should contact USADA?
20    A.  No, it was B12.  I could take it
21  orally.
22    Q.  Okay.  Were you aware of that, or
23  did someone tell you that?
24    A.  I was aware of it.  I could take B12
25  all day and not test positive for it.  It's not

## Page 223

1  a banned substance.  It's a vitamin..
2    Q.  All right.
3    Tell us about your conversation with
4  Dr. Martini.  What did he tell you?
5    A.  That he thinks it would be a great
6  way to get my hamstring back on track.
7    Q.  Okay.  And was that conversation in
8  Dr. Martini's office, or was it over the phone?
9    A.  I think it was over the phone.
10    Q.  So did Dr. Martini ever examine your
11  hamstring?
12    A.  Did he ever examine it?
13    Q.  Yeah, in March -- or in April of
14  2006?
15    A.  Not that I remember.
16    Q.  So he diagnosed you over the phone?
17    A.  (Nod of head.)
18    Q.  Is that correct?
19    A.  Yes.
20    Q.  And ordered an injection over the
21  phone; is that correct?
22    A.  He recommended it.  He didn't order
23  it.
24    Q.  All right.  And was it in this phone
25  conversation that Dr. Martini told you that

## Page 224

1  Randall Evans was taking classes to become more
2  medically inclined?
3    A.  Yes.
4    Q.  How did that topic come up?
5    A.  Um, I don't remember how it came up.
6  We were just talking about it.
7    Q.  Because it was your understanding
8  that Randall Evans, your assistant coach, was
9  going to be the one giving you the injection?
10    A.  Yes.
11    Q.  So, did you ask the questions
12  about -- first of all, had you seen Randall
13  Evans giving athletes injections before?
14    A.  No, but I know he gave Me'Lisa
15  Barber one.
16    Q.  And had Randall Evans been going to
17  medical or nursing school or any sort of
18  professional paramedic school or anything like
19  that?
20    A.  Yes, that's what I heard.
21    Q.  Okay.  What sorts of classes was he
22  taking?
23    A.  He was taking classes to be a
24  therapist, and try to get -- and try to work on
25  getting his license.



Page 225

1  Q. And how did you know that?
2  A. Because it was told to me.
3  Q. By who?
4  A. By Randall and Dr. Martini.
5  Q. Was he being trained by Dr. Martini?
6  A. No.
7  Q. Was he attending some school,
8  recognized school?
9  A. That's what I was told.
10  Q. Do you know?
11  A. I only know what I was told.
12  Q. And you were -- so you just accepted
13  the word of Dr. Martini and Randall Evans?
14  A. Yes.
15  Q. Have you subsequently found out
16  whether he was actually taking any sorts of
17  classes?
18  A. I didn't go in to see -- I didn't
19  pull up in the driveway of where he was taking
20  classes at, but, yeah.
21  Q. Do you believe he is?
22  A. I believe he was. I don't know if
23  he is now.
24  Q. You believe he was?
25  A. Yes.

Page 226

1  Q. But that's just based on his word;
2  you don't know where he was at the time?
3  A. Yes.
4  Q. Besides the injection that you
5  understood he had given to Me'Lisa Barber, what
6  was your understanding of Randall Evans'
7  experience in giving injections?
8  A. I didn't know if he had any
9  experience.
10  Q. So you didn't know? You just knew
11  he was taking classes and had given one other
12  person an injection?
13  A. Yes.
14  Q. And you are a gold medalist, double
15  world champion, and you allow this person, who
16  is learning to give injections, to inject you in
17  your hamstring while you were injured?
18  A. He wasn't a person who was learning.
19  He was my assistant coach.
20  Q. Did you feel like that was good
21  judgment?
22  A. At the point in time, yes.
23  Q. Do you now?
24  A. I trusted him, you know, I believed
25  him.

Page 227

1  Q. Do you believe in him now?
2  A. Do you believe him as in what?
3  Q. Well, do you trust him now?
4  A. My thoughts are skewed for a lot of
5  stuff that I found out about him.
6  Q. Including that he has been charged
7  with a criminal offense involving steroid
8  possession?
9  A. I didn't know about that until we
10  found out that information.
11  Q. But you have found that out?
12  A. Yes.
13  Q. When did you find that out?
14  A. Way after, when we was investigating
15  on this case.
16  Q. Before Mr. Evans injected you in
17  your hamstring, did you ask him whether he had
18  ever injected performance-enhancing substances
19  into any athletes?
20  A. No.
21  Q. Why not?
22  A. Because I didn't believe he did. It
23  was a B12 -- sitting right here, it's a B12
24  shot. That's why I was concerned about my leg.
25  I was concerned about if he was juicing up some

Page 228

1  of the athletes that I didn't know about.
2  Q. You testified that you were shown a
3  package that said B12 on it?
4  A. Yes.
5  Q. Did you then ask a question: What's
6  in that injection you are giving me?
7  A. I read the box. I mean, I asked
8  him, you know, to make sure what it was. And he
9  showed me the box, and I said "let me see the
10  box," and I read the box and the contents of it.
11  Q. Well, if you trusted Mr. Evans to
12  give you the shot and you trusted that he would
13  give you the right thing, did you feel like it
14  was important to read the box?
15  A. Yeah, why not?
16  Q. Okay. I'm just asking why you
17  wanted to read the box?
18  A. Because, that's human nature, just
19  to make sure, double-check anyway. That's -- if
20  I gave you something, you would double-check it,
21  even if we grew up together. Especially,
22  dealing with situations that I have before. I
23  had to make sure that everything was okay.
24  That's why I checked with Dr. Martini. That's
25  why --



Page 229

1    Q.  Where did the B12 come from?
2    A.  As far as I know, Dr. Martini.
3    Q.  How was it picked up?
4    A.  How was it picked up?
5    Q.  Mm-hm.
6    A.  I don't know.
7    Q.  How do you know it came from
8  Dr. Martini?
9    A.  Because that's where they said it
10  came from.
11    Q.  Who is they?
12    A.  Randall.
13    Q.  Randall is one person.  Who is they?
14    A.  I mean Randall.
15    Q.  Okay.  Was Trevor involved as well?
16    A.  Trevor was there.
17    Q.  Trevor was there when -- so both of
18  your coaches were there when you were given this
19  injection?
20    A.  Yes.
21        (Cell phone rings.)
22        MR. COLLINS: Sorry.  I thought I
23  turned this off.
24    Q.  (By Mr. Bock) What time of the day
25  was this?

Page 230

1    A.  I don't remember.  It was -- it was
2  still daylight outside.
3    Q.  Was it before or after practice?
4    A.  I wasn't practicing, because I was
5  hurt.
6    Q.  Right.  But didn't Trevor have a
7  responsibility for other athletes?
8    A.  He did.
9    Q.  And don't the athletes all train at
10  a particular time?
11    A.  Some train at different times.  I
12  mean, all I know is it's still daylight outside.
13    Q.  And you don't recall any more
14  specifically than that, when it occurred?
15    A.  (Nod of head.)
16    Q.  What was the point of both Trevor
17  and Randall coming over to your house to give
18  you the injections together?
19    A.  They travel together.
20    Q.  Did Randall Evans ever talk with you
21  about getting testosterone in Mexico?
22    A.  No.
23    Q.  Did you ever hear a conversation
24  about him getting testosterone in Mexico?
25    A.  No.

Page 231

1    Q.  Have you since learned that?
2    A.  I have heard Chris Whetstine say
3  something about that.
4    Q.  When did Chris Whetstine talk with
5  you about Randall Evans getting testosterone in
6  Mexico?
7    A.  When I asked him questions about how
8  does he think I tested positive.
9    Q.  What did he say?
10    A.  I have enough information to throw
11  Trevor under the bus, and I remember seeing
12  Randall Evans getting testosterone in Mexico.
13  So my question was:  If you saw that, then, why
14  didn't you say something then?
15    Q.  And when did this conversation with
16  Chris Whetstine occur?
17    A.  Well, after my positive.  It had to
18  have been, like November, around that time.  I
19  was at home.
20    Q.  November of 2006?
21    A.  I will have to say around that time.
22  I'm not very sure, but I know I was at home with
23  my parents.  I moved back home.
24    Q.  How did the topic come up?
25    A.  Topic of?

Page 232

1    Q.  Of -- I think you -- do you mind
2  reading his answer, his last answer back?  I'm
3  sorry.  I just want to make sure that my train
4  of thought is accurate.
5        (Reporter read the last question and
6  answer.)
7    Q.  So, at the time you had this
8  conversation with Chris Whetstine, you were not
9  sure how you tested positive, correct?
10    A.  Yes, sir.
11    Q.  This was in November of 2006?
12    A.  Around that time.
13    Q.  How many conversations did you have
14  with Chris Whetstine about how you tested
15  positive?
16    A.  Maybe like two.  I didn't talk to
17  him that much.
18    Q.  Was the one that you just testified
19  about the first one or the second one?
20    A.  Come again?
21    Q.  Was the conversation that you just
22  testified about the first one or the second one
23  that you had with Mr. Whetstine?
24    A.  I don't remember which conversation
25  it was.



Page 233

1    Q.   Do you recall anything else that you
2  talked about with Mr. Whetstine, when you were
3  trying to figure out how you testified positive?
4    A.   Other than that, he basically was
5  trying to put everything off on Trevor at that
6  point in time.
7    Q.   And at that point in time, did you
8  defend Trevor?
9    A.   No.  I mean, because, there was so
10 much information coming out about all of them,
11 all three of them, and I was so suspicious of
12 everybody.  I was suspicious of Chris because he
13 had a criminal background, and that's why he
14 couldn't get credentialed into the Olympics, and
15 I just found that out.  And Randall had a
16 criminal background.  And Trevor didn't -- I
17 found out, he had a lot of criminal, priors to
18 him, too.  So, any of them could have been a
19 suspect at that point in time.
20   Q.   So at that point in time, you
21 thought your positive test result could have
22 been explained by any one of those guys?
23   A.   Well, especially after talking with
24 Novitzky and him targeting Trevor Graham.  I
25 didn't feel that an agent of the government

Page 234

1  could be totally wrong.
2    Q.   Okay.  And when were your
3  supplements tested by Dr. Black?
4    A.   I don't remember.
5    Q.   Well, I'm trying to understand this.
6  How do you think that -- how were you thinking
7  that Randall Evans or Trevor Graham could have
8  gotten it?  How could they have been responsible
9  for the positive test?
10   A.   I wasn't thinking that they could
11 have done anything, I mean, because I was ruling
12 out situations.  I was still thinking
13 that, learning information about them, that
14 maybe they could have known knowledge of the
15 situation.
16   Q.   Well, you just said that any of them
17 could be a suspect.  How could they have caused
18 a positive test?
19   A.   If something happened to me, I
20 didn't know, I'm going to blame everyone until I
21 pin down how it happened.
22   Q.   Okay.  And I'm asking you how they
23 could have caused a positive test.
24   A.   I don't know.
25   Q.   You don't?

Page 235

1    And the "they" refers to Randall
2  Evans, Trevor Graham, and Chris Whetstine?
3    A.   They -- yes.
4    Q.   How could any one of those persons
5  have caused a positive test?
6    A.   Well, I was concerned Chris
7  Whetstine could have rubbed something on me.
8    Q.   How about the other two?
9    A.   I don't know.
10   Q.   They were suspects.
11   A.   Obviously I ruled them out.
12   Q.   How did you rule them out?
13   A.   Because they weren't touching my
14 body on a consistent basis.
15   Q.   Other than giving you injections and
16 giving you pills, right?
17   A.   Giving me a injection, not
18 injections.
19   Q.   Okay.
20   A.   And a pill.
21   Q.   And a pill?
22   A.   Yeah.
23   Q.   And the injection and the pill were
24 in the first week in April, two weeks before the
25 positive drug test, correct?

Page 236

1    A.   Yes.
2    Q.   I'm just going to ask you some
3  questions about your doping control official
4  records that are under Tabs 8 and 9 of USADA's
5  exhibit.  And I have prepared a summary of the
6  supplements that are listed, that I think would
7  make things a little quicker.  I will show it to
8  John and see if he has any objections to this
9  summary?
10     And what I propose is if we just go
11 through and confirm what's on it, but I think
12 having to have to deal with the whole stack
13 of --
14     MR. COLLINS:  So just so I understand
15 that you are saying this accurately reflects
16 everything that he wrote on all of his different
17 ones.
18     MR. BOCK:  Yes.
19     MR. COLLINS:  Without having the
20 opportunity to check all of them, obviously if
21 it becomes clear that one's wrong --
22     MR. BOCK:  Absolutely.  If there's --
23     MR. COLLINS:  Right.  As we went
24 through the other chart, we found out there were
25 things here and there that weren't --

Page 237

1       MR. BOCK: It's very possible. In
2 fact --
3       MR. COLBERT: This is just a
4 demonstrative, right? Not actually being
5 offered into evidence.
6       MR. BOCK: Correct. That's correct.
7       Then, I will, if it's okay with the
8 panel, give everybody a copy.
9       MR. COLBERT: Please.
10       MR. BOCK: And I will tell you, it
11 is -- there is the one meet left off there
12 inadvertently. And that was the May 12th world
13 record, I think, but I can either correct this
14 this evening, or we can just note that it's not
15 there.
16       MR. COLBERT: Well, this is only
17 demonstrative. It's not being offered into
18 evidence, correct?
19       MR. BOCK: Yeah, that's right.
20       Okay. The USADA doping control
21 forms are under Tab 8, so turn your attention to
22 the doping control form at the bottom says USADA
23 0155, and that is the 3-01-2003 doping control
24 form. So --
25       MR. COLBERT: Say that again.

Page 238

1       MR. CAMPBELL: 0155.
2       MR. BOCK: 0155 in the lower
3 right-hand corner.
4     Q. (By Mr. Bock) Do you recognize the
5 form here, Mr. Gatlin, USADA 0155 as a document
6 that you would have to complete each time you
7 did a drug test; is that correct?
8     A. Yes.
9     Q. And this document, you have to sign
10 in at the top and the top right-hand side when
11 you are approached to give the test, right?
12     A. Yes.
13     Q. And the time is noted when you are
14 notified up in the upper right-hand corner; is
15 that right?
16     A. Yes.
17     Q. And then Athlete Information part of
18 the form, which is the next section, is
19 completed when you arrive at the doping control
20 station; is that right?
21     A. Yes.
22     Q. And again, the time is noted there;
23 is that right?
24     A. Yes.
25     Q. And then the time that you actually

Page 239

1 sit down to process the sample after you have
2 actually produced the urine is the third time
3 that it's noted on the form; is that right?
4     A. Yes.
5     Q. And in this particular form, your
6 athlete representative was Trevor Graham, and
7 he's noted in the lower right-hand corner; is
8 that correct?
9     A. Yes.
10     Q. And the athlete representative is
11 just someone that is permitted to accompany you
12 while you go through the drug test, right?
13     A. Yes, it is.
14     Q. And at this point in time in March
15 of 2003, as you've testified, Trevor Graham was
16 your coach, correct?
17     A. Yes.
18     Q. And in the middle of the form,
19 there's a place where you can list the
20 medications and supplements that you have taken
21 within the last three days; is that right?
22     A. Yes.
23     Q. And on this particular form, you
24 noted that you have been taking amino acids,
25 creatine, a multivitamin and glutamine; is that

Page 240

1 correct?
2     A. Yes.
3     Q. And those substances are -- the dose
4 of those substances are also listed, correct?
5     A. Yes, they are.
6     Q. And you provide that information
7 when you go to a doping control station,
8 correct?
9     A. Yes.
10     Q. So have you had the opportunity to
11 go through the doping control records that are
12 part of the exhibits in this case?
13     A. No, I have not.
14     Q. They're under this Tab 8, and as we
15 go through these, if you have any questions
16 about them, then certainly bring it out.
17     But do you recognize these to be the
18 sorts of forms that you regularly filled out
19 when USADA did a drug test?
20     A. Yes.
21     MR. COLLINS: Could I just ask the
22 question: Are you going to go through all of
23 the different forms?
24     MR. BOCK: No. We can, if you want.
25     MR. COLLINS: I was going to object



Page 241

1  to relevance on stuff that was years before.
2      MR. BOCK: Right. Okay. Well,
3  most -- a lot of the things that he was taking
4  were consistent throughout his career.
5      Q.  (By Mr. Bock) And is that -- let me
6  just ask you -- answer this question: Were a
7  lot of these substances, the supplements that
8  you were taking, consistent throughout the
9  several years you were being coached by Trevor
10 Graham?
11     A.  Yes, it was.
12     Q.  And, for instance, one of the
13 substances that you took throughout this time
14 period was something called "Amino Fuel"?
15     A.  Yes.
16     Q.  Okay. And another of the
17 substances -- well, let me back up.
18     What is Amino Fuel?
19     A.  It's amino acid. You buy it in the
20 store, like some products are labeled different,
21 and it's called Amino Fuel.
22     Q.  Okay.
23     A.  It's amino acids.
24     Q.  And when you listed "amino acids" in
25 your doping control form, were you referring to

Page 242

1  Amino Fuel?
2      A.  Yes.
3      MR. COLBERT: Could I just ask you,
4  Mr. Bock, where is -- where does Amino Fuel show
5  up in any of these anti-doping records?
6      MR. BOCK: It generally says amino
7  acids, and it indicates that it's a liquid. The
8  last one, 12-5-06, actually lists Amino Fuel.
9  And that's IAAF doping form. It's under Tab 9.
10     MR. CAMPBELL: No Bates?
11     MR. COLLINS: That's actually 5-12.
12     MR. BOCK: Oh, is it actually 5-12?
13 Oh, that was the mistake. It's actually the
14 world record date.
15     MR. TYGART: It's USADA 0250.
16     MR. COLBERT: It's still under 9?
17     MR. TYGART: Yeah, it's the first
18 doping control official record under 9.
19     MR. BOCK: So that's where the cutter
20 -- he couldn't get there -- it got put under the
21 wrong date. Instead of 5-12, it's listed on
22 this chart as 12-5, and so that one was Amino
23 Fuel. Okay.
24     Q.  (By Mr. Bock) Referring to the
25 summary here, do you see on 12-9-2003, do you

Page 243

1  see that you took a product called Nitro-Tech,
2  and you can look at your doping control form for
3  12-9-2003, which is USADA 161, if you prefer.
4      A.  Okay.
5      Q.  Can you explain what Nitro-Tech is?
6      A.  It's like a post-workout shake.
7  Myoplex is like the morning shake before you go
8  work out, gives you the energy, and Nitro-Tech
9  is afterwards, usually.
10     Q.  And it looked to me that you were
11 consistently taking Nitro-Tech throughout the
12 time period that you were working with Trevor;
13 is that correct?
14     A.  Yes.
15     Q.  Okay. In terms of the product,
16 Amino Fuel, what research did you do to
17 investigate whether that substance had any
18 prohibited substance in it?
19     A.  I read up on it. I checked the
20 labels and everything. I mean, in every
21 substance that I have on here, were put into the
22 database on the Internet, the USADA database, to
23 make sure that they didn't have anything else
24 inside of it that was chemically combined to it.
25 That's the reason why I tested positive in 2001.

Page 244

1  Adderall was not on their list in 2001, but the
2  chemical combination of it, of the amphetamines
3  of it was.
4      Q.  Okay. And so other than looking at
5  the label, did you do any other investigation
6  regarding these substances?
7      A.  No.
8      Q.  No? Did you go to the Web site?
9      A.  Did I go to the Web site?
10     Q.  Yeah, for the manufacturers for
11 these products.
12     A.  Well, I went to GNC, the store.
13     Q.  Did you go to the Web site for the
14 manufacturers of the Nitro-Tech and the Amino
15 Fuels?
16     A.  No.
17     Q.  Did you think that was -- were you
18 aware about any concern relating to supplement
19 contamination?
20     A.  Was I concerned about supplement
21 contamination?
22     Q.  Yeah.
23     A.  No, I wasn't.
24     Q.  And why not?
25     A.  I mean, what could I do if it was --

Page 245

1  I wouldn't even know if it was contaminated or
2  not. You can buy supplements, it could be
3  contaminated. That's just the chance you take
4  in that one time.
5      Q. So, I'm going to show you --
6      A. I mean, if I'm able to buy it in a
7  store, I think it's better to buy it in a store
8  than try to buy it off the Internet.
9      Q. That's pretty much illegible, isn't
10 it?
11     MR. COLLINS: I'm going to object,
12 since he said he didn't go to the Web site, I
13 don't see how this is relevant.
14     MR. BOCK: I think it's relevant to
15 know what information Mr. Gatlin could have
16 found out about these products, if he had gone
17 to the Web site. Again, he's testified that
18 he's very careful, and this is impeaching his
19 testimony about how careful he was regarding
20 what he put into his body.
21     If it's helpful, I only have two
22 that I'm going to go to.
23     MR. COLBERT: Can I ask you, Mr.
24 Bock, to make whatever point it is you wish to
25 make and move along. We are getting -- we are

Page 246

1  starting to get a little tenuated, and we're
2  getting late, and you have got two minutes
3  before your 4:00 call.
4      MR. BOCK: Sure. I can cover these
5  two aspects before our call and be out of these.
6      MR. COLBERT: About two minutes?
7      MR. BOCK: Yes.
8      Q. (By Mr. Bock) If you had gone to the
9  Twinlab Web site that produces Amino Fuel, and
10 the product you took was from Twinlabs, correct,
11 Amino Fuel?
12     A. It's made by Twinlabs.
13     Q. And that's a picture of the bottle,
14 correct?
15     A. Yes.
16     Q. And you took that throughout your
17 career, correct?
18     A. Yes.
19     Q. And so there was -- on the label of
20 the product that you took, it says "anabolic,"
21 correct?
22     A. Yes.
23     Q. And did you understand what the
24 reference to anabolic means?
25     A. Yeah.

