

Page 405

1 was just doing his job; is that right?
2 A. Yes.
3 Q. That's what you believed?
4 A. Yes.
5 Q. And, in fact, he had been chastised
6 by Trevor Graham for not coming after you and
7 rubbing you down immediately after a race?
8 A. Not at that meet, but --
9 Q. At Mt. SAC?
10 A. Yes. Yes.
11 Q. And one time when he came after you,
12 rubbed you down, you told Trevor, Hey, let him
13 do his job?
14 A. I did.
15 Q. Do you recall any other treatment
16 that you received from Mr. Whetstine at
17 Prefontaine?
18 A. Rubdown, flush, that's all I can
19 remember.
20 Q. Do they occur one time, two times,
21 three times, four times?
22 A. I can't remember how many times.
23 Q. You don't remember how many times.
24 All right. And were you taking
25 Voltaren at the Prefontaine?

Page 406

1 MR. COLLINS: Objection. I'm not
2 sure what he means and need some clarification
3 as to the question. Voltaren could be taken by
4 a pill. What does he mean --
5 MR. BOCK: Can you allow me to ask
6 the questions and clarify? What is the
7 objection?
8 MR. COLLINS: I asked for --
9 MR. COLBERT: You are asking for
10 clarification?
11 MR. COLLINS: Yeah.
12 MR. COLBERT: Can you ask the
13 question again, Mr. Bock?
14 MR. BOCK: I would like to ask and
15 then follow up with questions rather than to
16 have to meet Mr. Collins' standard every time I
17 ask a question.
18 Q. (By Mr. Bock) Did you use Voltaren
19 at the Prefontaine clinic?
20 A. None that I know of orally. If
21 Chris Whetstine used it on my body, that's the
22 only way it would have been used.
23 Q. Okay. Did you believe that he was
24 using Voltaren cream on you at Prefontaine?
25 A. Yes, that's what I was told.

Page 407

1 Q. And did you believe that he was
2 using Voltaren cream on you throughout 2006?
3 A. Yes.
4 Q. How about the Reebok Classic, which
5 took place in early June of 2006. Do you recall
6 that event?
7 A. Yes, sir.
8 Q. And that took place in New York?
9 A. Yes.
10 Q. And your testimony on direct was
11 that you were drug-tested about two days after
12 that event on 6-5-06?
13 A. Yes, I was.
14 Q. At the Reebok Classic, what do you
15 recall about Mr. Whetstine's activities in
16 relation to you?
17 A. Actually, getting worked on, and
18 using his new procedures, and also trying to get
19 to me or work on me before press conference and
20 drug testing after the race.
21 Q. So you weren't drug-tested at that
22 event, were you?
23 A. No, sir.
24 Q. So there wasn't a drug testing for
25 you after that event?

Page 408

1 A. No. I mean, you don't know if you
2 are going to get drug-tested or not, and usually
3 by being a successful runner, you always think
4 you're going to get drug-tested, so I was not
5 drug-tested. I was more surprised that I did
6 not get drug-tested than if I did get
7 drug-tested.
8 Q. So, when you said that he made an
9 aggressive attempt to get to you before drug
10 testing, what does that mean?
11 A. Well, like he said, he made the
12 attempt to use his technique as using cream on
13 my body and my legs before a press conference or
14 before a drug testing. Usually, like basically
15 I said yesterday, he works on me after my races,
16 and after all the things that I go through, that
17 comes with the racing.
18 Q. How many events did you run at
19 Reebok?
20 A. I ran one event.
21 Q. What event was that?
22 A. The 100 meters.
23 Q. So, was it your understanding he was
24 using Voltaren cream at the Reebok event?
25 A. Yes, sir.

GATLIN v. UNITED STATES ANTI-DOPING AGENCY, INC.

Dockets.Justia.com



Page 409

1    Q.   And was it this peanut-buttery
2  substance that you described yesterday?
3    A.   I would say not in the color of
4  peanut butter, but the substance, as it was
5  smeared and gooked, yes.
6    Q.   I'm trying to get a better feel for
7  when your attorney referred to it as peanut
8  butter, was it really sticky?
9    A.   I would say as in the thickness, as
10  he was smearing peanut butter onto the bread,
11  it's hard to smear it on full all the whole way
12  around the whole bread, so it caked.
13    Q.   And that was consistent every time
14  he worked on you in 2006?
15    A.   Pretty much so in different
16  fashions, yes.
17    Q.   And as far as you know, it was the
18  same substance that was rubbed on you at every
19  time Mr. Whetstine did a massage on you in 2006?
20    A.   As far as I know.
21    Q.   And the first time he put that
22  substance on you was where?  Which event?
23    A.   Event?  It happened in March.
24    Q.   And where was that, at training in
25  North Carolina?

Page 410

1    A.   Yes, sir.
2    Q.   And did the substance have that
3  tingly feel in March?
4    A.   I can't remember.
5    Q.   You can't remember.  Did it have
6  that tingly feel at the Prefontaine Classic?
7    A.   I can't remember.
8    Q.   Did it have that tingly feel at the
9  Reebok Classic?
10    A.   Not to my recollection.  I can't
11  remember that.
12    Q.   Did it have that tingly feel at the
13  Penn relays?
14    A.   He didn't work on me.  He didn't
15  smear it on me at the Penn relays.  I was still
16  running more than one event.
17    Q.   That's the only event where he
18  didn't use Voltaren cream on you at all?
19    A.   No, not afterward, because I was
20  still running more than one event, multi-events,
21  and he had other people to work on as well.  I
22  was never -- I was never stingy with his time,
23  and so I didn't put it as in, this is Justin
24  Gatlin's masseuse; it was a Nike masseuse, and I
25  understood that from the beginning.  So I made

Page 411

1  sure that here people were sometimes, even in
2  front of me to get worked on, and I didn't want
3  anybody to think that this was my masseuse.  He
4  was employed by Nike.
5    Q.   The Penn relays were on April 29th,
6  2006, right?
7    A.   Yes, sir.
8    Q.   At those relays or in the one or two
9  days before, did you get a rubdown with the
10  Voltaren cream from Mr. Whetstine?
11    A.   I got a standard work on flush, I
12  would say that it was straight massage cream.
13    Q.   Straight massage --
14    A.   I don't recall.
15    Q.   You don't recall -- you don't know
16  for sure.
17    A.   No.
18    Q.   All right.  April 29, 2006, the Penn
19  relays, do you recall where Mr. Whetstine set up
20  his table?
21    A.   We have a bullpen, it's called a
22  bullpen where professional athletes are
23  corralled into a -- pretty much a circle, and
24  it's bordered by either benches or gates or
25  railings.  And usually, that's where all the

Page 412

1  athletes sit inside, and they get their clothes
2  on, and they put their spikes on, so he set up
3  his table inside the bullpen.
4    Q.   When you got your post-race rubdowns
5  from Mr. Whetstine, would you be on his table?
6    A.   Yes.
7    Q.   Were you on his table at the
8  Prefontaine Classic?
9    A.   Before or after?
10    Q.   After.
11    A.   Because I was on his table, when I
12  would get stretched before a race.
13    Q.   At the Prefontaine after the
14  competition?
15    A.   No, he came up to me.  I wasn't on
16  his table.
17    Q.   Okay.  And did he rub you down on
18  the table at the Prefontaine after your race?
19    A.   No, he didn't.
20    Q.   So he gave you the rubdown while you
21  were standing up?
22    A.   Yes, sir.
23    Q.   And at the Penn relays, was the
24  rubdown while you were standing up, after your
25  competition?



**Page 413**

1    A. I didn't get a rubdown at the Penn
2  relays.
3    Q. I'm sorry, you are right.
4      And at the Reebok event in New York,
5  was the rubdown standing up?
6    A. It was, sir.
7    Q. Now, you described some events on
8  April the 22nd, 2006, and at the Kansas Relays
9  and have gone through a number of different
10  events and uses of creams, and the only one that
11  you can recall that tingled was at the event in
12  Kansas; is that right?
13    A. Yes, sir.
14    Q. And at which time did the
15  application of the cream tingle when you were in
16  Kansas?
17    A. At what time?
18    Q. I mean, you have testified that he
19  rubbed you down three times while you were in
20  Kansas, right, with the Voltaren cream?
21    A. Yes.
22    Q. And the first one, you testified
23  occurred after midnight, so it would have been
24  early morning on Friday?
25    A. Yes.

**Page 414**

1    Q. And then you testified that -- and
2  then you testified that you were rubbed down
3  with that cream on Friday afternoon; is that
4  right?
5    A. Yes.
6    Q. And then you also testified that
7  immediately following your race on Saturday, you
8  were rubbed down?
9    A. I was.
10    Q. And in which of those instances did
11  the cream tingle?
12    A. To my recollection, it was the one
13  after, immediately after my race.
14    Q. And that's the only one that you can
15  recall, the only time that the cream tingled?
16    A. Yes, sir.
17    Q. And when the cream tingled, what was
18  your response? Tingled, I suppose could mean
19  different things to different people. What does
20  it mean to you?
21    A. Like a Vick's VapoRub or a BenGay
22  sensation.
23    Q. Okay.
24    A. Nothing that hurt my legs maybe to
25  feel like it was working, you know, that kind of

**Page 415**

1  feeling. Nothing to alarm you, you know, that
2  something felt odd or weird at that point in
3  time.
4    Q. Did you make any inquiry at the
5  time? This feels different, you know, did you
6  use a different cream on me or something?
7    A. At that point in time, when I felt
8  the sensation, Chris Whetstine was not around,
9  so I couldn't speak to anybody.
10    Q. So you started to feel that way
11  after you had already been rubbed down?
12    A. Yeah, the sensation did not last
13  long. It wasn't like it lasted for hours.
14    Q. Okay. And that's the only time that
15  you can recall that you felt anything different
16  about the cream that was used on you?
17    A. As far as I can remember.
18    Q. Now, your testimony under direct
19  from Mr. Collins was he had new Voltaren creams.
20  When you talked with Mr. Whetstine at the
21  beginning of the 2006 season, he was excited
22  about some of the new things he was going to do;
23  do you recall that?
24    A. Yes, I do.
25    Q. And he testified that he had some

**Page 416**

1  new Voltaren creams; is that right?
2    A. Yes, sir.
3    Q. So they were new, meaning they were
4  different than in 2005?
5    A. As far as I'm concerned, that's what
6  he said, yeah.
7    Q. And did you -- what did he tell you
8  about these new Voltaren creams?
9    A. He just said that it helps with the
10  fatigue better than it did with the previous
11  creams, and he also implied that the stiffness
12  on my joints that the acupuncture would help,
13  and also mixed with the Tecar machine that it
14  would help with the lasting ability with my
15  running and able to come back on the track
16  better.
17    Q. Did he tell you anything about what
18  new substances were in the Voltaren cream, if
19  any?
20    A. When he said Voltaren cream, new
21  Voltaren cream, I figured it was Voltaren cream.
22    Q. Did you ask him what was new about
23  the cream?
24    A. No, I didn't.
25    Q. Did you ask him to take a look at



Page 417

1  the label on the cream?
2      A.  No, I didn't.
3      Q.  So at any time, did you ask him to
4  take a look at the label on the cream?
5      A.  No.
6      Q.  And is it fair to say -- well, never
7  mind.
8          Is it fair to say that you don't
9  know the contents of any cream that was rubbed
10  on you by Chris Whetstine?
11      A.  Other than what he has told me.
12      Q.  And what has he told you?
13      A.  That it was a Voltaren cream, and
14  all was legal, and was certified to use it.
15      Q.  Did he tell you about the substances
16  in any other creams he used?
17      A.  No.
18      Q.  Did he only use Voltaren cream?
19      A.  He used Voltaren cream, and he used
20  massage cream.  He wouldn't use Voltaren cream
21  to do a flush.  He used, like, massage cream to
22  do a flush, so, as far as I know, he had like
23  two different types of creams.
24      Q.  In addition to the creams that
25  Mr. Whetstine would put on your body, was there

Page 418

1  a gel that was used for the Tecar machine?
2      A.  There was.
3      Q.  Because that's like an ultrasound
4  machine?
5      A.  Yes.
6      Q.  What was the content of that gel?
7      A.  As far as I know, it was -- it's a
8  specific gel that comes with the Tecar machine,
9  because a certain gel that you can't use, that I
10  know, for like ultrasound machines, because, it
11  will burn the sound head of the ultrasound
12  machine, like definitely harm your skin, harm
13  your body, it can give you up to third-degree
14  burns.
15      Q.  I guess my question is what is the
16  content of those gels?
17      A.  I'm not sure.
18      Q.  Did you ever inquire about what was
19  in the gels that were being placed on you to use
20  the Tecar machine?
21      A.  I asked him once, and he gave me --
22  it was a combination of massage creams, and
23  ultrasound makeup.
24      Q.  But the specific ingredients, you
25  were never told?

Page 419

1      A.  No.
2      Q.  Did anybody else use the Tecar
3  machine?
4      A.  Felix Sanchez, who is a 2005 world
5  champion.
6      Q.  I'm sorry, bad question.  Did
7  anybody else operate it on you?
8      A.  No.
9      Q.  Only Mr. Whetstine?
10      A.  Only Mr. Whetstine.
11      Q.  And how about ultrasound equipment?
12      A.  No.
13      Q.  How about did your coaches, did they
14  ever use the ultrasound equipment?
15      A.  No.
16      Q.  Maybe the thing to do -- well, let
17  me back up.  I want to take you now to June the
18  15th, 2006.  Probably one of the days of your
19  life you would probably rather forget, I'm sure,
20  and start there.  Tell me what your first
21  thoughts were about what might have caused this
22  positive test result.
23      A.  At that point in time, I had no idea
24  what could have caused the positive result.  I
25  took it upon myself, as you know, to take action

Page 420

1  to find out if any of my supplements were
2  tampered with.  Later on, find out if anyone had
3  any bad blood towards me.  I just felt that -- I
4  looked at everybody at that point in time, as a
5  suspect, even my training partners.  I was very
6  confused.  I was very upset.  Very distraught.
7  It was very confusing time for me.
8      Q.  And one of the first things that you
9  did was contact an attorney; is that right?
10      A.  Yes, sir.
11      Q.  And one of the first things they did
12  was hire an investigator?
13      A.  Yes.
14      Q.  And you were competing in
15  Indianapolis -- when did you get to Indianapolis
16  for the national championships in June?
17      A.  I don't remember the specific date
18  when I got there.  Usually, you get there, maybe
19  three or four days earlier before the meet
20  begins, so you have time to stretch your legs,
21  basically, and warm up, and get a feel for the
22  track.
23      Q.  And if my recollection is correct,
24  you won the national championship on June the
25  23rd in the 100 meters, and that was a Sunday;



Page 421

1 is that right?
2     A.  Yes, sir.
3     Q.  So you got there maybe like June
4 19th?
5     A.  I would say probably the 18th.
6     Q.  18th.  So you got there a few days
7 after you found out about the positive test
8 result?
9     A.  I did.
10     Q.  And you actually hired an
11 investigator in Indianapolis?
12     A.  Yes.
13     Q.  And did you subsequently find out --
14 you said that that investigator actually talked
15 with Chris Whetstine; is that right?
16     A.  Yes.
17     Q.  And I assume that you took a
18 statement from him or wrote down the
19 observations of what Mr. Whetstine said?
20     A.  I'm not sure.
21     Q.  Did you ask your attorneys about
22 that?
23     A.  I did later on.
24     Q.  And then you hired a second group of
25 investigators from New York?

Page 422

1     A.  Yes, sir.
2     Q.  And they actually went out and met
3 with Mr. Whetstine in Oregon; is that correct?
4     A.  Yes, sir.
5     Q.  And Mr. Whetstine gave them the
6 creams that he was using; is that correct?
7     A.  From what I know.
8     Q.  And to your knowledge, those creams
9 were never tested, correct?
10     A.  Those creams were given to my
11 lawyers, and from my lawyers they were given to
12 Dr. Black.
13     Q.  Okay.  And do you know if they were
14 ever tested?
15     A.  At that point in time, I did not
16 know if they were tested or not, because we had
17 a rift with the lawyer at that point in time.
18 And I went with John Collins, and a lot of
19 information was not handed over.
20     Q.  And I asked you about it yesterday,
21 in your examination, you may recall, so, did you
22 have the opportunity to find out whether those
23 creams from Mr. Whetstine were ever tested?
24     A.  Personally, I did not.  I don't
25 remember.

Page 423

1     Q.  And you recognize that USADA has
2 been given no information about any testing on
3 those creams by Mr. Whetstine; is that right?
4     A.  You are the first to tell me that.
5     Q.  Do you have any information that
6 would lead you to believe that those creams were
7 tested?
8     A.  Other than Dr. Black is a very
9 respected and well-recognized chemist.
10     Q.  Did the investigators that you hired
11 from New York taken a written statement from
12 Mr. Whetstine?
13     A.  They did.
14     Q.  And can I ask why that statement
15 hasn't been produced in these proceedings or
16 given to USADA?
17         MR. COLLINS: Objection.  He's asking
18 attorney/client privilege.  There was a report
19 made.  It's work product.
20         MR. CAMPBELL: In anticipation of
21 litigation, correct?
22         MR. COLLINS: Right, so, I don't have
23 to turn it over.
24     Q.  (By Mr. Bock) Let me ask you this:
25 Have you ever asked your attorney to turn that

Page 424

1 report over?
2     A.  I don't know the ins and outs of how
3 to be a lawyer.  As far as I know, the report
4 was talked about to my lawyers.  From that point
5 in time, I don't know any other information
6 about that.
7     Q.  Are there other statements that the
8 investigators have taken that have not been
9 provided to this panel and sent to USADA, to
10 your knowledge?
11         MR. COLLINS: Objection.  Same one.
12         MR. COLBERT: It sounds --
13         MR. BOCK: I don't know that the
14 content, whether a report exists is not
15 privileged.  The content of your communications,
16 Mr. Gatlin made --
17         MR. COLLINS: Work product is more
18 than my communication.
19         MR. COLBERT: Work product is a
20 little different from attorney/client
21 communication, to the extent that it's work
22 product by counsel makes even the existence of
23 it privileged.
24         MR. BOCK: They went into it on
25 direct examination.

## Page 425

1  MR. COLBERT: Well, I think you asked
2  him, if there's anything other than what was
3  testified to on direct examination, which would
4  take it outside the scope of cross.
5  MR. BOCK: Okay.
6  MR. COLBERT: I think that's the way
7  you phrased it. Is there anything else other
8  than what you have already talked about?
9  MR. BOCK: Other than the -- yes, you
10  are right. That was my question. So your
11  ruling is?
12  MR. COLBERT: My ruling is, to the
13  extent that you are asking for work product,
14  investigative reports, et cetera, prepared by
15  Mr. Collins and not produced in this case and
16  not submitted on direct, then it's privileged.
17  Q. (By Mr. Bock) You did testify about
18  a report that was prepared by Memo. Do you
19  recall that?
20  A. Yes, I do.
21  Q. And my recollection of your
22  testimony is that that was not instigated by
23  your attorney, but was instigated by you and
24  Mr. Nehemiah; is that correct?
25  A. It was brought on by my agent, yes.

## Page 426

1  Q. And that report also was -- that
2  report was provided directly to you and your
3  agent in written form; is that correct?
4  A. To my agent, yes.
5  Q. And that report has never been
6  provided to this panel or to USADA; is that
7  correct?
8  A. I don't know.
9  Q. What was in Memo's report?
10  A. Just the levels of my positive test,
11  and the T/E ratios, as far as I'm concerned.
12  Q. How about comments about creams that
13  were used by Trevor Graham?
14  A. No, not that I know of.
15  Q. But that was one of the reasons that
16  you went to him, right? Because he had
17  familiarity with what Trevor Graham did?
18  A. He was familiar in that area, that
19  subject, not by -- we didn't ask him anything
20  about Trevor Graham. We asked him about certain
21  creams.
22  Q. But the reason that you contacted
23  him was because the -- in the papers, it was
24  known that he worked with Trevor Graham, right?
25  A. The reason we contacted him was

## Page 427

1  because we didn't know what the chemical
2  compound of the cream that was put on me was,
3  and we figured that he would know, because
4  just -- because at that point in time, we know
5  that he was cooperating with the government, so
6  ... We figured if he was cooperating, and I was
7  cooperating, we were on the same side at that
8  point in time.
9  Q. But you contacted him because you
10  knew of his association with Trevor Graham.
11  Isn't that what you testified to on direct
12  examination?
13  A. I did not contact him. My agent
14  contacted him.
15  Q. Had your agent contacted him because
16  of his association with Trevor Graham, correct?
17  A. I did not have my agent contact him.
18  I did not order him contacted. My agent
19  contacted him, and brought it through me, and
20  felt at that point in time, it would be a good
21  idea to at least talk to him, and see what he
22  had to offer.
23  Q. Because he was associated in the
24  past with Trevor Graham?
25  A. Him being associated with Trevor

## Page 428

1  Graham, at that point in time, I felt, had
2  nothing to do with what was going on with me. I
3  was trying to find out what was in my system to
4  exonerate myself.
5  Q. I took notes on your first
6  examination, and do you recall testifying about
7  the newspaper showing you that that he was known
8  to be working with Trevor Graham or to have
9  worked with Trevor Graham?
10  A. I know that he knows Trevor Graham,
11  and he has a history with Trevor Graham.
12  Like I said, my motive to contact
13  with him had nothing to do with Trevor Graham.
14  My motive to contact him was to find out what
15  was in my system, and could he find out what was
16  in my system. Nothing to do with Trevor Graham.
17  Q. And at the time that you contacted
18  him, you were cooperating with the government,
19  correct?
20  A. Yes, I was.
21  Q. And this was November of 2006?
22  A. Yes.
23  Q. And your communications with him
24  took place over a several-month period; is that
25  right?

7-30-07 to 8-01-07                                    USADA vs. GATLIN

108 (Pages 429 to 432)

## Page 429

1    A.  Yes.
2    Q.  So approximately February 2007?
3    A.  I can't put a pinpoint date on it,
4  and with the communication with him, it was
5  usually through more than one person.  It was
6  usually through a conversation that he had with
7  my parents, and they were relaying the message
8  to me or with my agent.  I tried to really stay
9  away from having any kind of direct contact with
10 this person.
11        MR. BOCK:  Do you have an extra copy
12 or can he use your copy of our exhibits, I'm
13 sorry?
14        MR. COLLINS:  This one here?
15        MR. BOCK:  Or maybe --
16        MR. TYGART:  Here's one.
17        MR. COLBERT:  I have a set right
18 here.
19        MR. BOCK:  That's okay.  We will use
20 this.  Thank you.
21        MR. CAMPBELL:  Travis, did you get
22 that updated spreadsheet?
23        MR. TYGART:  She's still working on
24 it.  Actually, I think it was sent overnight to
25 here with the colored photos of the text, so

## Page 430

1  hopefully, we'll have it by 10 or 10:30.
2    Q.  (By Mr. Bock) I'm going to go over
3  with you some accounts of, that have been
4  publicly reported about what happened in
5  relation to your experience at the Kansas
6  Relays.  See if I can find it.
7        MR. COLLINS:  What tab are you going
8  to be referring to, just so I can find it.
9        MR. BOCK:  Tab 25.
10   Q.  (By Mr. Bock) And if you will notice
11 -- I'm going to refer to the document numbers in
12 the lower right-hand corner.  They say "USADA,"
13 and they go from USADA 0257 through the end of
14 the exhibit, which is 0285.
15        So, the first thing, the first one
16 that I will ask you about is USADA 0271 and
17 0272, which is part of a Washington Post article
18 from December 16th, 2006.
19   A.  Which one again?
20   Q.  0271, Page 0271?
21        MR. COLBERT:  It starts on Page 0270?
22        MR. BOCK:  Yes, that's where the
23 article starts, yes, sir.
24   Q.  (By Mr. Bock) Who is Cedric Walker?
25   A.  Cedric Walker was a USTF, which is

## Page 431

1  U.S. Track and Field worker, employee.
2    Q.  Do you know him?
3    A.  Yes.
4    Q.  At the beginning of USADA 0271 it
5  says -- or I'm sorry at the end of that page, it
6  says:  "Cedric Walker, USA Track and Field's
7  former relay program manager, said he observed
8  Whetstine working on sprinter Shawn Crawford and
9  Gatlin after a training session in Lawrence.
10 Walker said he noticed that after Whetstine
11 finished with Crawford, he reached in his bag
12 for a different cream to rub on Gatlin."
13        Have you seen that account before?
14 Are you familiar with that?
15        MR. COLLINS:  I'm not --
16        MR. COLBERT:  Not objectionable yet.
17   A.  Am I familiar with this article or
18 that event?
19   Q.  Are you familiar with that
20 information.  Have you ever heard that?
21   A.  I have never seen Cedric Walker
22 around when that happened, no.  I mean, I don't
23 know if that answers your question or not.
24   Q.  So you are not aware of whether
25 that's accurate or not?

