7-30-07 to 8-01-07                USADA vs. GATLIN

152 (Pages 605 to 608)

Page 605

1   know that my reputation and my name is more
2   important than anything they could ever do,
3   because I worked very hard for it. So I was
4   pulled into this as well, and so it means a lot
5   to me to see this thing right.
6       Q.  Do you know Chris Whetstine?
7       A.  I do.
8       Q.  How do you know Chris Whetstine?
9       A.  I was introduced to Chris around --
10  well, prior to -- I couldn't tell you how many
11  days or months prior to the Athens Olympics.
12      Q.  So you knew him shortly before 2004
13  then?
14      A.  Correct, going into Athens.
15      Q.  Who did he work for; do you know?
16      A.  Chris, I had the impression that he
17  was a consultant for Nike, and he worked with
18  the elite athletes, the visible athletes in
19  Nike, the medal contenders.
20      Q.  Do you recall a time where
21  Mr. Whetstine asked for your opinion and
22  assistance in negotiating a contract with Nike?
23      A.  Definitely.  At the end of the 2005
24  season -- or 2004 season, I should say, he was
25  very frustrated that his value wasn't

Page 606

1   appreciated, and he was losing money in his own
2   private practice to do this, and he felt he
3   couldn't do it unless he had a contract, in the
4   way, that he was kind of on assignment, I guess,
5   cherry-picking where they would send them.
6           He didn't like it.  So he asked me,
7   since he wasn't an expert in this, if I would
8   mind helping him out?
9           And I said, No problem.  You need to
10  have something in place, some type of structure.
11  And I told him, Don't worry about me charging
12  you a fee, it's not a problem, primarily,
13  because I knew he was working exclusively with
14  my client as a priority for Nike.
15      Q.  During this when you -- so who
16  conducted the negotiations with Nike?
17      A.  It was a conference call:  Tim
18  Phelan, who works under John Capriotti, who is
19  the director of Track and Field in North
20  America; and myself and Chris.
21      Q.  Prior to this conference call, did
22  Chris give you any indication of what his income
23  in 2004 was?
24      A.  The negotiations were based on Chris
25  making approximately $85,000 from his business,

Page 607

1   and so we used that as a baseline.
2           I implored Nike to get tax returns,
3   because I didn't know what Chris was saying, but
4   apparently, that wasn't an issue for them.  It
5   wasn't that much money in the grand scheme of
6   what they do.  So they used a $25,000 annual
7   stipend as a base pay, and $350 a day, plus his
8   expenses.
9       Q.  Okay.  Do you --
10      A.  And prior to that, it was about $250
11  they were paying him, so my negotiation got it
12  to 350.
13      Q.  Do you know approximately how much
14  he made in 2005 after you got him this deal?
15      A.  Nike paid out about $106,000 total.
16      Q.  To?
17      A.  To Chris Whetstine.
18      Q.  You indicated earlier, I believe,
19  that Justin Gatlin was a priority for him?
20      A.  Right.
21      Q.  Can you explain that?
22      A.  Well, they had Shawn Crawford.  They
23  had Felix Sanchez.  They had maybe Beshawn
24  Jackson -- they had, either your Number 1 in the
25  world or medalist or world champion in that

Page 608

1   capacity, and that was set anywhere from five to
2   seven athletes maximum.
3           But the priority was Justin, meaning
4   that that whatever Justin's schedule was, if
5   Justin was on a tour and he was going to these
6   events, that's where Chris had to go.  And if
7   anybody else was going to another event, oh,
8   well, because the money was invested into the
9   most preeminent event, which was the 100 meters.
10      Q.  Do you know of that 106,000,
11  approximately how much of it was attributable to
12  his work with Justin?
13      A.  Whew.  The majority of it.  We
14  planned out Justin's schedule that it came out
15  to be 87 days.
16      Q.  For just Justin?
17      A.  For just Justin and the Tour, right.
18      Q.  Is there a time in -- sometime in
19  the end of 2005, where you hear that Chris
20  Whetstine wanted to receive money directly from
21  Justin Gatlin?
22      A.  Yes.  September is the last leg of
23  the Tour.  It's on the Asian circuit.  We are in
24  Yokohama, Japan.  And it's a day before the
25  meet, and Chris asked me to come to his hotel

7-30-07 to 8-01-07                                    USADA vs. GATLIN

153 (Pages 609 to 612)

Page 609

1    room. And so I went to his hotel room.
2         And he was venting to me about how
3    much work he does and how much the athletes are
4    making, specifically, Justin. And he was
5    drawing that comparison into his disdain for
6    working with Marion Jones and the promises
7    that -- her camp had promised him bonuses, and
8    to this date, he had never received a penny; and
9    that Justin is making all this money, and didn't
10   I think that he should get a bonus.
11       Q.   What did you tell him?
12       A.   I told him he was paid by Nike,
13   Number 1; he didn't have a contract with Justin.
14   And Number 2, I used the analogy of myself. I
15   said I get fees off of Justin, and if Justin
16   were to give me a bonus, it's unexpected. It's
17   not expected. So I would never ask him for it.
18       And that -- so he needs to go back
19   to Nike and talk to Nike about it. But I wasn't
20   going to go to my client and ask my client to
21   give him a bonus.
22       Now, I did share the conversation
23   with Justin to let him know in case Chris came
24   to him, because I believe in full disclosure.
25       But he was very disappointed that

Page 610

1    Justin was making the kind of money he was
2    making, and he wasn't getting bonuses. He
3    had -- he said Justin gets bonuses for winning
4    medals. I'm participating in getting him fit
5    and right to run well, and so shouldn't I
6    benefit as well.
7         And although I didn't offer any
8    resistance to that, I couldn't help him in that
9    situation, because he didn't have a contract
10   with my client.
11       Q.   So this was where?
12       A.   Yokohama, Japan.
13       Q.   Is this the only time you had this
14   conversation, or a conversation like this?
15       A.   No. It continued about four days
16   later, when we went to Daegu, the last stop on
17   the Tour, Daegu, Korea.
18       Q.   Okay.
19       A.   And it was on a warmup track, and
20   Justin had just -- he had just finished working
21   with Justin, and Justin had gone into the
22   stadium, and he asked me, he said, Renaldo, how
23   much is Justin making in this meet?
24       And I go, He's doing pretty well.
25       He threw out a number, $50,000?

Page 611

1         And I said, He's doing pretty well.
2         And he goes, You're shitting me.
3         And I said -- and I smiled, and I
4    go, He does well.
5         And he goes, 75,000?
6         And I said, He does well.
7         And he got a little frustrated. And
8    I said, Chris, this is not the place. It really
9    isn't.
10       Q.   Did you -- did the topic come up
11   again, or did you learn of any other discussions
12   about Mr. Whetstine seeking a bonus?
13       A.   Well, Justin later told me that, you
14   know, he specifically wanted $5,000 from them.
15   Chris never asked me a dollar amount. He just
16   wanted to know, didn't I think he was entitled
17   to a bonus, but I did learn later that he
18   specifically came up and at least wanted a
19   dollar amount.
20       And he talked to me about a lot of
21   things. He talked about he had a 12-year-old
22   son he had to put through college, and all of
23   this.
24       And I said to him, Chris, if you are
25   losing money to do this, you are not as smart as

Page 612

1    I think you are, because I wouldn't lose money
2    to travel around with these athletes. I don't
3    care who they are. So if the practice is doing
4    that well, you need to make a decision, how
5    important is this to you.
6         But I read between the lines that
7    his practice obviously wasn't that well, because
8    he wouldn't be complaining and he wouldn't do
9    that, so I knew -- at least, I felt; I didn't
10   know. I felt that the fact that he was out on
11   the Tour 87-plus days and doing this, that this
12   was a consistent stream of money, because I
13   didn't think he was massaging that many people
14   on a daily basis to make this happen.
15       That was my personal opinion.
16       Q.   Right.
17       Now, do you hear anything from
18   Justin about -- is there any repercussions when
19   you find out that he requested $5,000 from
20   Justin?
21       A.   I know later on -- late into, going
22   into winter, Justin and I -- because we talked
23   all the time -- told me that they were not going
24   to work with Chris anymore. They were firing
25   him.

## Page 613

```
 1          And I don't know in the time frame,
 2   weeks, or a week later, Chris called me up and
 3   said that he just wanted me to know that he
 4   wouldn't be working with us. He gave his spin
 5   on it that, you know, he had to do other things,
 6   and he wasn't going to deal with, you know, the
 7   way Trevor treated him and the way Justin and
 8   those guys talked to him.
 9          And I just said, Well, you know,
10   business is business, I'm not involved in that,
11   but I will see you around.
12      Q.  Did you ever see Chris at meets and
13   Trevor at meets?
14      A.  Yes. Yes, I did.
15      Q.  How did you -- would you say the
16   relationship was?
17      A.  I never saw that much talking. I
18   mean, Chris was in his world, you know, working
19   on the athletes. Trevor kind of was the -- you
20   know, the -- kind of like the proud papa just
21   watching the work. And Trevor had this air
22   about him, so, you knew it was Trevor.
23      Q.  Did they look like they were
24   buddies?
25      A.  I didn't hang around that much,
```

## Page 614

```
 1   yeah. They were civil, yeah.
 2      Q.  Okay. Justin said he was going
 3   to -- they were going to be terminating Chris
 4   Whetstine?
 5      A.  Correct.
 6      Q.  Did they, at any time, start looking
 7   for a new physical therapist?
 8      A.  We all started looking. Once Justin
 9   told me that they had -- they were firing Chris
10   Whetstine, as his agent, I was going to do my
11   part and try to help on my side, if I could come
12   up with some suitable replacement.
13          And that's what I started doing.
14   Nike did the same thing on their side. We all
15   started looking. We had a few candidates.
16          Logistically on one of them, he had
17   a practice, he was relocating to North Carolina,
18   so he was in the midst of moving and selling his
19   practice, so he really couldn't do it in that
20   particular year. He could do it the year later.
21          There was the Seattle Seahawks
22   trainer, who was willing to do it, but he was
23   kind of cost-prohibitive, like $1,000 a day, as
24   opposed to 350 a day.
25          So that ran into the early part of,
```

## Page 615

```
 1   I think the next coming year and these guys --
 2   which would be '06 -- and these guys are getting
 3   ready to do their annual winter training, where
 4   they go down to Jamaica, and it was crunch time.
 5   They needed to have someone.
 6          Justin told me that they were going
 7   to bring Chris back.
 8          I was very concerned about that,
 9   because they had fired him, and he was told by
10   Nike, you know, once they had talked with Justin
11   that they needed somebody, that he had to go
12   back to work for Justin.
13          So I didn't talk to Chris about it,
14   but I knew that that had to be a bittersweet
15   pill, that you were fired, they had -- Trevor
16   had on his Web site Sprint Capitol that they
17   were looking for a massage therapist. So I knew
18   that had to be humiliating, that, you know, the
19   people fire you, you are not happy because the
20   guy is not paying you what you think you're
21   worth, and you can't do anything about it,
22   because he's not paying you, Nike is paying you.
23   And so I was very concerned about that.
24      Q.  You indicated you talked regularly
25   with Justin?
```

## Page 616

```
 1      A.  Yes.
 2      Q.  Did you ever talk about being
 3   careful to not test positive?
 4      A.  All the time. No matter what we
 5   did. If they were empty bottles, don't drink
 6   from it. Training meets, don't pick up
 7   anything. I was a constant reminder, because I
 8   knew about previous suspensions.
 9          So -- and I knew -- I knew what he
10   represented and how now we had to take the extra
11   precautions, whether it was what he was
12   drinking, what he was eating, reporting to USADA
13   his whereabouts. I mean, you couldn't afford
14   any slip-ups, you know. It was like Russian
15   roulette, you know, you just didn't know. So we
16   had to make sure he was on top of it.
17      Q.  When you were on the road, would
18   he -- did it appear he had learned, you know,
19   was being careful?
20      A.  Justin was very aloof on the road.
21   You didn't see Justin that much. I mean, Justin
22   was in his room. Justin ate in his room.
23   Justin didn't eat in the buffet or in the main
24   dining hall. Justin would come out for press
25   conferences, obviously for training, obviously
```

## Page 617

1  for clinic, you know, public relations type of
2  things. But I knew where to find Justin, yeah.
3  He was in his room.
4      Q.  Is it fair to say he had a
5  reputation for eating a lot of room service?
6      A.  Yeah, he was scarce. He wasn't
7  around much, yeah.
8      Q.  Do you know if he ever took any
9  supplements?
10     A.  Supplements, I know of -- and I
11 can't remember them all verbatim -- are just the
12 ones that I witnessed him writing on his USADA
13 form in drug testing, because I would accompany
14 him more often than not to drug testing.
15     Q.  You've been in the track and field
16 business for awhile. Is the taking of
17 supplements fairly common?
18     A.  Yes.
19     Q.  And there's a list that you can find
20 out whether a supplement is a banned substance
21 or a prohibited substance or not, right?
22     A.  Correct.
23     Q.  Have you ever heard of Voltaren?
24     A.  I have.
25     Q.  Do you know people that use

## Page 618

1  Voltaren?
2      A.  It's widely used. And fortunately,
3  or unfortunately, depending how you look at it,
4  globally, they have always been more liberal
5  than we have.
6      Q.  Who is "they"?
7      A.  The Europeans. The reference is
8  infrared laser came out when I was running. It
9  was prohibited in this country; widespread in
10 England, Germany, Austria, all these different
11 places. So I was getting laser all the time
12 because they could use it. It was a part of the
13 physio treatment. Now it's here.
14     So same thing with Voltaren. You
15 may need a prescription here, but, you know --
16 and there's some countries you still need a
17 prescription; but you can go to various
18 countries, buy it over the counter, and I guess
19 you would have it, and it's a legal substance,
20 so they use it, anti-inflammatory.
21     Q.  When you say a "legal substance," it
22 doesn't have a prohibited substance in it?
23     A.  Correct.
24     Q.  Earlier, I think you talked about
25 Justin being sort of a face for USA Track and

## Page 619

1  Field. Do you recall a meeting or anything
2  happening after he won the Olympics in 2004?
3      A.  Right. Craig Masback, CEO of USA
4  Track and Field, John Capriotti, director of
5  North America, of Nike; the Gatlins; Justin;
6  myself, had a meeting at the Nike hospitality in
7  Athens. And that meeting was to lay out to
8  Justin, his family, everyone involved with
9  Justin Gatlin, the significance of him winning
10 the Olympic gold medal, the responsibility that
11 was now bestowed on him, and that it wasn't
12 about him, it was about country, it was about
13 our integrity, our pride, and that under all
14 circumstances, he had to walk the straight and
15 narrow. He couldn't have any mistakes, any bad
16 judgments, character, et cetera.
17     So, it was one of those defining
18 moments, where -- you know, I call it
19 coming-to-Jesus talk. Okay. You are no longer
20 Justin Gatlin. You are the United States of
21 America. And everywhere you go, you got this
22 great smile, and everybody likes you, so, you
23 know, there's a lot that's being put on your
24 shoulders.
25     Q.  Did he recognize that burden?

## Page 620

1      A.  He embraced it, yes, wholeheartedly.
2      Q.  Going back to Voltaren briefly: Do
3  you know if Chris Whetstine ever used Voltaren?
4      A.  I know he used it. I didn't -- I
5  don't know -- I wasn't there watching all the
6  different things he was putting on, but I know
7  he had it in his repertoire, yes.
8      Q.  Do you know if other physios used --
9      A.  Yes, I do.
10     Q.  Who?
11     A.  Andy Miller, yeah.
12     Q.  Okay. In going back to Chris
13 Whetstine: After the positive came out, did you
14 have any exchanges with Chris Whetstine?
15     A.  After the positive came out?
16     I had e-mail correspondence with
17 Chris, and talking to him.
18     Q.  Did you ever threaten Chris
19 Whetstine?
20     A.  Never.
21     Q.  Did you ever -- so you sent him an
22 -- did you ever send him an e-mail?
23     A.  No. Chris Whetstine initiated an
24 e-mail to me.
25     Q.  I have copies of these, if you would

## Page 621

1    like.
2        A.  Sent me a copy of a -- an
3    unsolicited copy of an article that was written
4    about Justin.  And it was an unflattering e-mail
5    about Justin -- article about Justin.
6        Q.  Approximately when did he send that?
7        A.  November 26th, 2006.
8        Q.  May I hand it out to the panel?
9    Actually, I will give you a copy first.
10       MR. TYGART: And again, I will just
11   lodge an objection for the record.  I mean, we
12   should have had these exhibits.  We --
13   Mr. Whetstine has been called as a witness.  He
14   obviously could respond to some of them if
15   questions arise.  I mean, there's no reason on a
16   witness that he's called on his direct that we
17   should just now be getting a document that he
18   plans on questioning this witness by.
19       MR. BOCK: Absolutely.  I think we
20   should object.
21       MR. TYGART: I just did.
22       MR. BOCK: I know.  We're objecting
23   to its admission, because that's absolutely
24   right.  This document should have been provided
25   when Mr. Whetstine was on the stand.

## Page 622

1        MR. COLBERT: Can you see the --
2        MR. COLLINS: Yeah, I will show it to
3    you.  And if Mr. Whetstine had accurately
4    represented what he had said, it would never
5    have happened.  But this is a -- in a sense, a
6    rebuttal exhibit that I didn't ever know would
7    be an issue.
8        THE REPORTER:  Can we take just a
9    minute?
10       MR. COLLINS: Sure.
11       (Brief pause in proceedings from
12   1:22 p.m. to 1:25 p.m.)
13       MR. TYGART: So we -- on the
14   record -- we withdraw our motion.  You can ask
15   the witness the questions about it.
16       We would appreciate, however, and
17   request the panel to instruct Mr. Collins, if
18   there's any other documents that are being used
19   for purposes of examining his own witnesses in
20   this case, that were provided to us.
21       MR. COLBERT: Mr. Collins, do you
22   have any additional documents that you plan to
23   use in your case in chief that have not yet been
24   turned over to USADA?
25       MR. COLLINS: I don't know that I --

## Page 623

1    the only thing that's possible is I learned
2    after getting in Atlanta that Dr. Black had
3    tested a number -- all of the different
4    substances, the supplements that had been sent
5    to him, and he had also tested the different
6    creams from -- that the investigators had gotten
7    from Chris.
8        I learned Sunday night of the
9    supplements all being tested, and he e-mailed a
10   copy of that to me.  I then learned yesterday
11   morning, he found a new e-mail in which he had
12   sent documents on the things the investigators
13   got, to Cameron Myler in November that I never
14   was copied on.  I never got it.  And he found
15   that yesterday.  He didn't even know that when I
16   talked to him Sunday night.
17       So, I don't know that I need those
18   documents.  I could just ask him orally, if he
19   did these tests and which ones he did.  So all
20   those things were negative.
21       MR. COLBERT: I'm going to suggest to
22   you that if you do want to use a document, you
23   give it to the USADA now, or don't use the
24   document.
25       MR. COLLINS: When I found out

## Page 624

1    yesterday -- I had found out on the phone
2    yesterday -- I asked him to fax them here.  And
3    I didn't receive the fax.  In fact, if you
4    recall last night, I went out to look for a fax.
5        MR. COLBERT: That was the fax you
6    were waiting for from --
7        MR. COLLINS: Dr. Black.
8        MR. COLBERT: -- Dr. Black has not
9    sent you the documents yet?
10       MR. COLLINS: Well, I said I didn't
11   get them.  I have an e-mail of the ones, of the
12   supplements. I'm sorry.  I told him then, I
13   didn't get the fax.  I called him last night.
14   Send me -- so his office was to send me the
15   substances Chris Whetstine, they ran the tests
16   on.  His office manager sent me an e-mail -- or
17   actually, I think he sent it to me, and all I
18   got was the cover page, and I didn't get the
19   attachments with it.  So I haven't even seen
20   those, but I know they exist.
21       MR. COLBERT: So you are saying you
22   don't have any documents to give to Mr. Tygart,
23   as you sit here today.
24       MR. COLLINS: As I sit here right
25   now, I have an e-mail that has a PDF file

## Page 625

1 attached to it, that has the results for the --
2     MR. COLBERT: If you want to use it,
3 you can e-mail it to the AAA. They can print it
4 out. You can have it, and you can produce it.
5 And if you don't want to do that and you just
6 want to question Dr. Black without using
7 documents, then you can do that. But I would
8 ask you to do one of those two things.
9     MR. COLLINS: Okay. I will see how I
10 can get online.
11     MR. COLBERT: Do you have a PDF? I
12 will fix it for you right now.
13     UNIDENTIFIED SPEAKER: Do you have a
14 memory card?
15     MR. COLLINS: I have got a zip card.
16     MR. COLBERT: I got a flash drive
17 right here. Have you got a USB drive?
18     MR. COLLINS: Yes.
19     MR. COLBERT: Do you have one?
20     If you don't, I've got one right
21 there, you can put it on there, and print it.
22     Stick it on the printer.
23     MR. COLBERT: Actually, I like the
24 big old ones. The new ones are so small that I
25 have to get adapters to put it in. So if you

## Page 626

1 have one, just put it on there and give it to
2 them, and they should be able to print it out
3 for you.
4     MR. BOCK: My only comment, we
5 haven't seen what he's proposing to introduce.
6 We want this process and have operated
7 throughout, wanting this process to be open and
8 to bring in as much evidence as possible. But
9 we also want the process to be fair. And it's
10 very difficult for -- from our standpoint to
11 assure fairness when we're getting documents
12 piecemeal.
13     And in terms of what's been proposed
14 with respect to Dr. Black, I just want to point
15 out that the witness disclosure that was
16 provided to us says it is anticipated that
17 Dr. Black will testify about interpreting test
18 results of Justin Gatlin's April 22nd, 2006,
19 urine sample and other relevant information.
20     We have been given no prior notice
21 that there was any testing on any of the creams,
22 which is extremely significant information. And
23 now, on the last day of the hearing, a couple of
24 hours beforehand, we learn that there's a claim
25 that some creams have been tested. It's just --

## Page 627

1     MR. COLBERT: I hear your objection.
2 And --
3     MR. BOCK: I don't know if it's an
4 objection. I mean...
5     MR. COLBERT: I hear your
6 observation. But from what I hear from
7 Mr. Collins -- and I have no reason to
8 disbelieve him -- is that the -- he's -- some of
9 this information, some of the documents, he's
10 just learned about himself.
11     He has disclosed there will be other
12 relevant information. As far as I can tell, you
13 never asked for any further clarification, nor
14 sought to compel discovery in this case for what
15 he meant by other relevant information. He says
16 he's going to be able to ask Dr. Black. I would
17 suggest that once you see the document, like you
18 did with the last one, when you do your
19 objection, once you see the document, you can
20 decide whether you have a further objection or
21 not. But if we're in this as a search for what
22 actually happened, then, perhaps, we should
23 see -- you ask any questions --
24     MR. TYGART: It puts us in a very
25 difficult position, because --

## Page 628

1     MR. COLBERT: Mr. Tygart, you crossed
2 the witness repeatedly, demanding why didn't you
3 test the creams, and the witness didn't know.
4 And now, apparently, there will be an answer to
5 that.
6     So I understand you have a problem.
7 But, let's first get the document printed out,
8 let you see it, and the reason I want you to see
9 it now, is before Dr. Black gets on the stand,
10 and we can address it again before Dr. Black
11 testifies.
12     MR. BOCK: That's fine.
13     MR. CAMPBELL: Here's an observation.
14 If they need more time, you should be given
15 whatever you need.
16     MR. TYGART: That's the point. We
17 are in a very difficult position. We have
18 absolutely no objection to any piece of evidence
19 that he wanted to provide to be available for
20 this panel and to be available for us.
21     But for us just now, to be provided
22 a set of documents, tested -- that shows testing
23 that was done that he should have known about
24 for months. This case has been sitting for over
25 a year. We're just in a really difficult

