7-30-07 to 8-01-07                                    USADA vs. GATLIN

202 (Pages 805 to 808)

Page 805

1    Mr. Tygart referred to it as a butter knife. It
2    would be less accurate, is that the --
3         A.   It would be inherently less accurate
4    A compromise is made in the screening technique,
5    because the screening procedure is intended to
6    be comprehensive. You're looking for many
7    different compounds and products. The ions --
8    well, I don't want to get too technical.
9         But the way in which the machine is
10   calibrated, the way in which the sorts of
11   molecular fragments are examined is quite
12   different than in the confirmatory test, where
13   everything tends to be optimized for maybe a
14   single compound or a couple. And there are
15   calibrations or controls run to better identify
16   and quantify what is present.
17        Q.   Okay. So that's like earlier, you
18   testified that the screen says 10 parts per
19   million. But when you do the confirming, it's
20   less than 10 parts per million.
21        A.   It's a notion that typically --
22   you've compromised your screening -- analysis on
23   the screening assay when you do the screening.
24   When you did go to the confirmation test, you
25   gain and quantify more precisely and identify

Page 806

1    more precisely what you're looking for.
2         MR. COLLINS:  Okay. I have nothing
3    further, then.
4         MR. COLBERT:  Mr. Campbell or
5    Mr. Cheris?
6         MR. CAMPBELL:  Yeah, I have a couple
7    more questions.
8         Dr. Black, the Tim Montgomery case
9    was referenced. Were you testifying that the
10   steroid profile wasn't reliable to show the use
11   of steroids?
12        THE WITNESS:  That's correct. The
13   data compiled came from many laboratories. Some
14   of which were non-WADA laboratories, or a
15   non-WADA laboratory, I should say. And there
16   was no information available about whether these
17   were even Tim Montgomery's samples, what the
18   quality control was, what the calibrator was.
19        It was information compiled without
20   any of the supporting information. And all of
21   these results have been defined as negatives.
22   And I'm unfamiliar with any application of my
23   science and forensics, where 20 negative answers
24   become a positive answer.
25        I don't know that clinical studies

Page 807

1    of forensic processing has reached a point where
2    you can interpret the data in the way in which
3    it was interpreted and presented.
4         There are wheels within wheels of
5    how to look at the data. And I just disagreed
6    with the way in which that data was interpreted.
7    It doesn't follow the science I'm familiar with.
8    And I do not think it would be accepted in a
9    court of law.
10        MR. COLLINS:  Was it your
11   understanding that USADA had presented the
12   evidence to show the use of --
13        MR. TYGART:  Can I interject
14   something here? I think this line of
15   questioning about another case really puts USADA
16   at a severe disadvantage. Obviously we had an
17   expert witness in that case. Dr. Black was an
18   expert witness on the other side in that case.
19        But we don't have the opportunity to
20   call those witnesses now. And we're hearing a
21   one- sided view of the evidence from a paid
22   expert for the athlete that was unsuccessful in
23   that case. And that collateral attack about
24   what happened in another case is irrelevant.
25        MR. COLBERT:  Mr. Tygart, this is

Page 808

1    Edward Colbert. I understand your objection,
2    but I don't know that it would constitute a
3    collateral attack. I believe it was you,
4    Mr. Tygart, that raised the issue of the
5    Montgomery case, and I believe Mr. Campbell is
6    seeking some clarity about what occurred in that
7    case.
8         MR. TYGART:  My questions related
9    only to his experience in reviewing historical
10   longitudinal studies. Not any of the specifics
11   of the Tim Montgomery case.
12        And, look, where we started with
13   this is the parties agreed this wasn't relevant
14   information, and the panel requested it. We
15   scrambled around to provide it for you. And now
16   as we're trying to close this hearing, we're
17   getting a lot of questions about something the
18   parties thought was not relevant, and it's not
19   relevant.
20        And if you're going to rely on some
21   of the answers from Dr. Black, you're going to
22   be relying on information that he doesn't know
23   about. He admitted he doesn't know anything
24   about the low-mode process, which is what the
25   parties stipulated about. It's a dangerous --

## Page 809

1     MR. COLBERT: Mr. Tygart, I
2 understand that. But you're also the one that
3 raised the issue of low mode by questioning
4 Dr. Black about it. I think Mr. Campbell only
5 wanted to clarify a few things.
6     To the extent it's not relevant,
7 it's not relevant. But I quite frankly don't
8 mind hearing a little explanation of a few
9 things that were raised by USADA in questioning
10 Dr. Black.
11     MR. TYGART: I absolutely disagree.
12 There was no question by USADA on anything
13 dealing with the low mode prior to the panel
14 asking him questions on the longitudinal study.
15 The panel is gathering evidence for
16 itself on half of a picture. And a picture that
17 the parties agreed prior to the hearing was not
18 relevant.
19     And so if it's now going to be
20 relevant in the panel's mind, we're going to
21 need to take time to educate the panel or make
22 sure they don't make a decision based on one
23 side's presentation of it, and a side that
24 doesn't know half of the science that's out
25 there. This is not a fair process.

## Page 810

1     MR. COLBERT: I hear you,
2 Mr. Tygart, but I'm not going to tell
3 Mr. Campbell that he can't ask these questions.
4 And quite frankly, I thought the original
5 questions about the longitudinal study were very
6 limited and were over quickly. And this whole
7 area of expansion arose out of your
8 reexamination of Dr. Black.
9     MR. TYGART: The record speaks for
10 itself.
11     MR. COLBERT: It does. And I hear
12 your objection, which will speak for itself.
13 And it's on the record, as well. If Mr.
14 Campbell wants an answer to his question, I
15 don't see why he can't have it.
16     MR. TYGART: We're going to request
17 a postponement. And we're going to request the
18 opportunity to bring live witnesses that
19 understand and can go through a longitudinal
20 study. I think that's the only thing that's
21 fair, given the limited evidence on this issue
22 that the panel discovered for itself.
23     MR. BOCK: If I could just interject
24 something. And that would be -- I mean, I think
25 what we're asking for is some notice if the

## Page 811

1 panel is going to consider this evidence as
2 relevant. Because we obviously aren't prepared
3 to address this issue in detail, because it
4 wasn't something that was something of relevance
5 to the parties prior to the hearing.
6     If the panel gives us notice, then,
7 you know, we can address it. But I think you've
8 heard us. We don't think --
9     MR. COLBERT: Mr. Bock, I think
10 that's an eminently fair request. And we're
11 certainly -- if the issue comes up and we think
12 it's something relevant, we'll certainly give
13 the parties notice. But it may be an issue that
14 never simply comes to pass.
15     MR. COLLINS: This is John Collins.
16 Can I clarify one thing on the record? Travis
17 said we agreed it was irrelevant. I don't think
18 there was ever an affirmative disagreement that
19 it was irrelevant.
20     MR. COLBERT: For all purposes,
21 Mr. Collins, when you stipulate to a fact, I
22 think the purpose of relevance disappears just
23 by stipulating to a fact.
24     So, again, I'm not saying this is
25 going to be a basis of decision or any finding

## Page 812

1 of fact or any conclusion reached by the panel.
2 It's an issue we have questions about. More
3 questions were raised during the examination.
4     I think Mr. Bock is correct. I
5 think USADA would be entitled to notice if it
6 was determined by the panel that we should
7 consider any of this.
8     I'm not saying that it will be or is
9 being considered. And I hear your objection to
10 it. But, you know, I hope you're not now hoping
11 to back out of your stipulation.
12     MR. COLLINS: No, I'm not trying to
13 back out of the stipulation. We never agreed it
14 was irrelevant. And if there was notice that it
15 was going to be used for or against --
16     MR. COLBERT: Like I said -- both
17 parties will get notice.
18     MR. COLLINS: That's fine. I was
19 just doing it to clarify the record.
20     MR. COLBERT: That's fine. Both
21 parties will get notice. Mr. Campbell?
22     MR. CAMPBELL: I don't know if the
23 court reporter -- did I get my question out?
24     (The last question was read back.)
25     MR. CAMPBELL: Let me see if I can

## Page 813

1    rephrase it intelligently.
2         Was it your understanding that USADA
3    had presented the longitudinal steroid profile
4    in the Thompson case for the purpose of showing
5    the suppression in a natural profile to prove
6    use of steroids when there were otherwise no
7    positive tests?
8         THE WITNESS:  It was my
9    understanding that the longitudinal profile was
10   to show the variants of the T/E ratios as being
11   indicative of use.  And in association with
12   that, there was blood work that was also used
13   showing some results from blood analysis that
14   was used in concert with the urine result.
15        But I do not recall that it was a
16   suppression issue, as much as the variability of
17   the testosterone or the T/E ratio.
18        MR. COLLINS:  Now, you said that --
19   you testified that this kind of profile couldn't
20   be used reasonably to prosecute an athlete for
21   drug use.  What about conversely?  Could it be
22   used -- could it be reasonably used as evidence
23   to show that that athlete probably was not
24   engaging in a consistent pattern of doping?
25        THE WITNESS:  Oh, gosh.  That's an

## Page 814

1    excellent question.  And I guess I always think
2    from the other side.  I don't think -- if it's
3    not reliable in one way, I don't think I would
4    accept it as reliable in the other.
5         It certainly might be suggestive,
6    but I don't think it's definitive.  And I think
7    the weight is greater on the accusation side.  I
8    don't think it would be reliable enough to work
9    either way.
10        MR. CAMPBELL:  That's all the
11   questions I have.
12        MR. COLBERT:  Mr. Cheris?
13        MR. CHERIS:  Let me go into one.
14        On the lipigel product, there has
15   been a question raised as to it being a new
16   change in procedure.  And we see in here that
17   the lipigel does not contain anything of
18   steroids and precursors.
19        If one was going to spike a cream --
20   I know you talked about it being less likely on
21   a cream applied within an hour.  Is the lipigel
22   one which would be the base of a cream that
23   would be better to use if you were going to
24   spike a product, to get it into the system
25   faster, or would the lipigel, because of its

## Page 815

1    consistency, be one that would be less likely to
2    be one that you wanted to use?
3         THE WITNESS:  We didn't do an
4    analysis to show the viscosity or the oil base
5    on this product.  I'm not sure that I could
6    answer that question.  By its definition here,
7    it would seem unlikely.
8         If it's sticky and viscous, it might
9    be less likely to release drug through the skin.
10   But really we didn't do any analysis to try to
11   chemically define such a product to say this
12   would be a good vehicle by which a drug could be
13   administered.
14        MR. CHERIS:  In general, though, the
15   lighter-based creams would be easier to get a
16   drug into the body than a sticky, heavier
17   substance?
18        THE WITNESS:  Yes.
19        MR. CHERIS:  Thank you.
20        MR. COLBERT:  Dr. Black, we've spent
21   so much time on the steroid profile, I'd just
22   like for you to describe -- are you looking at
23   the steroid profile in front of you now that you
24   testified about?
25        THE WITNESS:  Yes.

## Page 816

1         MR. COLBERT:  I'd like to go down --
2    there's a series at the top of titles.  And
3    across the -- across the top of the horizontal
4    chart.
5         THE WITNESS:  Yes.
6         MR. COLBERT:  Can you just, for the
7    record, describe what those abbreviations mean
8    at the top of each page.  You can start with
9    ESG.  I think we all know what the bottle and
10   the collection is.
11        THE WITNESS:  The ESG is the
12   specific gravity of the sample, or the density.
13   The pH is a measure of acidity of the urine.
14   And these all appear to be normal pHs for the
15   urines.
16        The T/E would be the testosterone,
17   epitestosterone ratio.  The bracket around
18   testosterone indicates concentration.  And the
19   t-e-s-t would be the test -- the nanograms per
20   milliliter.
21        The same for the T/E.  The brackets
22   all across would indicate concentration of the
23   epitestosterone and testosterone,
24   etiocholanolone, and the
25   testosterone-to-androstenone ratio and the

Page 817

1 testosterone-to-etiocholanolone ratio.
2     MR. COLBERT: As I understand it,
3 for the testosterone concentration, I guess the
4 density is the concentration of testosterone?
5     THE WITNESS: Yes.
6     MR. COLBERT: The tests were
7 optimized for testing that. Not any of the
8 other substances --
9     THE WITNESS: Yes.
10     MR. COLBERT: -- is that your
11 understanding?
12     THE WITNESS: Correct. From UCLA's
13 laboratory. And I would say that's probably
14 consistent for all the levels.
15     MR. COLBERT: So the T/E is a
16 testosterone/epitestosterone level?
17     THE WITNESS: Yes.
18     MR. COLBERT: I'm going to pick one.
19 Go down to April 22, 2006. It's got a 0.19
20 under the T/E column.
21     THE WITNESS: Yes.
22     MR. COLBERT: What does that tell
23 you?
24     THE WITNESS: That tells me that the
25 mass concentration relationship of the

Page 818

1 testosterone is in much lower concentration than
2 the epitestosterone, since epitestosterone is
3 the denominator.
4     So there's only about .2, or
5 20 percent testosterone relative to
6 epitestosterone.
7     MR. COLBERT: But this chart would
8 not tell you one way or the other whether any of
9 these tests are positive for testosterone?
10     THE WITNESS: Well, you happened to
11 pick the sample that was the carbon isotope
12 abrasion test. This chart doesn't tell us
13 there's epitestosterone present within the
14 sample. But on its own, it wouldn't tell us the
15 testosterone or any precursor that was used.
16     MR. COLLINS: Mr. Colbert, in light
17 of the last question, I have a question for
18 Mr. Black. I believe he has the chart that was
19 given out last week. I don't believe he has the
20 one that we have, which has the CIRs -- which
21 tests CIRs that we got yesterday.
22     MR. COLBERT: Okay. What's your
23 question?
24     MR. COLLINS: The question is, When
25 we talked about the accuracy or the screening

Page 819

1 versus the confirmation, is there -- the CIR is
2 always a very accurate test. Is that your
3 understanding? It's not like there's a low
4 threshold and then they do it again.
5     MR. COLBERT: That's your question
6 for Dr. Black?
7     MR. COLLINS: Yes.
8     THE WITNESS: Yes. Actually,
9 typically, the carbon isotope abrasion test
10 would be prompted by something in the screening
11 test, either the T/E ratio or the concentration
12 of the testosterone or the epitestosterone, or
13 perhaps the concentration of the DHEA itself.
14     So the carbon isotope abrasion test
15 is usually a follow-up test performed based upon
16 other indicators that the sample may be
17 positive.
18     MR. COLLINS: Thank you.
19     MR. COLBERT: Nobody has any other
20 questions?
21     Then, Dr. Black, thank you very
22 much. You're excused from testifying. But we
23 would ask that you provide to the parties and to
24 the panel -- and you could do so through
25 Mr. Collins -- copies of the photographs.

Page 820

1 Color, if it's possible, of the photographs of
2 the products on which you reported.
3     THE WITNESS: We will do that. And
4 I will also verify whether or not the products
5 themselves still exist.
6     MR. COLBERT: Thank you.
7     THE WITNESS: Thank you. Goodbye.
8     MR. COLBERT: Thank you, Dr. Black.
9     Okay. Mr. Collins, that concludes
10 your case?
11     MR. COLLINS: It does.
12     MR. COLBERT: Mr. Tygart?
13     MR. TYGART: We'll be calling
14 Dr. Richard Hilderbrand.
15     MR. COLLINS: We've been going for
16 about two and a half hours. Would it be
17 possible to take a five-minute bathroom break?
18     MR. COLBERT: Yes. Surely. We will
19 probably take a few minutes to get Dr.
20 Hilderbrand. I've got about -- I've got like,
21 22, minutes after. Is 5:30 -- eight minutes --
22 enough for everybody?
23     MR. COLLINS: That would be 4:30,
24 Central; 3:30, Mountain time. Okay. Thanks.
25 Back in eight minutes.



**Page 821**

1       (A break was taken.)
2  WHEREUPON,
3       RICHARD L. HILDERBRAND,
4  being first duly sworn in the above cause, was
5  examined and testified as follows:
6       EXAMINATION
7  BY MR. TYGART:
8       Q.  Hi, Doctor.  It's Travis Tygart.
9  Can you hear me okay?
10      A.  I can.
11      Q.  I just have a few questions for you.
12  And thanks for joining us here in a very late
13  request.
14      What is your job at USADA?
15      A.  I'm science director.  And part of
16  that includes managing our drug reference
17  on-line, which is our web-based information
18  service and drug reference line, which is the
19  live service from 8:00 to 4:00 on business days.
20      Q.  And is one of your responsibilities
21  in your role at USADA to oversee the drug
22  reference line?
23      A.  Yes.
24      Q.  Describe the drug reference line.
25      A.  First, may I ask, can everyone hear

**Page 822**

1  me okay?
2       MR. CAMPBELL:  I can.
3       MR. COLBERT:  I can.  This is Edward
4  Colbert, Doctor.
5       MR. CHERIS:  Sam Cheris.  I can
6  hear.
7       A.  The drug reference line is a service
8  provided to support athletes when information is
9  needed on the status of medication.  The drug
10  reference line has a live coverage, as I said,
11  from 8:00 to 4:00 on business days.
12      After hours, there is either a pager
13  number or a cell phone number that can be used
14  for emergency calls.  So there is, in essence,
15  24-hour coverage of the drug reference line.
16  And the actual function is to provide
17  information on the status of medications that
18  athletes may need for treating accidents,
19  illness, injury, et cetera.
20      Q.  And is that a toll-free number?
21      A.  Yes, it is.
22      Q.  And what if you're outside of the
23  United States, is there a number you can call,
24  as well?
25      A.  Yes, there's a 719 number.

**Page 823**

1       Q.  And does USADA advertise that number
2  to athletes?
3       A.  Yes.  And that's published in our
4  literature.
5       Q.  And is it on the USADA website?
6       A.  Yes.
7       Q.  And what is the drug -- you
8  mentioned the DRO, the drug reference on-line.
9  What is that exactly?
10      A.  The drug reference on-line is a web-
11  based information service that includes
12  pharmaceuticals that are available in the U.S.
13  And they can be searched by brand name.  And
14  it's accessible 24 hours a day for anyone that
15  has access to the Internet.  There's no
16  restrictions on it, in other words.
17      Q.  Okay.  Is it USADA's standard
18  practice to report calls that come into the drug
19  reference line?
20      A.  Yes.  The standard practice is we
21  have a call log that is separate from the DRO
22  database that I mentioned.  We have a call log
23  that logs in the information from each one of
24  the calls that we receive.
25      Now, the line is intended to be

**Page 824**

1  anonymous.  In other words, we do not want to
2  put an athlete in a position of identifying
3  themselves if they're asking about prohibited
4  medication, and perhaps the use of that
5  medication.
6       So at times we receive names and
7  telephone numbers, and we record those.  At
8  other times, the caller prefers to remain
9  anonymous.
10      Q.  So is it the standard practice that
11  someone gives their name, whether it's an
12  athlete or an agent or a parent, for that to be
13  recorded in the database that you just
14  mentioned?
15      A.  Yes.  That, in the normal course of
16  business, would be recorded, along with phone
17  numbers.
18      Q.  And would you also list the
19  substance that they inquired about?
20      A.  Yes.  They are generally brief notes
21  about the situation, the conditions that are
22  being called about.  The substances and the
23  response that is provided.
24      Q.  Okay.  And do you have the
25  capability to search that database?

## Page 825

1      A.  We can search it by certain
2  characteristics: telephone numbers, names,
3  dates and -- let's see. Yes. So we can search
4  for limited information.
5      Q.  And in the last couple of days, have
6  you had the opportunity to review the database
7  for a call related to this case, the Justin
8  Gatlin case?
9      A.  Yes, I have.
10     Q.  And did you find any record of a
11  call from Renaldo Nehemiah in March of 2006?
12     A.  No, I did not.
13     Q.  Did you try alternative spellings --
14     A.  Yes.
15     Q.  -- for the name Renaldo Nehemiah?
16     A.  Yes, I did.
17     Q.  Did you see any calls from a Renaldo
18  Nehemiah in February of '06?
19     A.  No.
20     Q.  How about January of '06?
21     A.  No.
22     Q.  How about April of '06?
23     A.  No.
24     Q.  Any time in '06 did you get a call
25  from Renaldo Nehemiah?

## Page 826

1      A.  No. Not where the name was
2  identified.
3     Q.  How about did you check the name
4  "Justin Gatlin" during this time period.
5     A.  Yes, I did. And I found no entries.
6     Q.  So no entries in March of '06 or
7  February of '06?
8     A.  Correct.
9     Q.  And did you also check the name
10  Britton Stackhouse?
11     A.  Yes, I did.
12     Q.  And did you also check the name
13  Britton Stackhouse?
14     A.  Yes, I did.
15     Q.  And were there any records of a call
16  from a Brittany or a Britton Stackhouse in
17  February or March of '06?
18     A.  Not in any of the spellings that I
19  tried.
20     Q.  And any calls from a Brittany or a
21  Brit Stackhouse in '06 at all?
22     A.  No.
23     Q.  What is tripherylene?
24     A.  That's a corticosteroid that is used
25  for a number of medical conditions. It can be

## Page 827

1  used for inflammation. It's used for actually a
2  variety of things.
3     Q.  It's a prohibited substance?
4     A.  Depends on the mode of
5  administration. For certain things, it is
6  prohibited. And for some administrations, it
7  needs a prescriptive form. And for other
8  administrations, it is allowed.
9     Q.  If someone received an injection in
10  the knee for triamcinolone, what would you need
11  to have that accomplished without violating the
12  anti-doping rules?
13     A.  That would require an abbreviated
14  therapeutic-use exemption form, which is a
15  notification. It does not require preapproval.
16  It requires information on the athlete, doctor's
17  signature, and then the description of the
18  medical condition and the treatment.
19     Q.  Okay. There's been testimony in
20  this case, Dr. Hilderbrand, that a male doctor
21  from the drug reference line told Renaldo
22  Nehemiah that as long as you are not competing
23  within ten days of receiving a triamcinolone
24  injection, that you would be okay. Is that some
25  advice that would have been given out from the

## Page 828

1  drug reference line?
2     MR. COLLINS:  Objection on
3  foundation. It isn't indicated that he did it.
4     MR. TYGART:  Well, he oversees the
5  drug reference line. And I didn't ask him if he
6  did it. I asked him if that would be the type
7  of advice that would be given out on the drug
8  reference line.
9     MR. COLBERT:  I think it's a fair
10  question.
11     THE WITNESS:  May I answer?
12     MR. COLBERT:  Yes, please.
13     A.  The drug reference line would not,
14  in my opinion, ever provide that advice. The --
15  there are two types of injections that could be
16  given around the knee. One would be a local.
17  One would be intraarticular. And we have
18  evidence that the intraarticular injection,
19  which is actually an injection into the joint,
20  may give a positive result for several weeks.
21     Now, local injections, it would
22  depend on the site and the amount and things
23  like that. But I just don't believe that that
24  would be the advice given by anyone answering
25  the line.

