**BEFORE THE AMERICAN ARBITRATION ASSOCIATION**
**North American Court of Arbitration for Sport Panel**

United States Anti-Doping Agency, )
)
Claimant, )
)
v. )
) AAA No. 30 190 00900 05
George Hartman, )
)
Respondent. )
)

**<u>THE UNITED STATES ANTI-DOPING AGENCY'S MOTION TO DISMISS AMERICANS WITH DISABILITY ACT CLAIMS FOR LACK OF JURISDICTION</u>**

The United States Anti-Doping Agency ("USADA"), by counsel, respectfully submits this *Motion to Dismiss Americans with Disability Act Claims for Lack of Jurisdiction*.

## I. <u>SUMMARY OF USADA'S MOTION TO DISMISS</u>

This case involves a sports drug testing arbitration under the USADA Protocol for Olympic Movement Testing (the "USADA Protocol"). However, the sole defense raised by the Respondent George Hartman in his pre-hearing brief is the claim that, as applied to him, USA Judo's drug testing rules conflict with Titles II[1] and III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 1218142 *et seq*. Because, as a matter of law, a sports doping arbitration under the USADA Protocol is not a proper forum in which to raise Respondent's ADA claims USADA respectfully requests that the Panel promptly issue a pre-hearing ruling dismissing

[1] Respondent asserts that Title II of the ADA is applicable through § 504 of the Rehabilitation Act due to the fact that USADA receives federal financial assistance. Respondent is incorrect, however. Title II of the ADA applies only to public entities. A "public entity" is expressly defined in Title II of the ADA as:

(A) any State or local government;
(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and
(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of Title 49).

42 U.S.C.A. § 12131. Thus, there can be no legitimate claim that Title II of the ADA applies to USADA. Accordingly, Title II will not be discussed further in this brief.

Dockets.Justia.com

Respondent's ADA claims. Furthermore, in order to conserve resources for the Panel and the parties, and in order to facilitate the orderly and fair administration of this case, USADA requests that the Panel rule on this threshold legal issue well in advance of the hearing, before USADA's pre-hearing brief must be filed and prior to considering any other issue in relation to this case.

USADA's motion to dismiss Respondent's ADA claims is based on the following grounds:

1. The only explicit remedy provided for in the ADA is an action for injunctive relief in federal court. Therefore, any provision to arbitrate ADA claims must be "unmistakably clear."

2. The arbitration agreement in this case is the USADA Protocol which does not invest the Panel with authority to consider ADA claims.

3. USADA is not a "public accommodation," within the meaning of Title III of the ADA, therefore, even if an ADA claim could otherwise be brought in an arbitration under the USADA Protocol, USADA would not be a proper party to defend against Respondent's ADA claim. For these reasons, and as explained below, Respondent's ADA claims must be dismissed.

## II. FACTUAL BACKGROUND

Respondent is a 32 year-old judo athlete who was has been enrolled in the USADA out-of-competition testing pool since October, 2004. Respondent's March 2, 2005, out-of-competition urine sample was positive for the prohibited anabolic steroid testosterone.

Respondent's counsel contends that Respondent was administered testosterone by his coach and physician due to erectile dysfunction syndrome and hypogonadism. However, Respondent did not have, and had not applied for, a therapeutic use exemption ("TUE") for use

of testosterone at the time of the test and did not disclose his use of testosterone on his doping control official record at the time he provided his urine sample.

Respondent was charged in writing on July 12, 2005 with a first doping offense. Respondent's initial request for a TUE did not come until August 24, 2005. This request was denied due to incomplete documentation. Rather than appeal the denial of his initial TUE request, on December 14, 2005, Respondent filed a new TUE application to the International Judo Federation ("IJF").[2] Neither of the TUE applications submitted by Respondent contain any medical documentation which pre-date Respondent's March 2, 2005, positive urine test. In the event his TUE application to the IJF would be rejected, Respondent could appeal that decision to the World Anti-Doping Agency and subsequently to the Court of Arbitration for Sport. *See* WADA Code §§ 4.4 and 13.3.[3]

## III. DISCUSSION OF USADA'S MOTION TO DISMISS

### A. For ADA claims to be arbitrable the intent of the parties to arbitrate them must be "clear and unmistakable."

The exclusive forum made available in the ADA for challenging a violation of Title III of the ADA is federal district court.[4] Title III makes applicable the remedy provision of the Civil Rights Act (found at 42 U.S.C. § 2000a-3(a)). Section 2000a-3(a) makes clear that the remedy contemplated is injunctive relief in federal court, providing:

---

[2] Under the applicable rules including the WADA Code and the USADA Protocol, athletes who are in the IF's registered testing pool or who have entered international competition must apply to their IF for a TUE. This is in contrast to National-level athletes in the U.S., who may apply to USADA for a TUE. *See* WADA Code § 4.4.

[3] The cases are clear that CAS arbitration panels do not have authority to consider and grant permission to use medicinal products. The TUE process assigns the initial investigation and inquiry regarding an application for a TUE to independent, expert medical professionals to consider the application strictly on the basis of medical science.

[4] The title of the original legislation in which Section 2000a-3 was contained made clear that it was intended only to authorize a suit for injunctive relief in a court of law calling it a "bill . . . . **to confer jurisdiction upon the district courts of the United States** to provide injunctive relief against discrimination in public accommodations[.]" 1964 U.S. Code Cong. & Admin. News, p. 2355, 2391 (emphasis added).

> [w]henever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice prohibited by section 2000a-2 of this title, **a civil action for preventive relief,** including an application for a permanent or temporary injunction, restraining order, or other order, may be instituted by the person aggrieved and, upon timely application, **the court may, in its discretion, permit the Attorney General to intervene in such civil action** if he certifies that the case is of general public importance. . . .

(emphasis added).

In the context of arbitration provisions in collective bargaining agreements, the United States Supreme Court has said that "the right to a federal judicial forum [contained in the ADA] is of sufficient importance to be protected against less-than-explicit . . . waiver" in an arbitration agreement. *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 80, 119 S.Ct. 391, 396 (1998). Therefore, while ADA claims may be considered by arbitration panels if there has been an explicit agreement to arbitrate the ADA claim, it is clear that ADA claims may be considered in arbitration <u>only</u> if the agreement of the parties to refer such matters to arbitration is "clear and unmistakable." *Wright*, 525 U.S. at 81, 119 S.Ct. at 397. This means, at a minimum, that the arbitration agreement must explicitly refer to discrimination claims and likely means that the ADA must be specifically identified. *Id.*

**B. The USADA Protocol does not invest the Panel with authority to consider ADA claims.**

The USADA Protocol constitutes the arbitration agreement applicable to this dispute. This fact has been confirmed by the parties' stipulation which provides that the USADA Protocol including the WADA Code provisions apply to the "hearing for an alleged doping offense involving USADA specimen number 485340." *See Stipulation of Uncontested Facts and Issues Between USADA and George Hartman* at Paragraph 1.

