IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

CASE NO. 08-13572-F

U.S.D.C. No. 3:08cv241/LAC/EMT

---

JUSTIN GATLIN,

*Plaintiff-Appellant,*

v.

UNITED STATES ANTI-DOPING AGENCY INC.; USA TRACK AND FIELD,
INC.; UNITED STATES OLYMPIC COMMITTEE; and INTERNATIONAL
ASSOCIATION OF ATHLETICS FEDERATIONS,

*Defendant-Appellees.*

---

## MEMORANDUM OF DEFENDANT-APPELLEE INTERNATIONAL ASSOCIATION OF ATHLETICS FEDERATIONS IN OPPOSITION TO APPELLANT'S MOTION FOR INJUNCTION PENDING APPEAL

---

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA

---

Eugene D. Gulland
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 662-6000
Facsimile: (202) 662-6291

*Counsel for The International Association of Athletics Federations*

## *GATLIN V. U/S. ANTI-DOPING AGENCY, INC., ET AL.*

## *CASE NO. 08-13572-F*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Defendant-Appellee International Association of Athletics Federations submits this list, which includes the trial judge and all attorneys, persons, associations of persons, firms, partnerships or corporations that halve an interest in the outcome of this case:

1.   Lorene Jon Bielby, Esq.

2.   Honorable Lacey A. Collier

3.   Covington & Burling

4.   Joseph Z. Fleming, Esq.

5.   Justin Gatlin

6.   Bryan S. Gowdy, Esq.

7.   Greenberg Traurig, P.A.

8.   Eugene D. Gulland, Esq.

9.   International Association of Athletics Federations

10.  John K. Londot, Esq.

11.  John S. Mills, Esq.

12.  Mills & Creed, P.A.

13.  Robert C. Palmer, III, Esq.

14.  Brigid F. Cech Samole, Esq.

**CERTIFICATE OF INTERESTED PERSONS AND**
**CORPORATE DISCLOSURE STATEMENT**
(Continued)

15.   Elliott H. Scherker, Esq.

16.   The Honorable Elizabeth E. Timothy

17.   United States Anti-Doping Agency, Inc.

18.   United States Olympic Committee

19.   USA Track and Field, Inc.

20.   Wade, Palmer & Shoemaker, P.A.

21.   Zarzaur Law, P.A.

_____
Eugene D. Gulland

## OPPOSITION OF THE IAAF
## TO APPELLANT'S MOTION FOR INJUNCTION PENDING APPEAL

Defendant-appellee International Association of Athletics Federations ("IAAF") opposes in the strongest terms the motion of plaintiff-appellant Justin Gatlin for an injunction pending appeal. It is hard not to feel sympathy for a talented young athlete who made the mistake of using performance-enhancing drugs with the harsh consequence that he is disqualified from competing in the sport he loves. But that sympathy must give way to the stark fact that Mr. Gatlin cannot satisfy the high standards for obtaining the "extraordinary remedy of an injunction pending appeal." *Touchston v. McDermott*, 234 F.3d 1130, 1132 (11th Cir. 2000).[1]

*First*, Mr. Gatlin has no chance — let alone a substantial likelihood — of succeeding on the merits. As the district court recognized, Mr. Gatlin may not relitigate or collaterally attack the ruling of the unanimous international arbitration tribunal — the Court of Arbitration for Sport ("CAS") — that upheld his disqualification under international sports rules and procedures. *See Slaney v. IAAF*, 244 F.3d 580 (7th Cir. 2001). This principle is rooted in two important

---

[1]     *Touchston* provides that "the petitioners must show: (1) a substantial likelihood that they will prevail on the merits of the appeal; (2) a substantial risk of irreparable injury to the intervenors unless the injunction is granted; (3) no substantial harm to other interested persons; and (4) no harm to the public interest."

interests: (1) the need to uphold the laws, treaties and rules according finality to (and restricting judicial review of) arbitration awards, and (2) the need to respect U.S. law and international sports rules that prevent national courts from intervening in disputes over the eligibility of athletes to compete in the Olympic Games and other contests. In addition to this fatal flaw in Mr. Gatlin's case, we show below that he is unlikely to prevail on his ADA claims even if he could relitigate the issues.

*Second,* the balance of equities and public interest considerations incline decisively against Mr. Gatlin. The IAAF and other defendants in this case — like sports organizations throughout the world — are engaged in a long, tough battle against performance-enhancing drugs. Athletes will not be deterred from using prohibited substances unless they think that sanctions will be swift and sure, and that their rivals are not gaining a competitive advantage from cheating. In 2006, Mr. Gatlin defeated many rivals in races while, it was later discovered, he had used prohibited exogenous testosterone. Those past rivals have no remedy for what Mr. Gatlin's cheating stole from them. But they and all other athletes have the strongest interest in enforcing sanctions after the cheating is discovered. Otherwise, the credibility of the sanctions is eroded, the integrity of international competition is compromised, cheating appears to be rewarded, and athletes will wonder whether it is only fools who play by the rules.

## BACKGROUND

The IAAF is the international sports federation that governs international track and field competitions. It was created by its members, the track and field governing bodies of more than 200 nations and territories. The IAAF's offices are in Monaco and it has no presence in the United States.[2] It appears here for the limited but important purpose of resisting Mr. Gatlin's motion for an injunction pending appeal against IAAF.[3]

We will not try to duplicate the impressive presentations that defendants USOC and USADA made below in opposition to Mr. Gatlin's motion for a preliminary injunction. The IAAF seeks, however, to emphasize the importance of protecting the integrity and independence of the system for resolving disputes about the eligibility of athletes to compete in international competition. In years past, the IAAF and other international sports federations encountered many situations in which athletes sought the assistance of their national courts to overturn eligibility determinations made under the rules and procedures of

---

[2]    The IAAF has not yet been served in this case, and it will contest the district court's power to exercise personal jurisdiction over it. *See Reynolds v. IAAF*, 23 F.3d 1110 (6th Cir. 1994) (holding that there is no personal jurisdiction over the IAAF).

