UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JUSTIN GATLIN,

    Plaintiff,

v.                                            Case No, 3:08cv241/LAC/EMT

UNITED STATES ANTI-DOPING
AGENCY, INC.; USA TRACK AND
FIELD, INC.; UNITED STATES
OLYMPIC COMMITTEE.; and
INTERNATIONAL ASSOCIATION
OF ATHLETICS FEDERATIONS,

    Defendants.

**UNITED STATES OLYMPIC COMMITTEE'S RESPONSE TO PLAINTIFF'S MOTION FOR LEAVE TO FILE REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL AND/OR MOTION TO STRIKE PLAINTIFF'S PROPOSED REPLY MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL**

Defendant United States Olympic Committee (USOC) files this response to Plaintiff's Motion for Leave to File Reply Memorandum in Support of Emergency Motion for Injunction Pending Appeal (Plaintiff's Motion) and/or moves to strike Plaintiff's Proposed Reply Memorandum in Support of Emergency Motion for Injunction Pending Appeal (Proposed Rely). Mr. Gatlin's Proposed Reply makes promises that his subsequently filed Declaration-Expert Report of Horace Gautier on Issues of Swiss Law (the Gautier Declaration) does not keep.

In a transparent effort to obtain, at least *de facto,* the very relief that this Court denied, Mr. Gatlin's new counsel are advancing an unpled and hitherto-unasserted claim,

*i.e.*, that has no remedy in the Swiss Federal Supreme Court, the governing Court of Arbitration for Sport (CAS) rules and the statements of the CAS's Secretary General to the contrary notwithstanding. His Proposed Reply promises that Mr. Gautier will opine that the CAS decision "cannot be appealed" and the Swiss Federal Supreme Court "will not be able to provide any relief to Mr. Gatlin" before the Saturday trials take place. Proposed Reply at 2-3 & n.1. In actuality, however, the subsequently filed Gautier Declaration in complete accord with the expert declaration of Mr. Antonio Rigozzi, upon which the USOC has relied, and plainly reflects that any practical difficulty that Mr. Gatlin may encounter between now and Saturday morning in obtaining relief from the Swiss Federal Supreme Court is entirely a self-inflicted wound.

By bringing his federal action and eschewing available relief in Switzerland, Mr. Gatlin has created the very exigencies noted in the Gautier Declaration. Mr. Gautier does not opine on that circumstance, but his declaration makes it clear that the arguments in the Proposed Reply are untenable and that the submission should be disallowed.

## ARGUMENT

Both the CAS's Secretary General and the IOC's Director of Legal Affairs have, as noted in the USOC's earlier filings, stated that the CAS's decision is reviewable by the Swiss Federal Supreme Court. (DE:19; DE:20). Attempting – quite belatedly – to impeach that clearly available remedy's inexorable impact, Mr. Gatlin's Proposed Reply argues that, "[b]ecause the CAS has yet to issue an opinion in this case, its decision cannot be appealed" to the Swiss Federal Supreme Court, such that Mr. Gatlin does not have an avenue of review under the Olympic protocols. Proposed Reply at 2. The motion promises that, "[t]o support our statements on Swiss law, we expect to submit very soon the declaration of Horace Gautier, a Swiss lawyer whose practice includes international arbitration." *Id.*

2
Greenberg Traurig, P.A.

Mr. Gatlin's new counsel thereafter submitted the Gautier Declaration, and it is undeniable that the Proposed Reply promises an opinion that Mr. Gautier was unwilling to deliver. His declaration states that the deadline for taking an appeal under the Swiss Supreme Court Act (SCA) is 30 days from the service of "full" or "reasoned" award. Gautier Declaration at ¶12. But that provision "only implies in my opinion that the time for the filing of an appeal extends 30 days from service of the reasoned award, *not* that filing an appeal is prohibited before the reasoned opinion is served." *Id.* at ¶13 (emphasis added). Indeed, citing the same Swiss precedent upon which the USOC's expert, Mr. Rigozzi, has relied, the Gautier Declaration states that a pre-"reasoned award" may be appealed *and* that the Swiss Federal Supreme Court may grant a stay pending disposition of the appeal. *Id.* at ¶14.

What the Gautier Declaration speaks to most directly, however, is that Mr. Gatlin's status in the Swiss legal system is *entirely* his own doing. That is, Mr. Gautier states that obtaining relief from the Swiss court *at this point*, in sufficient time for Mr. Gatlin to participate in the trial, "would appear to be a practical impossibility" – and accordingly concludes that "therefore there is no available remedy in Switzerland that would permit an *expedited* consideration of the issues relating to Justin Gatlin's participation in the Olympic Trials this weekend." Gautier Declaration at ¶¶12, 18. Regardless whether that is correct or not, it need only be noted that Mr. Gatlin brought this action – over which this Court has *no* jurisdiction – on June 9, 2008, well over *two weeks ago*, and the Gautier Declaration recognizes that there would have been ample time to seek relief in the Swiss Federal Supreme Court within the then-extant time frame. *Id.* at ¶16. In other words, but for the self-inflicted wound of his action before this Court, Mr. Gautier recognizes that Mr. Gatlin could have sought relief before the Swiss Federal Supreme Court.