Page 247

1      Q. In your own words, what does
2  anabolic refer to?
3      A. It's a medical term.
4      Q. Referring to what?
5      A. The makeup of that product.
6      Q. Do you understand that anabolic
7  refers to increasing muscle mass?
8      A. Okay. I have only tested once, so I
9  have been taking this for the duration of all
10 these times.
11     Q. Yeah.
12     A. So, what does that have to do with
13 -- that's what I'm saying, like, okay?
14     Q. And do you recognize whether -- do
15 you know whether Twinlab produces steroids such
16 as DHEA?
17     A. I wouldn't be looking up steroids.
18     Q. So you wouldn't be investigating
19 that?
20     A. I wasn't trying to take any
21 steroids. I was trying to take Amino Fuel.
22     Q. And you understand that steroid
23 increases muscle mass, and so -- does the term
24 "anabolic" --
25     A. So does creatine. Creatine

Page 248

1  increases muscle mass too.
2      Q. Does the term "anabolic" on a
3  product that you are using cause you any
4  concern, make you want to investigate it
5  further?
6      A. Well, if it said anabolic steroid,
7  then, yeah, but it says "anabolic liquid," and
8  then I did my research on it, and it wasn't a
9  steroid.
10     Q. I'm going to show you -- this is the
11 Web page for Nitro-Tech. Is that the product
12 that you are taking?
13     A. Not Hardcore, just regular
14 Nitro-Tech.
15     Q. And it is also advertised to
16 increase lean muscle mass; is that correct?
17     MR. COLLINS: Objection.
18     MR. COLBERT: Mr. Bock, I don't want
19 to anticipate your objection. He's testified
20 that he doesn't take the product you are showing
21 on the screen.
22     Q. Have you ever taken Hardcore?
23     A. No, I have not. It says right
24 here...
25     Q. All right. I guess they're both

Page 249

1  Hardcore.
2         All right. And are you aware of --
3  let me just get out of this, so we won't have it
4  up on the screen.
5         Are you aware of whether the
6  manufacturer of Nitro-Tech manufactures
7  steroids?
8      A.  You asked me that. I said I didn't
9  look into that.
10        MR. BOCK: Okay.
11        Well, I promised that I would be
12 through at 4:00 with that aspect of the
13 examination.
14        MR. COLBERT: You want the witness
15 just to step down temporarily?
16        MR. BOCK: Yes.
17        MR. COLBERT: And this is going to be
18 Mr. Novitzky, and it's your witness, Counsel?
19        MR. COLLINS: Yes.
20        MR. COLBERT: This is acceptable to
21 you?
22        MR. COLLINS: That's fine.
23        MR. TYGART: Does he know to call in
24 the call-in number?
25        MR. COLLINS: No, we have got to

Page 250

1  call him with the call-in number. It may
2  take -- we should probably notify him, and then
3  take a couple-minute break because he's got to
4  have to get the AUSAs on the line.
5         (Off-the-record discussion about the
6  call; call placed to the parties.)
7         (Present on the telephone conference
8  were Jeff Finnigan, U.S. Assistant Attorney, San
9  Francisco, and Agent Jeff Novitzky.)
10        MR. COLBERT: Mr. Finnigan?
11 Mr. Finnigan, I think, is on the phone too.
12 Mr. Finnigan, Mr. Novitzky is with you?
13        MR. FINNIGAN: No, we are not
14 physically together.
15        MR. COLBERT: You're both on the
16 phone. And are you the only two that are going
17 to be on the phone?
18        MR. FINNIGAN: There should be
19 another AUSA, Jeff Nedrow joining us.
20        MR. COLBERT: Jeff Nedrow.
21        MR. FINNIGAN: He may have stepped out of
22 his office for a second. So he should be
23 calling us shortly, but if you need to get
24 started, we can do so whenever you're ready.
25        MR. COLBERT: Mr. Collins?

Page 251

1         MR. COLLINS: Certainly.
2         MR. TYGART: Can we swear the
3  witness?
4
5  WHEREUPON,
6  JEFF NOVITZKY,
7  the witness herein, having been first duly sworn
8  to state the whole truth, testified on his oath
9  telephonically as follows:
10
11        MR. FINNIGAN: And this is Jeff
12 Finnigan. Before we actually get into the
13 testimony, I was wondering if it's okay if I
14 just make some preliminary comment.
15        MR. COLBERT: All right. Please do.
16        MR. FINNIGAN: I think most of you
17 are aware, obviously, that we have an ongoing
18 investigation that Agent Novitzky is the lead
19 agent on. In addition to the ongoing
20 investigation, there are open pending cases
21 right now that we have that could potentially be
22 topics that are relevant to what you are doing
23 there today with Mr. Gatlin.
24        So I just wanted to point out, there
25 are sort of -- based on my understanding of

Page 252

1  what's happening today, there are basically four
2  categories, I just wanted to break down as far
3  as what Agent Novitzky can talk to and what he
4  cannot speak to.
5         First of all, he can testify today
6  to the facts of his contacts with Mr. Gatlin,
7  and what Mr. Gatlin did to assist Agent Novitzky
8  in the investigation. Again, because of the
9  fact that the investigation is ongoing and it
10 also involves certain grand jury material, he
11 will not be able to testify to other sort of
12 unrelated facts to Mr. Gatlin, because it may be
13 related to Mr. Gatlin's case.
14        He won't be able to testify to
15 putting a value, so to speak, on the cooperation
16 that Mr. Gatlin offered in the case, although,
17 again, he's fully ready to talk about the exact
18 facts, and then whatever value the arbitrators
19 assign to that obviously is your decision, and
20 Agent Novitzky will give that to you.
21        He's not going to offer any opinions
22 about the interpretation of any of the evidence.
23 An example there is, it's my understanding that
24 Mr. Gatlin is not contesting his positive test,
25 and so to the extent that Agent Novitzky would

7-30-07 to 8-01-07             USADA vs. GATLIN

64 (Pages 253 to 256)

---

Page 253

1  be asked whether he has a conclusion of whether
2  Mr. Gatlin did anything knowingly, that's
3  something that Agent Novitzky can't speak to.
4  But again, he can give you whatever facts you
5  need for you to draw whatever conclusions are
6  going to be drawn.
7         And then the other thing is, again,
8  Agent Novitzky cannot speak to other cases that
9  are ongoing investigations or pending cases, you
10  know, for example, as you I'm sure all know,
11  there's an indictment pending against Mr. Trevor
12  Graham, so Agent Novitzky cannot speak about
13  facts related to that person or any other
14  athlete for that matter.
15         There is one exception, though.
16  It's my understanding that there may be
17  questions about a person by the name of Chris
18  Whetstine and an interview that Agent Novitzky
19  had with that person. We don't have any
20  objection to you asking Agent Novitzky about
21  that, if, in fact, that's even something that
22  you want to ask about.
23         So with that said, I hope that that
24  doesn't curtail what you need to do today, and
25  I'm certainly open to fielding any questions

---

Page 254

1  that you might have, but because of the nature
2  of what we're doing, I just felt that it was
3  important to sort of lay some ground rules
4  before we get started.
5         MR. COLBERT: All right.
6         Mr. Collins, are you ready to begin?
7         MR. COLLINS: Yes.
8
9        EXAMINATION
10  BY MR. COLLINS:
11     Q.  Jeff, can you hear me okay?
12     A.  Yes, I can hear you good.
13     Q.  Just for the record, could you
14  please state your name, spelling the last name?
15     A.  Yes. Jeff Novitzky.
16  N-o-v-i-t-z-k-y.
17     Q.  Are you employed?
18     A.  Yes, I am.
19     Q.  How are you currently employed?
20     A.  I am employed as a special agent
21  with the Internal Revenue Service criminal
22  investigation.
23     Q.  And approximately how long have you
24  been involved?
25     A.  I have been a special agent with the

---

Page 255

1  IRS for approximately the last 15 years.
2     Q.  Are you familiar with an
3  investigation -- are you involved in an
4  investigation in looking into the doping in
5  sport?
6     A.  Yes, I have been in a general sense.
7  A lot of specific investigations, but in a
8  general sense for approximately the last five
9  years.
10     Q.  And that's what is generally known
11  sort of as the BALCO investigation?
12     A.  Correct.
13     Q.  I understand the limitations the
14  AUSA has placed on your testimony, so I will try
15  not to go around those or violate them, but in
16  speaking some generalities, approximately how
17  many witnesses have you interviewed during the
18  course of that investigation?
19     A.  Hundreds.
20     Q.  Is that 100 or multiple hundreds?
21     A.  Multiple hundreds.
22     Q.  Within those hundreds of
23  individuals, approximately how many have been
24  athletes?
25     A.  I would say right around or possibly

---

Page 256

1  a little bit greater than 100.
2     Q.  And of those athletes, approximately
3  how many have been track athletes?
4     A.  Probably a little less than half.
5     Q.  As part of that investigation have
6  there been a number of indictments?
7     A.  Yes.
8     Q.  Do you know approximately how many?
9     A.  Let me think here in my head.
10  Approximately seven.
11     Q.  How many of those indictments are
12  currently pending?
13     A.  There are two pending.
14     Q.  Do you know the name -- is Trevor
15  Graham one of those?
16     A.  Yes.
17     Q.  And who is the other one?
18     A.  The other one that is currently
19  pending is Tammy Thomas.
20     Q.  And do you know what sport she's
21  from?
22     A.  She was an Olympic-caliber cyclist.
23     Q.  With respect to Mr. Graham, what has
24  he currently been indicted for?
25     A.  He is under indictment for making

7-30-07 to 8-01-07                    USADA vs. GATLIN

65 (Pages 257 to 260)

## Page 257

1  false statements to federal agents in the course
2  of an interview he provided to them.
3      Q.   When was that interview?
4      A.   That interview was in 2004,
5  approximately, the summer of 2004.
6      Q.   And I believe, having read the
7  indictment before, the indictment indicates he
8  testified in the grand jury prior to that --
9      MR. FINNIGAN: You know, I'm going to
10  jump in -- this is Jeff Finnigan.  To the extent
11  that the indictment is available, it's a public
12  record, that information sort of speaks for
13  itself.  I would ask that you please not get
14  into any more details about Mr. Graham's case.
15      Q.   Okay.  I had one more question on
16  that topic --
17      MR. FINNIGAN: Okay.
18      MR. COLLINS: -- if you will.
19      Q.   (By Mr. Collins) The activities
20  covered in the indictment, can you give an
21  approximate time period?
22      A.   You know, I don't have the
23  indictment in front of me here, but without
24  being able to read it here, I wouldn't want to
25  go there, because I'm not sure.

## Page 258

1      MR. TYGART: Just to get through
2  this, we can agree to just jointly submit the
3  indictment.  It's a public document.  We're fine
4  with that.
5      MR. CAMPBELL: What's the dates,
6  since it's public?
7      MR. COLLINS: My understanding is the
8  activities to which he testified in 2004
9  occurred in late 1990s, up until mid- to late
10  2001.
11      MR. CAMPBELL: Okay.
12      MR. TYGART: And again, I would just
13  let the public document speak for itself.
14      MR. CAMPBELL: Do you have any
15  understanding inconsistent with that,
16  Mr. Tygart?
17      MR. TYGART: Based on what the
18  indictment says, I don't believe so, but again,
19  I haven't reviewed that recently.
20      MR. CAMPBELL: I'm just trying to get
21  my mind around it.
22      Q.   (By Mr. Collins) Have you ever met
23  Justin Gatlin?
24      A.   Yes.
25      Q.   When did you meet Justin Gatlin?

## Page 259

1      A.   The one and only time I met the
2  person was August 16th of 2006 during an
3  interview, that myself and my partner, Special
4  Agent Irwin Rogers conducted of him in New York.
5      Q.   Do you recall who else was at that
6  interview?
7      A.   Yes.  There was Mr. Gatlin, his mom,
8  Jeanette Gatlin, two attorneys, Brian Moss and
9  Cameron Myler, were both for Mr. Gatlin, myself,
10  and Special Agent Irwin Rogers.
11      Q.   How did you come to be interviewing
12  Mr. Gatlin?
13      A.   It was arranged through his attorney
14  Cameron Myler, and it was shortly after we heard
15  publicly about his positive drug test.  And I
16  put in the request through his attorney, Cameron
17  Myler, to interview Mr. Gatlin about his
18  positive drug test and about other possible
19  issues regarding his coach, Trevor Graham, and
20  possible other individuals.
21      Q.   And so Mr. Gatlin submitted to that
22  interview voluntarily?
23      A.   Yes, he did.
24      Q.   Now, did he receive a proffer letter
25  or anything in connection with that?

## Page 260

1      A.   Yes, he did.
2      Q.   And could you briefly explain what a
3  "proffer letter" is?
4      A.   Yes, a proffer agreement offers some
5  protection against an individual giving those
6  statements, and those statements -- of being
7  given cannot be used against them under a few
8  instances; the exception would be false
9  statements or a perjury case where that
10  information was not accurate.  But other than
11  that, in most instances, those statements
12  provided under that proffer agreement cannot be
13  used against the individual making that
14  agreement.
15      Q.   Okay.  But he's still obligated to
16  tell the truth?
17      A.   Yes, absolutely.
18      Q.   And I believe you are also entitled
19  to develop leads or whatever you want from that
20  information?
21      A.   Yes, we can, correct.
22      Q.   So this is something well short of
23  actual immunity?
24      A.   You know what?  I'm -- I don't want
25  to categorize that.  I'm not an attorney.  And

## Page 261

1  this is actually an agreement entered into
2  between the United States Attorney's Office and
3  a client in general, in this case, Mr. Gatlin.
4  So in terms of quantifying where it stands in
5  the immunity hierarchy, I don't think I'm good
6  with giving that opinion.
7       Q.  Okay.  But your understanding is
8  that it's certainly not the greatest level of
9  immunity?
10      A.  Correct.  It's not -- it's use
11 immunity, not transactional immunity, so it's
12 immunity just for the statement being given.  It
13 doesn't mean that this individual couldn't be
14 charged; just couldn't use the statements
15 against him if he was.
16      Q.  Okay.  Go ahead.  Did you have
17 something?  I didn't mean to cut you off.
18      A.  Again, unless it was a case of a
19 false statement or a perjury where actually
20 those false statements could be used against an
21 individual.
22      Q.  Understood.
23      Approximately, how long was this
24 interview?
25      A.  This interview lasted from

## Page 262

1  approximately 10 a.m. to 3:30 p.m., so it was
2  approximately five and a half hours.
3       Q.  Now, going into this interview, were
4  there any topics that were taboo or you couldn't
5  talk about with Mr. Gatlin?
6       A.  No.  In terms of any ground rules on
7  his side, no, we weren't told that anything was
8  off limits.
9       Q.  So you were free to ask anything?
10      A.  Yes, as far as we knew.
11      Q.  Okay.  Did you ask him about his
12 experience with Trevor Graham?
13      A.  Yes.
14      Q.  What did he indicate to you?
15      A.  He basically went through in
16 chronological order how he met Trevor Graham,
17 how he came to contract him as a coach, their
18 early years of training, where they trained, who
19 they trained with, really, the details regarding
20 Trevor, and, of the beginning to, you know,
21 really, the end, as the most recent part
22 connected to this interview, you know, summer of
23 2006.
24      Q.  So that went just to cover the terms
25 from when he joined Trevor Graham in 2002?

## Page 263

1       A.  Correct.
2       Q.  So when he -- at the end of this
3  positive test he was having your interview with
4  you, which would have been August 16th, 2006?
5       A.  That's correct.
6       Q.  Did he -- did you ask whether or not
7  Trevor Graham had ever given him any banned
8  substances?
9       A.  Yes.
10      Q.  And how did he answer those
11 questions?
12      A.  He answered that he -- no, that he
13 never knowingly received anything banned from
14 Trevor Graham.
15      Q.  Did he talk about anything with
16 Mr. Whetstine?
17      A.  Yes.
18      Q.  What did he tell you about
19 Mr. Whetstine?
20      A.  We went through some details of
21 Mr. Whetstine's role as a masseuse for Justin,
22 particularly during the spring and summer of
23 2006.  And he provided details about the
24 protocol used on him by Mr. Whetstine throughout
25 that period, specifically the applying of creams

## Page 264

1  and lotions onto him.
2       Q.  He indicated that he had worked with
3  Mr. Whetstine for more than just 2006, though,
4  correct?
5       A.  Yeah.  Referring to my report here,
6  yes, he did.  He talked about that he started
7  with Mr. Whetstine in 2004, but the majority of
8  our discussions regarding Mr. Whetstine had to
9  do with the 2006 season.
10      Q.  Did he indicate that
11 Mr. Whetstine -- I think he used the word
12 "protocols" for giving massages and use of
13 creams and stuff, changed at all in 2006?
14      A.  Yes, he told us that.
15      Q.  And how did he say they changed?
16      A.  He said that usually, in the past,
17 he would go back to the hotel, where
18 Mr. Whetstine would a massage his legs and apply
19 cream.  But in 2006 Mr. Gatlin stated that
20 Mr. Whetstine seemed eager to get the massage
21 creams on his legs as soon as possible.  And
22 that, in particular, he noticed this occurring
23 at the Kansas Relay meets, also, the Prefontaine
24 meets, the New York Reebok meets, and the Japan
25 meets.

## Page 265

1    Q.   Did you discuss any text messages
2  that Mr. Gatlin sent to Mr. Whetstine?
3    A.   Again, I'm just referring to a
4  report here that I took of that interview.
5       Yes, we did, yes.
6    Q.   And what did he say caused -- or how
7  his sending those text messages came to be?
8    A.   Basically, Mr. Gatlin told us that
9  he received a phone call from Trevor Graham, and
10  that Trevor Graham had told him that he just
11  talked to Chris Whetstine and that Whetstine
12  told Mr. Graham that he wanted to confess, but
13  he was scared because he thought he would get in
14  trouble with Gatlin.  And Mr. Gatlin told us
15  that this conversation he had with Trevor
16  basically sparked him to text-message to
17  Mr. Whetstine and basically tell him to tell the
18  truth.
19       Mr. Gatlin told us that
20  Mr. Whetstine replied, What do you mean?
21    Q.   Okay.  You subsequently had an
22  opportunity to interview Mr. Whetstine?
23    A.   Yes, I did.
24    Q.   Have you seen copies of the text
25  messages?

## Page 266

1    A.   Yes, I have.  I actually saw them on
2  his phone.
3    Q.   You saw them on Chris Whetstine's
4  phone?
5    A.   Yes.
6    Q.   And do you have copies of them?
7    A.   I transcribed what I saw on his
8  phone.
9    Q.   Do you know if USADA has copies of
10  all of those?
11    A.   I believe they do.  I have
12  independently spoken with them about them.  I
13  did not provide them to them, however.
14    Q.   Are you familiar with Mr. Gatlin
15  having sent Mr. Whetstine a text message saying
16  "My family and I just want me to run again,"
17  period.  "That's it," exclamation mark.  "We
18  will not come after you," exclamation mark.  "I
19  promise that's our word," exclamation mark.
20  "Let us work this out," exclamation mark.  "I am
21  tired of crying," period, which was sent on
22  August 7th of 2006?
23    A.   Yes, that's one of the text messages
24  I observed on Mr. Whetstine's phone.
25    Q.   Okay.  In your interview with

## Page 267

1  Mr. Gatlin, did he ever indicate that he
2  authorized Mr. Whetstine to rub any banned or
3  prohibited substances on him?
4    A.   No.
5    Q.   At a point during this interview,
6  did you request Mr. Gatlin to make an undercover
7  recorded phone call?
8    A.   Yes, I did.
9    Q.   When did you ask him to make it?
10    A.   At the end of the interview.
11    Q.   Who did you ask that he call?
12    A.   I asked him to call Trevor Graham.
13    Q.   And what was the purpose of asking
14  him to make a call?
15    A.   It was twofold:  Number 1, to gauge
16  the accuracy of the information that Mr. Gatlin
17  had just provided to myself and my partner; and
18  then Number 2, to possibly gather further
19  evidence of our case on Trevor Graham.
20    Q.   Okay.  Did he agree to make that
21  call?
22    A.   Yes, he did.
23    Q.   When did he agree?
24    A.   Very shortly after being requested.
25  There was a period of less than five minutes

## Page 268

1  where he, his mom and his attorneys went out of
2  the room to discuss it.  They came back in,
3  again, relatively shortly thereafter, indicating
4  that he was -- would be agreeable to make the
5  call.
6    Q.   After he agreed to make the call,
7  what did you do?
8    A.   We then sat down with him and
9  basically wrote out a script of what we wanted
10  him to talk to Trevor Graham about.
11    Q.   And then did he place the call?
12    A.   Yes, he did.
13    Q.   Did he discuss what you had asked in
14  the script?
15    A.   He did.
16       MR. FINNIGAN:  I'm sorry to break in
17  here, but I don't know if the calls have been
18  provided or not, I doubt they have, but to the
19  extent you want to go into the substance of the
20  call, I would ask that Agent Novitzky not be
21  asked those questions unless for some reason
22  that information cannot come from Mr. Gatlin.
23       MR. COLLINS:  Okay.  I don't think
24  I'm going to ask him to give the specific
25  details of the call, but I will ask him how they

7-30-07 to 8-01-07                    USADA vs. GATLIN

68 (Pages 269 to 272)

| | |
|---|---|
| **Page 269** | **Page 271** |

**Page 269**

1  were designed, what they were designed to
2  elicit, as I have already done with this one.
3      MR. FINNIGAN: Right. And the
4  procedure, the fact that calls were made, and
5  the procedures that were set up for the calls,
6  that's okay. The substance of the call is what
7  I would ask to not be asked about.
8      MR. TYGART: Just ask him if he can
9  testify what the purpose of the calls were.
10  That's what's relevant here.
11      MR. CAMPBELL: Is there something
12  that is going to be beneficial to your client's
13  case regarding the substance that you want him
14  to cooperate, because, obviously, he can testify
15  what you stated.
16      MR. COLLINS: Right. I may have to
17  go back and ask. I wasn't aware of the
18  limitations. When I had previously --
19      MR. CAMPBELL: Well, let's talk about
20  this, because I want to make sure that you get
21  to prove your case, whatever is correct.
22      What are the statements that are --
23  that you feel are key -- the key issues in your
24  client's case?
25      MR. COLLINS: The key ones would be