## Page 432

1    A.  No, I'm not.  I mean, I know that
2  there's been times when me and Shawn Crawford
3  are in the same area when Chris works on us, and
4  it probably happened around our Kansas Relays,
5  but was Cedric or anybody else around?  I did
6  not take any look at it, you know, it was a
7  regular routine.
8    Q.  Was there a point in time where you
9  were receiving a rubdown at the same time as
10 Shawn Walker?
11   A.  Crawford.
12   Q.  Shawn Crawford?
13        MR. COLLINS:  Objection.  Can we have
14 a time frame?  There were three different
15 rubdowns.
16   Q.  The first one was after midnight in
17 your room, correct?
18   A.  The only time that Shawn was around
19 was before, on Friday, at the practice track at
20 the high school.  That's the only time that
21 Shawn Crawford was around.
22        MR. CAMPBELL:  Who is Shawn Crawford?
23   A.  Shawn Crawford was my teammate.  He
24 won the gold medal in the 200 meters, Olympics.
25   Q.  Do you know if Shawn Crawford paid

Page 433

1    Chris Whetstine $5,000?
2        A. I have no idea.
3        MR. COLLINS: Objection.
4        MR. COLBERT: I would like to hear a
5    little foundation before you go that far afield.
6        MR. BOCK: I just asked whether he
7    knew if he had or not.
8        Q. (By Mr. Bock) Do you know whether
9    Chris Whetstine asked him for $5,000?
10       MR. COLLINS: Objection.
11       A. That's with Chris -- what he does
12   with Shawn --
13       MR. COLBERT: That's a foundation.
14   Whether he knows, whether he asked or not. I
15   will let you answer the question.
16       MR. COLLINS: I was objecting on
17   relevance, too, though.
18       Q. (By Mr. Bock) Mr. Crawford won a
19   gold medal like you did at the Olympic Games?
20       A. Yes.
21       Q. Yes. And Mr. Whetstine provided
22   therapy to Mr. Crawford as well, just like you?
23       A. Yes, he did.
24       Q. Let's look at that same article --
25   let me back up. When was the first time that

Page 434

1    you told Trevor Graham about the positive drug
2    test result?
3        A. Immediately after I got off the
4    phone with my agent and my family.
5        Q. And what did you say to him?
6        A. I basically said that I tested
7    positive. Do you know any way that I would have
8    tested positive? I gave him the rundown,
9    basically, like how did this happen to me? How
10   could this happen to me?
11       Q. And what did he say?
12       A. He said he doesn't know. He said
13   that he had nothing to do with the situation.
14   He said that he's been careful, I have been
15   careful, and everything has been legit,
16   workouts. He had nothing to do with my
17   supplements; I bought my own. At that point in
18   time, he was not a factor. I mean, I looked at
19   him as a suspect, like I did, like I told you,
20   everyone else, but he was not a factor.
21       Q. Did he, at that point, suggest any
22   possible reason for the positive test?
23       A. He was more baffled. He was
24   surprised and shocked himself, so, no.
25       Q. Did he make any suggestions about

Page 435

1    how you could find out what caused the positive
2    test?
3        MR. COLLINS: Objection. As to time
4    frame. Is this in this first conversation
5    still?
6        MR. BOCK: Yes.
7        A. He wanted to get in touch with Chris
8    Whetstine, I mean, who was in the circle, and he
9    didn't get in touch with him at that point in
10   time, that day.
11       Q. So he brought up Chris Whetstine
12   immediately?
13       A. I wouldn't say right at that point
14   in time, but he did bring him up.
15       Q. In that first conversation?
16       A. Yes, sir.
17       Q. And why did he say he wanted to get
18   in touch with Chris Whetstine?
19       A. Well, he was within that circle that
20   pretty much managed me, managed my success.
21       Q. Who else was in that circle?
22       A. Renaldo Nehemiah, my mother, my
23   father, Trevor Graham and Randall Evans.
24       Q. And Chris Whetstine?
25       A. Chris Whetstine, yes, sir.

Page 436

1        Q. What about Terri Blankenship?
2        A. She was as well, but she wasn't
3    there for the -- when I was there at the events
4    to perform. So I consider her more of somebody
5    to maintain my body, and maintenance of my body
6    when I'm at home and training.
7        Q. Okay. Did Trevor say he wanted to
8    get in touch with Randall Evans?
9        A. Randall, when I called, Randall was
10   there with him.
11       Q. So you talked to both of them on the
12   phone together?
13       A. Yes.
14       Q. Was it a speakerphone or they were
15   on separate phones, but you were all talking
16   together?
17       A. Yes.
18       Q. Where were they physically at that
19   point in time?
20       A. As far as I can remember, they were
21   at Trevor's house.
22       Q. Where were you?
23       A. At my house.
24       Q. And what did Randall Evans say in
25   that conversation?



Page 437

1     A. He was dumbfounded as well. He said
2 that he had no knowledge of how this could get
3 into my system or how it was done.
4     Q. And what did Randall Evans say, if
5 anything, about how to investigate the
6 situation?
7     A. Randall didn't give any inquiry
8 about how to investigate the situation.
9     Q. Okay. So, did anybody in terms of
10 trying to investigate the situation, did anybody
11 say anything other than, let's get in touch with
12 Chris Whetstine?
13     A. Did they say anything else?
14     Q. Yeah. Was there any other avenue to
15 investigate this?
16     A. Not to my recollection.
17     Q. And that conversation was on June
18 15th?
19     A. Yes.
20     Q. When is the next conversation you
21 have with Trevor about the situation?
22     A. I can't remember.
23     Q. Did you have any other conversations
24 with him before you left for Indianapolis?
25     A. Yeah, I mean, he was my coach.

Page 438

1     Q. And I assume this topic was of
2 maximum importance at that point in time for
3 you?
4     A. It was.
5     Q. So did you discuss it with him every
6 time you saw him for the next few days?
7     A. I can't remember.
8     Q. You can't remember? Okay.
9     What you recall, did you recall
10 Trevor Graham coming back to you after he had
11 spoken with Chris Whetstine?
12     A. I can't remember that.
13     Q. Do you recall Trevor Graham ever
14 talking with you any further about Chris
15 Whetstine?
16     A. Other than that he felt at the
17 beginning that Chris Whetstine maybe made a
18 mistake, but then towards that part, he felt --
19 he looked back and saw, recalled the different
20 arguments, recalled the different weird actions
21 that Chris Whetstine was taking that he didn't
22 do within the three-and-a-half-year period that
23 we have known him, and it just didn't add up why
24 he was acting weird.
25     Q. And when did Trevor reach that

Page 439

1 conclusion?
2     A. I don't know the specific day, the
3 time.
4     Q. When did he tell you?
5     A. The same thing, I don't know the
6 specific day or time, he told me. He asked,
7 like, at that point in time, everything was an
8 emotional blur, you know. I couldn't sleep. I
9 couldn't eat. Things just didn't seem right,
10 feel right. I had my mother telling me to come
11 home, and it was all a big ball of confusion at
12 that point in time.
13     Q. Okay. So what is the next thing
14 that you did after calling Trevor to look into
15 this situation?
16     A. I just got together with my circle,
17 my team, and we didn't have our B sample at that
18 point in time, so they felt that it was, it was
19 my best interest to go out there and talk to
20 Craig Masback at nationals, and to get his
21 approval to go out there and run.
22     Q. So you sat down with Trevor and
23 Randall Evans. And when you say your "circle,"
24 I don't know who that refers to.
25     A. I just told you my circle.

Page 440

1     Q. So Chris Whetstine?
2     A. I did not say that.
3     Q. But your mom, dad, Renaldo, Trevor
4 Graham and Randall Evans?
5     A. We didn't sit like physical and
6 talked.
7     We circulated the conversation,
8 basically.
9     Q. So, at that point in time, in June,
10 did you have concerns about Chris Whetstine?
11     A. June, meaning around nationals?
12     Q. Yes.
13     A. Going -- I was suspicious of
14 everyone at that point in time.
15     Q. You announced that your result was
16 -- okay. Then, the next thing that was supposed
17 to happen was that you were supposed to have the
18 showdown with Asafa Powell in England after the
19 national championships; is that correct?
20     A. Well, my lawyer said that we were
21 going to have a showdown anyway, even if I
22 didn't test positive at that point in time,
23 because they weren't giving the respectful
24 amount of money deserved for that race.
25     Q. But you had committed to go to some

## Page 441

1  races in England; is that right?
2      A.  I had committed to go to races in
3  England.
4      Q.  And why didn't you go?
5      A.  Well, I tested positive.  It was
6  a -- I felt that it was wrong for me to go out
7  there and run races knowing that I had this
8  hanging over my head, and why would -- me not
9  being a cheater, I didn't want to take on the
10  responsibility of winning prize money or winning
11  appearance fees and then have to give it back.
12  I mean, I felt that would be stealing, in a way,
13  so I didn't want to do that.
14      Q.  So you didn't run in the meets in
15  England in late June or July, because you wanted
16  to protect the other competitors in those
17  events?
18      A.  Yes.
19      Q.  And you didn't want them to have to
20  go through the disappointment, if you were to
21  beat them --
22      A.  I felt it was the honorable thing to
23  do.
24      Q.  Is that the only reason that you
25  didn't compete?

## Page 442

1      A.  At that point in time, I had a calf
2  injury as well.  It was a minor calf injury, but
3  it was something that my agent talked to, to the
4  England meet promoters and the European
5  promoters about.
6      Q.  And what -- so you stayed home, and
7  what did you do in the period of time between
8  June the 23rd and July the 29th?
9      A.  Other than cry?  I worked on -- I
10  worked on finding out what happened to me.  I
11  talked to my parents, make arrangements to come
12  home, worked on putting my house on the market.
13      Q.  And what happened on July the 29th
14  of 2006?
15      A.  I'm not familiar with that date on
16  the top of my head, I'm sorry.
17      Q.  Do you recall that there was a point
18  in time in which you made a public announcement
19  about the positive drug test, that the B sample
20  had been confirmed?
21      A.  I knew that my agent and Octagon did
22  make a public announcement.
23      Q.  And does July the 29th -- Saturday,
24  July 29th sound like the right date?
25      A.  I don't know.  Like I said, it

## Page 443

1  doesn't stick out in my head at that point in
2  time.
3      Q.  I turn your attention to USADA 0264,
4  which is an article dated July the 29th, 2006 --
5  Saturday, July 29th, discussing the
6  announcement, Saturday's announcement that you
7  had tested positive.
8      Do you have any reason to believe
9  that July the 29th is not the date that your
10  attorneys and your agent announced that you had
11  a positive test result?
12      A.  No.
13      Q.  I want to turn your attention to
14  USADA 0271.  Do you recall Trevor Graham saying:
15  "We know who the person is who actually did
16  this.  We hope the individual has the guts to
17  come forward and say he did it."
18      A.  Yes.
19      Q.  Do you recall, as stated in the one,
20  two, three, four, the fourth full paragraph,
21  that that statement by Trevor Graham took place
22  the day after your announcement of the positive
23  test result?
24      A.  I'm sorry, what paragraph?
25      Q.  The fourth full paragraph.  So, it

## Page 444

1  would be the fifth paragraph.
2      MR. COLBERT:  Is that the one that
3  begins:  "Graham denied any involvement"?
4      MR. BOCK:  Yes.
5      MR. COLBERT:  Thank you.
6      MR. COLLINS:  What was the question
7  again?  I just forgot, I'm sorry.
8      Q.  (By Mr. Bock)  Sure.
9      Do you recall that he made that
10  statement the day after you announced publicly
11  the positive test results?
12      A.  I don't know the date of the
13  statement.  It's here in the paper, but other
14  than that, it was in the paper he made the
15  statement.
16      Q.  And he made that statement closely
17  after your announcement, correct?
18      A.  As I said, I don't know.
19      Q.  Did you coordinate your announcement
20  with Trevor Graham?
21      A.  No.
22      Q.  Did you talk with him about his
23  conclusions about what had happened?
24      A.  Any statements that Trevor Graham
25  made, he made on his own in the paper.  Any

7-30-07 to 8-01-07                                    USADA vs. GATLIN

112 (Pages 445 to 448)

Page 445

1   statements I made, I took it to my lawyers and
2   to my agency, so it was not conspired together.
3       Q.   And were you communicating with
4   Trevor about what happened at that point in
5   time?
6           MR. COLLINS: Could you -- which
7   point in time?
8           MR. BOCK: July the 30th, 2006.
9           MR. COLLINS: Okay. Because you are
10  pointing to a December 16th article, right?
11          MR. BOCK: It references what
12  happened on July 30th, 2006.
13          MR. COLLINS: Okay.
14      A.   I can't remember the exact date when
15  I cut ties from Trevor and stopped talking to
16  him.
17      Q.   Well, that might be helpful if you
18  could at least try to narrow the range of
19  possible dates. Was it before or after July the
20  30th?
21      A.   I'm not sure.
22      Q.   You don't recall when you cut ties?
23          MR. COLBERT: Counsel, can I just ask
24  where in July 30th are you reading this article?
25  You keep referring to the July 30th. I haven't

Page 446

1   seen it.
2           MR. BOCK: "A day after Gatlin
3   announced the positive test result." And the
4   announcement was on July the 29th.
5           MR. COLBERT: Okay. And that is in
6   which paragraph?
7           MR. BOCK: The same paragraph.
8   "Graham denied any involvement doping in Gatlin.
9   A day after Gatlin announced the positive test
10  result, Graham claimed he knew who was
11  responsible "
12          MR. COLLINS: I'm going to object if
13  we're going to keep going by this statement in
14  Graham. Trevor Graham is not here. He said
15  that he saw the statement in the paper. He said
16  he wasn't coordinating statements with him. I
17  don't know what --
18          MR. COLBERT: I think he should have
19  some latitude to ask some of these questions.
20      Q.   (By Mr. Bock) If you would turn to
21  the next page of this article, USADA 0272.
22          This article refers -- Trevor Graham
23  gets fairly specific about what allegedly
24  happened in Kansas in terms of both putting --
25  Mr. Whetstine putting a product on you and what

Page 447

1   happened after the, after the race.
2           And, in fact, he identifies the
3   actual product that was supposed to have been
4   put on you, a cream by Sarati Laboratories.
5           Did you have a conversation with
6   Trevor Graham about him identifying the
7   particular product that he says was put on you?
8       A.   Yes.
9       Q.   When did that occur?
10      A.   I don't know the exact date.
11      Q.   What did he say?
12      A.   He said that he went and looked at
13  the Internet to find out what the cream was that
14  he thought that Chris Whetstine used, and he
15  came across DHEA.
16      Q.   And tell us more specifically how he
17  knew what to look for.
18          MR. COLLINS: I'm going to object as
19  to how -- he's asking him to testify to what to
20  Trevor Graham knew.
21          MR. COLBERT: Can you do that with
22  foundational questions?
23          MR. BOCK: Yes, I will withdraw the
24  question.
25      Q.   (By Mr. Bock) Did Trevor tell you

Page 448

1   about this investigation?
2       A.   He said that while Chris was
3   applying the cream on me in Kansas that he saw
4   a -- I think he said a pink tube, a white tube
5   and a pink squiggle on it, and he went back and
6   referenced that, and he came up with DHEA.
7       Q.   And when did he say this to you?
8       A.   I'm not sure of the date.
9       Q.   Well, was it before or after he
10  announced it to the world, and it started
11  showing up in his newspaper articles?
12      A.   I believe before the article.
13      Q.   And this particular article is
14  December of '06?
15          Did your investigators come up with
16  any information that would support Mr. Graham's
17  statement?
18          MR. COLLINS: Objection.
19          MR. BOCK: To your knowledge.
20          MR. COLLINS: Objection.
21          MR. COLBERT: What's the basis of the
22  objection?
23          MR. COLLINS: He's asking about the
24  information from an investigator's work product.
25          MR. COLBERT: Well, not if it was

Page 449

1  reported to Mr. Gatlin. Then it would be facts
2  in Mr. Gatlin's possession; it would no longer
3  be work product. He can answer the question, if
4  it was reported to Mr. Gatlin, then it's not
5  work product.
6      MR. COLLINS: If it was reported to
7  the attorney, it would be.
8      MR. COLBERT: That would be
9  attorney-client work product -- and facts
10  communicated are not --
11     MR. COLLINS: He can answer.
12     MR. COLBERT: Okay. Thank you.
13     A.  Nothing was reported to me about
14  anything being DHEA. I got no report -- other
15  than --
16     THE REPORTER: I'm sorry. I didn't
17  hear the last part.
18     A.  I didn't get any personal report
19  from any investigators.
20     Q.  So you have no reason of knowing
21  whether Mr. Graham's speculation is accurate or
22  not?
23     A.  It's a very strong speculation, and
24  I wouldn't say it was a bull's-eye, and
25  bull's-eye, but I think that it -- it's more of

Page 450

1  an oval-shaped peg than a square peg fitting in
2  a circle.
3      Q.  And why do you put so much weight on
4  what Mr. Graham said about the cream?
5      A.  Well, to do research on it,
6  especially doing research with my lawyer at that
7  point in time, Cameron Myler, we researched
8  DHEA, and some of the stuff that we learned
9  about it, and kind of went along with the story
10  of what happened.
11     Q.  Some of what stuff that you learned
12  about it went along with the story about what
13  happened?
14     A.  Well, DHEA, basically, from what I
15  remember, is a fast-acting substance that can be
16  in a cream form, and it is a -- not a
17  testosterone, but it can cause under USADA's
18  code, it can cause a positive or a precursor
19  positive.
20     Q.  Does it cause a tingly feeling?
21     A.  I don't know. I never used DHEA.
22     Q.  Did you inquire about that?
23     A.  Inquire if it caused a tingling
24  sensation?
25     Q.  Mm-hm.

Page 451

1      A.  I don't know anybody that used DHEA,
2  and I wasn't going to volunteer myself to do it.
3      Q.  So you didn't ask your investigators
4  or your agent or anybody, to investigate?
5      A.  Well, that was information that we
6  were gathering before that -- before my
7  relationship with my lawyer at that point in
8  time became strained.
9      Q.  And did you see the tube that
10  Mr. Whetstine had?
11     A.  Not to my recollection, no.
12     Q.  And you never asked him to see it,
13  correct?
14     A.  Where at? When?
15     Q.  In Kansas?
16     A.  In Kansas, no.
17     Q.  And you didn't hear about the tube
18  with the squiggly S on it until after you had
19  been reported positive, correct?
20     A.  Yes.
21     Q.  And that was the first time you
22  heard it after June the 15th, or after June the
23  15th, 2006, correct?
24     A.  Yes.
25     Q.  And the only person that you heard

Page 452

1  that from was Trevor Graham, correct?
2      A.  Yes.
3      Q.  And so to believe that that is the
4  case, that there was a tube with a squiggle on
5  it, we have to believe Trevor Graham, right?
6      A.  If he was a witness, I would feel --
7  if he wasn't there, there would be no reason to
8  believe him. If he saw it with his own eyes,
9  if -- the same thing with Cedric. I can't
10  determine what Cedric saw and what Trevor Graham
11  saw, there are two different witnesses.
12     Q.  Do you know the name of the company
13  that Trevor told you?
14     A.  No, I don't.
15     Q.  Did he tell you the name of the
16  company?
17     A.  Not that I remember.
18     Q.  But you understood that he was on
19  the Internet doing research about steroid
20  creams?
21     A.  That's what he told me.
22     Q.  And when did he tell you that he was
23  going to research steroid creams or had
24  researched steroid creams?
25     A.  This was after my positive test to

7-30-07 to 8-01-07                    USADA vs. GATLIN

114 (Pages 453 to 456)



Page 453

1  look up information about how I could test
2  positive, and what Chris was using from his
3  speculation of what he saw.
4      Q.  And did he tell you that he was
5  going to do that before he did it, or did he
6  come report to you after he had done this?
7      A.  He reported to me after he did it.
8      Q.  Do you recall anything else that he
9  reported to you in that conversation?
10     A.  Other than he was going to get to
11 the bottom of this, and this was B.S., so
12 nothing else happened there.
13     Q.  So it sounds to me like at that
14 point in time, when you said it was B.S.,
15 then -- why would somebody say that it's B.S.,
16 unless they have an idea of how it occurred?
17     A.  Well --
18         MR. COLLINS: I'm objecting.
19         MR. BOCK: You can object.  That was
20 a bad question.  I will withdraw it.
21         MR. COLBERT: I was waiting for that.
22         MR. COLLINS: I couldn't understand
23 at what point --
24         MR. BOCK: I'm just thinking ...
25     Q.  (By Mr. Bock) I'm going to ask you

Page 454

1  if you could turn your attention to an ESPN
2  interview that Trevor gave on August the 4th,
3  2006.
4         MR. COLBERT: Where is that?
5         MR. BOCK: On Page 0276.
6         MR. COLLINS: I guess he could set
7  some foundational questions, but I know you are
8  giving him latitude on this, but --
9         MR. COLBERT: He hasn't started yet,
10 so let's see what he asks, and then you can
11 object.
12     Q.  (By Mr. Bock) I'm going to read you
13 some quotes from Trevor Graham, and you tell me
14 whether or not he told you these things.
15     A.  Okay.
16     Q.  That the question to him was: "The
17 relays in Lawrence, Kansas -- what happened
18 there, the positive test?"
19         Trevor Graham says: "Well, there's
20 a number of things that happened.  Victor Conte
21 got out of prison in March.  In April, got
22 doping control.  We don't know how many people
23 are actually behind this thing, but leading up
24 to the Kansas Relays, we had trouble with this
25 masseuse.  It is the same masseuse that actually

Page 455

1  worked with Marion Jones and everyone else.  And
2  we always had problems, but somehow he does
3  great work.  So we had let him go and was not
4  going to work with him anymore."
5         Up to there, is that anything that
6  Trevor Graham had shared with you?
7      A.  That we let him go, that we're not
8  going to work with him anymore?
9      Q.  Yeah.
10     A.  Well, I mean it was my decision not
11 to work with Chris anymore.  Other than that, I
12 don't know anything about a conspiracy of any
13 kind.
14     Q.  So you don't know anything about a
15 conspiracy with Victor Conte?
16     A.  No.
17     Q.  "We put on the Sprint Capitol Web
18 site that we were trying to find a new
19 masseuse."
20         Did that occur?
21     A.  It did occur.
22     Q.  "We invited" -- I'm going to skip a
23 few lines.  "We invited him," meaning Chris
24 Whetstine back to the Mt. SAC relays.  "He came
25 to the Mt. SAC relays. When he arrived there,

Page 456

1  his first thing was like that 'motherf-Gatlin',
2  he is this, and he is that.  He kept going off
3  about Justin trying to get rid of him.  'He's
4  gonna get his.'
5         "I'm like, 'Look, Justin has nothing
6  to do with you.  I'm the one that actually don't
7  want you to work with him.  So I made that
8  decision.  And I made the decision now to bring
9  you back, but don't come with any B.S.'"
10        "He's like, 'No, it's not you, it's
11 Justin.  I know it is him.  I heard it is him.'"
12        "I said, 'Who did you hear that
13 from?'"
14        "He couldn't tell me."
15        Did he talk with you about Chris
16 Whetstine being upset with you for trying to get
17 rid of him?
18     A.  No, not in depth, not to that deep
19 of detail.  I knew that he was upset, because
20 now myself and Nike and him and Trevor Graham
21 did not want to work with him anymore, so ...
22     Q.  And the only testimony you provided
23 so far about him being upset with you is over
24 the $5,000, right?
25     A.  Yes.