Page 629

1    position.
2         MR. COLBERT: What I want to do is
3    move along. I want you to get the documents
4    now. The reason I'm pressing Mr. Collins is,
5    give them to you now while we're still examining
6    Mr. Nehemiah. You will have time to look at it,
7    and then perhaps, we can have another discussion
8    with the documents in front of us to see,
9    because -- for example, you withdrew your
10   objection to the last one, and let's just find
11   out --
12        MR. TYGART: We don't want him not to
13   be able to put in whatever he wants, but at some
14   point we need to --
15        MR. COLBERT: I understand you have a
16   generalized issue with the process. But let's
17   move on with this. Let's take a specific look
18   at these documents, and find out what they are,
19   while we complete the examination with
20   Mr. Nehemiah.
21        And so if you've loaded -- I seen
22   the green blinking. Have you loaded it?
23        MR. COLLINS: I have put them over.
24   And what I have done, just so the record is
25   clear, the e-mail with the supplement results I

Page 630

1    received -- or was sent to me at 4:57 and 42
2    seconds p.m., Central Daylight Time on July
3    29th. I didn't access my e-mail until after
4    10:00 that night.
5         MR. BOCK: John, we trust you.
6         MR. COLLINS: There seems to be
7    allegations that I'm hiding stuff.
8         MR. CHERIS: John, can we get that
9    printed out?
10        MR. COLBERT: Let's get it printed
11   out, and let's move on.
12        MR. COLLINS: Okay.
13        MR. BOCK: It's a matter of
14   preparation, not about whether we trust you.
15        (Brief recess in proceedings.)
16        MR. COLBERT: I will ask him to come
17   in and bring you the documents as soon as
18   they're printed, so there isn't any delay.
19        MR. BOCK: We can't view them while
20   the witness is testifying, so it doesn't really
21   matter.
22        MR. CAMPBELL: Well, we can take a
23   break after this witness.
24        MR. BOCK: I appreciate that, but
25   bringing them in right now as soon as possible,

Page 631

1    doesn't help a bit because --
2         MR. CAMPBELL: We'll proceed with
3    this witness testifying...
4         MR. COLBERT: Okay. Ready?
5
6              EXAMINATION (cont.)
7    BY MR. COLLINS:
8         Q.  Mr. Nehemiah, do you recall
9    receiving an e-mail from Chris Whetstine on
10   November 26th, 2006?
11        A.  I do. Yes, I do.
12        Q.  And do you recall sending an e-mail
13   back?
14        A.  I responded to the e-mail, yes, I
15   did.
16        Q.  Did you threaten him?
17        A.  No. At no time did I threaten him.
18        Q.  Okay. Calling your attention to the
19   last paragraph in the e-mail you sent to him,
20   would you please read that into the record?
21        A.  Starts out "in closing"?
22        Q.  Yes.
23        A.  In closing, Chris, the truth will
24   set you free. I don't care if the information
25   goes against Justin. I just want you to tell me

Page 632

1    the truth. Justin is willing to forgive you if
2    you are involved. We just want to move forward,
3    and I'm sure you do as well. Look how long you
4    have been out of work. I know you knew what was
5    going on with Trevor. You have for some time.
6    It's your call.
7         Q.  In sending that e-mail, was it your
8    intent to threaten Mr. Whetstine?
9         A.  I never had any intention to
10   threaten Chris. I just thought it was ironic
11   that he was sending me an e-mail unsolicited,
12   and I just thought he was grandstanding against
13   my client out of the blue, which I take
14   exception to, but I still was professional in my
15   response to him.
16        Q.  Let me draw your attention to the
17   February/March time frame of 2006.
18        Do you recall if Justin had any
19   physical issues at that time?
20        A.  Justin was having some problems with
21   soreness, tendinitis, I think, something --
22   tendinitis-like symptoms behind the knee,
23   sprinting, and it was causing him problems. And
24   they were concerned that he wasn't to be able to
25   progress and might retard his ability to be

7-30-07 to 8-01-07                         USADA vs. GATLIN

159 (Pages 633 to 636)

## Page 633

1   ready for his April competitions.
2      Q.   And how did you learn this?
3      A.   Justin talks with Britton
4   Stackhouse, who was our client service
5   coordinator, who talks regularly with the
6   clients. And her number one top assignment was
7   Justin, so she and Justin talked.
8      And then she came to me and informed
9   me that Justin was having some problems, that
10   Justin wanted to know if Dr. Martini could give
11   him an injection. And so had her find out what
12   the injection was going to be because I needed
13   to call USADA. And call USADA and find out,
14   because I know -- again, I have done this same
15   thing when I was competing, that there's a
16   window, prior to out of competition. You can
17   take this, an injection, a corticosteroid,
18   whether it's in a sheath or wherever. There are
19   certain places it can be. And as long as it's a
20   certain amount of days, whether it's ten days
21   out of competition, you are fine. If it's
22   inside that and it's in your body and you test
23   positive, you will be banned.
24      I called the USADA hotline, talked
25   to -- I think his name was a Dr. Blankenberg --

## Page 634

1   anyway, talked to USADA doctor, and he --
2   Dr. Richard Hilderbrand -- and he told me that
3   it was okay for this shot to be, as long as it
4   was ten days out of competition, and this
5   competition was about 30 days away, so I said
6   there's no problem.
7      And I said, Well, I need to make
8   sure that you have a record of this
9   conversation.
10      And he goes, These are recorded.
11      And I go, Fine.
12      Q.   Did you identify yourself in this
13   call?
14      A.   He knows -- yeah, I was Renaldo
15   Nehemiah. I'm actually -- I'm still waiting. I
16   put in a call recently to tell him to ask for
17   the record of the phone call, because they do
18   log the calls. And he says, unless they're
19   anonymous.
20      And I said, No, it wasn't anonymous.
21   It's from me. And I said, Do you need to know
22   the name of the client as well?
23      And he said, Yeah.
24      I told him the name of the client,
25   and he said he would get back to me.

## Page 635

1      Q.   When was that call?
2      A.   That was actually yesterday, that
3   call, because I don't have any documentation
4   since it was a recorded line.
5      So Dr. -- the doctor at the USA --
6   USADA hotline fully is aware of my call to him
7   about an injection for Justin Gatlin.
8      Q.   And that injection was in March of
9   2006, approximately March?
10      A.   Yes. Yes. So, upon getting the
11   green light from Dr, -- from the doctor at
12   USADA, I, in turn, go back to Britton and let
13   her know that she can let Justin know that he
14   can get the shot from Dr. Martini.
15      Q.   I think you may have mentioned it,
16   but you, in your career, received a similar-type
17   shot?
18      A.   I did. I had an insertion at the
19   hamstring, a problem with that area, and had an
20   injection. And it was a -- the principles
21   haven't changed. The concept, as far as the
22   sheath or the tissue or certain places you can't
23   have the injection, because of where it is, and
24   it had to be out of competition, X amount of
25   days removed from a competition to protect me

## Page 636

1   from testing positive. And they are explicit
2   about that when they tell you that, and so,
3   fortunately, we had a large enough window. It
4   was March. He wasn't running again until the
5   second week in April.
6      Q.   After Justin tested positive, have
7   you been involved in trying to discover what had
8   happened?
9      A.   Yeah, I have been, again, the
10   quarterback.
11      I found out very early that no one
12   wants to talk to attorneys, meaning Justin's
13   attorneys, and so I -- you know, I had to do my
14   part, you know. I believe that he was wronged.
15   I didn't know how it happened. And I was going
16   to try to find out however I could, so I was --
17   I made myself available.
18      Q.   Have you ever heard of a man named
19   Angel Heredia, also known as "Memo"?
20      A.   Yes, I have.
21      Q.   How did you come to learn of Memo?
22      A.   I can't tell you the exact month,
23   but it was in a New York Times article, that
24   they were talking about the BALCO investigation,
25   and I guess he was a person of interest. And

Page 637

1    another man by the name of John Burks, who was
2    listed in the article, was talking about his
3    relationship with Trevor Graham.
4            And I told Justin about the article,
5    and I asked him did he know this John Burks,
6    since John Burks used to work with Trevor
7    Graham. And he knew the name, and he didn't
8    know him personally, but he knew some former
9    athletes or some athletes that might know how to
10   get in touch with him.
11       Q.   Did there come a time when you got
12   in touch with Mr. Burks?
13       A.   I did. Justin was able to get the
14   phone number. And John Burks, I called him -- I
15   called him several times. He never returned my
16   phone call.
17           But when I did, he made me justify
18   who I was, because he didn't trust me. I guess
19   he felt this may have been federal government or
20   someone, but once I assured him who I was, and I
21   wanted to know what he knew about Memo. I read
22   this article. Your name is now prominently
23   displayed in this article.
24           And he wanted to know why. So,
25   well, obviously, my client has tested positive.

Page 638

1    This Memo character clearly disclosed in this
2    New York Times article that there was a
3    financial dispute between he and Trevor Graham.
4    And I wanted to know if he knew anything about
5    Memo, his relationship with Trevor, how close
6    they worked, if he could tell me about any of
7    Trevor's tendencies. I was trying to find
8    whatever I could that would obviously be a
9    smoking gun to help me have evidence that my
10   client was innocent.
11       Q.   Did you ever call Memo?
12       A.   John Burk gave Memo my number. Memo
13   called me, and then I called him back, yes.
14       Q.   Okay. Do you know approximately
15   when this was?
16       A.   I really can't say. I would say in
17   the middle of the summer, I guess. I don't
18   know.
19       Q.   Would --
20       A.   It could have been -- let's see, the
21   New York Times article was -- I thought it was
22   around July or shortly after, or just June,
23   shortly after Justin -- that I had found out
24   that Justin had tested positive, so within a
25   three- or four- or five-month period, I was in

Page 639

1    there.
2        Q.   So sometime within a few months
3    after --
4        A.   Yeah, I can't --
5        Q.   So if I said it was sometime around
6    Thanksgiving, would that seem --
7        A.   That's possible, yes. I don't know
8    the day. I just know I talked to him, yeah.
9        Q.   What did you learn when you talked
10   to -- talked to Memo?
11       A.   Memo was not a Trevor Graham fan.
12   He spoke only about Trevor wasn't as smart as he
13   thought he was. He disclosed certain tendencies
14   about Trevor Graham, that so many innocent
15   athletes have gotten hurt. He didn't know
16   Justin Gatlin at all, but everything he's read
17   and seen, he liked the guy. And he got on the
18   bandwagon, and said, "If I can do anything to
19   help you guys, I will."
20       Q.   Did you, at any time, ask him to do
21   anything to help?
22       A.   I did. I asked him to -- if --
23   well, he told me that over the years that he
24   worked with Trevor, that Trevor was good enough
25   to make his own creams.

Page 640

1            And I said, Really? And I said,
2    Well, we think it was a cream that contaminated
3    Justin.
4            And he says, Well, if you can give
5    me the information from his results, I have a
6    lab down here in Mexico, I can talk to my
7    people, and we can try to find out.
8            And I said, How are you going to
9    find out?
10           And he goes, Well, I can get all the
11   different measurements on his test, and we can
12   come up with different things. And I'm pretty
13   certain I can find out that, if the cream -- if
14   it was a cream that Trevor used -- or that was
15   used.
16       Q.   Did you ever arrange for Justin to
17   talk to Memo?
18       A.   I did. Memo wanted to talk to
19   Justin, because he wanted to find out, I guess,
20   specifically, certain things about Trevor. And
21   I was very uneasy about ever allowing Memo to
22   talk to Justin Gatlin directly, so I
23   conference-called it in.
24       Q.   Did Memo ever agree to prepare any
25   document or anything?

7-30-07 to 8-01-07                                    USADA vs. GATLIN

161 (Pages 641 to 644)

Page 641

1    A.   Yes, he did.  He disclosed to us
2    that he would have his people down in Mexico run
3    out all these series of tests.  He was hell-bent
4    that Justin was negative, et cetera, et cetera.
5    All I wanted him to do was tell me if, in fact,
6    it was a cream, based on all the results.  And
7    he was going to put it in a formalized report
8    for us.
9        Q.   So, the initial -- your initial
10   request from Memo is to find out if it was a
11   cream, and if so, what was in the cream?
12       A.   Correct.
13       Q.   Is that what Memo ended up
14   telling -- or preparing a report and what the
15   report said?
16       A.   Memo went every way but what we
17   asked him to do.
18       I don't know what he -- I don't
19   ultimately know what he ended up providing us.
20   We got a report.  It wasn't comprehensive at
21   all, but it was all about proving that Justin
22   never even tested positive.  And it was -- quite
23   frankly, I thought it was a waste of our time.
24       Q.   Did there ever come a time when Memo
25   was to be paid to generate this report?

Page 642

1    A.   Yes.  Yes.
2    Q.   How did that happen?
3    A.   Memo said there were going to be
4    expenses involved with getting all these
5    different scientists and people down there to
6    run all these different tests.  It turned out to
7    be a bunch of -- I think a bunch of B.S. in
8    hindsight, but -- and that he wanted to be paid
9    for his services.
10       The Gatlins and I discussed it.  We
11   knew that, obviously, we can't have people doing
12   things for us for free.  So we had to expect
13   that we were going to have to pay something to
14   have these tests run.
15       Q.   So did you negotiate a price?
16       A.   Yeah.  Memo wanted about 12-,
17   $13,000.  We got it down to $10,000, of which
18   five of it would be initially, and then the
19   other five when the work was completed.
20       Q.   Is that how it went down?
21       A.   No.  Actually, he ended up -- he got
22   the -- he wanted $5300 of the 5,000 [sic] up
23   front.  And so I sent to accounting at Octagon
24   an invoice for $5300 be sent to Memo.  He
25   provided me with his banking information,

Page 643

1    et cetera.  And that was taking place on a
2    Friday.
3        So on a Friday, they sent 5300 of
4    the reported $10,000.  And the following Monday,
5    they came in, and they made a goof, and they
6    sent another $5,300, to Memo, in which I told
7    them you are not supposed to send $10,600; it's
8    supposed to be 5300.  So we were after Memo to
9    get the money back.  And he was trying to say he
10   was going to wire to us.  He didn't, so Octagon
11   had to make up the money.  So Memo got away with
12   10,600.
13       Throughout repeated conversations
14   with him -- well, prior to him getting the
15   money, Memo was my worst nightmare when it came
16   to -- just a pain in my neck, calling all the
17   time.  Once he got the overpayment, we had to
18   track him down, and you couldn't get to him but
19   every now and then.  And then he accused me of
20   calling him a crook.  And I said, well, if the
21   deal ultimately was worth $10,000, and you got
22   10,6, just give me the $600 back.  And he never
23   gave us the $600 back, so...
24       So ultimately, you know, when you
25   are desperate to try to find a way to help your

Page 644

1    client -- you know, in my case, I was shaking
2    every tree out there.  I mean, people were
3    talking to me.  I figured they would talk to me.
4        And so I didn't know this Memo guy.
5    If he walked in front of me right now, I
6    wouldn't even know what he looked like.  Justin
7    really never knew what he looked like either.
8    So we were just trying to find a way.  And when
9    I heard "creams" and this guy talking about
10   Trevor and his people knowing how to make
11   creams, I just said aha, maybe this guy can help
12   us out, and if we can get close and find out
13   that it was a cream, great.  And that's what it
14   was all about.
15       Q.   So he never did -- Memo never did
16   produce anything saying what the cream was?
17       A.   He produced a lot of things that I
18   couldn't even understand, and not even other
19   experts that we had, scientists, chemists.  They
20   just said it didn't make a lot of sense.  How
21   could he come up with this explanation when he
22   didn't have the samples, the true samples?
23       Memo would tell me he didn't need
24   the samples; and, you know, different experts,
25   Well, you do need the samples,

Page 645

1    And so to make a long story short,
2 the family and I just thought he was full of it
3 after awhile, because we just weren't getting
4 what we wanted to get from him.
5    Q.   You were aware that Justin was
6 cooperating with Jeff Novitzky?
7    A.   Yes, I did, and so was I.
8    Q.   And you also were cooperating?
9    A.   Yes, I was.
10    Q.   Did there come a time when you
11 learned that Jeff Novitzky was unhappy that
12 there had been contact with Memo without letting
13 him know that you had contact with Memo?
14    A.   Yes, I did learn that.
15    Q.   And do you know approximately when
16 you learned that?
17    A.   I don't know when, but I got a phone
18 call from you, and you kind of panicked that he
19 was very angry. And I said, Well, no one has
20 ever told me not to talk to anybody. I didn't
21 know that.
22    Q.   What happened as soon as you were
23 aware?
24    A.   You and I discussed it, because he
25 wasn't talking to you either, and I had never

Page 646

1 talked to Jeff Novitzky ever. And I offered
2 that maybe I should give him a call. And I
3 called Jeff -- well, I left him a message, and
4 within 30 minutes Jeff Novitzky called me back,
5 and we talked just short of an hour. And I gave
6 him ever phone number I had for Memo. I gave
7 him the bank accounts for Memo. You know, I had
8 full disclosure.
9    Q.   Did you send him the Memo memo?
10    A.   The Memo memo.
11    Q.   The document that Memo had submitted
12 that he had all these weird assertions and
13 nobody could figure out what they were?
14    A.   Yeah. I sent him, yeah, when Memo
15 sent -- any correspondence that Memo sent to me
16 and was by e-mail, I would forward it off to
17 Jeff Novitzky, and he would write back in an
18 e-mail, "thank you very much."
19    Q.   Have you had any discussions with
20 Nike in 2007 regarding a massage therapist?
21    A.   I have. Yes, I have.
22    Q.   What did Nike tell you?
23    A.   Well, because I still have other
24 clients who are Nike clients and pretty
25 prominent -- actually, it was Tim Phelan. And I

Page 647

1 said, so who is -- Chris is out of the picture
2 now, so who is the new massage therapist that
3 you guys are working with?
4    And he said, We're out of that
5 business.
6    And I go, Well, it's probably a
7 smart move.
8    So the athletes are on their own
9 getting their own massage therapists. They're
10 no longer supported by Nike.
11    Q.   Did he give you any reason?
12    A.   I believed -- he didn't, but I
13 coined it the "Justin Gatlin" rule.
14    Q.   Now, you said you talked to Justin a
15 lot?
16    A.   Yes.
17    Q.   Did you ever ask him whether he
18 knowingly took a banned substance?
19    A.   Oh, yeah. I looked him right in his
20 face. Yeah.
21    Q.   What did he tell you?
22    A.   No, he didn't.
23    MR. COLLINS: Okay.
24    MR. BOCK: What time is your flight,
25 Mr. Nehemiah?

Page 648

1    MR. NEHEMIAH: An hour and 20
2 minutes.
3    MR. COLBERT: You are staying here,
4 so...
5    MR. BOCK: This is -- not going to
6 like this lawyer, apparently, but because,
7 there's no way I can finish your examination in
8 time for you to get your flight.
9    MR. CAMPBELL: Is there any way we
10 can do it later or by telephone, or would you
11 rather do it in person?
12    MR. BOCK: It needs to be done in
13 person.
14    MR. NEHEMIAH: That's fine. There's
15 another flight. It just makes my second flight
16 closer, but that's all right.
17    MR. BOCK: I apologize for that.
18    MR. NEHEMIAH: That's all right.
19    MR. BOCK: There's a document that we
20 were going to be provided yesterday that was
21 apparently an invoice received from Cary
22 Chiropractic for an injection in 2006. Can I
23 take a look at that?
24    MR. COLBERT: Are those multiple
25 copies?



Page 649

1    MR. COLLINS: Yes, I made copies for
2  everybody.  This is the original, if anybody
3  wants to see the originals.
4    MR. COLBERT: Copies for the panel.
5    MR. BOCK: Should I go ahead?
6
7    EXAMINATION
8  BY MR. BOCK:
9    Q.  Well, I think I will start,
10  Mr. Nehemiah, with your conversations with
11  USADA, since we represent USADA.
12    Well, let me back up and ask you
13  another question.  The hearing started yesterday
14  at 10 a.m.  Since the hearing started,
15  Mr. Collins has been in the room, Mr. Gatlin has
16  been in the room, and Mr. Gatlin's father, and
17  then there is witnesses that testified, and
18  Mrs. Gatlin's aunt.
19    Have you spoken about this case with
20  anyone since 10 a.m. on --
21    A.  Outside of the people you just
22  mentioned?
23    Q.  No.  Including those people.
24    A.  Inquiring as to how it's going, yes.
25    Q.  And did you discuss with them some

Page 650

1  of the testimony that was taking place?
2    A.  Pieces of it, yes.
3    Q.  And did you understand that there
4  was a strict instruction by the panel to
5  separate witnesses, so that there would not be
6  discussion about testimony that took place in
7  this room?
8    A.  I'm not privy to that, no.
9    Q.  Your answers were very specific.
10  Did you speak with Mr. Collins about the
11  testimony that took place in this room?
12    A.  No.  I spoke with Mr. Collins to
13  prepare myself for testimony.
14    Q.  And when did that preparation take
15  place?
16    A.  11:00 last night until about 1-ish.
17    MR. BOCK: Travis (Attorneys
18  conferring.)
19    Q.  And so I take it that you have heard
20  from Mr. Collins and the same questions that you
21  heard from him today, last night?
22    A.  Some of the questions that he was
23  going to ask me about, yes.
24    Q.  All right.
25    Another thing you did yesterday was

Page 651

1  that you called Dr. Hildebrandt; is that right?
2    A.  Correct.
3    Q.  And that call was made without
4  contact with USADA, was it?  I mean, USADA's
5  attorneys, I'm sorry.  The people in this room
6  that were representing the United States
7  Anti-Doping Agency?
8    A.  Correct.
9    Q.  And there's no communication through
10  Mr. Gatlin's counsel to us about that that
11  communication was going to occur.
12    A.  That's correct, I guess.  I don't
13  know.
14    Q.  And there was no effort prior to the
15  start of the hearing yesterday to attempt to
16  acquire that information from USADA; is that
17  correct?
18    A.  Prior to the hearing?
19    Q.  Yes, sir.
20    A.  Well, I looked in my files,
21  beforehand, and there was no record of it.  And
22  then -- so, in contacting USADA, I knew that
23  they had -- every call is recorded, and that was
24  their record.
25    So -- but I haven't heard back from

Page 652

1  USADA.  So I called them, and it wasn't
2  Dr. Hildebrandt that I talked to.  It was --
3  yesterday I talked to Dr. Hildebrandt.  So that
4  was the first time that I talked to
5  Dr. Hildebrandt about getting -- actually
6  getting that -- the correspondence of that call
7  back in 2006.
8    Q.  And that's one of the things we
9  wanted to clarify, that when you testified about
10  speaking with Dr. Hildebrandt, it was not the
11  individual that -- you never had spoken with him
12  before; is that right?
13    A.  I don't recall if it was
14  Dr. Hildebrandt who I spoke to yesterday.  It
15  was a doctor, but I don't know if it was
16  Dr. Hildebrandt.
17    Q.  Okay.
18    A.  Because I directly made sure that
19  when I was on that call with USADA official, I
20  said, How do I know that this is going to be
21  documented who I'm talking to, because if the
22  crap hits the fan, I don't want someone saying
23  they didn't talk to me.
24    And he said, No, these calls are
25  recorded.