7-30-07 to 8-01-07                                    USADA vs. GATLIN

208 (Pages 829 to 832)

## Page 829

1   Q.  (By Mr. Tygart) And the reason
2   that's not the advice is because there's no way
3   to know for sure how long a drug will stay in
4   someone's body; is that right?
5       A.  That is correct. Each person's
6   metabolism is a bit different, and they handle
7   the drugs differently. Our normal business
8   practice is to -- in a case where there's any
9   question, to advise the athlete to be
10  conservative. And that is to file the
11  abbreviated form or the therapeutic-use
12  exemption form as appropriate.
13      Q.  And an injection in the knee, just
14  so I'm clear, that would -- of triamcinolone,
15  that would only provide a TUE; is that right?
16      A.  Yes. It would be up to the
17  physician to decide whether he describes it as a
18  local or an intraarticular. But the knee, in my
19  experience here, would normally be considered a
20  local injection or intraarticular, and would
21  require the abbreviated form, not the standard
22  form which requires preapproval.
23      Q.  Okay. And the AHU,^  just so
24  everybody's clear, that's just as simple as
25  having your doctor sign a form and sending it

## Page 830

1   in. You don't have to wait for a response; is
2   that correct?
3       A.  That is correct. And no medical
4   documentation is required, other than the
5   doctor's information on his medical specialty,
6   the diagnosis, the treatment, and what I call
7   the course of treatment. That would be the
8   number of injections and the amounts given and
9   the location.
10      Q.  Are you familiar with the drug
11  Celestone?
12      A.  Celestone is another corticosteroid.
13      Q.  And is Celestone a drug that's
14  permitted to be used?
15      A.  Celestone would fall under the same
16  category that the triamcinolone would. And
17  that's a corticosteroid. So the prohibition, of
18  course, is only in competition. And it depends
19  on how it's administered.
20      Q.  And similarly, if someone inquired
21  about the drug Celestone, what would have been
22  USADA's drug reference line's advice if an
23  athlete needed to have an injection of
24  Celestone?
25      A.  The standard practice, of course,

## Page 831

1   would be to give the same answer. And that is,
2   if a competition is coming up, that the
3   conservative thing is to file the abbreviated
4   form.
5       Q.  Would you ever tell someone that, As
6   long as you don't compete within ten days of
7   using either triamcinolone or Celestone, you'll
8   be okay?
9       A.  I certainly would not, and I don't
10  believe Dr. Pedraza would provide that
11  information either.
12      Q.  And, Dr. Hilderbrand, you know what?
13  That's actually all -- well, I'll ask it.
14          Dr. Hilderbrand, you don't have any
15  evidence that would suggest that Celestone or --
16  an injection of Celestone or an injection of
17  triamcinolone would cause a positive CIR test,
18  do I?
19      A.  I have no evidence. In my opinion,
20  based on my knowledge of the metabolism of the
21  corticosteroids and of the anabolic steroids, I
22  would see no possibility that the
23  corticosteroids would contribute to a positive
24  CIR.
25          MR. TYGART: Okay. I have no

## Page 832

1   further questions.
2           MR. COLBERT: Mr. Collins?
3           MR. COLLINS: I just have a couple.
4   Travis answered one of them there.
5               EXAMINATION
6   BY MR. COLLINS:
7       Q.  You indicated if you took it -- I
8   think you were talking about the tri -- you can
9   say the word better than I can.
10      A.  The triamcinolone.
11      Q.  You talked about it leading to a
12  positive test. I think it was intraarticular.
13  That positive test you referred to was for that
14  substance, not for testosterone or precursors?
15      A.  Yes. I'm sorry. I do need to
16  clarify that. It would be an adverse analytical
17  result for the corticosteroid.
18      Q.  Which is in competition only?
19      A.  That is correct.
20      Q.  Now, if someone were to call the
21  drug hotline -- I don't know the technical name
22  for it.
23      A.  Drug reference line. Sorry.
24      Q.  -- and ask if a corticosteroid were
25  prohibited in competition or out of competition,

7-30-07 to 8-01-07                              USADA vs. GATLIN

209 (Pages 833 to 836)

Page 833

1 what would that answer be?
2     A.  The answer would be it would be
3 prohibited only in competition.  And then we
4 would inquire about the mode of administration
5 to determine if the therapeutic -- if the
6 standard form was required, if the abbreviated
7 form was required, or if the administration was
8 actually permitted.
9     Q.  And the abbreviated TUEs, you said
10 those are for notice purposes only?
11    A.  That is correct.  They do not
12 require preapproval, and do not require the
13 submission of medical records.  They go on the
14 doctor's signature alone.
15    Q.  Okay.  And when discussing if it's
16 out of competition, would someone from your
17 hotline give the advice you need to take it
18 sufficiently in advance for it to be out of your
19 system?
20    A.  Yes.  That is an inherent part of
21 our discussion, to ensure that the person
22 realizes that they need to have it not only out
23 of their blood, which is a common medical and
24 pharmacy description.  If it goes below a
25 certain amount in their blood, that's okay for

Page 834

1 them.  But we do explain to the person calling
2 that it has to be out of the blood and out of
3 the urine entirely by the time of competition.
4     Q.  And would you also tell them, then,
5 if you're going to ask -- if someone asked how
6 long it stayed in, would you refer them to their
7 doctor?
8     A.  Yes.  We do refer them to the doctor
9 or the pharmacist that filled the prescription.
10    Q.  All right.  And you would say to ask
11 them for how long they think it would be in,
12 because USADA can't give that answer definitely?
13    A.  Yes.
14    Q.  And these abbreviated TUEs, they are
15 not sent to USADA, are they?
16    A.  We do, in certain cases, act as a
17 mailbox.  We do act as assistance for the
18 athletes in handling them, since many of the
19 athletes are overseas.  They're actually spread
20 around the world, so we act as a mailbox.  Any
21 athlete can send their form to us.  Either the
22 abbreviated form or the standard form.
23        If it's within our authority to
24 process, then we make the decision here and
25 we'll convene a therapeutic use committee, as

Page 835

1 needed.  If it is not within our authority, then
2 we will forward it on to the International
3 Federation.  And this is really to provide
4 assistance to the athlete.
5     Q.  Okay.  That's when you're going to
6 make the decision that it's for a full TUE, not
7 an abbreviated TUE?
8     A.  That's right.
9     Q.  You said you act as a mailbox.  But
10 you can send it directly to the WADA?
11    A.  An athlete has the choice to send it
12 to us or to the International Federation.
13    Q.  So if a doctor prepared one, he
14 could send it directly to the IAAF?  You're
15 saying just --
16    A.  That's correct.
17    Q.  You're saying just to be safe, if it
18 showed up in a positive test, you'd want it to
19 be on file that that actually happened?
20    A.  Would you repeat the question?  I'm
21 not sure I understand you.
22    Q.  You said several times if someone
23 was going to take a drug before competition,
24 they should file a TUE, correct?
25    A.  That's correct.  If we were

Page 836

1 concerned about the time between dosing and the
2 potential in competition testing.
3        MR. COLLINS:  I don't have anything
4 further.
5        MR. COLBERT:  Mr. Tygart?
6        MR. TYGART:  Nothing further from
7 USADA.
8        MR. COLBERT:  Mr. Campbell?
9        MR. CAMPBELL:  No.
10       MR. COLBERT:  Mr. Cheris?
11       MR. CHERIS:  I'd like to just clear
12 up the one thing.
13       If you don't do an abbreviated TUE,
14 you haven't violated any rule.  And if your
15 doctor has said that it will be out of your
16 system in ten days, and it truly is, and doesn't
17 show up on a test, you haven't violated
18 anything; is that correct?
19       THE WITNESS:  Yes, that is correct.
20 If they do not test positive or do not provide
21 an adverse analytical finding at the
22 competition, that would not be a violation.
23       MR. CHERIS:  Thank you.
24       MR. COLBERT:  Thank you,
25 Dr. Hilderbrand.  I believe you're excused now.

## Page 837

1     MR. TYGART: Thanks so much.
2     THE WITNESS: Thank you.
3     MR. COLBERT: Mr. Tygart, Mr. Bock,
4 do you have another witness to call?
5     MR. BOCK: I guess if we were in the
6 same room, we'd have a quicker answer.
7     MR. COLBERT: Do you guys want to go
8 on line and chat?
9     MR. BOCK: Give us about three
10 minutes. Thanks.
11     MR. COLBERT: The rest of us will
12 stay on line. Thanks.
13     (A break was taken.)
14     MR. TYGART: This is Travis. Bill
15 will be back in one second.
16     MR. BOCK: I'm here.
17     MR. TYGART: We are going to rest
18 our case.
19     MR. COLBERT: All right. I assume,
20 then, that, Mr. Collins, assuming they only had
21 Dr. Hilderbrand to testify, and no rebuttal to
22 one of your witnesses, that you have no further
23 surrebuttal?
24     MR. COLLINS: I don't have any. The
25 one issue that kind of came up in cross is the

## Page 838

1 DHEA being sent in by Cameron Myler. If that's
2 sufficiently resolved by the panel, then I would
3 not have to call another witness.
4     MR. COLBERT: I think that's pretty
5 clear.
6     MR. COLLINS: Then I don't have any
7 other witnesses.
8     MR. COLBERT: All right. So that
9 leaves, as I understand it, we are going to
10 leave the record open only insofar as we are
11 waiting for a copy of the indictment, which was
12 going to be produced, but apparently didn't
13 arrive until yesterday. And to receive the
14 information from Dr. Black that was requested
15 during his cross.
16     Other than that, the record is
17 closed unless a party has some other point they
18 wish to make.
19     MR. COLLINS: I have one
20 housekeeping matter, just to make sure. Gatlin
21 17 is all 17 or 18 pages. It wasn't two
22 separate ones. Because I sent them as two
23 documents, but I assume they got merged.
24     MR. TYGART: 17 and 18 are two
25 documents.

## Page 839

1     MR. COLLINS: 17 is the supplements,
2 and 18 is the supplements and cream.
3     MR. TYGART: I don't know if we
4 marked it as 18.
5     MR. COLLINS: I put it down as 18.
6     MR. COLBERT: Okay. With that
7 clarification, that will be 17 and 18.
8     MR. TYGART: And, Johncie, if you're
9 on the phone, would you mind .pdfing to everyone
10 the indictment in the Trevor Graham case.
11     MS. WINGUARD: Okay.
12     MR. TYGART: Thanks.
13     MR. COLBERT: And, Mr. Collins, if
14 you would forward copies to Mr. Tygart and to
15 the three panel members as soon as you get them
16 in color, then that would constitute closing the
17 record.
18     MR. COLLINS: Will do.
19     MR. COLBERT: Do you know whether
20 you'll be able to get Dr. Black's records? He's
21 on the East Coast, but he's probably headed
22 home. But we would like to have them by Friday,
23 if we could.
24     MR. COLLINS: I will make that
25 request. I'll write a note to myself right now.

## Page 840

1     MR. COLBERT: Barring any unforeseen
2 information, we expect to close the record on
3 Friday and will proceed accordingly. Does
4 anybody else have anything they want to add?
5     MR. TYGART: In terms of the record,
6 we're prepared to do closing arguments.
7     MR. COLBERT: Do you need a short
8 period of time to prepare for that, or do you
9 want to proceed right away?
10     MR. TYGART: I'm fine proceeding
11 right away.
12     MR. COLBERT: Now, we had a little
13 unusual circumstance in that you went second
14 because of the stipulations. But normally you
15 would start your closing first. Do you wish to
16 proceed that way, or have you spoken about this
17 with Mr. Collins?
18     MR. TYGART: We have not spoken.
19 But because of the stipulation, USADA didn't
20 have a burden to carry. And I think typically
21 the party with the burden to carry has the
22 opportunity to go first. So we would afford
23 that opportunity to Mr. Collins.
24     MR. COLBERT: Okay. Mr. Collins,
25 they've passed the burden to you. So you will

7-30-07 to 8-01-07                    USADA vs. GATLIN

211 (Pages 841 to 844)

Page 841

1  be able to open, and you will have a short
2  rebuttal to USADA, if necessary. Are you
3  prepared to proceed now with close?
4          MR. COLLINS: I haven't had -- I
5  have a document prepared and I can go. I can't
6  say I've practiced it 20 times.
7          MR. COLBERT: But do you need five
8  minutes?
9          MR. COLLINS: No, I will go through
10 it, understanding that it's coming rather
11 quickly.
12         MR. COLBERT: When you say you
13 prepared a document, do you have any -- I guess
14 the question to you, Mr. Bock, is do you have a
15 demonstrative that you wanted to fax to the
16 panel or e-mail to the panel before you made
17 your closing?
18         MR. BOCK: I do not.
19         MR. COLLINS: I do not either. My
20 handwriting is illegible. It's a document I
21 prepared to read. My bullet-point outline to
22 myself. But not one I planned to publish by any
23 stretch.
24         (Discussion off the record.)
25

Page 842

1          CLOSING ARGUMENTS.
2
3          MR. COLLINS: I'd like to start by
4  thanking the panel for its time and attention.
5  They have obviously -- you've obviously been
6  very dedicated and listened attentively. You've
7  asked a number of questions, and we thank you
8  for that. And we also want to acknowledge the
9  task in front of you to understand the facts and
10 circumstances, then determine the just
11 proportionate result in light of those facts and
12 circumstances and in light of the WADA code.
13         We also note that the issue before
14 you has to do with the positive test result for
15 testosterone and its precursors from the April
16 22, 2006, urine test.
17         Before getting into the specifics of
18 the argument, we'd like to also note, as I did
19 in my opening, and as we just discussed with
20 Mr. Bock, that my client has the burden of proof
21 here in that there's been a stipulation that an
22 adverse analytical result has occurred.
23         What that means is my client,
24 Mr. Gatlin, had the burden of proof that he must
25 demonstrate by the probability of certain things

Page 843

1  under the WADA code.
2          The balance of probabilities, as the
3  panel is aware, is the mere preponderance. It's
4  not beyond a reasonable doubt. It's not clear
5  and convincing. It's not comfortable
6  satisfaction. It's just a mere preponderance.
7  Just weighing one side against the other.
8          It's also important to note there's
9  no presumption of guilt here. The only
10 presumption of the code has to do with the lab
11 results and how they're done. There's also no
12 presumption of use. The specific facts and
13 circumstances that Mr. Gatlin must demonstrate
14 by the balance of probabilities do not include
15 anything -- they're restricted to those parts
16 that come up in the exceptional circumstances,
17 which we'll get to in a few minutes.
18         Before that, I would like to also
19 address and note that while I put together a
20 closing argument here, I would like to reiterate
21 and reemphasize the briefs that we filed in this
22 case, because there are a number of things
23 raised in those. And I want to be clear that
24 we're not in any way waiving those arguments.
25         And to the extent there are actions

Page 844

1  requested there, that the panel consider those.
2  What we've done the last three days is the
3  evidentiary part of the hearing. But there were
4  a number of legal arguments and other items in
5  those briefs that we reiterate, and, again,
6  would ask to be considered.
7          Briefly, we'd like to discuss the
8  2001 positive test, which was also brought up on
9  the first day. As indicated in our briefs and
10 documents, the prior test involved Mr. Gatlin
11 taking prescription medicine for his disability
12 prior to his event.
13         The USADA did find that Mr. Gatlin
14 did not cheat. He did not intend to cheat and
15 did not enhance his performance. I'd also like
16 to note that there was no express finding of
17 fault in that matter.
18         It's Mr. Gatlin's position, as we
19 stated in our briefs, that that positive test
20 was too old and should not be counted. The WADA
21 code failed to address the age of offense in the
22 reach-back period. And the recent Thifa WADA
23 case decision said that was a violation of Swiss
24 law.
25         Mr. Gatlin has not waived or

Page 845

1  forfeited. I understand USADA believes he has
2  in entering into the first stipulation. As
3  indicated in our reply brief, we would seek that
4  that reply speak for itself on its face, and ask
5  that those items be considered.
6       Also, shortly after openings, before
7  we started getting into evidence, there was a
8  question as to whether the WADA Code 2.0
9  applies. And Mr. Tygart indicated USADA's
10  position that it does not apply.
11       As we've indicated in our briefs, if
12  you look at it, there's a lex mitior argument
13  that could be made. But more importantly, we
14  believe that looking at the WADA code -- WADA
15  Code 2.0 is attempting to address, particularly
16  with respect to the items that are at issue in
17  this case, the multiple -- the issue of multiple
18  positive tests.
19       And those factors are placed where
20  there have been CAS panels that found a lacuna
21  in the code. And we believe those apply in this
22  case. The CAS panel's recognition of those
23  before has indicated their ability to promote
24  natural justice, and proportionality allowed
25  them to fix an answer.

Page 846

1       The WADA Code 2.0, in our reading of
2  it, appears to be an audit of those CAS
3  decisions. In other words, it provides probably
4  the best possible road map of what the WADA
5  drafters were thinking as a way to draft a
6  position to those lacunas that are raised.
7       So it appears that since it's within
8  the apparent powers of this panel to be able to
9  do so if it wanted, to have some confidence in
10  how the WADA code would do that, it's our
11  opinion that looking at WADA 2.0 would be an
12  effective way to gauge the current temperature
13  there. Recognizing that that code has not been
14  fully adopted at this point.
15       So it could be a reference document
16  to use. Whether it's been adopted or not, it
17  certainly has weight and merit and could be
18  considered by the panel.
19       That brings me to the point of
20  exceptional circumstances. If the panel is to
21  determine that Justin Gatlin is at fault here --
22  and for Justin Gatlin to overcome the adverse
23  analytical finding, he must demonstrate
24  exceptional circumstances.
25       And the exceptional circumstances

Page 847

1  under the WADA code are a method by which an
2  athlete who has had an adverse finding may
3  reduce or eliminate any penalty or sanction.
4       First, I will address Mr. Gatlin's
5  cooperation. I think this is incredibly
6  significant here. You've had the opportunity to
7  listen to Justin himself testify on this point,
8  and you also had the opportunity to listen to a
9  special agent for the IRS, Jeff Novitzky,
10  testify about Justin's cooperation with the
11  ongoing BALCO investigation, and what led to the
12  ultimate indictment of Justin's track coach,
13  Trevor Graham.
14       I would also like to note, if you
15  would look at Paragraph 13 of the first
16  stipulation, Paragraph 1, that document
17  recognizes that Mr. Gatlin's assistance with the
18  United States government and Special Agent
19  Novitzky may be considered as extraordinary
20  circumstances or special circumstances.
21       "Extraordinary" keeps popping into
22  my head, because Justin's efforts here were so
23  extraordinary. You heard Mr. Novitzky testify
24  about how when he requested to speak with Justin
25  Gatlin, Justin agreed to do so promptly. And

Page 848

1  that he and his family -- he and his mother went
2  all the way to New York, and they met for over
3  five and a half hours with Special Agent
4  Novitzky, and there was no restriction.
5       Mr. Novitzky was allowed to ask
6  about any topic he wanted, and Justin would
7  answer him truthfully. You also heard how
8  Justin was required to answer him truthfully, or
9  he would risk penalty of perjury. You also
10  heard that Mr. Novitzky testified that he
11  believed Justin testified truthfully, and all of
12  it was corroborated by the undercover calls.
13       Which brings me to the next point,
14  which shows the extraordinary nature of the
15  cooperation by Justin Gatlin. Toward the end of
16  that five-and-a-half hour interview, Special
17  Agent Novitzky asked Justin to make an
18  undercover call to his coach, Trevor Graham.
19  And Justin did so on the spot. There was no
20  hesitation.
21       He agreed to do it immediately.
22  Justin clearly had nothing to hide, and wanted
23  to do everything to clear himself. Justin knew
24  he had not taken any banned substance. He had
25  exercised the utmost care not to take any. So

Page 849

1  when he was asked by the government to make a
2  call, he said yes right there.
3        Which also dovetails with Justin's
4  experience of being a spokesperson and trying to
5  live, to the best of his ability, a drug-free
6  life. Being drug-free adamantly, and spreading
7  the message elsewhere.
8        And in noting the extraordinary
9  nature of his cooperation, you will remember
10  Mr. Novitzky testified -- and you'll also recall
11  that his testimony was extremely limited in
12  spots about what he could say, because of
13  USADA's representatives that were on the phone.
14        But with respect to the BALCO
15  prosecutions, he noted that the BALCO
16  prosecutions have been completed to date. There
17  was not a single undercover call by Adalie,
18  which truly shows the nature that Justin was
19  willing to cooperate.
20        In the anti-doping movement, he was
21  willing to put himself at risk by making the
22  calls. And it also shows he had nothing to
23  hide.
24        I'd also call your attention to
25  Mr. Novitzky's testimony as to why he asked

Page 850

1  Justin to make a call right then and there.
2  Because that's very significant. He did that to
3  help corroborate what Justin had just said. He
4  then scripted the call to bring up -- and the
5  second reason he did it was to develop evidence
6  on targets.
7        The target of that call was Trevor
8  Graham, but there was also a request by
9  Mr. Novitzky for the later calls to Randall
10  Evans. You recall the discussions with
11  Mr. Evans. The U.S. DA did not let him go much
12  into that area, but he scripted a call to see if
13  a call to Trevor Graham would prove any holes or
14  give an indication that Justin had been
15  untruthful.
16        And Agent Novitzky testified that
17  that prong had been satisfied. And in doing so,
18  he had reviewed not just the transcript of that
19  one call, but the additional ten or so calls
20  that Mr. Gatlin made, which brings up another
21  point of extraordinary cooperation. That he
22  didn't make one call. He made ten over a long
23  period of time. Every time he was asked, he
24  would call.
25        Special Agent Novitzky further

Page 851

1  testified that Justin had satisfied the level of
2  cooperation for the government. He had done
3  everything the government had asked. He put in
4  an effort. He did note that there were a few
5  hiccups along the way, but then those hiccups
6  were promptly corrected.
7        I also should bring out in this
8  point that through the course of this hearing,
9  it's come to our attention that the government
10  and USADA, while we understand they were in
11  regular communication, it was not always a
12  complete two-way road. And in particular, I'm
13  referring to the information about Memo, or
14  Angel Heredia.
15        And having learned that not
16  necessarily all of the information that I
17  provided to the U.S. government, to the IRS, has
18  -- was not necessarily shared with USADA, we are
19  now in the process of getting all of that "Memo"
20  information to USADA so we can do something.
21        Now, Justin's cooperation, in
22  addition to being extraordinary, has also been
23  significant in establishing violations. Special
24  Agent Novitzky testified that Justin's
25  cooperation to date has led to the indictment of

Page 852

1  Trevor Graham.
2        As you can tell by USADA's response
3  when we had the incident where Mr. Gatlin had
4  seen it as an April Fool's joke, clearly Trevor
5  Graham is a person of interest to USADA. And
6  Mr. Gatlin, in doing anything to help in that
7  prosecution, is significant to USADA.
8        It also should be noted, while I
9  don't believe USADA commented about it, but it's
10  my understanding that USADA has a pending
11  investigation against Trevor Graham, and
12  Mr. Gatlin will be willing to cooperate in any
13  way he's asked.
14        You will recall I think I've already
15  mentioned that Special Agent Novitzky testified
16  that Mr. Gatlin provided evidence and recorded
17  calls to Mr. Evans, but Mr. Novitzky was not
18  allowed to talk at all about Mr. Evans.
19        I think the clear presumption from
20  the panel is that he is a person of interest in
21  that investigation -- the ongoing investigation,
22  and Justin's calls may very well lead to future
23  indictments. Obviously I can't say that with
24  any certainty, because I don't know what's
25  happening with the grand jury investigations.

7-30-07 to 8-01-07                                    USADA vs. GATLIN

214 (Pages 853 to 856)

| Page 853 |
|---|

1        But you also know that the
2    undercover operatives do not control the success
3    of the venture. And it would be inappropriate
4    to only reward undercover operatives on the
5    success of the issue. That would cause one to
6    potentially fabricate evidence. So the federal
7    government of the United States has set up a
8    system whereby they're awarded on their effort
9    of what they have done.
10        In sum, Justin Gatlin has gone above
11    and beyond standard cooperation. Typically when
12    cooperation happens in an anti-doping matter,
13    it's an athlete telling them about what they had
14    done, because those athletes had committed
15    knowing violations. And they would also tell
16    who else participated in those knowing
17    violations, so they could turn over their source
18    or co-conspirators.
19        As you've seen here by the
20    evidence -- which has been confirmed by
21    Mr. Novitzky, who indicated that there was no
22    evidence that Mr. Gatlin ever knowingly used a
23    banned or prohibited substance -- Mr. Gatlin has
24    had no such opportunity. He has no
25    co-conspirators. He had no one to turn in. But

| Page 854 |
|---|

1    he has done everything he can.
2        And to have a system where only the
3    guilty are available for any benefit of
4    cooperation would neither be just nor
5    proportionate. There should be a method whereby
6    individuals who go above and beyond and take the
7    risk of covert operations are rewarded for
8    taking those risks and fully cooperating.
9        And I submit what Justin Gatlin
10    deserves -- to the extent he receives any
11    penalty in this case, his actions and
12    cooperation with the United States government
13    and his cooperation with USADA should entitle
14    him to the maximum amount of reduction in
15    penalty allowed under the code.
16        At this point, I'd also like to call
17    attention to lacuna in the current code. I'll
18    call it lacuna, but with respect to the
19    undercover action, cooperation with government
20    enforcement. And the current amount that the
21    code is willing to give reduction.
22        And I'd note that the new code, at
23    least one of them from the WADA code -- the
24    first version of the WADA code indicated that
25    cooperation -- first it indicated that

| Page 855 |
|---|

1    cooperation for anti-doping should be counted.
2    And second is limiting it by 50 percent is not
3    enough of an incentive, in that the first draft
4    reduced it by 75 percent, while the latest code
5    currently has 50 percent.
6        I'd like to now turn our attention
7    to the no fault, or no fault or negligence.
8    Under this provision of the code, Justin is
9    expected to testify how the substance entered
10    his body.
11        I should note that under the
12    previous code, it would have to show by balance
13    of the probabilities that he's cooperated.
14        Here to establish no fault or
15    negligence, or no significant fault or
16    negligence, Justin is required to establish how
17    the prohibited substance entered his system.
18    And he is required to do this, again, by the
19    balance of probabilities.
20        Justin is not required to prove what
21    substance entered his body. He's not required
22    to prove its concentrations or anything else.
23    All he has to show is how it entered his body.
24    So as a balance of probabilities, we must look
25    at what is the evidence in this case.

| Page 856 |
|---|

1        In this case, Justin has testified
2    that he did not knowingly take any banned
3    substance. While athlete denials may be more of
4    an expectation, here you have Special Agent
5    Novitzky's testimony that he stated Justin was
6    truthful in his interview where he testified
7    that he did not knowingly ingest banned
8    substances.
9        There is other evidence
10    corroborating that Justin did not knowingly take
11    them. You also have Justin's testimony that he
12    did not ingest any banned substance orally or
13    through an injection. And as you've heard the
14    experts testify, there's really just three ways
15    the substance can enter one's system.
16        It can enter orally. It can enter
17    through an injection, or it can enter
18    transdermally. Justin's testimony here about
19    not ingesting any banned substance orally or
20    through an injection is credible, and has been
21    corroborated.
22        You also have the corroborating
23    testimony of Terri Blankenship, who confirmed
24    that she did not see any injection marks or
25    evidence of injection s when she gave Justin

Page 857

1  Gatlin a massage just four days later.
2       As a result, the evidence here has
3  ruled out all methods other than transdermal.
4  So by balance of the probabilities, the only
5  method it could be applied was transdermally.
6  So it entered his body through the skin.
7       In corroboration of this, you also
8  heard Dr. Black testify that his test results
9  are consistent with transdermal application.
10  You also know that Justin's supplements tested
11  negative. And as Travis in his questioning
12  indicated, even a contaminated substance would
13  not be there -- would not be a basis for it.
14       You also have Justin Gatlin's
15  testimony that there were no changes in his
16  routine or his supplements between 4-22 and
17  4-29. And I draw your attention to those dates,
18  because on April 22 was a positive test, and on
19  April 29 there was a negative test. And both of
20  those test CIRs. So you have the question about
21  how it entered his system.
22       And this is where, as you know,
23  we've entered a second stipulation. That
24  stipulation talks about there are individuals
25  who have low testosterone in their urine, and

Page 858

1  that adding or applying a substance to them
2  would not cause their T/E ratio to spike.
3       There's been testimony -- there's
4  certainly been indication here that somehow
5  something was administered to Justin without his
6  knowledge. I know when I first was involved in
7  that case, I was puzzled how you could have a
8  low T/E ratio and a positive CIR test.
9       It wasn't until I learned the
10  information contained in the second stipulation,
11  that something could have been administered to
12  Justin, which we believe we've established by a
13  balance of the probability was through his skin,
14  that would not lead him to suddenly have an
15  spike.
16       One would think if he had just had
17  something applied the day before, that his T/E
18  ratio would go through the roof. There's been
19  other cases where it's been reported that if
20  someone had something applied to them the day
21  before this test, they would have an
22  off-the-chart high testosterone or T/E ratio.
23       But you have learned in an
24  individual like Justin, who has naturally low
25  testosterone, that if administered, even if it's

Page 859

1  more than 24 hours beforehand, would not result
2  in a high T/E ratio, but would result in a
3  positive test or a CIR.
4       And so we believe the balance of the
5  probabilities indicates there was something
6  applied to him transdermally prior -- within the
7  24 hours or so prior to the race. And that is
8  how the substance -- the banned substance, the
9  prohibited substance entered his system.
10       Now, as I said a number of times,
11  the burden is to balance the probabilities. To
12  balance the probabilities, you must weigh
13  evidence on one side with evidence on the other
14  side.
15       Here there has been zero evidence
16  presented by USADA that the substance entered
17  his system any way other than through his skin.
18  There has been innuendo and indication that he's
19  done something else, but there's been no
20  evidence and no testimony to present anything
21  contrary than through the skin.
22       They have attempted to impeach the
23  credibility of Mr. Gatlin. But, again,
24  Mr. Gatlin's testimony was corroborated by the
25  undercover investigation of Mr. Novitzky.