It is well established that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which she has not agreed so to submit." *AT&T*

*Technologies, Inc. Communications Workers*, 475 U.S. 643, 648 (1985). Arbitrators are limited to the decision-making authority conferred upon them by the arbitration agreement. *McDonnell Douglas Fin. Corp. v. Pennsylvania Power 7 Light Co.*, 858 F 2d 825, 831-832 (2nd Cir. 1988) (courts must "carefully consider" whether the parties to an arbitration agreement intended the dispute at issue to be submitted to arbitration); *Mantle v. Upper Deck Co.*, 956 F.Supp. 719, 739 (N.D. Tex. 1997).

Whether an issue is subject to arbitration is a simple matter of contract interpretation. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). Therefore, the threshold legal question this Panel must determine is whether the claim of discrimination asserted by Respondent falls within the scope of the USADA Protocol. *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289, 122 S.Ct. 754, 762 (2002) ("Absent some ambiguity in the [arbitration] agreement, . . . it is the language of the contract that defines the scope of disputes subject to arbitration."); *Paine Webber, Inc. v. Hartman*, 921 F.2d 507, 511 (3rd Cir. 1990)(dispute is "arbitrable if it is determined a valid agreement to arbitrate exists between the parties and the specific dispute falls within the substantive scope of the agreement").

The Respondent does not contend that the USADA Protocol contains any provisions providing for the arbitrability of ADA claims, and the USADA Protocol clearly does not. In fact, the USADA Protocol plainly excludes all claims except those arising under specified sport rules. For instance, section 3 of the USADA Protocol provides:

> 3. **Choice of Rules**
> In conducting drug testing and results management under this Protocol for Olympic Movement Testing (the "Protocol"), USADA will be bound by the following rules:
>
> a. Those Articles of the WADA Code which must be incorporated into the rules of every anti-Doping

> Organization and are set forth in Annex A. Annex A is incorporated by reference into this Protocol.

The Results Management Section of the USADA Protocol states:

> USADA shall notify the athlete or other person in writing whether USADA considers the matter closed or alternatively what specific charges or alleged violations that will be adjudicated and what sanction consistent with the WADA Code, IF rules or the USOC ADP, USADA is seeking to have imposed.
>
> . . .

USADA Protocol Section 10(a). Further, section 10(d) provides:

> In all hearings conducted pursuant to the Protocol, the requirements set forth in the WADA code shall apply. If no WADA Code requirements is applicable, then, subject to paragraph 3(f), the IF anti-doping rules, the USOC ADP and the Protocol shall apply.

This same language is contained in R33(e) of the AAA Supplementary Procedures for the Arbitration of Olympic Sport Disputes and attached as Annex E to the USADA Protocol. Thus, an examination of the USADA Protocol reflects that there is no language from which a "clear and unmistakable" agreement to arbitrate ADA claims could possibly be construed. Therefore, Respondent's ADA claims must be dismissed because the arbitration agreement does not authorize them to be considered in this forum.

**C. USADA is not a "public accommodation," within the meaning of Title III of the ADA.**

Finally, even if the USADA Protocol expressly permitted the arbitration of ADA claims, Title III of the ADA is inapplicable upon its own terms. Title III of the ADA applies only if USADA is a "public accommodation" within the meaning of 42 U.S.C.A. § 12181(7). This statutory provision lists a great many types of public places, all of which have the common denominator of being places where the public gathers to obtain goods or services or to watch an event. USADA plainly does not fit within any of the listed examples of public accommodations.

Respondent's argument that USADA is a public accommodation is based upon 42 U.S.C.A. §§12181(7)(C), (D) and (L) which provide that public accommodations include:

> **(C)** a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;
> **(D)** an auditorium, convention center, lecture hall, or other place of public gathering; . . . and
> **(L)** a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

On their face the foregoing locations clearly do not describe USADA. Therefore, Respondent argues that "USADA **and** USA Judo are subject to the mandates of Title III of the ADA as private entities that own, lease or operate a place of public accommodation"[5] and that "USADA **and** USA Judo's tournaments take place at places of public accommodation."[6] Yet, these descriptions of USADA are plainly false and not supported by any evidence relied upon by Respondent. USADA does not operate any place of public accommodation. Rather, USADA is an independent contractor which provides athletic drug testing, sample collection, and results management to the United States Olympic Committee and its member organizations, including USA Judo.

Pursuant to the USADA Protocol the national governing body (NGB) of the athlete who has tested positive is not a party to the arbitration. The only parties may be the athlete (or other person, such as a coach, against whom the doping charge has been made), USADA, WADA and the IF. USADA Protocol § 10(b). Generally, the only parties with appeal rights are the athlete, USADA, WADA, the IF and in certain cases the IOC, International Paralympic Committee or an affected Anti-Doping Organization. WADA Code (Annex A) § 13.2.3. Therefore, ADA claims against USA Judo cannot be adjudicated in a USADA arbitration proceeding because, as an

[5] Respondent's Brief at 17 (emphasis added).
[6] Respondent's Brief at 23 (emphasis added).

NGB, USA Judo cannot be a party to such a proceeding under the plain terms of the arbitration agreement, i.e., the USADA Protocol.

Respondent argues at length that USADA is a proper party to an ADA claim, relying to a large extent on *PGA Tour, Inc. v. Casey Martin*, 532 U.S. 661 (2001). However, the *Martin* case underscores why USADA is not a proper party and why a USADA arbitration is not the proper place to address Respondent's ADA claims. One of the crucial questions in many cases under Title III, and certainly in *Martin*, was whether the defendant failed to make reasonable modifications in its procedures and whether the modification sought would "fundamentally alter" the nature of the services provided. Title III provides that a violation is "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, *unless the entity can demonstrate that making such modifications would fundamentally alter the nature* of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii) (emphasis added).