[3]    Last weekend, plaintiff-appellant transmitted electronic mail notices to IAAF's head-quarters in Monaco of (i) the district court's TRO entered late Friday afternoon, June 20, and (ii) the hearing on the preliminary injunction scheduled for 8:30 am on Monday, June 23. These notifications were neither seen nor read until Monday morning, June 23, and IAAF was unable to secure counsel in time to attend the hearing.

international federations.  Frequently the national courts were, or at least appeared to be, biased in favor of their countrymen.  The risks inherent in this situation are fairly summarized in Judge Posner's observation that "there can be few less suitable bodies than the federal courts for determining the eligibility, or the procedures for determining the eligibility, of athletes to participate in the Olympic Games." *Michels v. USOC*, 741 F.2d 155, 159 (7th Cir. 1984).  It was necessary to create a structure for resolving eligibility disputes that would guarantee fairness to athletes while preventing intervention and interference by national courts.  That structure consists of two tiers of arbitration, conducted in accordance with adversarial trial-type procedures that guarantee due process.

In this case, Mr. Gatlin was accorded a three-day hearing before a panel of the American Arbitration Association in 2006.  That panel ruled, in a lengthy written opinion, that Mr. Gatlin should be suspended for four years dating from May 25, 2006.  Mr. Gatlin then invoked the second tier of arbitration — a *de novo* proceeding before CAS, which is an independent international arbitration tribunal seated in Switzerland and governed by Swiss arbitration laws.  The CAS tribunal (consisting of Canadian and Swedish law professors and a prominent Swiss lawyer) received extensive written submissions and conducted two days of evidentiary hearings on May 28-29, 2008.  The live hearing was physically held in New York, for the convenience of Mr. Gatlin, his family (who attended), and

witnesses, but governed by Swiss law. Mr. Gatlin presented the same claims before CAS that he alleges in his complaint — including purported violations of the Americans With Disabilities Act ("ADA"). On June 6, 2008, the CAS tribunal unanimously upheld Mr. Gatlin's four-year suspension, and ruled that his suspension should run from July 25, 2006.

Mr. Gatlin does not, and could not, challenge the fairness of the arbitration proceedings. He does not contend that the arbitrators acted *ultra vires*, denied him due process, or committed any other error of the sort that would be sufficient to vacate an arbitration award. But in this action, Mr. Gatlin seeks to relitigate the issues resolved against him by the AAA and CAS arbitrators, and to collaterally attack their determinations. Mr. Gatlin, in other words, impermissibly seeks to have a national court intervene on his behalf to set aside an eligibility determination made in accordance with international sports rules and procedures.

## ARGUMENT

I. **Mr. Gatlin Misstates The Applicable Standard Governing An Injunction Pending Appeal.**

Mr. Gatlin argues that this Court's unpublished opinion in *Gonzalez v. Reno*[4] established a special relaxed standard for injunctions pending appeal under which the applicant's burden of showing success on the merits is "substantially less strict

---

[4] No. 00-11424-D, 2000 U.S. App. LEXIS 7025, *4 (11th Cir. Fla. Apr. 19, 2000).

than the 'substantial likelihood of success on the merits' element required to obtain a preliminary injunction." (Mot. at 4.) Mr. Gatlin infers this special rule from the Court's statement in *Gonzalez* that the applicant must show that it is "likely to prevail on the merits" rather than "substantially likely," or words to that effect. (*Id.*) This bald assertion is refuted by this Court's later published opinion in *Touchston*, which expressly requires applicants to show "*a substantial likelihood that they will prevail on the merits of the appeal.*" 234 F.3d at 1132 (emphasis added).

*Gonzalez*, moreover, recognized that the likelihood of success on the merits is "generally the most important" factor in weighing requests for an injunction pending appeal. 2000 U.S. App. LEXIS 7025, *4. But the Court concluded that it faced a unique situation in which the grant of an injunction would not adversely affect any other party and would be consistent with the public interest, so that a brief delay in deportation of Elian Gonzales was especially justified in light of the court's "doubt . . . about the correctness of the INS's interpretation" of the applicable law. *Id.*, at *8-9. Here, by contrast, there is no basis for any genuine doubt about the merits and it is clear that other persons and the public interest would be adversely affected by grant of an emergency injunction.

## II. Mr. Gatlin Cannot Show A Substantial Likelihood That He Will Prevail On The Merits Of His Appeal.

Because Mr. Gatlin is appealing the denial of a preliminary injunction, he will have to show that the district court's ruling was an abuse of discretion. *See McDonald's Corporation v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998). Far from an abuse of discretion, the district court's ruling was manifestly correct.

### A. The CAS Award Cannot Be Relitigated Or Collaterally Attacked In U.S. Courts.

In *Slaney v. IAAF*, the Seventh Circuit held that an athlete could not challenge her suspension under international doping rules in federal district court after the issues had been resolved against her in an arbitration. 244 F.3d at 590-92. The arbitration in *Slaney* was conducted under internal IAAF procedures, before track and field athletes could appeal to CAS, an independent international arbitration tribunal that must comply with the demanding requirements of Swiss law. In this case, the arguments for relitigating or collaterally attacking the arbitration award are accordingly even weaker than were Ms. Slaney's.

The prohibition against relitigating or collaterally attacking international athletic eligibility determinations reflects the broader principle that an arbitration award is a "binding adjudication on the merits" that cannot be relitigated in U.S. courts under the New York Convention (the multilateral treaty requiring signatory nations to recognize and enforce arbitration awards) and Chapter II of the Federal

Arbitration Act, 9 U.S.C. §§ 201, *et seq. Fotochrome, Inc. v. Copal Co., Ltd.*, 517 F.2d 512, 517 (2d Cir. 1975); *see also Industrial Risk Insurers v. M.A.N. Gute. GmbH,* 141 F.3d 1434, 1440-44 (11th Cir. 1998). The same principles of finality and standards prohibiting review of the merits apply to domestic arbitration awards under Chapter I of the FAA. *See LaPine v. Kyocera Corporation,* 2008 U.S. Dist. LEXIS 41172 (N.D. Cal. May 23, 2008).