The Proposed Reply recognizes none of this. Moreover, the motion for leave argues that Mr. Gatlin's ADA and RHA claims were *not* decided in the Swiss arbitration process, including his appeal before the CAS. Response at 6. Failure to consider a claim is a recognized ground for reviewing a CAS decision. *Cañas v. ATP Tour* (March 22, 2007 decision of 1st Civil Law Court of Swiss Federal Supreme Court) § 5.3 (copy attached).

## CONCLUSION

Based upon the foregoing, the USOC requests the Court to deny Plaintiff's Motion and/or to strike the Proposed Reply.

Dated this 26th day of June, 2008.

    Respectfully submitted,

    GREENBERG TRAURIG, P.A.
    101 East College Avenue
    Post Office Drawer 1838
    Tallahassee, Florida 32302
    Phone: (850) 222-6891
    Fax: (850) 681-0207

    /s/ Lorence Jon Bielby
    **LORENCE JON BIELBY**
    **Florida Bar No. 0393517**
    **JOHN K. LONDOT**
    **Florida Bar No. 0579521**

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served per Federal Rule of Civil Procedure 5(b)(2)(E) and Northern District of Florida Local Rule 5.1(A)(6) this 26th day of June 2008, to the following:

Joseph A. Zarzaur, Jr.
Zarzaur Law, P.A.
Post Office Box 12305
Pensacola, Florida 32591
*Counsel for Justin Gatlin*

John S. Mills
Bryan S. Gowdy
Mills & Creed, P.A.
865 May Street
Jacksonville, Florida 32204
*Counsel for Justin Gatlin*

Robert C. Palmer, III
Wade, Palmer & Shoemaker, P.A.
25 West Cedar Street, Suite 450
Pensacola, Florida 32502
*Counsel for United States Anti-Doping Agency, Inc and U.S. Track & Field, Inc.*

/s/ Lorence Jon Bielby
LORENCE JON BIELBY

# ATTACHMENT

**Federal Tribunal**
4P.172/2006

**Judgment of 22 March 2007**
**1st Civil Law Court**

**Composition**
Judges Corboz (President), Klett, Rottenberg Liatowitsch, Kiss and Mathys.
Clerk: Mr Carruzzo

**Parties**
Guillermo **Cañas**, Av. Leandro N. Alem 356, 13, AR-Buenos Aires,
appellant, represented by Mr Cédric Aguet, Attorney-at-law, rue Eynard 6, 1205 Geneva

versus

**ATP Tour**, US-Ponte Vedra Beach – 32082 Florida,
respondent, represented by Mr Georg von Segesser, Attorney-at-law, PO Box 6333, 8023 Zurich;
**Court of Arbitration for Sport (CAS)**, represented by its Secretary General, Matthieu Reeb, Château de Béthusy, avenue de Beaumont 2, 1012 Lausanne

**Subject**
International arbitration; right to a fair hearing; public policy, public law appeal against the award issued by the Court of Arbitration for Sport on 23 May 2006.

**In fact:**

**A.**

**A.a** Guillermo Cañas, an Argentinean national born in 1977, is a professional tennis player resident in Buenos Aires (Argentina). The Association of Tennis Professionals Tour (ATP Tour, hereinafter: ATP) is a not-for-profit legal entity composed of male professional tennis players and tournament organisers; its headquarters are in the State of Delaware (United States of America). Guillermo Cañas has been an ATP member since 1995 and a member of the ATP Players' Council since 2004.

The ATP issues rules that are applicable to its members (the ATP Rules). These rules are designed in particular to combat doping. To this end, they make provision for various sanctions, which may be either lifted or reduced if a player can establish that the presence of a prohibited substance in his body is not the result of a fault or of a significant fault committed by himself. Sanctions are imposed by the ATP Anti-Doping Tribunal, whose decisions may be referred to the Court of Arbitration for Sport (CAS). As regards awards issued by the CAS, Article P.3 of the ATP Rules (2005 edition) stipulates the following:

"The decision of CAS shall be final and binding on all parties and no right of appeal will lie from the CAS decision. The CAS decision shall have immediate effect and all parties shall take action to ensure that it is effective."

The ATP's anti-doping rules also state that they are subject to Delaware law in all respects.

A.b On 21 February 2005, while he was participating in an ATP tournament in Acapulco (Mexico), Guillermo Cañas provided a urine sample. The analysis of this sample revealed the presence of a diuretic which appears on the list of prohibited substances, a finding confirmed by the analysis of the second sample.

In a decision of 7 August 2005, the Anti-Doping Tribunal determined that the player had committed a doping offence and suspended him for two years, with effect from 11 June 2005. It also ordered him to pay back all the prize money he had earned during the tournaments in which he had since participated, including the Acapulco tournament.

**B.**
Guillermo Cañas appealed this decision. His main complaint was that he had not committed any fault. In the alternative, the appellant claimed, in summary, that it was contrary to the law of Delaware as well as European and American competition rules to sanction him for accidentally taking a medicine containing a substance which reduced his sporting capabilities.

The CAS issued its award on 23 May 2006. Partially upholding the appeal, it ruled that Guillermo Cañas had committed a doping offence during the Acapulco tournament and consequently upheld the first instance decision to disqualify the player's results during that tournament and order him to pay back any prize money he had been awarded at that tournament. However, the CAS reduced the suspension imposed against Guillermo Cañas from two years to 15 months and ordered the ATP to pay back to the player the prize money he had earned during competitions in which he had participated after the Acapulco tournament.