**Page 270**

1  the discussions unbeknownst to Mr. Graham that
2  he was being recorded about anything he had ever
3  taken, what it was about the B12 shot, things
4  like that, which corroborate the testimony of
5  what Mr. Gatlin said about it.
6      MR. CAMPBELL: So those are specific
7  statements about what Mr. Gatlin just testified
8  about regarding his B12 shots, and what is it --
9  what's it called? Voltaren.
10      MR. COLLINS: Yeah.
11      MR. CAMPBELL: Anything else?
12      MR. COLLINS: There's some other
13  questions. I'm not going to ask him for
14  specific quotes, but I will ask him generally if
15  there was any evidence produced as a result of
16  those.
17      MR. FINNIGAN: Well -- I'm sorry.
18  Are you directing that to me?
19      MR. CAMPBELL: We're having a
20  discussion right now. My concern is -- seems to
21  be the B12, and the Voltaren, the pill, seems to
22  be pretty important issue that was in cross, and
23  now you are trying to, I guess, what would you
24  call it?
25      MR. TYGART: He's trying to get

**Page 271**

1  Trevor Graham statements that were recorded by
2  Justin Gatlin when he made that phone call.
3      MR. CAMPBELL: Regarding the B12.
4      MR. TYGART: He should just call
5  Trevor Graham, if we want evidence of what
6  Trevor Graham and him talked about.
7      MR. CAMPBELL: But there's a
8  credibility issue. I mean, let's put it this
9  way. Are you willing to accept what he says
10  about that?
11      MR. BOCK: Wait a minute. We don't
12  have to --
13      MR. COLBERT: Let me just -- let me
14  stop it because I know we do have Mr. Novitzky
15  and Mr. Finnigan on the phone, and they're sort
16  of standing by.
17      I understand that Mr. Finnigan has
18  some concerns about some specificity of some of
19  the information or the quotations.
20      Mr. Collins, on behalf of
21  Mr. Gatlin, is indicating he may want to ask him
22  generally, may ask him to say what Mr. Gatlin
23  has said, and whether he can corroborate it.
24  Maybe we could see how far we can go, and see if
25  we run up against something, if Mr. Collins can

**Page 272**

1  rephrase his question to the satisfaction of Mr.
2  Finnigan.
3      MR. FINNIGAN: This is Finnigan
4  again. It's not a question of specifics or
5  generally. I don't want Agent Novitzky asked
6  about the substance of the conversation --
7      MR. COLBERT: With Mr. Graham.
8      MR. FINNIGAN -- whether that's
9  directly or indirectly. For example, if you
10  were to ask, well, I'm not going to ask you
11  about what Mr. Gatlin said, or what Mr. Graham
12  said, but did that corroborate what Mr. Gatlin
13  had previously told you, that's an indirect way
14  of getting at the substance of the conversation.
15      So I'm asking you to not ask him
16  about any specifics of the conversation of the
17  calls. And, again, that goes back because
18  there is an open case with respect to
19  Mr. Graham. As you know, he's facing an
20  indictment and has a trial date in about a month
21  or so.
22      MR. COLBERT: What can you ask
23  Mr. Novitzky? Can you try asking Mr. Novitzky
24  generalized questions without getting details
25  and see how far he's permitted to answer.

Page 273

1    MR. COLLINS: Yeah, let's see where
2 we go.
3    MR. COLBERT: Let's see what we can
4 do, and if you run up against a wall, you may
5 run up against the wall.
6    MR. COLLINS: Okay. My frustration
7 is not with the panel.
8    Q.   (By Mr. Collins) So this first call
9 is made where?
10    A.   It was made in the law offices in
11 New York City where the interview was conducted.
12    Q.   And you scripted this call?
13    A.   Correct.
14    Q.   And the purpose of this call was to
15 elicit information about doping and activities
16 Mr. Graham had done?
17    A.   It was twofold: It was to test and
18 corroborate the information that Mr. Gatlin just
19 provided myself and my partner; and then
20 secondly, to attempt to gather possibly more
21 information for our pending case against
22 Mr. Graham.
23    MR. TYGART: Did somebody join?
24    MR. NEDROW: Yes, hey, I really
25 apologize. This is Jeff Nedrow, from the U.S.

Page 274

1 Attorney's Office, with Jeff Finnigan, and I'm
2 coming in a little late, and I apologize. So, I
3 will just remain silent. Please go ahead with
4 wherever you guys were at.
5    Q.   (By Mr. Collins) How long was
6 approximately this first call?
7    A.   It was approximately 20 minutes.
8    Q.   Forgive me if I already asked this:
9 Did Mr. Gatlin cover all the topics you had
10 scripted?
11    A.   Yes.
12    Q.   During the course of that
13 conversation, did you learn any facts indicating
14 that Justin had knowingly received any banned
15 substance from Trevor Graham?
16    MR. FINNIGAN: Here's where I would
17 ask, that goes into the substance. In fact, the
18 previous question really did too, but that now
19 we're getting into specific substance of a
20 conversation with somebody who is facing an
21 indictment, and I don't want to go there.
22    MR. COLBERT: This is Edward Colbert.
23 I'm on the panel. Can I ask -- let me try this
24 following general question. I understand
25 Mr. Novitzky said that one of the purposes was

Page 275

1 to determine whether or not they could
2 corroborate the information that Mr. Gatlin
3 provided. Can I ask you generally, did the
4 phone call corroborate the information
5 Mr. Gatlin provided?
6    MR. FINNIGAN: Well, perhaps, a
7 better way to ask it: In the course of your
8 dealings with Mr. Gatlin -- I guess, either way
9 we're going to get into the same issue, but I
10 was going to say, perhaps, you can just ask
11 Agent Novitzky if he found Mr. Gatlin to be a
12 credible and cooperative person.
13    Q.   (By Mr. Collins) Okay. Did you find
14 Mr. Gatlin to be a credible and cooperative
15 person, Mr. Novitzky?
16    A.   Well, that's a -- I mean, that's a
17 complex question. Based -- because there was
18 many -- there's many issues and many levels of
19 that answer to that question. Do you want to
20 go -- I mean, it's going to take a while to
21 answer that. Do you want me to go through
22 everything?
23    MR. COLBERT: We're here. Go ahead.
24    MR. CHERIS: We're here. Go ahead.
25    A.   Okay. So, again, in determining

Page 276

1 that, it's not as easy as giving a yes or a no.
2    In terms of his cooperation that day
3 August 16th, absolutely. He came all the way up
4 to Florida with his mother in a very short time
5 period, within a couple of days of our request.
6 You know, sat with us for five and a half hours,
7 answered every question that we asked, agreed to
8 make this phone call, you know, literally
9 minutes after we asked him to do it. The script
10 that we laid out, he agreed to that. He asked
11 follow-up questions as we were sort of listening
12 in on the conversation.
13    So in terms of August 16th, I
14 absolutely found him to be both very
15 cooperative, and based upon all the facts that I
16 learned that day, from interview and phone
17 calls, found him to be credible.
18    Now, some issues have come up since
19 then, that, I don't know diminish that statement
20 completely, but there have been some issues that
21 have come up.
22    There was -- do you want me to go
23 through those?
24    MR. CHERIS: Keep going.
25    MR. COLLINS: Sure.

## Page 277

1    A. There was categorization that he
2  made to us during the interview of a pill that
3  was given to him by Randall Evans. He
4  categorized the pill during our interview as a
5  "Voltaren bean." When myself and my partner
6  heard the word "bean" used, based on our
7  investigation to that period of time, we had
8  heard testosterone and Decadron being referred
9  to as a "bean," so it kind of spurred our
10  interest when we heard that.
11    So we asked several follow-up
12  questions regarding that categorization and
13  description of that pill. He described it as
14  green with a V on it.
15    This wasn't an instance where we
16  just left it. We followed up and said, Are you
17  sure that's what it looked like?
18    He said, yeah, he was sure it was
19  green with a V on it.
20    We came to find out later, much
21  later, months, maybe a year later, that he told
22  someone else that the pill was brown, and brown
23  is the color of these testosterone and Decadron
24  pills, so we had some concern about that.
25    We actually had Mr. Gatlin, his

## Page 278

1  mother, and Mr. Collins on a phone call, and
2  brought that to their attention. They did come
3  up with an explanation about his confusion
4  regarding the coloring, and that he had been
5  taking an Excedrin which was a green, but these
6  Voltaren pills that he had been taking all along
7  were brown. You know, a little bit unclear,
8  where that leaves him, you know, in the
9  credibility issue in that department.
10    There was another issue that has
11  come up since about his contacting an individual
12  by the name of Memo Heredia, who has come up in
13  our investigations. In fact, there was a very
14  public newspaper account of him in the New York
15  Times some time ago, about allegedly being a big
16  drug supplier in track and field.
17    We asked him questions about Memo
18  during the day of the interview. We actually --
19  that was one of the things we scripted to have
20  him ask Mr. Graham about.
21    We came to find out that Mr. Gatlin
22  and/or Mr. Nehemiah, his agent, had made contact
23  with Memo Heredia, and actually contracted him,
24  and paid him anywhere from 5- to $10,000 to put
25  together some type of a report for him on the

## Page 279

1  positive drug case issue.
2    This was all unbeknownst to us. He
3  didn't -- we found out about this secondhand,
4  not from them. And that was a big issue towards
5  us, in terms of, you know, cooperation and
6  credibility, because typically, when we're
7  dealing with cooperators and looking at those
8  issues, you know, one of the issues with a
9  cooperator is full disclosure of everything.
10    And while we did get some
11  explanation that they weren't sure that we
12  needed to know this, and they thought we already
13  knew some of this, the bottom line, it was not
14  the case that they told us this was going on
15  when it was going on. So that was another issue
16  that came into play.
17    There was another instance after
18  Mr. Gatlin made the first phone call for us. He
19  was provided with a recorder to make
20  subsequent -- or to record subsequent phone
21  calls between he and Mr. Graham, and also
22  Mr. Evans, Randall Evans, who is Trevor Graham's
23  assistant.
24    He did -- made additional --
25  recorded 11 calls, which is technically a

## Page 280

1  positive through his cooperation and his
2  credibility. Those calls were with Mr. Graham
3  and Mr. Evans.
4    There was one weekend, where I got a
5  call from him that he received a call from
6  Mr. Graham but didn't have a recorder with him.
7  I told him that wasn't a big deal, because these
8  things sometimes happen, and told him to go get
9  the recorder and make a call back to get that
10  previous conversation on the record.
11    He said he didn't have the recorder
12  with him, and that he was traveling to New
13  Orleans and wouldn't be back for three days, so,
14  maybe was looked upon negatively in terms of his
15  cooperation and credibility, because we thought
16  when we gave him the recorder on that day, that
17  we made it known that he needs to have that with
18  him at all times, and the occasional call or two
19  if you didn't have it on person, would be fine
20  as long as you get it, you know, several minutes
21  thereafter. In this case, he went for a weekend
22  and didn't bring it with him at all.
23    Again, after that issue, though, he
24  was fine about that. And I talked to
25  Mr. Collins about that who told me that he

## Page 281

1  brought Mr. Gatlin back online, and it appeared
2  to be that way. He had the recorder with him
3  from then on out, and it appeared, to the best
4  of my knowledge, that he was -- captured all the
5  pertinent calls that we wanted him to.
6      So, again, kind of long-winded
7  there, but that question is not a simple
8  question to answer. I mean, there are many
9  factors and many instances that would go into
10  evaluating his cooperation and his credibility.
11      MR. COLBERT: Just so I'm clear,
12  Mr. Novitzky, can you put in the time frame of
13  this first call and the 11 other recorded calls,
14  when this gap in coverage occurred?
15      A.  So the gap in coverage when he
16  didn't have the recorder with him?
17      MR. COLBERT: Yes.
18      A.  That occurred early on. It was
19  after the first call which he made in our
20  presence, and then it might have been before the
21  next call was made. If not then, very early on
22  in the course of the 11 calls.
23      Q.  (By Mr. Collins) Did he indicate
24  where he went?
25      A.  I think it was a period of, I think,

## Page 282

1  three days, where he didn't have it because he
2  traveled away and didn't bring it with him.
3      Q.  Did he indicate where he traveled
4  to?
5      A.  New Orleans is what he said.
6      Q.  Okay. The -- another time frame,
7  these conversations with Memo?
8      A.  Mm-hm.
9      Q.  Do you know approximately when those
10  occurred?
11      A.  Those occurred at a much later date.
12  This was -- would have been, I believe, the
13  start of the 2000 -- the end of 2006, October,
14  November 2006.
15      Q.  And at that time, it had been
16  determined that he didn't need to continue
17  recording all his calls, correct?
18      A.  Correct, at that time, we had taken
19  the recorder back from him, so, obviously, he
20  was not under instructions to record any more
21  calls, so, correct.
22      Q.  And once it became known that there
23  was a miscommunication that these things should
24  have been reported to you, did Justin fully tell
25  you everything about them?

## Page 283

1      A.  Yes, definitely. Once it was known,
2  I got all of the details of that communication.
3  I got details about the payment, details about
4  the reports that had been prepared by this
5  individual in exchange for the payment, details
6  about how he came in contact with this
7  individual, so, yes.
8      Q.  And he actually gave you bank
9  account numbers or Renaldo Nehemiah was -- gave
10  you bank account numbers?
11      A.  Yes. I got the account numbers, the
12  routing numbers, showing the money wired from
13  Mr. Gatlin's account to Mr. Heredia's account,
14  yes.
15      Q.  And you were given phone numbers for
16  Mr. Heredia?
17      A.  Yes, I was.
18      Q.  And you were given a copy of the
19  memo?
20      A.  The memo that Mr. Heredia prepared?
21      Q.  Yes, as I have artfully called the
22  "Memo memo"?
23      A.  Yes.
24      Q.  Now, in dealing with cooperating
25  witnesses, is it uncommon for there to be, what

## Page 284

1  I will refer to as hiccups or issues like this?
2      A.  Well, I mean, these issues are kind
3  of unique, but, in general -- I will answer the
4  first part -- that in general, no, it is not
5  uncommon for there to be issues about, you know,
6  things that were kind of brought in about, you
7  know recording all the time, about passing along
8  information in a timely manner. Generally, it
9  is my experience based upon dealing with
10  cooperators and my criminal investigations to
11  see these things occurring.
12      Q.  And speaking of common or uncommon,
13  is the level of cooperation in making recorded
14  calls you received from Mr. Gatlin common with
15  the other athletes that you have interviewed
16  within the BALCO investigation?
17      MR. FINNIGAN: Let me jump and ask
18  for some clarification there. What do you mean
19  "common with other athletes"?
20      MR. COLLINS: Well, he's interviewed
21  approximately 40 athletes. I'm not asking who
22  made what, but it's my understanding that making
23  undercover calls like this is relatively
24  unprecedented.
25      MR. NEDROW: Yeah. I'm sorry,

Page 285

1    Mr. Collins. This is Jeff Nedrow. We're not
2  going to be able to answer that, and I hope you
3  understand that -- or have the Agent Novitzky
4  answer that, because it necessarily gets into
5  the question of what other people are doing as
6  to recording and things of that sort, and that
7  would directly threaten or compromise, possibly,
8  other investigative matters. So, we're going to
9  have to --
10       MR. COLLINS: Well, he can testify
11  historically about the cases that are already
12  indicted and resolved.
13       MR. NEDROW: He has, but your
14  question, basically, based the question of other
15  individuals who may or may not be undertaking
16  investigative efforts, similar to that, what
17  he's described Mr. Gatlin is doing, and I'm not
18  commenting on whether that's ongoing or not, but
19  to the extent it is, that's not a dead issue,
20  and, therefore, we're not going to let him
21  answer the question.
22       MR. CHERIS: How about 2006, was his
23  utilization --
24       MR. NEDROW: You know, I'm just not
25  comfortable, to the extent that the question is

Page 286

1    getting into how common -- which I agree to
2  that, unless you guys correct me if I'm wrong --
3  into how -- to what extent was other recording
4  going on by other athletes, who were
5  cooperating, I'm not comfortable, and I don't
6  think the government is comfortable allowing him
7  to get into that.
8       So I'm sorry, but we can't -- and I
9  don't want there to be any comments about
10  this just going into ongoing investigative
11  aspects. And I realize 2006 tends to put in a
12  historical context, but there may be things in
13  2006 that are still ongoing now.
14       MR. COLLINS: Well, that doesn't
15  apply to the context of the cases that have
16  already been indicted and resolved. You could
17  certainly talk about the number of athletes that
18  made undercover recorded calls there.
19       MR. NEDROW: Cases that have been
20  indicted and resolved -- if the question were
21  just limited to in the original BALCO case, if
22  you are asking him in a lead-up to indicting the
23  original BALCO defendants or something like
24  that, I suppose you can limit it that way, even
25  though -- yeah, I suppose you can limit that

Page 287

1    way.
2       Q.  (By Mr. Collins) Okay. So in the
3  cases that have already been indicted and
4  resolved, how many athletes recorded the number
5  of -- I think, you indicated Justin recorded
6  something of 11 calls?
7       A.  Right.
8       Q.  How many athletes recorded 11
9  undercover calls in those investigations?
10       A.  Well, are you asking specifically
11  for 11 or recorded any undercover calls.
12       Q.  Well, any, and then how many
13  recorded up to the extent Justin did?
14       A.  Yeah, in the original -- in the
15  original BALCO investigation, there were no
16  recorded calls by athletes. There were none.
17       Q.  Okay. Have you had the opportunity
18  to interview a Randall Evans?
19       A.  That's one I don't think I can
20  answer. I think. According to the ground rules
21  that Mr. Finnigan talked about early on that the
22  one individual we were okay with talking about
23  was Whetstine, but he didn't want any other
24  individual.
25       MR. FINNIGAN: That's correct.

Page 288

1       Q.  Okay. How about this: During the
2  course of your investigation, have you found any
3  credible facts to dispute Justin's description
4  of how he received the B12 shot?
5       MR. FINNIGAN: That's an indirect way
6  of potentially bringing in other evidence that
7  could be related to open investigations or
8  pending indictments, and Agent Novitzky can't
9  get into that.
10       Q.  Let me ask: Did you learn any facts
11  in the undercover calls made by Justin Gatlin
12  indicating that he knowingly received any banned
13  substances?
14       A.  I did not obtain any information in
15  any of the undercover calls that would be
16  evidence of his received knowingly banned
17  substances.
18       Q.  And would that be from Trevor
19  Graham?
20       MR. FINNIGAN: We're -- again, this
21  is an indirect way of getting this information
22  from people who really are either facing an
23  indictment or witnesses other than Mr. Gatlin
24  and Mr. Whetstine, so I'd ask that we don't go
25  there.

Page 289

1    MR. COLLINS: Okay.
2    Q.   (By Mr. Collins) So your last
3  statement, then, did include your interview with
4  Mr. Whetstine?
5    A.   When you said the undercover phone
6  call, you asked -- I thought the question was
7  whether or not I had obtained any evidence via
8  the undercover phone calls about Mr. Gatlin's
9  knowing receipt of banned substances.
10   Q.   Okay.  Well, what about in your
11  interview with Mr. Whetstine?  Was there any
12  facts learned that Mr. Gatlin knowingly received
13  any banned substance?
14   A.   I received no evidence in that
15  interview that would constitute evidence of his
16  knowing receipt of banned substances.
17   Q.   Now, I think we have sort of reached
18  the outer limits of where we can go there.
19   I want to ask generally, what is
20  your understanding in the federal system, how a
21  cooperating individual receives credit for
22  cooperating?
23   A.   On many, many different levels.  You
24  know, myself, as a case agent who is going out
25  and doing the day-to-day work with these

Page 290

1  cooperators, in general, what I tell them before
2  the cooperation starts is that the necessity for
3  truthfulness, Number 1, timeliness, in their
4  cooperation.  I mean, it's one thing to
5  cooperate off the bat versus a week later and
6  calling me up and saying, okay, now, I'm ready
7  to cooperate.  Thoroughness, disclosure, 100
8  percent disclosure.
9    So we go over all those things.
10  Obviously, you know, cooperation that leads to
11  obtaining evidence of criminal activities is
12  positive, but I always tell cooperators that,
13  you know, it's not your job to do that.  Your
14  job is to follow my instructions, follow them to
15  the letter, and then the rest will take care of
16  themselves.
17   I do that, because I don't want
18  cooperators thinking that if they're following
19  directions and not getting the evidence they
20  think that I want, they're going to go out of
21  their way to manufacture or produce that
22  evidence.
23   So I generally tell them that it's
24  not, that it's the effort that matters with
25  cooperating to me.