Page 457

1     Q.   Not that you didn't work with him.
2 You thought he did good work?
3     A.   I thought he still did a good job,
4 but I still thought his character, after that
5 point in time, after the $5,000, it was -- he
6 was, it was strictly business, you know, it was
7 strictly business, but at the same time, we had
8 a rapport.  He never came to me and cussed me
9 out, as he's saying in the article.
10     Q.   Do you believe Trevor Graham's
11 statement here that he cussed you out to Trevor
12 Graham?
13     A.   Do I believe his statement?
14     Q.   Yeah.
15     A.   Honestly, yes, I do.
16     Q.   Okay.  I'm going to skip a
17 paragraph.  And it goes on and talks about
18 Kansas Relays:
19          "We got up next morning for the
20 relays.  We ran the relay.  After the relay,
21 they grabbed Justin for doping.  But at the
22 relay, there was other groups there too.
23 Somehow, some of these other groups that was
24 there didn't get tested.  Just my athletes got
25 tested, and others.  But a particular group did

Page 458

1 not get tested in the Kansas Relays."
2          Was there a particular group of
3 athletes -- did Trevor ever tell you that there
4 was a particular group of athletes that didn't
5 get tested at the Kansas Relays?
6     A.   He was upset, because SHI, who was
7 quote/unquote on track, our rival group, and it
8 was Maurice Greene's home town of Kansas, it was
9 his quote/unquote stomping grounds, and none of
10 his athletes were tested, even if they came
11 first, and usually, when an athlete wins a race,
12 they're the ones subject to be tested.  And
13 there was a number of John Smith athletes that
14 got first in their events, and were not pulled
15 for testing.
16     Q.   So he discussed that issue with you?
17     A.   He complained to me about it.  We
18 didn't go into depth about the situation.
19     Q.   And he complained to you about it
20 before he made it public; is that right?
21     A.   Yes.
22     Q.   And then it goes on:  "And we
23 noticed that.  Somehow when we are going to
24 doping control, Chris stopped Justin, and is
25 like, 'Let me massage him really quick, Coach.'

Page 459

1 And I said, 'No, you ain't got to massage him,
2 man.  We're going to doping.  He just run a
3 relay.  What do you need to rub him for?  It's a
4 relay.'"
5          Do you recall that?  Did that
6 conversation occur?
7     A.   I didn't hear that conversation.
8     Q.   You did not?  Okay.
9          Then the next statement from Trevor
10 Graham.  "We ain't got no meets coming up in the
11 next two weeks.  So, he'll be all right."
12          Do you recall that?
13     A.   No.
14     Q.   And, in fact, you did have a meet
15 coming up in the next week, correct?
16     A.   That's Trevor Graham's statement,
17 not mine.
18          MR. COLLINS:  I'm going to object.
19 He's trying to impeach a Trevor Graham statement
20 in the newspaper article.
21          MR. COLBERT:  I don't think he's
22 trying to impeach him.  I think he's trying to
23 find out whether or not this witness would adopt
24 these statements as accurate or not accurate.
25 It doesn't sound like impeachment to me.

Page 460

1          MR. COLLINS:  Well, he already said
2 he didn't hear the statement.  And then he asked
3 something, isn't it in fact, true, you had
4 another competition next week?
5          MR. COLBERT:  That doesn't sound like
6 impeachment.  He's asking a fact, whether or not
7 he had a meet the following week.  I think he
8 can answer the question.
9          MR. COLLINS:  Okay.
10     A.   Put it like this:  The accuracy of
11 what Trevor Graham had said and his recollection
12 of a meet, in this report is not of mine.
13     Q.   I understand that.  I understand
14 that.
15     A.   So ...
16     Q.   But I want to know how much of it is
17 accurate, how much he told you.
18     A.   Okay.
19     Q.   And when he told you.
20     A.   Okay.
21     Q.   And then it goes on:  "Then he kept
22 coming at Justin.  'Let me massage it.'  And
23 Justin was like, 'Let him do his job, Coach.'  I
24 was like, no."
25          Do you recall that part of the

Page 461

1 conversation?
2 A. My recollection was Chris came over
3 while I was already being interrupted by another
4 group of people being a US Track and Field
5 official, and a USADA agent was going to
6 drug-test me. Trevor Graham was standing over
7 here. And Chris Whetstine came up and
8 approached me. And while Chris Whetstine began
9 to do his act, that's when Trevor Graham said,
10 Hey, man, what are you doing? In that kind of a
11 voice. And that's when I interrupted, like, Let
12 him do his job. He hasn't been doing his job
13 anyway. Let him do what he has to get paid for.
14 Q. Okay. Then, it goes on: "Then
15 Justin walked over to the massage table, and he
16 pulled Justin's pants down. Justin was on the
17 phone, I think. He pulled Justin's pants down
18 to his ankles. And then he told Justin to lay
19 on the table real quick. Justin laid on the
20 table."
21 Is it accurate that you laid on the
22 table?
23 A. In detail, working with Chris at
24 that point in time, he pretty much did, pretty
25 much did all of his work while standing there.

Page 462

1 And he brought me to the table to appease,
2 basically, appease Trevor Graham. If you are
3 going to do it right, then do it and get him on
4 the table, so ...
5 Q. So he actually went over to the
6 table as well?
7 A. For a very brief moment.
8 Q. And then the article says: "He
9 pulled a tube out of his pocket, not out of his
10 bag, and then he just squirted a tube on
11 Justin's leg."
12 Did you see him pull a tube out of
13 his pocket? Can you verify that's accurate?
14 A. I remember him reaching for his
15 pocket. Other than that, I don't know what the
16 tube was.
17 Q. Describe where you were when --
18 A. I was standing. That's when I
19 recognized, I recognized him in a motion of his
20 hand, he didn't pull out of the bag. He had it
21 in his shorts pocket.
22 Q. And was he in front of you when this
23 occurred? Was Chris Whetstine in front --
24 A. Yes, he was kneeling down in front
25 of me.

Page 463

1 Q. And so you would say that that is
2 accurate that he pulled the tube out of his
3 pocket?
4 A. I would say that.
5 Q. Did you discuss that aspect of your
6 recollection with Trevor Graham?
7 A. Not that I know of.
8 Q. And then the question from ESPN at
9 the end is: "The tube?"
10 And Trevor's Graham's response was:
11 "Yeah, it was a tube with like an "S" on it,
12 like a crooked "S" on it. I said to him, 'That
13 is not Voltaren.'"
14 Did you hear that statement from
15 Trevor Graham?
16 A. No, I did not.
17 Q. "And he was like, 'Get away. Move
18 back.' So I was trying to get around him now,
19 but he already squirted it on him, and so then
20 he stuck it in his pocket. I tried to reach my
21 hand in his pocket."
22 Did you hear Trevor Graham try to
23 reach his hand into Chris --
24 A. I did not see this. At that point
25 in time I was already -- I probably was already

Page 464

1 being transported to the press conference and to
2 my drug testing after that.
3 Q. All right. Did Trevor talk with you
4 about these statements that he claimed that they
5 asked him --
6 A. Yes.
7 Q. -- about whether it was Voltaren,
8 and that he tried to get the tube from him?
9 A. Yes, he did.
10 Q. When did he say that?
11 A. This was after my positive, after me
12 knowing on June 15th.
13 Q. And before you cut ties with him?
14 A. Yes.
15 Q. Do you believe that that actually
16 happened?
17 A. Well, on the circumstances that he
18 was not with me when I went into the press
19 conference, and he came in, maybe ten minutes
20 later, I can say that something, some kind of
21 interaction between them did occur.
22 Q. So I take it from what you have told
23 me that the first person to cast suspicion on
24 Chris Whetstine was Trevor Graham; is that
25 right?



Page 465

1    A.  Yeah.
2    Q.  And other than what you have
3  testified to already, is there any other
4  information that -- upon which you base a belief
5  that your positive test result came from the
6  cream that was applied to you by -- by Chris
7  Whetstine?
8    A.  Only from his actions from this
9  case.  I mean, he -- he neither tried to
10  exonerate himself or tried to help find out what
11  happened to me in any way, and the only thing he
12  did was to deny the situation.  He either -- he
13  reluctantly gave up creams to the agents that
14  came to see him, so he wasn't very helpful in my
15  situation at all.
16    Q.  How do you know he only reluctantly
17  gave up the creams?
18    A.  That's what was reported to me by
19  the agents, that he wouldn't even let them in
20  the door or they had to sit outside on the
21  porch, and at times when they knew he was home,
22  he wouldn't open the door.
23    Q.  Do you know why those agents aren't
24  here testifying for you?
25    MR. COLLINS: Objection.

Page 466

1    Q.  Other than what your attorney has
2  told, do you know why those investigators aren't
3  here testifying for you about these events,
4  these claims that you are making?
5    A.  I can answer the question?
6    MR. COLBERT: He's limited his
7  question, to other than what your attorney has
8  told you.
9    A.  As far as I know, that there was --
10  I don't know the legal term -- but there was
11  malpractice between the Myler firm, where we
12  paid the money as documented proof that we paid
13  the money, and they were supposed to pay the
14  agents.  And they did not pay the agents, and
15  the agents were upset about that situation.
16    And that's what, really, one reason
17  why it caused a rift between the lawyer I had
18  before, and why I have a lawyer now.  There was
19  some shady stuff going on, and that was supposed
20  to be my lawyer, so ...
21    Q.  Okay.  Are you familiar with the
22  fact that a fight apparently occurred on June
23  21st or June 22nd in Indianapolis during the
24  national championships, between Chris Whetstine
25  and Llewellyn Starks?

Page 467

1    A.  I have heard about it.
2    Q.  Do you know what that fight was
3  over?
4    A.  All I know is that they had an
5  argument in the club when Chris Whetstine said
6  he was sick.  I don't know how you go to the
7  club while you are sick, but -- and then they
8  were talking and having a conversation, and it
9  got a little heated, and then Llewellyn Starks
10  jumps up, and says, I know what you are doing to
11  our Nike athletes, and it's F'd up, and then
12  from there, it carried on to outside, to outside
13  the hotel, in front of the hotel, which they
14  caught the fight on camera, and that that's all
15  I know.
16    Q.  Is there a way that Llewellyn Starks
17  would have known about your positive tests
18  during June the 21st?
19    A.  Not that I know of.
20    Q.  And what is the circle that you
21  shared those positive test results with, other
22  than the inner circle that you have already
23  talked described, and Craig Masback, who else
24  did you tell about the attorney rules?
25    A.  No one that I remember.

Page 468

1    Q.  And your attorney and investigator?
2    A.  Yes.
3    Q.  Anybody at Nike?
4    A.  Not that I remember.
5    Q.  How about John Capriotti?
6    A.  I did not tell him personally, no.
7    Q.  When was the first time that you
8  told Nike?
9    A.  I don't remember.
10    MR. BOCK: We have been going for, I
11  guess, about an hour and a half.  Do you mind if
12  I take a quick break, while I just go back
13  through my notes, and see if there's anything
14  else?  We're certainly close to the end.
15    MR. COLBERT: Okay.  Take a
16  five-minute break.
17    MR. BOCK: Okay.  Thank you.
18    (Brief recess taken from 9:30 to
19  9:45 a.m.)
20    (All parties present, including
21  Justin Gatlin, Mr. and Mrs. Gatlin and Visie
22  Simms.)
23    MR. COLBERT: Are we ready?
24    MR. BOCK: I kind of would like
25  Travis to get back actually,



Page 469

1      MR. COLBERT: Okay. Well, he thinks
2  you are going to start without him.
3      MR. BOCK: I know he does. I think
4  he will be back in just a second. Let me go
5  tell him that.
6      (Pause in proceedings.)
7      MR. COLBERT: We're back on the
8  record.
9      Mr. Bock, anything further?
10      MR. BOCK: Yes, thank you very much.
11      EXAMINATION (cont.)
12  BY MR. BOCK:
13      Q. Could I ask you, Mr. Gatlin, to turn
14  to Tab 6, which is a better copy of the doping
15  control official record for the Kansas Relays
16  than can be found under Tab 8, which is a little
17  darker.
18      A. Okay.
19      Q. When you filled out the section of a
20  doping control form listing the substances that
21  you were to take -- or that you had taken within
22  the last three days, you understood that you
23  were supposed to put down any medications or
24  other substances, including supplements that you
25  had taken; is that correct?

Page 470

1      A. Yes.
2      Q. And on April 22nd, 2006, you told
3  USADA that you were taking a multivitamin,
4  protein shake, Liquid Amino and Red Bull and
5  Adenergy, correct?
6      A. Yes.
7      Q. And those were all substances that
8  you had taken within the last three days,
9  correct?
10      A. Yes.
11      Q. In fact, you indicated that the last
12  time you had taken each of those substances was
13  on that day of the test, correct?
14      A. Yes.
15      Q. But you did not list Voltaren cream
16  on this doping control form, correct?
17      A. Yes.
18      Q. Why not?
19      A. These are substances that they asked
20  me that I take.
21      Q. Yeah.
22      A. I didn't see any reason for to put
23  down Voltaren cream. These are all oral things
24  that they asked me that I took orally.
25      Q. Does it say "oral" there?

Page 471

1      A. I'm telling you what they asked me.
2      Q. When you say "they asked me," what
3  do you mean? Did you have a conversation with a
4  doping control officer that they said "don't put
5  down creams"?
6      A. No, they didn't say that. But they
7  asked me all things that I had taken between the
8  time period orally.
9      Q. They said "orally"?
10      A. Yes, they did.
11      Q. Okay. And who is "they"?
12      A. You just said, the doping control
13  people.
14      Q. Okay. And when did they tell you
15  that?
16      A. In the doping control.
17      Q. Mr. Gatlin, when in the doping
18  control did they tell you?
19      A. They were telling me that when I
20  was -- after I had given my urine sample, that's
21  when they fill out this information.
22      Q. Okay. And was that the first time
23  that you had ever been told not to -- or to put
24  down what you had taken orally?
25      A. Basically, yeah, anything I have

Page 472

1  taken.
2      I mean, well, this is not my first
3  time. They have asked on different occasions,
4  yes.
5      Q. Okay. So was it your understanding
6  that you were only supposed to put down oral
7  substances?
8      A. It was my understanding that at that
9  point in time, anything that I had took, because
10  they also asked you later, have you -- have you
11  had any injections or anything like that, at
12  that point in time, so ...
13      Q. So if you had -- if you had had an
14  injection, you don't think that you should put
15  it on this form?
16      A. Yeah.
17      Q. If you had an injection within the
18  last three days?
19      A. That was the questions they asked,
20  yeah.
21      Q. We're not communicating, and it may
22  be my fault.
23      A. Anything that they asked me?
24      Q. Yeah.
25      A. That's the answer that I gave them.



Page 473

1     Q.   Okay.  So, did you read this form
2  before you signed it?
3     A.   Yes.
4     Q.   And did you read where it says to
5  put down any medications or other substances
6  that you have taken during the preceding three
7  days?
8     A.   Yes.
9     Q.   And would you agree with me that the
10 cream, Voltaren cream, is another substance that
11 you took, and it's not listed.
12    A.   It was applied to my -- it was
13 applied to my body.  I mean, I don't see taking
14 it as me ingesting it.  I mean, that was the way
15 I took it as "taking."
16    Q.   Well, you were aware, were you not,
17 that athletes have used steroid creams and doped
18 with them in events for 20 years?  Weren't you
19 aware of that?
20    A.   20 years?  No, I wasn't.  I mean,
21 the only time I have heard of it was other than
22 when I found out I tested positive, and then an
23 article in BALCO.
24    Q.   So you knew from the BALCO cases
25 that testosterone cream was used, correct?

Page 474

1     A.   Yes.
2     Q.   And that was in 2004, correct?
3     A.   Yes.
4     Q.   So you knew that you could test
5  positive for steroid by taking a cream, correct?
6     A.   Yes.
7     Q.   And you knew that you had taken a
8  cream, but you didn't use it -- or you didn't
9  list it, correct?
10    A.   Voltaren, yes.
11    Q.   Okay.  Now, you've testified that
12 you used Voltaren cream basically throughout
13 your career, correct?
14    A.   Yes.
15    Q.   But, for instance, if you now turn
16 to USADA Exhibit 8, and --
17    A.   It's Tab 8.
18    Q.   Tab 8.  Look at USADA 0209 -- do you
19 have 0209?  That is the doping control records
20 for 6-26-05?
21    A.   I'm sorry, I'm lost.  I see that you
22 are looking at a different kind of page.
23    Q.   That's 7; 8 is right here.
24    MR. CAMPBELL:  It's not sequential.
25 You tricked us.

Page 475

1     MR. COLLINS:  What is it?  0209 or 8
2  or what number?
3     MR. CHERIS:  0209.
4     MR. COLBERT:  Looks like this is
5  6-26-05.
6     Q.   (By Mr. Bock)  6-26-05.
7     I don't see Voltaren cream or any
8  cream listed on that doping control.
9     A.   Well, like I told you, you know,
10 since he started new -- he started his new
11 techniques that were '04; I would go to my press
12 conferences and drug testing; '05, he would work
13 on me after my press conferences and drug
14 testing.  I remember saying that.
15    Q.   Yeah, but he also -- he worked on
16 you before the meet as well.
17    A.   He never flushed me up before a
18 meet.  He only stretched me before the meet.
19    Q.   Okay.  So in the three days before
20 meets in '05, you never received any creams?
21    MR. COLLINS:  I'm going to object as
22 to the relevance.  I don't understand what -- it
23 doesn't say Voltaren on here.  It's a
24 no-positive test.  It's from something in June.
25 I don't remember him testifying about what

Page 476

1  happened in '05.
2     MR. CAMPBELL:  I think he's trying to
3  show lack of care with his testimony about
4  writing stuff down on the sheet, for what it's
5  worth.
6     MR. COLLINS:  Okay.  But there's no
7  testimony at all that he ever got any in '05.
8     MR. COLBERT:  Let --
9     Q.   (By Mr. Bock)  Let me go back to
10 Kansas.  What did the doping -- did the doping
11 control officer give you any instructions
12 regarding filling out the doping control sheet?
13    A.   He asked me questions, and I filled
14 the form out in the usual way.
15    Q.   Okay.  Did you fill out the form and
16 write down the substances, or did the doping
17 control officer?
18    A.   The doping control officer did.
19    Q.   And so you told the doping control
20 officer what substances you were using, correct?
21    A.   Yes.
22    Q.   And you did not tell the doping
23 control officer that you were using Voltaren
24 cream, correct?
25    A.   Yes.



Page 477

1    Q.  I would like to turn your attention
2  to USADA 0214.
3        MR. CAMPBELL: Is it the same --
4        MR. BOCK: I'm sorry, it's the next
5  page.  It's the doping control record for
6  4-29-06, that is the Penn Relays, correct?
7    A.  Yes.
8    Q.  And on that doping control form, the
9  substances listed that you were taking were
10  Myoplex, creatine, Red Bull, multivitamin,
11  Voltaren cream, correct?
12    A.  That's what it says.
13    Q.  So one week later, you told the
14  doping control officer that you were using the
15  cream, correct?
16    A.  That's what's down there.
17    Q.  So, why would you one week later
18  tell the doping control officer that you were
19  using a cream that you did not at the Kansas
20  Relays?
21    A.  I don't know.  I mean, it's down
22  there right there.
23    Q.  Okay.  And you certified when you
24  signed these forms that you were accurate, that
25  the information was accurate, correct?

Page 478

1    A.  Yes.
2    Q.  And you understood that these forms
3  were important, correct?
4    A.  Yes.
5    Q.  Because you had had a prior doping
6  offense, you knew it was important to follow the
7  procedures, correct?
8    A.  Yes.
9    Q.  And so when we compared these two
10  forms, one on the 22nd, and one week later on
11  2006, one that reads them would assume that you
12  didn't receive any creams on the 22nd, but you
13  did on the 29th.
14        Can you understand why somebody
15  might come to that conclusion?
16    A.  Yes.
17    Q.  And the information that you
18  provided to the doping control officer would
19  indicate that you did not use a cream on April
20  the 22nd, but you did on April the 29th,
21  correct?
22    A.  Yes.
23    Q.  You understand that you are a member
24  of the IAAF's registered testing pool?
25    A.  Yes.

Page 479

1    Q.  I want to turn your attention to
2  USADA Tab 25, and the very first of the news
3  articles underneath that tab.
4    A.  This one right here?
5    Q.  No --
6        MR. TYGART:  Should be 25.
7        MR. BOCK:  25.
8        MR. GATLIN: After the tab?  Okay.
9        MR. COLBERT: It's the March 14th,
10  2003, article, Mr. Bock?
11        MR. BOCK:  Yes, in the London Daily
12  Mail.
13    Q.  (By Mr. Bock) There's a quote from
14  you towards the bottom, the third-to-the-last
15  paragraph from the bottom: "I accepted the
16  suspension."
17        Do you see that?
18    A.  I see that.
19    Q.  It says: "I accepted the
20  suspension.  I just broke the rules which were
21  the rules.  A lot of people wouldn't come back
22  from something like that, but it motivated me to
23  do better."
24        Is that an accurate quote?
25    A.  As far as I can remember.

Page 480

1    Q.  Okay.  And you remember saying
2  things -- you remember saying things to the
3  effect of you understood that you broke the
4  rules back in 2004?
5    A.  Well, I understood that I felt that
6  this situation I was in, me being ADD and the
7  Adderall that was not on the banned list at all,
8  and then I didn't understand that it was a
9  chemical makeup of amphetamines.  I understood
10  that.  I felt that both sides had arguments that
11  were very valid.  And I think that at that point
12  in time, it was something that we came to, and I
13  did not want to fight with USADA.  I had no
14  reason to fight with USADA.
15    Q.  Okay.
16    A.  I didn't want -- I didn't want to
17  slam them.  I didn't want to slam them in the
18  press.  It was just after me winning a
19  championship, you know.  I wanted to be a good
20  role model to kids out there.  I didn't want
21  them to see that I'm against the people who are
22  supposed to protect us as athletes.
23    Q.  In relation to that first doping
24  offense, you do agree with the general principle
25  that an athlete is responsible for what goes

7-30-07 to 8-01-07                                    USADA vs. GATLIN

121 (Pages 481 to 484)

Page 481

1  into their body, correct?
2       A.  I do agree.  And I also agree with
3  the comment that USADA also made towards the end
4  of the arbitration then that I did not cheat nor
5  did I intend to cheat.
6       Q.  Yeah, and I'm not attempting to
7  challenge that at all.
8            Just briefly back to your
9  relationship with Trevor Graham.
10           And if you could look, flip forward
11  to USADA 261, which is a newspaper article from
12  July 22nd, 2005.
13           MR. COLLINS: Where?  This is the
14  same batch?
15           MR. BOCK: Yes.
16           MR. COLLINS: These are sequential.
17           MR. BOCK: Those are sequential as
18  opposed to the other ones.  We just like to mix
19  things up a little bit.
20           MR. TYGART: Keep it entertaining.
21       Q.  (By Mr. Bock) Do you see the
22  sentence that begins: "Gatlin is open about the
23  question of doping"?  It's one, two, three, four
24  from the bottom?
25       A.  Yes.