Page 653

1    And I said, Fine.
2    Q. And you specifically recall having
3  that conversation?
4    A. Oh, yeah, definitely. I did it on
5  behalf of my client. Again, it's Justin Gatlin,
6  and you are talking about an injection, so I'm
7  not going to just talk to a stranger and not be
8  able to document it.
9    Q. All right. Was it male or a female
10  doctor you spoke with at USADA?
11    A. Male, it was a male doctor.
12    Q. Okay. And the date you testified
13  earlier, was sometime around the middle of
14  March?
15    A. Yes, sir. That's correct.
16    Q. And that was after the injection
17  Mr. Gatlin had received; is that correct?
18    A. No, no. Mr. Gatlin called Britton
19  Stackhouse, was talking to Britton Stackhouse,
20  who came to me. He was having a problem with
21  his leg, and he wanted to know if it would be
22  okay to get an injection, but he wanted to make
23  sure it was okay, it was legal and legitimate.
24    And then we said, Don't do anything.
25  Thank you for calling us first. We will get in

Page 654

1  touch with USADA. We'll get back to you.
2    Q. Okay.
3    A. I made the call to USADA.
4    Q. Okay.
5    A. Britton is my client service, but
6  when it comes to serious matters, I jump on the
7  sword. So I'm the one that did it.
8    Q. Okay.
9    A. And then I convey it to her, and she
10  conveys it to Justin.
11    Q. So your understanding was that
12  Mr. Gatlin had a -- describe, then, the
13  communication that you had with Mr. Gatlin after
14  you spoke with USADA?
15    A. I told him that the doctor at USADA
16  said it was okay to get the injection. I knew
17  what the injection was at the time, that
18  Dr. Martini wanted to use, and it was outside --
19  it was out of the competition, outside the
20  window, and it wasn't in jeopardy of being in
21  competition test, because he wasn't going to run
22  for almost a month.
23    Q. Okay. And what was your
24  understanding was going to happen there?
25    A. Well, it was a combination of

Page 655

1  things. Justin had fluid buildup in the leg,
2  some form of tendinitis, so I knew that they
3  were draining the leg. I knew they were going
4  to inject him with an anti-inflammatory, and,
5  you know, corticosteroid.
6    Q. Okay.
7    A. Yeah.
8    Q. All right. And so your
9  understanding in mid-March of 2006, was that
10  Justin was going to be injected with a
11  corticosteroid?
12    A. Yes, prior to the season starting,
13  yes.
14    Q. After you had spoken with him in
15  mid-March?
16    A. I spoke with Justin in March about a
17  problem. Made the call for him.
18    Q. In mid-March?
19    A. Prior to his competition starting.
20    Q. Okay.
21    A. Because he was having trouble in
22  training. Made the call to USADA, got
23  clearance. My office, then conveyed that
24  message to Justin, and they went forth with the
25  procedures.

Page 656

1    Q. All right. All right. And so if
2  there was testimony yesterday that the in --
3  that the injection occurred on March the 1st,
4  there must have been two injections; is that
5  right?
6    A. The procedure may have been two or
7  three injections. It could have been two types
8  of medicines.
9    Q. Okay. So there could have been --
10    A. And the syringe of taking fluid off,
11  so there may have been three, for all I know.
12  But the process was an anti-inflammatory to help
13  him get back to training, take the inflammation
14  out.
15    Q. Did the USADA individual that you
16  are claiming you spoke with in mid-March inform
17  you that the process for addressing this sort of
18  situation is to fill out an abbreviated TUE,
19  known as a TUE form?
20    MR. COLLINS: I have one quick
21  objection. I believe when I asked in direct
22  examination, I said late February, beginning
23  March. And I don't think I said mid-March. I
24  think that was his testimony. He's
25  reclassifying it as mid-March. And on --

7-30-07 to 8-01-07                                          USADA vs. GATLIN

165 (Pages 657 to 660)

Page 657

1  earlier in cross-examination, you say, "Did it
2  happen mid-March after the shot?" And his
3  response was, "No, it was before the shot."
4       MR. BOCK: John, I'm taking notes
5  here. And it's absolutely inappropriate for you
6  to interject with an objection like that. You
7  were informed by the panel, requested by the
8  panel not to make speaking objections like that
9  yesterday. That is inappropriate.
10      MR. COLLINS: I will ask for a
11 sidebar next time.
12      MR. BOCK: You should.
13      MR. TYGART: Just make the objection.
14      MR. COLBERT: Just make the
15 objection. I understand the objection.
16      Counsel has been asking the
17 questions. I think the witness has been
18 answering the questions accurately, to the best
19 of his ability. And you can always go back on
20 redirect, if you think there's a need for
21 rehabilitation, if you think there is.
22      MR. COLLINS: Okay.
23      MR. BOCK: And I don't mean to be
24 short with anybody, but there's a process here.
25 And I think --

Page 658

1       MR. COLBERT: I have ruled, Counsel.
2  Why don't we just move along, please?
3       Q. (By Mr. Bock) Is Britton Stackhouse
4  your employee?
5       A. She's former now, as of November
6  2006.
7       Q. Okay. Was this anything in relation
8  to her departure that has anything to do with
9  this case?
10      A. No, no, not at all.
11      Q. All right. Was she involved in the
12 communication to USADA?
13      A. No, I was.
14      Q. Because that's not something that
15 you would have permitted?
16      A. No. I mean, as much as I had
17 confidence in Britton, certain things I just
18 took over. I wasn't going to allow something
19 that sensitivity, I wasn't passing the buck. I
20 mean, he's my client and she works for me, so
21 there are instances throughout my management of
22 anybody that works with me, that it's my call.
23 And so, when you are talking about something
24 that could affect his career, I'm going to make
25 the call. I'm not going to have to point the

Page 659

1  finger at Britton, because the buck stops with
2  me. So I made that call.
3       Q. Did you get in a conference call
4  then with Justin to convey?
5       A. I was in Britton's office when she
6  was talking to Justin. She said, Renaldo just
7  walked in. And then she was sharing with him
8  what I had already told her.
9       Q. I see.
10      A. Yes.
11      Q. Were you aware of the injection that
12 Randall Evans was going to give Mr. Gatlin
13 before it occurred in April of 2006?
14      A. I learned of it throughout his
15 course of his communication with Cameron Myler.
16      Q. Okay. And did you learn about any
17 other injections received from Randall Evans?
18      A. I have only known one that was in
19 question, which was a B12.
20      Q. Let me take you back to 2004. We
21 had some pretty specific comments to the media
22 about whether Justin could or should continue to
23 be coached by Trevor Graham; is that fair?
24      MR. COLLINS: I don't mean to
25 interrupt. I just didn't catch the time frame.

Page 660

1       MR. BOCK: In 2004?
2       MR. COLLINS: Okay.
3       A. I remember a quote, one that I
4  recall, which was you are judged by the company
5  you keep. I don't recall seeing anything else I
6  have ever said.
7       Q. (By Mr. Bock) Did you have a
8  sit-down discussion with Justin and/or the
9  members of his family about whether Justin
10 should continue to be coached by Trevor Graham,
11 following the 2004 Olympic Games?
12      A. We had a discussion about Trevor
13 Graham freely making comments, and how we have
14 to have Trevor zip it, because Trevor isn't the
15 most positively received person, and hence, you
16 are judged by the company you keep. So having a
17 coach out there that has been ostracized by the
18 free world in making comments when I thought
19 they were inappropriate, it wasn't healthy for
20 my client, and the timing of it since my client
21 had just won Olympic gold, I thought it wasn't
22 advisable.
23      Q. And what comments were inappropriate
24 that Trevor Graham was saying?
25      A. The night that Justin Gatlin won the

Page 661

1  gold medal was the night that he disclosed to
2  the public that he was the one that turned in
3  the syringe.
4      Q.  And why was that an inappropriate
5  comment?
6      A.  I think it's obvious.  You are
7  telling the world that you had access to a
8  previously undetectable steroid, and his top
9  client just won the Olympic gold medal.  It was
10  incomprehensible to me, and I was not pleased.
11  If -- it was Justin's moment, and so comments
12  like that were unwarranted.  I didn't like it.
13  And, you know, you are judged by the company you
14  keep.  So if he's saying those kinds of things,
15  it could, throw a cloud over him, you know, what
16  Justin was trying to accomplish.  And this was
17  Justin's moment.  It wasn't -- that had no place
18  in what was taking place.
19      So, I was outspoken about it, but I
20  was reserving my comments, but, you know, I
21  thought I was on point.
22      Q.  So you thought that the public could
23  draw a connection between the fact that Trevor
24  had access to an undetectable steroid and the
25  athletes that Trevor was coaching?

Page 662

1      A.  Well, I think, Olympic gold medal
2  and someone saying a steroid on the same night
3  was a recipe for potential disaster.  And I
4  wasn't pleased, and as his agent and his
5  manager, I had to say something about it.  But I
6  was tactful, and I just said, you know, you are
7  judged by the company, meaning that comments
8  like those aren't healthy.  And I had the
9  conversation with the family about it, and they
10  ultimately agreed with me.
11      Q.  Okay.  At that point in time, 2004,
12  were you concerned that just based on either
13  things that you were hearing on the
14  track-and-field circuit or what you were reading
15  in the media, were you concerned about Trevor
16  Graham and whether he was a good influence on
17  his athletes in terms of substances that those
18  athletes used?
19      A.  No, only because, there is
20  widespread talk as we sit here today, on any
21  athlete that is performing well, male or female.
22  There's drug discussion.  Is he cheating?  Is
23  she cheating?  Is the coach doing it the right
24  way?  Is the coach not doing it the right way?
25  So Trevor Graham was among a host of coaches

Page 663

1  that fell into that category, so I have long
2  since stopped worrying about it.  I just watch
3  the performance, and let the powers that be
4  monitor it.  Otherwise, I lose my mind trying to
5  enjoy a sport that I love.
6      Q.  Have you personally had conflicts
7  with Trevor Graham at any point in time?
8      A.  Well, yes, to the point that his
9  arrogance tends to spill over into, he forgets
10  that he's a coach, and he's not the manager.
11      And, you know, I don't tell him how
12  to -- I didn't tell him how to coach, and I
13  wasn't going to have him tell us how to manage.
14  So that's where the conflict was, if we had any.
15      But that was quickly squashed
16  because I just turned to Mom Gatlin, and say,
17  remember the line's in the sand, and he didn't
18  want to challenge the Gatlins.  So that's all I
19  ever did.  And it was only once or twice, and it
20  was short-lived, maybe a brief conversation.
21  And I would tell Mrs. Gatlin.  She would call,
22  because I wasn't going to get in a fight with
23  Trevor.  I knew my job.  I wanted him to do his
24  job.
25      Q.  After June the 15th, 2006, did you

Page 664

1  have any conflict with Trevor?
2      A.  June?
3      Q.  June 15th, 2006, which was the day
4  that Mr. Gatlin found out about the positive A
5  sample?
6      A.  No.  I had previous discussion --
7  well, I had discussions with Trevor Graham from
8  around June 18th to June 23rd at our national
9  championships, and I don't believe I have spoken
10  to Trevor Graham since.
11      Q.  Okay.  And the discussions were
12  about the positive drug test?
13      A.  Trying to figure out, yeah, what
14  happened, how it happened, asking him
15  point-blank, you know, was he involved.
16      Q.  Did he have a theory at that point
17  in time about what happened?
18      A.  Yeah, he had several theories, yeah.
19      Q.  What did he tell you about his
20  theories?
21      A.  Well, initially, he was trying to
22  figure out what it was, and then as was publicly
23  stated to the press by him, he accused Chris
24  Whetstine.
25      Q.  And he accused Chris Whetstine -- he



Page 665

1  accused Chris Whetstine publicly. What did he
2  say to you about Chris Whetstine?
3      A.  I don't know if he said it to me.
4  He said it to the press that Chris Whetstine had
5  put a cream on him.
6      Q.  Well, the way we got there, was I
7  was asking you about your conversations with him
8  from June 18th to June 23rd.
9      A.  Right.
10     Q.  Did he raise the issue of Chris
11 Whetstine at that time?
12     A.  Initially, he raised the -- the
13 discussion was about there was a cream, and they
14 were trying to figure out what kind of cream.
15 Was Chris using creams?  And he recalled seeing
16 certain creams.
17         And so it was all about, we need to
18 find out if this is the cream to use, and then
19 if it is, we need to find out if this cream is a
20 legal cream.  And then shortly thereafter -- I
21 don't know exact day -- or if it was -- that he
22 eventually came out and said, he assumed Chris
23 Whetstine was responsible.
24     Q.  So sometime in between June 18th and
25 June 23rd, Trevor Graham said it was a cream

Page 666

1  that caused the positive test result?
2      A.  He felt it was, yes.
3      Q.  Do you know why?
4      A.  I have no idea why.
5      Q.  Was anybody else present when he
6  told you it was a cream?
7      A.  Gatlins may have been present at one
8  point during that -- the national championships,
9  when that discussion came out.  We were on
10 conference call with the attorneys when he
11 described the cream, the tube that the cream
12 came in.  I was --
13     Q.  What was -- I'm sorry.  Go ahead.
14     A.  For me, I just -- you know, whether
15 it was Trevor or it was Chris or whoever, I knew
16 that between the two of them, somebody had to
17 know what happened.
18     Q.  And when he described the tube that
19 the cream came in back in June of 2003, what did
20 Trevor Graham say?
21     A.  He described the tube back in June
22 of 2006.
23     Q.  I said "3."  I meant "6."  I'm
24 sorry.  Thank you for correcting me.
25     A.  Okay.  Initially, he said it was a

Page 667

1  white tube with a squiggly line, and it actually
2  came out to be the female version of DHEA.
3      Q.  Did he say anything else about the
4  tube?
5      A.  No, not at all.  Just said it had a
6  squiggly S kind of thing, a pink squiggly S.
7  And for the research, that it was DHEA, but it
8  was a female version.
9      Q.  So I assume if he was talking about
10 a tube with a squiggly S on it, he was also
11 talking about Chris Whetstine at that time?
12     A.  Well, a tube that he had seen in
13 Chris's possession and using on Justin, yeah.
14     Q.  And Trevor told you that that was a
15 DHEA cream?
16     A.  No, we found out that it was DHEA.
17 Trevor -- we had Trevor take us through this
18 process of what this tube looks like.  And so
19 Trevor went online, located this tube, and he
20 said "that's it," and that's what it said
21 underneath it, DHEA.
22     Q.  Were you with him while he was
23 online?
24     A.  Not when he navigated it.  When I
25 saw it online, it was there, it was on the

Page 668

1  laptop.
2      Q.  And did he come up with -- did he
3  navigate while you were sitting there?
4      A.  Never did.  Never did.
5      Q.  How did it come about that it came
6  up on -- whose laptop?
7      A.  It was his.
8      Q.  Okay.  How did it come up -- about
9  that it came up on Trevor's laptop?
10     A.  It was about midnight, I think the
11 night of the -- actually the night of the 18th,
12 when we first arrived that Justin told me that
13 Trevor wanted to see me.  I was staying at the
14 Hyatt Regency; Trevor was staying at the Westin.
15 I walked over to the Westin.  Trevor was in the
16 lobby lounge, and he had a laptop sitting on his
17 desk.  And right there in front of me, he says,
18 This is what I saw Chris using on Justin.
19         And I looked at it, and I go okay.
20         And he says, That's the squiggly S,
21 and it said DHEA.
22     Q.  So, at that point in time, did you
23 feel like you knew the source of the positive
24 test?
25     A.  No, no.  I just felt it was too

## Page 669

1   convenient.
2     Q.  Why is that?
3     A.  I -- you know, just -- you know, you
4   hear about all the rumors, you have all these
5   thoughts in your mind, so at that point, I
6   wasn't believing -- believing him at all. I
7   mean, I didn't have any reason to. I didn't
8   have any reason not to, but I was just taking it
9   all in.
10     And since I wasn't representing
11   Justin from a legal standpoint, we directed that
12   information to his attorneys, and it was up to
13   them to decide the veracity of it. I mean --
14   but I just -- it was just strange to me, but,
15   you know, when I asked him how he found it, he
16   just said, he knew it had -- it was a cream, he
17   saw him using it, he was surfing the Net.
18     And I just said, You know what?
19   Okay, this is the information. We will pass it
20   off to the attorneys, and I left it at that.
21     Q.  Was there any discussion about going
22   to USADA at that point, and saying, Look, here's
23   this information. It's June the 18th. Now this
24   is even public. The B sample's not even been
25   done. Let's tell them what we know.

## Page 670

1     A.  That's not my role.
2     Q.  I understand. Was there any
3   discussion about it?
4     A.  The only thing I recall, and I don't
5   know specifics of it, but countless
6   conversations with Cameron saying that she had
7   conversations with Travis --
8     Q.  You probably can't tell me --
9     A.  -- so I don't know what those
10   conversations entailed and what those
11   conversations were about.
12     Q.  I guess conversations with Travis,
13   we can talk about.
14     MR. COLLINS: She wasn't his lawyer,
15   so that's not a privileged communication.
16     MR. BOCK: Yeah, okay. I don't
17   know -- okay. If you don't consider it
18   privileged, that's fine.
19     Q.  (By Mr. Bock) So there was no
20   specific conversation about Trevor going to
21   USADA and revealing what he had told you?
22     A.  I'm not privy to that, no.
23     Q.  Now, as I ask these --
24     MR. COLLINS: Did you guys already
25   take copies of these?

## Page 671

1     MR. COLBERT: You have got all the
2   copies.
3     MR. COLLINS: I didn't know they came
4   to me. They came from that direction.
5     Q.  (By Mr. Bock) Let's talk about your
6   interactions with Memo.
7     A.  Okay.
8     Q.  That article that you saw that
9   caused you to give him a call, that was -- you
10   testified, I think an article in the New York
11   Times?
12     A.  It was in the New York Times,
13   correct.
14     Q.  Did that article describe Memo as a
15   supplier of drugs for Trevor Graham?
16     A.  No. I don't know exactly, but I
17   recall it describing him as a person that the
18   federal government was interested in; talked
19   about his -- he had a relationship with Trevor
20   Graham that had gone badly over the financial
21   dispute; and -- but this was being told through
22   the eyes of John Burks, because John Burks was
23   telling this story. And so I had seen the memo
24   in relationship to Trevor. John Burks was a
25   former -- whether it was an assistant coach, or

## Page 672

1   someone who worked along with Trevor -- so
2   between the two of them, I was trying to find
3   out if I could find a way to get closer to what
4   really could have happened to my client.
5     Q.  Did you know Memo's age?
6     A.  No. I don't know anything about
7   him, just the name "Memo."
8     Q.  So -- and I think you testified that
9   you never saw him in person, just talked over
10   the phone?
11     A.  Voice on the phone.
12     Q.  And that voice over the phone, you
13   realized, was cooperating with the government?
14     A.  I didn't know anything about that.
15     Q.  I thought you said that he was in
16   the article.
17     A.  No, that he was a person of interest
18   with the government. I don't know if he was
19   cooperating. I never got that.
20     Q.  Did you ask him?
21     A.  No. I never -- naively, I never
22   thought I -- you know, he would tell me if he
23   could talk to me or not talk to me. And in my
24   full disclosure to Jeff Novitzky, I had nothing
25   to hide. I was just asking the guy questions.

7-30-07 to 8-01-07                                    USADA vs. GATLIN

169 (Pages 673 to 676)

Page 673

1    So I felt somebody would tell me, you can't talk
2  to him, or I can't talk to you, or don't talk to
3  him. And no one ever said that to me.
4        Q.  And so you -- where is Memo located?
5        A.  Who knows?  He talked about Mexico.
6  He talked -- the bank was in Laredo, Texas, but
7  he shuffled around phone numbers to me.  You
8  know, I had three different phone numbers to
9  call him.  And he would get back to me.  It was
10 one of those "leave a message and I will get
11 back to you," and it would be a day or two, or
12 hours later, so, again -- you know.
13       Q.  How did you make the initial contact
14 with him?
15       A.  John Burks got him to call me.  John
16 Burks never gave me his information.  John Burks
17 gave him my information, and he called me.
18       Q.  Okay.  And when did you first start
19 having concerns with this relationship with
20 Memo?
21       A.  Concerns of what, between who?
22       Q.  Well, did you at any point have any
23 cautions, here's a guy who's moving around.  You
24 don't know where he is.  You don't know much
25 about his background.  You are talking with him

Page 674

1  about how somebody got doped.  Did you ever have
2  any cautions felt --
3        A.  Well, the one thing that I knew that
4  I wasn't doing anything wrong by asking
5  questions.  And based on what I read, he knew
6  Trevor Graham.  He had a relationship with
7  Trevor Graham.  And if it's drugs, I figured
8  they're on the move, they're willing to do
9  whatever.
10       I didn't care about all that,
11 because I just want to know, if you could
12 point me to what it was, at the end of the day.
13 And so I was the rookie Inspector Clouseau, if
14 you will.  And, you know, I didn't have anything
15 to hide; I was just asking him naively innocent
16 questions to get closer to the truth.
17       Q.  All right.  And this was, as
18 Mr. Collins pointed out, sometime around
19 Thanksgiving 2006?
20       A.  Yeah, fall, yeah.
21       Q.  So to use your terminology, this
22 Inspector Clouseau didn't believe it was the
23 Sarati cream.  You were trying to find out what
24 other cream --
25       A.  What did you call that?

Page 675

1        Q.  The cream that Trevor Graham showed
2  you, on -- whatever it was, what he showed you
3  on his computer?
4        A.  Mm-hm.
5        Q.  You weren't buying that story.  You
6  were looking for another kind of cream; is that
7  right?
8        A.  I didn't care what kind of cream it
9  was.  If it was a cream, I just wanted to find
10 out what kind of cream, the chemical makeup of
11 the cream that could give us relevance to
12 proving my client's innocence.
13       So when Trevor showed me the
14 squiggly S, it could have an A, a Z.  It didn't
15 matter what it was.  I had never seen it.  I'm
16 not -- I have never been exposed to that world,
17 so even when I saw it, it didn't mean anything
18 to me; like, okay, I will pass it on to the
19 attorneys.  When Memo talked about a cream, he
20 could have been talking about that same tube.
21 It wouldn't have struck a chord with me outside
22 of if he would have said a squiggly S, and I
23 would have said, Oh, I've heard that before.
24       Q.  But you were trying -- after
25 Thanksgiving, in 2006, you are still trying to

Page 676

1  find out what kind of cream it was?
2        A.  Yeah, I'm trying to find out, if
3  it's a cream, the contents of that cream.  Are
4  they consistent with what would cause a positive
5  result in my client's urine?
6        Q.  Why weren't you looking to find out
7  whether it could have been a pill?  Whether it
8  could have been a supplement, or --
9        A.  Well, I think, in my e-mail
10 correspondence to Chris Whetstine, all I wanted
11 was the truth, whatever it is.  So, up until
12 that point, the world was talking about the
13 creams, meaning people in the know, Memo, who
14 was very confident that he taught Trevor pretty
15 well, and Trevor can make up creams, and those
16 guys use creams, and he felt very confident that
17 Trevor himself wasn't doing it, but there were
18 people doing it.  So ...
19       Q.  Why was he confident that Trevor
20 himself didn't do it if he taught Trevor how to
21 do it?
22       A.  Trevor could make it up, but Trevor
23 wasn't applying it, you know.  I used the
24 analogy that if Trevor was involved, he was the
25 Godfather.  He'd watch it happen.  So Trevor

7-30-07 to 8-01-07                    USADA vs. GATLIN

170 (Pages 677 to 680)

Page 677

1    could stand on the sideline, and if you asked
2    him did he do it, he said no. And guess what?
3    He didn't do it, but other people did.
4        Q. Did -- as you sit here today --
5        A. And I watched Trevor at meets, and
6    Trevor was always standing to the side watching
7    Chris Whetstine or whoever work on the clients.
8        Q. As you sit here today, do you
9    believe that the Godfather is responsible for
10   this positive test result?
11       A. My gut has always been until proven
12   otherwise, that he knows something about it.
13   Whether he did it himself, I don't know, but I
14   have always felt that between he and Chris,
15   therein lies the answer.
16       Q. How about Randall Evans, did you
17   have concerns about him?
18       A. I didn't know much about Randall. I
19   didn't know what his real true role was.
20   Sometimes, when -- if Trevor couldn't go to the
21   meets, Randall would go, so he was kind of just
22   watching over Justin, but I didn't necessarily
23   think he was his coach. Trevor was, but I
24   didn't know that much about it.
25       Q. Did you know that he was providing

Page 678

1    medical care in the form of an injection through
2    your client?
3        A. Again, I have only heard of one
4    injection, which was a B12 pill, and that was in
5    the offices of Cameron Myler in New York City,
6    when they were discussing a B12 shot.
7        Q. Okay. So that was the first time --
8    you didn't know --
9        A. First and only time, I heard about
10   it.
11       Q. Okay. Have you come across any
12   other concerns about Randall Evans' character or
13   his connection with prohibited substances?
14       A. Well, we know through a -- special
15   investigators that he has a less-than-stellar
16   past, whether it's domestic abuse and some
17   other -- I don't know if they're petty, but
18   criminal activities. I can't specifically say
19   if they were drug-related, but I know that he's
20   had his run-ins.
21       Q. Question: You finding out from Memo
22   that he has information that a USA Track and
23   Field coach named Trevor Graham is mixing
24   creams, involved with getting prohibited
25   substances to athletes, just a question why you