Page 860

1       So, thus, under a balance of the
2  probabilities, Justin Gatlin has established how
3  the substance entered his system, which was
4  through his skin.
5       Now, having met the burden of how it
6  entered his system, it becomes important to
7  evaluate the relevant fault. Because once you
8  get by the first threshold, you look at is there
9  no fault or negligence or is there no
10  significant fault or negligence.
11       Here, in viewing it, if you get to
12  the no significant fault or negligence, you must
13  look at Justin's negligence relative to everyone
14  else, and what it was in the totality of the
15  circumstances.
16       You've heard significant evidence in
17  this case about possible sabotage. You'll also
18  note in our briefs that no one here has
19  claimed -- sorry.
20       Before getting to that, with respect
21  to the skin, you've also heard that the only
22  person who had access to his skin was Chris
23  Whetstine. And there's no evidence that there's
24  been any other access to Justin's skin or that
25  anything was rubbed on him.

Page 861

1    As indicated in our briefs and
2 through the investigation, Justin Gatlin has not
3 been able to confirm whether Mr. Whetstine
4 knowingly or unknowingly rubbed this on his
5 skin. With respect to unknowingly, there was
6 evidence that there's significant concern in
7 track and field. That it's a very competitive
8 industry, and unfortunately, not the most polite
9 industry out there, for lack of a better way to
10 describe it.
11    And there's concern that others --
12 there's a lot of money involved, prestige and
13 careers. And there's certainly significant
14 concern amongst everybody about the possibility
15 of sabotage. So it is impossible for us to
16 determine whether or not Mr. Whetstine --
17 whether somebody may have, quote, spiked his
18 materials, his creams or what have you that was
19 rubbed on him, or if he intentionally used them.
20    There was testimony by Dr. Black
21 that he tested the materials that were given to
22 him by Mr. Whetstine. But we have no -- those
23 are the materials that Mr. Whetstine voluntarily
24 gave to the investigators. There is no
25 information, though, that those are the actual

Page 862

1 tubes or substances that were applied to
2 Mr. Gatlin on April 22.
3    We would note that during his
4 testimony, Mr. Whetstine indicated that he often
5 ran out of -- at least with respect to the
6 Lipogel or the Voltaren substance that he wrote
7 down, that he frequently ran out. And that a
8 tube could run out in an application of three
9 athletes.
10    So by a balance of probabilities, we
11 did not have the actual substances tested. So
12 it's entirely possible that the substance rubbed
13 on him that day was, in fact, spiked, or could
14 have been substituted, or somebody could have
15 put something else in it.
16    Mr. Whetstine did testify that he
17 attempted to keep his stuff clean, but he did
18 also acknowledge that someone could have grabbed
19 his bag or could have done something.
20    That brings us to the knowing
21 violation, or the possibility that Mr. Whetstine
22 may have knowingly sabotaged Justin Gatlin.
23 Back in my days as a prosecutor, what that case
24 would best be known as is a circumstantial case.
25 And as I said in my brief, we've been unable to

Page 863

1 eliminate that Mr. Whetstine may have acted
2 knowingly.
3    In assessing a circumstantial case,
4 you need motive and opportunity. Opportunity is
5 not a question here. Clearly he had access to
6 Justin's skin here, and could rub something on
7 him. The testimony in this hearing was he gave
8 Justin three treatments in approximately 36
9 hours. He did one Thursday night or Friday
10 night after midnight. There was one Friday
11 evening, and there was the rubbing of stuff
12 immediately beforehand.
13    As you've heard from Dr. Black,
14 those substances all could have been what was
15 excreted in the urine.
16    With respect to motive, we learned
17 that Mr. Whetstine had demanded a bonus that he
18 was not paid. He was clearly upset about that.
19 He learned that he was terminated, and that he
20 was not going to be rehired. But only when they
21 couldn't find somebody to replace him, they
22 brought him back on.
23    But we also heard Mr. Whetstine had
24 had a run-in with Trevor Graham the week before
25 April 22, and it appeared that his termination

Page 864

1 would again be imminent. And it was clear that
2 they were going to continue to look for someone
3 else. And that at one point, there was
4 questions about why would he give up the best
5 job that he ever had. But there was also clear
6 indication that he may not have that job very
7 long. In fact, it may already have been done.
8    You heard Mr. Novitzky testify that
9 he had interviewed Mr. Whetstine, and he could
10 not give the same opinion as to his testimony as
11 he could about Justin, because he was unable to
12 corroborate, as he had with Justin, through
13 undercover calls.
14    But you also know from the testimony
15 that Mr. Whetstine has submitted false
16 statements under oath before. You heard how he
17 submitted false affidavits. He submitted false
18 bankruptcy files. You listened to him change
19 his testimony from beginning to end as to what
20 his possible income was. And you also heard Mr.
21 Whetstine indicate the racist comments he made.
22    And the reason that's significant is
23 how it indicates the motive. How he may be
24 losing his job, and was being fired by people
25 that he held those opinions about.

7-30-07 to 8-01-07                                    USADA vs. GATLIN

217 (Pages 865 to 868)

Page 865

1     You also heard significant testimony
2 about how Justin exercised utmost care. You
3 heard how when he was on the road, he wouldn't
4 leave the room. You heard how he would check
5 into hotels under false names. He would not
6 drink out of a water bottle unless he opened it
7 himself. If he put it down or lost sight of it,
8 he wouldn't drink it again.
9     And that clearly was showing he was
10 using his utmost care. The testimony also shows
11 the sort of environment in which track athletes
12 have to adhere, and the risk of sabotage that is
13 always present.
14     Now, in evaluating Justin's fault or
15 negligence here, I would like to note the
16 uncontroverted evidence, the clear evidence that
17 Justin Gatlin suffers from ADD. And also note
18 for the record that USADA receives a
19 significant -- as a matter of public knowledge,
20 receives public funding.
21     As a result of the Rehabilitation
22 Act of the United States, which is essentially
23 the same as the Americans with Disabilities Act,
24 but applies to those who receive those funds,
25 that applies here. I'd also like to note the

Page 866

1 guidance from the Puerta panel which states the
2 definition of no significant fault or negligence
3 requires the panel to look at the totality of
4 the circumstances.
5     I'd also draw the attention to the
6 WADA directive that a sanctioned body cannot
7 create unrealistic and impractical expectations
8 that the athletes have to come up with. So
9 those limit what is utmost care.
10     In addition, however, Justin's case
11 is special. Justin suffers from ADD, so when
12 evaluating utmost care for an individual who
13 suffers from ADD, that disability must be taken
14 into consideration to determine if he was
15 negligent or, if he was negligent, the
16 significance of his negligence under the
17 circumstances with respect to others.
18     Also, there is a requirement for
19 agencies -- for parties like USADA who receive
20 federal money, to make reasonable accommodations
21 in light of that disability. Here USADA has
22 made no accommodation for Justin Gatlin's
23 disability.
24     It wants to hold him to the highest
25 possible standard, which is an impossible

Page 867

1 standard for someone in Justin's position or
2 with his disability to meet. They want to hold
3 Justin accountable. That's one of the main
4 things that they said they often questioned the
5 kid on during the evidentiary hearing.
6     I felt as though I was sitting
7 through depositions for a Trevor Graham trial,
8 not a Justin Gatlin trial. USADA has indicated
9 that Justin's negligence, or at least the
10 questions lead me to believe that his negligence
11 was associated with Trevor Graham. And they
12 want to hold Justin Gatlin accountable because
13 he trained with Trevor Graham. Clearly USADA
14 had information about Trevor Graham that Justin
15 Gatlin did not.
16     They also want to hold Justin Gatlin
17 accountable, because there was a question about
18 receiving Voltaren, which is an over-the-counter
19 substance in Europe, but not here. But in no
20 circumstances is it a banned substance in any
21 way.
22     So if it's unfair to hold Justin to
23 an unreasonable standard here, and to hold him
24 to a standard that's so high that it could not
25 be met. That to not take into account his

Page 868

1 disability is a violation of U.S. law.
2     Justin Gatlin's actions must be
3 viewed in light of the Rehabilitation Act and
4 the Americans with Disability Act, and in
5 evaluating his fault or his significant fault or
6 negligence, it should be clear to the IAAF that
7 this matter is an exceptional circumstance.
8 That Justin Gatlin deserves the greatest
9 reduction possible. And it should also be clear
10 to the IAAF that the U.S. law applies.
11     I would now like to also discuss
12 proportionality. It is clear from the CAS
13 decisions that any penalty given to Mr. Gatlin
14 must be just and proportionate. And to be just
15 and proportionate, it must be what other
16 athletes have received. Here USADA is seeking
17 eight years.
18     Eight years for Justin Gatlin, an
19 athlete for his age and his sport, that's a life
20 penalty. So before instituting such a drastic
21 penalty, which as Arbitrator Nicolai pointed out
22 in the Howell case I cited in my brief, the
23 scrutiny that must be given before doing it
24 would be to look at how other athletes have
25 done.

Page 869

1    In doing so, in determining what is
2 just and proportionate here, we must remember
3 that Justin did not knowingly ingest a
4 prohibited substance. As he said, he had a
5 prior positive test. And that was for taking
6 his prescription medicine.
7    Now, in determining penalty, I would
8 like to point out one I think is particularly
9 relevant, which is what happened in the Michelle
10 Collins case.
11    Michelle Collins, as the panel
12 knows, is an athlete that was part of the BALCO
13 case. And the AAA decision is available on the
14 website for USADA, and is part of the public
15 record.
16    In that case, the AAA found out that
17 Ms. Collins -- again, I think I should point out, no
18 relation -- engaged in a balance of behavior
19 including EPO, PHD. She actively conspired with
20 Victor BALCO and others to hide doping, and did
21 so systematically.
22    Her hearing came to the AAA panel in
23 the United States. She did not cooperate with
24 USADA, and she asserted her Fifth Amendment
25 privilege.

Page 870

1    As a result of the findings in that
2 case and the severity of her offenses, the AAA
3 panel issued an eight-year ban. The same ban
4 the USADA is seeking in this case.
5    Just looking at what she had done
6 compared to what Justin Gatlin has done, the
7 proportionality should tell you that Justin
8 Gatlin should receive less than that penalty.
9    But Ms. Collins' story does not end
10 there. After receiving the eight-year ban,
11 Ms. Collins indicated she was going to appeal
12 her case to CAS.
13    MR. CAMPBELL: Mr. Collins -- sorry.
14 This is Chris Campbell. Wasn't it Ms. Collins'
15 first offense?
16    MR. COLLINS: It was her first
17 offense, but it's also relevant in the extent of
18 that offense, and that she got an eight-year
19 period. But I wanted -- the point I was going
20 to make here is when she threatened to appeal,
21 CAS agreed to lower her penalty from eight years
22 to four.
23    So she got a 50 percent reduction
24 after a panel had already found her guilty, just
25 to avoid the expense of the CAS appeal.

Page 871

1    MR. TYGART: I don't think I've ever
2 objected on close, but I'll just object to the
3 characterization that USADA resolved that to
4 avoid the expense of going forward. There's
5 actually no evidence to that, and it's a
6 bold-faced lie. So I just have to put an
7 objection in there.
8    MR. COLBERT: All right. Noted.
9 Could you continue, Mr. Collins.
10    MR. COLLINS: And her reduction --
11 prior to having the CAS appeal, her reduction
12 was agreed by USADA to reduce it to 50 percent.
13 And the story doesn't stop there.
14    As I've seen in recent articles,
15 Ms. Collins has now begun to provide some
16 cooperation with USADA. I'm not sure who she is
17 testifying with. I assume it's Trevor Graham,
18 based on the stipulation in this case. But
19 based on that, USADA is now prepared to reduce
20 her sentence by another 25 percent to three
21 years, so she may be eligible to compete.
22    Here USADA has offered Justin
23 nothing for his cooperation in making undercover
24 calls. They are still suggesting that he
25 receive the full eight years. That is neither

Page 872

1 just nor proportionate.
2    If you were going to be calculating
3 the penalty under the new WADA code, which
4 addresses the lacunas, and the current code in
5 this case -- in my pre-hearing brief, that's
6 addressed specifically on Pages 21 and 22 --
7 under those provisions, it's clear that the
8 penalty here under Justin's prior offense and
9 what this offense is, is that he should receive
10 a penalty of six to eight years.
11    And given that Justin is innocent
12 and had unknowing use here, at most, it is clear
13 the worst possible scenario would be that he be
14 subject to six years.
15    From that, you would deduct his
16 exceptional circumstances, as indicated in the
17 brief. That reduction for his cooperation would
18 result in a sentence anywhere from six months to
19 18 months.
20    Lastly, there was a significant
21 amount of discussion and there's evidence in the
22 record about all of the numerous CIR tests on
23 Justin Gatlin. These tests results are
24 specifically important, and when they occurred
25 for the start date of any penalty here.

Page 873

1      I'd like to refer you to the brief,
2  with respect to the possible start date.
3  There's been no justification of why it took so
4  long for the results to be reported to Mr.
5  Gatlin. And in light of the Puerta case, it was
6  a different scenario, even after a positive B.
7  But in light of the lacuna and what they were
8  doing, that went back to the date of the test.
9      It's our belief that in the balance
10  of proportionality, that Justin Gatlin, if he
11  were to receive any penalty, that it too should
12  go back to April 22, 2006.
13      With respect to the other CIR tests,
14  they are important. IAAF Rule 39.4 indicated
15  that fairness requires that Justin Gatlin not be
16  required to forfeit or be disqualified for
17  events. And here we believe in light of all
18  these other CIRs, it was clear that this one
19  test on April 22, 2006, is an aberration.
20      That he was running clean. I don't
21  know -- my understanding from the testimony is
22  that CIRs are pretty rare. Or not from the
23  testimony, but from Mr. Tygart's statements at
24  the beginning of this hearing on Monday, that
25  CIRs are very rare. And I'm not aware of

Page 874

1  anybody receiving this many CIRs in this period
2  of time. And they were all fair, except for the
3  aberration.
4      In light of that, fairness would
5  dictate that he not be disqualified or prevented
6  from anything other than the Kansas opening.
7      In the opening of this statement, I
8  talked about the war on drugs. The war on drugs
9  is significant and understandable. But over the
10  course of this hearing, you've learned that
11  Justin Gatlin is an innocent victim of that war
12  on drugs.
13      He unknowingly took a prohibited
14  substance, as Mr. Novitzky's testimony
15  corroborated. I think possibly the best way to
16  address the issue of the war on drugs -- doping
17  was stated by the Puerta panel when it stated --
18  which is a CAS panel, which stated "it was
19  argued by some that it is an inevitable result
20  of a remorseless war on doping in sports. In
21  any war, there may be occasional innocent
22  victims. There may be an innocent victim in
23  wars when bullets fly. But the panel is not
24  persuaded that the analogy is appropriate nor
25  that it is necessary for there to be undeserving

Page 875

1  victims in the war against doping.
2      "It is a hard war, and it requires
3  eternal vigilance. No matter how hard the war,
4  it is incumbent on those who wage it to avoid
5  unjust and disproportionate retribution."
6      In closing, I simply ask you to use
7  the authority you have under the WADA code and
8  CAS precedent to avoid Justin Gatlin from
9  becoming a innocent victim of the war on drugs
10  in the sport. I ask that you take into
11  consideration all of the facts and circumstances
12  in this matter, and do what is just and
13  proportionate. Thank you.
14      MR. CAMPBELL: Mr. Collins, this is
15  Chris Campbell. I have a few questions for you,
16  if that's all right, Mr. Chair?
17      MR. COLBERT: Yes, please.
18      MR. CAMPBELL: You said that Terri
19  didn't notice any injection marks in Mr. Gatlin?
20      MR. COLLINS: Correct.
21      MR. CAMPBELL: It's my understanding
22  that Mr. Gatlin took injections March 1, March
23  13, and then a B12 injection.
24      MR. COLLINS: I asked her if she
25  noticed any marks on April 26, and she indicated

Page 876

1  she did not.
2      MR. CAMPBELL: Your question was
3  limited to April 26?
4      MR. COLLINS: Yes.
5      MR. CAMPBELL: Now, also, you talked
6  about USADA not presenting any evidence of a
7  Voltaren application, or ingestion of steroids
8  by any other source.
9      MR. COLLINS: Correct.
10      MR. CAMPBELL: What about the
11  evidence, if you could explain it to me, about
12  the Voltaren pill that was taken by Mr. Gatlin?
13  And I believe that was in the presence of his
14  coaches. I'm not sure.
15      Then also, there was testimony by
16  Agent Novitzky talking about a brown and a green
17  pill.
18      MR. COLLINS: Yes. Justin, when he
19  was asked by Agent Novitzky about what he had
20  taken, told him everything that he had taken.
21  And he indicated there was that time he received
22  a B12 shot. And that the next day, he received
23  a pill that was a Voltaren pill.
24      At the time of the interview, Justin
25  Gatlin indicated he believed it was a green

7-30-07 to 8-01-07                                    USADA vs. GATLIN

220 (Pages 877 to 880)

## Page 877

1  pill. And then later, he -- in the
2  conversation -- indicated it was a brown pill.
3  And that was something that caused concern with
4  Agent Novitzky as to how that could have
5  happened, because one time he called it brown
6  and one time he called it green.
7           Agent Novitzky asked him about that.
8  He said, "Oh, I thought it was" -- he couldn't
9  remember what it was. And you heard the
10 testimony by Justin that was just about two
11 weeks when he came back from trying out with the
12 Tennessee Titans, he thought it was. That he
13 was sore, and he bought some Excedrin Back and
14 Body Pain. And he opened it up.
15          It was in a package. It was a green
16 pill, and he started jumping up and down in the
17 airport, because he finally figured out why he
18 said it was a green pill. Because at the time
19 he had that B12 shot, he was also taking
20 Excedrin Back and Body to try to relieve the
21 stiffness and get it out.
22          And once he did that, we promptly
23 called Mr. Novitzky -- Agent Novitzky about
24 that, and Agent Novitzky, as you know, in the
25 end, indicated that the calls all corroborated

## Page 878

1  what Justin had said. And Justin said he
2  received a B12 shot.
3           So the calls corroborated that he
4  received a B12 shot. And he also indicated that
5  he received Voltaren. And the calls
6  corroborated that he received Voltaren. So
7  while there may have been confusion over what
8  shape or color the pill was, there was never any
9  evidence that indicated it was anything but
10 Voltaren. And there was no evidence that he
11 ever received anything other than a B12 shot.
12         MR. CAMPBELL: Okay. I don't have
13 any more questions, Mr. Chair.
14         MR. COLBERT: All right.
15 Mr. Cheris?
16         MR. CHERIS: On the first offense,
17 your desire is that this not be counted because
18 it is old? Because -- what other rationale did
19 you have?
20         MR. COLLINS: The first and foremost
21 is because it is old. I know everybody
22 appreciated me doing an analysis of the
23 sentencing guidelines. I know Mr. Bock
24 certainly was.
25         But it's our position that first,

## Page 879

1  you have the Thifa WADA case that says that the
2  WADA code, to a comply with Swiss law, would
3  have to provide some limitation on how far back
4  you can apply a prior offense.
5           And it's our position if you look at
6  the sentencing guidelines, just like it's not
7  fair to give a one-size-fits-all penalty to
8  every offense, it's not fair to give a
9  one-size-fits-all reach-back for every
10 circumstance. It's not appropriate to reach
11 back forever.
12          It also should be noted in the Thifa
13 case that Thifa's reach-back is only two years.
14 WADA has addressed that by saying in the new
15 WADA code, there should be an eight-year period.
16 But, again, it's not differentiated by the type
17 of offense.
18          As you recall, the offense we
19 indicated that Justin tested positive before was
20 ADD medication. No intent to cheat. No
21 violation. And it was basically a paperwork
22 violation that happened in his first USA track
23 and field event ever, which was a junior
24 national event.
25          With respect to the sentencing

## Page 880

1  guidelines, the shortest penalty possible is
2  with respect to juvenile crimes.
3           MR. CHERIS: Juvenile crimes are for
4  people under the age of 18. It's not for junior
5  national championships. It's juniors who have
6  not yet reached 18. He was 19.
7           MR. COLLINS: I know the age of
8  majority varies around the world.
9           MR. CHERIS: I understand. But
10 there's nothing in the world that says because
11 it's a juvenile standard championship, juvenile
12 codes around the country are 18. And in many
13 cases, we try people as young as 16 as adults.
14          MR. COLLINS: There's certainly
15 other ways you can do it. But also I know
16 people can't drink until they're 21.
17          MR. CHERIS: I understand that. But
18 if you have something specific you want to give
19 me, go ahead. Otherwise, that's a red herring.
20 Let's move on.
21          MR. COLLINS: But the severity of
22 it, and also how far you can count back on
23 something, and the way it was treated by the
24 IAAF, it was akin to one that would be reversed
25 or overturned. That would never count.

7-30-07 to 8-01-07                    USADA vs. GATLIN

221 (Pages 881 to 884)

Page 881

1    So those are the arguments with
2 respect to how it would count. And there was
3 also still the fact that there was no fault --
4 no specific finding of fault in that case.
5    MR. CHERIS: You've claimed that it
6 was proven that the product entered the system
7 by the process-of-elimination method. That
8 requires that you believe the person who's
9 giving the testimony saying, "I didn't take the
10 pill and I didn't take a shot. Therefore, it
11 must be this."
12    You have to believe the person to
13 begin with. Otherwise, you wouldn't get to the
14 idea that we discovered how it got into the
15 system.
16    MR. COLLINS: That's true if the
17 only person making such a statement was the
18 person making it. You also have here, though,
19 that those statements were made to Special Agent
20 Novitzky, who's done investigations and did
21 recorded calls, which the calls specifically
22 talked about what he was given and when he was
23 given it.
24    And those calls specifically
25 corroborated that he did not take a shot or take

Page 882

1 a pill. That the only thing was through the
2 skin. So it's not simply the athlete that you
3 must rely on.
4    MR. CHERIS: We have to look at
5 Novitzky's testimony and see whether it rises to
6 the level that you've given it.
7    MR. COLLINS: Okay. He said that
8 the telephone calls corroborated Justin's
9 statements.
10    MR. CHERIS: Of not knowingly
11 taking --
12    MR. COLLINS: Yes.
13    MR. CHERIS: I think I have what I
14 need.
15    MR. COLBERT: All right.
16    MR. CAMPBELL: I've got another
17 follow-up.
18    MR. COLBERT: Go ahead,
19 Mr. Campbell.
20    MR. CAMPBELL: You made a reference
21 to the Americans with Disabilities Act, and I
22 just want to ask you: Are you claiming that
23 with respect to the first positive one or the
24 second positive one?
25    MR. COLLINS: In our brief, we

Page 883

1 reserved the right to claim it with respect to
2 the first one, to the extent it's used to
3 enhance this one.
4    MR. CAMPBELL: So is that your
5 position?
6    MR. COLLINS: I have not
7 exhaustively looked at it and talked with my
8 client about whether or not to bring that claim.
9    MR. CAMPBELL: Are you saying you're
10 not bringing that claim?
11    MR. COLLINS: I'm not relitigating
12 or trying to reopen the one from 2001 at this
13 time. If it's used and if it happens to violate
14 it, we're reserving the right to bring such a
15 case. But it's our position that it shouldn't
16 be counted.
17    MR. CAMPBELL: Why shouldn't it be
18 counted? What's the basis for your argument
19 that it shouldn't be counted?
20    MR. COLLINS: The original one?
21    MR. CAMPBELL: Yeah.
22    MR. COLLINS: Well, I just went
23 through it. That it's too old, and we don't
24 believe it should be counted.
25    MR. CAMPBELL: Too old? That's it?