The question in the *Martin* case was whether the elimination of the walking rule for Casey Martin would fundamentally alter the game of tournament golf. The similar question raised by Respondent's counsel is the contention that elimination of the prohibition against the use of testosterone would not, in the case of Respondent, fundamentally alter the sport of elite, competitive judo.

In *Martin* resolution of the fundamental alteration of the game question required detailed factual testimony in the trial court and intricate parsing and analysis of the Rules of Golf by the witnesses and ultimately by the Supreme Court. *See Martin*, 532 U.S. at 682 – 691. The need for such a detailed factual inquiry about the rules of the game is precisely why a doping

arbitration under the USADA Protocol is not the proper place for a trial of Respondent's ADA claim. USADA does not have detailed experience in the rules of Judo and is not as well positioned as USA Judo or the IJF[7] to address Respondent's argument that the use of testosterone by a competitor would not fundamentally alter the nature of the sport of judo. The appropriate place, if any, for such an inquiry is in federal court should Respondent decide to challenge the application of Judo's anti-doping rules to him in a lawsuit under the ADA.[8]

## IV. CONCLUSION

For the reasons set forth above, USADA respectfully requests that this Panel dismiss all claims of discrimination alleged by Hartman against USADA as such claims fall outside the scope of the arbitration agreement, the USADA Protocol, and this Panel's authority.

February 15, 2006.

Respectfully submitted,

Travis T. Tygart
General Counsel
1330 Quail Lake Loop, Suite 260
Colorado Springs, Colorado 80906
Telephone: (719) 785-2031
Fax: (719) 785-2028

William Bock, III
Kroger, Gardis & Regas, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
Telephone: (317) 692-9000
Fax: (317) 264-6824

[7] USADA notes that Respondent will have an opportunity to arbitrate claims against the IJF if he so chooses should the IJF deny his request for a TUE. USADA expresses no opinion whether such an arbitration would be a proper place for the consideration of ADA claims.

[8] A federal court would also be an appropriate forum to consider whether the provisions of the ADA, as applied to Hartman's case, have been pre-empted or in any way conflict with the Ted Stevens Olympic and Amateur Sports Act which provides that the exclusive remedy for addressing athletic eligibility decisions is provided by the United States Olympic Committee Constitution.

## CERTIFICATE OF SERVICE

The undersigned certifies that service of the foregoing has been accomplished by serving the foregoing upon the following parties, via facsimile and electronic mail this 15th day of February, 2006.

Allen Rosenberg
Rosenberg & Sklar
1301 Arlington Ridge Rd., Suite 501
Arlington, VA 22202
rosencoach@aol.com

Christopher Campbell
515 Oak Manor Drive
Fairfax, CA 94930
campbellsportslaw@comcast.net

Margery Gootnick
46 Knollwood Drive
Rochester, NY 14618
mgootnick@ix.netcom.com

Michael S. Straubel, Esq.
Valparaíso University Sports Law Clinic
651 South College Avenue
Valparaiso, IN 46383
mike.straubel@valpo.edu

# AMERICAN ARBITRATION ASSOCIATION
## North American Court of Arbitration for Sport Panel

In the Matter of the Arbitration between

United States Anti-Doping Agency, Claimant
and
George Hartman, Respondent
Re: 30 190 00900 05

## AWARD OF ARBITRATORS

WE, THE UNDERSIGNED ARBITRATORS ("Panel"), having been designated by the above-named parties, and having been duly sworn and having duly heard the proofs and allegations of the parties, and, after hearings held on May 3, May 4 and May 5, 2006, do hereby render its full award pursuant to its undertaking to do so by June 19, 2006.

1. Summary

Respondent tested positive for testosterone in a March 2, 2005 Out-of-Competition drug test. He admits being administered testosterone, but argues that his testosterone treatment was medically necessary as a result of his disability.[1] Respondent requested that his two-year period of ineligibility be reduced under the Exceptional Circumstances provision of the World Anti-Doping Code ("Code") Article 10.5. In addition, Respondent requested protection under the Americans with Disability Act ("ADA"). For the reasons explained below, the Panel finds that Respondent failed to sustain his burden of proof that he suffers from a disability. As a consequence, the Panel imposes a two-year period of ineligibility, along with other sanctions as required by the Code.

[1] For privacy reasons, the Panel will not identify the symptoms or alleged disability.

2. Parties

2.1 Claimant, USADA, is the independent anti-doping agency for Olympic Sports in the United States and is responsible for conducting drug testing and any adjudication of positive test results pursuant to the United States Anti-Doping Agency Protocol for Olympic Movement Testing, Effective as Revised August 13, 2004 ("USADA Protocol").

2.2 The Respondent, George Hartman, is a member of the United States Judo Association ("USA Judo").[2] In 2005, Respondent was ranked number two in the United States under the 100kg weight category. Respondent has been in the USADA's Out-of-Competition testing pool since November of 2004.

3. Jurisdiction

3.1 This Panel has jurisdiction over this doping dispute pursuant to the Ted Stevens Olympic and Amateur Sports Act ("Act") §220521 because this is a controversy involving Respondent's opportunity to participate in national and international competition for his NGB. The Act states:

> **An amateur sports organization is eligible to be recognized, or to continue to be recognized, as a national governing body only if it . . . agrees to submit to binding arbitration in any controversy involving . . . the opportunity of any amateur athlete . . . to participate in amateur athletic competition, upon demand of . . . any aggrieved amateur athlete. . ., conducted in accordance with *the Commercial Rules of the American Arbitration Association, as modified and provided for in the corporation's constitution and bylaws.* .**
> .(emphasis added)

*Ted Stevens Olympic and Amateur Sports Act § 220521.*

[2] USA Judo is a National Governing Body ("NGB") as defined by the Ted Stevens Olympic and Amateur Sports Act (the "Act").

3.2 Under its authority to recognize an NGB[3], the United States Olympic Committee ("USOC") established National Anti-Doping Policies, effective August 13, 2004 ("USOC Policies"), which provide:

> **. . .NGBs shall not have any anti-doping rule which is inconsistent with these policies or the USADA Protocol, and NGB compliance with these policies and the USADA Protocol shall be a condition of USOC funding and recognition.**

*National Anti-Doping Policies*, ¶13.

3.3 Regarding athletes, the USOC Policies provide:

> **. . .By virtue of their membership in an NGB or participation in a competition organized or sanctioned by an NGB, Participants agree to be bound by the USOC National Anti-Doping Policies and the USADA Protocol.**

*National Anti-Doping Policies*, ¶12.