Mr. Gatlin's extended argument about whether the Amateur Sports Act preempts the ADA and Rehabilitation Act (Mot. at 7, *et seq.*) cannot help him because Mr. Gatlin already submitted those statutory issues to arbitration and is bound by the arbitrators' rulings. "[S]tatutory claims," including claims under federal anti-discrimination laws "may be the subject of an arbitration agreement." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (holding that age discrimination claim was subject to compulsory arbitration). "'By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial forum.'" *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). A party that submits statutory issues to arbitration must abide by the result "'unless Congress itself has evinced an intention to preclude waiver of judicial remedies for the statutory rights at issue.'" *Id.* (quoting *Mitsubishi Motors*, 473 U.S. at 628).

Congress has evinced no intention to preclude waiver of judicial remedies for antidiscrimination statutes, including the ADA and Rehabilitation Act. In fact, the ADA explicitly endorses arbitration: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under this chapter." 42 U.S.C. § 12212. This language "demonstrates Congress did not intend to exclude the ADA from the scope of the [Federal Arbitration Act]." *Miller v. Pub. Storage Mgmt.*, 121 F.3d 215, 218 (5th Cir. 1997). Indeed, employees may be compelled to agree to arbitrate claims based on any form of discrimination, including alleged violations of the ADA. *See Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1313-15 (11th Cir. 2002).

Accordingly, the CAS award resolved the statutory claims as they relate to Mr. Gatlin's eligibility to compete. "[U]nconditional submission of an issue to arbitration, without any objection to the arbitrator's authority to decide that issue, cedes authority to the arbitrator, or represents consent to arbitration of that issue." *Rock-Tenn Co. v. United Paperworkers Int'l Union*, 184 F.3d 330, 334 (4th Cir. 1999) (internal quotations omitted); *see also, e.g., Nghiem v. NEC Elec., Inc.,* 25 F.3d 1437, 1440 (9th Cir. 1994) ("a party may not submit a [statutory] claim to arbitration and then challenge the authority of the arbitrator to act after receiving an unfavorable result") (quotation omitted); *Jones Dairy Farm v. Local No. P-*

*1236, United Food & Commercial Workers Int'l Union,* 760 F.2d 173, 175-76 (7th Cir. 1985); *Piggly Wiggly Operators' Warehouse, Inc. v. Piggly Wiggly Operators' Warehouse Independent Truck Drivers Union, Local No. 1,* 611 F.2d 580, 584 (5th Cir. 1980); *Gardner v. Shearson, Hammill & Co.,* 433 F.2d 367, 368 (5th Cir. 1970) (*per curiam*) (voluntary submission of statutory claim to arbitration precludes relitigation in federal court).

As the district court correctly recognized, the Amateur Sports Act ("ASA"), 36 U.S.C. §§ 220501, *et seq.*, establishes another reason why Mr. Gatlin cannot challenge the CAS ruling in this case. The ASA vests in the USOC the exclusive authority for determining the eligibility of US athletes to participate in the Olympic Games, and courts have no jurisdiction over lawsuits seeking to establish eligibility. 36 U.S.C. § 220503(3); *Slaney,* 244 F.3d at 594-95; *Lee v. U.S. Taekwondo Union,* 331 F. Supp.2d 1252 (D. Haw. 2004). Moreover, as addressed below, the ASA does, in fact, preempt the ADA in relation to eligibility determinations.

### B.     Mr. Gatlin Would Be Unlikely To Prevail On The Merits of His ADA Claims.

Based on its initial consideration of the issues for purposes of the preliminary injunction, the district court expressed the view that Mr. Gatlin pleaded causes of action under the ADA that would probably be viable if the court were free to adjudicate the merits of his claims. The IAAF believes that, in the

hurried context of the TRO/preliminary injunction motions, the district court did not have an adequate opportunity to hear and consider the reasons why Mr. Gatlin has no substantial likelihood of prevailing on his ADA claims.

Attached hereto is counsel's testimony addressing the ADA issues that IAAF submitted in the CAS proceeding.[5] (Because CAS is an international tribunal, IAAF presented legal submissions on the ADA issues through a testimonial declaration by U.S. counsel.) The IAAF submits that the counsel's testimony provides strong grounds for concluding that Mr. Gatlin's ADA claims are without merit.

As the counsel's testimony reflects, the ASA preempts other federal statutes whenever they would affect international athletic eligibility — unless Congress has specifically declared otherwise. Thus, the courts have refused to apply the antitrust laws where they would affect eligibility rules and rulings of international federations and their U.S. members. *See JES Properties, Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224, 1228-32 (11th Cir. 2006); *Behagen v. Amateur Basketball Ass'n*, 884 F.2d 524 (10th Cir. 1989); *Eleven Line, Inc. v. North Texas State Soccer Ass'n*, 213 F.3d 198, 204 (5th Cir. 2000). The same reasoning necessarily applies to every situation in which U.S. domestic law would interfere with the ability of

---

[5] The counsel's statement was submitted to the district court in connection with the preliminary injunction hearing.

U.S. sports federations to harmonize their rules with the rules of international federations with which U.S. federations must comply under the ASA.

As one court has observed, the ASA *does* expressly forbid discrimination against athletes on the basis of race, color, age, religion, gender, and national origin, so that "the omission of disability as a prohibited discriminatory factor under 36 U.S.C. § 220522(a)(2)(8) is significant." *Shepherd v. USOC,* 464 F.Supp.2d 1072, 1079 (D.Colo. 2006). Under the ruling in *JES Properties* and *Behagen*, this is compelling evidence that the ADA and Rehabilitation Act cannot apply to disputes over international eligibility. *Shepherd* was not an eligibility case, which explains why the court dismissed the ADA and Rehabilitation claims on the merits, rather than on grounds of preemption. (*See* Mot. at 11.)[6] The other cases cited by Mr. Gatlin involved forms of discrimination specifically forbidden by the ASA, but even those cases held that the courts must not use discrimination laws to overrule international eligibility determinations. (*See* Mot. at 10-11.)