The arbitrators accepted the version of the facts presented by the appellant regarding the circumstances in which the prohibited substance had entered his system. It appears, in summary, that on 20 February 2005 Guillermo Cañas went to the tournament doctor to obtain medicine for influenza. Since he had run out of this medicine, the doctor had given him a prescription. However, following an error committed by a member of the tournament staff, who had been asked to go and purchase the prescribed medicine from the pharmacy, the player did not receive the correct medicine, but one which should have been given to the coach of a different player. In law, the CAS considered that the appellant was not totally blameless. Since he had not received the medicine directly from the doctor, but through the intermediary of several other people, the experienced tennis player, who was seeded and an active member of the Players' Council, should have examined the medicine before taking it, in order to ensure that it was the medicine prescribed by the doctor. The arbitrators then ruled on the extent of the fault. Accepting that the player had not intended to take a prohibited substance and stressing that he had not been at all responsible for the error in the delivery of the medicine, they pointed out the exceptional nature of the case and accepted that the appellant had demonstrated that he had not been guilty of any fault or significant negligence. The period of suspension could therefore be reduced, according to the ATP Rules, by up to half of the period of

suspension applicable under the Rules, which was two years in this case. In order to determine the extent of the reduction, the CAS took into account all the mitigating and aggravating factors of the case, its own previous decisions relating to medical prescriptions and all of the circumstances. It concluded that the maximum reduction of 12 months could not be granted to the appellant and that the period of suspension should be reduced by nine months. Finally, the arbitrators ruled that, for reasons of fairness, they could not disqualify the player from the tournaments in which he had participated since the Acapulco tournament.

## C.

On 22 June 2006, Guillermo Cañas submitted a public law appeal in accordance with Article 85 (c) of the Swiss Federal Act on Judicial Organisation (OJ), with the aim of having the CAS award annulled. The appellant complained that his both his own right to a fair hearing and Swiss public policy had been violated.

In a letter dated 23 August 2006, the CAS announced that it would not rule on the appeal.

On 15 September 2006, the ATP submitted a response, concluding primarily that the appeal was inadmissible and, in the alternative, that it should be rejected. In its response, it included excerpts from the ATP Rules (2005 version) and a document dated 12 March 2005, written on ATP headed paper and signed by Guillermo Cañas, in which the latter made the following declaration:

"PLAYER'S CONSENT AND AGREEMENT TO ATP OFFICIAL RULEBOOK"

I, the undersigned player, consent and agree as follows:

1. I consent and agree to comply with and be bound by all of the provisions of the 2005 ATP Official Rulebook ("the ATP Rules"), including, but not limited to, all amendments to the ATP Rules and all the provisions of the Anti-Doping Program incorporated in the ATP Rules. I acknowledge that I have received and had an opportunity to review the ATP Rules.

2. I also consent and agree that any dispute arising out of any decision made by the Anti-Doping Tribunal, or any dispute arising under or in connection with the Anti-Doping Program, after exhaustion of the Anti-Doping Program's Anti-Doping Tribunal process and any other proceedings expressly provided for in the Program, shall be submitted exclusively to the Appeals Arbitration Division of the Court of Arbitration for Sport ("CAS") for final and binding arbitration in accordance with the Code of Sports-Related Arbitration. The decisions of CAS shall be final, non-reviewable, non-appealable and enforceable. I agree that I will not bring any claim, arbitration, lawsuit or litigation in any other court or tribunal. The time limit for any submission to CAS shall be 21 days after the decision of the Anti-Doping Tribunal has been communicated to me.

3. I have read and understand the foregoing Player's Consent and Agreement."

Referring to this document in particular, the respondent argued in its reply that Guillermo Cañas had legitimately agreed not to appeal the CAS award.

In a letter dated 18 September 2006, the appellant asked the Swiss Federal Tribunal to order a second exchange of documents. The respondent opposed this proposal in a letter dated 19 September 2006.

The judge responsible for examining the case partially upheld the application in a ruling dated 11 December 2006 and granted the appellant a period of time in which to give his opinion on the validity and significance of the aforementioned document.

On 15 January 2007, within the period granted, the appellant submitted his written response, asking the Federal Tribunal to rule that the waiver of appeal which he had signed on 12 March 2005 was invalid.

In a ruling dated 19 January 2007, the respondent was granted the right to submit a rejoinder. It did so before the stipulated deadline in a letter dated 15 February 2007, in which it set out the reasons why, in its opinion, the validity of the waiver of appeal signed by Guillermo Cañas should be confirmed.

**In law, the Federal Tribunal considers:**

**1.**
The Federal Tribunal Act of 17 June 2005 (LTF; RS 173.110) entered into force on 1 January 2007 (RO 2006 p. 1242). Since the disputed award was issued prior to that date, the procedure remains governed by the Swiss Federal Act on Judicial Organisation (OJ; Art. 132 para. 1 LTF).

**2.**
Pursuant to Art. 37 para. 3 OJ, the Federal Tribunal produces its judgments in an official language, generally speaking the same language as the disputed decision. If the disputed decision is written in a different language (English in this case), the Federal Tribunal uses the official language chosen by the parties. The statements submitted to the Federal Tribunal by both parties are in French. Therefore, the present judgment is issued in French.