Page 291

1    Q.   I'm just taking a note here.
2  Thanks, Jeff.  One second.
3    Now, when you ask a witness to make
4  undercover calls, does that witness control the
5  outcome as to what the other side is going to
6  say?
7    A.   No.  I mean, they control their
8  effort, they control, you know, following
9  instructions with me, but in terms of what
10  they're getting from the individual they're
11  calling, no.
12   Q.   And there are some risks assumed in
13  acting in an undercover capacity?
14   A.   Absolutely.
15   Q.   Typically, the witnesses that act in
16  an undercover capacity are facing some criminal
17  charge; is that correct?
18   A.   Correct.
19   Q.   So someone who makes recorded calls
20  like Justin who has no pending case is somewhat
21  unusual?
22   A.   Well, yes, and no.  I mean,
23  typically, there are instances where if you are
24  a witness, will agree to make undercover calls.
25  But the majority of the time, at least in my

Page 292

1  personal experience, and that's all I can
2  testify to, is that most of the individuals that
3  throughout my career -- and not just in this
4  case, but throughout my career -- would agree to
5  make recorded calls have some criminal exposure.
6    Q.   And at the time Justin made some, he
7  had none?
8    A.   Correct.  We told him that from
9  early on, unless he was not truthful with us,
10  that he was viewed in this matter as a witness.
11   Q.   Now, to testify today, a subpoena
12  was sent to you; is that correct?
13   A.   That's correct.
14   Q.   Now, as I understand it, that was
15  sent because of requirements from your office in
16  the federal government.  That was not an
17  indication that you weren't willing to testify
18  to discuss what Justin had done to cooperate?
19   A.   Yes, I would say that's correct.
20   Q.   So absent the office policy, you
21  would have willingly participated in today's
22  call?
23   A.   Well, I mean, absent the office
24  policy, is what I have to adhere to, so there is
25  no "absent the office policy." That's always

7-30-07 to 8-01-07                    USADA vs. GATLIN

74 (Pages 293 to 296)

## Page 293

1  that's given.
2      Q.  I forgot.  You are an IRS agent.
3      No, I'm just teasing Jeff, thanks.
4  That is the correct answer.
5      Now, did you consider Justin's
6  agreement to cooperate prompt?
7      A.  Yes, especially, you know, as I
8  talked about, in terms of the August 16th date.
9  I mean, he literally flew out to New York that
10 week that we requested it.  And then obviously,
11 the call, the request to make the call, that
12 wasn't something that I talked about with his
13 attorneys previous to that day.  Didn't give any
14 indication that we were even thinking about
15 that, and part of that was because I wanted to,
16 you know, to judge the reaction I would get from
17 that request.  And again, as I testified, it was
18 a period of minutes, where he agreed to make
19 that call.
20     Q.  Now, in preparation for testifying
21 today, you have reviewed Justin's file and
22 relistened to all the tapes, correct?
23     A.  Correct.
24     Q.  And we spent a fair amount of time
25 today talking about what I referred to as the

## Page 294

1  hiccups in his cooperation, but in light of
2  those hiccups, did they change your impression
3  or understanding of any of the facts that you
4  learned in the calls?
5      A.  No.  They definitely caused me to
6  question about some of the things that he told
7  us, but it also caused me to go back and listen
8  to those calls again, and, you know, I have
9  listened, not in this case, but throughout my
10 career, to a lot of calls like these, and I like
11 to think I have some ability to detect, you
12 know, genuineness, especially when one party is
13 not aware that these calls are being recorded,
14 so, no, I mean, the roundabout answer to that
15 question is no.
16     Q.  I'm sure the AUSAs will hop in if
17 I'm overstepping here.  If Justin were
18 cooperating in a criminal case for you, would
19 you make a recommendation as to his cooperation?
20     A.  Let me tell you how it works in a
21 criminal case.  The United States Attorney's
22 Office is the entity that determines what type
23 of consideration an individual gets who
24 cooperates.  Myself, as an agent, just passes
25 along the facts of the cooperation.  As I did

## Page 295

1  earlier, I talked about the timeliness.  I
2  talked about him agreeing to make the call.  I
3  talked about the little hiccup.  In a criminal
4  case, I would do the exact same thing to the
5  United States Attorney's Office.
6      Ultimately, they would make a
7  decision, and, in both cases, would run that by
8  the case agent to see if they were comfortable
9  with that.  But it is not my job to determine
10 how much credibility or how much weight a person
11 gets from the cooperation.  I just want to pass
12 along what the facts of that cooperation.
13     Q.  So you wouldn't say what you think
14 his sentence should be, is what you think you
15 are telling me?
16     A.  Correct.
17     Q.  Would you give a rating?
18     A.  Yeah, a rating, possibly, but, I
19 mean, the Number 1 thing I would do is pass
20 along the facts of the cooperation.  Sometimes
21 attorneys would have specific questions, like
22 you did, about certain areas of those facts,
23 about the hiccups, and was that a big deal.  Did
24 they come around afterwards, after we informed
25 them that you want this to change where they

## Page 296

1  were doing things wrong.  They will definitely
2  ask me specifics about.  But, I mean, I can't
3  say that I have ever been asked for a rating or
4  for a grade.  It's more just general disclosure
5  of the facts of that cooperation.
6      Q.  Okay.  And then I guess I'll end by
7  you believe Justin then did come in and explain
8  how the hiccups happened, and came clean with
9  everything about that?
10     A.  Definitely got explanations about
11 the hiccups.  In some areas, you know, I think
12 it rectified what the problem was.
13     Again to the best of my ability, and
14 as I testified before, throughout this case, I
15 have not obtained any evidence, despite these
16 hiccups and despite these concerns, looking back
17 now historically, I have not obtained any
18 evidence of his knowing receipt and use of
19 banned substances.
20     MR. COLLINS: Thank you.  That's all
21 I have.
22     MR. NOVITZKY:  Okay.
23     MR. TYGART:  Should we proceed?
24     MR. COLBERT:  Yes.
25

Page 297

1    EXAMINATION
2  BY MR. TYGART:
3    Q.  Agent Novitzky, this is Travis
4  Tygart with USADA.
5        First, let me just thank you for all
6  your work on this case, but all the others.  It
7  has had a huge impact for the world that we live
8  in, so thank you.
9        I'm going to ask you a few
10  questions.  If I get anywhere near some of the
11  topics you are not allowed to discuss, I will
12  defer to Mr. Finnigan and Mr. Nedrow to stop me.
13  It's obviously a difficult task for all of us,
14  including Mr. Collins, to navigate some of these
15  issues, so thanks for your patience, and I will
16  say that in advance.
17        The first question, just so I'm real
18  clear, I heard, I think, three areas where
19  Mr. Gatlin did not meet your full satisfaction;
20  is that right?
21    A.  Correct.
22    Q.  And the three, just so I have them,
23  he said -- and we will get into some more detail
24  on these, but generally the three areas are he
25  told you a color of a Voltaren bean that you

Page 298

1  later found out he told someone else was a
2  different color; is that correct?
3    A.  Correct.
4        And in terms of your generalization
5  of not meeting my area of expectation, I would
6  categorize the first one a little bit
7  differently in that there was definitely some
8  questions that came up, of his description, of
9  this pill to us versus what we've learned, as he
10  described it to someone else, and then, you
11  know, at some time in the future, a change of
12  explanation, so some concerns about that.
13    Q.  Okay.  And let me just add --
14    A.  -- definitely we're in a different
15  category, because those were controllable things
16  that we just thought he didn't do at that period
17  of time.
18    Q.  Well, while we're on the color of
19  the pill that he described to you on that August
20  date when you all met in New York, tell me in
21  detail how he described that to you on that
22  date.
23    A.  Okay.  So, he basically talked about
24  an injection that he got from Randall Evans.  He
25  said it was a B12 injection.  He said that he

Page 299

1  ran that injection by his doctor, Dr. Martini, I
2  think it was, and that Trevor Graham and Randall
3  came over to his house, and that Randall
4  actually administered this injection into his
5  hamstring.
6        Mr. Gatlin told us that his
7  hamstring had been sore, and that basically,
8  they thought it might help him heal, and that
9  the injectable B12 would be much more effective
10  for him, because it would go right to the
11  muscle.
12        Mr. Gatlin described that after the
13  injection, his hamstring was a little bit sore,
14  and basically, Mr. Gatlin said he complained to
15  Mr. Evans that his hamstring was sore.  He said
16  that Mr. Evans had a bottle that was labeled
17  Voltaren, V-o-l-t-a-r-e-n, on the bottle.  And
18  he said that Mr. Evans told him that the bottle
19  contained Voltaren bean, and that Mr. Evans took
20  a pill from the bottle, and told him that it
21  would help him for anti-inflammatory purposes.
22        We then, again, as I talked about
23  it, asked Mr. Gatlin to describe the pill, and
24  he described it as green with a V on it.
25    Q.  Agent Novitzky, did he tell you the

Page 300

1  day that he received the injection of the B12?
2    A.  Yes, he did.  He said that that
3  injection was -- going back here in my report,
4  stand by one second.  So he told us in regard to
5  the date, the shot was administered a week
6  before the Mt. SAC track meet, which he said the
7  Mt. SAC track meet took place on April 15th.
8  So, again, the report says a week before that,
9  which would be, talking seven days, so right
10  around April 8th, 2006.
11    Q.  Okay.  And did he tell you the
12  day -- in relation to the shot, did he tell you
13  what day he took the Voltaren -- what he
14  described as the Voltaren bean?  Did he tell
15  what day he took that pill?
16    A.  He described it, it was understood
17  to be approximately the next day.
18    Q.  Did you ask him about any other
19  injections he received?
20    A.  Yeah, we did ask about any other
21  substances, injections, pills.  And he had
22  indicated to us that was the only one, the
23  one that he got from Randall, B12.
24    Q.  So the injection -- in your
25  conversation, your meeting with Mr. Gatlin in

Page 301

1 New York, in August of '06, you asked him about
2 all the injections he received, and the only one
3 he told you about was an injection he received
4 from Randall Evans on April, let's say, 7 or 8
5 that was an injection of B12?
6    A.  Yeah, other than, you know, common
7 injections that you would get at the doctor for
8 checkup or, you know, blood tests or things like
9 that, and that was the only one of the category
10 coming from a Randall Evans or a Trevor Graham.
11    Q.  Well, do you remember if it was
12 discussed, if he said anything about an
13 injection that he had received prior, you know,
14 in -- let's say, in the month of March of 2006?
15    A.  No, nothing specifically was talked
16 about.  My recollection is, you know, have you
17 received any other injection?  And that the
18 answer would have been something like, well,
19 other than when you go to a doctor, and things
20 like that, no, nothing other of these sorts, and
21 in these sorts, we're talking in reference to
22 the B12 injection by Mr. Evans.
23       But again, it was -- we didn't
24 follow up on that, about, well, with other
25 injections are you talking about with checkups

Page 302

1 of the doctor?  It was more much more in general
2 question, and we didn't follow up on it.
3    Q.  Okay.  So Mr. -- let me just put it
4 out there.  Mr. Gatlin has testified in this
5 proceeding that he received an injection of, I
6 think, a combination of an anti-inflammatory
7 steroid in March of 2006, given to him, in his
8 knee, by Dr. Martini.  Did that topic come up at
9 all in your discussion with Mr. Gatlin on August
10 of 2006?
11    A.  No, in that we didn't ask him about
12 specific injections given by doctors during that
13 period of time; however, the one area that maybe
14 we did ask him about, were, I guess conceivably
15 that could have been answered was: What, during
16 the period of time in the spring of '06, you
17 know, could possibly have caused this positive
18 drug test that you had?  Did you get any pills
19 or injections from people?  And that's when he
20 went into -- that's when he went into the B12
21 and the bone.  So that's about as specific as we
22 would have asked him in that category that could
23 have been covered by a doctor during that period
24 of time.
25    Q.  Do you think you asked him any

Page 303

1 question -- well, did you ask him if he used any
2 prohibited substances?
3    A.  Yes.
4    Q.  And what was his response to that?
5    A.  His answer was no, never knowingly.
6    Q.  Would it surprise you that he has
7 testified here today that, in fact, he took an
8 injection of an anti-inflammatory steroid that
9 was prohibited in March of 2006?
10       MR. COLLINS:  I'm going to object to
11 that, because it's out of context.  He indicated
12 that he did it after calling USADA.  The
13 implication of the question --
14       MR. COLBERT:  Are you also objecting
15 that he used the characterization of the word
16 "prohibited" in the context of this question?
17       MR. COLLINS:  Yes.
18       MR. COLBERT:  I think it's a valid
19 objection.
20       MR. BOCK:  He testified that it was a
21 prohibited substance.
22       MR. COLBERT:  He testified in
23 response to your question, Mr. Bock, and your
24 characterization, and his attorney didn't object
25 to it, and I might have sustained the objection

Page 304

1 to at the time, but it was never objected to.
2 So, he's objected now.  I'm going to sustain the
3 objection --
4       MR. TYGART:  Well, but --
5       MR. COLBERT:  -- to the
6 characterization of a prohibited substance.
7       MR. TYGART:  That's fine.
8       MR. COLBERT:  You can ask him if
9 he -- you can ask him and you did, whether he
10 told him whether he ever got a shot of an
11 anti-inflammatory and a steroid combination.
12 And the answer was no.  And now you are
13 basically being argumentative with the witness
14 as to whether he would characterize it as a
15 prohibited substance or not.
16       MR. TYGART:  Well, no, he testified
17 that he was told, as long as he didn't compete
18 for ten days, it was fine to take.  I think the
19 necessary implication there, or inference there,
20 is that it was a prohibited substance; as long
21 as he didn't have it in his system when he
22 competed --
23       MR. COLBERT:  We're not arguing with
24 this witness.
25       MR. TYGART:  Okay.  That's fine.

7-30-07 to 8-01-07                              USADA vs. GATLIN

77 (Pages 305 to 308)

## Page 305

1    That's fine.
2        Q.  (By Mr. Tygart) Mr. Novitzky, again,
3    I think you said this, but just so I'm clear,
4    the purpose for you approaching Justin Gatlin
5    and speaking with him in August of 2006, that
6    was for purposes of investigating Trevor Graham;
7    is that right?
8        A.  Correct.
9        Q.  And you weren't investigating
10   whether or not Justin Gatlin intentionally used
11   prohibited substances, were you?
12       A.  Only to the context that possibly
13   Mr. Graham provided him with something.
14       Q.  Okay.  I assume, but I could be
15   wrong, you didn't further your investigation to
16   prove whether or not Mr. Gatlin intentionally
17   used prohibited substances or not?
18       A.  Correct.
19       Q.  Okay.  When -- in addition to --
20   well, were there any other -- were there any
21   other pills besides the Voltaren bean that
22   Mr. Gatlin indicated that he took when you met
23   with him in August of 2006?
24       A.  No.  He talked about just that bean,
25   on that one occasion.

## Page 306

1        Q.  And as I understand your testimony,
2    he, at a later point -- at a later point, it
3    came up directly with Mr. Gatlin that you
4    understood he had described that bean in a
5    different, in a different color; is that right?
6        A.  Correct.
7        Q.  When did that conversation take
8    place, if you remember?
9        A.  The conversation that I had with
10   Mr. Gatlin explaining about that?
11       Q.  Yeah.  Confronting Mr. Gatlin
12   about --
13       A.  That was recently.  That was
14   approximately a month ago.
15       Q.  Okay.  And then you also testified
16   that there was a -- you had now learned that he
17   had an explanation for why he told you green on
18   the day and then told someone else brown when
19   describing that pill.  When did you learn of
20   that explanation for that inconsistency?
21       A.  I actually learned about it from
22   Mr. Collins.
23       Q.  So you haven't actually heard that
24   from Mr. Gatlin?
25       A.  Correct.

## Page 307

1        Q.  And when was it that you heard about
2    that from Mr. Collins?
3        A.  That was even more recently, a
4    couple of weeks ago.
5        Q.  Okay.  Agent Novitzky, you also
6    testified previously about -- actually, I think,
7    you said based on your interview with -- and it
8    may have been, I didn't quite hear it, it might
9    have been with your interview with Chris
10   Whetstine or possibly your conversation with
11   Justin Gatlin, but that you learned that there
12   was a protocol change that happened in 2006, and
13   the protocol being what Mr. Whetstine did to
14   Mr. Gatlin?
15       A.  Correct.  And I learned that from
16   Mr. Gatlin.
17       Q.  So that came from Mr. Gatlin?
18       A.  Correct.
19       Q.  And did he tell you -- I think you
20   rattled off a few meets that I just didn't quite
21   get.  What meets did he tell you that that
22   protocol change occurred?
23       A.  He said it started with the Kansas
24   relay meet, and he said that, again, the
25   protocol change was Mr. Whetstine's eagerness to

## Page 308

1    get the massage cream on his legs as soon as
2    possible after a race, whereas in the past, they
3    would typically go back to the hotel.  He would
4    describe in the past that he would run a race,
5    talk to the media, go to drug testing, and then
6    return to the hotel, where Mr. Whetstine would
7    massage his legs with the cream and lotion.
8        He said, in '06, however,
9    Mr. Whetstine became eager to get the massage
10   creams on his legs as soon as possible.  And
11   that they then further explained that this
12   occurred first at the Kansas relay meet, the
13   Prefontaine meet, the New York Reebok meet, and
14   the Japan meet.
15       So he asked Mr. Whetstine why he was
16   so eager to do this, and Mr. Whetstine replied
17   that he just wanted to do his job.
18       Q.  And when you spoke with
19   Mr. Whetstine, did you ask him about that
20   statement?
21       A.  Yes.
22       Q.  And what was his response to that
23   statement?
24       A.  He denied that the protocol --
25       THE REPORTER:  He denied what?  I'm



Page 309

1    sorry.
2        Q.  Can you repeat that, Agent Novitzky,
3    please, for the record?
4        A.  Yes, Mr. Whetstine denied that the
5    protocol had changed.
6        THE REPORTER:  Thank you.
7        Q.  Agent Novitzky, you also testified,
8    and it was in the context of some questions
9    about text messages that were sent from Justin
10   Gatlin to Chris Whetstine that you -- did you
11   keep a copy of those, or did you just see them
12   on his phone?
13       A.  I saw them on his phone and
14   transcribed them from what I saw on the paper.
15       Q.  And the statements that were made
16   from Justin, supposedly from Chris Whetstine to
17   Trevor Graham that you heard from Justin Gatlin,
18   did you ask Chris Whetstine about those
19   statements?
20       A.  Yes.
21       Q.  And what was Chris Whetstine's
22   response to Trevor Graham's allegation that he
23   admitted to applying this cream with a
24   prohibited substance on Mr. Gatlin?
25       A.  He stated that was inaccurate.

Page 310

1        Q.  When did you discover that
2    Mr. Gatlin had contacted the individual everyone
3    is referring to as "Memo"?
4        MR. FINNIGAN:  To the extent that
5    goes into a conversation that Agent Novitzky had
6    with somebody other than Mr. Gatlin, I would ask
7    that that not -- that that subject be -- well,
8    that that subject is off limits.  If you want to
9    ask to the extent Agent Novitzky had
10   communications with Mr. Gatlin --
11       MR. TYGART:  Yeah --
12       MR. FINNIGAN:  That's fine.
13       Q.  (By Mr. Tygart) Agent Novitzky, did
14   you bring it to -- did you approach Mr. Gatlin
15   about the fact that he had contacted Memo, or
16   did he approach you?
17       A.  I actually approached Mr. Collins.
18       Q.  Okay.  And when was that?
19       A.  That would have been in February of
20   2007.
21       Q.  Has Mr. Gatlin's assistance that
22   he's provided led to you discovering any
23   violation of laws dealing with
24   performance-enhancing drugs?
25       A.  No.

Page 311

1        Q.  Has his assistance allowed you to
2    establish any violations of laws dealing with
3    performance-enhancing drugs?
4        A.  No.
5        Q.  Has his assistance led to you
6    discovering the violation of any laws?
7        A.  No.
8        Q.  And has his assistance led to you
9    establishing a violation of any laws?
10       A.  The last one, you were a little
11   broken up.  Could you repeat that that one.
12       Q.  Has his assistance led you to
13   establishing a violation of any laws?
14       A.  No.
15       Q.  Agent Novitzky, just a point we're
16   trying to clarify, the Reebok meet that you
17   referred to, I think you said the "Reebok New
18   York relays"?
19       A.  Yes.  The New York Reebok meet is
20   how I have it recorded, and I believe that is
21   the Reebok meet that took place in New York.
22       Q.  Do you know any further information
23   about that particular meet?
24       A.  No.
25       Q.  Do you know when it was?