Page 482

1       Q.  Okay.  And the question comes after
2  a statement about the BALCO scandal, and the
3  paragraph before talks about your Coach Trevor
4  Graham.
5            Do you see that?
6       A.  Yes.
7       Q.  Okay.  And here's the quote from you
8  which is in that fourth paragraph from the
9  bottom.
10           "There is a cloud, but we can take
11  away that cloud" -- I'm sorry -- "there is a
12  cloud, but we can take that cloud away," you
13  said, quote: "I know what to say 'no' to, and
14  what to say 'yes' to."
15           Did you make that statement?
16      A.  Yes, in referring to track and field
17  as a whole.  I can't determine what, how a
18  reporter splices and uses information the way
19  they want to use it, but that was referring to
20  track and field as a whole, and campaigning
21  together as athletes to take this cloud away
22  from our sport.
23      Q.  And when you said, "I know what to
24  say 'no' to, and what to say 'yes' to," what
25  were you referring to?

Page 483

1       A.  That was in the sense of prohibited
2  substances.
3       Q.  So you were not referring to Trevor
4  Graham?
5       A.  No.
6       Q.  Why is Trevor no longer your coach?
7       A.  For the simple fact, because, at
8  this point in time, it wouldn't be allowable.  I
9  mean, that's not the right thing to do.  And to
10  show, I guess, USADA -- I mean, he's under
11  indictment right now, you know, and he has a lot
12  of legal things that are going on with him.  And
13  it doesn't look good on my part to be with
14  someone like that, who is -- who has had a
15  chance of being arrested or put in jail or those
16  kind of conducts.
17      Q.  Okay.  Well -- and I understand
18  that, and I appreciate that, and I would give
19  that some weight.
20           But at the same time a lot of people
21  are accused and they're not guilty, right?  And
22  I assume that if you felt that he was wrongfully
23  accused, you would stick with him?
24      A.  Well, he was being accused
25  throughout '04 and '05 of different things.  Up

Page 484

1  to this date, he has been indicted; you know.
2  Those are facts.
3       Q.  Okay.
4       A.  So I mean, it was -- that was the
5  factual statement.
6       Q.  So was it the indictment that caused
7  you to end your relationship with him?
8       A.  Partially.
9       Q.  What were the other factors?
10      A.  It's just that I needed a clear
11  slate.  I just needed to step away from that
12  situation.  And I strongly felt that at one
13  point in time, if it was sabotage, it could have
14  been -- I could have been used as a pawn in the
15  situation.
16      Q.  Explain that statement.
17           MR. COLBERT: Counsel, I notice it's
18  just a minute or so after ten.  We were told
19  that there was a hard stop because you need to
20  get Mr. Whetstine, and you know --
21           MR. BOCK: I got one more question,
22  okay.
23           I will withdraw that question.
24      Q.  (By Mr. Bock) Have you had a
25  falling-out with Randall Evans?

Page 485

1    A.  "Falling-out" meaning --
2    Q.  Meaning that you no longer associate
3  with him.
4    A.  I do not associate with him.  There
5  was no cussing or arguing of any kind, but I do
6  not talk to him.
7    Q.  And why don't you associate with
8  Randall Evans?
9    A.  Because he's not my coach anymore.
10  He's not the assistant coach.  I'm here in
11  Florida.
12    Q.  All right.  But you are on friendly
13  terms with him?
14    A.  If I saw him walking down the
15  street, I would say "Hello, Randall."  I mean, I
16  wouldn't call him on a daily basis, and check on
17  him and see how he's doing, if that's what you
18  are asking.
19    Q.  Do you know why he's not here to
20  testify?
21    MR. COLLINS: Objection.
22    A.  No, I don't know.  I didn't even
23  know if he was supposed to come.  I'm sorry.
24    MR. BOCK: That's my last question.
25    MR. COLBERT: Okay.  I think -- I

Page 486

1  don't know if you have any redirect, but I
2  understand Mr. Whetstine can only do it right
3  now, so I think it would be important that we at
4  least take a break now, and get Mr. Whetstine on
5  the phone.
6    MR. COLLINS: Sure.
7    MR. COLBERT: All right.
8    (Pause in proceedings, phone call
9  placed to Chris Whetstine and his lawyer, Mr.
10  Roseta.)
11    MR. TYGART: I have got you on a
12  speakerphone in front of a USADA panel here in
13  the Justin Gatlin case.
14    MR. ROSETA: I have Chris Whetstine
15  here with me.  I'm going to put you on the
16  speakerphone here at my end.  If I lose you, why
17  don't you give me a call back.
18    MR. CAMPBELL: Who is that?  It's his
19  lawyer?
20    MR. ROSETA: Travis, can you hear me?
21    MR. TYGART: I can hear you.  Can you
22  hear -- okay.  I'm going to turn you over to the
23  chairman of the panel, Chairman Colbert.  This
24  is Rick Roseta, who I understand is Mr. Chris
25  Whetstine's attorney.

Page 487

1    And Rick, Chris is there with you as
2  well?
3    MR. ROSETA: Yes, sir, that's right.
4    MR. TYGART: All right.  I'm going
5  to turn you over to the chair of the panel.
6    MR. ROSETA: All right.
7    MR. COLBERT: Mr. Roseta, can you
8  hear me?
9    MR. ROSETA: I can.
10    MR. COLBERT: Okay.  You understand
11  that Mr. Whetstine is being called to testify in
12  this case, and to be examined by Mr. John
13  Collins to begin with, who is counsel for Justin
14  Gatlin.
15    But before we commence, I want you
16  to know we have a court reporter here, who will
17  take down everything that's asked and answered,
18  and she will also administer the oath before we
19  commence.  Is that all right?
20    MR. ROSETA: Yes, sir.
21    MR. COLBERT: Madam Reporter, would
22  you administer the oath?
23
24  WHEREUPON,
25    CHRIS WHETSTINE,

Page 488

1  the witness herein, having been first duly sworn
2  to state the whole truth telephonically,
3  testified on his oath as follows:
4
5    MR. COLBERT:  All right.  Mr.
6  Collins?
7    MR. COLLINS: I just have -- before
8  we get to questioning -- I have a housekeeping
9  issue I'd like to discuss with the panel, but I
10  need the people on the phone to hear.  I was --
11    MR. COLBERT: Well, first, can you
12  hear Mr. Collins?
13    MR. WHETSTINE: Yes.
14    MR. COLLINS: Mr. Whetstine, who is
15  not present, is in a room with his lawyer, and I
16  can't see what communications, if any, are
17  occurring, between Mr. Whetstine and his
18  attorney.
19    Yesterday, we had a witness testify,
20  but none of them were in the same room, and so
21  if a lawyer tried to communicate to the other
22  one, presumably, they would have done it on the
23  phone or something there, so, could we -- I
24  mean, if Mr. -- normally, a witness doesn't have
25  a right to have a lawyer object anyhow,

Page 489

1    Yesterday was a little bit of a special
2  circumstance, because it was the government.
3          But, maybe if he's going to advise
4  him to take the Fifth Amendment on something,
5  that would be appropriate, but short of that, I
6  don't think that there should be a whole lot of
7  communication between the witness and his lawyer
8  when it's not present and we don't see what's
9  happening.
10         And I'd ask that there be at least a
11 cautionary instruction. Obviously, that's the
12 best I can do under the situation. But it
13 certainly puts me at a distinct disadvantage.
14         MR. COLBERT: Well, let me -- let me
15 ask this, Mr. Roseta: If you have an issue with
16 any of the questions or you wish to instruct
17 him, would you please announce yourself on the
18 phone and state your objection to the question,
19 rather than just communicating to Mr. Whetstine
20 sort of off camera? Could you do that,
21 Mr. Roseta?
22         MR. ROSETA: Yes, I would be happy to
23 do that.
24         MR. COLBERT: All right.
25 Mr. Collins?

Page 490

1
2              EXAMINATION
3  BY MR. COLLINS:
4    Q.  Mr. Whetstine, this is John Collins.
5  I think you and I spoke briefly on July 10th,
6  you may recall?
7    A.  Yes, sir, good morning.
8    Q.  Good morning.
9         I would like to start, if you could
10 state your name and spell your last name for the
11 record.
12   A.  My name is Christopher Whetstine.
13 My last name is spelled W-h-e-t-s -- as in
14 Sam -- t-i-n-e.
15   Q.  Mr. Whetstine, have you ever met
16 Justin Gatlin?
17   A.  Yes, sir.
18   Q.  When did you first meet Justin
19 Gatlin?
20   A.  I first met Justin Gatlin after he
21 was injured in Mexico City in May of 2003.
22   Q.  Where did you meet him?
23   A.  In Portland, Oregon.
24   Q.  And you live in Eugene, though,
25 right?

Page 491

1    A.  Yes, sir.
2    Q.  And why was the meeting in Portland?
3    A.  I had received a phone call by the
4  director of global athletics, Mr. John
5  Capriotti, who asked my presence there in order
6  to solicit my cooperation in assisting Justin in
7  recovering from a significant injury that he had
8  sustained to his hamstring, and which
9  subsequently resulted in bringing me on board in
10 order to assist him in getting his career back
11 on track.
12   Q.  So you were called by Nike?
13   A.  Yes, sir.
14   Q.  Had you worked with Nike prior to
15 2003?
16   A.  No.
17   Q.  Had you worked with Nike athletes
18 prior to 2003?
19   A.  Yes, sir.
20   Q.  Who were some of the Nike athletes
21 you worked on?
22   A.  Oh gosh, I've worked with plenty.
23 Let's start with a list of probably the most
24 famous, beginning with my association at the
25 Prefontaine Classic, where I served as -- well,

Page 492

1  I did serve, up until recently -- as Director of
2  Athlete Support Services, which is an exclusive
3  Nike showcase event, a position I've held since
4  1995.
5         So, in '98, I was hired by Vector
6  Sports Management to work with their athletes,
7  which was predominantly Nike athletes, including
8  Marion Jones, C.J. Hunter, Michelle Collins,
9  LaTasha Colander, who is LaTasha
10 Colander-Richardson, at the time. Gosh, Jeff
11 Hartwig, the pole vaulter. Bob Kennedy. And I
12 have worked with Haile Gebrselassie, though he's
13 actually an Adidas athlete. I mean, the list of
14 elite superstars kind of goes on and on. Dennis
15 Mitchell, Christie Gaines, Kelli White.
16        Let's see, you need more names than
17 that?
18   Q.  No, that's fine.
19   A.  Okay.
20   Q.  You rattled off a number of names.
21 I don't know that I got them all.
22   A.  Would you like me to go through the
23 list again for you?
24   Q.  No. I was just going to draw your
25 attention to a few of these. You said C.J.

Page 493

1    Hunter?
2        A.   Yes, sir.
3        Q.   Michelle Collins?
4        A.   Yes.
5        Q.   LaTasha Colander. Kelli White. Was
6    it Christie Gaines?
7        A.   Yes, sir.
8        Q.   Marion Jones. Was -- Marion Jones
9    was on there, right?
10       A.   Yes, sir.
11       Q.   Other than Marion Jones, do you know
12   if all of those athletes tested positive or were
13   subject to the BALCO investigation?
14           MR. BOCK: I'm going to object.
15   Okay. Go ahead.
16           MR. TYGART: I just -- I mean, I'll
17   lodge it as totally irrelevant to this
18   proceeding. But, you know, I'm going to defer
19   to the panel. He's not our witness, so we're
20   not really going to run interference for any
21   questions, but it seems these other athletes
22   have some -- should have somebody here to stop
23   that sort of questioning when it's not relevant.
24           MR. COLLINS: I think all of them
25   were subject to USADA discipline, which is

Page 494

1    public record.
2            MR. COLBERT: Ask the question and
3    see what --
4        Q.   (By Mr. Collins) Okay. You can
5    answer the question.
6        A.   Could you restate the question,
7    please?
8        Q.   I was asking if you're aware -- I
9    believe Marion Jones has never had a USADA case
10   actually brought against her, but I think all
11   the other athletes have had, like, a USADA or --
12   back when USA Track and Field were doing it,
13   some sort of doping issue; is that correct?
14       A.   Bob Kennedy.
15       Q.   No, no, no. The names I read.
16       A.   Oh, yeah, a lot of them. The
17   preeminent athletes in the industry have had
18   accusations lodged against them over the years.
19       Q.   So when you, in 2003, when John
20   Capriotti brings you up, that's the first time
21   you get employed by Nike?
22       A.   Yes, sir.
23       Q.   Prefontaine is sometimes called the
24   Nike race, because Prefontaine was near and dear
25   to the founder of that Nike -- his name suddenly

Page 495

1    escapes me. But is that a Nike event, or does
2    that -- have its own entity; do you know?
3        A.   It's run by Northwest Events
4    Management. The coordinator of the event, the
5    meeting director, his name is Tom Jordan. He's
6    been the event director for 22 years, but it
7    is -- it's a Nike-sponsored showcase event as
8    the primary sponsor.
9        Q.   Okay. So after 2003, did you
10   continue to work for Nike?
11       A.   Yes, sir.
12       Q.   For how long?
13       A.   Up until the date of my injury, July
14   22nd, 2006, but my contract expired December
15   31st, 2006.
16       Q.   It was June 25th, or -6th? I'm
17   sorry. I missed --
18       A.   The date that I was assaulted in
19   Indianapolis was June 22nd, 2006.
20       Q.   Okay. But your contract ran through
21   the rest of --
22       A.   Yes, I was never -- yes.
23       Q.   When did you sign that contract?
24       A.   The contract was signed in June of
25   2005, retroactive to January 1st, 2005.

Page 496

1        Q.   Did anyone help you negotiate that
2    contract with Nike?
3        A.   I performed the contract
4    negotiations on my own with the assistance of
5    Renaldo Nehemiah. Renaldo Nehemiah, yeah, that
6    was then the person I went to.
7        Q.   Prior to signing the contract which
8    became effective January of '05, what was your
9    relationship with Nike? Did you have a contract
10   or some other arrangement?
11       A.   We had a verbal agreement. I worked
12   on a daily fee basis.
13       Q.   Do you recall what the daily fee
14   was?
15       A.   Yes, sir.
16       Q.   What was that?
17       A.   $350 a day, plus customary expenses.
18       Q.   How was the day part of that
19   calculated? Was that -- did you have to travel?
20   Did you have to see an athlete? Did you see one
21   athlete? I just don't -- I'm just trying to
22   figure that -- actually, let me strike that
23   question. I will try to be a little more
24   articulate.
25           When you were working with Nike, you

Page 497

1  worked with Justin Gatlin, correct?
2      A.  Yes, sir.
3      Q.  You also saw other athletes?
4      A.  Yes, sir.
5      Q.  What constituted a "day" to kick in
6  the 350?
7      A.  Well, a day could include -- you
8  know, it could run the gamut from driving to
9  Portland to work on Daniel Kipngetich Komen and
10  Eliud Kipchoge, who are preeminent and middle-
11  and long-distance athletes, as I did in 2006,
12  to -- I also worked with Alberto Salazar in the
13  Oregon Project -- to hopping on a plane and
14  flying 5,000 miles and getting off the plane and
15  promptly beginning a ten-hour day.
16      Q.  You refer to something known as the
17  Oregon Project?
18      A.  Yes, sir.
19      Q.  Could you explain what that is?
20      A.  Alberto Salazar, who is -- I guess
21  we would call him a legend in the industry --
22  came up with an innovative project, where he
23  brought preeminent -- well, developmental or --
24  and it was also open to higher-level athletes
25  where they were developing them for the

Page 498

1  marathon.  They would take 5,000-meter and
2  10,000-meter guys and kind of like a marathon
3  training school of sorts.  There's been much
4  written about --
5      Q.  That's the one that involves the
6  house where they seal it and suck the air
7  pressure out to 10,000 feet so it's like you are
8  living in altitude?
9      A.  Yeah, they did that to me once.
10      Q.  But that's part of the Oregon
11  Project?
12      A.  Yeah.
13      Q.  Now, what was your relationship,
14  what services would you perform for the
15  athletes?
16      A.  Are you speaking specifically of my
17  relationship with Alberto Salazar?
18      Q.  No, not an Oregon Project.  I'm
19  sorry.  Just generally, when you would treat an
20  athlete, what sort of services would you
21  provide?  I'm assuming it wasn't legal services
22  like I provide?
23      MR. TYGART:  Do you want to give some
24  sort of time frame?  I mean, just to try to get
25  this to the relevant issues.

Page 499

1      Q.  (By Mr. Collins) Since meeting
2  Justin Gatlin.
3      A.  Since meeting Justin Gatlin, what
4  was the parameters of my job description?
5      Q.  What services did you provide to
6  athletes?
7      A.  Massage therapy services.
8      Q.  What would that entail?
9      A.  Well, typically for me, it would
10  begin with evaluation of the video.  I would
11  collect all video that I could find to evaluate
12  the form and style of the athlete; discuss
13  certain postural and biomechanical issues with
14  the coach; evaluate the athlete on the track
15  from multiple angles, making sure to attend
16  every single practice; preparing the athlete
17  prior to practice, with various techniques,
18  generally, with a handful of athletes at that
19  point.  And then typically working on them after
20  or during, even, the session, and then following
21  up with therapy services, generally in the hotel
22  room or whatever venue we were at, after the --
23  and I would be speaking specifically of a day at
24  practice after the -- after the session was
25  over.

Page 500

1      Q.  Now, you talked about looking at
2  video and analysis and style and form.  You
3  weren't coaching these athletes, were you?  You
4  were looking for a different purpose?
5      A.  I'm not a coach, no.
6      Q.  Okay.  So what were you looking for
7  in the videos?  I'm just --
8      A.  Just problems, structural problems.
9      Q.  What kind of structural problem?
10      A.  Problems with heel-strike push-off,
11  mid-stance, drive-space-through-acceleration
12  problems; anything that pertains to the
13  discipline involved, any moments that pertains
14  to the discipline involved.
15      Q.  Okay, then, what would be the
16  problem?  I'm not sure I understand.
17      A.  I think maybe this is beyond your
18  scope, but I will try to answer it for you in
19  layman's terms.
20      When someone runs, they will --
21  generally, they will break it down into a series
22  of what you'd say events within the discipline,
23  like block-clearance-to-drive phase, drive phase
24  to acceleration, you know.  And so then they
25  would practice these things over and over again.

## Page 501

1    Quite a fascinating process, because
2  you are dealing with, you know, obviously, let's
3  say the top .01 percent of humanity. And so you
4  will watch these people, and you will gauge them
5  at the moment of fatigue. And you have to have
6  a keen eye to be able to discern what is going
7  wrong, attempt to correct it, convey that to the
8  coach so that he can assist the athlete in
9  providing him with training cues that can help
10  him to overcome that barrier once the
11  physiological obstruction is removed.
12    Q.  Okay. I think I understand now.
13  What you are saying is you would look and see if
14  there was a certain movement he was doing, he
15  was doing it in some way that caused the stress
16  on his body as opposed to whether it was slowing
17  him down? Is that an accurate summary of what
18  you are saying?
19    A.  I guess so.
20    Q.  Okay. You said you would work on
21  after and during practice. What sort of work
22  would you perform?
23    A.  Well, whatever was required or
24  requested by the athlete.
25    Q.  Can you be a little more specific?

## Page 502

1    A.  Oh, I'm sorry.
2    It would typically begin with the
3  athletes stretching or doing some light drills.
4  And then they would come over to the table for
5  what's a -- a series of movements that I perform
6  that are -- fall loosely under the title of
7  "active-isolated stretching," to -- well, they
8  would run, that would take, from active-isolated
9  stretching if we didn't have any -- if there
10  were no problems to confront, to addressing the
11  particular problem; let's say, if an athlete
12  came to me, and he said, you know, my right
13  hamstring is really tight, and maybe we need to
14  take an extra look at this today to see what's
15  going on.
16    Q.  And if someone said their hamstring
17  is tight, what would you do?
18    A.  Once again -- well, let's see. I'm
19  going to try to just keep this as simple as
20  possible. I would perform an evaluation on the
21  client, and then use the techniques, from -- it
22  would generally be a very quick session from,
23  you know, various types of stretching techniques
24  to palpation techniques to help relieve the
25  stress on whatever structure was affected.

## Page 503

1    Q.  Did you do things more than just
2  stretching?
3    A.  Massage, if required.
4    Q.  And what would the massage entail?
5    A.  Generally kneading, pétrissage,
6  effleurage, cupping, active-isolated stretching,
7  most of it generally with -- you know, they will
8  have their warmup gear on, so they are trying to
9  get their muscles as hot as possible, so they
10  don't generally expose it to the open air, so
11  most of it's -- most of that's done with their,
12  you know, with their tights on and stuff like
13  that, so you are a little bit limited in your
14  techniques.
15    Q.  That's when you are at the practice,
16  right?
17    A.  Yeah.
18    Q.  That's not the case when you are
19  giving them in your room?
20    A.  Oh, no.
21    Q.  Would you -- did you use anything to
22  assist you in your massages?
23    A.  A table.
24    Q.  That's it?
25    A.  A rope.

## Page 504

1    Q.  A table and rope. Anything else?
2    A.  No.
3    Q.  What about when you are in the room?
4    A.  Table, rope, gel, lotion, cream.
5    Q.  Any machines?
6    A.  Yes, sir.
7    Q.  What machines would you use?
8    A.  I was trained by Nike in the Tecar
9  machine, which is an RFI machine that we were
10  exposed to in Rome in 2005. They had a trainer
11  work with me on the road through the remainder
12  of 2005. A trainer from the company accompanied
13  me to various meets, worked with me, trained me
14  to -- on how to use the machine properly.
15    And then I followed up with an
16  extensive two-week training session in October
17  of 2005, where I was given a one-on-one -- well,
18  not a one-on-one. There was two instructors --
19  well, three instructors, actually, working with
20  me eight hours a day, in order to give me an
21  advanced certification for the application of
22  techniques using this technology.
23    Q.  What is a Tecar machine? Explain it
24  to somebody like myself.
25    A.  I'm going to have a little bit of a

Page 505

1  hard time doing that right now, because it's a
2  little complicated. I would have to direct you
3  to their Web site, Tecar.com.
4          As you know, I received a head
5  injury, and it's really hard to -- it's kind of
6  hard to explain. So I don't think I'm going to
7  be able to adequately explain that even to a lay
8  person.
9      Q.  In just 40,000-foot description, you
10 know. I'm not asking for the fine engineering
11 of it.
12     A.  Oh, it would get warm.
13     Q.  So it just gets warm?
14     A.  Yeah.
15     Q.  So it's kind of like a hot rock?
16     A.  No, it's not a hot rock, sir.
17     Q.  Well, does -- it must do something
18 more than just get warm.
19     A.  No, it doesn't. It gets warm. That
20 is a 40,000-foot description of what you are
21 asking for.
22     Q.  Maybe I had you a little too far
23 away. Maybe we need to zoom a little closer.
24         What is it doing that they -- you
25 know, I find it hard to believe that Nike had

Page 506

1  someone accompany you for the season, sent you
2  to two weeks' extensive training where you met
3  for hours a day with three instructors to get
4  training for something that just gets warm?
5      MR. TYGART: But, John, I mean, just
6  to try to move this along; in fairness, you
7  asked him how the machine works. It sounds like
8  a complex machine. Why don't you ask him how he
9  operates the machine on an athlete when he's
10 using it? Isn't that what you really are after?
11     MR. COLLINS: I want some idea of
12 what it's delivering to the athlete. He said
13 it's warm. I assume it's something more than
14 warm.
15     A.  In layman, what you feel is warm,
16 and it helps loosen up tissues.
17     MR. COLBERT: This is Edward Colbert.
18 Can I ask a question: You used the expression an
19 RFI machine. Can you tell us what you mean by
20 RFI?
21     A.  Radio frequency.
22     MR. COLBERT: So it uses radio waves?
23     A.  Yeah.
24     Q.  (By Mr. Collins) So it would be
25 somewhat similar to an ultrasound machine?