Page 679

1    didn't call USADA and provide that information
2    on behalf of your client or on behalf of
3    yourself?
4        A. I provided that information to the
5    attorney. I mean, again, I played the
6    quarterback, so any information I got, I
7    forwarded it on. I mean, ad nauseam. I was
8    writing notes. Every time I picked up the phone
9    and talked to anybody, a plethora of notes here,
10   and I would call Cameron Myler and Brian and
11   read verbatim what I just wrote down after a
12   conversation.
13       Q. Okay. As the quarterback on the
14   team, did you -- there was some testimony
15   yesterday about who could have done what,
16   whether certain agencies should have acted that
17   maybe would have prevented this positive test
18   result.
19       Did you, as Trevor's agent -- Trevor
20   -- sorry -- as Justin Gatlin's agent ever
21   conduct an investigation concerning Trevor
22   Graham or Randall Evans or, you know, background
23   checks on them?
24       A. No. They fall under the auspices of
25   USA Track and Field. And so -- I mean, one of

Page 680

1    my concerns -- I'm on the agent screening
2    committee and the agent certification committee.
3    For U.S. Track and Field, I'm on the
4    disciplinary committee and at the IAAF level, so
5    we have those mechanisms that I actively
6    participate in monitoring what we do as agents.
7        So one would assume, since they have
8    been around longer than our formalized agent
9    group, that USOC, USA Track and Field all would
10   have. I find it kind of ironic that as soon as
11   Justin Gatlin got in trouble, Trevor Graham was
12   expelled from every possible venue, but not when
13   Marion Jones was called into question, Tim
14   Montgomery was called into question, Kelli
15   White, all these different people had to work
16   with -- whether it was Chris Whetstine or Trevor
17   Graham. So if they could work that efficiently
18   then, now, they could have been doing it all
19   along.
20       And if we have to be monitored, why
21   shouldn't coaches?
22       So it's not -- the onus isn't on me.
23   The onus is -- for instance, John Smith is
24   rumored to have been a drug coach. He's had
25   several clients that test positive. John Smith

Page 681

1 was a 2005 world championship coach, and people
2 were up in arms about that, but he's a coach in
3 good standing, whether I like it or not.
4 Whether I believe he's a clean coach or not, it
5 doesn't matter. He's recognized by everybody,
6 domestic and internationally, as a coach in good
7 standing. Thus was Trevor Graham.
8 So, my personal feelings didn't
9 matter. He was getting credentialed. He was
10 passing their smell test. And if I didn't
11 have -- outside of what I thought or heard out
12 in the rumblings in the hotel lobbies, that's
13 not enough for me to go with any concrete
14 information. You know, I don't have facts. I
15 have people just talking.
16 Q. Well, you conducted an investigation
17 for Mr. Gatlin, so I guess my point is, it's
18 fair to say that there's nothing that prohibited
19 you from conducting a background information of
20 coaches for your client, was there?
21 A. Well, the attorneys did. They hired
22 private investigators who came back with the
23 information on Randall, came back with the
24 information on Trevor Graham, but I mean, as far
25 as what his legitimacy as a coach --

Page 682

1 Q. Backing you up to the point at which
2 you were hired --
3 A. Hired by who?
4 Q. By Mr. Gatlin.
5 A. I manage Mr. Gatlin's career, yes.
6 Q. Okay. That's okay. It's probably
7 not that relevant.
8 Well, Mr. Gatlin had hired
9 Mr. Graham before I ever came into his career.
10 That was a preexisting coach, that everything
11 was fine. So all I did was take over for the
12 new -- the agent that was terminated. I didn't
13 hire the coach. I didn't participate in the
14 hiring of that coach.
15 Q. Okay. Let's talk a little bit about
16 Chris Whetstine. I understand that you had had
17 some communications with him.
18 You provided this e-mail, which we
19 will get to -- or e-mail -- sorry, but did you
20 have any phone conversations with him?
21 A. I would call Chris to, one, see how
22 he was doing; number two, to see if he had any
23 information that he could share with me that
24 could help shed light on what had happened. I
25 discussed openly with him about what Trevor

Page 683

1 Graham said. I wanted his take on it. I didn't
2 have information to prove he did it or didn't do
3 it.
4 Q. But you believed the answer lay with
5 him or Trevor Graham?
6 A. I believe the answer lied with Chris
7 Whetstine because in this same document,
8 November 26th, I shared with Chris a
9 conversation that Chris candidly had with me
10 about his personal knowledge of one, two, three
11 different instances that involved drug
12 paraphernalia, drug supplies, that he was either
13 asked to purchase or he saw being purchased.
14 And he held himself out to me as a man of
15 integrity.
16 And I said, yeah, but you are still
17 working with the people that solicited you to go
18 buy the drugs, still working with the people
19 that you saw buy drugs, and I'm supposed to
20 think that you are a man of high integrity.
21 And then he'd tell me he had enough
22 information to bury both Trevor Graham and his
23 wife, and when it comes to asking about my
24 client, his lips are sealed.
25 Wait a minute, if you are that close

Page 684

1 to this, you have to know what's been going on.
2 So those are the types of conversations I had
3 with Chris.
4 Q. And you're frustrated with him.
5 A. I'm frustrated with him when he
6 sends me unsolicited newspaper articles that
7 are, you know, unfavorable about my client, and
8 he's telling everybody that he would never do
9 such a thing, and then he tells me that he
10 watches somebody buy testosterone who is in his
11 camp, and he does nothing about it. He watches
12 a coach and an agent ask him to buy -- give him
13 a list of drugs to go buy in the 2000 Olympic
14 Games, and then he decides, no, I'm not going to
15 do that, and he comes back and he still has the
16 list. He says nothing to anyone, and he's still
17 working for them.
18 Q. And you found that frustrating;
19 fair?
20 A. I found that, you know, it was
21 hypocrisy is what I thought, and I thought he
22 was full of it, because, I thought, you know, if
23 you are that noble and you're not involved, what
24 do you have to lose?
25 Q. And so then you expressed those

Page 685

1  feelings to Chris Whetstine?
2       A.  Definitely.  Not in the same tone
3  I'm doing right now.  I was -- you know, I just
4  asked the questions, I begged the questions in
5  my e-mail.  I'm not -- I can vent behind the
6  scenes, but when I talk to anyone, I articulate
7  in a different way, just because I need to get
8  what I need out of them, if I'm able to, so I'm
9  not going to become confrontational.
10      Q.  Okay.  And the information that you
11  were receiving from Chris Whetstine was that
12  Trevor Graham was providing drugs to athletes,
13  correct?
14      A.  That Trevor Graham provided him a
15  list to buy drugs years ago.
16      Q.  Okay.
17      A.  I don't know what he did, was doing
18  with it.  I can't go that far.
19      Q.  All right.  And that Randall Evans
20  had purchased testosterone.
21      A.  Correct, in Mexico.
22      Q.  And did Chris Whetstine offer to you
23  to take a polygraph examination?
24      A.  He's bragged about taking one, you
25  know --

Page 686

1       Q.  Okay.  And did you pass --
2       A.  -- publicly, but --
3       Q.  Did you pass that on to the lawyers,
4  that he was willing to take a polygraph
5  examination?
6       A.  He's told the lawyers that.  He
7  didn't have to tell me.  He's told them.
8       Q.  You were asked by Mr. Collins on his
9  direct examination about various conversations
10  that you had with Mr. Whetstine about his
11  financial means; do you recall that?
12      A.  Yes, sir.
13      Q.  And you indicated in response to his
14  questions that he had a financial need; is that
15  right?
16      A.  Chris did, yes.
17      Q.  And one aspect of that need was the
18  need to provide for his son, correct?
19      A.  Correct.
20      Q.  Do you have any idea why Chris
21  Whetstine would try to do something that would
22  eliminate the source of his income with Nike?
23      A.  Why would he do something to
24  eliminate his source of income?
25      Q.  Yeah.  Let me put it this way:

Page 687

1  Justin Gatlin was a source of income, wasn't he,
2  indirectly?
3       A.  Indirectly, mm-hm.
4       Q.  Why would Chris Whetstine, in
5  financial need, try to undercut his source of
6  income?
7       A.  I can hypothesize for a variety of
8  reasons, you know.
9           Again, if you are pissed off at
10  someone --
11          MR. COLLINS:  I think I'm going to
12  object.  It's a hypothesis.  If you want to have
13  him hypothesize, you can, but ...
14          MR. COLBERT:  How much is this
15  rhetorical, Mr. Bock?
16      Q.  (By Mr. Bock)  Let me just ask a
17  question in a different way.
18          Do you know -- is -- the objection
19  has been that it's hypothetical that he would do
20  that, or that -- what his motives were.  And do
21  you agree that any conclusions you would draw
22  about his motives would be hypothetical?
23          MR. COLLINS:  Object on that.
24          MR. COLBERT:  I guess what I'm asking
25  you is:  Are you asking him whether the witness

Page 688

1  has any conclusions, or asking him to speculate
2  as to what conclusions he might draw if he drew
3  them, which seems to me to be a little farther
4  afield than asking him what his conclusions
5  might be.
6           MR. BOCK:  Thank you.
7           MR. COLBERT:  All right.
8       Q.  (By Mr. Bock)  I think I've been
9  asked -- or suggested that maybe I could ask you
10  about whether you have any conclusions about
11  Mr. Whetstine's motivation?
12      A.  Yes.  If I have drawn any
13  conclusions as a possible scenario which would
14  involve Chris Whetstine, I feel it is very
15  plausible that Chris Whetstine, because of
16  conversations I have had with him being upset
17  about money, being upset about the way he felt
18  that he was personally treated and talked to
19  from time to time between Trevor Graham and my
20  client Justin Gatlin, that it is very possible
21  that he could have done this, just as easily as
22  it was -- it was the perfect crime, because,
23  Trevor Graham was public enemy Number 1.  I
24  could have done it, and they all would have said
25  Trevor Graham.

Page 689

1    So I don't know if Chris Whetstine
2 did it, but it is very plausible that he could
3 have done it and gotten away with it, because
4 they weren't looking at Chris. They were all
5 looking at Trevor Graham, and they had been
6 looking at him for a long time. So Trevor
7 Graham was the perfect pigeon. I'm not saying
8 that he didn't do it. But you were asking me is
9 it plausible.
10    Q.  No, I appreciate that.
11    And you have no reason to believe
12 that he would have a motivation to do it other
13 than the dispute over money, the dispute over
14 $5,000; is that correct?
15    A.  I don't know if it's the $5,000. I
16 have never taken a side. I just want the
17 answer. I stay consistent with my e-mail to
18 him. I don't care who did it. I just want to
19 know who did it.
20    Q.  I'm just saying in terms of you said
21 it's plausible, and the basis upon which you say
22 that it's plausible is limited to the dispute
23 over the money.
24    MR. COLBERT: I don't think that was
25 the witness's testimony.

Page 690

1    MR. BOCK: I'm just asking if that's
2 the case.
3    MR. COLBERT: I think it's been asked
4 and answered, but you can answer -- ask it
5 again.
6    A.  Well, Justin Gatlin, even in his own
7 words, is multi-million dollar client. Chris
8 Whetstine is a physio employed by Nike, so even
9 if he's hurting himself, he's hurt him too. So,
10 you know, from a vindictive standpoint, yeah, I
11 might be cutting off my throat, but I cut off
12 yours too.
13    I mean, so -- I don't sit around
14 thinking like that, and that's for his legal
15 team to try to figure that out, but I -- you
16 know, I've had to consider all of these. I have
17 never had anything against Chris Whetstine. I
18 never was one to automatically jump on Chris
19 Whetstine, but I have had to consider the
20 possibility that Chris Whetstine could be
21 involved.
22    Q.  And as you sit here today, you don't
23 know whether he's involved, correct?
24    A.  That is correct.
25    MR. BOCK: Mr. Nehemiah, thank you

Page 691

1 very much for your testimony. I don't have any
2 other questions. Pass the witness.
3    MR. COLBERT: Do you have anything
4 further, Mr. Collins?
5    MR. COLLINS: No.
6    MR. COLBERT: Mr. Campbell?
7
8    EXAMINATION
9 BY MR. CAMPBELL:
10    Q.  Well, I'm a little bit confused
11 about this date. This is a March 1st injection
12 date, and then as you were asked, you said the
13 conversations took place before the injections.
14 That would seem to me to be February. Can you
15 clarify?
16    A.  Well, I can't specifically recall
17 the date. I just know that there was one
18 discussion with my client about needing and
19 wanting to have an injection. Then there was a
20 follow-up conversation with myself with USADA
21 and a doctor at USADA, and it was that early
22 time. So I don't know exactly when it was.
23    And subsequently, the injections
24 took place. That's the only time the injections
25 took place, and that's the only time the

Page 692

1 conversation took place.
2    To have me pinpoint whether it was
3 March 1st, 12th, 13th, I couldn't tell you that,
4 but I know it was early, and it was one time
5 that Justin called me up and wanted to know
6 about the injections.
7    Q.  Okay.
8    Yes, and I have another question
9 too.
10    What do you do with respect to your
11 athletes in terms of talking to them about Chris
12 Whetstine, his treatments? Have you had any
13 conversations with your clients? How many
14 clients do you have that are treated by Chris
15 Whetstine or have been?
16    A.  Let's see. James Carter was one.
17 Justin Gatlin. And Allyson Felix was treated
18 one time by him.
19    Again, I guess we all are -- we all
20 are -- have blinders on when it comes to the
21 physio. He's hired by Nike, everything must be
22 okay. And I don't know if there are any
23 regulatory bodies. Apparently, there aren't.
24 But outside of me thinking that they use basic,
25 you know, massage oils and basic Johnson &

Page 693

1   Johnson creams and Voltaren, I really don't know
2   that much about it.
3       Q.  How long have you been involved in
4   track, did you say?
5       A.  Track and field as an athlete, since
6   '76, but as an agent, probably ten-plus years.
7           And the other mindset, just so you
8   know from my point of view, is that I want to do
9   what I do, and that is on this management side,
10  that's what I do.  I'm not really involved in
11  the physio side and the coaching side.  And
12  because of all of those concerns, I do not want
13  to get pulled into that, but I'm a part of that
14  whole scenario, no matter what it is, because
15  it's easy to get pulled into it.  So I know I
16  manage, and I do the day-to-day operations, and
17  I don't do coaching and I don't do massage.  I
18  don't really want to know about all of that.
19  And --
20      Q.  I can appreciate that.
21          Are you aware of any instances where
22  either the IAAF or USA Track and Field, Nike or
23  anybody has sat down and talked with athletes
24  and told them, hey, if you get a massage from a
25  therapist, you need to check out all of the

Page 694

1   items that they massage you with?
2       A.  No.  The blanket statement is that
3   the athlete is responsible for what goes in or
4   on his body, which if any of you ever had a
5   massage, a massage therapist could show you the
6   tube, you lay your head down in that donut, you
7   have no idea what's going on behind you.
8           And I think it is a reach -- I'm not
9   saying that physios are out there doing it --
10  but it is a reach to think that some guy or
11  young lady is laying down getting a massage, and
12  they have put their livelihood at stake on this
13  person, and this person, whether it's a good
14  intentions or bad intentions, and you are
15  expecting them to turn back around the whole
16  time you are getting a massage and see
17  everything that you are doing?  I mean, if you
18  go to a track meet, there's a tent full of
19  massage therapists.  It's not regulated, it's
20  not monitored, and God knows what's going on in
21  there.
22      Q.  Are there any warnings up in any of
23  these tents with massage therapists?
24      A.  None.
25      Q.  Are these tents provided by the

Page 695

1   sports organizations?
2       A.  Correct, every one.
3       Q.  And which sports organizations
4   provide the tent?
5       A.  Local organizing committee, U.S.
6   Track and Field.  If it's a USA Track and
7   Field-sanctioned event, if in this country.
8   It's an IAAF event, sanctioned if it's out of
9   the country.  And they usually -- for instance,
10  if there's a meet at the national championships,
11  they have whatever approved or accredited
12  physios who do their ranking system or earn the
13  right to be on teams.  There are maybe six or
14  seven of them who are designated to be there, in
15  case an athlete doesn't have his or her own
16  massage -- personal massage therapist.  And then
17  in that tent, there's any of 30.  But there's no
18  one walking around monitoring creams, what
19  they're doing, nothing.
20      Q.  Are you with the IAAF, did I hear
21  you say?
22      A.  I'm on the disciplinary board for
23  agents.
24      Q.  For agents?
25      A.  Yes.

Page 696

1       Q.  So, as far as you know, from your
2   participation as an athlete and as an agent, if
3   the massage therapists are sanctioned by -- or
4   not sanctioned -- but allowed to do their job by
5   both IAAF and USA Track and Field?
6       A.  Without regulation.
7       Q.  Given what you know now, do you
8   think it would be your responsibility to sort of
9   monitor, even those sort of activities by your
10  client?
11      A.  I understand your question.  It's
12  not a practical one, because if you had -- if
13  you have one client, two clients, you could
14  probably do that.  You have 10 clients, 12
15  clients or more, you can't stay in that tent.
16  You have other clients who have other needs and
17  other things that are going on and other
18  responsibilities around an event.
19      Q.  I'm not talking about the tent.  I'm
20  talking about the structure.
21      A.  Well, I talk to all my clients when
22  they first become clients about the dos and the
23  don'ts, what they have to do, you know, ongoing
24  education, making sure we know certain things.
25          You know, if I had my druthers, I

Page 697

1  would love -- whether it's USA Track and Field
2  or IAAF -- to have only these creams can be
3  used. You bring these creams in -- I mean, you
4  don't bring them in. You go into the tents,
5  they give you the creams, and no creams come out
6  of the tent, and you have no bags with you or
7  anything. I would love to be that scrutinized,
8  you know, just like an athlete has to do his
9  whereabouts and his drug-testing protocol.
10      But you don't know where these
11  creams are coming from. They can buy them in
12  the country, out of the country, and it's just
13  very hard to stay on top of it. I mean, guys
14  slipping -- I mean, I can walk in a tent, and
15  once you have a credential to get on the
16  facility, there's no one saying, "Are you a
17  physical therapist, why are you in here?"
18      So you could walk in there, if you
19  have a ticket to the meet. So -- I mean,
20  that's -- that's how dangerous it is.
21      Q.  Tell me what you tell your athletes
22  about being careful.
23      A.  Well, Number 1, first and foremost,
24  their name is all they will ever have. So
25  that's the first thing.

Page 698

1      Secondly, is that I have never done
2  drugs. I don't support people that do drugs.
3  I'm not going to work with people that do drugs.
4  Number 2.
5      They have to be accountable 24-7 on
6  what's going on. Yes, I'm here to help manage
7  your career, but I'm also trying to help you
8  learn about your career, your life, and take
9  ownership of it. So, yeah, you might not know a
10  lot, and I have to hold your hand initially, but
11  at some point, I have to let go of your hand.
12      And you have to understand, you
13  can't turn to me and think that I'm going to
14  have all the answers for you, so -- and we go
15  step by step every week, whether it's from the
16  time they're going to the airport to the time
17  when I'm picking them up, what their fees and
18  all of that are, where they go for massage, who
19  is massaging them. Are they a massage
20  therapist? Are they a chiropractor? Are they
21  an acupuncturist? What is it that you need?
22  Are they recognized? Are they certified? Are
23  they just saying they do this? So making sure
24  that they know, get comfortable with the
25  consistency of the same person, so that

Page 699

1  different people aren't always messing with
2  their bodies.
3      Being as on top of everything as
4  they can, yeah.
5
6      EXAMINATION
7  BY MR. COLBERT:
8      Q.  I have a question. I believe in
9  your testimony, Mr. Nehemiah, you said you had
10  communicated with Mr. Gatlin's original
11  attorney. Was that Cameron Myler?
12      A.  Yes. And Brian -- what is Brian's
13  last name? Moss? Mass? Moss, Brian Moss,
14  Cameron Myler. I didn't mention his name
15  before, but he was the other part of it.
16      Q.  And in your communications, you
17  relayed everything that you learned about Memo,
18  the things you learned about Memo, and
19  everything else that you learned in this
20  investigation, you relayed to the counsel that
21  you identified?
22      A.  Oh, yeah, I spoke to them daily,
23  yeah.
24      Q.  I think you also said that it was
25  your understanding that those attorneys were in

Page 700

1  communication with USADA?
2      A.  I know for a fact they were, because
3  Cameron would tell me at various times, good or
4  bad, her conversations with Travis or her
5  frustrations, et cetera. So, to what extent
6  they talked about it, I don't know, but she was
7  in constant communication with Travis.
8      Q.  But you were given to understand by
9  Cameron Myler that she was in constant
10  communication with USADA through Mr. Tygart?
11      A.  Yes.
12      MR. COLBERT: Thank you. I have
13  nothing further.
14      MR. BOCK: Could I ask a couple of
15  follow-ups?
16
17      EXAMINATION
18  BY MR. BOCK:
19      Q.  In terms of your -- the response to
20  the questions that were just asked, your
21  communication with Memo, it's my understanding,
22  took place after Cameron Myler was out of the
23  case; is that right?
24      A.  I couldn't tell you exactly the
25  timing of that, no. I don't know.

## Page 701

1    Well, I don't know when Cameron
2  Myler was technically ever out of the case.  She
3  never officially recused herself.  She just kind
4  of was MIA for periods of time, and then she
5  would resurface with an e-mail every now and
6  then, so as recently as when we first got here,
7  I mean ...
8    Q.  So the testimony that we heard
9  earlier, was that Jeff Novitzky called John
10  Collins angry about the communication with Memo?
11    A.  Yes.  At a point in time, through
12  the frustration of the family of the way Brian
13  was handling things and the way Brian
14  communicated things, there was a decision by the
15  Gatlin family to terminate his participation.
16    When I first got the call around
17  June 14 and 15 from Mrs. Gatlin that Justin
18  Gatlin tested positive, I told her, "Give me a
19  few minutes and let me see what I could do."
20    And I remembered that a former
21  client of mine, Christie Gaines, who was
22  involved in the BALCO, had used Cameron Myler.
23  And so I looked up Cameron's name, and I called
24  her, and I asked her if she would be interested
25  in taking on the case.

## Page 702

1    So, that's how I got involved with
2  Cameron Myler.
3    Q.  The point is, my understanding is
4  that the prior testimony was that John Collins
5  called you very upset because Jeff Novitzky had
6  bitten his head off because there had been no
7  communication about the contact with Memo,
8  this --
9    A.  He was mad that we didn't tell him
10  that we were talking to Memo.
11    Q.  Yeah.
12    A.  And as I sat here today --
13    Q.  Had you communicated that to
14  Mr. Collins, the communications with Memo?
15    MR. COLLINS: Can I ask a question
16  here?
17    MR. COLBERT: Why don't you -- let
18  him answer the question.  Let the witness answer
19  the question as it's presently posed on the
20  floor, unless you have an objection to the
21  question.
22    MR. COLLINS: No, that's fine.
23    MR. COLBERT: Go ahead.
24    A.  When John Collins came on as
25  counsel, the conversation -- once conversations

## Page 703

1  either commenced or continued with Memo, John
2  was privy to those conversations.
3    Q.  (By Mr. Bock) Now, a couple of other
4  follow-ups.
5    When you talked about this letter or
6  this e-mail that you sent on November 26th,
7  2006, had you received any new information, new
8  avenues since November 26th, 2006, that would
9  lead you to believe that Chris Whetstine was
10  acting alone in being responsible for the
11  positive test result of Mr. Gatlin?
12    A.  Acting alone?  No, I haven't
13  received any new evidence.
14    Q.  So you have received no new
15  information since you sent this e-mail; is that
16  correct? About Mr. Whetstine's activities, that
17  would cause you concern.
18    MR. COLLINS: I'm going to object.
19    A.  -- no new --
20    MR. COLBERT: On what basis is your
21  objection?
22    MR. COLLINS: It's overbroad.  It's
23  asking -- it's --
24    MR. BOCK: I'm just going to rely on
25  his answer to the first question.  I will

## Page 704

1  withdraw the question.
2    Q.  (By Mr. Bock) The last question:
3  What evidence do you have that Mr. Gatlin's
4  positive test result was caused by the cream?
5    A.  What evidence do I have?
6    MR. COLLINS: I object.  He doesn't
7  have the evidence.  The evidence is what's
8  presented to you.
9    MR. COLBERT: He has asked a very
10  simple question.  It can be answered very
11  simply.  Sorry.
12    A.  I don't -- the only semblance of
13  evidence is from experts including Dr. Black
14  saying that the positive results could be
15  consistent from that of a cream being used.
16  Didn't say that it did, but it didn't rule out
17  that it wasn't.  So I don't know if that's
18  evidence, but it doesn't say that it wasn't
19  cream, but it could be a cream.
20    So it's an understanding in my mind.
21  I don't call it evidence, but there's a
22  possibility that it was a cream, and it would
23  have been consistent -- his test scores would be
24  consistent with a cream being used.
25    MR. BOCK: Thank you very much.