Page 884

1    MRS. GATLIN: This is Mrs. Gatlin.
2 Can I say something with reference to this
3 question?
4    MR. CAMPBELL: Mrs. Gatlin, if you
5 could let me finish. I think you've heard that
6 that's not -- okay. Never mind.
7    MR. COLLINS: We also looked at
8 there was no finding of fault. And when you go
9 to evaluate him as to how it would work and how
10 would you adjust it, that's also been raised.
11    MR. COLBERT: All right. Thank you,
12 Mr. Collins.
13    Mr. Tygart?
14    MR. BOCK: This is Bill Bock. I'm
15 going to do the close.
16    MR. COLBERT: Thank you, Mr. Bock.
17    MR. BOCK: Sure. First of all, I,
18 like Mr. Collins, want to extend thanks to the
19 United States Anti-Doping Agency Panel and to
20 all of the assistants in the process. There are
21 difficult circumstances in this case. It wasn't
22 enjoyable to be in the room with everybody
23 dealing with these circumstances, but that was
24 because of the nature of the circumstances, not
25 because of the manner in which anybody conducted

7-30-07 to 8-01-07                    USADA vs. GATLIN

222 (Pages 885 to 888)

Page 885

1    themselves. And we do appreciate the dignity of
2    every proceeding and everybody involved in the
3    proceedings, including very specifically the
4    Gatlins and Justin, his mother and father.
5            USADA's interest in these
6    proceedings is the fair and just application of
7    the anti-doping rules. Mr. Collins has talked
8    about a war on drugs. I don't like war
9    analogies, but there's no question that doping
10   in sports threatens to destroy the value of
11   sports. And the use of sports is an example or
12   tool to clarify values and to inspire.
13           And so on many levels, it's
14   important to athletes and it's important to the
15   public at large that that sport be clean. And
16   that is USADA's interest.
17           I also, as a preliminary comment,
18   would like to make clear that it is USADA's view
19   and the personal views of those involved from
20   USADA that Justin Gatlin is entitled to respect
21   for his past accomplishments. And he is also
22   entitled to respect for the dignified manner
23   that he, and as I've said already, the members
24   of his family conducted themselves during the
25   hearing.

Page 886

1            And I think he's also entitled to a
2    measure of sympathy for some difficult
3    circumstances that he has encountered in his
4    career. And I also, at the risk of kind of
5    belaboring this point, do want to note that the
6    fact that he has risen above the present
7    circumstances of his doping offense and has
8    recently apparently spoken in churches and youth
9    meetings of the dangers of drugs and having
10   goals and acting with integrity, that is
11   evidence of noble acts.
12           And we're heartened that whatever
13   the decision of the panel will be in this
14   case -- and I add that USADA believes that it
15   should be a lengthy suspension for Mr. Gatlin --
16   I think these acts demonstrate that he can and
17   will persevere, and hopefully will continue to
18   apply himself to important and noble tasks. And
19   regardless of the circumstances of this case,
20   leave a legacy that is inspiring.
21           This proceeding is only fair if set
22   rules are applied. And those rules bind this
23   panel as it would any court or adjudicated body,
24   perhaps more so, because this is arbitration.
25   And it's the responsibility of the panel to

Page 887

1    apply the rules of the arbitration in a very
2    specific fashion.
3            So therefore, those noble acts of
4    Mr. Gatlin that I just testified about cannot
5    influence the decision the panel is called to
6    make, insofar as they may have an impact on the
7    panel's view of his credibility.
8            In a few minutes, we'll talk about
9    the credibility of his testimony. And I'm sorry
10   to say that our view of the credibility of his
11   testimony on the specific facts of this case is
12   relatively low. We believe he made a number of
13   inconsistent statements that would undermine his
14   credibility for the purposes of the positive
15   test result that was entered in his case.
16           In the Knox case, the panel made a
17   very specific and, I think, pertinent point.
18   And it said in Paragraph 7.5.2 of that case
19   that, "the world anti-doping code does not
20   provide that the athlete's personal history also
21   be taken into account when fixing the penalty."
22           It goes on to say that, "the same
23   applies to the question of how severely the
24   penalty impacts upon the athlete or his personal
25   life." And it says in that same paragraph, "the

Page 888

1    athlete's age, the question of whether taking a
2    prohibited substance had a performance-enhancing
3    effect on the peculiarities of a particular type
4    of sport, according to the anti-doping code, are
5    matters to be weighed during the period of
6    ineligibility."
7            So there was testimony about how
8    this situation impacted Mr. Gatlin and how much
9    money he lost, and whether he's been penalized
10   enough, I think was the suggestion of some of
11   that testimony.
12           And very simply, those are not
13   relevant considerations for this panel. And if
14   they were, then Mr. Gatlin would be treated
15   differently than other athletes, simply because
16   of the athletic success that he's enjoyed in the
17   past, and the amount of money that he could
18   potentially earn as a result of that success.
19   And that would not be just.
20           The burden, as Mr. Collins pointed
21   out, is Mr. Gatlin's to carry. And if Mr.
22   Gatlin is required to carry that burden, there's
23   but one conclusion that this panel can reach,
24   and that is that a very lengthy period of
25   suspension is appropriate.

7-30-07 to 8-01-07                    USADA vs. GATLIN

223 (Pages 889 to 892)

Page 889

1    As I think some of the last
2 questions to Mr. Collins indicated that much of
3 the evidence in this case that the defense has
4 relied on almost exclusively is Mr. Gatlin's own
5 testimony.
6    There's a claim that his testimony
7 is corroborated in some particulars. I want to
8 address some of those points in a minute. In
9 particular, I'll go ahead and address the claim
10 of corroboration of his testimony by Agent
11 Novitzky.
12    Number one, I don't believe he
13 corroborated his testimony. He did not provide
14 evidence that what Mr. Gatlin said was truthful.
15 He did not. He did not provide evidence of a
16 witness saying, "Yes, I was there. I saw that
17 too."
18    Rather what he said was he had not
19 been able to find evidence to disprove what
20 Mr. Gatlin said. And that's far short of
21 corroboration.
22    At the end of the testimony,
23 everyone in the room wanted Agent Novitzky to
24 answer a specific question about what he could
25 draw from the evidence. And he was unable to

Page 890

1 conclude whether Justin Gatlin had used
2 testosterone knowingly or unknowingly.
3    There are some very specific rules
4 that apply regarding the weight to be given an
5 athlete's testimony in these sort of
6 proceedings. It's been often recited in CAS
7 cases that the presence of a denial is devalued
8 by the fact that it has become a point for the
9 guilty, as well as the innocent.
10    Every case -- doping case that
11 proceeds to hearing involves a claim by the
12 athlete that they're -- that they didn't use a
13 prohibited substance. And those sorts of
14 statements are not entitled to much weight. And
15 we've cited a number of cases to that effect.
16    One is the -- I hope I'm pronouncing
17 it correctly -- the Chowke case, where the panel
18 said, quote, The panel, based on objective
19 criteria, must be convinced of the occurrence of
20 such alleged fact."
21    And that was in addressing the fact
22 that the athlete was a victim of conspiracy.
23 And the Teeter case, also provided in Paragraph
24 6.11, there was a discussion that indicated that
25 an athlete's good character evidence and own

Page 891

1 testimony that he thought his drink was spiked
2 was insufficient evidence that, in fact, the
3 drink was spiked.
4    And the panel said, "Respondent's
5 explanation was lacking in corroborating
6 evidence and unsatisfactory, thereby failing the
7 balance of probability test."
8    In the Wegh case, the panel found
9 that Mr. Wegh was a sympathetic witness. And
10 said, "while we found Mr. Wegh to be a
11 sympathetic witness who may have taken
12 contaminated food substance, the mere conjecture
13 that it was contaminated does not meet his
14 burden."
15    That lack of a willingness in
16 sport-doping arbitrations to rely upon the
17 testimony -- uncorroborated testimony of an
18 athlete is also reflected in the IAAF rules,
19 38.12 (iii). I'll go ahead and refer to it.
20    It provides that, first of all,
21 exceptional circumstances exist only in
22 circumstances where the case is truly
23 exceptional. And it prevents an allegation that
24 the prohibited substance or prohibited substance
25 was given to the athlete without his knowledge

Page 892

1 as something that is not to be taken into
2 consideration as a circumstance which is truly
3 exceptional.
4    And by stating that it's an
5 allegation, I think the intent of the goal is to
6 convey that someone can't simply come into a
7 proceeding and say, "I have an explanation for
8 what happened to me. I've excluded all
9 possibilities, therefore, it must be X."
10    If it did, it would open the door to
11 any athlete making such a claim, and it would be
12 track and field's equivalent of, quote, the
13 butler did it, end quote. It would simply be a
14 convenient scapegoat that would be used by
15 athletes in every anti-doping case.
16    Mr. Collins indicated at the
17 beginning of the hearing that Trevor Graham not
18 be the elephant in the room. And I think that
19 was an interesting point to make, because from
20 beginning to end in this case, the effort of the
21 defense was to prop up a story about what
22 allegedly caused the positive test result that
23 was created by Trevor Graham.
24    And in order to buy Justin Gatlin's
25 explanation of the events in this case, one must

## Page 893

1 place confidence on the explanation provided by
2 Trevor Graham on June 17, 2006, three days after
3 learning of the positive test result, when
4 Trevor Graham came up with this explanation that
5 was attempted to be presented by Mr. Graham in
6 the hearing.
7        There's been no additional evidence
8 since that time. And I think the evidence in
9 the case is that those closest to Mr. Gatlin,
10 including Mr. Gatlin himself, including Renaldo
11 Nehemiah, don't really know what happened.
12        The key issue in this case, the
13 threshold issue that without which there cannot
14 even begin to be a case, is whether Justin
15 Gatlin can establish how the prohibited
16 substance entered his system. That is
17 analytical point No. 1 in our opinion for this
18 panel. And it's embodied in IAAF Rule 40.2,
19 which relates to the no-fault or negligence
20 standard, and in IAAF Rule 40.3, which relates
21 to the no significant fault or negligence
22 standard.
23        Under both circumstances, the
24 language is identical. The athlete must
25 establish how the prohibited substance entered

## Page 894

1 his system in order to have his period of
2 eligibility eliminated under Rule 3.2, or
3 reduced under 40.3.
4        That is the key initial legal issue.
5 And after that, then there are secondary
6 inquiries that the panel must make. There are
7 certain things that, like I said, you can't base
8 a claim of innocence or a claim of exceptional
9 circumstances merely upon a claim of innocence.
10        And, thirdly, an athlete also must
11 demonstrate utmost caution in order to have a
12 penalty completely reduced. But I'm going to
13 spend most of the time on this question of what
14 we see as the key threshold issue, which is
15 whether the source of the positive test result
16 can be explained.
17        Again, the burden was on Mr. Gatlin
18 to prove the source of his positive test result.
19 And his counsel, as I discussed with Mr. Gatlin
20 in his examination, has made public statements
21 to the media claiming that, "We'll explain the
22 full stack of circumstances and everything
23 around it to the arbitration panel."
24        Respectfully, I would have to submit
25 that there were significant gaps in the

## Page 895

1 information that was presented to the panel.
2 First of all, Trevor Graham was not before the
3 panel. No effort apparently was made to bring
4 him before the panel. Whether he would have
5 testified, it's not possible to say. Perhaps
6 it's unlikely, given that he's under indictment.
7        But I think in relation to Trevor
8 Graham, it's significant to note that, number
9 one, the theory of this case is his theory.
10 Number two, he is under indictment. And, number
11 three, the principal players in this case all do
12 not believe in the integrity of Mr. Graham and
13 whether any trust can be placed in his claims.
14        How do we know that? Because the
15 quarterback for the Gatlin team, Mr. Nehemiah,
16 engaged with Mr. Gatlin in an effort to search
17 out Memo. Because he knew how Trevor, not Chris
18 Whetstine, but Trevor was allegedly making
19 creams containing prohibited substances in them.
20 That was late in 2006, well after this positive
21 test result was announced.
22        That the focus wasn't exclusively on
23 Chris Whetstine, as it was at the hearing and
24 where Trevor Graham attempted to place it at the
25 beginning. Rather the principal players in this

## Page 896

1 hearing all believe that the explanation of this
2 result had to do with Trevor Graham in some way.
3        And when I asked Mr. Nehemiah and
4 Mr. Gatlin whether there was any new information
5 that they had come up with about Chris Whetstine
6 after that point in time, I think you heard them
7 both say that there was new evidence.
8        Rather what happened is they have
9 simply brought this panel the best story they
10 could find. And, unfortunately, that story is
11 one that was created by Trevor Graham.
12        But in addition to Mr. Graham, you
13 were told by Randall Evans that he had relevant
14 evidence that this panel should hear. In
15 Mr. Gatlin's proposed witness list, it was said
16 that, "It is anticipated that Randall Evans will
17 testify regarding the events around the April
18 22, 2006, Kansas relays and other relevant
19 information."
20        We did not hear from Trevor Graham's
21 assistant and Justin Gatlin's other coach,
22 Randall Evans. And there is no doubt that he
23 had evidence that is relevant to the claims that
24 were made in this case.
25        MR. COLLINS: I'm going to object at

Page 897

1 this point about testimony of somebody that
2 didn't testify. A draft witness. I think
3 that's inappropriate.
4     MR. CAMPBELL: Bill, this is Chris.
5 I think you should go on, if you want. But just
6 in my mind, it's obvious that those guys weren't
7 going to testify. So I just don't know what
8 weight -- I wouldn't give it any weight. But
9 that's just my personal opinion.
10     MR. BOCK: Okay. He was on his
11 witness list and it was represented to the panel
12 and to us as of Thursday of last week that he
13 was going to testify. So I think that he was
14 apparently willing to testify and prepared to
15 testify. And I have not heard that Randall
16 Evans was under indictment. I don't know
17 whether he is or not. But I have not heard
18 that. And there certainly was no evidence in
19 the hearing that he was under indictment.
20     MR. COLBERT: This is Edward
21 Colbert. I understand the argument you're
22 trying to make.
23     MR. BOCK: Okay.
24     MR. COLBERT: But I agree with
25 Chris. If you want to talk about it -- but I

Page 898

1 don't see where it -- I'd rather have you
2 explain to me why it's relevant. But the fact
3 that someone did not testify -- was on a list
4 and did not testify should not constitute an
5 inference of any sort against the party. It
6 goes on in trials every day.
7     MR. BOCK: I think that when --
8 okay. In response to that, my explanation of
9 why -- I don't know that we're asking anybody to
10 draw a clear inference of guilt. We're simply
11 pointing out that the party with the burden did
12 not produce witnesses that could have explained
13 some inconsistencies in the testimony, which
14 I'll get to in a minute.
15     MR. COLBERT: Okay. That's fine.
16     MR. BOCK: Let's move on to someone
17 else that we didn't hear from. And that was
18 Dr. Martini.
19     With respect what happened with the
20 injection that was received by Mr. Gatlin in
21 April of 2006, only two weeks before the
22 positive test results, we heard that Dr. Martini
23 told Mr. Gatlin that Randall Evans was becoming
24 medically inclined, and would give Justin Gatlin
25 an injection in his hamstring on August -- or,

Page 899

1 I'm sorry, in April. And the testimony varied
2 from Mr. Gatlin whether it was April 6 or 7.
3     I think if you listened to
4 Mr. Novitzky's testimony, it was April 8. So
5 sometime in that three-day period in 2006, this
6 individual without any qualifications --
7 according to Mr. Gatlin, this individual was
8 authorized by a physician to give him an
9 injection.
10     I would submit that that really
11 makes no sense. And we know -- and creates a
12 very suspicious set of circumstances. In
13 addition, other items of evidence that I think
14 we're missing would have been the investigative
15 report that the investigators undertook.
16 Justin's medical records, and his prescription
17 history, which Dr. Black was talking about
18 today, which was not provided.
19     Let me get to some of the
20 inconsistencies that we noted in Mr. Gatlin's
21 testimony and in the presentation of the
22 evidence to the panel. Number one is what I
23 would call the injection falsification. And
24 when I use the term "falsification," I'm not
25 saying that necessarily the testimony was

Page 900

1 intentionally false, but the evidence is that
2 Mr. Gatlin's testimony regarding the injections
3 that he received was false.
4     If you take a look at Gatlin
5 Exhibit 16, which is the payment history from
6 injections that were given by Dr. Martini, that
7 document reflects two injections given in March
8 of 2006. One for triamcinolone and the other
9 for Celestone.
10     The testimony from Mr. Gatlin's
11 mouth could not have been clearer that there was
12 one injection by Dr. Martini that took place on
13 March 1. What this document that was given to
14 us when I requested it at the beginning of
15 Mr. Nehemiah's testimony reflects is that Justin
16 Gatlin's testimony regarding the occurrence of
17 injections is not entitled to credence.
18     And it demonstrates that between
19 March 1 and the positive test result on April
20 the 22nd, there were -- that we can verify at
21 this point in time -- at least three injections
22 received by Mr. Gatlin.
23     Now, I'm not sure what that says
24 about Ms. Blankenship's observative capacity or
25 ability to observe whether injections occurred.

Page 901

1  Mr. Collins' reliance upon the fact that she
2  allegedly didn't see any injection marks is
3  somehow an indication that he had not received
4  an injection in the time preceding the April 22
5  urine test. But, in fact, we know that he had
6  received three injections, and she didn't
7  apparently pick that up.
8        The second inconsistency in
9  Mr. Gatlin's testimony that I want to bring to
10 your attention is what I'll call the "bean
11 denial." You heard me ask Mr. Gatlin very
12 clearly use the term "beans." And he was very
13 clear before the panel he had never used that
14 term. Perhaps Memo brought it up in a
15 conversation. Perhaps somebody brought it up in
16 the conversation with him. But he had never
17 used that term.
18       And that testimony was undercut by
19 Agent Novitzky who said that term jumped out at
20 him when Justin mentioned it, because that told
21 him that he had taken a Voltaren bean. And the
22 reason it jumped out to him is because the term
23 "bean" is a street term for a testosterone pill.
24       Again, the fact that Justin now
25 claims that he didn't ever use the term "bean"

Page 902

1  is another reason to discount his testimony.
2        A third inconsistency in his
3  testimony is what I'll call a color confusion.
4  You will recall that Agent Novitzky testified
5  that Justin Gatlin told him that he was given a
6  green bean by Randall Evans. Yet talking
7  several months later with Memo, he told Memo it
8  was a brown bean. And Agent Novitzky was very
9  upset about that inconsistency in the testimony.
10 And it's significant, again, because a brown
11 bean is the color of testosterone pills.
12       Now, the next discrepancy is what
13 I'll call the Excedrin testimony. That is the
14 claim that Mr. Gatlin is asking you to believe
15 that he had a eureka moment in the airport
16 within the last week or two before this hearing,
17 and he suddenly came up with the explanation
18 that would explain his color confusion. And
19 that explanation was Excedrin Back and Body
20 Pain.
21       And Excedrin Back and Body Pain came
22 up a great deal during his testimony. He was
23 using it, according to him, frequently in 2006
24 to deal with the pain of his various ailments.
25 Do you recall that he talked about the pain that

Page 903

1  he was experiencing in his knee? That he talked
2  about the pain from what he described as a
3  damaged hamstring and his knee, to use Excedrin
4  Back and Body Pain.
5        But this is an explanation that is
6  completely uncorroborated. In fact, if you will
7  look at the doping control official records, or
8  if you'll look at the demonstrative exhibit that
9  USADA provided, or I provided to the panel and
10 parties, you will see that when Justin Gatlin
11 listed an analgesic or aspirin-like product on
12 his doping control records, in every instance,
13 it was Tylenol. And you will see that there is
14 no reference to Excedrin Back and Body Pain in
15 his doping control official records.
16       So I suppose what he is asking you
17 to believe is that while every time it was
18 picked up on a doping control record that he was
19 using an analgesic, it was Tylenol. But somehow
20 he switched his pain relief of choice to
21 Excedrin Back and Body Pain, the green pill,
22 just during this particular period of time that
23 it was most helpful to make his testimony
24 consistent.
25       MR. COLBERT: Mr. Bock, I don't mean

Page 904

1  to interrupt you. But if you could give me a
2  three-minute break to continue. We've been
3  going for quite some time. Three to five
4  minutes; is that all right with everybody?
5        MR. BOCK: Sure.
6        MR. COLBERT: All right. We'll wait
7  on the line. Thank you.
8        (Brief recess was taken.)
9        MR. BOCK: What we have when we
10 combine color confusion with the Excedrin
11 explanation, if you remove those, what we think
12 are relatively improbable accounts of the facts,
13 what Justin Gatlin has admitted is that he took
14 a brown pill that was given to him by Randall
15 Evans the day after an injection in early April
16 2006.
17       That date would have been, according
18 to the testimony in the case, between April 7
19 and April 9. He took a brown pill that he
20 described to Investigator Novitzky as a bean.
21 It was given to him by Randall Evans, his coach,
22 assistant coach, who the testimony is had
23 purchased testosterone previously in Mexico. To
24 what use he put that testosterone, we do not
25 know. We do know that he was charged with an

7-30-07 to 8-01-07                                    USADA vs. GATLIN

227 (Pages 905 to 908)

## Page 905

1  offense involving the possession of steroids.
2         MR. COLLINS: I'm going to object.
3  I don't know that that's on the record.
4         MR. BOCK: Well, Justin admitted
5  that he found that out later during his direct
6  examination. So what we know is that Justin
7  Gatlin, if you accept his explanations of what
8  happened, took a brown pill. And there was no
9  evidence that Voltaren comes in a brown pill
10 form.
11        The next inconsistency that I'd like
12 to point out is what I'll call the hamstring
13 harpoon. Justin Gatlin's testimony was that in
14 April of 2006, his hamstring was, according to
15 him, damaged. And that it was so damaged that
16 he required an injection.
17        Nonetheless, his testimony to the
18 panel was that it became better a few days after
19 the Kansas meet. Or, I'm sorry. A few days in
20 advance of the Kansas meet. But that testimony
21 was undercut first by Terri Blankenship, who
22 said that he was still suffering from a
23 hamstring injury on April 26, 2006, when she
24 massaged him.
25        And I'll get back -- when I talk

## Page 906

1  about Mr. Collins' motive and opportunity, we'll
2  get back to the hamstring situation.
3         The fifth area of what I would
4  consider inconsistency in the testimony is the
5  convenient tingle. You will recall that
6  Mr. Gatlin testified that on one occasion, he
7  felt a tingling feeling. And that happened to
8  be that one occasion of the application of cream
9  provided to him by Mr. Whetstine immediately
10 prior to his drug test.
11        That's kind of curious. It, I
12 suppose, was thrown out there as an explanation
13 for the positive drug test, because it was the
14 only time that he said he ever had this tingling
15 feeling.
16        What's interesting about that, in
17 part, is the specificity of his recollection.
18 Because Mr. Gatlin could not recall specifics
19 regarding the drug testing process for 4-29-06
20 or 5-28-06 when I asked him. But yet he was
21 very specific in his recall regarding all
22 aspects of the events on the 22nd of April. And
23 he recalled this tingling feeling.
24        If we're to believe Mr. Gatlin that
25 somehow a different substance was put on him on

## Page 907

1  April 22, right after he competed, then he has a
2  problem. Because Dr. Black, you heard,
3  testified that it was improbable -- therefore,
4  by definition, not carrying a burden of balance
5  of the probabilities. Improbable that anything
6  applied to him just an hour before the test
7  could have created this positive test result.
8         So, scientifically, the evidence is
9  improbable that that tingling explanation has
10 any merit. Then finally we have an
11 inconsistency which I'll call the too-perfect
12 explanation. And that is the ability of the
13 events to change from being consistent and a
14 consistent practice, except when it's necessary
15 to avoid consistency in the evidence.
16        An example: The Penn relays. It
17 was CIR tested. It was not a positive CIR test.
18 The explanation? Well, "Mr. Whetstine didn't
19 put the cream on me before that test." That was
20 the explanation.
21        Now, Mr. Whetstine testified
22 inconsistently. He said, "I've adopted the same
23 approach for every competition." And why
24 wouldn't he? If he was truly out to get Justin,
25 why would he have avoided the opportunity to do