3.4 In compliance with the Act, the USADA Protocol, Article 10 (b), provides that hearings regarding doping disputes "will take place in the United States before the American Arbitration Association ("AAA") using the supplementary Procedures."[4]

4. Background and Procedural Facts.

4.1 On March 2, 2005, as part of an out-of-competition drug test Respondent provided a urine sample #485340 ("Sample") at the request of a USADA Doping Control Officer. The UCLA accredited laboratory ("UCLA Lab"), which conducted the test, received the Sample on March 4, 2005. On March 9, 2005, the laboratory performed a screening test on the Sample. The screening test indicated the Sample was negative for any prohibited substance under the Code. On March 28, 2005, Claimant sent a letter to Respondent informing him of this negative test.

[3] Act, §220505(c)(4).
[4] The supplementary procedures refer to the American Arbitration Association Supplementary Procedures for the Arbitration of Olympic Sport Doping Disputes, as approved by the USOC's Athletes' Advisory and NGB Councils.

4.2 However, as a result of the low epitestosterone levels in the Sample, on March 30, 2005 the UCLA Lab conducted additional testing with Carbon Isotope Ratio ("CIR"). Using this method, the Sample tested positive for Testosterone. Thereafter, On May 5, 2005, Claimant informed Respondent of this positive test.

4.3 On May 7, 2005, Respondent requested that the B Sample be analyzed. On June 3, 2005, Claimant reported that the B Sample test confirmed the positive A Sample.

4.4 On July 12, 2005, the USADA Anti-Doping Review Board ("Board") recommended, among other things, a minimum two-year suspension from the date Respondent accepted the sanction. The Board's recommendation also provided that all of Respondent's competitive results would be cancelled retroactive to March 2, 2005.

4.5 Respondent was also advised of his right to contest the sanction proposed by Claimant by requesting a hearing before a panel of North American Court of Arbitration for Sport ("CAS") arbitrators who are also American Arbitration Association ("AAA") arbitrators in accordance with the USADA Protocol. Respondent advised Claimant of his election to proceed to arbitration, and by letter dated July 29, 2005, Claimant formally initiated this arbitration.

4.6 On August 23, 2005 Respondent became eligible to participate, and accepted a position to compete as part of USA Judo's team, at the 24th World Judo Championships held in Cairo, Egypt, starting September 8, 2005. As a result, Claimant requested an expedited hearing under USADA Protocol, R-7. Arbitrator Carolyn Witherspoon presided over the expedited hearing and ordered that the substantive hearing be conducted no later than August 31, 2005.

4.7 On August 26, 2005 the Panel conducted its first, of many, telephonic preliminary hearing with Mr. Tygart and Respondent. Respondent was not represented by counsel because he could not afford one. Given the complicated nature of these proceedings, the Panel urged Respondent to seek the assistance of the USOC Athletes Ombudsman to obtain an attorney that

could represent him on a pro bono basis. The Panel also inquired why Respondent had not accepted a provisional suspension.

4.8 On August 28, 2005, Respondent accepted a provisional suspension. In addition, Respondent informed the Panel that the Athletes Ombudsman was attempting to locate counsel for him. For these reasons, the Panel vacated the August 31, 2005 hearing date.

4.9 On September 9, 2005, Respondent informed the Panel that the Athletes Ombudsman had located an attorney that would represent him on a pro bono basis. Mr. Michael Straubel of Valparaiso University Law School had agreed to represent Respondent as part of the Law School's Sports Law Clinic program. Mr. Straubel is the Director of the Valparaiso Sports Law Clinic.[5] Thereafter, a second preliminary hearing was scheduled for September 12, 2005.

4.10 After the September 12, 2005 preliminary hearing, the Panel ordered the following: (1) the parties were to keep the Panel updated on the status of the Therapeutic Use Exemption ("TUE") application, (2) by October 3, 2005, the Respondent was to advise Claimant whether he would raise the ADA as a defense[6], and (3) witness lists, exhibits and briefs were to be filed by Respondent on October 14, 2005 and by Claimant on October 28, 2005. The hearing was reschedule for November 14 & 15, 2005.

4.11 Respondent's counsel requested that the November 14 & 15, 2005 hearing date be vacated because the TUE process was taking longer than he had anticipated. He wanted that process completed before the hearing. Claimant did not object. Therefore, the briefing schedule and hearing date was vacated.

4.12 On December 20, 2005, David Askinas (a Panel member) recused himself from the Panel because he had accepted the position of Executive Director of an NGB. Margery F.

[5] This Clinic provides pro bono legal services for Olympic athletes who cannot otherwise afford legal representation. Mr. Anthony Calando and Mr. Stephen Starks were the Valparaiso students representing Respondent in this proceeding.
[6] Respondent advised Claimant of the ADA defense on a timely basis.

Gootnick was named in his place. Thereafter, through a series of preliminary hearings[7], the hearing was set for May 3 through May 5, 2006 in Mesa, Arizona. The parties stipulated to a briefing schedule.

4.13 On January 30, 2006, Respondent filed his pre-trial brief, which contained an ADA defense. On February 15, 2006, Claimant filed a motion to dismiss Respondent's ADA defense for lack of jurisdiction. Claimant supplemented this Motion on March 1, 2006. Claimant's motion and supplemental motion requested that the Panel rule on whether it had jurisdiction over Respondent's defense before the evidentiary hearing scheduled to start May 3, 2006. On March 3, 2006, Respondent filed a "Motion to Join USOC and clarify USA Judo as a party." After the Panel reached its decision regarding the ADA jurisdictional issue, it received Respondent's Motion to Dismiss USADA's Lack of Jurisdiction Motion on Timeliness Grounds.

4.14 On March 10, 2006, the Panel held it would not rule on Claimant's motion to dismiss Respondent's ADA defense until Respondent "had an opportunity (through a full evidentiary hearing) to establish that he had a disability that would enable him to seek relief under the World Anti-Doping Code ("Code"), Article 10.5." The Panel informed the parties that it would use "the ADA's definition of a disability and controlling case law in its Article 10.5 analysis." It was the Panel's view that there was no reason to decide the ADA jurisdictional issue, as a case of first impression, if Respondent could not sustain his burden of proof that he had a disability under the Panel's Article 10.5 analysis.