---

[6]  *Shepherd* involved the question whether disabled athletes were discriminated against in the furnishing of training resources. No eligibility or other international issue was presented.

## III.    An Emergency Injunction Would Harm
Other Persons And The Public Interest.

We have already noted the ways in which the emergency injunction sought by Mr. Gatlin would cause harm to other persons and to the public interest. (*See* p. 2, above.) We offer a few additional comments.

*First,* Mr. Gatlin seeks to participate in the U.S. qualifying trials for the Olympic Games starting on Friday, June 27. The trials are conducted in "heats," with only the fastest runners in each heat advancing to succeeding rounds, until the finalists for the U.S. team ultimately emerge. If an emergency injunction allows Mr. Gatlin to compete, runners in Mr. Gatlin's heats may be eliminated because of his participation and thus lose an opportunity to advance that they would otherwise enjoy. There is the real risk that, if it is later determined that Mr. Gatlin is not entitled to a preliminary injunction, one or more persons will have lost a chance to be on the team because Mr. Gatlin was permitted to run.

*Second,* the IAAF cannot overstate its concern that the credibility of the worldwide doping enforcement procedures is undermined when cheating athletes are perceived to have "beaten the system." The international federations, doping regulators and Olympic committees have expended every effort to design fair procedures for resolving eligibility disputes. Those procedures were followed scrupulously in this case, and the finality of the rulings should not be questioned because the independent arbitrators' decision is controversial to some observers. If

an emergency injunction issues, U.S. athletes competing in the upcoming trials will lose confidence in the fairness of the enforcement regime, and track and field organizations throughout the world will suspect that U.S. courts are willing to tip the scales in favor of U.S. athletes without regard to international rules and procedures.

*Third*, in this and many other doping cases, the press and popular imagination fix on the plight of the young athlete who is denied the chance to compete on the worldwide stage of the Olympic Games. The international federations and allied organizations that do the unglamorous day-to-day work of protecting the integrity of sport and the health of athletes are painted as faceless, heartless bureaucrats. But doping control requires rules, and the rules must be enforced strictly and unsentimentally if they are to deter violations effectively. Without that, the sport has no integrity and athletes will conclude that they must use performance enhancers because so many of their rivals are doing so with seeming impunity.

# CONCLUSION

For the foregoing reasons, Mr. Gatlin's motion for an injunction pending appeal should be denied.

Respectfully submitted,

Eugene D. Gulland[7]

**Covington & Burling LLP**
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 662-6000 (Phone)
(202) 662-6291 (Facsimile)

***Counsel for Defendant-Appellee***
***International Association of***
***Athletics Federations***

---

[7] Assisted by summer associate Emily M. Loeb, NYU Law School '09.

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing opposition was delivered by electronic mail and U.S. Mail on June 26, 2008, to:

Joseph A Zarzaur, Jr.
Zarzaur Law, P.A.
Post Office Box 12305
Pensacola, Florida 32591
*Counsel for Justin Gatlin*

Robert C. Palmer, III
Wade, Palmer & Shoemaker, P.A.
25 West Cedar Street, Suite 450
Pensacola, Florida 32502
*Counsel for United States Anti-Doping Agency, Inc. and U.S. Track & Field, Inc.*

John S. Mills
Brain Gowdy
Mills & Creed, P.A.
101 East College Avenue
Post office Drawer 1838
Tallahassee, Florida 32302

Elliott H. Scherker
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, Florida 33131

_____
Eugene D. Gulland

| | |
|---|---|
| IN THE MATTER OF JUSTIN GATLIN | )<br>)<br>) |

CAS 2008/A/1461
CAS 2008/A/1462

## WITNESS STATEMENT OF EUGENE D. GULLAND

I, Eugene D. Gulland, say as follows:

1.     I am a partner of the law firm of Covington & Burling LLP with my offices at 1201 Pennsylvania Avenue, N.W., Washington, D.C., USA 2004.  I am a graduate of Princeton University and The Yale Law School.   Since I joined Covington in 1973 my practice has consisted entirely of civil litigation (both trials and appeals) before US and foreign courts, domestic and international arbitration tribunals, and administrative agencies.  I have represented IAAF before US courts in lawsuits involving the eligibility of US athletes under the IAAF Constitution and Rules and the Amateur Sports Act ("ASA").   I have also represented clients concerning the requirements of the Americans With Disabilities Act ("ADA").   A brief curriculum vitae is attached.

2.     The International Association of Athletics Federations (IAAF) has provided me a copy of the Brief dated 25 February 2008 submitted for Mr. Gatlin in this proceeding. The IAAF has asked me testify as to my professional opinion concerning the correctness of the argument contained therein at pages 34-38 under the heading "Any Sanction for the 2001 Positive test was in violation of the American[s] with Disabilities Act."  The IAAF also provided me with other background documents, which are listed in the Annex to this testimony.

3.     I considered the Brief and background documents and conducted legal research that I believe to be entirely sufficient to reach legal conclusions that I present here with a high degree of confidence. For the reasons described below, I conclude that the ADA accorded no valid defense to Mr. Gatlin's doping violation in 2001 involving Adderall and does not now require that the 2001 offense be disregarded in assessing the penalty for Mr. Gatlin's violation in 2006 involving exogenous testosterone. Supporting that ultimate conclusion are three grounds, each of which independently undermines Mr. Gatlin's ADA defenses: (i) the ADA does not regulate the eligibility rules that are prescribed by international sports federations and implemented by their U.S. members; (ii) Mr. Gatlin identifies no conduct by the IAAF that would violate the ADA even if it did apply; and (iii) Mr. Gatlin irrevocably waived any ADA defense by failing to assert it in the 2002 proceedings and accepting the decision of the AAA in that case.