**3.**

3.1 Submitted before the deadline (Art. 89 para. 1 OJ), in the form prescribed by the law (Art. 90 para. 1 OJ), against a final award issued as part of international arbitration (Art. 176 ff of the Swiss Federal Code on Private International Law - LDIP), the present public law appeal, within the meaning of Art. 85 (c) OJ, which only contains complaints mentioned in Art. 190 para. 2 LDIP, is admissible in view of these various requirements.

3.2 Article 88 OJ, as interpreted in case-law, requires a practical and current reason for an appeal. The Federal Tribunal exceptionally refutes this requirement when the appellant raises a question of principle that is likely to come up again in the same terms, even if it is unable to issue a ruling before the stipulated deadline (ATF 127 III 429 rec. 1b and the judgments mentioned).

In the present case, it is true that the 15-month suspension that was imposed against the appellant ended on 11 September 2006. However, the fact remains that the disputed award has a permanent impact on the financial situation of the tennis player concerned, since it requires him to pay back the prize money he won at the Acapulco tournament. In this respect, the present case is different from that which led to the judgment published in ATF 127 III 429. Consequently, without even having to decide whether this is an exceptional case as described in the aforementioned case-law, the appellant clearly has an interest in persuading the Federal Tribunal to rule that the CAS award was issued in violation of his right to a fair hearing or that it is incompatible with Swiss public policy.

Guillermo Cañas is therefore entitled to appeal. It must also be determined whether he had legitimately agreed to waive his right of appeal.

**4.**

**4.1** In their respective written pleadings, both parties discuss at some length the validity of the disputed waiver of appeal. It is appropriate to begin by summarising the arguments put forward by both parties on this subject.

**4.1.1** From a technical point of view, the appellant asserts, with reference to judgment 4P.62/2004 of 1 December 2004, that a waiver of appeal is ineffective if it appears in the rules of an arbitration body, since the Federal Tribunal demands that the desire to waive the right of appeal must be demonstrated by an express act. He adds that the respondent must have been aware of that, as it thought it had to make him sign a specific document incorporating the ad hoc clause taken from its own rules.

Considered from a factual point of view, the waiver concerned is ineffective for at least three reasons, according to the appellant: firstly, because it was signed under duress in the sense of previous decisions issued under the Convention for the Protection of Human Rights and Fundamental Freedoms (ECHR); secondly, because the "pseudo-waiver" of a tennis player's right of appeal against a CAS arbitral award in a doping case, whatever its form, goes against the *ratio legis* of Art. 192 LDIP; finally, thirdly, because, where the fight against doping is concerned, the only way of applying Art. 192 LDIP whilst respecting the principle of equality is to render invalid any advance waiver of appeal.

**4.1.2** The respondent begins by expressing doubt about the admissibility of most of the claims submitted by the appellant in his reply, on the grounds that the appellant did not confine himself to arguments related to the document mentioned in the presidential ruling of 11 December 2006, but took the opportunity to supplement the arguments that he should have included in his original appeal.

In substance, the respondent accuses the appellant of having deliberately left gaps in his summary of his situation vis-à-vis the ATP and the decision-making process within this legal entity, in an attempt to show that he was in a position of total "allegiance" with regard to the ATP. In its opinion, the appellant distorted European case-law concerning duress and failed to mention the fact that he is a member of the Players' Council, which proves that he cannot have been forced to sign the document in question. In the respondent's view, the complaint that the law had been fraudulently

evaded was dependent on a *ratio legis* which the legislator cannot have envisaged. Finally, the principle of equal treatment did not mean that the appellant's interpretation of Art. 192 LDIP should necessarily be adopted.

**4.2** In a ruling of 11 December 2006, the appellant was granted a period of time, in accordance with Art. 93 para. 3 OJ, in which to express his views on the "validity and significance" of the document appended to the response and reproduced in section C of the present judgment. Therefore, his right to assert his views on this document is no longer open to debate at this stage of the proceedings. Insofar as the respondent wishes to deny him that opportunity with reference to the case-law relating to the quoted provision (judgment 4P.114/2006 of 7 September 2006, rec. 3.2.3; rec. 3, unpublished, of ATF 131 III 173), that case-law cannot be followed.

Moreover, the subject of the reply, as defined by the aforementioned ruling, was not restrictive and included any objection relating to the technical or factual validity of the waiver of appeal submitted by the respondent, as well as any argument relating to its significance. Whatever the respondent may say, the appellant's reply does not therefore exceed the boundaries which were laid down.

**4.3** Under the terms of Art. 192 para. 1 LDIP, if neither party has a domicile, a place of habitual residence or a place of business in Switzerland, they may, by an express declaration in the arbitration agreement or in a subsequent written agreement , exclude all appeals against the award of the arbitral tribunal; they may also exclude an appeal only on one or several of the grounds enumerated in Article 190, paragraph 2. According to case-law, a waiver of appeal is authorised with respect to all awards (ATF 131 III 173 rec. 4.1) and all grounds of appeal (judgment 4P.198/2005 of 31 October 2005, rec. 2.2).

The validity of the waiver of appeal, within the meaning of Art. 192 para. 1 LDIP has both technical and factual aspects, which should be examined in turn.