Page 312

1        A.  My understanding, in terms of
2    chronological order that it was after the
3    Prefontaine meet and before the Japan meet.
4        Q.  Okay.
5        A.  But, again, that was just on the
6    statements we got from Mr. Gatlin.
7        Q.  Was it possibly the Penn Relays?  Or
8    was it an entirely different relay?
9        A.  My understanding it was entirely
10   different than the Penn Relays.
11       Q.  Okay.  Agent Novitzky, have you --
12   are you aware that Randall Evans has denied
13   giving an injection of B12?
14       MR. COLLINS:  I'm going to object.  I
15   wasn't allowed to go into this.
16       MR. NEDROW:  Yeah, and I -- on behalf
17   of the government and following Mr. Collins'
18   statement, yeah, unfortunately, we need to stay
19   away from questions about Randall Evans, citing
20   again, ongoing investigative matters and, you
21   know, possible trials coming up, witness
22   testimony, things of that sort.
23       MR. TYGART:  Okay.  We don't have any
24   further questions.
25       MR. COLBERT:  Do you have any

7-30-07 to 8-01-07                                    USADA vs. GATLIN

                                                      79 (Pages 313 to 316)

Page 313

1  further --
2          MR. COLLINS: One second.
3          MR. COLBERT  just one second,
4  Mr. Novitzky.  We will be right with you.
5          MR. COLLINS: I'm okay.
6          MR. COLBERT: All right.  Mr.
7  Novitzky, the panel has just a few things for
8  you.
9          MR. NOVITZKY: I can barely hear you
10 guys.  If you guys can get a little closer to
11 the phone.
12         MR. COLBERT: Let me see if this
13 microphone is working.  Okay.  You
14 have to speak up.  Apparently, the local mikes
15 aren't working.
16         Chris, why don't you identify
17 yourself for the --
18         MR. CAMPBELL: Yeah.  Mr. Novitzky,
19 my name is Chris Campbell, and I think we have
20 met before in the Gaines/Montgomery case.
21         MR. NOVITZKY:  Yeah, absolutely.
22 How are you doing, Mr. Campbell?
23         MR. CAMPBELL: How are you doing?
24         MR. NOVITZKY:  Good.
25              EXAMINATION

Page 314

1  BY MR. CAMPBELL:
2      Q.  I have got one question for you:  Do
3  you have any information that could suggest that
4  Mr. Gatlin may have unknowingly been
5  administered a banned substance?
6          MR. FINNIGAN: You, know, I'm going
7  to ask that Agent Novitzky not go into that
8  because that's -- I mean, that's really an
9  open-ended and broad question.  And obviously, I
10 entirely understand the relevance and why you
11 are asking it, but it invites a narrative by
12 Agent Novitzky to go into interviews of lots of
13 people beyond just Mr. Gatlin, and
14 Mr. Whetstine, which are the only two that we
15 can really go into.
16         Beside that, I think he's sort of
17 answered sort of the opposite question.
18     Q.  (By Mr. Campbell) Well, one was with
19 respect to his knowingly being administered.  My
20 question with respect to his unknowingly being
21 administered.  Those are two different issues.
22         MR. FINNIGAN: Fair enough.
23         MR. NEDROW: How about this?  This is
24 the other AUSA, Jeff Nedrow.
25         How about, based on the facts that

Page 315

1  Agent Novitzky has already talked about, because
2  I think the concern is -- and I echo the
3  sentiment expressed -- Agent Novitzky can't talk
4  about all of the information he has available,
5  because some of it directly pertains to these
6  ongoing indictments, but what he can talk about
7  is the facts that he's gathered, that he's
8  already summarized in terms of speaking with
9  Mr. Gatlin, in terms of Mr. Gatlin's telephone
10 calls with Mr. Graham, in terms of Mr. Gatlin's
11 conduct.  And he can comment -- he can the
12 answer that question, I think, if we limit it to
13 the facts that he's discussed in his testimony
14 today.  But it needs to be clear that he's only
15 referencing the facts that if he testified to
16 today is not extending into other facts he has
17 available.
18         MR. BOCK: Can I ask a follow-up
19 question, just to clarify:  And does that also
20 mean that if there's testimony that impeaches
21 any of the statements that may have been made by
22 either Mr. Whetstine or Mr. Gatlin, that he
23 couldn't testify about those, if they came from
24 another witness?
25         MR. NEDROW: Yes.  We can't allow

Page 316

1  him, unfortunately, to preserve the integrity of
2  our ongoing federal investigative matters, to
3  get into facts that he's developed outside this
4  kind of really narrow factual parameters of what
5  he's testified to today.  And again, I
6  apologize.  I realize it somewhat potentially or
7  theoretically impedes what you guys are doing,
8  but we can't -- we can't allow him to do that,
9  in terms of this investigative and
10 prosecutorial --
11         MR. BOCK: Can I just throw in a
12 comment?  I guess it's an objection, although,
13 obviously, we really appreciate what has been
14 shared.  In answering a broad question like, is
15 there evidence that he unknowingly did it and
16 limiting it only to testimony from two people
17 when he's aware of testimony of a lot of other
18 people, I don't know that there is any value to
19 that.
20         MR. COLBERT: I'm sure you can argue
21 in closing the relevance, the merit, the weight,
22 but if he's willing to answer it, Mr. Campbell
23 would like an answer, I have no objection to him
24 answering it, with those limitations.
25         MR. CAMPBELL: We might as well get

Page 317

1   the answer.
2         MR. CHERIS: Go ahead.
3         MR. COLBERT: Mr. Novitzky, with all
4   of that, can you answer the question?
5         MR. NOVITZKY: Okay. I'm sorry, was
6   there another question?
7         MR. COLBERT: Repeat your question
8   with all the qualifications.
9         MR. CAMPBELL: I think it's the
10  question that was rephrased by one of your
11  attorneys.
12        MR. COLLINS: Mr. Nedrow, I think.
13        MR. CAMPBELL: Mr. Nedrow, you want
14  to rephrase the question?
15        MR. NOVITZKY: Just so I'm clear
16  what's being asked, I need to ask it again.
17        Q.  (By Mr. Campbell) Well, I mean, the
18  question was: Do you have any information that
19  could suggest that Mr. Gatlin may have
20  unknowingly been administered a banned
21  substance, but that question would be limited by
22  the -- help me out here --
23        MR. TYGART: Chris Whetstine, what he
24  learned from Chris Whetstine.
25        MR. NEDROW: And I appreciate the

Page 318

1   question. I think it would simply be: Do you
2   have any information, limited to the information
3   discussed today in his testimony, is there
4   anything within that factual set, basically,
5   that leads you to -- I'm sorry. Now I'm losing
6   what the thrust was, but it was that Mr. Gatlin
7   unknowingly took the substance.
8         Is that the question?
9         MR. NOVITZKY: Basically, and based
10  only on all those things I'm allowed to talk,
11  the call, and the interview with Mr. Gatlin.
12        MR. CAMPBELL: Well, with Evans, I
13  believe, and Whetstine?
14        MR. NEDROW: Mr. Whetstine is fine,
15  but Mr. Evans is not fine from our perspective
16  in terms of the factual universe. But
17  Mr. Whetstine is fine, yes.
18        A.  Well, I mean, limiting it to that,
19  in that I have already earlier testified that I
20  obtained no information in those areas of
21  Mr. Gatlin -- Mr. Gatlin's knowing use of banned
22  substances, and just knowing the public knows
23  that he did test positive for a banned
24  substance, putting those two things together,
25  you know, that would indicate to me, at least

Page 319

1   the possibilities of him unknowingly being given
2   these things. But in terms of any other
3   specifics from those two areas and specific
4   knowledge of his unknowing receipt, no, I don't
5   have any.
6         Q.  And with respect to -- I think,
7   Chris Whetstine is, you say, not off-limits --
8   is it Whitestein (phonetic)? Whetstine, I'm
9   going to get it wrong the whole time.
10        And you assessed sort of the
11  credibility of Mr. Gatlin. How would you assess
12  the credibility of Mr. Whetstine?
13        A.  Difficult. It's not an easy
14  question to answer like the last one was.
15        Many things about that guy. He's
16  suffering, you know, apparently, from some type
17  of head injury. Can be lucid at times, and not
18  at others. Tends to ramble a lot. You know,
19  did have somewhat reasonable explanation for
20  things.
21        But in assessing his credibility, I
22  would have to say, because he didn't make
23  recorded calls for me, a lot more difficult to
24  put a value on his credibility versus somebody
25  like Mr. Gatlin, who goes ahead and makes these

Page 320

1   calls right off the bat, and gives me another
2   measuring stick to establish that. I didn't
3   have those measuring sticks with Mr. Whetstine,
4   to the extent I did with Mr. Gatlin.
5         Q.  And how deep did you go into the
6   issue of him putting cream on his legs before
7   the doping test?
8         A.  Yeah. We went very deep into it,
9   and he denied that any of the creams were
10  changed from in the past what he was using. He
11  did talk about going from a cream-based to a
12  lipid-based Voltaren cream, which would cause it
13  to sit on the leg as opposed to being massaged
14  into the leg, so he did have an explanation for
15  that.
16        Again, he said that the protocols
17  didn't change in '06, and anybody who said it
18  did is lying.
19        He claims that he wasn't putting
20  anything on him to try to sabotage Mr. Gatlin
21  because it would be against his interest to do
22  that.
23        Q.  Did he talk about putting the cream
24  on him right before he went to drug testing?
25        A.  Yes, he did. But he said that he

Page 321

1  did that, he said, because he needed to get that
2  cream on there as fast as possible after a race.
3      Q.  Did he talk to you -- did he talk to
4  you about any disputes that he had with
5  Mr. Gatlin?
6      A.  Not so much with Mr. Gatlin.  He
7  said -- he did say, in particular, that if
8  anything changed with Mr. Gatlin, he would be
9  the first one to say, hey, what's going on, and
10  that nothing like that ever happened in regard
11  to this period of time in '06.
12      You know, he definitely talked about
13  things with Mr. Graham and the disputes that he
14  was having with him, a lot of this having to do
15  with previous athletes and pain and things, but
16  not so much Mr. Gatlin, no.
17      Q.  He didn't tell you about a $5,000
18  dispute he had with Mr. Graham?
19      A.  Let me go back and look at my notes
20  just to make sure, my report.  I don't believe
21  he did, and if you just bear with me for a
22  second, as I page through here.
23      No, he didn't.
24      Q.  Were you aware of whether there was
25  a $5,000 dispute between him and Whetstine and

Page 322

1  Mr. Gatlin?
2      A.  I was not aware of that.
3      Oh, wait a second, I was aware of
4  that.  I'm sorry.  I was aware of that.
5  Mr. Gatlin did tell me about that.
6      MR. COLBERT:  Agent Novitzky?
7      A.  But no, I don't recall specifically
8  asking Whetstine about that.
9      MR. COLBERT:  Agent Novitzky, can you
10  hear us?
11      MR. NOVITZKY:  Yes.
12
13      EXAMINATION
14  BY MR. CHERIS:
15      Q.  Did Mr. Gatlin fail to do anything
16  that you requested of him?
17      A.  You know, on an interim basis, you
18  know, I talked about when he didn't have the
19  recorder with him, and we explicitly told him
20  that he needed to keep that thing with him, and
21  understood the call or two where he may not have
22  had it his pocket to get the recording of a
23  call, but that he needed to have it close.
24  That, to me, in terms of the scope of issues,
25  was a relatively minor hiccup, because, again,

Page 323

1  after we cleared that up again, after him not
2  having the recorder for that weekend, he had it
3  with him for the rest of the duration.
4      There was one instance, where we
5  were trying to track down an individual familiar
6  to Mr. Gatlin, and this was in the tail end of
7  his recording and the meat of the cooperation he
8  was giving us, and let's just categorize it as a
9  little less-than-enthusiastic cooperation on his
10  behalf.  I think part of him was getting a
11  little frustrated about him making all these
12  calls, doing things for us, and not really
13  seeing anything in his return, and actually
14  called to get a car description and a license
15  plate, and I was kind of put off a little bit,
16  but I sensed that, in talking to Mr. Collins,
17  after, that there were some minor frustrations
18  on his behalf, and he didn't call me back
19  shortly thereafter, and that was never an issue
20  again.
21      So, other than those two minor
22  issues, no, never really didn't do anything that
23  I asked him to do.
24      Obviously, there was that one
25  instance, regarding disclosure, where we weren't

Page 324

1  told about his dealings with this Memo, although
2  that wasn't a specific instruction that he, you
3  know, declined to follow.
4      MR. COLBERT:  Mr. Novitzky, this is
5  Edward Colbert.
6      EXAMINATION
7  BY MR. COLBERT:
8      Q.  I just wanted -- two things, follow
9  up on the last one:  Did I understand your
10  testimony earlier, though, that this failure to
11  tell you about Memo was after he was no longer
12  reporting calls, and generally after this sort
13  of daily give-and-take that you have been having
14  with him for some number of months.
15      A.  You are correct.  That is correct.
16      Q.  The only other question I have is
17  in -- during this whole period of time, was the
18  United States Anti-Doping Agency involved with
19  you or cooperating with you in this
20  investigation as well?
21      A.  I have been in contact with the
22  United States Anti-Doping Agency on a regular
23  basis for the last several years.  I have used
24  them throughout my investigations, as an expert
25  for me.  They have assisted me with learning the

7-30-07 to 8-01-07                    USADA vs. GATLIN

82 (Pages 325 to 328)

Page 325

1  different drugs, learning the drug-testing
2  protocols. So, yeah, I mean, I have been in
3  regular contact with them.
4          And portions of that contact,
5  although not nearly all of them, have been in
6  reference to my investigation with Trevor
7  Graham, and obviously some of that flowing over
8  into this Justin Gatlin's positive test, which
9  for a period of time, you know, we were
10  inquiring about for relativity with Trevor
11  Graham.
12      Q.  So during this period of time, was
13  USADA aware that Mr. Gatlin was cooperating with
14  you?
15      A.  Yes, they were.
16      Q.  And were you --
17      A.  Not in detail, but in general.
18      Q.  And did you share information with
19  USADA that you developed through your
20  cooperation with Mr. Gatlin?
21      A.  I would share information if it
22  could help my investigation. So for
23  investigative disclosure purposes, where I
24  thought that the sharing of that information
25  could be beneficial in my case, I would do so.

Page 326

1  I have never throughout this thing been in the
2  practice of sharing it just to share it for
3  their benefit. It's always been done for a
4  benefit on the criminal side.
5      Q.  Did USADA ask you or suggest to you,
6  during this period of cooperation the sorts of
7  things you might ask Mr. Gatlin to look into or
8  to provide you with that information?
9      A.  I'm sorry, that one trailed off a
10  little at the end there. Could you ask again?
11      Q.  During the period of time this
12  cooperation was going on and you were working
13  with Mr. Gatlin, did USADA ask you to have
14  Mr. Gatlin provide certain information or
15  suggest to you things that they -- that you
16  might ask Mr. Gatlin?
17      A.  No, but the other held true, in that
18  I would bounce things off them about certain
19  areas that I might want to get into, again, for
20  help in my case. I was, constantly being using
21  them, you know, as experts, which we do often in
22  criminal investigations to outside parties,
23  outside agencies, so I would say the other was
24  true. But, no, they weren't asking me -- your
25  question was, Were they asking me to do things?

Page 327

1      Q.  Or suggesting to you potentially
2  fruitful avenues of inquiry?
3      A.  Again, you trailed off a little bit
4  there.
5      Q.  Whether they asked you to do
6  something specific -- if I understand you, you
7  discussed things that you were looking into with
8  USADA for purposes of obtaining information from
9  USADA that would help you.
10      A.  Correct.
11      Q.  And during that period of time,
12  USADA knew that you were working with
13  Mr. Gatlin.
14      A.  Correct.
15      Q.  Did they ever suggest to you things
16  that you might ask Mr. Gatlin to help you with?
17      A.  Yeah, I mean, I don't -- I can't
18  recall anything specific, but in general, they
19  would have, because I would have been asking
20  them for that information.
21          MR. COLBERT: Okay. I have nothing
22  further. Hang on one moment. We may be
23  finished.
24          (Panelists conferring.)
25          THE REPORTER: Mr. Nedrow, this is

Page 328

1  Debbie Resling, the reporter. Could you spell
2  your last name for me, please?
3          MR. NEDROW: Yes, thank you. And,
4  again, I'm sorry for not being on time.
5          My last name is spelled N- as in
6  Nancy -E-D- as in David R-O-W.
7          THE REPORTER: And your first name?
8          MR. NEDROW: Jeff, J-e-f-f.
9          THE REPORTER: Okay. Thank you. And
10  then only one other question I had, too, because
11  I couldn't hear it -- you said, Mr. Novitzky, it
12  was a green pill with V as in Victor or B as in
13  boy on it?
14          MR. NOVITZKY: V as in Victor.
15          THE REPORTER: Thank you.
16          MR. COLBERT: Jeff Finnigan and Jeff
17  Nedrow are the two AUSAs.
18          MR. CAMPBELL: Mr. Nedrow and
19  Mr. Finnigan?
20          MR. FINNIGAN: Yes, sir.
21          MR. CAMPBELL: We would like to ask
22  you to consider doing something, if you could.
23          We would like to ask you to consider
24  whether you could disclose any relevant evidence
25  of unknowing administration of a banned

## Page 329

1 substance on behalf of Mr. Gatlin, and that we
2 could treat strictly confidential, because, as
3 you understand, this case deals with whether he
4 will be able to compete for eight years. So
5 it's a serious matter, and to the extent that
6 there is some evidence that suggests that he was
7 unknowingly administered banned substances, that
8 would be important.
9     MR. FINNIGAN: I probably need to get
10 off the phone and talk with Jeff about that, but
11 my gut reaction is that we cannot because of the
12 restrictions we put on the testimony earlier,
13 and because it was our understanding going into
14 this that Agent Novitzky was here to describe
15 Mr. Gatlin's cooperation and for you to give
16 that whatever weight you will in your ultimate
17 decision related to Mr. Gatlin. And we didn't
18 expect to go beyond this, and we don't intend to
19 speak beyond this. So I'm happy to get off and
20 talk with Jeff Nedrow, but that's my gut
21 reaction to that request.
22     MR. NEDROW: I generally agree, but
23 let me suggest this, sir -- I think, that was
24 Mr. Campbell.
25     We appreciate the situation you are

## Page 330

1 in, and I agree with Jeff Finnigan. What I
2 would like to do is let's determine if there's
3 anything else besides that question, and if
4 that's it, then perhaps, we can very briefly
5 speak amongst ourselves, if you will. We will
6 have to hang up to do that obviously. And then
7 call right back, like in five minutes or a
8 maximum of ten, and then, we will either tell
9 you no or we will respond to it in some fashion.
10     MR. COLBERT: Okay. And I think
11 Mr. Tygart and Mr. Collins have something
12 perhaps to answer your question if that's the
13 only thing.
14     MR. TYGART: This is Travis for
15 USADA. We would just jointly submit that same
16 question, and would encourage you to provide
17 some answer to that question, so that this panel
18 can have that in front of them to consider. So,
19 we would absolutely have no objection to it, and
20 would actually, in fact, ask that you do that,
21 if at all possible.
22     MR. COLBERT: Mr. Collins?
23     MR. COLLINS: I'm fine with that. My
24 question was a different question.
25     MR. COLBERT: Do you have anything

## Page 331

1 else for these?
2     MR. COLLINS: I have one quick
3 question for Jeff Novitzky.
4     MR. NOVITZKY: Three Jeffs.
5     MR. COLLINS: I realized I had to add
6 a last name there.
7
8     EXAMINATION.
9 BY MR. COLLINS:
10     Q.  Trevor Graham was indicted
11 approximately November 1st or 2nd?
12     A.  Correct.
13     Q.  And once an individual is indicted,
14 you can't keep making undercover calls to him.
15 That's generally, the case, correct?
16     A.  Generally, although, I would
17 always --
18     MR. FINNIGAN: Let me jump in on
19 that, because, I guess that's why -- I'm
20 concerned the way it's phrased could be a little
21 confusing.
22     Are you asking Agent Novitzky as his
23 general practice, or what the -- you know, like,
24 you know, ethics rules are for lawyers in terms
25 of contacting represented persons? That's

## Page 332

1 all -- the only concern I have on that.
2     MR. COLLINS: I understand that. And
3 Jeff -- and I won't add a last name, so it's
4 generic to all of you -- you may or may not
5 know, I used to be an AUSA in Chicago.
6     MR. FINNIGAN: Okay, great.
7     MR. COLLINS: And so -- and I
8 understand that, but I can't be the witness,
9 that once a guy is indicted, you certainly can't
10 be making calls about the indictment. Maybe
11 there's a future thing you could do, and maybe
12 that's an exception, I'm not trying to get that
13 out. What I was trying to get was some
14 explanation as to why the calls ended when they
15 did.
16     MR. NEDROW: I get it. And maybe
17 what you just said is the better objection
18 clarification is what you just said about the
19 subject matter, about the with -- you know,
20 person's been indicted as opposed to new
21 violations. But maybe you're just asking him
22 the way that -- as the question is now, why the
23 calls ceased when they did.
24     Q.  (By Mr. Collins) Okay. Can you
25 answer that question, Jeff Novitzky?

## Page 333

1      A.   Yes, because, the purpose of him
2   making the calls, Number 1, to corroborate what
3   he told us, and measure his credibility; and
4   Number 2, to see if we could gather more
5   evidence of our -- in our investigation of
6   Trevor Graham.
7           Those two purposes of doing that
8   were met, and we didn't feel that any more
9   additional calls were needed, and felt that
10  based upon the 11 calls that he had made, we
11  were able in those two areas to come up to a
12  conclusion, and didn't think it needed to go any
13  further.
14          MR. COLLINS: Okay.
15          MR. COLBERT: All right. Then, if
16  you would please consult amongst yourselves, and
17  then call us back. I'm not sure the number
18  here, or whether you want us -- want to call one
19  of the counsel on the cell phone, and then we
20  can call you back or how you'd want to handle
21  that.
22          MR. NEDROW: Can we still use or is
23  it -- we received a very helpful e-mail --
24          MR. TYGART: We will just leave it
25  on.

## Page 334

1           MR. NEDROW -- will that still work?
2   Or when we hang up, do we have to go through a
3   different route?
4           MR. TYGART: Jeff, this is Travis.
5   We will keep it on from our end, and I think you
6   can just call in, but if not, you can call my
7   cell phone.
8           MR. NEDROW: Okay. Then we will try
9   to be as quick as possible, I know it's late
10  there. But I really want to make sure I have
11  got the exact question. The exact question: Is
12  there any other evidence, not restricted
13  basically to the facts that that were discussed
14  today that would show that Mr. Gatlin
15  unknowingly took the substances, which now have
16  been shown to have been taken. Is that
17  basically it?
18          MR. CAMPBELL: I think so.
19          MR. COLBERT: Yeah.
20          MR. BOCK: Or that led to a positive
21  test result, yeah.
22          MR. NEDROW: Yeah, the last part that
23  led to the positive test result, but the issue
24  being, is there any evidence out there to
25  suggest that he unknowingly took the substances?

## Page 335

1   Is that basically it?
2           MR. COLBERT: Yes.
3           MR. CHERIS: Yes.
4           MR. NEDROW: Okay. Then, yes, if
5   that's okay, we'll call you back as quickly as
6   we can.
7           MR. COLBERT: Thank you.
8           MR. NEDROW: I will call you right
9   back, Jeff. Thanks. Bye.
10          MR. COLBERT: Okay. This might be an
11  appropriate time to do, if you wanted to -- it's
12  almost 6:00. Do you need a five-minute break or
13  a ten-minute break?
14          MR. COLLINS: Sure.
15          MR. COLBERT: I know you want to
16  finish with Gatlin today.
17          MR. COLLINS: I have a witness that
18  has an 8:00 plane that's maybe a 15-minute
19  witness. Can we take her, and then you can --
20          MR. TYGART: We're fine with that.
21          MR. COLBERT: And then finish with
22  Mr. Gatlin, and start off fresh in the morning.
23          MR. TYGART: So we'll take 5, and
24  then --
25          MR. COLBERT: Yeah, let's take 5.