Page 507

1      A.  I mean, if you are doing your
2  40,000-foot leap, I guess so, but, no, it's not
3  anywhere close to an ultrasound machine.
4      Q.  Do you know how expensive this
5  machine was?
6      A.  Nike said it was a 25,000 Euros
7  machine.
8      Q.  Now, you said you used gels,
9  lotions, and creams. Can you describe those?
10 Let's start with the gels.
11     MR. TYGART: And again, just for
12 efficiency purposes, can we set some foundation
13 of when he used different creams and lotions?
14     MR. COLLINS: We already set the
15 foundation since Justin Gatlin.
16     MR. COLBERT: I think that's correct,
17 and the witness able to identify gels, liquids,
18 and creams, and identify any ones he uses, and
19 if you want to follow up about if they've
20 changed over time, you can do that. But why
21 don't we just get a list of them first.
22     MR. TYGART: Just so I'm clear, you
23 are talking about any gels, lotions, or creams
24 that were used on Justin Gatlin after he started
25 working with him in May of 2003?

Page 508

1      MR. COLLINS: No, just that he was
2  working with generally. I'm trying to get some
3  general idea of what he does, and I think I
4  narrowed it to gels the first time.
5      MR. COLBERT: Why don't we just get a
6  listing of them, and follow up.
7      Q.  (By Mr. Collins) Could you list the
8  gels you've used since 2003?
9      A.  Do you want me to tell you
10 everything I used?
11     Q.  Sure.
12     A.  Okay. I used a product called
13 Graston Technique. It's a mineral,
14 beeswax-based emollient. I began to use this
15 after 2003, because as I traveled
16 internationally, the problem that I found is
17 that when you are working on the
18 African-American population, the tendency of the
19 body to absorb lotion or oil is greatly
20 increased. And it just became a weight problem.
21 And so when you put a beeswax mineral oil -- not
22 a beeswax mineral oil, but basically -- you can
23 look up Graston Tech on-line, and you use that
24 as like a nonpermeable sort of base.
25         And then I would use Biotone

## Page 509

1  Advanced Therapy Massage Gel -- it's called
2  massage gel -- and it's basically a massage oil.
3  And that's the product I settled on after using
4  various Biotone products, a company by whom I'm
5  sponsored. And I settled on the Advanced
6  Therapy Massage Gel because you could use a
7  lighter application, and once again, that would
8  diminish the amount that I would have to carry
9  on these extensive trips that I would have to
10  take.
11        As well, dating back to 1998, under
12  the express direction of Trevor Graham, I was
13  instructed to use Voltaren cream, and that was
14  to be used immediately -- this started with
15  Marion Jones -- immediately on the athlete
16  post-competition. It's an anti-inflammatory
17  product that is sold over the counter in Europe,
18  and later, I found in Mexico as well.
19        And let's see. I used the Tecar
20  products, two of the Tecar products from the
21  Italian: the Tecar gel; and then there's a --
22  kind of like a -- I don't know if you would call
23  it a balm. I gave out -- I gave samples of all
24  of this stuff from -- actually, it was from the
25  bags that I was using, to Justin Gatlin's

## Page 510

1  investigators straight from my bags that I was
2  using at nationals, when they visited my house
3  in July of 2006, yeah, last year, 2006.
4        Hold on a second. Biotone, Graston
5  Tech, Voltaren cream, the Tecar gel plus the
6  balm. That's it.
7     Q.  Okay. Now, you indicated you tried
8  to use some that absorbed a little less because
9  African-Americans absorb more frequently because
10  of the weight? I'm not sure -- then later you
11  said it had to do with how much you had to
12  carry.
13        Are you indicating that you would
14  bring a big volume of this stuff? Is that what
15  I was to understand?
16     A.  Of the Graston Tech? No, I would
17  bring a very small amount of that. I would
18  take maybe, you know, a dab of it, and you could
19  basically cover the whole, you know, whatever
20  you are working on. If the person is small,
21  it's the anterior portion of the thigh and lower
22  extremity, or the reverse being true if they're
23  flipped over.
24        And you can use a very small amount
25  of it, and it would provide a non -- I don't

## Page 511

1  know if a nonpermeable, but a less permeable
2  surface; then apply the oil, so that you could
3  get the proper viscosity required to complete
4  the job without having to go over to the pump
5  over and over and over again.
6        And, you know, then you are going to
7  be searching around for, you know -- you know,
8  new lotion, and then you are going to be buying
9  stuff that's off-the-shelf. And, you know, you
10  don't want to be doing that, because you don't
11  know what the product is, you don't know its
12  viscosity, you don't know ultimately its
13  content, you know, because we have -- we're
14  very, very cautious and very careful about
15  things like that.
16        I mean, I'm not only very particular
17  about the product I use. I started out just
18  using olive oil, if you want to know the truth
19  -- of course, extra virgin. But I would use
20  just olive oil. And of course, when we're at a
21  hotel, you can get that out of the kitchen when
22  you run out, but -- of course, that stains your
23  clothing, so -- I'm kind of just running far
24  afield here.
25     Q.  Okay. So it's safe to say you would

## Page 512

1  run out of this stuff fairly often?
2     A.  No, not at all. That's my point, is
3  I used the Graston Tech a base so I wouldn't.
4     Q.  But you would still, over the course
5  of a year, you would have to refill several
6  times?
7     A.  Oh, over the course of the year?
8     Q.  Yeah.
9     A.  Between my practice and my trips on
10  the road?
11     Q.  Yeah.
12     A.  Oh, yeah.
13     Q.  About how often?
14     A.  Well, running out is relative. I
15  mean, Biotone sends it to me by the gallon.
16  Graston Tech, we buy it by the case. You don't
17  run out. You buy it a year's worth, or, you
18  know, in the case of Biotone, gosh, I have got
19  products I have had to give away to the sports
20  clubs that I managed the therapy staff for
21  because we were worried that the product was
22  going to get out of date.
23        Excuse me. I now want to add two
24  more products to the list of products that I
25  used. I did not include Biofreeze products,

Page 513

1  which is both the PROSSAGE heat product, and the
2  Biofreeze, whether it be in the Biofreeze spray,
3  roll-on or gel.  Typically, we preferred the
4  spray or the roll-on because it's also, once
5  again, a product that you can stain your
6  clothing with.  And when we're on the road, you
7  are sensitive to that, because of how much
8  clothing you can carry and when you can get to
9  the laundry and issues like that.
10      Q.  When you say you wouldn't buy off
11  the shelf, were you mixing your own stuff?
12      A.  No.  It was sent to me by the
13  company.  You order direct.
14      Q.  Now, you said you were sponsored by
15  a company.  Other than Nike, what company
16  sponsored you?
17      A.  I was sponsored by a number of
18  companies.  Impact, which is the maker of
19  vibrocusser, which is, you know, vibrocusser,
20  it's an impact tool, it's a massage tool, kind
21  of like a vibrating tool.
22      Biotone, Biofreeze, Nike, PowerBar.
23  I'm on PowerBar Team Elite, where I advise the
24  staff on athlete -- their athlete roster,
25  distribute products at events.  I made sure that

Page 514

1  I would take pictures of athletes that were
2  sponsored by them, so that they could get
3  their -- you know, get the pictures to the
4  athlete, so they could send them in to PowerBar,
5  so they could get their -- you know, there's
6  contracts -- there's little bonuses that they
7  use, stuff like that.  So those are the
8  companies.
9      Q.  When you say you are sponsored by
10  them, you receive compensation from those
11  companies?
12      A.  I receive -- most of it is product
13  in-kind, except for my relationship with Nike,
14  of course, which was financial.
15      Q.  And then the product in-kind you
16  received, you used on the athletes in different
17  places and used in your regular business?
18      A.  Yes, sir.
19      Q.  And you would get it in large
20  volume?
21      A.  Well, they would send it to me in
22  large volumes for particular sporting events.
23  And so that's what I would refer to as, you
24  know, like, what I use in my practice, I would
25  have a one-gallon pump bottle, you know, that

Page 515

1  would typically -- I mean, that would, of
2  course -- as you can imagine, that would last
3  forever.
4      And then they also sent me lots of
5  products for distribution, as I was the director
6  of athlete support services for the Nike
7  Prefontaine Classic, as I mentioned earlier, as
8  well as distributing their product on the road
9  to other, to other -- well, athletes and massage
10  therapists along with product information.
11      Oh, and I was also sponsored by
12  StrongLite, who made a special table for me,
13  that would be less of an encumbrance in airport,
14  you know, weight and baggage, with a specially
15  built table for me.
16      Q.  Your regular practice, your non-Nike
17  practice, you were making $350 a day with Nike.
18  What would you make in your normal practice?
19      MR. CAMPBELL: I think it was 850, he
20  said, a day.
21      MR. COLLINS: 350.
22      MR. CAMPBELL: It was 3?
23      A.  At which point in time?
24      Q.  Say 2003.
25      A.  Oh, I would work, you know, anywhere

Page 516

1  from three to six sessions a day, which could
2  include anywhere from 5 to 8-plus hours' worth
3  of work.
4      Q.  What would your compensation be for
5  a day, then?
6      A.  I think in 2003, my rate was $70 per
7  session.  It's since gone to 80.
8      Q.  Do you know when it went to 80?
9      A.  I can't tell you specifically, no.
10      Q.  So the 350, you gave me an estimate
11  of three to six sessions a day and $70 a day, so
12  the 350 a day you are getting from Nike roughly
13  would roughly equal what you are making in your
14  practice?
15      A.  Roughly.
16      Q.  And do you have a pretty busy
17  practice?
18      A.  Yes, sir.
19      Q.  In 2003, 2004, generally, working
20  five days a week?
21      A.  Well, with the travel schedule,
22  during the season of travel, it was difficult.
23  I mean, you're kind of in a -- it places a
24  therapist with a private practice in a difficult
25  situation, because you're attempting to maintain

Page 517

1  contact with your client base, but nonetheless,
2  how can you do that when you are traveling
3  internationally?
4       That's what finally precipitated the
5  contract negotiations between myself and Nike,
6  because I had found when I was doing the numbers
7  that I was just losing way too much money by
8  having this job. The numbers weren't working
9  out. I would generally end up with some slow
10 time that just wasn't commensurate for a person
11 of my skill level.
12      Q. Approximately how many days a year
13 in 2003 -- how many days a year in 2003 were you
14 on the road? Do you know?
15      A. No, I don't know. I don't know.
16 Every -- I don't know.
17      Q. How about 2004?
18      A. Whew, probably 110.
19      Q. And in 2004, you were getting the
20 350 a day from Nike?
21      A. Yes.
22      Q. And you also had -- other than 110
23 when you were back, you had some income. I
24 understand you had some slow times, but you had
25 some income too at home?

Page 518

1       A. Yes.
2       Q. And any idea of approximately how
3  much you were working back in your practice?
4       A. Well, according to my family, too
5  much. I was supposed to take some downtime. I
6  don't know. I'm just editorializing. I don't
7  know. I can't tell you truthfully.
8       Q. Approximately the same amount as you
9  did with the days on the road?
10      A. Oh, no, my days on the road were
11 typically 10-, 12-hour days.
12      Q. No, I mean out of the 365 days in
13 the year, you spent 110 of them on the road in
14 2004, you are estimating. Do you think you
15 worked another 110 at home in your private
16 practice?
17      A. I don't know. I'm not going to
18 guess.
19      Q. Okay. How about 2005? How many
20 days on the road?
21      A. Probably a hundred -- more than 100.
22 It's my estimation.
23      Q. Okay. Did you ever provide any
24 chiropractic treatment to athletes?
25      A. No.

Page 519

1       Q. Did you ever provide acupuncture?
2       A. Yes.
3       Q. When did you start doing that?
4       A. Just a couple of times in 2006.
5       Q. Who did you practice that with?
6       A. Justin had a hamstring problem, and
7  we sought relief from that from some -- I
8  think -- I can't remember where it was, but it
9  was -- I think it -- maybe it was Osaka. And he
10 found that that worked very well for him. And a
11 couple of other times, they showed me something
12 very specific to do that would work with him.
13      Q. Who showed you?
14      A. The professionals, the
15 acupuncturist.
16      Q. Are you a licensed acupuncturist?
17      A. No, sir.
18      Q. Are you a licensed massage
19 therapist?
20      A. Yes, sir.
21      Q. Is a licensed massage therapist
22 authorized to do acupuncture?
23      A. No, sir.
24      Q. But you did it anyhow?
25      A. Yes, sir.

Page 520

1       Q. Now, did different treatments that
2  you would give athletes change over time?
3       A. Yes, sir.
4       Q. Do you recall a change in your
5  protocol from 2005 to 2006?
6       A. No.
7       Q. Do you recall using a new machine in
8  2006?
9       A. The machine was introduced in 2005.
10      Q. And that's the Tecar machine?
11      A. Yes.
12      Q. You talked about different gels and
13 creams and stuff. Did you start using any new
14 gels or creams in 2006?
15      MR. COLBERT: Mr. Whetstine, did you
16 hear the question?
17      MR. WHETSTINE: I didn't. No, I
18 didn't.
19      MR. COLBERT: Ask your question
20 again.
21      Q. (By Mr. Collins) In 2006, did you
22 use any new or different gels, creams, or
23 lotions?
24      A. I answered that. I said no.
25      Q. So the creams and lotions you used



Page 521

1  in 2006 are the same ones you used in 2005?
2      A.  Yes, sir.
3      Q.  You indicated a number of your
4  substances you buy directly from the
5  manufacturer; is that correct?
6      A.  Yes, sir.
7      Q.  What about Voltaren cream, do you
8  buy that directly from the manufacturer?
9      A.  No.
10     Q.  Where do you buy Voltaren cream?
11     A.  Over the counter in Europe, and it's
12 also, as I found out, available in Mexico.
13     Q.  You speak Spanish, correct?
14     A.  "Sí."
15     Q.  Bueno.
16         (Laughter.)
17     Q.  Have you purchased Voltaren in
18 Mexico?
19     A.  Yes, sir.
20     Q.  Do you know when?
21     A.  Yes.  Specifically, I went to the
22 pharmacy with Randall Evans in our trip to
23 Monterrey, Mexico, in May of 2004.  And I would
24 like to note at that time, I watched the witness
25 Randall Evans buy pure testosterone.

Page 522

1      Q.  So you bought Voltaren cream in
2  Mexico in 2004.  Is that the only time you
3  bought Voltaren cream in Mexico?
4      A.  Yes.
5      Q.  Where in Europe would you buy it?
6      A.  You try to get it in Switzerland
7  because -- I have spoken to a doctor there, and
8  he said that there's two different types of
9  Voltaren.  One of them is -- it's called
10 Emulgel.  And if you are familiar as I'm certain
11 you probably have done research on this since
12 taking this case, that's more of a -- well, to
13 differentiate the Emulgel, from a Lipigel, which
14 the doctor explained to me that the absorption
15 rate of the Lipigel is much higher, and so in a
16 situation like where we're at, where you want to
17 apply the Voltaren on the athlete and have a
18 high absorption rate, you'd use the Lipigel.
19         But you try to get it -- you try to
20 get it in Switzerland.  And we -- you know,
21 there's meets in Switzerland, from a -- you
22 know, Lausanne and Zurich, and so, typically,
23 that would be the preferable place.
24         But, you know, anywhere you go, you
25 want to -- on instruction from, you know, my

Page 523

1  associate, Mr. Graham and billed directly to
2  Nike, I was purchasing Voltaren regularly at
3  many places in Europe.
4      Q.  So how would you bill it directly to
5  Nike when you were buying it?
6      A.  Under the terms of my contract.
7  Under reasonable expenses.
8      Q.  Okay.  So it wasn't like there was a
9  bill for Voltaren being sent from the store to
10 Nike.  You were paying for it at the store.
11     A.  Yes.
12     Q.  You were just getting reimbursed by
13 Nike?
14     A.  Yes, sir.
15     Q.  And would you buy this in similar
16 quantity, or would you have to buy this multiple
17 times?
18     A.  Well, you know, it's not real cheap,
19 and I was paying for it myself prior to
20 reimbursement, so, you know, I would buy as much
21 as I could afford, I mean, 10 tubes, 15 tubes,
22 if I could get it.
23     Q.  How long would a tube last?
24     A.  Post race, you could use up a tube
25 on three athletes.

Page 524

1      Q.  So, what about in practice?  Would
2  you use Voltaren ever other than just after a
3  race?
4      A.  You know, if the athlete's
5  experiencing, you know, like tightness,
6  inflammation, we would use it.  Typically, when
7  you have your -- you know, sadly enough, we have
8  to stratify our clientele, and you will have
9  your top-tier athletes, and then your -- I hate
10 to say that, but second-tier athletes.  You want
11 to treat them all fairly, but in all reality, if
12 you have two tubes of Lipigel and two tubes of
13 Emulgel, you are not going to put your Lipigel
14 on your second-tier athletes.
15         I don't know if that addressed your
16 question, but, you know, those are just the
17 problems of life on the road.
18         But, you know, we would -- if Justin
19 requested, if Justin was saying that he felt
20 tightness and soreness and because of his
21 stride-length pattern, and lower-extremity
22 extension during his acceleration phase, which
23 is, you know, something that is absolutely
24 incredible to watch.  He put himself at a lot of
25 risk for injuries to his hamstring, and quite

Page 525

1 often complained of, you know, problems in those
2 associated areas.
3        Q.  So if you could run out of a tube
4 on, say, three athletes after a race, if you
5 gave three athletes treatment before a race, you
6 could presumably again run out of a tube?
7        A.  Well, you wouldn't have as generous
8 of an application, if you are in the treatment
9 room.  When you are dealing with it in a
10 post-event setting, you know, you are typically
11 contending with more fabric.  You know, the
12 athlete is going to pull up their tights, let's
13 say, and then you apply the cream while they're
14 standing, and then, you know, they'll like --
15        Let's give a typical example.  I
16 mean, I have done this probably 100 times, where
17 the athletes would just have their tights on,
18 and typically, you want to get to the athlete --
19 and it's my instruction to get to the athlete as
20 quickly as possible and apply the substance to
21 them.  They would typically have their tights
22 on, but, you know -- like, say, in Helsinki or
23 something where it's 58 degrees and raining out.
24 Of course, the athlete is going to get their
25 tights back on immediately after running.

Page 526

1        But as you can see, what would be
2 inherent -- an inherent problem with that
3 situation is that when the athlete then pulls
4 their tights back down over their legs, there's
5 going to be some absorption of the Lipigel into
6 the fabric of their clothing, and so you need to
7 accommodate for that.
8        And, you know, so that is the only
9 difference there.  So that would affect the
10 amount of distribution.  I can't tell you by
11 what percentage, but certainly you could see how
12 that would affect the distribution of the
13 product.
14        Q.  You have indicated a couple of times
15 now, your pattern and you're saying since 1988,
16 since learning it from Trevor Graham was that
17 you would greet an athlete, or try to get an
18 athlete as soon as possible after a race?
19        A.  Yes, sir.
20        Q.  So you wouldn't -- say that athlete
21 was being sent to doping or had a press
22 conference, you wouldn't wait till after the
23 press conference, you would get to them right
24 after the race?
25        A.  Yes, sir.

Page 527

1        Q.  And that was always your practice?
2 Did you hear me?
3        A.  Yes, sir.
4        MR. COLBERT:  Could you answer the
5 question, again?  I'm sorry, we had an
6 interruption here.
7        A.  Yes, sir.
8        Q.  So your answer is yes, that that was
9 always your practice from 1998 on?
10        A.  Absolutely.
11        Q.  Now, if you are buying 10 to 15
12 tubes at a time, and you could use a tube on
13 three athletes, you had to be buying Voltaren
14 cream fairly frequently, correct?
15        A.  As much as I could afford, as often
16 as I needed to, yes.
17        MR. ROSETA:  Counsel, this is Rick
18 Roseta.  Mr. Whetstine just indicated to me that
19 he would like to go ahead and go use the
20 restroom.  Would that be permissible, if I just
21 leave the line open, and we take a couple of
22 minutes?
23        MR. COLBERT:  It's fine.  How much
24 does Mr. Whetstine -- time does he need?  Five,
25 ten minutes?  What does he need?  We will take a

Page 528

1 similar break here.
2        MR. ROSETA:  Whatever you would like
3 to do.  I just wanted to let you know --
4        MR. COLBERT:  It's actually certainly
5 permissible, Mr. Whetstine.  Shall we say we'll
6 be back -- is five minutes sufficient?
7        MR. ROSETA:  Sure.  Do you want to
8 recall me, or do you want me to just leave --
9        MR. COLBERT:  Let's leave the line
10 open.
11        MR. TYGART:  Can you see if they have
12 any time concerns on their end?
13        MR. COLBERT:  I guess the next
14 question I'd have is:  Do you have any time
15 concerns with regard to -- I know it's about
16 8:00 in the morning your time?
17        MR. ROSETA:  Yes.  Yes, it is.
18        MR. COLBERT:  Is there any particular
19 time concern you would have over the next hour
20 or so?
21        MR. ROSETA:  Only if Mr. Whetstine
22 gets too tired.  He is --
23        MR. COLBERT:  That's fine.  If
24 Mr. Whetstine is tired at some point and wants
25 to take a short break, just let us know.

Page 529

1    MR. ROSETA: Okay. We'll do that.
2  Why don't we take a break, then, for him to
3  relieve himself, and we can come back. I will
4  let you know when we're ready to go.
5    MR. COLBERT: That's fine. Thank you
6  very much.
7    (Brief recess taken.)
8    MR. ROSETA: Mr. Whetstine is back
9  and ready to go, if you'd like.
10   MR. COLBERT: I will call the other
11 parties in. Thank you.
12   (Brief recess taken.)
13   MR. COLBERT: We're back on the
14 record, Mr. Whetstine. Is it Whet-stene
15 (phonetic) or Whet-stine (phonetic)?
16   MR. WHETSTINE: Whet-stine
17 (phonetic). Thank you.
18   MR. COLBERT: Thank you.
19   Q. (By Mr. Collins) Now, I think we
20 left off where you indicated that you would run
21 out of these tubes fairly often, and you'd have
22 to -- you would purchase as many as you could,
23 when you could, what you could afford, and it
24 was fairly often.
25   To follow up on that, what would

Page 530

1  happen when you ran out of Voltaren cream in the
2  U.S.? Where would you purchase it?
3    A. Well, I try -- you don't. You try
4  and make sure and have enough.
5    Q. So there's never a time where you
6  ran out while you were in the U.S.?
7    A. Possibly, but not that I recall.
8    Q. Did you ever buy any over the
9  Internet?
10   A. No, sir.
11   Q. Have you ever bought any substances
12 from a company called BioMart?
13   A. No, sir. Until today, I have never
14 even heard of this company.
15   Q. When you were at a meet, you would
16 carry your materials in a bag?
17   A. Yes.
18   Q. Would you have all your materials in
19 a bag, or would some be in the room, some be in
20 a bag? How would that work?
21   A. Well, I was taught very early on by
22 Trevor Graham to keep all my materials under
23 very close observation -- this was in the late
24 '90s -- and as well, to help safeguard, you
25 know, the athletes' stuff as well, because as we

Page 531

1  travel, we would not only be responsible for our
2  own stuff, but when the athlete goes to compete,
3  you have to safeguard their bag, and you know,
4  you'll have, let's say, five athletes and three
5  people. Of course, Trevor can't carry all of
6  the bags, so, you know, they would be -- that's
7  it.
8    Q. So you worked with Trevor Graham for
9  a long time?
10   A. Off and on for ten years.
11   Q. And you are friends with him?
12   A. Well, golly, I thought I was.
13   Q. "I thought I was," is that referring
14 to some of the allegations he's made since
15 Justin has tested positive?
16   A. Yeah. I mean, in 2006, I would have
17 to say it was probably the best year in our
18 relationship that we had ever had. We would go
19 on long walks together, talked about politics,
20 religion, he showed an immense amount of concern
21 for Justin Gatlin in trying to keep him on
22 focused and on track, so that we could attain
23 our goal.
24   And, finally, you know, having come
25 from a situation where I had terminated my

Page 532

1  relationship with Marion Jones twice, I really
2  felt that we had hit our stride, that we were a
3  solid team, and that everything was going
4  fantastically, and especially when we were
5  rewarded with the world record. Just we were on
6  top of the world.
7    Q. Oh, in 2006, the world record?
8    A. Yeah, in Doha?
9    Q. So you don't recall a time in late
10 2005, early 2006 where Sprint Capitol was
11 advertising on its Web site for a new massage
12 therapist?
13   A. Well, I never checked their Web site
14 for the posting, of course. I had a job.
15   But, as I understand, it was later
16 claimed by Trevor Graham that he had run some
17 posting, although in all fairness, he had told
18 me that it was all Renaldo Nehemiah was
19 conspiring and attempting to influence Justin to
20 replace me. And it was quite a seed of
21 animosity that had developed between Renaldo and
22 Trevor, after Renaldo had counseled Trevor -- or
23 excuse me, counseled Justin and commented
24 publicly about his association with a known drug
25 coach.