Page 705

1     MR. COLBERT: Mr. Nehemiah, thank you
2  very much. I'm sorry that we kept you past your
3  plane. But you are excused now, so maybe you
4  can get the second one.
5     MR. NEHEMIAH: No problem. Thank
6  you.
7     MR. COLLINS: Take a few-minute
8  break.
9     MR. COLBERT: Take a five-minute
10 break, and then you have Dr. Black. Why don't
11 you call -- take the time.
12    (Brief recess taken from 3:05 to
13 3:30 p.m.)
14    MR. COLBERT: We're resuming on
15 redirect testimony of Justin Gatlin. Pardon?
16    MR. GATLIN: Part 3.
17    MR. COLBERT: Part 3. It's the
18 redirect.
19    Sorry, Mr. Gatlin. I believe you
20 said, Mr. Collins, you had a few questions you
21 wanted to ask on redirect?
22    MR. COLLINS: Yeah, very few.
23    Since he's been called out of order
24 a few times, one of them is outside the scope of
25 my direct.

Page 706

1     MR. BOCK: We don't have any
2  objection.
3     MR. COLLINS: You do or don't?
4     MR. BOCK: We do not.
5     MR. COLLINS: Okay.
6     MR. BOCK: Right?
7     MR. TYGART: Wait until we hear the
8  question.
9     MR. COLLINS: You can tell none of us
10 have had any sleep.
11
12 WHEREUPON,
13    JUSTIN GATLIN,
14 the Respondent herein, having been reminded of
15 his oath to state the whole truth, testified as
16 follows:
17    EXAMINATION
18 BY MR. COLLINS:
19    Q.  Mr. Gatlin, you understand you are
20 still under oath? We did that already.
21    A.  Yes.
22    Q.  There was some questions asked to
23 you on cross-examination about not being with
24 Trevor Graham as a coach currently?
25    A.  Yes.

Page 707

1     Q.  Do you have any coach right now?
2     A.  I do not have a coach.
3     Q.  Do you have -- this is a technical
4  question, housekeeping. I don't think the --
5     A.  Can I follow that up real quick?
6     Q.  Certainly.
7     A.  I mean, ironically, in the process,
8  I have had athletes come to me to ask me to
9  coach them and train them as well, so, I don't
10 know if that shows that I was --
11    Q.  Okay.
12    MR. COLLINS: We've talked a number
13 of times, but I don't know that we have ever
14 moved in the -- you were going to get the color
15 photos.
16    MR. BOCK: I got the colored photos.
17    (Photos passed out.)
18    MR. COLLINS: If you could just take
19 a quick look at those -- do you want me to do
20 all the setting up of the foundation, or are you
21 okay with letting them in?
22    MR. COLBERT: Do you object to the
23 admission of these as a collective exhibit?
24    MR. TYGART: No, we don't.
25    MR. COLBERT: Should we mark these as

Page 708

1  Exhibit 14? Gatlin Exhibit Number 14, I think
2  is the next number.
3     MR. COLLINS: Okay.
4     MR. COLBERT: Okay.
5     MR. COLLINS: Did we ever -- I guess
6  we're doing the housekeeping. We showed this.
7  We talked about it. There was no objection to
8  it coming in, but I don't think we numbered it.
9     MR. COLBERT: You are talking now
10 about the November 26th, 2006 --
11    MR. COLLINS: E-mails, yeah.
12    MR. COLBERT: -- e-mails? I believe
13 there was no objection to the question. Are you
14 moving the admission?
15    MR. COLLINS: Yes.
16    MR. COLBERT: Without objection
17 then --
18    MR. BOCK: No objection.
19    MR. COLBERT: -- 15?
20    MR. BOCK: I just wanted to make
21 clear that Exhibit 15 is the e-mail that I was
22 examining Mr. Nehemiah on during his
23 cross-examination.
24    MR. COLBERT: The record will reflect
25 that.

## Page 709

1    MR. COLLINS: Absolutely.
2    MR. TYGART: While we're on
3 housekeeping, should I -- I have got the updated
4 urine charts.
5    MR. COLLINS: Yeah, I'd love that.
6    MR. TYGART: Okay. Can we do that?
7    MR. CAMPBELL: What's this exhibit?
8 Number 15?
9    MR. COLBERT: This is the -- 15 is
10 the e-mail.
11    Okay. And so this is -- you are
12 passing out, now, sheets that are updated
13 steroid profile. And this is what was attached
14 to the second stipulation and is a replacement
15 for that?
16    MR. COLLINS: Why don't we move it in
17 as a new one, because if we were talking about
18 in -- the other ones had Bates stamps numbers
19 and stuff like that --
20    MR. COLBERT: Well, I believe that
21 was -- I believe you originally attached the --
22 the second stipulation hasn't been moved as an
23 exhibit, has it, and you've got 29 --
24    MR. TYGART: I would just move that
25 this be moved as Exhibit 16, just to make it

## Page 710

1 real clear. We will keep the stipulation as it
2 is.
3    MR. COLBERT: It's your exhibit,
4 though, right? So, it would be your Exhibit 30,
5 I believe.
6    MR. TYGART: That's fine.
7    MR. CAMPBELL: 30?
8    MR. COLBERT: I thought they had 28.
9 They had 28 -- I think they had --
10 29 was -- was 29 the full packet that was
11 submitted, and this is the one individual sheet,
12 so make this 30.
13    MR. CAMPBELL: So make it, it's a new
14 one, so USADA 30.
15    MR. COLBERT: Because it's a revised
16 one.
17    Okay.
18    MR. COLLINS: And then I was going
19 to --
20    MR. COLBERT: Yes or no on this one?
21    MR. COLLINS: Yeah, I was going to
22 have -- do you want me to have Justin establish
23 that or his mother, or is there any objection to
24 that coming in?
25    MR. COLBERT: We're talking now,

## Page 711

1 Counsel, about the Cary Orthopedic and Sports
2 Medicine statement of July 12th, 2006, showing
3 some codes and billing dates and payment dates,
4 and we passed out earlier. Do you have any
5 objection to this coming in as Exhibit 16?
6    MR. CAMPBELL: No. It would be
7 Exhibit 17..
8    MR. CHERIS: Mr. Tygart, do you
9 realize that on your new steroid profile they
10 still have the collection date as 4-28, not
11 4-26?
12    MR. TYGART: You know, I literally
13 pulled it out of the overnight packet that I
14 got, so I haven't had a chance to analyze it.
15    MR. COLLINS: At least we're
16 consistent.
17    MR. TYGART: And, I think -- well, I
18 think if -- I mean, we got that from the
19 Montreal date, because it's the IAAF collection
20 date.
21    MR. COLBERT: Yeah, I think it's
22 clear on the record what it is.
23    MR. TYGART: Is everybody okay with
24 that?
25    MR. COLBERT: The record now reflects

## Page 712

1 it as the same error.
2    MR. TYGART: That's fine.
3    MR. CHERIS: That's all I want to
4 know.
5    MR. TYGART: Thank you, though.
6    MR. COLBERT: I think that's all the
7 housekeeping.
8    MR. COLLINS: Well, this just came in
9 as 16?
10    MR. COLBERT: The Carey bill is in as
11 16, Exhibit 16, Gatlin Exhibit 16. Here.
12    (Multiple discussions off the record
13 concerning exhibits.)
14    MR. COLLINS: Sorry.
15    MR. COLBERT: Okay. Now, that's all
16 the housekeeping, then?
17    MR. COLLINS: I believe it is.
18    MR. TYGART: Before you move on, are
19 you going to attempt, while we're all here, to
20 introduce this?
21    MR. COLBERT: Is that to be used with
22 Dr. Black?
23    MR. COLLINS: Yes.
24    MR. COLBERT: I suggest that we wait
25 for Dr. Black.

Page 713

1    MR. TYGART: Okay.
2    MR. BOCK: Well, the only thing
3  was -- and we can discuss this later on the
4  record -- but -- after his testimony, but we
5  ought to cover what can and can't be --
6    MR. COLBERT: Let's do it after we
7  finish with Mr. Gatlin's testimony, rather than
8  taking his time.
9    Q.  (By Mr. Collins) You have in front
10  of you, those -- while we've had this little
11  circus going on, you had the opportunity to
12  review those in front of you?
13    A.  Yes, sir.
14    Q.  Do you recognize those?
15    A.  Yes, I do.
16    Q.  And what are those?
17    A.  These are our text messages sent
18  from me and Chris Whetstine, conversations of
19  the text message.
20    Q.  When you sent those -- I think, we
21  discussed that yesterday in your direct
22  testimony, but now that we have the copies in
23  front of you, are those the ones that you
24  testified about yesterday?
25    A.  Yes, sir.

Page 714

1    Q.  And when you sent those, did you
2  have any intent to threaten or coerce
3  Mr. Whetstine?
4    A.  Not at all.  I think that some of
5  the documents, it shows that I was showing
6  compassion to him and his family.
7    Q.  Did you ever offer a bribe to
8  Mr. Whetstine?
9    A.  No, I did not.
10    Q.  Did you ever authorize anybody to
11  offer a bribe?
12    A.  No, sir.
13    Q.  Now, yesterday there was some
14  testimony about an April Fool's joke, and I
15  believe it was 2004.  Do you recall that
16  incident?
17    A.  I do.
18    Q.  Where were you?  Or do you recall
19  where you were when the -- you saw that
20  document?
21    A.  I think I was at home with my
22  parents when I got it.
23    Q.  Do you recall your dad got rather
24  emotional?
25    A.  Well, as I say, my dad has had 26

Page 715

1  years in the military, and I have only seen my
2  dad cry, like, twice, and that was one of the
3  instances he cried.
4    Q.  Did you call -- you make a call to
5  Trevor Graham at or about that time?
6    A.  Afterwards.
7    Q.  What did you tell him?
8    A.  Basically, that I was just -- I
9  really didn't complain.  I was just showing him
10  on the Internet that, it was more of a
11  conversation going to, like, why is people
12  messing with us?  Why are they messing with me?
13  That's what the conversation was about.
14    Q.  Did you mention anything about some
15  actions your dad had taken after seeing it?
16    A.  To Trevor Graham?
17    Q.  Yes.
18    A.  Yeah, I did.
19    Q.  What did you tell Trevor?
20    A.  That my dad was going to shoot you,
21  if it was true.
22    Q.  Okay.  Ask one last question:  Did
23  you ever conspire with Trevor Graham to try to
24  bribe Chris Whetstine?
25    A.  No, sir.

Page 716

1    MR. COLLINS: I have nothing further.
2    MR. BOCK: We don't have any
3  questions.
4    MR. COLBERT: Mr. Gatlin, thank you
5  very much.  You are excused as a witness.
6    MR. GATLIN: Thank you very much.
7    MR. COLBERT: I know this has been a
8  very trying ordeal for you.
9    MR. GATLIN: It has.  And I
10  appreciate everyone's time and availability to
11  come out, and I know you-all have other things
12  to do, and I appreciate you just hearing my part
13  and my situation, and understanding and being
14  fair about it.  And I think that everyone here
15  has been fair, and, really assess the problem
16  and the situation I have gone through.  And I
17  have -- just wish that everything could be
18  resolved the way that we want it to be resolved,
19  and I just want to represent my country, like I
20  have been representing my country.
21    I really don't have anything to say
22  about that.  I just think I was born to run, and
23  that's what I want to do, and I didn't really
24  want to have no part in doing anything that was
25  to harm my country or deface my country, and I

Page 717

1  apologize for that.  And I wish that we could
2  have met under circumstances that we could have
3  been on the same side of the table, and maybe
4  one day in the future, we can.
5          I appreciate that.  Thank you.
6          MR. COLBERT:  Thank you.
7          MR. BOCK:  Thank you, Justin.
8          MR. COLBERT:  All right.  That
9  leaves, as I understand it, at least, for what's
10  been scheduled, we have for Mr. Gatlin's case,
11  we have remaining Dr. David Black.  He is
12  scheduled to testify tomorrow at noon West Coast
13  time, 3:00 East Coast time, and all the times in
14  between will fill themselves in.  We will do it
15  by phone.  Can we ask USADA to set up a bridge,
16  or would you like us to do it?
17          MR. TYGART:  We'll set it up.
18          MR. COLBERT:  And if you send an
19  e-mail to all counsel as to the call-in, that
20  would be great.
21          And then for USADA, if I understand
22  correctly, based on our original discussion, you
23  have Dr. Cedric Shackleton as a potential
24  witness, as a witness -- definite witness; and
25  Dr. Bowers, as a possible witness.  And those

Page 718

1  are the only currently scheduled witnesses that
2  you have.
3          MR. TYGART:  And just one caveat,
4  depending on the scheduling since we haven't
5  talked to them, it may be Hans Geyer or
6  Dr. Shackleton now, but only one of them and
7  only in response to anything that Dr. Black may
8  raise.  And then possibly Dr. Richard
9  Hildebrandt on something that he was not listed,
10  but it was raised today, so, I just -- with
11  respect to the call that Renaldo Nehemiah
12  allegedly made.
13          MR. COLBERT:  All right.  You will
14  let us know about that?
15          MR. TYGART:  We will.
16          MR. CAMPBELL:  Could you pass on our
17  condolences to Dr. Bowers, please?
18          MR. TYGART:  We will.  Thank you very
19  much.
20          MR. COLBERT:  Is there any other
21  further bookkeeping matters?  Housekeeping?
22          MR. BOCK:  Is it fair to say, though,
23  that there's an agreement that except for those
24  witnesses that have just been identified -- or
25  actually, the one witness that was identified by

Page 719

1  Mr. Gatlin, that in terms of his case in chief,
2  the record is closed.
3          MR. COLBERT:  As I understand it, and
4  based on our original discussions on Monday
5  morning for housekeeping, the -- Mr. Gatlin has
6  one more witness; that's Dr. Black as an expert.
7          However, he reserves his right, you
8  may recall, on Monday, to call witnesses in
9  rebuttal, depending on what your witnesses may
10  say, but he's agreed that that's what he will
11  limit himself too, in the event that he needs to
12  call somebody, and he won't know that until
13  after your witness has testified.
14          MR. BOCK:  Right.  Right.  So,
15  okay --
16          MR. COLBERT:  We're not going to
17  generally reopen the case for submission of
18  evidence or anything else.
19          MR. BOCK:  Okay.  Thanks.
20          MR. COLLINS:  That is my
21  understanding as well.
22          MR. BOCK:  And what are we going to
23  do in terms of the argument?
24          MR. COLBERT:  Well, we can do the
25  argument at the close of all the testimony

Page 720

1  tomorrow, if it closes.
2          Obviously, we have the issue of
3  possible rebuttal.  We would hope that that
4  would be done immediately following, if
5  possible, we can do the close -- and I
6  understand, you would rather do oral closing,
7  rather than written documents; however, if you
8  have demonstratives that you wish to use for
9  closing, then we would have to address that.
10          MR. BOCK:  We could just e-mail them
11  to you.
12          MR. COLBERT:  You could just e-mail
13  them to us, if you could just do --
14          MR. CAMPBELL:  Can you do PowerPoint?
15          MR. BOCK:  I don't know.  I haven't
16  created any at this point.
17          MR. COLBERT:  Then if that's the
18  case, if you have demonstratives or if you have
19  demonstratives or particular slides you wish us
20  to look at to refer to the specific -- we've got
21  all the exhibits here, so we're only really
22  talking about, it's not any new exhibits, but
23  any demonstratives, where you may summarize what
24  you believe your exhibits or the testimony of
25  the witness has shown, then I'd suggest that you

Page 721

1  e-mail it to the other party and to each panel
2  member, what those slides are, and you can refer
3  to them, as you go through oral argument, we can
4  review them on our computers, if that sounds
5  acceptable to you?
6       MR. BOCK: Great, thank you.
7       MR. COLBERT: Mr. Collins? Yes?
8       MR. COLLINS: I believe we've
9  already covered it, but my client has asked me,
10 so I thought I would confirm, the stipulation
11 that we entered at the first thing, yesterday,
12 the one with Catlin, Michelle Collins --
13      MR. TYGART: The second stipulation,
14 right?
15      MR. COLLINS: That's in, right?
16      MR. COLBERT: That's in.
17      MR. TYGART: Yeah, that's been
18 provided to the panel.
19      MR. COLLINS: That's been provided.
20 I just --
21      MR. COLBERT: I don't think it's been
22 given an exhibit number. It's just been
23 submitted as stipulation of the parties, much
24 as --
25      MR. COLLINS: If we are going to

Page 722

1  arm-wrestle over it, whether we call it "son of
2  stipulation" or stipulation --
3       MR. COLBERT: We will be happy to
4  give it a number if you'd like.
5       MR. COLLINS: He said Stipulation 2.
6  I'm okay with that.
7       MR. COLBERT: I'm happy to give it
8  an exhibit number, but I think it's in the
9  record now as a stipulation between the parties,
10 so we don't need to give it an exhibit number.
11      MR. BOCK: That's fine.
12      MR. COLBERT: Mr. Campbell?
13      MR. CAMPBELL: I'm good.
14      MR. COLBERT: Mr. Cheris?
15      Okay. We'll stand adjourned until
16 noon tomorrow.
17      MR. COLLINS: Depending on where you
18 are.
19      MR. TYGART: And that was noon
20 Pacific Coast.
21      MR. COLBERT: Thank you.
22
23      (Recessed at 3:40 p.m.)
24
25

Page 723

1       (Proceedings commenced at 1:00 p.m.
2  on Wednesday, August 1, 2007; all the same
3  parties were present telephonically. Also
4  present were Justin Gatlin, Mr. and Ms. Gatlin
5  and Johncie Wingard. The proceedings were
6  reported by Stephanie Ostdahl.)
7       WHEREUPON,
8            DAVID L. BLACK, Ph.D.,
9  the witness herein, being first duly sworn
10 telephonically to testify to the truth in the
11 above cause, was examined and testified on his
12 oath as follows:
13           EXAMINATION
14 BY MR. COLLINS:
15      Q.  Good afternoon, Dr. Black. This is
16 John Collins.
17      A.  Good afternoon.
18      Q.  Could you please -- I believe --
19 actually, I believe you've already stated your
20 name and spelled it for the record; is that
21 correct?
22      A.  Correct.
23      Q.  Could you please give us some
24 background information about yourself. You
25 indicated earlier you're a Ph.D. What is that

Page 724

1  Ph.D. in?
2       A.  My doctorate degree is in forensic
3  toxicology. My field of practice is in legal
4  medicine. And that was earned at the University
5  of Maryland school of medicine graduate program.
6       Q.  Okay. Are you currently employed?
7       A.  I am currently employed with Aegis
8  Sciences Corporation.
9       Q.  What are your duties at Aegis?
10      A.  Well, I am president of the company,
11 and my responsibility extends to ensuring that
12 we're compliant with all regulations and laws
13 that cover our practice of business or our
14 practice of forensic sciences in that regard,
15 though I have a staff of management which I
16 direct.
17      I have directors -- four directors
18 that I direct, and then those directors have a
19 total of about 70 other individuals that make up
20 the Aegis team of scientists and employees.
21      Q.  Could you briefly explain what Aegis
22 does.
23      A.  Well, Aegis Sciences is a forensic
24 toxicology laboratory. We only provide forensic
25 services. We provide services to law

## Page 725

1  enforcement for driving under the influence of
2  drugs, for crime scene evidence analysis. We
3  also provide services for postmortem death
4  investigation.
5       We are also one of 44 federally
6  certified laboratories in the United States
7  under the United States Department of Health and
8  Human Services which provides workplace drug
9  testing services to both private business and
10 government agencies.
11      We also provide services to prison
12 systems and parole and probation. Testing
13 prisoners to ensure there's no use of drug, as
14 well as parolees and probationers to make sure
15 they're compliant with conditions of parole,
16 which prohibit drug use.
17      We also provide a significant
18 service of doping analysis. We provide services
19 to many universities. We provide services to
20 NASCAR. We provide services on behalf of the
21 Major League Baseball Players Association. We
22 also provide services to World Wrestling
23 Entertainment, which is not a sport, but an
24 entertainment industry. And we also provide
25 other specialty testing for other forensic

## Page 726

1  applications where the results may be entered
2  into civil or criminal litigation.
3       Q. Okay. I assume when you discussed
4  the doping analysis for universities, Major
5  League Baseball and NASCAR, that that's your
6  current list of clients; is that correct?
7       A. That's correct.
8       Q. Have you done doping analysis for
9  any other sports?
10      A. Well, I did originally set up the
11 National Football League testing program back in
12 the early '80s when Pete Rozell was
13 commissioner, and have provided services to a
14 number of application settings, both testing
15 animals, as well as humans in various
16 competitive sports.
17      So there have been other
18 applications in the science to those settings
19 where there's a need to hold individuals
20 accountable for whether or not they are using
21 drugs for doping.
22      MR. CAMPBELL: Just a -- I'm sorry.
23 Travis, is it you or Bill that's going to be
24 responsible for any cross here?
25      MR. TYGART: Can you hear me? Yeah,

## Page 727

1  I will be.
2       MR. COLLINS: I don't know that it's
3  technically required to move him to be an
4  expert.
5       MR. TYGART: That's fine. I think
6  you need to get his resume to the panel.
7       MR. COLLINS: Okay. I will -- if
8  it's okay with the panel, I will distribute that
9  to them. There's no objection to him being an
10 expert, though?
11      MR. TYGART: I mean, you can ask him
12 questions. I'm going to -- you know, until I
13 hear what he's going to testify about, I
14 can't -- I mean, for all purposes, I can't agree
15 to that at this point.
16      MR. COLBERT: This is Edward
17 Colbert. I guess the question I would ask is,
18 Do you at present have a general objection to
19 him being proffered generally as an expert on
20 drugs?
21      MR. TYGART: No. I have no problem
22 with that. I don't obviously waive my ability
23 to ask particular questions into those areas.
24      MR. COLBERT: But you don't want to
25 conduct voir dire now?

## Page 728

1       MR. TYGART: No, I don't.
2       MR. COLBERT: Mr. Collins?
3       MR. COLLINS: Actually, I would have
4  one more background question.
5       Q. (By Mr. Collins) Have you ever
6  testified as an expert in a sports anti-doping
7  case?
8       A. Yes, many times.
9       Q. Could you give some of them, if you
10 remember.
11      A. Well, gosh. Probably the case that
12 received the most attention was the Butch
13 Reynolds case which I testified regarding --
14 which was a positive test out of a French
15 laboratory, a Paris laboratory. But I've also
16 testified on behalf of Sandra Farmer-Patrick,
17 George Quigley, Dave Johnson, Tara Marshall, Gia
18 Johnson.
19      In addition to that, I've testified
20 in many NCAA hearings or in university
21 administrative hearings where drug testing
22 results from Aegis have been used -- well, in
23 the instance of university hearings, where Aegis
24 test results have resulted in suspension from
25 play or loss of scholarship for student athletes

Page 729

1 at the university level.
2 And, of course, beyond that, I've
3 testified many times in criminal proceedings and
4 civil proceedings where individuals have been
5 charged with murder or vehicular homicide or
6 parole or probation violations where people have
7 gone to jail. I testify a great deal in various
8 matters.
9 Q. When you testify, is it usually for
10 the defendant or the plaintiff?
11 A. Oh, probably 99.9 percent plus of
12 the work that -- or the testimony that I've
13 provided historically has been what I guess you
14 would call the prosecution. It's been taking
15 evidence -- the facts gathered by testing that
16 are used as a basis for some sort of drug use
17 that causes an individual in criminal or civil
18 proceedings to forfeit rights, privileges,
19 freedom, money.
20 Q. Are you aware of the case today, the
21 Justin Gatlin/USADA matter?
22 A. I am.
23 Q. And you've been retained by
24 Mr. Gatlin in this case?
25 A. I have, yes.