## Page 908

1  so at the Penn relays? It's just too perfect.
2         It's completely inconsistent. It
3  fits the CIR test explanation if -- or it
4  appears to be an effort to fit the CIR test
5  explanation to the facts which would otherwise
6  be inconsistent.
7         Okay. I'd like to move on to the
8  effort to impeach Mr. Whetstine. First of all,
9  it's not necessary, really, for USADA to
10 establish anything about Mr. Whetstine's
11 testimony. I think the doubt that we have to
12 place on Mr. Gatlin's testimony is sufficient.
13        Nonetheless, there is a great deal
14 of evidence in the record that corroborates
15 Chris Whetstine's testimony. Not the least of
16 which is the evidence that was presented today
17 regarding testing of the creams. There's no
18 evidence that he possessed any cream containing
19 a prohibited substance. And, in fact, he
20 voluntarily spoke -- the testimony was he
21 voluntarily spoke with investigators five to six
22 hours.
23        That is not what one would expect
24 from an individual that had participated in an
25 effort to hurt Mr. Gatlin. Why would he have

Page 909

1 ever allowed himself to be questioned for five
2 or six hours if he truly had something to hide?
3 Why also would he have given the creams to the
4 investigators? He was under no obligation to do
5 that.
6 In addition, Jeff Novitzky, the very
7 person which Mr. Collins would like you to
8 believe corroborates Mr. Gatlin's testimony,
9 also corroborates -- if that were the case --
10 Chris Whetstine's testimony, because he didn't
11 find any evidence that Mr. Whetstine had been
12 untruthful.
13 Mr. Whetstine volunteered to take a
14 lie detector test. And he completely, on every
15 significant point, rebutted the testimony that
16 he was the source of this positive test result,
17 which is the explanation that is attempting to
18 be made here.
19 Mr. Collins said when one looks at a
20 situation like this, we should look at two
21 things: motive and opportunity. And he said
22 that Mr. Whetstine had both. Certainly Justin
23 Gatlin, Trevor Graham and Randall Evans had both
24 motive and opportunity.
25 The explanation that you're being

Page 910

1 asked to believe is that for $5,000,
2 Mr. Whetstine would risk his job and the primary
3 source of his income by undermining Mr. Gatlin.
4 The motive for Mr. Gatlin and Trevor Graham is
5 much clearer. And that is the substantial
6 amount of money that would come through doping.
7 Secondly, we have strong evidence in
8 the record that there was -- that Mr. Gatlin was
9 dealing with an injury. That testosterone is
10 frequently used to help athletes recover more
11 quickly from injuries.
12 (An interruption occurred in the
13 proceedings.)
14 MR. BOCK: The hamstring injury for
15 Mr. Gatlin, as Terri Blankenship testified, was
16 lingering late into April in 2006. Again,
17 providing motive to use a substance that would
18 allow recovery from that injury.
19 In terms of any weight to be placed
20 on the testimony of Mr. Nehemiah, he had a
21 similar motive. And he testified that he was
22 desperate to find a way to help his client.
23 So in some terms of art -- and I
24 apologize. It was probably too long. I think
25 there were many inconsistencies that were

Page 911

1 insufficiently explained, and there certainly
2 hasn't been --
3 (An interruption occurred in the
4 proceedings.)
5 MR. BOCK: I just want to conclude
6 by getting to a couple of the legal issues.
7 First is the treatment of the first offense.
8 And I think the basic point there is that it's
9 inappropriate to attempt to collaterally -- it
10 would be inappropriate to attempt to
11 collaterally attack the first decision.
12 It's clear from the IAAF rules that
13 the primary purpose of requiring a first
14 offense, and then on the second offense
15 increasing the penalty is notice to the athlete.
16 There's no question that Mr. Gatlin had notice
17 that his second offense could result in a
18 lifetime suspension.
19 MR. CHERIS: Mr. Bock, answer me a
20 couple of questions on that. If current code
21 were in existence in 2001, would Mr. Gatlin have
22 been eligible for a TUE?
23 MR. BOCK: No. Because an
24 amphetamine is not a specified substance. Well,
25 he could potentially -- in fact, back up.

Page 912

1 He could have gotten potentially a
2 medical exemption in 2001, which would have been
3 akin to a TUE. So, yes. In 2001, he could have
4 applied for a medical exemption. In 2006, he
5 could have gotten a TUE.
6 MR. CHERIS: He could have gotten a
7 TUE for the substance -- back in 2001, we're
8 getting, "Stop taking it X days before
9 competition," and the decision that was rendered
10 said, basically, he followed the advice that was
11 given at that point in time.
12 Today, no one would give him that
13 advice. Dr. Hilderbrand was pretty clear in the
14 idea that you go for professional or temporary
15 TUEs or full TUEs if you're taking something
16 obviously regularly. And he said had today's
17 rules and today's athletes been in existence in
18 2001, he would have applied for and received the
19 TUE, taken the substance, stopped taking it when
20 he was supposed to, and he would have had no
21 offense. So why can't we treat it that way?
22 MR. BOCK: I disagree with that
23 conclusion. And it's inconsistent with the
24 Puerta panel. I don't see any conclusion in the
25 panel that he was simply advised to discontinue

Page 913

1  the substance and get off it. That was what he
2  chose to do. But there was a process that he
3  could have pursued.
4          And the panel's opinion recites that
5  Mr. Gatlin never sought any medical exemption
6  from the IAAF. That's a specific finding of the
7  panel. And the decision in Paragraph 2 says
8  that while Mr. Gatlin may have violated the IAAF
9  and the anti-doping rules because he did not
10 first seek an exemption from the IAAF for his
11 medication before he competed, he is certainly
12 not a doper.
13         Sure, there was a recognition by the
14 first panel that if he had applied for an
15 exemption, he might have gotten it and there
16 wouldn't have been an offense. But he didn't do
17 that. He violated the rules. And just like any
18 other athlete -- we've provided you a long list
19 of other athletes who have been in similar
20 circumstances. He did not follow the rules in
21 applying for an exemption back then.
22         And if he didn't follow the rules by
23 not applying -- if he did not apply for a TUE,
24 he would be suspended.
25         MR. CHERIS: If he didn't apply for

Page 914

1  a TUE. But the education system that is in
2  place now is much better, and you have a lot
3  more athletes understanding what they need to do
4  than you had in 2001. The educational process
5  was not the same.
6          MR. BOCK: Well, you know, there
7  wasn't evidence of what the educational process
8  is. I suppose that that is very possible. But
9  there's no evidence. But what I would say is
10 that that first offense provided Mr. Gatlin
11 notice that a second offense would result in a
12 lifetime ban. And that was -- he accepted that.
13 And he made statements to the media about, "I
14 understand. The next offense is a lifetime
15 ban."
16         The testimony in the hearing was he
17 understood the next offense would be a lifetime
18 ban. And the primary purpose of imposing a
19 lifetime ban after a second offense is so that
20 the athlete will have notice of how serious it
21 is, and they will conform their behavior to the
22 rules. And so he had that notice, regardless of
23 the circumstances of his first offense.
24         MR. CHERIS: And how long do you
25 think -- so the first offense is notice. It's

Page 915

1  not something that -- you're saying that this
2  is -- you get one that's easier. Then you get a
3  second, it's harder, because you're a repeat
4  offender?
5          MR. BOCK: Right. Right. I think
6  that the IAAF rules suggest that the primary
7  motive of separating the offenses is notice.
8  And if you look at the rules -- I'll find it for
9  you -- they indicate that if you have two doping
10 offenses that are in close proximity to each
11 other, that they're only considered to be
12 separate offenses if the athlete has notice of
13 the first offense before the second.
14         And I think that that rule is a
15 clear indication that the primary value that is
16 attempting to be vindicated by the two-offense
17 requirement before a lifetime ban is notice to
18 the athlete, as opposed to deterring recidivism.
19         MR. CHERIS: Even though we have all
20 the educational programs, no one gets notice
21 really until they get caught the first time?
22         MR. BOCK: Well, in every case, the
23 claim of the athlete is, "I didn't know." And
24 in every case, they didn't know the rules. They
25 weren't sure what was on the list. They didn't

Page 916

1  know where to go to look for the list.
2          If it wasn't specifically listed,
3  but it's pharmacologically related, how would
4  they know? Going through a hearing process
5  provides an athlete with an understanding of how
6  serious a doping violation is. And, therefore,
7  I think makes it fair on the second offense to
8  impose a lifetime ban.
9          The rule for multiple violations is
10 Rule 40.6. And the indication is that you can't
11 have a second offense unless the athlete has
12 received notice of the first offense. And
13 that's in 40.6.
14         MR. CAMPBELL: This is Chris
15 Campbell. I just wanted to follow up, Sam,
16 unless you're not finished.
17         MR. CHERIS: Go ahead. I'll come
18 back in, if I need to.
19         MR. CAMPBELL: I can understand your
20 arguments with respect to this offense. I am
21 having problems with your argument with respect
22 to the first offense, because it seems to me we
23 have an obligation to weigh all the issues of
24 the first offense in interpreting the penalty
25 that we would give an athlete.

## Page 917

1 And also, in my mind, a disability
2 is a substantial issue in the first offense.
3 And nobody has talked about it. So give me your
4 comment on that.
5 MR. BOCK: Okay. Number one, I
6 think it's pretty clear that Mr. Collins is not
7 raising that issue in attempting to collaterally
8 attack the first offense in that manner.
9 MR. CAMPBELL: Hey, Bill, before you
10 go there -- and I don't mean to cut you off.
11 But does that prevent me and the arbitrators
12 from considering that relevant information?
13 MR. BOCK: Well, yeah. I think
14 there's a reason that he's not going there, and
15 that is this: He didn't present any evidence
16 that would relate to any sort of disability in
17 this hearing.
18 MR. CAMPBELL: This is all the
19 evidence he needs for a decision. The
20 statements made in the first decision.
21 MR. BOCK: No, there's nothing in
22 that first decision that indicates that
23 Mr. Gatlin was so disabled that he was unable to
24 apply for an exemption for the use of an
25 amphetamine. I mean, that's the issue. Was he

## Page 918

1 so disabled that he was incapable of seeking an
2 exemption? And that's the only way that the
3 disability would provide him any excuse.
4 And I think there's absolutely -- I
5 mean, you saw Mr. Gatlin. He's an intelligent
6 young man. He presents himself very well. He's
7 articulate. He is able to -- and he was clearly
8 able to follow the rules back in 2001. And his
9 disability had absolutely nothing to do with him
10 not following the rules. It's not an issue.
11 MR. CAMPBELL: And that's your
12 argument? Are there any other bases that you
13 have on your argument?
14 MR. BOCK: I guess you say it's my
15 argument. I haven't heard an argument to the
16 contrary that I can respond to, either from
17 Mr. Collins or from the panel. So, you know, I
18 don't know -- I don't understand why I'm being
19 asked for an explanation of, "Is there any other
20 basis," because no one has articulated a reason
21 that the first offense doesn't apply --
22 MR. CAMPBELL: Let me give you an
23 argument --
24 MR. BOCK: -- in terms of a
25 disability argument.

## Page 919

1 MR. CAMPBELL: Let me give you an
2 argument that I thought I heard in Mr. Collins'
3 closing. I think he said something to the
4 effect that the kid had ADD, right?
5 So is that disability, I guess -- is
6 it difficult to comprehend that the rules --
7 what rules were required to comply with for
8 having -- I'm murdering it.
9 It seems to me the first offense
10 said the predominant method for people who had
11 ADD was to stop taking it before the meet. That
12 was what most people did. Then there was a
13 document that was submitted by Mr. Collins that
14 said, in fact, he saw it in the instructions to
15 people with ADD to stop taking the medication
16 before the meet.
17 MR. BOCK: Can you show me that in
18 the first defense?
19 MR. CAMPBELL: Which one do you want
20 me to show you?
21 MR. BOCK: The concept that somehow
22 Mr. Gatlin was advised that he was to stop
23 taking his medication shortly before -- or some
24 period of time before the event.
25 MR. CAMPBELL: I said I think that

## Page 920

1 was in one of the documents that Mr. Collins
2 produced as part of this hearing. Maybe I'm
3 wrong. I thought I read it.
4 MR. COLBERT: I think it's at
5 Gatlin 2. Or, no, wait. Maybe it's Gatlin 3.
6 Gatlin 3.
7 MR. BOCK: Gatlin 3? I'm reading
8 through here. I'm not saying it's not in here,
9 but I don't see it.
10 MR. COLLINS: It's on Page 2.
11 MR. BOCK: Where are you, John?
12 MR. COLLINS: The third section on
13 Page 2, "Competitive Advantage. Not taking it
14 for approximately three days. He's unaware that
15 despite the fact that he did not take his
16 medication" --
17 MR. BOCK: All right. So I don't
18 see an indication that he was advised by anybody
19 that he could just stop taking his medication.
20 MR. CAMPBELL: I thought I read
21 somewhere, and maybe I didn't --
22 MR. COLLINS: I think it was always
23 in my pre-hearing brief.
24 MR. CHERIS: Page 9, Paragraph 6.
25 This is the finding of the panel. I'm just

Page 921

1  taking it as being true. "USADA advises
2  athletes, after consultation with their
3  physicians, to discontinue using the ADD
4  medication prior to competition in order for the
5  medication to clear their system."
6          How far in advance was he to stop
7  taking his medication?
8          MR. TYGART:  This is Mr. Tygart.
9  Can you refer me to that paragraph one more
10  time?
11         MR. COLBERT:  Actually, you get to
12  go back to Tab No. 2, Page 3 -- Tab 2, Page 6,
13  Paragraph 9.
14         MR. TYGART:  And I think if you look
15  at Page 5, Paragraph 3, he didn't receive any
16  advice from USADA, because he never sought it.
17  But he, on his own, didn't want it in his
18  system, because it made him feel sluggish and he
19  was unable to run.
20         MR. CHERIS:  I know Mr. Tygart's
21  question.  This is the way it goes with respect
22  to the issue.  Before USADA or IAAF reached a
23  ruling, WADA actually issued a ruling about
24  that supplement, and athletes in some cases,
25  where they had fully looked at all the

Page 922

1  medicines, were determined to be not at fault.
2          Now, in this respect, if you look at
3  this, say you're in an environment now where we
4  have an athlete with a known disability.
5  Because it was not just -- it was not just
6  Mr. Gatlin that found he had a disability.  It
7  was an independent international panel.
8          And if there is a document out there
9  saying that, "Oh, yeah, you just need to stop
10  taking it," that -- that could go to the issue
11  of fault.  That's even before we get to the
12  issue of, Does this kid have a disability?  And
13  with a disability, does he get reasonable
14  accommodation?  And do we have -- USADA, the
15  IAAF, this panel -- have an affirmative duty to
16  accommodate that disability?
17         MR. BOCK:  And, again, my response
18  would have to be the same.  There was an
19  accommodation.  It was to allow him to apply for
20  an exemption.  His disability had nothing
21  whatsoever to do with that, his failure to
22  apply.  You don't get -- I mean, if you have --
23  your disability --
24         MR. CAMPBELL:  If you have --
25         MR. BOCK:  Let me say this:  If your

Page 923

1  disability is that you have asthma, you don't
2  get to not apply for a TUE because of that.
3  It's just not an explanation that, "Well, I'm
4  disabled, so I can do whatever I want."  You
5  still have to comply with the sport rules, which
6  are to seek an exemption, or I suppose you can
7  go a more dangerous route and rely on the advice
8  of your doctor, if you choose.
9          MR. CAMPBELL:  Well, what would be
10  the method that Mr. Gatlin would have learned
11  about this rule requiring him to apply for an
12  exemption?
13         MR. BOCK:  The methods that
14  Mr. Gatlin learned from his first doping
15  offense?
16         MR. CAMPBELL:  No, what would have
17  been the method that Mr. Gatlin would have
18  learned to apply for an exemption before his
19  first doping incident in order to avoid that
20  first doping incident?
21         MR. BOCK:  Chris, what you're
22  attempting to do is to go behind the first
23  offense and collaterally attack it and look at
24  the evidence in that first hearing and apply
25  another standard to it.  And there was a

Page 924

1  procedure to do that in the hearing that we had.
2  And you're asking me to talk to you about
3  evidence that was in the hearing.
4          MR. CAMPBELL:  This is what I'm
5  telling you, Bill.  I've got an obligation to
6  seek justice.  And in my mind, justice deals
7  with, in this case, this individual that had a
8  disability.  And I can't ignore that in my
9  proportionality analysis.
10         MR. BOCK:  Well, I guess I need to
11  understand how a proportionality analysis comes
12  into play when there's not a demonstration of
13  exceptional circumstances.
14         MR. CAMPBELL:  You don't think
15  disability is an exceptional circumstance?
16         MR. BOCK:  I don't think that
17  Mr. Gatlin's disability had anything -- has
18  anything to do with this case.  It doesn't have
19  anything to do with -- it's not any sort of
20  explanation for his second doping offense.
21         MR. CAMPBELL:  I agree with you on
22  that.
23         MR. BOCK:  And as to the first
24  offense, it was an offense not as to his
25  disability, but because he did not comply with

Page 925

1   the rules and compete without amphetamines in
2   his system, or obtain an exemption to do so.
3        MR. CAMPBELL:  And that point, I'm
4   having a problem with.  I can agree with the
5   first point.  The second offense had nothing to
6   do with the first offense.  But the first
7   offense, in my mind, had everything to do with
8   the length of the censure that you're
9   recommending.
10       MR. BOCK:  If that were the case, if
11  that were a theory that should have been present
12  in this case, then it should have been presented
13  and we should have had an opportunity to address
14  it, I suppose, in evidence of 2001.
15       MR. CAMPBELL:  Let me say this:
16  this is an issue to me.  And if both parties are
17  going to address it, I would love to hear it.
18  Because in my mind, this is the central issue.
19  This is the issue in the case.
20       MR. CAMPBELL:  Well, what I'm trying to
21  say is our position is any evidence of a
22  disability would be completely irrelevant to the
23  question of why didn't Mr. Gatlin comply with
24  the rules back in 2001.
25       MR. CAMPBELL:  Yeah, I don't agree

Page 926

1   with that.
2        MR. BOCK:  You're saying that
3   because he was ADD, he was incapable of seeking
4   an exemption?  We have athletes every year that
5   are ADD and that apply for TUEs and they're able
6   to comply with that process.  He could have done
7   it in 2001.  He didn't.
8        As a result, you can't be consistent
9   with the many decisions that have sanctioned an
10  athlete for failing to follow the TUE process
11  and say that, "Well, because Mr. Gatlin has a
12  disability, we're not going to consider him at
13  fault," when there was a specific process in
14  place where he could have sought it.  And his
15  failure to seek it had nothing to do with his
16  disability.
17       MR. CAMPBELL:  Well, that's making a
18  number of assumptions that I'm not prepared to
19  make.
20       MR. BOCK:  Okay.  I'm not sure --
21       MR. CAMPBELL:  I would welcome --
22  because, to me -- and I'm saying this just as
23  one member of the panel.  Not the whole panel.
24  For me, while the other issues seem to be quite
25  clear, this issue is not.  You ought to address

Page 927

1   it.  You should.  I want to put you on fair
2   notice.  This is the issue for me.
3        MR. BOCK:  And my response is, with
4   all respect -- and certainly I understand your
5   desire to want to do justice.  And certainly
6   that's where you need to be, in terms of your
7   desire.  But in terms of analyzing the issue, I
8   have to disagree that you can even analyze it.
9   Because there isn't -- it makes no sense to go
10  back and try and collaterally attack this prior
11  doping offense and say it wasn't an offense.
12  And to try to talk about facts related to the
13  2001 offense when, number one, it wasn't raised
14  in this hearing.  And, number two, we know that
15  his disability did not prevent Mr. Gatlin from
16  seeking an exemption.  And that was the offense.
17       The offense was his negligent
18  failure to seek an exemption for his condition,
19  and apply to use amphetamines.  That was his
20  doping offense.  I mean, it's not -- I agree
21  with you it's not as -- as a matter of moral
22  culpability, it's not as significant as using a
23  steroid.  I agree with that.  But the rules
24  don't allow you to completely discount it simply
25  because you think it's a more trivial offense.

Page 928

1        I mean, he received the benefit of
2   the IAAF's consideration that it was less
3   significant than a steroid because they
4   reinstated him.  That issue has been resolved.
5   The proportionality of relating to that first
6   offense has already been addressed, and he was
7   not -- and he never has argued that the penalty
8   he received for his first offense was
9   disproportionate.
10       And I think if you look at that
11  first offense and the opinion, it's clear that
12  the panel said, "Yes, you committed a violation,
13  because you didn't follow the rules."
14       And in every case where that occurs,
15  under either the prior system where it was
16  called an exemption and the current system where
17  it's called an exemption -- a therapeutic use
18  exemption, under both systems, it is an
19  offense-involving negligence.  That's just what
20  every case that has considered this sort of
21  issue has characterized a failure to follow the
22  rules by seeking an exemption.
23       MR. CAMPBELL:  We agree it was
24  negligence.  That was the issue at that point,
25  and not the full extent that we have under the

## Page 929

1 WADA code today.
2     MR. BOCK: The current standard
3 today is no significant fault or negligence.
4 And there's no difference.
5     MR. CAMPBELL: You think there's no
6 difference between how you define fault back
7 when he tested positive in 2001 and how you
8 define fault under the WADA code today?
9     MR. BOCK: Analytically, I can't
10 come up with a difference. And I would
11 certainly respond to any sort of analytical
12 difference that could be described.
13     What's the difference between --
14 okay. What's the difference?
15     MR. CAMPBELL: Negligence is the
16 ordinary man's standard.
17     MR. BOCK: Okay.
18     MR. CAMPBELL: The standard we have
19 today in the WADA code is you've got to take the
20 utmost care. It's almost impossible to meet.
21     MR. BOCK: The utmost care only
22 applies to no fault or no negligence. Utmost
23 care applies to no fault or negligence.
24     MR. CAMPBELL: If there's no fault,
25 then negligence refers back to the no fault,

## Page 930

1 doesn't it? Doesn't it say in viewing no
2 significant fault or negligence, you have to go
3 look at that he had taken utmost care? I think
4 the issue was negligence back in 2001. Today
5 it's some other definition.
6     The indistinguishable
7 facts in today's cases are treated the exact
8 same way they were in this case, which is to say
9 it was a doping offense. And today if an
10 athlete failed to file a TUE, it would be a
11 doping offense, and they could have their
12 sanction reduced by half under the no
13 significant fault standard, potentially. But
14 not always.
15     But potentially they could get it
16 reduced by half. That's as far as any case has
17 ever gone. And that's why USADA characterized
18 it that way in the stipulation. And I don't
19 think that it makes sense to characterize it in
20 any other fashion.
21     And, again, as I said, the purpose
22 of the rules is to provide the athlete notice.
23 And Mr. Gatlin did have notice that his next
24 offense would be a lifetime ban.
25     The other legal issues that I should

## Page 931

1 probably address briefly are substantial
2 assistance. If this panel were to find that
3 there may be substantial assistance -- or a
4 panel were to find there may be any sort of
5 exceptional circumstance, the obligation of the
6 panel is then to refer the matter to the IAAF
7 for a final determination on that issue, after
8 which the IAAF would remand it to the panel for
9 further action consistent with their decision on
10 that issue.
11     In terms of whether there may be --
12 whether there may be exceptional circumstances
13 in relation to substantial assistance, we would
14 note that USADA views this case as fairly close
15 to the line.
16     The evidence of discovering -- the
17 athlete has to establish that the assistance has
18 been provided to the IAAF or USADA or other
19 relevant body. That description is provided.
20 And we would agree that "other governing body"
21 could be a government prosecutor. So we don't
22 dispute that assistance to a prosecutor can be
23 substantial assistance.
24     The next part of the standard is
25 whether it was assistance in discovering or

## Page 932

1 establishing an anti-doping rule violation.
2 Certainly it does not appear that Mr. Gatlin
3 provided any assistance in discovering an
4 anti-doping rule violation. Whether he provided
5 assistance in establishing an anti-doping rule
6 violation is maybe a closer call. We think
7 perhaps that circumstance occurred here. But
8 it's difficult to say.
9     From Mr. Novitzky's testimony, at
10 best, Mr. Gatlin provided some testimony that
11 perhaps corroborated some basic facts that
12 they -- that were helpful to their prosecution
13 of perhaps Mr. Graham. And if that's the case
14 and there are helpful facts, then he may, at a
15 minimal level, meet the substantial assistance
16 factor.
17     I think a couple other things that
18 need to be taken into consideration is whether
19 his information that was provided was complete
20 and accurate. Whether the statements were
21 truthful.
22     Again, there's some evidence that
23 goes both ways on those factors. But in any
24 case, we don't believe that if there were any
25 reduction under this factor, that it would

## Page 933

1   likely or should be a significant reduction.
2   Simply because while we think phone
3   conversations is certainly a commendable act,
4   it's unclear to us that that effort really
5   resulted in material help to the investigation.
6   And we would not like to see athletes able to
7   reduce their penalty simply by agreeing to make
8   some phone calls, if those phone calls don't
9   result in any assistance to anybody.
10          The final issue is the start date.
11  And IAAF Rule 40.9 is applicable, and it's
12  clear. And it says that the start date must be
13  the date of the hearing. There's not an
14  exemption in the IAAF of starting from the date
15  of the sample collection.
16          We've been on the phone for a long
17  time. And I apologize for the length of the
18  close, but unless there's any other questions,
19  that's USADA's submission to the panel.
20          MR. COLBERT: Mr. Bock, this is
21  Edward Colbert. Are you suggesting that if
22  there is an award from the panel, it begins on
23  July 31 or July 30 of 2007, and not on the date
24  of a voluntary withdrawal from competition in
25  2006, whether it's the date of collection or

## Page 934

1   not?
2           MR. BOCK: Well, yeah. I think it's
3   perhaps inartful the way the rules are written,
4   but the panel would start the suspension from
5   the date of the hearing, and give credit for the
6   period of professional suspension.
7           So the stipulation contains the date
8   of the professional suspension, which I think is
9   July 25.
10          MR. COLBERT: I understand your
11  position. I just want to make sure we're clear
12  about that.
13          MR. CHERIS: It starts at the date
14  of the award, and then you give credit for time
15  served?
16          MR. BOCK: Actually, it starts the
17  date of the hearing.
18          MR. COLBERT: But then you get
19  credit for time served, starting from the date
20  of fighting for ineligibility. And then when an
21  athlete has served the period of professional
22  suspension, that's the total period to be
23  served?
24          MR. BOCK: You're right, Mr. Cheris,
25  and I was wrong. The rule reads the hearing

## Page 935

1   decision, not the actual hearing date. So I
2   guess that puts a little pressure on the panel.
3           MR. COLBERT: But as a practical
4   matter, it won't make a lot of difference. If
5   the decision is 30 days from now, and there is
6   an award, then he gets credit for 30 days. If
7   it's tomorrow, he gets credit for tomorrow. So
8   however it is, he gets a credit.
9           Mr. Campbell?
10          MR. TYGART: This is Travis. If you
11  look at Paragraph 9 of the stipulation, it says
12  the credit shall begin on July 25, the day that
13  he began serving a professional suspension.
14          MR. CAMPBELL: That's also what the
15  rule says.
16          MR. TYGART: Also in that same
17  paragraph, it reserves the right to preserve the
18  WADA code in addition to the IAAF code. There's
19  a section indicating you can get that additional
20  time.
21          MR. BOCK: Yeah, certainly
22  Mr. Gatlin has a right to make that argument.
23  But that argument is not available under the
24  IAAF rule.
25          MR. CAMPBELL: Did you guys agree

## Page 936

1   what code applies? One or the other?
2           MR. BOCK: The stipulation states
3   that the IAAF anti-doping rules are applicable
4   to the hearing. It's in Paragraph 2. It says,
5   "USADA protocol and NSA and the International
6   Athletic Association (IAAF) rules are applicable
7   to this hearing for doping offense in USADA
8   096040."
9           MR. CAMPBELL: But it also said the
10  WADA code.
11          MR. BOCK: The mandatory provisions.
12  You're right. That's right.
13          MR. TYGART: This is Travis. Just
14  real quick on this point. What we've agreed to
15  is accurately reflected in that paragraph that
16  you went through. We included the Eddie
17  Heliphat case, because the IAAF rule is
18  different than the WADA case on that point.
19          All we ask is you articulate -- on
20  whatever basis you decide you articulate the
21  exact basis, so it gives comfort to anyone who
22  may be reviewing this decision.
23          MR. COLBERT: Mr. Collins, if you
24  want five minutes, if you have any reply or
25  response, I'll let you close, if you want.