4.15 The Panel also denied, without prejudice, Respondent's motion to implead and join the USOC and USA Judo. The Panel informed Respondent that if it found that he had a disability and justice required; it would entertain Respondent's motion to join USA Judo and the USOC, organize a briefing schedule, and establish hearing dates.

[7] The Panel had scheduled the hearing dates for March 7 through March 8 in Phoenix, Arizona. At the request of the Respondent, this hearing date was likewise vacated.

4.16 From reviewing parties' initial briefs, it was apparent the Panel's decision would be largely influenced by the testimony of expert witnesses. As a consequence, the Panel determined it was appropriate to obtain evidence from an independent medical expert on the question of Respondent's disability (pursuant to its authority to do so under the Supplementary Procedures for the Arbitration of Olympic Sport Doping Dispute, R-45(e)) because: (a) this testimony would involve complicated, conflicting medical and scientific arguments; (b) the athlete was asserting a disability, a significant issue in the Olympic movement;[8] (c) Respondent's ADA defense was a case of first impression for an AAA panel; (d) the Respondent could not afford an attorney and therefore would certainly not be able to afford any expert witness other than his own doctor; and (d) the Panel felt obligated to ascertain the truth of the matter.[9]

4.17 The Panel requested the parties input regarding the selection of the independent medical expert. Over the objection of Claimant[10], the Panel eventually retained the services of Dr. Roger E. Johnsonbaugh, an endocrinologist practicing in Phoenix, Arizona. The Panel requested, but emphasized that it did not order, that Respondent submit to an Independent Medical Exam ("IME") by Dr. Roger E. Johnsonbaugh. Respondent submitted to the IME, and Dr. Johnsonbaugh's report was provided to the parties the day before the hearing, on May 2, 2006.

5. Stipulations

The parties stipulated to the following:

1. That the USADA Protocol for Olympic Movement Testing governs the hearing for an alleged doping offense involving USADA specimen number 485340;

2. That the mandatory provisions of the World Anti-Doping Code ("WADA Code") including, but not limited to, the definitions of doping, burdens of proof,

[8] Under the Act, §220503, the USOC is required to encourage and provide assistance for athletes with disabilities and §2205524(7) requires the NGBs to encourage participation by individuals with disabilities.
[9] Other AAA panels have used the services of independent medical experts when faced with conflicting expert testimony. *See* USADA v. Vencil, AAA No. 30 190 00291 03 (July 30, 2003).
[10] USADA argued that the panel did not have the authority to hire an independent medical expert. Further, USADA argued that the panel should not hire an expert that would prove Respondent's case.

Classes of Prohibited Substances and Prohibited Methods, sanctions and the international Standard for Therapeutic Use Exemptions, and contained in USADA Protocol at Annex A are applicable to this hearing for the doping offense involving USADA specimen number 485340;

3. That Mr. Hartman gave the urine sample designated as USADA specimen number 485340 on March 2, 2005, as part of the USADA Out-of-Competition testing program;

4. That each aspect of the sample collection and processing for the A and B bottles of USADA specimen number 485340 was conducted appropriately and without error;

5. That the chain of custody for USADA specimen number 485340 from the time of collection and processing at the collection site to the receipt of the sample by the World Anti-Doping Agency accredited laboratory at the University of California in Los Angeles ("UCLA Laboratory") was conducted appropriately and without error;

6. That the UCLA Laboratory's chain of custody for USADA specimen number 485340 was conducted appropriately and without error;

7. That the UCLA Laboratory, through accepted scientific procedures and without error, determined the sample positive for the administration of exogenous testosterone or its precursors in both the A and B bottles of USADA specimen number 485340;

8. That on August 25, 2005, Mr. Hartman submitted an application for a Therapeutic Use Exemption ("TUE") to USADA for the use of Testosterone Cypionate in the treatment [of his alleged medical condition];

9. That Mr. Hartman agreed to provide USADA with copies of any and all documents submitted by him to the International Judo Federation ("IJF") concerning his TUE application and to copy USADA on any and all correspondence between Mr. Hartman and the IJF regarding his application for a TUE;

10. That Mr. Hartman agreed that the presence of exogenous testosterone or its precursors in both the A and B bottles of USADA specimen number 485340 is a first doping offense;

11. That the Parties agreed the period of ineligibility will be a maximum of two (2) years beginning on the date of the hearing panel's decision with credit being given for the time Mr. Hartman has served a provisional suspension beginning on March 28, 2005, to a minimum of one (1) year beginning on the date of the hearing panel's decision with credit being given for the time Mr. Hartman has served a provisional suspension beginning on March 28, 2005;

12. That Mr. Hartman reserved his right to argue applicable defenses only for the purposes of seeking a reduction in the two-year period of ineligibility under the applicable rules;

13. That Mr. Hartman will be disqualified from and forfeits any and all competitive results, if any, received subsequent to March 2, 2005, the date that USADA specimen number 485340 was collected. . .

6. Parties Arguments

6.1 Respondent makes several arguments. First, that he is disabled under the ADA and that Claimant and USA Judo have discriminated against him on the basis of his disability. Second, that §504 of the Rehabilitation Act should preclude both Claimant and USA Judo from discriminating against him because they are entities which receive federal government funding. Third, there are Exceptional Circumstances which explain and justify Respondent's inability to apply for a TUE. Fourth, Respondent was taking testosterone injections as a medical necessity. Fifth, Respondent's injection of testosterone were not performance enhancing. They only brought him back to levels slightly below those of a normal male.

6.2 Respondent supported his arguments with the testimony of the following witnesses: (1) Alexandra Hartman, Respondent's wife; (2) Jeffrey Sitzler, Respondent's training partner; (3) Dr. Walter Van Helder, Respondent's treating physician; and (4) Respondent. The Panel found the testimony of Respondent's witnesses to be credible, with the exception of the testimony of Dr. Van Helder and certain aspects of Respondent's testimony.