## I.

4.     Mr. Gatlin bases his ADA defense upon Title III of the statute, which provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges . . ." (Brief at 3, quoting 42 U.S.C. § 12182.) I assume for the purposes of this section of my testimony that enforcement against Mr. Gatlin of the IAAF Doping Regulations that were the basis for his suspension in 2002[1] should be regarded as a "discriminat[ion] on the basis of disability" within the meaning of 42 U.S.C. § 12182. Even on that assumption (which I show in Section II to be incorrect), Mr. Gatlin would have no defense based on the ADA because another federal statute — the Amateur

---

[1]     See ¶¶ 6-12 of the 2002 decision of the American Arbitration Association ("AAA") panel, which quotes the then-applicable IAAF Regulations 55, 59, 60 and excerpts from the Schedule of Prohibited Substances.

Sports Act, 36 U.S.C. §§ 220501, *et seq.* ("ASA") — specifically regulates the eligibility of U.S. athletes who compete in international competitions.

5.     In a nutshell, the ASA directs the United States Olympic Committee ("USOC") to recognize one national governing body ("NGB") for each sport included in the program of the Olympic Games. Section 220521(a). Each NGB must be — and remain — a member in good standing of the international federation for that sport. Section 220522(a)(6). Every NGB has the exclusive authority to "designate individuals and teams to represent the United States in international amateur athletic competition . . . and certify, *in accordance with applicable international rules*, the amateur eligibility of those individuals and teams." Section 220523(7) (emphasis added).[2]     Similarly, each NGB is responsible for conducting or approving international competitions in that sport to be held in the United States, and for giving necessary approvals for participation in international competitions held abroad. Section 220523(a)(4)-(5). To implement the requirements of the ASA, the USOC requires that every NGB must "carry out those responsibilities required by the respective international federations." USOC Bylaws § 17.1(M).

6.     Under the ASA statutory scheme, a person cannot even be considered an "amateur athlete" unless he or she "meets the eligibility standards established by the [NGB] for the sport." 36 U.S.C. § 220501(b)(1). As noted, those standards must be "in accordance with applicable international rules." Section 220523(7). In this case, the USATF is the NGB for track and field sports, and it is obligated to observe and carry out the IAAF's rules governing eligibility — including doping regulation. *See* IAAF Rule 42 (requiring members to enforce doping and other eligibility rules as a condition of continued membership in the IAAF.) The

---

[2]     An "international amateur athletic competition" is a competition including both U.S. and non-U.S. participants. Section 220501(b)(5).

object of these provisions of the ASA (and of the USOC's bylaws) is to protect the eligibility of U.S. athletes and U.S. teams to participate in international competitions held in both the United States and abroad.

7.     The question of how to accommodate the very specific eligibility rules of the ASA with potentially conflicting more general provisions of other federal laws was presented in *Behagen v. Amateur Basketball Ass'n of the United States*, 884 F.2d 524 (10th Cir. 1989). A trial court had ruled that the Amateur Basketball Association — NGB for the sport — and the international basketball federation, FIBA, had violated the federal antitrust laws by enforcing a FIBA rule under which Behagen was ineligible to compete. The unanimous Court of Appeals reversed, finding that "Congress intended an NGB to exercise monolithic control over its particular amateur sport, including coordinating with the appropriate international sports federation and controlling amateur eligibility for Americans that participate in the sport." 884 F.2d at 529. In these circumstances, the Court of Appeals ruled, even the strong policies embodied in the federal antitrust laws must give way to the more specific requirement of the ASA that NGB must observe and enforce international federation eligibility rules.

8.     Two other unanimous federal appeals courts in other circuits have endorsed *Behagen. See Eleven Line, Inc. v. North Texas State Soccer Ass'n*, 213 F.3d 198, 204 (5th Cir. 2000); *JES Properties, Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224, 1228-32 (11th Cir. 2006). The 11th Circuit Court of Appeals refused even to entertain arguments that USA Equestrian (the NGB for equestrian sports) had imposed restrictions on eligible competitions that were much more restrictive than was reasonably required to protect the competitions, observing that "[t]his Court will not substitute its own judgment for that of the USEF regarding the optimum way to fulfill its obligations." 458 F.3d at 1232.

9.     In accordance with the principle that Congress intended the ASA to be the comprehensive system for resolving athletic eligibility disputes, U.S. courts have also consistently held that athletes may not challenge eligibility determinations by alleging that NGBs and international federations have violated rights protected by state laws.  These decisions hold that state laws that might conflict with athletic eligibility rules and eligibility determinations are "preempted" — that is, they must yield to the policy and procedures embodied in the ASA.  In other words, athletes may not circumvent the ASA by filing state law claims law that would effectively require a court to re-examine an athletic eligibility determination made according to the ASA scheme.  *See, e.g., Slaney v. International Amateur Athletic Federation*, 224 F.3d 580, 595 (7th Cir. 2001); *Dolan v. United States Equestrian Team, Inc.*, 608 A.2d 434, 437 (N.J. App. Div. 1992); *Cantrell v. United States Soccer Federation (USSF)*, 924 P.2d 789, 792 (Okl. App. 1996); *Walton-Floyd v. United States Olympic Committee*, 965 S.W.2d 35, 40 (Tex. Ct. App. 1998).

10.     I am not aware of any cases that address the precise issue presented here — the extent to which the ASA displaces the ADA in an eligibility dispute.  But there are four reasons why I believe that U.S. courts would find that there are even stronger grounds here than in the *Behagen* and *Slaney* lines of cases for not interfering with the international federation's eligibility rules and procedures as applied by USATF acting as an NGB.

a.     *First*, federal courts have long emphasized that the federal antitrust laws play such a strong, longstanding and organic role in the U.S. market economy that implied exemptions to their application should only be allowed in the most compelling circumstances.  This special principle is acknowledged in all three Court of Appeals opinions applying or

- 5 -

endorsing the *Behagen* rule.[3] Nevertheless, each of the unanimous courts agreed that the ASA deserves recognition as a rare exception to the rule against implied exemptions from the antitrust laws. I am not aware of any decision according to the ADA a status equivalent to that accorded to the antitrust laws in weighing implied exemptions.