**4.3.1** In a recent judgment, the Federal Tribunal indicated the conditions under which it is possible to accept the existence of an express declaration by the parties excluding all appeals against the awards of the arbitral tribunal (ATF 131 III 173 rec. 4.2 and references). It stated, in substance, that it is usual to only accept waivers of appeal on a limited basis and that an *indirect* waiver is insufficient. This means a waiver which does not result directly from the arbitration agreement or a subsequent written agreement, but which appears in a separate, pre-existing document to which the parties refer. Therefore, the requirement that the waiver is the subject of an express declaration means that an arbitration rule making provision for such a waiver is invalid (see ATF 116 II 639 rec. 2c). However, in an effort to clarify its previous case-law, the Federal Tribunal explained that, in order to be valid, a waiver of appeal should not expressly mention Art. 190 and/or 192 LDIP. It deems it necessary but sufficient for the express declaration of both parties to show indisputably their common desire to exclude all appeals. Deciding whether or not this is the case is a matter of interpretation and will always remain so, which means that it would be inappropriate to lay down rules applicable to all possible situations. Criticising this decision, a German-speaking author focused on the term "indisputably", which he apparently thought represented an additional condition for the admissibility of a waiver of appeal (Felix Dasser, *Internationale Schiedsentscheide ohne Rechtsmittel:*

*Ab jetzt gilt's ernst*, in *Jusletter* of 9 May 2005, no. 22). If that was really his opinion, he was wrong. The term in question was only meant to indicate that the result of the objective interpretation of a waiver of appeal should not be open to debate. Nonetheless, the fact remains that the need to interpret a declaration of will assumes, by definition, that the parties do not agree on the meaning of such a declaration, or in other words that there is some dispute over its meaning.

The precedent set by the aforementioned judgment has since been confirmed and there is no need to re-examine it here, despite the criticisms it has attracted from certain authors (see judgments 4P.198/2005 of 31 October 2005, rec. 1.1, 4P.98/2005 of 10 November 2005, rec. 4.1, 4P.154/2005 of 10 November 2005, rec. 4 and 4P.114/2006 of 7 September 2006, rec. 5.2 with references to authors criticising this case-law).

**4.3.2**

**4.3.2.1** By introducing, in Art. 192 LDIP, the possibility for the parties to exclude all appeals against the award, the legislator had two objectives: firstly, to make the Swiss arbitration system more attractive for international arbitration by removing awards from the dual control of the appeals body and the exequatur judge; and secondly, to lighten the workload of the Federal Tribunal (Jean-François Poudret / Sébastien Besson, *Droit comparé de l'arbitrage international*, no. 839. p. 828; Bernhard Berger / Franz Kellerhals, *Internationale und interne Schiedsgerichtsbarkeit*, Berne 2006, no. 1664). The idea underlying the first of these two objectives was that the international award would be subject in any case to judicial control at the enforcement stage, in accordance with the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 19 June 1958 (RS 0.277.12), while Art. 192 para. 2 LDIP states that the same would be true with regard to awards enforceable in Switzerland (see message of the Federal Council of 10 November 1982 concerning the LDIP, in FF 1982, pp. 255 ff, 451; see also: BO CN 1986, p. 1365 [Hess]). The *ratio legis* of Art. 192 LDIP therefore clearly establishes that, in the mind of the legislator, this provision was primarily intended to apply to international commercial arbitration and, in particular, to awards that need to be submitted to the exequatur judge. It is therefore unlikely that the legislator had international sports arbitration in mind, especially not disputes relating to the suspension of athletes, when adopting this provision. Indeed, since the International Olympic Committee (IOC) and most major international sports federations are based in Switzerland, the condition laid down in Art. 192 para. 1 LDIP immediately excludes any waiver of appeal against awards issued in disputes involving such legal entities. Furthermore, sanctions imposed against athletes, such as disqualification or suspension, do not require any exequatur procedure in order to be enforced. Considered from a historical perspective, Art. 192 para. 1 LDIP does not therefore appear to be designed to apply to appeals against awards issued in the field of sporting sanctions.

**4.3.2.2** As is suggested by the text of Art. 192 para. 1 LDIP, a waiver of appeal is based on an agreement between the parties, whether in the arbitration agreement or in a subsequent written agreement. Such an agreement, just like any other contract, is only valid if the parties have, mutually and in agreement with each other, demonstrated their wish to exclude all appeals. Freedom of contract, which forms part of the parties' freedom to arrange their own affairs, requires that such a demonstration

does not emanate from a desire that is subject to any kind of interference. It is especially important that the expression of the desire to exclude all appeals should not be invalidated by any form of constraint, since such an exclusion denies its author of the possibility of appealing any future award, even if it were to violate the fundamental principles of the rule of law, such as public policy, or essential procedural guarantees such as the proper composition of the arbitral tribunal, its jurisdiction, the equality of the parties or even the right to a fair hearing in an adversarial proceeding.