## Page 336

1   And maybe somebody should wait in the room in
2   case they come back.
3           (Brief recess taken.)
4           Mr. Justin Gatlin, Mr. Gatlin and
5   Visie Simms are still present in the room.)
6   WHEREUPON,
7           TERRI BLANKENSHIP,
8   the witness herein, having been first duly sworn
9   to state the whole truth, testified on her oath
10  as follows:
11
12          EXAMINATION
13  BY MR. COLLINS:
14      Q.   Hi, I'm John Collins. We've talked
15  on the phone. I'm Justin Gatlin's attorney.
16  These three men are the arbitrators. These two
17  fine gentlemen are the attorneys for USADA. And
18  Debbie is the court reporter.
19          Could you please state your name for
20  the record, spelling your last name for the
21  record?
22      A.   Terri King Blankenship,
23  B-l-a-n-k-e-n-s-h-i-p.
24      Q.   Could you give us a little of your
25  personal background, just briefly? How are you

## Page 337

1  currently employed?
2      A.  I'm in business.  I'm a massage
3  therapist licensed for the state of North
4  Carolina.  I specialize in neuromuscular and
5  orthopedic therapy.
6      Q.  How were you occupied prior to
7  becoming a massage therapist?
8      A.  I have been in law enforcement for
9  approximately 20 years as a local police
10 officer, and then I worked for the state who
11 lends me out to the federal government, and to
12 the state and local government.
13     Q.  And did you have in your course of
14 law environment any exposure to steroids --
15 steroid trafficking in any way?
16     A.  Yes, I did.
17     Q.  And what was that?
18     A.  We started noticing people working
19 out at gyms were having access to anabolic
20 steroids, and this was prior to them becoming
21 controlled substances.
22         But what we got involved with was
23 high school football players using anabolic
24 steroids, and the bottles and the needles, the
25 syringes were being found in locker rooms, so we

## Page 338

1  investigated that.  That was happening in
2  Alamance County, North Carolina.  So we
3  investigated that.
4         And subsequently to our
5  investigation and the involvement of the Drug
6  Enforcement Administration, at some point after
7  that, anabolic steroids became a controlled
8  substance.
9      MR. CAMPBELL:  What year are we
10 talking about?
11     A.  It's going to be mid- to late '80s.
12 I can't give you an exact year, I'm sorry.
13     Q.  (By Mr. Collins)  Do you know Justin
14 Gatlin?
15     A.  Yes, sir.
16     Q.  And how do you know Justin Gatlin?
17     A.  I know Justin as a patient in my
18 clinic.
19     Q.  Approximately how long have you
20 known Justin?
21     A.  Since 2003.  My first visit with
22 Justin was in July of 2003.
23     Q.  And he was a client, you said?
24     A.  Yes, sir, he was referred to our
25 office by Dr. Tom Ayres, with a hamstring pull.

## Page 339

1  And so we started treatment then.  That would
2  have been July.  And then I started seeing
3  Justin after that, and I saw him just about
4  every week, up through 2006.
5      Q.  What sort of substances would you
6  use to rub on Justin when you were treating him?
7      A.  The massage therapy lotion that I
8  used is called Biotone Advanced Massage Therapy
9  Lotion.  If I use any type of muscle analgesic,
10 it's BIOFREEZE that contains camphor and sulfur.
11 And if I use another one, it's called Sombra,
12 S-o-m-b-r-a, and that's got camphor, sulfur, and
13 cayenne pepper in it.
14         I had wanted to bring a sample of
15 that with me, but the airport wouldn't let me
16 put it on the plane.  So, I'm sorry, I couldn't
17 bring that with me.
18     Q.  Have you ever had any discussions
19 with Justin Gatlin regarding doping in sport?
20     A.  Yes, we have.
21     Q.  Could you please relay those
22 conversations?
23     A.  I specifically asked Justin on one
24 occasion about racing with someone that he knew
25 was using a performance-enhancing drug, because

## Page 340

1  he prided himself on racing clean.  And I said,
2  How would it make you feel if someone who was
3  using a performance-enhancing medication beat
4  you in an important race?
5         And he was very dignified in his
6  answer, and he said to me, Who won the race?
7  And it was that simple of an answer.  He didn't
8  put the person down.  He didn't say anything
9  positive or negative about it.  He didn't say
10 anything positive or negative about himself.  He
11 just said "Who won the race?"  And I took that
12 as meaning that he ran clean, and if he runs
13 clean, then he's the winner.
14     Q.  Now, over this approximately
15 three-year period that you were working with
16 Justin, did he ever come to your office
17 suffering from allergies?
18     A.  Yes.
19     Q.  And could you describe that?
20     A.  Every spring, he would come in
21 suffering terribly with allergies.  His eyes
22 would be running, his nose would be running.  He
23 was obviously uncomfortable.
24         And a number of times, I said,
25 Justin, is there nothing you can take to make

7-30-07 to 8-01-07                                    USADA vs. GATLIN

86 (Pages 341 to 344)

Page 341

1   you feel better?
2        And he said, Terri, I don't take
3   anything.
4        Q.   Now, in working with him on this
5   regular basis, did you notice any changes in his
6   body?
7        A.   What type of changes?
8        Q.   You know, for example, could you
9   tell if he was in season or out of season?
10       A.   Yes, I could.
11       Q.   And how could you tell?
12       A.   He would be slimmer out of season.
13  In season, you could tell the training was
14  starting, and he would get just a little bit
15  bigger, not very much, but the muscle tissue
16  itself never really changed.  He would be a
17  little bit more toned, but as far as the way the
18  tissues and the muscles felt, it pretty much
19  stayed the same all the way through.
20       Q.   Did you ever while you were treating
21  him notice him to have any sudden growth or
22  muscle development?
23       A.   No, sir.
24       Q.   Did you notice anything that made
25  you think he had ever taken any steroids or

Page 342

1   steroid precursors?
2        A.   Never.
3        Q.   Would you recognize the look of
4   someone had taken such a thing?
5        A.   Yes, sir.
6        Q.   And why is that?
7        A.   It's a whole different look, and
8   it's a whole different feel.  People that I have
9   come across who are using anabolic steroids or
10  performance- enhancing medication have a very
11  chiseled, cut look about them.  Their muscles
12  are -- they always look as if they've just
13  stepped out of the gym and they're still real
14  pumped up, and it never really goes down.  The
15  tone of the muscle is much firmer than a muscle
16  who is just in shape, in tone.
17       Muscles that are just very well
18  taken care of, they're very well hydrated,
19  they're taken care of, that are defined are very
20  smooth and soft and easy to work through.  It's
21  not a struggle to work through it.
22       People who are on steroids, their
23  muscle tone feels completely different to the
24  touch.
25       Q.   Did you have occasion to work on

Page 343

1   Mr. Gatlin on April 26th, 2006?
2        A.   Yes, I did.
3        Q.   Do you know what treatment you gave
4   him?
5        A.   I worked on his hamstring.
6        Q.   Did it -- how did he feel at that
7   time?  Did he feel as if he had taken any
8   performance-enhancing substance?
9        A.   No, sir.
10       Q.   Do you recall seeing any needle
11  marks on Mr. Gatlin?
12       A.   Never.
13       Q.   Did you ever have occasion to
14  discuss Justin's positive test with him?
15       A.   Very, very little.
16       Q.   Can you describe that conversation?
17       A.   I received a phone call that he had
18  a test positive, and he was quite upset about
19  it.  Of course, I was upset about it.
20       From that point on, we really didn't
21  talk very much about it.  It was almost as if I
22  didn't want to know more than what Justin felt
23  like he could tell me, because I didn't want to
24  put him on the spot by asking him specific
25  questions that he could not answer.

Page 344

1        Q.   Did you ever ask him if he had done
2   it?
3        A.   I asked him straight out several
4   times if he had done it.
5        Q.   What did he tell you?
6        A.   He told me no.
7        And I also told Justin, I said,
8   Justin, if you did this, tell me.  I will still
9   love you.  You will still be my friend.  I will
10  tell you, it's not the smartest thing you have
11  ever done in your life.  Where are we going from
12  here?  I said, but you have got to be honest
13  with me and tell me.
14       And he said, I didn't do it, Terri.
15       And he's never wavered from that.
16       MR. COLLINS:  I have nothing
17  further.
18       MR. BOCK:  I just have a couple of
19  questions.
20
21       EXAMINATION
22  BY MR. BOCK:
23       Q.   You mentioned that he had a
24  hamstring issue in April of 2006?
25       A.   Yes, sir.

Page 345

1    Q.  Do you recall when during the month
2   that issue came up?
3       MR. COLLINS: I thought she said
4   April of 2003.
5       MR. CAMPBELL: April 26th, 2006, I
6   have written down.
7       MR. COLBERT: That's what she said,
8   so you asked her.
9       MR. COLLINS: I asked her if she
10  treated him on that day, just as a massage.
11      MR. COLBERT: That's not how the
12  testimony came out.
13      MR. COLLINS: And she said she
14  treated his hamstrings.
15      MS. BLANKENSHIP: Right.
16      MR. CAMPBELL: April 26th, 2006,
17  right.
18      MR. TYGART: April 26th, 2006.  That
19  was the testimony.
20      MR. COLLINS: Right.  I asked her if
21  she gave him treatment.  I don't think she
22  testified that he had hamstring issues on that
23  date.
24      MR. CAMPBELL: That was the
25  testimony.

Page 346

1       MR. TYGART: That was the testimony.
2    A.  On April the 26th, I worked on his
3   hamstrings.
4       MR. COLBERT: '06?
5    A.  '06.
6       MR. COLLINS: Okay.  Well, I will
7   clear it up on redirect.  That's okay.
8    Q.  (By Mr. Bock) Well, could you just
9   tell me what the issues were with his
10  hamstrings?
11   A.  They were tight.  He -- his
12  original -- this might clear some things up --
13  his original reason for coming to our office was
14  for a pulled hamstring back in 2003.  And so his
15  hamstrings were always a focal point for us to
16  look at and to watch, to make sure -- so where
17  they wouldn't be exceptionally tight, I would
18  always work the hamstrings to make sure -- and
19  if they were just a little bit tight, I would do
20  the favorite thing for him, and I would
21  cross-fiber them, which is not very pleasant,
22  but it's quite effective to relieve a pulled or
23  tight hamstring.
24   Q.  And do you recall this visit on
25  April 26th, 2006, or do you need to refer to

Page 347

1   your notes to recall?
2    A.  I can pretty much recall the visit.
3    Q.  Okay.  Then, what was -- were his
4   hamstrings worse than usual at that point in
5   time?
6    A.  I would say no.  He wouldn't -- his
7   hamstrings would go in spurts.  There would be
8   some times that they were okay, and then -- I
9   can go through and tell you what -- the times
10  that we worked specifically hamstrings, or if I
11  worked on his shoulder or whatever.
12      But I would say, no, not really any
13  different than what they had been in the past.
14   Q.  And so, specifically, in the month
15  of April 2006, did his -- I'm going to use the
16  term, medical term here -- did his hamstrings
17  stay quiescent?  I mean, the same?  Or were they
18  at a stage where they were not improving or
19  getting worse or better?  Or did the conditions
20  of his hamstrings change --
21      MR. COLLINS: I was going to object.
22      MR. BOCK: I hadn't finished the
23  question.
24      MR. COLLINS: All she's testified is
25  one --

Page 348

1       MR. COLBERT: My objection was you
2   are about eight compound questions.
3       MR. BOCK: All right.  I'm sorry.
4       MR. COLBERT: And I was just going
5   to suggest --
6       MR. BOCK: I'll withdraw the question
7   and --
8       MR. COLBERT: Okay.
9       MR. TYGART: Don't use medical terms.
10      MR. COLLINS: We're telling you --
11   Q.  (By Mr. Bock) I'm sorry, let's get
12  to the point.
13      In April of 2006, did the condition
14  of his hamstrings change over the course of the
15  month?
16      MR. COLLINS: Could I ask for
17  foundation as to how many times in April she
18  worked on him?  She testified that he was on the
19  road most of that month.
20      MR. COLBERT: Why don't you let him
21  ask his question, and you can clear up on
22  redirect if you like.
23      THE WITNESS: All right.  Whose
24  question am I answering?
25      MR. COLBERT: Mr. Bock's.

7-30-07 to 8-01-07                    USADA vs. GATLIN

88 (Pages 349 to 352)



Page 349

1    Q.  (By Mr. Bock) I will clear up this
2   point, because on direct, you testified that you
3   worked with him every week, correct?
4    A.  Approximately every week, yes, sir.
5    Q.  And was that true in April of 2006?
6    A.  In April of 2006, I worked on him,
7   April the 5th, and that was a flush on his legs.
8   April the 12th, was a cancellation.  April the
9   26th, we worked -- it was a flush and a
10  hamstring work.
11   Q.  April the 26th?
12   A.  Yes, sir.
13   Q.  So, when you say "cancellation,"
14  that means he didn't show?
15   A.  Well, there was a reason why he
16  didn't come in.
17   Q.  That's fine.
18   A.  But it wasn't just like he didn't
19  show up.  He canceled.
20   Q.  I didn't know if the cancellation
21  was a massage term or something?
22   A.  No.
23       MR. COLLINS: He's really backing off
24  that side stuff now.
25   Q.  Okay.  So you saw him April 5th.

Page 350

1   What was the condition of his hamstrings like at
2   the time?
3    A.  They would always feel a little
4   tight.  I always worked hamstrings.
5    Q.  Was there anything out of the
6   ordinary on April 5th?
7    A.  No.
8    Q.  Did he complain about any particular
9   pain or issues with his hamstrings on April 5th?
10   A.  Not that I recall.
11   Q.  And then how about on April 26th?
12   A.  No, he still didn't complain.  This
13  was just from what I felt.
14   Q.  Okay.  March of 2006?
15   A.  Okay.
16   Q.  Did he complain about -- when you
17  massaged, did you massage areas other than his
18  hamstrings?  I mean, did you give him a massage
19  on his whole legs?
20   A.  Yes, sir.
21   Q.  Did he complain about any other
22  issues related to his legs or complain about any
23  issues related to his legs in March of 2006?
24   A.  I have got in my notes spring of
25  2006, March the 23rd and March 29th, I did all

Page 351

1   lower, and then I did a flush.  There was a
2   time, and I do not know if it was in March or
3   not, that there was something bothering Justin.
4   And I'm trying to recall where that was, but I
5   knew that it was something that I didn't feel
6   comfortable working with, so I asked him if he
7   wanted to go see a doctor with it.  And I don't
8   know if that was in -- I can't say for positive
9   that was in March.
10   Q.  And do you recall what part of his
11  body that issue was --
12   A.  It was in his leg.  It wasn't a
13  shoulder or an arm or anything like that.  It
14  was definitely in his leg.
15   Q.  Can you be any more specific
16  regarding part of his leg?
17   A.  I would say calf.
18   Q.  Okay.  So you suggested he go to the
19  doctor about his calf.
20   A.  Yes.
21   Q.  Did he follow up on that suggestion?
22   A.  I don't know.
23   Q.  Do you do any other work for any
24  other athletes in the Sprint Capitol group?
25   A.  I did.

Page 352

1    Q.  How many other athletes --
2        MR. COLLINS: I'm going to object.
3   It's outside the scope.
4        MR. BOCK: This is the only time --
5        MR. COLBERT: I think it's allowable.
6    A.  Is this just -- when you say "Sprint
7   Capitol," is this just the group that Justin ran
8   with?
9    Q.  Yeah, Trevor Graham's group?
10   A.  Just one.
11   Q.  And do you know Trevor?
12   A.  I have met Trevor, but I do not know
13  him.  I don't know that I would know him if he
14  walked in the door.
15   Q.  Other than this other athlete -- I
16  won't ask the name -- and Mr. Gatlin, have you
17  worked with any other track athletes?
18   A.  Yes, sir.
19   Q.  About how many?
20   A.  I worked with the entire team from
21  Qatar when they were here training.  And then I
22  have worked with other athletes that are in
23  different training groups.
24   Q.  Any of those track athletes that you
25  have worked with, have they been on steroids to

Page 353

1  your knowledge?
2      A.  Not to my knowledge.
3      Q.  So you have never worked with a
4  track athlete, to your knowledge, that was on
5  steroids; is that correct?
6      A.  Not a track athlete, no.
7      Q.  So the athletes that -- the clients
8  that you had that were on steroids, were those
9  weightlifters, bodybuilders?  What kind of
10  athletes --
11      A.  I have had a bodybuilder, and I have
12  had a football player.
13      Q.  And when you refer to this chiseled
14  look, or -- are you referring to what part of
15  their body?
16      A.  Everywhere.  That's just it.  It's
17  every -- every muscle in their body is very
18  well-defined, and it looks as if it's just
19  finished working out.
20      Q.  And are you familiar with that --
21  the workout routines of the football player and
22  the weightlifter that were on steroids?
23      A.  Am I familiar with their workout
24  routine?
25      Q.  In general?  Do you know if they

Page 354

1  lifted weights?
2      A.  Oh, yeah, I know they did lift
3  weights.
4      Q.  Did they lift a lot of upper body
5  weights?
6      A.  Upper and lower.
7      Q.  Upper and lower.  Okay.  All right.
8      MR. FINNIGAN: This is Jeff Finnigan.
9  Are you guys all still there?
10      MR. COLBERT: Yes.  And Mr. Finnigan,
11  if you will just hold on for about a minute,
12  we're just wrapping something up, if that's
13  okay?
14      MR. FINNIGAN: Sure, no problem.
15      MR. COLBERT: Then we can excuse the
16  other witness in the room.
17      MR. FINNIGAN: Let me get the other
18  ones back in, so they know that we're all here.
19      MR. COLBERT: All right.  We will let
20  you know when we're ready to.
21  Jeff and Jeff, are you there?
22      MR. NEDROW: Yes, Jeff Nedrow is
23  here.
24      And everyone else is still there?
25      MR. COLBERT: Yes. Is there a mute

Page 355

1  button on that?  Just hit it just for a minute.
2      MR. TYGART: And we're done with this
3  witness.
4      MR. COLBERT: Can you hit the mute
5  button just for a second?
6      MR. CAMPBELL: Wrong machine.
7      MR. FINNIGAN: Are you still there?
8      MR. BOCK: We just muted you, and I'm
9  going to mute you again.  Okay.
10      MR. NEDROW: You can hear me though?
11      MR. COLBERT: Okay.  You are done.
12  Do you have a question you want to follow up?
13      MR. TYGART:  Let them know that we
14  can hear them.
15      MR. BOCK: Hey, guys, we can hear
16  you.  Just want you to know.
17      MR. NEDROW:  You guys are giving us
18  a timeout to sort something out?
19      MR. COLBERT: We're giving you
20  timeout for about one minute.
21      MR. FINNIGAN: No problem.  Thank
22  you.
23      MR. COLLINS: I have one question.
24      (Pause in telephone call to complete
25  the testimony of Ms. Blankenship.)

Page 356

1          EXAMINATION
2  BY MR. COLLINS:
3      Q.  If Chris Whetstine was in North
4  Carolina, would you work on Justin?
5      A.  I wasn't allowed to work on Justin,
6  if he was in town.
7      Q.  And why was that?
8      A.  It had something to do with the
9  contract with Nike.  Justin would have an
10  appointment with me, and if Chris was in town, I
11  couldn't work on Justin.  And so sometimes the
12  cancellations would be because Chris was in
13  town.
14
15          EXAMINATION
16  BY MR. BOCK:
17      Q.  A follow-up on that question then.
18  Do you know if the cancellation on April 12th
19  was because Chris Whetstine was in town?
20      A.  I do believe that it was.
21      Q.  Okay.  Thanks.
22      A.  That's not a for-sure positive, but
23  I do believe that it was, because it wasn't long
24  after that, that I didn't work on Justin
25  anymore. So -- and I remember that Chris was in

7-30-07 to 8-01-07                    USADA vs. GATLIN

90 (Pages 357 to 360)

Page 357

1  town pretty soon after -- or before I stopped
2  working with Justin.
3      Q.  Oh, so you are no longer working
4  with Justin?
5      A.  Justin no longer lives in Raleigh.
6      Q.  I see.  When did that -- when did he
7  move?
8          MR. COLBERT: Go ahead.  This is
9  about five questions.
10     A.  I don't know.  I think he might have
11  moved in June, but that's a guess.
12         MR. BOCK: Sorry.  I don't have any
13  others.  Sorry.
14         MR. COLLINS: No.
15         MR. COLBERT: Thank you very much.
16  You have been very helpful.  And thank you
17  for -- I'm sorry it took so long to get to
18  you --
19         MS. BLANKENSHIP: That's okay.
20         MR. COLBERT: -- but you are excused.
21         MS. BLANKENSHIP: Thank you for
22  letting me be here.
23         MR. COLLINS: Good luck in catching
24  your plane.
25         MS. BLANKENSHIP: Thank you.