Page 533

1    Q.   Now, you, in your last statement,
2  you said something to the effect that Trevor
3  Graham says -- well known Renaldo Nehemiah is
4  trying to replace me.
5        When you used the word "me," were
6  you referring to what Trevor Graham was saying
7  about Trevor Graham, or was that "me," Chris
8  Whetstine?  I wasn't sure I understood that
9  quote.
10    A.   Well, it has always been, as I --
11  you know, it was paramount in my contract with
12  Nike to make that a very distinct separation.
13  And I guess I'm alluding to the confusion that
14  Trevor Graham suffered from thinking that I
15  worked for him.  And in my reassociation with
16  the sport of track and field -- I came back from
17  working on the PGA tour after I had left Marion
18  for the second time prior to World Championships
19  in 2001 -- that I would never work for an
20  athlete directly.  I mean, I worked for Ben
21  Crane, but when it came down to a group setting
22  such as this, I would never work for an athlete.
23  I would definitely never work for Trevor Graham.
24  And sometimes things became a bit contentious in
25  reinforcing that point to Mr. Graham.  And I

Page 534

1  believe that is the episode that you are
2  referring to here.
3        Q.   Well, actually, I'd asked a
4  different question than that.
5        A.   Oh, I'm sorry.  What was that?
6        Q.   You had just given a statement
7  saying that Trevor Graham had said it was all
8  Renaldo Nehemiah trying to replace me, and when
9  you used the word "me," I didn't know if you
10  were using that as what Trevor Graham had said,
11  so Trevor Graham said it was all about Renaldo
12  trying to replace Trevor, or if Renaldo
13  Nehemiah, when the Web -- because we were
14  talking about the Web posting on Sprint Capitol.
15  So is it your testimony that Renaldo Nehemiah
16  was trying to replace you, Chris Whetstine, or
17  was Renaldo Nehemiah trying to replace Trevor
18  Graham?
19        A.   You are being very confusing.
20  You're trying to say Trevor is advertising for a
21  replacement of Trevor on his Web site?
22        Q.   No, I'm trying to understand a
23  statement you made.  I will try it again.  Okay.
24  You learned about -- you didn't look at the Web
25  site, but you learned that Sprint Capitol was

Page 535

1  looking for a massage therapist, correct?
2        A.   Yeah.  I had phone calls --
3  conversations with Trevor Graham, and he
4  explained to me how he was fiercely attempting
5  to protect my job against the vicious attempts
6  by Renaldo Nehemiah to usurp his power over
7  Justin and influence Justin to no longer work
8  with me.
9        Q.   Okay.  When you said "me" there, you
10  are saying --
11        A.   I'm talking about a fellow named
12  Chris Whetstine, the guy you're talking to.
13        Q.   Okay.  That was what I --
14        A.   I'm sorry if I'm not being clear
15  enough.  It seems to make perfect sense to me.
16  But I'm sorry, I will be more clear.
17        Q.   Thank you.  So Renaldo was trying to
18  replace you?
19        A.   That's not what Renaldo said.
20        Q.   Okay.  What did Renaldo say?
21        A.   I don't know that he actually
22  commented.  He -- I don't think that he actually
23  specifically commented on the issue.
24        Q.   Renaldo is a friend of yours,
25  though, right?

Page 536

1        A.   Yes.
2        Q.   Because he had negotiated your
3  contract with Nike?
4        A.   Well, he helped me.  Like I said,
5  again, I would have to say, I thought Renaldo
6  was my friend as well.  I recognized both him
7  and Don Quarry as, you know, greats.
8        When I came into the business in
9  '98 -- I mean, you have to understand my
10  history.  I was born and raised here in Eugene,
11  Oregon.  And I was raised as a little kid who
12  would stand outside the fence at Hayward Field
13  and, you know, watch the Prefontaine on the
14  track.  And I wasn't reading the baseball
15  scores.  I was reading Edwin Moses and Renaldo
16  Nehemiah, completely in awe of the sport,
17  complete with my own tube of Shoe Goo, and
18  repairing my old Adidas over and over again, you
19  know, just a typical running kid from Eugene.
20        And so I found very few people that
21  I enjoyed more than speaking with Renaldo
22  Nehemiah, and attempted to develop a
23  relationship with him, wherein if an athlete,
24  you know, ever asked me for advice about what
25  agent, you know, they might consider, I would

Page 537

1 always make sure and let them know that I felt
2 that Renaldo Nehemiah was a person who I felt
3 was fair, credible, and a person of good
4 integrity.
5     Q.  Okay.
6     A.  Unfortunately, however,
7 Mr. Nehemiah --
8     Q.  I think you have answered my
9 question.
10     A.  You don't want to hear the end of
11 it?
12         MR. COLBERT: I would like to hear
13 the end of it.  This is Edward Colbert.
14     A.  Oh, at the last conversation that I
15 had with Mr. Nehemiah seemed to echo the tone of
16 when I was -- I will use the word "threatened"
17 by both Trevor Graham and Justin Gatlin -- or
18 working together, in August of 200- -- yeah, in
19 August of 2006, he made a similar comment to me
20 as Justin and Trevor had done.  And I think it
21 was in December.
22         And when he said, Well, what are you
23 going to -- what are you going to do to help out
24 Justin Gatlin?  As if he was also asking me to
25 become the fall guy for whatever has happened

Page 538

1 here in this unfortunate circumstance.
2     Q.  Do you know if that was done by
3 e-mail or by phone?
4     A.  It was done by phone.
5     Q.  Okay.  You don't recall an e-mail in
6 December of 2006 from Renaldo Nehemiah telling
7 you he wanted you to just tell the truth,
8 whether it was good or bad for Justin, whatever
9 came out, just tell the truth?
10     A.  I don't recall, but I believe that's
11 what I'm doing right now.
12     Q.  But you said you felt that you were
13 threatened by Renaldo Nehemiah?
14     A.  It felt threatening.  It felt like
15 after, you know -- you have to understand, sir,
16 I was beaten severely as a result of this.  And
17 subsequent to that, I was contacted by both
18 Mr. Graham and Mr. Gatlin on the same day in an
19 attempt to -- they were colluding in an attempt
20 to get me to sign an affidavit with the promise
21 of paying me off in order to take the fall for
22 this.
23         And when I heard Mr. Nehemiah speak
24 words echoing that same sentiment and tone,
25 well, it -- that stuff scares me.

Page 539

1     Q.  Now --
2     A.  I've made no further contact with
3 Renaldo Nehemiah since that time, because of the
4 nature of his comments.
5     Q.  Now, you claim that -- you just
6 claimed in that answer that Justin Gatlin and
7 Trevor Graham threatened you and tried to buy
8 you off.
9         As I understand, you have also
10 produced to the federal government and USADA
11 copies of text messages from Justin Gatlin.
12     A.  Yes, sir.  I have produced copies of
13 text messages, the phone calls from Trevor
14 Graham of the same day, as well as a phone call
15 of September 21st, 2006, wherein Justin Gatlin
16 claimed that he knew exactly what this
17 conspiracy was all about, that he knew why
18 Llewellyn Starks had beaten me up, and claimed
19 that I had colluded with John Smith, Emanuel
20 Hudson, Llewellyn Starks, and a couple of other
21 guys -- and I'm now quoting verbatim from his
22 communication to me -- and that the truth would
23 soon be told.
24     Q.  All right.  Those text messages were
25 not sent in September, were they?

Page 540

1     A.  They were sent August 6th or 7th,
2 the same day that -- hours after Trevor had
3 contacted me on -- it would be August 6th or 7th
4 of 2006.
5     Q.  Are you aware that prior to Justin
6 Gatlin sending those text messages, Trevor
7 Graham had informed him that you were willing to
8 come clean and say what you had done, but you
9 were worried that you might get sued by Justin?
10     A.  No.
11     Q.  Does Justin in those text messages
12 use -- you know, when you ask him what he wants
13 you to do, he says to tell the truth, is that in
14 those text messages?
15     A.  After he said he won't hurt me or my
16 family.
17     Q.  Well, a lawsuit which would hurt
18 your finances would hurt you, wouldn't it?
19     A.  Excuse me?
20     Q.  Would a lawsuit against you hurt
21 your finances and put you in jeopardy, that
22 would hurt you, wouldn't it?
23     A.  I guess so.  I'm under no threat of
24 any lawsuits.
25     Q.  I want to go back a little bit.  You

## Page 541

1  talked about how you would be protective -- or
2  that Trevor Graham had told you to watch over
3  your stuff closely --
4      A.  Yes, sir.
5      Q.  -- at a meet.
6          Is it possible that anybody ever got
7  access to your bag?
8      A.  No.
9      Q.  So it was never out of your sight?
10     A.  Oh, it's been out of my sight, yes.
11     Q.  But no one could get access to it?
12     A.  Anything is possible, but I would
13  say if you were to take a cross-section of
14  people, I would say that I'm extremely
15  professional.  When I leave my room, I make sure
16  all of my stuff is secured.  When I'm in an
17  environment where other athletes and spectators
18  are, I keep a very close watch over my stuff.
19  And I'm -- so was I being careful as I possibly
20  could be?  Yes.
21     Q.  Now, you indicated that your routine
22  didn't change much with respect to cheating
23  athletes -- or didn't change at all, I believe
24  was your testimony, from 2005 to 2006, correct?
25          MR. ROSETA: Would you restate that?

## Page 542

1  It didn't come through.
2      Q.  You previously indicated that his
3  routine of working with the athletes did not
4  change at all between 2005, 2006 -- or be more
5  specific, that he would come up to the athletes
6  immediately after the race.  That's what Trevor
7  Graham had instructed him in '98, and that
8  remained his procedure through 2006?
9      A.  Up to the very last time I worked on
10  Justin Gatlin.
11     Q.  Okay.  Was it always part of your
12  procedure that you would then rub stuff on the
13  back of their knees and then on their inner
14  thighs?
15     A.  To include the back of the knee and
16  the inner thigh, the front of the thigh, and the
17  anterior and posterior, lower extremity as well.
18     Q.  Now, you indicated that you kept
19  tight controls over your materials, so if
20  Randall Evans were to have said that he looked
21  in your bag and saw a bottle that said "BioMart"
22  on it, he would not have had that opportunity?
23     A.  Randall Evans would be lying.
24     Q.  If Justin Gatlin said he looked in
25  your bag and saw a bottle that said "BioMart" on

## Page 543

1  it, would he have not had that opportunity to do
2  that?
3      A.  That would also be a complete
4  fabrication.
5      Q.  So if he said he looked in your bag
6  in Indianapolis with another person in the room,
7  that would be a complete fabrication?
8      A.  Randall Evans came into my room
9  after I had been beaten.
10     Q.  I was asking about Justin Gatlin.
11  I'm sorry.
12     A.  Oh, about Justin Gatlin?  Oh, I
13  mean, sir, there's no BioMart.  All this
14  BioMart, I don't know what you are talking
15  about.  It does not exist.
16     Q.  You're not aware that there's a
17  BioMart company in China, in Shanghai, China,
18  that makes a number of substances including
19  testosterone, human growth hormone, and other
20  substances?
21     A.  No, I have no knowledge.
22     Q.  You have been to Shanghai?
23     A.  Yes, sir.
24     Q.  Now, do you recall asking Justin
25  Gatlin for a bonus at the end of the 2005

## Page 544

1  season?
2      A.  No, I asked Renaldo Nehemiah.
3      Q.  But you were being paid by Nike at
4  the time?
5      A.  Yes.
6      Q.  Are you aware that based on your
7  asking for this bonus, it caused friction with
8  the Gatlins and Nike?
9      A.  No, I have no knowledge of that.
10         My -- my employer never brought it
11  up to me.  And there is a clause in my contract
12  that if I ever engage in any unprofessional
13  behavior, that my contract is subject to
14  immediate termination.
15     Q.  So if someone -- if someone was to
16  testify that when they notified John Capriotti
17  that you had asked for a bonus and John
18  Capriotti got all upset, that person would be
19  making it up?
20     A.  I'm not saying that.  I was saying I
21  would be surprised if John Capriotti hadn't
22  immediately called me and said -- and made his
23  concerns known to me.
24     Q.  And you are saying that John
25  Capriotti never called you to say there was a

Page 545

1    concern about you asking for a bonus?
2        A.   None.
3        Q.   So based on that, you believe that
4    John Capriotti was never notified of you
5    requesting that bonus?
6        A.   I can't comment on that.
7        Q.   Now, you have had some prior legal
8    issues, haven't you?
9        A.   Yes, sir.
10       Q.   You have got a marijuana conviction?
11       A.   Yes, sir.
12       Q.   And it was not just for use, it was
13   for unlawful manufacture of a controlled
14   substance?
15       A.   Yes, sir.
16       Q.   It was unlawful delivery of a
17   controlled substance.
18       A.   Yes, sir.
19       Q.   That was a while ago, like, '93?
20       A.   Yeah, I was like 27 years old.  I'm
21   43 now.
22       Q.   Now, you have also been disciplined
23   by the sanctioning or servicing -- the state
24   agency that oversees massage therapists for
25   engaging in conduct that would endanger the

Page 546

1    health, safety of a client or the public,
2    correct?
3        A.   Yes, sir.
4        Q.   Now, you are aware that you are
5    under oath today, correct?
6        A.   Yes, sir.
7        Q.   And you are aware that you have to
8    tell the truth, right?
9        A.   Yes.
10       Q.   And anytime you are under oath, you
11   have to tell the truth, correct?
12       A.   Yes.
13       Q.   You haven't always told the truth
14   when you are under oath, have you?
15       A.   Excuse me?
16       Q.   You have not always told the truth
17   when you are under oath, have you?
18       A.   I don't know what you are referring
19   to, sir.
20       Q.   So, you have been involved in a
21   custody battle for a number of years, correct?
22       A.   Two years.
23       Q.   So earlier today you testified under
24   oath that in 2005 and 2004, you were well over
25   100 days on the road?

Page 547

1        A.   Yes, sir.
2        Q.   Do you recall filing an affidavit on
3    or about March 3rd of 2006, in the state of
4    Oregon, Circuit Court of State of Oregon for
5    Lane County in the matter of Christopher Thomas
6    Whetstine and Theresa Marie Keene in which you
7    stated that you, in this affidavit, that you
8    limit your international travel to 60 days per
9    year?
10       A.   I don't recall.
11       Q.   So if you put that in an affidavit,
12   that would be a false statement under oath,
13   correct?
14       A.   Let's -- you know, if you need me to
15   go back and look at my overall travel dates, we
16   may find that on -- in those years, specifically
17   the dates when that happened, when that
18   affidavit was written, that that was the case.
19       I know that as my -- as my work
20   increased for Nike, and I'm now including --
21   well, if we could parse it out and separate the
22   trips that I would take to the Oregon Project
23   wherein I would take my son with me and he would
24   spend the night with me in the Oregon Project,
25   you can probably account for about 20 days a

Page 548

1    year there, so I guess let's subtract that from
2    the affidavit, we can begin the math there.
3        And beyond that, I think this is a
4    game of semantics, but I want to assure you that
5    I in no manner, shape, or form am attempting to
6    not tell the truth here or at that time.
7        Q.   Okay.  Now, in that same affidavit,
8    you indicated that you only earn $10,000 from
9    your private practice; is that correct?
10       A.   Yes, sir.
11       Q.   But didn't you indicate here that
12   you make approximately $350 a day, and you
13   worked approximately 100 days in your private
14   practice?
15       A.   Yes, sir.
16       Q.   Doesn't that add up to a number much
17   bigger than $10,000?
18       A.   Yes, sir.  You would have to discuss
19   my tax accounting with my tax accountant and the
20   strategies that they use to reduce a single
21   employee.  But, you know, I'm a -- I'm starting
22   to get tired here -- a single -- whatever you
23   call me, you know?  A guy that works with his
24   Social Security number.
25       Q.   Okay.  Well, let's --

Page 549

1    A.   When it all works out --
2    Q.   Well, in 2005 you made over a
3  hundred --
4    A.   -- the net and the gross are
5  different, you know, and -- as well as expenses.
6    Q.   Now, you indicated in 2004, you were
7  on the road, that was the year of the Olympics,
8  and I think when I asked how many days you were
9  traveling, went, whew, well more than 100 was
10  something like your answer, correct?
11    A.   I would -- you know, it seems in
12  retrospect, yes, that it was more than 100.
13    Q.   Now, at the end of 200- -- and you
14  were making $350 a day when you traveling in
15  2004, correct?
16    A.   Yeah. Yes.
17    Q.   And that was just with Nike,
18  correct?
19    A.   Yes.
20    Q.   And you had a business in 2004 at
21  home that you were also making and generating a
22  lot of revenues by seeing patients,
23  approximately $350 a day when you saw clients
24  there too, correct?
25    A.   Not generating a lot of revenue.

Page 550

1  Quite typically, I would come home, fall down,
2  and get back up when it was time to go on the
3  road again. You have no idea how exhausting
4  this job is; typically, fly halfway across the
5  world, anywhere from, you know, 4 days to 12
6  days, and then turn around and fly home, have a
7  five-day, six-day, ten-day layover and turn
8  around and fly back.
9    Q.   So you are wanting to change your
10  testimony earlier today where you said you were
11  working regularly at home. Now, you weren't
12  regularly at home; is that the change you want
13  to make to your testimony?
14    A.   Working regularly, but not as much.
15    Q.   Okay. Well, you previously
16  indicated you were working approximately the
17  same.
18         Regardless, you filed for bankruptcy
19  at the end of 2004, correct?
20    A.   Yes, sir.
21    Q.   And in 2005, you filed your
22  statement of financial affairs with the
23  bankruptcy court, correct?
24    A.   Yes, sir.
25    Q.   And you were to be honest and

Page 551

1  truthful in that, correct?
2    A.   Yes, sir.
3    Q.   And you reported income of only
4  $24,000 on that statement. That's not a true
5  statement, is it?
6    A.   I don't have the form in front of
7  me, sir.
8    Q.   But if you represented on that form
9  that you filed $24,000, would that be a true
10  statement?
11    A.   I did not attempt to lie in the
12  bankruptcy proceeding.
13    Q.   You just intended to underrepresent
14  what you were making.
15         Correct?
16         I -- I will withdraw the question.
17    A.   I do not want to respond to
18  inflammatory questions.
19         THE REPORTER: I didn't hear that.
20  I'm sorry.
21    Q.   You need to repeat your answer.
22    A.   I said, I do not want to respond to
23  inflammatory questions.
24         THE REPORTER: Thank you.
25    Q.   So you are refusing to answer that

Page 552

1  question?
2         MR. COLBERT: You have withdrawn your
3  question.
4         MR. COLLINS: I withdraw it.
5         MR. COLBERT: You've withdrawn it.
6    Q.   (By Mr. Collins) All right.
7         Now, you indicated Trevor Graham was
8  a good friend of you, and you were getting along
9  as well as you had ever gotten along in 2006.
10  You enjoyed talking politics and going on long
11  walks, correct?
12    A.   Yes, sir.
13    Q.   So why would you represent to
14  somebody that working with Trevor Graham was
15  like being the white man walking into the cotton
16  field?
17    A.   To whom did I say that?
18    Q.   It's been represented to me -- are
19  you saying you never made that statement?
20    A.   I do not recall making that
21  statement.
22    Q.   Okay. Do you recall making the
23  statement that when this talk of a conspiracy
24  that you were involved in was all about a black
25  man's conspiracy. Do you remember making that

7-30-07 to 8-01-07                    USADA vs. GATLIN

139 (Pages 553 to 556)



Page 553

1    statement?
2        A.  I don't recall.
3        Q.  Do you recall making a statement
4    that there's this emerging middle class of
5    blacks.  They get their piece of the pie and all
6    they can see is where they came from.
7            Do you remember making that
8    statement?
9        A.  Yes.  This came from my association
10   and reading about the emerging Mexican middle
11   class culture that's been widely documented, and
12   the fears that have been represented in that
13   culture through their -- well, through the
14   eradication of the Mexican middle class through
15   the inflation of the '80s and early '90s, which
16   eradicated that class, and just trying to -- you
17   know, as I worked with this group, I tried to
18   read and try to come up with some sort of
19   historical perspective in order to understand
20   what it was that I was really involved in,
21   because, after a few years, I began to
22   understand that a little white kid from the
23   Pacific Northwest was quite a bit different than
24   a person who has been raised in the South under
25   circumstances which I could in no way

Page 554

1    comprehend.
2        Q.  Now, we started this with you
3    recalling talking to me briefly on the phone on
4    July 10th, 2007, three weeks ago today, correct?
5        A.  Yes, sir.
6        Q.  Do you remember at the end of that
7    conversation saying to me, "John, you sound
8    white like me, you are probably a good guy"?
9        A.  I think I said -- yeah, yeah, I said
10   that.
11           MR. COLLINS:  I have nothing further.
12           MR. COLBERT:  Mr. Bock or
13   Mr. Tygart?
14
15           EXAMINATION
16   BY MR. TYGART:
17       Q.  Mr. Whetstine, this is Travis Tygart
18   with the U.S. Anti-Doping Agency.  I'm going to
19   ask you a few questions.  Can you hear me okay?
20       A.  Yes, I can.
21           If you guys don't mind, I have been
22   up since 3:00 this morning with a severe
23   migraine headache, and I would like to take just
24   a very short break.  I don't want to delay your
25   proceedings.  I want to make this as expedient

Page 555

1    as possible, but I would just like to take
2    about, maybe a three- to five-minute break in
3    order to just --
4            MR. COLBERT:  Mr. Whetstine, this is
5    Edward Colbert.  You are certainly entitled to
6    take a break.
7            MR. WHETSTINE:  Thank you, sir.
8            MR. COLBERT:  And I think the time to
9    take it would be now before the cross commences.
10   Do you want to take five minutes, is that
11   enough?  Or do you need more?
12           MR. WHETSTINE:  I really don't want
13   to delay these proceedings any more.  I want to
14   get this over with.
15           MR. COLBERT:  Why don't we say we'll
16   take about five minutes, and as we did before,
17   we'll wait for your attorney to tell us on the
18   phone when you are ready to go.
19           MR. WHETSTINE:  Okay.  That would be
20   great.  I appreciate that.
21           MR. COLBERT:  Surely, Mr. Whetstine.
22           MR. WHETSTINE:  Thank you, sir.
23           MR. COLBERT:  Meanwhile, we will
24   leave the line open.
25           (Brief recess taken.)