Page 730

1 Q. When, approximately, did your
2 involvement begin?
3 A. Well, my original involvement began
4 in mid-June of 2006 when I was contacted by an
5 attorney, Cameron Myler, to travel to UCLA to
6 witness the B-bottle test. And subsequent to
7 that, a service was also provided in analyzing
8 supplements that were sent to Aegis for
9 analysis.
10 We had two sets of supplements sent
11 and submitted for analysis. And then more
12 recently, about the 1st of May of this year, I
13 was asked once again to be involved in this
14 case.
15 Q. Have you reviewed documents for
16 today?
17 A. I have. I've reviewed a -- well,
18 I've gone back and re-reviewed the original data
19 packets on the A sampling and B sampling
20 testing. I've also reviewed the results of the
21 supplement testing. I've also looked at a
22 multi-page document that I think is the
23 principal point of interest; a longitudinal
24 chart of T/E values. And then also I did look
25 at a prescription that was provided to Justin

Page 731

1 Gatlin in March of 2006 for tri-insulin. And I
2 did look at that prescription history based upon
3 your request.
4 Q. Speaking of those substances
5 provided to Mr. Gatlin in 2006, what is
6 triamcinolone?
7 A. It's a compound that is used for
8 various medical needs. But it's not a compound
9 that we typically include in our testing
10 process.
11 Q. Why is that?
12 A. None of our programs have requested
13 that the drug be included in the programs as a
14 banned agent.
15 Q. Is it fair to characterize that
16 substance as an antiinflammatory?
17 A. It is.
18 Q. With your understanding of
19 triamcinolone -- I'm sure I'm butchering the
20 name here.
21 A. Triamcinolone.
22 Q. Triamcinolone. Is that a substance
23 which, in a test, would provide a positive
24 result for testosterone or its precursors?
25 A. No, it would not move in the path of

Page 732

1 testosterone in the body. And I would not hold
2 the opinion that it would hold a positive test.
3 Q. Have you heard of a substance
4 Celestone, which is a glucocorticoid?
5 A. No, I'm not familiar with that
6 compound.
7 Q. Now, you indicated that you received
8 a number of supplements from -- I believe it was
9 Cameron Myler that sent them to you.
10 A. Yes.
11 Q. Is that correct? And what tests did
12 you perform on those supplements?
13 A. They were sent in two groups. There
14 was an original group of eleven supplement
15 products that were sent in June of 2006, and
16 then a second group of six sent in late October.
17 But we have a supplement profile that we provide
18 a service that looks for steroid or
19 precursor compounds.
20 We have several of these. And this
21 particular analysis included testing for 19
22 Norandrostenediol, 19 Norandrostenedione, 19
23 Nortestosterone, 19 Norandrosterone, 19
24 Noretiocholanolone, 19 Norepiandrosterone, 4
25 hydroxytestosterone, 1 Androstenediol.

## Page 733

1  Androstenediol, Androstenedione, DHEA, and
2  testosterone. So those were the drugs included
3  in the analysis.
4      Q.  And where did you get the list of
5  those drugs to test?
6      A.  This is a profile that we offer as a
7  service when we're testing supplement products
8  for precursor chemicals or chemicals that may be
9  banned by a sports organization when, in fact,
10  there may be some suspicions that a supplement
11  contains such drugs.
12     Q.  And was one of the supplements you
13  received something called Essential Alpha Lean?
14     A.  Oh, gosh, I'd have to go back
15  through the list.
16     Q.  I believe -- to help you --
17     A.  Here, I have found it. It's
18  actually the first -- one of the first sets of
19  supplements tested. Yes, one of them was
20  Essential Alpha Lean Omega Blend.
21     Q.  And what did that substance -- can
22  you describe that substance?
23     A.  Well, we received 76 clear solid
24  capsules containing a yellow liquid. The
25  capsules were 23 by 9 millimeters in dimension.

## Page 734

1  The average weight of each capsule was 1.46
2  grams. They were received at our organization
3  in a clear plastic bottle with a white cap, and
4  it was identified as essential Alpha Lean Omega
5  Blend, Lot No. 50512048.
6      Q.  And you tested that supplement with
7  the battery of tests for those substances that
8  were testosterone and testosterone precursors
9  that you previously mentioned?
10     A.  Yes.
11     Q.  What were the results of that test?
12     A.  It was negative. We did not detect
13  any of those compounds.
14     Q.  And is there a screen cutoff?
15     A.  Yes. We tested to 10 parts per
16  million on the product.
17     Q.  And is there a confirmed
18  confirmation cutoff?
19     A.  Yes. 2 parts per million, by
20  weight.
21     Q.  I'd like to draw your attention to
22  another supplement. Did you receive one that
23  was referred to as L-Carnitine?
24     A.  Yes. L-Carnitine, we did receive
25  such a product.

## Page 735

1      MR. TYGART: Can I interject -- it's
2  not an objection. And this is Travis from
3  USADA. Would that be okay with the panel?
4      MR. COLBERT: Yes.
5      MR. TYGART: John, it sounds like
6  he's reviewing a document when he's answering.
7  It sounds like you may be reviewing a document
8  in questioning. Are these the documents -- if
9  that's, in fact, correct, are those the
10  documents that you provided to us yesterday?
11     MR. COLLINS: Yes. The ones I'm
12  looking at are the documents I gave to you
13  yesterday.
14     MR. TYGART: And I'd like to ask the
15  witness one question, or maybe a couple
16  questions on the documents, if I can.
17     MR. COLBERT: This is Edward
18  Colbert, Mr. Tygart. You want to cross the
19  witness now, or are you just getting
20  clarification on the question?
21     MR. TYGART: I just want to make
22  sure that he's testifying from the same document
23  that we're testifying from -- that we all have
24  in front of us, and not a different document.
25  And I'm specifically concerned about that,

## Page 736

1  because I noticed on one of -- well, actually on
2  all of these, with maybe the exception of one,
3  this doesn't look like the final certified copy.
4  And it's not -- if you look at the bottom of the
5  one that we just went -- that he just went
6  through, the essential Alpha Lean Omega Blend,
7  there's no certification signature.
8      I think it even says "draft." Maybe
9  it doesn't say draft report, but it looks like
10  not the final report.
11     MR. COLBERT: Well, let me just ask
12  this of the witness. Dr. Black, do you have
13  documents there other than the ones which you've
14  provided to Mr. Collins?
15     THE WITNESS: No, I do not.
16     MR. COLBERT: Okay. I would
17  suggest, then, Mr. Tygart, that you save for
18  cross- examination anything that you find amiss,
19  or ask him questions on cross about certifying
20  or if there's any difference about what you have
21  and what he testifies to at the hearing. That
22  would be certainly fair grounds for cross.
23     MR. TYGART: Okay. That's fine.
24     MR. COLBERT: Thank you.
25     MR. COLLINS: This is sort of a

Page 737

1 housekeeping matter.
2      MR. COLBERT: Who's that? John?
3      MR. COLLINS: This is John Collins.
4 It was a little confusing at the end of the day
5 yesterday, and I don't remember if, in fact,
6 we've given these documents to the panel.
7      MR. CAMPBELL: This is Chris
8 Campbell. I was just thinking I don't have
9 those documents.
10      MR. COLBERT: I do not either.
11      MR. CHERIS: I do not either.
12      MR. COLLINS: Okay. Then I didn't.
13 I could -- is everybody on e-mail?
14      ALL (simultaneously): Yes.
15      MR. COLLINS: Can we take a two-
16 second recess. I will step out and have my
17 assistant make a .pdf of these two documents.
18      MR. COLBERT: Did you have them
19 already on a .pdf at the hearing yesterday?
20      MR. COLLINS: I guess I did.
21      MR. COLBERT: Just send it to us.
22      (A brief recess was taken.)
23      MR. CAMPBELL: This is Chris
24 Campbell. Have we identified these as exhibits
25 or given them an exhibit number?

Page 738

1      MR. COLLINS: Not yet.
2      MR. COLBERT: Not yet.
3      MR. CAMPBELL: Also, are we on the
4 second page of the document, or what page are we
5 on?
6      MR. COLLINS: We should be on Page 2
7 of the eleven-page document. And for
8 identification purposes at this time, I believe
9 we left off at 16. So this would be Gatlin 17.
10      Is that correct, Mr. Chairman?
11      MR. COLBERT: If you'll hold on a
12 second, I have my list. The last one I had was
13 Exhibit 16, which was a chiro/orthopedic bill.
14 So this would be 17.
15      MR. TYGART: And this is Travis. If
16 we could just -- we're not going to object to
17 these coming in, although I think we have a lot
18 of good reasons to do so. We're going to let
19 them in. But what I need to know and have in
20 the record that whatever document Dr. Black
21 testifies from is a document that I have in
22 front of me and that the panel has.
23      So my proposal for that, John, which
24 I think I would be comfortable with, would be
25 for him to identify -- where it says the Donor

Page 739

1 ID, Laboratory ID at the top, for him to
2 identify before you ask him questions about each
3 one of these documents, if that's the document
4 he's referring to, or we're going to have to
5 number each one of these separately.
6      MR. COLLINS: Okay. I'll do that.
7 I'm happy to do that.
8      MR. TYGART: Okay.
9      MR. COLLINS: In that case, we
10 should go back to the first page one, which was
11 Donor -- I've been handed a confirmation sheet.
12 Mr. Cheris should shortly have his fax of the
13 other one.
14      Q. (By Mr. Collins) Back to the other.
15 Could you -- the document we just discussed,
16 Mr. Black, could you give the donor ID
17 information at the top?
18      A. Yeah. In the upper right-hand
19 corner, the document is identified Donor ID:
20 Essential Alpha Lean. And the Laboratory ID is
21 4334714.
22      MR. BOCK: And I apologize. This is
23 Bill Bock. This is Exhibit 17 we're talking
24 about?
25      MR. COLLINS: This would be

Page 740

1 Exhibit 17. Group Exhibit 17.
2      MR. BOCK: Okay. Thank you.
3      Q. (By Mr. Collins) Going back to the
4 next one, the L-Carnitine -- Carnitine, could
5 you, Mr. Black, give the donor ID and laboratory
6 ID for that document?
7      A. In the upper right-hand corner,
8 donor ID is identified as L-Carnitine, and the
9 laboratory ID is 4334715.
10      Q. And what was the substance that was
11 tested?
12      A. Well, it was received by us as an
13 oval tablet. And, again, we provided the
14 testing for the same steroid precursor
15 chemicals.
16      Q. And approximately how many tablets
17 did you receive?
18      A. We received seven white oval
19 tablets.
20      Q. And what were the approximate weight
21 of the tablets?
22      A. The weight was 1.30 grams on
23 average. And they were contained within a black
24 plastic bottle labeled L-Carnitine. And there's
25 a lot number identified on this product, as

7-30-07 to 8-01-07                                    USADA vs. GATLIN

186 (Pages 741 to 744)

Page 741

1  well.
2      Q.  And what were the results of the
3  tests that you ran on this substance?
4      A.  These were negative for the steroids
5  and precursors that were included in our
6  testing.
7      Q.  I'll turn your attention to the next
8  document, which in the series I have is for a
9  substance called Thermo Burst?
10     A.  In the upper right-hand corner, the
11 third item I have has an ID of Thermo Burst with
12 a laboratory ID of 4334716.
13     Q.  And this substance, what did you
14 receive here?
15     A.  We received 42 light brown-colored
16 oval tablets, average weight of 1.54 grams,
17 contained within a black plastic bottle.  And
18 the gold cap was labeled Thermal Burst.
19     Q.  And did you run the tests for
20 testosterone and testosterone precursors on the
21 substance?
22     A.  Yes.  The same test was applied, and
23 the result was none detected, or negative.
24     Q.  I'll turn your attention to the next
25 one, which I have as Mega Men.

Page 742

1      A.  Yes.  The next document, upper
2  right-hand corner has a donor ID of Mega Men.
3  And the laboratory ID is 4334717.
4      Q.  Okay.  And what was this substance
5  that you received here?
6      A.  We received 104 light brown oval
7  tablets with an average weight of 1.366 grams.
8  And they were contained within a white plastic
9  bottle labeled Mega Men.
10     Q.  And did you run the test for
11 testosterone and testosterone precursors on
12 this?
13     A.  Yes.  We conducted the same testing
14 with none detected, or negative findings.
15     Q.  I'll turn your attention to the next
16 document that I have, which is a quick shot
17 Creatine gel.
18     A.  Yes.  The upper right-hand corner of
19 this document is "Donor ID:  Quick Shot Creatine
20 Gel," with a laboratory ID of 4334718.
21     Q.  What was the substance you received
22 here?
23     A.  We received 30 milliliters of a
24 purple gel, which was within a sealed black and
25 red drink pouch.  And it had a labeling on it of

Page 743

1  Quick Shot Creatine Gel.
2      Q.  And did you test this substance for
3  testosterone and its precursors?
4      A.  We did and the results were none
5  detected.
6      Q.  Which is a negative result?
7      A.  Yes.
8      Q.  Okay.  Turning to the next one.
9      A.  The upper right-hand corner says the
10 donor ID is Pure IGF Extreme.  Laboratory ID is
11 4334719.  We received 30 millimeters of a cloudy
12 brown liquid within a glass amber bottle
13 containing a medicine dropper.  And the testing
14 for testosterone and the precursors and the
15 other steroids tested were none detected, or
16 negative.
17     Q.  Okay.  Turn the page to the next
18 one.
19     A.  The next report, upper right-hand
20 corner, "Donor ID:  Myoplex Original."
21 Laboratory ID is 4334720.  We received 82.024
22 grams of a chocolate powder within a sealed
23 drink mix pouch labeled as the Myoplex product.
24 And the analysis for the same steroid-related
25 compounds were none detected, or negative.

Page 744

1      Q.  The next one, please.
2      A.  The next report in the upper
3  right-hand corner is a donor ID of Thermo Burst.
4  Laboratory ID of 4334721.  We received 19 light
5  brown oval tablets.  Average weight of 1.15
6  grams.  They were contained within a black
7  plastic bottle with a gold cap.  And the results
8  of testing this product were also none detected,
9  or negative.
10     Q.  The next one, please.
11     A.  The next report, upper right-hand
12 corner, Donor ID:  CLA dietary supplement.
13 Laboratory ID is 4334722.  We received 52 clear
14 capsules that contained a yellow liquid.
15 Average weight of 1.745 grams, and contained
16 within a black plastic bottle.  And the results
17 of analysis of this product were also none
18 detected, or negative.
19     Q.  The next one, please.
20     A.  The next report has a donor ID of
21 Adenergy.  Laboratory ID of 4334713.  We
22 received 75 white oval tablets with an average
23 weight of 1.17 grams in a black plastic bottle.
24 And the test results for the analysis of this
25 product were also none detected, or negative.

Page 745

1    Q.   I believe there's one more.
2    A.   The next report upper right-hand
3  corner donor ID is identified as Ultra Water.
4  Laboratory ID 4334723. And we received 26 clear
5  capsules containing a brown powder with an
6  average weight of 900 milligrams. And they were
7  contained within a black plastic bottle. And
8  our results for this analysis were none
9  detected, or negative.
10    Q.   Okay. Were you responsible for
11  overseeing these tests?
12    A.   Ultimately, yes. Dr. Tim Roberts is
13  the lab director here. The testing occurs in
14  the laboratory. Dr. Roberts is responsible to
15  me, and I'm responsible for what goes on in the
16  laboratory.
17    Q.   And are you aware that the results
18  are true and accurate?
19    A.   Yes.
20      MR. COLLINS:  Before I move to the
21  next document, Mr. Cheris, have you received it?
22      MR. CHERIS:  I have.
23    Q.   (By Mr. Collins)  Dr. Black, I would
24  like to draw your attention to the next
25  document, which is -- the cover page is a fax,

Page 746

1  and there are six substances behind it. Six
2  reports or six substances behind it. And the
3  first one I have is the donor ID for a lipigel.
4  Do you have that document?
5    A.   I do have that document.
6    Q.   Would you please describe what that
7  is.
8    A.   The document I have, again, upper
9  right-hand says, "Donor ID: Lipigel."
10  Laboratory ID of 4334763. This is a -- we
11  received 147 milligrams of a sticky orange gel
12  inside a plastic cylinder with cloth tape
13  labeled lipigel. And the results of this
14  testing, including the same drugs as tested
15  previously, was none detected, or negative.
16    Q.   Okay. I'd like to turn your
17  attention to the next document. I have a donor
18  ID of Biotone.
19    A.   Next document, upper right-hand
20  corner, "Donor ID: Biotone," Laboratory ID
21  4334764. We received 199.036 grams of a light
22  yellow lotion inside of a clear plastic bottle
23  with a white cap. And this was subjected to the
24  same analysis, and the results were none
25  detected, or negative.

Page 747

1    Q.   Turning your attention to the next
2  document.
3    A.   The next report, upper right-hand
4  corner, "Donor ID:  Graston mobilization cream."
5  Laboratory ID of 4334765. We received 1.621
6  grams of an off-white cream inside of a Ziploc
7  bag labeled Graston mobilization cream. And the
8  results of analysis of this product were also
9  none detected, or negative.
10    Q.   The next one, please.
11    A.   The next report, upper right-hand
12  corner, donor ID of Tecar cream. Laboratory ID
13  of 4334766. We received 7.083 grams of a white
14  cream inside of a Hefty Ziploc bag wrapped with
15  cloth tape labeled Tecar. The results of this
16  analysis were none detected, or negative.
17    Q.   Okay. The next one?
18    A.   The next report, upper right-hand
19  corner, "Donor ID: Tecar Pro Massage Liquid.
20  Laboratory ID:  4334767." We received 15
21  milliliters of a clear liquid inside of a sealed
22  amber glass bottle with a white cap. The
23  analysis of this product resulted with a none
24  detected, or negative report.
25    Q.   Okay. And then lastly, there's one

Page 748

1  for a DHEA, deep hydrating aloe cream.
2    A.   Yeah. The next report, upper
3  right-hand corner, "Donor ID:  DHEA deep
4  hydrating aloe cream. Laboratory ID:  4334768."
5  And the result of this analysis -- excuse me.
6  We received 56 grams of the white cream inside
7  of a sealed lotion tube labeled as DHEA, deep
8  hydrating essential aloe cream. And the results
9  of this testing were positive for DHEA.
10    Q.   Okay. And where did you receive --
11  or from whom did you receive these substances?
12    A.   These products were sent to us by
13  way of Attorney Cameron Myler.
14    Q.   And the same with these. Were you
15  responsible for overseeing the testing of these
16  substances?
17    A.   Yes.
18    Q.   And do these results truly and
19  accurately reflect the testing on those
20  substances?
21    A.   Yes.
22    Q.   And the results achieved?
23    A.   Yes.
24    Q.   You earlier indicated that you
25  reviewed the test results, the A and the B from

7-30-07 to 8-01-07                                 USADA vs. GATLIN

188 (Pages 749 to 752)

Page 749

1 the 4-22-2006 samples; is that correct?
2    A.  Yes.
3    Q.  And your analysis of those results,
4 were you able to form an opinion of whether or
5 not those test results would be consistent with
6 the application of a cream or other transdermal
7 application within the past 24 hours or so?
8    A.  Yes.
9    Q.  And what was that opinion?
10    A.  The report -- the analysis and
11 report indicate the presence of -- or indicate
12 the use of testosterone, or precursor androgens
13 or steroids.  And those, in fact, can be
14 absorbed and passed across the skin through
15 transdermal absorption.  And if they're used
16 within 24 hours of the collection of the sample,
17 it could result in a positive test.
18    Q.  When you say that's consistent with
19 a transdermal application, you're not implying
20 that that's the only possibility?
21    A.  No, no.  Certainly there's no way of
22 knowing from the test results what the route of
23 administration was.  It could have been by other
24 means.  By injection or oral route.  The
25 administration certainly could be by some other

Page 750

1 route.  These results would be consistent with a
2 cream or consistent with other ways of applying
3 a drug.
4    Q.  Okay.  Also these are tests based on
5 urine samples; is that correct?
6    A.  Yes.
7    Q.  And would the urine samples
8 determine exactly what the substance was?
9    A.  No, not by this testing.
10    Q.  Also, are you, in your practice,
11 aware of any -- the existence of any creams or
12 gels that contain testosterone?
13    A.  Oh, certainly.  There are products
14 that are used clinically for the application of
15 testosterone.  Solvey Pharmaceuticals has a
16 product.  Androgel very efficiently delivers
17 testosterone transdermally.  The FDA
18 documentation indicates the delivery of
19 testosterone to the blood occurs within 30
20 minutes after application.
21    Q.  I've asked about testosterone.  But
22 precursors would also have the same result?
23    A.  The androtestosterone, they would be
24 expected to behave in the same way clinically.
25    Q.  And, again, those could be applied

Page 751

1 transdermally?
2    A.  Yes, they can.
3    Q.  But transdermally is not the only
4 way they can be applied?
5    A.  Yes.  Correct.
6        MR. COLLINS:  I believe that's all I
7 have for Mr. Black.
8        MR. TYGART:  This is Travis.  May I
9 proceed with a few questions?
10        MR. COLBERT:  Yes, please,
11 Mr. Tygart.
12             CROSS EXAMINATION
13 BY MR. TYGART:
14    Q.  Dr. Black, how are you?
15    A.  Just fine, Mr. Tygart.
16    Q.  It's been a long time.
17    A.  Yes, it has.
18    Q.  But I hope you and your family are
19 doing well.  I'm going to ask a few questions.
20 And be sure to let me know if you have trouble
21 understanding them or can't hear them well.  I
22 know it's a little difficult with all of us by
23 speakerphone.  And I've got three kids running
24 around the house, as well, so please forgive me.
25        Let me start, I guess, just to clear

Page 752

1 up a couple things with the supplement documents
2 you just went through.  I guess first starting
3 on Gatlin 17, the first page, which I think you
4 previously identified as the Essential Alpha
5 Lean.  Do you see that document?
6    A.  I do.  I have it in front of me.
7    Q.  Okay.  Where it says "specimen
8 type," and it says "urine," did you actually
9 receive any urine?
10    A.  No.  That's boilerplate.  The
11 laboratory information system that we use has
12 some boilerplate in it that's not easily
13 manipulated.
14    Q.  So what you actually received are
15 the products that are listed here, not the urine
16 after someone claimed they used those products?
17    A.  That's correct.
18    Q.  Okay.  That's what I thought.  At
19 the bottom where it says, "Certified by," and
20 then, "Date," is there any reason why this
21 document is not certified by anyone?
22    A.  Well, that, too, is boilerplate.
23 For the analysis, most of the work that we do,
24 the certification and the dating of
25 certification occurs on the actual data for the

7-30-07 to 8-01-07          USADA vs. GATLIN

189 (Pages 753 to 756)

Page 753

1   documentation itself. We do not, for much of
2   our work, register that information into the
3   lims. But our federal- regulated program for
4   our workplace drug testing, we have to do that.
5   And the boilerplate was established for that.
6      Q.   Okay.
7      A.   But for our sports testing and much
8   of our other testing, all of that documentation
9   would be contained within a data packet, when
10   that data packet is requested.
11      Q.   So if there was a data packet
12   requested, would you have that certified by
13   someone and then a date that that was certified?
14      A.   That's correct.
15      Q.   So since it's not certified and
16   there is no date, does that imply there was no
17   data packet produced with this document?
18      A.   We're not requested to assemble a
19   data packet. But in order for the tests to be
20   reported, there has to be a certified
21   scientist's review of the information. And
22   dependent on the case, there may also be a
23   review by Dr. Roberts.
24      Q.   But there would be -- I guess, if it
25   were requested, there would be supporting

Page 754

1   documents underneath, chromatograms and that
2   sort of thing, that would show the actual
3   analysis that was performed?
4      A.   That's correct. The supporting
5   documentation would include all the chain of
6   custody documentation, the chromatography, mass
7   spectrography, and the review documentation.
8      Q.   Okay. Let me ask you just a few
9   questions about the screen and the confirmation.
10   I see there it has listed on all these
11   documents, screen cutoff is 10 -- and that ppm,
12   is that parts per million?
13      A.   It is.
14      Q.   And the 2 for the confirmation
15   cutoff is also 2 ppm. Is that also parts per
16   million?
17      A.   That's correct.
18      Q.   And basically what that means, as I
19   understand it, is that your detection method
20   would go as low as that number. For the
21   screen, 10 parts per million, but is it accurate
22   that it would not look below that number?
23      A.   Well, it's 10 parts per million as a
24   reporting cutoff. It's certainly possible,
25   depending upon the signal or noise response on

Page 755

1   the instrument, or the cleanliness of that
2   particular injection to see below that. But the
3   reporting threshold would apply. If we saw a
4   response below 10 parts per million, it would
5   not be scheduled for confirmatory analysis.
6      Q.   Okay. Just because you have the
7   screen cutoff and the confirmation cutoff
8   categories with the reporting threshold of 10
9   and 2 parts per million respectively, does that
10   mean that you did the confirmation analysis on
11   all of these products, or does it just indicate
12   that that is your reporting threshold for these
13   products?
14      A.   If it's reported as a negative,
15   there are two possibilities -- or none detected.
16   One is that we did not see any responses on the
17   screen test that indicated there should be
18   confirmation testing applied. So it would have
19   been reported as none detected. Or it's
20   possible there was a response that we saw above
21   10 parts per million, but when it was scheduled
22   for confirmatory analysis, focusing on a
23   suspected compound, it was not identified to be
24   present at greater than 2 parts per million.
25      Q.   Okay.