Page 937

1    first. But I'd ask you to keep it short, if you
2    do.
3         MR. COLLINS: Could I ask a favor?
4    That I'm allowed to talk to my client first
5    before using that five minutes?
6         MR. COLBERT: If you do it in one
7    minute.
8         MR. CHERIS: Take two minutes,
9    Mr. Collins.
10        (A brief recess was taken.)
11        MR. COLLINS: I would -- just sort
12   of going through my notes, Mr. Bock went at
13   length saying age should not be a consideration
14   in -- the age of a career when considering the
15   sanction of proportionality. Clearly that's not
16   the case. Since it would effectively end his
17   career, it can be considered.
18        Also, with respect to providing no
19   evidence -- or no evidence to disprove something
20   else, I would note for the panel, which I'm sure
21   is already evident to them, that the burden of
22   Mr. Gatlin having to prove a negative is
23   extraordinarily difficult.
24        There was a number of comments about
25   Mr. Novitzky's testimony. There was a couple of

Page 938

1    times where they said he didn't find anything
2    corroborating. And I'd encourage the panel to
3    go back and look at his testimony. At the end
4    of his direct testimony, looking at my notes, he
5    had not received and obtained evidence from
6    anyone regarding knowing use.
7         Part of that would include the B12
8    shots and the Voltaren pill, whether it's green
9    or brown. Whether it's a bean or pill.
10   Voltaren by any other name is still Voltaren,
11   and there's been nothing to indicate it was
12   anything but Voltaren.
13        I'd also note at the end of cross-
14   examination, there was no use of a banned
15   substance. And Mr. Novitzky, as I had said,
16   said there was the possibility of an unknowing
17   use, because there was no indication of a
18   knowing use.
19        And then lastly, when they came back
20   on the phone, when he said there was no
21   conclusions they can draw, that's not what I had
22   in my notes as to what it was. But it was that
23   they obtained no conclusive evidence that
24   Mr. Gatlin took, used or was administered
25   knowingly or unknowingly a banned substance.

Page 939

1         But, again, listen. I assume you'll
2    have an opportunity to review the record. There
3    was a lot of talk about Trevor Graham. Whether
4    it was Trevor Graham's story or not. The record
5    was abundantly clear that Justin Gatlin never
6    ruled out the possibility that Trevor Graham was
7    involved in this.
8         In fact, the greatest evidence of
9    that was they, in fact, recorded calls,
10   undercover calls with Trevor Graham. Those
11   calls didn't produce any evidence with respect
12   to the B12 shot being anything other than B12.
13   And there was nothing about the Voltaren pill
14   being anything other than Voltaren.
15        As the Voltaren pill, in fact, there
16   was evidence in the record of it being a pill.
17   It's a brown pill. It's in a blister pack. He
18   gets it from Europe. By just looking it up on
19   the web, you can see it is a brown pill, and
20   they come in 50 milligrams or 75 milligrams, and
21   you can see it.
22        With respect to Dr. Martini and the
23   number of injections, where they used it to try
24   to impeach Justin, it was at the same time he
25   was having his knee drained. Whether he

Page 940

1    remembered whether he was having an injection or
2    getting his knee drained are different matters.
3    You can see the confusion.
4         MR. CHERIS: I must say,
5    Mr. Collins, it would be helpful to have
6    Dr. Martini testify.
7         MR. COLLINS: I apologize for not
8    having called him prior to the hearing. Since
9    the testimony was there was no indication that
10   what he received in those injections would
11   render a positive test, it wasn't considered to
12   be relevant until cross-examination when they
13   started asking significant questions about it.
14        The only convenient part of the Penn
15   relays you failed to note is that you do not get
16   rubdowns between races, and Justin had not
17   finished running that day.
18        And the testimony about Chris
19   Whetstine didn't knowingly give banned
20   substances, this is not the power -- this is one
21   of the things that WADA -- they don't have the
22   ability of search and seizure, to go in and take
23   things.
24        So you couldn't get everything
25   there. And the point that he turned his

7-30-07 to 8-01-07          USADA vs. GATLIN

236 (Pages 941 to 944)

Page 941

1 products over voluntarily, it was three months
2 later, and most likely it was long gone. And at
3 that point, he could give them anything. He
4 knew that whatever it was was long gone.
5      So there's nothing to be read into
6 the fact that he willingly gave stuff. In fact,
7 I would be shocked that what he gave was
8 anything but proved negative.
9      That Renaldo Nehemiah was desperate
10 for his client, I respectfully disagree. He
11 asked for the truth, whether it helped Justin
12 Gatlin or hurt Justin Gatlin. He was simply
13 looking for the truth.
14      There was also talk about
15 proportionality. There were a lot of issues.
16 Mr. Bock said that proportionality only comes
17 into play if there were exceptional
18 circumstances. I disagree with that
19 interpretation. And I am not alone.
20      If you look at the CAS opinion, it
21 points to Law Review, Swiss law, and other
22 things that there are still regulations which
23 cannot directly or indirectly replace the
24 fundamental doctrine of proportionality with a
25 priority for every thinkable case. It continues

Page 942

1 on and talks about substantial assistance, but
2 nevertheless, the possibility of future
3 cases proved by Article 10.5 of the WADA code
4 must be seriously envisioned.
5      And we should note that other cases
6 also indicate that when evaluating the penalty,
7 you must take into account all the facts and
8 circumstances.
9      In light of that, we have,
10 throughout this process, maintained that the
11 panel has the right to look at the first
12 opinion, the substance of the first case, to
13 find out whether whatever penalty he receives
14 here, if he is to receive a penalty, that he
15 receive a light penalty. Eight years would end
16 his career.
17      That penalty, by definition, would
18 include some level of punishment for what
19 happened in that first offense. And they must
20 certainly consider that.
21      Lastly, I want to talk about --
22 there were issues of motivation, and people had
23 issues -- or that Trevor Graham and Justin
24 Gatlin had motivations to take prohibited
25 substances to make millions of dollars. Nobody

Page 943

1 is going to make millions of dollars at the
2 Kansas relays. It's a relatively insignificant
3 event on the track calendar.
4      If he was so hurt that he couldn't
5 return, they would have simply missed the meet.
6 There's no indication that Justin Gatlin would
7 have knowingly participated in any known scheme
8 to compete at the Kansas relays. And to
9 underscore that is all the negative CIRs.
10      If he was out there knowingly
11 cheating and getting away with it, the other
12 CIRs would have turned up positive. He had no
13 idea they were going to do CIRs, and they all
14 came back clean. It indicates no knowing
15 attempt to cheat on behalf of Mr. Gatlin.
16      With that, I want to again thank the
17 panel. Obviously you're thinking long and hard
18 about this case. I really appreciate it. And
19 on behalf of the Gatlins, I want to thank you.
20      We would ask as you deliberate --
21 we're not asking you to do anything out of the
22 code, or out of what's there or different than
23 what any other CAS panel has. But to use your
24 powers to create a just and proportionate
25 sanction in this matter.

Page 944

1      MR. COLBERT: Thank you.
2 Mr. Collins, can I ask you, you read from the
3 Scizado case. Did you provide that to the
4 panel?
5      MR. COLLINS: I did not. It was
6 quoted in the Puerta case. If I was doing
7 proper legal citation, I would have said Puerta.
8      MR. COLBERT: All right. I didn't
9 remember that being provided to the panel.
10      All right. Mr. Campbell?
11 Mr. Cheris? Any questions?
12      MR. CAMPBELL: I do not.
13      MR. COLBERT: All right. We're
14 waiting for the documents. I believe we may
15 have already received the indictment from
16 Ms. Wingard. So we're waiting for the documents
17 from Dr. Black for purposes of putting documents
18 in the record.
19      The panel will hold the hearing open
20 until the transcript is available. We don't
21 know exactly when it's going to be available. I
22 was told, I believe, it's on standard
23 turnaround. So when the panel receives the
24 transcript, that will constitute closing of the
25 hearing. Do you have any questions?

7-30-07 to 8-01-07                                          USADA vs. GATLIN

                                                           237 (Pages 945 to 947)



Page 945

1          MR. COLLINS:  I was just going to
2    note I would call Dr. Black promptly.
3          MR. COLBERT:  All right.  We'll wait
4    to hear from you.  But if Dr. Black doesn't get
5    around to providing us the photos and the
6    information, and the transcript comes in in the
7    next couple of days, then all we can do is wait.
8          It's either the transcript or
9    Dr. Black's photos.  But I don't expect Dr.
10   Black's photos to take more than a couple of
11   days.
12         MR. COLLINS:  I don't either.
13         MR. COLBERT:  Anything else,
14   gentlemen?
15         MR. COLLINS:  Thank you very much
16   for your time.
17         MR. GATLIN:  Thank you very much for
18   your attention.
19         MR. COLBERT:  It's been a very
20   difficult case.  I think the parties have done
21   an admirable job in stating their positions, and
22   we look forward to getting the last of the
23   information and the transcript, and the panel
24   will then enter its deliberation phase.  Thank
25   you very much, gentlemen and ladies.  And we'll

Page 946

1    speak to you at some later time perhaps.
2          (The above proceedings were
3    concluded at 6:45 p.m., on August 1, 2007.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 947

1    REPORTER'S CERTIFICATE.
2
3          I, DEBRA K. RESLING, RMR, and Certified
4    Realtime Reporter, appointed to take the within
     arbitration, do certify that before the hearing
     the witnesses were duly sworn by me to testify
5    to the truth; that the hearing was taken by me
     at the American Arbitration Association
6    Arbitration Association, 2200 Century Parkway,
     Suite 300, Atlanta, Georgia on July 30 and 31,
7    2007, then reduced to typewritten form
     consisting of 723 pages herein; the telephonic
8    hearing was taken on August 1, 2007, by
     Stephanie Ostdahl, RPR, the foregoing is a true
9    transcript of the questions asked, testimony
     given and proceedings had.
10
          I further certify that I am not related to
11   any party herein or their Counsel, and have no
     interest in the result of this litigation.
12
          In witness hereof I have hereunto set my
13   hand this 20th day of August, 2007.
14
                    Debra K. Resling, RMR
15                  Certified Realtime Reporter
                    and Notary Public.
16                  4 Cheyenne Boulevard
                    Colorado Springs, CO  80906
17
     My commission expires February 28, 2009
18
19
20
21
22
23
24
25

&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;

# BEFORE THE AMERICAN ARBITRATION ASSOCIATION

*North American Court of Arbitration for Sport Panel*
*USADA vs. Justin Gatlin*
*AAA No. 30 190 00170 07*

&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;

# TRANSCRIPT OF PROCEEDINGS
## Word Index

&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;&#x2740;

*American Arbitration Association Office*
*2200 Century Parkway, Suite 300*
*Atlanta, Georgia*
*July 30 – August 1, 2007*

✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦✦

Transcript provided by:

## RESLING SPORTSCRIPT
4 Cheyenne Boulevard
Colorado Springs, Colorado 80906
(719) 632-6391, (719) 661-7226 (cell)

**A**

AAA 1:5 27:8,22
  44:11 625:3
  869:13,16,22
  870:2
abandon 27:21
abbreviated
  656:18 827:13
  829:11,21
  831:3 833:6,9
  834:14,22
  835:7 836:13
abbreviations
  816:7
aberration
  873:19 874:3
aberrational
  29:6,12
abilities 66:11
ability 17:5
  35:20 178:19
  294:11 296:13
  416:14 632:25
  657:19 727:22
  845:23 849:5
  900:25 907:12
  940:22
able 12:19 15:12
  25:7 38:24
  52:8 57:11
  77:23 83:22
  93:6 126:1
  137:8 143:3
  144:12 222:3
  245:6 252:11
  252:14 257:24
  285:2 329:4
  333:11 416:15
  501:6 505:7
  507:17 565:23
  588:7 600:20
  603:18 626:2
  627:16 629:13
  632:24 637:13
  653:8 685:8
  749:4 773:7
  786:4 839:20
  841:1 846:8
  861:3 889:19
  918:7,8 926:5
  933:6

abnormally
  132:13
abrasion 761:9
  761:11 776:21
  796:3 818:12
  819:9,14
absence 15:4
absent 111:13
  292:20,23,25
absolutely 12:16
  43:4 45:23
  236:22 260:17
  276:3,14
  291:14 313:21
  330:19 370:2
  379:8,8 390:13
  390:25,25
  524:23 527:10
  566:7 575:4
  621:19,23
  628:18 657:5
  709:1 767:17
  788:7 809:11
  918:4,9
absorb 508:19
  510:9 774:11
absorbed 510:8
  749:14 771:10
  772:3,5
absorption
  522:14,18
  526:5 577:3
  749:15 771:4
  772:11,12
  773:20 776:2
abundance
  126:25
abundantly
  939:5
abuse 678:16
acceleration
  500:24 524:22
accept 271:9
  588:5 814:4
  905:7
acceptable
  249:20 721:5
accepted 29:20
  44:10 108:22
  156:23 225:12
  479:15,19

807:8 914:12
access 177:9
  337:11 541:7
  541:11 630:3
  661:7,24
  823:15 860:22
  860:24 863:5
accessible
  823:14
accident 369:7
accidentally
  166:18
accidents 822:18
accommodate
  526:7 922:16
accommodation
  866:22 922:14
  922:19
accommodati...
  866:20
accompanied
  504:12
accompany
  239:11 506:1
  617:13
accomplish
  661:16
accomplished
  827:11
accomplishme...
  386:15
accomplishme...
  595:15 885:21
accord 139:17
account 175:9
  278:14 283:9
  283:10,11,13
  283:13 431:13
  547:25 867:25
  887:21 942:7
accountable
  698:5 726:20
  867:3,12,17
accountant
  371:3 372:13
  548:19
accounting
  548:19 642:23
accounts 430:3
  578:22 646:7
  904:12

accredited
  695:11
accuracy 267:16
  460:10 818:25
accurate 111:1
  124:14 154:24
  232:4 260:10
  431:25 449:21
  459:24,24
  460:17 461:21
  462:13 463:2
  477:24,25
  479:24 501:17
  557:1 745:18
  754:21 762:2,3
  795:15,22
  805:2,3 819:2
  932:20
accurately
  236:15 622:3
  657:18 748:19
  936:15
accusation
  814:7
accusations
  494:18
accused 483:21
  483:23,24
  643:19 664:23
  664:25 665:1
achieved 748:22
achieving 132:1
aching 161:10
acid 93:24
  241:19
acidity 816:13
acids 239:24
  241:23,24
  242:7
acknowledge
  842:8 862:18
acquire 651:16
acquired 49:14
  788:20
act 79:10 291:15
  461:9 834:16
  834:17,20
  835:9 865:22
  865:23 868:3,4
  882:21 933:3
acted 28:15

148:9 679:16
  863:1
acting 140:4
  291:13 438:24
  566:23 703:10
  703:12 886:10
action 139:16
  150:1,11
  152:16 419:25
  568:20 571:1
  798:1,3 854:19
  931:9
actions 139:13
  438:20 465:8
  715:15 843:25
  854:11 868:2
active 75:5
actively 680:5
  869:19
active-duty
  364:11
active-isolated
  502:7,8 503:6
activities 257:19
  258:8 273:15
  290:11 407:15
  678:18 696:9
  703:16
activity 566:15
  585:19
acts 886:11,16
  887:3
actual 122:4
  154:25 260:23
  447:3 752:25
  754:2 822:16
  861:25 862:11
  935:1
acupuncture
  77:1 89:4,7
  142:24 416:12
  519:1,22
acupuncturist
  519:15,16
  698:21
ad 679:7
Adalie 849:17
adamant 577:4
adamantly
  849:6
adapters 625:25

add 51:7,7,12
  209:8 298:13
  331:5 332:3
  438:23 480:6
  512:23 548:16
  598:4 599:25
  600:11,17
  840:4 865:17
  866:11,13
  879:20 886:14
  919:4,11,15
  921:3 926:3,5
added 28:5
  779:4
Adderall 51:5,6
  51:10,15,22
  244:1 365:4,9
  480:7
adding 858:1
addition 251:19
  305:19 417:24
  728:19 851:22
  866:10 896:12
  899:13 909:6
  935:18
additional 111:6
  113:21 279:24
  333:9 622:22
  802:21 850:19
  893:7 935:19
address 22:19
  41:11 43:18
  113:22 600:9
  628:10 720:9
  802:22 811:3,7
  843:19 844:21
  845:15 847:4
  874:16 889:8,9
  925:13,17
  926:25 931:1
addressed 43:9
  123:21 524:15
  872:6 879:14
  928:6
addresses 41:17
  872:4
addressing
  502:10 656:17
  890:21
Adenergy 470:5
  744:21

adequately
  505:7
adhere 292:24
Adidas 53:25
  54:1 492:13
  297:16 536:18
adjacent 404:4
adjourned
  401:2 722:15
adjudicated
  886:23
adjust 786:25
  884:10
adjusted 792:14
administer
  487:18,22
administered
  299:4 300:5
  314:5,19,21
  317:20 329:7
  358:21 774:22
  815:13 830:19
  858:5,11,25
  938:24
administering
  762:20
administrating
  762:21
administration
  328:25 338:6
  749:23,25
  767:21 771:16
  772:14 774:23
  780:5 794:2
  827:5 833:4,7
administrations
  827:6,8
administrative
  728:21
admirable
  945:21
admission 21:22
  621:23 707:23
  708:14
admit 113:13
admitted 309:23
  808:23 904:13
  905:4
admitting 21:18
adopt 459:23

adopted 26:23
  846:14,16
  907:22
adults 880:13
advance 31:22
  44:6 153:22
  297:16 833:18
  905:20 921:6
advanced 339:8
  504:21 509:1,5
Advantage
  920:13
adverse 16:4
  17:17 832:16
  836:21 842:22
  846:22 847:2
advertise 823:1
advertised
  248:15
advertising
  532:11 534:20
advice 145:21
  536:24 827:25
  828:7,14,24
  829:2 830:22
  833:17 912:10
  912:13 921:16
  923:7
advisable
  660:22
advise 489:3
  513:23 797:8
  829:9
advised 571:5
  912:25 919:22
  920:18
advises 921:1
Aegis 724:7,9,20
  724:21,23
  728:22,23
  730:8 761:8,10
  761:13
affairs 550:22
affect 58:8 526:9
  526:12 658:24
  768:2,2,14
  771:24,24
  784:21,22
affidavit 538:20
  547:2,7,11,18
  548:2,7 564:6

affidavits
  864:17
affirmative
  811:18 922:15
afford 523:21
  527:15 529:23
  616:13 840:22
afield 433:5
  511:24 688:4
afraid 377:25
African-Amer...
  508:18
African-Amer...
  510:9
afternoon 10:20
  19:15,16,18
  92:20 93:14
  95:22 414:3
  723:15,17
afterward
  410:19
age 48:15 369:1
  596:3 672:5
  844:21 868:19
  880:4,7 888:1
  937:13,14
agencies 326:23
  679:16 725:10
  866:19
agency 1:7 3:3,6
  14:5 125:8,10
  208:19,20
  324:18,22
  445:2 545:24
  554:18 651:7
  884:19
agents 53:9,9
  257:1 465:13
  465:19,23
  466:14,14,15
  680:6 695:23
  695:24
agent's 143:14
  199:8,12
aggravated
  393:6
aggressive
  404:22 408:9
agitated 568:23
  568:23

ago 161:1 212:2
  278:15 306:14
  307:4 545:19
  554:4 594:4
  685:15 758:1
agree 12:7 26:8
  149:7 258:2
  267:20,23
  286:1 291:24
  292:4 329:22
  330:1 473:9
  480:24 481:2,2
  640:24 687:21
  727:14 756:17
  756:22 767:5
  770:4,8,13,25
  771:2,21
  774:16 775:2,7
  775:8 776:3,7
  897:24 924:21
  925:4,25
  927:20,23
  928:23 931:20
  935:25
agreeable 268:4
agreed 15:6,16
  25:15 34:9
  35:13,15 36:1
  36:11 44:7
  268:6 276:7,10
  293:18 364:13
  662:10 719:10
  802:7 808:13
  809:17 811:17
  812:13 847:25
  848:21 870:21
  871:12 936:14
agreeing 35:22
  39:22 295:2
  933:7
agreement 33:9
  44:1 151:8
  260:4,12,14
  261:1 293:6
  400:10 496:11
  571:14 718:23
  769:22
agrees 36:7
  39:25
aha 570:4
  644:11

ahead 32:4
  40:23 186:12
  195:18 261:16
  274:3 275:23
  275:24 317:2
  319:25 357:8
  358:15 373:23
  383:24 386:12
  493:15 527:19
  649:5 666:13
  702:23 880:19
  882:18 889:9
  891:19 916:17
ailments 902:24
ain't 459:1,10
air 498:6 503:10
  613:21
airport 82:15
  87:19 161:9,11
  339:15 385:3
  515:13 583:25
  698:16 877:17
  902:15
akin 880:24
  912:3
Alabama 2:5
Alamance 338:2
Alameda 2:7
Alan 55:6
alarm 415:1
Alberto 497:12
  497:20 498:17
Alexander 48:10
alibi 579:12
allegation 38:12
  38:19,21
  309:22 891:23
  892:5
allegations 9:6
  38:7,25 370:7
  531:14 630:7
alleged 208:7
  890:20
allegedly 188:2
  278:15 446:23
  718:12 892:22
  895:18 901:2
allergies 175:23
  340:17,21
allow 39:11 57:9
  226:15 315:25

316:8 390:20
  390:23 406:5
  658:18 910:18
  922:19 927:24
allowable 352:5
  483:8
allowed 14:1
  297:11 311:1
  312:15 318:10
  356:5 380:21
  696:4 827:8
  845:24 848:5
  852:18 854:15
  909:1 937:4
allowing 286:6
  640:21
allows 798:20
alluding 533:13
Allyson 692:17
aloe 579:5 748:1
  748:4,8 758:18
  759:5 787:23
aloof 616:20
Alpha 733:13,20
  734:4 736:6
  739:20 752:4
  763:5,16,21
  765:20,21
  767:4,5,12
  768:3,14,25
  769:24 770:11
  772:21 775:4
  776:18
altercation
  141:6
altered 783:24
alternative
  825:13
altitude 498:8
aluminum
  583:18
Alvin 198:4
amber 743:12
  747:22
amend 559:12
amended 41:2
Amendment
  489:4 869:24
America 606:20
  619:5,21
American 1:1,2