6.3 Claimant refutes Respondent's arguments. First, Claimant argues that Respondent's disability discrimination claims fail as a matter of law because the claims are not arbitrable under the arbitration agreement, the USADA Protocol for Olympic Movement Testing. Second, the ADA does not apply to Claimant in this proceeding under Title I, II, and III or under the Rehabilitation Act. Third, the ADA does not create an exemption for athletes in Respondent's circumstances to use prohibited steroids. Fourth, even if such an exemption could be created it would be inappropriate for the Panel to do so in this arbitration. Fifth, Respondent

has failed to establish that he is disabled and needs testosterone for any legitimate medical reasons. He has not submitted credible medical evidence that he has an "impairment which substantially limits a major life activity", the ADA standard. Sixth, that Respondent's failure to apply for a TUE during the two-year period he was taking testosterone eliminates any possibility of a reduction in the period of ineligibility that should be imposed. Claimant alleges that the TUE process is entirely consistent with the ADA and Respondent's failure to follow it eliminates any legitimate ADA claim as well as any claims that Exceptional Circumstances exist. Seventh, even if Respondent has a disability recognized by the ADA, he is unable to establish that the administration of testosterone is a reasonable and necessary medical treatment under the circumstances. Finally, even if Respondent has a disability and establishes that the administration of testosterone by his doctor is reasonable and necessary, this accommodation if granted by the Panel would fundamentally alter the nature of the sport of judo and would jeopardize the health and safety of other competitors.

6.4 Claimant supported its arguments with the testimony of the following witnesses: (1) Dr. Richard Auchus, an associate processor of endocrinology and metabolism and internal medicine at the University of Texas, Southwestern Medical Center at Dallas; and (2) Dr. Harrison J. Pope, a professor of psychiatry on the faculty of Harvard Medical School in Boston and director of biological psychiatry laboratory at McLean Hospital. The Panel found the testimony of Claimant's expert witnesses (together with the testimony of the Panel's independent expert, Dr. Johnsonbaugh) to be credible and controlling in this matter.

7. Disability Analysis

7.1 Under the WADA Code International Standard, Anabolic Agents, including testosterone, are listed as substances and methods prohibited at all times (in-and out-of-competition). In stipulation number 10, Respondent concedes that he has committed a first

doping offense under Article 2 of the Code as a result of taking testosterone. Article 2 of the Code provides:

> **The following constitute anti-doping rule violations:**
> **2.1 The presence of a Prohibited Substance or its *Metabolites* or *Markers* in an *Athlete's* bodily Specimen.**
> **2.1.1 It is each *Athlete's* personal duty to ensure that no *Prohibited Substance* enters his or her body. Athletes are responsible for any Prohibited Substance or its *Metabolites* or *Markers* found to be present in their bodily Specimens. Accordingly, it is not necessary that intent, fault, negligence or knowing Use on the *Athlete's* part be demonstrated in order to establish an anti-doping violation under Article 2.1.**

*Code*, Article 2.

7.2 Sanctions for Article 2 violations are provided for in Article 10:

> **. . . The period of Ineligibility imposed for a violation of Articles 2.1 . . .**
> **• First violation: Two (2) years' Ineligibility. . .**
> **However, the Athlete or other person shall have the opportunity in each case, before a period of Ineligibility is imposed, to establish the basis for eliminating or reducing this sanction as provided in Article 10.5.**

*Code*, Article 10.2.

Article 10.5.2 allows the Respondent to argue for a reduction in his sanction, it provides:

> **. . . If an *Athlete* establishes in an individual case involving such violations that he or she bears *No Significant Fault or Negligence*, then the period of *Ineligibility* may not be less than one-half of the minimum period of *Ineligibility* otherwise applicable. If the otherwise applicable period of *Ineligibility* is a lifetime, the reduced period under this section may be no less than 8 years. When a *Prohibited Substance* or its *Markers* or *Metabolites* is detected in an *Athlete's* Specimen in violation of Article 2.1 (Presence of Prohibited Substance), the *Athlete* must also establish how the *Prohibited Substance* entered his or her system in order to have the period of *Ineligibility* reduced.**

*Code*, Article 10.5.2.

Respondent's standard of proof is provided in Article 3 of the code:

> **3.1 Burdens and Standards of Proof.**
> **. . .Where the *Code* places the burden of proof upon the *Athlete* or other *Person* alleged to have committed an anti-doping rule violation to rebut a presumption or establish specified facts or circumstances, the standard of proof shall be by a balance of probability.**

*Code*, Article 3.1.

7.3 Once you parse through all the medical arguments in this case, it is clear that Respondent argues that he suffers from a disability caused by a head trauma that somehow interferes with the Respondent's pituitary gland producing the luteinizing hormone (LH) (the hormone required for the production of testosterone).[11] He contends this disability allows the Panel to reduce his period of ineligibility under Article 10.5.2 and the ADA.[12]

7.4 Respondent's physician and expert witness, Dr. VanHelder, testified that the 2003 blood test that showed his level of testosterone at 256 ng/dL confirms that he suffers from this pituitary gland problem.[13] In rebutting that testimony, Dr. Auchus testified that while it was acceptable to screen patients with a random total testosterone level for the symptoms Respondent was exhibiting (the only diagnostic test employed by Dr. VanHelder), it was improper to confirm a diagnosis of Respondent's alleged disability with only one random blood test.[14] Dr. Auchus' view was supported by the Panel's independent medical expert, Dr. Johnsonbaugh.[15]

7.5 Dr. Van Helder's diagnosis was flawed because he failed to do confirmatory tests which include morning measurements of total testosterone, initial measurements of LH (as noted above), FSH and prolactin, and an assessment of free testosterone. [16] These confirmatory tests were necessary, in part, because testosterone levels are not consistent during the day.[17] There is a strong diurnal rhythm and pulsality. Both of which factors influence testosterone levels.[18] Due to the phenomenon of pulsality, testosterone concentrations taken only 20 minutes apart can have about a twenty percent (20%) difference.[19]

[11] Transcript of Proceedings, *USADA vs. George Hartman* AAA No. 30 190 00900 05, Mesa, Arizona, ("Transcript"), pp. 222, 292 (May 3, 2006 through, May 5, 2005).
[12] Article 10.5 allows for the elimination of the period of ineligibility in 10.5.1, *No Fault or Negligence*. The parties have stipulated (number 11) that this provision does not apply as Respondent will serve at minimum a one year period of ineligibility.
[13] Transcript, p. 237-238.
[14] Transcript, p. 481-494
[15] Panel Exhibit 1, ¶9.; Transcript, p. 194.
[16] Transcript, pp. 490-494.
[17] Transcript, pp. 482-483.
[18] Transcript, pp. 483; 540-541.
[19] Transcript, pp. 485-486; 540.