        b.    *Second,* it is notable that the ASA explicitly prohibits discrimination against athletes on the basis of race, color, age, religion, sex and national origin, but not on the basis of disability. *See* 36 U.S.C. § 220522(a)(8). In a decision rejecting a claim that the ADA requires that disabled athletes receive the same level of training and financial support as other athletes, a federal district court observed, "The omission of disability as a prohibited discriminatory factor under 36 U.S.C. § 220522(a)(8) is significant." *Shepherd v. USOC,* 464 F.Supp.2d 1072, 1079 (D. Colo. 2006). That the ASA prohibits many forms of discrimination that are also prohibited by other laws, but does not include disability within those specified prohibitions, should lead U.S. courts to conclude that Congress did not intend disability under the ADA to be a basis for challenging eligibility decisions under the ASA.

        c.    *Third,* as noted earlier, the ASA defines "amateur athlete" to include only those persons who are eligible under the rules applied by the NGB for the sport pursuant to the ASA. 36 U.S.C. § 220501(b)(1). This strongly reinforces the conclusion that athletic eligibility must be controlled by the ASA rather than other legal authorities.

        d.    *Fourth,* an additional compelling reason for interpreting the ASA as displacing the ADA is the importance of avoiding collisions between U.S. law and international rules governing eligibility. Where Congress has not specifically directed otherwise, U.S. courts may find that laws having extraterritorial effects should not apply even within the U.S. in

---

[3]    *See Behagen,* 884 F.2d at 528-29; *Eleven Line,* 213 F.3d at 204; *JES Properties,* 458 F.3d at 1231-32.

circumstances that would interfere with international harmony and invite retaliation. *See, e.g., McCulloch v. Sociedad Nacional de Marineros*, 372 U.S. 10, 21 (1963). There is no "affirmative intention of the Congress clearly expressed" that the ADA should apply here. *Id.* at 22. U.S. courts would therefore be inclined to follow the "legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application." *Small v. United States*, 544 U.S. 385, 388-89 (2005).

11.     For the foregoing reasons, I conclude with a very high level of confidence that a U.S. court would rule that, by reason of the specific eligibility policy and procedures embodied in the ASA, Mr. Gatlin may not raise the ADA as a defense to his 2001 doping offense either standing alone as a basis for enhancing the penalty for his 2006 offense.

**II.**

12.     In this section of my testimony, I address three reasons why Mr. Gatlin would not have a valid defense under the ADA to his 2001 violation, even if I disregard that the ASA properly controls this eligibility dispute.

### *No Discrimination on the Basis of Disability*

13.     It bears repeating that Mr. Gatlin contends that application of the IAAF doping rules in 2001 "discriminated against [him] on the basis of disability." ADA, 42 U.S.C. § 12182(a), *quoted in* Brief at 35. Mr. Gatlin fails to explain adequately why punishment for his 2001 offense should be regarded as discrimination "on the basis of disability."

14.     I assume for purposes of this testimony that Mr. Gatlin could have shown that his ADD learning disorder qualified as a "disability" when he was still a student in 2001. (*See* Brief at 5.) But it is not enough to show a disability; Mr. Gatlin must show that IAAF "discriminated against [him] on the basis of [that] disability." The undisputed fact is that the IAAF's rules and procedures take no account of learning disabilities in determining eligibility, and Mr. Gatlin's

brief amply describes how his learning disability did not prevent him from achieving great distinction in IAAF athletics.

15.   It begs the question for Mr. Gatlin to cite court decisions addressing the legal responsibility of educational institutions not to discriminate against persons on the basis of their learning disabilities. (*See* Brief at 35.) In such circumstances, the learning disability burdens the student's ability to participate in educational activities. A school is accordingly obligated to offer "reasonable modifications" to compensate for the student's learning disability instead of denying educational opportunities altogether. *See* 42 U.S.C. § 12182(b)(2)(A)(ii). But IAAF is not an educational institution. It imposes no academic standards or guidelines as a condition of athletic eligibility, and the learning disabilities of athletes have no bearing on their performance on the running track.

16.   Thus, the IAAF was not obligated by the ADA to modify its doping rules in 2001 to accommodate a learning disability that had no effect on Mr. Gatlin's ability to compete in athletics. More than that, a disability does not entitle a person to offer the ADA as a defense to punishment for violation of rules of conduct that serve legitimate and non-discriminatory purposes. Thus, for example, an employee discharged for emotional and profane outbursts in the office cannot "hide behind the ADA and avoid accountability for his actions" even assuming that post-traumatic stress disability triggered his conduct. *Hamilton v. Southwestern Bell Telephone Co.*, 136 F.3d 1047, 1052 (5th Cir. 1998). Similarly, the ADA does not prevent discharge of a diabetic employee for careless driving caused by insulin shock, particularly where the employee failed to monitor his insulin levels. *Siefken v. Village of Arlington Heights*, 65 F.3d 664, 666 (7th Cir. 1995). It appears that Mr. Gatlin failed to monitor his own amphetamine levels before competing in 2001. That he ran under the influence of amphetamines in violation of IAAF's

neutral rules against prohibited substances is not excused by the ADA because he took medication and sat for his English Composition examination a few days before he competed.