Competitive sport is characterised by a very hierarchical structure at both national and international levels. Established on a vertical basis, the relations between athletes and the organisations that govern the different sporting disciplines are different from the horizontal relations between the parties to a contract (ATF 129 III 445 rec. 3.3.3.2 p. 461). This structural difference between the two types of relations has an impact on the volitional process that leads to the conclusion of an agreement. In principle, when two parties are on an equal footing, each expresses its wishes without being subject to the goodwill of the other. This is generally the case in international commercial relations. The situation is quite different in the world of sport. Apart from the fairly hypothetical situation where a famous athlete is so well known that he is able to dictate his conditions to the international federation governing his sport, experience shows that, most of the time, athletes do not have a great deal of power over their federation and have to adhere to its wishes whether they like it or not. Therefore, an athlete who wishes to participate in a competition organised under the auspices of a sports federation whose regulations include an arbitration clause has no option but to accept such a clause, particularly by adhering to the statutes of the sports federation in question in which the clause appears. This is especially true where professional athletes are concerned. They are confronted with the dilemma of either agreeing to arbitration or practising their sport as an amateur (for discussion of the problem of enforced arbitration, see Antonio Rigozzi, *L'arbitrage international en matière de sport*, no. 475 ff and no. 811 ff., with numerous references to the different opinions expressed on this subject). Faced with the choice of either submitting to arbitral jurisdiction or practising his sport "in his garden" (François Knoepfler / Philippe Schweizer, *Arbitrage international*, p. 137 i.f.) while watching the competitions "on television" (Rigozzi, *op. cit.*, p. 250, note 1509 and the first author mentioned), an athlete who wishes to face genuine opponents or who wishes to do so because it is his only source of income (prize money or earnings in kind, advertising income, etc.) will in effect be compelled *nolens volens* to take the first option.

It is clear that an athlete's waiver of appeal against future awards will not generally be the result of a freely expressed desire on their part. The agreement that results when such a wish tallies with that expressed by the sports organisation concerned will therefore be affected from the very outset by the fact that one of the parties was forced to give his consent. Now, by agreeing in advance to submit to any future award, the athlete, as we have seen, immediately waives his right to seek punishment for future violations of fundamental principles and essential procedural guarantees that might be committed by the arbitral tribunal ruling on cases in which he is a party. Furthermore, with regard to disciplinary measures imposed against him, such as a suspension, which does not need to be the subject of an exequatur procedure, he will not be able to submit his complaints on this subject to the enforcement judge. Therefore, in view of its importance, a waiver of appeal should not, in principle, be used as a defence

against an athlete, even if it meets the technical requirements laid down in Art. 192 para. 1 LDIP (in this regard, see Gabrielle Kaufmann-Kohler / Antonio Rigozzi, *Arbitrage international – Droit et pratique à la lumière de la LDIP*, Berne 2006, no. 766). This conclusion is all the more necessary insofar as the refusal to hear an appeal by an athlete who had no other choice but to agree to waive his right of appeal in order to be allowed to participate in competitions also appears questionable under Article 6 para. 1 of the European Convention on Human Rights (see Kaufmann-Kohler / Rigozzi, *op. cit.*, no. 767; more generally, see also: Sébastien Besson, *Arbitration and Human Rights*, in ASA Bulletin 2006, pp. 395 ff., 405 f., nos. 35 to 37; Franz Matscher, in *La Convention européenne des droits de l'homme, Commentaire article par article*, 2nd edition, p. 285, note 1).

**4.3.2.3** The liberalism which characterises case-law relating to the form of arbitration agreements in international arbitration is also evident in the flexibility with which this case-law deals with the problem of the arbitration clause by reference (ATF 129 III 727 rec. 5.3.1 p. 735 and the judgments mentioned), including in the sports field (judgments 4P.253/2003 of 23 March 2004, rec. 5.4, 4P.230.2000 of 7 February 2001, rec. 2a and 4C.44/1996 of 31 October 1996, rec. 3c; see also: Rigozzi, *op. cit.*, no. 796 ff). Conversely, as we have already highlighted, case-law is strict when it comes to accepting waivers of appeal, since it states that such a waiver may not be made indirectly (see rec. 4.3.1) and does not, in principle, allow them to be used as a defence against an athlete (rec. 4.3.2.2).

It is probably true that it is rather illogical, in theory, to treat an arbitration agreement differently from an agreement to exclude all appeals in respect of form and consent (for more on this, see François Knoepfler in François Knoepfler / Philippe Schweizer, *Jurisprudence suisse en matière d'arbitrage international*, in RSDIE 2006, pp. 105 ff., 159). However, in spite of appearances, this difference in treatment is logical insofar as it promotes the swift settlement of disputes, particularly in sport, by specialised arbitral tribunals that offer sufficient guarantees of independence and impartiality (concerning the CAS, see ATF 129 III 445 rec. 3.3.3.3), while at the same time ensuring that the parties, especially professional athletes, do not give up lightly their right to appeal awards issued by a last instance arbitral body before the supreme judicial authority of the state in which the arbitral tribunal is domiciled. In other words, this logic is based on the continuing possibility of an appeal acting as a counterbalance to the "benevolence" with which it is necessary to examine the consensual nature of recourse to arbitration where sporting matters are concerned (Rigozzi, *op. cit.*, no. 1352).

**4.4**

**4.4.1** Art. R59 para. 4 of the Procedural Rules contained in the Code of Sports-related Arbitration of the Court of Arbitration for Sport stipulates, as part of special provisions applicable to the appeal arbitration procedure, that CAS awards may not be challenged by way of an action for setting aside to the extent that the parties have no domicile, habitual residence or business establishment in Switzerland and that they have expressly excluded all setting aside proceedings in the arbitration agreement or in an agreement entered into subsequently, in particular at the outset of the arbitration (see also Art. R46 para. 2, which makes the same provision for the ordinary procedure). However, as Rigozzi rightly points out, this provision, insofar as it

"merely paraphrases the text of Art. 191 para. 2 [corr. 192 para. 1] LDIP" does not prevent an appeal being lodged against a CAS award if there is no separate written agreement stating otherwise (*op. cit.*, no. 1347).