Page 358

1          MR. COLBERT: Okay.  Let's put them
2  back on the box.  We'll demute them.
3          MR. COLLINS: I just press the mute
4  button again, I assume?
5          MR. COLBERT: Hello.  Hi.  Okay.
6  We're back in the room, and we're back on the
7  record.  Right?  Thanks for calling back, guys.
8          MR. FINNIGAN: Thanks for your
9  patience.
10  This is Jeff Finnigan.
11  Jeff Novitzky can provide an answer
12  to the previous question, but there's -- never
13  say "never," but there's probably not going to
14  be any follow-up to it.
15          But, Jeff, you can go ahead and
16  answer it.
17          MR. NOVITZKY: Okay.  So my answer
18  to the question is in the course of my
19  investigation, I obtained no conclusive evidence
20  that Justin Gatlin either took, used, or was
21  administered banned substances, either knowingly
22  or unknowingly.
23          MR. COLBERT: All right.  Did you get
24  that?
25          I suppose you could try a follow-up

Page 359

1  if you had one, but I'd take their caution
2  strongly.  Nobody has any further questions?
3          MR. TYGART: We don't.
4          MR. COLBERT: Mr. Collins?
5          Mr. Finnigan, Mr. Novitzky, and
6  Mr. -- the other Jeff -- Nedrow, thank you very
7  much.  I appreciate your calling back and making
8  the effort.
9          MR. NOVITZKY: You are welcome.
10         MR. COLBERT: I think Mr. Novitzky
11  is excused at this time.  Thank you again.
12         MR. FINNIGAN: Thank you.
13         MR. NEDROW: Thanks, guys.
14         MR. NOVITZKY: Thank you.
15         MR. NEDROW: Bye-bye.
16         (This completed the telephone
17  conference call.)
18         MR. COLBERT: All right.  So,
19  that -- now, I guess, we were in the middle of
20  crossing Mr. Gatlin.
21         I note for the record, it is 6:20.
22  I don't like to speak for the entire panel.  I
23  have no problems staying.  I don't know what
24  we're looking at.  I would think that -- we've
25  had Mr. Novitzky. We've had Ms. Blankenship.  I

Page 360

1  don't know how many more witnesses you have.
2  I'm just thinking planning for tomorrow.
3          You have just one expert, possibly
4  two, tomorrow, that you've got listed.  So do
5  you know how long they're going to take?
6          MR. TYGART: They will both be
7  relatively short in comparison.  30 minutes, I
8  would expect, but again --
9          MR. COLBERT: And, Mr. Collins, what
10  witnesses do you have to call that you haven't
11  yet?
12         MR. COLLINS: We have Mr. Nehemiah,
13  which I expect will be less than Novitzky but
14  more than Blankenship.
15         Dr. Black, I would put in that same
16  category.  I don't expect -- I expect him to be
17  similar to what your -- I don't think there's a
18  big dispute on science on this one, so I don't
19  think they're going to be saying a whole lot of
20  different things, so I don't expect him to be
21  any longer than theirs.  He will testify,
22  though, about all the different substances he
23  tested, that were submitted, so that would be a
24  little different than what his will do.
25         (Mr. Gatlin and Ms. Blankenship left

7-30-07 to 8-01-07                                      USADA vs. GATLIN

91 (Pages 361 to 364)

Page 361

1    the room.)
2         MR. TYGART: And you have Jeanette
3    Gatlin is the only other person on your list,
4    anyway.
5         MR. COLLINS: And Chris Whetstine,
6    we'll be calling, since they're not calling him.
7    And I would imagine that Mr. Whetstine would be
8    approaching in time Mr. Novitzky. I don't know
9    how much time you would spend with him, but I
10   imagine that my direct examination of him would
11   probably take in the neighborhood of an hour.
12        MR. CAMPBELL: Didn't you say is he
13   represented by counsel? Represented by counsel?
14        MR. TYGART: Yeah.
15        MR. COLBERT: Okay. So longer --
16        MR. CAMPBELL: Are we going to get
17   him to testify? You know, that's like if you
18   are on examination and the guy is not going to
19   testify --
20        MR. COLBERT: You can ask him -- and
21   find out. The reason -- you can go off the
22   record.
23        (Discussion off the record.)
24   WHEREUPON,
25        JEANETTE GATLIN,

Page 362

1    the witness herein, having been first duly sworn
2    to state the whole truth, testified on her oath
3    as follows:
4         MR. COLLINS: I hate to do this to
5    you, but could I talk to Jeanette for one minute
6    before she goes on? I didn't know, we just got
7    here.
8         MR. COLBERT: Do you have any
9    objection?
10        MR. TYGART: We don't have any
11   objection.
12        MR. COLBERT: Okay. We'll take a
13   couple-minute recess.
14        (Recess taken.)
15        MR. COLBERT: Mr. Collins?
16        MR. CHERIS: Should we go on the
17   record and swear the witness?
18        MR. COLBERT: She has sworn the
19   witness already.
20        MR. CHERIS: She's already sworn.
21   Okay.
22
23        EXAMINATION
24   BY MR. COLLINS:
25        Q.  Could you please state your name and

Page 363

1    spell your last name for the record?
2         A.  Jeanette A. Gatlin, G-a-t-l-i-n.
3         Q.  Ms. Gatlin, are you familiar with
4    Justin Gatlin?
5         A.  Yes, I am.
6         Q.  How would that be?
7         A.  February 10th, 1982, I gave birth to
8    him.
9         Q.  As Justin's mother, are you
10   familiar -- was there a time when he was growing
11   up when he was diagnosed with having attention
12   deficit disorder?
13        A.  Yes, he was.
14        Q.  Do you know approximately when that
15   was?
16        A.  Yes, he was nine years old in the
17   4th grade, and I was called in by his teacher.
18        Q.  What was that about?
19        A.  She told me that she thought he
20   needed to be evaluated because she saw that he
21   would lose focus. And the particular incident
22   that made her call me is that they were taking a
23   test, and Justin lost focus because there was a
24   bird on the ledge of the window at the school.
25   And when the test papers were passed forward,

Page 364

1    the only thing he had on his paper was a bird
2    that he drew, and he just totally lost focus of
3    the test and everything else that was going on
4    and focused on the bird. And she thought he
5    needed to be evaluated.
6         Q.  Did you take him to get any
7    treatment?
8         A.  Yes.
9         Q.  What was that?
10        A.  We took him to -- my husband was
11   active-duty military at the time. We took him
12   to the military doctor, and he was evaluated.
13   They agreed that he had attention deficit
14   disorder, and they prescribed Ritalin at the
15   time.
16        Q.  Do you know approximately how long
17   he stayed on Ritalin?
18        A.  He stayed on Ritalin approximately
19   about two years.
20        Q.  Were there any issues with his
21   taking Ritalin?
22        A.  He lost appetite, and he was always
23   kind of thin and lanky, and the doctor thought
24   that there may be something else that they could
25   prescribe to him that wouldn't be as severe with

Page 365

1   suppressing his appetite.
2       Q.  Do you know what his medicine
3   switched to?
4       A.  Adderall.
5       Q.  Do you know approximately how long
6   he was on that?
7       A.  Well, yeah, if he was diagnosed at
8   nine, he was on Ritalin for maybe two years,
9   about there.  And then he was on Adderall for
10  eight years, because he was on medication for a
11  combination of 10 years.
12      Q.  I want to fast-forward a little bit.
13  Could you please describe how it was that Justin
14  came to be coached by Trevor Graham?
15      A.  We were in our vehicle.  We had just
16  come back from vacation.  We got a phone call
17  that we had lost a relative in New York.  We
18  didn't have the money for all three of us to
19  fly, just coming back from vacation, so my
20  husband said, We'll drive.
21          We got in the car, and we were
22  driving.  We were on our way to New York.  And
23  Justin received a phone call on his cell phone.
24  And all I could hear was -- in the back seat
25  was, no, huh-uh, that's not true.

Page 366

1           You know, and I got annoyed, and I
2   said, Hang up the phone.  If you don't know who
3   you are talking to, or if they're not telling
4   you the truth, hang up on them.
5           So then he said that, Mommy, this
6   person is saying that they are Trevor Graham.
7           And I'm saying, and so who is Trevor
8   Graham?
9           He said, He's Marion's coach.
10          Why is Marion's coach calling?  So,
11  then, he gives me the phone.  And Trevor says
12  that he is Trevor Graham -- after him and Justin
13  had the conversation that they had about him and
14  who he was -- he tells me that Nike is
15  interested in giving Justin a contract if he is
16  interested in turning professional.
17          I told him that if Nike wanted to
18  give him a contract, then who are you?  Why are
19  you calling?
20          And he told me that Nike did not
21  want to have the appearance of pulling young
22  athletes out of school, you know, before they
23  graduated.
24          So I said to him, If all of this is
25  legit, and you are who you say you are, this is

Page 367

1   my home number.  We should be back within ten
2   days, and you can call me.
3       Q.  Did he call?
4       A.  Yes, he did.
5       Q.  And approximately how long
6   thereafter did Justin go to be coached by Trevor
7   Graham?
8       A.  This was through the summer months.
9   Justin did return back to UT in August.  He may
10  have had one or two classes at that time, but he
11  declared.  He told his collegiate coach, and we
12  went and got him.  So I would say probably by
13  the end of August, at the latest, he had decided
14  to go professional, and John Capriotti came to
15  our home and brought a contract.
16      Q.  Who's John Capriotti?
17      A.  John Capriotti is the Nike person
18  that's in charge of Nike, I guess, worldwide
19  sprint division.
20          And he came to our house and brought
21  a contract, and we sat down at our dining room
22  table, and we went over the contract, and Justin
23  signed the contract.
24      Q.  As a mother for Justin, I imagine
25  you are slightly protective?

Page 368

1       A.  Yes.
2       Q.  Where was Trevor Graham located?
3       A.  Raleigh, North Carolina.
4       Q.  And where was Justin going to be
5   training?
6       A.  Raleigh, North Carolina.
7       Q.  And would this have been the first
8   time, other than going to college, that Justin
9   would be moving out of the house?
10      A.  Yes.
11      Q.  Did you have any discussions with
12  Trevor Graham as to what you expected of him, if
13  your son was going to go coach with him?
14      A.  Yes.
15      Q.  What were those conversations?
16      A.  That Justin -- for one, we had no
17  family or relatives or anybody in North
18  Carolina, and we were holding him responsible
19  for Justin's welfare.
20          He said that he was going to take
21  care of him.  He would treat him like his own
22  son.  He also stated that he had a son that was
23  going to be relocating to Raleigh to live with
24  him, and he already had three other children
25  that were there in the house.  And that his son

7-30-07 to 8-01-07                              USADA vs. GATLIN

93 (Pages 369 to 372)

Page 369

1 was around the same age as Justin, and that they
2 would become good friends, and he would make
3 sure that he was okay, nothing would happen to
4 him.
5    Q. Did that son move in?
6    A. Actually, that son got killed in a
7 car accident shortly before he was scheduled to
8 relocate to live in Raleigh with his father.
9    Q. Did you have any discussions with
10 Mr. Graham as to whether or not or what sort of
11 environment Justin would be training in with
12 respect to illegal and banned substances?
13    A. At that time, we did not. We knew
14 nothing about illegal or banned, or whatever,
15 substances. We knew nothing about it. We had
16 no knowledge of the drug world out there other
17 than the fact that, you know, we kind of hear
18 little whispers, you know, by reading the
19 Internet.
20       And all that was said at that time,
21 was, are you sure nothing is going to happen to
22 Justin? Are you going to make sure that he
23 doesn't get involved in all this other stuff,
24 that, you know, my husband was reading about, on
25 the Internet, and I was reading about on the

Page 370

1 Internet.
2       And he said, Absolutely, that has
3 nothing to do with us, my camp, and the way I
4 train my athletes.
5    Q. Okay. Maybe I wasn't clear on my
6 question. I wasn't asking with respect to what
7 allegations may have been about him. Did you
8 say anything about what could or could not be
9 done with Justin?
10    A. Oh, for sure.
11    Q. What did you say there?
12    A. You cannot do anything that's going
13 to create any kind of a problems for him at all,
14 that he's going to get in any kind of trouble,
15 because you know that he does have a strike
16 against him.
17    Q. All right.
18       Now, you indicated that Nike -- you
19 signed with Nike -- did you -- actually, prior
20 to that.
21       After Justin turns professional and
22 signs with Nike, does he form a corporation or
23 anything like that happen?
24    A. Yes.
25    Q. And can you explain that?

Page 371

1    A. We had him incorporated, and we
2 named the corporation 100 Percent Pure Juice.
3 And we consulted a lawyer and an accountant, and
4 they thought financially, that would be the best
5 thing for him, being that he was young and he
6 didn't have any kind of dependents or tax
7 shelters at that time.
8    Q. How did you come about with that
9 name?
10    A. That was a nickname that was given
11 to Justin by his high school track buddies,
12 because we went to the meets. We participated.
13 We followed. And when Justin would go to the
14 meets, I would make him a thermos of juice to
15 take to the meets with him. And the kids
16 started calling him "Juice Boy," because he
17 wasn't drinking sodas, so he became the Juicer,
18 and the kids started calling him "Juice," so we
19 figured, you know, that was a good name.
20    Q. Did you have a role with this
21 corporation?
22    A. Yes, I did.
23    Q. And what was that role?
24    A. I was -- or I am, still, president
25 of the corporation and, slash, manager.

Page 372

1    Q. What is sort of your duties for the
2 corporation?
3    A. My duties for the corporation is to
4 make sure that I keep up on the manager end of
5 it as to where Justin was running, his track
6 meets, the pay and who was paying him.
7       And at the same time on the other
8 end of it, it was to keep up and to pay all of
9 his expense, his living expenses, his bills, to
10 take care of his taxes, make sure all of his
11 taxes were paid, and to make sure that whatever
12 responsibility financially that this corporation
13 had, to work with our accountant to make sure
14 that those responsibilities were taken care of.
15    Q. What about the paperwork? Who would
16 receive all that?
17    A. I did.
18    Q. Now, when did Justin go with Trevor
19 Graham?
20    A. Justin went with Trevor Graham the
21 end of 2002 school year, the end of the school
22 year 2002, which would be --
23    Q. The spring?
24    A. Well, yeah, after his sophomore
25 year.

Page 373

```
 1      Q.   His sophomore year?
 2      A.   He didn't go back to his junior year
 3   per se.
 4      Q.   What we're talking about is the
 5   summer of '02?
 6      A.   Yes.
 7      Q.   I want to call your attention to
 8   April 1st, 2004.
 9           Do you recall an incident of an
10   April Fool's prank involving Justin?
11      A.   Yes.
12      Q.   Could you explain what that was?
13      A.   On the Internet, they had listed:
14   Justin Gatlin had tested positive.
15           And actually, I was at the dentist's
16   office. Justin was home. He had not really
17   just located -- I mean, he was home for
18   visiting -- and anyway, my husband ran across
19   this article on the Internet saying that Justin
20   Gatlin had tested positive. And he called me at
21   the dentist's office, I went running home, and
22   he -- should I say it all?
23      Q.   Go ahead.
24      A.   He was packing his gun.
25      Q.   And where was he headed?
```

Page 374

```
 1      A.   He was headed to kill Trevor Graham.
 2      Q.   And why was it?
 3      A.   Because it said Justin had tested
 4   positive, and Trevor had promised that there
 5   would be nothing that going on in his camp.
 6   He was going to take care of Justin. And he
 7   knew, he knew that he already had that other
 8   offense hanging over him.
 9      Q.   I trust you stopped him?
10      A.   We stopped him, because --
11           MR. TYGART:  Unfortunately. Excuse
12   me.
13      A.   I'm saying -- I'm saying, How can
14   you go kill this man? I mean, you are going
15   to -- anyway, my husband is crying. Tears are
16   coming out of his eyes. He's crying. He's
17   ready to kill Trevor. And then Justin goes on
18   the Internet, and he sits there, and he looks at
19   it, and he says, Dad, Dad, Dad, Dad, read the
20   bottom of it. Read the bottom of it. And the
21   bottom of it, said April Fool's.
22      Q.   Do you know who posted that?
23      A.   I have no idea, but we were very
24   angry about it. And my husband was saying
25   that -- you know, they can't be playing jokes
```

Page 375

```
 1   like this with people's lives. And then all of
 2   a sudden, somebody else may read it and believe
 3   it without going through it, like he didn't go
 4   through it. And we never did find out who
 5   posted it, but I think it was on -- if I'm not
 6   mistaken, on maybe the sub-10, it was either
 7   sub-10 or letsrun.com. It was one of the two of
 8   those, because those are the two that he
 9   watched -- he read.
10      Q.   Would you attend Justin's meets over
11   the years?
12      A.   Yes.
13      Q.   After he turned professional?
14      A.   Most definitely.
15      Q.   Are you aware of any precautions
16   Justin would take to make sure that he was
17   drug-free?
18      A.   Yes. One of the first meets that I
19   attended, Justin was already there, and we were
20   trying to find out what room he was in, and we
21   were all checking in the same hotel, and they
22   told me they didn't have any Justin Gatlin in
23   that hotel. So, you know, we were a little
24   baffled, and then come to find out that Justin
25   was checked in the hotel under "John Brown."
```

Page 376

```
 1           My question is:  Justin, why are you
 2   here under John Brown?
 3           So nobody will know what room I'm
 4   in, so nobody will try to sneak into my room and
 5   do anything to my supplies of vitamins and
 6   nutritional things and anything else that I have
 7   in here.
 8      Q.   What about when he would drink
 9   water, would you ever --
10      A.   His bottles were always marked, and
11   once he started to drink out of them, they were
12   never left alone. So he never had the same
13   bottle that somebody else had.
14      Q.   Do you know where Justin would eat
15   when you traveled?
16      A.   Justin was deemed the "king of room
17   service." Taking care of all of the bills,
18   there was nothing unusual for Justin to come,
19   for me to get a bill from his credit card where
20   he had charged room service. Justin had $2,000
21   in room service bills from eating in his room
22   and watching movies in his room, and that was
23   pretty much the norm. If he was at a meet for
24   three or four days, that was the norm.
25      Q.   Fast-forwarding a little bit here --
```

Page 377

1 or moving on to June of 2006, did there come a
2 time where you learned that Justin had tested
3 positive for a banned substance?
4     A.  Right.
5     Q.  When was that?
6     That was June 14th, 2006.  UPS
7 delivered a USADA packet.
8     Q.  And who opened the packet?
9     A.  I opened the packet, and I wasn't
10 sure exactly what it was saying, so I called
11 Renaldo.
12     Q.  And who is he?
13     A.  Renaldo is Justin's agent.  And I
14 read to him what the opening page was.  And
15 Renaldo said, This does not look good.
16     Q.  What did you do next?
17     A.  I started crying, and I called my
18 husband.  My husband came home.  He went through
19 the packet.  And then he got on the phone, and
20 he called Justin.
21     Q.  How did that go?
22     A.  While we were on the phone, all I
23 could hear was him screaming and screaming on
24 the other end, and how, no, no, no, no, I'm
25 dead, I'm dead.  And we were afraid that he was

Page 378

1 going to do something to himself.  He was in
2 North Carolina, and we were in Florida.  You
3 know, to -- you can't get there.  You can't
4 comfort him.  You can't keep him safe from doing
5 whatever.  He was just -- he was -- he was -- he
6 was screaming.  He was screaming and yelling,
7 and he was driving, and he was in his truck, and
8 he fell out.  He stopped, and he fell out, and
9 he fell apart.  He just kept on saying, I'm
10 dead, I'm dead, I'm dead.  It's over, it's over,
11 it's -- I'm dead, Mommy, I'm dead.
12     Q.  Do you need a Kleenex?
13     MR. COLBERT: Would you like to take
14 a short break?
15     MRS. GATLIN: I'm okay.  I'm okay.
16     Q.  (By Mr. Collins) What did you do
17 next?
18     A.  I said, Come home.  Come home now.
19 Come home.  You can't stay there.  Come home.
20 Come home.  You have to come home.  You know --
21 and actually, he had his friend -- he didn't
22 want us to come and get him.  He didn't want us
23 to come and get him.  And I don't know why, to
24 this day, he didn't want us to come and get him,
25 but his best friend from high school track flew

Page 379

1 up to Raleigh, and then they came back together
2 in Justin's truck the next morning.
3     Q.  Did he ever indicate whether he did
4 it?
5     A.  He indicated that he --
6     Q.  Did he ever say that he knowingly
7 took a substance?
8     A.  Oh, absolutely not.  Absolutely not.
9 He kept on saying, I don't know how this
10 happened.  I don't know how this happened.  I'm
11 careful.  I watch everything.  I know one thing,
12 I'm dead.  That's all my child kept saying was
13 that he was dead.  He was dead.
14     Q.  Since that experience, have you
15 noticed any toll on your son?
16     A.  Most definitely.  Most definitely.
17     When Justin came home, before we
18 went back and relocated him, Justin would be
19 sleeping, you could hear him at night.  You
20 could hear him, he just uh-huh, ugh-huh,
21 ugh-huh, you go in there, and he is just
22 jumping.  He is just jumping.  He is cold and
23 sweaty, and he's crying, and breaking down, when
24 you talk to him, in the daytime, baby, think
25 about it, thing about what happened, he just

Page 380

1 breaks down, he starts crying, and he's shaking
2 and falling apart.  He's not sleeping at night.
3 He's restless, I'm going through, getting up all
4 time of night, going in there and check on him.
5     Q.  As the person who keeps the finances
6 for his company --
7     (Cell phone rings.)
8     Q.  -- sorry about that.
9     Are you aware of any losses his
10 company has suffered because of this positive
11 test?
12     A.  Of course.  He -- his company have
13 lost, at this point in time, everything.  He's
14 not -- he's not earned a dime in a year.  He has
15 not received a paycheck in a year.  We, thank
16 God -- thank God with God's blessing and the
17 housing market the way it is, we sold his North
18 Carolina house.  That's how you are getting
19 paid.
20     Q.  Would it be a fair statement to say
21 if he was exonerated here and allowed to run
22 again, that he would have suffered no
23 consequences as a result of this positive test?
24     A.  That would not be fair to say at
25 all.  Not only has my child, Justin Gatlin,

Page 381

1 suffered and still suffering, his name, his
2 reputation. We have all suffered. We have all
3 suffered. I have -- I'm bald, not by choice.
4 This is the haircut that anybody that knows me
5 has never seen on me before. I have long hair.
6 My hair was coming out in clumps. I had to go
7 and have my hair cut off through the stress of
8 this. I have never suffered high blood pressure
9 before until this.
10    Justin -- Justin walks tall, and
11 he's strong, and he's strong and he's positive.
12 But he -- I see the hurt in him. I see how he's
13 just well, can -- Momma, can I buy a pair of
14 jeans? Can I buy a pair of jeans? Do we have
15 money? Can I buy a pair of jeans? You know,
16 he's suffering. He doesn't know where he's
17 going to get another paycheck, what's going to
18 happen, and how he's going to continue to live.
19    This is his life.
20    Q. In spite of this, is he -- are you
21 aware of him speaking on behalf of staying off
22 drugs?
23    A. I received a phone call from the
24 Escambia County Sheriff's Department, and they
25 asked if Justin Gatlin could come and speak to

Page 382

1 their graduating cadets. And I said to this
2 particular person, Are you aware of the charges
3 that are in the newspaper against Justin?
4    And she said, Yes, ma'am.
5    I said, I don't want my child to
6 come there and be hurt or embarrassed.
7    And she said, We want Justin to
8 come. We believe in him. We have faith in him.
9    Justin stood up there and talked to
10 that graduating class of cadets, and told them
11 about staying away from drugs, staying clean,
12 and the only thing that would mess up their life
13 if they got involved with drugs. Justin spoke
14 to the D.A.R.E. program. 4,000 students, high
15 school and college, in Escambia County, on the
16 naval base about staying clean and staying away
17 from drugs. They said it was the biggest
18 turnout they ever had.
19    Q. This was after the positive test?
20    A. This was all after the positive
21 test. Justin spoke to church groups. The
22 church asked him -- not our church -- asked him
23 to come and speak to their youth group. And he
24 stood there, and he spoke to them, and he read
25 from the Bible, and he told them to obey the

Page 383

1 parents, obey the laws, stay away from drugs,
2 keep their body clean. Keep their minds
3 straight, keep them focused.
4    And that's what I said, my child is
5 strong, because with all of this that's going on
6 with -- in his life, he can still stand there
7 and talk about staying clean and not getting
8 involved with drugs, knowing what he got hanging
9 over his head.
10    MR. COLLINS: I don't have anything
11 further.
12
13    EXAMINATION
14 BY MR. BOCK:
15    Q. Mrs. Gatlin, my name is Bill Bock,
16 and I'm one of the attorneys for USADA, and I
17 need to ask you a few questions.
18    And certainly, now, or at any time,
19 you are free to ask for a break, or, you know,
20 take a break, so I want you to understand that.
21    Would you prefer to take a break
22 right now?
23    A. No.
24    MR. BOCK: Go ahead, John.
25    MR. COLLINS: It just dawned on me.