Page 556

1            MR. ROSETA:  Counsel?
2            MR. COLBERT:  Hang on.  Yes, hold it,
3    hold it.  Hello, Counsel?
4            MR. ROSETA:  Mr. Whetstine is ready
5    to go, if you would like to continue.
6            MR. COLBERT:  All right.  I will get
7    everybody in the room.  Thank you.  I just had
8    to run over to the microphone there.
9            (Brief pause in proceedings.)
10           MR. COLBERT:  We'll begin in about
11   30 seconds, gentlemen.  We're gathering
12   everybody back into the room.
13           All right.  Mr. Bock or Mr. Tygart?
14   Mr. Tygart.
15
16           EXAMINATION
17   BY MR. TYGART:
18       Q.  Thank you.
19           Mr. Whetstine, this is Travis Tygart
20   from USADA.  I'm going to ask you a few
21   questions.  Can you hear me okay?
22       A.  Yes, sir, I can.
23       Q.  And I just have a few.  You
24   testified earlier after the world record was set
25   that you all were on top of the world.  Is that

## Page 557

1 accurate?
2    A.   Yes, sir.
3    Q.   And what do you mean by you all were
4 on top of the world?
5    A.   Well, it is the realization of any
6 athlete's dream to break a world record, and of
7 course, the marquee event being the 100 meter,
8 when you consider how far we've come, we've
9 taken a guy who has fallen down on the track and
10 had a very serious hamstring injury.  We've
11 worked very hard in rehabilitation with him
12 trying to develop -- not only rehabilitate his
13 injury, but help develop his focus, you know,
14 the sense of community and everything that we
15 had, it just kind of felt like, you know, it was
16 kismet at that moment.
17          We were -- what can I say?  We were
18 so happy on that trip.  I mean, Trevor and I
19 probably spent a total of eight to ten hours,
20 you know, out walking, you know, every morning,
21 before daybreak.  We went fishing in the Persian
22 Gulf together.  We -- it was fantastic.  And of
23 course to culminate with the world record after
24 all of our hard work, it just felt that we had
25 done everything right.  And after my painful

## Page 558

1 experiences with Marion Jones, and having the
2 opportunity to come back and work for the
3 company and have all the ducks placed in a row
4 and stay in a row, it was a great feeling,
5 Mr. Tygart.
6    Q.   And when you say "we all" were on
7 top of the world, who were you referring to,
8 when you say "we all"?
9    A.   Well, you know, when I say "we all,"
10 I consider everybody involved in this project.
11 You know, of course, Justin Gatlin, who is, in
12 my opinion, an incredible athlete, a very nice
13 person.
14          I would like to interject, I'm very
15 saddened -- I was crushed when I heard of this
16 positive test.
17          Let me just collect myself here for
18 a second.
19          When I say that, I'm referring to
20 everyone, beginning with Justin Gatlin and
21 ending with Justin Gatlin, but including Trevor
22 Graham, Randall Evans, Renaldo Nehemiah, the
23 generous support that we received from Nike, and
24 I guess, me.  And exactly -- you know, there's a
25 little story.  I was pretty inspired by the

## Page 559

1 events that had happened, and I had a -- it just
2 so happened -- a connection to the Wheaties
3 corporation --
4          MR. COLLINS: Is there a question
5 pending?
6    A.   -- and the people who designed their
7 boxes.  And I designed a special box wherein I
8 took a picture of the world record and placed it
9 on the box with a generous amount of copy on the
10 back describing the 9.85 and what was then was
11 the 9.76, and luckily, right before we went to
12 print, we got to amend it and change it to 9.77,
13 but with, you know, I guess, a generous copy on
14 the back.
15          And I presented this commemorative
16 box, which was a miniature Wheaties box that was
17 encased in Plexiglas, and I presented it to Tim
18 Phelan, Llewellyn Starks, John Capriotti, those
19 three being the team that I worked with from
20 Nike; Renaldo Nehemiah, Justin Gatlin, and then,
21 of course Trevor and Randall.
22          It was -- it was very special, you
23 know.
24    Q.   What was the time frame when you had
25 that Wheaties box commemorated?

## Page 560

1    A.   Well, we began work on the project,
2 of course, after the world record.  What was the
3 date after the world record, May?
4    Q.   May 12th?
5    A.   So we had to get it done between --
6 well, of course, May 12th, I'm in Doha, so it's
7 kind of hard to work from there, but between --
8 from May 12th to probably June 7th, we had to,
9 you know, overcome the obstacles of the -- well,
10 that's the time frame when it happened, and, of
11 course, there were some glitches along the
12 way --
13    Q.   And were there --
14    A.   -- because we decided to change the
15 world record to 9.77 from --
16    Q.   Were there -- Mr. Whetstine, were
17 there costs for that, to produce that Wheaties
18 box?
19    A.   What is that?
20    Q.   Were there costs to produce that
21 Wheaties box?
22    A.   Yes, sir.
23    Q.   And who paid for those?
24    A.   I did.
25    Q.   You yourself?



Page 561

1    A.   Yes.
2    Q.   Did you get reimbursed for doing
3  that?
4    A.   Oh, no, this is something I did to
5  commemorate the event for my team.
6    Q.   Okay.  You spoke with the federal
7  government about this case as well; is that
8  right?
9    A.   Yes, sir.
10    Q.   Did you tell them anything
11  inconsistent with what you have said here today?
12    A.   No.
13    Q.   And you also spoke with
14  investigators from Mr. Gatlin's team; is that
15  right?
16    A.   Yes, sir.
17    Q.   Did you provide any products to
18  Mr. Gatlin's investigative team?
19    A.   Yes.  I provided them with every
20  single product that I've described to you here
21  today.
22        I have to have, you know, the caveat
23  here that I have a head injury, and at the time,
24  when they showed up unannounced, I was suffering
25  terribly and descending into this -- sort of

Page 562

1  this -- whatever we're going to call it, this
2  post-concussive -- you know, I was really hurt.
3  So when I say I gave them everything, I gave them
4  that I gave them the Voltaren.  I gave them the
5  products from the Italians.  I gave them the
6  Graston Tech.  I gave them the Biotone, and I
7  would imagine I offered them the Biofreeze and
8  the Biotone as well.
9        But I'm having some recollections as
10  to their saying, well, we don't need those.  But
11  I don't know if they actually took those two
12  products, but to my recollection, that that
13  stuff came right out of the bag that I used at
14  Nationals.
15    Q.   Okay.  Do you have any knowledge of
16  how Justin Gatlin tested positive?
17    A.   None, sir.
18    Q.   Did you apply any prohibited
19  substances to Mr. Gatlin?
20    A.   No, sir.
21    Q.   Did you apply testosterone cream to
22  Mr. Gatlin?
23    A.   No, sir.
24        MR. TYGART: I don't have any further
25  questions.

Page 563

1        MR. COLLINS: I don't have anything.
2        MR. COLBERT: Do you have any?
3        MR. CAMPBELL: Mr. Whetstine, yeah,
4  you had -- this is Chris Campbell.  I'm one of
5  the arbitrators.
6        MR. WHETSTINE: Hello.
7        MR. CAMPBELL: Can you hear me okay?
8        MR. WHETSTINE: Yes, I can hear you
9  fine, sir.
10
11        EXAMINATION
12  BY MR. CAMPBELL:
13    Q.   All right.  I think you had
14  testified earlier that there was offers of
15  bribes made to you, is that correct, to testify
16  about giving Mr. Gatlin the drug?
17    A.   Well, what had happened was on
18  August 7th, I was in a physical therapy
19  appointment.  I have had surgery on my right
20  hand, and the list of injuries that I sustained
21  to my body, not just the head injury, but my
22  body here, are extensive.  And I had surgery on
23  my right hand.
24        So anyway, I was in my physical
25  therapist's office, and Trevor Graham began to

Page 564

1  phone me and phoned me several times.  And in
2  that conversation, he began to engage me and
3  threaten me with a lawsuit, telling me that they
4  had evidence on me.  They knew what I had done.
5  It was time for me to come clean, that Justin
6  Gatlin had an affidavit ready for me to sign,
7  and that if I were to do so, that they would
8  then take care of me.
9        While Mr. Graham was attempting to
10  be careful in the conversation, also, including
11  indicating to me that he was not recording that
12  phone conversation, it was very clear to me what
13  he was saying.  He was telling me that if I were
14  to take the fall for this unfortunate
15  circumstance, that I would be paid off in return
16  for providing that cooperation.
17        Later on that evening, I began
18  receiving text messages from Mr. Gatlin that I
19  did provide to the federal government and USADA,
20  trying to continue this conversation, and
21  soliciting me, using -- he was saying, you know,
22  I know how much you love your son, and I want
23  that too, and all I love to do is run, and do
24  the right thing, and only you can set it right,
25  and keep it between you and me and Trev for now,

Page 565

1  and these sort of things, I won't hurt you and
2  your family.
3      That was clearly indicating that I
4  was being threatened by these guys and being
5  solicited to collude with them to engage in an
6  attempt to take the fall in exchange for some
7  monetary gain.
8      Now, what I did with that
9  information was I immediately contacted the
10  federal government to ask them, you know, what
11  it is that I'm supposed to do in response to
12  that. And they immediately wanted to come up,
13  and I guess we'll use the word -- you know, I
14  grew up in Watergate days -- "wire tap," but,
15  you know, surveil and be in my home for a period
16  of like three days; and they would be up
17  tomorrow, which would have been -- whenever -- I
18  think it was a Tuesday, that would have been
19  Wednesday.
20      The Gatlin camp was in New York. I
21  am led to believe that that was the first
22  physical contact that Trevor and Justin had been
23  able to make with each other, and that's when
24  the plan was hatched, because they were supposed
25  to provide some sort of documentation that

Page 566

1  Friday -- maybe it was to you guys, which I
2  guess would put us on the 10th -- maybe it was
3  to you guys, I guess you would have to look at
4  your calendar, but the federal government
5  certainly knew what I was talking about, and
6  they wanted to surveil for three days.
7      My doctor said absolutely not. And
8  so quite truthfully, out of my concern for
9  Justin Gatlin in that he may have been being
10  unduly influenced by Mr. Graham, we contacted --
11  and I say "we," through my counsel -- contacted
12  his attorneys and let them know what Justin was
13  doing, and to save Justin from what I figured
14  was being induced by the federal government for
15  whatever rubric this sort of activity would fall
16  under.
17      I also made a second phone call to
18  Justin Gatlin's attorney, in an attempt to help
19  quiet him, after the September 21st phone call,
20  wherein he indicated to me that there was a
21  conspiracy that I was involved in, that he knew
22  why Llewellyn Starks had beaten me up, that I
23  was acting in concert with Emanuel Hudson, John
24  Smith, and a couple of other guys. And that's
25  kind of running on, but I want to be complete

Page 567

1  and truthful in my answer, and that pretty much
2  covers what happened.
3      Q.  Other than what you have just
4  testified to, is there any other evidence that
5  would suggest that they were -- that either
6  Trevor Graham or Justin Gatlin were trying to
7  bribe you?
8      A.  No, that was the extent of the
9  contact.
10      The only other thing that worried me
11  was finally, after so much cooperation that I
12  had given them, Renaldo Nehemiah flat-out asked
13  me: So what are you going to do to help Justin
14  Gatlin?
15      And the echo of that inflection and
16  tone reflecting back to the incidents I have
17  just described, made me suspicious, and I
18  terminated all contacts with Renaldo,
19  understanding that we weren't a team anymore.
20      Q.  And I don't know if you are free to
21  testify to this, but what caused your fight with
22  Llewellyn Starks?
23      A.  I have no idea. What happened
24  directly preceding the fight, my girlfriend and
25  I had gone out -- I worked a ten-hour day, and

Page 568

1  we had gone out and encountered him at a
2  location. And he was extremely intoxicated, and
3  my girlfriend witnessed him receive a phone call
4  where he -- you know, we were in a bar, and she
5  could -- she was at the opposite end -- you
6  know, he took the call at the opposite end of
7  the bar. This was the same day that USATF -- we
8  later find out that USATF and Nike and the
9  Gatlin people met together, and he yelled
10  "what?" I mean, really loud.
11      I was speaking with Mark Wetmore at
12  the time, and Debbie -- I mean, we have all
13  been, you know, pretty close. We have worked
14  together for quite awhile. And Debbie was
15  visibly concerned about Llew and interjected in
16  my conversation with Mr. Wetmore, "What's wrong
17  with Llew?" To which I commented flippantly,
18  "Honey, Llew is drunk."
19      After that, she decided it would be
20  the best course of action due to his behavior,
21  that we walk him home.
22      And along the way, he became
23  agitated and further agitated, and I wasn't
24  engaged in conversation with him, Debbie was.
25      She was quite disturbed by his

7-30-07 to 8-01-07                    USADA vs. GATLIN

143 (Pages 569 to 572)

Page 569

1  behavior. And he had -- he finally turned to me
2  and said: I know what you have done. I know
3  what you --
4       I'm going to paraphrase: I know
5  what you did to the athletes. I know what
6  you've done. You are fucking the Nike athletes.
7  You are fucking -- I'm sorry for the language --
8  is that okay to drop the F-bomb here?
9       MR. COLBERT: That's -- you are
10  giving quotes, that's fine.
11       A. Okay.
12       He said: You are -- I know what you
13  did. You are fucking Nike athletes. You are
14  fucking Nike. We're sick of you from the top
15  down. You are being fired. And I'm in charge
16  of finding your replacement.
17       I didn't respond to him. He
18  repeated that same diatribe verbatim. You have
19  to understand the man was extremely intoxicated,
20  and he repeated it again.
21       I voiced my disapproval of his
22  comment, and he attacked me.
23       Q. What was he referring to, "I know
24  what you have done"; do you have any ideas?
25       A. Well, I didn't at the time.

Page 570

1       After the investigators showed up in
2  late July and then the news broke, Debbie and I
3  looked at each other, and it was kind of an
4  "aha" moment, and we put two and two together.
5  And then after we read Jeanette Gatlin's quote
6  in the paper referring to the meeting that took
7  place within hours of the assault that took
8  place upon me, it seemed to make -- it seemed
9  more than coincidental.
10       Does that fully answer your
11  question?
12       Q. Yeah, I think it does.
13       MR. COLBERT: All right.
14       Sam?
15
16       EXAMINATION
17  BY MR. CHERIS:
18       Q. Okay. My name is Sam Cheris. I'm
19  one of the other arbitrators. Could you please
20  give me the background on what the issue was
21  with regard to the sanction that you received
22  from the State of Oregon?
23       A. Well, I'm prohibited by the terms of
24  the settlement to speak about the particulars of
25  the case, you know, involving what happened and,

Page 571

1  you know, the name of the person, et cetera.
2  But I can characterize it.
3       It was a frivolous lawsuit that was
4  brought by me that required some investigation
5  by our board, and I was advised by my counsel
6  that instead of spending thousands and thousands
7  and thousands of dollars to fight this, that
8  they would be willing to settle for the most
9  minimal of sanctions against me in order to step
10  away. And so we went with that course of
11  action.
12       Q. Okay. Not very helpful. Okay.
13       A. I'm sorry. I'm prohibited by the
14  rules of the agreement we entered into with the
15  State from describing any of the particularities
16  of the case, and I'm reticent to violate that.
17  I would like to be more helpful.
18       Q. Did the case have anything to do
19  with the utilization of any substances with
20  regard to a client?
21       A. No.
22       It more has to do with a client who
23  showed up distressed and didn't get better, and
24  since they didn't get better and they'd always
25  gotten better before, that it must be my fault.

Page 572

1       I will go out on a limb. It
2  correlated very closely to a death in the
3  person's family. And other professionals
4  examined the individual and determined them --
5  that it was -- that I was foolish to continue to
6  help them, and that I had damaged myself by
7  continuing to help this person who probably
8  needed to see a counselor more than they needed
9  to see me. And I really am going out on a limb
10  there. But I will provide that information.
11       Q. You were asked to give a bonus --
12  you asked to get a bonus from Renaldo Nehemiah?
13       A. Yes. When we were in Yokohama in
14  2006, I had a professional meeting with Renaldo
15  wherein I discussed the possibility of a
16  consideration -- I offered up for consideration
17  the idea of having his client consider bonusing
18  me.
19       I mean, we had experienced a great
20  deal of success, as well published in the papers
21  and seen on television, and, you know, we had
22  the world -- I mean, we were, the world
23  championships, gold medals in the Olympics. I
24  mean, I just offered up the idea. I put it in
25  his hands.

Page 573

1      Q.  Were you an employee of Mr. Gatlin?
2      A.  Was Mr. Nehemiah an employee of
3  Mr. Gatlin?
4      Q.  No, were you?
5      A.  Oh, no. I'm a sole contractor for
6  Nike.
7      Q.  For Nike.
8         You were in need of money at that
9  time? Your finances weren't very good?
10     A.  That was not what prompted the
11  solicitation of the idea to Mr. Nehemiah. It
12  just seemed reasonable, given the degree of
13  success that we had. He bonused another member
14  of the camp.
15        It's not uncommon for people of the
16  caliber of Michael Johnson, Marion Jones, people
17  like that, to show appreciation to their staff,
18  and one of the ways to do that is to bonus the
19  athletes, you know, much like you receive a
20  Christmas bonus. And Renaldo had been bonused,
21  Randall had been bonused.
22        And I asked Renaldo if he would
23  engage Mr. Gatlin professionally to ask about
24  the consideration of a bonus. It was by no
25  means a demand. It was done very

Page 574

1  professionally. It was not discussed with
2  Mr. Gatlin. I do not consider that
3  professional. It was only discussed with
4  Mr. Nehemiah.
5      Q.  How did you feel about the fact that
6  you were rebuffed and not given any bonus?
7      A.  I don't think that "rebuffed" is the
8  correct term. I mean, I was employed by Nike.
9  It was an idea that was floated across the
10  table.
11        And of course, I was -- would I be
12  happier if someone bonused me? Yes. But did it
13  change the course of my behavior? In no way did
14  it change that.
15     Q.  When you heard of Justin Gatlin's
16  positive tests, what came to your mind as the
17  possibility of how this occurred?
18     A.  I had no idea. I had no idea how it
19  could have occurred.
20     Q.  Did you do any introspection as to
21  whether anything you did might have
22  inadvertently caused this?
23     A.  Well, I knew that nothing that I did
24  would have inadvertently caused it.
25     Q.  Did you sit down with Mr. Gatlin or

Page 575

1  Mr. Nehemiah or Mr. Graham and say, Let's
2  brainstorm as a team and try to figure out what
3  this is?
4      A.  Absolutely. I worked together with
5  Justin Gatlin's investigators to begin with. I
6  gave them a -- well, after I -- when they showed
7  up, I called Justin to make sure that they
8  weren't posing as someone else. They had
9  indicated to me that they were working with the
10  federal government, which did not turn out to be
11  true. But, aside from that mistruth, they were
12  working with Justin, and that was good enough
13  for me.
14        And I was not well at the time, but
15  I gave them a five- to six-hour interview at my
16  home, wherein I provided them a full history of
17  what I had done, a description of all of my
18  techniques, provided them with samples straight
19  out of my materials, my -- you know, the
20  recent -- the most recent stuff that I had used
21  on him; and followed up with them with requests
22  for them to give me a fair and independent
23  polygraph examination. I probably asked them
24  three times. I asked Justin to help clear me,
25  so that they could move on to discover what had

Page 576

1  happened, by polygraphing me.
2        I also asked Mr. Nehemiah to
3  polygraph me, as well as the federal government,
4  in my first encounter with Mr. Tygart, and even
5  went as far as Amy Shipley of the Washington
6  Post. I suggested that she get all of these
7  people together and try to establish some fair
8  and determined effort to sit me down and do
9  whatever it is they do in order so that the
10  investigation could move forward in the right
11  direction, because as long as they were going to
12  be pointing the finger at me, they were going in
13  the wrong direction.
14        And I mean, I don't know what more I
15  could have done. I cooperated fully.
16     Q.  The product Voltaren that you used,
17  is this the Emulgel, E-m-u-l-g-e-l from
18  Novartis? Or is it a different product?
19     A.  Yeah, Novartis, that's -- I
20  recognize that. I mean, I haven't looked at a
21  bottle of Voltaren probably since I gave it to
22  them.
23        There's two types. There's the
24  Emulgel, and then there's Lipigel.
25     Q.  Right.

Page 577

1      A.   And I was told by a doctor in
2   Switzerland that when you have a lipid-based
3   formula that the absorption rate is higher.  And
4   so, you know, he was quite adamant with me.  He
5   just said, you know, you are going to lose a lot
6   of the effect of the Emulgel.  You need to use
7   the Lipigel, and it's only available in certain
8   places.  And he let me know -- I was in Zurich.
9   And he said, you know, Zurich is where you can
10  get it.
11      Q.   And that would be spelled l-i-p-i-d
12  g-e-l?
13      A.   I can't hear you, but I will spell
14  it.  You know how to spell Voltaren,
15  V-o-l-t-a-r-e-n.
16      Q.   Right.
17      A.   And it's L-i-p-i-g-e-l.
18      Q.   Thank you.
19      A.   You are welcome.
20      MR. COLBERT:  Mr. Whetstine, this is
21  Edward Colbert.  I just have one question,
22  myself, and then I think we're going to
23  probably done.
24      MR. WHETSTINE:  Okay.
25      MR. CAMPBELL:  I have got a couple

Page 578

1   more.
2      MR. COLBERT:  Oh, well, then maybe
3   not.  Let me just ask you my question.
4
5      EXAMINATION
6   BY MR. COLBERT:
7      Q.   There was a good deal of discussion,
8   at one point, and some articles in the paper
9   that apparently described a time at the April
10  22nd Kansas Relays when you were applying a gel
11  or other cream to Mr. Gatlin's legs after the
12  competition and before he went to drug testing.
13      Did you read any of those articles?
14      A.   Yes, sir.
15      Q.   Do you remember reading an article
16  in which Trevor Graham was interviewed and said
17  that he had observed you taking a tube from your
18  pocket instead of from your bag, and that it was
19  a white tube with a letter S on it, or a pink
20  squiggle.  Do you remember reading that?
21      A.   Yeah, that was one of the three or
22  four different accounts, I think, that he
23  provided of exactly what happened, wasn't it?
24      Q.   Well --
25      A.   I recall that, yes.