Page 756

1      A.   So it's possible that -- I don't
2   have all the raw data in front of me, but it's
3   possible that some of these may have given an
4   indication of above 10 parts per million on the
5   screen, but on the confirmatory we did not
6   identify a compound as present, or as present
7   above 2 parts per million.
8      Q.   Okay. Just so I have it, it's
9   possible that the screen, since that's, you
10   know, essentially a butter knife analysis, could
11   have indicated a need or suspicion to go to the
12   confirmation. But if you did go to the
13   confirmation and it was below the 2 parts per
14   million, it would indicate none detected?
15      A.   That's correct.
16      Q.   Okay. And, Dr. Black, you would
17   agree, wouldn't you, if any of these supplements
18   that were reported "none detected," if there was
19   any trace of a steroid -- of testosterone or a
20   testosterone precursor, that that would not
21   cause the positive test result in this case?
22      A.   I would agree with that.
23      Q.   Okay. Dr. Black, did you -- and let
24   me just ask you to flip just a couple of pages
25   to the one you identified as Pure IGF Extreme.



Page 757

```
1        A.  I'm on that page.
2        Q.  Okay.  What is IGF, if you know?
3        A.  IGF is insulin growth factor.
4        Q.  Okay.  Is that a prohibited
5   substance?
6        A.  It is.
7        Q.  And even in the sports that don't
8   test for -- I think you said things like
9   glucocorticosteroids, they do test for IGF?
10       A.  Yes.
11       Q.  Did you test this for IGF?
12       A.  No, we did not.
13       Q.  Did anyone request you to test this
14  for IGF?
15       A.  No.  We were only asked to test for
16  testosterone or its precursors.
17       Q.  Okay.  So the only tests you did on
18  the IGF, once again, identified as Pure IGF
19  Extreme, the only tests you did on that were for
20  the steroid precursors that you previously
21  identified?
22       A.  Yes.
23       Q.  Do you know if you have any of this
24  substance remaining?
25       A.  This testing occurred just over a
```

Page 758

```
1   year ago, but it's very likely we still have it
2   archived.  We hold product and samples frozen
3   for a year.  I'd have to verify.  We're just
4   past the report date of July 13.  But it is
5   possible this is still in holding.
6        Q.  So you typically would hold it
7   frozen for a year, but since we're past that
8   date, you just don't know for sure if you still
9   have it?
10       A.  That's correct.  The staff is very
11  efficient at discarding the archived samples.
12  But it's certainly possible that this is still
13  on the premises.
14       Q.  It's been a busy summer, as well.  I
15  understand.  Let me ask you if you'll look at,
16  on the other set of documents that you went
17  through, the last page, the DHEA deep hydrating
18  aloe cream.  And just --
19       A.  I'm on that page.
20       Q.  Okay.  Thanks.  Do you recall this
21  says -- where you read from -- "Received 56
22  grams" -- I assume -- "of white cream inside a
23  sealed lotion tube," was that a new package?
24       A.  I would -- we take pictures of all
25  of our products.  And we don't have the picture
```

Page 759

```
1   in front of us.  I would not know offhand if
2   that was sealed as a new product or if that came
3   to us already having been opened and used.
4        Q.  And then you have in quotes "labeled
5   DHEA, Deep Hydrated Essential Aloe Cream."  Did
6   it actually have "DHEA" written right on the
7   label?
8        A.  Yes.
9        Q.  So is it fair to say if someone
10  actually used that and bothered to look at the
11  label, they would clearly see DHEA there?
12       A.  Yes.
13       Q.  Did this one have a pink squiggly or
14  crooked "S" on it, by any chance?
15       A.  I would have to look at the picture.
16  It's been quite some time, and I didn't go back
17  to look at each of the pictures in each of the
18  products.  So I'd actually have to go back and
19  look at the picture to answer that.
20       Q.  So it might.  You just don't know?
21       A.  Correct.
22       Q.  Are you aware of where this product
23  came from?
24       A.  All of the products -- in terms of
25  its original source or through the attorney?
```

Page 760

```
1        Q.  Its original source.
2        A.  No.  These came to us by way of
3   Cameron Myler.  And I'm -- I would have to go
4   back to the documentation to look at the
5   shipping source, but they were all requested
6   through Cameron Myler's office --
7        Q.  Okay.
8        A.  -- for the testing.
9        Q.  Is it possible a manufacturer sent
10  this one to you directly?
11       A.  That would be very unlikely.
12       Q.  Okay.
13       A.  Normally, product is sent to us by
14  an attorney or by an athlete themselves.
15       Q.  Do you know if this was a product
16  that Mr. Gatlin used?
17       A.  No, I do not.
18       Q.  Does the name of the company Sarati
19  help refresh your recollection with respect to
20  the source of this product.
21       A.  No.
22       Q.  Have you ever heard of a company,
23  Sarati?
24       A.  There are so many supplement
25  products or various products in the marketplace.
```

## Page 761

1 I have heard the term, and I think I've heard
2 the term in context with this case. But I don't
3 recall seeing a Sarati product directly.
4 Q. Okay. So you don't have any
5 recollection of testing any Sarati products?
6 A. That's correct.
7 Q. Dr. Black, have you -- let me start
8 here. Do your -- does Aegis do carbon isotope
9 abrasion testing?
10 A. No, Aegis doesn't offer the carbon
11 isotope abrasion test.
12 Q. And I didn't see any documentation
13 by you or Dr. Robert or anyone else at Aegis.
14 Did I miss that?
15 A. No, we are not published on that
16 methodology.
17 Q. And I also didn't see -- just going
18 through your CV, I didn't see any scientific
19 papers about the excretion times of synthetic
20 testosterone or its precursors. Have you
21 written any papers in that area?
22 A. No.
23 Q. And, similarly, I didn't see any
24 articles published by you concerning the effect
25 of synthetic testosterone or its precursors on

## Page 762

1 the testosterone metabolite. Did I miss
2 something there again, or is that accurate?
3 A. That's accurate. I've not published
4 in those areas. We've certainly conducted the
5 excretion studies for our own purpose, but not
6 for publishing.
7 Q. Tell me if I'm wrong. When you
8 earlier formed an opinion about where the
9 prospective test results in Mr. Gatlin's case
10 came from, possibly being consistent with the
11 use of a transdermal application of testosterone
12 and its precursors within a 24-hour time period,
13 that opinion is based on you reviewing the
14 literature primarily?
15 A. Well, reviewing the literature, as
16 well as training. The transdermal application
17 of medication is quite common in pharmacy and in
18 medicine. So although we're talking about a
19 specific application, it's a generally available
20 way of administering drugs. And one of the many
21 routes of administrating medication.
22 Q. And, Dr. Black, I think you
23 testified earlier you reviewed the lab packs in
24 this case --
25 A. Yes.

## Page 763

1 Q. -- prior to your testimony today?
2 A. Yes.
3 Q. And, of course, I know you were at
4 the B sample, as well, when you testified
5 earlier. Do you remember that the five Alpha
6 metabolite on the A sample was a negative 29.4?
7 A. I don't know if I remember. I'll
8 have to look at it. But I do recall that the
9 data was sufficient for identifying the presence
10 of synthetic. I am looking at the data right
11 now.
12 Q. Okay. There's no dispute over these
13 numbers. I just want to -- I just want to ask
14 you a few questions about those numbers. What
15 document do you have in front of you that would
16 help you identify the five Alpha, the five Beta,
17 and the pregnanediol? And then I'll walk you
18 through just a few questions.
19 A. I'm looking at the report that was
20 issued on June 29 by Michael Cetera with the
21 analytic data of the five Alpha, of the five
22 Beta, and the five pregnanediol.
23 Q. Let's use that. And for the rest of
24 our benefit, you said Exhibit 5(B), the
25 second-to- the-last page. And, Dr. Black, just

## Page 764

1 to make sure I'm referring to the same page you
2 are, it's a letter dated June 29, 2006, to Terry
3 Madden at USADA?
4 A. Correct.
5 Q. It says, "Confidential drug testing
6 report for USADA 7712," and then in parentheses,
7 "87MO5B"?
8 A. Yes.
9 Q. And it's signed by Dr. Michael
10 Cetera?
11 A. Yes.
12 Q. What is the five Beta number that is
13 listed there?
14 A. The five Beta Androstenediol?
15 MR. COLLINS: Travis, this is John
16 Collins.
17 MR. TYGART: Yeah?
18 MR. COLLINS: Just so I know I'm
19 looking at the right one, is this the one that
20 in the top upper right-hand corner it says Page
21 11?
22 MR. TYGART: Yes.
23 MR. COLLINS: And it's 4045607?
24 MR. TYGART: Right.
25 Q. (By Mr. Tygart) And, Dr. Black,

7-30-07 to 8-01-07                USADA vs. GATLIN

192 (Pages 765 to 768)

Page 765

1   just to get you to the right document, on that
2   letter where it says "IMS Laboratory Conclusion:
3   Positive - outside the normal ranges," and then
4   just below it, it says "analytical data" -- do
5   you see that?
6        A.   I'm sorry.  Say that again.
7        Q.   About -- close to just two lines
8   above the signature line where it says
9   "analytical data," and it's underlined --
10        A.   Yes.
11        Q.   -- do you see that statement?
12        A.   Yes.
13        Q.   So that first column, which is the
14   five Beta metabolite; is that correct?
15        A.   It's the Androstenediol, yeah.
16        Q.   And that's at negative 28.9; is that
17   right?
18        A.   That's correct.
19        Q.   And the next column where it says
20   five Alpha --
21        A.   The five Alpha Androstenediol.
22        Q.   That's a negative 25.7; is that
23   right?
24        A.   That's correct.
25        Q.   And then the next column is what

Page 766

1   column?
2        A.   That's the five Beta pregnanediol.
3        Q.   And is the pregnanediol and -- for
4   ease of my voice and in reference for the rest
5   of us, I'm just going to call that the P-diol;
6   is that okay?
7        A.   Sure.
8        Q.   So the P-diol, is that, as you
9   understand it, the endogenous reference
10   compound?
11        A.   It's one of a number that can be
12   selected to compare the Carbon 12-Carbon 13
13   ratio against.  The laboratory may choose
14   others, but that is one of the reference
15   compounds, yes.
16        Q.   And in this case, that was the
17   endogenous reference compound that was selected
18   for analysis by the UCLA laboratory?
19        A.   Yes.
20        Q.   And the reason you select an
21   endogenous reference compound like the P-diol is
22   because if you use synthetic testosterone or its
23   precursors, it will have no effect on that
24   endogenous reference compound.  In this case,
25   the P-diol; is that correct?

Page 767

1        A.   Correct.
2        Q.   And then again, for ease of all of
3   us, I'm going to refer to the other two
4   metabolites as the five Alpha and the five Beta.
5   Would you agree that the five Alpha and the five
6   Beta are metabolites that are downstream of
7   testosterone?
8        A.   Yes.
9        Q.   And if you use synthetic
10   testosterone, you would see a bigger number,
11   although it is a negative number.  But you would
12   see an increase in that five Alpha and that five
13   Beta metabolite; is that correct?
14        A.   Well, I don't know if that's correct
15   or not.  I don't know if that's necessarily
16   true.  I don't know if there's enough data to
17   say that absolutely.  The DHEA and
18   Androstenediol insert themselves upstream from
19   the testosterone.  And what the relative
20   contribution may be compared with the
21   testosterone administration, I think that's a
22   dilemma.  You can't tell that.  You can't tell
23   which is used.
24        Q.   And I probably confused that
25   question, because I said testosterone.  And I

Page 768

1   mean if you used testosterone or its precursors,
2   it will affect -- or it may affect the five
3   Alpha and the five Beta metabolites?
4        A.   Oh, yes.  This is a very delicate
5   test.  No, these downstream metabolites can be
6   distinguished from the P-diol.
7        Q.   And if they are affected -- and
8   affected becoming more negative, as we see
9   here -- that assures you of the use of
10   testosterone or its precursors?
11        A.   Yes.
12        Q.   And what you said earlier, that you
13   could use DHEA, you don't know for sure how much
14   that's going to affect the five Alpha and the
15   five Beta; is that right?
16        A.   Well, it would certainly be hard to
17   predict.  I think we can say with a high degree
18   of certainty that DHEA and Androstenediol, which
19   are precursors to testosterone, would have an
20   impact on this test.
21        Q.   Okay.  Do you think a contaminated
22   supplement -- a supplement contaminated through
23   the manufacturing process with Androstenediol or
24   DHEA could result in an increase in the five
25   Alpha and the five Beta to the extent you see

Page 769

1  here?
2      A.  Well, I guess we'd have to have a
3  better quantitative definition of
4  "contaminated." For most of the contaminated
5  substances I've seen, I would say no. I would
6  not think that a contaminated substance would
7  result -- there would be enough contaminant in
8  the product to lead to these results.
9      Q.  And that's a -- I appreciate your
10 answer. And I'm not talking about a spiked
11 supplement. I'm talking about just a
12 contaminated supplement through the
13 manufacturing process.
14     A.  Yeah, we've seen contaminated
15 supplements with considerable variances, in
16 terms of how much contamination. But certainly
17 there is a distinction, as you just referred to,
18 with a spiked product with a chemical entered by
19 intention, as opposed to a poor manufacturing
20 process.
21     Q.  And would that -- what you just
22 said, you're in agreement, I think, with me,
23 that a contaminated supplement would not cause
24 these -- this increase of the five Alpha and the
25 five Beta. To this extent, would that also hold

Page 770

1  true for a cream or a lotion that may be
2  contaminated?
3      A.  I would -- well, I would have to
4  agree if it's a contaminated substance of low
5  parts per million or even parts per billion
6  contamination, that it would, more likely than
7  not, lead to a result such as this.
8      Q.  Dr. Black, would you agree that the
9  reference to Mr. Gatlin's endogenous reference
10 compound by the UCLA laboratory of minus 28.1,
11 and the difference between the five Alpha and
12 the five Beta in testosterone metabolites --
13 would you agree that's a significant difference?
14     A.  It is certainly significantly
15 different to define them as positive. It's
16 greater than 3 delta units, and it's above a
17 minus 28 criteria under the technical document.
18 So I would say certainly this is a clear
19 positive.
20     I don't know if I would put a degree
21 on it, if this is a really strong positive.
22 I've reviewed about ten such cases. So I would
23 not have the body of knowledge necessarily that
24 the folks at the UCLA laboratory would have.
25     Q.  Okay. Would you agree that a

Page 771

1  cream -- and let me be broader than that.
2      Would you agree that topical use,
3  whether by patch, gel, or cream has a slower
4  absorption into the body than an oral use of
5  testosterone?
6      A.  Not necessarily. Transit through
7  the gut can take sometimes, depending upon food
8  in the stomach, perhaps a couple of hours. An
9  hour and a half or an hour for a drug to be
10 effectively absorbed and taken up into the blood
11 stream.
12     The Solvey Pharmaceutical data on
13 their androgen product indicates delivery into
14 the blood within 30 minutes. So I don't know
15 that that would necessarily hold in all cases.
16 Transdermal administration is effective.
17     Q.  But, Dr. Black, that's -- what you
18 just referenced there was not the blood system;
19 is that right?
20     A.  Correct.
21     Q.  So my question was, Would you agree
22 that an oral injection -- excuse me. An oral
23 use or an injected use would more rapidly
24 affect -- would more rapidly affect -- show its
25 effects in the urine than a topical use of

Page 772

1  synthetic testosterone?
2      A.  Well, whether taken orally or
3  transdermally, the first drug has to be absorbed
4  into the blood compartment. Once it's in the
5  blood compartment, it's going to be absorbed
6  into the kidneys and then appear in the urine.
7  So in terms of lag times, the drug would have to
8  first be in the blood and then go into the
9  urine.
10     If there were food delay out of the
11 stomach or some absorption issue from the
12 stomach that delays absorption into the blood,
13 then the drug would be present in the urine
14 after a transdermal administration.
15     Q.  Okay.
16     A.  But either way, the drug should
17 appear within hours in the urine. Perhaps even
18 sooner, depending on the conditions.
19     Q.  And when you say appear in the
20 urine, you mean in -- do you mean affecting the
21 five Alpha -- affecting the testosterone
22 metabolites the way we see here, or do you mean
23 detected in the urine by some other means?
24     A.  Well, the metabolites, too, would be
25 detected rather readily. As blood is being

Page 773

1 filtered through the kidneys, there is also
2 blood flow through the liver. Metabolite is
3 going to occur. And those metabolites will be
4 occurring in the blood compartment fairly
5 quickly. So there's certainly going to be a lag
6 time between each of these dynamic events. But
7 I don't know that I would be able to point to a
8 pharmacokinetic study that shows oral or
9 transdermal of this drug showing a competitive
10 presence in the urine or how quickly each one
11 goes into the urine.
12     Q. Would you think it's likely that a
13 testosterone cream applied to the skin -- to the
14 knee area and the leg area an hour before drug
15 testing would result in these test results?
16     A. I can't exclude it as a possibility.
17 I think it could be argued that it may be
18 improbable. I don't know that I could say that
19 I could exclude it as a possibility. The
20 transdermal absorption of the drug, by studies,
21 have shown very quick delivery into the blood.
22 And from the blood, there's obviously a dynamic
23 event from filtration through the kidneys and
24 metabolism through the liver. I don't know that
25 I could exclude it; but I may say that it's less

Page 774

1 probable.
2     Q. Okay. Would you say that it's
3 highly unlikely?
4     A. As a scientist, I usually like a lot
5 of numbers to look at to form an answer to such
6 a question. Based upon what I know, I could
7 only -- I think I'm most comfortable in saying I
8 think I could exclude it. I think it's less
9 likely.
10     Q. Okay. And it's less likely because,
11 again, a cream has to absorb into your body, be
12 processed, and end up in your urine? Is that
13 essentially the problem?
14     A. That's correct.
15     Q. And an hour is an awfully short time
16 for that to occur; wouldn't you agree?
17     A. I think it is a short time. I think
18 another dynamic event as part of this process is
19 the testing being applied is extremely
20 sensitive. We're dealing in low parts per
21 billion. So there's more to consider than just
22 the dose administered and the route of
23 administration. There's a factor in trying to
24 determine how probable this might be.
25     Q. But for CIR results, you're looking

Page 775

1 at -- you're looking at the carbon make-up, and
2 to change -- would you agree to change your
3 carbon make-up from a 24, as we see in the
4 P-diol, to a 29 as we see in the five Alpha,
5 that's a significant change that would take
6 either a tremendous amount or a sustained amount
7 over time? Would you agree with that statement?
8     A. I would agree that's one way to
9 state it. I don't know anything about Justin's
10 metabolism. I don't know anything about his
11 enzyme systems. We do know that there are --
12 for almost any drug that we talk about, there
13 are fast metabolizers and slow metabolizers, and
14 a majority of people in between.
15     But the whole field of
16 pharmacogenomics, which looks at how drugs are
17 handled within individuals, there's a growing
18 appreciation that there's a greater diversity of
19 how individuals handle drugs than what has been
20 previously understood.
21     I don't know if -- Justin may be a
22 fast metabolizer. He could be a slow
23 metabolizer, which would make this event more
24 improbable.
25     Q. Okay. You testified earlier that --

Page 776

1 I think you said that it could be consistent
2 with absorption of the cream within 24 hours of
3 use or transdermal use. You'd also agree that
4 it's just as consistent with an injection of
5 testosterone?
6     A. Yes.
7     Q. And would you also agree it's just
8 as consistent with the use of an oral dose of
9 testosterone?
10     A. Yes.
11     Q. And on those two questions, use of
12 testosterone or its precursors?
13     A. Correct, yes.
14     Q. Are you aware of any scientific
15 studies that show an hour after use of a topical
16 testosterone cream, gel, or patch would result
17 in metabolites we see here with the five
18 Alpha and the five Beta compared to negative 24
19 B-diol?
20     A. No. Clinical testing doesn't use
21 clinical isotope abrasion testing. I'm not
22 aware of any clinical studies or any large base
23 of data that would support that.
24     Q. Okay.
25     MR. TYGART: You know, Dr. Black, I

7-30-07 to 8-01-07                                    USADA vs. GATLIN

195 (Pages 777 to 780)



Page 777

1  appreciate your time. Let me just look at my
2  notes real quick.
3          I think that's all the questions I
4  have, Dr. Black. We appreciate your time. I'll
5  turn you back over to the panel.
6          MR. CAMPBELL: Thank you.
7  Mr. Collins, do you have any redirect?
8          MR. COLLINS: I have a few more.
9
10         EXAMINATION
11 BY MR. COLLINS:
12     Q.  With respect to the substance that
13 you received from Cameron Myler, the DHEA, do
14 you recall having discussions with Cameron Myler
15 about how there was concern that the DHEA cream
16 may have been rubbed on Justin Gatlin?
17     A.  Yes, I do.
18     Q.  And do you recall hearing that there
19 was indications that the DHEA had a pink "S" on
20 the tube as Mr. Tygart asked you?
21     A.  I must confess, I don't recall that
22 conversation with Cameron. Specifically, I know
23 the name Sarati was brought up, but I don't know
24 about the pink logo.
25     Q.  Do you recall Cameron indicated that

Page 778

1  she had looked up on the Internet and found DHEA
2  substances?
3      A.  Oh, yes.
4      Q.  And it was Cameron Myler who
5  supplied the substances to you?
6      A.  Yes.
7      Q.  And she did not indicate that she
8  had received that substance from Justin Gatlin,
9  did she?
10     A.  No, I don't think so.
11     Q.  Also, Mr. Tygart asked you a number
12 of questions about contaminated creams or
13 substances. And I believe there was also some
14 discussion of spiked substances. And this was
15 in the context of the difference between the B-
16 and the P, or the A- and the P-diols that we
17 just went through.
18     A.  Yes.
19     Q.  A spiked substance could actually
20 have a far higher concentration, correct?
21     A.  Yes.
22     Q.  That's sort of the difference
23 between a spiked and a contaminated?
24     A.  Yes. There's no clear definition
25 between the two. Although the supplement

Page 779

1  products appear to fall into two groups: those
2  with quite low concentrations of banned chemical
3  presence, as opposed to other products where it
4  appears the banned product has been added
5  intentionally.
6      Q.  And Mr. Tygart also asked you in
7  talking about the difference between the diols,
8  the P-diol and the A-diol, I believe it was, was
9  approximately minus 5. A little less than that
10 actually. About 4 and a half. And he indicated
11 that might show an extended period of use over
12 time. Do you recall that question?
13     A.  Yes.
14     Q.  Would the fact -- would an extended
15 period of time, in your knowledge, of a Sierra
16 test -- if there was a negative Sierra test a
17 week later, would that change your opinion?
18     A.  I'm sorry. Could you reform the
19 question?
20     Q.  Sure. He indicated that those
21 differences would -- could likely be from an
22 extended use of one of the upstream substances;
23 is that correct?
24     A.  Yes.
25     Q.  If there had been extended use,

Page 780

1  would you expect there to be a negative Sierra
2  test when there was not that difference just
3  seven days later?
4      A.  It all depends on the form of
5  administration. But I personally don't know
6  that such a distinction can be made. Usually
7  there's little interpretive value out of urine
8  with regard to length of use, how much, and
9  exactly when.
10         But if there had been repeated
11 injections of drug, then I would expect the CIR
12 to remain positive for a longer period of time.
13 But orally ingested products are in and out of
14 the body quickly. Transdermal compounds with
15 discontinuation of use would result in a
16 negative test rather quickly.
17         I would think the most likely
18 negative would be for injectable, where there
19 would be a continual leaching at the injection
20 point, and it would continue to be leaching into
21 the body.
22     Q.  When you said the better way, you're
23 not saying the only way would be discontinued
24 use?
25     A.  No.