1:14 186:6
  947:5
Americans
  865:23 868:4
  882:21
amino 239:24
  241:14,18,19
  241:21,23,24
  242:1,4,6,8,22
  243:16 244:14
  246:9,11
  247:21 470:4
amiss 736:18
amount 293:24
  440:24 509:8
  510:17,24
  518:8 526:10
  531:20 559:9
  611:15,19
  633:20 635:24
  775:6,6 790:23
  803:7 828:22
  833:25 854:14
  854:20 872:21
  888:17 910:6
amounts 51:3
  830:8
amphetamine
  42:17 51:4
  119:25 399:5,6
  911:24 917:25
amphetamines
  244:2 399:4
  480:9 925:1
  927:19
Amy 576:5
anabolic 246:20
  246:24 247:2,6
  247:24 248:2,6
  248:7 337:19
  337:23 338:7
  342:9 783:5
  798:13 831:21
anabolics 786:7
analgesic 339:9
  903:11,19
analogies 885:9
analogy 609:14
  676:24 874:24
analysis 5:9,11
  36:3 39:3 42:4

42:23 122:18
  500:2 725:2,18
  726:4,8 730:9
  730:11 732:21
  733:3 743:24
  744:17,24
  745:8 746:24
  747:8,16,23
  748:5 749:3,10
  752:23 754:3
  755:5,10,22
  756:10 766:18
  805:22 813:13
  815:4,10
  878:22 924:9
  924:11
analytic 763:21
analytical 124:8
  124:15,19
  765:4,9 832:16
  836:21 842:22
  846:23 893:17
  929:11
Analytically
  929:9
analyze 40:17
  711:14 927:8
analyzing 730:7
  927:7
anchor 108:23
  119:5
Anderson 53:4
andro 792:7
  796:10
Androgel
  750:16
androgen
  771:13 786:6
  804:13
androgenic
  783:5
androgens
  749:12 784:8
  784:19
Androstenediol
  732:25 733:1
  764:14 765:15
  765:21 767:18
  768:18,23
Androstenedi...
  733:1

androtestoster...
  750:23
Andy 620:11
and/or 37:15
  198:4 278:22
  660:8
Angel 168:2,4,6
  168:9 636:19
  851:14
Angeles 85:8
angles 499:15
angry 374:24
  396:16 645:19
  701:10
animals 726:15
animosity
  532:21
ankles 461:18
announce
  489:17
announced
  440:15 443:10
  444:10 446:3,9
  448:10 895:21
announcement
  442:18,22
  443:6,6,22
  444:17,19
  446:4
annoyed 366:1
annual 607:6
  615:3
anonymous
  634:19,20
  824:1,9
answer 13:4,20
  189:6,9,11
  232:2,2,6
  241:6 263:10
  272:25 275:19
  275:21 281:8
  284:3 285:2,4
  285:21 287:20
  293:4 294:14
  301:18 303:5
  304:12 315:12
  316:22,23
  317:1,4 319:14
  330:12,17
  332:25 340:6,7
  343:25 358:11

358:16,17
433:15 449:3
449:11 460:8
466:5 472:25
494:5 500:18
527:4,8 539:6
549:10 551:21
551:25 567:1
570:10 628:4
677:15 683:4,6
689:17 690:4
702:18,18
703:25 759:19
769:10 774:5
787:9 788:7
795:15 804:22
806:24 810:14
815:6 828:11
831:1 833:1,2
834:12 837:6
845:25 848:7,8
889:24 911:19
answered 158:6
193:3,15
263:12 276:7
302:15 314:17
487:17 520:24
537:8 690:4
704:10 791:7
832:4
answering
162:13 316:14
316:24 348:24
392:3 657:18
735:6 828:24
answers 431:23
650:9 698:14
787:1 806:23
808:21
anterior 510:21
542:17
anticipate 11:11
12:24 20:20
248:19
anticipated
19:21 626:16
896:16
anticipation
423:20
antiinflammat...
731:16

anti-American
603:25
anti-doping 1:7
3:3,6 39:14
40:6,9,11
125:8,10 242:5
324:18,22
554:18 651:7
728:6 827:12
849:20 853:12
855:1 884:19
885:7 887:19
888:4 892:15
913:9 932:1,4
932:5 936:3
anti-inflamma...
75:21 78:11,15
198:25
anti-inflamma...
77:7,8 161:1
182:22 184:14
186:2 199:24
210:14,17,18
299:21 302:6
303:8 304:11
509:16 618:20
655:4 656:12
Antonio 198:15
anybody 22:17
46:15,18 54:4
74:22,24 78:16
107:4 129:7
138:14,24
144:22 165:14
190:25 222:18
320:17 368:17
381:4 386:1,1
391:25 395:7
411:3 415:9
419:2,7 432:5
437:9,10 451:1
451:4 468:3
541:6 608:7
645:20 649:2
657:24 658:22
666:5 679:9
693:23 714:10
840:4 874:1
884:25 898:9
920:18 933:9
anymore 167:23

356:25 390:24
455:4,8,11
456:21 485:9
567:19 600:3
612:24
anytime 19:19
546:10
anyway 117:4
228:19 361:4
373:18 374:15
440:21 461:13
563:24 634:1
apart 378:9
380:2
apiece 583:13
apologize
221:14 273:25
274:2 316:6
648:17 717:1
739:22 910:24
933:17 940:7
apparent 846:8
apparently 14:7
86:20 122:17
193:17 206:4
313:14 319:16
466:22 578:9
607:4 628:4
648:6,21
692:23 838:12
886:8 895:3
897:14 901:7
appeal 45:12,14
870:11,20,25
871:11
appear 616:18
772:6,17,19
779:1 792:21
816:14 932:2
appearance
366:21 441:11
601:16
appearances 3:1
600:12
appeared 3:3,5
3:8 281:1,3
863:25
appears 104:14
104:17 121:17
123:8,14 779:4
783:1,3 846:2

846:7 908:4
appease 462:1,2
appetite 51:20
364:22 365:1
applicable 35:5
36:6 39:10
40:2,25 42:16
933:11 936:3,6
application 34:6
413:15 504:21
509:7 525:8
583:14 726:14
749:6,7,19
750:14,20
762:11,16,19
781:19,24
785:14 806:22
857:9 862:8
876:7 885:6
906:8
applications
726:1,18
781:21
applied 38:16
42:23 465:6
473:12,13
741:22 750:25
751:4 755:18
773:13 774:19
785:25 789:21
790:23 792:18
799:10 814:21
857:5 858:17
858:20 859:6
862:1 886:22
907:6 912:4,18
913:14
applies 845:9
865:24,25
868:10 887:23
929:22,23
936:1
apply 33:19
41:14,19,20
42:3 264:18
286:15 511:2
522:17 525:13
525:20 562:18
562:21 755:3
845:10,21
879:4 886:18

887:1 890:4
913:23,25
917:24 918:21
922:19,22
923:2,11,18,24
926:5 927:19
applying 35:3
263:25 309:23
448:3 578:10
676:23 750:2
858:1 913:21
913:23
appointed 947:3
appointment
356:10 563:19
appreciate 9:3
26:3 34:1
114:21 209:9
316:13 317:25
329:25 359:7
392:3 483:18
555:20 591:17
622:16 630:24
689:10 693:20
716:10,12
717:5 769:9
777:1,4 785:9
801:14 802:18
885:1 943:18
appreciated
16:7 86:23
606:1 878:22
appreciation
573:17 582:10
775:18
approach
310:14,16
907:23
approached
44:2 238:11
310:17 461:8
approaching
305:4 361:8
appropriate
21:25 206:12
335:11 489:5
829:12 874:24
879:10 888:25
approval 439:21
approved 41:24
42:2 695:11

approximate 257:21 740:20
approximately 48:13 73:16 78:5 83:4,11 83:12 93:13 96:4 98:1 101:11 135:11 136:24 156:13 157:14 165:22 254:23 255:1,8 255:16,23 256:2,8,10 257:5 261:23 262:1,2 274:6 274:7 282:9 284:21 300:17 306:14 331:11 337:9 338:19 340:14 349:4 363:14 364:16 364:18 365:5 367:5 429:2 517:12 518:2,8 548:12,13 549:23 550:16 596:5 601:25 606:25 607:13 608:11 621:6 635:9 638:14 645:15 730:1 740:16 779:9 863:8 920:14
arbitration 1:1 1:2,13,15 27:18 28:11,14 182:8 481:4 886:24 887:1 894:23 947:4,5 947:6
arbitrations 891:16
Arbitrator 868:21
arbitrators 33:18 34:1 252:18 336:16 563:5 570:19 917:11
archived 758:2 758:11

area 19:4 65:5 67:19 147:21 169:3 196:21 196:23,25 298:5 302:13 403:23 404:1,3 404:6 426:18 432:3 635:19 761:21 773:14 773:14 810:7 850:12 906:3
areas 12:18 13:25 65:13 295:22 296:11 297:18,24 318:20 319:3 326:19 333:11 350:17 525:2 727:23 762:4
arguably 41:23
argue 21:24 316:20
argued 773:17 874:19 928:7
arguing 206:11 304:23 485:5
argument 21:19 41:5,16,25 84:23,24 119:9 467:5 719:23 719:25 721:3 842:18 843:20 845:12 883:18 897:21 916:21 918:12,13,15 918:15,23,25 919:2 935:22 935:23
argumentative 304:13
arguments 5:16 30:24 34:24 46:17 109:15 109:16 438:20 480:10 840:6 842:1 843:24 844:4 881:1 916:20
arm 91:2 351:13
arms 681:2
arm-wrestle

722:1
arose 810:7
arrange 640:16
arranged 259:13
arrangement 496:10
arrangements 8:12 14:7 442:11
arrested 483:15
arrive 85:24,25 238:19 584:1 838:13
arrived 455:25 668:12
arrogance 663:9
art 910:23
artfully 283:21
article 37:15,17 37:21 40:4 41:15 55:7 152:6 373:19 390:1 430:17 430:23 431:17 433:24 443:4 445:10,24 446:21,22 448:12,13 457:9 459:20 462:8 473:23 479:10 481:11 578:15 621:3,5 636:23 637:2,4 637:22,23 638:2,21 671:8 671:10,14 672:16 942:3
articles 182:4,5 386:21 387:3,5 387:8 389:17 389:19,23 448:11 479:3 578:8,13 684:6 761:24 871:14
articulate 496:24 685:6 918:7 936:19 936:20
articulated 918:20
Asafa 440:18

Asia 599:4
Asian 608:23
aside 575:11
asking 8:20 22:8 155:21 193:13 193:16 194:12 194:12 195:25 200:22 221:24 228:16 234:22 253:20 267:13 272:15,23 284:21 286:22 287:10 314:11 322:8 326:24 326:25 327:19 331:22 332:21 343:24 370:6 396:18 406:9 423:17 425:13 447:19 448:23 460:6 485:18 494:8 505:10 505:21 537:24 543:10,24 544:7 545:1 657:16 664:14 665:7 672:25 674:4,15 683:23 687:24 687:25 688:1,4 689:8 690:1 703:23 809:14 810:25 824:3 898:9 902:14 903:16 924:2 940:13 943:21
asks 13:6 162:16 162:20 454:10
aspect 249:12 463:5 686:17
aspects 33:16 246:5 286:11 906:22
aspirin 186:4
aspirin-like 903:11
assassination 604:18
assault 570:7
assaulted 495:18

assay 795:7 804:7,15,21 805:23
assemble 166:3 753:18
assembly 65:15
asserted 869:24
assertions 646:12
assess 319:11 716:15
assessed 319:10
assessing 319:21 863:3
assign 252:19
assignment 606:4 633:6
assist 195:15 252:7 491:10 501:8 503:22
assistance 37:17 39:13,17,20,22 39:25 40:5 310:21 311:1,5 311:8,12 496:4 605:22 834:17 835:4 847:17 931:2,3,13,17 931:22,23,25 932:3,5,15 933:9 942:1
assistant 9:4 75:2 83:8,9 143:14 157:10 185:2 199:8,12 207:3 220:18 224:8 226:19 250:8 279:23 485:10 671:25 737:17 896:21 904:22
assistants 884:20
assisted 40:8 324:25
assisting 491:6
associate 485:2 485:4,7 523:1
associated 43:5 427:23,25 525:2 867:11

association 1:1
1:15 30:24
171:4 427:10
427:16 491:24
532:24 553:9
590:2 725:21
813:11 936:6
947:5,6
assume 18:7
22:6 25:17
49:24 104:18
105:25 120:1
126:5 305:14
358:4 421:17
438:1 478:11
483:22 506:13
588:14 667:9
680:7 726:3
758:22 802:15
837:19 838:23
871:17 939:1
assumed 219:9
291:12 665:22
assuming 19:7
21:16 57:6
66:21 106:16
123:18,25
124:10 164:19
189:5 208:11
216:10 393:16
498:21 792:13
795:20 796:7
796:15,20
797:9 837:20
assumptions
118:7,9 926:18
assure 548:4
626:11
assured 637:20
assures 768:9
assuring 589:14
asthma 923:1
ate 191:18
616:22
Athens 388:7
605:11,14
619:7
athlete's 524:4
557:6 800:4
887:20 888:1
890:5,25

athletic 596:1
888:16 936:6
athletics 491:4
Atlanta 1:16
167:1,3 384:23
623:2 947:6
attached 104:15
625:1 709:13
709:21
attachment
104:6 111:20
113:7 127:20
attachments
624:19
attack 807:23
808:3 911:11
917:8 923:23
927:10
attacked 569:22
604:15
attain 531:22
attempt 9:12
38:21 273:20
404:22 408:9
408:12 501:7
538:19,19
551:11 565:6
566:18 651:15
712:19 911:9
911:10 943:15
attempted
536:22 859:22
862:17 893:5
895:24
attempting
206:6 481:6
516:25 532:19
535:4 548:5
564:9 845:15
909:17 915:16
917:7 923:22
attempts 535:5
attend 375:10
499:15 588:8
attended 375:19
attending 225:7
attention 74:3
128:9 167:14
167:24 237:21
278:2 363:11
364:13 373:7

443:3,13 454:1
477:1 479:1
492:25 631:18
632:16 728:12
734:21 741:7
741:24 742:15
745:24 746:17
747:1 842:4
849:24 851:9
854:17 855:6
857:17 866:5
901:10 945:18
attentively
842:6
attorney 2:2,4,6
3:2,4,7 9:8
142:2,3 157:11
182:6 250:8
259:13,16
260:25 303:24
336:15 409:7
420:9 423:25
425:23 449:7
466:1,7 467:24
468:1 486:25
488:18 555:17
566:18 679:5
699:11 730:5
748:13 759:25
760:14
attorneys 181:4
259:8 268:1
293:13 295:21
317:11 336:17
383:16 421:21
443:10 566:12
636:12,13
650:17 651:5
666:10 669:12
669:20 675:19
681:21 699:25
Attorney's
261:2 274:1
294:21 295:5
attorney-client
449:9
attorney/client
423:18 424:20
attributable
608:11
atypical 587:9

audience 65:19
audit 846:2
auditoriums
65:15
August 1:4,19
4:3 65:22
149:13 155:1
156:3 259:2
263:4 266:22
276:3,13 293:8
298:19 301:1
302:9 305:5,23
367:9,13 454:2
537:18,19
540:1,3 563:18
723:2 898:25
946:3 947:8,13
aunt 54:12
649:18
Aurora 2:5
AUSA 250:19
255:14 314:24
332:5
AUSAs 13:21
14:10 250:4
294:16 328:17
auspices 679:24
Austria 618:10
Authenticating
22:11
authority
834:23 835:1
875:7
authorize 179:6
714:10
authorized 29:4
267:2 519:22
899:8
autographs 97:1
automatically
40:1 690:18
autopilot 159:5
availability
716:10
available 7:22
7:24 8:18,21
15:6,17 257:11
315:4,17
521:12 577:7
586:2,3 628:19
628:20 636:17

762:19 790:11
806:16 823:12
854:3 869:13
935:23 944:20
944:21
avenue 3:8 39:9
437:14
avenues 37:9,12
327:2 703:8
average 581:2
734:1 740:23
741:16 742:7
744:5,15,22
745:6 783:14
786:24,25
avoid 29:21
870:25 871:4
875:4,8 907:15
923:19
avoided 907:25
avoiding 57:25
award 933:22
934:14 935:6
awarded 853:8
aware 33:8
69:12 112:25
185:8 215:25
222:22,24
244:18 249:2,5
251:17 269:17
294:13 312:12
316:17 321:24
322:2,3,4
325:13 375:15
380:9 381:21
382:2 387:2
392:9 431:24
473:16,19
494:8 540:5
543:16 544:6
546:4,7 586:2
591:9 595:7
598:4,6 635:6
645:5,23
659:11 693:21
729:20 745:17
750:11 759:22
776:14,22
793:4,15 797:2
798:9 801:24
843:3 873:25

awe 536:16
awfully 774:15
awhile 568:14
　594:4 617:16
　645:3
awkward
　143:20
Ayres 338:25
A-diol 779:8
a.m 1:17 6:1
　86:17 91:14
　262:1 402:1
　468:19 649:14
　649:20

**B**

B 97:20 145:15
　146:21 148:25
　164:13 173:22
　328:12 439:17
　442:19 669:24
　730:19 748:25
　763:4 778:15
　873:6
baby 379:24
background
　178:5 204:25
　233:13,16
　336:25 570:20
　593:23 673:25
　679:22 681:19
　723:24 728:4
　784:22
backgrounds
　595:19
backing 349:23
　682:1
backup 23:4,5
bad 26:9,9,13,14
　26:15 30:8
　216:4 389:15
　389:15 419:6
　420:3 453:20
　538:8 619:15
　694:14 700:4
badly 671:20
baffled 375:24
　434:23
bag 34:23
　129:18,19
　431:11 462:10

462:20 530:16
530:19,20
531:3 541:7
542:21,25
543:5 562:13
578:18 582:1,4
587:11 588:21
747:7,14
862:19
baggage 515:14
bags 176:19
　509:25 510:1
　531:6 586:22
　588:6 697:6
balance 31:15
　31:20 37:22
　102:21 843:2
　843:14 855:12
　855:19,24
　857:4 858:13
　859:4,11,12
　860:1 862:10
　869:18 873:9
　891:7 907:4
BALCO 30:2
　67:14 255:11
　284:16 286:21
　286:23 287:15
　386:18 387:13
　473:23,24
　482:2 493:13
　586:16 636:24
　701:22 847:11
　849:14,15
　869:12,20
bald 381:3
ball 439:11
ballistic 97:18
　98:13
balloon 590:9
balm 509:23
　510:6
ban 35:23 44:22
　870:3,3,10
　914:12,15,18
　914:19 915:17
　916:8 930:24
band 580:7
　581:13
bandwagon
　639:18

bank 175:9
　283:8,10 646:7
　673:6
banking 642:25
bankruptcy
　550:18,23
　551:12 864:18
banned 29:4,5
　66:24 67:3
　77:11 79:15
　137:11,17
　178:25 179:4,7
　186:11 187:9
　223:1 263:7,13
　267:2 274:14
　288:12,16
　289:9,13,16
　296:19 314:5
　317:20 318:21
　318:23 328:25
　329:7 358:21
　369:12,14
　377:3 480:7
　617:20 633:23
　647:18 731:14
　733:9 779:2,4
　848:24 853:23
　856:2,7,12,19
　859:8 867:20
　938:14,25
　940:19
bar 118:22
　568:4,7
Barber 79:2,4
　197:12 220:20
　221:17,23
　224:15 226:5
barely 313:9
Barnes 106:5
barrier 501:10
　594:11
Barring 840:1
bars 161:13
Barton 93:1
base 382:16
　465:4 508:24
　512:3 517:1
　607:7 776:22
　814:22 815:4
　894:7
baseball 64:25

197:4 536:14
725:21 726:5
based 16:2 17:2
　29:18 34:5
　35:5,7,16 36:8
　36:13,21 37:16
　39:12 40:18
　42:22 43:13
　104:20 127:9
　147:24 187:14
　215:2 226:1
　251:25 258:17
　275:17 276:15
　277:6 284:9
　285:14 307:7
　314:25 318:9
　333:10 394:2
　544:6 545:3
　602:8 606:24
　641:6 662:12
　674:5 717:22
　719:4 731:2
　750:4 762:13
　774:6 785:25
　786:1 792:11
　809:22 819:15
　823:11 831:20
　871:18,19
　890:18
baseline 607:1
bases 918:12
basic 598:11
　692:24,25
　911:8 932:11
basically 14:20
　53:21 60:19
　89:14 93:23
　97:16,23 132:3
　149:23 158:14
　167:2 169:23
　170:24 172:16
　174:9 198:20
　233:4 252:1
　262:15 265:8
　265:16,17
　268:9 285:14
　298:23 299:7
　299:14 304:13
　318:4,9 334:13
　334:17 335:1
　408:14 420:21

434:6,9 440:8
450:14 462:2
471:25 474:12
508:22 509:2
510:19 715:8
754:18 879:21
912:10
basis 18:4 42:3
　193:10,24
　235:14 322:17
　324:23 341:5
　392:8 448:21
　485:16 496:12
　598:7 601:3
　612:14 689:21
　703:20 729:16
　811:25 857:13
　883:18 918:20
　936:20,21
bat 290:5 320:1
batch 481:14
Bates 24:17
　104:10 242:10
　709:18 782:15
bathroom
　101:25 102:3
　144:3 592:23
　820:17
baton 99:6
　595:12 597:4
　597:11
battery 38:20
　734:7
battle 546:21
bean 191:14,14
　191:17,19,23
　191:24 192:1
　192:10,12,13
　192:19 193:2,6
　193:7,8,9,10
　193:21 194:13
　194:15,20
　277:5,6,9
　297:25 299:19
　300:14 302:21
　305:21,24
　306:4 901:10
　901:21,23,25
　902:6,8,11
　904:20 938:9
beans 170:23

901:12
bear 321:21
Beasley 99:14
99:25 100:1
beat 340:3
441:21 797:3,7
beaten 538:16
539:18 543:9
566:22
beating 796:25
becoming 337:7
337:20 768:8
875:9 898:23
bed 91:8 95:16
beeswax 508:21
508:22
beeswax-based
508:14
began 61:14
461:8 508:14
553:21 560:1
563:25 564:2
564:17 587:17
730:3 935:13
begged 685:4
beginning 63:20
112:11 181:15
262:20 410:25
415:21 431:4
438:17 491:24
497:15 558:20
656:22 864:19
873:24 892:17
892:20 895:25
900:14
begins 420:20
444:3 481:22
933:22
begun 871:15
behalf 3:3,5,8
271:20 312:16
323:10,18
329:1 381:21
653:5 679:2,2
725:20 728:16
943:15,19
behave 750:24
behavior 544:13
568:20 569:1
574:13 869:18
914:21

Bekele 590:15
belaboring
886:5
belief 465:4
873:9
believed 30:19
30:20 81:6
138:2 226:24
405:3 647:12
683:4 848:11
876:25
believes 590:18
845:1 886:14
believing 669:6
669:6
belly 78:21
101:24
Ben 533:20
benches 411:24
beneficial
269:12 325:25
benefit 33:21,22
33:22 221:25
326:3,4 610:6
763:24 854:3
928:1
BenGay 414:21
Beshawn 607:23
best 66:10 90:7
131:19 134:24
281:3 296:13
371:4 378:25
439:19 489:12
531:17 568:20
586:19 589:4,7
590:8,23 596:3
600:16 657:18
846:4 849:5
862:24 864:4
874:15 896:9
932:10
bestowed 619:11
Beta 763:16,22
764:12,14
765:14 766:2
767:4,6,13
768:3,15,25
769:25 770:12
776:18
Betas 804:14
better 51:25

55:10 62:4,5
83:16 108:6
180:23 217:13
218:19,19,21
218:23 219:17
245:7 275:7
332:17 341:1
347:19 409:6
416:10,16
469:14 479:23
571:23,24,25
597:16 769:3
780:22 804:18
805:15 814:23
832:9 861:9
905:18 914:2
beyond 12:10
167:20 314:13
329:18,19
500:17 548:3
729:2 843:4
853:11 854:6
Bible 382:25
big 26:5 57:15
108:19 129:15
144:15 278:15
279:4 280:7
295:23 360:18
439:11 510:14
625:24
bigger 67:20
341:15 404:7
548:17 767:10
biggest 382:17
bilingual 585:2
bill 53:4 125:4
181:3 376:19
383:15 384:15
384:18,22,24
523:4,9 712:10
726:23 738:13
739:23 790:17
790:25 837:14
884:14 897:4
917:9 924:5
billed 523:1
billing 711:3
billion 770:5
774:21
bills 372:9
376:17,21