7.6 Dr. Auchus testified that because of the existence of a diurnal rhythm, testosterone levels are properly measured in the morning.[20] The single testosterone concentration measurement relied upon by Dr. VanHelder was taken in the afternoon.[21] The variability in random testosterone concentrations caused by diurnal rhythm varies even "more than" 20%. There can be "a much greater change" when dealing with measurements taken hours apart.[22] "[F]or the vast majority of young people, there is a considerable difference between the morning levels and the afternoon levels."[23] "[V]alues as low as 100 in the afternoon are seen in people who have values as high as 500 in the morning."[24] Therefore, there is no reasonable scientific basis upon which Respondent's single testosterone concentration measurement in the afternoon of May, 2003 can be considered low. Not only was it within the normal range of values; but, due to variability caused by diurnal rhythm and pulsality, Respondent could have had registered values higher than 500 on that same day.[25] Because the appropriate tests were not undertaken Respondent's precise range cannot be known, and there is no basis for a conclusion that Respondent's testosterone levels fell below the normal range. The Panel's independent medical expert confirmed Dr. Auchus' conclusions, Dr. Johnsonbaugh stated: "I think he gave testosterone to a patient who had a normal testosterone level."[26]

7.7 In addition, Dr. Auchus testified that confirmatory testing of free testosterone levels (which Dr. VanHelder did not do as part of his diagnostic work up) is necessary because "the amount of . . . hormone binding globulin, varies from person to person."[27] "[M]ost people who have a low normal level of total testosterone . . . have low levels of this binding protein, so . . . they don't need as much total testosterone to generate . . . a normal amount of the biologically

[20] Transcript, pp. 483-484.
[21] *Id.*
[22] Transcript, pp. 486-487; 538.
[23] Transcript, p. 540.
[24] Transcript, p. 538.
[25] Transcript, p. 538.
[26] Panel Exhibit 1, final paragraph.
[27] Transcript, p. 491.

active free testosterone."[28] "So if Dr. Van Helder had any question about whether the total testosterone was normal or not, it's imperative to measure the free testosterone by an accurate method."[29] Dr. VanHelder improperly failed to measure free testosterone before reaching his diagnosis.[30] Moreover, even two years after his diagnosis when he first attempted to measure free testosterone he failed to use an accurate measuring technique. [31]

7.8 Furthermore, the very evidence produced by Dr. VanHelder demonstrated that in 2005 Respondent's pituitary gland was functioning normally with respect to the production of Growth hormone, Prolactin, TSH and Cortisol.[32] In other words, all the hormones produced by the pituitary gland were functioning within normal ranges with the exception of those that would have been suppressed by the exogenous administration of testosterone (luteinizing hormone (LH) and FSH).

7.9 To refute this conclusion, Dr. Van Helder testified a head injury could cause the selective reduction of the LH harmones in the pituitary gland.[33] Dr. Van Helder stated: "There is something which is preventing the cells which secrete LH. . . to secrete those hormones properly, and I don't know what that something is. I believe it's a repetitive trauma. I have no way to know or not to know." Respondent submitted no medical evidence showing a head injury occurred, and Respondent's medical records were devoid of any references to a head injury. Given the above, the Panel finds Dr. Van Helder's head-trauma theory speculative.

7.10 The more likely explanation is that the pituitary gland is functioning normally and the two-year exogenous, administration of testosterone has suppressed the LH production in a normal functioning pituitary gland.[34]

---

[28] *Id.*
[29] *Id.*
[30] Transcript, p. 492.
[31] *Id.*
[32] Transcript, p. 254, 292.
[33] Transcript, p. 258.
[34] Panel Exhibit 1, ¶9; Transcript, pp. 498-502

7.11 Moreover, the value of 0.0 of LH found in Respondent's September, 2005, blood test is almost certainly reflective of suppression due to his exogenous testosterone use because even if the pituitary were not functioning properly it would probably still secrete some testosterone; "about the only thing that can cause [the complete absence of LH] is exogenous administration of androgens or estrogens."[35]

7.12 For the reasons stated above, the Panel finds that Respondent failed to sustain his burden of proof that he suffers from "a physical or mental impairment that substantially limits one or more of the major life activities" (i.e., he has a disability) that would allow him to seek a reduction in his period of ineligibility under Article 10.5.2 of the Code. Moreover, as Respondent has failed to sustain his burden of proof on this issue, it is not necessary or appropriate for the Panel to consider the parties arguments regarding the ADA.

8. Medical Treatment Analysis

8.1 While Respondent does not satisfy the Exceptional Circumstances test under 10.5.2 on the basis of a disability, he can still argue for a reduction of his period of ineligibility on the grounds that he was obtaining legitimate medical treatment for his symptoms. In WADA v/ Lund (CAS OG 06/001), the athlete was taking hair replacement medicine. In that case, the panel actually gave the athlete less than a one-year suspension by starting the period of ineligibility from the time of the test, not the hearing. In Squizzato v/ FINA (CAS 2005/A/830), the athlete tested positive for trace amounts of steroids as a result taking a foot fungus medication. Her two-year period of ineligibility was reduced to a one-year suspension under Article 10.5.2. In Vlasov v/ATP (CAS 2005/A/873), the athlete sought legitimate medical treatment for depression. As a result of this medical treatment, he tested positive for a stimulant, Pemoline. His two-year period of ineligibility was likewise reduced to one year.

[35] Transcript, p. 507.

active free testosterone."[28] "So if Dr. Van Helder had any question about whether the total testosterone was normal or not, it's imperative to measure the free testosterone by an accurate method."[29] Dr. VanHelder improperly failed to measure free testosterone before reaching his diagnosis.[30] Moreover, even two years after his diagnosis when he first attempted to measure free testosterone he failed to use an accurate measuring technique.[31]

7.8 Furthermore, the very evidence produced by Dr. VanHelder demonstrated that in 2005 Respondent's pituitary gland was functioning normally with respect to the production of Growth hormone, Prolactin, TSH and Cortisol.[32] In other words, all the hormones produced by the pituitary gland were functioning within normal ranges with the exception of those that would have been suppressed by the exogenous administration of testosterone (luteinizing hormone (LH) and FSH).

7.9 To refute this conclusion, Dr. Van Helder testified a head injury could cause the selective reduction of the LH harmones in the pituitary gland.[33] Dr. Van Helder stated: "There is something which is preventing the cells which secrete LH. . . to secrete those hormones properly, and I don't know what that something is. I believe it's a repetitive trauma. I have no way to know or not to know." Respondent submitted no medical evidence showing a head injury occurred, and Respondent's medical records were devoid of any references to a head injury. Given the above, the Panel finds Dr. Van Helder's head-trauma theory speculative.