*Allowing Amphetamines Might "Fundamentally Alter" IAAF Competitions*

17.    The ADA provisions invoked by Mr. Gatlin expressly state that there is no obligation to specially accommodate an individual's disability if doing so would require "modifications" that would "fundamentally alter" the goods, services, facilities, privileges and accommodations being offered.  ADA, 42 U.S.C. § 12182(b)(2)(A)(ii).  In *PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001), the United States Supreme Court explained that this situation can arise in sport where a proposed modification "that has only a peripheral impact on the game itself might nevertheless give a disabled player . . . an advantage over others and, for that reason, fundamentally alter the character of the competition." *PGA Tour*, 532 U.S. at 688.  The Court stressed that "*the waiver of an essential rule of competition for anyone would fundamentally alter the nature of [PGA's] tournaments,*" but found that allowing a disabled golfer to use a golfcart would neither waive an essential rule of golf nor confer an unfair competitive advantage on a disabled golfer.  *Id.* at 689 (emphasis added).[4]

18.    If the IAAF's rules against amphetamines and other prohibited substances are "essential" rules of competition fostering the integrity of sport, protecting the welfare of athletes and preventing unfair competitive advantages, then the ADA does not require IAAF to offer any "modification" of rules allowing the in-competition use of such prohibited substances.  It is not my role as a legal expert to address the factual component of that issue.  But I do not think it is open to dispute that the IAAF has for many years devoted a major part of its resources to medical

---

[4]    PGA contended that allowing the use of a golfcart would unfairly conserve the strength of the disabled golfer, but the trial court found that the disabled golfer "'easily endures greater fatigue even with a cart than his able-bodied competitors do by walking.'"  532 U.S. at 690.

research and doping control in the belief that a failure to exclude drugs would fundamentally alter athletics in a very bad way. Indeed, the IAAF Council's Statement on ADD-related cases in 2002 "confirm[ed] the position of the IAAF Medical Committee" and concluded that "the integrity of athletics competitions" requires a procedure of "close medical supervision" under which athletes suffering from ADD may use medications and still compete without "amphetamines present within their bodies." (Gatlin Ex. 16.)

### *Failure to Seek Accommodation*

19.     Mr. Gatlin had "the burden of proving that a modification was requested and that the requested modification is reasonable." *Johnson v. Gambrinus Company/Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997). But he is unable to bear this important "initial burden of demonstrating that he requested reasonable accommodations." *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1077 (8th Cir. 2006). Mr. Gatlin neither notified the IAAF that he had a learning disability nor requested that the IAAF accommodate his disability in any manner. Thus, Mr. Gatlin never took the steps that were necessary to trigger any statutory rights to modification of IAAF's rules.[5]

20.     Mr. Gatlin cannot excuse his failure to request a modification in 2001 by speculating that the IAAF would have refused to grant it. To the contrary, in 2001-02, IAAF Rule 55.5 and Section 5 of the Procedural Guidelines for Doping Control provided a specific

---

[5]     *Humphrey v. Memorial Hospital Ass'n*, 239 F.3d 1128 (9th Cir. 2001), does not dispense with the requirement that the disabled person actually seek a reasonable modification and does not provide for a "retroactive" request long after the time for such accommodation has passed.

    Instead, the court observed that the employer has a continuing duty to "consider each request for reasonable accommodation" in an "interactive process" of seeking an effective solution to unresolved day-to-day workplace problems. 239 F.3d at 1138. The case does not contemplate the situation here, in which a retroactive request for modification is made some six years after Mr. Gatlin stopped taking medication to treat ADD.

procedure for obtaining a "prior exemption" based upon written application supported by a certificate from an attending physician. We cannot know whether IAAF would have granted an exemption if Mr. Gatlin had applied for it, but it is undisputed that Mr. Gatlin did not seek an exemption or any other form of modification of IAAF rules. That the IAAF Council *later* adopted (in 2002) a specific ADD medication policy requiring close medical supervision to "ensure that athletes do not compete with amphetamines present in their bodies" (Brief 29) does not free Mr. Gatlin from his obligation to have sought a timely modification in 2001. Mr. Gatlin is not genuinely requesting any "modification" now, but instead is asking for a "second chance," which the ADA does not require. *Siefken*, 65 F.3d at 666.

### III.

21.     In the preceding section of this testimony, I discussed why as a matter of U.S. law Mr. Gatlin's failure to seek accommodation from the IAAF in 2001 is fatal to his ADA defense. In fact, Mr. Gatlin's waiver is much bigger than that. It appears that he did not raise any ADA defense in the 2002 AAA proceedings. Even in the 2007 AAA proceedings, the tribunal observed that "Mr. Gatlin did not present reasoned arguments with respect to [the ADA] claim, nor explicate the law as it might apply, nor apply the present facts to that law."[6] Despite being represented by counsel throughout the 2002 and 2007 proceedings, it is only now in this CAS arbitration that he has offered an ADA defense for his violation in 2001. And he does so some six years after he willingly accepted the 2002 AAA decision as a compromise settlement.

22.     With all respect to Mr. Gatlin's counsel, it is difficult as an American lawyer to take seriously the argument that the 2002 AAA decision, followed by the IAAF Council decision granting early reinstatement, are somehow without legal effect and that "no legitimate sanction

---

[6]     *See* 2006 AAA Award ¶ 6.15. The Panel also commented that the ADA issues "had not been argued then [in 2001]."

was imposed for the 2001 positive test." (Brief at 23.) I think that any practicing lawyer in the United States would see clearly what happened in the 2002 AAA proceedings — a "plea bargain" compromise. The parties and the Panel agreed to the entry of a Decision finding "on uncontested facts" that Mr. Gatlin committed an "inadvertent violation" of IAAF Rules with the expectation that the two-year suspension required by IAAF rules would "be considered in an application for early reinstatement which, the Panel is informed, Mr. Gatlin intends to file with the IAAF." (2002 AAA Decision at 7-8.) A major purpose of the plea bargain was to resolve a jurisdictional conundrum: the IAAF could not grant early reinstatement unless Mr. Gatlin had first been suspended. Accordingly, the Panel suspended Mr. Gatlin and retained jurisdiction only to address a single contingency — "should the IAAF not take expeditious action in granting Mr. Gatlin early reinstatement to a term appropriate to his circumstances and satisfactory to Mr. Gatlin." (*Id.* at 8.)

23.    That contingency never came to pass.  The IAAF Council granted the early reinstatement.  In doing so, "the Council stressed that Gatlin HAD committed a doping offence and issued a warning that any repetition of his positive result would result in a life ban." (IAAF Newsletter dated July 30, 2002, at 2.)  Thus the plea bargain compromise was complete:  Mr. Gatlin conceded inadvertent violation of the IAAF Rules, received a suspension, but won early reinstatement and resumed his running career.  The work of the AAA panel was done.  Its 2002 Decision had become final when the IAAF granted early reinstatement, because the sole ground on which jurisdiction had been reserved had been removed.  The matter was at an end.