In this case, the condition that the parties should be of foreign origin is not an obstacle. Furthermore, the appellant does not contest that he was bound by the ATP anti-doping rules, 2005 edition ("7.06 Tennis anti-doping program 2005"). He also expressly agreed to submit to these rules by signing the ad hoc declaration contained in Appendix 2 (p. 166 of the official rulebook; see section C, above.). Under paragraph 2 of this declaration, the tennis player expressly agrees not to appeal any CAS award by any legal means ("The decisions of the CAS shall be final, non-reviewable, non-appealable and enforceable"). Incidentally, the situation in this case was not ambiguous, since the parties only had one means of appeal against the CAS award in international arbitration (see Art. 191 para. 1 LDIP). Moreover, this is clearly a *direct* waiver, since the ad hoc declaration appears in the very text signed by the athlete. This waiver of appeal therefore meets the technical requirements laid down in Art. 192 LDIP and the corresponding case-law.

There is therefore no need to examine whether the same conclusion could have been drawn, in the absence of an ad hoc declaration by the athlete, vis-à-vis the waiver clause contained in the aforementioned Art. P.3 of the ATP Rules (see A.a, above).

**4.4.2** For the aforementioned reasons, a waiver of appeal cannot, in principle, be used as a defence against the athlete, notwithstanding its technical validity. The lengthy explanations contained in the rejoinder do not demonstrate any need to make an exception to this principle in the present case.

The respondent explains in detail the procedures for drawing up and amending its rules, in order to show that tennis players are involved in the process via their Council, of which the appellant is a member. However, it is irrelevant whether a tennis player who is an ATP member participates or not – and if he does, to what extent – in the formation of the wishes of this legal entity. The only decisive factor in this context is whether the player can refuse to sign the ad hoc declaration in which he promises not to appeal against any CAS awards, while preserving his right to enter competitions organised by the respondent. As the latter openly admits, that is not the case, as is confirmed by the following section of Art. B.1 of its anti-doping rules, 2005 edition ("7.06 Tennis anti-doping program 2005", p. 143 of the official rulebook): "Further, for each calendar year all such Players shall, as a condition of entering or participating in any event organized or sanctioned by the ATP, deliver to ATP a signed consent in the form set out in Appendix 2".

For the same reason, the respondent's attempt to demonstrate that it is different from traditional international sports federations because it was only recently established and because of its non-monopolistic, jointly managed structure is equally irrelevant. It is probably true, in the absolute, that there is nothing to prevent players and organisers from setting up a separate tour to rival that of the ATP. However, it is certainly true that the ATP in fact represents all the top male tennis professionals. Therefore, unless they decide not to participate in the lucrative competitions that it organises, ATP members have no choice but to sign the waiver of appeal. There is no doubt that this was the case where the appellant is concerned.

It must therefore be concluded from this analysis that the appellant did not legitimately waive his right to appeal against future CAS awards. There is therefore no reason why the appeal should not be heard.

**5.**

**5.1**

**5.1.1** Referring to Article 190 para. 2 (d) of the LDIP, the appellant's principal complaint is that his right to a fair hearing was violated insofar as the CAS failed to examine certain relevant arguments which were essential to the decision he had asked it to take.

Supposing that the arbitrators knowingly disregarded the arguments in question, they should, in the appellant's opinion, have explained why. The appellant adds, in the alternative, that the right to a fair hearing in sports arbitration cases also includes the right to receive a reasoned decision.

As a further alternative, if the Federal Tribunal were to refuse to extend the scope of the right to a fair hearing in sports arbitration cases, the appellant submits that the disputed award is incompatible with Swiss public policy within the meaning of Art. 190 para. 2 (e) of the LDIP because it does not contain reasons on certain relevant points.

**5.1.2** In its reply to the appeal, the respondent goes to great lengths to demonstrate that the CAS did receive the arguments which it allegedly disregarded, but that these arguments were irrelevant in view of the reasoning it followed. In its opinion, the appellant is actually trying to disguise his basic criticisms, which are inadmissible, as an oversight (which it claims is not the case) likely to justify the annulment of the award.

Incidentally, the respondent believes it is at the very least doubtful that the specific characteristics of sports arbitration are such that the notion of the right to a fair hearing can be broadened so as to cover the appellant's complaints.

**5.2** According to established precedents, the right to a fair hearing in an adversarial proceeding, enshrined in Articles 182 para. 3 and 190 para. 2 (d) of the LDIP, does not demand that an international arbitral award should contain reasons (ATF 116 II 373 rec. 7b; see also ATF 130 III 125 rec. 2.2; 128 III 234 rec. 4b).

However, case-law also suggests that the right to a fair hearing includes a minimum duty for the court to examine and deal with the relevant issues (ATF 126 I 97 rec. 2b). This duty has been extended in case-law to the field of international arbitration (121 III 331 rec. 3b, p. 333) and, therefore, to international sports arbitration (judgment 4P.26/2005 of 23 March 2005 concerning the CAS, rec. 3.2). It is violated if, as the result of an oversight or misunderstanding, the arbitral tribunal fails to take into consideration the claims, arguments, evidence or offers of evidence presented by one of the parties and relevant to the decision to be taken (ATF 121 III 331 rec. 3b, p.333). The right of the party concerned to communicate his point of view to the

arbitrators is thus infringed; he is in the same situation as if he had not been allowed to submit his arguments to them in the first place (ATF 127 III 576).