Page 384

1 I'm sorry. I lost my train, when we were doing
2 it, and I forgot to ask her about that medical
3 receipt she doesn't have. You want me to just
4 put it on the record? Because you said you
5 wanted me to put it on the record and have it
6 shown tomorrow.
7    MR. COLBERT: You started -- you
8 haven't actually started cross.
9    MR. BOCK: No, I don't have an
10 objection.
11
12    EXAMINATION (cont.)
13 BY MR. COLLINS:
14    Q. You testified that you receive the
15 bills. Do you recall receiving a medical bill
16 from a Dr. Martini with respect to a shot in
17 March?
18    A. I received a bill from Carey
19 Chiropractic, which is where Dr. Martini works.
20 And the bill's date of service from Dr. Martini,
21 a injection on 3-1-2006.
22    Q. And do you have that bill with you
23 in Atlanta?
24    A. I have the bill with me. I just
25 took it downstairs to the car because I thought



Page 385

1　everybody was breaking, and I didn't know I was
2　going to testify, so I put it in the car, and my
3　husband took the other witness to the airport.
4　　　MR. COLBERT: That's fine.
5　　　MR. COLLINS: Just lay a foundation.
6　　　MR. COLBERT: Mr. Bock?
7　　　MR. BOCK: Sure.
8
9　　　EXAMINATION
10　BY MR. BOCK:
11　　Q.　First, Mrs. Gatlin, we want to thank
12　you for coming. Obviously, I think, probably a
13　lot of parents in this room. But I can't tell
14　you that we understand what you have been
15　through, and how you're feeling. But we do
16　empathize, so I'm going to try to make my
17　questions very brief.
18　　　I want to ask you, though, about
19　Trevor Graham.
20　　　And it -- from what I understand,
21　you had some concerns about Trevor Graham before
22　2006; is that fair?
23　　A.　No, it's not fair, because I really
24　didn't have any concerns per se about Trevor
25　Graham. I had concerns about any -- and

Page 386

1　anybody, if it wasn't Trevor Graham, anybody
2　else, that I was turning my child over to, to
3　enter into the professional world that we knew
4　nothing about.
5　　Q.　Okay.
6　　A.　Didn't matter who the coach was. My
7　concerns would have exactly been the same.
8　　Q.　And in -- your son has testified
9　earlier today -- and I know you weren't here --
10　about how he was upset --
11　　　(Cell phone rings.)
12　　Q.　Go ahead.
13　　　-- he was upset after he won the
14　100-meter championship in the Olympic Games,
15　which is an incredible accomplishment, that that
16　moment was interrupted by reporters focusing on
17　Trevor Graham, and his provision of the syringe
18　as part of the BALCO scandal.
19　　A.　Mm-hm.
20　　Q.　Did -- and there, then, were a
21　series of many, many articles in the
22　newspapers --
23　　A.　Mm-hm.
24　　Q.　-- about Trevor Graham.
25　　A.　Mm-hm.

Page 387

1　　Q.　About the number of athletes that
2　had testified positive. You are aware of those
3　articles?
4　　A.　After the fact, yes, sir.
5　　Q.　Okay. And so did those articles
6　cause you concern -- cause you to talk with
7　Justin about who was this Trevor Graham?
8　　A.　Those articles did cause us concern.
9　We talked about it. We -- as Justin was feeling
10　that, you know, all of this came out after the
11　Olympics, this was the first time, first time
12　that we ever, ever heard of any connection with
13　Trevor Graham and this BALCO and the syringe.
14　　　The whispers that we heard after
15　that still wasn't Trevor Graham, because people
16　were saying that, oh, it could have been John
17　Smith that turned it in. What we found out when
18　Trevor reported to the newspaper, that's when we
19　knew about Trevor's involvement as to what
20　happened back then.
21　　　Prior to that, we had no knowledge.
22　We didn't know anything or anything like that at
23　all.
24　　Q.　And that was in the summer of 2004?
25　　A.　Yes, it was.

Page 388

1　　Q.　Okay. And did you and Mr. Nehemiah
2　meet and discuss with Justin the process of
3　terminating this relationship with Trevor
4　Graham?
5　　A.　Everybody kind of talked about,
6　well, Trevor just doesn't look good or whatever.
7　And I distinctly remember in Athens in a
8　conference room with John Capriotti of Nike,
9　with U.S. Track and Field CEO, Craig Masback,
10　Tim Phelan of Nike, Renaldo Nehemiah, Justin and
11　myself was at a roundtable.
12　　　The only thing that was said at that
13　time about Trevor Graham -- and I believe that
14　it came from Craig Masback -- is that we need to
15　shut Trevor down, not let Trevor talk to the
16　media, and protect Justin.
17　　　Nobody said anything about, leave
18　him, you got to go. Nobody said anything about
19　that.
20　　　My question at that time was that if
21　all of you knew about Trevor or suspected about
22　Trevor, we didn't know anything. We didn't know
23　anything about track and field, other than high
24　school and what he had done in college. We
25　didn't know anything about any of these people.

Page 389

1   We didn't know them.
2       Why were we not informed by somebody
3   then, by saying, Well, you know, maybe you-all
4   shouldn't go with Trevor Graham. Nobody told us
5   anything. No one told us anything.
6       The only response that I got to that
7   was the fact that Trevor Graham was considered
8   to be the hero that turned in the serum to clean
9   up the sport, and he was a good guy in
10  everybody's eyes. And if he was the good guy in
11  their eyes, and they all had a lot more
12  experience and knowledge than we did, because he
13  was cleaning up the sport, why would we think
14  any different. Nobody told us any different.
15  Nobody said anything about bad guy, bad move.
16      Q.  So you never read any of the
17  newspaper articles that raised doubts and
18  concerns about him?
19      A.  I read newspaper articles, yes, I
20  did. But you know what? Trevor was being paid
21  by Nike and sent to us by Nike, just like Justin
22  was being paid by Nike. Now, who do you
23  believe? Do you believe the newspaper articles?
24  Or do you believe the person that's paying you
25  and the person that's paying your coach?

Page 390

1       I read a newspaper article today
2   that was totally wrong, the facts were all
3   wrong, and if I wasn't involved in this and
4   sitting here, I wouldn't have known that was
5   wrong.
6       Q.  Has Trevor Graham ever in your
7   experience and your knowledge, in his statements
8   either to you, to your husband or to Justin,
9   ever been untruthful or inaccurate regarding the
10  issue of doping?
11      A.  To me?
12      Q.  Mm-hm.
13      A.  Absolutely not. Trevor has never
14  said anything to me about any of this that has
15  come out to be "You lied to me, Trevor."
16      Q.  And so do you still have the utmost
17  faith and confidence in Trevor Graham?
18      A.  I don't have utmost faith and
19  confidence in nothing and nobody.
20      Q.  Would you allow -- if it were your
21  decision -- and I recognize that he's a man and
22  can make his own decisions, but as his mother,
23  if it were up to you, would you allow Justin to
24  train with Trevor Graham anymore?
25      A.  Absolutely not. Absolutely not.

Page 391

1       Q.  Why is that?
2       A.  Because, I feel that -- and I'm
3   going to say what I feel. I feel that if Trevor
4   was Public Enemy Number 1 and everybody else
5   involved did their job, we wouldn't be sitting
6   here with Justin now.
7       Q.  So I take it from that comment that
8   you hold Trevor responsible for the situation
9   that Justin is in?
10      A.  No, you took it that way because
11  that's the way you want to take it, but that's
12  not what I said.
13      Q.  Do you hold him responsible in any
14  way for your -- the situation that Justin is in
15  right now?
16      A.  I hold the whole system responsible.
17      Q.  Okay. Can you narrow that any more?
18  Is there any one individual that you hold
19  responsible?
20      A.  Any one individual?
21      Q.  Yes.
22      A.  I have doubts, not only on whatever
23  it is that's saying about Trevor, and I have
24  doubts or whatever was said about Chris
25  Whetstine. I have doubts that anybody has been

Page 392

1   forthcoming and truthful. So I can't pinpoint
2   one person, because I pinpoint everybody.
3       Q.  I appreciate your answering these
4   questions.
5       Did you keep in touch with Justin
6   about his physical condition?
7       A.  Of course. I spoke to Justin almost
8   on a daily basis.
9       Q.  Were you aware of his physical
10  condition in April of 2006?
11      A.  April in 2006?
12      Q.  Yes, ma'am. The positive tests came
13  from a urine sample provided on April 22nd,
14  2006.
15      A.  The notification came to me before
16  it got to him.
17      Q.  Yeah, I know. And that came in
18  June. But I am just trying to make sure we're
19  talking about the same time period.
20      A.  As far as I know, there was no
21  April, when he ran? When he ran in April and
22  got the positive test, are you talking about a
23  physical condition then?
24      Q.  Yeah, I'm just wondering if during
25  that month, he complained to you about any

7-30-07 to 8-01-07                    USADA vs. GATLIN

99 (Pages 393 to 396)

Page 393

1    physical hardship that he was facing.
2        A.  It was before April.  It was back in
3    March that he complained about, he had -- he had
4    a hamstring that was -- he didn't say pulled,
5    but he had a hamstring that was irritated,
6    aggravated or whatever, and that that's -- was
7    one of the issues that he had, but that was
8    March.  When he got back out there on the track
9    in April, he was fit; otherwise, he wouldn't
10   have been out there.
11       Q.  Is it possible that he had hamstring
12   issues in April?
13       A.  Anything is possible, but unlikely.
14   I don't know.  I don't know.  Anything is
15   possible.
16           The thing is, I'm assuming that if
17   my son and any other athlete is hurt, then
18   they're not going to go out there and run.
19       Q.  Okay.  Were you informed of any
20   injections that Justin received in his legs?
21       A.  Yes.
22       Q.  Could you describe those, please?
23       A.  I know about the one that we
24   testified about, Dr. Martini.  And then I was
25   told that Justin received a B12 -- by Justin

Page 394

1    that he received a B12 shot from Randall when he
2    and Trevor came over to his house, based on his
3    pulling his hamstring.
4        Q.  When did you first find out about
5    that?
6        A.  Probably, I don't know, April.
7        Q.  April when?  Of which year?
8        A.  Well, all of this was in '06, so it
9    had to be '06.
10       Q.  Okay.
11       A.  Has to be '06.  March 12th, end of
12   March, first of April, whatever, around there,
13   first week before, because he was complaining
14   that he was hurt.
15           And I said, Well, are you all right?
16   Are you ready to go?
17           And, yeah, I got the shot -- B12
18   shot, and I will be ready.
19       Q.  And you made a comment about a
20   statement that you had made to Justin's coach,
21   Trevor Graham.  You said, You cannot do anything
22   that creates problems or trouble.  He does have
23   a strike against him.
24           What were you referring to --
25       A.  We were referring to the fact that

Page 395

1    he was going to take such good care of Justin,
2    and we knew from the first test how rigid USADA
3    is, and how the system, in my mind, failed him
4    the first time around, and we could not take any
5    chances for it to happen Number 2.  And that
6    would have -- conversation would have took place
7    with anybody.  It wouldn't have mattered if it
8    was Trevor or you that was his coach, you would
9    have got the same conversation.
10       Q.  Does that refer to the fact that you
11   realized that the next time there would be a
12   doping issue, it was going to be embarrassing?
13       A.  Of course.  Of course.  That's why
14   all the care was taken.
15           MR. BOCK:  Okay.
16           Mrs. Gatlin, thank you for your
17   time.
18           MR. COLLINS:  I have got two
19   questions.
20
21           EXAMINATION
22   BY MR. COLLINS:
23       Q.  First, with respect to your handling
24   of finances, do you recall an issue with respect
25   to a bonus and Chris Whetstine in December of

Page 396

1    '05?
2        A.  Yes.
3        Q.  Could you explain that?
4        A.  Chris Whetstine asked Justin to give
5    him a $5,000 bonus in December '05, once it came
6    out, in Track and Field magazine, Number 1
7    athlete in the world.
8            I told Justin that we're not giving
9    Chris anything, because Chris does not work for
10   you.  Chris is hired and works for Nike.  If he
11   thinks he deserves a bonus, then he needs to get
12   his bonus from his employer.
13           I got on the phone, and I called
14   John Capriotti of Nike, and I said, Chris wants
15   Justin to pay him a $5,000 bonus.  John
16   Capriotti got angry, and I dare he tell -- he
17   call an athlete -- and da-da-da-da-da-da -- and
18   he doesn't have any right asking the athlete for
19   money and this and that, and everything like
20   that.
21           And I said, Well, he did.
22           So Chris did not get the bonus.
23       Q.  And my other question was:  At any
24   time after the Olympics in 2004 when Trevor
25   Graham indicated that he had turned in the

7-30-07 to 8-01-07           USADA vs. GATLIN

100 (Pages 397 to 400)

Page 397

1   syringe, did you receive any information from
2   USADA that it had information about Trevor
3   Graham that would cause pause for one to train
4   with him?
5      A.   We did not get that information from
6   USADA. We did not get that information from USA
7   Track and Field. We did not get that
8   information from Nike. Not one single entity
9   involved in the situation ever gave us any
10   indication that Justin needs to move.
11      MR. COLLINS: I have nothing further.
12      MR. BOCK: I don't have any
13   questions.
14      MR. COLBERT: Mrs. Gatlin, thank you
15   very much for your time.
16      MR. CAMPBELL: I have a few
17   questions.
18
19      EXAMINATION
20   BY MR. CAMPBELL:
21      Q.   Mrs. Gatlin, you said that the first
22   instance when Mr. Gatlin tested positive, the
23   system failed him. Could you explain to me what
24   those failures were?
25      A.   To me, the system failed him,

Page 398

1   because Justin was diagnosed at nine years old.
2   At this particular time, Justin was 19 years
3   old. He had been under medication for ten
4   years. United States government has programs in
5   place to protect people with disability. In
6   school, from K through college, his collegiate
7   records had all of that information, all of that
8   information.
9      So my feeling is that the system
10   failed him because you have our federal
11   government protecting you on your right -- or
12   the right side -- right hand, making sure you
13   get your education, making sure that programs,
14   tutors, and everybody else are involved to give
15   you that education; and then we have USADA on
16   the other side, which is still part of this same
17   United States government, crucifying him for
18   something that you recognize as a disability
19   here, but use it as a drug offense over here.
20      Justin was an athlete second, and a
21   student first. He was a student athlete.
22   Justin's medication depended on his tests that
23   he had to take prior going to the junior
24   nationals. He took his medication. And he was
25   off his medication for three or four days,

Page 399

1   because he knew he was going to Nationals.
2      When they said he got a drug test
3   and he was charged with drugging for
4   amphetamines, we didn't even know what an
5   amphetamine was. Had no clue what an
6   amphetamine was.
7      Q.   Isn't it true that USADA actually
8   helped you in trying to get Mr. Gatlin
9   reinstated?
10      A.   According to John Collins, yes.
11   According to John Collins, yes.
12      Q.   And are you familiar with any other
13   facts of the case with respect to Mr. Gatlin, on
14   the first, for his first offense? Were you
15   involved with any decision-making going on in
16   that case?
17      A.   John and I talked on the phone.
18      Q.   I don't want to talk about your
19   conversation.
20      A.   Okay. The only thing I know is that
21   they were trying to work out something where
22   they reinstated him early, and he got back out
23   there on the track -- well, he didn't get back
24   out there on the track because he was still in
25   school or whatever; and the statement that was

Page 400

1   made that they did not believe that Mr. Gatlin
2   was a drug cheat or intended to cheat in any way
3   whatsoever, nor did the medication gave him an
4   edge.
5      So, I thought if that was a
6   statement that they came out with, that was
7   favorable. That was favorable. At least,
8   people know that he wasn't drugging.
9      Q.   And that was the extent of the
10   knowledge that you had about the agreement that
11   was reached with IAAF?
12      A.   Yes. Yes.
13      MR. COLBERT: Thank you, Mrs. Gatlin.
14   I think that's all the questions of the panel or
15   the parties have. Thank you very much. I'm
16   sorry it's taken so long.
17      MRS. GATLIN: That's okay.
18      MR. COLBERT: You may be asked
19   tomorrow a question about the document to
20   identify it, but that will be very short and
21   brief.
22      MRS. GATLIN: That's okay.
23      MR. COLBERT: Is that all right?
24      MRS. GATLIN: That is fine.
25      MR. COLBERT: All right. Thank you

Page 401

1   very much.  You are excused.
2       So, we're adjourned here until
3   tomorrow, 8:00?
4       MR. TYGART: Yeah, that's fine.
5   Unless you were going to call Dr. Black.
6       MR. COLLINS: I never got the fax, so
7   I don't want to have the same issue.  As soon as
8   I get it, I will send it over to you.
9       (Recessed at 7:20 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 402

1       (Proceedings commenced at 8:00 a.m.
2   on Tuesday, July 31, 2007; all the same parties
3   were present.  Also present were Justin Gatlin,
4   Mr. and Ms. Gatlin and Visie Sims.)
5       THE REPORTER: Just remind you of your
6   oath from yesterday.
7       WHEREUPON,
8       JUSTIN GATLIN,
9   the Respondent herein, having been reminded of
10  his oath to state the whole truth, testified as
11  follows:
12      EXAMINATION
13  BY MR. BOCK:
14      Q.  Mr. Gatlin, you recognize that you
15  are still under oath; is that correct?
16      A.  Yes.
17      Q.  I want to talk with you about a
18  doping control test that took place at the Nike
19  Prefontaine Classic on May 28th, 2006.
20      A.  Okay.
21      Q.  Can you tell me about the
22  Prefontaine, and when did you come into town?
23      A.  I'm not sure on that date, when I
24  exactly came in town.  Usually, before we come
25  in town, maybe, a day or two earlier.

Page 403

1       Q.  You can't recall?
2       A.  I can't recall, no.
3       MR. COLLINS: Just -- I'm sorry.
4   This is after -- this is when?  May 28th --
5       MR. BOCK: May 28th, 200- --
6       MR. COLLINS: -- so this is after the
7   test.
8       MR. BOCK: Yes.
9       MR. COLLINS: I just wanted to make
10  sure.
11      Q.  (By Mr. Bock) Then where did you
12  stay at the Prefontaine Classic?
13      A.  I stayed in the athletes' hotel.
14  Usually, they set up a hotel, that's usually for
15  all the athletes.
16      Q.  Where did Mr. Whetstine set up his
17  station?
18      A.  As far as I know, he had a hotel
19  room as well.
20      Q.  How about at the track, where did he
21  set up his massage table?
22      A.  He set up his massage table in the
23  warmup area where all the other tables were set
24  up.
25      Q.  In the where?

Page 404

1       A.  Warmup area.
2       Q.  Where was that?
3       A.  Warmup area, okay.  Well, if the
4   track was right here, it was adjacent to it.
5   This would be the competition track, and this
6   would be the warmup area.  It's a smaller
7   version of the bigger track.
8       Q.  Is that indoors or outdoors?
9       A.  It was outdoors.
10      Q.  And what do you recall in terms of
11  the rubdowns that you received from
12  Mr. Whetstine in relation to the Prefontaine?
13      A.  The rubdowns, meaning after my race
14  or --
15      Q.  Meaning, what treatment did you
16  receive from him?
17      A.  I remember getting a rubdown
18  afterwards in the same fashion.
19      Q.  When you say "in the same fashion,"
20  what do you mean?
21      A.  After I finished running, he made an
22  aggressive attempt to rub me down before I went
23  to press conference or drug testing.
24      Q.  And your testimony earlier was that
25  when he was coming after you to rub you down, he