Page 579

1      Q.   Have you heard of Sarati
2   Laboratories?
3      A.   No, sir.
4      Q.   Have you heard of a cream, Deep
5   Hydrating Essential Aloe Cream?
6      A.   Only after this investigation.
7      Q.   Did you ever have any tubes that
8   were white tubes with pink squiggles or stylized
9   letters Ss on them?
10      A.   No.  I can provide you a little
11  insight into -- I'm going to step out on a limb
12  here, and call it Mr. Graham's alibi.  And let
13  you know -- I want to be careful, because I
14  don't want to be inflammatory.
15      I'm a pretty firm supporter of
16  Justin Gatlin, and I don't want to believe that
17  Justin did anything wrong, okay?
18      But in the light of the truth and
19  fairness, where they're concocting this story
20  from is that my sponsor Biotone, okay?  There's
21  a -- I am given a product to distribute from
22  Biotone, Biofreeze, to athletes and therapists;
23  not only therapists that are under my direction,
24  but other therapists, who would be, you know,
25  ostensibly of some notoriety, if they were to be

Page 580

1   making a plane trip from one place to another.
2      And one of the bottles that Biotone
3   has -- I think it's called the Dual Purpose
4   Massage Cream, a product that I don't use.  I
5   use an oil, which I have already described to
6   you earlier in my testimony.  And this Biotone
7   Dual Purpose Massage Cream has a pink band on
8   it.
9      And so, somehow they have leapt from
10  the Prefontaine Classic, which is probably, I
11  think, June 7th -- some time in early June when
12  that product first showed up for distribution to
13  my staff, courtesy of Biotone, and something
14  that they claim that happened months prior.
15      It's a product I don't even use.
16  It's solely for distribution to my staff.
17      Q.   What's in that cream, do you know?
18  The Dual Purpose Massage Cream?
19      A.   What's -- sorry?
20      Q.   How does it differ from the Biotone
21  product you do use?
22      A.   Oh, I use an oil.  It's just a
23  cream.  Some people prefer one.  Some people
24  prefer the other.  I like the higher degree of
25  viscosity.  I'm a bit more aggressive in my

## Page 581

1  techniques, and I also have more people to work
2  on, quite a bit more thorough than the average
3  person.
4      Q.  Do you know if the ingredients in
5  the Dual Purpose Massage Cream are different
6  than the one that you use?
7      A.  I can't tell you specifically. I'm
8  not a, you know, a massage therapy product
9  chemist, but I know that, you know, like if you
10  were to open up your wife's cabinet and look at
11  the face cream and then look at a jar of olive
12  oil, you know, one would look quite -- the one
13  with the pink band on it would look like the --
14  your wife's -- your wife's, you know, face
15  cream, and the other one would look like a jar
16  of olive oil.
17      Q.  But you don't know that the Dual
18  Purpose Massage Cream that you have described
19  contains any prohibited substance?
20      A.  If that were the case, every athlete
21  at the Prefontaine Classic that year would have
22  tested positive.
23      Q.  Why is that so? Because you said
24  you don't use it.
25      A.  Because I distribute it to 17 other

## Page 582

1  therapists. I give out a goodie bag that has
2  all Biotone and Biofreeze products, PowerBar,
3  and literature from StrongLite. Part of the
4  goodie bag that we give, you know, and we give
5  them Nike shoes and shirts and PowerBar shirts,
6  and so they have all of these different products
7  that they can use and choose from as they are
8  performing services, most of it gratis. And
9  it's a way for us to demonstrate our
10  appreciation, as well as providing them --
11  products for them to use.
12      MR. COLBERT: Thank you,
13  Mr. Whetstine.
14      Mr. Campbell?
15      MR. CAMPBELL: Yeah, I just wanted --
16  this is Chris Campbell again. I just wanted to
17  follow up. I hope you don't mind if I call you
18  Chris.
19      MR. WHETSTINE: That's fine, sir.
20
21      EXAMINATION
22  BY MR. CAMPBELL:
23      Q.  It's easy for me to pronounce, since
24  I'm used to doing it. My name is Chris.
25      You made a reference to Randall

## Page 583

1  Evans purchasing testosterone in Mexico.
2      A.  Yes.
3      Q.  Do you know what he was using that
4  testosterone for?
5      A.  Well, he told me it was for sexual
6  performance. I don't care what he was using it
7  for. I was furious.
8      He -- I was livid.
9      Q.  This was in 1998?
10      A.  No.  This was in 2004, yeah,
11  because, he was in Mexico in 2003, and we went
12  back in 2004. And as he was purchasing two
13  packages that had 8 vials apiece. I mean, he
14  was saying it was for topical application for
15  sexual enhancement. And these were bottles --
16  you know, like they have the -- like a skinny
17  neck, like a tight neck with a -- like an
18  aluminum cap? And that to me means that --
19  that's like what you see in the hospital. I
20  mean, that's something that you can inject in
21  somebody.
22      And I was furious. And, as he was
23  paying for it, I left. I wanted nothing to do
24  with that and told him so. Made sure that I was
25  not in the airport with him, that we left on --

## Page 584

1  you know, did not arrive at the same time for
2  our departures, called my girlfriend --
3  actually, on Justin Gatlin's phone, called my
4  girlfriend, expressed that I was furious.
5      And she inquired about it; and, you
6  know, I get -- it does have some levity to it.
7  She said, Well, if that's what he's saying,
8  honey, you don't need any of that stuff. I
9  mean, she was joking with me.
10      Q.  So why were you furious?
11      A.  I was extremely furious at why --
12  you know, I was furious.
13      Q.  Why were you furious?
14      A.  He's buying testosterone, sir.
15  That's a prohibited substance. I don't want any
16  exposure or knowledge of anything.
17      Q.  So I mean, were you -- did you
18  consider that he was buying it for other
19  athletes?
20      A.  I didn't care what he was doing. I
21  didn't want him doing it in front of me.
22      Q.  When you say it's a prohibited
23  substance, I'm a little bit -- it was legal for
24  him to buy that in Mexico, correct?
25      A.  I don't know. You know, the story

## Page 585

1   is you can get whatever you want in Mexico, and
2   his wife is Spanish. He actually says his wife
3   works for the FBI, was his claim, and she was an
4   FBI agent and was bilingual, and so, I guess he
5   had some lingo, but -- what's the question?
6     Q. Well, I guess I'm just trying to
7   figure out -- I'm trying to figure out why were
8   you furious? It seems to me if he was buying it
9   for himself, it would be okay. If he was in
10  Mexico, obviously, he shouldn't be transporting
11  it across the border.
12     But if he was buying it for other
13  people, it seems to me -- especially for
14  athletes -- that would be a valid reason for
15  being furious.
16     A. Sir? My integrity, hard work, and
17  my word are all that I have to go on in this
18  business. I do not want to be exposed to, have
19  knowledge of any illegal activity, okay? And I
20  don't care what he's buying it for. I don't
21  care what he's buying it for. Okay?
22     Q. Now, it's my understanding that this
23  Voltaren, this stuff that you purchased in
24  Switzerland and Mexico, you have to have a
25  prescription in the United States, for that; is

## Page 586

1   that correct?
2     A. I'm not aware that it's available in
3  the United States. It's only available in
4  Europe and Mexico, and it's purchased over the
5  counter.
6     Q. Have you ever come across anything
7  else that caused you concern about illegal
8  substances or prohibited substances while you
9  were working with -- during this period with
10  Nike?
11     A. No, not at all. That includes my
12  involvement all the way back to 1998 -- well,
13  the only thing. No, no. I mean, I was -- I was
14  suspicious and voiced my concerns to Nike when I
15  performed services on a couple of athletes who
16  later became involved in the BALCO
17  investigation. But I quickly learned that my
18  employer was not concerned about these issues,
19  and it was probably best if I just didn't bring
20  it up.
21     Q. Now, you talked also about being
22  careful with your bags while you were traveling
23  to events; is that correct?
24     A. Yes, sir.
25     Q. Is that correct?

## Page 587

1     A. Yes, sir.
2     Q. And you also talked about being
3  careful about selecting the products that you
4  used for the athletes?
5     A. Yes.
6     Q. And I'm trying to figure out: What
7  caused you to be that careful?
8     A. Well, it was the way they taught us,
9  you know? It wasn't atypical to have other
10  coaches trying to get close to you and stare
11  inside your bag, or whatever, and there were
12  always rumors of drug talks on the circuit and
13  all of this innuendo.
14     And I certainly -- you know -- well,
15  Trevor, you know, C.J., Marion, everybody was
16  very -- you know, when they -- when it first
17  began -- I was the greenhorn on the circuit,
18  and, you know, one of the first things was you
19  keep strict control of all of your material, and
20  you don't talk to the press.
21     Q. And when you say "they" taught us,
22  who is "they"?
23     A. C.J. Hunter, Trevor Graham, Charlie
24  Wells, and I guess, by some extension Marion
25  Jones, because, you know, we had a good rapport.

## Page 588

1     Q. And did you ever communicate the
2  fact that you took such care to any athletes?
3     A. Well, it was well known, because
4  they were also -- every athlete is instructed to
5  never accept an open water bottle. Always
6  secure your bags. Never leave anything out in
7  the open when you are not able to keep it in
8  eyesight or attend to it. And it's just -- you
9  know, those are just kind of the rules of the
10  road.
11     Q. But how would they know you were
12  careful?
13     A. My degree of professionalism, I
14  would assume.
15     Q. So nobody would have told them?
16     A. I'm sorry. I don't understand.
17  Told them -- it was --
18     Q. I'm trying to figure out --
19     A. I mean, when Trevor is screaming at
20  Shawn Crawford for leaving his water bottle out
21  and leaving his bag out, just sitting there, and
22  walks away to a competition, other athletes kind
23  of learn by extension, you know.
24     Q. But how would other athletes learn
25  to have faith and trust in what you were doing?

Page 589

1    A. I can only imagine that through,
2 like I said, my hard work, integrity, my
3 reputation, you come to expect that I'm looking
4 out for your best interests.
5    Q. And do you feel that all the
6 athletes felt that you were looking out for
7 their best interests until this event occurred?
8    A. Well, I certainly had no shortage of
9 people trying to get on my list. I worked with,
10 you know, the elite of the elite. And I have
11 had many people, you know, contact me and
12 demonstrate, you know, their sadness over what's
13 happened to me, and, you know, that I got hurt,
14 and, you know, that it will all -- assuring me
15 that it will all go away, and I will be back out
16 there some day soon, and, you know, get well
17 soon, and that kind of stuff.
18    So, you know, I haven't really heard
19 anyone voice, you know, any open criticism of my
20 techniques or my history or anything, you know.
21    Q. How would -- I mean, would -- how
22 would your clients come to you, these other
23 track athletes, or these world-class athletes?
24 Would it be by word of mouth? Would it be by --
25 I mean, what's the process?

Page 590

1    A. Well, I think probably that by my
2 association and endorsement from their parent
3 sponsor, Nike, you know, whether it be through
4 an introduction by John Capriotti, who is, you
5 know, one of the preeminent influences in the
6 sport. I think if he were to come to you and
7 say, I would like you to meet this man, he's the
8 best in the business, or -- you know, I'm not
9 trying to blow up my balloon here but --
10    Q. Right.
11    A. You know, whatever technique that he
12 would use to encourage the person to meet with
13 me and work with me and get an evaluation, you
14 know, whether it be Felix Sanchez, Sanya
15 Richards, Eliud Kipchoge, Kenenesa Bekele, all
16 over the map. And you know, I have, I have -- I
17 still believe I have a very good reputation, and
18 that nobody believes this.
19    And, you know, that's really all I
20 have to say on this. I have done nothing wrong,
21 sir. I would never compromise the health of an
22 athlete, and have always done everything
23 possible to ensure the best performances
24 possible.
25    That's why I study videotape. I'm

Page 591

1 the only therapist that you will find, you know,
2 out on the track every day during practice in
3 order to study the biomechanics. I, typically,
4 was the first guy to have the races, you know,
5 and sit down with the athlete and show the race
6 to them. And you know, my passion for the sport
7 is -- I mean, like I said, I have grown up with
8 this.
9    Q. And are you aware of any programs
10 that Nike has with its athletes talking to them
11 about how to be careful about not taking
12 prohibited substances?
13    A. No, I'm not.
14    MR. CAMPBELL: Okay. That's it.
15    MR. COLBERT: Mr. Collins?
16    Mr. Whetstine, thank you very much.
17 We appreciate all the time you have given us,
18 you and your counsel. And you are excused at
19 this time. Thank you.
20    MR. WHETSTINE: Thank you, sir.
21    MR. COLBERT: Okay. Let's look at
22 what we have.
23    MR. COLLINS: I have Renaldo
24 Nehemiah, needs to leave -- he's got a 3:00
25 flight.

Page 592

1    MR. COLBERT: And you have -- let's
2 just take a second. You have got Renaldo
3 Nehemiah. You've got --
4    MR. COLLINS: Dr. Black.
5    MR. COLBERT: You've got Dr. Black.
6 You have Renaldo Nehemiah and Dr. Black, I
7 think, are the only witnesses you have left on
8 your case, right?
9    MR. COLLINS: Right. And I might
10 have a very few questions on redirect for --
11    MR. COLBERT: But you want to take
12 Dr. -- Renaldo now, rather than -- do you have
13 any problem?
14    MR. TYGART: We're fine with that.
15    MR. COLBERT: Okay. That's fine.
16    Do you want -- do any of you guys
17 want to work through lunch, you want to order
18 lunch, pick it up?
19    MR. CAMPBELL: We got to leave at
20 4:00.
21    MR. COLBERT: We have to motor on.
22    MR. COLLINS: I can work through
23 lunch, but I can't work through a bathroom
24 break.
25    (Brief recess taken.)

Page 593

1    MR. COLBERT: Okay.  Is everybody
2 ready?
3        Mr. Nehemiah?
4    MR. NEHEMIAH: Yes, sir.
5    MR. COLBERT:  It's a pleasure to
6 have a Terrapin here with us today.  Go Terps;
7 you're the turtle.
8        If you would like to swear the
9 witness, please.
10
11 WHEREUPON,
12    RENALDO NEHEMIAH,
13 the witness herein, having been first duly sworn
14 to state the whole truth, testified on his oath
15 as follows:
16
17    EXAMINATION
18 BY MR. COLLINS:
19    Q.  Could you please state your name and
20 spell your last name for the record.
21    A.  Renaldo Nehemiah.  N like in Nancy,
22 e-h-e-m -- as in Mary -- i-a-h, like Harry.
23    Q.  Let me ask you a few background
24 questions.
25        Are you familiar with the sport of

Page 594

1 track and field?
2    A.  Pretty -- yes.  Yes, I am.
3    Q.  I believe you ran at one point?
4    A.  Yes.  I ran awhile ago, but, yeah,
5 quite extensively.
6    Q.  Could you just very briefly give a
7 history of your --
8    A.  I was a national high school record
9 holder, and I was a world record holder for ten
10 years, and the first man to break the 13-second
11 barrier in the hurdles, and still the record
12 holder, two indoor world records today.  NCAA
13 champion, so ...
14    Q.  So you were -- when did you start
15 your track record?
16    A.  19- --
17    Q.  How old -- what grade?
18    A.  -- '73.
19    Q.  What grade?
20    A.  9th grade.
21    Q.  9th grade?
22    A.  Yes.
23        Well, before that, in some Boy Scout
24 and, you know, Junior Olympic kind of things,
25 Cub Scout, Junior Olympic races, yeah,

Page 595

1    Q.  How are you currently employed?
2    A.  I'm a director of track and field
3 worldwide with Octagon, Incorporated.
4    Q.  Do you know Justin Gatlin?
5    A.  I do.
6    Q.  How do you know Justin Gatlin?
7    A.  I first became aware of him as a
8 freshman -- when he was a freshman at the
9 University of Tennessee, and he was a high
10 school phenom and a collegiate phenom.  And I
11 don't know if it was 2001 or 2002, I believe, at
12 the NCAA championships at LSU, Baton Rouge, is
13 when I first met his family, formally, and had
14 my first chance to personally witness his
15 accomplishments on the track.
16    Q.  When you say he was a "phenom," what
17 does that mean?
18    A.  Well, Justin and I have similar
19 backgrounds, because I consider myself a high
20 school freak, and what he did was pretty
21 phenomenal as well.  So I also gave up my NCAA
22 eligibility after my junior year, and Justin did
23 the same in his -- after his sophomore year.  So
24 I had unique experience to impart on him,
25 because I had walked the walk before he did.

Page 596

1        So he had that type of athletic
2 prowess that he was a professional at a very
3 early age.  And so was I; I was the best in the
4 world at 18.
5    Q.  And in your approximately 25-year
6 experience now in track have you seen other
7 phenoms?
8    A.  Not at his early stage of
9 progression.
10        Justin won the 100 meters and 200
11 meters in consecutive years as a NCAA
12 freshman-sophomore, which hadn't been done, and
13 we haven't seen the likes of that in years.  So,
14 he was clearly a cut above the rest.
15    Q.  Do you when -- when did you begin
16 representing him?
17    A.  It was the -- I believe it was the
18 fall, it was November of 2003.  He had just won
19 the indoor world championships.  And then he was
20 hurt at our outdoor national championships, and
21 he decided that he wanted to go in a different
22 management direction at the end of that summer,
23 early fall.  And he and his family visited
24 Octagon, and we discussed representation at that
25 point.

Page 597

1    Q.  So had you talked with him about
2 representation prior to that?
3    A.  I initially back in his sophomore
4 season at the NCAA at Baton Rouge -- I don't
5 typically ever recruit underclassmen.  I play by
6 the rules, so -- but I also want to be
7 considered in case they do turn pro, I at least
8 want people to know that I'm interested.
9        So I had never met with Justin
10 personally.  I met with his family, mother and
11 father, at a hotel in Baton Rouge, and let them
12 know if their son was contemplating turning
13 professional, I did want to be considered, yes.
14    Q.  You gave a sales pitch?
15    A.  Yes, I did.
16    Q.  Could you have given them a better
17 one?
18    A.  Well, it wasn't good enough, because
19 he signed with another agent for the first seven
20 months, so I lost that one, but they knew who I
21 was.
22    Q.  I was just teasing you.
23    A.  Yeah, I know.
24    Q.  So you have been with Justin since
25 2003?

Page 598

1    A.  The fall of 2003.
2    Q.  The fall?
3    A.  Yes.
4    Q.  Are you aware that Justin has ADD?
5    A.  I am.
6    Q.  And how are you aware of that?
7    A.  I work with him on a regular basis,
8 so I could see it in all forms.
9    Q.  Could you just briefly explain some
10 of what that is?
11    A.  Well, some of the basic things.
12 Fortunately, he has a wide net of a support
13 cast, including our complete staff at Octagon,
14 his parents.
15        But, for instance, we could provide
16 him with an itinerary in an e-mail -- I think
17 one time he had what was similar to a
18 BlackBerry, and we'd e-mail it, but sometimes he
19 didn't even read the e-mail.  Or we could make
20 sure that he had the itinerary, and he may not
21 retain what was on it, and so he would fall back
22 and ask us, What time is my flight, or when am I
23 doing this, or when I am doing that?  And I used
24 to tease him about it, because I said, well, why
25 do we go through the effort of doing all of

Page 599

1 this, if you are not going to look at it?
2        One prime example was in September,
3 we were in New York City, and he had a track
4 meet in Asia that we were leaving about two or
5 three days after this promotional event, and he
6 had some running flats on that weren't -- they
7 were a little tight on him.  He just didn't like
8 the feel of them.  So he took them off and left
9 them in the hotel.  And then he got to Japan,
10 and he didn't have any training flats, so, you
11 know, we're scrambling to find training flats.
12        But for me, I'm thinking flats,
13 track and field event, they go hand in hand,
14 but, you know, he just didn't focus on it.
15        So it's those types of things, where
16 you could -- you could tell him something and
17 maybe an hour later ask, and he may not remember
18 that you even said it.  So you have to kind of
19 implore on him, I did tell you this, and walk
20 him through it, and he might remember it.
21    Q.  Did you find because of this that he
22 became very reliant on his -- what I think you
23 said -- support circle or something?
24    A.  Yeah.  Well -- and to put it in
25 context, it's one thing to have ADD.  It's

Page 600

1 another thing to be crowned the world's fastest
2 man in 2004, the Olympic Games, because he's not
3 your typical athlete anymore.
4        Justin Gatlin, we had to have a
5 whole staff.  I work with a staff of eight
6 people just in my Track and Field division.  And
7 all of us, collectively, had a part in the
8 management of Justin Gatlin.  And I had ten
9 other clients that I had to address, but Justin
10 needed -- not because of anything that he was
11 doing, as far as his ADD -- but just in all the
12 demands, personal appearances, photo shoots,
13 magazines, multiple sponsorship commitments.  We
14 had to regulate and delegate that.  So we all
15 had to be on the same page.
16        So the best of a person -- myself
17 that doesn't have ADD -- had to have a staff of
18 people I needed to rely on to help me just keep
19 on top of what he was doing.  So there's no way
20 that he was going to be able to do it, and
21 including his parents helping us out in any way
22 that they could.
23    Q.  Are his parents pretty involved?
24    A.  Oh, yeah.  Definitely.
25    Q.  Would you say Jeanette is fairly

7-30-07 to 8-01-07                                USADA vs. GATLIN

151 (Pages 601 to 604)

Page 601

1   involved?
2       A.   She's my right hand, yeah.  We talk
3   on a regular basis, and they have local
4   opportunities that she bounces off with me.  I
5   mean, I'm the quarterback, so no matter what
6   happens, everything goes through me.  Lines are
7   drawn in the sand.  Coach is coach.  We manage.
8   And ultimately, she's the CEO of everybody.
9       Q.   Now, as his agent, you oversee, and
10  you seek -- well, you help get him marketing
11  deals?
12      A.   Correct.
13      Q.   And --
14      A.   I work with our marketing people in
15  securing deals for him.
16      Q.   Right.  What about appearance fees?
17      A.   I negotiate pretty much 99 percent
18  of what he earns, yes.
19      Q.   And so --
20      A.   I put him in position to earn it.
21  He obviously earns it.
22      Q.   Right.  So you have an idea of what
23  he's made?
24      A.   I do.
25      Q.   Do you know approximately how much

Page 602

1   he made in 2005?
2       A.   In 2005, I have it right here, his
3   gross was 1. -- 1,549,000.
4       Q.   He got the double gold at Worlds in
5   2005?
6       A.   Mm-hm.
7       Q.   Do you have any projections of what
8   you thought he was going to make in 2006 based
9   on his deals he had signed?
10      MR. BOCK: I just want to make it
11  clear that while we're not objecting, we are not
12  conceding the relevance.
13      A.   Anywhere from 2.5 to $3 million.
14      Q.   And did you have any projections as
15  to what he would make in 2007 with another World
16  Championships?
17      A.   Well, if he got close to repeating,
18  probably double that, yeah, because that would
19  have been unprecedented.  The double in 2005
20  hadn't been done in almost 20 years, so for him
21  to do it again, which would have been something
22  inconceivable, financially would have been
23  tremendous.
24      Q.   How much did he actually end up
25  making in 2006?

Page 603

1       A.   2006, gross was 280,235.
2       Q.   So why was it not the 2.5 million?
3       A.   Well, Number 1, his entire
4   reputation, his name.  Justin Gatlin was not
5   just the face of the United States track and
6   field.  He was globally the face, the
7   international federation, everyone, so when it
8   was publicized that through his own words that
9   he tested positive back in July of '06, the
10  repercussions were widespread.  It knocked the
11  entire track and field community globally on its
12  heels.
13      Q.   Could you estimate how much money
14  he's lost as a result of that positive test
15  between then and now?
16      A.   5, 6 million dollars.
17      Q.   If he were to be reinstated today,
18  would he be able to recover that 5 million
19  dollars he's lost?
20      A.   Never.  Never.
21      I mean, he still has to -- there're
22  going to be some naysayers out there with his,
23  you know -- once you are branded, it takes a
24  whole lot for people to, you know, not look at
25  you sideways.  And the anti-American sentiment,

Page 604

1   globally -- and since our sport is predominantly
2   global, that's where Justin made the bulk of his
3   money.
4       Q.   Would you say irrespective of what
5   the decision is by this panel, as he sits here
6   today, has he suffered any consequences as a
7   result of it?
8       A.   He lives with it every day.  I live
9   it every day.  I'm faced with it every day.
10  It's been traumatic, obviously, mostly,
11  importantly for Justin, but for me too, because,
12  you know, I did it clean, and we had so many
13  things in common.
14      I'm very close to his family.  I was
15  attacked globally, you know, because of everyone
16  thinks that, I must know.  I don't live in the
17  same town, cities that any of my clients, but
18  it's a character assassination on me, because
19  I'm out there publicly.  You know, people know
20  that I walk the walk, and know I'm a no-nonsense
21  kind of guy, so -- and the Gatlins know that
22  too.
23      And my reputation has been
24  challenged by this, and I take that personally,
25  and Justin knows that.  Every one of my clients