Page 781

1    Q.   There certainly could be use within
2 24 hours?
3    A.   Yes.
4    Q.   And there was a lot of discussion
5 about what would happen within one hour.  Do you
6 recall that?
7    A.   Yes.
8    Q.   And you said it would be unlikely.
9 Or it would be less likely, I think you said.
10    A.   Well, I think the more compressed
11 time frame makes it less likely.  I don't have a
12 body of literature that will necessarily support
13 that opinion.  I'm using general principles of
14 pharmacology and toxicology to form such an
15 opinion.
16    Q.   But if the same substance or
17 substances were rubbed on more than once within
18 24 hours, we would not rely just on the one
19 application an hour before, correct?
20    A.   Well, if there had been several
21 applications over a 24-hour period, then I would
22 think that that would make it more likely that
23 it would be very consistent with such an
24 application.
25    MR. COLLINS:  I have nothing

Page 782

1 further.
2    MR. COLBERT:  Mr. Tygart?
3    MR. TYGART:  I don't have any
4 further questions.
5    MR. CAMPBELL:  How are you doing,
6 Dr. Black?  Chris Campbell.
7    THE WITNESS:  Just fine, sir.
8    MR. CAMPBELL:  Have you studied the
9 issue of suppression with -- endogenous
10 suppression of different steroids within the
11 body in the event that steroids are taken?
12    THE WITNESS:  Oh, yes.
13    MR. CAMPBELL:  And I don't know if
14 you have this in front of you.  It would be
15 Exhibit 0295.  Well, it's Bates number 295,
16 which was one of -- I think in the document
17 package that I think you were given, which would
18 be the longitudinal steroid profile.
19    THE WITNESS:  Yes, I have that right
20 in front of me.
21    MR. CAMPBELL:  And I'm looking at --
22 if you could take a look at that, could you tell
23 me whether you see any evidence of suppression
24 in this profile?
25    THE WITNESS:  Well, I think the --

Page 783

1 well, it appears that Justin Gatlin has
2 naturally low concentrations of testosterone and
3 epitestosterone.  Now, this appears to be
4 natural.  You know, certainly if someone takes
5 androgenic anabolic steroids for some period of
6 time, they can suppress their production.  But
7 the testosterone and epitestosterone results
8 seem very consistent between the number of
9 laboratories that were involved in the testing.
10    So it would seem that this would be,
11 perhaps, a natural condition within him.  But
12 there are low concentrations of the
13 testosterone.  Certainly the epis are more on
14 average around of the normal concentration.
15 Around 30, 35 nanograms per million.
16    MR. CAMPBELL:  And talking about
17 testosterone and epitestosterone, are there
18 other sorts of -- I don't know what you call
19 these, but any of those number of values, would
20 they be affected by suppression?
21    THE WITNESS:  By suppression, the --
22 I think in a technical document that the ratios
23 can be affected.  And those ratios may be
24 altered by use.  But I don't see anything here
25 that seems to be significant.  There doesn't

Page 784

1 seem to be any significant fluctuations or
2 deviations.
3    MR. COLBERT:  Mr. Campbell, I don't
4 mean to interrupt, but for the record, please,
5 Doctor, if you could describe what you mean "for
6 suppression."
7    THE WITNESS:  The suppression of the
8 system for the natural production of androgens.
9    MR. COLBERT:  I just want to make
10 sure it's in the record.  I just want you to
11 explain "suppression," and what you mean by
12 suppression.
13    THE WITNESS:  Well, suppression
14 occurs as a consequence of the use of the
15 synthetic products where the intricate system of
16 feedback loops indicate there's no need to
17 produce the natural product or the natural
18 testosterone and epitestosterone and other
19 androgens.
20    MR. COLBERT:  And would suppression
21 affect, generally speaking -- using your
22 toxicological background, would it affect
23 suppressed testosterone, as well as testosterone
24 of roughly the same ratios?
25    THE WITNESS:  My experience has been

Page 785

1  if there's suppression, it affects both the
2  testosterone and the epitestosterone. In fact,
3  we have seen cases where you have virtually no
4  detectable testosterone, and perhaps
5  epitestosterone.
6      MR. COLBERT: Thank you. Sorry,
7  Chris. I just wanted to make sure that was on
8  the record.
9      MR. CAMPBELL: No, I appreciate
10  that. That helps. If you don't mind, I'd like
11  to ask a few more questions, if I can get my
12  head straight.
13      So if Mr. Gatlin was using a
14  consistent application of testosterone, would
15  you expect suppression in this profile that we
16  have?
17      THE WITNESS: Yes. And I would
18  expect the suppression to occur equally on the
19  testosterone and the epitestosterone, if he were
20  using testosterone.
21      MR. COLLINS: Do you have any
22  indication of how reliable of an indicator
23  suppression is of taking synthetic testosterone?
24      THE WITNESS: You know, I make my
25  statements based upon having applied the science

Page 786

1  to very large athlete populations. But based
2  upon my experience, and without a -- let's say a
3  study of 10,000 individuals where we knew they
4  were steroid users, and we were able to discern
5  that there are some that do not have suppressed
6  androgen systems, from my experience, for those
7  individuals who do not routinely use anabolics,
8  we would see very low volumes of testosterone or
9  epitestosterone, and they may not even be
10  detectable.
11      MR. CAMPBELL: Thank you, Dr. Black.
12      MR. TYGART: This is Travis. As
13  soon as the panel is done, we'll have some
14  follow-up.
15      MR. COLBERT: Mr. Cheris, do you
16  have any questions?
17      MR. CHERIS: No, I don't.
18      MR. COLBERT: This is Edward
19  Colbert. I think you testified that the
20  epitestosterone looks to be a fairly normal
21  level quantitatively, whereas you thought the
22  testosterone levels looked naturally low.
23      THE WITNESS: That's correct. I
24  didn't do the average on these, so -- I didn't
25  average them out, and I did not adjust all of

Page 787

1  these answers to a specific gravity of 1.020.
2      Most of Justin's urines are quite
3  concentrated. He has generally a high specific
4  gravity indicating dehydration. So some of
5  these numbers are overstated by the fact that
6  they're -- the urines are quite concentrated.
7  They have specific gravities well above 1.020.
8      So I guess I should have further
9  clarified my answer by saying if these were
10  normalized to 1.020, the concentrations would be
11  quite normal.
12      MR. COLBERT: I believe you also --
13  I wanted to return to some of the products that
14  you tested.
15      THE WITNESS: Yes.
16      MR. COLBERT: You were asked some
17  questions about the DHEA. I think perhaps
18  Mr. Collins has cleared it up, but looking at
19  the sheets that you provided to us -- for
20  example, I'm looking at the very last one. And
21  I think you were asked a question about the fact
22  that it says, "inside a sealed lotion tube
23  labeled DHEA, deep hydrating essential aloe
24  cream."
25      THE WITNESS: Yes.

Page 788

1      MR. COLBERT: But I thought you
2  testified earlier that you wouldn't know whether
3  it actually came in a sealed tube or not.
4      THE WITNESS: Well, I guess a
5  picture is worth a thousand words. And I guess
6  the forensic scientist in me, if I was going to
7  go answer that question absolutely, I'd want to
8  go back and look at the tube itself.
9      MR. COLBERT: And you have the
10  photographs of these products?
11      THE WITNESS: We do.
12      MR. COLBERT: I would ask that
13  Dr. Black provide to the parties and the panel
14  the photographs.
15      And, Mr. Collins, maybe you can, for
16  the record, state whether or not this last
17  product, the DHEA cream, was obtained by the
18  investigators or --
19      MR. COLLINS: It was.
20      MR. COLBERT: So this was acquired
21  by Cameron Myler and included?
22      MR. COLLINS: Correct.
23      MR. COLBERT: Are there any other
24  products in either one of these reports that
25  were similarly provided not through the

Page 789

1  investigators?
2        MR. COLLINS: The investigators -- I
3  don't believe so. There is six total, correct?
4  Five of them came from the investigators.
5        MR. COLBERT: All right. So, for
6  example, Mr. Collins, the lipigel came from the
7  investigators?
8        THE WITNESS: Correct. The lipigel,
9  the Graston, the Bioderm, the Quintessence, and
10  the Tecar cream all came from the investigators.
11        MR. COLBERT: Dr. Black --
12        THE WITNESS: Yes?
13        MR. COLBERT: -- I want to ask you a
14  question. There's a question about a sticky
15  orange gel on the first one: Lipigel.
16        THE WITNESS: Yes.
17        MR. COLBERT: And the very last one,
18  DHEA cream, is described as a cream. It says
19  it's a white cream. There's been some testimony
20  about a consistency of a particular product that
21  was applied to the athlete, and it was described
22  as thick and peanut butter-like. That it has to
23  be smeared on.
24        Do you have any particular
25  familiarity with the lipigel product, such that

Page 790

1  you could describe it other than a sticky orange
2  gel?
3        THE WITNESS: No, I do not.
4        MR. COLBERT: The white cream -- do
5  you have any particular knowledge of the white
6  cream that's described as the DHEA product, that
7  it would be described as a thick, peanut
8  butter-like substance?
9        THE WITNESS: No, I cannot. But,
10  again, I could verify whether we have these
11  products available.
12        MR. COLBERT: Okay. I'd like to
13  know that.
14        THE WITNESS: So the pictures, as
15  well as the products.
16        MR. BOCK: If I could just -- this
17  is Bill Bock. I just want to clarify those
18  questions. They caused me a little bit of
19  concern, because I think when I examined
20  Mr. Gatlin, he said that the peanut butter-like
21  reference was not a description of the
22  consistency of the product, but rather the
23  amount that was applied to him.
24        MR. COLLINS: I was going to raise
25  the same point, Bill. This is John Collins.

Page 791

1        MR. COLBERT: Well, the record will
2  show what it shows. At this point, we'll have
3  to rely on what the record shows.
4        I think that may be the only
5  question that I had. I think between Mr. Cheris
6  and Mr. Campbell, most of my questions were
7  answered. Mr. Tygart had a follow-up.
8        MR. TYGART: I have some follow-up,
9  and then I had a statement that I wanted to make
10  on the record.
11        REDIRECT EXAMINATION
12  BY MR. TYGART:
13        Q. Dr. Black, you were asked a few
14  questions by the panel concerning this steroid
15  profile that was provided. When did you receive
16  that profile?
17        A. Let's see. Recently. It was within
18  the last several days.
19        Q. Okay. How much time have you spent
20  reviewing that profile?
21        A. I looked at it. I didn't have
22  enough time to do all the specific gravity
23  normalizations on it, so I have looked at it
24  for, I guess in total, looking at it several
25  times, perhaps an hour.

Page 792

1        Q. Perhaps an hour?
2        A. Yes.
3        Q. Did you run any graphs showing the
4  variability between any of the T and E numbers?
5        A. No, I did not.
6        Q. Did you run any comparisons between
7  the T and the andro and the T and the etio
8  numbers?
9        A. I didn't do my own calculations for
10  those, no.
11        Q. And based on the limited view that
12  you put into this document, I think your
13  conclusion -- I think what you said, assuming
14  that these are all adjusted numbers for specific
15  gravity, that it looks like Mr. Gatlin has a
16  naturally low T/E ratio; is that --
17        A. He has a naturally low testosterone.
18  And the specific gravity calculations applied to
19  the epis, they will come down to normal. But
20  the ratios themselves would not change. But,
21  yes, it does appear that the ratio is very
22  consistently normally low.
23        Q. And are you familiar with what's
24  called a low mode individual?
25        A. I don't think I've heard that term

Page 793

1 before.
2        Q.   You've never heard that term before?
3        A.   I don't think so.
4        Q.   Are you aware that there are some
5  individuals, even in certain populations, that
6  do not produce testosterone or epitestosterone
7  in their urine?
8        A.   Oh, yeah.  Well, I certainly know
9  that there are outlier individuals on both ends
10 of the spectrum.  We have individuals with
11 normal T/Es above 4-to-1, and we have other
12 individuals that have normal T/Es below 1.
13       Q.   And these -- I guess what I'm
14 getting at, since you're not familiar with the
15 low mode individuals, are you aware that there
16 are certain people, and particularly groups of
17 certain populations that can take synthetic
18 testosterone or synthetic epitestosterone, and
19 it's not going to show up in their urine?
20       A.   At all?
21       Q.   It will have no effect on their
22 testosterone-to-epitestosterone ratio.
23       A.   Well, I'm certainly not familiar
24 with the low mode terminology clinically.  I
25 guess I'm familiar with the notion that someone

Page 794

1  could take the synthetic testosterone -- by what
2  route of administration?
3        Q.   Well, let's say any.  Injection,
4  oral, cream.
5        A.   And the drug will not show up in the
6  urine?
7        Q.   Yeah.
8        A.   I guess I'd have to ask, Where does
9  it go?  That's quite interesting.  I think I'm
10 pretty well-educated in the field.  I don't
11 think I've ever heard of a drug going in the
12 body, but never coming out.
13       Q.   Okay.  Let me ask you about a test
14 result on 9-11-04.  Do you see that test result?
15       A.   I'm almost there.  Yes, I am.
16       Q.   Okay.  Sorry?
17       A.   Yeah.
18       Q.   Does that epi number cause you any
19 concern?
20            MR. COLLINS:  I'm going to object.
21 It seems irrelevant with a number two years
22 before the incident.
23            MR. TYGART:  And let me just ask
24 this now --
25            MR. CAMPBELL:  I don't think you

Page 795

1  have to, Travis.  The question is, Is there a
2  history of suppression?  And the history of
3  suppression comes from this chart.
4        A.   I guess my response to that is -- I
5  don't mean to be critical -- numbers -- all of
6  these numbers, since these were all negative
7  tests, come from a screening assay that are not
8  typically going to be quantified to either the
9  testosterone or the epi.
10            Certainly the caliber is always done
11 for the testosterone.  But since they were
12 negative findings, they were not always done
13 with a confirmatory significance in triplicate.
14            I wouldn't wonder if that's an
15 outlier and how accurate that answer is.  It
16 certainly could be an outlier, because these are
17 not confirmed results that we're looking at on
18 this chart.
19       Q.   (By Mr. Tygart)  Okay.  But I think
20 in your testimony earlier, you were assuming all
21 of these were what they were.  So in your mind,
22 if that's an accurate number, does that
23 epitestosterone that is at 123.3 in comparison
24 to these other numbers, does that cause you any
25 concern that doping may be going on?

Page 796

1        A.   It could certainly be suggestive.
2  It could be reason to run -- before there's
3  suspicion, to run a carbon isotope abrasion
4  test.  And it would have to be normalized.  So
5  this 123 would fall even further if you
6  identified this.
7        Q.   And that's assuming it's not
8  normalized, right?
9        A.   Correct.
10       Q.   And on that same test, the andro and
11 the etio numbers also cause you concern,
12 particularly in relation to the other numbers
13 there?
14       A.   Well, there's certainly higher
15 numbers.  Again, I'm assuming these are not
16 normalized numbers.  All of these numbers come
17 down.  Again, by a technical standard on this,
18 there's typically no suspicion until it exceeds
19 108,000 nanograms per million.  And this doesn't
20 have units on it.  I'm assuming these are
21 nanograms per mil.
22       Q.   Dr. Black, I did see on your resume
23 you have done -- and, I'm sorry, I missed some
24 of these.  But one of them was a talk you gave
25 on beating drug tests.

Page 797

1    A.  Yes.
2    Q.  Are you aware of one way a person
3  can beat a drug test is by using testosterone
4  and epitestosterone?
5    A.  Oh, certainly.  Certainly.  By the
6  way, that goes to lecture people on what people
7  are doing to beat drug tests.  It's not to
8  advise people how to cheat.
9    Q.  I'm assuming it wasn't to a group of
10  athletes.
11    A.  Right.  It's to inform people what
12  to look for.  That's come up before.  I wish I
13  wouldn't have titled it that.
14    Q.  When you look at the 7-8-2005 test,
15  which is further down, where it has "none
16  detect" -- "none detect TMV" means it was too
17  small to detect.  Does that cause you any
18  concerns?
19    A.  In terms of the testosterone, they
20  were unable to detect testosterone, but they
21  found 16 of epi.
22    Q.  Right.
23    A.  In terms of, quote, concern, I would
24  say this is an outlier.  This would be unusual.
25  I just don't know if it's suspicious, quote, to

Page 798

1  take action on it to suspect that someone is
2  doping.  I would presume if that were true, then
3  there would have been action taken on this.
4    Q.  You testified earlier, and I just
5  wanted to make sure I heard you right about
6  reviewing.  Did you say you reviewed
7  longitudinal profiles of 10,000 people you knew
8  to be using steroids?
9    A.  No, no, no.  I said I'm not aware of
10  any such large studies that have studied
11  individuals who are -- say, 10,000 individuals
12  who are taking testosterone or synthetic
13  anabolic steroids, so we could see in all 10,000
14  if some have suppressed systems and some are not
15  suppressed.
16    Q.  You're just saying in your opinion,
17  there's not enough done to put weight on this
18  chart, one way or the other?
19    A.  That's correct.  I'm saying there's
20  not a body of knowledge that allows us to look
21  at this data and go very far with our
22  conclusions.
23    Q.  And, in fact, you testified in the
24  Tim Montgomery hearing; is that right?
25    A.  I did.

Page 799

1    Q.  And I think it was your position
2  there that you shouldn't rely on these documents
3  for any purpose.  Do you recall that?
4    A.  Yeah.
5    MR. COLBERT:  Before I interrupt,
6  can I ask you to clarify what you mean by "these
7  documents"?
8    MR. TYGART:  I'm sorry.  A
9  longitudinal profile study.
10    A.  In terms of how these are applied, I
11  think it's problematic to take 20 negative tests
12  and turn them into a positive test.
13    Q.  (By Mr. Tygart)  And do you recall
14  at that hearing -- do you recall -- well, let me
15  ask it this way:  How many longitudinal studies,
16  prior to the Tim Montgomery case, had you
17  performed?
18    A.  Oh, gosh.  Going back to the '80s, I
19  don't know.  30 or 40 or 50.  I don't know.
20  I've never kept track.
21    Q.  Okay.
22    A.  But I've certainly done it many
23  times on athletes.
24    Q.  Okay.
25    A.  I mean, that's how we identified

Page 800

1  several that were naturally elevated T/Es.
2    Q.  In all of those -- you say the old
3  system.  All of those had -- all of those were
4  done when you reviewed an athlete's T/E that was
5  over 6-to-1; is that correct?
6    A.  Yes.
7    Q.  So you really -- prior to Tim
8  Montgomery -- never really had experience
9  looking at historical data; is that right?
10    A.  Oh, going back and recovering?
11  Well, I have had other cases where there has
12  been longitudinal data collated prior to the Tim
13  Montgomery case.
14    Q.  Okay.  That was historical data?
15    A.  Yes.
16    Q.  And you were dealing with a positive
17  that had -- or an elevated that was over 6-to-1
18  at least, right?
19    A.  Yes.
20    Q.  Okay.
21    A.  I don't recall -- we had tested our
22  staff longitudinally just to have a database of
23  T/E ratios.  We have a fellow on staff that has
24  a T/E ratio of less than 5, and we've tested him
25  over time.

Page 801

1    Q.  Just so I'm clear, you've never
2  heard the term "low mode" --
3    A.  Not a term I'm familiar with.
4    Q.  -- as it relates to the processing
5  of synthetic testosterone in one's body?
6    A.  And the drug goes in, but it doesn't
7  come out?
8    Q.  That's right.
9    A.  I'll be talking to a Pharm.D.
10  before the day is out about that.  I haven't
11  heard of that.
12    Q.  I'm going to send you some papers,
13  Dr. Black.
14    A.  I'd appreciate that.  I'd like to
15  look at that.  But that's contrary to all the
16  scientific knowledge I have.  It must go
17  somewhere.
18    Q.  Did John Collins consult you at all
19  on the stipulation that the parties entered --
20  I'm sorry.  The second stipulation that the
21  parties entered with respect to individuals that
22  use synthetic testosterone whose T/E ratios
23  don't increase?
24    A.  I am aware that there is a practice
25  of using cream products to try to stay below the

Page 802

1  4-to-1.
2    Q.  That's not the question.
3    A.  I'm sorry.
4    Q.  The question again was, Did
5  Mr. Collins talk -- speak with you about the
6  parties' second stipulation in which the parties
7  agreed that there are certain
8  populations/persons that can use synthetic
9  testosterone, and whose T/E values won't change?
10    A.  No, I don't think I heard that
11  stipulation.
12    MR. TYGART:  Okay.  I have no
13  further questions, but I just want the record to
14  say clearly the panel had some questions, and I
15  assume is investigating a piece of this case
16  that the parties did not think was relevant.
17    If the panel is going to rely on any
18  of that questioning, we would appreciate the
19  opportunity to have a witness who has, you know,
20  one, the knowledge of the low-mode situation,
21  but also has the additional experience, from our
22  end, to address the panel's concerns.
23    Because it would be -- particularly
24  in light of the fact that the parties did not
25  bring witnesses or prepare statements on any of

Page 803

1  these suppression points because they weren't
2  relevant, we think it would be a travesty if
3  reliance is given on any of the questioning and
4  the statements that we just went through with
5  respect to the longitudinal study.
6    MR. COLBERT:  All right.
7  Mr. Collins, Mr. Tygart had a substantial amount
8  of follow-up.  Do you have anything?
9    MR. COLLINS:  I do have one thing,
10  just to clarify it for the record.
11    RECROSS EXAMINATION
12  BY MR. COLLINS:
13    Q.  Dr. Black, could you look at the
14  document -- I believe it's USADA 0295.
15    A.  I do have that.  What exhibit is
16  that?
17    Q.  It's the follow-up to the exhibit
18  that we're looking at.
19    A.  That would be Exhibit 29?
20    Q.  I believe so.  I don't --
21    A.  Okay.
22    Q.  Do you see that document, Dr. Black?
23    A.  I do.
24    Q.  You were talking earlier about the
25  calibrations and what they were for.  Does that

Page 804

1  document indicate what it was optimized for?
2    A.  It does.  The letter is stating that
3  when they provided this data, that the data on
4  the longitudinal study is from screening data.
5  Since these were initially found to be negative
6  on the screening, it says, "Our steroid screen
7  assay is optimized for quantification.  The
8  screen is not optimized for epitestosterone, but
9  it will provide reasonable calculations of the
10  epitestosterone concentration."
11    Q.  And there's another sentence after
12  that that says it's not for --
13    A.  "The androgen, the testosterone or
14  the eleven Betas."  And that would be true.  On
15  a screening assay, you're really looking just
16  typically for the presence of the compounds.
17    Part of the confirmatory process is
18  to do a much better compound for what you
19  believe is present.  And it's important for
20  quantifying how much is there.  So it is not the
21  business of the screening assay to put out a
22  good quantitative answer.  That is reserved for
23  the confirmatory procedure.
24    Q.  So when you said there could be
25  outliers in the screening process -- I think