384:15
bill's 384:20
bind 886:22
Bioderm 789:9
Biofreeze
339:10 512:25
513:2,2,22
562:7 579:22
582:2
BioMart 144:9
144:10,15
145:5 530:12
542:21,25
543:13,14,17
biomechanical
499:13
biomechanics
591:3
Biotone 339:8
508:25 509:4
510:4 512:15
512:18 513:22
562:6,8 579:20
579:22 580:2,6
580:13,20
582:2 746:18
746:20
bird 363:24
364:1,4
birth 363:7
bit 19:24 27:2
28:4 34:22
51:24 66:21
82:2 90:18
96:18 97:15
99:8,23 100:16
111:11 180:19
180:22 186:9
186:23 196:9
215:14 256:1
278:7 298:6
299:13 323:15
327:3 341:14
341:17 346:19
365:12 376:25
481:19 489:1
503:13 504:25
533:24 540:25
553:23 580:25
581:2 584:23
631:1 682:15

691:10 790:18
829:6
bitten 702:6
bittersweet
615:14
black 5:1 10:4
148:23 154:1
188:17,18,21
189:21 210:4
234:3 360:15
401:5 422:12
423:8 552:24
592:4,5,6
623:2 624:7,8
625:6 626:14
626:17 627:16
628:9,10
704:13 705:10
712:22,25
717:11 718:7
719:6 723:8,15
736:12 738:20
739:16 740:5
740:23 741:17
742:24 744:6
744:16,23
745:7,23 751:7
751:14 756:16
756:23 761:7
762:22 763:25
764:25 770:8
771:17 776:25
777:4 782:6
786:11 788:13
789:11 791:13
796:22 801:13
803:13,22
806:8 807:17
808:21 809:4
809:10 810:8
815:20 818:18
819:6,21 820:8
838:14 857:8
861:20 863:13
899:17 907:2
944:17 945:2,4
BlackBerry
598:18
blacks 553:5
Black's 839:20
945:9,10

blame 234:20
Blankenberg
633:25
Blankenship
4:11 7:10 9:25
70:21 336:7,22
345:15 355:25
357:19,21,25
359:25 360:14
360:25 436:1
856:23 905:21
910:15
Blankenship's
900:24
blanket 694:2
Blend 733:20
734:5 736:6
blessing 380:16
blew 24:9
blinders 692:20
blinking 629:22
blister 82:19
939:17
blocks 97:23
block-clearan...
500:23
blood 67:6,8
301:8 381:8
420:3 750:19
771:10,14,18
772:4,5,8,12
772:25 773:2,4
773:21,22
813:12,13
833:23,25
834:2
blow 590:9
blue 632:13
blur 439:8
board 491:9
571:5 695:22
Bob 492:11
494:14
Bock's 348:25
bodies 692:23
699:2
body 29:17
31:10 39:2
60:16 75:22
76:8 81:25
82:3 88:23

89:6,15,16,22
91:1 93:19,25
94:4 97:17
102:3 128:22
132:12 138:3,7
138:11 143:12
143:25 160:16
160:25 161:10
169:23,25
187:16 188:2
190:13,14
235:14 245:20
341:6 351:11
353:15,17
354:4 383:2
406:21 408:13
417:25 418:13
436:5,5 473:13
481:1 501:16
508:19 563:21
563:22 633:22
694:4 732:1
770:23 771:4
774:11 780:14
780:21 781:12
782:11 794:12
798:20 801:5
815:16 829:4
855:10,21,23
857:6 866:6
877:14,20
886:23 902:19
902:21 903:4
903:14,21
931:19,20
bodybuilder
353:11
bodybuilders
353:9
boilerplate
752:10,12,22
753:5
bold-faced
871:6
bone 203:25
204:3
bonus 71:7,13
71:19 73:5
395:25 396:5
396:11,12,15
396:22 543:25

544:7,17 545:1
545:5 572:11
572:12 573:18
573:20,24
574:6 609:10
609:16,21
611:12,17
863:17
bonused 573:13
573:20,21
574:12
bonuses 514:6
609:7 610:2,3
bonusing 572:17
book 23:22
36:18
bookkeeping
718:21
Boothby 36:19
Boothby's 37:1
border 585:11
bordered 411:24
born 134:14
536:10 716:22
boss 205:1,1
bothered 759:10
bothering 351:3
bottle 82:14
130:9 144:19
161:17,17
176:21,24
246:13 299:16
299:17,18,20
376:13 514:25
542:21,25
576:21 588:5
588:20 734:3
740:24 741:17
742:9 743:12
744:7,16,23
745:7 746:22
747:22 816:9
865:6
bottles 176:14
176:18 337:24
376:10 580:2
583:15 616:5
bottom 24:1
103:24 237:22
279:13 374:20
374:20,21

453:11 479:14
479:15 481:24
482:9 736:4
752:19
bought 161:16
434:17 522:1,3
530:11 877:13
Boulevard
947:16
bounce 326:18
bounces 601:4
Bowers 10:23,25
21:4,5,6
717:25 718:17
box 80:11 228:7
228:9,10,10,14
228:17 358:2
559:7,9,16,16
559:25 560:18
560:21
boxes 559:7
boy 61:8 328:13
371:16 594:23
bracket 816:17
brackets 816:21
bragged 685:24
brain 111:13
162:8
brainstorm
575:2
brand 823:13
branded 603:23
bread 90:8
409:10,12
break 28:4
86:10 101:15
113:11 128:24
131:7 141:25
172:18 176:5,6
179:16 250:3
252:2 268:16
335:12,13
378:14 383:19
383:20,21
468:12,16
486:4 500:21
528:1,25 529:2
554:24 555:2,6
557:6 592:24
594:10 630:23
705:8,10

820:17 821:1
837:13 904:2
breakfast 91:16
92:8,9 96:8,10
breaking 379:23
385:1
breaks 20:10
380:1
breezeway 93:8
93:11,17
Brenda 199:14
Brian 157:13
259:8 679:10
699:12,13
701:12,13
Brian's 699:12
bribe 567:7
714:7,11
715:24
bribes 563:15
bridge 717:15
brief 6:11 25:25
35:24 38:12
41:2 42:8
86:16 102:11
166:9 336:3
385:17 400:21
462:7 468:18
529:7,12
555:25 556:9
592:25 622:11
630:15 663:20
705:12 737:22
824:20 845:3
862:25 868:22
872:5,17 873:1
882:25 904:8
920:23 937:10
briefed 46:14
briefing 34:16
34:21
briefly 33:13
66:16 260:2
330:4 336:25
481:8 490:5
554:3 594:6
598:9 620:2
724:21 844:7
931:1
briefs 21:14,15
23:16 25:20

7-30-07 to 8-01-07 USADA vs. GATLIN

10

46:12 843:21
844:5,9,19
845:11 860:18
861:1
bring 45:16
166:16 167:9
240:16 280:22
282:2 310:14
339:14,17
435:14 456:8
510:14,17
586:19 615:7
626:8 630:17
697:3,4 802:25
810:18 850:4
851:7 883:8,14
895:3 901:9
bringing 288:6
491:9 630:25
883:10
brings 494:20
846:19 848:13
850:20 862:20
Brit 826:21
Brittany 826:16
826:20
Britton 143:17
143:19 199:13
199:15 200:12
201:7,13
204:25 208:23
633:3 635:12
653:18,19
654:5 658:3,17
659:1 826:10
826:13,16
Britton's 659:5
broad 314:9
316:14
broader 771:1
broke 132:19
479:20 480:3
570:2
broken 311:11
bronze 62:2,7
Brooklyn
134:15
brought 164:2
191:6 278:2
281:1 284:6
367:15,20

425:25 427:19
435:11 462:1
494:10 497:23
544:10 571:4
777:23 844:8
863:22 896:9
901:14,15
brown 160:8,18
160:23 177:4
277:22,22
278:7 306:18
375:25 376:2
742:6 743:12
744:5 745:5
876:16 877:2,5
902:8,10
904:14,19
905:8,9 938:9
939:17,19
brown-colored
741:15
brushed 144:2
BS 164:8
buck 658:19
659:1
buddies 371:11
613:24
Bueno 521:15
buffet 616:23
build 97:14
buildup 655:1
built 515:15
bulk 604:2
Bull 470:4
477:10
bullets 874:23
bullet-point
841:21
bullpen 411:21
411:22 412:3
bull's-eye
449:24,25
bunch 94:3
164:8 188:25
642:7,7
burden 18:20
31:8 37:4,10
37:20,20 38:1
619:25 840:20
840:21,25
842:20,24

859:11 860:5
888:20,22
891:14 894:17
898:11 907:4
937:21
Burk 638:12
Burks 168:24
169:10,11
637:1,5,6,12
637:14 671:22
671:22,24
673:15,16,16
burn 418:11
burns 418:14
Burrell 57:19
Burst 741:9,11
741:18 744:3
bury 683:22
bus 96:23
231:11
business 76:6
161:4 337:2
457:6,7 514:17
536:8 549:20
585:18 590:8
606:25 613:10
613:10 617:16
647:5 724:13
725:9 804:21
821:19 822:11
824:16 829:7
busy 516:16
758:14
Butch 728:12
butchering
731:19
butler 892:13
butter 90:8
108:7 409:4,8
409:10 756:10
805:1
buttery 90:17
94:9 128:5
butter-like
789:22 790:8
790:20
button 355:1,5
358:4
buy 77:6 129:2,9
130:9 241:19
245:2,6,7,8

381:13,14,15
512:16,17
513:10 521:4,8
521:10,25
522:5 523:15
523:16,20
530:8 539:7
584:24 618:18
683:18,19
684:10,12,13
685:15 697:11
892:24
buying 511:8
523:5 527:11
527:13 584:14
584:18 585:8
585:12,20,21
675:5
Bye 335:9
Bye-bye 359:15
B-bottle 730:6
B-diol 776:19
b-e-a-n 191:14
B-l-a-n-k-e-n-...
336:23
B-r-i-t-t-o-n
199:18
B.S 453:11,14
453:15 456:9
642:7
B12 75:23 78:20
78:20,22,24
79:6,7,9,11,13
79:15,18 80:3
80:6,11 83:6
158:11,14
159:21,23
185:7 195:21
195:24 219:22
220:1,6 221:23
222:2,9,20,24
227:23,23
228:3 229:1
270:3,8,21
271:3 288:4
298:25 299:9
300:1,23 301:5
301:22 302:20
312:13 393:25
394:1,17
659:19 678:4,6

875:23 876:22
877:19 878:2,4
878:11 938:7
939:12,12

C

CA 2:7
cabinet 581:10
cadets 382:1,10
caked 409:12
calculated
496:19
calculating
872:2
calculations
792:9,18 804:9
calendar 566:4
943:3
calf 351:17,19
442:1,2
caliber 573:16
795:10
calibrated
805:10
calibrations
803:25 805:15
calibrator
806:18
California 78:3
88:6
called 7:14 9:7
10:8 12:4
17:23 18:22
19:12,22 20:4
30:24 53:8
55:6 66:2
73:25 75:1
76:11,14 85:1
91:22 125:2
134:25 135:18
148:2 158:20
162:3 199:3,9
199:10,20
201:6,22
241:14,21
243:1 270:9
283:21 323:14
339:8,11
363:17 373:20
377:10,17,20
396:13 411:21

436:9 487:11
491:12 494:23
508:12 509:1
522:9 530:12
544:22,25
575:7 580:3
584:2,3 613:2
621:13,16
624:13 633:24
637:14,15
638:13,13
646:3,4 651:1
652:1 653:18
673:17 680:13
680:14 692:5
701:9,23 702:5
705:23 733:13
741:9 792:24
824:22 877:5,6
877:23 887:5
928:16,17
940:8
caller 824:8
calling 7:11,15
8:16,17 11:12
11:13,15 12:1
15:25 16:15
21:3 25:17
53:10 141:14
164:6,8 166:2
250:23 290:6
291:11 303:12
358:7 359:7
361:6,6 366:10
366:19 371:16
371:18 439:14
631:18 643:16
643:20 653:25
820:13 834:1
calls 17:3 30:3
65:24,25
163:16 164:17
164:18 165:11
165:16,23
166:13 167:17
268:17 269:4,5
269:9 272:17
276:17 279:21
279:25 280:2
281:5,13,22
282:17,21

284:14,23
286:18 287:6,9
287:11,16
288:11,15
289:8 291:4,19
291:24 292:5
294:4,8,10,13
315:10 319:23
320:1 323:12
324:12 331:14
332:10,14,23
333:2,9,10
535:2 539:13
634:18 652:24
822:14 823:18
823:24 825:17
826:20 848:12
849:22 850:9
850:19 852:17
852:22 864:13
871:24 877:25
878:3,5 881:21
881:21,24
882:8 933:8,8
939:9,10,11
call-in 249:24
250:1 717:19
Calvin 198:4
camera 467:14
489:20
Cameron 139:9
147:23 156:18
157:7,9,12
191:2,4 259:9
259:14,16
450:7 623:13
659:15 670:6
678:5 679:10
699:11,14
700:3,9,22
701:1,22 702:2
730:5 732:9
748:13 760:3,6
777:13,14,22
777:25 778:4
788:21 838:1
Cameron's
701:23
Cammy 145:1
camp 58:8 88:5
185:12,12

198:7 370:3
374:5 565:20
573:14 609:7
684:11
campaign 65:11
132:20
campaigning
482:20
campaigns
85:18
camphor 339:10
339:12
camps 70:14
185:13
canceled 349:19
cancellation
349:8,13,20
356:18
cancellations
356:12
candidates
614:15
candidly 683:9
candy 161:13
cap 583:18
734:3 741:18
744:7 746:23
747:22
capability
824:25
capacity 291:13
291:16 608:1
900:24
Capdevielle
106:4
Capitol 56:17,18
56:21 57:22
88:2 197:7,10
351:24 352:7
455:17 532:10
534:14,25
615:16
Capriotti 71:19
367:14,16,17
388:8 396:14
396:16 468:5
491:5 494:20
544:16,18,21
544:25 545:4
559:18 590:4
606:18 619:4

capsule 734:1
capsules 733:24
733:25 744:14
745:5
captured 281:4
car 54:8 323:14
365:21 369:7
384:25 385:2
carbon 761:8,10
766:12 775:1,3
796:3 818:11
819:9,14
card 65:16
376:19 625:14
625:15
care 29:21 54:18
56:1 187:16,21
187:24 188:1
290:15 342:18
342:19 368:21
372:10,14
374:6 376:17
395:1,14 476:3
564:8 583:6
584:20 585:20
585:21 588:2
612:3 631:24
674:10 675:8
678:1 689:18
848:25 865:2
865:10 866:9
866:12 929:20
929:21,23
930:3
career 48:20
83:1 131:23
175:16 183:15
183:17 195:13
241:4 246:17
292:3,4 294:10
474:13 491:10
635:16 658:24
682:5,9 698:7
698:8 886:4
937:14,17
942:16
careers 861:13
careful 13:15
245:18,19
379:11 434:14
434:15 511:14

541:19 564:10
579:13 586:22
587:3,7 588:12
591:11 616:3
616:19 697:22
Carey 169:3
384:18 712:10
Carl 57:19
Carnitine 740:4
Carolina 56:4
56:12 70:4
72:5,6,16 73:9
73:14 74:10
77:14 103:7
105:13 107:13
135:20 169:3
337:4 338:2
356:4 368:3,6
368:18 378:2
380:18 409:25
416:17
carried 467:12
carry 102:19
132:14 509:8
510:12 513:8
530:16 531:5
840:20,21
888:21,22
carrying 907:4
carry-on 129:18
129:19
Carter 69:20
692:16
Cary 5:8 648:21
711:1
CAS 1:14 2:1
27:22 845:20
845:22 846:2
868:12 870:12
870:21,25
871:11 874:18
875:8 890:6
941:20 943:23
cases 34:11
42:21 45:2,9
251:20 253:8,9
285:11 286:15
286:19 287:3
295:7 473:24
770:22 771:15
785:3 800:11

834:16 858:19
880:13 890:7
890:15 921:24
930:7 942:3,5
cast 464:23
598:13
casualty 27:7
catch 139:2
659:25
catching 357:23
categories 252:2
755:8
categorization
277:1,12
categorize
260:25 298:6
323:8
categorized
277:4
categorizing
42:9
category 298:15
301:9 302:22
360:16 663:1
830:16
Catlin 721:12
caught 27:6
29:22 467:14
915:21
cause 26:13
248:3 320:12
387:6,6,8
397:3 450:17
450:18,20
676:4 703:17
723:11 756:21
769:23 794:18
795:24 796:11
797:17 821:4
831:17 853:5
858:2
caused 29:14
136:8 173:24
212:2 234:17
234:23 235:5
265:6 294:5,7
302:17 419:21
419:24 435:1
450:23 466:17
484:6 501:15
544:7 567:21

574:22,24
586:7 587:7
666:1 671:9
704:4 790:18
877:3 892:22
causes 729:17
causing 632:23
caution 126:25
359:1 894:11
cautionary
489:11
cautions 673:23
674:2
cautious 175:17
511:14
caveat 561:22
718:3
cayenne 339:13
cc 125:5,7,9
ccampbell@c...
2:8
ceased 332:23
Cedric 10:15
430:24,25
431:6,21 432:5
452:9,10
717:23
Celestone 732:4
830:11,12,13
830:15,21,24
831:7,15,16
900:9
cell 9:13 229:21
333:19 334:7
365:23 380:7
386:11 822:13
censure 925:8
central 7:6
630:2 820:24
925:18
Century 1:15
947:6
CEO 145:14
388:9 601:8
619:3
certain 36:7
57:10,18 62:15
71:6 114:16,16
116:14 194:22
252:10 295:22
326:14,18

418:9 426:20
499:13 501:14
522:10 577:7
633:19,20
635:22 639:13
640:13,20
658:17 665:16
679:16 696:24
793:5,16,17
802:7 825:1
827:5 833:25
834:16 842:25
894:7
certainly 15:20
111:14 240:16
251:1 253:25
261:8 286:17
332:9 383:18
468:14 489:13
526:11 528:4
555:5 566:5
587:14 589:8
707:6 736:22
749:21,25
750:13 754:24
758:12 762:4
768:16 769:16
770:14,18
773:5 781:1
783:4,13 793:8
793:23 795:10
795:16 796:1
796:14 797:5,5
799:22 811:11
811:12 814:5
831:9 846:17
858:4 861:13
878:24 880:14
897:18 909:22
911:1 913:11
927:4,5 929:11
932:2 933:3
935:21 942:20
certainty 194:14
768:18 852:24
CERTIFICA...
947:1
certification
504:21 680:2
736:7 752:24
752:25

certified 1:17
417:14 477:23
698:22 725:6
736:3 752:19
752:21 753:12
753:13,15,20
947:3,15
certify 947:4,10
certifying
736:19
cetera 14:6
425:14 571:1
619:16 641:4,4
643:1 700:5
763:20 764:10
822:19
chain 122:8
754:5
chair 487:5
875:16 878:13
chairman
121:25 486:23
486:23 738:10
challenge 36:2
149:7 481:7
663:18
challenged
604:24
champion 48:21
48:22 49:16
59:4 65:12
226:15 419:5
594:13 607:25
championship
48:24 50:1
60:1 88:17,18
140:8 386:14
420:24 480:19
681:1 880:11
championships
52:17 59:11,14
59:17 62:23
63:5 64:12
69:21 70:24
71:7 88:14
116:20 117:2,3
119:11,13
145:9 420:16
440:19 466:24
533:18 572:23
595:12 596:19

596:20 602:16
664:9 666:8
695:10 880:5
chance 134:20
245:3 483:15
595:14 711:14
759:14
chances 395:5
change 86:21
294:2 295:25
298:11 307:12
307:22,25
320:17 347:20
348:14 520:2,4
541:22,23
542:4 550:9,12
559:12 560:14
574:13,14
775:2,2,5
779:17 792:20
802:9 814:16
864:18 907:13
changed 264:13
264:15 309:5
320:10 321:8
341:16 507:20
635:21
changes 341:5,7
857:15
chant 58:4,10
Chapman 2:7
character 457:4
604:18 619:16
638:1 678:12
890:25
characteristics
825:2
characterizati...
303:15,24
304:6,871:3
characterize
304:14 571:2
731:15 930:19
characterized
928:21 930:17
charge 291:17
367:18 569:15
charged 187:13
227:6 261:14
376:20 399:3
729:5 904:25

charges 382:2
charging 96:12
  606:11
Charlie 587:23
chart 104:1
  105:4 106:25
  110:4 112:10
  236:24 242:22
  730:24 795:3
  795:18 798:18
  816:4 818:7,12
  818:18
charts 172:4
  709:4
chastised 405:5
chat 837:8
cheap 523:18
cheat 179:3
  400:2,2 481:4
  481:5 797:8
  844:14,14
  879:20 943:15
cheated 27:10
cheater 441:9
cheating 541:22
  662:22,23
  943:11
check 113:8
  123:11 124:12
  177:1,2 178:6
  207:15 236:20
  380:4 485:16
  693:25 826:3,9
  826:12 865:4
checked 177:3
  228:24 243:19
  375:25 532:13
checking 102:21
  375:21
checklist 131:22
checks 679:23
checkup 301:8
checkups
  301:25
chemical 244:2
  427:1 480:9
  675:10 769:18
  779:2
chemically
  243:24 815:11
chemicals 733:8

733:8 740:15
chemist 423:9
  581:9
chemists 644:19
Cheris 2:4 4:9
  4:20 46:7
  123:1,6 125:1
  125:13 275:24
  276:24 285:22
  317:2 322:14
  335:3 362:16
  362:20 475:3
  570:17,18
  630:8 711:8
  712:3 722:14
  737:11 739:12
  745:21,22
  786:15,17
  791:5 806:5
  814:12,13
  815:14,19
  822:5,5 836:10
  836:11,23
  878:15,16
  880:3,9,17
  881:5 882:4,10
  882:13 911:19
  912:6 913:25
  914:24 915:19
  916:17 920:24
  921:20 934:13
  934:24 937:8
  940:4 944:11
cherry-picking
  606:5
Cheyenne
  947:16
Chicago 3:8
  332:5
chief 16:15 17:7
  17:21 22:19
  622:23 719:1
child 379:12
  380:25 382:5
  383:4 386:2
children 368:24
China 543:17,17
chiropractic
  384:19 518:24
  648:22
chiropractor

698:20
chiro/orthope...
  738:13
chiseled 342:11
  353:13
chocolate 85:22
  743:22
choice 381:3
  835:11 903:20
choose 582:7
  766:13 923:8
chord 675:21
chose 913:2
Chowke 890:17
Christie 492:15
  493:6 701:21
Christmas 57:11
  573:20
Christopher 2:6
  490:12 547:5
Chris's 667:13
chromatograms
  754:1
chromatograp...
  754:6
chronological
  262:16 312:2
church 382:21
  382:22,22
churches 886:8
CIR 29:8,8,10
  105:21 109:20
  110:1,3 111:6
  112:5,7,23,25
  113:1,8,17,21
  113:24 114:2
  114:12,23
  115:7,11,20
  116:2 117:3
  123:15,17
  125:25 126:20
  126:21 127:3,4
  127:7,10,12,17
  134:3 135:8
  146:19 774:25
  780:11 819:1
  831:17,24
  858:8 859:3
  872:22 873:13
  907:17,17
  908:3,4

circle 2:5 3:3,5
  143:6 411:23
  435:8,19,21
  439:16,23,25
  450:2 467:20
  467:22 599:23
circling 145:7
circuit 547:4
  587:12,17
  608:23 662:14
circulated 440:7
circumstance
  39:3 489:2
  538:1 564:15
  840:13 868:7
  879:10 892:2
  924:15 931:5
  932:7
circumstances
  16:21 37:13,24
  38:2 182:9,14
  187:15 464:17
  553:25 619:14
  717:2 842:10
  842:12 843:13
  843:16 846:20
  846:24,25
  847:20,20
  860:15 866:4
  866:17 867:20
  872:16 875:11
  884:21,23,24
  886:3,7,19
  891:21,22
  893:23 894:9
  894:22 899:12
  913:20 914:23
  924:13 931:12
  941:18 942:8
circumstantial
  862:24 863:3
circus 713:11
CIRs 110:10,11
  117:17 119:14
  818:20,21
  857:20 873:18
  873:22,25
  874:1 943:9,12
  943:13
citation 944:7
cited 868:22

890:15
cities 604:17
citing 312:19
City 87:20
  134:13 135:5
  273:11 490:21
  599:3 678:5
civil 614:1 726:2
  729:4,17
CLA 744:12
claim 539:5
  580:14 585:3
  626:24 883:1,8
  883:10 889:6,9
  890:11 892:11
  894:8,8,9
  902:14 915:23
Claimant 1:8
claimed 140:11
  446:10 464:4
  532:16 539:6
  539:16,18
  752:16 860:19
  881:5
claiming 105:19
  656:16 882:22
  894:21
claims 320:19
  466:4 895:13
  896:23 901:25
clarification
  151:12 284:18
  332:18 406:2
  406:10 627:13
  735:20 839:7
clarified 787:9
clarify 106:2,20
  151:4 153:23
  194:11 205:16
  311:16 315:19
  406:6 652:9
  691:15 790:17
  799:6 803:10
  809:5 811:16
  812:19 832:16
  885:12
clarity 61:14
  142:20 808:6
class 382:10
  553:4,11,14,16
classes 52:7 81:4