7.10 The more likely explanation is that the pituitary gland is functioning normally and the two-year exogenous, administration of testosterone has suppressed the LH production in a normal functioning pituitary gland.[34]

---

[28] *Id.*
[29] *Id.*
[30] Transcript, p. 492.
[31] *Id.*
[32] Transcript, p. 254, 292.
[33] Transcript, p. 258.
[34] Panel Exhibit 1, ¶9; Transcript, pp. 498-502

8.2 The Panel accepted as true Respondent's testimony that he was suffering from symptoms that led him to seek medical treatment. In addition, Respondent responsibly and appropriately sought the assistance of a doctor, Dr. Van Helder, who had a sports medicine background.[36] Indeed, given Respondent's stated symptoms, Dr. Auchus confirmed that Respondent's initial treatment of testosterone on July 21, 2003 was medically and scientifically appropriate.[37] This was not true for the additional treatments starting on August 18, 2003.

8.3 Nevertheless, the Panel is unwilling to reduce Respondent's period of ineligibility on the facts of this case for the following reasons:

8.3.1 Contrary to Respondent's assertions, the systematic administration of testosterone is an accepted ergogenic aid, "clearly increase[ing] strength" in a "dose response relationship.[38] In fact, testosterone can possibly be strength enhancing "even in doses that would be considered physiologic" for persons suffering from the disability Respondent claims he has.[39] Respondent thus had an unfair advantage in competing against other Judo Players from 2003 onward.

8.3.2 Dr. Van Helder claimed that even with the testosterone injections Respondent's testosterone "level really never came anywhere close to an average person. . . at any time whenever we treated him."[40]This assertion was flatly inconsistent with the testimony of Dr. Auchus that it is well established that a 300 milligram shot of testosterone will raise blood levels of testosterone above 2,000 ng/dl and that blood levels "are well above normal for at least three days."[41]

8.3.3 The gaps in Dr. Van Helder's administration of testosterone coincided with major Judo competitions. In other words, Respondent went off of his injections at least thirty days prior to major competitions.

[36] Transcript, p. 201. Dr. Van Helder testified his second specialty was sports medicine.
[37] Transcript, p. 554.
[38] Transcript, p. 549.
[39] Transcript, p. 550.
[40] Transcript, p. 245.
[41] Transcript, pp. 501-504.

8.3.4 Dr. Van Helder has been a Judo coach in the Olympic movement for decades.[42] He claims a specialty in sports medicine (treating professional and amateur athletes[43]). He talked about following the Ben Johnson case, and understanding that Ben Johnson was caught because he failed to come off of his steroid treatments within the appropriate amount of time. One of the most incredible statements Dr. Van Helder made was that he did not know that the use of testosterone under a doctor's care could cause an athlete to test positive.[44] He testified that he did not realize that testosterone was a banned substance in the Olympics or Major League Baseball.[45] How could anyone interested in sport, living in America, and having a sports medicine background make such outlandish claims.

8.3.5 Respondent repeatedly testified that he was taking testosterone as part of his legitimate medical treatment. It was his medicine, not a performance enhancing drug. The Panel believes that, arguably, this is what Dr. Van Helder told Respondent. If true, Respondent's testimony is eerily consistent with athletes who were unwittingly doped as part of state-sponsored doping programs in Germany and China.[46]

8.3.6 Testosterone is not some obscure drug on the Code's ban substance list. Regardless of what Dr. Van Helder told Respondent, Respondent either knew or was responsible for knowing that the administration of testosterone is prohibited by the Code.

8.3.7 To allow Respondent a reduction in his period of ineligibility on the facts of this case would seriously undermine the fight against doping in sport. The behavior exhibited by Dr. Van Helder and Respondent in this case cannot be tolerated.

[42] He was a Judo coach for the Russian National Judo team and also was Respondent's coach at various times.
[43] He testified he was the physician for the Chicago Cubs during their winter training in Arizona. Transcript, p. 206.
[44] Transcript, pp. 466-467.
[45] Transcript, p. 467.
[46] See *For Power and Glory: State-Sponsored Doping and Athletes' Human Rights*, Sports Lawyers Journal, Volume 13, p. 1 (Spring 2006).

9. Provisional Suspension

9.1 At the hearing, Claimant disclosed that Respondent had competed in a local Judo tournament on November 5, 2005. However, Claimant did not argue that Respondent had breached the Provisional Suspension Agreement and some additional sanction was appropriate.

9.2 The parties agreed that Claimant would file written submissions on this issue by May 11, 2006 and Respondent would respond by May 24, 2006. Neither party made written submissions by their deadlines. Further, neither party requested an extension before the expiration of their deadline. However, on June 7, 2006, Claimant sent the Panel a letter from USA Judo stating that they sponsored the local tournament and it was covered by the Provisional Suspension Agreement.

9.3 Because the Claimant has not requested any additional sanctions be imposed regarding this issue or modifications to the agreed stipulations, the Panel will not adjust the beginning period of ineligibility stipulated to by the parties.

10 Decision and Award

On the basis of the foregoing facts and legal aspects, this Panel renders the following decision:

10.1 Respondent has committed his first doping offense under the WADA Code, Article 2.

10.2 The following sanctions shall be imposed on Respondent:

10.2.1 A two-year period of ineligibility commencing August 28, 2005 through August 28, 2007, including his ineligibility from participating in U.S. Olympic, Pan American or Paralympic Games, trials or qualifying events, being a member of any U.S. Olympic, Pan American or Paralympic Games team and having access to the training facilities of the United States Olympic Committee Training Centers or other programs and activities of the USOC

including, but not limited to, grants, awards, or employment pursuant to the USOC Anti-Doping Policies;

10.2.2 The retroactive cancellation of all competition results and awards occurring after August 18, 2003 and the date of this Award.

10. 3 The administrative fees and expenses of the American Arbitration Association totaling $750.00 shall be borne entirely by the United States Olympic Committee, and the compensation and expenses of the arbitrators and expert witness totaling $62, 770.87 shall be borne entirely by the United States Olympic Committee.

10.4 This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

10.5 This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

6/19/06
Date

Christopher L. Campbell, Chairman

Date

Allen Rosenberg, Arbitrator

Date

Margery Goodnick, Arbitrator