24.    As a matter of U.S. law, the 2007 AAA Panel was correct in ruling that it would be inappropriate to "retry" the issues resolved in 2002 Decision, or to "collaterally attack" the 2002 ruling.  (Award ¶ 9.6.)  Mr. Gatlin is precluded by well-settled U.S. law principles from trying to raise new ADA defenses and seeking to reopen the plea bargain compromise that is

embodied in the 2002 Decision. Matters resolved in an arbitral award may not be relitigated by the parties because "a valid and final award by arbitration generally has the same effect under the rules of res judicata as a judgment of a court." *Mactec, Inc. v. Gorelick,* 427 F.3d 821, 831 (10th Cir. 2005). Similarly, the law of Texas (where the 2002 AAA arbitration was held) provides that "[a]n arbitration award has the same effect as a judgment of a court of last resort." *Crossmark, Inc. v. Hazar,* 124 S.W.2d 422, 429 (Tex. App. — Dallas 2004). And multiple federal courts of appeal "have held that an order from an AAA arbitrator is binding unless the parties expressly agree otherwise, and does not require affirmation from a court to bring it into effect." *Centurion Air Cargo v. United Parcel Service,* 420 F.3d 1146, 1149 (11th Cir. 2005), *citing McKee Home Buyers Warranty Corp.,* 45 F.3d 981, 982 (5th Cir. 1995); *Rainwater v. Nat'l Home Ins. Co.,* 944 F.2d 190, 193 (1991). The award is no less binding where, as here, the parties have "stipulated to the arbitrator's award." *See Citicorp Real Estate, Inc. v. Smith,* 155 F.3d 1097, 1108 (9th Cir. 1998).

25.    If Mr. Gatlin had disagreed with the 2002 award, there are means under U.S. law by which he could have attempted to have the award vacated so that it would no longer be a binding adjudication that he had committed an inadvertent doping offense in 2001. Under the law of Texas, Mr. Gatlin might have filed an application in Texas courts to vacate "not later than the 90th day after the date of delivery of a copy of the award." Texas Civil Practice and Remedies Code § 171.088(b). If Mr. Gatlin had instead sought to vacate the Decision under the

Federal Arbitration Act, he would have been required to file an application in federal court "within three months after the award is filed or delivered." 9 U.S.C. § 12. Having failed to have the 2002 Decision vacated, U.S. law precludes him from relitigating the issues.

Respectfully submitted,

Eugene D. Gulland
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401
(202) 662-6000 Office
(202) 662-6291 Facsimile
egulland@cov.com

**ANNEX**

**Documentary and Materials Provided By IAAF**

- The Decision and Dissenting Opinion of the AAA Panel in Mr. Gatlin's 2006 case.

- Mr. Gatlin's Appeal Brief Dated 25 February 2008, with pertinent exhibits.

- The Decision of the AAA Panel in Mr. Gatlin's 2002 case.

- Extracts of minutes of the IAAF Council Meeting in Paris on 3-4 July 2002.

- IAAF Newsletter No. 57.

- IAAF Anti-Doping Rules as contained in the 2000-2001 Handbook.

- Section 5 of the Procedural Guidelines for Doping Control (2000 edition) dealing with the procedures for applications for exemptions to use prohibited substances.

# EUGENE D. GULLAND
(202) 662-5504
egulland@cov.com

## COVINGTON & BURLING LLP,
1201 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2401

| | |
|---|---|
| *Associate* | *1973 - 1980* |
| *Partner* | *1980 - Present* |

Areas of Practice:

> Extensive experience in civil litigation before federal and state courts, international courts and tribunals, administrative agencies, and arbitral panels, with experience in handling the trial and appeal of cases involving many sorts of commercial disputes; mergers and acquisitions; sports law; securities law; international investment disputes (ICSID); corporate law and officer/director liability; trading and regulation of commodities futures/options; business torts; antitrust law and trade regulation; professional malpractice; unfair international trade practices; and constitutional law.

Education:

Law School:    **YALE LAW SCHOOL**
J.D., 1972

College:        **PRINCETON UNIVERSITY**
A.B., 1969 — Highest Honors; Phi Beta Kappa;
Princeton University Scholar; Woodrow Wilson
School Scholar

Other Information:

Born August 27, 1947
Listed, *Who's Who in America, Who's Who in The World; Best Lawyers in America; Chambers USA, International Who's Who of Commercial Arbitration*
Captain, U.S. Army Infantry (1972-73)
Faculty, National Institute of Trial Advocacy (NITA)
Member, American Judicature Society

Bar Admissions:

        District of Columbia Bar
        Virginia State Bar
        United States Supreme Court
        United States Court of Appeals (1st Cir.)
        United States Court of Appeals (2nd Cir.)
        United States Court of Appeals (3rd Cir.)
        United States Court of Appeals (4th Cir.)
        United States Court of Appeals (6th Cir.)
        United States Court of Appeals (7th Cir.)
        United States Court of Appeals (9th Cir.)
        United States Court of Appeals (10th Cir.)
        United States Court of Appeals (D.C. Cir.)
        United States Court of Appeals (Fed. Cir.)
        United States Claims Court
        U.S. District Court for the District of Columbia
        U.S. District Court for the Eastern District of Virginia
        U.S. District Court for the District of Maryland

Arbitration Experience:

        International Centre for the Settlement of Investment Disputes (ICSID)
        London Court of International Arbitration
        International Chamber of Commerce (ICC) Arbitration
        American Arbitration Association Arbitration
        UNCITRAL Rules Arbitration
        Center for Public Resources (CPR) Arbitration

Agency Experience:

        Federal Trade Commission
        Securities and Exchange Commission
        Surface Transportation Board
        Federal Maritime Commission
        Federal Communications Commission
        U.S. International Trade Commission
        U.S. Customs Service

Law-Related Publications (list available on request)