It is incumbent upon the supposedly wronged party to demonstrate in his appeal against the award how the arbitrators' oversight has prevented him from asserting a relevant point (ATF 127 III 576 rec. 2f). It is up to him to establish firstly that the arbitral tribunal has failed to examine certain elements of fact, proof or law that he has properly submitted in support of his conclusions and, secondly, that these elements were likely to influence the outcome of the dispute. He must also demonstrate this with reference to the grounds given in the disputed award (judgment 4P.207/2002 of 10 December 2002, rec. 4.1). It goes without saying that, unless it is to be made a *probatio diabolica*, this demonstration should not refer to the reason why a relevant element was disregarded by the arbitrators. If the award makes absolutely no mention of the elements that are supposedly relevant to the outcome of the dispute, it is up to the arbitrators or the respondent to justify this omission in their observations on the appeal. They may do so either by demonstrating that, contrary to the appellant's claims, the omitted elements were not relevant to the outcome of the case or, if they were relevant, by showing that they were implicitly refuted by the arbitral tribunal (for a case in which this applies, see aforementioned judgment 4P.26/2005, rec. 3.3 i.f.). It should be pointed out in this context that the right to a fair hearing, even in the broader sense it is given under Swiss constitutional law, is only violated if the court does not meet its minimum obligation to examine the relevant issues (ATF 129 I 232 rec. 3.2; 126 I 97 rec. 2b). The arbitrators are therefore obliged to discuss all the arguments put forward by the parties in order that they should not be accused of violating the right to a fair hearing in an adversarial proceeding by failing to refute, even implicitly, a claim which is objectively devoid of all relevance.

5.3 In the present case, the appellant submitted a number of alternative arguments to the CAS, in case the latter rejected his principal claim that he had not committed any fault when taking the disputed medication. He therefore devoted a dozen pages of his statement of appeal to demonstrating how, in his opinion, imposing any kind of sanction against an athlete who had taken medication which had been given to him in error and which was *detrimental* to his sporting performance was a violation of Delaware law (applicable under the ATP Rules), in the light of both the principle of proportionality and the doctrine of *forfeiture* or *penalty*, and was also incompatible with American and European competition rules. Supposing that they had been deemed well-founded, these alternative arguments were liable to change the outcome of the dispute, since they suggested that no sanction at all should be imposed against the appellant. They could not therefore be considered irrelevant, whatever the respondent may say.

It should be noted that the CAS, although it does make a passing reference to Delaware law in its summary of the appellant's claims, makes no further mention of these alternative arguments in its legal analysis of the case. Since it decided not to rule on the public law appeal, the reasons for this are unknown. According to the respondent, they can be found in the fact that, by ruling that the suspension of 15 months conformed with the principle of proportionality, bearing in mind the full circumstances of the case, the arbitrators implicitly rejected the alternative arguments of the appellant. However, such a conclusion cannot be drawn on the basis of the text of the award. Indeed, it is one thing to say that a sanction is proportionate to the fault

committed, as the arbitrators concluded; it is another thing altogether to say that a sanction, even if it is proportionate to the fault committed, cannot be imposed against a tennis player in accordance with applicable State laws, or even inter-State laws, as the appellant claims. The arbitrators should therefore have indicated, at the very least, why they considered that the rules referred to by the appellant were not applicable in this case or had not been ignored by the ATP Anti-Doping Tribunal. Since they did not do so, it cannot be excluded – as the appellant claims – that such an omission was the result of an oversight on their part. If the omission had been deliberate, the problem would not have been much different: even if this were the case, the arbitrators should have mentioned it, even briefly (see Art. R59 para. 1 of the Procedural Rules contained in the CAS Code of Sports-related Arbitration), so that the appellant could be sure from reading the award that they had taken into account all of his objectively relevant arguments, even if they had been rejected.

It appears from these considerations that the right to a fair hearing was infringed by the CAS. Given the strict nature of this right (ATF 121 III 331 rec. 3c), the disputed award should be annulled, regardless of the response to the alternative arguments submitted by the appellant.

6.
The respondent, which is the losing party in this case, must pay the court fee as well as the expenses of the appellant (Art. 156 para. 1 and 159 para. 1 OJ). In order to determine these sums, the Federal Tribunal will take into account the importance of the case, which is not solely defined by the decision that the appellant should pay back the USD 17,250 that he earned from the Acapulco tournament, as well as the amount of work carried out by the appellant's representative in drafting the statement of appeal and the reply. Nevertheless, the Court should emphasise that this is not an international commercial arbitration case, but a dispute concerning a disciplinary sanction imposed against a professional sportsman.

**On these grounds, the Federal Tribunal rules as follows:**

1.
The appeal is upheld and the disputed award is annulled.

2.
A court fee of CHF 5,000 is charged to the respondent.

3.
The respondent must pay to the appellant a sum of CHF 10,000 to cover expenses.

4.
The present judgment is communicated to the representatives of the parties and to the Court of Arbitration for Sport (CAS).

Lausanne, 22 March 2007

On behalf of the 1st Civil Law Court of the Swiss Federal Tribunal

President:                                          Clerk: